**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CORPORAL B. KURT PRICE, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C.A. No. 04-956-GMS |
| v. | : | |
| | : | |
| COLONEL L. AARON CHAFFINCH, et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| SERGEANT CHRISTOPHER FORAKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 04-1207-GMS |
| v. | : | |
| | : | |
| COLONEL L. AARON CHAFFINCH, et al., | : | |
| | : | |
| Defendants. | : | |

**APPENDIX**
**TO OPENING BRIEF IN SUPPORT OF THE MOTION OF THE DEFENDANTS**
**TO BAR CERTAIN COMMUNICATIONS OF COUNSEL OR, IN THE ALTERNATIVE,**
**TO DISQUALIFY COUNSEL**

Date: October 14, 2005

Noel C. Burnham (DE Bar No. 3483)
Richard M. Donaldson (DE Bar No. 4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
(302) 504-7840

*Counsel for the Defendants L. Aaron Chaffinch,*
*Thomas F. MacLeish, David B. Mitchell, and*
*Division of State Police, Department of Safety and*
*Homeland Security, State of Delaware*

## Fitzgerald, Robert

| | |
|---|---|
| **From:** | Stephen J. Neuberger [SJN@NeubergerLaw.com] |
| **Sent:** | Monday, September 05, 2005 4:34 PM |
| **To:** | Fitzgerald, Robert |
| **Cc:** | Thomas S. Neuberger |
| **Subject:** | Capt. Ralph Davis |

Robert,

I understand that a written order from Col. MacLeish was sent to my client Capt. Ralph H. Davis, III, on Friday morning, September 2nd.  Generally, this e-mail orders him to seach his files for certain documents and other information related to the FTU and the NCOIC's of that facility.

Capt. Davis will of course comply with the Colonel's order.

However, I write you because there appears to a typo in the e-mail which relates to you.  The e-mail states that you will be directly contacting Capt. Davis about types of documents to search his files for.  Obviously this is a mistake because, as you know, you cannot directly communicate with my client under the relevant rules.

The reason I believe that this is a typo is because the e-mail is internally contradictory on this point.  Elsewhere, it specifically directs Capt. Davis to compile certain specific documents.

As I stated before, Capt. Davis will compile the requested documents and comply with Col. MacLeish's order.

I write because I wanted to bring this to your attention.

I hope you had an enjoyable and relaxing Labor Day weekend.

-Steve

***********************************
Stephen J. Neuberger, Esq.
The Neuberger Firm
Attorneys and Counsellors at Law
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
Phone: 302-655-0582
Fax: 302-655-9329
E-Mail: SJN@NeubergerLaw.com

**A-1**

## Fitzgerald, Robert

| | |
|---|---|
| From: | Ellis, Edward |
| Sent: | Tuesday, September 06, 2005 10:49 AM |
| To: | Fitzgerald, Robert |
| Subject: | FW: Price, Foraker, Warren lawsuits |

-----Original Message-----

| | |
|---|---|
| From: | Ellis, Edward |
| Sent: | Tuesday, September 06, 2005 10:48 AM |
| To: | 'SJN@neubergerlaw.com'; 'TSN@neubergerlaw.com' |
| Subject: | Price, Foraker, Warren lawsuits |

Steve:

This will reply to your email of September 5 to Robert Fitzgerald concerning our contact with Ralph Davis.

Ralph Davis is a management employee of the Delaware State Police who had management responsibility for the firing range and its personnel during the time period relevant to these lawsuits. Indeed, he was the direct supervisor of Chris Foraker, and the second level supervisor of Warren and Price. Although he was a client of yours in the past in an unrelated lawsuit, he is not -- and cannot be under RPC 4.2 -- your client in the current FTU litigation. To the contrary, he is a "constituent" of the DSP "whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability." RPC 4.2, comment 7.

Accordingly, your contact with Davis on the subject of the the Foraker-Price-Warren litigation would be improper under Rule 4.2. You have repeatedly assured me that you have had no such contact.

On the other hand, counsel for the DSP intend to contact, interview, or otherwise interact with management employees of the DSP as necessary and appropriate for the defense of the lawsuit. Davis is included in this group.

If you have a different view of the law in this area, let's get it out on the table now.

Ed Ellis
215-772-7322
215-917-4737(c)

A-2

Price, et al.                           v.                    Chaffinch, et al.
Ralph H. Davis, III              C.A. # 04-1207              September 6, 2005

Page 58

1   telling you?
2      A.  I believe so, yes, sir.  All this is from
3   Sergeant Ashley.
4      Q.  In effect, that there were two Glock handguns
5   missing is also something Sergeant Ashley said?
6      A.  Yes, sir.
7      Q.  Go over farther to the right where it says
8   "exhaust fan."
9      A.  Yes, sir.
10     Q.  Is that what it says?
11     A.  It does say that, yes, sir.
12     Q.  Do you remember what the discussion about that
13  was that led you to write down "exhaust fan"?
14     A.  I believe we're referring back to the exhaust
15  fan in the cleaning room.  The hood that was referenced
16  on the second page.
17     Q.  Okay.
18     A.  He was explaining that he had discussed this
19  with Facilities Management.
20     Q.  Okay.  And the last item over on the right,
21  could you read that for us?
22     A.  It says, "5th person," and I'm guessing that it
23  also says, "maintenance/clerical."  "Clerical" I'm very
24  sure about.  The "maintenance" I'm not very clear on.

Page 59

1      Q.  Was that Sergeant Ashley suggesting that a fifth
2   person be assigned to the FTU?
3      A.  Yes, sir.
4      Q.  And the function of that fifth person was to do
5   maintenance and clerical work?
6      A.  Clerical issues, yes, sir.
7      Q.  When you were done this meeting -- I think you
8   said it occurred in the office area -- what did you do
9   with this piece of paper or at least with the original of
10  this piece of paper?
11     A.  With the actual paper itself, what did I do with
12  the paper?
13     Q.  Yes.
14     A.  I maintained a file of Firearms Training Unit
15  issues and that went in that file.
16     Q.  Did you ever talk to Sergeant Ashley about the
17  things that were discussed in this meeting after the
18  meeting was over?
19     A.  I do not recall speaking to him about this, no,
20  sir.  It seemed to be resolved issues.  There was no
21  follow-up that I see here.
22     Q.  Are there things that Sergeant Ashley told you
23  in this meeting that are untrue?
24     A.  To the best of my knowledge, no, sir.

Page 60

1      Q.  Now, it is my understanding, captain Davis, that
2   last week you received an instruction from
3   Colonel MacLeish to search for documents that might be
4   pertinent to any of the plaintiffs in this case, who are
5   all sitting across the table from you, or the Firearms
6   Training Unit.
7          Did you, in fact, get such a communication?
8      A.  Yes, I did.  Not exactly at that verbiage, but I
9   received an e-mail from the Colonel's secretary asking me
10  to provide or research documents concerning the Firearms
11  Training Unit and the range.
12     Q.  Now, did you provide a copy of that e-mail to
13  Mr. Neuberger?
14         MR. NEUBERGER:  Objection.  Attorney/client
15  privilege.  I instruct Captain Davis not to answer on
16  that basis.
17         MR. ELLIS:  I don't think the mere fact
18  that he sent it to you is privileged.
19         MR. NEUBERGER:  I think it is.  I think you
20  can ask him whether he communicated about it without the
21  specifics of what the communication was.  But it's your
22  questions, obviously.
23  BY MR. ELLIS:
24     Q.  Have you had communications with Mr. Neuberger,

Page 61

1   and I'm referring to Stephen Neuberger at least for the
2   time being, about the substance of the lawsuit that
3   brings us here today?
4      A.  No, sir.
5          MR. NEUBERGER:  I'll object on privilege
6   grounds here again.  I understand you're not asking
7   specifics, and I understand that he answered, but go
8   ahead.
9      Q.  Have you had communications -- I may have asked
10  this in a slightly different way.  Have you had
11  communications with Mr. Neuberger about the content of
12  that e-mail that you got from the Colonel's secretary?
13     A.  Yes.
14     Q.  You, I understand, were a plaintiff in a lawsuit
15  brought against Colonel Chaffinch sometime last year.  Am
16  I correct about that?
17     A.  Yes.
18     Q.  Would I be correct that that lawsuit was filed
19  in, roughly, February 2004?
20     A.  Correct.
21     Q.  When did you retain the Neuberger law firm to
22  represent you in that lawsuit?
23         MR. NEUBERGER:  Objection.  Attorney/client
24  privilege again.

