**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

CHRISTOPHER FORAKER,              :
                                 :
            Plaintiff,            :
                                 :        C.A. No. 04-1207-GMS
        v.                       :
                                 :
L. AARON CHAFFINCH, et al.,       :
                                 :
            Defendants.           :


**OPENING BRIEF IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**


Date:  January 25, 2006              Noel C. Burnham (DE Bar # 3483)
                                    Richard M. Donaldson (DE Bar I.D. #4367)
                                    Montgomery, McCracken, Walker & Rhoads, LLP
                                    300 Delaware Avenue, Suite 750
                                    Wilmington, DE  19801
                                    (302) 504-7840

                                    *Counsel for Defendants L. Aaron Chaffinch,
                                    Thomas F. MacLeish, David B. Mitchell, and the
                                    Division of State Police, Department of Safety and
                                    Homeland Security, State of Delaware*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................. 1

III.   SUMMARY OF THE ARGUMENT ................................................................... 2

IV.   CONCISE STATEMENT OF FACTS ................................................................. 3

      A.      The Parties ................................................................................ 3

      B.      The DSP Firing Range ................................................................. 4

      C.      The Bullet Trap ......................................................................... 5

      D.      Range Maintenance .................................................................... 6

      E.      High Blood Lead Levels Caused A Change To "Frangible" Ammunition ........... 7

      F.      Frangible Ammunition .................................................................. 7

      G.      The FTU Staff Decided On Its Own To Cease Maintenance On The Bullet Trap ................................................................................ 8

      H.      Initial Response to Range Closing .................................................... 11

      I.      The State Auditor's Investigation .................................................... 13

V.     ARGUMENT: THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE THERE IS NO DISPUTE AS TO ANY MATERIAL FACT AND, PURSUANT TO RULE 56, FED. R. CIV. P., THE DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ............................................ 14

      A.      Defendants Are Entitled To Summary Judgment On Count I (Free Speech Clause) ................................................................................ 14

           1.      Standard of Review for Retaliation Claim under the First Amendment ...................................................................... 15

           2.      Plaintiff Cannot Show Any Retaliatory Actions By Defendants ............. 15

           3.      Chaffinch's Actions Are Either Not Adverse To The Plaintiff, Or Otherwise Protected ...................................................... 18

           4.      MacLeish has not acted adversely to Plaintiff ........................... 19

      B.      Defendants Are Entitled To Summary Judgment In Count II (Petition Clause) ................................................................................ 20

      C.      Defendants Are Immune From Plaintiffs' First Amendment Retaliation Claims ................................................................................ 21

      D.      Defendants Are Entitled To Summary Judgment On Count III (Defamation) ............................................................................ 23

# TABLE OF CONTENTS
(continued)

**Page**

    1.    Plaintiff Foraker is a public official or a public figure who must show that Defendants spoke with "actual malice." ................................. 23

    2.    Plaintiff Fails To Identify The Statements That Are Defamatory ........... 25

    3.    Defendants did not recite or publish some of the alleged defamatory statements ............................................................................. 26

    4.    The allegedly defamatory statements about Foraker are not capable of a defamatory meaning because they are expressions of opinion ........ 27

    5.    The statements that refer to Foraker are substantially true ..................... 29

E.    Defendants are entitled to summary judgment on Count IV (Invasion of Privacy) ................................................................................................................ 31

VI.    CONCLUSION ............................................................................................................. 33

# TABLE OF AUTHORITIES

**Page**

## CASES

Adreani v. Hansen, 400 N.E.2d 679 (Ill. App. Ct. 1980) ............................................. 33

Baker v. Burlington Northern, Inc., 99 Idaho 688, 587 P.2d 829 (1978) ..................................... 32

Baldassare v. New Jersey, 250 F.3d 188, 194-95 (3d Cir. 2001) ................................................. 22

Belcher v. City of McAlester, 324 F.3d 1203 (10th Cir. 2003).................................................... 16

Bell v. Birmingham Broadcasting Co., 96 So.2d 263 (Ala. 1957) ............................................. 33

Bonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151 (Del. 1981)....................................... 29

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)..................................................... 18, 22

Cefalu v. Globe Newspaper Co., 391 N.E.2d 935 (Mass. App. Ct. 1979) ................................... 33

Collier v. Target Stores Corp., Civ. No. 03-1144-SLR, 2005 WL 850855
    (D. Del. Apr. 13, 2005)............................................................................................. 26

Cox Com Inc. v. Lowe, 328 S.E.2d 384 (Ga. Ct. App. 1985) ...................................................... 33

Doe v. Cahill, 884 A.2d 451 (Del. 2005)........................................................... 23, 26, 28

Eichenlaub v. Twp. of Indiana, 385 F.3d 274 (3d Cir. 2004)....................................................... 20

Gill v. Delaware Park, LLC, 294 F. Supp. 2d 638 (D. Del. 2003) ......................................... 24, 28

Gill v. Snow, 644 S.W.2d 222 (Tex. Ct. App. 1982)................................................... 33

Godbehere v. Phoenix Newspapers, Inc., 783 P.2d 781 (Ariz. 1989) ......................................... 33

Goodrich v. Waterbury Republican-Am., Inc., 448 A.2d 1317 (Conn. 1982) ............................ 33

Green v. Phila. Housing Auth., 105 F.3d 882 (3d Cir. 1997)....................................................... 15

Hafer v. Melo, 502 U.S. 21 (1991) .............................................................................................. 21

Harlow v. Fitzgerald, 457 U.S. 800 (1982)................................................................................. 21

Hart v. City of Jersey City, 308 N.J. Super. 487, 706 A.2d 256 (1998)....................................... 32

Hunter v. Bryant, 502 U.S. 224 (1991)........................................................................................ 21

# TABLE OF AUTHORITIES
(continued)

**Page**

Jackson v. Filiben, 281 A.2d 604 (Del. 1971) ............................................................. 24

Johnson v. Heimbach, No. Civ. A. 03-2483, 2003 WL 22838476
    (E.D. Pa. Nov. 25, 2003)................................................................................... 18

Langworthy v. Pulitzer Publishing Co., 368 S.W.2d 385 (Mo. 1963)......................... 33

Logan v. District of Columbia, 447 F. Supp. 1328 (D.D.C. 1978).......................... 32, 33

Malley v. Briggs, 475 U.S. 335 (1986)....................................................................... 21

Martin v. Widener University Sch. of Law, No. 91C-03-255, 1992 WL 153540,
    (Del. Super. Ct. June 4, 1992)............................................................................ 24

McKee v. Hart, --- F.3d ---, 2006 WL 27474 (3d Cir. jan. 6, 2006)........................ 16, 18, 19, 21

McLaughlin v. Watson, 271 F.3d 566 (3d Cir. 2001)............................................ 21, 22

Mitchell v. Street, No. Civ. A 04-3213, 2005 WL 1993774 (E.D. Pa. Aug. 16, 2005)............... 21

Neish v. Beaver Newspapers, Inc., 581 A.2d 619 (Pa. Super. Ct. 1990)...................... 33

New York Times v. Sullivan, 376 U.S. 254 (1964)....................................................... 23

Patton v. Royal Indus., Inc., 70 Cal. Rptr. 44 (Cal. Ct. App. 1968) ........................... 33

Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999)...................................................... 19

Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc., No. 93C-09-021,
    1994 WL 555391 (Del. Super. Ct. Aug. 22, 1994)............................................ 28

Reardon v. News-Journal Co., 164 A.2d 263 (Del. 1960)............................................ 32

Riley v. Moyed, 529 A.2d 248 (Del. 1987) ......................................................... passim

Rinsley v. Brandt, 446 F. Supp. 850 (D. Kan. 1978)................................................... 32

Santillo v. Reedel, 430 Pa. Super. 290, 634 A.2d 264 (1993) .................................... 32

Schneck v. Saucon Valley School Dist., 340 F. Supp. 2d 558 (E.D. Pa. 2004) .......... 16

Shehee v. City of Wilmington, 67 Fed. Appx. 692 (3d Cir. 2003)............................... 15

St. Amant v. Thompson, 390 U.S. 727 (1968) ............................................................ 24

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000) ................................................ 16, 22

## <u>TABLE OF AUTHORITIES</u>
(continued)

<u>**Page**</u>

<u>Time, Inc. v. Hill</u>, 385 U.S. 374 (1967) ......................................................................... 32

<u>Werner v. Times-Mirror Co.</u>, 14 Cal. Rptr. 208 (Cal. Ct. App. 1961) ......................................... 33

<u>X-Men Securities, Inc. v. Pataki</u>, 196 F.3d 56 (2d Cir. 1999) ....................................................... 16

## <u>STATUTES</u>

42 U.S.C. § 1983 ................................................................................................................ 1

## I.     **INTRODUCTION**

This is an action in which the sergeant in charge of the Delaware State Police Firearms

Training Unit asserts that the present and former superintendents of the DSP have retaliated

against him because he sued one of them successfully over a lateral job transfer several years

ago.  The retaliation is alleged to consist of defamatory comments by one of the defendants and a

series of minor employment-related interactions involving the other.

