# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **SERGEANT CHRISTOPHER D. FORAKER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1207-GMS** |
| **individually and in his official capacity as** | : | |
| **Superintendent of the Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as Deputy Superintendent of the** | : | |
| **Delaware State Police; DAVID B. MITCHELL,** | : | |
| **in his official capacity as the Secretary of the** | : | |
| **Department of Safety and Homeland Security of** | : | |
| **the State of Delaware; and DIVISION OF** | : | |
| **STATE POLICE, DEPARTMENT OF SAFETY** | : | |
| **AND HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY**
**AT LAW**
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Attorneys for Plaintiffs

Dated: January 25, 2006

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING..................................................................1

SUMMARY OF THE ARGUMENT.............................................................................1

STATEMENT OF FACTS......................................................................................2

    A.    Sgt. Christopher D. Foraker...............................................................2

        1.    Sgt. Foraker Performs His Duties Admirably and is an Exceptional Trooper.......3

        2.    Sgt. Foraker's History With the DSP..................................................3

    B.    Sgt. Foraker's Protected First Amendment Activity....................................4

        1.    The Initial Lawsuit....................................................................4

        2.    The Unprecedented Jury Verdict.........................................................5

        3.    The Settlement and Reinstatement......................................................5

    C.    Defendants' Open Vendetta Against Sgt. Foraker.......................................6

    D.    The Firearms Training Unit.............................................................7

        1.    The Longstanding Health and Safety Concerns at the FTU...............................7

            a.    The System "Will Inevitably Fail."..............................................7

            b.    A Representative Sampling of Problems.............................................8

            c.    Problems Revealed by Internal DSP Documents.......................................9

                (1).    Problems Under Sgt. Fitzpatrick...............................................9

                (2).    Problems Under Sgt. Parton...................................................10

                (3).    Problems During Sgt. Foraker's First Tenure at the FTU.........11

                (4).    Problems Under Sgt. Ashley....................................................12

        2.    The FTU Contains 700 Times the Safe Level of Lead in the Air.......................12

    E.    The Disastrous Conditions at the FTU on Sgt. Foraker's First Day Back......................13

    F.    Sgt. Foraker Speaks Out And Sounds the Alarm.........................................14

G.      Defendants Attack and Publicly Blame Sgt. Foraker for Destroying the FTU.................15

      1.      Defendants Decide to Give the Media Tours of the FTU.....................................15

      2.      Before the Tour, Chaffinch Brags that He is Going to "Stick It To" and "Put It On" Sgt. Foraker..............................................................................15

      3.      Chaffinch Blames Sgt. Foraker ....................................................................15

      4.      Defendants Gag Sgt. Foraker and Bar Him From Responding to These Defamatory Attacks............................................................................16

      5.      World-Wide Publication of These Defamatory Attacks.....................................17

      6.      Chaffinch Brags that "I Got Them Back."........................................................17

            a.      Chaffinch Brags to Major Baylor..............................................17

            b.      Chaffinch Brags to Capt. Conley..............................................18

            c.      Major Baylor, Capt. Conley and Capt. Dixon Discuss Chaffinch's Actions and Words..........................................................18

      7.      Major Baylor Urged Chaffinch to Retract His Accusations................................19

H.      Defendants' Allegations of Blame Are Malicious Falsehoods.........................................19

      1.      Chaffinch Has Admitted that His Allegations Are False.....................................20

      2.      The FTU is a Highly Technical and Specialized Facility....................................21

      3.      Sgt. Foraker's Evaluation for this Period of Time..............................................22

            a.      His Sterling Safety Record.........................................................22

            b.      High Praise for His Care for Divisional Equipment...........................23

            c.      High Marks Across the Board......................................................23

      4.      Politics Are To Blame, Not Sgt. Foraker.........................................................23

I.      Adverse Action.........................................................................................24

      1.      Defendants Diminish His Job Duties and Violate the Reinstatement Order.......24

            a.      Sgt. Foraker is the Section-Chief of the FTU..........................................24

            b.      Sgt. Foraker Previously Attended Section-Chief's Meetings.................24

   c. Defendants Throw Him Out of the Meeting and Order That He Never Return..................................................................................25

  2. More Adverse Actions..........................................................................26

J. Evidence of Causation...................................................................................26

  1. Knowledge of the Protected Conduct...................................................26

  2. Demonstrated Anger, Hostility and Antagonism - Defendants Loathe Sgt. Foraker..................................................................................................26

   a. Defendants' Close Friendship Also Gives Rise To a Motive to Retaliate......................................................................................26

   b. Chaffinch Is "Very Vindictive" and Demands "Blind" Personal Loyalty.........................................................................................27

   c. Troopers Also Fear Chaffinch Because Of His Powerful Political Connections...................................................................................27

   d. Fear of the Good Old Boy Network...........................................28

  3. Temporal Proximity..............................................................................28

  4. Intentional Destruction of Evidence......................................................28

  5. Violations of Laws, Rules, Policies and Procedures..............................29

  6. Disparate Treatment..............................................................................29

  7. Pretext and Coverup..............................................................................29

   a. Hostility Towards Sgt. Christopher Foraker..............................29

   b. Hostility Towards Captain Davis and Captain Warren.............29

   c. Hostility Towards Captain Conley.............................................30

   d. Hostility Towards Master Corporals Price and Warren.............30

   e. Hostility Towards the Filing of Lawsuits in General................30

   f. Summary of this Evidence.........................................................31

  8. Falsehoods.............................................................................................31

ARGUMENT.................................................................................................................31

I.      STANDARD OF REVIEW.............................................................................31

II.     PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH BY
        FILING AND SUCCESSFULLY PROSECUTING HIS EARLIER LAWSUIT, AND
        THAT LAWSUIT WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE
        RETALIATION AGAINST HIM.....................................................................31

        A.      Protected Activity.......................................................................31

                1.      Matter of Public Concern................................................31

                        a.      The Content Exposed Wrongdoing..........................32

                        b.      Form and Context...................................................32

                                (1).    Police Department Context............................32

                                (2).    Witness Intimidation and the Judicial Forum
                                        Context....................................................32

                                (3).    The Media Attention Context.......................34

                2.      Balancing of Interests....................................................34

        B.      Substantial or Motivating Factor.................................................35

                1.      Knowledge of Protected Conduct....................................35

                2.      Demonstrated Anger, Hostility and Antagonism..................35

                3.      Temporal Proximity......................................................36

                4.      Violations of Law, Policies and Procedures.........................36

                5.      Disparate Treatment......................................................36

                6.      Pretext and Coverup.....................................................36

                7.      Falsehoods.................................................................37

                8.      Intentional Destruction of Key Evidence..........................37

                9.      The Big Picture............................................................37

                10.     Summary...................................................................38

        C.      Same Decision Anyway Affirmative Defense..................................38

III.   PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING
       OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND HIS
       LAWSUIT WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE
       RETALIATION AGAINST HIM......................................................................................39

       A.     The Big Picture.......................................................................................39

       B.     The Activities Protected..........................................................................39

       C.     The Specifics...........................................................................................40

       D.     Substantial or Motivating Factor and Same Decision Anyway............................40

CONCLUSION.................................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

Adkins v. Rumsfeld, 389 F.Supp.2d 579 (D. Del. 2005)...............................................................35-36

Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999)...........................................................................38

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997).................................................................39-40

Andrews v. City of Phila., 895 F.2d 1469 (3d Cir. 1990).............................................................37

Arlio v. Lively, 392 F.Supp.2d 317 (D.Conn. 2005).....................................................................37

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc)......................................34

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001)...........................................................32

Bedford v. SEPTA, 867 F.Supp. 288 (E.D.Pa. 1994).................................................................35

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998)................................................31

Brady v. Fort Bend County, 145 F.3d 691 (5th Cir. 1998).........................................................38

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)..............................................................36,39-40

Briscoe v. LaHue, 460 U.S. 325 (1983)...................................................................................33

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972).....................................39

Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005).............................................................32

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991).................................................................38

City of San Diego v. Roe, 543 U.S. 77, 125 S.Ct. 521 (2004)...................................................34

Connick v. Myers, 461 U.S. 138 (1983)..................................................................................32

Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387 (M.D.Pa. 2003)........................................35

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005).......................................................................36

Feldman v. Phila. Hous. Auth., 43 F.3d 823 (3d Cir. 1994)......................................................36

Foraker v. Chaffinch, C.A.No. 02-302-JJF (D.Del. June 17, 2003) (slip op.)............................4-5

Green v. Phila. Hous. Auth., 105 F.3d 882 (3d Cir. 1997)........................................................33

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005).......................................................31,35,40

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)................................................................32,34

Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571 (3d Cir. 2003)..................................35

Johnston v. Harris County Flood Control Dist., 869 F.2d 1565 (5th Cir. 1989).......................................33

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997).........................................................36

Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992)........................................................................35

Konits v. Valley Stream Central High Sch. Dist., 394 F.3d 121 (2d Cir. 2005)........................................32

McDonald v. Smith, 472 U.S. 479 (1985)........................................................................................39

McGreevy v. Stroup, 413 F.3d 359 (3d Cir. 2005)..............................................................................34

Miller v. Cigna, Corp., 47 F.3d 586 (3d Cir. 1995) (en banc).................................................................35

Mitchell v. Street, 2005 WL 1993774 (E.D.Pa. Aug. 16, 2005).............................................................35

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)...........................................................35

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000).....................................................................38

O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989)........................................................................34

Ostad v. Oregon Health Sciences Univ., 327 F.3d 876 (9th Cir. 2003)....................................................38

Pickering v. Bd. of Educ., 391 U.S. 563 (1968)................................................................................34

Powell v. Alexander, 391 F.3d 1 (1st Cir. 2004)...............................................................................39

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996).............................................................................31,33

Rankin v. McPherson, 483 U.S. 378 (1987)......................................................................................34

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)........................................................37

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)..........................................................................34

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994).............................................................34-36,39-40

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc)............................37

Springer v. Henry, -- F.3d --, 2006 WL 121942 (3d Cir. Jan. 18, 2006)..................................................31

Springer v. Henry, 2002 WL 389136 (D.Del. March 11, 2002)...............................................................34

Stanley v. City of Dalton, Georgia, 219 F.3d 1280 (11th Cir. 2000)........................................................38

Stewart v. Rutgers, the State Univ., 120 F.3d 426 (3d Cir. 1997)...............................................36

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)......................................................................35

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002).............................................................33

Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23 (1st Cir. 2004)................................................38

Village of Arlington Heights v. Metropolitan Hous. Develop Corp., 429 U.S. 252 (1977)......................36

Waters v. Churchill, 511 U.S. 611 (1994).................................................................................34

Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995)..................................................................34

We, Inc., v. City of Phila., 174 F.3d 322 (3d Cir. 1999)...............................................................40

Wilcher v. City of Wilm., 60 F.Supp.2d 298 (D.Del. 1999)..........................................................32

Williams v. Hepting, 844 F.2d 138 (3d Cir. 1988)......................................................................33

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997)..........................................................35

Yalowizer v. Town of Ranchester, Wyoming, 18 Fed.Appx. 745 (10th Cir. 2001)..................................38

**Constitutions, Statutes and Rule**

U.S. Const., Amend. I..............................................................................................passim

Fed.R.Civ.P. 8(c)................................................................................................................38

Fed.R.Civ.P. 56(c)..............................................................................................................31

## NATURE AND STAGE OF THE PROCEEDING

This is a civil action for compensatory and punitive damages and for injunctive relief for retaliatory violations of the Speech and Petition Clauses of the First Amendment, and for supplemental state law claims. In June of 2003 Plaintiff obtained a jury verdict, and an award of $100,120 in compensatory and punitive damages, against defendant Chaffinch for multiple violations of his free speech rights. On December 1, 2003, under a Stipulated Order of this Court plaintiff was reinstated to his previous position. But upon his reinstatement defendants then set out to drive plaintiff from his employment and within three months in early 2004, orchestrated a local, national and international media campaign riddled with malicious falsehoods which have totally destroyed plaintiff's professional reputation.

