**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **SERGEANT CHRISTOPHER D. FORAKER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1207-GMS** |
| **individually and in his official capacity as** | : | |
| **Superintendent of the Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as Deputy Superintendent of the** | : | |
| **Delaware State Police; DAVID B. MITCHELL,** | : | |
| **in his official capacity as the Secretary of the** | : | |
| **Department of Safety and Homeland Security of** | : | |
| **the State of Delaware; and DIVISION OF** | : | |
| **STATE POLICE, DEPARTMENT OF SAFETY** | : | |
| **AND HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S COMPENDIUM OF UNREPORTED CASES FROM HIS OPENING
BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT (D.I. 64)**

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated:  January 25, 2006          Attorneys for Plaintiff

*Pleadings*

*FILED*
*CLERK U.S. DISTRICT COURT*
*DISTRICT OF DELAWARE*
*2003 JUN 17 PM 1:46*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT CHRISTOPHER D. FORAKER,      :
                                      :
              Plaintiff,              :
                                      :
         v.                           :    C.A. No. 02-302-JJF
                                      :
COLONEL L. AARON CHAFFINCH,           :
individually and in his official      :
capacity as Superintendent of the     :
Delaware State Police, DIVISION       . :
OF STATE POLICE, DEPARTMENT OF        :
PUBLIC SAFETY, STATE OF DELAWARE,     :
                                      :
              Defendants.             :

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (D.I. 19).  For the reasons discussed below, the Court will deny the Motion.

This is a public employee free speech retaliation case filed under 42 U.S.C. § 1983.  Plaintiff Christopher D. Foraker, a Sergeant ("Sgt.") in the Delaware State Police ("DSP"), was transferred in alleged retaliation for reporting various inappropriate acts of Corporal ("Cpl.") Eddie Cathell, who was Sgt. Foraker's subordinate and an alleged personal friend of the Superintendent of the DSP, Defendant Colonel ("Col.") L. Aaron Chaffinch.  Defendants have filed for summary judgment contending that Sgt. Foraker's transfer did not amount to adverse employment action and that Sgt. Foraker's speech was not protected

1

activity.[1]

## I.    Was Sgt. Foraker's Transfer An Adverse Employment Action?

On February 22, 2002, Sgt. Foraker was transferred from his position as the non-commissioned officer in charge ("NCOIC") of the Firearms Training Unit ("FTU") after having held the position for seven months, which, historically, is a very short tenure in the position.  The FTU is responsible for the firearms training of all police academy recruits and the annual retraining of all 620 DSP troopers.  In addition to his duties in the FTU, Sgt. Foraker also served as a member of the Special Operations Response Team ("SORT").  Sgt. Foraker's service in the SORT accounted for 53 to 71% of his overtime income.  Sgt. Foraker took a leave of absence from the SORT in March 2002 and resigned from the SORT in December 2002.

Sgt. Foraker contends he was permanently transferred to the Police Academy on February 22, 2002, to a dead-end job with no

---

[1]Defendants also contend that Sgt. Foraker's Section 1983 claims for monetary damages against the Division of State Police, Department of Public Safety, State of Delaware, and Col. Chaffinch in his official capacity (the "State Defendants") must be dismissed for lack of subject matter jurisdiction.  In response, Sgt. Foraker contends that he joined the State Defendants solely for the purpose of collecting attorneys' fees and costs associated with obtaining prospective relief.  (D.I. 1 at ¶ 6).  Because "an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment," the Court concludes that it has subject matter jurisdiction over Sgt. Foraker's claim for attorneys' fees and costs against the State Defendants.  Missouri v. Jenkins, 491 U.S. 274, 279 (1989).

job description or responsibilities. Defendants contend the transfer, which involved no change in rank, base pay, or benefits, was a temporary one intended to allow Sgt. Foraker to wrap up two projects related to his work in the FTU. After three weeks at the Police Academy, Sgt. Foraker was transferred to Troop 6 as a patrol sergeant with no change in rank, base pay, or benefits. Sgt. Foraker contends that Defendants transferred him to Troop 6 after they heard about his impending retaliation lawsuit.

Defendants contend that Sgt. Foraker's temporary transfer to the Police Academy does not rise to the level of an adverse employment action because it was short term. Sgt. Foraker contends that there is a genuine issue of material fact as to whether the transfer was temporary. Viewing the facts in the light most favorable to Sgt. Foraker, the Court agrees with Sgt. Foraker. (D.I. 22 at 17 n.10). If the transfer was not temporary, it would satisfy the adverse action requirement. Torre v. Casio, Inc., 42 F.3d 825, 831 n. 7 (3d Cir. 1994)(finding transfer without loss of pay or benefits to a dead end job was an adverse action). Because there is a genuine issue of material fact regarding whether the initial transfer was an adverse action, the Court concludes that summary judgment on the issue is inappropriate.

Defendants also contend that Sgt. Foraker's subsequent

3

transfer to Troop 6 as a patrol sergeant was not an adverse action because it was a mere lateral transfer involving no change in benefits, base pay, or rank. Defendants characterize the harm to Sgt. Foraker caused by the transfer as nothing more than a bruised ego and contend that Sgt. Foraker's preference to do another job does not make the transfer an adverse action. Defendants provide a detailed comparison of the two positions and argue that Sgt. Foraker's responsibilities and chances for overtime and promotion are actually higher in the new position.

In response, Sgt. Foraker contends that the transfer to Troop 6 was an adverse employment action because he suffered monetary loss as a result of it. Sgt. Foraker contends that the emotional distress and depression caused by Defendants' retaliation made him unable to safely discharge his duties in the SORT and led to his resignation. Sgt. Foraker contends that he lost the source of 53-71% of his overtime pay due to Defendants actions. The Court concludes that, viewed in the light most favorable to Sgt. Foraker, these facts raise a genuine issue of fact for trial that precludes summary judgment.

Sgt. Foraker also contends that the transfer to Troop 6 was not a mere lateral transfer. In essence, Sgt. Foraker contends that the position of NCOIC of the FTU is significantly different from and objectively more desirable than the patrol sergeant position at Troop 6. The Third Circuit has held that a transfer

4

to a less desirable position can constitute an adverse employment
action.  Jones v. School Dist. of Philadelphia, 198 F.3d 403,
411-12 (3d Cir. 1999)(finding adverse action when teacher
transferred to a less desirable school and lost the opportunity
to teach physics); Hampton v. Borough of Tinton Falls Police
Dept., 98 F.3d 107, 115-16 (3d Cir. 1996)(reversing grant of
summary judgment on the issue of adverse action where police
officer was transferred to less desirable assignment and
Department asserted transfer was merely lateral reassignment).
Based on these cases, the Court concludes that the decision
regarding whether Sgt. Foraker's transfer to Troop 6 was an
adverse employment action is a fact bound inquiry that must be
resolved by the jury.

    For all of these reasons, the Court concludes that summary
judgment is not appropriate as to the issue of whether Sgt.
Foraker suffered an adverse employment action.

**II.  Was Sgt. Foraker's Speech Protected Activity?**

    A public employee's claim of retaliation for engaging in
protected activity is analyzed under a three-step process:

> First, plaintiff must show that the activity in
> question was protected.  To be protected the speech
> must be on a matter of public concern, and the
> employee's interest in expression on this matter must
> not be outweighed by any injury the speech could cause
> to the interest of the state as an employer in
> promoting the efficiency of the public services it
> performs through its employees.  Second, plaintiff must
> show that the protected activity was a substantial or
> motivating factor in the alleged retaliatory action.

5

> Finally, defendant may defeat plaintiff's claim by
> demonstrating by a preponderance of the evidence that
> the same action would have been taken even in the
> absence of the protected conduct.

Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir.

1995)(internal citations omitted). Whether the speech is

protected activity is a legal question for the court, whereas

whether the protected activity was a substantial or motivating

factor and whether the same actions would have been taken absent

the protected activity are questions of fact for the jury. Id.

at 892 n.3; see also Baldassare v. State of N.J., 250 F.3d 188,

195 (3d Cir. 2001).

"An employee's speech addresses a matter of public concern

when it can be fairly considered as relating to any matter of

political, social, or other concern to the community ... The

public concern inquiry is a legal one, to be determined by the

content, form, and context of a given statement, as revealed by

the whole record." Watters, 55 F.3d at 892. "The content of the

speech may involve a matter of public concern if it attempts 'to

bring to light actual or potential wrongdoing or breach of public

trust on the part of government officials.'" Baldassare, 250

F.3d at 195.

Sgt. Foraker contends that his speech, which consisted of

several reports and email messages delivered to his superiors in

the DSP, concerned a subordinate who lied on the job, failed to

perform his job duties, had dangerously high levels of lead in

6

his blood, and sexually harassed a female civilian.  Sgt. Foraker contends that these issues are a matter of public concern because they relate to wrongdoing by a public official.

Defendants contend that Sgt. Foraker's speech was not protected activity because it was communicated internally as part of his normal job duties.  However, in <u>Givhan v. Western Line Consolidated School District</u>, 439 U.S. 410, 415-16 (1979), the United States Supreme Court stated: "[t]he First Amendment forbids abridgment of the 'freedom of speech.' Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."  Moreover, the Third Circuit has noted that:

> the community's interest in the free exchange of information and ideas relating to matters of public concern is not limited to public declarations. That interest is implicated in internal exchanges as well as in exchanges between an individual and members of the public.  Internal dissemination of information and ideas can be as important to effective self-governance as public speeches. Thus, if the content and circumstances of an internal communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech, even though it occurred in a private context.

<u>Baldassare</u>, 250 F.3d at 198 (internal punctuation omitted).

Because Sgt. Foraker's communications attempted to bring to

7

light wrongdoing on the part of a government official,[2] the Court

concludes that the communications, when viewed in the light most

favorable to the nonmovant, involved a matter of public concern.

The Court further concludes, based on <u>Baldassare</u>, that the

internal nature of Sgt. Foraker's communications does not deprive

---

[2]The DSP originally used lead based ammunition for firearms training; however, there came a time when the DSP realized that it needed to stop using lead based ammunition because of its hazardous side-effects, such as long-term, permanent damage to the nervous system. Thus, after building a multi-million dollar indoor range and spending $500,000 to upgrade its air handling system to eliminate lead particles discharged in the air, the DSP began using lead free handgun ammunition. Nonetheless, because there is not an adequate substitute, all shotgun ammunition remains lead based.

Because of the health hazards posed by lead based ammunition, Troopers working in the FTU are required to have their blood tested every 90 days to evaluate the lead levels in their blood. There are wide ranges of medical opinion as to what constitutes acceptable levels of lead in the bloodstream, but Sgt. Foraker was told by his superiors that a level of 20 was dangerous.

Cpl. Cathell's lead levels were consistently two to three times higher than any other Trooper at the FTU, even after the change to non-lead based handgun ammunition. Sgt. Foraker took steps to reduce Cpl. Cathell's exposure to lead and repeatedly asked Cpl. Cathell if he was doing anything off duty that could be adversely affecting his blood lead levels. Over the course of several years, Cpl. Cathell denied that he was doing anything which could be contributing to his abnormally high lead levels.

In October 2001, after Cpl. Cathell's lead levels came in more than twice as high as the next FTU Trooper, Cpl. Cathell admitted to Sgt. Foraker that he had been loading and reloading lead based ammunition for off duty shooting competitions. Sgt. Foraker subsequently reported to his superiors that Cpl. Cathell's lead levels were in the high teens and that Cpl. Cathell had been lying to his superiors about the cause of his high lead levels. Sgt. Foraker also reported that Cpl. Cathell was suffering from lesions, headaches, blurred vision, and tingling fingers. Finally, in January 2002, Sgt. Foraker reported that Cpl. Cathell's lead level had hit 20, which was the danger level set by Sgt. Foraker's superiors.

8

them of First Amendment protection.   Once a court determines that

the speech regards a matter of concern, it must evaluate whether

the employee's interest in the expression is outweighed by any

injury the speech could cause to the state's interest in

providing efficient public services.   <u>Watters</u>, 55 F.3d at 892.

Here, Sgt. Foraker's interest in reporting unacceptable behavior

by a subordinate is very high and actually serves to increase the

efficiency of the State Police.   Thus, the Court concludes that

the balance tilts in favor of treating Sgt. Foraker's speech as

protected activity.

NOW THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion

for Summary Judgment (D.I. 19) is **DENIED**.

June 17, 2003
—————————————
DATE

~~Joseph J. Farnan~~
—————————————
UNITED STATES DISTRICT JUDGE

9

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Robert J. MITCHELL, Plaintiff,
v.
Mayor John F. STREET and The City of
Philadelphia, Defendants.
**No. Civ.A. 04-3213.**

Aug. 16, 2005.

James E. Beasley, William T. Hill, The Beasley Firm,
Philadelphia, PA, for Plaintiff.
Shelley R. Smith, City of Philadelphia Law Department,
Philadelphia, PA, for Defendants.

MEMORANDUM

KELLY, J.

I. *INTRODUCTION*

**\*1** Presently pending before this Court is the
Defendants', Mayor John F. Street ("Mayor Street") and
the City of Philadelphia, Motion for Summary
Judgment. On July 7, 2004, Mitchell filed his
Complaint with this Court. Mitchell's Complaint
contains three counts. Specifically, the counts are:
Violation of the First & Fourteenth Amendment and 42
U.S.C. § 1983 (Count I); Violation of Article I, Section
I, of the Pennsylvania Constitution (Count II); and
Violation of Article I, Section XI, of the Pennsylvania
Constitution (Count III). Defendants have moved for
summary judgment on all three counts. For the
following reasons, Defendants' Motion is denied.
However, as will be explained in *infra* Part IV.B,
Counts II and III of the Complaint will be dismissed
without prejudice.

II. *BACKGROUND*

Plaintiff, Robert J. Mitchell ("Mitchell") is the former
Deputy Police Commissioner for the City of
Philadelphia. Mitchell held that title from 1996 until
2004. In early 2004, a rumor began to circulate that
Mitchell had obtained an illegal gun permit. In late
February, 2004, the media picked up the story and
reported that Mitchell allegedly possessed an illegal gun
permit. Initially, Police Commissioner Sylvester
Johnson ("Johnson") announced his support for
Mitchell at a press conference on February 26, 2004.
That same day, Mayor Street called a meeting to
discuss the gun permit issue. Present at this meeting
were Mayor Street, Johnson, Mitchell, Mayor Street's
Chief of Staff Joyce Wilkerson ("Wilkerson"),
Communications Director Barbara Grant ("Grant") and
Police Counsel Karen Simmons, Esquire ("Simmons").
At the meeting, Mitchell denied any wrongdoing with
respect to the gun permit. The parties dispute the actual
outcome of this meeting as it related to Mitchell's
continued employment, however, what is certain is that
on February 27, 2004, at a press conference, Mayor
Street stated that Mitchell would be taking a leave of
absence from his position as Deputy Police
Commissioner. An investigation then commenced into
the gun permit issue.

