Price, et al.                                  v.                          Chaffinch, et al.
B. Kurt Price                         C.A. # 04-956-GMS                    October 18, 2005

Page 106

1   had responsibility for modification of the range?
2       A.   No, sir.
3       Q.   Do you remember any discussion at that meeting
4   of whether the FTU personnel had been doing maintenance
5   of the bullet trap over the past couple months?
6       A.   I don't recall that specifically. I had
7   actually forgotten my note-taking material at the range
8   when we left for the meeting.
9       Q.   Are you saying that's why you didn't take any
10  notes?
11      A.   Yes, sir.
12      Q.   I'm just asking what you remember unaided by
13  notes, and you're saying you don't remember basically
14  anything that was said at that meeting?
15      A.   Not all that you're telling me, no.
16      Q.   Is there anything that I haven't asked you
17  about that you do remember from the meeting? From the
18  meeting itself, not anything that was said --
19      A.   No, sir.
20      Q.   Do you recall speaking at the meeting?
21      A.   No, I do not.
22      Q.   Do you recall being asked any question at the
23  meeting?
24      A.   No, sir.

Page 107

1       Q.   Do you recall anything that any of the four of
2   you from the Firearms Training Unit said during that
3   meeting?
4       A.   No, sir. I think all of our information was
5   being relayed by Captain Warren, if my memory serves me
6   correctly. Again, I don't recall specifically.
7       Q.   Is that the only meeting at the academy that
8   you attended with people from Facilities Management
9   present?
10      A.   That's the one I remember. I may have been at
11  one there. I remember years ago they came up to the
12  range for meetings and so forth, and we had a lot of
13  meetings with Facilities Management over my tenure as a
14  firearms instructor at the indoor range.
15      Q.   Those are meetings at the range?
16      A.   Yes.
17      Q.   I'm talking about a meeting at the academy. Is
18  that the only one you were at?
19      A.   That's the only one I can remember.
20      Q.   How many times have you met Bob Furman?
21      A.   I think that time.
22      Q.   Is that the only time?
23      A.   Yes.
24      Q.   You said that there was a second meeting that

Page 108

1   you were at with Lieutenant Colonel MacLeish it would
2   have been at the time and that was one that occurred in
3   the museum.
4       A.   Yes.
5       Q.   Do you recall when that occurred? I'm sorry.
6   I asked you that. You said you don't recall, but it was
7   after the meeting at the academy?
8       A.   Yes.
9       Q.   Who was present at that meeting?
10      A.   Lieutenant Colonel MacLeish, Major Eckrich, I
11  believe, Mr. Gene Sharpe from fiscal, I believe
12  Captain Homiak and Captain Yeomans, Sergeant Foraker,
13  Corporal Warren, Corporal Warwick, and myself. Did I say
14  Lieutenant Davis and Captain Warren?
15      Q.   You did not yet.
16      A.   They were there, too, I believe.
17      Q.   Do you recall what Homiak did in that meeting
18  or said?
19      A.   He stated that he had been tasked by the
20  lieutenant colonel to conduct a survey of other agencies
21  with indoor firing ranges as far as how maintenance was
22  conducted.
23      Q.   Did he report at that meeting on what he had
24  found?

Page 109

1       A.   Yes.
2       Q.   What did he say that you recall?
3       A.   The gist of it as I can remember was that there
4   was a variety of different issues. It varied from
5   hazardous material teams coming in to clean the range
6   after the shoot, to instructors who were trained and
7   equipped to clean the range after the shoot.
8       Q.   Do you remember anything else that Homiak
9   reported on?
10      A.   No, sir, I don't recall.
11      Q.   Do you recall whether Homiak was actually at
12  that meeting or whether you simply got a report handed
13  out from Captain Homiak?
14      A.   I want to say he was there, but -- I believe he
15  was there.
16      Q.   What did Captain Yeomans say or do during that
17  meeting?
18      A.   I believe he had been tasked by Lieutenant
19  Colonel MacLeish to contact a Dr. Schwartz from Johns
20  Hopkins University Hospital in regards to blood lead
21  levels.
22      Q.   Did you get a copy of his report?
23      A.   I did, but I believe I turned that over to my
24  attorney.

A - 97

28 (Pages 106 to 109)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 110

1    Q.    Did Captain Yeomans report on what he had
2    found?
3    A.    Yes.
4    Q.    Do you recall what he said?
5    A.    He at one time stated that Dr. Schwartz said we
6    should strive to keep our blood lead levels below 10.
7    Q.    Do you remember anything else?
8    A.    No, sir.
9    Q.    Do you recall a discussion of research that
10   Captain Yeomans had done with a Professor Miller at the
11   University of Delaware?
12   A.    No, sir.
13   Q.    Do you remember anything else Yeomans said or
14   did during the meeting?
15   A.    No, I do not.
16   Q.    Do you recall anything that Lieutenant Colonel
17   MacLeish said during that meeting?
18   A.    Yes.
19   Q.    What did he say?
20   A.    He stated that we worked in a hearing -- I'm
21   sorry.  That we worked in a firing range and hearing loss
22   was expected, as was elevated toxin levels in our
23   bloodstream.
24   Q.    Did you say anything to him when he said that?

Page 111

1    A.    No, sir.
2    Q.    Did you agree with that?
3    A.    No.
4    Q.    Have you been to other firing ranges, indoor
5    firing ranges, since you have been working at the
6    Delaware State Police range?
7    A.    As far as on a tour or shooting in them?
8    Q.    Either.  Or both.
9    A.    I have not shot in another agency's indoor
10   range.  I do know we went to the FLETC range in
11   Cheltenham, Maryland, and we also went to the FBI range
12   in Quantico, Virginia.
13   Q.    Did you also go to the FLETC range in Glenco,
14   Georgia?
15   A.    No, sir.
16   Q.    Did you go to any other range during the time
17   that you were with the State Police Firearms Training
18   Unit other than the Cheltenham, Maryland, one and the
19   Quantico one?
20   A.    No, sir.  That was the only two.
21   Q.    When you work at a firing range, you're working
22   with lead projectiles, are you not?
23   A.    Yes.
24   Q.    Even though the handgun ammunition the Delaware

Page 112

1    State Police uses is frangible, it doesn't have lead, the
2    shotgun ammunition still has lead, right?
3    A.    Yes.
4    Q.    Prior to your switching over to frangible, all
5    the ammunition had lead, right?
6    A.    Yes.
7    Q.    Would you expect, given that exposure to lead,
8    that people who work in an indoor firing range might have
9    elevated blood lead levels?
10   A.    No.
11   Q.    Why do you think you're tested for serum blood
12   lead levels if you wouldn't expect that to cause --
13   working there to cause a higher blood level of lead?
14   A.    I would assume it would be to make sure we do
15   not get a higher lead level than what is considered to be
16   normal.
17   Q.    Do you understand that, as a firing range
18   instructor, you are more exposed to lead than a person in
19   the general population?
20   A.    Yes.
21   Q.    Would you expect that, in that type of job,
22   you're likely to have elevated blood lead levels?
23   A.    Not if the building is functioning correctly
24   with the air-handling system.

Page 113

1    Q.    When you were in the outdoor range, didn't you
2    have your blood lead tested?
3    A.    No.  But I will say that prior to -- or I
4    believe it's the first lead level done on the sheet that
5    you showed me, if I may?
6    Q.    You may do whatever you like with those
7    exhibits.
8    A.    It's Exhibit No. 13.  We were at that time
9    currently working with the recruit class in the outdoor
10   range shooting leaded ammo, and I was a 4 percent, which
11   is considered okay even if you're a kid, according to the
12   documentation we have here.
13   Q.    You also had 5s where you were shooting indoor,
14   right?
15   A.    Yes, sir.
16   Q.    Had you ever prior to 1998 had a blood lead
17   test done?
18   A.    Not that I can recall, sir.
19   Q.    You believe that you should be able to shoot in
20   an indoor range and have no elevation of your blood lead
21   level at all?
22   A.    If the building's functioning correctly, that's
23   what I do believe.
24   Q.    What's the basis for that belief?

**A - 98**

Price, et al.                            v.                    Chaffinch, et al.
B. Kurt Price                    C.A. # 04-956-GMS              October 18, 2005

Page 114

1    A.   As an employer, I would expect everything,
2  every precaution to be done to ensure my health and to
3  make me educated in regards to what I need to do to make
4  sure that I stay healthy in that environment.
5    Q.   Have you ever talked to experts in ranges to
6  determine whether it's realistic to expect that, as an
7  instructor in an indoor firing range, you would have
8  blood lead levels the same as the population at large?
9    A.   I have not talked to --
10   Q.   Have you ever done any research on that
11 question?
12   A.   No, sir, I have not.
13   Q.   We're back to the meeting that occurred in the
14 museum conference room.  Do you recall anything else that
15 Lieutenant Colonel MacLeish said during that meeting?
16   A.   I think he commented at one time that he was
17 interested in getting us trained in hazardous material
18 abatement.
19   Q.   Do you recall anything else?
20   A.   Not directly, no.
21   Q.   Do you recall any discussion of contracting out
22 the hazardous material cleanup work?
23   A.   That may have occurred.  I don't specifically
24 recall that.

Page 115

1    Q.   Do you recall anything that Major Eckrich said
2  during that meeting?
3    A.   No, sir, I do not.
4    Q.   Do you recall anything that Captain Warren said
5  during that meeting?
6    A.   No.  I'm sorry.  I don't.
7    Q.   Do you recall anything that Lieutenant Davis
8  said during that meeting?
9    A.   No, sir.
10   Q.   Did you say anything during the meeting?
11   A.   No, sir.  Not that I can --
12   Q.   Not that you can recall?
13   A.   No, sir.
14   Q.   Do you recall anything that Sergeant Foraker
15 said during that meeting?
16   A.   No, sir, I do not.
17   Q.   How about anything that Corporal Warwick said?
18   A.   I do not recall that.
19   Q.   Corporal Warren, do you recall anything that he
20 said?
21   A.   No, I don't.
22   Q.   What did you understand the purpose of the
23 meeting to be?
24   A.   I wasn't sure because, quite honestly, the only

Page 116

1  one from the FTU that was specifically invited was
2  Sergeant Foraker, and we showed up, as well, and I think
3  it kind of set them back a little bit.
4    Q.   Set who back?
5    A.   The people that were there, because they had to
6  grab more chairs to accommodate more bodies that showed
7  up.
8    Q.   How do you know that none of the rest of you
9  were invited?
10   A.   MacLeish made the comment that "We did not know
11 that you people were coming."
12   Q.   If you weren't invited and you didn't know the
13 purpose of the meeting, why did you show up?
14   A.   I wanted to be there because it had to do with
15 the range.  I assumed that that's what it had to deal
16 with.
17   Q.   Were you given any instructions coming out of
18 that meeting?
19   A.   No, sir.  Not that I recall.
20   Q.   Do you recall anybody at that meeting asking
21 whether the FTU officers, including yourself, required
22 any more medical attention?
23   A.   I don't recall that being said.
24   Q.   Do you recall anyone telling Lieutenant Colonel

Page 117

1  MacLeish at that meeting that you and Corporal Warren
2  were having hearing trouble?
3    A.   That may have happened.  I don't recall that.
4    Q.   At the point that you went to this meeting, had
5  you already been to Omega Health?
6    A.   I don't know what the date of that meeting
7  was -- only thing I can tell you is that the Omega Health
8  visit was March 1st of 2004.  I don't recall what date
9  the meeting was at the museum, and I apologize.  I don't
10 remember that date.
11   Q.   That's okay.  It is not expected that you
12 remember every date.
13        Do you remember how the Omega Medical
14 examinations got set up?
15   A.   I know that Sergeant Foraker had had dialog
16 with, I believe it was, Mr. Joe Farrell from
17 Environmental Solutions and that he -- since we were
18 being exposed to the same type of things that his workers
19 do, I think he wanted to get us to the people that were
20 familiar with toxic exposures, more so than HealthWorks.
21   Q.   What was the matter with HealthWorks?
22   A.   I don't believe they had the background to go
23 as in-depth or have the experience that Omega Medical had
24 with exposures.

30 (Pages 114 to 117)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 118

1  Q.  Are you the person who set up the appointments
2  at Omega?
3  A.  No, sir.
4  Q.  Do you know who set up the appointments?
5  A.  No, I don't.
6  Q.  Are you the person who asked for the State
7  Police to send you to Omega?
8  A.  I think we did that collectively.
9  Q.  Do you recall at the meeting that occurred at
10  the museum with Lieutenant Colonel MacLeish and the other
11  folks that you've identified whether you knew of the
12  results of the examination you had gone for at Omega?  In
13  other words, did you have in your mind as you went into
14  that meeting the results of the examination at Omega?
15  A.  I believe we had the hearing results that day.
16  Q.  You mean the day you had the exam?
17  A.  Yes.  But I don't know what date the meeting
18  was at the museum as far as if we knew that -- if it was
19  before or after, I can't remember, the Omega visit.
20  Q.  Was there any discussion in the meeting at the
21  museum of the results of the Omega testing?
22  A.  I think there was some discussion about the
23  hearing loss.
24  Q.  At the meeting in the museum?

Page 119

1  A.  I believe so, yes.
2  Q.  What was the substance of that discussion?
3  A.  That hearing loss had incurred, but we were
4  really unsure as to what our status was.  If my memory
5  serves me correctly.
6  Q.  When you say "our," who's "our"?
7  A.  Myself and Corporal Warren.
8  Q.  Who is it that made that statement that you
9  were not sure "what our status was"?
10  A.  I can't recall specifically.  I just remember
11  that being discussed.
12  Q.  When you or somebody else said that you weren't
13  sure of the status of yourself and Corporal Warren, did
14  anybody in the room respond to that?
15  A.  No, sir, not that I remember.
16  Q.  Did you ask anybody in the meeting whether you
17  could get tested further?
18  A.  I don't recall making that statement.
19  Q.  Is there anything else that happened in the
20  meeting with Lieutenant Colonel MacLeish and the other
21  folks you identified in the conference room at the State
22  Police museum that you haven't told me about?  Can you
23  think of anything that happened that we haven't
24  discussed?

