Price, et al.  
Wayne H. Warren, Volume 1

v.  
C.A. # 04-956-GMS

Chaffinch, et al.  
October 17, 2005

---

Page 82

1  A. I can remember when we switched from WD-40 to a
2  citrus cleaner in our parts washer when we were doing
3  our armorers breakdown, I was getting a lot of
4  headaches from that very strong odor and I asked him
5  why we didn't have an exhaust fan in the armorers
6  room. And I said that the citrus cleaner was giving
7  me headaches and I couldn't work in there.
8     And on another occasion the hearing
9  protectors that we were using in the range were
10  starting to fail and we said, you know, we have to get
11  these things fixed because they're failing.
12  Q. Okay.
13  A. And then I believe one other time when my blood
14  serum spiked to 9 I told him that I was concerned
15  about sticking my hands in the tank and changing the
16  pumps and working on the filters.
17     And there may have been something else at
18  that point, but those are the three things that I can
19  recall.
20  Q. All right. When you say, "blood serum," you're
21  talking about the blood lead level, right?
22  A. That's correct.
23  Q. Do you recall when the citrus -- what do you
24  call it? Oil?

---

Page 83

1  A. It's a citrus cleaner.
2  Q. Is it like a penetrant?
3  A. Similar to that. It's similar to what you see
4  on TV or what the people are using now to clean their
5  houses. It's a citrus-based cleaner and it was being
6  used by our mechanics and we got it in our parts
7  washer to clean the oil off the weapons.
8  Q. Oh, it cleans the oil off?
9  A. That's correct.
10  Q. Do you recall when you switched over from WD-40
11  to the citrus cleaner?
12  A. No. I can't recall.
13  Q. Do you recall in December of 2003 the
14  facilities management people coming in to plan an
15  exhaust hood in the armorers room?
16  A. I recall them coming there to survey the area.
17  Q. When did that occur?
18  A. I can't tell you exactly but, again, that would
19  probably be on the maintenance records. Also when the
20  complaint was made or when the request was made should
21  be there also.
22  Q. When you say, "maintenance records," what are
23  you referring to?
24  A. When we're calling into facilities management

---

Page 84

1  for a problem with the building, it should have been
2  documented.
3  Q. How do you know it should have been documented?
4  A. I would assume that's how they would perform a
5  work order to send someone there to perform the work.
6  Q. Okay. Do you know that there's some sort of a
7  log or maintenance record kept by facilities
8  management?
9  A. I believe so. I called and requested that from
10  I can't recall the gentleman's name now, but he said
11  he would have to check with his boss to see if they
12  could release that information to me. So I assume
13  that there were records being kept.
14  Q. Did you ever get such a record?
15  A. No, I did not.
16  Q. And you don't remember who you asked?
17  A. I can't recall the guy's name at this point.
18  Q. How many times did you discuss with Sergeant
19  Ashley the citrus cleaner?
20  A. I can't recall, but I had several conversations
21  with him.
22  Q. Do you remember any of them?
23  A. I can remember telling him that I couldn't stay
24  in that environment, that it was overwhelming, the

---

Page 85

1  smell of that citrus cleaner, and I couldn't stay in
2  there and work on weapons.
3  Q. So did you remove yourself from that area and
4  clean the weapons somewhere else?
5  A. I would go in and out.
6  Q. Where did this discussion with Sergeant Ashley
7  take place?
8  A. At the firearms training unit.
9  Q. Do you remember what room it took place in?
10  A. No, I do not.
11  Q. Do you remember if anybody else was there?
12  A. I'm pretty sure that Corporal Price heard me
13  ask about that situation.
14  Q. And what did Ashley say in response?
15  A. He after a couple of requests I remember him
16  telling me that they didn't have money to install the
17  exhaust vent.
18  Q. Okay. Anything else?
19  A. Basically that's all he said.
20  Q. But then at some point after that you said that
21  the facilities people came in to survey for the
22  exhaust vent?
23  A. At some point in time. I can't recall exactly
24  when it was.

**A - 144**

Price, et al.                               v.                        Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS          October 17, 2005

Page 86

1    Q.  Do you recall there being plans to put in the
2    exhaust system in December 2003 when the range was
3    shut down for Christmas?
4    A.  No.  I can't recall that.
5    Q.  You said that their hearing protectors were
6    failing.  What are the hearing protectors?
7    A.  The muffs that we were wearing that allowed us
8    to hear the instructors and to protect us from the
9    noise.  We also wore the foam plugs in our ears and
10   then the muffs over top.
11          The muffs and the communications were
12   starting to fail.  We couldn't communicate back and
13   forth.  Intermittently that communication was not
14   going through and that's a safety issue out on the
15   range.
16   Q.  And what time period are we talking about?
17   A.  I would say that probably started in the summer
18   of 2003, and that's just a guess.
19   Q.  Okay.  And what type of communication did you
20   have with Sergeant Ashley about that?
21   A.  We just explained to him that the
22   communications were starting to fail and it was an
23   integral part of our operation and we needed to be
24   able to communicate with one another and the fact that

Page 87

1    it didn't seem like they were providing that much
2    hearing protection.
3    Q.  And what did he say in response to that?
4    A.  Well, we're going to look into it and we made
5    some phone calls to see what it would cost to
6    refurbish or replace those systems.
7    Q.  When you say, "we made some phone calls," who
8    is the "we"?
9    A.  I can't recall if it was myself, Corporal Price
10   or who actually talked to the representatives to get
11   that information.
12   Q.  And whatever became of that?
13   A.  As I recall, it was going to cost $1500 to
14   either refurbish or replace those systems and Sergeant
15   Ashley said that we didn't have the money to do that;
16   that we were going to have to do something else.
17   Q.  And so did anything ever get replaced or
18   refurbished?
19   A.  He replaced that system with a wireless system
20   of Power Com Plus, I believe it was, or a Power Com
21   II.  I know it was a Power Com wireless system to
22   replace that current system.
23   Q.  When you say, "a wireless system," now the
24   system that you said was failing, that didn't have

Page 88

1    wires running out of the ear sets, did it?
2    A.  Yes, it did.
3    Q.  It did?
4    A.  Mm-hmm.
5    Q.  Where did they plug into?
6    A.  They plugged into a receiver and a transmitter
7    that we had on our belt.  And it was a controlled
8    system within the range itself that was on its own
9    frequency controlled by the range.
10   Q.  When you say that he replaced the system with a
11   wireless system, what do you mean by "a wireless
12   system"?
13   A.  It wasn't the system that was set up in the
14   control booth.  These were just simple radios that
15   were purchased, I believe they were purchased from
16   Lawmen's Supply, and they were on a frequency that the
17   normal public had access to.
18          So someone riding down the road with a
19   little walkie-talkie or a little communications device
20   could interrupt our firearms training just by clicking
21   the button and talking and we would receive that
22   information.  Plus we were putting out our information
23   to the general public to receive also.
24   Q.  And when did the system get replaced?

Page 89

1    A.  I believe that was the summer or fall of 2003.
2    Again, the purchase records would probably indicate
3    exactly when that happened.
4    Q.  How many times did you discuss the hearing
5    protection with Sergeant Ashley?
6    A.  Several times again.
7    Q.  When you say, "several," how many times?
8    A.  That would be -- I'm just guessing.  I would
9    say at least ten times.
10   Q.  Was this the subject of a meeting of the staff
11   at the range?
12   A.  What type of meeting are you talking about?
13   When Ashley left or when he was still there.  In the
14   situation that --
15   Q.  No.  When he was still there.
16   A.  When he was still there?  Once we started
17   trying those systems, they failed and we explained to
18   him that they were failing and the problem that we
19   were encountering with other people cutting into the
20   communications.
21   Q.  And so what did he say about that?  What was
22   his response?
23   A.  Kurt was the lead on that one and I think he
24   said, "Kurt, you whine about everything."

23 (Pages 86 to 89)

Case 1:04-cv-01207-GMS    Document 75-6    Filed 02/02/2006    Page 3 of 19

Price, et al.                                    v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS          October 17, 2005

Page 90

1  Q. Anything else?
2  A. "We don't have the money to spend on these
3  things."
4  Q. And are we talking about now the fall of 2003?
5  A. That's correct, somewhere in the fall of 2003.
6  Q. So that would have been shortly before Ashley
7  left?
8  A. That's correct.
9  Q. Now, you testified that you talked to Sergeant
10 Ashley about your blood serum going up to 9, excuse
11 me, spiking to 9.
12     When did you do that?
13 A. I'm not sure. And I got to retract that
14 statement. I'm not sure what it went to, but I knew
15 it started to rise. And I can remember Kurt's going
16 up and we were discussing the issue. And I believe
17 Dr. Green stated that the oil and water mixture were
18 helping the lead get into our bloodstream so we
19 shouldn't, we shouldn't be placing our hands in the
20 water tank.
21 Q. Okay. Were you placing your hands in the water
22 tank?
23 A. That's how we had to free up the pumps. And
24 also we were touching the filters to clean out the

Page 91

1  filters.
2  Q. When did Dr. Green say that to you?
3  A. He didn't say it to me.
4  Q. Who did he say it to?
5  A. He said it to Corporal Price. And we were
6  discussing the issue that we felt that something was
7  causing our levels to go up. And we're laypeople. We
8  didn't understand what the problem was. We had no
9  training in this area at all.
10 Q. Well, you must have studied blood lead levels
11 in the last two years, have you not?
12 A. Yes.
13 Q. You know that a blood lead level of 9 is below
14 any threshold for blood lead poisoning, don't you?
15 A. Are you saying that anything below 9 is not
16 dangerous? Is that what you're saying to me?
17 Q. I'm saying that there's no standard published
18 by any agency in the country that flags a 9 as a
19 problem. Isn't that correct?
20 A. That's correct.
21 Q. You know what the OSHA limit is, right?
22 A. Not really because it changes and I have seen
23 different levels coming out of OSHA.
24 Q. You haven't seen one lower than 10, have you?