16 (Pages 58 to 61)

Price, et al.                                    v.                    Chaffinch, et al.
Ralph H. Davis, III                        C.A. # 04-1207              September 6, 2005

Page 62

1    MR. ELLIS: Date of hire, date of retaining
2  a lawyer is never privileged.
3        MR. NEUBERGER: Under what authority is the
4  date not privileged?
5        MR. ELLIS: It's not a communication.
6  What's privileged --
7        MR. NEUBERGER: I think it is, the fact
8  that there is a meeting and when it would have occurred.
9        MR. ELLIS: You're going to take the
10 position that you are this witness's attorney for purpose
11 of the Foraker, Warren, Price lawsuit?
12       MR. NEUBERGER: I think you can certainly
13 ask him that, but I am going to take that position.
14       MR. ELLIS: You're not going to let him
15 answer the question as to the date which your father at
16 the time for his own lawsuit --
17       MR. NEUBERGER: The date, yes. And I am
18 going to instruct him.
19       MR. ELLIS: I want that clear for the
20 record because we may end up in court on some of this
21 stuff.
22 BY MR. ELLIS:
23    Q.  Your attorney has indicated that he is your
24 attorney for purposes of this current lawsuit. By "the

Page 63

1  current lawsuit" I mean the Foraker, Price, Warren
2  lawsuit. Did you hear that when he said that a couple
3  seconds ago?
4    A.  Yes, I did.
5    Q.  I'd like to ask you when that representation
6  began.
7        MR. NEUBERGER: Hold on.
8        MR. ELLIS: If you're going to instruct him
9  not to answer, that's fine. I want to get the
10 parameters. But I think I have to ask the question in
11 order to properly prepare the record.
12       MR. NEUBERGER: Can you give me a second to
13 think about that? Because I'm trying to go through my
14 knowledge of the case law.
15       MR. ELLIS: Absolutely.
16       MR. NEUBERGER: I'll object to that on
17 privilege grounds and instruct Captain Davis not to
18 answer specifically when the representation began.
19 BY MR. ELLIS:
20    Q.  What are the terms of Mr. Neuberger's
21 representation of you; in other words, are you paying
22 him?
23       MR. NEUBERGER: Objection. Attorney/client
24 privilege. Instruct the client not to answer.

Page 64

1  BY MR. ELLIS:
2    Q.  Do you have a retainer agreement?
3        MR. NEUBERGER: Again, same objection.
4  Attorney/client privilege. Instruct Captain Davis not to
5  answer.
6  BY MR. ELLIS:
7    Q.  If the question is imprecise, do you have a
8  representation agreement, in other words, a letter, in
9  which Mr. Neuberger has set forth the terms of his
10 representation of you in connection with the Warren,
11 Price, Foraker lawsuit?
12       MR. NEUBERGER: You can answer that.
13   A.  Could you repeat the question?
14       MR. ELLIS: Can you read it back, please?
15       (The reporter read back as instructed.)
16       THE WITNESS: No, I do not.
17 BY MR. ELLIS:
18   Q.  Were the terms of his representation of you
19 subject to an oral discussion?
20       MR. NEUBERGER: Are you asking him what the
21 specific contents of the discussion were?
22       MR. ELLIS: No.
23       MR. NEUBERGER: Whether there was a
24 discussion --

Page 65

1        MR. ELLIS: Just whether there was a
2  discussion.
3    A.  Yes.
4    Q.  When did that discussion take place?
5        MR. NEUBERGER: Now, is this just a
6  variation on when the representation began question?
7        MR. ELLIS: It isn't necessarily, but it
8  could be, but it really depends on the subject of the
9  communication which you said he's not going to answer.
10 Whether it reveals it or not, I can't tell you.
11       MR. NEUBERGER: To the extent it's asking
12 when the representation began, I will object on privilege
13 grounds and instruct the client not to answer.
14       MR. ELLIS: You're going to instruct him
15 not to answer when he had a conversation with you at
16 which you set the terms of the representation in this
17 lawsuit, meaning the Foraker, Price, Warren lawsuit.
18       MR. NEUBERGER: I'm sorry. Could I ask the
19 court reporter to read that again?
20       (The reporter read back as instructed.)
21       MR. NEUBERGER: Yes.
22       MR. ELLIS: Yes, you're instructing him not
23 to answer?
24       MR. NEUBERGER: I'm sorry. Correct.

17 (Pages 62 to 65)

Case 1:04-cv-01207-GMS     Document 32-3     Filed 10/14/2005     Page 6 of 23

Price, et al.                                           Chaffinch, et al.
Ralph H. Davis, III        v.    C.A. # 04-1207        September 6, 2005

Page 66

1   BY MR. ELLIS:
2       Q.  Have you ever, and by that I mean ever,
3   discussed with Tom Neuberger or Steve Neuberger the
4   circumstances at the Firearms Training Unit?
5       A.  I do not recall an occasion where we discussed
6   that.
7               MR. NEUBERGER:  For the purposes of the
8   record, I'm letting you ask that question without waiver
9   of the privilege.
10              MR. ELLIS:  I don't think it sought
11  privileged information.
12              MR. NEUBERGER:  Right.  To the extent it
13  did, I just want that on the record, Ed.
14  BY MR. ELLIS:
15      Q.  Are you prepared, Captain Davis, to meet with me
16  outside the presence of Mr. Neuberger or his father to
17  discuss the substance of the Foraker, Price, and Warren
18  lawsuit?
19      A.  No.
20      Q.  Are you prepared to meet with me to discuss your
21  actions in terms of supervision of Foraker, Price, and
22  Warren when they were under your command at the Firearms
23  Training Unit?
24      A.  Without my representative?

Page 67

1       Q.  Without your attorney present.
2       A.  No.
3       Q.  Why not?
4       A.  I think because of my history with the division,
5   my history with Colonel MacLeish.  For those reasons, I
6   feel that I need to be very careful what I say, how I say
7   it.
8       Q.  What specifically is it about your history with
9   Colonel MacLeish that makes you say what you just said?
10      A.  I just feel uncomfortable and prefer my legal
11  counsel to be there.
12      Q.  Did you ever serve under the direct command of
13  Colonel MacLeish?
14      A.  No, sir.
15      Q.  You presently, as I understood your testimony,
16  report to Major Eckrich; is that correct?
17      A.  That's correct.
18      Q.  Before the deposition today did you have lunch
19  with the three plaintiffs?
20      A.  No, sir.  Well, let me retract that.  I met them
21  as they were going out to get lunch.  I came back, I sat
22  in Mr. Neuberger's office.
23              MR. NEUBERGER:  Just for the record, I
24  think you mean Mr. Tom Neuberger.

Page 68

1       THE WITNESS:  His dad's office.  They came
2   back in and sat down and finished their lunch.  But I
3   didn't go out to lunch with them.
4       Q.  You sat in Tom Neuberger's office while they ate
5   their lunch?
6       A.  A couple.  I think some of them had finished.
7       Q.  Did you discuss the case?
8       A.  No, sir.
9       Q.  What did you talk about?
10      A.  My daughter, their daughters.
11      Q.  All daughters?
12      A.  We're lucky.
13      Q.  Going back to Exhibit 2 for a minute, did you
14  turn a copy of that document over to the State Auditor?
15      A.  Yes, sir, I believe I said I did that earlier.
16  I did give them this document, a copy of it.
17      Q.  Have you given it to anybody else?
18      A.  No, sir.
19      Q.  The only place it went from your file is to the
20  State Auditor?
21      A.  To the best of my knowledge, yes, sir.
22      Q.  Where is your file today?
23      A.  At my home.
24      Q.  At your home?

Page 69

1       A.  Yes, sir.
2       Q.  You have your FTU file at your home?
3       A.  I took it home because I was directed from the
4   Colonel to review my file and I took it home and took out
5   the pertinent documents.
6       Q.  When you say you took out pertinent documents,
7   what do you mean by that?
8       A.  The ones that he asked me to provide.
9       Q.  In other words, the ones that you felt were
10  responsive to the directive?
11      A.  That's it.
12      Q.  Where do you normally keep your file?
13      A.  In my desk.
14      Q.  Your desk is now at headquarters; is that right?
15      A.  That's correct.
16      Q.  Who did you turn over the Firearms Training Unit
17  to; in other words, to whom did you turn over the
18  Firearms Training Unit when you changed jobs?
19      A.  When I left, I was performing two duties, the
20  director and the assistant director duties.  So the
21  incoming director was Captain Albert Homiak and the
22  incoming assistant director was Lieutenant Ronald Hagen.
23  So I turned all of my duties over to them collectively at
24  the same time, which would have been the September of

18 (Pages 66 to 69)



Slip Copy                                                                    Page 1

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,
and
Manessta BEVERLY, Intervenor,
v.
HORA, INC. (d/b/a "Days Inn") and Marshall
Management, Inc., Defendants.
**No. Civ.A. 03-CV-1429.**

June 8, 2005.

Dawn M. Edge, Jacqueline H. McNair, Judith A. O'Boyle, Equal Employment Opportunity Commission, Philadelphia, PA, for Plaintiff.

Andrew N. Howe, Samantha M. Peirce, Hartman, Hartman, Howe & Allerton, Reading, PA, Beth A. Friel, Montgomery McCracken Walker & Rhoads LLP, Philadelphia, PA, Howard Kurman, Laura L. Hoppenstein, Offit Kurman Yumkas & Denick PA, Owings Mills, MD, for Defendants.

Anne L. Carroll, Reading, PA, for Movant.

Jana R. Barnett, Wyomissing, PA, for Intervenor.

*MEMORANDUM and ORDER*

PRATTER, J.

**I. INTRODUCTION AND SUMMARY OF DECISION**

**\*1** The pending motion to disqualify the Intervenor's counsel from participation in this case as an attorney and advocate presents the Court with the unwelcome task of considering whether a lawyer's conduct merits her removal from this case over her client's objection.