The defendants expect to establish that the evidence for the following points is

undisputed:

- Foraker made decisions about the DSP firing range that contributed to its
  shutdown in February 2004 for environmental contamination;

- The defendants have made no defamatory or otherwise tortious statements about
  Foraker;

- Foraker has suffered no adverse employment action since his first lawsuit ended
  with the undoing of the lateral transfer; and

- The employment-related interaction about which he complains is not actionable
  under 42 U.S.C. § 1983 or the First Amendment to the United States Constitution.

Accordingly, the Defendants ask the Court, pursuant to Rule 56 of the Federal Rules of Civil

Procedure to enter judgment in their favor and against Plaintiff Foraker on all counts of his

complaint.

## II.     **STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

This case arises under 42 U.S.C. § 1983 and the laws of the State of Delaware.

Specifically, Plaintiff Christopher Foraker asserts that Defendants L. Aaron Chaffinch and

Thomas F. MacLeish retaliated against him because he filed and won an earlier retaliation

lawsuit against Defendant Chaffinch.  Plaintiff filed this Complaint on August 30, 2004, alleging

First Amendment retaliation under the Free Speech Clause (Count I); First Amendment

retaliation under the Petition Clause (Count II); defamation (Count III); and false light invasion

of privacy under state law (Count IV).  (D.I. # 1; <u>see also</u> Combined Appendix to Defendants'

Opening Briefs in Support of Motions for Summary Judgment ("CA") at A-30).[1])  Pursuant to

the Court's Order entered February 17, 2005, discovery in this matter ended on December 30,

2005.  By stipulation of the parties and agreement of the Court, depositions of additional

witnesses were taken in January 2006.

Through discovery, it has become clear that Plaintiff has no factual basis for his claims of

retaliation, defamation, or invasion of privacy.  Accordingly, Defendants ask this Court to enter

summary judgment in their favor and against Plaintiff on all counts of the Complaint.

## III.    <u>SUMMARY OF THE ARGUMENT</u>

1.     Defendants are entitled to summary judgment on Count I (Free Speech

Retaliation) and Count II (Petition Clause Retaliation) because they did not take action adverse

to Plaintiff Foraker.

2.     Defendants are entitled to the defense of qualified immunity on Counts I and II

because, at the time Defendants engaged in the allegedly retaliatory acts against Plaintiff, it was

not clearly established that such conduct might violate the First Amendment.

3.     Defendants are entitled to summary judgment on Count III (Defamation) because

Plaintiff Foraker does not specify the statements upon which he bases his claim.

4.     Defendants are entitled to summary judgment on Count III because the statements

upon which Plaintiff Foraker bases his claim are not capable of defamatory meaning in that they

---

[1] Under the Court's February 17, 2005 Order, this case was combined for discovery purposes with the companion case of <u>Price v. Chaffinch</u>, No. 04-956-GMS (D. Del.).  Defendants have separately filed a Motion for Summary Judgment in <u>Price</u>.  To prevent redundancy and unnecessary overrun of paper, Defendants submit a Combined Appendix for both cases.

are merely statements of opinion or they cannot be reasonably be considered damaging to Plaintiff's reputation.

     5.      Defendants are entitled to summary judgment on Count III because the statements upon which Plaintiff Foraker bases his claim are true.

     6.      Defendants are entitled to summary judgment on Count III because Plaintiff Foraker, a public official and a limited public figure, cannot demonstrate that Defendants spoke with actual malice, as that term has been defined by the Supreme Court.

     7.      Defendants are entitled to summary judgment on Count IV (False Light Invasion of Privacy) because the statements made by Defendants are true, Defendants did not act with the requisite intent, and the statements do not concern Plaintiff Foraker's private life.

## IV.    <u>CONCISE STATEMENT OF FACTS</u>

### A.    <u>The Parties</u>

Defendants in this action are L. Aaron Chaffinch, retired Superintendent of the Delaware State Police ("DSP"), Colonel Thomas F. MacLeish, the current Superintendent, David B. Mitchell, Secretary of Safety and Homeland Security, and the DSP as an organization. Cols. Chaffinch and MacLeish are sued both in their official and individual capacities. Sec. Mitchell is named in his official capacity only.

Plaintiff Christopher Foraker is a twenty-year veteran of the DSP first assigned to the Firearms Training Unit in 1998. On August 1, 2001, Gerald Pepper, then Superintendent of the DSP, promoted Foraker to sergeant and made him the non-commissioned officer-in-charge (NCOIC) of the FTU. On April 8, 2002, Col. Chaffinch, the newly appointed Superintendent, transferred Foraker from the FTU and replaced him with Sgt. Richard Ashley. Foraker challenged the lateral reassignment in <u>Foraker v. Chaffinch</u>, No. 02-302-JJF (D. Del.),

contending that Chaffinch retaliated against him for excessively criticizing a subordinate range officer who happened to be a friend of Chaffinch. In June 2003, a jury found that Col. Chaffinch had violated Foraker's free-speech rights by transferring him and awarded Foraker $100,120 in compensatory and punitive damages.

After the verdict, the parties settled the case, agreeing that, among other things, Chaffinch would return Foraker to his position as NCOIC of the FTU. (CA at A-55.) Foraker returned to the FTU on December 1, 2003. It was at that point that the events giving rise to this action began.

### B.    The DSP Firing Range

The Firearms Training Unit ("FTU") is responsible for firearms training and certification programs in the DSP, as well as recordkeeping and field activities associated with DSP weapons and body armor. The weapons training and certification programs, which require that the trainees shoot guns, took place at the DSP indoor firing range until it closed in March 2004. It remains closed pending modifications to its mechanical systems.

The Auditor of Accounts for the State of Delaware ("State Auditor") issued a report covering certain events that are the subject of this lawsuit. (CA at A-512 – A-525.) The State Auditor reviewed the history of the firing range, from its inception in 1992, through the construction in the mid-1990s, the opening in 1998, and its operation until the DSP shut it down in March 2004. The State Auditor found that the process for bidding, designing, and building the firing range was flawed. The State Auditor concluded that, in the competitive bid process for selection of an architect/engineer, the responsible Facilities Management project manager made an arithmetic error in computing the scores of two of the bidding companies. As a result, a Delaware company with no experience in designing and building firing ranges was awarded the contract over an out-of-state company preferred by DSP representatives participating in the

selection process.  The State Auditor also found that, unbeknownst to the DSP, the project

manager had already decided to award the contract to a Delaware firm regardless of the outcome

of the competition.

State troopers have complained since 1998 that the HVAC system did not properly

remove smoke and other airborne contamination from the range during shooting.

Notwithstanding the complaints, it also appears that the HVAC worked effectively for

substantial periods during the existence of the range.  (CA at A-520.)

### C.    <u>The Bullet Trap</u>

The DSP decided on a Savage Range Systems, Inc. Snail Trap System as the bullet

recovery system in the firing range.  (CA at A-520.)  None of the current DSP management was

involved in this decision.  The Savage system is a 140-foot, steel-lined cylinder that functions as

a backstop for rounds that have passed through the target area.  One side of the cylinder has an

opening that points at the shooters.  This opening has an inclined steel apron that directs lead

bullets into the trap, which catches them in a steel deceleration chamber.  Once inside the

chamber, the bullet loses energy and, upon being spent, falls out of the chamber onto a conveyor

belt that takes it to the end of the bullet trap and deposits it in a drum for disposal.  The front of

the bullet trap, i.e., the angled ramps that direct the bullets into the chamber, are covered with

water cascading from a nozzle at the top of the trap.  The water serves two functions:  first, it

allows the bullet to hydroplane, improving its ricochet into the deceleration chamber; second, it

washes away lead dust, thereby eliminating a source of potential environmental contamination.

The water from the cascade system recirculates through the system.  It washes into a long water

tank underneath the bullet trap and pumps feed the water from the tank to the spray nozzles,

which feed the water cascades and begin the water's return journey through the system.  The

Savage bullet trap system was designed specifically for use in firing ranges in which lead is the standard ammunition.