The record includes the depositions of defendant Ret. Col. L. Aaron Chaffinch, defendant Col. Thomas MacLeish, Major Randall Hughes, Ret. Major David Baylor, Ret. Major Joseph Forester, Capt. Glenn Dixon, Capt. Ralph H. Davis, III, Capt. Nathaniel McQueen, Jr., Ret. Capt. Gregory A. Warren, Lt. Joseph Aviola, plaintiff, his interrogatory answers, various documents and the Complaint and Answer. ("Compl. & Ans.").[1]

This is plaintiff's opening brief and appendix in support of his motion for summary judgment on Counts I and II - his First Amendment retaliation claims.

## SUMMARY OF THE ARGUMENT

Plaintiff engaged in First Amendment protected activity by filing and successfully prosecuting his earlier First Amendment lawsuit challenging defendant Chaffinch's illegal

---

[1] The record includes deposition and trial testimony from <u>Foraker1</u>, the companion case of <u>Price, et al. v. Chaffinch, et al.</u>, as well as <u>Dillman v. Chaffinch, et al.</u>, C.A. No. 02-509- KAJ, and <u>Conley v. Chaffinch, et al.</u>, C.A.No. 04-1394-GMS. References to Plaintiff's Answers to Interrogatories in the companion <u>Price</u> case will be referenced as "<u>Price</u> Inter. # __" and Plaintiff's Answers to Interrogatories in the present case will be referenced as "<u>Foraker</u> Inter. # __". References to pleadings in the earlier Foraker case will be referenced as "<u>Foraker 1</u> Compl. & Ans. ¶ 4" and references to the present action will be cited as "<u>Foraker 2</u> Compl. & Ans. ¶ 3".

1

conduct.  In light of the overwhelming record evidence, as a matter of law, no reasonable jury

could conclude that plaintiff's lawsuit did not play a substantial role in the retaliation against

him.  Because defendants have waived their <u>Mt. Healthy</u> affirmative defense, summary judgment

should be entered against them on Counts I and II.

### STATEMENT OF FACTS

**A. Sgt. Christopher D. Foraker.**  Plaintiff is a Sergeant and 20 year veteran of the

DSP.  (<u>Foraker 2</u> Compl. & Ans.¶ 3; Foraker 5; A10,37,1100).  As defendants tellingly admitted

in the first case, he "is an excellent police officer."  (<u>Foraker 1</u> Compl. & Ans. ¶ 4; A815,827).

Moreover, numerous Captains, Majors, and the current Lt. Col. and Colonel have consistently

testified over time that Sgt. Foraker is a consummate professional who receives awards and

accolades wherever he goes, including the DSP's "Exceptional Performance Award" for his work

at the Firearms Training Unit ("FTU").[2]  As defendant MacLeish testified during the first suit in

2002,  "Chris is a good troop," (MacLeish 60,36; A1006,1000), "the Foraker name carries a good

reputation," (MacLeish 56; A1005), and he is "the kind of person you would want to have under

your command."  (MacLeish 60,63-64 36; A1006-07,1000 ).[3]  In retired Major Forester's words,

"I have nothing but good things to say about [Sgt. Foraker], anything, whether on the job or off

the job" - he "has a reputation of the highest order."  (Forester 51; A616).  As the present Lt. Col.

testified, Sgt. Foraker is "a man of very high integrity, truthfulness and character" (Seifert 46;

A959), three qualities which are unquestioned by his commanders.  (Papili 87-88, 15; Swiski 65;

MacLeish 63; Seifert 46; Yeomans 25-26; Warren 27-28; Davis 17; McQueen 7,26,32-33;

Forester 51; A873-74,855,980,1007,959,1181,1168,487,1542,1547-48,616).

---

[2] (Marcin 27, 31-32, 40, 47; Baylor 5,68; Papili 17-20; Swiski 61; MacLeish 33-36,56-57,60,63-64; Seifert 9-13; Mergenthaler 21-24; Mergenthaler ex.1; Warren 26-27; Foraker 11,93,95-96,98-99, 157-158;McQueen 33; Forester 51,108-09; A1040-41,1043,1045,1013,1029,856-57,979,1000,1005-07,950-51,1147,1152-59,1168,1101,1122-23,1138,1548,616,674).

[3] At his 2005 deposition, although refusing to lavish the same praise on Sgt. Foraker, MacLeish begrudgingly admitted that Sgt. Foraker is "a good trooper" and "a good officer."  (MacLeish 32; A101).

**1. Sgt. Foraker Performs His Duties Admirably and is an Exceptional**

**Trooper.** Sgt. Foraker's most recent performance evaluation (12/1/03 - 9/3/04), which addresses

the very time period at issue in this case, is in the record and speaks volumes about the kind of

Trooper and man that he is. His work is always of the "highest calib[er]." (A841). "Sgt. Foraker

is clearly a valuable asset to the Division of State Police." (A842) (emphasis added). He

"Consistently and Substantially Exceeds Expectations" as to his "Contribution to [the]

Organization." (A836). Despite the fact that he has "one of the most stressful jobs in the

Division" (CF11), "Sgt. Foraker has performed [his] duties admirably, always keeping the safety

of the FTU staff and those training under his command paramount." (A841) (emphasis added).

He "Far Exceeded Expected Results" in his duty to "[m]aintain a safe training environment."

(A838). He is a "skilled communicator" (A841) who "possesses excellent organizational skills

and employs these skills to accomplish Divisional and Academy goals." (A842). On a "[d]aily"

basis, "Sgt. Foraker makes a positive impact on the Delaware State Police, numerous federal and

local law enforcement agencies, and the citizens of Delaware." (A842).

> There is no doubt that Sgt. Foraker is an exceptional leader and supervisor and
> demonstrated these abilities on a daily basis during the rating period. When compared to
> his peers, Sgt. Foraker clearly performs at a level above his contemporaries.

(A842) (emphasis added).

**2. Sgt. Foraker's History With the DSP.** Sgt. Foraker joined the DSP in 1985

and then served throughout the state on patrol, as a canine handler and as a team leader of the

Special Operations Response Team (SORT). In 1997 he transferred into the FTU. (Foraker 5-

11,17-18,89; Foraker 1 Compl.& Ans. ¶ 4; A1100-01, 1103,1121,815,827). While serving there,

his leadership abilities were recognized and he was chosen by the DSP to attend the

Northwestern School for Police, Staff and Command, a 12 week leadership school with special

emphasis on supervisory and managerial skills. (Foraker 99-101; Seifert 8-9; A1123-24,9550).

At the FTU, in addition to his SORT duties, he served as a firearms instructor and, beginning on

August 1, 2001, his outstanding work was further recognized when he was promoted to Sergeant and became the non-commissioned officer in charge (NCOIC) of the entire Unit.  (Foraker 1 Compl. & Ans. ¶ 7, 4; Foraker 18,20-26,102-103; A815,827,1103-05, 1124). But less than seven months later, on February 22, 2002, Sgt. Foraker ran afoul of the good old boys network in the DSP.  He was demoted, transferred out of the FTU and given a dead end assignment at the Police Academy because he disciplined a close personal friend of Chaffinch for wrongdoing. (Foraker 9-10,92-93,103; Foraker 2 Compl. & Ans. ¶ 8; Chaffinch Ex. 1 at ¶¶ 1-3  - Special Verdict Form; A1101,1122,1124,11,038,477).

    **B. Sgt. Foraker's Protected First Amendment Activity.**

        **1. The Initial Lawsuit.**  As a result of that retaliatory transfer, Sgt. Foraker filed suit against defendant Chaffinch and the DSP in April 2002.  See Foraker v. Chaffinch, et al., C.A.No. 02-302-JJF (D.Del.).  (Foraker 2 Compl. & Ans. ¶ 10; A11,38).  Sgt. Foraker alleged that Chaffinch had transferred him to a dead end position in retaliation for his speaking out and reporting numerous inappropriate actions by a trooper under his command who was a close personal friend of Chaffinch's.  First, Sgt. Foraker reported this trooper for having unhealthy levels of lead in his bloodstream.  Second, he wrote this trooper up for lying in the course of his state police duties.  Third, he insisted that this trooper be reported and disciplined for sexually harassing and touching a vulnerable female civilian cleaning contractor at the FTU.  Lastly, he gave this trooper a negative performance evaluation because of his wrongdoing.  See Foraker v. Chaffinch, C.A.No. 02-302-JJF (D.Del. June 17, 2003) (slip op.) at 6-7 (attached) (noting the four areas of speech).[4]

    In June 2003, Judge Farnan found that Sgt. Foraker's speech "involved a matter of public concern."  Id. at 8.  After reviewing the sizeable and detailed factual record in this regard, Judge

---

    [4]  There is a massive amount of evidence from the first case in this regard, all of which is in the present record. (See, e.g. Foraker 116, 119-20; A1128-29).

Farnan found that "Sgt. Foraker's interest in reporting unacceptable behavior by a subordinate is very high and actually serves to increase the efficiency of the State Police." Id. at 9. The District Court continued and held that Sgt. Foraker's speech about wrongdoing by Chaffinch's close personal friend was protected by the First Amendment. Id.

**2. The Unprecedented Jury Verdict.** The case went to trial in June of 2003 where the federal court jury -

> found that defendant Chaffinch had violated plaintiff's First Amendment free speech rights by illegally transferring him from the FTU in retaliation for engaging in protected speech activity.

(Foraker 2 Compl. & Ans. ¶ 11; A11,38). The careful jury awarded $40,120 in compensatory damages. (Chaffinch Ex. 1 at ¶ 6 - Special Verdict Form; A478). The discerning jury continued and found that Chaffinch had acted with "malice or with callous and reckless indifference or oppressively" and that his "conduct was so shocking and offensive" that it warranted an award of $60,000 in punitive damages "to punish and deter [his] illegal conduct." (Id. at ¶¶ 7-8; Foraker 2 Compl. & Ans. ¶ 11; A478,11,38).

The jury verdict that the Colonel of the State Police had maliciously violated the First Amendment rights of a Trooper under his command was "unprecedented" in the history of the State Police (MacLeish 38; Chaffinch 27; Baylor 414; A103,432,405), and received widespread media coverage throughout the State. (MacLeish Ex. 1 - media articles; Chaffinch 25,173; MacLeish 21-22; Foraker 2 Compl. & Ans. ¶18; A200-07,431,468,98-99,13,39).

**3. The Settlement and Reinstatement.** The case subsequently settled in November 2003 pursuant to a settlement agreement and a Stipulated Order. (Foraker 2 Compl. & Ans. ¶¶ 12-17; A12-13,38). The Order stated that Sgt. Foraker

> is ordered reinstated to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit of the Delaware State Police with all of the rights, privileges, duties, responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002.

(Stipulated Order at ¶ 1; A4,34). The Court specifically retained jurisdiction to enforce its

reinstatement Order.  (Id. at ¶ 3; A4,34).  The parties also agreed that there was to be no retaliation against Sgt. Foraker following his reinstatement.  (Settlement Agreement at ¶ 2; A1). The settlement of the case and Sgt. Foraker's reinstatement also received widespread media coverage throughout the State.  (MacLeish Ex. 1; A200-07).