On March 11, 2004, Mitchell filed a complaint in
Equity with the Court of Common Pleas of Philadelphia
County. The complaint sought to enjoin Mayor Street
and the City of Philadelphia from removing him from
his post as Deputy Police Commissioner pending the
results of the investigation regarding the gun permit.[FN1]

> FN1. That complaint was dismissed as moot
> by the Court of Common Pleas on June 11,
> 2004. (*See* Defs.' Mot. Summ. J. Ex. E).

On May 26, 2004, Philadelphia District Attorney Lynne
Abraham announced the results of her investigation into
the gun permit issue. The District Attorney concluded
that Mitchell had engaged in no wrongdoing
whatsoever.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 2
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

On May 27, 2004, Mitchell appeared on the Michael Smerconish ("Smerconish") radio program. [FN2] During this appearance, Smerconish and Mitchell discussed the District Attorney's public announcement regarding the gun permit issue and her findings that Mitchell engaged in no wrongdoing. On June 1, 2004, Mitchell received a letter from Johnson terminating his employment. Mitchell subsequently filed his Complaint with this Court approximately one month later.

> FN2. Mitchell previously appeared on the Smerconish show on March 4, 2004 after the announcement by Street that Mitchell was suspended from his position as Deputy Police Commissioner.

### III. *STANDARD*

**\*2** "Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.' " *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 267 (3d Cir.1991) (citations omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. [FN3] *Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992). Once the moving party has produced evidence in support of summary judgment, the non-movant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial. *Id.* at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> FN3. "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.' " *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F.Supp. 554, 561 n. 14 (E.D.Pa.1998) (citations omitted), *aff'd*, 172 F.3d 40 (3d Cir.1998).

### IV. *DISCUSSION*

Defendants have moved for summary judgment on all three counts. Under Count I, Defendants assert that no genuine issue of material fact exists regarding Plaintiff's claim for retaliation under both his First Amendment right to free speech and his right to petition. Second, under Counts II and III, Defendants assert that there is no cause of action for damages under the Pennsylvania Constitution. Finally, Mayor Street asserts he is shielded from liability based upon the doctrine of qualified immunity. These arguments will be considered in turn. [FN4]

> FN4. The Defendants do not contest that the Plaintiff has met the threshold for there to be municipal liability under *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, I will not engage in a discussion of this issue.

### A. COUNT I

Count I actually contains two separate causes of action. First, Mitchell asserts that the Defendants retaliated against him and terminated his employment based upon the filing of his equity complaint with the Court of Common Pleas of Philadelphia County. Mitchell asserts this violated his right to petition the government for a redress of grievances. Additionally, Mitchell asserts that he was fired in retaliation for exercising his free speech rights by appearing on the Smerconish radio program. The parties are in agreement as to the elements that make up both of these claims. Both claims require the following three-step analysis:

Slip Copy                                                                                                                    Page 3
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

[f]irst, plaintiff must show that he engaged in a protected activity. Second, plaintiff must show that the protected activity was a substantial factor motivating the dismissal decision. Finally, defendant may defeat plaintiff's claim by demonstrating that the same action would have taken place even in the absence of the protected conduct.

*San Filippo v. Bongiovanni,* 30 F.3d 424, 430 (3d Cir.1994) (citations omitted). [FN5] I will consider these elements as they relate to Plaintiff's right to petition and free speech causes of action.

> FN5. As set out in *San Filippo,* "a public employer may dismiss an employee for speech addressing a matter of public concern if the state's interest, as an employer, in promoting the efficiency of its operations outweighs the employee's interest, as a citizen, in commenting upon matters of public concern." 30 F.3d at 434 n. 11 (citation omitted). However, "[t]his balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." *Id.; see also, Dennison v. Pa. Dep't of Corr.,* 268 F.Supp.2d 387, 399 (M.D.Pa.2003). The Defendants deny that they fired Mitchell because of his allegedly protected speech so as to deem the balancing test inapplicable. Furthermore, neither party asserts that the balancing test should be utilized in this case.

1. Protected Activity

**\*3** The first step requires this Court to consider whether Mitchell engaged in a protected activity under his right to petition and free speech claims. As to his right to petition, Defendants concede that the filing of Mitchell's equity complaint with the Court of Common Pleas of Philadelphia County was a protected activity. However, Defendants vigorously contest that Mitchell engaged in any protected activity under his free speech claim.

The United States Court of Appeals for the Third Circuit ("Third Circuit") has noted that in a claim for retaliatory discharge from government employment, the plaintiff "must establish that the conduct which triggered the discharge was protected under the first amendment." *San Filippo,* 30 F.3d at 434. Specifically: [w]here the alleged retaliation is based on expressive conduct constituting speech, a court must first determine whether or not the speech can be fairly characterized as addressing a 'matter of public concern,' for a governmental employee who makes public comments about problems not of 'public concern' has no first amendment immunity against employer discipline.

*Id.* "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Baldassare v. N.J.,* 250 F.3d 188, 195 (3d Cir.2001)(internal quotation marks and citation omitted). Thus, a court must focus on the "content, form, and context of the activity in question." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995)). Furthermore, "[t]he content of the speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Id.* (internal quotation marks and citations omitted). Determining whether the public employee's speech involved a matter of public concern is a question of law for the court. *Id.* (citing *Watters,* 511 U.S. at 668; *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997)).

The parties dispute whether Mitchell's appearance on the Smercon ish radio program to discuss the gun permit issue and the District Attorney's findings constituted a matter of public concern. Defendants assert that this case is similar to *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, and that I should therefore find as a matter of law that Mitchell's speech did not involve a matter of "public concern." However, for the following reasons, I find that *Connick* is distinguishable from the instant case.

In *Connick,* the plaintiff, Shiela Myers ("Myers"), was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employed as an Assistant District Attorney in New Orleans for five and one half years. *461 U.S. at 140.* Myers was informed that she would be transferred to prosecute cases in a different section of the criminal court. *Id.* Myers opposed this transfer and she then "prepared a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. She then distributed the questionnaire to her co-workers the next day. *Id.* Later that day, Myers was terminated by Harry Connick ("Connick") the District Attorney for Orleans Parish for refusing the transfer. Myers brought suit under 42 U.S.C. § 1983, asserting that she had exercised her constitutionally protected right to free speech by distributing the questionnaire. *Id.*

**\*4** The United States Supreme Court ("Supreme Court") noted that practically all of Myers questions did "not fall under the rubric of matters of 'public concern.' " *Id.* at 145. The Supreme Court noted that the questionnaire did not seek to inform the public that the District Attorney's office was discharging its governmental responsibilities in the investigation or prosecution of criminal cases in an improper manner nor did the questionnaire seek to bring to light actual or potential wrongdoing on the part of Connick or others. *Id.* The Supreme Court continued by noting that the questions posed by Myers reflected her dissatisfaction with her transfer and her "attempt to turn that displeasure into a cause celebre." *Id.*

Unlike the majority of the questions posed in *Connick,* however, I find that the issues discussed on the Smerconish radio program did involve matters of public concern. Unlike *Connick,* the gun permit issue involved possible illegal activity and corruption on the part of a high ranking government official, namely Mitchell. As previously noted, the courts have stated that matters of public concern can include attempts to bring to light actual or potential wrongdoing on the part of government officials. *See Baldassare,* 250 F.3d at 195 (citations omitted). Thus, it follows that the discussion on the Smerconish radio program regarding the District

Attorney's investigation and findings regarding the possible wrongdoing and/or illegality of how Mitchell received the gun permit involved matters of "public concern." The instant case goes beyond the intra-office dissatisfaction in *Connick* since there is the additional element of potential wrongdoing/illegality that brought the gun permit issue to the forefront of the pubic sphere in the first place. Therefore, as Mitchell's appearance on the Smerconish radio program involved a matter of "public concern," Mitchell engaged in a protected activity under the law.

### 2. Substantial Factor Motiving the Dismissal

The next step in the analysis is to determine whether Mitchell's protected activities were a substantial factor which motivated the decision to terminate Mitchell's employment. The Defendants assert that Mitchell cannot satisfy this element. The Plaintiff asserts that he can survive summary judgment with respect to this element by discrediting the Defendants' reasons for his termination. For the following reasons, I agree with Plaintiff's position.

To survive summary judgment, "a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted). In this case, Mitchell attempts to discredit the Defendants reason for his termination. [FN6]

> [FN6.] While *Fuentes* was a Title VII case, courts have noted that "[p]retext analysis used in Title VII cases is also useful in deciding First Amendment retaliation claims." *Cavicchia v. Phila. Hous. Auth.,* No. 03-0116, 2003 WL 22595210, at *9 n. 2 (E.D.Pa. Nov.7, 2003), aff'd, 2005 WL 1506038 (3d Cir. June 27, 2005)(non-precedential)(citing *Azzaro v. County of Allegheny,* 110 F.3d 968, 981 (3d Cir.1997)(en banc); *Feldman v. Phila.*

Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

*Hous. Auth.,* 43 F.3d 823, 831 (3d Cir.1994); *Zappan v. Pa. Bd. of Prob. & Parole,* No. 00-1409, 2002 WL 32174230, at *11 (E.D.Pa. Nov.25, 2002); *Rodriguez v. Torres,* 60 F.Supp.2d 334, 340 n. 2 (D.N.J.1999) *Fogarty v. Boles,* 938 F.Supp. 292, 299 n. 4 (E.D.Pa.1996),* aff'd,* 121 F.3d 886 (3d Cir.1997)).

**\*5** The Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. Thus, it is the Defendants' position that Mitchell could not be retaliated against for his protected activities because the decision to fire him occurred before any of the protected activities occurred. However, I find that there are factual inconsistencies in the record that would allow a reasonable fact finder to find Defendants' proffered reason unworthy of credence. *See Fuentes,* 32 F.3d at 765 (citations and footnote omitted). For example, the Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. This meeting was called to discuss the gun permit issue. No party suggests that budgetary concerns were discussed at this meeting as it related to Mitchell's further employment as Deputy Police Commissioner. Yet, Johnson's press conference on June 1, 2004 detailing Mitchell's termination and the corresponding news coverage explains that Mitchell was fired for budgetary reasons. (*See* Pl.'s Resp. Defs.' Mot. Summ. J., Ex. O). This and other inconsistencies in the record discredit Defendants' proffered theory of Mitchell's termination enough so as to create material issues of fact as to this element. FN7

> **FN7.** Additionally, with respect to the free speech retaliation claim, the Third Circuit has noted that the temporal proximity between the employee's protected activity and the adverse employment action "is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997)(internal quotation marks and citations omitted). In this case, Mitchell

appeared on the Smerconish radio program and was terminated less than one week later. It is worth noting, however, that Mitchell's termination was also soon after the District Attorney made her findings with respect to the gun permit issue.

3. Same Action Would have been Taken Absent the Protected Activity

Defendants do not address this third element of Plaintiff's right to petition and free speech claims. Therefore, I find it unnecessary to address it in the context of deciding Defendants' Summary Judgment Motion. As there are material issues of fact remaining as to all three elements of Plaintiff's right to petition and free speech retaliation claims, I find summary judgment is inappropriate as it relates to Count I of Mitchell's Complaint.

B. COUNTS II AND III

Counts II and III seek money damages under the Pennsylvania Constitution, Article I, Section I and Article I, Section XI respectively. The Defendants assert that summary judgment should be granted in their favor because Plaintiff cannot maintain a cause of action under the Pennsylvania Constitution for money damages. For the following reasons, based upon the discretion given to me as stated under 28 U.S.C. § 1367(c)(1), I will decline to exercise supplemental jurisdiction over these two counts and dismiss them without prejudice.

Section 1367(c)(1) states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if the claim raises a novel or complex issue of state law." As one court in this District has recently noted, "[t]he question of whether there exists a 'right of action for money damages against government officials of the Pennsylvania Constitution' is unclear." *Gremo v. Karlin,* 363 F.Supp.2d 771, 794 (E.D.Pa.2005)(quoting *Robbins v. Cumberland County Children & Youth Serv.,* 802 A.2d 1239, 1251 (Pa.Cmwlth.Ct.2002)); *compare Erdman v. Mitchell,* 207 Pa. 79, 90-91, 56 A. 327, 331 (1903)(holding that there is a right of action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 6
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

for injunctive relief under the first article of the Pennsylvania Constitution); *Harley v. Schuylkill County*, 476 F.Supp. 191, 195-96 (E.D.Pa.1979)(extending *Erdman* to apply to claims for damages); *Jones v. City of Phila.*, 68 Pa. D. & C.4th 47, 68-75 (writing in support of its determination that Article I of the Pennsylvania Constitution is self-executing and permits private parties to seek civil remedies for constitutional violations); *with Millar v. Windsor Township*, No. 04-2529, 2005 WL 1513120, at *3-4 (M.D.Pa. June 24, 2005)(stating that there is a dearth of case law on the issue and declining to exercise jurisdiction over the state constitutional claims because deference to the state appellate courts is appropriate); *Tillman v. Alonso*, No. 04-4391, 2005 WL 1311588, at *5-6 (E.D.Pa. May 31, 2005)(explaining the uncertainty of the state of the law on the issue of bringing a state constitutional claim under Article I and declining to exercise jurisdiction over state constitutional claims because of this uncertainty); *Mulgrew v. Fumo*, No. 03-5039, 2004 WL 1699368, at *2-4 (E.D.Pa. July 29, 2004)(explaining that the issue of whether a direct right of action under Article I of the Pennsylvania Constitution is unclear and declining to exercise supplemental jurisdiction over these state constitutional claims).

**\*6** In light of the unclear state of the law on Mitchell's state constitutional claims, I find that the most appropriate course of action in this particular case is to decline supplemental jurisdiction over Counts II and III of the Complaint pursuant to 28 U.S.C. 1368(c)(1). [FN8] Therefore, Counts II and III will be dismissed without prejudice.

FN8. This decision is particularly prudent in light of the fact that it appears that the issue of "whether a cause of action for money damages arises under the state constitution is an issue currently pending before the Commonwealth Court of Pennsylvania." *Millar*, 2005 WL 1513120, at *3 n. 5 (citing *City of Phila. v. Jones*, No. 795-CD-2004 (Pa. Commw. Ct. filed Apr. 19 2004). "Argument was heard by the [Commonwealth] court *en banc* on June 8, 2005." *Id.*

### C. QUALIFIED IMMUNITY

Finally, Defendant Mayor Street asserts that he is entitled to qualified immunity. "Qualified immunity is available to government officials performing discretionary functions." *Lodato v. Ortiz*, 314 F.Supp.2d 379, 385-86 (D.N.J.2004)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818 (citing *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)). A court required to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [government official's] conduct violated a constitutional right? This must be the initial inquiry.... If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties's submissions, the next, sequential step is to ask whether the right was clearly established.

*Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(internal citation omitted).

Regarding the first part of the qualified immunity test, as set out in *supra* Part IV.A., I have found that Mitchell has alleged a violation of his constitutional rights to be free from retaliation for filing his equity complaint and for speaking out on a matter of public concern. Therefore, the first part of overcoming Mayor Street's qualified immunity has been satisfied by Mitchell.

Next, I note that the Defendants do not attempt to make any type of argument as to the second part of the qualified immunity test. Specifically, the Defendants sole argument with respect to qualified immunity is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

that, "[b]ecause the plaintiff cannot establish that his constitutional rights were violated, Defendant Mayor Street is entitled to qualified immunity, and, therefore, judgment in his favor." (Mem. Law. Supp. Defs.' Mot. Summ. J., at 11). Thus, Mayor Street does not attempt to contest that both of these rights were clearly established at the time he acted. However, it is clear that both of these rights were established at the time Mayor Street acted. *See Watters,* 55 F.3d at 891 (stating that "it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal.... Judicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech.") (citations omitted); *San Filippo,* 30 F.3d at 441-443 ("The mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee."); *Bennis v. Gable,* 823 F.2d 723, 733 (3d Cir.1987)(stating that the law was clearly established that a public employee could not be retaliated against for exercising his rights under the First Amendment). Thus, I find Defendant Mayor Street shall not be entitled to qualified immunity.

### V. *CONCLUSION*

**\*7** In conclusion, I find that summary judgment is improper as to Count I of the Complaint. I find that material issues of fact remain in Mitchell's claims for retaliation under the First Amendment's free speech and right to petition clauses. Additionally, I conclude that because Counts II and III raise novel and complex issues of state law, I will decline supplemental jurisdiction over these state constitutional claims and dismiss them without prejudice. Finally, I have concluded that Defendant Mayor Street is not entitled to qualified immunity.

An appropriate Order follows.

### ORDER

AND NOW, this 16th day of August, 2005, upon consideration of the Defendants' Motion for Summary Judgment (Doc. No. 11), and the Response and Replies thereto, it is hereby ORDERED that:
1. the Motion is DENIED; and
2. Counts II and III of the Complaint are DISMISSED WITHOUT PREJUDICE.


E.D.Pa.,2005.
Mitchell v. Street
Slip Copy, 2005 WL 1993774 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2150103 (Trial Motion, Memorandum and Affidavit) Order (Jul. 12, 2005)
• 2:04cv03213 (Docket) (Jul. 07, 2004)
• 2:04cv01110 (Docket) (Mar. 15, 2004)
• 2004 WL 2695311 (Trial Pleading) Complaint (2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Third Circuit.
David T. SPRINGER, M.D.
v.
Renata J. HENRY, individually and in her official
capacity as Director of the Division of Alcoholism,
Drug Abuse and Mental Health of the Department of
Health and Social Services of the State of Delaware;
Gregg C. Sylvester, M.D., in his official capacity as
Secretary of the Department of Health and Social
Services of the State of Delaware; Delaware
Department of Health & Social Services Appellant.
**No. 04-4124.**

Argued Oct. 26, 2005.
Jan. 18, 2006.

**Background:** Psychiatrist who worked as independent
contractor at state mental hospital brought action
against state official, alleging that his contract was not
renewed in retaliation for his memoranda criticizing
state of care at the hospital. The United States District
Court for the District of Delaware, Gregory M. Sleet,
entered judgment on jury verdict in favor of
psychiatrist, and officials appealed.

**Holdings:** The Court of Appeals, Sloviter, Circuit
Judge, held that:

6(1) plaintiff's memoranda addressed matters of public
concern and thus contained protected speech under the
First Amendment;

8(2) official was not entitled to qualified immunity;

10(3) whether plaintiff's contract would have been
renewed but for his memoranda, so as to support award
of economic damages, was question of fact for jury; and

14(4) evidence was sufficient to support of award of

punitive damages.

Affirmed.

**[1] Federal Civil Procedure 170A** 🔑2339

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(B) Grounds
            170Ak2338 Verdict or Findings Contrary to
Law or Evidence
                170Ak2339 k. Weight of Evidence. Most
Cited Cases
New trial should be granted only where the great weight
of the evidence cuts against the verdict and where a
miscarriage of justice would result if the verdict were to
stand.

**[2] Constitutional Law 92** 🔑90.1(7.2)

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.
Most Cited Cases
Public employee who files a claim of retaliation for
engaging in protected First Amendment activity must
first demonstrate that he engaged in protected activity,
i.e. speech that addresses a matter of public concern;
court then employs the balancing test to determine
whether employee's interest in the speech outweighs the
state's countervailing interest as an employer in
promoting workplace efficiency and avoiding
workplace disruption. U.S.C.A. Const.Amend. 1.

**[3] Civil Rights 78** 🔑1405

78 Civil Rights
    78III Federal Remedies in General

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                          Page 2
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

78k1400 Presumptions, Inferences, and Burdens of Proof
78k1405 k. Employment Practices. Most Cited Cases

**Constitutional Law 92 ⬡82(11)**

92 Constitutional Law
  92V Personal, Civil and Political Rights
    92k82 Constitutional Guaranties in General
      92k82(6) Particular Rights, Limitations, and Applications
        92k82(11) k. Public Employees; Military Personnel. Most Cited Cases
Public employee who files a claim of retaliation for engaging in protected First Amendment activity must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action; thereafter, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected conduct. U.S.C.A. Const.Amend. 1.

Public employee who files a claim of retaliation for engaging in protected First Amendment activity must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action; thereafter, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected conduct. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ⬡45**

92 Constitutional Law
  92II Construction, Operation, and Enforcement of Constitutional Provisions
    92k44 Determination of Constitutional Questions
      92k45 k. Judicial Authority and Duty in General. Most Cited Cases
Whether an employee's speech is protected under the First Amendment is a question of law. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law 92 ⬡90.1(1)**

92 Constitutional Law

92V Personal, Civil and Political Rights
  92k90 Freedom of Speech and of the Press
    92k90.1 Particular Expressions and Limitations
      92k90.1(1) k. In General. Most Cited Cases
First Amendment's protection of an employee's right to speak on matters of public concern extends to independent contractors. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law 92 ⬡90.1(1)**

92 Constitutional Law
  92V Personal, Civil and Political Rights
    92k90 Freedom of Speech and of the Press
      92k90.1 Particular Expressions and Limitations
        92k90.1(1) k. In General. Most Cited Cases

**Health 198H ⬡275**

198H Health
  198HI Regulation in General
    198HI(C) Institutions and Facilities
      198Hk268 Staff Privileges and Peer Review
        198Hk275 k. Actions and Judicial Review. Most Cited Cases
Five memoranda prepared by psychiatrist who worked at state mental facility as independent contractor, raising concerns on the state of healthcare at the facility, addressed matters of public concern and thus contained protected speech under the First Amendment. U.S.C.A. Const.Amend. 1.

Five memoranda prepared by psychiatrist who worked at state mental facility as independent contractor, raising concerns on the state of healthcare at the facility, addressed matters of public concern and thus contained protected speech under the First Amendment. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law 92 ⬡90.1(1)**

92 Constitutional Law
  92V Personal, Civil and Political Rights
    92k90 Freedom of Speech and of the Press

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 3
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

92k90.1 Particular Expressions and Limitations
92k90.1(1) k. In General. Most Cited Cases

**Health 198H ⌐═275**

198H Health
    198HI Regulation in General
        198HI(C) Institutions and Facilities
            198Hk268 Staff Privileges and Peer Review
                198Hk275 k. Actions and Judicial Review.
Most Cited Cases
Statements of psychiatrist employed as independent contractor at state mental hospital, that the hospital hired an unlicensed physician to work there, were not made recklessly, so as to preclude First Amendment free speech protection; physician had been granted temporary credentials to work at the hospital, but was not independently licensed. U.S.C.A. Const.Amend. 1.

Statements of psychiatrist employed as independent contractor at state mental hospital, that the hospital hired an unlicensed physician to work there, were not made recklessly, so as to preclude First Amendment free speech protection; physician had been granted temporary credentials to work at the hospital, but was not independently licensed. U.S.C.A. Const.Amend. 1.

**[8] Civil Rights 78 ⌐═1376(3)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(3) k. States and Territories and Their Officers and Agencies. Most Cited Cases
State official responsible for operation of state mental hospital was not entitled to qualified immunity with regard to violation of First Amendment free speech rights occurring when she failed to renew contract of psychiatrist who worked at hospital as independent contractor, allegedly in retaliation for his memoranda raising concerns on state of care at the facility; although official relied on new state bidding requirements when she did not renew the contract, she did not send

non-renewal letters to other independent contractor physicians, and provided no plausible reason for her targeting of the physiatrist. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⌐═1376(3)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(3) k. States and Territories and Their Officers and Agencies. Most Cited Cases
In determining whether state official is entitled to qualified immunity, court should ask whether the official acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

**[10] Civil Rights 78 ⌐═1431**

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1431 k. Other Particular Cases and Contexts. Most Cited Cases
Whether contract of psychiatrist at state mental hospital would have been renewed but for his memoranda criticizing state of healthcare at the hospital, so as to support award of economic damages, was question of fact for jury in psychiatrist's § 1983 action arising when his contract was not renew in alleged retaliation for exercising his First Amendment free speech rights. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[11] Federal Civil Procedure 170A ⌐═2127**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(F) Taking Case or Question from Jury
            170AXV(F)1 In General
                170Ak2126 Determination
                    170Ak2127 k. Construction of Evidence. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                          Page 4
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

**Federal Civil Procedure 170A ⟨⟩2609**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(E) Notwithstanding Verdict
         170Ak2608 Evidence
            170Ak2609 k. Construction of Evidence.
Most Cited Cases
On a motion for judgment as a matter of law, a district court must disregard all evidence favorable to the moving party that the jury is not required to believe. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

[12] **Damages 115 ⟨⟩91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In General. Most Cited Cases
Jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct.

[13] **Damages 115 ⟨⟩91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In General. Most Cited Cases
To support award of punitive damages, defendant's conduct must be, at a minimum, reckless or callous; punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard.

[14] **Civil Rights 78 ⟨⟩1465(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1458 Monetary Relief in General
         78k1465 Exemplary or Punitive Damages
            78k1465(1) k. In General. Most Cited Cases
Evidence that psychiatrist at state mental hospital was the only independent contractor physician whose contract was non-renewed after he wrote memoranda criticizing state of healthcare there, received

non-renewal notice only two days before proposal deadline, was not given extension that would have allowed him sufficient time to fill out requisite 30 page application form, and that state official that operated hospital was unhappy and unset with psychiatrist was sufficient to support of award of punitive damages in official's § 1983 action against the official. 42 U.S.C.A. § 1983.

On Appeal from the United States District Court for the District of Delaware, (D.C. No. 00-cv-00885), District Judge: Honorable Gregory M. Sleet.

Phebe S. Young (Argued), Marc P. Niedzielski, Department of Justice, Wilmington, DE, for Appellant.

Thomas S. Neuberger (Argued), Stephen J. Neuberger, Wilmington, DE, for Appellee.

Andrew L. Schlafly, New York, NY, for Amicus-Appellee Association of American Physicians and Surgeons, Inc.

Before SLOVITER, FISHER, and GREENBERG, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Circuit Judge.
**\*1** The case before us can be viewed on two levels. On one level, we have an appeal by an employer from an adverse verdict in favor of an employee (here independent contractor) on his claim of unlawful termination in retaliation for speech protected by the First Amendment. On the other level, the amicus curiae, the Association of American Physicians and Surgeons, argues that the issue transcends the relationship between the parties and instead impacts thousands of patients damaged as a result of hospital errors, incompetence, wrongdoing, and cover-ups. On either level, our task is to review the law applied by the District Court on a plenary basis and ascertain whether there is sufficient evidence to support the jury verdict.

I.

The Appellant (defendant in the District Court), Renata

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 5
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

Henry, has been the Director of the Division of Alcoholism, Drug Abuse, and Mental Health ("Division"), the division of the State of Delaware's Department of Health and Social Services ("DHSS") responsible for the Delaware Psychiatric Center ("DPC" or "Center") since July 1, 1999. Dr. Gregg Sylvester was the Secretary of DHSS from October, 1997 through January, 2001, the time period at issue here.

Plaintiff/Appellee, Dr. David T. Springer, a psychiatrist, was an independent contractor at the DPC from July 1, 1991 until June 30, 2000 pursuant to nine successive one-year contracts. Although each contract specified that Dr. Springer could be terminated without cause upon fifteen days' notice, and none of the contracts guaranteed renewal, at the end of each contract year Dr. Springer received and signed a proposed contract for the following year.

Each of Dr. Springer's yearly contracts since July 1, 1996 specified his duties as "[t]o provide psychiatric services to patients at Delaware Psychiatric Center." App. at 1431. The parties agree that in practice Dr. Springer also served as the director of the DPC psychiatric residency training program from 1993 until 2000, the elected president and the chairperson of its Medical Staff Executive Committee from 1999 to 2000, and a member of its credentials committee from 1993 to 2000.

In a series of five memoranda dated from October 21, 1999, to January 26, 2000, Dr. Springer voiced his critical opinions on matters relating to the policies, procedures and administration of the DPC. These were introduced into evidence at trial as Plaintiff's Exhibits PX-1 through 5. Other physicians, medical residents, and staff members signed onto these memoranda. We summarize them below but because they are central to the issues before us they are included verbatim in the Appendix to this opinion.

PX 1, a memorandum dated October 21, 1999 entitled "Concerns about Delaware Psychiatric Center," contains a long list of inadequacies on patient care and safety issues. App. at 1384. It describes the DPC as failing in the task of treating psychiatric patients with high quality care in a respectful and safe environment. The memorandum charges that there was "gross understaffing of the hospital;" that experienced psychiatrists had left because "they declined to compromise the patient care and safety;" that security was poor; that members of the staff had subjected patients to demeaning comments; that patients had complained of being physically abused; that "the patient units lack[ed] discipline due to lack of training provided to the aides and technicians;" and that "[s]taff [was] afraid to speak out on issues affecting patient care and safety." App. at 1384-86. In the final paragraph, the memorandum states that as "hospital administration has shown lack of concern over this it is time that these issues were put in front of legislature and electorate of Delaware whose family members come here for treatment and whose tax money is put into work." App. at 1387. Although the memorandum was signed by 11 psychiatric residents, Dr Springer conceded that he helped to edit the language of PX 1. The memorandum shows copies going to Governor Carper, the Secretary of Health & Social Services Sylvester, the Hospital Director Simono, the Medical Director Dr. Smayer, the Training Director Dr. Springer, Senators of Delaware, the DHCC, the Department of Public Safety, and the News Journal, and there was testimony that it was handed to Governor Carper during one of his visits to the hospital.