Page 120

1  A.  Not that I can remember right offhand.  I may
2  have discussed that further in my interrogatory answers.
3  I don't recall.
4  Q.  I just want to know what you can remember
5  sitting here now.
6      Did you have any discussion with
7  Lieutenant Colonel MacLeish about any health or safety
8  issues at the range before the meeting that occurred at
9  the academy with the Facilities Management people?  And
10  by "you," I mean you personally.
11  A.  I remember one day he showed up at the range
12  and came into the control room where I was calling the
13  line when we had a recruit class.
14  Q.  Was this at the Smyrna facility?
15  A.  Yes, sir, it was.  And I don't know -- I just
16  remember he popped in there and I was calling the line,
17  and when you're calling the line from that control room,
18  you can't -- you got to be 110 percent on that range
19  issue.  So I don't recall talking to him about the
20  health.
21  Q.  Did you have a discussion with him at some
22  point after the meeting that occurred in the museum?
23  A.  It was a date in April that we were at the
24  Wilmington Police Department's range when Lieutenant

Page 121

1  Colonel MacLeish responded to the range and told me to
2  get in the car with him, that he wanted me to look at the
3  National Guard range which we were going to utilize until
4  our facility got squared away.
5  Q.  Did you actually go to the National Guard
6  range?
7  A.  Yes, sir.
8  Q.  How far is the National Guard range from the
9  Wilmington Police Department range?
10  A.  Approximately 100 yards.
11  Q.  You drove from one range to the other?
12  A.  Yes, sir.
13  Q.  And did he talk to you?
14  A.  Yes.
15  Q.  What did he say to you?
16  A.  The conversation started out with if I did not
17  understand the order that he had given, and I was "What
18  order?"  What I was told that I was to instruct the
19  recruits on the class -- in the classroom at that range
20  but not go out on the firing line.  When the colonel
21  pulled up, we had just broken for lunch and I was outside
22  walking around with my headset in my hand, and I assumed
23  that he thought that I was on the line, and I was not.
24  Q.  I take it at the Wilmington Police Department

31 (Pages 118 to 121)

Price, et al.                                v.                    Chaffinch, et al.
B. Kurt Price                        C.A. # 04-956-GMS              October 18, 2005

Page 122

1  range there is a classroom building?
2    A.   Yes, sir.
3    Q.   Part of your function as an instructor is to
4  provide classroom instruction, right?
5    A.   Yes, sir.
6    Q.   You had just completed the instruction part of
7  your day?
8    A.   They had actually completed their shooting, and
9  I had walked outside after they had completed their
10  shooting from the classroom. They did not want me on the
11  line, on the firing line.
12    Q.   As you understood your instructions, you were
13  supposed to stay in the building so that you didn't get
14  exposed to noise?
15    A.   That's correct.
16    Q.   You were walking out of the building as the
17  recruits were finishing shooting?
18    A.   No. They had already finished shooting, and
19  guns were in the holster, no rounds going off, and I
20  walked outside and was talking with the other instructors
21  as he pulled up.
22    Q.   It's your impression that he thought that you
23  were on the line with them?
24    A.   Yes.

Page 123

1    Q.   You said that when he got you in the car, that
2  he said to you something about do you not understand my
3  order?
4    A.   Yes.
5    Q.   What order was he referring to?
6    A.   I don't know. I know Sergeant Foraker had a
7  discussion with me where he advised me that I could
8  continue my duties as far as range classroom instruction
9  was concerned, but they did not want me on the actual
10  firing line, and I was okay with that, obviously, because
11  I just wanted to stay -- I wanted to keep my hands in the
12  instruction end.
13    Q.   You just said that Sergeant Foraker told you
14  that they didn't want you on the firing line. Who did
15  you understand the "they" to be?
16    A.   I'm assuming the staff, be it the
17  administrative staff or the staff at the academy. It
18  didn't matter. I was told by my sergeant that they
19  didn't want me on the line. Regardless of who said it, I
20  wasn't going to be on the line.
21    Q.   Did anybody ever tell you that that was an
22  order that Lieutenant Colonel MacLeish had given?
23    A.   When MacLeish came, I understood it then.
24    Q.   But you did not understand it prior to that?

Page 124

1    A.   No.
2    Q.   What event occurred that caused you to be taken
3  off the live firing line?
4    A.   Lieutenant Colonel MacLeish at that point said
5  that he did not even want me on the premises while
6  shooting was being conducted. He did not want me even
7  remotely around the range, that he was looking out for
8  the division, as well as my health.
9    Q.   Let me back up a second. Your normal duties as
10  a firearms instructor include being on the line while the
11  guns are going off, right?
12    A.   It used to.
13    Q.   That's what a normal instructor does, right,
14  what an instructor does under normal circumstances?
15    A.   Yes.
16    Q.   You were told not to do that. Is that because
17  you had gotten the hearing test result back that said you
18  had hearing loss?
19    A.   Yes.
20    Q.   I know you have had a number of reports on your
21  hearing, but which of the reports triggered you being
22  taken off the live fire line?
23    A.   I believe it was the one from March 1st.
24    Q.   That would have been the one from Omega Health?

Page 125

1    A.   Yes, sir.
2    Q.   When you got the results from Omega Health, did
3  you turn them over to the Human Resources Department or
4  did you get them from someone in the State Police?
5    A.   We were given a copy by people at Omega. They
6  gave us a printout of our hearing test results, and I
7  turned that over to Christie Tuxward.
8    Q.   Did the folks at Omega explain to you what the
9  test results meant?
10    A.   They said that I had -- I now had severe
11  hearing loss, and that was pretty much the way they left
12  it.
13    Q.   After you turned the paperwork over to the
14  Human Resources Department, did you then hear back from
15  somebody above you in the chain of command as to what was
16  going to be done about your hearing loss?
17    A.   No, sir. I believe -- no, I can't recall a
18  specific conversation about what was going to be done
19  with my hearing loss.
20    Q.   You said that Sergeant Foraker told you that
21  you weren't allowed to be on the line?
22    A.   On the gun line.
23    Q.   While the guns were going off.
24    A.   Right. That was communicated to me by

**A - 101**

32 (Pages 122 to 125)

Price, et al.                                                v.                                  Chaffinch, et al.
B. Kurt Price                                   C.A. # 04-956-GMS                          October 18, 2005

Page 126

1  Sergeant Foraker, but nobody else talked to me about what
2  was going to happen, that I can recall.
3      Q.    Would Sergeant Foraker normally be the person
4  that you get your orders from?
5      A.    Yes, sir. He's my sergeant.
6      Q.    Do you remember how long after you went to
7  Omega that Sergeant Foraker gave you that instruction?
8      A.    No, sir, I do not recall.
9      Q.    Do you remember, when you had the meeting at
10 the academy that you described to me earlier, had you
11 already been restricted from live fire?
12     A.    I don't know.
13     Q.    How about at the point that you went to the
14 meeting at the State Police museum, had you already been
15 restricted from live fire?
16     A.    Not that I can recall.
17     Q.    At the point that Sergeant Foraker told you you
18 couldn't be on the line when live fire was going on, had
19 you been placed on light duty yet?
20     A.    I don't think so. I don't think I went on
21 light duty until June 18th of 2004.
22     Q.    So this was something that occurred before you
23 were put on light duty.
24     A.    I think this was -- I almost -- it was in

Page 127

1  April, because I answered this question in the
2  interrogatory from a note that I had made and provided in
3  the interrogatory, but I want to say it was either April
4  21st or April 19th. Somewhere in that time frame.
5  Without even looking at the notes, don't put me down on the
6  date, please, because I don't remember. It was in April.
7      Q.    No one's going to hold you to a date that's two
8  years ago.
9            Is there anything that Lieutenant Colonel
10 MacLeish said to you at the meeting at the Wilmington
11 Police Department range in April of 2004 that you haven't
12 told us?
13     A.    Yes.
14     Q.    What?
15     A.    Pardon my language. He said that he was not
16 going to fuck me.
17     Q.    What did you think he meant by that?
18     A.    As the lieutenant colonel of the Delaware State
19 Police and as somebody that has worked for the colonel
20 since he was a corporal in an acting sergeant's position,
21 I just found that knowing that the circumstances are
22 unknown with the hearing issues and everything else, and
23 after being informed that I could no longer be on the
24 range, quite honestly, why would he make that comment?

Page 128

1      Q.    Were you apprehensive when he asked you whether
2  you understood his order?
3      A.    I knew he was upset.
4      Q.    No. I'm not asking about him. I'm asking
5  about you. Were you apprehensive?
6      A.    Yes, I was.
7      Q.    The lieutenant colonel said to you that he was
8  acting in the best interest of the division, right?
9      A.    Yes.
10     Q.    And he said he was concerned about your health,
11 right?
12     A.    That's correct.
13     Q.    And he said he was not going to fuck you?
14     A.    That's correct.
15     Q.    And what was your reaction to those statements
16 that he made to you?
17     A.    I understood the first two, but "I'm not going
18 to fuck you" thing really threw me for a loop coming from
19 that man.
20     Q.    Why would it be any different coming from
21 Lieutenant Colonel MacLeish than coming from anybody else
22 that you knew in the Delaware State Police?
23     A.    Because he is a lieutenant colonel of the
24 Delaware State Police, that's why, and he's my

Page 129

1  supervisor, and my career and my life is in that man's
2  hands.
3      Q.    Wasn't he just telling you that he wasn't going
4  to do you any harm?
5      A.    Why would he make that comment?
6      Q.    Maybe because you appeared apprehensive.
7      A.    That was damned sure the wrong choice of words
8  to use.
9      Q.    Why is that?
10     A.    Just not an appropriate comment to make to
11 somebody who's got a hearing loss and is unsure about
12 their future with the Delaware State Police. I'm sorry.
13 I just took that as a personal threat.
14     Q.    In what way is that a threat to you?
15     A.    You're not going to fuck me? Why would you
16 make that comment?
17     Q.    Maybe because it's true.
18     A.    It might be. I took it that it's like
19 interrogation 101. When somebody makes that comment to
20 you, then to me I assume -- maybe that's a bad thing, but
21 at that point in time, call it paranoia or whatever, but
22 I assume that is exactly what he intended to do to
23 me. That is the way I took that remark. Maybe I
24 misunderstood his meaning, but I can tell you that is

33 (Pages 126 to 129)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 130

1  absolutely the way I took that remark.
2  Q. How long had you known Tom MacLeish?
3  A. I started working for Colonel MacLeish in 1986,
4  I think it was March, March of 1986, when I came off FTO.
5  He was my sergeant.
6  Q. Did you get along with him okay?
7  A. Yes, sir.
8  Q. Did he ever do anything underhanded to you?
9  A. He used to yell at me sometimes.
10  Q. That's not really underhanded, is it?
11  A. No. Sometimes I couldn't understand why he was
12  yelling, but that's just his management approach
13  sometimes.
14  Q. Did you have any reason to believe that when he
15  said to you he wasn't going to fuck you, that he really
16  meant the opposite?
17  A. As a colonel of the Delaware State Police, and
18  given the circumstances and what just happened to me,
19  that is what I felt. Right, wrong, or indifferent, that
20  was my instinct.
21  Q. I'm just asking why you had that instinct.
22  A. I guess I was paranoid at that point in time in
23  my career and still am.
24  Q. Where is the tower at the Wilmington police

Page 131

1  range?
2  A. That is approximately -- if I can remember
3  right now. I wasn't there long. It is about 30 yards
4  behind the shooting line. It's soundproof.
5  Q. Is it inside the classroom building?
6  A. No, I don't believe so.
7  Q. How high is the tower?
8  A. I don't know. I'm going -- it's a guess.
9  Twenty feet or so.
10  Q. How do you get up?
11  A. Go up a flight of stairs.
12  Q. Is it something that looks like it's on stilts?
13  A. No, sir. It's a concrete block building.
14  Q. It's soundproof?
15  A. Yes.
16  MR. ELLIS: Why don't we take a break for
17  a minute.
18  (A recess was taken.)
19  (Defendants' Deposition Exhibit No. 14 was
20  marked for identification.)
21  BY MR. ELLIS:
22  Q. This is a one-page document, Corporal Price.
23  It's an e-mail dated May 4th, 2004, and it appears to
24  come from you and go to Chris Foraker.

Page 132

1  Did you prepare this document?
2  A. Yes, sir.
3  Q. Why did you prepare this?
4  A. I had some questions as to nobody had spoken to
5  me in regards to what my duty status what, if I was on
6  full duty, light duty. I was concerned when I was
7  removed from the range as far as just what exactly was
8  going on with my career.
9  Q. You've testified that, on the occasion when
10  Lieutenant Colonel MacLeish spoke to you at the
11  Wilmington Police Department range, you had been inside
12  the building. Am I correct that, according to this
13  e-mail, you weren't inside the building but you were in
14  the tower?
15  A. Yes, according to the e-mail.
16  Q. Were you in the building or were you in the
17  tower? Which was it?
18  A. I'm assuming since I read this that it was the
19  tower, the soundproof tower. It's made of concrete
20  block. Sits back off the range.
21  Q. What were you doing in the tower?
22  A. I was watching through the plate-glass window
23  with the headset on watching the recruits shoot.
24  Q. What's the purpose of having the headset?

Page 133

1  A. I wanted to make sure that my hearing was not
2  going to be compromised.
3  Q. I thought the building was soundproof.
4  A. Yes, sir, it was. But I just had my headset
5  on.
6  Q. When you have the headset on, do you receive
7  radio transmissions?
8  A. Not there, no, sir.
9  Q. Does the tower at the Wilmington Police
10  Department range have communication systems that tell the
11  people on the firing line what to do?
12  A. I don't know. If they did, we weren't using
13  that. I believe they were using a hand-held system out
14  on the line.
15  Q. So was the tower being used for any purpose
16  other than for you to stand there and watch?
17  A. That's all I was doing, sir, was watching the
18  recruits shoot.
19  Q. Was there anybody in there with you?
20  A. I don't believe so.
21  Q. So when you first saw Colonel MacLeish, you had
22  a headset on?
23  A. No, sir.
24  Q. You had your headset in your hand?

**A - 103**

Page 134

1    A.  Yes, sir.  The recruits had finished shooting
2  and I believe they were policing up the range and were
3  getting ready to break for lunch, and I was, I believe,
4  engaged in discussion with firearms instructors.
5    Q.  Did you have any other discussion with
6  Lieutenant Colonel MacLeish concerning range issues?
7  Again, by discussion with him, I mean in which you
8  communicated with him and he communicated with you
9  directly.
10    A.  I don't recall any specifics.
11    Q.  Was there a point when you had a telephone
12  conversation with him in roughly late July of 2004?
13    A.  I don't remember -- I believe it was sometime
14  in July, sir.
15    Q.  Do you recall the event that I'm asking you
16  about?
17    A.  Actually was the first part of August.  Yes,
18  sir.  I had answered that in the interrogatory, but I
19  also have some recollection of it, but not as in-depth as
20  the interrogatory.
21    Q.  What do you recall about that event?
22    A.  I received a phone call at home from
23  Sergeant Foraker advising me that Lieutenant Colonel
24  MacLeish wanted to talk to me.  I in turn called my --

Page 135

1  one of my attorneys, Stephen Neuberger, and advised
2  him --
3    Q.  I don't want you to tell me anything you said
4  to your lawyer for the purpose of obtaining legal advice
5  or anything he said to you in the way of legal advice.
6  But we can stop with the fact that you called your
7  lawyer.
8        As a result of talking to your lawyer, did
9  you do something?
10    A.  I did not call Colonel MacLeish.
11    Q.  Did you, nevertheless, have a conversation with
12  Lieutenant Colonel MacLeish?
13    A.  Yes, sir.
14    Q.  How did that come about?
15    A.  I got paged by the executive staff secretary,
16  and I returned the page.
17    Q.  Which secretary are we speaking of here?
18    A.  Liz Seay.  Elizabeth Seay.
19    Q.  Did you actually talk to Colonel MacLeish?
20    A.  Yes.
21    Q.  How long did the conversation last?
22    A.  I'm going to guess.  It was five minutes or so.
23    Q.  What did he say to you?
24    A.  I voiced my concerns with our second auditor's

Page 136

1  interview with him, and I told him that I felt that the
2  division was trying to lay blame on the range mess on the
3  staff there.
4        I also voiced my concern about the
5  division sending our hearing test results to the TK Group
6  when they did not follow the protocol that the TK Group
7  mandated them.
8    Q.  What was his response?
9    A.  His response was that they did not prompt any
10  questions for the auditor's investigators to ask us, and
11  he said that the only way the division would take any
12  adverse action on us was if the auditors found any gross
13  negligence on our part.
14        I believe he also stated that they were
15  working on getting us to the University of Penn to see
16  Dr. Emmett.
17    Q.  Did he tell you why you would be going to the
18  University of Penn to see Dr. Emmett?
19    A.  A second opinion.
20    Q.  A second opinion on what?
21    A.  On I'm assuming our first opinion by Dr. Green.
22    Q.  On your hearing?
23    A.  I would assume so.  That and our metal
24  exposure.