Page 92

1  A. Not that I've seen, no.
2  Q. So I take it you had a discussion with Sergeant
3  Ashley over your blood lead level going up to 9?
4  A. I can't say that it was about it going up to 9
5  because I can't recall if that was the test which
6  showed 9, but I knew it was going up.
7  Q. Okay. It was going up. Maybe it was 8. Is 9
8  the highest it ever got to?
9  A. 9, as far as I know 9 is the highest that I
10 have seen.
11 Q. So at some point your blood lead level rose and
12 you talked to Sergeant Ashley about that?
13 A. That's correct.
14 Q. Where did that discussion take place?
15 A. At the firearms training unit.
16 Q. What part of the building?
17 A. I would imagine that would have taken part in
18 our office building because that's where we received
19 the results.
20 Q. When you say you imagine, do you actually
21 remember this conversation or are you just sort of
22 guessing?
23 A. No, I'm not guessing. I know the conversation
24 occurred. Where it occurred, I can't tell you exactly

Page 93

1  where it occurred, in what room.
2  Q. Who was present other than you and Sergeant
3  Ashley?
4  A. I can't recall.
5  Q. What did you say to Sergeant Ashley?
6  A. I just said, "I'm concerned about my lead level
7  increasing and I don't think we should be putting our
8  hands in the tank."
9  Q. And what did he say?
10 A. I'm not sure at that point what his response
11 was to me.
12 Q. Do you remember any part of the discussion
13 other than what you've just said?
14 A. No, not really. I know that I alerted him to
15 that fact.
16 Q. Did you tell him what your blood level reading
17 was that caused you concern?
18 A. I had told him it had gone up and that's why I
19 was concerned.
20 Q. Did you tell him what it had gone up to?
21 A. I can't recall.
22 Q. Was this in response to some sort of a document
23 you got that gave you a blood lead reading?
24 A. Yes.

**A - 146**

24 (Pages 90 to 93)

Case 1:04-cv-01207-GMS    Document 75-6    Filed 02/02/2006    Page 4 of 19

Price, et al.                                    v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1         C.A. # 04-956-GMS          October 17, 2005

Page 94

1    Q.  Do you remember approximately when this
2    conversation with Sergeant Ashley occurred?
3    A.  No, I cannot.
4    Q.  Did you change what you did in terms of the
5    bullet trap as a result of the increase in your blood
6    lead level?
7    A.  Yes.  Sergeant Ashley started performing most
8    of the maintenance at that point.
9    Q.  Is that because you refused to do it?
10   A.  I can't recall if I refused to do it or I said
11   that we shouldn't be doing it.  I can't recall.
12   Q.  Did Sergeant Ashley tell you to stop doing it?
13   A.  No, he did not.
14   Q.  Did you completely discontinue the maintenance
15   work at the back of the bullet trap at that point or
16   did you just reduce the amount that you did?
17   A.  I think, if I can recall, I reduced the amount
18   because I think the shotgun wadding still had to be
19   dipped out of the tank.
20   Q.  And you could do that without putting your
21   hands in the water?
22   A.  That's correct.
23   Q.  Did you have any discussions other than the
24   three you've identified with Sergeant Ashley about

Page 95

1    safety and health issues at the range during the time
2    Sergeant Ashley was in charge?
3    A.  I wouldn't say they were the only three
4    conversations.  I just can't recall anything further
5    at this point.
6         There were a lot of things that happened
7    over that period of time and I'm not going to be able
8    to remember all of them right now.
9    Q.  But you have given me what you recall at this
10   point?
11   A.  That's correct, three concerns that I can
12   remember.
13   Q.  Did you have concerns about the heating and
14   air-conditioning system at the range during the course
15   of the time that you worked there?
16   A.  Yes, I did.
17   Q.  Did you have those concerns during the period
18   Sergeant Foraker was there from August 2001 through
19   April 2002?
20   A.  Yes.
21   Q.  And what were those concerns?
22   A.  That the airflow wasn't always flowing the way
23   it should.  Sometimes I could feel something coming
24   back at me and I shouldn't have felt anything in my

Page 96

1    face.  I was pointing down range watching the shooters
2    behind them, so I really shouldn't have had anything
3    coming back at me at all.
4    Q.  Anything else?
5    A.  Water leaking on the floor.  That was a big
6    concern because of people on the range moving and I
7    was always afraid someone would slip because the roof
8    leaked.  And we constantly tried to monitor that and
9    keep that mopped up.
10   Q.  Where did the roof leak?  What part of the
11   roof?
12   A.  Actually, I don't know exactly where it leaked,
13   but I can tell you on the right side of the range at
14   the splitter there was always water in that location.
15   If you're facing down range to the right side of the
16   beam, of the splitter, we always had water there.
17   Q.  What are you referring to as the splitter?
18   Splitter, is that what you're saying?
19   A.  Splitter.  It's the big steel V that's going
20   down the range to deflect anything that would be shot
21   in, it would be going toward the bullet trap.
22   Q.  Any other concerns about the heating and
23   air-conditioning system during the time Foraker was
24   your boss the first time through?

Page 97

1    A.  I think the ventilation system was a constant
2    concern.
3    Q.  And you've just described that sometimes the
4    air would flow back at you.  Is that what your concern
5    was?
6    A.  That's correct.
7    Q.  During the time that you worked at the firearms
8    training unit were any modifications made to the
9    airflow system?
10   A.  Can you explain that a little further?
11   Q.  Any changes to the vents or the baffling or any
12   of the airflow, the ducts, did any of that occur
13   during the time that you worked there?
14   A.  None of the ductwork that I can recall was
15   changed since I started there.
16   Q.  That's what I meant.
17   A.  Correct.
18   Q.  Did you discuss what Sergeant Foraker, again
19   this is August 2001 through April 2002, your concerns
20   about the airflow?
21   A.  I can't recall a specific conversation, but I
22   know we were all concerned about the ventilation
23   system at times because we could feel the air coming
24   back at us and that was constant the entire time I was

25 (Pages 94 to 97)

Price, et al.                                v.                      Chaffinch, et al.
Wayne H. Warren, Volume 1        C.A. # 04-956-GMS          October 17, 2005

Page 98

1  assigned to the range.
2  Q.  During the course of the time that you have
3  been a state trooper have you been to indoor firing
4  ranges that were operated by other law enforcement
5  agencies?
6  A.  During the time that I've been a trooper?
7  Q.  Yes.
8  A.  Yes.
9  Q.  Now, how about, say, from 1995 through the
10 present, so the last ten years, were you at indoor
11 firing ranges operated by other law enforcement
12 agencies?
13 A.  Could you just repeat that one more time?
14 Q.  Yes.
15     During the last ten years have you been to
16 indoor firing ranges operated by law enforcement
17 agencies other than the Delaware State Police?
18 A.  Yes.
19 Q.  How many?
20 A.  Probably five.
21 Q.  And do you remember which five?
22 A.  The Federal Law Enforcement Training Center at
23 Cheltenham, Maryland, the FBI range at Quantico, the
24 New Jersey State Police range I believe it's in

Page 99

1  Trenton. There was a naval range over by Washington,
2  D.C. that we had the opportunity to see.
3     Maybe it was only four.
4  Q.  Did you go to the Federal Law Enforcment
5  Training Center range in Glynco, Georgia?
6  A.  I didn't go on a trip specifically to see that.
7  I don't think I saw that range, no.
8  Q.  Is it your understanding from your experience
9  as a trooper that most indoor firing ranges have
10 airflow problems?
11 A.  Yes.
12 Q.  That would include the FBI range that you went
13 to in Quantico, right?
14 A.  Yes.
15 Q.  What was the nature of the discussions you had
16 with Sergeant Foraker during the first time that he
17 was your supervisor about the airflow problems?
18 A.  At certain times you could feel air coming back
19 at your face.
20 Q.  Anything other than that?
21 A.  No. Not that I can recall.
22 Q.  Were there times when the air seemed to move in
23 the correct direction?
24 A.  Yes.