Defendants HORA, Inc. ("HORA") and Marshall Management, Inc. ("Marshall"), have filed a Joint Motion to Disqualify Jana R. Barnett, Esq., as counsel for Intervenor Plaintiff Manessta Beverly ("Intervenor" or "Ms. Beverly"). Defendants' motion has two basic features: first, that Ms. Barnett's pre-litigation tactics far over-stepped ethical boundaries and principles, and, second, that as a result of this conduct she is now likely to be called by Defendants as a witness at trial to undercut the validity of the Plaintiffs' claims. [FN1] Thus, the motion posits Ms. Barnett's disqualification on the basis of Pennsylvania's Rules of Professional Conduct, specifically Rules 3.7, 4.2, 4.4 and 8.4. Not surprisingly, Ms. Barnett disputes the allegations and accusations and argues that disqualification is neither appropriate nor warranted. The Equal Employment Opportunity Commission (the "EEOC"), as primary plaintiff, argues against Ms. Barnett's disqualification, primarily on the grounds that her removal would be prejudicial to the Intervenor.

> FN1. As discussed *infra,* the Court has by no means concluded that Defendants will be permitted to call Ms. Barnett as a witness or, if they are, what will be the permissible scope of questioning. Those decisions must await at least the final pretrial conference, if not the actual trial.

The Court accords heavy deference to a party, such as Intervenor Beverly, in choosing her own counsel. Nonetheless, that right necessarily must be equitably balanced against the rights of the other parties and the ethical considerations and concepts discussed herein. The Court has both the power and obligation to protect and promote the integrity of the legal system and legal profession and to monitor the conduct of counsel appearing before it.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 2

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

Reluctantly, for the reasons discussed in some detail below, the Court grants the motion to disqualify. The evidence presented to the Court demonstrates that counsel for the Intervenor, perhaps succumbing to her unrestrained ardor to advance her client's interests, lost sight of her other duties during the initial pre-pleading stages of this dispute and thereafter failed to respect the legal rights of others and disregarded her obligation to comport herself with professional dignity and independence. As a result, her continued involvement as trial counsel for a party in this case would pose either actual or potential conflicts of interest that risk further impeding the fair and orderly progress of the case. Therefore, Ms. Barnett will be precluded from future formal involvement in this litigation, other than to facilitate the efficient and expeditious transfer of the representation of Intervenor Beverly to new counsel and to remain available to be a witness at trial, if necessary.

II.    FACTUAL    BACKGROUND    AND EVIDENTIARY CONCLUSIONS

This litigation concerns allegations brought by the EEOC against HORA and Marshall. HORA owns, and Marshall managed, the Days Inn Hotel (the "Hotel") in Reading, Pennsylvania. The EEOC claims that HORA and Marshall engaged in unlawful employment practices by subjecting Ms. Beverly and other female employees at the Hotel to a sexually hostile work environment and then wrongfully terminating Ms. Beverly's employment. The claim is that Ms. Beverly's supervisor/trainer, Nelson Garcia, a male employee with bookkeeping and accounting duties at the Hotel, made unwanted sexual advances toward Ms. Beverly and other women on the Hotel office staff, but neither HORA nor Marshall took steps to prevent such acts even though they knew of them or knew of complaints about them. The EEOC also alleges that HORA and Marshall retaliated against Ms. Beverly by terminating her employment after she complained of the alleged sexual harassment. Ms. Beverly individually also asserts a Pennsylvania Human Relations Act claim. Ms. Barnett is Ms. Beverly's counsel in connection with that claim.

*2 Some seven months before this suit was filed and before commencement of any EEOC investigation into the matters at issue, Jana Barnett, as counsel for Ms. Beverly, began to communicate with Deborah Richardson who was the administrative assistant to the Hotel's General Manager, Daryl Carr, and to HORA's part-owner and senior on-site officer, Anna Koutroulelis. These communications are documented in a series of e-mails sent and received between approximately August 1, 2002 and September 12, 2002. [FN2] At the time, other than Ms. Richardson, Ms. Koutroulelis and Mr. Carr, the Hotel had only several other administrative or office employees. Mr. Garcia, whose alleged conduct is the subject of Ms. Beverly's and the EEOC's claims, was one of those employees. At the time in question, Ms. Barnett was Ms. Beverly's legal counsel, but she was not, at that time or ever, Ms. Richardson's legal counsel or legal counsel for any other HORA or Marshall employee. Ms. Richardson herself has voiced no personal claim of sexual harassment or retaliation and, according to her deposition testimony, apparently did not personally witness any such actionable or objectionable conduct.

> FN2. These e-mail communications began essentially at the same time Ms. Barnett transmitted notice of her client's claim to the EEOC. Information from these e-mails later made its way, largely without attribution or qualification, into a lengthy letter of November 18, 2002 from Ms. Barnett to the EEOC that purported to be background factual information supporting Ms. Beverly's claim and was intended to spur the EEOC to initiate significant litigation against HORA and Marshall.

Immediately following Ms. Beverly's July 23, 2002 termination as a trainee for the Hotel administrative staff, Richardson decided to help Ms. Beverly pursue a claim against HORA and Marshall. Thus, sometimes acting alone, and at other times with the help of co-worker Tammy Schneider, Richardson began to gather information about other HORA employees, about Mr. Garcia and about her employer's knowledge of Mr. Garcia's background.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

For example, Ms. Richardson and Ms. Schneider looked for a copy of the HORA sexual harassment policy that Ms. Beverly had signed and also looked for evidence pertaining to the reasons that Ms. Beverly had been sent home before the end of her shift on the day of her complaint to Hotel management about Mr. Garcia. Ms. Richardson also reviewed her personal copy of TV Guide to locate the listing for "Dangerous Touch", the HBO movie that Beverly said Mr. Garcia purportedly was watching during Ms. Beverly's last night at the Hotel and that Ms. Beverly found offensive.

Ms. Barnett suggests that Ms. Richardson did all of these things before either Ms. Beverly or Ms. Richardson ever contacted Ms. Barnett. Barnett Verified Statement, ¶ 1. Ms. Barnett suggests that Ms. Richardson was acting on her own initiative throughout the investigatory process rather than at the instigation of Ms. Barnett. Ms. Barnett apparently believes that if such a characterization could be supported by the record thus presented, it should insulate her from criticism inasmuch as Richardson could be seen as a self-motivated conduit for unsolicited, albeit helpful, information relative to Ms. Beverly's complaint. However, the record before the Court presents a significantly different version of events. Ms. Barnett's claim that the information she received was unsolicited and provided without her encouragement is seriously undermined and contradicted by the documented written e-mail exchanges between Barnett and Richardson in which Barnett *explicitly* encouraged Richardson's disclosures.

**\*3** In the lengthy e-mail exchanges that apparently prompted this motion, Ms. Barnett either sought or received information from Ms. Richardson that Ms. Barnett, as an attorney practicing in the field of employment law, knew or should have known was the Hotel's and Marshall's confidential business and personnel information. As an attorney familiar with employment litigation, Ms. Barnett also knew or should have know that some of that information was directly related to the Hotel's and Marshall's defense of Ms. Beverly's complaint. Furthermore, Ms. Barnett knew or should have known at the time of these communications that Ms. Richardson was a

secretly, but vehemently, disgruntled Hotel employee who occupied a position of intimate business trust at the high level of Hotel management. Richardson was the sole and direct, personal assistant to senior HORA and Marshall managers who, unlike Ms. Barnett, apparently were then unaware of Richardson's negative attitude about the Hotel operations and management. In many ways relating to the day-to-day operation of the Hotel, Ms. Richardson was the eyes, ears, voice and legs of on-site Hotel management, and as such, while she did not independently wield management powers or have the institutional power to technically bind either of the Defendants, as a legal evidentiary matter, she did have continuous exposure and direct access to extensive and relevant confidential and privileged information of the Defendants and Hotel personnel.

The evidence supports a conclusion that Ms. Barnett knew, or surely should have known, that Richardson had the means and motivation to share secretly with Ms. Barnett, *inter alia,* (a) her embellished surmises about her employers and Hotel personnel and litigation defense issues, (b) negative goals with regard to the efficacy of both HORA's and Marshall's management and business practices and, more problematically, (c) certain documents (or detailed descriptions of such documents) and other confidential and privileged information learned by Richardson, or told to Richardson by others, in the course of her employment and to which she had been entrusted with access. From a review of the e-mail traffic alone, it seems that Ms. Barnett must have recognized that Ms. Richardson was a well-placed, potentially useful "mole." She also was viewed by Barnett as a potential client and referral source for other potential clients. In any case, on the record here, Ms. Barnett was unabashed and unreserved in her exploitation of Ms. Richardson's position and of Ms. Richardson's obvious personal agenda.