### D. Range Maintenance

When the firing range opened in the fall of 1998, troopers assigned to the FTU received instruction in the maintenance of the bullet trap. Among other things, maintenance tasks included removing shotgun waddings and paper target "blow back" from the water tank below the bullet trap, unclogging the pumps that circulated water from the tank through hoses to the nozzles that fed the cascade system in the front of the bullet trap, and replacing filters on the water system. (CA at A-199 – A-200, A-214 (Foraker Dep. 20-23, 81); A-80, A-82 – A-83, A-86 (Price Dep. 40-41, 48-52, 62); A-136 – A-142 (Warren Dep. 51-55; 61-65; 67; 69; 73-76).) This routine maintenance prevented the water system from becoming too clogged to allow water to flow. Plaintiff Foraker was a member of the FTU in the fall of 1998 and performed this routine maintenance on a regular basis. (CA at A-22 – A-23.) New range officers received instruction in these tasks. (CA at A-135 – A-138 (Warren Dep. 46-58).)

Facilities Management purchased two pieces of equipment to be used by the FTU staff to keep the rest of the range clean. (CA at A-521.) One was a motorized floor scrubber, sometimes called a "Zamboni" by the troopers. A trooper actually sat on the floor scrubber to drive it around the concrete floor of the range. The second was a HEPA-VAC, which is an industrial vacuum cleaner with fine filters designed to trap airborne particulates. Both pieces of equipment remain on the firing range today. The FTU personnel used them sporadically over the six years the range operated.

### E.    High Blood Lead Levels Caused A Change To "Frangible" Ammunition

The DSP has regularly monitored the blood lead levels of troopers assigned to the FTU. By mid-2000, the management of the DSP had become concerned about elevated blood lead levels in certain troopers. Then-Col. Gerald Pepper assigned then-Maj. Joseph Swiski to study the problem. Swiski concluded that the DSP could reduce blood lead levels in troopers assigned to the range by switching from lead bullets to "frangible ammunition," which did not contain lead. (CA at 505-508.) The theory was that the removal of lead from the training ammunition in handguns would reduce lead contamination in the range.[2] Col. Pepper adopted Maj. Swiski's recommendations and, in 2000, the DSP switched from lead to non-leaded "frangible ammunition" in the firing range. Unfortunately, the switch from leaded to frangible ammunition had an adverse affect on the bullet trap.

### F.    Frangible Ammunition

When the DSP changed from lead to frangible ammunition in 2000, it expected that the Savage bullet trap would be compatible with frangible ammunition. This turned out not to be quite as true as expected.

Frangible ammunition, rather than decelerating inside the bullet trap, simply splatters into bullet fragments and dust wherever it hits. (See CA at A-521.) In the Savage trap, frangible ammunition particles are washed by the water system into the water tank that recirculates water back into the water system. At the DSP range, these particles and water formed a hard clay-like substance that proved difficult for FTU personnel to handle. (CA at A-521; A-137 (Warren Dep. 53).) It clogged the pumps, filters, and spray nozzles and caused the conveyor system to freeze

---

[2] The change to frangible ammunition in handguns did not completely eliminate lead from the firing range because law enforcement officers also shot leaded shotgun rounds in the range, and frangible ammunition was not available for shotguns in 2000.

up.  (Id.; see also CA at A-222 (Foraker Dep. 113).)  In September 2003, NCOIC Ashley hired

the conveyor company to replace the metal conveyor belt originally designed to transport spent

lead projectiles with a drag belt system designed to scoop the clay-like substance and carry it to

the end of the belt where it could be pushed into drums for disposal.  The drag belt system had

difficulties, too, and broke down within three months of its installation.  By the time it broke

down, Ashley had been replaced by Foraker.  (CA at 504.2.)

### G.    The FTU Staff Decided On Its Own To Cease Maintenance On The Bullet Trap

When Foraker returned to the FTU on December 1, 2003, he and his three subordinates

decided within a week to stop doing the maintenance necessary to keep the water system of the

bullet trap operational.  (CA at A-214 – A-215 (Foraker Dep. 81-82); A-89 (Price Dep. 75); A-

154 (Warren Dep. 124).)  According to the State Auditor's report, "the staff made the decision

not to continue performing maintenance and custodial functions due to health related issues and

not being qualified to perform those functions."  (CA at A-522.)  The FTU staff had performed

those functions – qualified or not – for more than five years.

At the point they stopped performing the maintenance functions, Plaintiff and the FTU

staff understood that their failure to perform those functions would cause the bullet trap system

to fail.  Wayne Warren, for example, testified that if maintenance and repair of the bullet trap

were to stop, the trap would "eventually clog up and stop," creating "more of a problem" with

"dust and smoke" inside the range building.  (CA at A-154 (Wayne Warren Dep. 123).)  Plaintiff

Price backed up Warren's testimony, stating that he "would assume that [the bullet trap] would

fail" if not maintained.  (CA at A-89 (Price Dep. 76).)

According to the State Auditor's Report, the FTU conducted 42 days of firearms training

between December 2003 and early February 2004 without performing any maintenance on the

bullet trap.  (CA at A-522.)  The result was as predicted by Plaintiffs: clogged pumps, clogged

filters, and dry shooting areas.  Then-Captain Greg Warren, then the DSP Director of Training, a

one-time plaintiff himself against Col. Chaffinch, and a vocal supporter of the plaintiffs in this

lawsuit, described the situation in a report he authored on January 30, 2004.  He stated:

> To complicate the air handling/filtration concerns, the bullet
> stopped/catch system is now operating dry, due to the dispersion
> system for the liquid lubricant that normally covers the front of the
> bullet trap system is not functioning properly.  Apparently the
> material the "non-toxic, frangible" bullets are made of pulverizes
> upon impact with the bullet stop system by design, which would
> generate some dust at any rate, however, with the backstop
> operating dry, the amount of dust being generated upon each bullet
> hitting this backstop area and disintegrating has been compounded
> dramatically.

(CA at A-511.5.)

Foraker began to encounter mechanical difficulties with the bullet trap system shortly

after he decided to stop doing maintenance on the bullet trap.  On December 19, 2003, he

reported in an e-mail to then-Lt. Col. MacLeish and Major Paul Eckrich (with copies to his chain

of command Greg Warren and Lt. Ralph Davis) that the drag belt that removed the spent

ammunition from the bullet trap had broken.  (CA at A-504.2 – A-504.3.)  He complained that

his predecessor Sgt. Ashley had ruined the mechanical system by tinkering with it.  MacLeish,

who was on vacation over the Christmas holidays in 2003, returned to work on January 5, 2004,

and responded by asking Foraker for cost estimates for the repair of the conveyer-belt system.

(CA at A-504.1 – A-504.2.)  He also asked Capt. Warren, who, as Director of Training, was

responsible for the range, to prepare a written report addressing Foraker's concerns and

proposing possible solutions.  (See also CA at A-336 (MacLeish Dep. at 44).)

Later on January 5, Foraker reported to MacLeish on repairs to the drag belt system.  (CA

at A-504.1.)  On Friday January 9, 2004, Foraker reported to Warren and Davis (but not

MacLeish) that "we are experiencing significant air flow problems at the range."  (CA at A-504.4 – A-504.5.)  Foraker went on to describe the following circumstances:

> "A reddish haze in the air that is suspended throughout the range when the bullet strikes the bullet trap.  The airborne particles are inhaled by the instructors and students.  When anyone blows their nose, a large amount of the reddish debris is discharged.  Students and instructors also complained of a copper penny taste in their mouth after shooting and described a significant eye mucus present when awakened the following morning after a day on the range . . .
>
> \*         \*         \*
>
> "The air quality problem is surely compounded by the fact that the wet ramp is dry in some areas due to the frangible material when wet turns to a pudding type mud that in short order causes the filter screens and the sprayer heads to clog and causes the pumps to fail as well . . .
>
> \*         \*         \*
>
> "The drag conveyer has failed once again . . . ."

(Id.)

Foraker contends that these conditions persisted throughout January, and he admits that the FTU staff did not do maintenance on the bullet trap during that period.  He witnessed the precise breakdown in the system that, as discussed above, Warren and Price had foreseen when the staff stopped doing routine maintenance of the bullet trap.

The FTU trained a recruit class in January 2004 despite the deteriorating conditions within the building.  (CA at A-205 (Foraker Dep. 44).)  Despite the "air flow problems," the broken conveyor belt, and the complaints of recruits, the FTU staff and Captain Greg Warren decided not to close the range until after they had finished training the class.  (CA at A-522; A-456.2 – A-456.3 (G. Warren Dep. 129-133).)