**C. Defendants' Open Vendetta Against Sgt. Foraker.**  As a result of Sgt. Foraker's lawsuit, defendants carry a personal vendetta against him.  As Chaffinch openly bragged throughout the DSP - "**I'm going to get that son of a bitch**." (Dixon 17-18,77; A527-28,542). He was "pissed" off.  (Baylor 402; A402).  "[I]f people f-ck with Chaffinch, I'm going to f-ck back."  (Dixon 10,53-54; A526,536-37).[5]  He regularly stated that Sgt. Foraker is a "real pain in the ass" and is a "f-cking a–hole."  (Dixon 16,76,74; A527,542).[6]  Chaffinch himself admits that he was "upset" and "unhappy" with Sgt. Foraker because of his lawsuit. (Chaffinch 40; A435). His loathing of Sgt. Foraker was visibly apparent (Baylor 402-404,440; A402,411) and it was clear that he did not like the lawsuit or the jury verdict.  (MacLeish 38; Baylor 404-05; A103,402).  In the same way, MacLeish was admittedly "irritated" and "not happy" that Sgt. Foraker had filed a lawsuit.  (MacLeish 34,31; A101-02).  Childishly, he "grits his teeth" and "growls" like a dog when in Sgt. Foraker's presence.  (Foraker 196,236; A774,784).  He agrees with Chaffinch and also swore under oath that he thinks Sgt. Foraker is a "**real pain in the ass**" because he had invoked his First Amendment rights. (MacLeish 164-165; A134).

Chaffinch has been "angry" at Sgt. Foraker "for a very long time," "since the lawsuit began."  (Dixon 14,22-23,52,55; A527,529,536-37).  He regularly mocked Sgt. Foraker and joked about his injuries described in his initial lawsuit.  (Dixon 14-15,74-75; A527,542).  He was angry the entire life of Sgt. Foraker's suit.  (Dixon 20,75; A528,542).  His "anger increased"

---

[5]  Chaffinch also said this about other Troopers who filed lawsuits.  (Dixon 10; A526).

[6]  Notably, Chaffinch refused to refer to Sgt. Foraker by his rank.  Instead, he substituted the word "f-cking" for the word 'sergeant.'  (Dixon 9-10,53; A525-26,536).

after Sgt. Foraker's unprecedented jury verdict and after Judge Farnan reinstated him to his prior position at the FTU.  (Dixon 20-21, Baylor 403-05,439; A528,402,411).  It was regularly discussed among commanders that Chaffinch was "going after Sgt. Foraker."  (See Dixon 69; A540).

**D.  The Firearms Training Unit.**  The FTU is a $3.3 million dollar facility that opened in 1998. (Chaffinch 114; A454).  As Major Baylor succinctly explained, the FTU "was a hazardous situation for [plaintiffs] and for anybody who trained in that facility at all, including myself." (Baylor 207; A314).  The FTU was "not a safe place to work." (Chaffinch 153; A463).

**1.  The Longstanding Health and Safety Concerns at the FTU**.  In defendants' own words, the FTU has had a "long history of problems" affecting health and safety since its very inception.  (Chaffinch 52,59; MacLeish 40; Foraker Inter. #6; Price Inter. # 5; A438,440,103,66-70,2279-85).[7]  A Captain who was involved with the facility since its planning stages was publicly quoted in the media as stating that the FTU has been "[t]he absolute epitome of a project from hell since its very inception." (MacLeish 150; A131).  An unqualified builder who had never before constructed a firearms range was hired, despite the fact that it had finished dead last in the bidding rankings. (Price Inter. #5; Foraker Inter. #9; MacLeish 115; FTU1599-1600; A2280,71-73,122,2139-40).  More problems soon followed.[8]

**a.  The System "Will Inevitably Fail."**  For example, in 1996 an expert firearms range builder reviewed the specifications and blueprints for the FTU's ventilation system.  In a letter to the State Police, the expert stated that:

---

[7]  There is a plethora of both record testimony and documents in this regard.  (See, e.g. Price Inter. # 5,9-12, and Ex.1; Foraker Inter. #6,9-10; MacLeish 39-59; MacLeish Ex. 6-16; Chaffinch 52-64; Chaffinch Ex. 2; Baylor 182-230; Davis 9-34,36-39; A2279-2301,2315-75,66-77,103-08,218-36,438-41,480-81,308-20,485-93).

[8]  As an April 26,1999 consultant report from Clark-Nexsen (the industry leader in constructing firing ranges) explained, "[m]any of these problems would not of occurred if you had hired an A/E firm who had previous experience in designing this type of specialized facility." (2144).

We have evaluated the ventilation system design for the proposed State Police Facility. We have evaluated the design of the fan, heating & cooling equipment, duct, filter, air flow and control systems and have concluded that this system, as designed **will not work**.

The definition of "will not work" is simply that the present design **will not perform as it is required** to under the present requirements of OSHA & NIOSH.

* * *

We have concluded that the designed system **will inevitably fail** if it is constructed as designed.

(MacLeish Ex. 6; A218) (emphasis added).  This warning was disregarded, and the facility has

been plagued by health and safety problems ever since.  Hundreds of thousands of dollars have

been poured into this multi-million dollar facility but to no avail.[9]  Indeed, the evidence reveals

that the FTU was doomed since its very inception.

        **b.  A Representative Sampling of Problems.**  Some of the many health

and safety problems include the following -

-     Unsafe levels of lead in the air, levels above the safety standards set by the National Institute of Occupational Safety and Health, (MacLeish Ex. 8; A222),

-     Unsafe levels of lead, copper, and other heavy metals in the bloodstream of the staff at the facility, (Price Inter. #5,10; Chaffinch 55,106; Chaffinch ex. 2; MacLeish ex. 15,11; A2279-85,2287-92,439,452,480-81,233,226-27),[10]

-     Clouds of smoke and haze containing bullet residue consisting of lead and other heavy metals that hover throughout the range and which those who work and train there were forced to breathe, (MacLeish ex. 13,7; Price Inter. #11,12;Chaffinch 56; A230-31,221,2292-2301,439),[11]

---

[9]  See, e.g. Foraker v. Chaffinch, slip op. at 8 n.2 (noting the record evidence that after spending millions of dollars to build the facility, because of the "hazardous side-effects" of lead, such as "long-term, permanent damage to the nervous system," the DSP was forced to spend another $500,000 to upgrade the ventilation system that was not removing dangerous particles of lead from the air).  And as the record in our present case has revealed, this expenditure of half a million dollars of taxpayer monies failed to fix the ventilation problems that continue to plague the FTU.

[10]  Notably, one of the areas of speech at issue in Sgt. Foraker's first suit was his speech about unsafe lead levels of an officer under his command.  (Chaffinch 20; A430).

[11]  Plaintiffs were repeatedly told by Facilities Management and the DSP that the bullets they were firing were non toxic.  (Davis 37-38; Price Inter. #12; A492-93,2300).  However, it turned out that they were deceived as the bullets were in fact made out of toxic heavy metals such as nitroglycerine, arsenic, tin, copper and zinc.  (Davis 38-40; Price Inter. #12; A493,2300-01).  The Troopers at the range

- Nosebleeds and a penny taste in the mouths of officers who train and work at the range, (Price Inter. #12 ; A2300).

As defendants themselves admitted, the facility was never properly funded by the State so it was not built properly from day one and has had problems with the ventilation system, old and broken down equipment, a broken bullet-trap, lead exposure, dust contamination, general contamination, smoke in the range, the ceiling collapsing under its own weight, the omission of a sprinkler system from this building that stores large amounts of explosive materials and failure to obtain a certificate of occupancy, among many other problems.  (Chaffinch 52-53, 55-57, 104; MacLeish 40, 46, 49-50, 52-53, 56-57; Price Inter. #5; A438-39,451,103,105-107,2279-85).  It has been shut down numerous times since it opened.  (MacLeish 40,114; A103,122).

  **c. Problems Revealed by Internal DSP Documents.**  There also is a voluminous record of internal DSP documents that attest to the long history of health and safety problems that have plagued the FTU since it opened.

  **(1). Problems Under Sgt. Fitzpatrick.**  For example, a November 8, 1998 internal DSP memo from Sgt. Fitzpatrick who was the original NCOIC of the newly opened FTU, is titled "Range ventilation problem" and discusses the malfunctioning HVAC system at the facility.  (MacLeish ex. 7; A221). It notes the "excessive odor of gun smoke" and warns that "the ventilation system is causing a horizontal tornado" in the middle of the range.  (Id.)  It notes that some of the ventilation problems were caused by the ceiling bullet "deflectors that were identified in the blue prints [and which] were not installed[,] therefore the system is not working properly."  (Id.)  The memo closes with a warning about the "urgency to get this problem rectified" and that "the range staff is exposed daily and there is a potential for serious health problems."  (Id.)

---

were "look[ed] down upon" by Facilities Management, which displayed a "defiant" and condescending attitude towards them as they tried to discover the composition of the bullets. (Davis 36-40; A492-93).

-9-

Less than one month later, a December 1, 1998 letter to the State of Delaware from Batta Environmental Associates reports that levels of lead "in the firing range area ... [are] above the OSHA limit." (MacLeish ex.8; A222).   Two days later, another internal DSP memo from Sgt. Fitzpatrick notes that the FTU has been shut down and "closed until the air handling system can be fixed." (MacLeish ex. 9; A223).

Continuing, another April 29, 1999 internal DSP memo from Sgt. Fitzpatrick discusses the "large amount of lead dust on the floor and equipment" at the range and assorted problems with the air filters in the HVAC system. (MacLeish ex. 10; A225).  It also discusses the spiking blood lead levels of the only two troopers who had yet been tested.  (Id.)  The NCOIC warns that "a major problem now exists" at the range.  (Id.)

And in a June 14, 1999 article entitled "Shooting range under fire for lead - State police are exposed to levels of metal in air twice federal standard," even the News Journal reported on the disastrous conditions at the FTU.  (A2639-41).  The article discusses unhealthy lead fumes, unsafe blood lead levels, the HVAC system which blows air 180 degrees in the wrong direction towards the shooters and that the staff who train there every day are at risk.[12]  Notably, the article also discusses how the chief administrator of the Division of Facilities Management also owned the very construction company that was hired to build the malfunctioning facility - a sweetheart backroom deal if there ever was one.  (A2640).

**(2).  Problems Under Sgt. Parton.**  A June 29, 2000 internal DSP e-mail from Sgt. Parton (Sgt. Fitzpatrick's successor as NCOIC) continues to sound the alarm about problems at the range.  (Chaffinch ex. 2 p.2; A481).  It warns that the lead levels of a trooper at the range had dramatically spiked and that "the medical staff at Health Works" had raised concern "in respect to safe levels of personal contamination."  (Id.).  He warns that a range

---

[12]  The April 14, 1999 Clark-Nexsen consultant report (A2143) also reported that the air was blowing "up range toward the shooters." (A2149).  The report continued and explained that the entire ventilation system needed to be replaced in order to reach safe air flow levels.  (A2150)

"instructor has reached a critical level of contamination and the problem needs to be resolved." (Id.). Sgt. Parton also discusses that he had met with Facilities Management "regarding the ventilation and contamination problems." (Id.). He notes that the range continues to "experience lead dust contamination," and that "we now know where the contamination source stems from," but that the state refuses to pay to fix the problems. (Id.).

Also in the record is yet another internal DSP memo from Sgt. Parton to Lt. Davis. (Chaffinch ex. 2 p.1; A480).[13] Sgt. Parton strongly contests the claim that "there were no reported problems at the range" from 1999-2002 and the claim that the range staff sat on problems during his tenure there. (Id.). In his own words, "[a]s the NCOIC of the range, I reported continuously regarding lead contamination, personnel lead levels and the recurring problems with the ventilation." (Id.). He cautions the State to use care in their claims that the range has never had problems, stating "I am not as naive or incompetent as they may believe. I have a very vivid memory of my tenure at the range and the problems that were encountered on a regular basis." (Id.) (emphasis added).

### (3). Problems During Sgt. Foraker's First Tenure at the

**FTU.** In light of the fact that this present suit arises from defendants publicly blaming Sgt. Foraker for destroying the multi-million dollar FTU, it is ironic that the longstanding health and safety concerns at the facility were one of the much litigated issues in Sgt. Foraker's earlier successful lawsuit - where not a single word of blame was ever leveled against him for destroying the facility. For example, Judge Farnan's summary judgment opinion in the earlier case devotes nearly a page long footnote to the issue of lead and lead exposure at the FTU. See

---

[13] Although undated, the document itself indicates that it was written after February 2004, and that it was sent while Davis was still a lieutenant. (Accord Davis 33; A491). Davis was promoted to Captain in September 2004. (Davis 6-7; A485). Thus it appears that this internal DSP memo was sent between February and September 2004. When viewed in the context of this case, it appears likely that it was sent in the spring of 2004 when defendants and Facilities Management were claiming that the FTU has never had any problems.