**\*2** PX 2, a memorandum dated November 23, 1999 (just one month after the earlier memorandum), from Dr. Springer, in his capacity as president of the DPC Medical Staff Executive Committee and co-signed by five other physicians, is captioned "Critical Issues in the Care of the Mentally Ill in Delaware" and is addressed to the DPC Governing Body.App. at 1388. It summarizes the earlier "plea for help" for the beleaguered program previously outlined by the DPC medical residents, and, in Dr. Springer's own words, "was basically a plea to the Governor, the hospital director, Ms. Henry, and other people." App. at 780. It states, inter alia, that "the capacity of DPC to provide [Delaware citizens with severe and/or long term mental illness] with treatment is deteriorating and facing collapse as of July 2000." App. at 1388.

The third memorandum, PX 3, is dated December 2,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

1999, less than two weeks later, and was written by Dr. Springer on behalf of the DPC Medical Staff Executive Committee. Dr. Springer testified that it was handed to a Medicare reviewer who was on campus "in hopes that the Medicare folks would help us in terms of some of the concerns that we had with patients." App. at 784-85. It was signed by four physicians in addition to Dr. Springer, and, in its own words, sought to bring attention to the unresolved issues at DPC, and "proposed actions that may begin us on the road to protecting and preserving patient care and safety." App. at 1390. The solutions proposed were to "Address Safety Issues as Soon as Possible;" "Fix Understaffing/Personnel Issues as Soon as Possible;" and "Increase Physicians' Authority to Ensure Quality and Safe Patient Care." *Id.*

PX 4, dated December 16, 1999, two weeks later, was written by Dr. Springer, in his capacity as President of the DPC Medical Staff, and Psychiatric Residency Training Director, and is addressed to the DPC Governing Body Members and consists of a proposed agenda for the December 22, 1999 Governing Body Meeting. That agenda lists some of the areas that the medical staff believed needed to be addressed under the headings "Need for a Psychiatric Residency Program at DPC," "Need to Attract and Retain Dedicated and Qualified Teaching Attendings" and "Contingency Plans." App. at 1392-93. Under the latter heading, the proposal urges that "if a decision is made to close the residency program, the current residents should be given the option of completing their entire training at DPC." App. at 1393.

The fifth memorandum, PX 5, was Dr. Springer's report to the DPC Governing Body, entitled "Medical Staff President Report to the Governing Body Meeting of January 26, 2000." App. at 1394. The evidence reflects that it was not presented until the March 21, 2000 DPC meeting. The Report summarized the issues of concern affecting patient care at DPC that the Medical Staff Executive Committee Officers proposed for discussion by the Governing Body. The Report stated that "[t]he most glaring issue at hand is that the DPC medical staff is now in open disagreement with the hospital administration about how the patients should be treated." App. at 1400. It notes, inter alia, that "the

situation has deteriorated to the point that physicians are essentially being asked to practice medicine at below their own minimum ethical standards on a routine basis" and lists "New Concerns Around Patient Care, Credentialling [sic] and Liability Issues for DPC." *Id.* It also discusses "New Patient Care Issue," "Ethical Issues," and "Continued Concerns Around Patient Care and Safety." App. at 1400-04. PX 5 additionally contains the two statements that Henry argues are "falsities" that allegedly deprive the communications of their First Amendment protection-one that she describes as alleging Medicare fraud and the other referring to an applicant as "unlicensed." Those statements will be discussed at length hereafter.

**\*3** On May 12, 2000, less than two months after Dr. Springer's presentation of the fifth memorandum, Henry notified Dr. Springer by letter that his contract at DPC would not be renewed upon its expiration on June 30, 2000, and that the Division would be publishing Requests for Proposals (RFP), to which Dr. Springer was "free to respond." App. at 1405.

Delaware state law had changed in 1996 to require that contracts for professional services exceeding $50,000 per year, such as those under which Dr. Springer worked, be awarded through a process of public bidding. 29 Del.Code Ann. tit. 29, §§ 6913, 6981 (2005). Dr. Sylvester instructed his Division Directors, including Henry, in accordance with these changes. Since May, 1999, the Division has published Requests for Proposals for the provision of psychiatric services to various Division programs, including the DPC. Dr. Springer did not respond to any of those Requests for Proposals.

It is Dr. Springer's position that he was the only physician whose contract was not renewed before or during the year 2000, ostensibly because of the new state requirement. Although Henry relies on this 1996 state law revision as one of the bases for non-renewal of Dr. Springer's contract, she produced no evidence that she had sent any such notice to anyone else. [FN1]

On October 6, 2000, Dr. Springer initiated the instant action under 42 U.S.C. § 1983, seeking monetary damages and injunctive relief [FN2] for the non-renewal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of his contract, claiming that said non-renewal constituted retaliation for his engagement in speech protected under the First Amendment. On November 9, 2001, Henry moved for summary judgment. She argued that Springer's speech was not protected because it addressed his personal concerns, it was disruptive, he would have been terminated because he failed to bid for renewal, he suffered no damages, and that Henry was entitled to qualified immunity. Dr. Springer moved for partial summary judgment on the ground that his speech was protected by the First Amendment, and argued that Henry was not entitled to qualified immunity because his First Amendment right was clearly established.

In a Memorandum and Order entered March 12, 2002 (the "March Order"), the District Court denied Henry's motion for summary judgment and granted Dr. Springer's motion. The Court held that (1) Dr. Springer's "speech was protected under the First Amendment" because "[t]he content of Springer's speech clearly addressed a matter of public concern" and (2) Henry "is not entitled to qualified immunity" because "Springer's right to engage in speech was clearly established at the time he was terminated," and there were no facts to show that Springer's comments had any disruptive effect. App. at 49. The court stated, in conclusion, "a jury must decide whether his protected speech motivated his termination, whether he would have been terminated in the absence of the speech, and whether he suffered damages." App. at 16. The case proceeded to trial.

**\*4** On April 1, 2004, the jury returned a verdict for Dr. Springer. In response to special interrogatories, it found the following: (1) Dr. Springer had "proven by a preponderance of the evidence that his protected activity under the First Amendment reflected in Plaintiff's Exhibits 1, 2, 3, 4 and 5 was a substantial or motivating factor in the decision to not renew or offer him a new contract," App. at 18-19; (2) PX 2, 3, 4, and 5 were the instances of protected activity for the decision not to renew Henry's contract; (3) Henry had failed to prove "by a preponderance of the evidence that regardless of plaintiff's exercise of his First Amendment rights, [that she] would ... not have renewed his contract in July 2000," App. at 19; (4) Dr. Springer suffered actual injury from the non-renewal of his contract; (5)

the damages that Dr. Springer had suffered which were proximately caused by the nonrenewal of his contract were \$285,464 to the present and \$588,431 into the future, App. 20; and (6) \$100,000 in non-economic damages. In an additional interrogatory, the jury found that (7) Henry "acted recklessly, intentionally or maliciously with regard to plaintiff," App. at 22, and awarded Dr. Springer \$25,000 in punitive damages in connection with the latter finding.

On September 17, 2004, the District Court entered a memorandum opinion and order on the parties' motion for post-trial relief ("September Opinion") in which it upheld the jury verdict in all respects but struck the \$100,000 award of non-economic reputation damages. Henry filed this timely appeal.

II.

A.

[1] The standards by which we review the trial court's rulings are well-settled. We exercise "plenary review over the District Court's denial of judgment as a matter of law," applying "the same standard as the District Court." *Johnson v. Campbell,* 332 F.3d 199, 204 (3d Cir.2003). We also exercise plenary review of a district court's grant of summary judgment. *McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir.2005). We review the denial of a new trial for abuse of discretion. *Foster v. Nat'l Fuel Gas Co.,* 316 F.3d 424, 429-30 (3d Cir.2003). A new trial should be granted only where the "great weight" of the evidence cuts against the verdict and "where a miscarriage of justice would result if the verdict were to stand." *Sheridan v. E.I. Dupont de Nemours & Co.,* 100 F.3d 1061, 1076 (3d Cir.1996) (en banc).

B.

[2] [3] We have recently reviewed the analysis applicable when a public employee files a claim of retaliation for engaging in protected First Amendment activity. *McGreevy,* 413 F.3d at 364. The plaintiff must

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                        Page 8
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
(Cite as: --- F.3d ----)

first demonstrate that s/he engaged in protected activity, i.e. speech that addresses a matter of public concern. We then employ the balancing test derived from *Pickering v. Board of Educ. of Township High School Dist. 205, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968),* "to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption." *McGreevy,* 413 F.3d at 364 (quoting *Pickering,* 391 U.S. at 568). Next, the plaintiff must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action. Thereafter, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected conduct. *Id.*

**\*5** [4] [5] [6] Whether an employee's speech is protected under the First Amendment is a question of law. *Azzaro v. County of Allegheny,* 110 F.3d 968, 975 (3d Cir.1997) (en banc); *Baldassare v. New Jersey,* 250 F.3d 195 (3d Cir.2001). The First Amendment's protection of an employee's right to speak on matters of public concern extends to independent contractors. *Bd. of Comm'rs, Wabaunsee v. Umbehr,* 518 U.S. 668, 686, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). [FN3] *See also O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 721, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996). Henry has not seriously disputed that the contents of Dr. Springer's speech (i.e., a physician's critique of patient safety and unsafe working conditions) constitute matters of public concern. In several cases cited by the District Court the courts held that statements by health care providers regarding patient care involved matters of public concern. *Scheiner v. New York City Health and Hospitals,* 152 F.Supp.2d 487, 495-96 (S.D.N.Y.2001); *Kattar v. Three Rivers Area Hosp. Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999). We adopt the District Court's determination that Dr. Springer's speech raising concerns on the state of healthcare at the DPC facility addressed matters of public concern. The distribution of the five communications to persons within the hospital and those responsible for governing the hospital as well as to public officials and the general public through the media was not inappropriate.

Henry's appellate brief lists sixteen issues but essentially they condense to Henry's claim that the District Court erred in holding that Dr. Springer's speech was protected under the First Amendment without analyzing whether the five memoranda contained false statements that are allegedly unprotected [FN4] and in holding that Henry was not entitled to qualified immunity. We consider each issue in turn.

### 1. The alleged false statements

Henry's claim asserting that material containing falsities is unprotected under the First Amendment must be considered in the context of now well-established principles. In *Pickering,* where the principles relating to a government employee's free speech right were first enumerated, a teacher was dismissed by the Board of Education for writing and publishing in a newspaper a letter criticizing, inter alia, the Board's allocation of school funds between educational and athletic programs. The Supreme Court unequivocally rejected the view of the Illinois Supreme Court "that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work...." *Pickering,* 391 U.S. at 568. The Court repeated its earlier statement made the preceding year that "[t]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Id.* at 568 (quoting *Keyishian v. Bd. of Regents,* 385 U.S. 589, 605-06, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).

**\*6** It was in its discussion of the required balancing "between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *id.* at 568, that the *Pickering* Court made any reference to false statements. The Court reviewed Pickering's speech and determined that some of the statements were erroneous. It did not hold that the speech was therefore unprotected, as Henry would have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                              Page 9
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

us do. The Court stated:

What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

391 U.S. at 572-73 (footnote omitted). It continued: The public interest in having free and unhindered debate on matters of public importance-the core value of the Free Speech Clause of the First Amendment-is so great that it has been held that a State cannot authorize the recovery of damages by a public official for defamatory statements directed at him *except when such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity.*

391 U.S. at 573 (emphasis added) (citations omitted).

Unlike the *Pickering* Court's acceptance that Pickering's communication included false assertions, we are not prepared to accept without question Henry's assertion that PX 5 contained false statements. They may be more accurately viewed as exaggerations in the context in which they were made.

[7] One of the two statements Henry alleges was false, that the hospital hired a physician who was not licensed, was discussed by the District Court in its September Opinion. PX 5 states that "[t]wo Acting Medical Directors were appointed by the administration in one week, including an unlicensed psychiatrist." App. at 1401. Henry objects to the statement that the Administration appointed an "unlicensed psychiatrist." Henry argues that the psychiatrist referred to was actually licensed to practice at DPC. Dr. Springer testified that the basis for his statement was that the psychiatrist in question was "not an independently

licensed psychiatrist" or physician but rather had only a DPC institutional license, granted by Henry herself. The District Court's September Opinion states that Henry requested temporary credentialing for a particular physician applicant. Dr. Springer objected, three members of the Credentialing Committee voted to grant the physician partial privilege and two, including Dr. Springer, voted not to do so. Henry refused to sign the physician applicant's credentialing unless he was given full unrestricted privileges. At the conclusion of the discussion of that incident in one half of a page on PX 5, the Report states that "[t]he Medical Staff requests that the Governing Body pass a motion supporting adherence to the Medical Staff Bylaws, especially in regard to matters of credentialing [sic] physicians to the DPC Medical Staff." App. at 1401. Dr. Springer's asserted bases for his statements do not support a contention that they were recklessly made.

*7 The other falsity Henry alleges relates to the section of the same Report headed "Ethical Issues" and alleges that "[i]n order to give the appearance to Medicare reviewers that DPC had adequate staffing," nurses, psychologists, and staff were brought in from elsewhere. The Report denominates this action as unethical, states that it might bring future negative actions against the hospital and requests that the Governing Body pass a motion that DPC must "follow ethical principles in dealing with state, federal or other regulations or other overseeing bodies." App. at 1401. This discussion hardly accuses Henry or DPC with Medicare fraud, as Henry contends.

Even if these statements contain a somewhat one-sided view, their recounting, totaling no more than one page in the 14 1/2 pages of PX 1 through PX 5, does not support Henry's characterization of the exhibits as containing falsities. They represent a small portion of the evidence presented.

The District Court permitted counsel for Henry to present testimony at trial as to falsity, yet evidence elicited from Henry on direct examination establishes that she believed there to be no untrue allegations in PX 3 or PX 4. The trial transcript demonstrates that the "falsities" counsel for Henry tried to elicit through his client's testimony were merely Henry's disagreements

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with Dr. Springer as to what policies would best improve the DPC:

[Counsel for Henry]: Okay. Turning to Exhibit 3-and again, this is one that you have seen quite a bit in the past few days, I think-are there allegations contained in this document which you believe are untrue?

[Henry]: No.

[Counsel for Henry]: Are there recommendations in this document with which you disagree, that is, that you would believe are not a good idea?

[Henry]: Yes.

....

[Counsel for Henry]: No. 4, Exhibit 4, are there allegations contained in this that you believe are, let's start with true?

[Henry]: Are there allegations that are true? A lot of these are recommendations. Allegations, I don't see allegations that are true.