Page 137

1    Q.  Is there anything else that transpired in that
2  discussion you had with Lieutenant Colonel MacLeish in
3  August of 2004?
4    A.  Not that I can recall directly.  There may be
5  something more in my interrogatory answer to that.
6    Q.  As far as what you can tell sitting here today,
7  you raised a concern with him about how you had been
8  questioned by the auditor, right?
9    A.  Yes.
10    Q.  And you raised a question as to how the
11  audiology group from Illinois was handling your audiology
12  issue?
13    A.  Yes.
14    Q.  And then he said in response to you that there
15  was nobody contemplating any action against you from
16  within the State Police at the present time for anything
17  connected with the maintenance of the range.
18    A.  He said that if the state auditors found there
19  was gross negligence on our part, that the division would
20  look into it.
21    Q.  Did you feel that you had been grossly
22  negligent?
23    A.  No.
24    Q.  Did he tell you that there was going to be any

A - 104

Price, et al.                                          v.                                Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                      October 18, 2005

Page 138

1  employment action taken against you in the absence of
2  gross negligence?
3      A.   No.
4      Q.   Did you ask him?
5      A.   No.
6      Q.   I take it he also said that he was going to get
7  a second opinion on your hearing problem.
8      A.   He was going to get a second opinion on hearing
9  and metal exposure.
10     Q.   Did you think that was a good thing, to get a
11 second opinion?
12     A.   Yes.
13     Q.   Why?
14     A.   I'd rather have two than one.  I believe that's
15 the norm in our society, as well.
16     Q.   By the time you had that conversation with
17 Lieutenant Colonel MacLeish, am I correct that you had
18 your hearing tested by Omega, right, first?
19     A.   At that time we had actually had two hearing
20 tests by Omega.
21     Q.   So you had had two hearing tests by Omega.  Had
22 you also had one from Dr. Cooper?
23     A.   Yes.
24     Q.   Had you had any others?

Page 139

1      A.   I don't believe so.
2      Q.   Were the hearing tests that you had had up at
3  that point consistent to the effect that you had a
4  substantial noise-induced hearing loss?
5      A.   Dr. Cooper advised me that my hearing loss had
6  not really changed in my left ear, but it had gotten
7  worse in my right ear.  He also advised that I was not a
8  candidate for a hearing aid.
9      Q.   Did he say why?
10     A.   He said my hearing loss did not -- he feels
11 that the amount of hearing loss that I had, a hearing aid
12 would not be beneficial; says it's not that severe yet.
13     Q.   Your hearing loss is not that severe?
14     A.   That's correct.  That's what he told me.  I got
15 to rely on his decision.
16     Q.   During the course of 2004 where you were
17 working on range issues, did you have any discussions
18 with Aaron Chaffinch?  I'm sorry.  About the range.
19     A.   No, sir.
20     Q.   Have you ever worked with Aaron Chaffinch?
21     A.   When I was at Troop 5 in Bridgeville on FTO, he
22 was in the drug unit office, and I would just see him to
23 talk to him.  But we never worked together.
24     Q.   Have you ever talked to him about the firing

Page 140

1  range?
2      A.   No.
3      Q.   Have you ever talked to David Baylor about the
4  firing range?
5      A.   I know there were times when Major Baylor was
6  still on the job when he would stop by the range.  I
7  remember one particular time when he stopped by and we
8  were talking about his classmate, Corporal Bruce Peachey,
9  but as far as discussion directly involving the range, I
10 don't know that I ever did.
11     Q.   How about Major Papili, did you ever discuss
12 health or safety concerns at the range with him?
13     A.   No, sir.
14     Q.   How about Major Eckrich?
15     A.   I don't recall.
16     Q.   Aside from the meeting.  I know you
17 testified --
18     A.   I don't know about anything with -- I know we
19 would talk about -- I know he's an avid rabbit hunter.
20 We would talk about things like that, but I don't know if
21 we talked about the range.
22     Q.   How about Major Hughes, did you ever have any
23 discussions with Major Hughes about the range?
24     A.   No, sir.  Not that I can recall directly.  My

Page 141

1  recollection from discussions with Major Hughes was he
2  telephoned me on June 18th and placed me on light duty.
3      Q.   So Major Hughes is the person who told you
4  were on light duty because of your hearing loss?
5      A.   Yes.  That was my fitness of duty exam which
6  fitness for duty exam -- which occurred June 17th of
7  2004.
8      Q.   So at the point that you talked to Lieutenant
9  Colonel MacLeish in August 2004, you had already been
10 placed on light duty?
11     A.   Yes.
12     Q.   And he told you that he would get a second
13 opinion for you?
14     A.   Yes.
15     Q.   You were interviewed by the State Auditor's
16 Office, right?
17     A.   Yes.
18     Q.   How many times were you interviewed by the
19 State Auditor's Office?
20     A.   I don't want to sound -- in regards to the
21 range itself, correct?  Because I got interviewed by them
22 in regards to issues on Corporal Cathell, as well.
23     Q.   I'm not referring to Corporal Cathell's issues.
24     A.   I want to make sure.  I was interviewed two

A - 105

36 (Pages 138 to 141)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 142

1    times by the State Auditor's Office.
2        Q.    Would I be correct that the first one was about
3    May 11th or May 12, 2004?
4        A.    Somewhere in there I do believe.
5        Q.    And the second one was sometime in late July?
6        A.    I think so.
7        Q.    Did you participate in assembling a lot of
8    three-ring binders, much like we have got here sitting
9    around the table, to be presented to the Auditor's
10   Office?
11       A.    I believe I did, yes.
12       Q.    What role did you play in assembling the
13   three-ring binders?
14       A.    It may have just been taking paperwork -- I
15   don't know, to be honest with you. I can't be specific
16   with that. I do remember we turned over a lot of
17   documentation.
18       Q.    Did you yourself gather information to be
19   incorporated into the binders?
20       A.    I don't recall that, no.
21       Q.    How did you come to be interviewed by the State
22   Auditor's Office?
23       A.    As I understood it, it was an order by
24   Governor Minner that we were to cooperate in the

Page 143

1    investigation of the FTU.
2        Q.    Who delivered that order to you?
3        A.    I believe it was my attorney, Mr. Neuberger.
4        Q.    Did you get any kind of direction from anybody
5    inside the State Police to make yourself available to
6    talk to the Auditor's Office?
7        A.    Not that I can recall.
8        Q.    I think you had said you had been interviewed
9    by auditors with respect to other issues?
10       A.    Yes.
11       Q.    One of them had something to do with
12   Eddie Cathell?
13       A.    Yes.
14       Q.    Any others?
15       A.    No. Not that I can recall. I think that was
16   it.
17       Q.    What was the issue with Eddie Cathell?
18       A.    Something about the fund at the range and how
19   monies were -- how Corporal Cathell had acquired the
20   money and what he used the monies for.
21       Q.    The Brass Fund?
22       A.    Something like that, yes.
23       Q.    Where did your first interview take place with
24   the State Auditor's Office?

Page 144

1        A.    With the range now?
2        Q.    Yes.
3        A.    It occurred in Mr. Neuberger's conference room.
4        Q.    Is that the one with no windows that's real
5    cold all the time?
6        A.    Yes.
7            MR. NEUBERGER: Very comfortable.
8            MR. ELLIS: Off the record.
9            (Discussion off the record.)
10   BY MR. ELLIS:
11       Q.    Who was present for the interview?
12       A.    There were three auditors and my attorney and
13   myself when I went through.
14       Q.    Did the auditors ask you questions?
15       A.    This was the first interview, right?
16       Q.    Yes.
17       A.    Yes, they did. And I also provided a written
18   statement to them.
19       Q.    Do you remember what any of the questions were?
20       A.    I would have to look at -- I think it was
21   general information as far as when did I start up there
22   and what my duties were.
23       Q.    Do you remember how long the interview lasted?
24       A.    I'm going to guess that it was between 15 and

Page 145

1    20 minutes.
2        Q.    What did they ask you other than how long you
3    worked there?
4        A.    I can't remember all -- it was general-type
5    information.
6        Q.    Did you give them any documents?
7        A.    I gave them that prepared statement, I think.
8    I know I gave it to my attorney. I'm assuming he would
9    have made that available to them.
10       Q.    You didn't hand it to them, though?
11       A.    No, sir. In fact, I could not finish reading
12   the statement.
13       Q.    You what?
14       A.    I could not finish reading the statement. I
15   got upset.
16       Q.    Why could you not finish reading the statement?
17           MR. NEUBERGER: You seem to be losing your
18   composure. Do you want to take a break here?
19           THE WITNESS: No. I'll be all right.
20       A.    Because I don't know what might happen to my
21   kids. I don't know what I brought home to those kids. I
22   don't know if I can send them to college. I'm sorry.
23       Q.    Do you want to take a break?
24       A.    No. Let's roll. My family is all that I got.

37 (Pages 142 to 145)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 146

1    (Defendants' Deposition Exhibit No. 15 was
2    marked for identification.)
3    BY MR. ELLIS:
4    Q.   Corporal Price, I'm ready to take a break if
5    you want.
6    A.   No, sir.  Let's roll, please.
7    Q.   Then take a look at Exhibit 14.
8    A.   14 or 15?
9         MR. NEUBERGER:   This is a new one.  It's
10   15.
11        THE WITNESS:  14 is my e-mail.
12   Q.   Can you tell us what Exhibit D-15 is?
13   A.   It appears to be my statement that I prepared
14   for the Auditor's Office.
15   Q.   Did you have any help preparing it?
16   A.   No, sir.
17   Q.   Did you show it to anybody before you turned it
18   over to them?
19   A.   No, I did not.
20   Q.   Did you read this statement to the auditors?
21   A.   Yes, sir.  As far as I could.
22   Q.   Do you remember how far you got?
23   A.   The part about my kids.  Then Mr. Neuberger had
24   to take over for me because like I do here, I lost my

Page 147

1    composure.  I apologize.
2    Q.   So you read all the way to the top of the third
3    page?
4    A.   Yes, sir.
5    Q.   Did you give copies of Exhibit D-15 to the
6    auditors?
7    A.   I don't know.  My attorney had it.  I don't
8    know if he gave it to them or not.
9    Q.   I'm sorry.  I asked you a couple minutes ago
10   whether you gave copies to anybody before you went into
11   that meeting.  I think you said no.
12   A.   No.  Not before I went into the meeting, no.
13   Q.   So you walked into the meeting with copies of
14   this statement in your hand?
15   A.   A copy, my copy.
16   Q.   Did anybody else have copies that you know of?
17   A.   Not that I can recall.
18   Q.   I take it from your testimony that you read
19   this document to the auditors as they're sitting in the
20   room with you.
21   A.   Yes, sir, that is correct.
22   Q.   Why did you read it to them instead of just
23   handing it to them?
24   A.   I was going under the advice of my attorney.

Page 148

1    Q.   Did they ask you any follow-up questions after
2    you read the document to them?
3    A.   I don't recall, sir.  I was shook up.
4    Q.   What shook you up was reading the part at the
5    top of page 3 that has to do with your kids?
6    A.   Yes.
7    Q.   And this has to do in part with the results of
8    your Omega Medical test.
9    A.   Part.  Also the swipe sampling and so forth.
10   Q.   Let me show you another document.
11        (Defendants' Deposition Exhibit No. 16 was
12   marked for identification.)
13   BY MR. ELLIS:
14   Q.   Take a minute to review D-16, please.
15   A.   (Complied.)
16        Yes, sir.
17   Q.   Is this a letter you received from Omega
18   Medical in March 2004?
19   A.   Yes.
20   Q.   The blood work results that are identified down
21   in the fifth bullet point states that the blood lead
22   levels of copper, zinc, lead and zinc protoporphyrin are
23   all within normal limits.  Do you see that?
24   A.   Yes.

Page 149

1    Q.   The 24-hour urine for copper and lead was high,
2    right?
3    A.   Yes.
4    Q.   And you report that to the auditors over in
5    Exhibit 15, right?
6    A.   Yes.
7    Q.   Take a look at the last page of 15.
8         Why is it you reported in Exhibit 15 that
9    your 24-hour urine test results were high but you didn't
10   report that the blood tests were all within normal
11   limits?
12   A.   Why did they conduct -- my question's there.
13   My concern was they conducted a 24-hour urinalysis.  If
14   it's in my urine, that means it's in my body and it's
15   being processed by my internal organs.  My concern is
16   what effect is that going to have on me?
17   Q.   Actually, if it's in your urine, it means it's
18   out of your body, right?
19   A.   Right, but it's got to go through my bladder,
20   I'm assuming my kidneys, my liver.
21   Q.   Did you see the explanation in the 24-hour
22   urine section of Exhibit D-16 which explains that 24-hour
23   urine for these metals is not considered reliable?
24   A.   I read that here, yes.

A - 107

38 (Pages 146 to 149)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 150

1    Q.    Did you read it when you got it in March 2004?
2    A.    Yes.
3    Q.    Did you have any questions about that?
4    A.    I sure did.
5    Q.    Did you ask Omega Medical?
6    A.    I asked Captain Yeomans because it said here
7    you need a repeat follow-up six to eight weeks under
8    recommendations.
9    Q.    I see that, but my question is: Did you have
10   any questions for Omega about their explanation about why
11   they're telling you that high lead and copper levels in
12   the urine are not significant?
13   A.    I don't recall any specific conversation with
14   anybody at Omega in regards to that.
15   Q.    I realize that you didn't call them, but did
16   you have any questions that you would have liked to have
17   asked them?
18   A.    Yes.
19   Q.    Why didn't you call them?
20   A.    My wife actually responded and asked that of
21   Captain Yeomans.
22   Q.    Captain Yeomans isn't a doctor, right?
23   A.    He was going to get an answer -- he told my
24   wife in a meeting, I think it was, July 6 that he would

Page 151

1    get back to her, and that never happened.
2    Q.    Would you take a look at the last sentence in
3    this letter that's dated March 18th, 2004?
4    A.    Yes.
5    Q.    It says, "If have any questions please do not
6    hesitate to call me," and gives a phone number, right?
7    A.    Yes.
8    Q.    That's the doctor who examined you, right?
9    A.    I would assume that's the phone number to where
10   she works, yes.
11   Q.    Did you call?
12   A.    No.
13   Q.    Did you have your wife call?
14   A.    No.
15   Q.    Do you understand that the preferred test for
16   exposure to copper, zinc, and lead is the blood test
17   rather than the urine test?
18   A.    That's what they say, yes.
19   Q.    Do you have any reason to doubt that?
20   A.    Yes.
21   Q.    Why?
22   A.    I have done some research on my own, and I have
23   found that some areas say that urinalysis and also air
24   sampling is a better way to check for metal exposure.