Page 100

1  Q.  So it wasn't fouled up all the time; it was
2  only fouled up part of the time?
3  A.  I'm not sure about that statement because we
4  walked the line so we're moving from one location to
5  the next location, so I'm not sure if you stayed in a
6  particular location that you wouldn't feel the same
7  thing all the time.
8     So what I am saying is we were in constant
9  movement back and forth across the range when we were
10 out there, so whether or not the same thing occurred
11 at the same location all the time, I'm not sure.
12 Q.  So when you're describing what would occur
13 you're describing being at a certain position on the
14 range where the air would blow back at you?
15 A.  That's correct.
16 Q.  But you could move down, say, a half a dozen
17 shooting positions and the air would be flowing
18 towards the target the way it's supposed to?
19 A.  You could move away from that location, that's
20 correct. I wouldn't say a half a dozen. I wouldn't
21 give a specific number, but I would say you could move
22 away from the location.
23 Q.  Now, say you were to stay in the same location
24 from day to day or from week to week, were there

Page 101

1  circumstances in which the air would be flowing
2  differently? In other words, it would be fine one day
3  and not another?
4  A.  I couldn't make a determination on that because
5  we were constantly moving in different positions and
6  we didn't look at that as hard at that point.
7  Q.  After Sergeant Ashley became your supervisor,
8  did you have discussions with him about airflow within
9  the range?
10 A.  Yes.
11 Q.  How many times, to your recollection?
12 A.  I would be afraid to give you a number really.
13 I mean, it was, it was a constant conversation.
14 Q.  Is the airflow problem at the range something
15 that the range training officers talked about a lot?
16 A.  Yes.
17 Q.  So it was a problem from the beginning of your
18 time there until the end?
19 A.  That's correct.
20 Q.  Were the discussions you had with Sergeant
21 Ashley any different from the discussions you had with
22 Sergeant Foraker about the conditions at the range?
23 I'm sorry. The airflow I'm talking about now.
24 A.  Probably. Because I can remember one winter,

26 (Pages 98 to 101)

Case 1:04-cv-01207-GMS    Document 75-6    Filed 02/02/2006    Page 6 of 19

Price, et al.                                v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS            October 17, 2005

Page 102

1  and I'm not sure, 2002, I can't recall exactly what
2  winter it was, but we had to go onto the roof and
3  reset the ventilation system, the whole motor because
4  it would shut down because it was going below a
5  certain temperature or that's what we were told why it
6  shut down.
7        But, anyway, it had to be reset in order
8  for it to come up and start working again. So at that
9  particular point in time I was getting a little upset
10  that we had to go on the roof and reset the system.
11  Q. So the system only shut down during that one
12  particular winter; it didn't do it in the other
13  winters when you worked there?
14  A. I don't think it did it as much. I'm sure it
15  did because it would shut down more so in the
16  wintertime than it would any other time, but there was
17  one particular time it seemed like we were just having
18  a lot of problems with it.
19  Q. When you say reset the system, what is it that
20  you had to do?
21  A. We had to press a button up on the unit itself.
22  Like the larger unit outside, we would have to open
23  the door and hit a reset button within that unit.
24  Q. All right. You say it happened more in the

Page 103

1  winter than the summer?
2  A. Oh, yes.
3  Q. Did it happen at all in the summer?
4  A. I can't ever recall anyone stating that that
5  was what the problem was in the summertime.
6  Q. So this was strictly a cold weather problem?
7  A. Yes.
8  Q. Did it happen in the winter of 2001-2002 when
9  Sergeant Foraker was the head of the range?
10  A. Well, I'm not sure if it did or not because I
11  know when it wouldn't come up that we would call
12  facilities management and usually they would send
13  someone out and correct the problem. But when it was
14  happening during that one period of time I asked the
15  technician, I said, "You know, we're wasting time
16  waiting for you to get here. Can you show me how to
17  correct this problem?"
18        And that's when he explained to me that
19  once it got below a certain temperature that the unit
20  would shut down and it would have to be reset. I
21  asked him how he got the thing started because he
22  would go up on the roof and come back down and the
23  thing would start back up again.
24  Q. Who was that technician? Do you remember?

Page 104

1  A. I think his name was Ron Whitehouse. I believe
2  that's his last name and that's, again, just a....
3  Q. He's not a facilities management employee, is
4  he?
5  A. No. He's a Trane employee. He works for
6  Trane.
7  Q. So your procedure would be you would call
8  facilities management and facilities management would
9  send Trane out to fix whatever was wrong?
10  A. Sometimes they would send their own maintenance
11  man to come.
12  Q. And who was that? Do you remember?
13  A. It varied over different periods of time of who
14  had the building.
15  Q. My question originally a couple of minutes ago
16  was whether the complaints that you had about the HVAC
17  system were any different when Ashley was the sergeant
18  in charge from what it was when Foraker was the
19  sergeant in charge. And I think you said that it
20  seemed that the system was going off, it had to be
21  reset more that one particular winter.
22        Aside from that, was there any difference
23  in the complaint between when Foraker was in charge
24  the first time and when Ashley was in charge?

Page 105

1  A. I really don't think so. There was a problem
2  the whole time I was assigned there.
3  Q. When you talked to Sergeant Ashley about it,
4  did he seem to agree with you that there was a
5  problem?
6  A. Yeah. He knew there was a problem, but he
7  didn't seem like it was any big deal.
8  Q. Well, when Sergeant Foraker was in charge the
9  first time through, did he seem to recognize there was
10  a problem?
11  A. Yes, he recognized there was a problem.
12  Q. Did it seem like a big deal?
13  A. Yes.
14  Q. Did he ever do anything about it?
15  A. I don't know what was done at that point in
16  time.
17  Q. During the whole time that you were at the
18  range when there was shooting going on, were there
19  days when the ventilation system seemed to work
20  correctly, there were good days?
21  A. Yes, I would say so.
22  Q. And then there were really bad days?
23  A. That's correct.
24  Q. Do you have any idea what caused there to be a

27 (Pages 102 to 105)

Price, et al.                                           v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                    October 17, 2005

Page 106

1  good day or what caused there to be a bad day?
2  A.  No.
3       MR. ELLIS:  Off the record.
4       (Discussion off the record.)
5       (Recessed for lunch at 12:30 p.m.)
6       - - - - -
7       AFTERNOON SESSION
8            1:30 p.m.
9  BY MR. ELLIS:
10  Q.  This morning when you began your testimony,
11  Corporal Warren, you testified that you were taking
12  two drugs.  The second one was Lexapro?
13  A.  That's correct.
14  Q.  What was the first one?
15  A.  Protonix.
16  Q.  Can you spell that?
17  A.  P-r-o-t-o-n-i-x.
18  Q.  Is there any other medication that you're
19  taking on a regular basis at present?
20  A.  I was taking Allegra for allergies.
21  Q.  Anything else?
22  A.  No.
23  Q.  What do you take when you get a headache?
24  A.  Nothing.

Page 107

1  Q.  Now, when Sergeant Foraker returned to the
2  firearms training unit, I think the parties will all
3  be in agreement that it occurred on December 1, 2003.
4       The question I have for you is:  How did
5  you learn that he was coming back?
6  A.  I think -- well, there's always rumor.  The
7  State Police is full of rumor.  But I think Sergeant
8  Ashley informed us that he was going to be transferred
9  out of the FTU, that Sergeant Foraker was returning.
10  Q.  Do you recall how long before the transfer
11  Sergeant Ashley told you that?
12  A.  I would say less than a month.
13  Q.  Prior to Sergeant Foraker's return, did you
14  have a meeting with anybody from the executive staff
15  concerning Sergeant Foraker's return?
16  A.  Yes.
17  Q.  And who did you have a meeting with?
18  A.  Lieutenant Colonel MacLeish.
19  Q.  Who was present at the meeting?
20  A.  Myself, Corporal Price and I'm not sure if
21  anyone else was present.
22  Q.  Was there another officer assigned to the range
23  at that point, other than Sergeant Ashley, of course?
24  A.  Yes.  I think Corporal Peachey was still

Page 108

1  assigned to the unit.
2  Q.  Was James Warwick assigned there yet?
3  A.  I'm not sure.
4  Q.  Do you remember if Corporal Peachey was present
5  at the meeting?
6  A.  I'm not sure.
7  Q.  Do you remember if Corporal Warwick was present
8  at the meeting?
9  A.  I'm not sure about that.
10  Q.  Where did the meeting occur?
11  A.  At the FTU, firearms training unit.
12  Q.  In one of the offices?
13  A.  Yes.
14  Q.  Do you remember which office?
15  A.  I'm pretty sure it was the little conference
16  room that we had off the main office section.
17  Q.  To the best of your recollection, there were
18  only three people there, you, Corporal Price and
19  Lieutenant Colonel MacLeish?
20  A.  I think Sergeant Ashley may have been there,
21  but I'm not sure.  I can say for sure that myself and
22  Corporal Price were there.
23  Q.  What happened at that meeting?
24  A.  Lieutenant Colonel MacLeish informed us that

Page 109

1  Sergeant Foraker was coming back to the FTU.
2  Q.  You already knew that, right?
3  A.  Yes.
4  Q.  And what else did Lieutenant Colonel MacLeish
5  say?
6  A.  That he wanted -- what I can remember is that
7  he just come in and said he wanted full cooperation
8  with Sergeant Foraker.
9  Q.  Do you remember anything else?
10  A.  Not specifically, no.
11  Q.  How long did that meeting last?
12  A.  I couldn't tell you.
13  Q.  Did you take any notes of the meeting?
14  A.  No.
15  Q.  Did you say anything at the meeting?
16  A.  I probably did.
17  Q.  Do you remember what you said?
18  A.  No.
19  Q.  Do you remember if Corporal Price said anything
20  at the meeting?
21  A.  I can't recall any specifics of the meeting
22  other than what was, what was said by Lieutenant
23  Colonel MacLeish, that Sergeant Foraker was going to
24  be transferred back and he wanted 100 percent

A - 150

28 (Pages 106 to 109)

Price, et al.                                                      v.                                              Chaffinch, et al.
Wayne H. Warren, Volume 1                          C.A. # 04-956-GMS                            October 17, 2005