As mentioned above, Ms. Barnett describes herself as the fortuitous recipient of unsolicited information, most of which she emphasizes would be and in fact was produced later during the regular, somewhat more orderly, discovery process. These

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

are insufficient excuses for Barnett's conduct in this Court's view, given what the available evidence discloses. The Court is constrained also to acknowledge that nothing has been presented to the Court to indicate that Barnett ever *discouraged* Ms. Richardson from providing materials and information to her well before and outside the normal rules and channels of discovery. It also appears to be an inescapable conclusion that Ms. Barnett had or should have had a complete and accurate appreciation of the motivations for Ms. Richardson's assembling this information, thus raising what should have been cautionary concerns about Richardson's "information" and information gathering methods. The Court has no doubt that had Defendants in the summer of 2002 known of such behavior by their trusted administrative assistant for senior Hotel management, including the subsequent disclosure by her of private defense information to Ms. Barnett, they very likely would have sought to sever or otherwise close off this information pipeline, leaving the process of appropriate disclosures for the inevitable litigation process.

**\*4** It bears emphasizing that Ms. Richardson testified during her deposition that she never personally observed Mr. Garcia acting inappropriately toward any Hotel employee, including Ms. Beverly:

Q: Do you know whether Mr. Garcia made any sexual overtures to any employee at Days Inn, from your own personal knowledge?
A: No
...
Q: What is the factual basis for your belief that Manessta [Beverly] was fired because she complained of Nelson Garcia's sexual harassment?
A: Because of the note that she left for Anna, Daryl, and myself and that is where it has in there the sexual harassment.
Q: So your belief that she was fired because she complained about Mr. Garcia's sexual harassment is predicated upon the note that Manessta wrote; is that correct?
A: That's correct.
Q: But you don't have personal knowledge of any of the incidents that comprised that note, do you?

A: No.
...
Q: Now, during the time that Manessta Beverly worked [at the Hotel], did you have an opportunity to evaluate her performance?
A: No.
(Def. Motion, Ex. 2, at 56-58, 62-63) (emphasis added).

Richardson also admitted to having no first hand knowledge of anything that transpired between Garcia and Beverly:

Q: My question is, since you weren't on the shift with Ms. Beverly and Mr. Garcia, you have no firsthand information about anything that transpired between those two employees, do you?
A: I have no idea what went on between Nelson and Manessta.
(Def. Motion, Ex. 2, at 65) (emphasis added).

Moreover, Ms. Richardson admitted to behaving disloyally due to her intense dislike for her superiors at the Hotel:

Q: Is it fair to say, by the way, that as of the date of this e-mail, which is August 31, 2002, is it fair to characterize your attitude towards Days Inn as fairly bitter?
A: Towards management, yes.
Q: That's a fair statement?
A: I was very upset with what was going on there, yes, because I thought it was very unfair.
Q: You were angry towards management?
A: Yes.
(Def. Motion, Repl. Ex. 2, at 18) (emphasis added).

Specifically, Ms. Richardson did not like her boss, the Hotel General Manager, Daryl Carr. Richardson described her relationship with Carr as "stormy," that they "never s[aw] eye to eye on anything," and that she was of the opinion that Mr. Carr performed his job poorly. (Def. Motion, Repl. Ex. 2, at 30).

The significance of the foregoing testimony disclosing the limits on Richardson's *bona fides* as a source of information is that either Ms. Barnett made no effort to assess Richardson's credibility before mining her for information, or Barnett knew, but ignored, that Richardson presented very

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

significant credibility and competence issues.

Additional specific excerpts from the e-mail exchange will explain the context of the Court's concerns and the basis for the seemingly severe evaluation and ruling here.

In her first e-mail message, dated August 1, 2002, 4:10 p.m., Ms. Barnett thanked Ms. Richardson for her "encouraging letter" and for providing Barnett with a copy of the Hotel's employment handbook. Ms. Barnett also educated Richardson to Barnett's views as to the conditions under which the two of them could continue communications about Ms. Beverly and inside information about the Hotel, telling Richardson that they could freely communicate if (1) Richardson became Barnett's client or (2) Richardson was not in a "management position." Richardson did not accept Barnett's legal representation solicitation, but she obviously understood the hinted management/non-management distinction and quickly told Barnett she was not a "manager." Therefore, she apparently and immediately accepted the invitation to feel "free to communicate" with Barnett, stating:

*5 I am willing to help Manessta in any way that I can. I have made copies of her time sheets showing that [Manessta] left early on several occasions.... I am probably on limited time there now so if I can help with anything let me know. Perhaps I will be hopping on Manessta's wagon too.... Thank you for helping us out.

(Def. Motion, Ex. 1, at 13-15.) [FN3]

> FN3. Copies of Ms. Beverly's actual time sheets were not provided by Richardson to Ms. Barnett, but the information contained in them was communicated.

Less than a week later, on August 7, 2002, Ms. Barnett e-mailed Ms. Richardson with an update on the status of Ms. Beverly's EEOC administrative charge. (Def. Motion, Ex. 1, at 13.) [FN4] In that e-mail, Ms. Barnett expressly encouraged Ms. Richardson to remind the Hotel that retaliation is prohibited and again pressed the question of whether Richardson wanted Barnett to represent

her. Ms. Barnett closed this e-mail by offering: "[l]et me know what I can do to protect you." (Def. Motion, Ex. 1, at 13). At no time did Ms. Barnett inform Richardson the extent to which Richardson might be jeopardizing her job by acting counter to her fiduciary duties to her employer. Likewise, it appears from the extensive e-mail exchanges that Ms. Barnett did not bother to explain to Richardson that Richardson and Beverly well could have conflicting interests as matters continued to develop.

> FN4. The Court can only assume for present purposes that Barnett had her client's authority to share this--and other--information with Richardson, although Barnett has provided no evidence to confirm that assumption. However, in the absence of any submission to the contrary, the Court is not considering that there has been any violation of R.P.C. 1.6 concerning the maintenance of client confidences.

After the Defendants were served with the EEOC Charge of Discrimination, they initiated an internal investigation during which several Hotel employees, including Richardson, were interviewed by senior Marshall and Hotel personnel as guided by counsel. These private interviews became one of the subjects of the lengthy e-mail discussion between Ms. Barnett and Ms. Richardson, including a recounting of much of the content of the interviews and the resulting feedback from the Hotel's management. For example, Ms. Richardson wrote to Ms. Barnett:

I want to add here that [Anna Koutroulelis, HORA's Treasurer] was in on all the interrogations and she is also aware of my complaint to Mike Marshall [of Marshall Management] ... She wanted to know why I didn't come to her with this and I told her because I'm not sure which way she would go with it ... Anna did state that the outcome on the 22nd (the night they fired Manessta[) ] was not the outcome that she wanted. What she exactly meant by that I don't know ... I left there feeling that she was not going to believe anything Manessta said ... I'm sorry but I have to go now. Wil [sic] try to keep

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 6

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

you posted unless I get a GAG [sic] order.
(Def. Motion, Ex. 1, at 10-12) (emphasis added).

Ms. Barnett's response to this information was to reply to Richardson on August 8 by asking Ms. Richardson to increase her efforts to provide additional and more detailed information:

If you think of anything else that was said during the interviews, or if you find out that additional people were interviewed, would you make notes?
(Def. Motion, Ex. 1, at 8). [FN5]

> FN5. This statement seriously undermines Ms. Barnett's response to Defendants' argument that she did not encourage Ms. Richardson to disclose "all information she learned on the job, including a privileged client-lawyer conversation, and ... that [Ms. Barnett] could not ethically receive the intercepted communications." To the contrary, from the e-mail traffic one can conclude that Ms. Barnett went to some length to plant the seeds of encouragement for Ms. Richardson to report to Ms. Barnett everything Richardson deemed helpful to Ms. Beverly's case.

Ms. Barnett contends that there was "nothing improper" with regard to this request because she was thinking at the time that "memories do fade", and she "wanted to make sure that there was a complete record of who was interviewed and what was said during the interviews." *See* Intervenor's Response to Defendants' Motion to Disqualify, at 5. However, at that point in time, Barnett, as an experienced lawyer familiar with the litigation process, should have recognized Richardson as a likely future deponent and, possibly, trial witness. Nevertheless, rather than leaving such a potential witness in a "pristine" state, in this same e-mail to Richardson, Barnett endeavored to further encourage and manipulate Richardson by telling her

*6 Anna [Koutroulelis, Richardson's boss and a Hotel owner and officer,] apparently turned a blind eye to previous complaints of discrimination, and someone took personnel files, so you shouldn't be embarrassed or [feel] guilty by your lack of trust in her.

(Def. Motion, Ex. 1, at 8-9). Barnett apparently sensed that Richardson was concerned about possibly losing her job because she then listed in the e-mail a number of reasons why loss of a job may actually be beneficial. In addition, Barnett attempted to stir up more litigation by suggesting to Richardson the option of filing a "charge of discrimination (retaliation is a form of discrimination) with the EEOC and PHRC."