On February 11, 2004, an industrial hygienist conducted a comprehensive indoor air quality analysis of the firing range and sampled the carpet in the office area and the floors, walls, and other surfaces in other parts of the building for hazardous substances.  The industrial

hygienist gave a preliminary report to the FTU staff, Capt. Warren, Lt. Col. MacLeish and Maj. Eckrich on February 25, 2004, stating that the bullet trap system was completely broken, the ventilating system was not working as intended, and the entire building was contaminated with lead and other hazardous materials.  The industrial hygienist recommended that the building be shut down as an active shooting range.  No shooting occurred after February 11th, 2004.  After receiving the final report of the industrial hygienist dated March 21, 2004, the DSP closed the range and removed the FTU personnel from the building.

     **H.**     **Initial Response to Range Closing**

During February and March 2004, a series of consultants reported to the DSP and Facilities Management on the problems with the HVAC, the bullet trap, the conveyor system, and general contamination at the firing range.  The DSP and Facilities Management held a series of meetings culminating in the decision by the Department of Administrative Services that it would direct the remediation process for the contaminated site and its rehabilitation for use as a firing range.  (See, e.g., CA at A-461 –A-462.)

On March 20, 2004, the Delaware State News carried a news article describing problems at the firing range, and quoting DSP Director of Training Captain Greg Warren for the proposition that the range "is the absolute epitome of a project from hell since its very inception."  (CA at A-528.)  Other news articles followed.

At the height of the newspaper coverage of the range problems, DAS Secretary Gloria Homer and Defendant Superintendent Chaffinch conducted a media tour through the range, which was not operational at the time.  During the media tour, Secretary Homer made a number of comments to the effect that the facility had been poorly maintained by DSP personnel.  (CA at A-533 – A-538.)  She also noted that the bullet trap had not been cleaned properly, and that the

back of the trap 'where the track is, was so poorly maintained that it became unworkable." (Id.)

Chaffinch was also quoted.

> He [Chaffinch] said he attended a "staff shoot" in September.
>
> "There was some discoloration in the bullet trap but that was about it," he said. "I think people who live in glass houses shouldn't throw stones. It's a lot dirtier now. Things seemed in their proper places in the fall. I've never seen it like this."
>
> Asked what "people" he was referring to, Col. Chaffinch said he was referring to "the people that provided (the media) with this information in the first place."
>
> "The previous sergeant in charge did a good job," he continued.
>
> "Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped."
>
> The "previous sergeant" was Sgt. Richard Ashley, who was picked by the colonel in April 2002 to replace Sgt. Christopher D. Foraker as range supervisor.
>
> After Sgt. Foraker successfully sued the colonel in U.S. District Court last year, the court ordered Sgt. Foraker returned to his old job. Capt. Warren has a federal job discrimination lawsuit against Col. Chaffinch pending.
>
> "We will work collectively with Administrative Services to make corrections and establish a standard operating procedure protocol," Col. Chaffinch said.
>
> "If the people that are assigned here now don't feel that protocol is part of their protocol, they will be assigned elsewhere."
>
> Contacted later, Col. Chaffinch said Sgt. Ashley has retired. He would not permit the Delaware State News to interview Capt. Warren or Sgt. Foraker.
>
> "I have the authority to say yes or no," he said. "I'm not going to allow those people to be interviewed at this point in regard to this particular situation. I'm not trying to create any more of a mess than we already have."
>
> He praised Sgt. Ashley for his work at the range.

"Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning," he said. "Sgt. Ashley was willing to do that."

"I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel (bullet trap cleaning) was part of his purview. He felt that was putting him in harm's way."

(Id.)

## I.     The State Auditor's Investigation

On April 21, 2004, the Governor requested the State Auditor to review "the issues surrounding the closing of the DSP Firing Range in March 2004." (CA at A-512.) As part of his investigation, the State Auditor interviewed the four DSP range officers and Captain Greg Warren at the office of their common attorney in Wilmington, and re-interviewed Captain Greg Warren, Foraker, and Price at their attorney's office on July 28, 2004.

The State Auditor issued his report on October 12, 2004. He made the following conclusions pertinent to this case.

On December 1, 2003, a new Sergeant took over command of the firing range. In an interview he informed us that shortly thereafter he met with the current staff and as a result of that meeting a decision was made not to perform any maintenance at the range. The staff made the decision not to continue performing maintenance and custodial functions due to health related issues and not being qualified to perform those functions.

On December 19, 2003, the Sergeant in charge sent an e-mail to his superiors noting that the conveyor system was not functional and expressing his and his staff's concern with health related issues pertaining to their performing maintenance on the bullet trap and recovery system. The Sergeant also indicated he had contacted the conveyor system supplier and an environmental group to resolve the current problems.

We found no evidence in the documentation made available to us where DSP command was notified that range staff would not be performing duties related to the maintenance and custodial

-13-

<u>functions historically accomplished by range staff</u>.  The DSP
provided us with information that identified 42 days of firearms
training from December 2003 until February 2004.  In addition, the
DSP Lieutenant Colonel stated that he spoke to the Captain in
charge of the range and asked him whether or not the range should
be closed and he was told by the Captain that the range did not need
to be closed.

* * *

<u>We can only surmise that with the failing of the conveyor system,
no maintenance performed on the bullet recovery system, and no
custodian maintenance being performed to clean the firing range,
that these situations contributed to an unhealthy and unclean
environment leading to the ultimate closing of the firing range</u>.

(CA at A-522 (emphasis added).)  In other words, Foraker played a role in the demise of the

facility when he and his staff stopped performing maintenance on the bullet trap but kept using

it, knowing that failure would be the certain result.


**V.     ARGUMENT:  THE COURT SHOULD GRANT SUMMARY JUDGMENT
        BECAUSE THERE IS NO DISPUTE AS TO ANY MATERIAL FACT AND,
        PURSUANT TO RULE 56, FED. R. CIV. P., THE DEFENDANTS ARE
        ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

**A.     Defendants Are Entitled To Summary Judgment On Count I (Free Speech
        Clause)**

Foraker asserts that Defendants Chaffinch and MacLeish "took action adverse to [him] …

in retaliation for [his] First Amendment protected speech."  (CA at A-50 (Compl. ¶ 81).)

Specifically, Foraker contends that, in retaliation for the lawsuit Foraker had filed against Col.

Chaffinch in April 2002, Defendants Chaffinch and MacLeish made statements to the media

about his performance at the DSP's indoor firing range, sent him to fitness-for-duty exams,

changed minor components of his job, and otherwise violated rights under both the Free Speech

clause and the Petition clause.  Defendants are not liable to Foraker because the acts about which

Foraker complains are not "adverse" as a matter of law, some of those acts were themselves

protected by the First Amendment, the acts were motivated by Defendants' concerns about the

health and safety of the FTU officers and the need to enforce DSP policies and procedures that exist to protect the public.

### 1.    Standard of Review for Retaliation Claim under the First Amendment

Plaintiff's claim of First Amendment retaliation "is analyzed under a three-step process." Green v. Phila. Housing Auth., 105 F.3d 882, 885 (3d Cir. 1997) (citations omitted).  First, he must demonstrate that he engaged in protected activity, i.e. exercised his constitutional right to free speech.  Shehee v. City of Wilmington, 67 Fed. Appx. 692, 693 (3d Cir. 2003).  Second, he "must show the protected activity was a substantial or motivating factor in the alleged retaliatory action."  Green, 105 F.3d at 885 (citing Swineford v. Snyder County Pa., 15 F.3d 1258, 1270 (3d Cir. 1994)).  Lastly, Defendants may defeat Plaintiff's claims "by showing that the same actions would have been taken even absent the protected conduct."  Shehee, 67 Fed. Appx. at 693-94.

In this case, Plaintiff contends that he "engaged in protected speech … by filing and ultimately winning his initial lawsuits against defendant Chaffinch."  (CA at A-33 (Compl. ¶ 10).)  For purposes of this motion, Defendants need not address whether filing and winning a previous lawsuit is protected speech under the first step of a First Amendment retaliation analysis.  Defendants are entitled to summary judgment on Count I because Plaintiff cannot present evidence of retaliatory acts and, therefore, cannot satisfy the causation requirement of the second step.  Plaintiff cannot show that his "speech" caused Defendants to act adversely toward him.

### 2.    Plaintiff Cannot Show Any Retaliatory Actions By Defendants.

The second step of the First Amendment retaliation analysis, whether Plaintiff's protected activity was a substantial or motivating factor in the alleged retaliatory action, is actually "two distinct inquiries: 'did the defendants take an action adverse to the public employee, and, if so,

was the motivation for the action to retaliate against the employee for the protected activity.'"