Foraker v. Chaffinch, slip op. at 8 n.2.  This is because one of the issues in the case was the

unsafe levels of lead in the bloodstream of a Trooper at the range.  Id. at 6-7 (noting that one of

the areas of Sgt. Foraker's speech concerned a subordinate who "had dangerously high levels of

lead in his blood.") (Foraker Inter. #6; A67-70).  A great deal of testimony from members of

Chaffinch's own Executive Staff and other documents also addressed this in the earlier case.

(Foraker Inter. #6; A67-70).

        **(4).  Problems Under Sgt. Ashley.**  Also in the record is an

undated internal DSP letter/memo to Major Hughes from Sgt. Ashley (who was the NCOIC after

Chaffinch transferred Sgt. Foraker out of the FTU in April 2002 in retaliation for his protected

speech).  Ashley explained that the "Bullet Recovery System is inoperable." (A2180).  He

explains that numerous attempts have been made to fix the bullet trap, but that "[a]ll previous

attempts to make the system operate have failed."  (Id.).  He continues and notes that the bullet

trap was not designed for frangible (non-lead based) ammunition, and that the use of such

ammunition "has caused the Bullet Recovery System to fail."  (Id.).

        In addition to the bullet-trap not working during Ashley's tenure, the HVAC system was

failing, often times it would simply turn off by itself.  Sometimes, the range staff had to risk life

and limb and climb up onto the roof of the FTU to try to reset the massive system.  A pink

colored dust settled on all horizontal surfaces.  The pumps on the bullet trap died and were

repeatedly replaced in an effort to get the failing system to function.  The conveyer belt seized up

and became inoperable.  Officers became sickened from the pungent odors from the armorer's

room.  Protective headsets failed.  The floor scrubber also broke down and ceased to function.

(Price Inter. #11; A2292-97).

        **2.  The FTU Contains 700 Times the Safe Level of Lead in the Air.**  Yet

another disturbing example of the health hazards at the FTU was noted in the April 13, 2004

report prepared and issued by Harvard Environmental (A22180-82) at the request of the State of

Delaware. The report found that even in 2004, in the internal air supply ductwork of the HVAC system which is supposed to supply **clean air** to the facility, the lead levels were 140,000 micrograms per square foot (A2202-03,2265), **700 times** the acceptable level as identified by the U.S. Navy.  (See A1492 - noting that the safe level identified by the Navy is 200 ug/SF).[14]  Not surprisingly, the Delaware media also picked and reported on this disturbing fact.  (TNJ, 4/15/04; A2376).[15]

   **E. The Disastrous Conditions at the FTU on Sgt. Foraker's First Day Back.**  Sgt. Foraker was reinstated to the FTU on December 1, 2003.  (Foraker 2 Compl. & Ans. ¶ 17,1; A8, 13).  Upon his arrival at the facility that day, he encountered a disaster area.

   Sgt. Foraker, as well as Master Corporals Price and Warren have submitted extensive sworn answers to interrogatories attesting to the disastrous state of the FTU that day.  (See Price Inter. #12; A2297-2301).  For example, as in the past under the prior NCOICs, there was a heavy buildup and accumulation of red, copper and pink colored dust covering all horizontal surfaces throughout the facility.  (Id. at #12 p.33-34; A2298-99).  The HVAC system was dangerously blowing air and toxic bullet debris 180 degrees in the wrong direction - into the respiratory zones of the shooters and instructors - instead of away from them.  (Id. at #12 p.33-34; A2298-99).[16]

---

   [14] Plaintiff notes that the chart on page A2188, in conjunction with the diagram on page A2202, explains that the "Supply Air Trunk" ducts are the clean air supply ducts (such as the duct abbreviated SA1C) which are supposed to blow clean air forward towards the front of the range and away from the Troopers and instructors shooting on the firing line.  As noted in the text above, it is these clean air ducts that contain 700 times the safe level of lead.

   [15] Earlier that year, in February 2004, Mr. Art Nielson, a certified federal industrial hygienist who inspects federal firing ranges, inspected the FTU and told Sgt. Foraker and his officers that if the FTU was a federal range, then he would shut it down because of the hazardous levels of air contamination. He also stated that the building was not fit for occupancy. (Price Inter. #15; A2303-04).

   [16] As Sgt. Foraker testified, "I'm not an engineer...but I do know that the breeze is supposed to go to the bullet trap and up into the filters.  It's not supposed to go backwards."  (Foraker 154,174; A719, 724).  When Sgt. Foraker brought this issue to the attention of the State's experts, the response was "I wish I could tell you it's working, but all I can tell you is it's working as best it can."  (Foraker 154-55; A719).  Perhaps this explains why the clean air ventilation ducts contained 700 times the safe level of lead.

-13-

Other problems abounded, including: the bullet trap not functioning properly; the drag belt system not working properly; officers and students at the facility were suffering from nosebleeds, sore throats, irritated eyes, and a penny taste in their mouths; and instructors were being sickened from the toxic fumes in the armorer's room. (Id. at #12 p.33-34; A2298-99).[17]

Additionally, plaintiff's supervisor Capt. Davis was present the morning of December 1st and toured the facility with Sgt. Foraker. His sworn deposition testimony confirms the sworn testimony of Sgt. Foraker and Master Corporals Price and Warren. He testified that the FTU was an absolute mess and in near total disarray when he toured the facility that morning and that there was a dust or powder covering everything in the building. (Davis 9-14; A485-87).

**F. Sgt. Foraker Speaks Out And Sounds the Alarm.** Immediately upon discovering the gravity of the problems at the FTU, Sgt. Foraker sounded the alarm and brought the problems to the attention of his superiors. (See, e.g. Foraker Inter. #10; A73-77). His performance evaluation praises his reaction in this regard.

> Upon returning to the DSP FTU, Sgt. Foraker identified safety issues that placed the health of the FTU staff in serious jeopardy. Sgt. Foraker immediately brought this to the attention of the Academy staff as well as the DSP Executive Staff with information concerning the conditions at the range.

(A838). His supervisor noted that Sgt. Foraker's performance was "Distinguished" in this regard and again praised him for "immediately identifying safety issues" that jeopardized the health and safety of all who trained there. (A839). After notifying the staff, Sgt. Foraker went above and beyond as he

> continued to provide updates of the range conditions, conducted research to identify the cause of the problems, and attempted to identify potential solutions. Sergeant Foraker made this information available to the DSP Academy and Executive staffs, the Department of Administrative Services, and the Delaware Auditors Office. (A839).

> Capt. Davis also testified at length about Sgt. Foraker raising the alarm both orally and in

---

[17]  These interrogatories address the conditions and problems at the facility in excruciating detail. Plaintiff notes that these deplorable and hazardous conditions at the FTU also are discussed in the summary judgment brief being filed contemporaneously in the Price, et al. v. Chaffinch, et al. case.

writing about the many problems at the FTU. (Davis 17-40; A487-93). He testified that Sgt. Foraker was "basically pleaing for help." (Davis 30; A491). The record is full of e-mails in which Sgt. Foraker raised these serious issues up through the chain of command, some directly to defendant MacLeish and in others to Capt. Davis and Capt. Warren. (See, e.g. MacLeish ex. 11-15; Price Inter. #13 and ex. 1; A226-33,2301-02,2315-56).

**G. Defendants Attack and Publicly Blame Sgt. Foraker for Destroying the FTU**.

      **1. Defendants Decide to Give the Media Tours of the FTU.** Chaffinch gave the media two tours of the FTU during which he defamed Sgt. Foraker and his men. (Chaffinch 65). These tours were attended by reporters from the Delaware State News, the News Journal and WBOC-TV out of Salisbury, MD. (Chaffinch 65-67,70-71,88-89,91; A441-43,447-48). MacLeish attended the second tour. (Chaffinch 88; MacLeish 81-82; A447,113-14).

      **2. Before the Tour, Chaffinch Brags that He is Going to "Stick It To" and "Put It On" Sgt. Foraker.** Before leaving headquarters to give the first media tour on April 6, 2004, Chaffinch went down to the traffic section and talked to Captains Dixon and Conley.[18] There, "he pointed his finger saying that he is going to put it on him, on f-cking Foraker." (Dixon 12,51; A526,536). He was going to "stick it to" Sgt. Foraker. (Conley Decl. ¶ 7; A1564-65). He was "going to put it on Foraker and lay a lot of the blame on Foraker for the range." (Dixon 8,65; A525,539). Chaffinch stated, "[y]ou f-ck with Aaron Chaffinch, I f-ck back." (Dixon 54; A537). He continued and stated "I'm going to stick it up their ass" and "show them what I'm all about." (Conley Decl. ¶ 7; A1565). It was clear that he "definitely wanted somebody to know what his feelings were at that time." (Dixon 53; A536). He was "gunning after" Sgt. Foraker. (Dixon 68; A540).

      **3. Chaffinch Blames Sgt. Foraker.** True to his word, Chaffinch proceeded to

---

[18] Even Chaffinch admits that this meeting "may have" occurred. (Chaffinch 177,182; A469, 471). This is because Chaffinch "would just periodically stop in there and just talk about things." (Dixon 64; A539).

the FTU and attacked Sgt. Foraker and blamed him for destroying the multi-million dollar FTU facility. (See MacLeish ex. 5; A214-17). First he accused sergeant Foraker of incompetence and neglect of duty. For example, "[t]he previous sergeant in charge did a good job ... Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped." (Id. at p.3; Chaffinch 76-77; Foraker Inter. #5 ; A850,444, 64-66). "There was some discoloration in the bullet trap [prior to December 1, 2003] but that was about it. ... I think people who live in glass houses shouldn't throw stones. It's a lot dirtier now. Things seemed in their proper places in the fall. I've never seen it like this. (MacLeish ex. 5 p.3; Chaffinch 76; A214, 850,444). He noted that the facility required daily cleaning. Calling Sgt. Foraker a coward, he continued - "I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel (bullet trap cleaning) was part of his purview. He felt that was putting him in harm's way." (MacLeish ex. 5 p.3; Chaffinch 78-79; A214,850,445). Chaffinch also adopted the numerous defamatory statements made by another state official in the same article - "Col. Chaffinch acknowledged problems but indicated the blame lies only with one or two troopers under his command." (MacLeish ex. 5 p.1; Chaffinch 73-74; A214,443-44).

Chaffinch has told MacLeish in numerous conversations that all of the problems at the FTU were caused by Sgt. Foraker and his men. (MacLeish 98-99; A118). "Chaffinch felt that [Sgt.] Foraker and the staff were responsible for the shutdown." (MacLeish 60; A108). But even though he disagrees that Sgt. Foraker and his men were responsible for destroying the FTU, defendant MacLeish did see fit to place 50% of the blame for the destruction of the facility on the whistleblowers who reported that the facility was broken and was poisoning and otherwise injuring those who worked and trained there. (MacLeish 58; A108).

### 4. Defendants Gag Sgt. Foraker and Bar Him From Responding to These Defamatory Attacks. Immediately after Chaffinch attacked Sgt. Foraker and blamed him for the

-16-

disastrous conditions at the range, ace reporter Tom Eldred of the State News asked to speak to

Sgt. Foraker and his supervisor so that they could defend themselves and respond. Chaffinch

refused to allow the men to defend themselves and instead maliciously gagged them. "I have the

authority to say yes or no ... I'm not going to allow these people to be interviewed at this point in

regard to this particular situation." (MacLeish ex. 5 p.3; Chaffinch 78,80,83-84,86-88; MacLeish

91-93; A214,445-47,116). MacLeish also has gagged Sgt. Foraker (Foraker Inter. # 11; A77-78),

and even he admitted that such gagging is "unfair." (MacLeish 104; A119).