[Counsel for Henry]: Do you see allegations that are false or is it just a matter of recommendations?

[Henry]: The majority of these are recommendations.

[Counsel for Henry]: Are they recommendations that were consistent with the plan that you had for correcting the problems at the hospital?

[Henry]: There is one suggestion that I would not agree with on this, that would not fit in my plans with how I thought the problems needed to be fixed.

[Counsel for Henry]: Otherwise, you had no big problem with this?

[Henry]: No.

App. at 1180-81.

Such "recommendations," by definition, cannot be false. The testimony before the court was unequivocal: Henry answered "[n]o" to every question about whether she could find false allegations in PX 3 or PX 4. *Id.*

Henry additionally argues that the District Court did not allow her to present sufficient testimony to support her falsity argument. She adduces a page of bullet-pointed "[s]tatements contained in Plaintiff's Exhibits 1-5 upon which Ms. Henry's full testimony would have been helpful." Appellant's Br. at 18-19. However, every one of these statements is devoid of factual assertions except the last, and this last statement relates to PX 5 discussed above, not PX 3 or 4.

**\*8** Henry's argument that the District Court failed to fulfill its duty by submitting the five documents to the jury as protected despite Henry's contention that there was undisputed evidence that each contained statements which were untrue or believed to be untrue misses its mark. The issue is not falsity *vel non* but whether such statements, even if untrue, were knowingly or recklessly made. *See Pickering,* 391 U.S. at 574 (1968). [FN8] There was no such evidence. On the contrary, the District Court stated that "[i]t is apparent that [Dr. Springer] was motivated by a desire to improve conditions at the DPC and was frustrated that, in his view, he was encountering resistance." App. at 46-47. Because we reject Henry's argument that the communications were unprotected because of alleged falsities, it is irrelevant whether the District Court submitted two of the memoranda to the jury as protected and decided post-trial that the remaining were protected. After examination of the documents as the Supreme Court did in *Pickering,* we hold that all five exhibits are protected under the First Amendment.

### 2. *Reiteration of Qualified Immunity Defense*

[8] Henry's other argument reiterates her pre-trial argument that she was entitled to qualified immunity, an argument the District Court rejected in its March Order denying Henry's motion for summary judgment on that ground. Henry now argues that in view of the evidence presented at trial, the District Court erred in failing to reconsider its ruling rejecting her claim of entitlement to qualified immunity as a matter of law.

The District Court held that Dr. Springer's right to speak on various problems confronting hospital administration was clearly established. The court also rejected Henry's contention that Springer's right was not clearly established because his contract was not certain to be renewed under the new bidding process.

Promptly after this ruling, Henry filed an interlocutory appeal. This court dismissed the appeal for lack of jurisdiction, holding that "disputes of fact preclude this court from exercising jurisdiction." *Springer v. Henry,* No. 02-1776 at 3 (3d Cir. Nov. 27, 2002) (citing *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132

L.Ed.2d 238 (1995)). [FN6] We identified only one such dispute of fact in said order: "[T]he parties dispute whether appellee, David T. Springer, was treated differently than other physicians with respect to rebidding for their positions." *Id.* We deferred our review of qualified immunity pending "appeal at the conclusion of the case," i.e., the instant appeal. [FN7] *Forbes,* 313 F.3d at 147-48.

We exercise plenary review of the District Court's determination that Henry was not entitled to qualified immunity. [FN8] *Leveto v. Lapina,* 258 F.3d 156, 161 (3d Cir.2001); *see also Forbes,* 313 F.3d at 148 ("In assessing a claim of qualified immunity, we must review the law relevant to the official's behavior and ask whether the official could have believed that his or her actions were justified by law.").

**\*9** Henry relies on the Sixth Circuit's decision in *Gossman v. Allen,* 950 F.2d 338 (6th Cir.1991), where the court held that the employer was entitled to qualified immunity on a claim that it violated the employee's rights because a reasonable official could have believed that Gossman knowingly or recklessly made false statements, and could be terminated on the basis of those unprotected statements. *Id.* at 341-42. *Gossman* does not support Henry's claim of qualified immunity because Henry, unlike the employer in that case, failed to proffer any persuasive evidence that Springer made false statements or that any of the statements he made were made with his knowledge or with recklessness as to their falsity. Therefore, no reasonable official could have fired Springer on the basis of those statements.

[9] As the Supreme Court has noted, "the court should ask whether the [official] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Henry raises the issues of knowledge and recklessness for the first time in the instant appeal; [FN9] she never sought to present evidence as to Dr. Springer's mental state with regard to allegedly false statements.

Because Dr. Springer's First Amendment right to speak out was clearly established at the time of his non-renewal, we consider whether, viewing the evidence in the light most favorable to Dr. Springer, it would be clear to a reasonable official in Henry's position that s/he could not properly refuse to renew Dr. Springer's contract because of the new state bidding requirement. *See Saucier v. Katz,* 533 U.S. 200, 202 (2001); *Karnes v. Skrutski,* 62 F.3d 485, 494 (3d Cir.1995). In our Interlocutory Order of November 27, 2002, we stated that whether a reasonable official could have sent the non-renewal notice depends primarily upon whether "appellee, David T. Springer, was treated differently than other physicians with respect to rebidding for their positions." *Springer,* No. 02-1776 at 3 (Interlocutory Order).

Both at trial and on appeal, Henry has failed to refute evidence tending to show that Dr. Springer was the only independent contractor physician whose contract was non-renewed in 2000 and the only such physician to have ever received a non-renewal letter during his nine years of working at the hospital. Viewing this record in the light most favorable to Dr. Springer, no reasonable official could have sent a non-renewal letter to only one of at least five other independent contractor physicians at the hospital.

Henry nonetheless argues that "[a] reasonable official in [ ] Henry's position could have believed that requiring [Dr. Springer] to comply with state procurement laws did not violate [Dr. Springer's] rights." Appellant's Br. at 41. We view the question before us somewhat differently. As our order denying the interlocutory appeal suggests, the relevant question is whether a reasonable official in Henry's position could have believed that there was any constitutional basis for requiring only Dr. Springer and no other independent contractor physician to comply with state procurement laws. Because Henry provided no plausible reason for her targeting of Dr. Springer to the exclusion of other independent contractor physicians, the answer to this question is in the negative. Henry's rationale that she began to enforce the bidding requirement with Dr. Springer because he was the independent contractor physician who was at DPC the longest is not plausible. On the facts viewed in the light

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                          Page 12
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

most favorable to Dr. Springer, *see* Karnes, 62 F.3d at 494, no reasonable official could have believed that the decision to target solely Dr. Springer could be based on any reason other than retaliation for protected speech.

C.

**\*10**  [10] Henry challenges the judgment for both economic damages and punitive damages. The jury awarded Dr. Springer $873,895 for his economic loss notwithstanding Henry's counsel's argument that Dr. Springer did not suffer any economic injury as a result of losing his job. She argues that there was no assurance that his contract would have been renewed and that he was never promised that it would be. Her claim is unpersuasive.

Dr. Andrisani, Dr. Springer's expert witness, gave testimony sufficient to serve as the basis for the jury's finding that Dr. Springer's contract would have been renewed absent the non-renewal letter. FN10 The only contradictory evidence was the testimony of Dr. Link, Henry's expert witness. It was the jury's role to determine which expert was more credible, and the jury reasonably could have adopted the view of Dr. Springer's expert witness.

[11] On a Rule 50 motion for judgment as a matter of law, a district court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The District Court correctly observed in its September Opinion that "[w]hether Springer's contract would have been renewed but for his memos was a question of fact properly before the jury." App. at 39. Drawing all inferences in favor of Dr. Springer, a reasonable juror could infer that he would work many years at the DPC. The evidence was sufficient to support the jury's economic damages award.

[12] [13] [14] A jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct. *See* Alexander v. Riga, 208 F.3d 419, 430-31 (3d Cir.2000); *see also*, Smith v. Wade, 461 U.S. 30,

54-56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). This standard is disjunctive: "[T]he defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard." *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir.1989). In response to special interrogatories, the jury specifically found $25,000 in punitive damages appropriate because Henry acted "recklessly, intentionally or maliciously with regard to [Dr. Springer]." App. at 22.

Although we might not have reached the same verdict as the jury, the record contains sufficient evidence to support the jury's conclusion that Henry singled out Dr. Springer for intentional disparate treatment. As we noted above, Dr. Springer produced unrefuted evidence that he was the only independent contractor physician whose contract was non-renewed in 2000. The District Court ruled that "[a] reasonable jury could have concluded that Henry was motivated by evil intent or reckless indifference." App. at 41.

The jury's finding of reckless or intentional behavior is supported by consideration of the circumstances under which Dr. Springer received Henry's non-renewal notice which informed him his contract would not be renewed and that "the Division will be publishing Requests for Proposals." App. at 1405. Although an RFP with a submission deadline of 11:00 a.m. on Wednesday, May 17 ("May 17 RFP") was issued on April 10, 2000, (App.1472-73), Henry did not send the non-renewal notice to Dr. Springer's home address until Friday, May 12. Henry testified-and the jury was entitled to believe-that he received the notice of non-renewal on the evening of Monday, May 15, less than two days before the proposal deadline. FN11 As the District Court noted, "Henry notified Springer only five days, at best, before the proposal deadline despite the fact that the position had been advertised for over a month." App. at 41.

**\*11** On May 16, 2000, Dr. Springer tried fruitlessly to obtain an extension that would have allowed him sufficient time to fill out the requisite thirty page application form by the May 17 RFP's proposal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deadline, which form Henry had failed to attach to the non-renewal letter. On the same day, Henry was notified of Dr. Springer's attempt to secure an extension in filling out the application, but there is no evidence that she attempted to assist him despite the fact that the timing of her non-renewal notice was the source of his impediment. Even Dr. Sylvester testified that Henry followed "unusual" procedures in ending Dr. Springer's employment. [FN12] App. at 681.

The jury finding of callous or malicious behavior also is supported by Henry's attitude toward Dr. Springer and the medical staff in general. Dr. Sylvester testified that Henry viewed her interactions with the medical staff, including Dr. Springer, as "adversarial." App. at 666. Three witnesses-Henry, Dr. Sylvester, and Dr. Springer-testified that Henry was upset and unhappy with Dr. Springer. Dr. Springer testified that during meetings of the DPC Governing Body Henry was "angry and spoke [to him] with a lot of emotion," App. at 780. Based on its observations at trial, the jury could have concluded that Henry acted vindictively.

The evidence supports the jury finding that Henry acted at least recklessly or callously, if not intentionally or maliciously, with respect to Dr. Springer's constitutionally protected rights. [FN13] The District Court did not err in affirming the jury's punitive damages award. [FN14]

IV.

We see no error of law. Nor can we conclude that the verdict was against the weight of the evidence. For the foregoing reasons, we will affirm the judgment of the District Court in its entirety.

APPENDIX

CONCERNS ABOUT DELAWARE PSYCHIATRIC CENTER

DATE: 10/21/99

Delaware Psychiatric Center, the only state run hospital

for mentally ill, serving all of Delaware, treats the sickest and most vulnerable segments of our society. As most patients are quite ill, may not have involved families, and have no choice of treatment facility, the state hospital has an enormous responsibility to treat these psychiatric patients with high quality care in a respectful and safe environment. Unfortunately, DPC is failing in this task with the prospects for improvement slim.

PATIENT CARE and SAFETY ISSUES:

1) There is gross understaffing of the hospital. Psychiatrists routinely treat 45 patient each; one psychiatrist is responsible for 85 patients. There is also an inadequate of nurses to safely run the hospital. The hospital treating environment is not conducive to recruiting and retaining qualified personnel.

K3 is the most acute unit in the hospital with a stated capacity of 32 patients. The unit even when it is over-census; at times exceeding 50 patients. This poses a great safety hazard because of overcrowding and understaffing. Patients are unable to be adequately monitored for safety with little or no time for any treatment.

**\*12** Over the course of last few years, at least 6 Board Certified and dedicated psychiatrists have left K3 as they declined to compromise the patient care and safety. It appears that the main function of the administrative Unit Director is to act as a monitor to keep the patient census down; not to promote quality patient care. When staff members do not agree with demands of the Unit Director, he often becomes hostile and threatening, making for an intolerable working environment. This has been brought to the notice of administration repeatedly with no action taken resulting in an extraordinary deterioration of morale.

2) The admission area is almost always understaffed. There is rarely ever a nurse present in the admission area. The nurse who is supposed to cover the admission area is rarely available due to widespread understaffing. Patients who are agitated and need to be medicated immediately are not treated in a timely manner.

3) Security officers are rarely present in the admission area. Though they are present on the hospital campus,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                 Page 14
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

it may take up to 10 minutes for security to arrive when called in the case of violent patient.

The following are 2 examples of safety concern:

An agitated, intoxicated and psychotic patient barricaded and locked himself in an office of the admission area and attempted to hang himself with a phone cord.

Acutely psychotic and/or severely depressed patients while on arm's length observation are often allowed to go to the restroom unaccompanied by staff.

4) When the unit gets overcrowded, no beds are available for patients, they have to sleep on cots, or on couches in the dayrooms, which compromises the safety of patients and staff. These cots are unsafely stored in the computer room of the unit. A staff member was injured when cots landed on her head.

5) Acutely psychotic patients have been able to escape the unit at will. Patients have been able to walk through doors, climb fence or break window guards to escape.

6) A patient who was on arm's length observation for suicidal intent, at the time went into her room and tied a pillow cover around her neck with an intention to strangle herself. She was found in time before a tragedy happened. The incident was investigated but no action taken.

7) There seems to be too much attention focused on keeping the patient census down. There is often pressure to discharge patients before an adequate and safe treatment plan has been formulated. There is intense pressure to keep the number of suicide watches down.

There are times when a patient voluntarily walks into the admission area with an expectation of seeing a psychiatrist and instead the Unit Director, a social worker, evaluates them. Invariably the patient is asked to leave by the unit director and does not get to see a psychiatrist.

Similarly, when a patient with legal charges is brought into the admissions area the unit director often triages the patient without allowing for a psychiatric evaluation and discharges the patient.

**\*13** 8) There have been a numerous instances when the Unit Director and other staff have subjected the patients in the admission area to demeaning comments. Besides being unethical and disrespectful these comments often result in aggravating a severely mentally ill patients. On numerous instances K3 Unit director has been observed to be demeaning to numerous patients. Patients often become agitated and violent requiring unnecessary medication of the patient. When staff members questioned the Unit Director about the inappropriateness of his comments, the Unit Director has become verbally threatening toward the staff members.

Recently there were 2 cases on the unit when patients had complained of being physically abused by the staff members. Families of the patients were very concerned about the safety of their family members. However, investigations into staff misconduct often do not lead to appropriate disciplinary action.