Page 152

1    Q.    Who is it that says that?
2    A.    I think it was the Great Smoky Mountain Labs.
3    Q.    Where is it that you did this research?
4    A.    On the Internet.
5    Q.    Is this something that you did back at the
6    time?
7    A.    It was sometime after that, yes.
8    Q.    Do you remember when you did that research?
9    A.    I couldn't nail it down for you.
10   Q.    Has what you found been produced as part --
11   A.    No. I didn't print it out. I just read about
12   it.
13   Q.    So there's a place called, is it, Great Smoky
14   Lab?
15   A.    Great Smoky Mountain Laboratories. I don't
16   recall the Web site, as far as what the actual address
17   is.
18   Q.    I understand that, but that's the entity that
19   operated the Web site?
20   A.    Yes. From what I understand, there's no real
21   set standard as far as blood, urine. Just depends on who
22   you spoke to.
23   Q.    Have you asked any other doctor that you have
24   seen in the last two years whether the blood test is the

Page 153

1    preferred test for measuring exposure to heavy metals?
2    A.    No, I have not spoken to a doctor about that.
3    Q.    Have you seen anything to suggest that the
4    urine test would be more valuable, other than a Web site
5    operated by Great Smoky Mountain Laboratories?
6    A.    Not that I have found.
7    Q.    Why did you mention the urine test in your
8    statement to the Auditor's Office but not the blood test?
9    A.    Because it was a concern to me.
10   Q.    Has your wife done any research into the
11   question of whether the blood lead level is a reliable
12   indicator of exposure to zinc, copper, or lead?
13   A.    I don't know.
14   Q.    Do you recall whether your lawyer said anything
15   at the meeting with the auditors other than to read the
16   portion of this statement that you weren't able to read?
17   A.    I don't recall any dialog.
18   Q.    Do you know if any of your colleagues in the
19   Firearms Training Unit had been in to talk to the
20   auditors before you were?
21   A.    I don't remember how the order went that day.
22   Q.    Do you remember --
23   A.    I don't remember who was first. I don't think
24   it was me. I don't remember.

39 (Pages 150 to 153)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 154

1    Q.    Do you remember who was there that day?
2    A.    From the Auditor's?
3    Q.    No.  From the Firearms Training Unit.
4    A.    I recall it was Sergeant Foraker,
5    Corporal Warren, and Corporal Warwick.
6    Q.    Did you all drive up together in the car?
7    A.    I think we did.
8    Q.    Did Corporal Warwick have a statement prepared?
9    A.    I'm assuming he had.
10    Q.    Did Sergeant Foraker have a statement prepared?
11    A.    Again, that's something -- that would be an
12    assumption on my part.
13    Q.    In the case of Warwick, would that also be an
14    assumption?
15    A.    Yes, sir.
16    Q.    Did you ever see the statements of any of the
17    other individuals that were there that day?
18    A.    Not that I can recall.
19    Q.    Do you remember anything else that happened at
20    the meeting with the auditors on May 12, 2004, other than
21    what we have talked about?
22    A.    That was what I can remember.
23    Q.    Did they sound interested in what you had to
24    say?

Page 155

1    A.    Yes.
2    Q.    Did they take documents from that meeting?
3    A.    I'm assuming they did.  I know there was a
4    bunch there.
5    Q.    Was it your understanding when you left
6    Wilmington that day that your attorney was going to have
7    a news conference about what you had said to the auditor?
8    A.    No, sir.
9    Q.    Did you have in your mind any idea that
10    Mr. Neuberger was going to call in the press to discuss
11    the case?
12    A.    Not that I was aware of.
13    Q.    Are you aware that he did?
14    A.    I don't believe he held a press conference.  I
15    know our statements were released to the media.
16    Q.    Do you know who released them?
17    A.    That would be an assumption on my part, but
18    I'm -- should I assume?
19    Q.    Why don't you assume for this one.
20         MR. NEUBERGER:  Let's not assume.  I
21    object to your speculating.
22    BY MR. ELLIS:
23    Q.    You certainly didn't release them, did you?
24    A.    No.

Page 156

1    Q.    Do you believe that it was your attorney who
2    released them?
3         MR. NEUBERGER:  I'll object.  There's no
4    foundation that the media received these documents, the
5    document that you're talking about.
6         MR. ELLIS:  Let him answer the question
7    anyway.
8         MR. NEUBERGER:  I understand.
9         MR. ELLIS:  Go ahead and answer the
10    question
11    BY MR. ELLIS:
12    Q.    Do you believe that it was your attorney that
13    released the documents to the press?
14    A.    Again, that would be an assumption on my part.
15    Q.    Is that what you assume?
16    A.    I'm going to assume that.
17    Q.    Did you have any contact from the Auditor's
18    Office between May 2004 and the end of July 2004?
19    A.    I know we were interviewed again by then.
20    Q.    Was that in July?
21    A.    Yes.
22    Q.    Between the first interview and the second
23    interview, did you have any further contact?
24    A.    No.

Page 157

1    Q.    Did anybody within the State Police chain of
2    command talk to you about the auditor's investigation
3    between May and the end of July 2004?
4    A.    Not that I can recall.
5    Q.    Did anybody come to you asking for information
6    to be turned over to the Auditor's Office?
7    A.    Not that I can recall.
8    Q.    When you met with the auditors the second time,
9    did you have a prepared statement?
10    A.    No.
11    Q.    Where did that meeting take place?
12    A.    Mr. Neuberger's office.
13    Q.    Same conference room?
14    A.    Yes.
15    Q.    Who was present in the room when you were
16    interviewed?
17    A.    Mr. Neuberger and the three investigators.
18    Q.    Would you remember the names of the
19    investigators if I gave them to you?
20    A.    If you tell me their names, I'm sure that was
21    probably their names, but I don't remember -- only one I
22    know I think, is Rothenburger, because I remember at one
23    time -- or whatever his name was, I think he was a
24    policeman with the State of Delaware for a short period

40 (Pages 154 to 157)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 158

1  of time.
2      Q.   Do you recall perhaps him being a range master
3  for a county police department in New Jersey?
4      A.   I think that's what he said, yes.
5      Q.   Do you remember a guy named George Eilers,
6  E-i-l-e-r-s, going there?
7      A.   He may have been.  I don't know.
8      Q.   Does the name Ed Watson ring a bell with you?
9      A.   No.
10     Q.   You were in a room with three auditors, one of
11 whom was named Rothenburger?
12     A.   Yes.
13     Q.   How long did that meeting last?
14     A.   Twenty minutes to half an hour.  Somewhere in
15 there.  Again, that's very general.
16     Q.   Do you remember which of the three was asking
17 you questions?
18     A.   The Rothenburger guy mostly.
19     Q.   Do you remember what questions he asked you?
20     A.   I don't really recall the specific questions as
21 far as I think he made statements I did not care about
22 the staff or people at the range because we let people
23 train in an unsafe environment.  And, quite honestly, I
24 felt that it was a witch-hunt at that point in time.  And

Page 159

1  the questions that I was being asked and the way I was
2  being talked to, I should have been Mirandized and also
3  advised of my police men's bill of rights.  I felt that
4  they were placing the blame on me.
5      Q.   What did they say to you that made you believe
6  that?
7      A.   That I didn't care about the students and the
8  staff that worked at the FTU, and that's the furthest
9  thing from the truth.
10     Q.   What did you understand them to be referring to
11 when they --
12     A.   I'm assuming the conditions at the range.
13     Q.   Did they tell you what conditions?
14     A.   No, they did not.
15     Q.   Did they ask you about the maintenance of the
16 bullet trap?
17     A.   They may have.  I don't recall the specific
18 questions they asked.
19     Q.   In the first meeting with the auditors, the
20 meeting that occurred in May of 2004, did they ask you
21 any questions about the bullet trap?
22     A.   I don't recall.
23     Q.   Did they ask you any questions about the bullet
24 trap in the second meeting?

Page 160

1      A.   They may have.  I don't recall.
2      Q.   Do you remember any question they asked you in
3  the second meeting?
4      A.   The flavor of the discussion was they were
5  laying the blame on the staff of the FTU.
6      Q.   The blame for what?
7      A.   I'm assuming the conditions there.
8      Q.   Again, I don't want you to assume.  Did they
9  say what they were blaming you for?
10     A.   The clouds of smoke, the material, the pinkish
11 material that was deposited on the range and throughout
12 the building.
13     Q.   I know you don't remember any of the questions,
14 but what is it that they said that led you to believe
15 that they were blaming you?
16     A.   Their attitude and demeanor.
17     Q.   Can you differentiate --
18     A.   They were -- it was more or less an
19 accusation-type mode they were in and finger-pointing at
20 me.
21     Q.   You're talking about all three of them now, not
22 any one of the three or two of the three?
23     A.   I know Rothenburger, he was saying that I had
24 the authority to close the range down.  No, I don't.  And

Page 161

1  then there was a man that sat to my left, kind of a
2  heavyset man with gray hair and glasses, and he was
3  making comments, as well.  I don't remember his name.
4      Q.   Do you remember any of the comments he made?
5      A.   No, but the flavor -- not specific, but the
6  flavor was it was our fault.
7      Q.   You remember there being a flavor in this
8  meeting that you, meaning the people in the Firearms
9  Training Unit, were responsible for conditions at the
10 range.
11     A.   Yes.  That's the way I interpreted it.
12     Q.   Just want to get on this before we move on.
13 You don't remember exactly what any of the three auditors
14 said that led you to that conclusion?
15     A.   Rothenburger making the comment that I did not
16 care about the staff, nor the students.
17     Q.   And Rothenburger also made some comment that
18 you had the authority to shut down the range?
19     A.   Yes.
20     Q.   Did anybody in the Firearms Training Unit have
21 the authority to shut down the range?
22     A.   No, sir.
23     Q.   Who has the authority to shut down the range?
24     A.   The few times that it had been shut down

41 (Pages 158 to 161)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 162

1 before, it comes from executive staff.
2    Q.   When had it been shut down before?
3    A.   When we had the environmental cleanups before
4 the bullet trap.
5    Q.   Those were all planned in advance, weren't
6 they?
7    A.   It got contaminated. I don't know if it was
8 planned, but they had to shut the range down to bring in
9 the hazardous material team to clean the range up.
10    Q.   What I mean by "planned" is that there was a
11 recognized problem, a contractor is engaged to fix the
12 problem, they scheduled time and shut it down to fix the
13 problem. Isn't that what happened?
14    A.   Yes. I assume so.
15    Q.   Suppose you have an unsafe condition on the
16 range. Do you as an instructor allow shooting to go on?
17    A.   What type of -- I don't understand your
18 question. What type of unsafe condition? Are we talking
19 about an AD where somebody gets shot? Are we talking
20 about all the numerous leaks that occur on the range
21 floor when the weather gets bad? What type of unsafe
22 condition?
23    Q.   What do you consider an unsafe condition on the
24 range?

Page 163

1    A.   If somebody obviously gets shot or gets sick,
2 we have to deal with that situation.
3    Q.   Suppose someone on the range passes out in the
4 middle of a shoot. As they're falling down, the gun goes
5 off and a couple of bullets are ricocheting all over the
6 range. Under those circumstances would you stop
7 shooting?
8    A.   Yes.
9    Q.   Who would make that decision?
10    A.   The safety officers and the range folks. The
11 NCOIC until we got this situation -- again, a lot would
12 depend on what the situation was. If we needed to call
13 in evidence technicians or whatever the case might be.
14 We have had instances of recruits passing out and we have
15 had one person that may have had a heart attack while
16 there.
17    Q.   Have you had occasions when bullets
18 occasionally went off sideways?
19    A.   By the grace of God, they have always gone down
20 range.
21    Q.   Safety is very important to you at the range,
22 right?
23    A.   Yes.
24    Q.   Is there anything more important than safety?

Page 164

1    A.   Not when you're dealing with a firearm.
2    Q.   When Mr. Rothenburger said to you that you had
3 the authority to shut down the range if it wasn't safe,
4 what did you say?
5    A.   That I did not have that authority.
6    Q.   What did he say to that?
7    A.   I don't recall how it went from there.
8    Q.   Did you ever discuss with Sergeant Foraker
9 whether conditions at the range posed a safety hazard?
10    A.   We had a lot of dialog about conditions at the
11 range and what we didn't know.
12    Q.   You didn't know whether it was safe or not?
13    A.   We didn't know what conditions were at the
14 range and what was unsafe and what was -- we had no
15 training in hazardous material, if that's what you're
16 making reference to. Our training is pretty much
17 firearms-related, in how to shoot weapons and so forth.
18    Q.   Are you telling me that there's no amount of
19 smoke or dust in the shooting area of the range that
20 would cause you to shut it down?
21    A.   I'm not qualified to make that determination.
22    Q.   So then you're telling me that there's no
23 amount of dust and smoke that will --
24    A.   I'm assuming if there was a fire and you

Page 165

1 couldn't see, that we would evacuate the building and
2 call 911.
3    Q.   But short of that, there's no circumstance
4 under which you're going to shut down the range?
5    A.   I don't have that authority.
6    Q.   Did your attorney say anything in the meeting
7 with the auditors in July of 2004?
8    A.   The only thing that I can specifically recall
9 was that the comment was made by Mr. Neuberger that
10 issues were being looked into as a possibility of a
11 federal lawsuit being filed.
12    Q.   Who did Mr. Neuberger say that to?
13    A.   I'm not sure.
14    Q.   By the way, when we're talking about
15 Mr. Neuberger, we're talking about Thomas Neuberger?
16    A.   Yes, sir. The gentleman to my left.
17    Q.   Do you remember anything else that occurred
18 during the second interview you had with the auditors?
19    A.   No, sir.
20    Q.   Did you cry during the second interview?
21    A.   No. I was too mad.
22    Q.   Did you tell them that it sounded like they
23 were accusing you of doing something wrong?
24    A.   Yes, I did.

A - 111

42 (Pages 162 to 165)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 166

1    Q.    What was their response?
2    A.    I don't recall one.
3    Q.    Do you recall anything else from that meeting?
4    A.    Not directly, no.
5    Q.    Did Mr. Foraker show up that day to be
6    interviewed, as well?
7    A.    I believe so, yes.
8    Q.    How about Corporal Warren?
9    A.    I don't believe he was there for that one.
10    Q.    How about Corporal Warwick?
11    A.    I don't recall him being there.
12    Q.    Do you know why it was just you and
13    Sergeant Foraker that day?
14    A.    No, sir, I don't recall.
15    Q.    You testified a little while ago that at the
16    May interview with the auditors they seemed very
17    interested in what you had to say.
18    A.    Yes.
19    Q.    And you testified that in the July meeting with
20    the auditors they seemed accusatory?
21    A.    Yes.
22    Q.    Did they give you any idea what they had
23    learned between May and July that caused what you
24    perceived to be a change in their attitude towards you?