Page 110

1    cooperation with him.
2    Q.  Were you in favor of Sergeant Foraker coming
3    back?
4    A.  At that point in time I'm not sure.  Sergeant
5    Foraker had been transferred out because Sergeant
6    Ashley had been transferred in and now we were having
7    another change of supervisors.
8    Q.  Okay.  You don't remember anything more than
9    what you have told me about that meeting with
10   Lieutenant Colonel MacLeish?
11   A.  No.
12   Q.  When Sergeant Foraker returned did he have some
13   sort of an introductory meeting with the staff?
14   A.  Yes.
15   Q.  And when did that take place?
16   A.  I'm pretty sure it was probably the first week
17   that he came back.
18   Q.  And who was present at that meeting?
19   A.  I think Lieutenant Davis was there and I don't
20   know if we were actually involved in the meeting or we
21   were just talking in the building, but I remember, I
22   remember Lieutenant Davis was there.  I'm not sure
23   if -- I'm really not sure who was there and what part
24   of the meeting, you know, if we were even involved in

Page 111

1    the meeting or we were just part of the discussion
2    during that time.
3    Q.  What do you remember happened that day?
4    A.  I just remember Sergeant Foraker returning to
5    the FTU.  I know that or I'm pretty sure that
6    Lieutenant Davis showed up and Sergeant Ashley would
7    have been there also.  And they just -- they had their
8    meeting and we had some discussion with them at that
9    point.
10   Q.  You had some discussion with whom?
11   A.  With Sergeant Foraker.  And I'm not sure --
12   well, I'm sure we were talking to Sergeant Ashley
13   also.  I don't think we were involved in a sit-down
14   meeting, per se.  I think they were involved in a
15   sit-down meeting.
16   Q.  I'm sorry.  When you say, "we," who are you
17   referring to?
18   A.  Corporal Price and myself.
19   Q.  How about Warwick, was he there that day?
20   A.  I'm not sure.
21   Q.  It's my understanding that Warwick came in the
22   firearms training unit about a month before Sergeant
23   Foraker returned.  Does that jive with your
24   recollection?

Page 112

1    A.  I remember him in there approximately the same
2    time.  I don't know if he was in there a little
3    earlier or not.
4    Q.  What's the first discussion that you had with
5    Sergeant Foraker after he returned on December 1, 2003
6    about the maintenance of the bullet trap?
7    A.  As I recall, he was asking us, asking me about
8    why it appeared to be so dirty.
9    Q.  Why what appeared to be so dirty?
10   A.  The bullet trap and the range area.  And we
11   explained to him that the maintenance was getting
12   overwhelming, plus the fact that we had health
13   concerns about cleaning the area.
14        Also, I remember discussing with him the
15   headset situation.  And I don't know if he brought
16   that up or we just brought that information to his
17   attention because of the safety issue of operating
18   with a wireless system.
19   Q.  Well, how long after he returned do you recall
20   there being a discussion about the maintenance work
21   that you had been doing behind the bullet trap?
22   A.  I would say pretty much as soon as he returned,
23   that first week or so.
24   Q.  And was this a discussion you had with Sergeant

Page 113

1    Foraker yourself or was it a discussion that you had
2    as a group with Sergeant Foraker?
3    A.  Most of our discussions were conducted in the
4    FTU office where we all have desks in the same office
5    setting and we talk back and forth about different
6    things that are occurring.  Usually that's the way we
7    conducted the business.  It was an open line of
8    communication back and forth and everyone would hear
9    conversations.
10        I mean, we were working together as a
11   unit, as a team to conduct training and to operate in
12   that facility.  So there wasn't a lot of, you know,
13   closed door type of things.  It affected -- everyone
14   was affected by everything that was going on in the
15   building.
16   Q.  When you say, "everyone," you're referring to
17   the four of you that were assigned to the firearms
18   training unit?
19   A.  Yes.  Anyone who was coming into the building
20   also, any adjunct instructors or any students, anyone
21   who was exposed to that building.
22   Q.  What do you recall was the first discussion you
23   had, what is the substance of the first discussion you
24   had with Sergeant Foraker about the maintenance of the

29 (Pages 110 to 113)

Price, et al.                                      v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 114

1  bullet trap after he returned in December of 2003?
2  A.  I can't tell you what the first thing was, but
3  I can tell you that the ventilation system and the
4  deposits of dust was a major concern because we were
5  seeing the deposits build up more than usual.
6  Q.  Okay.  I'm really referring to the work that
7  was done behind the bullet trap in terms of keeping
8  the water flow going, keeping the conveyor belt going,
9  cleaning out the shotgun wadding, that type of thing.
10     I mean, when do you recall there being,
11  when do you recall there being a discussion with
12  Sergeant Foraker about that?
13  A.  During his return, pretty, pretty soon after
14  his return.  I can't give you the exact date or time
15  or if that was the first thing that we discussed with
16  him.
17  Q.  I'm not asking you whether that was the first
18  thing you discussed with him, but at some point or
19  another you talked to him?
20  A.  That's correct.
21  Q.  What was the substance of the discussion?
22  A.  About the amount of accumulation of dust behind
23  the bullet trap.  It was starting to appear
24  everywhere.

Page 115

1  Q.  So you talked to him about dust accumulating
2  behind the bullet trap?
3  A.  That's correct.
4  Q.  Did you also talk to him about the pumps
5  clogging?
6  A.  Yes.
7  Q.  And what was the substance of the discussion
8  about the pumps clogging?
9  A.  Everything seemed to be requiring more
10  maintenance.
11  Q.  More than what?
12  A.  More than normal.
13  Q.  And is that something that you were informing
14  Sergeant Foraker of?
15  A.  I'm not so sure that it wasn't questioned by
16  Sergeant Foraker and it was commented back by me.  I'm
17  not sure that I just talked to him and explained to
18  him or he was questioning about what he observed.  I
19  can't discern exactly how that occurred.
20  Q.  Did you discuss the need to replace the filters
21  in the system?
22  A.  I can't recall if that particular conversation
23  came up at that time.
24  Q.  Did you discuss the need to pull the wadding

Page 116

1  out of the water, the shotgun wadding out of the water
2  behind the bullet trap?
3  A.  Again, I can't remember a specific conversation
4  about that.
5  Q.  Was there any point when you discussed with
6  Sergeant Foraker whether you would continue to do
7  maintenance behind the bullet trap?
8  A.  I think that what I conveyed to him was that I
9  thought it was a health risk for us to continue doing
10  maintenance with the bullet trap because of the
11  situation that we had encountered with Sergeant
12  Ashley.
13  Q.  What situation are you referring to?
14  A.  Well, when the blood serum level started to
15  elevate with lead and Dr. Green's comment to Corporal
16  Price about the water helps, the water and oil helps
17  take the lead into your system.  So that was a concern
18  once we found that out from Dr. Green.
19  Q.  Well, when is it that you found that out from
20  Dr. Green?
21  A.  I can't give you a specific date on that.
22  Q.  You don't recall finding that out from
23  Dr. Green sometime in 2004?
24  A.  Dr. Green did not relay that information to me.

Page 117

1  Corporal Price spoke out in that office setting about
2  what Dr. Green had told him.
3  Q.  Do you not recall that having occurred in 2004
4  rather than 2003?
5  A.  I can't give you a specific time when that
6  actually happened, when I heard that conversation from
7  Corporal Price.
8  Q.  Was there a point when you participated in a
9  discussion with the other members of the FTU in which
10  you decided that you were not going to do the
11  maintenance on the pumps and the filters and the water
12  system behind the bullet trap?
13  A.  I think there probably was a conversation and
14  concern that we really didn't know what we were
15  getting into.
16  Q.  What do you mean you didn't know what you were
17  getting into?  This was something that you had done
18  for two-and-a-half years, right?
19  A.  Yes, it was.
20  Q.  When did you have that discussion,
21  approximately?  You know that Sergeant Foraker
22  returned on December 1st.
23  A.  After Sergeant Foraker returned we started
24  voicing our concerns and that's when I think we all

A - 152

30 (Pages 114 to 117)

Price, et al.    v.    Chaffinch, et al.
Wayne H. Warren, Volume 1    C.A. # 04-956-GMS    October 17, 2005

Page 118

1  reached the decision that we had to be limited in how
2  much maintenance we were actually doing.
3  Q. Was there a point when you stopped doing any
4  maintenance behind the bullet trap, you personally?
5  A. There probably was, but I couldn't give you the
6  specific time, even when we quit scooping the shotgun
7  wadding out.
8  Q. I'm going to show you a document that has
9  previously been marked as an exhibit in another
10  deposition so you will see an exhibit designation on
11  there. It says Papili 2 on the bottom right.
12    Do you see that?
13  A. Yes, I do.
14  Q. This is a document that the parties have
15  exchanged in this lawsuit. Are you familiar with that
16  document?
17  A. It appears to be the auditor's report.
18  Q. Have you read that before today?
19  A. I've read so many different documents I'm not
20  sure if I read this or not.
21  Q. Why don't you just take a look at it for a
22  minute and see if you have read it before?
23  A. (Reviewing document) I believe I've read this.
24  Q. Okay. Could you turn to page 11, please?