In the course of the e-mail exchanges, Ms. Richardson also disclosed to Ms. Barnett that she, Richardson, had reviewed Mr. Garcia's personnel file at least twice for evidence of written discipline, but did not discovery any such evidence. (Def. Motion, Ex. 1, at 11-12). [FN6] Richardson also had earlier revealed to Barnett the following tidbit when she reported to Barnett that Garcia had been fired:

> FN6. Ms. Barnett claims that "Ms. Richardson never told me that she reviewed the personnel file of Nelson Garcia for written disciplines but did not locate any. She did tell me that it was her job to file such documents, and that she had not filed any for Mr. Garcia." (Barnett Verified Statement, ¶ 8). However, the e-mail correspondence between Richardson and Barnett provides a somewhat different story. In Ms. Richardson's August 31, 2002, e-mail to Barnett, Richardson states:
> Letting you know again that there is nothing in Nelson's file pertaining to any written warning that he supposedly received from Manessta and Myndi's complaints. So nothing better show up there all of a sudden.
> (Def. Motion, Ex. 1, at 1) (emphasis added). In a previous e-mail to Barnett, Richardson also indicated that she had direct knowledge of Garcia's personnel file:
> Why give a written warning if there was [no basis for previous allegations against Nelson Garcia]? [Mike Getzy] also stated that Daryl gave Nelson another written

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 7

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

warning in Manesstta's case. Another written warning after he already has given one seems unusual because that is something I do believe should be kept in their personnel file.
(Def. Motion, Ex. 1, at 11-12) (emphasis added). Together, these statements to Ms. Barnett, at a minimum, intimate that Ms. Richardson was informing Barnett that she had, at some time in the past, maintained and/or reviewed Nelson Garcia's personnel file.

Are you aware that Nelson is apparently on parole? From what I have gathered it was in New Jersey that a woman had a restraining order out on him for harassment.
(Def. Motion, Ex. 1, at 4).

Barnett's August 9, 2002 e-mail reply to this obvious office gossip shows, at a minimum, her unlawyer-like disregard for the reputation of a third party, namely, Nelson Garcia, or the legitimate hospitality industry business interests of the Defendants. Barnett wrote:

Thanks for the update. I'm very glad that they took this step. Although it's clear that you cared about your co-workers, you were most concerned about *the unsuspecting [Hotel] female guests who were sleeping and unaware of the fact that an ex-con had been given access to the keys to their rooms. While we don't know what he was convicted of, his behavior towards his co-workers indicated that he didn't respect boundaries,* so your fears had free reign.
(Def. Motion, Ex. 1, at 3-4). (emphasis added). Richardson's e-mails had made no prior mention of such concern about "female guests," and no evidence has been presented that the Hotel had ever had complaints from its clientele in such regard. [FN7]

FN7. Because the discovery process later produced documentation that Mr. Garcia apparently had been convicted on a stalking charge, Ms. Barnett contends that the information provided to her by Ms. Richardson proved to be "consistent" with

certain allegations against Mr. Garcia, and there was nothing improper about Ms. Richardson sharing the information about Mr. Garcia's personnel file. Regardless of what one might think about Richardson's intermeddling, the primary issue here is Ms. Barnett's responsibility as a lawyer, not Richardson's behavior, except as it was encouraged and exploited by Ms. Barnett without any apparent effort of restraint.

While Richardson was away on vacation in mid-August 2002, the e-mail traffic slowed, resuming when she returned. Ms. Barnett's e-mail of August 20, 2002, to Richardson requested that Richardson photocopy the TV Guide containing the title and description of the movie the alleged harasser purportedly had playing on the television in the Hotel lobby during the last night of Ms. Beverly's employment there. (Def. Motion, Ex. 1, at 2). Ms. Beverly had reportedly found the program to be a disquieting part of the alleged harassment. Ms. Barnett repeated this request in a September 1 e-mail to Richardson in which she also invited Richardson to come to her home office. (Def. Motion, Ex. 1, at 20). Ms. Richardson complied. (Def. Motion, Ex. 1 at 21; Def. Motion, Repl. Ex. 2, at 14, 19).

*7 On August 31, 2002, Ms. Richardson wrote to Ms. Barnett disclosing the substance of an apparently private attorney-client conversation between HORA's owners and HORA's legal counsel. Apparently, this conversation had been reported to Richardson by Tammy Schneider, a co-worker who eavesdropped on the three-hour legal consultation between Hotel management and counsel:

On Thursday evening Anna, her father and her brother had a 3 hour meeting at the hotel with an attorney. Tammy overheard part of it that being Anna stating that she knew there was a problem with Nelson at one time but she didn't realize that it was an ongoing situation.
(Def. Motion, Ex. 1, at 1) (emphasis added). Thus, Barnett knew what she was receiving via Richardson (i.e., her opponents' client confidences communicated to opposing counsel) and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

dubious nature of the filters through which the information made its way to her. The subsequent e-mails show no effort by Barnett to disabuse Richardson or her other secret sources of this means of funneling the opponents' privileged information to her.

That same day, Richardson also described to Ms. Barnett a confidential document from Marshall addressed to HORA in response to the EEOC charge. Richardson wrote:

Oh and by the way ... the little bit that I did see of the fax on Wednesday gave specifics that need to be forwarded to EEOC ( [i.e.,] written warnings, any written documentation from an employee regarding their complaint[,] etc) by Marshall and/or Daryl. [FN8]

> FN8. Daryl Carr was a Marshall employee serving as the General Manager of the Hotel at the time in question.

(Def. Motion, Ex. 1, at 1) (emphasis added). Ms. Richardson also had previously recounted to Barnett an earlier fax from Marshall to the Hotel General Manager about the receipt of the EEOC notice, reporting that she was "ecstatic" as a result of that development. (Def. Motion, Ex. 1, at 1-2).

In the final Barnett-Richardson e-mail produced to Defendants, Richardson wrote to Ms. Barnett on September 12, 2002, regarding certain confidential information that Marshall was preparing to send to the EEOC. Defendants contend that this information was not subject to disclosure to the Intervenor Plaintiff under EEOC regulations. The EEOC's protocols on the proper handling of such a disclosure is open to interpretation on this point. While it is conceivable that the EEOC might at some point disclose a witness's statement to a complainant's counsel, at the time she received Richardson's rendition of the information, Barnett had no way of knowing what the EEOC would eventually decide to share and what would be withheld. In fact, Barnett could not even then know whether what was being disclosed to her by Richardson was a draft of a respondent's reply to the EEOC that had yet to be discussed with

or reviewed by counsel:

Today a fax came through to Daryl from Mike Getzy [FN9] that had Daryl's reply to the EEOC. I only got a brief glance but what I did see was Daryl stating that on the 20th he received several calls at home from both Manessta and Nelson and one of the calls from Manessta was regarding the TV incident. He also states that he spoke with Manessta several times about her attitude and her appearance. He states that because of her attitude he had decided that she was not proper material to be working the desk representing the hotel and that she was terminated during her probationary period.

> FN9. Michael Getzey is the Executive Vice-President of Marshall Management, Inc.

*8 (Def. Motion, Ex. 1, at 18). Ms. Barnett contends that Ms. Richardson did not provide a copy of Mr. Carr's statement to her, she merely had knowledge of its utterance. Barnett also argues that Mr. Carr's statement was later disclosed by counsel for the Hotel during the discovery process.

As a result of the above factual information learned during discovery regarding the relationship between Ms. Barnett and Ms. Richardson, defense counsel formally notified Ms. Barnett in a joint letter dated February 25, 2005, that if she failed to voluntarily withdraw from this case, Defendants would move for her disqualification. Offered the opportunity to voluntarily withdraw, Ms. Barnett chose not to do so. The filing of the disqualification motion followed. Given the nature of the dispute, the Court provided all parties the opportunity for a hearing, oral argument and briefing.

III. ANALYSIS

*A. Standard of Review*

The Court has "substantial latitude" when deciding whether to disqualify an attorney. *Wheat v. United States,* 486 U.S. 153, 163-64, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The Court's power to disqualify an attorney is derived from its inherent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

authority to supervise the professional conduct of attorneys appearing before it.

The party seeking to disqualify opposing counsel bears the burden of showing clearly that continued representation would be impermissible. *J & J Snack Foods Corp. v. Kaffrissen,* 2000 WL 562736 at *2 (E.D.Pa. May 9, 2000), citing *Cohen v. Oasin,* 844 F.Supp. 1065, 1067 (E.D.Pa.1994). Nevertheless, our circuit court has suggested that if the district court has any doubts regarding the existence of a violation of the professional conduct rules, those doubts should be resolved *in favor of* disqualification as a response to the need to maintain public confidence in lawyers and other participants in the administration of justice. *See Imbesi v. Imbesi,* 2001 WL 1352318, at *2 (E.D.Pa.2001); *J & J Snack Foods,* 2000 WL 562736 at *2, citing *Int'l Bus. Mach. Corp. v. Levin,* 579 F.2d 271, 283 (3d Cir.1978) (emphasis added).

The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid *even the appearance of* impropriety. *Kramer v. Scientific Control Corp.,* 534 F.2d 1085, 1088-1089 (3d Cir.1976); *Richardson v. Hamilton International Corp.,* 469 F.2d 1382, 1385-1386 & n. 12 (3d Cir.1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). *See also, Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976). Indeed, the courts have gone so far as to suggest that doubts as to the existence of an asserted conflict of interest *should be resolved in favor of* disqualification. *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *Chugach Elec. Ass'n v. United States D.C. for Dist. of Alaska,* 370 F.2d 441, 444 (9th Cir.), *cert. denied,* 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967).