Schneck v. Saucon Valley School Dist., 340 F. Supp. 2d 558, 568 (E.D. Pa. 2004) (citation

omitted); see Belcher v. City of McAlester, 324 F.3d 1203, 1207 n.4 (10th Cir. 2003).  Foraker

has suffered no adverse action as a matter of law.

Foraker has not lost pay, benefits, status, seniority or any other indicia of employment as

a state trooper since he returned to the FTU in December 2003.  He is able to work as a trooper

until he turns 55 years old in 2018.  He complains that MacLeish sent him for fitness-for-duty

examinations in 2004.   A fitness-for-duty examination is not an adverse action.  Thus, he has

suffered no employment consequence as a result of anything Chaffinch or MacLeish did.

Even though an employee does not lose pay or status as an employee, it is possible for

him to state a claim for a "campaign of retaliatory harassment."  Suppan v. Dadonna, 203 F.3d

228, 234-35 (3d Cir. 2000) (citing Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76 & n.8

(1990)).  However, "not every critical comment – or series of comments – made by an employer

to an employee provides a basis for a colorable allegation that the employee has been deprived of

his or her constitutional rights."  McKee v. Hart, --- F.3d ----, No. 04-1442, 2006 WL 27474, at

*4 (3d Cir. Jan. 6, 2006) (citing Suarez Corp. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)).

Furthermore, if the alleged harassment is itself the speech of one of the defendants, as

Foraker alleges in this case, then the court must consider the First Amendment rights of that

speaker and

> in the absence of a threat, coercion, or intimidation intimating that
> punishment, sanction, or adverse regulatory action will imminently
> follow, such speech does not adversely affect a citizen's First
> Amendment rights, even if defamatory.

Suarez Corp., 202 F.3d at 687 (citation omitted).  Accord X-Men Securities, Inc. v. Pataki, 196

F.3d 56 (2d Cir. 1999).

As the Fourth Circuit held in <u>Suarez Corporation</u>,

> The requirement that public official's speech include a threat, coercion, or intimidation, to adversely affect a citizen's First Amendment rights recognizes that a balance must be struck between the citizen's right to exercise his First Amendment rights and the public official's personal First Amendment rights, as well as his duty to the public to speak out about matters of public concern.

202 F.3d at 688, n.13 (citation omitted).  It is under these standards that we must analyze

Foraker's claims against Chaffinch.

Foraker asserts the following as retaliatory actions by Chaffinch:

(1)    Chaffinch blamed Foraker for the shut down of the facility during the April 6, 2004, media tour of the firing range (CA at A-61 – A-62); and

(2)    At the July 2004 Section Chiefs and Troop Commanders meeting, Chaffinch gave him an "absolute hateful stare" (CA at A-244 (Foraker Dep. 188-89)).

Foraker asserts the following as retaliatory action by MacLeish:

(1)    MacLeish blamed Foraker for the shut down of the facility during the April 6, 2004, media tour;

(2)    At the July 2004 Section Chiefs and Troop Commanders Meeting, MacLeish informed Foraker that as NCOIC of the FTU he was not to attend the meetings unless he was invited to address a firearms issue (CA at A-244; A-247 (Foraker Dep. 203); A-62 – A-63);

(3)    MacLeish attempted to convince a troop captain not to use Foraker as an "echo" in the honor guard at a trooper's funeral in July 2004 (CA at A-247);

(4)    MacLeish growled at Foraker (CA at A-245 – A-246 (Foraker Dep. 195-96));

(5)    MacLeish micromanaged Foraker by requiring that he justify manpower requests and budget allocations (CA at A-248 – A-251 (Foraker Dep. 204-16)); and

(6)    MacLeish refused to allow Foraker to give speech at recruit graduation. (CA at A-246 – A-247 (Foraker Dep. 197-200).)

The claims against Chaffinch and MacLeish are addressed separately.

### 3.    Chaffinch's Actions Are Either Not Adverse To The Plaintiff, Or Otherwise Protected.

At the April 6, 2004, media tour of the range, Chaffinch as the officer in charge of the state agency that used the range.  In response to questioning to DAS Secretary Homer and himself, he offered the opinion that the range was cleaner the previous September than it was on April 6, that the prior sergeant had kept it cleaner, and that the current sergeant in charge, Plaintiff Foraker, had stopped doing maintenance of the facility because he felt it put him and his men in harm's way.  Chaffinch's statements were entirely accurate.  See supra Part IV.G.  They are also entitled to Constitutional protection of their own.  Suarez Corp., 202 F.3d at 688, n. 13.

Because Chaffinch's statements to the press are mere "criticism," they are not, as a matter of law, actionable under the First Amendment or § 1983.  Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003); see McKee, --- F.3d ----, 2006 WL 27474, at *5; Johnson v. Heimbach, No. Civ. A. 03-2483, 2003 WL 22838476, at *6 (E.D. Pa. Nov. 25, 2003).  Furthermore, Chaffinch's comments do not contain "a threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow." Suarez Corp., 202 F.3d at 685.  For that reason they do not arise to retaliatory action under the First Amendment and Foraker cannot recover under § 1983.

Foraker sees retaliation in a "hateful stare" that Col. Chaffinch allegedly gave him at meeting.  The First Amendment was not meant to protect a hypersensitive plaintiff from looks, body language, or other subjective expressions of displeasure that cannot be tied to any real harm.  See McKee, --- F.3d ----, 2006 WL 27474, at *3; see also Bart, 677 F.2d at 625 (cautioning that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of

ordinary firmness from that exercise"). Cf. Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999)("if every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure.").

These assertions are the sum of Foraker's retaliation claims against Chaffinch. They do not, alone or in combination, establish a claim under §1983 and the First Amendment.

### 4.    MacLeish has not acted adversely to Plaintiff.

The first allegedly retaliatory act asserted against MacLeish, as listed above, is readily addressed. Foraker says that MacLeish, like Chaffinch, attacked him in the press on April 6, 2004. MacLeish was not at the media tour on April 6, there is no evidence that he was, and the media did not report his presence. (See CA at A-533 – A-538.) Accordingly, Foraker's claim fails.

Foraker asserts that MacLeish, motivated by Foraker's earlier lawsuit against Chaffinch, asked him to leave a section chief and troop commander's meeting in July 2004. It is true that MacLeish told Foraker not to attend a section chief and trooper commander meetings – he was not a section chief or troop commander. (CA at A-62 – A-63; A-244 (Foraker Dep. 188-89); A-380 (MacLeish Dep. 220-21).) He was the NCOIC of the firing range, who reported to a lieutenant who reported to a section chief, the Director of Training. (Id.) Foraker cannot identify a single meaningful change in his job status, authority, or responsibilities as a result of being removed from the July meeting. This action is too trivial to be actionable. See McKee, --- F.3d ----, 2006 WL 27474, at *5 (holding that defendants' decision to remove plaintiff as "co-leader" of an investigation was not "deprivation of a constitutional right").

The allegations about Foraker's participation in a funeral honor guard, MacLeish's "growling," and Foraker's graduation speech are also too trivial to be actionable. Foraker did in fact participate in the honor guard. (CA at A-247 (Foraker Dep. 203); A-545 – A-455 (McQueen Dep. 28-31).) If MacLeish growled, no reasonable jury could conclude that it would deter a person in Foraker's position would be deterred from the exercise of his right to free speech. The elimination of Foraker's award speech to reduce the length of the graduation ceremony is surely not a constitutional question.

As to the micromanagement, Foraker attributes it to his new supervisor, Capt. Harry Downs, the head of the training academy after Capt. Greg Warren retired, Capt. Albert Homiak, Downs's successor, and Lt. Ronald Hagans, the second-in-command at the DSP Academy in 2005. (CA at A-248 – A-251 (Foraker Dep. 204-16).) He says that they made him justify his manpower requests and his budgets. There is no proof that anyone higher than these officers was responsible. Furthermore, the "micromanaging" did not involve anything more than asking Foraker to do his job as those superior officers saw it. It is not actionable conduct on the part of MacLeish.

In short, Foraker's claims of retaliation amount to little more than trivial complaints about his supervision. To the extent he asserts a claim for what Col. Chaffinch said to the media, that claim is barred as a matter of law.