**5. World-Wide Publication of These Defamatory Attacks.** As Chaffinch

admitted, stories about these defamatory attacks ran in the State News, the News Journal,

American Police Beat Magazine and on WBOC-TV. (Chaffinch 70-71; Foraker Inter. #5, 13 at

p.30-31; Foraker 235; A443,783,64-66,82-86). In addition to being testified to, both the State

News and the American Police Beat Magazine articles are in the record. (MacLeish ex. 5; A214-

17 A850).[19] These defamatory allegations also were published throughout the local community.

(See, e.g. Price Inter. #3 p.11-13; A2276-78).

**6. Chaffinch Brags that "I Got Them Back."**

**a. Chaffinch Brags to Major Baylor.** Upon returning from his media

tour, Chaffinch asked Major Baylor to come into his office. (Baylor 386, Chaffinch 185-86;

A398, 471-72). He then told Major Baylor words to the effect of "I got them back" (Baylor 387,

390; A398-99), "I got my shots in" (Baylor 392; A399) and "I got my digs in." (Baylor 406, 409-

10,441; A403-04,412). The meaning here was clear to this neutral observer - "he was taking his

shots at" Sgt. Foraker. (Baylor 409; A404). This "was his chance to get his dig back." (Baylor

412; A404). Then, clearly referring to Sgt. Foraker's earlier lawsuit, Chaffinch again stated that

---

[19] The State News article remains on the internet for the entire world to continue to see. (See www.newszap.com/articles/ 2004/04/07/dm/central_delaware/dsn03.txt) (visited on January 1, 2006). The other has an international circulation. (See www.apbweb.com/subscribe.htm (visited on January 21, 2006)).

people "who live in glass houses shouldn't throw stones." (Baylor 387-88, 390, 407; Chaffinch 185; A398-99,403,471).

Baylor then asked "who" did you get back at and Chaffinch pointed to the Academy building. (Baylor 387, 410; A398,404). It was clear that Chaffinch was "referring to that whole group of individuals" at the range in general. (Baylor 389,391,410; A399,404). But specifically, Baylor immediately knew that he was referring to Sgt. Foraker. (Baylor 389; A399). "I recall that the Colonel clearly blamed Chris for it." (Baylor 393,422-23; A400,407). When understood "in the framework and the context" of what was occurring in the DSP at the time, it was clear to everyone that Chaffinch was referring to Sgt. Foraker. (Baylor 410-11,441; MacLeish 86,88,90; A404,412,115-16). It's "pretty clear from reading" the article that he was accusing Sgt. Foraker of neglect of duty. (MacLeish 90; A116).

**b. Chaffinch Brags to Capt. Conley.** That same afternoon, Chaffinch returned to the Traffic Section and again spoke to Capt. Conley. He was "visibly excited and was bragging about the media tour." (Conley Decl. ¶ 9; A1565). He "thought that he had done a great thing" and acted "very proud of himself." (Id.). Chaffinch bragged that he had, among other things, "put it on them" and "took it to him." (Conley Decl. ¶ 10; A1565).

**c. Major Baylor, Capt. Conley and Capt. Dixon Discuss Chaffinch's Actions and Words.** Baylor, Conley and Dixon later met and talked about what Chaffinch had told them. (Dixon 13,55-57,96-97; Conley Decl. ¶ 11; A526,537,547,1565).[20] They expressed shock and surprise. (Dixon 14,67-71; A527,540-41). "We simply could not believe what the Colonel had done by publicly attacking the men and blaming them for the problems at the range." (Conley Decl. ¶ 11; A1565).

---

[20] Although he does not have a present memory of it, Major Baylor testified that he very well may have discussed Chaffinch's words and actions with Captain Dixon and Captain Conley. (Baylor 394-95, 424-26, 448-53; A400,407-08,413-15). He observed that the FTU matter "was a matter of discussion amongst senior level people like myself" and other officers. (Baylor 395; A400).

**7. Major Baylor Urged Chaffinch to Retract His Accusations.** Baylor urged the Colonel to immediately call the media and retract his attacks on Sgt. Foraker, but Chaffinch refused. (Baylor 387-88,390,407-09,412; A398-99,403-04). He told Chaffinch that he "didn't want it to appear that [Chaffinch] was coming at" the range troopers - but Chaffinch "didn't want to hear it." (Baylor 390,409; A399,404). Baylor was left with the impression that Chaffinch's view was that because Sgt. Foraker had sued him, "now it's my time to get you back." (Baylor 409; A404).[21]

**H. Defendants' Allegations of Blame Are Malicious Falsehoods.** As Major Baylor succinctly explained (Baylor 209-210; A314-15), blaming plaintiffs for destroying the FTU -

> would be the equivalent of blaming troopers for operating a Ford vehicle in which the gas tank exploded when they were hit from the rear because ... somebody decided to run into them. You can't blame the trooper for that and I don't think you can blame the troopers for this.

The defense blame tactic will not hold water. In the DSP, a Trooper is brought up on charges and disciplined for something as minor as backing into a telephone pole or dinging the bumper on his car. (MacLeish 48; Hughes 41; A105,1744).[22] Thus, it is notable that despite the present defense claim that plaintiffs destroyed a multi-million dollar training facility, they have never been brought up on charges for their alleged misconduct. (MacLeish 47-48,53-54,58,100; A105-08,118). MacLeish admitted that the only internal DSP investigation that ever took place

---

[21] Baylor told Chaffinch that Chaffinch was making a "personal" attack and that this was inappropriate and would hurt the organization. (Baylor 413; A405). Baylor also testified that when you are the leader of an organization, "you don't give a public statement where you throw any of your subordinates under the bus." (Baylor 417; A406). You don't try to shift the blame to your subordinates for problems. (Baylor 417-18,420; A406). That is "bad judgment" and "bad leadership." (Baylor 418; A400).

[22] Similarly, if a Trooper has a problem with his $22,000 patrol car, he is not allowed to tinker with the engine, tweak the transmission or make any other repairs. Instead, only a fully trained and equipped divisional mechanic is authorized to do so. (Chaffinch 113-115; MacLeish 63-64; A453-54,109). Yet it is defendants' position that despite a total lack of training or protective equipment (Chaffinch 60; MacLeish 64-65; A440,109), plaintiffs were responsible for maintaining this specialized $3,300,000 facility.

-19-

completely <u>absolved</u> Sgt. Foraker and his men of all responsibility for the disaster at the FTU.

(MacLeish 54-56; A107).

### 1. Chaffinch Has Admitted that His Allegations Are False. Chaffinch also

admitted that his allegations that Sgt. Foraker and his men destroyed the FTU are false.

Q.  Do you know whose fault it was that the FTU had to be shut down?

A.  I don't think you can pinpoint to any one person.  I think it goes all the way back possibly to, you know, historical building being built and the problems that -- the things that were changed due to the budgetary concerns and even the fact that some of the officers at that time helped with -- with putting together -- or building some portions of the range.  But, specifically, I don't know except what I have read.

* * *

Q.  In your opinion, did Sergeant Foraker, Master Corporal Price, and Master Corporal Warren cause the FTU to be shut down?

A.  No, sir.

* * *

Q.  Is it your position that Sergeant Foraker and Master Corporals Price and Warren did not care about the safety of their students?

A.  No, sir.

Q.  Is it your position that Sergeant Foraker and Master Corporals Price and Warren did not care about the safety of those who they trained at the FTU?

A.  No, sir, it is not.

Q.  Is it your position that Sergeant Foraker and Master Corporals Price and Warren were incompetent?

A.  No, sir, it is not.

Q.  Is it your position that their incompetence destroyed the FTU?

A.  That's not applicable because of the answer to the previous question.

Q.  So no?

A.  There wasn't incompetence, so it has to be non-applicable.

(Chaffinch 56-58; A439-40).  Defendant MacLeish also represented and admitted at his

deposition that it is not his position in this case that Sgt. Foraker or his men destroyed the FTU.

-20-

(MacLeish 50; A106).

In fact, MacLeish admitted that he disagrees with Chaffinch's statement that Sgt. Foraker was responsible for the problems at the FTU. He disavowed Chaffinch's public blaming of the men and swore that he disagrees with it. (MacLeish 59-60,87; A108,115). The problems were not caused by the men, but by "a culmination of things that led to the shutdown of the range." (MacLeish 60; A108). "[T]he magnitude of the problems we had up there were greater than what any one individual could have been responsible for." (MacLeish 49; A105).

**2. The FTU is a Highly Technical and Specialized Facility.** The FTU is "a specialized facility" with "a lot of highly technical equipment." (MacLeish 63; Price Inter. #10; A109,2287-92). The men did not design the FTU, the ventilation system, the bullet trap, or any of the other highly technical systems at the range. They were never given training in hazardous material cleanup, disposal or abatement. They were never given protective equipment to wear such as Tyvex suits, moon suits, respirators or even little booties for their feet (Chaffinch 60-62; MacLeish 64-65; Price Inter. #10; A440-41,109,2287-92), all of which violates the State of Delaware's own standards that require, for example, the use of a respirator when cleaning up lead at a firing range. (MacLeish ex. 4; A211).

All Chaffinch will say is that some maintenance was not being done at the range, but even he refuses to say that this hazardous material and other maintenance was the responsibility of Sgt. Foraker or his men or whether the decision to stop doing maintenance was justified. (Chaffinch 61, 57, 59, 115; 439-40,454).[23] And as an internal DSP memorandum prepared at MacLeish's request in March 2004 explains, a survey of firing ranges nationwide reveals that "[s]omeone other than range personnel handle scheduled maintenance and removal of lead and other toxins in all cases." (MacLeish ex. 3 p.2; MacLeish 65-70; A208,110-11). Nationwide,

---

[23] Despite the fact that there are standard operating procedures for nearly everything in the DSP, defendants admit that there were no SOPs for cleaning the FTU. (MacLeish 62-63, 72-73; Foraker Inter. #9; Price Inter. #10; A109,111,71-73,2287-92).

range officers only conduct routine upkeep such as "changing lights to putting salt on icy sidewalks." (Id.). Other agencies bring in outside vendors and specialists to conduct hazmat cleanup. (Id.). Only Dallas P.D. uses its own officers to conduct some hazmat maintenance, but requires the officers to wear appropriate "protective gear and respirators" (Id.), protective equipment that was never provided to plaintiffs.

### 3. Sgt. Foraker's Evaluation for this Period of Time.

#### a. His Sterling Safety Record. Sgt. Foraker's official DSP

performance evaluation for the time period beginning on December 1, 2003 is in the record. (A834-42).[24] He "Far Exceeded Expected Results" in his duty to "[m]aintain a safe training environment." (A838). As his supervisor wrote -

> Upon returning to the DSP FTU, Sgt. Foraker immediately identified safety issues that placed the health of the FTU staff in serious jeopardy. Sgt. Foraker immediately brought this to the attention of the DSP Academy staff, as well as the DSP Executive Staff, with information concerning the conditions at the range.

(A839). His evaluation continues and commends Sgt. Foraker for "Areas or Incidents Where Performance Was Distinguished, Exceeded Expectations, or Resulted in Commendation, If Any." (A839). There, his supervisor praised Sgt. Foraker, stating -

> On December 1, 2003, Sergeant Foraker was reassigned to the DSP FTU. Sgt. Foraker immediately identified safety issues that placed the health and safety of the FTU staff and officers training at the DSP range in jeopardy. Sergeant Foraker brought the conditions to the attention of the DSP Academy staff. After notifying the staff, Sergeant Foraker continued to provide updates of the range conditions, conducted research to identify the cause of the problems, and attempted to identify potential solutions. Sergeant Foraker made this information available to the DSP Academy and Executive staffs, the Department of Administrative Services, and the Delaware Auditors Office.