On one of the units, an HIV pregnant patient had a delivered her baby in the seclusion room of DPC. The patient stated that when she had gone up to the staff and reported that she was in labor, staff asked her to go to the seclusion room instead of arranging for her to be transferred to hospital. Needless to say, the safety of the newborn was also jeopardized in this case.

9) All the patient units lack discipline due to lack of training provided to the aides and technicians before they start working on the unit. There are numerous instances of staff lying, speaking disrespectfully, and in an intimidating manner to other staff and patients. The hospital administration, by its lack of firm response to this, is implicitly supporting that kind of behavior.

Staff is afraid to speak out on issues affecting patient care and safety. As they are afraid of being punished by the administration. Staff has also expressed fear of speaking out and/or disciplining the staff for fear of getting their tires slashed, having feces smeared on their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                        Page 15
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

car or worse. The administration has been made repeatedly aware of this problem, with no action to date.

10) Delaware Psychiatric Residency Training Program, the only training program in the state of Delaware began in the late 1950's and grew rapidly to serve Delaware State.

The primary goal of the Delaware Residency Program in Psychiatry was and is ability to develop a broad range of professional skills for the residents so that they can effectively and competently practice psychiatry in a wide variety of settings. The varied activities of the Delaware *Residency* Program in Psychiatry may be seen as composed of concentric circles. The first circle consists of service related to community needs; an example is an intimate working relationship with the DPC, community psychiatry, crisis intervention, and numbers of general hospitals, etc. The second circle consists of teaching, training, research, and continuing education in the Delaware State community. The Delaware Psychiatric Center is responsible for teaching in all four years of the postgraduate training in general psychiatry. That training takes place in the everyday world of medical practice through selfless commitment of residents to the patients with a genuine concern for their interests, needs, and safety.

**\*14** Excellence in psychiatry requires intensive training and experience with a fundamental emphasis on assessment, treatment planning and application of modern therapeutic technology. Individual supervision, educational seminars, rounds, and case conferences are the primary techniques used to convey knowledge, clinical skills, and the professional attitudes appropriate for a clinician. However, during the last few years it became harder and harder to provide excellence in training for residents due to the lack of integrity of staff, increased tenseness among hospital administration and clinical staff, and undermining the physician role in therapeutic process.

Resident doctors are the only physicians providing services to the hospital from 4:30 PM to 8AM on weekdays and all day weekends. During this time frame resident doctors provide not only psychiatric but also all medical care to over 350 patients in addition to admitting patients around the clock. Inability of the hospital administration to retain dedicated teaching psychiatrists has created a void in the training of the residents. Having a residency program is not only a monetary benefit for the hospital but residency provides educational environment within and outside hospital system. The residency program, fully accredited for over 40 years has produced quality psychiatrists that after graduation have settled in the area to function in the Public Mental Health sector, will likely be closed due to insufficient dedicated teaching psychiatrists that hospital administration has not been able to retain.

As hospital administration has shown lack of concern over this it is time that these issues were put in front of legislature and electorate of Delaware whose family members come here for treatment and whose tax money is put into work.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

|  | **NAME** | **SIGNATURE** |
|---|---|---|
| **PGY IV:** | Dr Fahim Fahim. | |
| | Dr. Panna Jolapara. | |
| **PGY III:** | Dr. R. Rizvi. | |
| | Dr. R. Srinivasa. | |
| | Dr. Dilip J. Joshi. | |
| | Dr. G. Sahani. | |
| **PGY II:** | Dr. Shafiqa Azamy. | |
| | Dr. Aleya Karim. | |
| **PGY I:** | Dr. Art Pogre. | |
| | Dr. Sharad Sawant. | |
| | Dr. A. Yarlagadda. | |

CC: Governor, Mr. Thomas R. Carper.

Secretary of Health & Social Services, Gregg C. Sylvester, MD.

Hospital Director, Mr. Jiro Shimono.

Medical Director, Dr. Phyllis Smoyer.

Training Director, Dr. David Springer.

Senators of State of Delaware.

DHCC.

Dept. of Public Safety, Brian J. Bushneller.

News Journal.

*DELAWARE HEALTH AND SOCIAL SERVICES*

DIVISION OF ALCOHOLISM, DRUG ABUSE
AND MENTAL HEALTH

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 17
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

To:                          Delaware Psychiatric Center Governing Body (Renata
                             J. Henry, Chairperson, Eugene Wolinsky,
                             Vice-Chairperson, Gregg C. Sylvester, MD, Cabinet
                             Secretary, Benjamin Fileti, Isaiah F. Henry, Stephen
                             Moores, M.C., Dorothy Patterson, Gary L. Wirt, Ed.D.)

Cc:                          Mr. Thomas Carper, Governor
                             Mr. Jiro R. Shimono, ACSW, Hospital Director

From:                        Delaware Psychiatric Center Medical Staff Executive
                             Committee Officers (David T. Springer, MD, President,
                             Cheryl Cantrell, MD, Vice-President, Fawzia Hasan,
                             MD, Secretary, Ellis Kendle, MD, Medical Staff
                             Activities Director, Syed Munir, MD, Member-at-large,
                             Hugo Del Villar, MD, Member at Large)

Date:                        November 23, 1999

Re:                          Critical Issues in the Care of the Mentally Ill in
                             Delaware

**\*15** Delaware Psychiatric Center (DPC), known as Delaware State Hospital for a century prior to 1996, is the only state psychiatric hospital in Delaware and, as such, the only inpatient facility available to Delaware citizens with severe and/or long term mental illness. The patients' conditions include schizophrenia, depression, bipolar disorder, severe personality disorders, substance abuse, dementia, brain injury, mental retardation, and psychiatric complications of medical illnesses, such as, AIDS. Currently, as the number of people with these problems increases, the capacity of DPC to provide them with treatment is deteriorating and facing collapse as of July 2000.

For several years, we have had difficulty maintaining adequate numbers of psychiatrists at DPC. We are heavily dependent on the physicians in our 50+ year old psychiatry residency program (the only one in Delaware) to provide clinical coverage, both psychiatric and medical. However, residents must be both educated and supervised. Every board certified teaching psychiatrist we have hired in the last five years has resigned after a relatively short stay, citing hostile and unsafe working conditions and understaffing. Since the sixth such resignation in October 1999, it has

seemed unlikely that the residency could be continued after the current academic year, in spite of the fact that no one wants to lose this valuable program. The negative impact of closing or failing to fill the positions in the residency can hardly be overstated: it would mean the loss of all night, weekend and holiday coverage, and daytime admission coverage for the hospital.

On October 21, 1999, the DPC residents wrote a letter to Governor Carper, with copies to state administrators and legislators, that was essentially a plea for help for their beleaguered program. Their letter received attention in the media and spawned a series of interesting responses and editorials. The Governing Body of the hospital should take immediate steps to reverse the current downward spiral, before it is too late. We must hire residents for the academic year beginning in July 2000 no later than March 2000. We have four months to reverse the trends of the last five years.

The Medical Staff requests that the Governing Body schedule a series of emergency meetings with the specific goal of hiring and retaining teaching psychiatrists and maintaining the psychiatry residency program.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

*S. Munir M.D*
*Fulham MD.*
*David Simpson*
*[signature]*
*[signature]*
*Hugh Vic Miller MD*

*DELAWARE HEALTH AND SOCIAL SERVICES*

DIVISION OF ALCOHOLISM, DRUG ABUSE AND
MENTAL HEALTH

TO: WHOM IT MAY CONCERN

FROM: Delaware Psychiatric Center Medical Staff
Executive Committee Officers

DATE: December 2, 1999

We have been trying unsuccessfully to communicate issues
of patient care and safety to the hospital administration for
several years. Unfortunately, often when such issues have
been raised they have been objected to because of the
"process" of bringing attention to these problems at
Delaware Psychiatric Center. The unresolved issues remain.

**\*16** Our oaths as physicians require us to strive for the best
in patient care. To remain silent when the situation has
deteriorated so badly, and as is about to get significantly
worse, would be gross negligence and would seriously
jeopardize the civil rights of the patients.

We look forward to working with the administration to
aggressively deal with these issues before the lives of our
patients and their families are put at serious risk. The chance
to have free and open communication with those who can
and will implement the required changes in the system in a
timely manner is the cornerstone of a solution to these
problems. We must roll up our sleeves and pull together to
deliver the top quality patient care which we know how to
do.

The following is a list of proposed actions that may begin as
on the road to protecting and preserving patient care and
safety. We encourage others to come up with other creative
solutions to some of the problems plaguing Delaware
Psychiatric Center.
1) ADDRESS SAFETY ISSUES AS SOON AS POSSIBLE
a) The patient census reached 367 this week, which are 67
patients over what we can reasonably care for given current
clinical resources.
b) Stop addressing the census problem by accusing
psychiatrists of "keeping too many patients." Address the
census problem by increasing the number of beds, and
staffing for those beds, in the hospital.
2) FIX UNDERSTAFFING/PERSONNEL ISSUES AS
SOON AS POSSIBLE
a) There should be a permanent waiver to the bid process for
contract physicians who apply for positions at DPC.
b) All barriers to hiring Merit system psychiatrists at
competitive rates should be eliminated.
3) INCREASE PHYSICIANS' AUTHORITY TO ENSURE
QUALITY AND SAFE PATIENT CARE
a) Have a chief psychiatrist and charge nurse run each
treatment unit.
b) Appoint, at least, two Board-Certified psychiatrists to the
Governing Body. Schedule an additional meeting of the
Governing Body as soon as possible to discuss issues of
patient care and safety, as well as, to ensure the psychiatric
residency's survival.
c) Give to the Governing Body a complete detailed
accounting of expenditures (including each employee or
contractor's name, position, and amount paid) to evaluate
whether the current allocation of resources reflects the
priority of direct patient care. There appear to be many
employees who are working under clinical sounding job
descriptions, but whose jobs do not include direct clinical
care. Monies identified as superfluous should be spent on
hiring true clinical staff and creating new patient units.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 19
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

which lists some proposed actions.

*DELAWARE HEALTH AND SOCIAL SERVICES*

DIVISION OF ALCOHOLISM, DRUG ABUSE AND
MENTAL HEALTH

To: DPC Governing Body Members

From: David T. Springer MD

President, DPC Medical Staff

Psychiatric Residency Training Director

Re: PROPOSED AGENDA FOR DECEMBER 22, 1999
GOVERNING BODY MEETING

Date: December 16, 1999

Thank you for taking the time to meet to discuss critical
issues affecting the DPC Psychiatric Residency Program.
Your commitment and interest is greatly appreciated. The
following is an outline of some of the areas that the Medical
Staff believes needs to be addressed to ensure the future of
the residency program. In addition, I am enclosing a memo
from the DPC Medical Staff Executive Committee Officers

I. NEED FOR A PSYCHIATRIC RESIDENCY
PROGRAM AT DPC

**\*17** - the severity of psychiatric and medical illnesses of
DPC patients require 24 hour coverage by psychiatrists
- replacing resident coverage with attending psychiatric
coverage would likely cost $800,000 more than having a
residency program
- even if extra monies were allocated, the likelihood of
finding sufficient numbers of dedicated attending
psychiatrists to cover 370 patients, seclusion orders and
acute admissions on nights, weekends, and holidays would
be remote
- the loss of the academic atmosphere provided by the
residency would have a deleterious effect on patient care

II. NEED TO ATTRACT AND RETAIN DEDICATED
AND QUALIFIED TEACHING ATTENDINGS

- Without sufficient numbers of qualified teaching
attendings, the residency cannot survive
- qualified teaching attendings will only agree to come and
stay at DPC if they feel that they can work in an
environment that is safe and where they have an ability to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

provide quality care
- having insufficient staffing and overcrowding throughout the hospital is not conducive to attracting and retaining teaching psychiatrists
- having an apparent emphasis on keeping the census down at DPC is demoralizing and confusing for psychiatrists and staff
- psychiatrists need to have the authority, not just the responsibility, to treat patients (i.e. psychiatrists should not be accused of keeping patients too long in the hospital, not be pressured to take patients off suicidal watch, not have minimal roles in administrative decisions affecting patient care, not have to fight for adequate funding for medication and doctors, not have roadblocks put in the way of hiring new psychiatrists and not be reproached for questioning the orthodoxy of the non-medical viewpoint)

### III. CONTINGENCY PLANS

- if a decision is made to close the residency program, the current residents should be given the option of completing their entire training at DPC

MEDICAL STAFF PRESIDENT REPORT TO THE GOVERNING BODY MEETING OF JANUARY 26, 20000

In preparation for the January 29, 2000 Governing Body meeting, the Medical Staff Executive Committee Officers propose that the following be discussed in fulfillment of the Medical Staff's obligation to inform the Governing Body of issues of concern affecting patient care at DPC.

The most glaring issue at hand is that the DPC medical staff is now in open disagreement with the hospital administration about how the patients should be treated. We have for years had a situation in which the physicians were legally responsible for making the most important clinical decisions but at the same time were reporting to lay administrators. This created a tense situation in which administrative techniques could be used to pressure physicians into making a particular decision. At present, the situation has deteriorated to the point that physicians are essentially being asked to practice medicine at below their own minimum ethical standards on a routine basis. Therefore, we are morally obligated to fight this practice, including notification of the appropriate regulatory agencies that might have the power to intervene and demand improvements.

### NEW CONCERNS AROUND PATIENT CARE, CREDENTIALLING AND LIABILITY ISSUES FOR DPC

**\*18** 1) New Patient Care Issue
On three separate days, the hospital administration told the psychiatric residents on call to abruptly transfer patients either to another unit within the hospital or to another facility, either on a weekend day or in the middle of the night. Two transfers were of elderly patients at around 8 PM on a Friday night. Residents were given direct orders by non-psychiatric administrators to discharge and transfer the patients without consultation or approval of the unit attending psychiatrist or the backup attending psychiatrist. Transferring patients at off-hours, without adequate planning and preparation of the patient and their families can be seriously disruptive to the patient's treatment. This includes disrupting the patient's relationship with his psychiatrist and treatment team members, a lack of doctor to doctor transfer of sick patients, disregard for sick patients' need to get reoriented to a new treatment team, and disruption of the discharge planning and family contacts that have occurred to date.
It is of equal concern that residents, with training licenses, were instructed against hospital policy and with possible violation of state regulation, to follow orders of non-psychiatric administrators.
The Medical Staff requests that the Governing Body pass a motion that supports the fact that only an attending psychiatrist may order treatment for a patient at DPC and that non-psychiatric administrators may not order treatment, including the discharge of patients.
2) Credentialling
There has been a serious shortage of psychiatric staff at DPC for years. Little was done about this until Medicare made an unannounced site visit and discovered the dire staff shortages. The measures taken by the administration, unfortunately, showed little concern for the patients' best interests and were in violation of hospital policies, Medical Staff bylaws and JCAHO regulations.
A 35 per hour a week contract psychiatrist was placed on the admissions unit of DPC with "temporary privileges" in flagrant violation of medical staff by laws.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

There was no meeting of the Credentials Committee or the Medical Staff Executive Committee. The Medical Staff Executive Committee or President of the Medical Staff did not designate anyone to act on their behalf. There was no recommendation of the Credentials Committee or Medical Staff Executive Committee. There was no consideration of the applicant's review of performance and peer recommendation as communicated verbally and by email to Mr. Shimono by Drs. Springer and Cantrell. Two Acting Medical Directors were appointed by the administration in one week, including an unlicensed psychiatrist.