Page 167

1    A.    I don't recall any issue that they brought up.
2    Just their attitude and the way they spoke to me.
3    Q.    Did Aaron Chaffinch ever say anything to you
4    that would lead you to believe that he was mad at you for
5    having provided all this information about the safety and
6    health conditions at the range in Smyrna?
7    A.    No.
8    Q.    Do you believe that he had anything to do with
9    putting you on light duty?
10    A.    I can't make that assumption.
11    Q.    Are you saying you don't know?
12    A.    I don't know.
13    Q.    I know you've testified that you had
14    discussions with Thomas MacLeish on several occasions.
15    Did he ever tell you that he blamed you for conditions at
16    the range?
17    A.    I know it came out in his deposition that he
18    put 50 percent of the blame on the staff of the FTU for
19    the conditions there.
20    Q.    I'm talking about prior to the institution of
21    the lawsuit.
22    A.    There was a media story that was run in the
23    State News and on WBOC TV where he, Colonel MacLeish, and
24    Gloria Homer blamed the staff of the FTU for the

Page 168

1    conditions of the range in the media.
2    Q.    Are you referring to the tour of the firearms
3    training facility that Gloria Homer was involved in?
4    A.    Yes, sir.
5    Q.    Were you at the range that day?
6    A.    No.
7    Q.    I don't believe Lieutenant Colonel MacLeish is
8    mentioned in that story.  Do you have any reason to
9    believe he was there that day?
10    A.    I know he was quoted on the WBOC release.
11    Q.    How do you know that?
12    A.    I observed it on television.
13    Q.    Was he actually interviewed?
14    A.    Yes.  If I'm not mistaken, he was in our
15    office, judging by -- he was in the office of the range.
16    Q.    What is it that he said that was on TV?
17    A.    That the staff -- they felt that the staff was
18    partly to blame for the issues at the range.
19    Q.    Do you have a tape of that?
20    A.    I do not, no.
21    Q.    Do your lawyers have a tape of it?
22    A.    I don't know.
23         MR. NEUBERGER:  I thought it's been
24    produced.  You have had that forever.  We will give it to

Page 169

1    you.
2         MR. ELLIS:  We don't have a tape of
3    anything.
4         MR. NEUBERGER:  I have seen it.  Something
5    else lost in the thousands of pages of whatever.  There's
6    something floating around.  We're off the record.
7         (Discussion off the record.)
8    BY MR. ELLIS:
9    Q.    Do you believe that you were placed on light
10    duty because of something you did in connection with the
11    firearms training facility?
12    A.    Yes.
13    Q.    What is it you did that you think caused you to
14    be put on light duty?
15    A.    When we spoke to the auditors and turned over
16    the volumes of information and when the story got out in
17    the media.
18    Q.    Do you know how the story got out in the media?
19    A.    No, sir.  I already testified to that.
20    Q.    I'm sorry.  Which story are you talking about?
21    You testified about --
22    A.    The statements, our statements that we made to
23    the Auditor's Office.
24    Q.    Do you think that you should be on full,

43 (Pages 166 to 169)

Price, et al.                          v.                          Chaffinch, et al.
B. Kurt Price                    C.A. # 04-956-GMS                 October 18, 2005

Page 170

1  active, unrestricted duty at this point?
2      A.  I think that in a patrol capacity I would be a
3  safety issue due to my background-noise problem. But
4  there are functions within the State Police that I could
5  do in regards to my hearing loss.
6      Q.  Like what, for instance?
7      A.  I know there was a trooper by the name of
8  Ron Tate who was having psychological issues, and he was
9  in what's called SBI, or detective licensing, the State
10 Bureau of Identification, where he was fingerprinting
11 people for background checks. I could do that.
12         I feel that I could be an instructor at
13 the training academy. I have a background in training.
14 I'm a certified handcuff instructor, defensive tactics
15 instructor. I feel that there's plenty of places that
16 they could put me and accommodate me like they have done
17 in the past with other troopers.
18     Q.  Tell me what other troopers have been
19 accommodated. I assume you want to be accommodated till
20 you're age 55?
21     A.  I would like to, yes.
22     Q.  That would be to the year what, 2018?
23     A.  I'm 42 now. So that's what, 13 and -- yes.
24     Q.  You want to be in a position where you don't

Page 171

1  have to be exposed to criminal activity, basically, for
2  the next 13 years?
3      A.  Yes.
4      Q.  Do you know of anybody that's been put in that
5  capacity for 13 years?
6      A.  I know Detective Sergeant Steve Swain has been
7  in the evidence locker on the State Police ever since I
8  have been on the State Police. I am now in my 21st year.
9      Q.  Why do you believe Swain was placed there,
10 because of some disability?
11     A.  I know he was involved in an auto wreck in
12 which his vocal cords were damaged and he cannot speak
13 clearly.
14     Q.  How often do you speak to, was it,
15 Sergeant Swain?
16     A.  I would see him approximately three times a
17 year for three certifications at the range.
18     Q.  Anybody else?
19     A.  Major Joe Forrester who stayed on the job till
20 he was 55, and he had hearing aids, and my doctor tells
21 me that I'm not yet a candidate for hearing aids. I kind
22 of feel that that's a little unfair.
23     Q.  Did Forrester wear a hearing aid for 13 years?
24     A.  I don't know.

Page 172

1      Q.  Anybody else?
2      A.  Charlie Klim had hearing issues, and he stayed
3  till he was 55.
4      Q.  How do you know Klim had hearing issues?
5      A.  I used to see him walking around with a hearing
6  aid.
7      Q.  How long ago did Klim leave?
8      A.  Oh, goodness. That would be a guess.
9      Q.  Was it before 1995?
10     A.  I don't know.
11     Q.  Anybody else? I'm sorry. Do you know how long
12 Klim was wearing the hearing aid?
13     A.  No, I don't.
14         I know Sergeant Henderson used to work in
15 supply who eventually went off on a disability pension.
16 As I can recall, he was never placed on light duty, and
17 he continued to work paid jobs with full police
18 powers and authority, could wear his uniform, could work
19 overtime, and could run marathons. He had a back
20 problem, but he would run. And then all of a sudden he
21 goes to supply and within sometime later he retired.
22 Twenty-five-year service and he had a back-related
23 injury. I feel that was an accommodation. As his back
24 injury deteriorated, then they put him in supply. But as

Page 173

1  I can recall, he was actually never placed on light duty.
2      Q.  How long was he in supply?
3      A.  I'm going to say it was probably close to three
4  years. Again, that's a guess. I apologize for that.
5  But it was quite sometime.
6      Q.  Can you think of anybody else? Can you think
7  of anybody who's been accommodated for 13 years?
8      A.  Oh, 13 years? I don't know how long
9  Captain Citro was accommodated for, but as I can recall,
10 he didn't go on light duty until he had approximately two
11 years left or he was on light duty -- I forget how all
12 that panned out, but that injury occurred back in the mid
13 to early '80s, and he didn't leave until I'm going to --
14 that would be a guess. But it was after 2000.
15     Q.  You don't know when Citro went on light duty,
16 do you?
17     A.  No, I do not.
18     Q.  What's your source of information, just sitting
19 at these depositions?
20     A.  Yes. I just want to be treated like everybody
21 else and past practice of the State Police.
22     Q.  It's your belief that the past practice of the
23 State Police is to carry a trooper as long as necessary
24 to get him to 55 regardless of his injury?

A - 113

44 (Pages 170 to 173)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 174

1    A.   To try to accommodate them, yes.
2    Q.   Would you want to be treated like
3  James Romanelli?
4    A.   I can stay on light duty for at least two
5  years? Is that what you're making reference to? Because
6  I believe that's what his status was.
7    Q.   He was told to separate after less than two
8  years, wasn't he?
9    A.   I don't know. I was told to separate in less
10  than a year.
11    Q.   Have you had your wife's blood lead levels
12  checked?
13    A.   No.
14    Q.   Your children?
15    A.   Yes.
16    Q.   What was the result?
17    A.   I think one was a 4 and one was a 5. I can't
18  recall which was which.
19    Q.   Both within normal limits?
20    A.   Yes. That's what their pediatrician stated.
21    Q.   When did you have them tested?
22    A.   I can't remember the exact time. It was pretty
23  much when all this stuff broke out.
24    Q.   When you say "all this stuff," there's been a

Page 175

1  lot of stuff. Which part?
2    A.   I'm sorry. The swipe sampling came back and
3  they found that the area that we changed our clothes in
4  was higher than the standards for the Navy firing range.
5    Q.   So that's back in early 2004.
6    A.   I would assume so. It's been a while.
7    Q.   Are you referring to the test results that came
8  back from Nielson & Associates?
9    A.   No, sir.
10    Q.   Harvard Environmental?
11    A.   Yes.
12         MR. ELLIS:  Why don't we take a break for
13  a couple minutes.
14         (A recess was taken.)
15  BY MR. ELLIS:
16    Q.   How long after you got the results from the
17  Harvard study did you have your children's blood lead
18  levels checked?
19    A.   I don't remember exact dates. It was shortly
20  thereafter.
21    Q.   Did you have their blood tested for zinc?
22    A.   I don't know what all the doctor did. My wife
23  took them there.
24    Q.   But you're sure there was blood lead level

Page 176

1  tested?
2    A.   There was blood tests done.
3    Q.   You're sure that lead was one of them?
4    A.   I'm certain of that because I remember one -- I
5  think one was a 4 and one was a 5. I don't recall which
6  were which.
7    Q.   I wanted to ask you about a couple pieces of
8  the complaint in this case, and I'm not going to mark it
9  as an exhibit, but I'll put a copy of it in front of you,
10  and I'd like you to turn to page 14 of the complaint.
11  There are faxed marks all over this document, but the
12  bottom middle of the page has a little number in it which
13  I think is the number in the complaint.
14    A.   The bottom middle what now?
15    Q.   Has a number 14 on it.
16    A.   Yes, sir.
17    Q.   See paragraph 54?
18    A.   Yes.
19    Q.   Could you read that to yourself for a minute?
20    A.   (Complied.)
21         Okay.
22    Q.   You have previously testified today about a
23  telephone call you had with Lieutenant Colonel MacLeish
24  in early August of 2004.

Page 177

1    A.   Yes.
2    Q.   Is paragraph 54 meant to refer to the same
3  telephone call?
4    A.   Yes.
5    Q.   Did you ask Lieutenant Colonel MacLeish to have
6  a union representative present?
7    A.   I had spoken with Sergeant Fiscella in regards
8  to speaking to MacLeish.
9    Q.   My question is: When Colonel MacLeish called
10  you -- I'm sorry. His secretary called you, right?
11    A.   Yes.
12    Q.   And asked you to call back the headquarters,
13  right?
14    A.   Yes.
15    Q.   And when you called back, did Lieutenant
16  Colonel MacLeish get on the phone?
17    A.   Yes.
18    Q.   And then you had the conversation that you
19  described earlier?
20    A.   That's correct.
21    Q.   Did you ask him to have a union rep on the line
22  with you?
23    A.   No, but -- not specifically, no.
24    Q.   Generally?

A - 114

Price, et al.                                                                        Chaffinch, et al.
B. Kurt Price                              v.                                         October 18, 2005
                                    C.A. # 04-956-GMS

Page 178

1   A.  Yes.
2   Q.  What generally did you say to him that you
3   believe was a request to have a union representative on
4   the phone line?
5   A.  I know that when I spoke with Mr. Neuberger,
6   that he was sending an e-mail stating that he would
7   represent me.  I also explained to Mr. Neuberger that, if
8   that would not be allowed, I would at least like to have
9   a union representative there.
10  Q.  I recognize you might have said that to
11  Mr. Neuberger, to Mr. Fiscella, but did you say it to
12  Lieutenant Colonel MacLeish?
13  A.  I don't recall me making that statement.
14  Q.  You described the conversation with Lieutenant
15  Colonel MacLeish earlier.  Did you consider that an
16  interrogation?
17  A.  Yes.
18  Q.  Why?
19  A.  Him speaking to me after my attorney advised
20  him not to.
21  Q.  Did he ask you any questions in that
22  conversation?
23  A.  He made a comment, and I can't recall the exact
24  comment, but he commented that he did not know anything

Page 179

1   about an auditor's investigation on that date.
2   Q.  But my question is:  Did he ask you any
3   questions.
4   A.  I don't recall a specific question.
5   Q.  Do you recall whether there were any questions?
6   A.  I don't know.
7   Q.  In order to have an interrogation, don't you
8   have to have questions?
9   A.  I don't know.
10  Q.  Could you turn to page 18 --
11  A.  Did you say 18?
12  Q.  18, yes.  One-eight.  The top of page 18, the
13  first complete sentence on the page is part of
14  paragraph 7, and it says, "One comparable trooper with
15  hearing loss greater than Corporal Warren has been
16  allowed to operate a patrol vehicle with complete police
17  powers."
18      Do you know the name of that trooper?
19  A.  No, sir.
20  Q.  Do you know how that sentence got in the
21  complaint?
22  A.  I did not write this specific complaint.
23  Q.  Have you during the time period that's at issue
24  here, which we're talking basically 1994, have you had

Page 180

1   any contact with Dave Mitchell directly about the
2   conditions of the firing range?
3       MR. NEUBERGER:  I'm sorry.  Did you say
4   1994?
5       MR. ELLIS:  I may have.  I meant 2004.
6   Print what I meant, not what I said.
7   BY MR. ELLIS:
8   Q.  In 2004 did you have any direct contact with
9   Dave Mitchell about the health and safety issues at the
10  range?
11  A.  At a retired association's picnic, after we had
12  announced our lawsuit, Secretary Mitchell and
13  Sergeant Fiscella took me and Sergeant Foraker into the
14  conference room at the DSTA, which is our state troopers
15  association, and we discussed some concerns.
16  Q.  Could you tell me the content of that
17  discussion?
18  A.  Secretary Mitchell basically told me to, in his
19  words, put my concerns in a drawer and shut the drawer,
20  that the department would take care of me.
21  Q.  How long did this meeting last?
22  A.  I want to say maybe half an hour.
23  Q.  There must have been something said other than
24  put my concerns in a drawer.

Page 181

1   A.  He told some war stories about when he was a
2   policeman I think with Maryland State Police, and I think
3   it was Prince George's County Police Department.  Just
4   general conversation that way.
5   Q.  Do you recall anything that you said at the
6   meeting?
7   A.  I was concerned about how the division was
8   sending my medical records that were incomplete,
9   protocols not met like that, sent to the TK Group.  I
10  voiced my concern as though I felt I was being pushed out
11  the door.
12  Q.  Anything else?
13  A.  There's a lot of war stories being told.  That
14  was pretty much it, really.
15  Q.  Did you tell any war stories?
16  A.  I may have.
17  Q.  Do you recall Sergeant Foraker saying anything
18  in that meeting?
19  A.  Not directly, no.
20  Q.  Did Sergeant Fiscella say anything in that
21  meeting?
22  A.  Sergeant Fiscella said that he felt that the
23  department may take me out of the Firearms Training Unit
24  and place me back into a patrol setting.