Page 119

1  A. Okay.
2  Q. I want to ask you about the first paragraph.
3  I'm going to read it to you: It says, and I quote,
4  "On December 1, 2003, a new Sergeant took over command
5  of the firing range. In an interview he informed us
6  that shortly thereafter he met with the current staff
7  and as a result of that meeting a decision was made
8  not to perform any maintenance at the range. The
9  staff made the decision not to continue performing
10  maintenance and custodial functions due to health
11  related issues and not being qualified to perform
12  those functions."
13    Is that statement, it's three sentences in
14  that paragraph, is that an accurate statement of what
15  happened?
16  A. What I think you have to do is I don't
17  understand what the word "maintenance" means.
18  Q. Okay. Aside from that?
19  A. Well, to perform any maintenance, normal
20  maintenance was performed right up to the last day
21  that we shot. And that meant that we had to clean the
22  interior of the range where the students were
23  shooting. Shell casings had to be swept up and put
24  into the barrels and the cardboard had to be taken out

Page 120

1  and removed.
2    So maintenance, all maintenance, some
3  maintenance? This to me says perform any maintenance
4  at the range. Well, any maintenance, does that mean
5  that sweeping up the shell casings is not maintenance?
6  Q. I would not have interpreted that as
7  maintenance, but I don't want to get into an argument
8  with you over what the auditor's office uses as
9  definitions.
10    So just let me ask you this: Did the
11  staff make the decision not to continue to perform
12  certain maintenance and custodial functions?
13  A. Certain maintenance, that's correct.
14  Q. What was it that you decided not to continue
15  doing?
16  A. Going back and replacing pumps or putting our
17  hands into that solution, cleaning any of the filters
18  from the pumps itself.
19  Q. Anything else?
20  A. And I'm not sure if we would have decided that
21  we weren't going to scoop the wadding out at that
22  point in time because, as I said, certain maintenance
23  was still performed right up until the last day.
24  Q. Well, after you had this meeting and decided

Page 121

1  what you weren't going to do, do you recall yourself
2  personally going back and scooping the shotgun wadding
3  out of the conveyor system?
4  A. Do I remember that? No, I do not.
5  Q. Are you saying that you didn't do it or you
6  just don't remember?
7  A. I'm saying I don't remember.
8  Q. Do you recall seeing any of the other officers
9  assigned to the range pulling the shotgun wadding out
10  of the water area?
11  A. No.
12  Q. So the auditor says that there was a meeting.
13  Was there, in fact, a meeting?
14  A. An informal meeting as I discussed prior to?
15  Q. Yes.
16  A. Yes.
17  Q. So there was discussion among the four of you
18  as you were in the area where you had your desks in
19  the front of the range?
20  A. That's correct.
21  Q. And as a result of that informal discussion, as
22  you call it, a decision was made not to perform
23  certain functions behind the bullet trap?
24  A. That's correct.

A - 153

31 (Pages 118 to 121)

Price, et al.                                                        v.                                  Chaffinch, et al.
Wayne H. Warren, Volume 1                        C.A. # 04-956-GMS                        October 17, 2005

Page 122

1    Q.  One of the functions would be unclogging the
2    pumps?
3    A.  That's correct.
4    Q.  One of the functions would be replacing the
5    pumps, right?
6    A.  That's correct.
7    Q.  Another of the functions would be unclogging
8    the filter that is on the hose?
9    A.  That's correct.
10   Q.  Now, was there a discussion or at this informal
11   meeting that you had was there a discussion of what
12   would likely happen to the bullet trap system if you
13   stopped doing those particular maintenance functions?
14   A.  I'm not sure if that was discussed or if it was
15   discussed that someone else is responsible for
16   performing the cleaning, someone needs to be
17   responsible for performing the cleaning.
18   Q.  Let me ask you as somebody who had worked at
19   the range at that point for roughly two-and-a-half
20   years if you stopped doing those maintenance and
21   repair functions involving the pumps and the filters
22   and the water system, what did you expect was going to
23   happen with the system if you just stopped doing it?
24   A.  If anyone stopped doing it?

Page 123

1    Q.  Right.  In other words, if it ceased to be
2    done.
3    A.  It's going to eventually clog up and stop.
4    Q.  And what would be the consequence in the front
5    of the bullet trap, in other words, the shooting area,
6    if that were to happen?
7    A.  Then it would create more of a problem.
8    Q.  And would the nature of the problem be dust and
9    smoke in the area?
10   A.  That's always going to occur.
11   Q.  I'm sorry?
12   A.  That's always going to occur.
13   Q.  And it would be worse if the water system
14   doesn't work, right?
15   A.  That's correct.  That's correct.
16   Q.  Did anybody at this informal meeting of the
17   staff at the FTU say if we stop doing that we're
18   likely to create problems?
19   A.  No.  We felt if we didn't stop doing it we were
20   going to create more of a health risk for ourselves.
21   Q.  I understand that.  But I'm asking whether any
22   of you discussed the potential consequences of not
23   doing the work on the pumps and the filters and that
24   sort of thing that we have been talking about today?

Page 124

1    A.  I don't know if we had a discussion on it, but
2    I think we all knew what the outcome would be.
3    Q.  Now, you testified a few minutes ago that there
4    was some thought that somebody else ought to be doing
5    the work or ought to be doing the maintenance work
6    that the troopers had previously done.  Am I correct
7    about that?
8    A.  That's correct.
9    Q.  And describe to me who said what in terms of
10   that discussion.
11   A.  I couldn't.  It's been a long time ago.
12   There's no way I could tell you exactly who said what
13   in that meeting.
14   Q.  Okay.  Now, going back to the exhibit that you
15   have in front of you, Papili 2, and going back to the
16   top of page 11, if you understand the term maintenance
17   as used in the third line of that sentence to be the
18   maintenance on the pumps and the filters and the water
19   system at the back of the bullet trap, is that a
20   correct statement as far as you know, that paragraph,
21   that first paragraph on page 11?
22   A.  Yes.
23   Q.  Now, was there a discussion between yourself
24   and the other members of the staff, including Sergeant

Page 125

1    Foraker, in December 2003 as to who you would get to
2    do the work that you didn't want to do in the back of
3    the bullet trap?
4    A.  I don't think we discussed who we would get,
5    who was responsible for that job.
6    Q.  I don't understand what you're saying.
7    A.  At that point in time we didn't feel that we
8    were responsible for cleaning behind the bullet trap
9    because we had no training, we had no equipment.  We
10   didn't know what we were dealing with.  No one told us
11   what was contained in that water tank, what chemicals
12   we were putting our hands in.
13   Q.  What you're saying is that you believed you had
14   been doing a job for the last two-and-a-half years
15   that you weren't responsible for doing?
16   A.  Or had no knowledge of what we were actually
17   doing, that's correct.
18   Q.  Well, okay.  But you actually did this work for
19   two-and-a-half years and you believed that you weren't
20   responsible for doing it?
21   A.  That's correct.
22   Q.  Did Corporal Price at this meeting articulate
23   the same idea?  In other words, did he say to you or
24   to anybody else in the room that he didn't believe he

A - 154

32 (Pages 122 to 125)

Price, et al.                           v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS          October 17, 2005

Page 126

1  was responsible for doing it?
2  A.  I think we all felt that way.  Whether or not
3  he said it, I can't tell you exactly what he said.
4  Q.  What did Sergeant Foraker say?  Do you
5  remember?
6  A.  He was of the same opinion, that it was outside
7  of our realm.
8  Q.  Of the group of you in that office whose idea
9  was it to stop doing this work?
10  A.  I think it was probably all of us together.
11  There were health concerns here.
12  Q.  I understand that.  I'm not questioning that at
13  all.
14      I'm just trying to figure out whose idea
15  it was.
16  A.  I couldn't sit here and tell you it was one
17  person's idea because I think we were all concerned.
18  Q.  Had you articulated that concern to Sergeant
19  Ashley when he was there?
20  A.  About putting our hands in the water?
21  Q.  Yes.
22  A.  Yes.
23  Q.  And I take it in your case you had that
24  discussion with him when you talked to him about your

Page 127

1  serum blood lead level rising and you believe that had
2  something to do with the mixture that was in the
3  water?
4  A.  That's correct.
5  Q.  Any other time you talked to Sergeant Ashley
6  other than that time?
7  A.  I'm sure there was, but I can't recall every
8  conversation that we had during that time.
9  Q.  Did you ever tell anybody in the Delaware State
10  Police that the firearms training unit personnel had
11  stopped doing the maintenance on the water system, the
12  pumps, the filters that we have talked about behind
13  the bullet trap?
14  A.  I can't recall ever saying that.
15  Q.  Are you saying it didn't happen or are you
16  saying that you may or may not have and you just don't
17  remember?
18  A.  I can't recall saying that.
19  Q.  Did you ever have any discussion with
20  Lieutenant Davis about maintenance work behind the
21  bullet trap?
22  A.  I can't recall.  I know that he came in a
23  meeting when we contacted facilities management and
24  there was some discussion in front of the bullet trap

Page 128

1  and in the rear, but I can't recall whether or not I
2  told him about the maintenance issue at that point in
3  time.
4  Q.  Do you recall when that meeting occurred?
5  A.  That was January of 2004.
6  Q.  And who was present from facilities management?
7  A.  Mark DeVore and Doyle Tiller.
8  Q.  And why were they called?  What was the subject
9  matter?
10  A.  The ventilation system was failing and I was
11  getting concerned about breathing whatever it was in
12  the air.  And once we found out that it was -- and I'm
13  not sure if I found out.  I'm pretty sure I found out
14  beforehand what the frangible ammunition was composed
15  of.  I think that occurred after, after we knew that
16  we were breathing sintered copper.
17      And I explained to him that the
18  ventilation system was failing again and that I wanted
19  the air tested, I called facilities management and
20  requested that the air be tested.
21  Q.  You're talking about DeVore now you're talking
22  to or Tiller?
23  A.  I talked to Doyle Tiller about that.  Actually,
24  I talked to the secretary.  The secretary told me he

Page 129

1  wasn't there and then I received a call back from
2  Doyle Tiller.
3  Q.  So Tiller and --
4  A.  Mark DeVore and I believe one of the
5  maintenance people also was present initially at the
6  building when those two arrived.  And I'm not sure if
7  he remained when we talked out on the range and behind
8  the bullet trap or not.
9  Q.  Do you remember who that was?
10  A.  No.
11  Q.  Was it Mark D'Allesandro?
12  A.  I'm not sure.
13  Q.  So you're saying Lieutenant Davis was present
14  for that discussion?
15  A.  Yes, he was.
16  Q.  That discussion was primarily about the HVAC?
17  A.  That's correct.
18  Q.  Did you ever discuss with Captain Greg Warren
19  the fact that the firearms training unit personnel
20  were not doing the maintenance work on the water
21  system behind the bullet trap?
22  A.  I can't recall.
23  Q.  Did you ever talk to Lieutenant Colonel
24  MacLeish about that subject?