*9 *Int'l Bus. Mach. Corp.,* 579 F.2d at 283 (emphasis added). The Court of Appeals for the Third Circuit has also advised that a district court

should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule

is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions.

*Miller,* 624 F.2d at 1201, citing *United States* ex rel. *Sheldon Electric Co. v. Blackhawk Heating & Plumbing Co.,* 423 F.Supp. 486 (S.D.N.Y.1976); *Baglini v. Pullman, Inc.,* 412 F.Supp. 1060 (E.D.Pa.1976), *affirmed,* 547 F.2d 1158 (3d Cir.1977). While Ms. Barnett argues that the controlling case law does not support a court's reliance exclusively upon violations of professional rules to disqualify counsel, the Court disagrees. Indeed, as indicated above, in some instances courts have found that even the *appearance of* ethical impropriety can support disqualification. [FN10] Here, the Court finds not only the appearance, but also the existence of improper professional behavior by Ms. Barnett.

> FN10. The Court is mindful that, unlike some other states' ethics rules and unlike many judicial codes of conduct, the Pennsylvania Rules of Professional Conduct do not presently contain an express "appearance of impropriety" proscription. However, the Court's evaluation of a lawyer's conduct must give consideration to inescapable "appearances" if the Court is to be attentive to the duty to help maintain "public confidence in the propriety of the conduct of those associated with the administration of justice ..." *See IBM v. Levin, supra* at 283. The Court must also acknowledge an inescapable and overarching purpose of the Rules of Professional Conduct, namely, to promote a high level of recognizable integrity and confidence in the persons licensed to practice law so that observers of lawyers will not have cause to see a profession peopled by practitioners for whom the ends always justify the means.

By using Ms. Richardson as an informational mole and subsequently representing the information from Ms. Richardson's reports as factually true as part of her campaign with the EEOC, Ms. Barnett has not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 10

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

only violated her adversaries' legal rights that permit an appropriately calculated and sometimes negotiated flow of information through the traditional discovery process, but she also contemporaneously risked undermining the EEOC's official role and thwarted policies underlying a number of ethical rules.

Ms. Barnett conducted a surrogate-like EEOC investigation without the knowledge of the Hotel, Marshall or their lawyers. Had the Hotel's or Marshall's lawyers known of Ms. Barnett's actions, they very likely would have taken appropriate action to attempt to govern the flow of information to both Ms. Barnett and the EEOC. [FN11] They are entitled to undertake such efforts if they are undertaken honestly and in compliance with applicable rules. The Hotel or Marshall should have been given this opportunity.

> FN11. Defendants have not specified the exact misrepresentations that were made by Ms. Barnett to the EEOC, but it is clear from the record before the Court that a significant amount of information that was gleaned by Ms. Barnett to support the allegations in her November 18, 2002 letter to the EEOC resulted from improper communications (mostly e-mails) with Ms. Richardson and that Ms. Barnett surely should have known that much of Ms. Richardson's information was either improperly disclosed or based only on second- or third-hand office gossip. Ms. Barnett's letter to the EEOC, however, gives no hint of the actual nature or reliability of her sources of information. Ms. Barnett concedes that on November 18, 2002, approximately two months after the last e-mail with Ms. Richardson, she "sent the EEOC's investigator a nine page letter which recommended that the EEOC interview various women, shared her understanding of what various people knew, and transmitted various documents." Intervenor's Response to the Joint Motion to Disqualify at 8.

Every litigator knows that the discovery process has certain formal and informal rules. Ms. Barnett broke or ignored many of them. While some lawyers look at discovery with something of a Darwinian eye, the ethical rules should not be perused as if they were on an à la carte menu. Ms. Barnett is not permitted to pick and choose which ethical rules to ignore or misinterpret simply because avoidance or abuse of those rules seems conveniently more beneficial to her client.

*B. Standards for Lawyer Conduct*

Lawyers admitted to practice in Pennsylvania take an oath, *inter alia,* to
> Employ, for the purpose of maintaining the causes confided to me, such means only as are consistent with truth and honor ...
> **\*10** [and]
> ... abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged ...
Supreme Court of Pennsylvania Attorney's Oath.

The Rules of Professional Conduct adopted and promulgated by the Pennsylvania Supreme Court [FN12] apply to all Pennsylvania-admitted attorneys and are made operative in this Court by Local Rule of Civil Procedure 83.6, R. IV. As expressly stated in the Preamble to the Rules, the Rules themselves are rules of reason, to be "interpreted with reference to the purposes of legal representation and of the law itself." While some of the Rules set forth specific "do's and don't's", many of them are less precise. Some are aspirational instead of mandatory. This makes the Rules perhaps less easy to apply in some circumstances, but it does not make them any less efficacious for gauging lawyer conduct. Often, the ethics rules identify occasions on which a lawyer has some discretion, even though the Rules themselves provide no guidance on how to exercise that discretion. [FN13] However, as is also recognized in the Preamble to the Rules, the nature of the legal profession is to present lawyers with conflicting responsibilities "to clients, to the legal system and to the lawyer's own

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 11

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

interest in remaining an upright person" which "must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying these Rules." Preamble to the Rules of Professional Conduct ¶ 8. [FN14]

> FN12. The present formulation of the Pennsylvania Rules of Professional Conduct was adopted by the Pennsylvania Supreme Court by order dated August 23, 2004, with an effective date of January 1, 2005. The conduct at issue here predates the 2004 amendments, but none of those amendments changes the text of the rules referred to in this Memorandum and Order.

> FN13. In this regard, lawyers can often glean greater specificity-- and, in some respects, more restrictive guidance--from the American Law Institute's RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS.

> FN14. *See also* RPC 2.1 (in counseling a client "a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant ...").

A lawyer who exalts his or her responsibility as a client's agent to the point of ignoring the lawyer's responsibilities flowing from the lawyer's simultaneous, and equally important, role as officer of the court and as a professional whose conduct affects the quality of justice and public perception of the legal profession does not meet the letter or spirit of the rules of ethics or the expectations of the Court. Such a lawyer contributes to the causes for the scorn so many laypersons now seem to have for lawyers and the reportedly widespread distrust of our legal system. The standards of conduct applicable to and expected of lawyers require more than merely comporting oneself to escape discipline. Stated differently, the ethical rules ought not be read as an intellectually meager, uninspiring statement of minimum standards to be abused by those who would argue that lawyers need only meet those minimum standards. Escaping discipline is not

the measure of professionalism. The Rules represent a framework or floor for absolute minimum standards of professional conduct. Unlike corporate law theory's ongoing ideological debate whether companies engage in a race to the "top" (or perhaps, the "bottom") with regard to corporate governance, because a lawyer's professional conduct obligations include the corollary duty of earnest advocacy, a race to achieving the pinnacle of the standards of professionalism should be a lawyer's only competitive concern. Thus, calculating one's behavior to merely comply with the wording of the professional rules, while doing violence to their spirit, is fundamentally inconsistent with a lawyer's responsibilities to the parties, to the community at large and to the Court.

**\*11** A discussion of the rules and principles that Ms. Barnett transgressed in this case follows.

*C. Communication with Person Represented by Counsel--Pennsylvania Rule of Professional Conduct 4.2*

Pennsylvania Rule of Professional Conduct 4.2 and its annotated comments state:
> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

*See also,* Local R. Civ. P. 83.6, R. IV. With regard to organizations, the comments state:

> ...

> [6] A lawyer who is uncertain whether a communication with a represented person is permissible may seek a court order. A lawyer may also seek a court order in exceptional circumstances to authorize a communication that would otherwise be prohibited by this Rule, for example, where communication with a person represented by counsel is necessary to avoid reasonably certain injury.
> [7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

...

[9] In the event the person with whom the lawyer communicates is not known to be represented by counsel in the matter, the lawyer's communications are subject to Rule 4.3.

In turn, Rule 4.3, "Dealing with Unrepresented Person," states:

(a) In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.

(b) During the course of a lawyer's representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the lawyer knows or reasonably should know the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client.

(c) When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding.

In the absence of specific guidance on this particular issue from the Court of Appeals for the Third Circuit or the Pennsylvania Supreme Court, district courts have employed tests consistent with the plain language of Rule 4.2 and its comment. *See Belote v. Maritrans Operating Partners, L.P.,* 1998 WL 136523 at *2 (E.D.Pa. Mar.20, 1998) (citations omitted). The purpose of Rule 4.2 is to prevent attorneys from taking advantage of "uncounselled lay persons and to preserve the efficacy and sanctity of the lawyer-client relationship." *Dondore v. NGK Metals Corp.,* 152 F.Supp.2d 662, 666 (E.D.Pa.2001); *Carter-Herman v. City of Phila.,* 897 F.Supp. 889, 901 (E.D.Pa.1995) (citing G.C. Hazard, Jr. & W.W. Hodes, *The Law of Lawyering* 730 (2d ed.1990); C.W. Wolfram, *Modern Legal Ethics* § 11.6 at 612-13 (1986)). *See also,* Restatement (Third) of the Law Governing Lawyers § 99.