### B.     Defendants Are Entitled To Summary Judgment In Count II (Petition Clause)

Retaliation claims under the Petition Clause of the First Amendment are subject to the same three part test applied above to Plaintiff's free-speech claim. See Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir. 2004) (citations omitted) (applying "three-part test" to free

speech and petition claims); <u>Mitchell v. Street</u>, No. Civ. A 04-3213, 2005 WL 1993774, at *2

(E.D. Pa. Aug. 16, 2005) (applying "three-step analysis" to free speech and petition claims).

 Plaintiff Foraker's petition claim, also based on his first lawsuit, is identical to his free

speech claim and, for the reasons discussed above, is deficient as a matter of law.

  **C.** **<u>Defendants Are Immune From Plaintiffs' First Amendment Retaliation</u>**
    **<u>Claims</u>**

 Both Defendants are entitled to the defense of qualified immunity on Plaintiff's

retaliation claims.  When a public official is sued in his individual capacity, he may assert

personal immunity defenses, such as qualified immunity.  <u>Hafer v. Melo</u>, 502 U.S. 21, 27-29

(1991).  The purpose of the qualified immunity defense is to provide government officials "some

degree of immunity to avoid unacceptable interference with their duties and the hindrances

possibly associated with threats of liability."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 806 (1982).

Qualified immunity protects all but the plainly incompetent or those who knowingly violate the

law.  <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).  The issue is appropriately resolved by the

court at the summary judgment stage.  <u>Hunter v. Bryant</u>, 502 U.S. 224 (1991); <u>Harlow</u>, 457 U.S.

at 818.

 To determine whether a defendant is entitled to qualified immunity, a court must first

decide "whether a constitutional right would have been violated under the facts alleged."  <u>McKee</u>

<u>v. Hart</u>, --- F.3d ----, 2006 WL 27474, at *3 (3d Cir. Jan. 6, 2006) (quotations omitted).   Second,

assuming the violation is established, the court must "consider whether the right was 'clearly

established.'"  <u>Id.</u> at *3 (quotations omitted).  A right is "clearly established" if its "contours are

sufficiently clear that a reasonable official would understand that what he is doing violates that

right."  <u>Id.</u> at *5 (quoting <u>McLaughlin v. Watson</u>, 271 F.3d 566, 571, 572 (3d Cir. 2001)).  In

other words "there must be sufficient precedent at the time of the action, factually similar to the

plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." Id.

In McKee, decided just weeks ago, the Third Circuit considered whether its previous decision in Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000), which held that evidence of a "campaign of retaliatory harassment" was sufficient for a First Amendment claim to proceed, in combination with its decision in Baldassare v. New Jersey, 250 F.3d 188, 194-95 (3d Cir. 2001), which reiterated a public employee's right to be free from retaliation for exercising certain types of speech, was enough to inform the defendant that his particular actions would violate the Constitution.

The court found that Suppan "gave little guidance as to what the threshold of actionability is in retaliatory harassment cases." Id. at *6. The court concluded that Baldassare involved only a "straightforward retaliation claim" that did not address the more contextually specific question of what type or amount of activity would create a cognizable claim of harassment. Id. Finally, the court found that its holding in Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003) – that "criticism, false accusations, or verbal reprimands" were not retaliatory acts – supported the defendant's claims that his trivial actions were constitutionally permissible. Given the state of the existing precedent, the McKee court held that a reasonable official in defendant's position "would not have been aware that making a few comments over the course of a few months (the gist of which was asking an employee to focus on his job) might have run afoul of the First Amendment." Id. In other words, the law was not "clearly established."

Foraker's case is similar to McKee. Nothing in the case law of the Third Circuit had "clearly established" in 2004 that the alleged conduct in this case – indirect and truthful comments about Plaintiff's job performance, unpleasant expressions, a fitness-for-duty

examination, and minor modifications of job responsibilities – could subject Defendants to a trial

for retaliation.  There was, when Chaffinch and MacLeish were acting in their capacity as

superintendent, a "dearth of precedent of sufficient specificity (and factual similarity) regarding a

public employee's First Amendment right to be free from retaliatory harassment." Id. at *7.  The

precedent that was available did not clearly establish that Plaintiffs' claims, even when

considered in their totality, would amount to a constitutional violation.  Accordingly, Defendants

are entitled to qualified immunity.

### D.    Defendants Are Entitled To Summary Judgment On Count III (Defamation)

To establish his defamation claim under Delaware law, Plaintiff must "ultimately prove

that: 1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement

was published; and 4) a third party would understand the character of the communication as

defamatory." Doe v. Cahill, 884 A.2d 451, 463 (Del. 2005).  In addition, Plaintiff Foraker, who

is a public official or a public figure, must prove that the allegedly defamatory statements are

false and that Defendants made the statements with "actual malice." Id.  Foraker cannot satisfy

these legal requirements.

### 1.    Plaintiff Foraker is a public official or a public figure who must show that Defendants spoke with "actual malice."

A plaintiff who is a public official or public figure must also show "by clear and

convincing evidence that the defendant published defamatory falsehoods with actual malice."

Riley v. Moyed, 529 A.2d 248, 250 (Del. 1987).  "Actual malice" is a term of art in

constitutional law, defined by the Supreme Court as publication of a statement "with knowledge

that it was false or with reckless disregard of whether it was false or not." New York Times v.

Sullivan, 376 U.S. 254, 279-80 (1964); Gill v. Delaware Park, LLC, 294 F. Supp. 2d 638, 646

(D. Del. 2003).  Similarly, "reckless disregard" is a term of art, defined by the Supreme Court to mean publishing with "a high degree of awareness" of probable falsity.  St. Amant v. Thompson, 390 U.S. 727, 731 (1968).  In other words, to prove actual malice, a plaintiff must prove, by clear and convincing evidence, that "the defendant in fact entertained serious doubts as to the truth of his publication."  Id.

Plaintiff Foraker is a public official or public figure for purposes of Delaware defamation law.  Delaware courts have held that police officers are public officials for the purpose of a defamation claim.  See Jackson v. Filiben, 281 A.2d 604 (Del. 1971) (holding that a police sergeant was a public official under the Sullivan rule).  Moreover, a person who is not an "all-purpose" public figure may become one for a limited purpose.  Martin v. Widener University Sch. of Law, No. 91C-03-255, 1992 WL 153540, at *7 (Del. Super. Ct. June 4, 1992).  A limited-purpose public figure is an individual who "injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."  Id. (citation omitted).  The controversy surrounding the range is of great interest to the public because it concerns, among other things, the allocation of taxpayer money and the competency of the process by which state contracts are awarded.  The Governor's office and other Delaware politicians have become involved in the controversy.  (See, e.g., CA at A-539 – A-541.)  There has also been an official governmental investigation of the range at the expense of the taxpayers. (CA at A-512 – A-525.)  These factors, in addition to the considerable amount of media attention the issue has received, qualify the situation as a public controversy the center of which is occupied by Foraker.

As a public figure, Foraker must meet the high standard of proving by clear and convincing evidence that Defendants made defamatory statements about him with the clear knowledge that those statements were false.

### 2.    Plaintiff Fails To Identify The Statements That Are Defamatory.

Plaintiff's Complaint and his responses to discovery claim that he has been defamed by "statements" that he does not identify:

- Plaintiff claims generally that Col. Chaffinch "ratified" or "adopted" statements of Sec. Gloria Homer (CA at A-61), but fails to identify specifically which statements Chaffinch took as his own or when and how he adopted them. In fact, there is no evidence that Chaffinch did so.

- Plaintiff asserts that Col. MacLeish adopted Chaffinch's statements (which, of course, were originally, Gloria Homer's statements). Foraker does not specify which statement he thinks MacLeish adopted, electing instead to assert merely that he adopted them all. (See, e.g., CA at A-244 (Foraker Dep. 188).) There is no evidence that he did so.

- Plaintiff generally claims that Defendants defamed him in an on-air news report by television station WBOC and in articles in the News Journal. (CA at A-61.) With regard to the WBOC report, Foraker does not explain which statement by either Defendant he thinks is actionable. [3] With regard to the News Journal, Foraker does not even identify a specific article, much less a specific statement, that he thinks is defamatory.