(A840) (emphasis added). Safety is a "paramount" concern at the FTU and "Sgt. Foraker is very cognizant of this need and above all else, views the safety of the shooters and instructors as his

---

[24] Plaintiff notes that in addition to Capt. Davis, Major R.L. Hughes reviewed, signed off on and approved Sgt. Foraker's sterling performance evaluation. (A2650-61). This is notable in light of the fact that, as Major Baylor testified, Major Hughes is a close friend of defendant Chaffinch who hates Sgt. Foraker because of his successful lawsuit against his friend. (Baylor 403-04, 438-39; A402,411).

primary function and concern." (A840). "Sgt. Foraker has performed [his] duties admirably, always keeping the safety of the FTU staff and those training under his command paramount." (A841).[25]

     **b. High Praise for His Care for Divisional Equipment.** Sgt. Foraker's evaluation also gives him high marks for his "Care of Equipment" where he received the highest possible rating - "Consistently and Substantially Exceeds Expectations." (A835). The evaluation continues and notes that his Divisional equipment and vehicle were always "above Divisional standards," "in good working order and maintained in the appropriate fashion." (A841).

     **c. High Marks Across the Board.** Despite having "one of the most stressful jobs in the Division" (A840), Sgt. Foraker's administrative skills, work habits and management/supervisory skills all received high marks, either "Consistently Exceeds Expectations" or "Consistently and Substantially Exceeds Expectations." (A835-37; accord A839 - commending Sgt. Foraker's "diligence and abilities"). He "possesses and demonstrated outstanding leadership and supervisory skills during the rating period." (A842). He "handles all situations regardless of the degree of complexity or stress through the application of common sense, sound judgment, ethics, and knowledge of Divisional policies and procedures." (A842).[26]

     **4. Politics Are To Blame, Not Sgt. Foraker.** As testimony and an April 2004 internal DSP e-mail reveal, the DSP and the State of Delaware twice refused free offers of help

---

   [25] This sterling performance evaluation is another nail in the coffin of the defense claim that Sgt. Foraker and Capt. Davis' interests are adverse and that plaintiff's counsel should be disqualified. (See D.I. 46-47). The evaluation reveals that Capt. Davis praised Sgt. Foraker's exceptional performance of his duties even under the most trying of circumstances and that Capt. Davis recognized many of the same problems at the FTU that Sgt. Foraker did.

   [26] Then Captain Homiak, who MacLeish recently promoted to Major, completed part of Sgt. Foraker's evaluation and also commended him for his "exceptional" work and "attention to detail." (A2645). Tellingly, he also praised Sgt. Foraker for "truthfully" doing his job in such an "exceptional" manner. (Id.).

from the Centers for Disease Control and the National Institute of Occupational Safety and Health - who offered to bring in their experts and doctors and conclusively determine the source of all safety and health problems at the FTU and provide free medical testing to all of the officers exposed there. (Foraker 179-80; Davis 27-28; Price Inter. #5 at p. 20-21; MacLeish ex. 18; MacLeish 177-83; FTU3846; A725, 490, 2285-86,237,137-39,2662).[27]  An internal DSP e-mail reveals that the State refused the free offers of help because of "politics." (MacLeish ex. 18; A237). This is in accord with Chaffinch's sad admission that politics play a role in the day to day operations of the DSP (Chaffinch 157; A464), even when it comes to health and safety.

**I. Adverse Action.**

   **1. Defendants Diminish His Job Duties and Violate the Reinstatement Order.**

   **a. Sgt. Foraker is the Section-Chief of the FTU.** Sgt. Foraker is the section-chief of the FTU. (Baylor 397-398,432-433; Davis 35; Foraker 193; A401,409-10, 492, 773). "[E]very person that held the [position of officer-in-charge of the FTU] from the time I came on, [Lt.] Cunningham, [Lt.] Bryson, [Sgt.] Fitzpatrick, all of them were considered section chiefs." (Baylor 432; A409). This is common knowledge throughout the DSP. (Baylor 432-33; A409-10). Nonetheless, MacLeish denies Sgt. Foraker is a section chief (MacLeish 221; A148), despite the fact that even the DSP computer system recognizes him as such. (MacLeish ex. 20; MacLeish 223-229; A1495-96, 149-50).

   **b. Sgt. Foraker Previously Attended Section-Chief's Meetings.** Sgt. Foraker's duties at the FTU included attending commanders and section chief's meetings. (Baylor 398; Foraker Inter. #12; Foraker 193-95; A401,773,79-82). He previously attended these meetings during his first tenure at the range. (Baylor 398-99; Foraker Inter. #12; A401,79-82).

---

[27]  The record includes an example of a lengthy Health Hazard Evaluation Report done by NIOSH for the Fort Collins, CO Police Department when that department requested help on the limited issue of hearing protection for SWAT officers at their firing ranges. (A2662-96).

Notably, he was not the only sergeant to attend these meetings - in fact, "an array of sergeants" would attend these meetings. (Baylor 400-401, 434-35; A401-02,410).

### c. Defendants Throw Him Out of the Meeting and Order That He Never Return.

Sgt. Foraker received a written order to attend a meeting on July 20, 2004. (MacLeish ex. 20 at p. CF27,29; Foraker Inter. #12; Davis 35-36; A1495-96,843-44,492, 79-82). He has received similar orders from each individual defendant. (MacLeish ex. 20 at p. CF29,35-36,43,62-63; A1495-96, 844-49). Yet despite these orders, with Chaffinch's knowledge and acquiescence (Chaffinch 168; Foraker 189; A467,772), MacLeish publicly threw Sgt. Foraker out of this meeting and ordered that he never attend another. (Foraker Inter. #12; Baylor 399-401,433-434; MacLeish 230; Foraker 189,194-95; A79-82,401-02,410,151,772,773). MacLeish told him that no sergeants were allowed to attend the meeting. (Baylor 400; A401). This "struck me odd because we had some sergeants in there." (Baylor 400-01; A401-02). Sgt. Foraker being thrown out was "unusual" because "that had not been done before." (Baylor 434-35; A410). As Capt. McQueen testified, MacLeish "wasn't happy," he was visibly "agitated" and "upset". (McQueen 22-23; A1546). Sgt. Foraker also vividly described the "absolute hateful stare" Chaffinch gave him while MacLeish threw him out of the meeting. (Foraker 188-89, 229-30,236; A772,782,784). Sgt. Foraker has since received numerous written orders to attend these meetings, yet cannot in light of MacLeish's conflicting order to the contrary. (MacLeish ex. 20; Foraker Inter. #12; A1495,79-82).

After Sgt. Foraker was removed, Capt. McQueen told Chaffinch that he required Sgt. Foraker's assistance in the funeral of a fallen comrade. (McQueen 8-12; A1542-43). Chaffinch gave Capt. McQueen a "dirty look" and a "negative look, like he wasn't pleased." (McQueen 14,17,21-22, 28; Foraker 189-90; A1544-47,772). Chaffinch's angry visual reaction to Capt. McQueen's request became a hot topic of conversation among Troopers in attendance. (McQueen 14-17,24; A1544, 1546). Capt. McQueen also was disgusted by the efforts to exclude

-25-

Sgt. Foraker.  (McQueen 25; A1546).  He later told Sgt. Foraker that "what they are doing to you is not right."  (McQueen 27; Foraker 191; A1547,772).

      **2. More Adverse Actions.**  As Sgt. Foraker explained, defendants have continued to retaliate against him in numerous additional ways.  They have: defamed him on a local, national and international scale by falsely accusing him of destroying the multi-million dollar FTU; materially and significantly altered and diminished his job duties and responsibilities; violated the plain terms of Judge Farnan's reinstatement Order; violated the plain terms of the settlement agreement; deprived him of the personnel necessary to staff the FTU; diminished his command authority and autonomy; barred him from speaking at graduation ceremonies; deprived him of the ability to make even the most minor of financial decisions; baselessly sent him for numerous fitness for duty exams; bad-mouthed him throughout the DSP which undermines his command authority; and have actively exerted pressure down through the chain of command in an attempt to force Sgt. Foraker to retire.  (Foraker Inter. #15,12; Foraker 195-216; A773-79,87-88,79-82).

      **J.  Evidence of Causation.**

      **1.  Knowledge of the Protected Conduct.**  It is undisputed that defendants knew of Sgt. Foraker's earlier successful lawsuit.  (Foraker 2 Compl. & Ans. ¶ 18; MacLeish 15-16,25; Chaffinch 17; A8,52,39,97,99,429).

      **2.  Demonstrated Anger, Hostility and Antagonism - Defendants Loathe Sgt. Foraker.**  See Facts at section **C** above.

      **a.  Defendants' Close Friendship Also Gives Rise To a Motive to Retaliate.**  Chaffinch and MacLeish are admittedly "buddies" and "friends."  (Chaffinch 16-17; MacLeish 7; A429,95).  MacLeish publicly brags that he and Chaffinch are "joined at the hip." (MacLeish 9; A95).  He "feel[s] very strongly" that his good friend Chaffinch is an "honorable man," a "good trooper," a "good person," and a "good man" who was "a good leader" for the

DSP. (MacLeish 9-12; A95-96). He thinks that the numerous suits, jury verdicts, and court opinions upholding these jury verdicts are merciless. (See MacLeish 107-114; A1213-15).

**b. Chaffinch Is "Very Vindictive" and Demands "Blind" Personal Loyalty.** Chaffinch has always expected "blind loyalty" from all those in the DSP. (Dixon 24; A529; Dixon 105; A1594). "You have to just follow him ... and if you don't, he is done with you. You may suffer any consequences from that." (Dixon 105; A1594; Dixon 85; A544). Chaffinch himself has repeatedly admitted that "personal loyalty" is a factor he considers when making personnel decisions. (Chaffinch 158-159; A465; Chaffinch 179; A1383). As MacLeish and others testified, personal loyalty is a factor in all decisions Chaffinch makes. (MacLeish 64; Baylor 20-21; A1202,1799). A trooper should never allow personal feelings to influence his decisions (MacLeish 26; A1193), yet numerous witnesses swear Chaffinch does just that.

Captain Dixon worked closely with Chaffinch in Sussex County for 17 years. (Dixon 77, 90,92,4; A542,546,524; Dixon 7-10; A1570-71). He testified that Chaffinch "is very vindictive" and "use[s] his rank or office in the state police to be vindictive." "[I]t is common knowledge ... you would not cross him ... because of his vindictiveness. You knew that your career would pretty much stop." (Dixon 71-72; A1586; Dixon 24,44; A529,34). "He goes after people ... if he feels that anyone has betrayed him. That's his makeup." (Dixon 44; A534). In the same way, Master Corporal Price has served with Col. MacLeish for many years. (MacLeish 171; A136). In his own words, MacLeish also "is a very vindictive man. I would go so far as to say that he is the definition of the word vindictive." (Price Decl. ¶ 13; A2596).

**c. Troopers Also Fear Chaffinch Because Of His Powerful Political Connections.** Chaffinch believes he can get away with anything because, as he openly brags, his close relationship with Delaware State Senator Thurman Adams will protect him. (Dixon 64-65; A1584; Dixon 91; A546). "Uncle Thurman ... would take care of him no matter what." (Dixon 64-65; A1584). "[I]f he needed anything done, he would just go to ... the Thurmanator, and it

would be done." (Dixon 65; A1584).[28]  Chaffinch is "a very powerful person, he has political ties that are very strong." (Dixon 72-73; A541).  As Chaffinch admitted, politics play a role in the day to day operations of the DSP.  (Chaffinch 157; A464).  Because of this, as one commander stated, opposing Chaffinch "would be the start of ending my career with the State Police." (Dixon 73; A541).

Captain Dixon even expressed concern that despite Chaffinch's retirement, he would still find a way to retaliate against him because of Dixon's truthful subpoenaed deposition testimony, (Dixon 72; A1586), perhaps by way of Chaffinch's "close" friendship with MacLeish and Senator Adams. (Chaffinch 16-17,190-191; MacLeish 7; A429,473,95).  In Capt. Dixon's words, despite the fact that Chaffinch is retired, "I'm afraid of him now" because of how "politically entangled" he is and because of what he did to Sgt. Foraker, who had dared to file a suit against him.  (Dixon 90-91; A546).