The Medical Staff requests that the Governing Body pass a motion supporting adherence to the Medical Staff Bylaws, especially in regard to matters of credentialling physicians to the DPC Medical Staff.

3) Ethical Issues

In order to give the appearance to Medicare reviewers that DPC had adequate staffing, nurses were brought in from other state facilities, psychologists and other staff were made to work as psychiatric aids in return for compensation time the following week. Recently, at least two nurses have been reassigned from patient care units back to the administrative building.

**\*19** The Medical Staff believes that utilizing staff in a manner, in which they might be put in a position to deceive federal regulators about the permanence of their positions, is unethical and may risk future negative actions against the hospital.

The Medical Staff requests that the Governing Body passes a motion that DPC must follow ethical principles in dealing with state, federal or other regulators or other overseeing bodies.

*CONTINUED CONERNS AROUND PATIENT CARE AND SAFETY*

The administration's written response to both the resident's and medical staff's concerns attempted to portray that all their concerns were addressed. The residents and medical staff believe that few, if any, concerns were adequately addressed and that serious concerns remain which continue to affect patient care and safety at DPC.

1) Patient Care and Safety Issues:

The Medical Staff have been requesting that a nurse be assigned to the admissions unit for over six years, yet the administration is still only "considering" the assignment. Inadequate security presence in the admissions area has not been addressed. Voluntary "walk-in" patients are routinely turned away by the Unit Director without allowing the patient to be seen by a psychiatrist. Potential patients for admission are accepted by the Unit Director or clerk without a DPC psychiatrist accepting the patient. There remain safety issues for the planned admission area patient unit.

2) Patient Length of Stay:

The Medical Staff oppose the appointment of a consultant to "ensure that patients are receiving the best care possible with the appropriate length of stay." The Medical Staff have not received any notification that their care of individual patients, including the length of time they are treated in the hospital has been inappropriate. It is evident that the purpose of hiring a consultant, at taxpayer's expense, is to try to lower the length of stay. It is the hope that DPC does not go down the failed road of managed care where reduced length of stay becomes more important than quality care for the individual patient.

3) Resignation of teaching psychiatrists in the last five years who have cited hostile unsafe working conditions

The Medical Staff encourages the Governing Body to set up a subcommittee to investigate this matter.

4) Impact of failing to fill positions in residency program

The Medical Staff requests that the Governing Body passes a motion giving explicit support and long-term commitment to the residency program.

5) Personnel Issues

The Medical Staff requests that the Governing Body form a Personnel subcommittee to investigate personnel practices at DPC. It is evident that there is a significant lack of uniformity in the application of disciplinary measures.

In addition, acts of vandalism and threats of vandalism (for example, tires slashed or feces smeared on cars) in retaliation for discipline of staff members has not been adequately addressed.

**\*20** 6) Allocation of Resources

The Medical Staff believes that a gross analysis of administrative costs versus direct service costs would not shed enough light on the actual allocation of resources. Hundreds of thousands of dollars of taxpayer money have been spent on adjunctive activities while the hospital has been understaffed for years. The truth can only been found out in the details. The Medical Staff requests that the entire Governing Body or subcommittee investigate.

The Medical Staff requests the Governing Body investigate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))

**(Cite as: --- F.3d ----)**

Page 22

the exact costs of paying for uninsured patients at Meadow Wood Hospital and Rockford Hospital and whether that money would be better spent in opening up more patient space at DPC.

7) Request for a series of emergency meetings with the DPC Governing Body

The Medical Staff believes that the Governing Body should meet on, at least, a monthly basis at this time, as addressing the above issues and ones that follow demand a lot of time and attention.

8) Proposals not yet addressed:

a) Need for permanent waiver to bid process for hiring contract psychiatrists.

b) Eliminate all administrative barriers to hiring Merit psychiatrists.

c) Have a chief psychiatrist and charge nurse run each treatment unit.

d) Appoint, at least, two board-certified psychiatrists to the Governing Body.

*ADDITIONAL PROPOSED ITEMS FOR THE AGENDA*

1) SHOULD POPULATION-BASED METHODS, SUCH AS, CENSUS OR LENGTH OF STAY BE DETERMINANTS OF QUALITY CARE OR THE INDIVIDUAL TREATMENT OF THE PATIENT?

2) SHOULD THE MENTALLY ILL BE AT GANDER HILL AND WCI OR DPC? (please see enclosed article)

3) WHAT IS DPC'S CONTINGENCY PLAN FOR THE POSSIBILITY THAT MEDICAID MANAGED CARE COMPANIES, WHICH HAVE BEEN GOING BANKRUPT AT AN INCREASING RATE AROUND THE COUNTRY, WILL BE UNABLE TO CARE FOR DELAWARE'S MEDICAID PSYCHIATRIC PATIENTS?

4) WOULD THE NEEDS OF THE CHRONICALLY MENTALLY ILL BE BETTER SERVED BY HAVING A BOARD-CERTIFIED PSYCHIATRIST BE THE DIRECTOR OF THE HOSPITAL?

5) SHOULD PATIENTS (WITH SIGNIFICANT BRAIN DISEASE) AT DPC BE TREATED UNDER A MEDICAL MODEL OR A SOCIAL WORK MODEL OF CARE?

FN1. Henry did not seek Dr. Sylvester's approval

for her non-renewal action.

FN2. Dr. Springer sought a variety of monetary damages and injunctive relief against the defendants. DHSS was dismissed for all purposes by stipulation on June 19, 2001. On the same day all claims for monetary damages against the individual defendants in their official capacities were dismissed. The request for an injunction was moot. Thus, the only remaining claim is against Henry in her individual capacity.

FN3. Accordingly, we refer to Springer as a "public employee" or "employee" interchangeably.

FN4. Dr. Springer contends that Henry waived her falsity defense by failing to raise it in the pretrial order. He relies on our decision in *Ely v. Reading Co.,* where we adopted the proposition that "[t]he pretrial order is generally binding on the parties ... [and] cannot be modified without the permission of the court and a showing of manifest injustice." 424 F.2d 758, 763 (3d Cir.1970) (citing Fed. R. Civ. Pro. 16; 3 Moore's Federal Practice § 16.11). In *Ely,* we upheld the district court's refusal to permit Ely's expert witness to testify where the expert's name was not listed in the pretrial order but was only included in an unauthorized supplemental pre-trial memorandum. *Id.* at 763, n. 13. We held that "[t]he decision of whether or not to permit a change [in a pretrial order] is within the discretion of the trial judge" and that "[a]ppellate interference with this discretion should be kept at a minimum." *Id.* at 763.

*Ely* is inapposite to the present facts. Under *Ely,* we review for a "clear abuse of discretion." However, our decision in *Ely* did not hold that an argument automatically is waived if not extant in the pretrial order. Here the District Court allowed Henry to present testimony at trial as to the truth or falsity of statements in PX 1-5. Dr. Springer does not argue that the District Court abused its discretion in so allowing. Instead, his argument appears to suggest that even though Henry presented testimony on the falsity issue at trial she has waived her right to raise the issue *on appeal* because it was not present in the pretrial order. We

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

find no legal support for such a proposition and reject Dr. Springer's contention that Henry waived her falsity argument.

FN5. Henry failed to argue in her opposition to Dr. Springer's motion for partial summary judgment that any allegedly false statements made by Dr. Springer were made with knowledge or reckless indifference to their falsity. She addressed the issue only in her discussion of the disruption analysis, stating that allegedly "false statements were crafted to cause disruption." As such, Henry cannot now complain that the District Court failed to consider knowing or reckless falsity in its March Order. *Baldassare,* 250 F.3d at 198 ("The public employer ... bears the burden of justifying the discharge, which varies depending upon the nature of the employee's expression.") (citations omitted).

FN6. This Interlocutory Order was filed some two weeks before our December 11, 2002 decision in *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 146 (3d Cir.2002), in which we "announce[d] a supervisory rule to be followed in all subsequent cases in which a summary judgment motion based on qualified immunity is denied on the ground that material facts are subject to genuine dispute," which supervisory rule now "require[s] the District Courts to specify those material facts that are and are not subject to genuine dispute and explain their materiality."

FN7. In *Curley v. Klem,* 298 F.3d 271, 278 (3d Cir.2002), we noted that "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right."

FN8. Demonstrating that it did not view our Interlocutory Order as a vacation of its qualified immunity decision at summary judgment, the District Court "construe[d] defendant's [Rule 50] motion as an untimely motion for reconsideration of its previous summary judgment ruling," a procedural disposition under which Henry's motion

would be "granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension." App. at 35-36. Noting that "[n]o additional evidence was introduced at trial to change the court's understanding of the issue," the District Court ruled that "Henry is not entitled to qualified immunity for the reasons stated in the court's [March Order]." App. at 36 (including in a footnote the entire text of the March Order's qualified immunity decision).

FN9. Henry originally based her motivation for sending Dr. Springer a non-renewal letter on the public bidding requirements imposed on her by changes in State law that took effect in 1996. *See* Note 3, *supra* (citing 29 Del.Code Ann. tit. 29, §§ 6913, 6981 (2005)). Indeed, when Henry sought to introduce evidence of falsity at trial, the District Court commented, "I thought [Henry's claimed reason for not renewing Dr. Springer's contract] was because he simply didn't apply for a new contract." App. at 1176.

FN10. Dr. Paul J. Andrisani analyzed economic data and evaluated courtroom testimony and concluded that Dr. Springer had suffered a total economic loss of $1,281,068 based upon a 60 hour work-week. The jury limited Andrisani's calculation of loss to $873,895. There was sufficient expert testimony on loss to support the jury verdict. (App.39-40.)

FN11. The Request for Proposals provided that "QUESTIONS CONCERNING THIS RFP MUST BE SUBMITTED IN WRITING BEFORE THE DEADLINE OF April 19, 2000 AT 4:30 PM," App. at 1472, some four weeks prior to Dr. Springer's receipt of the non-renewal notice.

FN12. In arguing against the punitive damages award, Henry relies in part on *Brennan v. Norton,* 350 F.3d 399 (3d Cir.2003), where the court found insufficient evidence on the record for punitive damages. Henry attempts to portray *Brennan* as a case with far more evidence adverse to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                Page 24
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

defendant than the present case. However, in purporting to cite that evidence, Henry instead cites Brennan's own unsubstantiated allegations. In fact, we concluded that there was insufficient evidence for a punitive damages award specifically because there was insufficient evidence for a jury to find that Brennan's unsubstantiated allegations (of harassment and retaliation) were correct. *See Id.* Brennan's version of the facts had no evidentiary support in the record. *Brennan,* 350 F.3d at 429. By contrast, in the instant case, there is ample evidentiary support for the jury finding.

FN13. We are mindful in our review of whether there was sufficient evidence to support the punitive damages award of the possible conflict of interest the Delaware Department of Justice has in representing Henry regarding this specific issue. A letter from Springer's counsel to the Department of Justice offering to settle the pending matter on appeal references a formal opinion authored by the Delaware Attorney General which explained that state law bars Delaware from paying any portion of a civil judgment against a state official if a jury finds that official is liable for punitive damages. App. at 1954-56. Thus, the practical effect of the punitive damages award in this case would render Henry individually liable for the entire amount. As a result, we note the possible disincentive for the State to represent Henry zealously with respect to the punitive damages award.

In this case, Appellant's voluminous brief devotes two cursory sentences to its analysis that the record is insufficient to support a punitive damages award. *See* Appellant's Br. at 54. We do not suggest that the State intentionally omitted arguments regarding the punitive damages award; rather, we raise the issue to note our concern over the possibility of a conflict. *See, e.g.,* Del. Rules of Prof'l Conduct R. 1.7. We urge the Delaware Department of Justice to look into this issue in the future. Mindful of the possible conflict in this case, we have examined the sufficiency of the evidence de novo, and we are convinced, based upon our independent review, that there is sufficient evidence to uphold the punitive damages award.

FN14. We reject Henry's argument that Dr. Springer's counsel inserted racially inflammatory language during his rebuttal closing argument. Henry failed both to object to the language in question during closing argument and to raise an objection to the allegedly inflammatory statement in her motion for a mistrial. The first time Henry complained of the misconduct was in her motion for a new trial. We therefore apply the plain error standard.

Dr. Springer's counsel stated during rebuttal in his closing argument, that "An octopus, when it's attacked by an enemy, emits a *jet black* inky film throughout the water and in the disarray, confusion, the octopus escapes. In this case, from the very first moment, the defendant has been *emitting black fluid* to cloud the issues in this case." App. at 1369-70 (emphasis added). Thereafter, in discussing damages, counsel referred to Dr. Springer as "a 45-year old-white male professional." App. at 1370. Henry is an African-American female and Dr. Springer is a white male. Race was never raised elsewhere as an issue in the present case.

In his argument to this court Dr. Springer's counsel sought to justify his comments as for identification. We find that unacceptable. We deplore any introduction of race into a case where race is not at issue. Nonetheless, the District Judge, himself an African American, found possible neutral reasons and concluded that "[t]he court is satisfied that the octopus and black ink analogy is common enough and did not likely confuse the issues for the jury." App. at 49.

Inasmuch as the District Court who had an opportunity to view the closing argument in the context of the trial, found the remarks unobjectionable, combined with Henry's failure contemporaneously to object to the language, we will not hold that the District Court abused its discretion in denying Henry's motion for a new trial.

C.A.3 (Del.),2006.
Springer v. Henry
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                       Page 25
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**


• <u>04-4124</u> (Docket) (Oct. 28, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H** Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

David T. SPRINGER, M.D., Plaintiff,

v.

Renata J. HENRY, individually and in her official capacity, and Gregg C. Sylvester, M.D. in his official capacity, Defendants.

No. 00-885(GMS).

March 11, 2002.

MEMORANDUM AND ORDER

SLEET, District J.

**\*1** On October 6, 2000, Dr. David Springer filed this complaint against Renata J. Henry and Dr. Gregg Sylvester. Springer was a physician who had been under contract to provide medical services at the Delaware Psychiatric Center ("DPC"). Springer alleges that Henry and Sylvester refused to renew his contract in retaliation for remarks he made concerning the operation of the DPC facility. Springer contends that his termination therefore violated the First Amendment.