A - 115

46 (Pages 178 to 181)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 182

1　　Q.　This was a period during which you were on
2　light duty, isn't it?
3　　A.　Yes, sir.
4　　Q.　Did he say how he thought the department could
5　do that if you were restricted from active duty?
6　　A.　He did not make any statements to that effect.
7　　Q.　Did you question him about that?
8　　A.　I don't recall specific questions that I asked
9　about it.  I was pretty shocked that he would make that
10　comment.
11　　Q.　Did you tell him you were shocked?
12　　A.　Later I think I did.
13　　Q.　Later that day?
14　　A.　No.  This was -- Sergeant Fiscella and I have
15　had a lot of conversations over a period of time.  He's
16　my union president.
17　　Q.　When you told him you were shocked, what did he
18　say back?
19　　A.　He just said that he felt that that was an
20　option that the State Police might have with me.  I think
21　he called it job restructuring.
22　　Q.　Do you believe that your reputation has
23　suffered as a result of the events that are described in
24　the case?

Page 183

1　　A.　Yes.
2　　Q.　What is it that has caused your reputation to
3　suffer?
4　　A.　Comments that were made to the media about the
5　staff at the FTU allowing the building to degenerate.
6　　Q.　Anything else?
7　　A.　Comments that have been made by Colonel
8　MacLeish that I testified to here today.  I don't think
9　he's too sensitive to my situation, nor does he care.
10　　Q.　I'm sorry.  The question was what has harmed
11　your reputation.  I recognize you testified about
12　comments made to the media about the FTU staff's handling
13　of the range.  Are there any other things that Colonel or
14　Lieutenant Colonel MacLeish has said to harm your
15　reputation?
16　　A.　Those are the ones I have direct knowledge of.
17　　Q.　When you say "those," you're talking about
18　comments he's made to the media.
19　　A.　Yes.
20　　Q.　Specifically the comment he made, whatever it
21　is, to the television station?
22　　A.　Yes.
23　　Q.　Anything else?
24　　A.　And Colonel Chaffinch making the comment --

Page 184

1　　Q.　I'll get to Colonel Chaffinch.  I just want
2　Colonel MacLeish for now.
3　　A.　I'm sorry.  That, and the unique thing about
4　the Firearms Training Unit is that we see every sworn
5　Delaware state trooper in the state of Delaware.  In
6　addition to that, we also train the municipal people.  We
7　know all the police officers.  It's a small community.
8　And I just feel that it's done me damage.
9　　Q.　I will get to that in a minute.
10　　A.　I'm sorry.
11　　Q.　I want to first identify what it is that did
12　you damage, and you testified that MacLeish made a
13　statement to WBOC --
14　　A.　Yes.
15　　Q.　-- that you saw on television.
16　　A.　Yes.
17　　Q.　Is there anything else that MacLeish said?
18　　A.　Right now I cannot think of anything.
19　　Q.　How about Colonel Chaffinch, is there anything
20　that he said that harmed your reputation?
21　　A.　He also made a comment in the State News when
22　they did the tour.
23　　Q.　That's the tour with Gloria Homer?
24　　A.　Yes.  That the staff was to blame for the

Page 185

1　deterioration of the building.
2　　Q.　Anything else Chaffinch said that damaged your
3　reputation?
4　　A.　Not that I have direct knowledge of, no.
5　　Q.　You testified that you have contact with most
6　or all of the police officers in the state of Delaware.
7　Right?
8　　A.　Yes, sir.
9　　Q.　How do you know that it's harmed your
10　reputation in that group of people?
11　　A.　Just comments that have gotten back to us.
12　　Q.　Like what, for instance?
13　　A.　That the staff -- I'm assuming when they say
14　staff, this is just comments that were made.  I'm just
15　repeating these comments that I heard -- are blaming us
16　for the range mess.
17　　Q.　Who blamed you for the range mess?  What police
18　officers, excluding MacLeish or Chaffinch, whatever they
19　happened to have said?
20　　A.　Oh, my goodness.  A lot of folks made mention
21　of it.
22　　Q.　Well, name one.
23　　A.　I can't right off the top of my head.
24　　Q.　Can you name anybody that's told you that they

A - 116

47 (Pages 182 to 185)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 186

1  think less of you because of the comments that MacLeish
2  or Chaffinch made to the media?
3      A.  Not where they think less of us, no.
4      Q.  Have people told you that they think more of
5  you?
6      A.  No.
7      Q.  Have they told you that they hold you in less
8  esteem now on account of what Colonel Chaffinch or
9  Colonel MacLeish said to the media?
10     A.  Not that anybody has said to me directly.
11     Q.  Why do you think that your reputation has been
12 harmed by these statements?
13     A.  Because they put it out in the media that it
14 was our fault for that.  And everybody can form an
15 opinion when they read or hear that.
16     Q.  Has anybody told you what opinion they have
17 formed?
18     A.  Not that I can put a finger on right now.
19     Q.  Then why do you believe that they formed a
20 negative opinion of you as a result of these statements
21 that have been made to the press by Chaffinch or
22 MacLeish?
23     A.  They showed pictures of the range in the media
24 and on TV and showed -- and then stated that it was the

Page 187

1  staff's fault and that we let that occur.
2      Q.  Has anybody come up to you and said that they
3  read the article in the State News and that it must be
4  your fault?
5      A.  No.
6      Q.  Has anybody that you know come up to you and
7  said that they read the article in the State News?
8      A.  Yes.
9      Q.  Who?
10     A.  Our next-door neighbors, various friends and
11 associates.  Everybody reads the State News in Kent and
12 Sussex County just about.
13     Q.  What did your neighbors say to you about the
14 article that was in the State News?  By "the article" I
15 assume we're referring to the April 7th article that had
16 to do with the Gloria Homer/Chaffinch tour?
17     A.  Yes.
18     Q.  Is that what you're referring to?
19     A.  Yes.
20     Q.  What did your neighbors say to you about that
21 article?
22     A.  They could not believe that we were being
23 blamed.
24     Q.  So it sounds like your neighbors were sticking

Page 188

1  up for you.
2      A.  Probably.
3      Q.  What about other friends?  Can you name anybody
4  else other than your neighbors -- let me back up a
5  second.
6          When you say your neighbors, are you
7  talking about people that live immediately next to you in
8  your development?
9      A.  Yes.
10     Q.  Do you have neighbors on both sides of you?
11     A.  Yes.
12     Q.  When we talk about neighbors, are we talking
13 about both sets of neighbors?
14     A.  Pretty much so.  The one made comments to me,
15 but they have also commented to my wife.
16     Q.  What is it that they have said to your wife?
17     A.  Pretty much the same issue, that they can't
18 believe we're being blamed.
19     Q.  Has anybody said to you that they read the
20 article in the State News, that they believe the
21 allegations and that they think that you're a bad person
22 because of what was put in the paper?
23     A.  No.
24     Q.  Would you say that your friends and associates

Page 189

1  have, by and large, been supportive of you?
2      A.  Yes.
3      Q.  When you talk about bad things that have
4  happened to you at the State Police, you're talking about
5  being put on light duty, for one thing, right?
6      A.  Yes.
7      Q.  And second is the fact that you're at some
8  point going to have to leave because you can no longer do
9  the essential functions of the job, right?
10     A.  That's what I have been told.
11     Q.  Is there anything that's happened to you that's
12 been bad in terms of your employment with the State
13 Police other than those two things?
14     A.  Getting the letter saying that I must terminate
15 before even having a year of light duty.
16     Q.  And that has to do with the ultimate
17 determination of your employment which hasn't occurred
18 yet, right?
19     A.  That's correct.
20     Q.  Anything else?
21     A.  The way I have been treated by Lieutenant
22 Colonel -- or Colonel MacLeish.
23     Q.  Is there anything other than --
24     A.  Things that he said.

A - 117

48 (Pages 186 to 189)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 190

1    Q.    The conversations you have had with him, you
2    described them all today?
3    A.    Yes, sir.
4    Q.    Anything else?
5    A.    Bad things with the division; is that correct?
6    Q.    In terms of your employment, yes.
7         MR. NEUBERGER: Well, what's confusing is
8    you just were asking all these reputation questions.
9         MR. ELLIS: I was done asking him about
10   that.
11        MR. NEUBERGER: I understand. Now he's
12   understanding you some official division action versus
13   other actions what you just questioned him on.
14   BY MR. ELLIS:
15   Q.    What I'm referring to is actions that are
16   specifically part of your employment relationship. And I
17   thought that the two things we agreed on was, No. 1,
18   being put on light duty; No. 2, being told that you're
19   going to have to separate.
20        Is there anything else in terms of your
21   employment that has happened to you that is bad that you
22   believe is a result of the reporting you did to the
23   auditors in terms of the range?
24   A.    The light duty issue, if I can just touch on

Page 191

1    one issue on that.
2    Q.    Sure.
3    A.    It's cost me a lot of money as far as working
4    pay jobs and overtime. It has created a financial stress
5    on my family and I.
6    Q.    I do understand that, and that's kind of the
7    result of being placed on light duty. But it's light
8    duty that causes all that, right?
9    A.    Yes.
10   Q.    You understand the light duty to have to do
11   with your hearing loss, right?
12   A.    That's what they say, yes.
13   Q.    What makes you say that you were placed on
14   light duty because of your gathering information and
15   presenting it to people in terms of safety and health
16   concerns at the range?
17   A.    There's no such standards for hearing within
18   the State Police. They had a major that stayed on with
19   hearing aids till he was 55. My doctor, who is a hearing
20   specialist, says that I am not a candidate for a hearing
21   aid yet, and I feel that there are places that I can
22   still function within the State Police. And they have
23   accommodated people in the past with medical-related
24   issues. Never in the history of the State Police or at

Page 192

1    least that I can think of has anybody been placed on
2    light duty for a hearing loss. And to the contrary, when
3    there was hearing loss, it was you need glasses, get
4    glasses. You need -- your hearing goes bad, get a
5    hearing aid.
6    Q.    You're saying that, but you don't want to be
7    put back on patrol, right?
8    A.    I don't want to be put in harm's way where I
9    can get myself or someone else injured because of
10   something I don't pick up. But there's other areas that
11   I can --
12   Q.    You acknowledge there are things you don't pick
13   up, right?
14   A.    Yes.
15   Q.    Is there any other reason why you believe that
16   you were put on light duty because of your activities and
17   researching and presenting information on the range?
18   A.    Testimony by Colonel MacLeish. During one of
19   his depositions he stated that we were pain in the asses.
20   I feel that that was another vehicle or motive for him to
21   get rid of us.
22   Q.    Anything else?
23   A.    Not that I can think of right offhand.
24   Q.    You testified a couple minutes ago that being

Page 193

1    put on light duty had caused you financial harm because
2    you couldn't work what you called pay jobs.
3    A.    Yes, sir.
4    Q.    What pay jobs did you formerly perform that you
5    could not perform because you're on light duty?
6    A.    The NASCAR race in Dover, that was two events a
7    year. I worked that probably for the last 15 years or
8    longer.
9         I also provided some security at
10   basketball games, as well as other events where
11   celebrities would come to town at Comcast cable place
12   where they used to have them. We would go there
13   and provide security for celebrities.
14   Q.    Where are you talking about?
15   A.    In Dover. Yes, sir.
16   Q.    Was it an arena?
17   A.    No. It was just actually where the Comcast
18   cable company has their business. They would bring
19   certain celebrities in.
20   Q.    Okay.
21   A.    Of course the overtime that went with recruit
22   training.
23   Q.    Any other pay jobs or overtime that you're
24   missing?

49 (Pages 190 to 193)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 194

1  A.  Not that I can recall right off.
2  Q.  Do you recall how much money you made in
3  overtime in 2003?
4  A.  I'd have to look at my activity sheets. I can
5  give you an example, though. Just for the two races I
6  would make almost $2,000 at each race.
7  Q.  What type of work did that involve?
8  A.  Directing traffic and crowd control.
9  Q.  Are those the sorts of things that you think
10  you can do without good hearing?
11  A.  I don't think I'm qualified to make that
12  determination.
13  Q.  I recognize that you're not a doctor, but would
14  you think that crowd control and directing traffic are
15  things that require hearing?
16  A.  I would say you need some hearing for it.
17  Q.  During the course of your employment in the
18  Firearms Training Unit, have you developed contacts in
19  the firearms industry?
20  A.  Yes.
21  Q.  Have you talked to any of them about employment
22  there --
23  A.  Yes.
24  Q.  -- in the year 2018 when you would have retired

Page 195

1  from the State Police?
2  A.  Yes.
3  Q.  Who have you talked to?
4  A.  Just brief discussions with a gentleman by the
5  name of Al Clark.
6  Q.  I'm sorry. Al?
7  A.  Al Clark.
8  Q.  Al Clark?
9  A.  Yes, sir.
10  Q.  Who's Al Clark?
11  A.  He is a retired Navy SEAL. And he operates a
12  business called Specialized Tactical Training Services in
13  which he trains the United States Navy and also the
14  United States Marine Corps at Camp David.
15  Q.  What type of training does he do?
16  A.  He puts on tactical pistol schools, weapons
17  retention schools, long gun-type schools.
18  Q.  What's a weapons retention school?
19  A.  How to maintain your weapon if somebody is
20  trying to get it.
21  Q.  Hold onto it literally.
22  A.  It's a defensive tactic program.
23  Q.  What discussions have you had with Mr. Clark
24  about employment?

Page 196

1  A.  He said that he would be interested in me upon
2  retirement.
3  Q.  When did you have those discussions with
4  Mr. Clark?
5  A.  I believe the last time I talked to Mr. Clark
6  would have been sometime in February of 2004 at the Shot
7  Show in Las Vegas.
8  Q.  Do you have any reason to think that anything
9  that's occurred since February 2004 would make Mr. Clark
10  reluctant to hire you?
11  A.  I don't feel that -- with the amount of hearing
12  loss that I have, I don't know that it would be in my
13  best interest to be around a million rounds going off a
14  year.
15  Q.  What you're saying is that you might not be
16  able to accept that type of job for medical reasons.
17  A.  Possibly. I don't know if there's any type of
18  physical that I have to take or not. I don't know what
19  the standards are there.
20  Q.  Have you discussed employment with anybody else
21  in the firearms industry?
22  A.  I always keep a bug in George Harris's ear.
23  George Harris from the Sigarms Academy. I talk to him or
24  I used to.

Page 197

1  And also another gentleman by the name of
2  Bank Miller who works at Firearms Law Enforcement
3  Training Center, but not FLETC, if that makes sense to
4  you. It's a private entity out in Utah.
5  Q.  Sigarms is the manufacturer of the weapons that
6  the Delaware State Police use now.
7  A.  Yes, sir.
8  Q.  Have you discussed employment with Sigarms in
9  any of these conversations you have had with
10  George Harris?
11  A.  Yes.
12  Q.  Has he told you that he would be interested in
13  hiring you?
14  A.  He told me if he had a position, he would be
15  interested.
16  Q.  Is that a position that you might not be able
17  to accept because of your hearing loss?
18  A.  Yes.
19  Q.  Bank Miller is with somebody who trains law
20  enforcement officers on how to use weapons?
21  A.  I believe it's a subsidy of Action Target in
22  Provo, Utah.
23  Q.  Have you discussed employment with Bank Miller?
24  A.  I just joke with him, "Hey, keep me in mind

50 (Pages 194 to 197)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 198

1 because I would love to go to Utah."
2     Q.    Why would you love to go to Utah?
3     A.    It's a beautiful country.
4     Q.    It is that.
5          Is that the type of job that you would be
6 unable to accept because of your hearing loss?
7     A.    Like I say, I don't know -- I'm just assuming
8 that because I don't know what type of entry-level
9 physicals you have to have or what the standards are. I
10 would have to look into it deeper.
11     Q.    Are both the Sigarms job and the Bank Miller
12 job ones that would require you to be exposed to weapons
13 discharge?
14     A.    I would assume so, yes.
15     Q.    When's the last time you had a conversation
16 with Bank Miller?
17     A.    Approximately two to three weeks ago, maybe a
18 month ago, on the telephone.
19     Q.    Did you call him or did he call you?
20     A.    I actually called Sergeant Foraker and
21 Sergeant Foraker handed him the phone.
22     Q.    What did you talk about?
23     A.    He just wished us luck with our issue.
24     Q.    You didn't talk about employment with him?