**A - 155**

Price, et al.                 v.                Chaffinch, et al.
Wayne H. Warren, Volume 1      C.A. # 04-956-GMS      October 17, 2005

Page 130

1   A. I can't recall.
2   Q. How about Colonel Chaffinch?
3   A. I can't recall.
4   Q. Did you ever talk to Colonel Chaffinch about
5   any part of the firearms training unit or about any
6   concern you ever had at the firearms training unit?
7   A. Talk to him directly?
8   Q. Yes.
9   A. I don't remember any time.
10   Q. How about Lieutenant Colonel MacLeish or now
11   Colonel MacLeish, did you ever talk to him directly
12   about concerns you had at the firearms training unit
13   about the health concerns or safety concerns?
14   A. During what period of time?
15   Q. Any period of time.
16   A. Yes.
17   Q. When?
18   A. Once we found out that we had a major health
19   problem and concern there, we started having meetings
20   and we explained to him during this meeting, the first
21   meeting what our concerns were.
22   Q. When approximately did that meeting occur?
23   A. That would have been early 2004, I believe.
24   Q. And --

Page 131

1   A. After the range was shut down.
2   Q. Now, the range, the shooting stopped at the
3   range in about mid-February, right?
4   A. February or March.
5   Q. And the range was formally shut down around the
6   middle of March, right?
7   A. That's correct.
8   Q. Are you talking about some conversation that
9   occurred after the range was shut down and all of the
10   personnel were moved out or was it before that?
11   A. It was during that time period. I'm not sure
12   if it was before or after, but in that specific time
13   period that's when the conversations started with
14   Lieutenant Colonel MacLeish.
15   Q. Where did that meeting take place?
16   A. I can remember one meeting was at the State
17   Police Academy conference room on the second floor. I
18   think that was our first meeting.
19   And I can remember another meeting, I
20   think it was on the second floor of the museum. I
21   believe that was one of the other meetings.
22   Q. So there were two times when you met with --
23   A. Those are the two times that I can remember. I
24   think there was more than that, but I can't, I can't

Page 132

1   recall exactly how many meetings there were, but those
2   two meetings I can remember.
3   Q. Now, the one that occurred at the State Police
4   Academy, who was present other than yourself and Tom
5   MacLeish?
6   A. I'm pretty sure Corporal Price was present,
7   members of facilities management and I think that
8   would have been Doyle Tiller, Mark DeVore and some of
9   the maintenance men that were assigned at previous
10   times to the building. I'm not sure if the academy
11   staff was there.
12   I think Sergeant Foraker was there, but
13   there should be, should have been meeting notes.
14   Q. Did you take notes?
15   A. No. But it wasn't my meeting. There should
16   have been meeting notes if it occurred at the academy.
17   Q. What do you mean there should have been meeting
18   notes? You mean you would have expected somebody at
19   the meeting to take notes?
20   A. Usually when the staff holds a meeting someone
21   is taking notes. I may have taken notes at that
22   particular point in time. I can't recall a hundred
23   percent.
24   Q. If you took notes would you have turned them

Page 133

1   over to your lawyer to be turned over to us as part of
2   the lawsuit?
3   A. Probably.
4   Q. Well, why don't you check and make sure that
5   there aren't some notes sitting in your home or in
6   your car that we haven't seen yet? Otherwise, I will
7   continue to just ask you to give them to
8   Mr. Neuberger, if that's the case.
9   A. I think everything I have has been turned over
10   to Mr. Neuberger or the auditor's office.
11   Q. Okay. That was my question.
12   The meeting that occurred at the academy,
13   do you recall when that was?
14   A. No. Just during that time frame of the winter.
15   Q. Was it held at the academy because the range by
16   that time had been shut down?
17   A. I'm not sure what the reason why was.
18   Q. Do you remember the substance of the
19   discussion?
20   A. Yeah. The State Police firing range.
21   Q. Do you remember was there discussion of the
22   maintenance of the bullet trap at that meeting?
23   A. Probably.
24   Q. And when you say, "Probably," do you remember

A - 156

34 (Pages 130 to 133)

Price, et al.                          v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1        C.A. # 04-956-GMS          October 17, 2005

Page 134

1 the discussion?
2 A. Well, the entire problem was being discussed by
3 both sides, by the State Police and facilities
4 management. And they were trying to come up with an
5 idea of how to correct it, what happened and how to
6 correct the problem.
7 Q. Did the subject of the maintenance of the water
8 system at the bullet trap come up in that meeting?
9 A. I'm not sure, per se. Probably yes, but I
10 can't recall a specific conversation with what you're
11 asking me.
12 Q. I'm really not asking you to lay odds. I just
13 want to know if you remember anything being discussed
14 at that meeting. If you don't remember, that's fine.
15 I'm not trying to get you to invent anything.
16 A. No. I can't, I can't recall any specifics.
17 Q. Do you know who Bob Furman is?
18 A. Yes.
19 Q. Was he present at that meeting?
20 A. I think he was.
21 Q. Do you remember him saying anything at that
22 meeting?
23 A. Not anything specific. I remember him talking.
24 Q. So just so I get this clear, at that State

Page 135

1 Police Academy meeting you don't recall the substance
2 of any discussion about maintenance of the water
3 system of the bullet trap?
4 A. No.
5 Q. Now, you said there was another meeting that
6 occurred at the museum?
7 A. That's correct.
8 Q. Is that the State Police Museum?
9 A. Yes.
10 Q. And who was present at that meeting?
11 A. Lieutenant Colonel MacLeish, Corporal Price,
12 Sergeant Foraker, Captain Yeomans, I think Major
13 Eckrich, I'm going to say Captain Warren.
14 Q. Anybody else that you can remember?
15 A. Did I say Lieutenant Davis?
16 Q. No.
17 A. I think he was present.
18 Q. Was there anybody from facilities there?
19 A. At that meeting I don't think there was anybody
20 from facilities management.
21 Q. Which occurred first? The meeting at the State
22 Police Academy or the meeting at the museum?
23 A. The meeting at the State Police Academy, I'm
24 pretty sure.

Page 136

1 Q. What do you recall about the meeting at the
2 museum?
3 A. That's when we were talking about lead levels
4 and they presented us with a study of different lead
5 levels. I think Lieutenant Colonel MacLeish said that
6 if -- how did he put it? People in the military
7 assigned to the artillery are expected to incur
8 hearing loss. It was something to that -- don't quote
9 me exactly, but it was a statement made in that
10 respect at that meeting.
11 Q. Anything else that you remember about that
12 meeting?
13 A. I remember them presenting some information
14 about blood lead levels, a study that Captain Yeomans
15 had performed, and I think Captain Homiak had a study
16 there also.
17 Q. Were you given copies of the studies?
18 A. Yes. Yes.
19 Q. Do you remember anything else about the meeting
20 at the museum?
21 A. I can't recall if he also made the comment --
22 he made a comment at one of these meetings "I can't
23 believe you guys didn't clean." And I'm not sure if
24 it was at that meeting or one of the previous

Page 137

1 meetings. There were more meetings than just the two
2 that I mentioned.
3 Q. I understand that.
4 When you say, "he," who is the "he" you're
5 referring to?
6 A. That was Lieutenant Colonel MacLeish. I'm
7 sorry.
8 Q. He said he can't believe that you guys didn't
9 clean?
10 A. That's right.
11 Q. Clean what?
12 A. (The witness shrugged.)
13 Q. Do you remember what came before that?
14 A. Well, we were talking about the range. That
15 was the reason why we had the meeting.
16 Q. Were you talking about the bullet trap?
17 A. He didn't specifically say the bullet trap.
18 Q. Were you talking about the bullet trap before
19 he made the comment that you seem to remember?
20 A. No. I think we were just discussing the range
21 itself.
22 Q. The range itself? Now, the range has a lot of
23 components, right?
24 A. That's correct.