*12 Here, the correspondence between Ms. Barnett and Ms. Richardson is somewhat analogous to the issues presented in *Belote.* [FN15] In *Belote,* plaintiff's counsel sent an investigator to speak to the captain of a ship on which the plaintiff had been injured. However, the interview was conducted without providing notice to or obtaining the consent of counsel for defendant Maritrans. *Id.* at *1. Maritrans also claimed that the plaintiff's investigator failed to reveal to the interviewee, Captain Whitmore, that the investigator was working for the plaintiff, Belote. As is true in the instant matter, in *Belote,* "plaintiff's counsel's efforts proved quite fruitful."

> FN15. The instant matter is inapposite to the issues presented in *Faragher v. National Railroad Passenger Corp.* ("AMTRAK"), 1992 WL 25729 (E.D.Pa. Feb.7, 1992). In *Faragher,* the court found that no parties existed at the time of the allegedly *ex parte* communications because, at the time plaintiff's counsel spoke to the Amtrak employees, no complaint had been filed. Here, however, Ms. Barnett continued to correspond with Ms. Richardson after Barnett filed a complaint with the Pennsylvania Human Relations Commission on behalf of her client, current Intervenor, Manessta Beverly, and after she had initiated the EEOC's processes. *See id.* at * 1-2. Litigation against HORA and Marshall was foreseeable

It is clear here that Barnett at least sensed that she was trekking in ethically challenging terrain by communicating with Richardson. Barnett's consideration of the issue, however, was limited to a "control group" test that she used to lead Richardson away from a self-description of being a member of Hotel management. The Comment to Rule 4.2 focuses on individuals whose act or omission with regard to the Plaintiff's injury can be imputed to Defendants. *See also, Belote,* 1998 WL 136523 at *3. Here, as discussed above, the broad

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 13

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

nature of Ms. Richardson's responsibilities as the close assistant to the Hotel General Manager may have placed Richardson in such a position as to impute liability to Defendants. [FN16] To be sure, as a threshold analysis, one of the concerns in assessing the instant matter was determining Ms. Richardson's level of responsibility consistent with her employment at the Hotel. From the record, it does not appear that the Hotel is a large operation. It does not have many employees. Therefore, it is reasonable to assume that "managerial" responsibilities and discretion are spread amongst workers who may not necessarily have traditional titles given to those in managerial roles. This is not an organization with a large, hierarchical command structure, such as a police department, where the lines of managerial responsibility are clearly delineated. *See cf. Carter-Herman,* 897 F.Supp. at 904. From her repeated references to her role *vis á vis* Hotel personnel files, Ms. Richardson had responsibilities that might be consistent with someone with human resources oversight. Moreover, Richardson obviously occupied a position central to management operations given the fact that she was the sole assistant to the most senior managers responsible for the Hotel's day-to-day operations and had access to confidential information and materials as a result. While the standard for determining who has "speaking authority" or "authority to bind" a business entity is somewhat imprecise,

> FN16. On August 1, 2002, Ms. Barnett indicated to Ms. Richardson that "[i]f you agree that you do not hold a management position, then we're free to communicate with each other.... If we can communicate ethically, I look forward to it." (Def. Motion, Ex. 1, at 16). As discussed *supra,* because of the small, intimate nature of the Hotel's staff and Ms. Richardson's demonstrated level of access and responsibility, Barnett's reliance on Richardson for such an ethical determination, without further investigation, was not appropriate.

it includes employees below the level of

corporate management because otherwise the third category of employees mentioned in Rule 4.2 would be redundant to the employees described in the first category of Rule 4.2 ("persons having a managerial responsibility on behalf of the organization").

**\*13** *See Weeks v. Indep. Sch. Dist.,* 230 F.3d 1201, 1209 (10th Cir.2000). Thus, the issue does not evaporate with a dismissive inquiry about job titles. Ms. Barnett should have proceeded with much greater caution. Section 102 of the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, which precludes a lawyer seeking information from non-clients who are under some duty not to reveal such information, raises at least cautionary flags that should have tempered Barnett's giddy exchanges with Richardson. *See* § 102, comment d. At a minimum, Ms. Barnett should have considered awaiting the institution of proper discovery procedures, notifying the Hotel or Marshall or her interest to speak with Ms. Richardson without representation (after advising Richardson of her right to representation) or considering other appropriate actions to prevent possible spoliation of evidence.

*D. Legal Rights of Defendants-Pennsylvania Rule of Professional Conduct 4.4*

Rule 4.4, "Respect for Rights of Third Persons" states:

> (a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.
> (b) A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender.

Here, the Defendants and their employees, including Nelson Garcia, are considered third persons.

It is clear to this Court that Ms. Barnett obtained evidence by methods that violated the legal rights of the Defendants. Specifically, through Ms.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 14

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

Richardson, Ms. Barnett obtained purported confidential and proprietary information belonging to the Hotel and Marshall, as well as Nelson Garcia, such as (1) the employee handbook, (2) the contents of Garcia's personnel file, (3) Daryl Carr's statement to the EEOC, (4) the EEOC's inquiries to Defendants, and (4) other attorney-client privileged information that Ms. Schneider, one of Ms. Richardson's co-workers, learned while eavesdropping on a lengthy conversation between Defendants and their legal counsel. That the improperly obtained information was provided in hard copy or its substantive elements were relayed by paraphrasing in an e-mail or voice communication does not alter the fact that the information was improperly obtained. [FN17]

> FN17. Ms. Barnett alleges that this Court should question Defendants' credibility with regard to the employee handbook because they made no such claims when the EEOC requested it and Defendants did not object to its disclosure during discovery. Such an argument belies the fact that, at the time of Ms. Beverly's complaint, it is clear from their submissions to this Court that Defendants were entitled to assess the propriety of Ms. Barnett using an internal mole to gather information in an attempt to bolster Ms. Beverly's claims, without Defendants' being able to protect their legal rights.

With regard to Ms. Schneider overhearing, or as Defendants' counsel describes it, "eavesdropping", on Defendants' attorney-client communications, Ms. Barnett cannot rely on her unusual theory that Ms. Schneider may be considered a "stranger" under the law, thereby vitiating Defendants' privilege argument. *See Montgomery County,* 175 F.3d at 301, citing *Rhone-Poulenc,* 32 F.3d at 862. At the time, Ms. Schneider was Defendants' employee.

The comment to Rule 4.4 states that an attorney's responsibility to her client requires the attorney to subordinate the interests of others to those of the client, but that responsibility does not imply that an attorney is entitled to disregard the rights of third

persons. The rights of third persons include "legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."

*14 It is clear from the e-mails produced to this Court that Ms. Barnett encouraged Ms. Richardson to disclose to her *all* information she learned while working with the Hotel. There is no evidence in this record, other than Ms. Barnett's verified statement, that Ms. Barnett told Ms. Richardson and Ms. Schneider that relaying an opponent's attorney-client conversation is improper. Nor did Ms. Barnett discourage Ms. Richardson from such continued improprieties. *See* (Def. Motion, Ex. 1, at 8) (where Ms. Barnett requested of Ms. Richardson, "if you think of anything else that was said during the interviews, or if you find out that additional people were interviewed, would you make notes?"). Thus, on this record, it is not clear to this Court that Ms. Barnett properly disclosed or emphasized to Ms. Richardson that it was, in fact, an ethical violation for her to receive or relay such intercepted communications.

Consistent with this rule, Ms. Barnett should have refrained from maintaining correspondence with Defendants' employee, Ms. Richardson, instead giving Defendants the opportunity to determine their legal rights *vis á vis* Ms. Barnett's justifiable desire to gather evidence with regard to her submission(s) to the EEOC. Furthermore, the discovery rules are necessary because once information has been improperly obtained, it is nearly impossible to return the parties to the equitable position that existed prior to the improper disclosure. Here, the Court is in the position of requiring the barn to be locked after much of the livestock has been given away by a farmhand and butchered.

In the instant matter, Defendants may be seeking the opportunity at trial for the jury to determine whether Ms. Barnett misrepresented Ms. Richardson's admittedly hearsay evidence to the EEOC, and thus to the Defendants and this Court, because such information was previously presented

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

as factual, first-hand evidence of Ms. Beverly's accusations against Mr. Garcia. In fact, as Ms. Richardson admitted during her deposition: (1) she had no first-hand knowledge of any interaction between Ms. Beverly and Nelson Garcia; (2) she never witnessed Mr. Garcia harassing any employee; and (3) her correspondence may have been tainted by her hostility toward her employers at the Hotel.

Another aspect of Barnett's violation of the rights of others merits mention, namely, the gossipy approach she pursued to tar Mr. Garcia's reputation by her thinly-veiled suggestion that Hotel guests were at serious risk of harm by Garcia--even though Barnett had absolutely no knowledge of Garcia's background. She virtually accused him of being a dangerous prowler lurking at the doors to guests' rooms. Such commentary was unwarranted and out of order. [FN18]

> FN18. *Cf.* Restatement (Third) of the Law Governing Lawyers § 106, comments b, c and d. Another ethics rule, Rule 3.4, "Fairness to Opposing Party and Counsel," is implicated here as well. As a technical matter, the Court is not aware of any violation by Ms. Barnett of the specific prohibitions set out in that Rule. While one might argue under Rule 3.4(a) that the Barnett-Richardson communications operated to so manipulate Richardson's potential as a witness that they amount to an obstruction of Defendants' access to evidence, the Court makes reference to Rule 3.4 here because its "basic fairness" tenor reminds advocates that, in the words of the comment to the Rule, "[t]he procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery, and the like."