To satisfy his obligations on a motion for summary judgment, "[i]t is essential for Plaintiff to identify the defamation communication, otherwise, it is impossible to know whether the communication gives rise to a cause of action …." Layfield v. Beebe Medical Center, No. 95C-12-007, 1997 Del. Super. Lexis 472, *18 (Del. Super. July 15, 1997) (finding that claim

---

[3] Explaining why the range closed, Col. MacLeish told WBOC, "The Firearms Training Unit began experiencing some problems – some health problems that that copper taste in your mouth – runny nose, stuffiness, things of that nature." (CA at A-553.1 – A-553.4.) Discussing changes that the DSP planned, MacLeish went on to say, "On the Delaware State Police's side, there will be a very sound, strict, standard operating procedure that will be done and followed." Chaffinch noted, "Our concern first is with the people that will be in here training. So, until such time as we know that it's safe and healthy to be here, we won't be here." In sum, Defendants simply explained that their actions, both in the past and in the future, have been guided by the welfare of their troopers, including Plaintiff. There is no mention of Plaintiff, directly or indirectly. No reasonable person could understand these comments as defamatory attacks on Foraker.

"necessarily fails as a matter of law because [plaintiff] cannot identify the alleged defamatory communication"); see also Collier v. Target Stores Corp., Civ. No. 03-1144-SLR, 2005 WL 850855, at *10 (D. Del. Apr. 13, 2005). Plaintiff's allegations fail to meet this basic requirement. At this stage of the proceedings, Defendants should not have to guess the what, when, where, and to whom of Plaintiff's defamation claims. Because Plaintiff Foraker fails to meet this threshold burden, Defendants are entitled to summary judgment on these general assertions of defamation.

### 3. Defendants did not recite or publish some of the alleged defamatory statements.

Plaintiff must prove that Chaffinch or MacLeish made defamatory statements. Doe, 884 A.2d at 463. In this case, however, Plaintiff Foraker identifies as defamatory a number of statements that neither Chaffinch nor MacLeish uttered. (See CA at A-195 – A-197 (Foraker Dep. 4-10).) All of these comments, contained in the April 7 State News article (CA at A-533 – A-538), were made by Sec. Gloria Homer or were the reporter's take on Homer's statements.[4]

Plaintiff argues that Col. Chaffinch "adopted" Sec. Homer's statements and is, therefore, liable for her allegedly defamatory statements. This concept is meaningless in the context of this

---

[4] The allegedly defamatory statements of others include:

(1) "Flammable materials are stored in the shooting area."
(2) "Mrs. Homer said, 'Facilities Management only provides custodial services and is not otherwise responsible.'"
(3) "'We [i.e., Facilities Management] are not responsible for the equipment or cleanup of the range,' Mrs. Homer said as she began the tour."
(4) "'We're looking for the test results later this week,' she [i.e., Sec. Homer] said. 'I haven't seen any indication yet that those (that used the range) have had higher than standard lead levels in their blood. The proof is in the blood tests, not in how well the equipment works.'"
(5) "'Ventilation can only do so much,' she [i.e., Sec. Homer] said. 'The hygiene of the facility is just as important.'"
(6) "Mrs. Homer and Mr. Furman pointed to material scattered on the floor or on shelves."
(7) "She [i.e., Sec. Gloria Homer] pointed to a propane gas tank on the floor at the back of the range."

case.  Foraker cannot show that Gloria Homer, Secretary for Administrative Services, acted as an

agent for Col. Chaffinch, a superintendent of the State Police in another cabinet department.  Nor

can Foraker identify any example of Chaffinch or MacLeish repeating or republishing Homer's

statements.

Accordingly, the court should grant summary judgment for Chaffinch and MacLeish on

Count III.

    **4.**       **The allegedly defamatory statements about Foraker are not capable of a defamatory meaning because they are expressions of opinion.**

Foraker's defamation claim rests on five statements reportedly made by Col. Chaffinch at

the April 6 tour and published in an article in the Delaware State News the next day:

    (1)    "When I was here in the fall, everything was going as well as the previous times I'd been here…. It's a lot dirtier now.  Things seemed in their proper places in the fall.  I've never seen it like this."

    (2)    "I think people who live in glass houses shouldn't throw stones…. [Referring to the people that provided (the media) with this information in the first place."

    (3)    "The previous sergeant in charge [i.e., Richard Ashley] did a good job.  "Things changed in December when another sergeant came in.  That's at least a portion of where the ball was dropped."

    (4)    "Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning…. Sgt. Ashley was willing to do that.  I cannot say Sgt. Foraker was willing to do that.  He was interested in instruction and teaching people how to shoot.  He did not feel (bullet trap cleaning) was part of his purview.  He felt that was putting him in harm's way."

    (5)    "If the people that are assigned here now don't feel that protocol is part of their protocol, they will be assigned elsewhere."

Foraker must show that these statements are "capable of defamatory meaning."  In

answering this question, Delaware courts must determine "*first,* whether alleged defamatory

statements are expressions of fact or protected expressions of opinion; and [*second*], whether the

challenged statements are capable of a defamatory meaning." <u>Doe</u>, 884 A.2d at 463 (citation omitted). It is Chaffinch's position that these statements are protected expressions of opinion.

It is well established that "a pure statement of opinion is constitutionally protected and cannot be defamation as a matter of law. Whether a statement constitutes opinion or factual representation is a question of law and is made from the position of an ordinary reader." <u>Gill v. Delaware Park, LLC</u>, 294 F. Supp. 2d 638, 647 (D. Del. 2003) (internal citations omitted.). Courts employ a four-part test to determine whether a statement is a fact or opinion: "First, the Court should analyze the common usage or meaning of the challenged language. Second, the Court should determine whether the statement can be objectively verified as true or false. Third, the Court should consider the full context of the statement. Fourth, the Court should consider the broader social context into which the statement fits." <u>Riley v. Moyed</u>, 529 A.2d 248, 251 (Del. 1987).

The most important factor is the verifiability of the statements. This is because "[f]actual statements are uniquely capable of objective proof of truth or falsity while opinion statements are not since they reflect the maker's state of mind." <u>Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc.</u>, No. 93C-09-021, 1994 WL 555391, at *5 (Del. Super. Ct. Aug. 22, 1994) (citation omitted).

In this case, the statements by Col. Chaffinch are mostly expressions of opinion. For example, Chaffinch's statement, "When I was here in the fall, everything was going as well as previous times," cannot be proven true or false. It is not possible to verify what Chaffinch considers to be "going well;" nor can this standard be compared to "previous times" because he did not identified any specific time. Similarly, there is no way to determine the factual content of Chaffinch's statements about the condition of the range in the Fall – whether things "seemed"

-28-

to be in their proper places or even what Chaffinch meant by the term "proper places." Considering the language and the context in which the statement was made, it is obvious that Chaffinch is merely expressing his opinion and impressions about the condition of the range from his own limited experience.

Chaffinch's repetition of the adage, "I think that people who live in glass houses shouldn't throw stones," conveys an opinion or an emotion but nothing concrete. Chaffinch's comments about Sgt. Ashley are also statements of opinion. Whether Ashley did a "good job" is a generic opinion. It suggests nothing factual about Foraker.

All these statements were made in the context of the public debate and at the beginning of a media investigation into the cause of the problems at the shooting range. When statements are made in the context of a public controversy, it is understood that those involved in the debate may use colorful, hyperbolic, or persuasive language in order to make their point. Riley, 529 A.2d at 253, n.5. Accordingly, the statements are protected speech and are not capable of a defamatory meaning.

**5.    The statements that refer to Foraker are substantially true.**

"It is hornbook law that truth is an absolute defense to a defamation action." Bonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1155 (Del. 1981); see Riley v. Moyed, 529 A.2d 248, 254 (Del. 1987) ("To support a cause of action for libel, the underlying facts must be false as well as defamatory."). Even if a statement technically false, "[u]nder Delaware law there is no liability for defamation when a statement is determined to be substantially true." Id. at 251 (emphasis added). The material consideration, therefore, is whether "the 'gist' or 'sting' of the [statement] was true," that is, whether "it produces the same effect on the mind of the recipient which the precise truth would have produced." Id.

-29-

In this case, Chaffinch's statements, to the extent they possess any factual content, are true. When asked how the condition of the range deteriorated to a point where shutting it down was necessary, Col. Chaffinch responded, "Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped." It is undisputed in this case that when Foraker resumed control of the range on December 1, 2003, things changed. Prior to that time, the FTU staff working at the range had routinely performed certain maintenance on the bullet trap, including replacing pumps and filters on the trap's water system and cleaning out the water tank. See supra Part IV.G. As the State Auditor found (CA at A-522), Foraker and his staff stopped doing the maintenance. Id. As a result, the amount of smoke and dust in the range increased and the environmental conditions deteriorated.[5] Id. In sum, Foraker and his men changed well-settled maintenance practices, exacerbating the problems that eventually caused the range to be shut down. Col. Chaffinch did not defame Foraker when he noted these changes; he merely described what happened.