**d. Fear of the Good Old Boy Network.**  Lastly, a good old boy network also exists within the DSP.  (Dixon 45-46; <u>see</u> Baylor 16; A534-35,1798).  Politics play a role in day to day operations of the Division. (Chaffinch 157; Baylor 16; A464,1798).  In today's State Police, actions "are more based on who you know and who your connections are with and who your friends are than on merit."  (Baylor 16; A1798).  This also gives rise to a strong motive to retaliate when someone rocks the boat.

**3. Temporal Proximity.**  Sgt. Foraker's first lawsuit ended and he was reinstated to the FTU on December 1, 2003.  (<u>Foraker 2</u> Compl. & Ans. ¶ 17; A8,52).  And as discussed, defendants' defamatory media attacks began in early April - just four months later.

**4. Intentional Destruction of Evidence.**  As discussed in greater detail in plaintiff's sanctions brief that is being contemporaneously filed, despite the pendency of this

---

[28]  "Thurmanator" is Chaffinch's affectionate nickname for his political patron and "powerful protector."  (Dixon 91,103; A546,549).

litigation, defendants intentionally destroyed Chaffinch's computer hard drive to prevent plaintiff from gaining access to the incriminating evidence it contained.

     **5. Violations of Laws, Rules, Policies and Procedures.** As discussed above, defendants materially violated Judge Farnan's reinstatement order when they diminished Sgt. Foraker's job duties by, among other things, throwing him out of and forever barring him from attending Section Chief's meetings.

     **6. Disparate Treatment.** First, as discussed above, the FTU has simply never functioned correctly and has a long history of problems. Yet despite this long history of problems under each and every officer-in-charge who has ever served there, the only one defendants have ever blamed for destroying the facility is Sgt. Foraker. Second, as also discussed above and as testified to at length by Major Baylor, Sgt. Foraker is the only sergeant to ever be thrown out of the Section Chief's meetings. Lastly, he also is the only officer-in-charge of the FTU to ever be ejected from these same meetings.

     **7. Pretext and Coverup.** Despite their repeated denials of retaliatory motive and claims of innocent intent, the record reveals that defendants are blatantly hostile towards officers who file lawsuits or otherwise speak out against them and the DSP. Thus, under the case law discussed in the Argument below, defendants' denials of retaliatory intent can be disbelieved and instead, pretext and a coverup can be inferred as revealed by defendants hostility towards those members of a protected class - those who file lawsuits and speak out.

     **a. Hostility Towards Sgt. Christopher Foraker.** As discussed in the Facts above, there is overwhelming record evidence of defendants' loathing of Sgt. Foraker because he had filed a lawsuit.

     **b. Hostility Towards Captain Davis and Captain Warren.** Similarly, defendants also hated these officers because they also had sued Chaffinch and the Division. Major Baylor testified that defendants bore hostility towards them because they had filed

-29-

lawsuits.  They "didn't like" them because of it.  (Baylor 363-64,389,410-11; A353,399,404).

   **c.  Hostility Towards Captain Conley.**  Similarly, defendants also

hated Captain Conley who also filed a lawsuit against Chaffinch in October 2004.  Shortly

thereafter, she amended her initial lawsuit to include the unprecedented retaliatory actions taken

against her by Chaffinch and MacLeish.  (See Conley v. Chaffinch, et al., C.A.No. 04-1394-GMS

at D.I. 7).  There is abundant testimony that Chaffinch was "mad," "ang[ry]," "displeased,"

"pissed off," "upset," and "unhappy" about the suit.  (See, e.g. Dixon 69-71, MacLeish 120-121,

Aviola 79,82 84; A585-86,1216,1689-90). He very well may have used some colorful language

and other profanity to describe it.  (Aviola 79;A1689).   In the same way, MacLeish was

"annoyed by her actions" in filing a lawsuit.  (MacLeish 179-180;A1231).  He was "unhappy,"

"upset," "displeased," "disappointed," and "disgusted" by her suit.  (MacLeish 179-180,125-

127,131-132,180-181, Aviola 82,84; A1231,1218-19,1231,1690 ).

   **d.  Hostility Towards Master Corporals Price and Warren.**  In the

same way, MacLeish testified that he thinks that plaintiff Master Corporals Price and Warren

also are a "real pain in the ass" for speaking out.  (MacLeish 164-165; A134; accord Baylor 253;

A325).  He is "not happy" and emphatically expressed that he is very "disappointed" in the fact

that they filed suit.  (MacLeish 214-217,211-213; A146-47).  Chaffinch has expressed the same

feelings (MacLeish 218-219; A148), and is "not happy" about their suit. (Chaffinch 142;A461 ).

He refers to the suit as "f-cking bull-sh-t."  (Dixon 79,23-24;A543,529 ).

   **e.  Hostility Towards the Filing of Lawsuits in General.**  In light of

the foregoing evidence, it is not surprising that Chaffinch admittedly does not "like it" when

Troopers invoke their First Amendment rights to file lawsuits against the DSP.  It makes him feel

"upset."  (Chaffinch 40, 175; A435,469).  MacLeish has repeatedly admitted the same.

(MacLeish 31, 33-35; A101-02; MacLeish 125-26; A1217-18).  They do not like fact that

negative publicity inevitably arises from the filing of these suits. (MacLeish 31,35; Chaffinch 40;

A101-02,435).

**f. Summary of this Evidence.** Thus, there is abundant evidence which demonstrates that defendants' denials of retaliatory intent can be disbelieved as a pretext for hostility towards those members of a protected class - those who speak out and file lawsuits.

**8. Falsehoods.** Finally, defendants falsely accused Sgt. Foraker and his men of destroying the FTU, despite the overwhelming record evidence that the FTU was doomed since its very inception and has always been a hazardous place to work. Similarly, defendants falsely claimed that sergeants are forbidden from attending Section Chief's meetings and that Sgt. Foraker is not a Section Chief, both claims which are flatly contradicted by Major Baylor's sworn testimony discussed above.

## ARGUMENT

### I.     STANDARD OF REVIEW.

A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. <u>Boyle v. County of Allegheny, Pa.</u>, 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c).

### II.     PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH BY FILING AND SUCCESSFULLY PROSECUTING HIS EARLIER LAWSUIT, AND THAT LAWSUIT WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST HIM.

Public employee claims of retaliation for engaging in protected First Amendment activity are analyzed using a three-step process. <u>Hill v. City of Scranton</u>, 411 F.3d 118, 125 (3d Cir. 2005); <u>Springer v. Henry</u>, -- F.3d --, 2006 WL 121942, *4 (3d Cir. Jan. 18, 2006).

#### A.     Protected Activity.

**1. Matter of Public Concern.** "An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" <u>Pro v. Donatucci</u>, 81 F.3d 1283, 1288 (3d Cir. 1996). This is determined by reference to the "content, form, and context of a given statement, as revealed by

the whole record." <u>Connick v. Myers</u>, 461 U.S. 138, 147-48 (1983).

        **a. The Content Exposed Wrongdoing**.  "The content of the speech may help to characterize it as relating to a matter of social or political concern of the community if . . . the speaker seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials" <u>Holder v. City of Allentown</u>, 987 F.2d 188, 195 (3d Cir. 1993), such as misconduct in violation of the highest law in the land, by the highest ranking police official in the state - which Sgt. Foraker's first lawsuit revealed.  Speech is on a matter of public concern when it attempts "to expose specific wrongs and abuses" within the government, as plaintiff's suit also did.  <u>Baldassare v. State of N.J.</u>, 250 F.3d 188, 196 (3d Cir. 2001) (internal punctuation omitted).  It is well established that speech that seeks "to bring to light actual or potential wrongdoing or breach of the public trust" by public officials is of the utmost public concern.  <u>Id.</u> at 197; <u>accord id.</u> at 196 ("Disclosing corruption, fraud and illegality in a government agency is a matter of significant public concern.").  Plaintiff's earlier lawsuit which revealed and exposed Chaffinch's illegal behavior thus is of the utmost public concern. <u>See</u> <u>Konits v. Valley Stream Central High Sch. Dist.</u>, 394 F.3d 121, 125-26 (2d Cir. 2005) (prior lawsuit against public officials alleging civil rights violations is speech 'on a matter of public concern'").

        **b. Form and Context**.

        **(1). Police Department Context.**  The Third Circuit has regularly "noted the 'awesome and dangerous power' conferred to police officers and the 'need in a democratic society for public confidence, respect and approbation of the public officials on whom the state confers that awesome power.'" <u>Caver v. City of Trenton</u>, 420 F.3d 243, 256 n.11 (3d Cir. 2005); <u>see</u> <u>Wilcher v. City of Wilmington</u>, 60 F.Supp.2d 298, 304 (D.Del. 1999).  When police officers violate the law, that is certainly a matter of public import.

        **(2). Witness Intimidation and the Judicial Forum Context.**

-32-

"[P]ublic policy ... requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." Briscoe v. LaHue, 460 U.S. 325, 333 (1983). Given that those who file and prosecute lawsuits challenging government misconduct are those who will give damaging testimony against the government at a later stage of the proceeding, permitting unchecked retaliation against those who invoke the judicial process contributes to and encourages witness intimidation and squarely inhibits the very truth seeking function that courts are supposed to protect. This is why "court testimony, whether compelled or voluntary, is always a matter of public concern." Swartzwelder v. McNeilly, 297 F.3d 228, 238 (3d Cir. 2002) (citing Green v. Phila. Hous. Auth., 105 F.3d 882, 887 (3d Cir. 1997) (voluntary testimony); Pro, 81 F.3d at 1291 (subpoenaed testimony)). "The function of witnesses is fundamental to the administration of justice" and "[e]very consideration of public policy requires that they should be as fearless in testifying as the judge and jury are independent in weighing their testimony." Williams v. Hepting, 844 F.2d 138, 141 (3d Cir. 1988). "[T]he context of a courtroom appearance raises speech to a level of public concern, regardless of its content." Green, 105 F.3d at 887. In Pro, the Circuit found that even when the witness did not actually testify in the court proceedings, since she "was ready to testify truthfully," she was nevertheless entitled to First Amendment protection. 81 F.3d at 1291.

"The goal of ... civil trials is to resolve a dispute by gathering the facts and arriving at the truth, a goal sufficiently important to render testimony given in these contexts as speech 'of public concern.'" Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1578 (5th Cir. 1989) (quoted in Green, 105 F.3d at 887). The Third Circuit has justified such holdings because of "[t]he utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for appearance and truthful testimony." Green, 105 F.3d at 887. The "judicial interest in attempting to resolve disputes by arriving at the truth would be in jeopardy" if defendants' misconduct herein is sanctioned Id.

**(3). The Media Attention Context.** Whether a particular issue receives news coverage also is relevant in determining the public import of speech.[29] In the Supreme Court's words, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." City of San Diego v. Roe, 543 U.S. 77, 125 S.Ct. 521, 525-26 (2004) (per curiam). The widespread media coverage plaintiff's suit received is telling.  (MacLeish ex. 1; A200-07).

    **2. Balancing of Interests.** Second, the trial court must next balance the interests of the government as an employer in promoting the effective and efficient fulfillment of its public responsibilities against the public employee's interest as a citizen in speaking out on matters of public concern and the value to the community at large of being free to hear such speech. Azzaro v. County of Allegheny, 110 F.3d 968,  980 (3d Cir. 1997)(en banc).  The burden is on the employer here to make a "substantial showing." Waters v. Churchill, 511 U.S. 611, 674 (1994) (plurality opinion); Watters v. City of Phila., 55 F.3d at 816.

    "The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) (internal punctuation omitted).  As the Supreme Court has warned, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." Rankin v. McPherson, 483 U.S. 378, 384 (1987).

    Importantly however, "[t]his balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." San Filippo v. Bongiovanni, 30 F.3d 424, 434 n.11 (3d Cir.