Presently before the court are two motions-Springer's Motion for Partial Summary Judgment and the defendants' Motion for Summary Judgment. Springer's motion asserts that his speech was protected under the First Amendment. He further contends that if the court determines that his speech was protected-a question of law-a jury must decide whether his speech caused his termination. Finally, Springer contends that defendant Henry is not entitled to qualified immunity because his First Amendment right was clearly established prior to his termination.

The defendants' motion argues that Springer's speech was not protected because it addressed his personal concerns. Alternatively, the defendants argue that Springer's speech was disruptive. Additionally, the defendants contend that Springer would have been terminated regardless of his speech due to his failure to bid for renewal of his contract. Moreover, the defendants argue that Springer has failed to prove that he has suffered damages as a result of their alleged actions. Finally, the defendants argue that Henry is entitled to qualified immunity because it was not certain that Springer's contract would be renewed, and therefore, his rights were not clearly established.

Upon review of the briefs and the law, the court agrees with Springer that his speech was protected under the First Amendment. Moreover, the undisputed facts establish that his speech was not disruptive. Furthermore, the court agrees with the plaintiff that his right to engage in speech was clearly established at the time he was terminated. Therefore, Ms. Henry is not entitled to qualified immunity. Thus, the court will grant the plaintiff's motion for partial summary judgment on the issues of protected speech and qualified immunity. The court must, therefore, deny the defendants' motions on these issues.

Additionally, the court finds that questions of fact remain as to whether Springer's speech was the motivation behind his termination, whether the circumstances required his termination such that his speech was immaterial, and whether he suffered damages. In light of these genuine issues of material fact, summary judgment is inappropriate on these issues. Thus, the court will deny the defendants' motion in its entirety. The court will now explain the reasons for its decision.

II. FACTS

Dr. David Springer began working for the DPC in 1991. [FN1] The hospital was supervised by the Delaware Department of Health and Social Services ("DDHSS"). More specifically, it was supervised by the DDHSS's Division of Alcoholism, Drug Abuse, and Mental Health ("DADAMH"). Renata Henry was the director of the DADAMH. [FN2] Dr. Gregg Sylvester was the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 2
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Secretary of the DDHSS. From August 1992 to June 2000, Springer was the director of the DPC. In that capacity, he was responsible for training psychiatric residents. He was also a member of the credentials committee responsible for hiring new doctors.

> FN1. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

> FN2. Although she served as director of DADAMH, Ms. Henry is not a physician.

**\*2** The DPC confronted numerous, serious problems. Several patients had committed suicide. Others had escaped. In December 1999, the federal Healthcare Financing Agency threatened to end DPC's federal funding. Moreover, the Delaware News Journal ran several highly critical articles about the DPC.

On November 23, 1999, Springer wrote a memorandum addressed to the Governor, the DPC Governing Board, and Ms. Henry. Springer's memo addressed at least twenty-three separate topics. However, the memo generally described attempted suicides, security failures (including patient escapes), under-staffing, violations of Medicare regulations (including an alleged failure to properly notify Medicare officials of the correct number of staff on hand), and lack of quality medical care. Springer also mentioned the need to continue the medical residency program. On March 21, 2000, Springer filed a report with the DPC Governing Board which addressed concerns similar to those outlined in his memo. In his report, however, he also alleged fraud and threatened to take his concerns to regulatory agencies.

Like the other doctors at the DPC, Springer was an independent contractor under contract with the DPC. From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms do not guarantee renewal. Nevertheless, Springer's contract-as well as those of the other DPC physicians-was renewed each year.

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. In early 2000, Secretary Sylvester instructed his division directors to comply with the new provisions and require public bidding on professional service contracts. The DPC physicians earned more than $50,000 per year.

After Springer wrote his memo to the Governor, the situation at the DPC workplace became progressively worse. On May 12, 2000, Henry notified Springer that his contract would not be renewed. Springer was told that he would have to submit a bid to maintain his employment. Defendants maintain that all fifteen DPC psychiatrists were required to submit bids. Conversely, Springer maintains that he was the only physician who was made to reapply. Moreover, Springer contends that he was not informed of the bidding procedures until the day before the bids were due.

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. However, DPC offered three other reasons. First, they believed that Springer was insubordinate because he failed to return documents relating to the credentials certification of a physician applicant. Springer asserts that he missed the deadline for returning the materials because he wished to consult his attorney. Second, DPC alleged that Springer improperly kept patient records at home. Springer submits that he never kept originals or copies of patient documents in his home office. Finally, DPC told Springer that he had improperly considered his personal feelings in deciding whether a certain physician applicant should be credentialed. Springer contends that he did not act inappropriately in the decision-making process.

### III. STANDARD OF REVIEW

**\*3** Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).* When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence-not mere allegations-for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F .2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50.

### IV. DISCUSSION

#### A. Springer's Rights under the First Amendment

In order to establish that his First Amendment rights were violated, Springer must demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997). He must then establish that his protected speech was a motivating factor behind the alleged retaliation. *See id.* Finally, the burden will then shift to the defendants to demonstrate that the same action would have been taken if the speech had not occurred. *See id.*

#### 1. Springer's Speech was Protected

The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of public concern. *See Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997). Second, the court must balance the government's interest in effective administration against the employee's free speech rights. *See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School,* 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

#### a. Matters of Public Concern

**\*4** Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill,* 511 U.S. 661, 668 (1994). To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996) (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983).

The content of Springer's speech clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993). The cases cited by the plaintiff clearly establish that health care issues are matters of public concern when addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals,* 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital); *Kattar v. Three Rivers Area Hospital Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999) ("In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern.") (collecting cases).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 4
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

In the present case, similar to *Schneiner* and *Kattar,* Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned deficiencies at the facility. Moreover, many of problems Springer addressed involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of Springer's speech addressed issues that would be relevant to many groups of Delaware residents.

The defendants assert that Springer's statements were motivated by his own personal interests and thus did not address a matter of public concern. This allegation is based on the fact that Springer's comments also addressed the medical residency program. The defendants argue that since Springer was in charge of the residency program, only he would benefit from such comments. The court rejects this argument. First, a medical residency program could be beneficial to the DPC even in Springer's absence. Second, and more important, the medical residency program was but one of many points Springer addressed. The record clearly demonstrates that the vast majority of Springer's comments addressed the safety and medical concerns at the DPC. Thus, the court finds that the content of Springer's speech addressed a matter of public concern.

**\*5** The context of Springer's speech also indicates that he was addressing a matter of public concern. First, his comments were addressed to the Governor, the DPC Governing Board, and Ms. Henry. If Springer merely wanted to raise his personal issues, addressing his comments to Henry alone would have sufficed. The fact that his statements were addressed to public officials, however, indicates that was attempting reach an audience that could provide redress for the serious issues he raised. Furthermore, the federal government had already begun to investigate problems at the DPC long before Springer's statements. Additionally, several News Journal articles had also addressed the issues Springer raised. *See Watters v. City of Philadelphia,* 55

F.3d 886, 895 (3d Cir.1995) (noting that news coverage can be relevant to determining whether speech addresses a matter of public concern.) The involvement of the federal government and the press strongly indicates that the public was interested in the operations of the DPC. Thus, the court finds that the content and context of Springer's speech addressed a matter of public concern.

### b. Balancing the Government's and Springer's Interests

The only argument the defendants assert on this point is that Springer's comments were disruptive to the DPC's operation. The defendants assert that Springer's comments were intended to be disruptive. The court has reviewed the defendants' recitations of the facts and neither recitation includes facts that would permit the court to reasonably conclude that Springer's comments had any disruptive effect. Indeed, as far as the court can tell, the only fact that the defendants assert in support of this argument is that after agreeing to return the documents regarding the physician applicant, Springer delayed in producing the documents while he consulted his attorney. First, the defendants have failed to adduce facts demonstrating that the delay was disruptive. More important, even if this delay in returning the documents was disruptive, the defendants have failed to show how this disruption was in any way related to Springer's *speech.* Therefore, the court rejects the defendants' argument and concludes that they have not sufficiently demonstrated a government interest sufficient to outweigh Springer's First Amendment rights.

### 3. The Remaining Prongs of the Test

The court finds that summary judgment is inappropriate as to whether Springer's termination was motivated by his speech or, similarly, whether he would have been terminated in the absence of the speech. First, the record reveals that any number of factors could have motivated the defendants' decision to terminate Springer's contract. Indeed, the defendants have provided at least three reasons that are unrelated to Springer's comments-his insubordination, keeping

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

documents at home, and improperly considering his personal feelings during the physician applicant process. However, issues of fact surround whether plaintiff was truly insubordinate, whether he kept documents at home, or whether he had a "vendetta" against the physician applicant. Springer denies all of these allegations. Thus, the parties do not agree on the facts concerning these issues. The court cannot decide these issues on the record before it because they all involve credibility determinations. The motivation behind the defendants' decision is, therefore, a question of fact that is more properly addressed to the fact-finder than to the court. Moreover, it is unclear whether the plaintiff would have been terminated if he had not spoken. The defendants' assert that all fifteen psychiatrists were required to bid for their contracts. Conversely, Springer contends that he was the only physician made to bid. Additionally, Springer asserts that he was not notified of the bidding process in a timely fashion. Since the parties disagree on this highly relevant fact, the jury, rather than the court, should decide this matter. The court will, therefore, deny summary judgment on these two prongs.

### 4. Damages

**\*6** The court similarly finds that summary judgment on the issue of damages is inappropriate. Based on Singer's tax returns for the years 1997 to 2000, the defendants assert that he suffered no economic loss. Conversely, Springer alleges that his 2001 tax return (not mentioned by defendants) proves a significant economic loss. Moreover, Springer states that he can provide expert testimony to prove that he has, indeed, suffered damages. In light of these conflicting factual interpretations, the court finds that there is a genuine issue of material fact on the damages issue. Therefore, the court will also deny defendants' motion on this point.

### B. The Qualified Immunity Issue

Henry is not entitled to qualified immunity. Although state officials may be sued in federal court, their liability may be limited by the doctrine of qualified

immunity, which permits officials to avoid liability for actions performed in the course of their official duties. The Supreme Court recently affirmed the two part test for qualified immunity. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, are sufficient to show that the defendant violated a constitutional right. *See Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001). Second, if a constitutional violation can be demonstrated on the facts alleged, the court must next consider whether the right was clearly established at the time of the alleged violation. *See id.* at 2156. In *Saucier,* the court further clarified that the right must be established in a "particularized" sense, meaning that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* Additionally, the court noted that although the court must decide whether the facts alleged-not proved-by the plaintiff amount to a constitutional violation, even where there may be a material issue of fact, if the law did not put the officer on notice that his conduct was unlawful, summary judgment may be permissible. *See id.* at 2156-57.

The parties here contest only whether Springer's rights were clearly established at the time he was terminated. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *See id.* at 2156. More specifically, a right is clearly established where case law speaks "with obvious clarity to the specific conduct in question." *United States v. Lanier,* 520 U.S. 259, 271 (1997).

Relevant Supreme Court precedent establishes that "independent government contractors cannot be terminated for exercising their First Amendment rights." *Board of Comm. Wabaunsee v. Umbehr,* 518 U.S. 668, 686 (1996). *See also O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 721 (1996) (noting same). Thus, the Supreme Court has recognized on at least two occasions that an independent contractor-such as Dr. Springer-- has a constitutional right to free speech. Therefore, it cannot be more clear that this right was clearly established.

**\*7** The defendants assert that this court should be

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

persuaded by *Hauge v. Brandywine School District,* 131 F.Supp.2d 573 (D.Del 2001). In that case, the court held that the right to be free from retaliation was not clearly established because due to the "fact-intensive nature of the *Pickering* balancing test," the officials were not on notice that their conduct violated the First Amendment. *Id.* at 584. The court will not follow *Hauge* for two reasons. First, the court is persuaded by the plaintiff's contention that *Hauge,* although it may have been correctly decided on the record before that court, is unique. Although the *Hauge* court granted qualified immunity based on the fact-intensive balancing required by the *Pickering* test, neither the plaintiff nor the defendants have presented any authority to permit this court to conclude that the *Pickering* balancing test must always lead to a denial of qualified immunity. [FN3] If the court were to accept the defendants' position, qualified immunity could never be denied in First Amendment retaliation cases. This is an extreme result, one the *Hauge* court probably did not intend and one that this court will not sanction.

> FN3. Indeed, the *Hauge* court itself cites no authority for this novel proposition.

Second, this case is factually distinguishable from *Hauge.* Hague involved a school district administrator who brought allegations of fraud against the school district. *See id.* at 577-578. This case involves a physician who spoke on the various problems confronting hospital administration. Under facts very similar to those in this case, courts have found that the right to speak was clearly established. *See Schneiner,* 152 F.Supp.2d at 493 ("There is no doubt that the plaintiff [physician's] rights under both the First Amendment and the Fourteenth Amendment [to comment on health care at the hospital] were clearly established at the time the plaintiff was disciplined."). Thus, considering the facts before this court, this court also finds that Springer's right was clearly established at the time he spoke. [FN4]

> FN4. The court finds that the defendants' reliance on *Saucier v. Katz,* 121 S.Ct. 2151 (2001) for the proposition that there must be

exact congruence between the precedential facts and the facts of the present case is misplaced. First, *Saucier* involves a completely different context-excessive force under the Fourth Amendment. More important, *Saucier* does not require that the facts of each case be identical. The court therefore rejects the defendants' argument on this issue.

Finally, the defendants contend that the plaintiff's right was not clearly established because under the new bidding process, his contract was not certain to be renewed. As Springer notes, however, independent contractors are entitled to First Amendment protection where there is a *preexisting* contractual relationship. *See Umbehr,* 518 U.S. at 685 (noting that holding establishing right to First Amendment speech was limited to independent contractors with "preexisting commercial relationship" with government). Springer had been under contract with the DPC since 1991. Thus, it is clear that he had a pre-existing commercial relationship. The court therefore rejects the defendants' argument on this issue.

For these reasons, the court finds that Ms. Henry is not entitled to qualified immunity.

### V. CONCLUSION

For all of the foregoing reasons, the court concludes that Springer's speech was protected. Nevertheless, a jury must decide whether his protected speech motivated his termination, whether he would have been terminated in the absence of the speech, and whether he suffered damages. Finally, Henry is not entitled to qualified immunity. Thus, the court will deny the defendants' motion for summary judgment and grant Springer's motion for partial summary judgment.

**\*8** NOW, THEREFORE, IT IS HEREBY ORDERED that:
1. The Defendants' Motion for Summary Judgment (D.I.35) is DENIED;
2. The Plaintiff's Motion for Partial Summary Judgment (D.I.38) is GRANTED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


D.Del.,2002.
Springer v. Henry
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00885 (Docket) (Oct. 06, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on January 25, 2006, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**