Page 199

1     A.    No, sir. I'm not mentally prepared to talk
2 about employment right now.
3     Q.    When's the last time you talked to
4 George Harris?
5     A.    I think it was e-mail form, probably somewhere
6 in the area, and this is a guess, four to five months
7 ago.
8     Q.    Did you discuss employment in the e-mail?
9     A.    No, sir. Just general conversation.
10     Q.    Did you think that Sergeant Ashley did a good
11 job as sergeant in charge of the range?
12     A.    I think he did the best he could.
13     Q.    What do you mean by that?
14     A.    He had a very limited background when he came
15 into the unit. But he did the best he could.
16     Q.    Did you think he did a better job than
17 Sergeant Foraker?
18     A.    No.
19     Q.    Did you testify in the case that
20 Sergeant Foraker brought in 2003 that at that point the
21 Firearms Training Unit was running better than it ever
22 had?
23     A.    I don't recall that comment.
24          MR. NEUBERGER: Could I ask you what day

Page 200

1 that is?
2          MR. ELLIS: It's Volume D, as in David,
3 Monday, June 23, 2003. Did I say page 192? Take a look
4 at page 192.
5 BY MR. ELLIS:
6     Q.    Do you recall testifying in that case?
7     A.    Yes.
8     Q.    Do you recall who asked you the questions?
9     A.    No, I do not. May have been Ms. Killian. I
10 don't know. I'm assuming it is because here's an answer
11 where I said, "No, ma'am."
12     Q.    You wouldn't say that to Mr. Tupman?
13     A.    I hope not.
14     Q.    Do you recall being asked the question: "Do
15 you think there was a problem with Chris Foraker's manner
16 of supervision with Ed Cathell?" Actually, before I ask
17 you any questions, just read that page.
18     A.    Thank you. (Complied.)
19     Q.    I'm going to lean over your shoulder.
20          Do you recall the testimony that I have
21 just shown you on page 192?
22     A.    Yes.
23     Q.    Do you recall being asked if there was a
24 problem with Foraker's supervision with Ed Cathell?

Page 201

1     A.    Yes.
2     Q.    And do you recall your answer being "No, ma'am,
3 I do not"?
4     A.    Right.
5     Q.    Do you recall being asked the next question,
6 "Do you feel like you're working on a team at the range?"
7     A.    Yes.
8     Q.    Do you see the answer there?
9     A.    Yes.
10     Q.    And then do you see where he asks a question,
11 "Is it better than when Chris Foraker was a supervisor?"
12 Do you remember being asked that question?
13     A.    Yes.
14     Q.    What's your answer?
15     A.    The answer is "I would say we're better than
16 much -- pretty much the whole time I was in the unit." I
17 don't know what that meant, if that's a typo or what. "I
18 don't know. Right now we're kind of doing things the way
19 we need to have them done."
20     Q.    "I would say better than much -- pretty much
21 the whole time I was in the unit." Do you know what you
22 meant by that?
23     A.    I know that a lot of our certifications had
24 expired under various supervisors at the range. We were

Wilcox & Fetzer, Ltd.

Professional Court Reporters

51 (Pages 198 to 201)
(302)655-0477

Price, et al.     v.     Chaffinch, et al.
B. Kurt Price    C.A. # 04-956-GMS   October 18, 2005

Page 202

1  getting recertified and picking up new training and
2  bringing that back to the division.
3      Q.   You're talking about during the time period
4  that you testified?
5      A.   Yes.
6      Q.   During the time that Ashley was your
7  supervisor, did you have any arguments with Ashley over
8  whether you would do work on the watering system line to
9  the bullet trap?
10     A.   Arguments?
11     Q.   Yes.
12     A.   No, sir.  I advised him, like I stated earlier
13  today.
14     Q.   In other words, you told him that you were
15  going to back off on it and he said okay?
16     A.   Yes.
17     Q.   Did you overhear any discussions that he had
18  with any other of the instructors at the FTU on that
19  subject?
20     A.   Not that I can recall.
21     Q.   You had a discussion with him and that was the
22  end, as far as you were concerned?
23     A.   As far as I knew, yes.
24          MR. ELLIS:  I have no further questions.

Page 203

1          MR. NEUBERGER:  We don't have any
2  questions, but we will reserve reading and signing.
3          (Deposition concluded at 4:40 p.m.)
4          - - - - -
5
6      T E S T I M O N Y
7
8  DEPONENT:  B. KURT PRICE          PAGE
9
10  BY MR. ELLIS.................................. 3
11
12      E X H I B I T S
13
14  DEFENDANTS' DEPOSITION EXHIBIT NO.      MARKED
15
16  11 - A typewritten document................... 12
17  12 - A copy of a photograph................... 53
18  13 - A multi-page document from SmithKline
        Beecham Laboratories.......................... 85
19
    14 - An e-mail dated May 4, 2004, to
20  Christopher Foraker from Kurt Price.......... 131
21  15 - A three-page document entitled,
        "Statement to Auditor's Office".............. 146
22
    16 - A letter dated March 18, 2004, to
23  Kurt Price from Vaneeta Kubal, M.D........... 148
24  ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 204

Page 204

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 205

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
     )
NEW CASTLE COUNTY)

 I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 18th day of
October, 2005, the deponent herein, B. KURT PRICE, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
 I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
 I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

    Kimberly A. Hurley
    Certification No. 126-RPR
    (Expires January 31, 2008)

DATED:        A - 121

Wilcox & Fetzer, Ltd.  Professional Court Reporters  (302)655-0477



**WILCOX & FETZER LTD.**

# In the Matter Of:

# Price, et al.
## v.
# Chaffinch, et al.

## C.A. # 04-956-GMS

---

## Transcript of:

# Wayne H. Warren
### Volume # 1
### October 17, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A - 122

Price, et al.
Wayne H. Warren, Volume 1

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 17, 2005

1                                    VOLUME 1                          Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,        )
                                       )
            Plaintiffs,                )
                                       ) Civil Action
v.                                     ) No. 04-956-GMS
                                       )
COLONEL L. AARON CHAFFINCH, et al.,    )
                                       )
            Defendants.                )
-------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,       )
                                       )
            Plaintiff,                 )
                                       )  Civil Action
v.                                     ) No. 04-1207-GMS
                                       )
COLONEL L. AARON CHAFFINCH, et al.,    )
                                       )
            Defendants.                )

            Deposition of WAYNE H. WARREN taken
pursuant to notice at the law offices of Montgomery,
McCracken, Walker & Rhoads, LLP, 300 Delaware Avenue,
Suite 750, Wilmington, Delaware, beginning at 10:10
a.m., on Monday, October 17, 2005, before Kurt A.
Fetzer, Registered Diplomate Reporter and Notary
Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          For the Plaintiffs                        **A - 123**
                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

Price, et al.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS          October 17, 2005

Page 2

```
 1  APPEARANCES:  (Cont'd)
 2      EDWARD T. ELLIS, ESQ.
 3      MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
          123 South Broad Street
 4        Philadelphia, Pennsylvania  19109
          For the Defendants
 5
    ALSO PRESENT:
 6      B. KURT PRICE
        CHRISTOPHER D. FORAKER
 7
 8              - - - - -
 9          WAYNE H. WARREN,
10      the deponent herein, having first been
11      duly sworn on oath, was examined and
12      testified as follows:
13              EXAMINATION
14  BY MR. ELLIS:
15      Q.   Could you state your name for the record,
16  please?
17      A.   Wayne Howard Warren.
18      Q.   And you are currently a member of the Delaware
19  State Police?
20      A.   Yes, I am.
21      Q.   And what's your rank?
22      A.   Master corporal.
23      Q.   What's your date of birth?
24      A.   5-22-58.
```

Page 3

```
 1      Q.   Are you married?
 2      A.   Yes.
 3      Q.   What's your wife's name?
 4      A.   Mary Lou.
 5      Q.   Does your wife work?
 6      A.   Yes, she does.
 7      Q.   What does she do?
 8      A.   She's a Registered Nurse with a pain doctor in
 9  the Lewes area.
10      Q.   A pain doctor?
11      A.   Yes.  Gabriel Samori.
12      Q.   Gabriel?
13      A.   Samori.
14      Q.   Can you spell it, please?
15      A.   S-a-m-o-r-i.
16      Q.   Do you have children?
17      A.   Yes, I do.
18      Q.   How many?
19      A.   Two.
20      Q.   What are their ages?
21      A.   Jackie is 18 and Jennifer is 16.
22      Q.   And is Jackie a female?
23      A.   Yes.
24      Q.   Where is Jackie in school?
```

Page 4

```
 1      A.   Kennesaw State University in Kennesaw, Georgia.
 2      Q.   How about Jennifer?
 3      A.   She's in Cape Henlopen High School.
 4      Q.   Do you live in Lewes, Delaware?
 5      A.   Yes, I do.
 6      Q.   Can you give me your address, please?
 7      A.   16820 Ketch, K-e-t-c-h, Court in Lewes.
 8      Q.   Are you presently actively working as a state
 9  trooper?
10      A.   No, I'm not.
11      Q.   When is the last day that you were active as a
12  state trooper?
13      A.   That would have been June 17th, 2004, I
14  believe, before I was placed on light duty.
15      Q.   Okay.  I guess I probably used a bad phrase
16  then.
17          When I said actively working, I meant
18  going to, going on the job and performing some work
19  for the State Police.  You were actually going to work
20  after June 17th, 2004, were you not?
21      A.   That's correct.
22      Q.   And am I correct that you are presently not
23  working?
24      A.   That's correct.
```

Page 5

```
 1      Q.   And when is the last day that you reported for
 2  duty?
 3      A.   I believe it was May 12th of this year, 2005.
 4      Q.   Why did you stop reporting to work?
 5      A.   I was given a letter by Captain Downs stating
 6  that I was going to have to separate from the division
 7  by June 10th of this year.
 8      Q.   Okay.  Now, who was Captain Downs?
 9      A.   He was the captain in charge of the training
10  academy.
11      Q.   So he was the director of training as of May
12  12th, 2005?
13      A.   That's correct.
14      Q.   Why did his giving you the letter telling you
15  that you would have to separate on June 10th cause you
16  to stop coming to work?
17      A.   Well, it was a traumatic experience.  I was
18  just given a letter stating that I had to separate
19  from the division by June 10th.
20      Q.   Was this unexpected?
21      A.   Absolutely it was unexpected.
22      Q.   What is your employment status since May 12th?
23  Has it been sick leave?  Has it been --
24      A.   Sick leave.
```

A - 124

2 (Pages 2 to 5)

Price, et al.
Wayne H. Warren, Volume 1

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 17, 2005

Page 6

1  Q.  So you have been taking sick leave since May
2  12th, 2005?
3  A.  That's correct.
4  Q.  Have you been sick?
5  A.  Cytologically or physically?
6  Q.  Well, let's start with physically.
7       Have you been physically ill?
8  A.  I've had diarrhea, headaches, depression.
9  Q.  And did the diarrhea start on May 12th?
10  A.  No.
11  Q.  Did the headaches start on May 12th?
12  A.  I would say I had a severe headache on the
13  evening of May 12th.
14  Q.  And how about the depression, did that start on
15  May 12th?
16  A.  I wouldn't say it started on May 12th, no.
17  Q.  Can you tell me when the diarrhea started?
18  A.  I can't tell you for sure.
19  Q.  Can you tell me if it was before May 12th or
20  after May 12th?
21  A.  I've had problems with my stomach ever since
22  this incident occurred.
23  Q.  When you say, "this incident," what are you
24  referring to?

Page 7

1  A.  The fact that I was being placed on light duty
2  and being retaliated against by the division.
3  Q.  I think you have testified that you were first
4  placed on light duty in June 2004.
5       Is that when the diarrhea started?
6  A.  I can't remember exactly when I've had the
7  stomach problems.
8  Q.  Now, how about the headaches, when did the --
9  let me back up a second.
10       I've looked at some of your medical
11  records and I see in your medical records that you
12  suffer from migraines occasionally?
13  A.  I've had headaches.
14  Q.  Is it your understanding that these are
15  migraine headaches?
16  A.  I don't know the difference between a migraine
17  headache and a regular headache, to be honest with
18  you.
19  Q.  Have you consulted with a doctor about the
20  headaches?
21  A.  Yes.
22  Q.  What do you take for the headaches, what
23  medicine?
24  A.  I'm currently taking Protonix for my stomach

Page 8

1  problems and Lexapro.  Nothing specifically for
2  headaches.
3  Q.  The Lexapro is an antidepressant, isn't it, or
4  antianxiety drug?
5  A.  That's correct.
6       MR. NEUBERGER:  Off the record.
7       (Discussion off the record.)
8  BY MR. ELLIS:
9  Q.  How frequently do you get headaches?
10  A.  I can't really say.
11  Q.  Can you say whether it's more than once a week?
12  A.  Possibly.  It depends on what week you're
13  talking about, I mean a certain time frame or...
14  Q.  Do you associate the headaches with any
15  particular activity?
16  A.  Well, when I was at the range I was getting
17  headaches frequently the last part of that assignment.
18  Q.  When you say, "the last part of that
19  assignment," can you give me a time frame?
20  A.  That would have been fall and winter of 2003 up
21  until the range closed in I think it was March of
22  2004.
23  Q.  Now, you used the term "frequently."  You said
24  you were getting headaches frequently.  What do you

Page 9

1  mean by "frequently"?
2  A.  At that point in time?
3  Q.  Yes.
4  A.  Probably every other day or every day.
5  Q.  Okay.  And after you were removed from the
6  range, did the headaches stop?
7  A.  They didn't stop completely, no.
8  Q.  But they became less frequent?
9  A.  That's correct.
10  Q.  For example, you're sitting here today on a
11  Monday morning.  Do you have a headache right now?
12  A.  No, I do not.
13  Q.  Did you have a headache over the weekend?
14  A.  Not that I can remember.
15  Q.  Did you have one last week?
16  A.  Not that I can remember.
17  Q.  Okay.  Going back to May 12th, 2005, at the
18  point that you went off on sick leave, did you provide
19  any doctor's note to your boss?
20  A.  After May of 2005?
21  Q.  Right.  Well, I think you testified that the
22  last day that you were on, that you reported to work
23  was May 12th, 2005, right?
24  A.  I believe that's correct.