**A - 157**

35 (Pages 134 to 137)

Price, et al.                                                    v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                        C.A. # 04-956-GMS                      October 17, 2005

Page 138

1  Q.  Were you discussing the components of the
2  range?
3        In other words, were you talking about the
4  offices or the shooting area?
5  A.  I think it was the overall condition of the
6  range.
7  Q.  The sentence you remember, which is "I can't
8  believe that you guys didn't clean," seems to come out
9  of the blue here.  What did it follow?  Do you have
10  any recollection of why he got -- where did he get the
11  idea that you didn't clean?
12  A.  Well, because as far as I know, Sergeant
13  Foraker was informing him of the condition and what
14  was going on with the range pretty much on a weekly
15  basis, maybe even a daily basis.  So he knew what was
16  happening with the facility or he should have known
17  what was happening with the facility.
18  Q.  And what do you base that statement on?  Why do
19  you think he should have known?
20  A.  The fact that Sergeant Foraker told us that he
21  was informing the staff as to the condition of the
22  range?
23  Q.  Do you know whether Sergeant Foraker ever told
24  the staff that you had stopped performing the

Page 139

1  maintenance on the water system at the back of the
2  bullet trap?
3  A.  Do I know 100 percent?
4  Q.  Do you know any percent?
5  A.  No.
6  Q.  Did Sergeant Foraker ever tell you that he
7  informed the staff -- when you say, "the staff" you
8  mean the executive staff, right?
9  A.  That's correct.
10  Q.  Did Sergeant Foraker ever tell you that he had
11  informed the staff that you weren't doing the
12  maintenance in the back of the range anymore?
13  A.  I can't recall if he said that specifically,
14  but he told them that we were reducing the amount of
15  maintenance that we were performing.
16  Q.  And you know that because that's what he said
17  to you?
18  A.  That's correct.
19  Q.  And what he said to you is "I have told the
20  executive staff that we are reducing the amount of
21  maintenance we're performing"?
22  A.  I don't know if that's his exact terminology,
23  but he informed us that he had relayed it up the chain
24  of command.

Page 140

1  Q.  And exactly what is it that he said to you he
2  had relayed up the chain of command?
3  A.  That there is maintenance problems at the range
4  and we can't continue to clean the range.
5  Q.  Go back to the exhibit that's in front of you,
6  Papili 2, and go down, please, to the third paragraph
7  on page 11.
8        The first sentence states as follows:
9  Quote, "We found no evidence in the documentation made
10  available to us where DSP command was notified that
11  range staff would not be performing duties related to
12  the maintenance and custodial functions historically
13  accomplished by range staff."
14        Do you have any information that would
15  suggest that that sentence is not accurate?
16  A.  I do not.
17        MR. ELLIS:  Could you put a mark on that?
18  I'm going to call them D, just D-1, Defendant's 1.
19        (Defendant's Deposition Exhibit No. 1 was
20  marked for identification.)
21  BY MR. ELLIS:
22  Q.  What I have put in front of you is a chain of
23  e-mail messages and I don't know whether you have seen
24  these before or not, Corporal Warren.  So what I would

Page 141

1  like you to do is to begin at the back at a Friday,
2  December 19, 2003 e-mail and then you will see a
3  response and then you will see a response to the
4  response.
5        Could you just take a look at that and
6  tell me if you have seen these messages before?
7  A.  (Reviewing document)  I believe I have seen
8  this before.
9  Q.  Starting with the one at the back of the chain,
10  and that's the one dated Friday, December 19, 2003
11  from Chris Foraker to Thomas MacLeish and Paul
12  Eckrich, when did you first see that?
13  A.  Are you talking about the last page where it
14  starts out "explained to Mr. D'Allesandro"?
15  Q.  No.  I'm talking about -- well, that's actually
16  the tail end of the message.  If you go to the page
17  before the one you were just reading from, you will
18  see the beginning of that e-mail where it has the
19  writer and the people that it's addressed to.
20  A.  Right.
21  Q.  Going from there to the end of the next page is
22  one message.
23        Have you seen that before?
24        MR. NEUBERGER:  Why don't you just read it

A - 158

36 (Pages 138 to 141)

Price, et al.
Wayne H. Warren, Volume 1

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 17, 2005

Page 142

1  over quietly to yourself?
2         THE WITNESS:  That's what I am going to
3  do.
4     A.  (Reviewing document) Bits and pieces of this
5  look familiar.
6     Q.  Let me ask you, first of all, which bits and
7  pieces look familiar?
8     A.  About the drag or dredge system has been
9  damaged.  The drive chain has been broken.  I observed
10  that.
11    Q.  Let me clarify my question to you.
12        I'm not interested in whether any of the
13  events that are described in the message are familiar
14  to you.  I know they probably are.
15        My question is:  Have you seen the actual
16  e-mail before?
17    A.  I'm not sure.
18    Q.  Take a look at the one on the top page that's
19  addressed to Lieutenant Colonel MacLeish from Chris
20  Foraker.
21        Did you ever see that message before?
22  Again, I recognize that you're going to be familiar
23  with the events.  My question is whether you saw the
24  message before.

Page 143

1     A.  I probably have, yes.
2     Q.  And when did you first see this message?
3     A.  I'm not sure.
4     Q.  Did you see it at or around the time it was
5  written?
6     A.  I'm not sure.  I looked at a volume of
7  paperwork and I can't tell you exactly when I saw each
8  piece of information.
9     Q.  You mean you looked at a volume of paperwork as
10  a part of this litigation?
11    A.  When we were conducting the investigation as to
12  what went wrong.
13    Q.  Do you see in the second paragraph that there's
14  a discussion that somebody may have attempted to
15  sabotage the system?  It's about two-thirds of the way
16  down the second paragraph on the first page of the
17  exhibit.
18    A.  Yes, I do see that.
19    Q.  Do you recall Sergeant Foraker's contention
20  that someone may have tried to sabotage the system?
21    A.  Yes, I can remember that.
22    Q.  Did you ever talk to him about that?
23    A.  Yes.
24    Q.  And do you remember why he thought that

Page 144

1  somebody had tried to sabotage the system?
2     A.  I think because there was material in the belt
3  down in the tank, in the recovery tank that looked
4  like small pieces of chain.
5     Q.  It wasn't small pieces of chain though, was it?
6     A.  No, it was not.
7     Q.  And how do you know it wasn't?
8     A.  Because I've observed it on different occasions
9  from bullets being fired by the federal government.
10    Q.  It's FBI ammunition.  Is that right?
11    A.  That's correct.
12    Q.  When Sergeant Foraker said to you that somebody
13  is trying to sabotage the drive chain by putting a
14  chain down in there, did you tell him that no, that
15  wasn't the case; it was just FBI ammunition?
16    A.  At that point in time I'm not sure.
17    Q.  When he described the problem to you did you
18  recognize it as FBI ammunition?
19    A.  Not until we actually had a chance to observe
20  the ammunition.
21    Q.  How long after the discussion you had about
22  sabotage was it before you actually observed whatever
23  that was that was in the tank?
24    A.  I can't give you the exact time frame.

Page 145

1     Q.  Was it before Sergeant Foraker had all of the
2  locks changed on the building?
3     A.  I don't think so.
4     Q.  How was it that you came to be looking at the
5  material that was in the water tank?
6     A.  That's what I am trying to remember.  I can't
7  recall exactly when that event transpired, but I knew
8  it didn't happen immediately because we were concerned
9  that something may have fallen into the tank.  I know
10  it wasn't immediately, so I'm not sure exactly when we
11  discovered that what he was viewing was the actual FBI
12  ammunition that had been used there.
13    Q.  If you take a look at this e-mail, the first
14  sentence of the third paragraph says that the foreign
15  material was dredged out and Mr. Toplack made several
16  more adjustments and left the system up and running
17  prior to his flight back to Ohio on Tuesday, December
18  30.
19        That would suggest the sabotage allegation
20  was raised prior to December 30, 2003, right?
21    A.  As it appears here, it would.
22    Q.  Does that correspond to your recollection?
23    A.  I wish I could be of more help, but I can't
24  recall exactly when it happened, whether we were even

A - 159

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                          v.                            Chaffinch, et al.
Wayne H. Warren, Volume 1            C.A. # 04-956-GMS                October 17, 2005

Page 146

1   notified at that particular point in time as to what
2   had transpired or what had been found.
3       Q.   Did Sergeant Foraker ever say to you who he
4   thought might have tried to sabotage the system?
5       A.   No.
6       Q.   Did you believe that anybody had tried to
7   sabotage the drag belt?
8       A.   At that point in time?
9       Q.   Yes.
10      A.   I really didn't know.
11      Q.   Do you recall any superior officer of yours
12  initiating an investigation into whether sabotage had
13  occurred?
14      A.   No.
15      Q.   How is it that you -- I may have already asked
16  this -- how is it that you eventually realized that it
17  wasn't a chain, it was just the FBI's ammunition that
18  was creating the appearance of a chain?
19      A.   I think once we observed what they were talking
20  about as far as it appeared to be a chain, well,
21  unless you actually see it, you have no idea. A chain
22  could be several different sizes, several different
23  shapes, but once it was observed then we could
24  identify it exactly what it was or what we thought it

Page 147

1   was.
2       Q.   I guess my question is: Was the reason you
3   were looking at it because somebody wanted you to
4   investigate it to see whether it really was a chain?
5       A.   Yes.
6       Q.   Do you remember who it was that told you to do
7   that investigation?
8       A.   I don't know if it was an investigation or if
9   it was just a comment and I can't tell you now exactly
10  who found it or who got the first piece of it to
11  actually look at it in the first place.
12      Q.   I had understood it was you. Was it not you?
13      A.   I don't recall if it was or it wasn't, but I
14  can recall the incident as it appeared to be a chain.
15      Q.   And when you saw what the material really was,
16  did you immediately recognize it as the FBI's
17  ammunition?
18      A.   Yes.
19      Q.   Now I want to just go back for a minute to the
20  meeting that occurred at the State Police Academy and
21  this is the meeting at which I think you testified
22  that yourself, Sergeant Foraker, Corporal Price, some
23  people from facilities management and MacLeish were
24  present at.