In conclusion, this Court shares Defendants' deep concerns that Ms. Barnett misrepresented Ms. Richardson's allegations as factual and those statements have been repeated to the parties and to the Court; thus, it is also appropriate that Ms. Barnett should be disqualified pursuant to Rule 4.4.

*E. Inducement to Engage In Ethical Violations-Pennsylvania Rule of Professional Conduct 8.4*

**\*15** Rule 8.4, "Misconduct" states:

It is professional misconduct for a lawyer to:
  (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
  ...
  (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
  ....

Here, Ms. Barnett knowingly violated Rule 8.4 by surreptitiously inducing Richardson to assist Barnett in violating the ethical rules by providing privileged documents and information without Defendants' permission. Ms. Barnett's repeated manipulation of Ms. Richardson, as is apparent to this Court from the record, is a blatant violation of Pennsylvania's professional rules. Thus, disqualification of Ms. Barnett pursuant to this Rule is also appropriate.

*F. Defendants Intend to Call Attorney Jana Barnett as a Trial Witness*

Defendants also raise the possibility that Ms. Barnett may be a material witness in this case because, during the initial stages of her investigation on behalf of her client, Ms. Barnett was not only gathering information but also formulating facts with Ms. Richardson's assistance, who was not (and never has been) her client. Defendants also likely would intend to argue that Barnett's extensive commentary and communication with Richardson irrevocably colored at least Richardson's (and possibly others') testimony.

Even though a discussion of Ms. Barnett's possible role as a trial witness and the applicable ethical

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 16

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

Rule is included here, the Court has by no means concluded that Defendants will be permitted to call her as a witness or, if they are, what the scope of questioning of her may be. Defendants do argue that it will be important for the jury to be able to learn, first-hand, how Ms. Barnett investigated and generated certain purported pieces of factual information, including (a) how and why Barnett contacted Richardson and (b) other information Barnett may have learned from the numerous contacts with Richardson, but the content of which (i) are not contained in the e-mail exhibits, (ii) have not been borne out during depositions, or (iii) cannot be testified to by Ms. Richardson. Defendants have also stated their intention to present evidence that the information elicited by Ms. Barnett from Ms. Richardson had a material effect on (and possibly negatively colored) both the EEOC processes and proceedings as well as the litigation itself.

As long as Defendants' theories and arguments are relevant and not overly prejudicial, it is not for this Court to question or dictate pre-trial litigation strategy to the Defendants. They may be earnestly intending to try to present evidence to the jury consistent with their belief that the EEOC relied upon Ms. Barnett's representations, whether factually-based or not, in bringing its claims against Defendants. However, the Court is singularly wary of the opportunity for mischief--or worse--by being too quick to allow counsel to try to turn opposing counsel into a witness unless there is an undeniably compelling need for her testimony. Thus, no decision about Barnett being a witness has been made. The applicable ethical rule bears discussion, however.

**\*16** With certain specific exceptions not pertinent here, Rule 3.7 prohibits a lawyer from acting as an advocate at trial in which she is likely to be a necessary witness. The Restatement also addresses this situation. Restatement (Third) of the Law Governing Lawyers § 108. Consistent with this rule, the Court of Appeals for the Third Circuit recently observed that "it is often impermissible for an attorney to be both an advocate and a witness." *United States v. Merlino,* 349 F.3d 144, 152 (3d

Cir.2003). Additionally, "disqualification may also be appropriate where it is based solely on a lawyer's personal knowledge of events likely to be presented at trial, even if the lawyer is unlikely to be called as a witness." *Id.* (emphasis added); *see also, United States v. Locascio,* 6 F.3d 924, 933 (2d Cir.1993). Nevertheless, Rule 3.7 may only bar the lawyer-witness's participation at trial. *See George v. Wausau Insurance Co.,* 2000 WL 276915 at \*2 (E.D.Pa. Mar.13, 2000). Thus, if the only matter at hand was to determine whether Ms. Barnett is a potential trial witness, without the implication of the professional conduct rules, discussed *supra,* the plain language of Rule 3.7 supports the conclusion that an attorney presumably may continue to represent a client in an action where the attorney may be called as a witness, until the actual trial. *See id.* (citing *Lebovic v. Nigro,* 1997 WL 83735 (E.D.Pa. Feb.26, 1997); *accord Rounick v. Fireman's Fund Ins. Co. of Wisconsin,* 1996 WL 269495 (E.D.Pa. May 20, 1996); *Electronic Laboratory Supply Co., Inc. v. Motorola, Inc.,* 1990 WL 96202 (E.D.Pa. July 3, 1990)).

Here, defense counsel states their intention to call Ms. Barnett as a witness to testify about her influence over the facts provided to the EEOC and Barnett's lack of first-hand information with regard to the EEOC investigation. From the record, it appears that Ms. Barnett had personal knowledge of the sources of the allegations (and their genesis) presented to the EEOC because Barnett was intimately involved in cobbling together these allegations with Ms. Richardson's assistance. At this stage and on the established record before the Court, both Ms. Barnett and Ms. Richardson may seem to be material, complementary witnesses in this matter, especially with regard to Defendants' theory that Ms. Barnett's manipulation of Ms. Richardson caused Richardson to take on the role of a corporate informational mole within the Hotel's chain of command, providing Ms. Barnett with information regarding the Hotel and Marshall that the Defendants consider confidential and proprietary. [FN19] The record thus developed also supports Defendants' contention that Ms. Richardson seemed eager to provide any and all information, regardless of the parties' respective

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

rights and the record contains virtually no indication that Ms. Barnett discouraged such behavior.

> FN19. Pursuant to American Bar Association Formal Opinion 92-368 (1992), an attorney who receives documents that are privileged or confidential on their face should avoid reading the materials, notify the attorney who transmitted the materials and obey that attorney's instructions with respect to the confidential information. This Formal Opinion analogizes inadvertent disclosure to the receipt of another person's property, and concludes that the receiving attorney may not make unauthorized use of the confidential / privileged communications. However, the Philadelphia Bar Association, Opinion 91-19 (1991), has concluded that attorneys who receive confidential information *through no fault of their own* or of their client's, may use the information at trial. The facts here are distinguishable from the assumption in the Philadelphia Bar opinion, as Ms. Barnett received certain confidential and/or privileged information by her own fault and did little, if anything, to prevent continued disclosure. During oral argument, however, Ms. Barnett suggested, in response to the Court's questions, that she thinks she must have orally admonished the eavesdropper not to do that again. Hr. Tr. at 55-58.

Defendants also make a credible argument that Ms. Barnett's testimony may serve as a crucial supplement to Ms. Richardson's testimony with regard to a presentation to the jury by Defendants that the information provided to the EEOC resulted from Ms. Barnett facilitating or fueling a potential personal vendetta by a disgruntled Ms. Richardson, who testified that she was angry with management and did not get along with the Hotel's General Manager.

*17 In summary, even absent the violations of the professional conduct rules discussed above, the Court, in consideration of Defendants' motion, was mindful of the possible need to disqualify Ms. Barnett because the nature of her representation of Ms. Beverly may have required disqualification, as the parties move closer to trial, as a result of Barnett's role as a potentially necessary witness.

*G. Sanctions*

Federal courts have the inherent power to discipline attorneys practicing before it. *See Matter of Abrams*, 521 F.2d 1094, 1099 (3d Cir.), *cert. denied*, 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975). Consistent with this power, this Court may prohibit or remedy litigation practices which constitute ethical violations or seriously undermine the integrity of a proceeding. *See University Patents, Inc. v. Kligman*, 737 F.Supp. 325, 327 (E.D.Pa.1990). See also, Restatement (Third) of the Law Governing Lawyers § 6, comment i. While the Court's authority in such matters is quite broad, it does have limits. *See Abrams*, 521 F.2d at 1099 (citing *In re Ruffalo*, 390 U.S. 544, 547, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968)). The proper exercise of this power must strike a balance between several competing considerations. *See Ex parte Burr*, 9 Wheat. 529, 22 U.S. 529, 529-30, 6 L.Ed. 152 (1824). First, the unfettered practice of law is of great importance and it should not be intruded upon lightly. *See id.* Nevertheless, it is the judiciary's responsibility to ensure the integrity of the profession. *See id.* Moreover, the Court must balance plaintiff's right to counsel of her choice against her adversary's right to prepare and try a case without prejudice. *See University Patents*, 737 F.Supp. at 325. Thus, when imposing sanctions "for ethical violations in *unclear* areas of law, the relevant issue to consider is not whether the plaintiff's counsel incorrectly interpreted the law, but whether counsel ignored the unsettled nature of the law." *See Belote, supra* at *6-7 (citing *University Patents*, 737 F.Supp. at 329 (E.D.Pa.1990).

Giving Ms. Barnett the benefit of the doubt, many of the professional conduct issues in the instant matter may be considered by some practitioners to be unsettled. Nonetheless, considering the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.