Col. Chaffinch was also truthful and accurate when he stated, "I cannot say Sgt. Foraker was willing to do [hands-on, daily cleaning of the bullet trap]. He was interested in instruction and teaching people how to shoot. He did not feel (bullet trap cleaning) was part of his purview. He felt that was putting him in harm's way." Foraker and his staff were, in fact, not willing to continue maintaining the bullet trap in the way it had been done before he returned in December 2003. Second, it cannot seriously be doubted that Col. Chaffinch was right when he noted that Foraker was interested in instruction (i.e., teaching police recruits and others how to shoot) and that he considered training, not cleaning, his primary responsibility. (CA at A-212 (Foraker Dep.

---

[5]  Additionally, sometime in December, the conveyor-dredge system on the bullet trap ceased functioning. (CA at A-203 (Foraker Dep. 35-36).) Foraker nevertheless continued to use the range to train recruits classes and other DSP units. (CA at A-205 (Foraker Dep. at 44).)

72).)  Finally, Plaintiff Foraker, as well as Cpls. Price and Warren, have themselves explained

that they stopped doing the maintenance because of health concerns and to avoid "harm's way."

(CA at A-522; see, e.g., id. at A-212 (Foraker 73).)

Col. Chaffinch also stated that "Sgt. Ashley was willing to do [the hands-on, daily

cleaning of the bullet trap]."  Even if one credits Foraker's claims that this comparison to his

immediate predecessor as NCOIC of the range injures his reputation, it cannot be the basis of

liability because every part of it is substantially true.  Foraker admits that the bullet trap required

extensive cleaning.  (CA at A-199 – A-200, A-214 (Foraker Dep. 20-23, 81).)  Additionally, the

record contains overwhelming evidence that Ashley performed that maintenance, even while

allowing others to "back off."  (CA at A-95.)  Foraker nitpicks that Ashley must not have been

"willing" to do maintenance because not all parts of the bullet trap were fully and completely

functional on December 1, 2003, the date Foraker assumed control of the FTU.  (CA at A-211

(Foraker Dep. 68-69).)  This technical objection does not negate the substantial evidence that

Sgt. Ashley consistently performed the tasks necessary to keep the trap running.  (CA at A-907 –

A-955).)  Foraker may speculate that this statement is part of some scheme to "frame" him, but

he can present no evidence to challenge its accuracy.

Because the statements that refer to Plaintiff Foraker are substantially true, the Court

should grant summary judgment to Defendants on Count III of the Complaint.

## E.    Defendants are entitled to summary judgment on Count IV (Invasion of Privacy)

One commits the tort of false light invasion of privacy by "giving publicity to something

that places the plaintiff in a false light before the public, the false light being highly offensive to

a reasonable person, and knowing of or acting 'in reckless disregards as to the falsity of the

publicized matter and the false light in which the other would placed.'"  Wyshock v.

Malekzadeh, No. 91C-09-22, 1992 Del. Super. Lexis 247, at *5-6 (Del. Super. Ct. June 10, 1992).

      Plaintiff Foraker's claim for false light publicity fails for three reasons.  First, Defendants have done nothing to put Plaintiff Foraker in a "false" light.  As fully discussed above, the allegedly tortious statements of Defendant Chaffinch are substantially true.  Inability to prove falsity is fatal to a claim for false light invasion of privacy.  Hart v. City of Jersey City, 308 N.J. Super. 487, 706 A.2d 256, 258 (1998); Santillo v. Reedel, 430 Pa. Super. 290, 634 A.2d 264, 266 (1993); Baker v. Burlington Northern, Inc., 99 Idaho 688, 587 P.2d 829 (1978); Rinsley v. Brandt, 446 F. Supp. 850 (D. Kan. 1978); Logan v. District of Columbia, 447 F. Supp. 1328 (D.D.C. 1978) (no cause of action if statements "substantially true").

      Second, a plaintiff making claims for false light invasion of privacy must establish that the defendant acted with knowledge that his statements were false or with reckless disregard of whether they were false or not.  Time, Inc. v. Hill, 385 U.S. 374, 380-91 (1967) (holding actual malice standard applicable to a false light suit by private individuals when the subject of the article involved matters of public interest); Foraker cannot present evidence that suggests that Chaffinch or MacLeish spoke about Foraker's performance of his range duties without properly considering the truth of their statements.  That is, even if their allegedly invasive comments were not true, Defendants did not act with the requisite fault to hold them liable for invasion of privacy.

      Lastly, a public figure cannot sustain an action for false light invasion of privacy because someone has publicized his public activities.  See Reardon v. News-Journal Co., 164 A.2d 263, 266-67 ("The general purpose of protecting the right to privacy relates to one's private life, not when he life has become matter of legitimate public concern."); see also Neish v. Beaver

Newspapers, Inc., 581 A.2d 619, 624-25 (Pa. Super. Ct. 1990) ("Appellant's stature in the community as a public figure resulted in a relinquishment of insulation from scrutiny of his public affairs.").  In Godbehere v. Phoenix Newspapers, Inc., 783 P.2d 781, 790 (Ariz. 1989), the court held that the plaintiffs, a sheriff and his deputies, had "no right of privacy" and there was "no false light invasion of privacy action for matters involving official acts or duties of public officers."  Id. at 789.[6]

In this case, Plaintiff Foraker has not identified any publication by either Defendant that even hints at any aspect of Foraker's private life.  Rather, the statements about which Foraker complains, given their broadest implications, concern Plaintiff's performance as the NCOIC of the Firearms Training Unit and his maintenance of an indoor firing range.  Insofar as the very premise of Plaintiff Foraker's lawsuit in the companion case of Price v. Chaffinch, No. 04-956-GMS, is that the indoor range is a matter of public concern, he cannot now be heard to argue that his role at the range is a purely private matter.  In sum, Foraker as a "public figure" subjected to statements about his performance of a public role, cannot sustain a claim for false light invasion of privacy as a matter of law.

## VI.    CONCLUSION

For the reasons set forth above, Defendants requests that the Court enter summary judgment in their favor and against Plaintiff on all counts of the Complaint.

---

[6] See Bell v. Birmingham Broadcasting Co., 96 So.2d 263 (Ala. 1957); Patton v. Royal Indus., Inc., 70 Cal. Rptr. 44 (Cal. Ct. App. 1968); Goodrich v. Waterbury Republican-Am., Inc., 448 A.2d 1317 (Conn. 1982); Logan v. District of Columbia, 447 F. Supp. 1328 (D.D.C. 1978) (applying D.C. law); Cox Com Inc. v. Lowe, 328 S.E.2d 384 (Ga. Ct. App. 1985); Adreani v. Hansen, 400 N.E.2d 679 (Ill. App. Ct. 1980); Cefalu v. Globe Newspaper Co., 391 N.E.2d 935 (Mass. App. Ct. 1979); Langworthy v. Pulitzer Publishing Co., 368 S.W.2d 385 (Mo. 1963); Gill v. Snow, 644 S.W.2d 222 (Tex. Ct. App. 1982); see also Werner v. Times-Mirror Co., 14 Cal. Rptr. 208 (Cal. Ct. App. 1961) (holding that matters relating to the public life of a politician, even though not concerning "official" acts, may not form the basis of a false light cause of action, because of the clear public interest in all questions relating to the public life of those seeking or holding public office).

Respectfully submitted,


Date:  January 25, 2006                    /s/ Noel C. Burnham
                                   Noel C. Burnham (DE Bar No. 3483)
                                   Richard M. Donaldson (DE Bar No. 4367)
                                   Montgomery, McCracken, Walker & Rhoads, LLP
                                   300 Delaware Avenue, Suite 750
                                   Wilmington, DE 19801
                                   Telephone:  (302) 504-7840
                                   Facsimile:  (302) 504-7820

                                   Edward T. Ellis
                                   Robert J. Fitzgerald
                                   Montgomery, McCracken,
                                     Walker & Rhoads, LLP
                                   123 South Broad Street
                                   Philadelphia, PA  19109
                                   (215) 772-1500

                                   *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that two (2) copies of the Opening Brief in Support of Defendant's

Motion for Summary Judgment were served by first class mail this 25th day of January 2006 on:

Thomas Stephen Neuberger, Esquire
Stephen J. Neuberger, Esquire
The Neuberger Firm, P.A.
Two East Seventh Street
Suite 302
Wilmington, DE  19801

Martin D. Haverly, Esquire
Two East Seventh Street
Suite 302
Wilmington, DE  19801-3707
*Attorneys for Plaintiffs*


_____/s/ Noel Burnham_____
Noel C. Burnham (DE Bar No. 3483)