---

[29]  See, e.g. Pickering v. Bd. of Educ., 391 U.S. 563 (1968) (newspaper); O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989) (television); Holder, 987 F.2d 188 (newspaper); Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) (newspaper); Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995) (newspaper); Springer v. Henry, 2002 WL 389136 (D.Del. March 11, 2002) (newspaper).

1994) (emphasis added).[30]  If the employer denies that it dismissed the employee because of his protected speech, the balancing test "has no application." Id.  Accordingly, because defendants flatly deny that they retaliated against plaintiff because of his speech, the balancing test "has no application." Id.  Consequently, plaintiff's speech is protected by the First Amendment.

**B.  Substantial or Motivating Factor.**  Following the determination that his conduct was constitutionally protected, plaintiff must demonstrate that this conduct was a "substantial" or "motivating factor" in the relevant decision.  Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  "But for" causation is not needed. Suppan, 203 F.3d at 236.  "'Substantial factor' does not mean 'dominant' or 'primary' factor." Hill, 411 F.3d at 126 n.11.  Instead, a plaintiff need only show that his protected activity "played any substantial role in the relevant decision." Suppan, 203 F.3d at 236; see Miller v. Cigna, Corp., 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse decision).  As discussed at section **J** of the Facts above, the record is overflowing with evidence more than sufficient to meet plaintiff's burden.

**1.  Knowledge of Protected Conduct.**  Sufficient evidence must be produced to demonstrate that the defendants knew of the protected activity.  Keenan v. City of Phila., 983 F.2d 459, 466 (3d Cir. 1992).  Here, all defendants were aware of the filing of plaintiff's lawsuit. See Facts at **J.1.** above.

**2.  Demonstrated Anger, Hostility and Antagonism.**  "[A] plaintiff [also] can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997); accord Adkins v. Rumsfeld, 389 F.Supp.2d 579, 586 (D.Del.

---

[30]  Accord Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571, 575 n.6 (3d Cir. 2003); Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387, 399 (M.D.Pa. 2003); Mitchell v. Street, 2005 WL 1993774, *2 n.5 (E.D.Pa. Aug. 16, 2005); Bedford v. SEPTA, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994).

2005).  For example, evidence that a defendant is "irritated" or otherwise angered by a plaintiff

can be compelling evidence of causation.  See Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005)

(defendant "irritated" by protected conduct).  See Facts at section **J.2** above.

      **3.  Temporal Proximity.**  Temporal proximity "is an obvious method by which

a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected

activity was the likely reason for the adverse action."  Kachmar v. Sungard Data Sys., Inc., 109

F.3d 173, 177 (3d Cir. 1997) (internal punctuation omitted).  When a plaintiff engages in a

pattern of protected activity and is

> dismissed shortly after the final episode of such protected activity, a fact-finder may
> reasonably infer that it was the aggregate of the protected activities that led to retaliatory
> dismissal.  This inference would be particularly strong if the plaintiff can show that the
> decision maker lacked a pretext on which to dismiss the plaintiff until shortly before the
> time of dismissal.

San Filippo, 30 F.3d at 444.  As discussed in the Facts section **J.3.** above, Sgt. Foraker was

retaliated against a mere four months after his lawsuit concluded.

      **4.  Violations of Law, Policies and Procedures.**  Violations of laws, rules

policies and procedures also are proof of wrongdoing.  See Village of Arlington Heights v.

Metropolitan Hous. Develop. Corp., 429 U.S. 252, 267 (1977); Stewart v. Rutgers, the State

Univ., 120 F.3d 426, 434 (3d Cir. 1997).  Here, defendants have materially violated Judge

Farnan's reinstatement order.  See Facts at section **J.5.** above.

      **5.  Disparate Treatment.**  Similarly, evidence of disparate treatment also can

demonstrate causation.  San Filippo, 30 F.3d at 444; Brennan v. Norton, 350 F.3d 399, 421 (3d

Cir. 2003); Adkins, 389 F.Supp.2d at 586.  Such evidence abounds on our record.  See Facts at

section **J.6.** above.

      **6.  Pretext and Coverup.**  Pretextual explanations by a defendant also are proof

of causation.  Feldman v. Phila. Hous. Auth., 43 F.3d 823, 831 (3d Cir. 1994); Adkins, 389

F.Supp.2d at 586.  This is because "[r]esort to a pretextual explanation is, like flight from the

scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1069 (3d Cir. 1996) (en banc). Pretext evidence is abundant on our record. As discussed in the Facts at section **J.7.** above, defendants' denials of retaliatory intent can be seen as pretexual in light of their past practice of retaliating against those who speak out and file lawsuits.[31]

       **7. Falsehoods.** As the Supreme Court has held, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000). "We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful [retaliation]." Sheridan, 100 F.3d at 1069. Record evidence here is overwhelming in this regard. See Facts at **J.8.** above.

       **8. Intentional Destruction of Key Evidence.** As the Third Circuit has explained, a party's destruction of evidence is evidence of guilt and illegal conduct. Id (spoliation). As explained in great detail in plaintiff's destruction of evidence sanctions brief that is being contemporaneously filed, defendants also destroyed Chaffinch's entire work hard drive to deny plaintiff access to key evidence contained therein.

       **9. The Big Picture.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not [only] on individual incidents, but on the overall scenario." Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990). The big picture in our case makes clear that defendants illicitly sought to destroy plaintiff because he had exposed Chaffinch's wrongdoing and exposed Chaffinch's misconduct to the light of day.

-----

    [31] See Arlio v. Lively, 392 F.Supp.2d 317, 323-24 (D.Conn. 2005) (in the First Amendment retaliation context, admitting prior acts of retaliation to establish that the defendants' denials of hostility towards those who filed lawsuits were a pretext for animus towards those in the protected class - those who file lawsuits).

**10. Summary.** Thus, in light of the overwhelming record evidence discussed above - evidence ranging from defense admissions that Chaffinch inappropriately considers personal loyalty when making decisions, to Chaffinch's proud proclamations that "I'm going to get that son of a bitch," to his bragging to Major Baylor and others that I really "got my shots in," to the other evidence of falsehoods, disparate treatment, pretext and destruction of key evidence - it is clear that the filing of plaintiff's lawsuit, <u>at the very least</u> "played a substantial role" in the decision to blame Sgt. Foraker for destroying the FTU. As a matter of law, no reasonable jury could conclude otherwise.

**C. Same Decision Anyway Affirmative Defense.** The burden of proof then "shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'" <u>Nicholas v. Pa. State Univ.</u>, 227 F.3d 133, 144 (3d Cir. 2000). This last step is an "affirmative defense" to be met by the defendants. <u>Id</u>.[32]

But defendants here failed to plead this affirmative defense in their Answer to the Complaint as required under the Federal Rules, <u>see</u> Fed.R.Civ.P. 8(c) (a party must plead any "matter constituting an avoidance or affirmative defense"), so no discovery was needed on this issue. Accordingly, it has been waived and plaintiff seeks such a ruling from the Court at this time. <u>See</u> <u>Charpentier v. Godsil</u>, 937 F.2d 859, 863 (3d Cir. 1991) (noting the general rule that "[f]ailure to raise an affirmative defense by response pleading or by appropriate motion generally results in the waiver of that defense.") (internal footnotes omitted).

Accordingly, summary judgment should be granted for plaintiff on his First Amendment free speech count. He has clearly engaged in protected conduct. And as a matter of law, in light

---

[32] Accord <u>Vazquez-Valentin v. Santiago-Diaz</u>, 385 F.3d 23, 30 (1st Cir. 2004); <u>Adler v. Pataki</u>, 185 F.3d 35, 47 (2d Cir. 1999); <u>Brady v. Fort Bend County</u>, 145 F.3d 691, 712 (5th Cir. 1998); <u>Ostad v. Oregon Health Sciences Univ.</u>, 327 F.3d 876, 885 (9th Cir. 2003); <u>Stanley v. City of Dalton, Georgia</u>, 219 F.3d 1280, 1292 (11th Cir. 2000); <u>Yalowizer v. Town of Ranchester, Wyoming</u>, 18 Fed.Appx. 745, 754 (10th Cir. 2001) (all noting that this <u>Mt. Healthy</u> prong is an affirmative defense).

of the overwhelming record evidence, the filing of his lawsuit has certainly played a role in the unprecedented retaliation that occurred.  Last, because defendants chose not to assert their affirmative defense, liability has been established and all that is needed is a trial on damages.

**III.     PLAINTIFF ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND HIS LAWSUIT WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST HIM.**

**A.    The Big Picture.**  The First Amendment protects the "right to petition the Government for a redress of grievances."  U.S. Const., Amend. I.  "The right to petition the government for grievances is a fundamental component of a just and orderly society."  Anderson v. Davila, 125 F.3d 148, 164 (3d Cir. 1997).  "[W]hen one files a 'petition' one is addressing the government and asking government to fix what ... government has broken or has failed in its duty to repair."  San Filippo, 30 F.3d at 442. "[T]he values in the right of petition as an important aspect of self-government are beyond question."  McDonald v. Smith, 472 U.S. 479, 483 (1985).

**B.    The Activities Protected.**  "For decades, the Supreme Court has consistently recognized the right to petition all branches of the government, including the courts, for redress of grievances as among the most precious of the liberties safeguarded by the Bill of Rights." Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004) (internal punctuation and citation omitted). "The right to petition extends to all departments of Government."  Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).  It extends to "administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government."  Id.; see McDonald, 472 U.S. at 484 ("filing a complaint in court is a form of petitioning activity").  It "is undisputed that filing lawsuits and grievances ... implicate[s] the Petition Clause of the First Amendment."  Brennan, 350 F.3d at 417; see Anderson, 125 F.3d at 161 (the filing of an employment discrimination lawsuit constitutes protected petitioning).  As the Third Circuit has recently noted, "any lawsuit brought by an employee against a public employer qualifies as a protected 'petition' under the First Amendment so long as it is not 'sham

litigation.'" <u>Hill</u>, 411 F.3d at 126.

      **C. The Specifics.** The protected status of petition is a matter of law. <u>Id.</u> at 127. Like free speech claims, petition clause claims also are analyzed using the same three-part protected activity analysis. <u>Id.</u> at 125. Importantly, the protected activity analysis under the petition clause is different than that under the free speech clause in that there is no disruption balancing nor is there a public concern analysis. Instead, matters of purely private concern are protected, as long as the petition is not a sham. <u>Hill</u>, 411 F.3d at 126; <u>San Filippo</u>, 30 F.3d at 440, 443; <u>We, Inc., v. City of Phila.</u>, 174 F.3d 322, 330 n.2 (3d Cir. 1999); <u>Brennan</u>, 350 F.3d at 417; <u>see</u> <u>San Filippo</u>, 30 F.3d at 434-43. As the Circuit stated in <u>Brennan</u>, a plaintiff need only show that their petition "was not frivolous in order to make out a prima facie claim for retaliation under the Petition Clause." 350 F.3d at 417. The government simply may not retaliate against those who petition it as such a result "is hardly consistent with the fundamental principles of orderly protest, which our Constitution sought to preserve by protecting our right to petition the government for redress." <u>Anderson</u>, 125 F.3d at 163. The factual record and jury verdict set forth above demonstrates, the filing of plaintiff's First Amendment free speech retaliation lawsuit with this Court was clearly not a sham. Thus, it is protected by the petition clause.

      **D. Substantial or Motivating Factor and Same Decision Anyway.** Plaintiff incorporates by reference his analysis discussed in the free speech argument above as to these two causal factors. As a result, summary judgment should be granted for plaintiff.

<u>**CONCLUSION**</u>

      For the above stated reasons, the Court should grant summary judgment for plaintiff on liability for his First Amendment speech and petition clause counts and order a trial on damages.

-40-

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY AT LAW**

/s/ Martin D. Haverly
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: January 25, 2006          Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

January 25, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Foraker/ Briefs / Foraker - -SJOB.final

-42-