**A - 125**

3 (Pages 6 to 9)

Price, et al.                                    v.                            Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS                October 17, 2005

Page 10

1  Q.  And since then you have been on sick leave?
2  A.  That's correct.
3  Q.  Did your supervisor ask you for a doctor's note
4  to explain why you were out on sick leave?
5  A.  No.
6  Q.  Did you provide one?
7  A.  No.
8  Q.  Have you been seeing a doctor for whatever
9  condition it is that puts you out on sick leave?
10  A.  Yes, I have.
11  Q.  And who's that?
12  A.  Dr. Stanislav.
13  Q.  And how long has it been, when is the last time
14  you saw Dr. Stanislav?
15  A.  Probably last week.
16  Q.  When is the last time before that?
17  A.  The records would indicate the times that I
18  have been seeing him.  I can't recall.
19  Q.  Can you give me an estimate of how many times
20  you have seen him since May 12th, 2005?
21  A.  No, I can't.
22  Q.  Would you say that it's less than ten?
23  A.  I can't give you any estimate.
24  Q.  No estimate at all?

Page 11

1  A.  No.
2  Q.  What have been your daily activities since May
3  12, 2005?
4  A.  Pretty much staying at home and just around the
5  house.
6  Q.  When your daughter went away to college, did
7  you take her down to Georgia?
8  A.  Yes, I did.
9  Q.  And was that in August of 2005?
10  A.  That's correct.
11  Q.  Did you drive?
12  A.  Yes, I did.
13  Q.  Did you drive your own car?
14  A.  Yes, I did.
15  Q.  Who went with you?
16  A.  My wife and my daughter.
17  Q.  How long did that take?
18  A.  Well, it was about a 13-hour drive down there.
19  We stayed a couple of days and we came back.
20  Q.  Did you find that experience stressful?
21  A.  That experience stressful?  Not really.  Not
22  any more stressful than daily life.
23  Q.  Have you played any sports since May 12, 2005?
24  A.  No.

Page 12

1  Q.  Did you play any sports in 2004?
2  A.  No.
3  Q.  2003?
4  A.  No.
5  Q.  I think I heard from somebody in the State
6  Police that you were a softball player.
7  A.  Softball coach.
8  Q.  Oh, you were a coach?
9  A.  Mm-hmm.
10  Q.  Were you also a softball player?
11  A.  A long time ago.
12  Q.  Okay.
13  A.  Smarter.
14  Q.  When is the last time you played?
15  A.  Probably twelve years ago, something like that,
16  twelve or thirteen years ago.
17  Q.  Do you have a regular athletic activity that
18  you've engaged in in the last ten years?
19  A.  I worked out, ran.  That's about the extent of
20  my physical activity.
21  Q.  When you say, "worked out," what's that mean?
22  Lift weights?
23  A.  Exercise.  No, I haven't really lifted weights
24  probably in ten years, I would say.  Maybe a little

Page 13

1  longer.
2  Q.  What is your typical workout?
3  A.  Just do some exercises, running, stretching.
4  Q.  Have you been able to run since May 12, 2005?
5  A.  Not really.
6  Q.  Why not?
7  A.  I just haven't felt like it.
8  Q.  Have you worked out since May 12, 2005?
9  A.  Other than walking, no.
10  Q.  When you say that you do stretching, what type
11  of stretching?
12  A.  Just a normal stretching routine, stretch my
13  back, stretch my legs, arms.
14  Q.  Do you currently have any physical ailments?
15  A.  I have a shoulder problem.
16  Q.  What's the nature of your shoulder problem?
17  A.  The collarbone is rubbing the shoulder bone,
18  pressed into the...
19  Q.  Rotator cuff?
20  A.  Rotator cuff.  I believe that's what it is.
21  Q.  Have you been told that you have to have
22  surgery?
23  A.  Yes.
24  Q.  And do you have a torn rotator cuff?

A - 126

4 (Pages 10 to 13)

Price, et al.    v.    Chaffinch, et al.
Wayne H. Warren, Volume 1    C.A. # 04-956-GMS    October 17, 2005

Page 14

1    A.  No.
2    Q.  What's the nature -- is it an impingement?
3    A.  Apparently, that's what it is.  They're going
4    to have to remove some of the collarbone, the end of
5    the collarbone that's going into the rotator cuff
6    joint, I guess.
7    Q.  So your expectation is that you would have to
8    have surgery to shave the bone?
9    A.  That's correct.
10   Q.  Does that cause you trouble sleeping at night?
11   A.  No, I would say not.
12   Q.  Have you also been diagnosed with carpal
13   tunnel?
14   A.  Yes, I have.
15   Q.  When did you receive that diagnosis?
16   A.  It was in December and I think it may have been
17   2003.  I'm not sure about the year, but it was in
18   December.  That I'm sure of.
19   Q.  What are the symptoms of the carpal tunnel?
20   A.  My hands are numb.
21   Q.  Are they numb right now?
22   A.  Sort of.
23   Q.  Are you being treated for carpal tunnel?
24   A.  No.

Page 15

1    Q.  Why aren't you being treated for it?
2    A.  I was given wrist splints and as far as I know,
3    that's about all they can do.  If it gets worse, they
4    told me that they could, they could do an operation to
5    relieve the numbness, if it got to that point.  I'm
6    not big on the operation.
7    Q.  Have you been hunting since May 12th, 2005?
8    A.  Yes.
9    Q.  Where did you go hunt?
10   A.  In the Lewes area.
11   Q.  What did you hunt for?
12   A.  Deer.
13   Q.  When?
14   A.  When?
15   Q.  When?
16   A.  Probably a couple of weeks ago.
17   Q.  What's deer season in Delaware?
18   A.  Actually, it starts September 1st.
19   Q.  And how long does it run?
20   A.  Until January 31st.  I believe that's when it
21   is.
22   Q.  And what weapons are you allowed to use during
23   that period?
24   A.  Currently bow and arrow and muzzle loader.

Page 16

1    Q.  And --
2    A.  And shotgun on the weekends for doe.
3    Q.  What do you shoot with?
4    A.  Bow and arrow.
5    Q.  So you were hunting with a bow and arrow a
6    couple of weeks ago?
7    A.  Mm-hmm.
8    Q.  Do you plan on going hunting this fall?
9    A.  Yes, I do.
10   Q.  Where do you plan on going?
11   A.  In Delaware and West Virginia.
12   Q.  When is it that you're planning to go to West
13   Virginia?
14   A.  This weekend.
15   Q.  How about when are you planning to hunt in
16   Delaware?
17   A.  Whenever I get a chance.
18   Q.  When you go to West Virginia do you hunt with a
19   bow and arrow?
20   A.  Yes, I do.
21   Q.  Do you hunt with a gun at all anymore?
22   A.  Sometimes.
23   Q.  Back some years ago you hunted with a gun, did
24   you not?

Page 17

1    A.  Yes.
2    Q.  What type of weapon?
3    A.  12-gauge shotgun.
4    Q.  Did you ever hunt with a rifle?
5    A.  No.  I can't ever remember killing one with a
6    rifle.
7    Q.  I may have asked you this already.  But when
8    you go to West Virginia what are you going to hunt?
9    Deer?
10   A.  Deer.
11   Q.  Do you also hunt birds?
12   A.  No.
13   Q.  How about in the Lewes area, do you hunt birds?
14   A.  No.
15   Q.  So the only thing you hunt is deer?
16   A.  Pretty much deer.
17   Q.  Do you ever hunt rabbits, squirrels, anything
18   like that?
19   A.  No.
20   Q.  During the period since May 12th, 2005 have you
21   been paid by the State Police every week?
22   A.  Yes.
23   Q.  Have you had any type of outside income?
24   A.  No.

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1            C.A. # 04-956-GMS              October 17, 2005

Page 18

1  Q.  Have you undertaken any jobs around the house
2  during that period since May 12th?
3  A.  Yes.
4  Q.  Like what job?
5  A.  Just worked around the house doing landscaping,
6  cleaning, normal maintenance of a house.
7  Q.  You testified a few minutes ago that you had
8  been a softball coach.  What type of softball did you
9  coach?
10  A.  Girls softball.
11  Q.  What level?
12  A.  I've been coaching since my daughter was 11 and
13  she's 18, so probably 9 years.
14  Q.  And was this a municipal league or was it a
15  high school league or what type of a league?
16  A.  It's a travel team.  We travel around and play
17  different areas.
18  Q.  Does your daughter Jennifer play softball?
19  A.  No, she does not.
20  Q.  When is the last time you coached?
21  A.  This summer.
22  Q.  Just this past summer?
23  A.  That's correct.
24  Q.  2005?

Page 19

1  A.  Right.
2  Q.  Is your daughter in college on a softball
3  scholarship?
4  A.  Yes, she is.
5  Q.  Oh, she is?
6  A.  Mm-hmm.
7  Q.  Congratulations.
8  A.  Thanks.
9       MR. NEUBERGER:  He's a good coach.
10      MR. ELLIS:  He may be, but there has to be
11  some genetics there too.
12      MR. NEUBERGER:  It's the mother.
13      THE WITNESS:  Yeah, it is.
14  BY MR. ELLIS:
15  Q.  Do you expect to coach softball next summer?
16  A.  I hope to.
17  Q.  What was your first -- let me back up a second.
18      When did you start with the Delaware State
19  Police?
20  A.  January 31, 1983.
21  Q.  You went through the Police Academy, right?
22  A.  That's correct.
23  Q.  What class were you?
24  A.  I think it was the 46th.

Page 20

1  Q.  Why don't you go through with me the positions
2  you've had with the State Police from the beginning
3  when you were a recruit?
4  A.  I started as a recruit trooper in January of
5  1983.  I graduated from the academy, was the
6  Governor's outstanding recruit upon graduation, was
7  assigned to the patrol unit at Troop 7.
8       After that assignment I was transferred
9  into the special investigations unit out of Troop 9 in
10  Odessa.
11  Q.  Troop 9 you said?
12  A.  That's correct.
13      I think that was five or six years there.
14  At that time I transferred back to the patrol unit at
15  Troop 7, was transferred into the special
16  investigations tactical unit.  It was a newly formed
17  unit.
18  Q.  Is that the drug unit?
19  A.  No.  What it was was it was a unit that was
20  assigned to control the open air drug markets in
21  marked police cars.  We were a proactive unit.  We
22  would actually go into the neighborhoods.  There was
23  five officers, flood the area and do more or less just
24  take-offs of what we could see.  We were arresting

Page 21

1  people, more or less like the Wilmington jumpout squad
2  is doing up here.  We would go in and identify drug
3  dealers or people that were doing different types of
4  crime and address them immediately.
5       We worked also with the drug unit
6  providing them with backup and cover and also
7  executing warrants for them.
8  Q.  How long were you with the special
9  investigations tactical unit?
10  A.  I think that was three years.  And then we were
11  absorbed into what was called the Governor's Task
12  Force.  I think I was in that for a little over two
13  years, I believe.  The dates will all be on my
14  personnel file.
15      And from there, I was transferred back to
16  Troop 4 patrol and from Troop 4 patrol I was
17  transferred into the firearms training unit.
18  Q.  And I understand you went into the firearms
19  training unit in August 2001?
20  A.  That's correct.
21      And I was a member of the special
22  operations response team since I believe '86 or '87.
23  Q.  Until when?
24  A.  Till right now, I guess.  No one has told me

A - 128

Price, et al.    v.    Chaffinch, et al.
Wayne H. Warren, Volume 1    C.A. # 04-956-GMS    October 17, 2005

Page 22

1  anything about that.
2    Q.  When is the last time you actually worked with
3  the SORT team?
4    A.  I'm not sure.  It would have been -- actually,
5  I think I am sure.  I think it was June 17th, 2004.  I
6  think I did a surveillance with the drug unit.
7    Q.  Prior to your going to the firearms training
8  unit in 2001, how often did you go to the range in
9  Smyrna?
10    A.  That's a hard question to answer.  The special
11  operations team has monthly training and sometimes we
12  would report to the range to shoot and on different
13  occasions I was assigned to the range temporarily.
14    Q.  Okay.  At what point did you start getting
15  temporary assignments at the range?
16    A.  I can't answer that at all.
17    Q.  Do you remember what job you were in when you
18  starting getting temporary assignments at the range?
19    A.  Actually, I think I was in the special
20  investigations unit.  So it was --
21    Q.  Now, that's the unit that you described as
22  dealing with open air drug markets?
23    A.  No.  The special investigations unit was the
24  actual drug unit itself, my second assignment with the

Page 23

1  division.
2    Q.  At that point were you certified as a range
3  instructor?
4    A.  Yes.
5    Q.  When did you first get certified as a range
6  instructor?
7    A.  I don't know the exact date, but it would again
8  be in my personnel file when the FBI certified me.
9    Q.  Going back to the question I had asked you
10  about how often you went to the range, did you have to
11  qualify twice a year like everybody else?
12    A.  Actually, we were qualifying more than that
13  with the special operations team and it varied.  I
14  mean, sometimes, you know, the policy was followed and
15  sometimes it wasn't followed.  Sometimes we didn't get
16  in the qualifications.
17        But, again, you would have to obtain the
18  records from the special operations team to see
19  exactly when I was qualifying.
20    Q.  Which policy are you referring to?
21    A.  The policy of the special operations team of
22  how often we would have to shoot.  And it's been
23  changed over the years.
24    Q.  I understand that.  But you're saying that the

Page 24

1  SORT team had to qualify more frequently than rank and
2  file troopers?
3    A.  That's correct.
4    Q.  So however many times the SORT team had to
5  qualify, that number of times you would have been at
6  the range?
7    A.  Yes.
8    Q.  Did you go to the range -- well, I think you
9  testified that you were also assigned there on
10  temporary duty.
11    A.  That's correct.
12    Q.  Under what circumstances would you be assigned
13  there on temporary duty?
14    A.  As a safety officer to walk the line behind the
15  shooters.
16    Q.  Why would you be assigned there from some other
17  location?  Was it because there weren't enough safety
18  officers assigned there permanently?
19    A.  That's correct.
20    Q.  Prior to the opening of the range in Smyrna in
21  1998, where did the Delaware State Police shoot?
22    A.  We shot on a range off of Denneys Road, an
23  outdoor range.
24    Q.  Was this a Delaware State Police range?

Page 25

1    A.  That's correct.
2    Q.  Were you also assigned temporary duty at that
3  outdoor range?
4    A.  Yes.  When it was the outdoor range, yes.
5    Q.  Between the time the range opened in 1998 and
6  the time you were assigned there permanently in 2001,
7  did you serve as a temporary duty officer?
8    A.  I believe I did.
9    Q.  When you arrived at the firearms training unit
10  in August 2001, who else was assigned there?
11    A.  Sergeant Chris Foraker, Master Corporal Kurt
12  Price, Master Corporal Eddie Cathell.
13    Q.  At some point was Cathell replaced?
14    A.  Yes, he was.
15    Q.  Do you remember when that was?
16    A.  I believe it was in November.
17    Q.  Of what year?
18    A.  Of -- I can't recall.
19    Q.  Who replaced Cathell?
20    A.  Who replaced Cathell?  Well, we had Corporal
21  Bruce Peachey, Master Corporal Bruce Peachey was also
22  assigned to the range at that point.  That was it.
23    Q.  Did Peachey come before Cathell left?
24    A.  I'm not sure.

A - 129

7 (Pages 22 to 25)