Page 148

1           Do you recall Major Eckrich being at that
2   meeting?
3       A.   He could have been.
4       Q.   Do you recall Captain Warren being at that
5   meeting?
6       A.   He could have been.
7       Q.   You don't remember one way or the other?
8       A.   No.
9       Q.   How about Ralph Davis, do you recall him being
10  there?
11      A.   (Witness shakes head).
12      Q.   Do you recall anybody at that meeting asking
13  the question of you when the last time was that the
14  bullet trap had been cleaned out?
15      A.   No, I can't remember.
16      Q.   Do you recall that questioning being asked of
17  Sergeant Foraker?
18      A.   No.
19      Q.   You're saying you don't remember whether this
20  happened or not?
21      A.   I don't know if that question was asked at that
22  particular meeting or not.
23      Q.   Do you remember any meeting at which you were
24  present with Sergeant Foraker and the rest of the FTU

Page 149

1   group in which somebody from facilities management
2   asked you when the last time was that maintenance had
3   been done on the system at the bullet trap, the water
4   system in the back of the bullet trap?
5       A.   No.
6       Q.   You're saying you don't remember if it happened
7   or not?
8       A.   No.
9       Q.   No, you don't remember?
10      A.   I don't remember. No. Excuse me. No, I don't
11  remember whether or not that question was asked.
12      Q.   Now, my understanding is that the firing range,
13  the building itself wasn't in use over the Christmas
14  holiday in 2003. Does that correspond to your
15  recollection?
16      A.   I don't believe it was.
17      Q.   By not in use I mean people weren't shooting.
18      A.   I understand what you're saying. That's
19  correct.
20      Q.   Now, immediately after the first of the year
21  did a class come back and start shooting?
22      A.   Yes.
23      Q.   At that point I would like you to tell me what
24  did you observe in the shooting area in terms of smoke

**A - 160**

38 (Pages 146 to 149)

Price, et al.
Wayne H. Warren, Volume 1

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 17, 2005

Page 150

1 and debris and that sort of thing at the point that
2 the shooting began in January?
3    A.  Pretty much the same thing, that there were
4 problems with the ventilation system, debris kept
5 accumulating and depositing it along the sides of the
6 building inside the range itself and behind the bullet
7 trap.
8    Q.  Was the face of the bullet trap starting to dry
9 up? In other words, the water was not cascading down
10 as it should?
11    A.  Not as it should, no.
12    Q.  Did the situation continue to get worse through
13 January?
14    A.  I would say probably, yes.
15    Q.  At some point did you go to Sergeant Foraker
16 and ask him whether he thought it was advisable to
17 continue shooting in circumstances that were
18 deteriorating?
19    A.  I think that was part of our discussion, yes.
20    Q.  And what did he say?
21    A.  I can't recall exactly what his words were.
22    Q.  Do you remember what you said?
23    A.  No. I just said that "This is something that
24 has to be resolved. I mean, we're getting into a

Page 151

1 situation here that we got to deal with."
2    Q.  Were the environmental conditions at the range
3 worse in January 2004 than they had been in December
4 2003?
5    A.  I would probably say yes.
6    Q.  Were they worse in December 2003 than they had
7 been the previous summer?
8    A.  Yes.
9    Q.  So what we're dealing with is a continually
10 deteriorating situation, right?
11    A.  That's correct.
12    Q.  Now, in January 2004 do you recall either
13 yourself or any of the other officers at the range
14 saying to Sergeant Foraker "I think we should shut
15 this down" or words to that effect?
16    A.  Yes. I think there was concern about operating
17 and we wanted, we really wanted help from facilities
18 management.
19    Q.  What do you mean help from facilities
20 management?
21    A.  We were operating in a building that we had no
22 training, no protective gear. We had no, I mean no
23 background of what we were being exposed to. They
24 employ an industrial hygienist. They should have sent

Page 152

1 someone in to evaluate that building. They should
2 have made a determination. They have the scientific
3 knowledge to determine whether or not the building is
4 unsafe.
5        We had no knowledge other than common
6 sense.
7    Q.  In January 2004 it's my understanding from
8 reading various documents in the case that there was
9 reddish dust all over the place. Is that something
10 that you recall?
11    A.  That's correct.
12    Q.  There was a haze in the shooting area. Is that
13 correct?
14    A.  That's correct.
15    Q.  The air was in some cases blowing the haze back
16 towards the shooters. Is that correct?
17    A.  That's correct.
18    Q.  People like yourself, for example, were getting
19 a penny taste in your mouth. Is that something that
20 you experienced?
21    A.  Yes, I did.
22    Q.  And you heard reports from other people in the
23 building that experienced the same thing?
24    A.  Yes, I did.

Page 153

1    Q.  Was there any doubt in your mind that there was
2 something wrong with that building?
3    A.  None.
4    Q.  Now, did Sergeant Foraker have the authority as
5 the officer in charge, noncommissioned officer in
6 charge of the range to shut it down if he believes
7 it's unsafe?
8    A.  I'm not sure.
9    Q.  You're not sure?
10    A.  No.
11    Q.  Did you ever say to him that you thought maybe
12 we should shut it down because it's not safe?
13    A.  I just expressed a concern of health reasons
14 about what was going on there.
15    Q.  Did he ever suggest to you that it should be
16 shut down because it's not safe?
17    A.  I think we were all concerned about the health
18 and safety of everyone in that building. But when we
19 called in facilities management, I posed that question
20 to Mark DeVore and asked him if it was safe to work in
21 the environment. And he said the ventilation system
22 was working as designed and that was the engineer who
23 viewed that situation in January of 2004, along with
24 the industrial hygienist. He observed the situation.

39 (Pages 150 to 153)

Price, et al.                              v.                         Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS                October 17, 2005

Page 154

1      If it was a serious concern, I think he
2  should have made a decision there. He's the one with
3  the qualifications. I'm not an industrial hygienist.
4  I'm a firearms instructor.
5      Q. I do understand that and I'm not trying to make
6  you an industrial hygienist. But the facilities
7  management people were not responsible for the
8  day-to-day operation of the range, were they, in the
9  sense of putting state troopers in the range and
10  supervising their activities in the range?
11     A. In that sense I agree with you, that's correct.
12     Q. When DeVore, I think it was, said to you that
13  the HVAC system was working as intended, did you say
14  to him "But the bullet trap is not"?
15     A. I just wanted to know if we were working in a
16  safe environment.
17     Q. Well, did you ever point out to him that you
18  and the other FTU personnel had stopped doing the
19  maintenance of the water system in the back of the
20  bullet trap?
21     A. Yes.
22     Q. You told that to DeVore?
23     A. Yes.
24     Q. And when did you tell him that?

Page 155

1      A. That would have been in January of I believe
2  2004.
3      Q. When in January?
4      A. I can't tell you the exact date.
5      Q. Was it early or late January?
6      A. I can't tell you the exact date.
7      Q. Did he have a response to that when you told
8  him?
9      A. He was asking questions about the situation at
10  the range and he wasn't real cooperative about
11  anything other than I asked him about the previous air
12  testing. I asked him if there was a baseline test
13  when we started using frangible ammunition.
14     Q. I'm sorry. What do you mean "a baseline test"?
15  Of what?
16     A. Of the air quality, what the air contained.
17     Q. When you told him that you had stopped doing
18  the maintenance on the water system in the back of the
19  bullet trap, what was his response?
20     A. I'm going to have to back up on that. I'm not
21  sure if I actually told him we had stopped doing any
22  maintenance on the water system at all. I'm not sure
23  that was discussed particularly. I'm not sure he even
24  asked that question.

Page 156

1      He observed the back of the range along
2  with Doyle Tiller. But whether or not that question
3  was asked, I'm not sure. They asked about the floor
4  scrubber, if the floor scrubber was being used.
5      Q. And what did you tell him?
6      A. No, it wasn't.
7      Q. Why wasn't the floor scrubber being used? Is
8  that the thing that you guys called the Zamboni?
9      A. That's correct.
10     Q. Why was that not being used?
11     A. Well, I'm not sure if it was up and running 100
12  percent. I can't recall that or not, but I know there
13  was a concern on once we got the effluent in the floor
14  scrubber what we were supposed to do with it.
15     Q. By "the effluent" you mean the —
16     A. The wastewater after it picks up the lead and
17  copper.
18     Q. Well, what had you been doing with it for the
19  previous two-and-a-half years?
20     A. I hadn't been doing anything with it because I
21  didn't operate the machine. I had no training, no
22  background in it whatsoever.
23     Q. I understand that. Somebody operated the
24  machine?

Page 157

1      A. Corporal Cathell usually operated that machine.
2      Q. Do you know what he did with the water when he
3  was done?
4      A. Do I know what he did with it?
5      Q. Yes.
6      A. I never saw him do it, but I think he dumped it
7  outside.
8      Q. In the weeds?
9      A. Right outside the range, yes, on the ground.
10     Q. But you never saw him do it?
11     A. I never saw him do it.
12     Q. After Cathell left, did anybody use the
13  machine?
14     A. I'm not sure, to be honest with you.
15     Q. Would you agree with me that using frangible
16  ammunition and shooting it at that bullet trap when
17  it's dry exacerbates the HVAC problem?
18     A. Would I agree with that?
19     Q. Yes.
20     A. Yes.
21     Q. At any point did you have a discussion with
22  Sergeant Foraker or any of the other FTU troopers
23  wherein you suggested shutting down the range until
24  you could get a contractor in to do the work on the

A - 162

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477