Price, et al.                           v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS          October 17, 2005

Page 158

1  bullet trap that you didn't feel competent to do or
2  capable of doing or safe doing?
3     A.  I think there was discussion about
4  discontinuing shooting, but I don't know what happened
5  with that information.
6     Q.  When you say there was discussion about
7  discontinuing shooting, among whom?
8     A.  Amongst the firearms instructors and the people
9  that were assigned to the range and I can't give you
10  everyone involved in the conversation, but Sergeant
11  Foraker was part of the conversation, yes.
12     Q.  Do you believe that Sergeant Foraker would have
13  the authority to shut down the range if he didn't
14  believe it was safe?
15        MR. NEUBERGER:  Well, that was asked and
16  answered.
17        But go ahead, you can answer.
18     A.  Do I believe he has the authority to shut down
19  the range?
20     Q.  Yes.
21     A.  I would think he would have to go through the
22  captain of the academy.  I think he would have to
23  consult with the captain of the academy who would
24  probably consult with the lieutenant colonel before

Page 159

1  that decision was made since he's ultimately in
2  charge.
3     Q.  Could you go back to Exhibit Papili 2, please?
4     A.  2 or 1?
5     Q.  Papili 2, which is this (indicating) one,
6  please.
7        Could you turn to page 11 which is where
8  we looked before?  I want you to read the fourth
9  paragraph down.  It's two sentences.  Just read it to
10  yourself for a minute.
11     A.  The fourth paragraph down?
12     Q.  Yes, the fourth paragraph on page 11.  It
13  begins "When we interviewed the Sergeant."
14     A.  (Reviewing document) I'm finished.
15     Q.  Referring to the first sentence, do you agree
16  that that's an accurate description of what was going
17  on at the range in January 2004?
18     A.  Yes, I do.
19     Q.  Did you believe that it was a safety issue?
20     A.  Yes.
21     Q.  Did Sergeant Foraker ever tell you it was not a
22  safety issue?
23     A.  No.
24     Q.  Did he ever tell you it was perfectly fine to

Page 160

1  function in that environment?
2     A.  No.
3     Q.  Let me back up a second.
4        Did you ever have any discussion with
5  Captain Greg Warren concerning the health and safety
6  issues at the range?
7     A.  Yes.
8     Q.  And how many times did you talk to him about
9  health and safety conditions at the range?
10     A.  I couldn't -- I can't guess at that.
11     Q.  Do you remember when the first time was you
12  talked to him about it?
13     A.  No, I can't.
14     Q.  Was it after Chris Foraker had returned to the
15  range or was it before?
16     A.  I can't recall.
17     Q.  Do you remember when the last discussion you
18  had with him was?
19     A.  That was probably just before he left.  I mean,
20  the range was a concern and still is a concern.
21     Q.  Do you remember the substance of any of the
22  discussions you had with Captain Warren?
23     A.  The only thing I can actually remember was
24  Captain Warren asking about the composition of the

Page 161

1  bullets and making a statement that "I was told that
2  you were shooting ceramic ammunition and then I
3  received an MSDS and it stated that you were shooting
4  sintered copper."
5        That's about the only conversation that I
6  can actually say I remember him saying.
7     Q.  Was there anything more to it than that?
8     A.  I'm sure there was, but that's all I can
9  actually recall.
10     Q.  Okay.  Did you ever have any discussion with
11  Major Eckrich about the health and safety concerns at
12  the range?
13     A.  Yes.
14     Q.  How many times did you talk to him?
15     A.  Again, I couldn't even begin to guess at the
16  amount of times.
17     Q.  Was it more than once?
18     A.  Yes.
19     Q.  Do you remember when the first one was?
20     A.  No.
21     Q.  Did you ever have a discussion with Major
22  Eckrich, aside from the group meetings that you have
23  described at the academy or at the museum near
24  headquarters, about the conditions at the range?

A - 163

Price, et al.                              v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS                   October 17, 2005

Page 162

1  A. I'm sure I've talked to him about that
2  situation.
3  Q. Have you talked to him one on one?
4  A. There was a meeting at the range itself and I
5  can remember Bob Furman present and Major Eckrich was
6  present. And we discussed the maintenance issues at
7  the range and I think he agreed or made a statement
8  that the range personnel shouldn't be in charge or
9  required to do the maintenance of the range.
10      Other than that, there were conversations,
11 but I can't recall.
12 Q. Do you remember the substance of any other
13 discussion with Major Eckrich about health or safety
14 at the range?
15 A. I remember discussing an issue about taking the
16 lead home to my family and contaminating my house.
17 Q. Was that a conversation that you had with him
18 or was it an exchange of e-mails?
19 A. Well, it was an exchange of e-mails, but I
20 think there was a conversation over that also.
21 Q. Was that face to face or was it on the phone?
22 A. I can't recall.
23 Q. Do you remember the substance of the
24 conversation?

Page 163

1  A. Just that I was concerned about contaminating
2  my home once we got the swipe samples back and we
3  started seeing how contaminated the entire building
4  was, including the places where we were changing our
5  clothes.
6  Q. So you actually discussed this with Major
7  Eckrich?
8  A. Yes.
9  Q. What was the substance of it?
10 A. I just voiced my concern.
11 Q. What did he say?
12 A. I'm not sure if he gave me a response or not or
13 he was going to look into it. I can't recall.
14 Q. Did you have any discussions with Major Papili
15 about health or safety at the range?
16 A. I have had several discussions with Major
17 Papili, but I can't specifically remember any one time
18 where I discussed the issues of the range. I'm sure I
19 did, but I can't remember.
20 Q. How about Major Baylor?
21 A. Again, I know I talked to him, but I can't
22 recall any specific conversation.
23 Q. You have several times in the course of our
24 discussion today mentioned an investigation, you

Page 164

1  called it, into the range.
2      What are you referring to?
3  A. When a recruit came forward and explained to me
4  and Corporal Price that we had serious health concerns
5  at the range, he inquired about what the composition
6  of the bullets were. I couldn't give him an answer.
7  I couldn't, I couldn't tell him with 100 percent
8  certainty what the composition of the bullets were.
9  He had previous background with hazardous materials
10 and he said, "Well, I think that we need to, we need
11 to research this because some of the recruits are
12 complaining."
13      We sat down and we listened to him as to
14 what he had to say and we passed that information up
15 the chain of command. Just talking to people in
16 facilities management, really it came after the first
17 meeting when we were trying to explain a very valid
18 concern and problem with the ventilation system. And
19 I can remember it, that the state's engineer, Mark
20 DeVore, was trying to intimidate and he wasn't
21 concerned about what was going on.
22      And then the industrial hygienist said,
23 "Well, we never had a problem with this before."
24 Well, I had heard of previous problems at the range,

Page 165

1  so that kind of sparked my interest as to look a
2  little deeper as to what was going on with this
3  building and facility. And I'm thinking well, all
4  these problems existed. Why wasn't someone up on it
5  and why hasn't these problems -- why haven't the
6  problems been corrected and what are the problems in
7  this building?
8      So being an investigator, I started
9  looking around a little bit. The first thing I did
10 was I went back and I checked the panel in the
11 building, the electrical panel. It had a final
12 inspection sticker on it. There were no other
13 previous inspections performed and I just thought that
14 was kind of suspicious that there wasn't a subpanel or
15 a rough-in inspection performed on that electrical
16 panel. The electricians are usually pretty good with
17 their inspections and following the building codes.
18      So I thought well, do you know what? We
19 really need to talk to someone about this building.
20 And we started looking into the building. We called
21 the county to obtain any records that they may have
22 had. Since the building was constructed in New Castle
23 County, we thought surely we would have a building
24 permit issued there. We would have the inspections

A - 164

42 (Pages 162 to 165)

Price, et al.                                         v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 166

1  that were performed and we would have a certificate of
2  occupancy and when the certificate of occupancy was
3  issued.
4        We were thrown off a little bit with that
5  and then we were finally told that there was never a
6  certificate of occupancy issued for that building.
7  Actually, there was never a building permit issued to
8  construct the building. So that really provoked my
9  interest a little bit more and I thought do you know
10  what? Something is really wrong here. The State of
11  Delaware, we are a Department of Public Safety. Why
12  aren't we following the rules?
13        So from that point on we started looking
14  at every aspect of the building.
15  Q.  Well, what other aspects of the building did
16  you look at? Who is the "we," by the way?
17  A.  Members of the firearms training unit.
18  Q.  So what other aspects of the building were you
19  looking at?
20  A.  Well, we checked out to see if the fire marshal
21  had performed an inspection, and he didn't. And I
22  just found that kind of odd, since we're housing
23  ammunition and explosives, that the fire marshal
24  wouldn't do an inspection on that building.

Page 167

1        So we asked for the information from the
2  Fire Marshal's Office and we got stonewalled there a
3  little bit until their attorneys reviewed our request
4  or my request. I gave him a written request for any
5  information that they may have on the building and the
6  only thing they had was a letter requesting a
7  sprinkler exemption from the range, which they
8  granted.
9  Q.  What else did you look at?
10  A.  The letter that didn't contain the ammo storage
11  room in that request and why the room designations
12  were not on that letter.
13  Q.  Okay. What else?
14  A.  If there had been any previous problems with
15  the building. Why wasn't the air being monitored?
16  Q.  You knew that there had been previous problems
17  with the building, didn't you?
18  A.  Yes. But I didn't see anything in writing
19  where any scientific test had been conducted and no
20  one was monitoring the air in the building.
21  Q.  Anything else that you did as part of this
22  investigation?
23  A.  Yes.
24  Q.  What? Just what else?

Page 168

1  A.  Well, we started -- we got that information,
2  found out that the air had been monitored and tested
3  in November of '98 by a company by the name of Batta,
4  that the air quality was over the OSHA limit for lead,
5  requested swipe samples to be done in the building by
6  Environmental Solutions.
7        They performed the swipe sampling and
8  levels came back all over the building that were
9  higher than what they should have been to OSHA
10  standards, reported the information. They brought in
11  Harvard Environmental and they redid the same type of
12  swipe testing procedures. And, again, it got the same
13  results: The building had contaminants throughout
14  that exceeded the OSHA limits.
15  Q.  What year was this done?
16  A.  That was in 2004. And then we were just
17  researching the building. How did this all happen?
18  And we found out that the bidding process or the
19  selection of the architectural engineering firm was
20  skewed and the wrong company actually received the
21  bid. They designed the building and it wasn't going
22  to work.
23        They had an expert who looked at the
24  ventilation system plans and said that it would fail

Page 169

1  and explained to them in writing that it was going to
2  fail prior to it being constructed. And we found a
3  letter from Randall Hair, an OSHA consultant, and
4  Traci Trunzdale, an OSHA consultant also, and
5  explained what they should do about the ventilation
6  system and also that they should be concerned about
7  the decibel level of noise in that type of building
8  and recommendations made to control those things.
9  Q.  Anything else that you found?
10  A.  Well, I think it's all contained or a lot of it
11  is contained in the auditor's report there.
12  Q.  I do recognize that. I'm just seeing what you
13  remember.
14        Do you remember anything more than what
15  you just described?
16  A.  I'm sure I'm going to forget a lot of things
17  because it's a rather large investigation containing a
18  few thousand documents. We looked at the ventilation
19  system, that there were modifications made to the
20  ventilation system, that there were problems since day
21  one with the ventilation system. It was never checked
22  or passed or inspected prior to turning it over to the
23  State Police for our use. The air wasn't monitored
24  constantly.

43 (Pages 166 to 169)

Price, et al.                                v.                        Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS                October 17, 2005

Page 170

1    Once we had a problem, the solution to the
2  problem was switching to frangible ammunition. I
3  don't think there was any investigation as to what
4  cause the frangible ammunition would have to the
5  bullet trap that was initially installed.
6       Also, the ventilation system itself, the
7  HVAC system was modified several times and there was
8  no scientific testing conducted to prove that it was
9  operating correctly. We took someone's word for it.
10  And we were in a poisonous building all the time in my
11  opinion.
12    Q.  Who was responsible for the decision to go to
13  frangible ammunition?
14    A.  I'm not sure. And I know there was no baseline
15  testing performed when we switched to frangible
16  ammunition. No one came in to test the air to see how
17  much contaminants were in the air at that point in
18  time when we switched over. So we switched over to
19  frangible ammunition and we never received a baseline
20  air quality test to see how much dust was being
21  generated by shooting that ammunition. That was never
22  performed.
23       And if we're shooting mostly frangible
24  ammunition and sintered copper ammunition, why were we

Page 171

1  only getting our blood serum checked for lead when we
2  were actually breathing probably more copper? And was
3  copper controlled? It was controlled we found out.
4  Why weren't we getting a blood serum test for copper
5  and zinc also that was contained in the ammunition?
6       And one thing led to another and one thing
7  led to another. What was the decibel levels of the
8  range or the work environment? No one could tell us.
9  Therefore, we couldn't figure out a time weighted
10  average of exposure.
11       How long could we actually work in that
12  environment? No one told us that. No one knew what
13  the decibel level protection were for the earmuffs and
14  the earplugs. We were operating in a dangerous
15  building without any equipment or any training. No
16  one told us that we were working in such a dangerous
17  environment.
18       And I checked with the State Police to
19  find out who was responsible, was there a right-
20  to-know officer, and I was told we didn't have a
21  right-to-know officer. And one thing led to another.
22  I mean, it was just like why are you doing this to us?
23       And then we're trying to correct the wrong
24  and then we're being retaliated against further.

Page 172

1  We're being stymied. We're not allowed to come to the
2  meetings to discuss problems on the range. So one
3  thing led to another. There's so much in the
4  investigation and that's what I am calling it, an
5  investigation, because that's what it is. We looked
6  into documents and information. I can't figure out
7  why they would treat someone that way.
8    Q.  At any point have you been tested for your
9  serum level of copper?
10    A.  Yes.
11    Q.  Did it ever test outside of the normal limits?
12    A.  It was considered high normal.
13    Q.  It was below the threshold of being high,
14  wasn't it?
15    A.  That's correct.
16    Q.  How about for zinc, were you ever tested for
17  zinc?
18    A.  Yes.
19    Q.  Have you ever tested outside of the normal
20  limits?
21    A.  Yes. The first time I was tested. And I think
22  actually it was the only time I have been tested.
23    Q.  Have you ever had a doctor tell you that the
24  zinc had caused you any health problems?

Page 173

1    A.  No.
2    Q.  How about the copper?
3    A.  No.
4    Q.  In other words, no doctor has ever told you
5  you had a health problem?
6    A.  The only thing a doctor told me about copper is
7  he said it wasn't my liver's friend and that was
8  Dr. Green of Health Works.
9       MR. NEUBERGER:  Ed, we have been going for
10  an hour and a half. Could we take a break?
11       MR. ELLIS:  Sure.
12       MR. NEUBERGER:  Thank you.
13       (A brief recess was taken.)
14       MR. ELLIS:  Can you mark that one?
15       (Defendant's Deposition Exhibit No. 2 was
16  marked for identification.)
17  BY MR. ELLIS:
18    Q.  Could you take a look at what I have asked the
19  court reporter to mark as D-2 and tell me if that's a
20  document you're familiar with? It's got Delaware
21  State Police Firearms Training Range Current Range
22  Status And Analysis written on the front with the name
23  of Captain Gregory A. Warren, 01/30/04.
24    A.  (Reviewing document).

**A - 166**

44 (Pages 170 to 173)

Price, et al.                                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1                        C.A. # 04-956-GMS                  October 17, 2005

Page 174

1    Q.  Are you familiar with this document?
2    A.  Yes.
3    Q.  Did you write any part of it?
4    A.  No.  I don't know if I provided any information
5    for him.
6    Q.  That was my next question.
7        Did you provide any information to Captain
8    Warren for this report?
9    A.  I'm unsure, unless I would read the whole
10   report.
11   Q.  Well, take a look at it for a few minutes
12   anyway.
13   A.  (Reviewing document).
14   Q.  Let me ask you a question preliminarily.
15       Did you become aware in January 2004 that
16   Lieutenant Colonel MacLeish had asked Captain Warren
17   to prepare a report on problems at the range and what
18   could be done about them?
19   A.  No.
20   Q.  You're not aware of that?
21   A.  No.
22   Q.  You can take a look at the page of this
23   document that says Chronology, it starts with
24   Chronology of Events.  There are no page numbers on

Page 175

1    the document, but it's the sixth page I think of the
2    document.  It starts on the top Chronology of Events.
3        Another way of looking at it is the third
4    page up from the back.
5    A.  I didn't go back far enough.  Sorry.
6    Q.  The bottom paragraph on that page begins
7    "Captain Warren responded to the Range on January 20
8    to meet with the Range staff."
9        Do you see that?
10   A.  Yes.
11   Q.  Do you recall a meeting you had with Captain
12   Warren at the range concerning the multiple concerns
13   raised at the facility?
14   A.  Yes.  I remember the meeting.  I don't remember
15   a whole lot of what was said other than about
16   Environmental Solutions.
17   Q.  Do you recall whether Environmental Solutions
18   had done testing there or not?
19   A.  At that point?
20   Q.  Yes.
21   A.  I'm not sure.
22   Q.  Was that the company that Mr. Farrell worked
23   for?
24   A.  Yes.

Page 176

1    Q.  Was Mr. Farrell at that meeting?
2    A.  I'm not sure if he was at the meeting or not.
3    Q.  Do you recall anything that happened at that
4    meeting?
5    A.  No.  Because there were so many different
6    meetings and things that were happening.  If this was
7    the original meeting, we expressed our concerns to
8    Captain Warren and we requested Environmental
9    Solutions to come in and do a swipe sample.
10   Q.  Well, it would appear that Environmental
11   Solutions was actually at the building this day, would
12   it not, based on Captain Warren's memo?
13   A.  That's correct.  But I don't know if they were
14   there to meet with him after our meeting or if the
15   meeting included them with all of us present.
16   Q.  If you go over on to the next page, please,
17   beginning in the third paragraph is a series of what
18   appear to be actions that Captain Warren is telling
19   the staff are going to be taken.  I would like to go
20   through them with you.
21       "Contact Environmental Solutions to
22   initiate the air quality testing."  Is that something
23   that actually happened?
24   A.  I believe it did.

Page 177

1    Q.  Number 2, "Contact Carey's Heating and Air
2    Conditioning."
3        Did that actually happen?
4    A.  Yes.
5    Q.  Number 3 is "Pilot and R&D the 'clean fire'
6    round."
7        Did that occur?
8    A.  I can't recall that one.
9    Q.  What do you understand a "clean fire" round to
10   be?
11   A.  It was lead-free.
12   Q.  Is that the same type of ammunition that the
13   FBI uses?
14   A.  I believe it is.
15   Q.  So that's the same thing that looks like the
16   chain?
17   A.  A spring or a chain.
18   Q.  You think that is the same thing?
19   A.  I believe so.
20   Q.  "Identify alternate sites" is number 4.
21       Is that something that happened?
22   A.  Yes.
23   Q.  Number 5 is "All staff and students will
24   immediately start wearing paper air mask."

45 (Pages 174 to 177)

Price, et al.                                     v.                      Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 178

1    Did that occur?
2    A.  No.
3    Q.  Do you recall a discussion of that?
4    A.  Yes.
5    Q.  What did Captain Warren say about the paper air
6    masks?
7    A.  He said that authority, Lieutenant Colonel
8    MacLeish, that we would all have to start wearing
9    paper dust masks.
10   Q.  Did he tell you how that came up in the
11   conversation with Lieutenant Colonel MacLeish?
12   A.  He basically told us we were going to have to
13   start wearing dust masks.
14   Q.  That's all he said?
15   A.  That's all I can recall that he said.
16   Q.  Did you actually start doing it?
17   A.  No.
18   Q.  How did you learn that the range was going to
19   be shut down?
20   A.  I think we received the swipe sampling back
21   from Environmental Solutions.  We had two different
22   samplings conducted, one with Environmental Solutions
23   and one by Harvard Environmental.  And I think it was
24   the one that we received from Environmental Solutions

Page 179

1    in a letter from Art Nielson, who was an industrial
2    hygienist, that recommended that the range be closed
3    after he reviewed the swipe sampling.  And I'm not
4    sure if the air test was done at that point or not.
5    Q.  Did somebody in the State Police have to tell
6    you that the range was being shut down?
7    A.  Yes.
8    Q.  Who was it that told you?
9    A.  I can't recall.
10   Q.  Did you learn it from Sergeant Foraker?
11   A.  I can't recall.
12   Q.  I have another document to show you.
13       MR. ELLIS:  I am going to ask the court
14   reporter to mark that as No. 3.
15       (Defendant's Deposition Exhibit No. 3 was
16   marked for identification.)
17   BY MR. ELLIS:
18   Q.  My question is going to be whether you're
19   familiar with that document.
20       By the way, the document in terms of
21   description has on the front cover Delaware State
22   Police Firearms Training Facility Responsibility
23   Status Analysis, Sergeant Christopher D. Foraker,
24   02/09/04.

Page 180

1    A.  (Reviewing document) I've probably seen this.
2    Q.  Did you participate in preparing it?
3    A.  I don't know if anything was used that I had at
4    this point.
5    Q.  Did you write any part of it?
6    A.  No.
7    Q.  When was the first time you talked to anybody
8    in the State Police above you in the chain of command
9    about your hearing problem?
10   A.  I can't recall the exact time that that
11   happened.
12   Q.  Do you recall ever raising your personal
13   hearing issue with anyone inside the State Police?
14   A.  I'm sure that I made the comment after my wife
15   told me that I should get a hearing test in the office
16   area, but I think -- I can't remember when I went to
17   human resources and asked Kristy Tuxward what I had to
18   do about the problem.
19   Q.  You recall going and talking to Kristy Tuxward
20   about your hearing problem?
21   A.  Right.
22   Q.  You have no recollection of when that was?
23   A.  (Witness shakes head).
24   Q.  You have previously described a meeting that

Page 181

1    occurred at the museum, at the State Police Museum?
2    A.  That's correct.
3    Q.  You don't, by any chance, recall that meeting
4    occurring on March 17th, 2004, do you?
5    A.  No.
6    Q.  Do you recall whether at that meeting Sergeant
7    Foraker told the lieutenant colonel, which would have
8    been MacLeish at the time, that you and Corporal Price
9    were having hearing trouble?
10       MR. NEUBERGER:  I'm sorry.  Did you say
11   March 14th of '04 or did you mean '05?
12       MR. ELLIS:  I meant March 17, '04.
13       MR. NEUBERGER:  And you're saying in March
14   of '04 Sergeant Foraker --
15       MR. ELLIS:  Yes, March 17, '04 is the
16   date.  If I screwed up the date, I'm sorry.
17       MR. NEUBERGER:  No.  I was confused.  I
18   got you now.  I'm with you.
19   BY MR. ELLIS:
20   Q.  Do you recall at that meeting whether Sergeant
21   Foraker raised with the lieutenant colonel the
22   question of your hearing?
23   A.  No, I do not.  I can't recall that.
24   Q.  You have no recollection one way or another?

A - 168

46 (Pages 178 to 181)

Price, et al.                              v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS         October 17, 2005

Page 182

1    A.  None.
2    Q.  You're not saying it didn't happen; you just
3  don't remember?
4    A.  I don't remember, that's correct.
5    Q.  Do you remember anybody else at that meeting
6  raising the question of your and Corporal Price's
7  hearing?
8    A.  No.
9    Q.  You were tested first for hearing by Omega.  Is
10  that right?
11    A.  No.
12    Q.  Which is the first doctor that tested you for
13  your hearing?
14    A.  On which occasion?
15    Q.  Well, beginning in the beginning of 2004.  In
16  other words, this whole issue of the range starts up
17  in early 2004 and I know that you had a series of
18  tests of your hearing.
19        What was the first one that you can
20  recall?
21    A.  I think that was March 1st, I believe, at Omega
22  Medical.
23    Q.  So the first one was at Omega?
24    A.  That's correct.

Page 183

1    Q.  And how did you come to go to Omega?
2    A.  We were discussing issues with Joe Farrell of
3  Environmental Solutions and we were concerned that
4  Bayhealth maybe was not as adequate in our exposure to
5  heavy metals or any other hazardous materials that we
6  may be exposed to.  And we asked him who his
7  technicians had to go see or who oversaw the program
8  at Environmental Solutions since those people were
9  being exposed to pretty much a lot of the same things
10  we were since they were removing that hazardous
11  material from the range.
12        He recommended Omega Medical and said that
13  they would do a pretty good job; that they do the work
14  on employees of Environmental Solutions.  So that's
15  how we ended up going to Omega Medical.
16    Q.  Did somebody at the firearms training unit
17  arrange for the State Police to pay for Omega?
18    A.  I believe so, yes.
19    Q.  Was that you that set that up?
20    A.  I don't recall.
21    Q.  So you were tested by Omega for blood lead
22  levels?
23    A.  Mm-hmm.
24    Q.  Yes?

Page 184

1    A.  Yes.
2    Q.  And you were also tested for I guess the blood
3  copper level?
4    A.  Yes.
5    Q.  Also zinc?
6    A.  Yes.
7    Q.  And you had your hearing tested as well?
8    A.  Yes.
9    Q.  What else was tested?  Anything else that's
10  pertinent to the conditions at the range?
11    A.  Cardiopulmonary function test, chest X-ray.
12        I'm not sure what else.  Those are the
13  things that I can remember.
14    Q.  What did the result come back in terms of your
15  hearing?
16    A.  I had high frequency.
17    Q.  High frequency hearing loss?
18    A.  Loss, mm-hmm.
19    Q.  What was the next step in getting your hearing
20  tested?
21    A.  (Pause).
22    Q.  Let me back up a second.
23        Who was the next doctor that you saw about
24  your hearing?

Page 185

1    A.  I'm not sure if it was Dr. Cooper at that
2  point.
3    Q.  Was it either Dr. Cooper or Dr. Green?
4    A.  Yes.  Or I could have been sent back to Omega
5  for another test.  And that's where it's confusing
6  because there's Bayhealth or Omega, Dr. Cooper
7  somewhere along the line, Dr. Green.  Well, he
8  actually did the fitness for duty exam.  And then I
9  was sent back to Omega to get a second test and also
10  to fill out a questionnaire by a company by the name
11  of the TK Group.
12        And I can't remember in what order I did
13  that.
14    Q.  Now, the Omega examination concluded that you
15  had high frequency hearing loss, right?
16    A.  That's correct.
17    Q.  And Dr. Cooper concluded the same thing, right?
18    A.  That's correct.
19    Q.  And Dr. Green in his fitness for duty exam
20  concluded the same thing, right?
21    A.  That's correct.
22    Q.  And did you ever get a result when you went
23  back to Omega from the examination by the TK Group?
24    A.  Yes.

A - 169

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Price, et al.                                    v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 186

1    Q.   And what was that conclusion?
2    A.   That I had high frequency hearing loss, but it
3    was domestic related.
4    Q.   Domestic as opposed to work related?
5    A.   That's correct.
6    Q.   So by "domestic" it would include shooting
7    hunting rifles or hunting shotguns; it doesn't
8    necessarily have to do with something that happens in
9    your house?
10   A.   I don't really know what it meant because no
11   one ever talked to me about it. I got it in a letter.
12   Q.   Now, you were also sent to see Dr. Emmett at
13   the University of Pennsylvania, right?
14   A.   That's correct.
15   Q.   Did anybody ever explain to you why you were
16   going to see Dr. Emmett?
17   A.   It was a second opinion from Dr. Green. And
18   also Dr. Green after he made the statement that copper
19   is not your liver's friend he recommended that we be
20   checked out by someone else.
21   Q.   By the way, have you had your liver checked
22   out?
23   A.   No.
24   Q.   In none of these tests did you ever have your

Page 187

1    liver checked out?
2    A.   Not to my knowledge.
3    Q.   Have you ever had any kind of a test that said
4    that you had a problem with your liver?
5    A.   Not that I know of.
6    Q.   Let me show you what I will mark as No. 4.
7         (Defendant's Deposition Exhibit No. 4 was
8    marked for identification.)
9    BY MR. ELLIS:
10   Q.   Are you familiar with Exhibit D-4? This is a
11   letter from Dr. Edward A. Emmett from the University
12   of Pennsylvania Medical Center to Captain Yeomans at
13   the State Police.
14   A.   (Reviewing document) I'm familiar with this.
15   Q.   Who did you get a copy of this from?
16   A.   Captain Yeomans.
17   Q.   Now, did you have a discussion with Captain
18   Yeomans about it when he gave it to you or after he
19   gave it to you?
20   A.   I'm certain that I did.
21   Q.   Do you remember the substance of the
22   discussion?
23   A.   No.
24   Q.   Look at the last page of the letter.

Page 188

1         Do you see where at the top of the last
2    page Dr. Emmett says, quote, "To be certain about his
3    inability to meet the requirements for a Delaware
4    State Trooper I would recommend that he undergo
5    functional hearing testing from Ms. Sherrie Davis at
6    the Hospital of the University of Pennsylvania"?
7         Did you, in fact, undergo a functional
8    hearing test?
9    A.   Yes, I did.
10   Q.   Why did you do that?
11   A.   I was ordered to do so by the division.
12   Q.   Did you understand that if you had a certain
13   performance in the functional hearing testing that you
14   would be allowed to continue work?
15   A.   I'm sorry?
16   Q.   Excuse me. Just wait one second, please.
17        Did you understand that Dr. Emmett in this
18   letter that's marked Exhibit D-4 had concluded that
19   you were not capable of meeting the requirements of
20   performing the job of a Delaware State Trooper?
21   A.   Yes.
22   Q.   And why did you understand, what was your
23   understanding as to why he wanted you to go through
24   the functional hearing test?

Page 189

1    A.   To see if I could hear in a controlled
2    environment.
3    Q.   It's a different kind of test than the typical
4    tone test, right?
5    A.   Yes, it is.
6    Q.   Was it your understanding that if you could
7    perform on the functional hearing test you would be
8    able to continue as a Delaware State Trooper?
9    A.   Yes.
10   Q.   You went and did the functional test, right?
11   A.   That's correct.
12   Q.   And then let me show you No. 5.
13        (Defendant's Deposition Exhibit No. 5 was
14   marked for identification.)
15   BY MR. ELLIS:
16   Q.   Exhibit D-5 is a letter dated February 24, 2005
17   from Dr. Emmett to Captain Yeomans.
18        Have you seen that before?
19   A.   Yes.
20   Q.   Where did you receive this?
21   A.   From Captain Yeomans.
22   Q.   Did you have a conversation with Captain
23   Yeomans as a result or at the point that you received
24   this?

A - 170

48 (Pages 186 to 189)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Price, et al.            v.            Chaffinch, et al.
Wayne H. Warren, Volume 1     C.A. # 04-956-GMS     October 17, 2005

Page 190

1   A. I recall some of the conversation.
2   Q. Did this letter surprise you?
3   A. Yes, it did.
4   Q. Why?
5   A. Because I know I have trouble with my hearing,
6 but most of my trouble is in a noisy environment so if
7 I have background noise, I'm incapacitated. And
8 that's why I went to get my hearing checked in the
9 first place. I mean, I knew I had a hearing problem.
10      And this test is really an outdated test.
11 It's for hearing aid candidates. It's really not for
12 troopers and there were no standards set by the State
13 Police to even measure what this was.
14   Q. Prior to your having your hearing tested by
15 Omega on March 1, 2004, did you believe you were
16 capable of performing the duties of a Delaware State
17 Trooper?
18   A. In what capacity? I don't understand what
19 you're asking.
20      Could I function as a Delaware State
21 Trooper? Is that what you're asking me?
22   Q. Yes.
23   A. Yes.
24   Q. Now, when you asked me the question in what

Page 191

1 capacity, what do you mean by that? Are you saying
2 that you're recognizing that the job of a firing range
3 instructor is different from the job of a sergeant in
4 the human resources department?
5   A. Yes.
6   Q. Did you believe at the point that you -- I'm
7 sorry. Let me back up a second.
8      You've testified previously that you were
9 active on the SORT team?
10   A. Yes.
11   Q. And you still are or you're still at least
12 carried on the SORT team?
13   A. I'm carried on the SORT team.
14   Q. And that during the spring of 2004, during the
15 spring of 2004 were you still going on SORT missions?
16   A. Yes.
17   Q. Before you were tested, did you believe that
18 you could be a SORT officer as part of your duties?
19      In other words, were you capable given
20 what you believed to be some hearing problems of
21 performing as a SORT officer?
22   A. In certain capacities.
23   Q. What do you mean by that?
24   A. If I weren't relying on my hearing 100 percent,

Page 192

1 if that wasn't a part of the job, if I were an
2 administrative officer or I dealt with supplies or
3 equipment or training, to evaluate things, yes, I
4 think I could do that.
5   Q. But you don't believe that you could -- let me
6 make sure you understand the question.
7      Prior to March 1, 2004 did you believe
8 that you could be on a SORT mission where you would be
9 breaking down doors or undertaking surveillance of a
10 dark building or apprehension of a dangerous suspect?
11   A. I think I would have been limited.
12   Q. You continued to do that type of thing up until
13 June of 2004 though, didn't you?
14   A. No.
15   Q. You said that you did your last SORT activity I
16 think on June 17th, 2004?
17   A. June 17th, 2004, that evening.
18   Q. What was the job?
19   A. To recon or surveil a mobile home where we were
20 going to execute a search warrant the following
21 morning. So all I would do is a physical drawing of
22 the area, assess the area, determine the amount of
23 exterior perimeter personnel that would be needed,
24 what we would have to do with the roadway.

Page 193

1      Basically, I surveyed the area in a
2 vehicle with an undercover officer.
3   Q. When's the last time you were actively involved
4 with a SORT operation that was going to take down a
5 suspect?
6   A. Probably during that same year.
7   Q. Early 2004?
8   A. Mm-hmm.
9   Q. After March 2nd?
10   A. I'm not sure.
11   Q. After you had the first test result back from
12 Dr. Emmett, this is Exhibit 4, did you believe that
13 you were capable of performing the duties of a road
14 trooper?
15   A. No.
16   Q. Did you believe you were capable of performing
17 the activities of a firearms training unit instructor?
18   A. According to Dr. Emmett, no.
19   Q. Well, how about according to you?
20   A. I didn't want to incur any more hearing loss,
21 no.
22   Q. After you received Exhibit D-5, you then went
23 back up to see Dr. Emmett again, right?
24   A. That's correct.

A - 171

49 (Pages 190 to 193)

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1          C.A. # 04-956-GMS                  October 17, 2005

Page 194

1   Q.   And you had a conversation with him?
2   A.   Yes, I did.
3   Q.   How long did it last?
4   A.   I have no idea.
5   Q.   Was it in his office in Philadelphia?
6   A.   Yes, it was.
7   Q.   Do you remember what you said to him?
8   A.   Yes, I do.
9   Q.   What did you say to him?
10  A.   I wanted him to explain the functional hearing
11  test to me and also explain the audiogram.  He
12  couldn't explain the functional hearing test.  I said
13  I have researched this in-depth and I learned that a
14  functional hearing test is a lot different than a
15  hearing and noise test, a HINT test, which is given to
16  police officers and firefighters in the State of
17  California as a mandatory hearing test.
18       And the reason why they give them a
19  hearing and noise test is because anyone with high
20  frequency hearing loss will not be able to hear in a
21  noisy environment.  And since police officers usually
22  deal with noisy environments and that's a safety
23  issue, I was very concerned over my safety, health and
24  welfare and any of the officers that would be relying

Page 195

1   on me.
2   Q.   At the point that you saw Dr. Emmett the second
3   time, which I gather from Exhibit 6 -- I guess I might
4   as well have marked Exhibit 6 at this point.
5       (Defendant's Deposition Exhibit No. 6 was
6   marked for identification.)
7   BY MR. ELLIS:
8   Q.   I take it that your second meeting with
9   Dr. Emmett was on March 18, 2005?
10      MR. NEUBERGER:  This says 16th in the
11  first sentence.  Do you see that?
12      MR. ELLIS:  I'm sorry.  You're
13  right.
14  BY MR. ELLIS:
15  Q.   March 16th, 2005?
16  A.   Yes.
17  Q.   That was the date of your second meeting?
18  A.   Third meeting.
19  Q.   Third meeting.  Okay.  Did you meet with
20  Dr. Emmett the second time you went up?
21  A.   No, I did not.
22  Q.   So you met with the audiologist?
23  A.   That's correct.  My mistake.
24  Q.   You were on light duty at this point, right?

Page 196

1   A.   That's correct.
2   Q.   Did you want to come off of light duty and be
3   available to be assigned generally within the force?
4   A.   Yes.
5   Q.   You did want to come off of light duty?
6   A.   Yes.
7   Q.   But you don't believe that you would have been
8   capable of performing as a road trooper, right?
9   A.   That's correct.
10  Q.   You don't believe that you would have been
11  capable of performing in the firearms training unit,
12  right?
13  A.   In the capacity as you stated as a firearms
14  trainer, no.
15  Q.   Well, that's what you're doing is firearms
16  training though, isn't it?
17  A.   That's correct.
18  Q.   So what you wanted, I take it, is to be cleared
19  for full duty but not to be put in certain
20  assignments?
21  A.   Yeah.  Actually, I wanted to be accommodated as
22  a lot of other troopers are in the Delaware State
23  Police who have injuries.
24  Q.   But you didn't want to be available for certain

Page 197

1   functions?
2   A.   I was concerned for my safety and the safety of
3   other troopers if I were put in situations that I knew
4   I could fail.
5   Q.   Did you get a copy of Exhibit 6?
6   A.   Yes.
7   Q.   Who did you get it from?
8   A.   Captain Yeomans.
9   Q.   All right.  Now, you said that you wanted to be
10  accommodated like a lot of other troopers had been
11  accommodated.
12      Can you give me the names of these other
13  troopers who have been accommodated?
14  A.   Well, ones with hearing loss would be Major
15  Joseph Forrester and Lieutenant Charles Klim.
16  Q.   Anybody else?
17  A.   Well, there are several other officers who have
18  injuries, but those are the two that I know of with
19  hearing disabilities.
20  Q.   Okay.  Do you know of any other corporals that
21  were accommodated with hearing loss?
22  A.   Corporals?
23  Q.   Yes.
24  A.   Not to my knowledge I don't.

A - 172

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                      v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                    October 17, 2005

Page 198

1    Q.  Who was Lieutenant Klim?  What was his job?
2    A.  He was in charge of IA at one time or he worked
3    with internal affairs at one time.
4    Q.  When did he retire?
5    A.  I have no idea.
6    Q.  Did he work past 1995?
7    A.  I have no idea.
8    Q.  Did you know the guy?
9    A.  I know him, yes.  I knew who he was and I knew
10   that he had hearing problems.
11   Q.  How did you know that he had hearing problems?
12   A.  Just through talk with the State Police.
13   Q.  Did he ever tell you that he had hearing
14   problems?
15   A.  No.
16   Q.  Was he ever given light duty for a hearing
17   problem?
18   A.  I have no idea.
19   Q.  So it's basically somebody that you have heard
20   about that you heard had hearing problems?
21   A.  That's correct.
22   Q.  How long did you want the State Police to put
23   you in a job where you wouldn't be exposing yourself
24   or other people to danger?

Page 199

1    A.  I planned on working until I was 55.
2    Q.  So you just expected the State Police to put
3    you in that kind of a job for as long as you wanted
4    to?
5    A.  I just wanted the same treatment as other
6    troopers before me.
7    Q.  Tell me another trooper who was allowed to work
8    to 55 who wasn't capable of performing the job of a
9    road trooper.
10   A.  Major Joseph Forrester.
11   Q.  Aside from that.
12   A.  That's with the hearing issue.  We have a
13   Sergeant Steve Swaine, who's been in evidence at Troop
14   4 and he's still on the job, currently on the job.
15   Q.  What's Wayne's problem?
16   A.  He has a voice problem.
17       And I think there were other people listed
18   in the interrogatories that we submitted or should
19   have been.
20   Q.  What's Wayne's rank?
21   A.  He's a sergeant.
22   Q.  Do you believe he was placed there to
23   accommodate the fact that he has a voice problem?
24   A.  I know he was.

Page 200

1    Q.  How do you know that?
2    A.  He had an accident and his voice is cracking.
3    He's very hard to understand.  One of the things that
4    we have to be able to do is communicate, the same job
5    function that I would have to be able to do using your
6    senses.
7    Q.  Why do you think he was put there as an
8    accommodation?
9    A.  Because he can't effectively communicate with
10   the public.  He has problems speaking.
11   Q.  I understand that you think he has problems
12   speaking.  But did somebody tell you that he was put
13   there as an accommodation?
14   A.  When it happened and when he came back to work
15   they said well, they're going to put him in the
16   evidence detection unit.
17   Q.  But who told you that he was put there because
18   he had trouble communicating?
19   A.  That was just the, just the talk of the
20   division.
21   Q.  Oh.
22   A.  From personal observation I know he can't speak
23   that well.
24   Q.  Okay.

Page 201

1        MR. ELLIS:  Can I take a break for a
2    minute?
3        (A brief recess was taken.)
4    BY MR. ELLIS:
5    Q.  Were you present at the range on the date when
6    there was a media tour?
7    A.  No, I was not.
8    Q.  Were you present at the range at any point when
9    Gloria Homer went through?
10   A.  No, I was not.
11   Q.  Were you present when Colonel Chaffinch went
12   through?
13   A.  Yes, I was.
14   Q.  And who was Colonel Chaffinch with the day he
15   went through?
16   A.  Lieutenant Colonel MacLeish, Secretary Mitchell
17   and Governor Minner.
18   Q.  When was that?
19   A.  I'm bad with dates.  2004.
20   Q.  Anybody other than those four people, Chaffinch
21   MacLeish, Mitchell and Minner?
22   A.  Governor Minner, Secretary Mitchell, Colonel
23   Chaffinch, Lieutenant Colonel MacLeish, I believe
24   Major Eckrich and I believe Secretary Mitchell had

51 (Pages 198 to 201)

Case 1:04-cv-01207-GMS    Document 75-7    Filed 02/02/2006    Page 12 of 33

Price, et al.                                  v.                        Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 202

1   someone with him. He came there on two occasions, so
2   I'm not -- I know on one occasion he had someone with
3   him and I thought on the second occasion he had
4   someone also.
5   Q.   Were you part of the tour?
6   A.   Yes, I was.
7   Q.   What were you doing as part of the tour?
8   A.   I was explaining to them what had happened at
9   the range.
10  Q.   Did you take them all around the entire
11  building?
12  A.   Yes, I did.
13  Q.   Did you take them to the area behind the bullet
14  trap?
15  A.   Yes.
16  Q.   Did you take them in the armorers room?
17  A.   Yes, I did.
18  Q.   So every piece of the inside of the building?
19  A.   We walked around the entire building, that's
20  correct.
21  Q.   What did you tell them had happened? I mean,
22  you said that you were there giving them an
23  explanation of what had happened?
24  A.   Yes.

Page 203

1   Q.   What is it you said had happened?
2   A.   I explained to them that the ventilation system
3   had failed. Also, the bullet trap had failed, the
4   ventilation system had probably never worked properly.
5   Q.   Do you remember what reaction you got out of
6   the group?
7   A.   I think at one time when we were explaining how
8   the ventilation system was failing Governor Minner
9   made a comment about the beam, how that probably
10  caused problems with the airflow.
11  Q.   The beam?
12  A.   The beam, the beam running down the center of
13  the building.
14       Behind the bullet trap there were things
15  lying on the ground where somebody had been doing some
16  work and she just said well, someone didn't clean up
17  after themselves. And when we were in classroom
18  number 1 she made that, she said it looks like there
19  was poor housekeeping. She made that comment.
20       Those are the only two things that really
21  stick out. I mean, there were questions and answers.
22  They would ask me a question. I would explain it to
23  them the best I could as to what I observed.
24  Q.   Was there anybody else from the firearms

Page 204

1   training unit present?
2   A.   I don't believe so.
3   Q.   I'm sorry?
4   A.   I don't believe so, no.
5   Q.   Do you know who assigned you to do the tour?
6   A.   I'm not sure if Major Eckrich called and asked
7   me to be there. He asked me to be there on the Friday
8   before because I think the tour that we're talking
9   about was on a Monday. So Secretary Mitchell wanted
10  to come in on the Friday before and view it without
11  anyone and I gave him the tour.
12       And then I believe it was a Monday that he
13  brought the Governor and then the colonels accompanied
14  her.
15  Q.   So Mitchell went through by himself with you?
16  A.   On the Friday with his -- he had a gentleman
17  with him and I'm not sure exactly who that was. And
18  Major Eckrich was there also.
19  Q.   So Eckrich, Mitchell and somebody with Mitchell
20  went through it on a Friday?
21  A.   That's correct.
22  Q.   And then the whole group went through on a
23  Monday?
24  A.   That's correct. I'm pretty sure that's how it

Page 205

1   was.
2   Q.   Do you remember anything that Lieutenant
3   Colonel MacLeish said during that tour?
4   A.   The only thing that I think Lieutenant Colonel
5   MacLeish made comment about was the room that we were
6   training simmunitions in. I think he explained that
7   training to the Governor. That's the only thing that
8   sticks in my mind for whatever reason.
9   Q.   Do you remember anything that Colonel Chaffinch
10  said to you?
11  A.   I can't recall.
12  Q.   Do you remember anything else that Major
13  Eckrich said?
14  A.   I can't recall anything else.
15  Q.   Has either Lieutenant Colonel or Colonel
16  MacLeish ever said anything to you to lead you to
17  believe that he was retaliating against you for
18  anything that you did at the firearms training unit?
19  A.   The one comment, as I stated earlier, he said,
20  "I can't believe you guys didn't clean" was kind of
21  putting the blame on us for the situation. And I
22  really didn't understand where that comment came from,
23  but it was placing blame on us for the situation.
24  Q.   Okay. And, again, when did he make that

**A - 174**

Price, et al.                                              v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                        October 17, 2005

Page 206

1  statement?  That was at one of the meetings at either
2  the academy or the museum?
3     A.   That's correct.  It was one of the meetings,
4  one of the range meetings that we had.
5     Q.   And was that after he had learned that you had
6  stopped doing the maintenance on the water system at
7  the back of the bullet trap?
8     A.   Yes.  And I don't know if it was particularly
9  the water system.  I don't know how he -- he just
10  said, "I can't believe you guys didn't clean."  He
11  never specifically said clean what.
12    Q.   The officers in the firearms training unit were
13  never responsible for cleaning up the office area,
14  were they?  Didn't you have a contractor come in and
15  do that?
16    A.   Yes.
17    Q.   So you were never responsible for cleaning the
18  office area?
19    A.   No.
20    Q.   Anything else that MacLeish said that would
21  lead you to believe that he was retaliating against
22  you?
23    A.   I don't know.  I think the actions speak louder
24  than the words.  He put us on light duty and sent a

Page 207

1  letter to us explaining that we were being placed on
2  light duty.
3     Q.   Are you saying that the act of sending you the
4  letter was retaliatory?
5     A.   I view it as that, that's correct.
6     Q.   Why?
7     A.   Well, he stripped us of all of our police
8  powers, the economic impact that that had on my family
9  and that was it.  It was a letter.  There was no
10  communication.  He didn't call me in his office and
11  say, "Corporal Warren, I would like to discuss with
12  you your future and your situation with the State
13  Police."
14         It was simply a letter sent to me
15  explaining I was on light duty and that I couldn't
16  wear my uniform, I couldn't work any extra duty, I
17  couldn't drive a marked police car, I couldn't carry
18  my gun.  I could still have my gun, but I couldn't use
19  it for police duties.  To turn my head from any acts
20  of crime.  Just that happened and shortly after that I
21  had to give up my assigned vehicle, which was a Dodge
22  Durango, couldn't do any type of SORT work whatsoever.
23         I'm sure there were other things listed in
24  interrogatories.  I can't recall everything that

Page 208

1  happened to me that --
2     Q.   I recognize that there are all these things
3  that happened to you, but my question is:  Did Tom
4  MacLeish, colonel or lieutenant colonel, ever say
5  anything to you that led you to believe that he was
6  doing that for retaliatory reason as opposed to for a
7  legitimate reason?
8     A.   He never communicated one way or another to me
9  in that respect.
10    Q.   How about Aaron Chaffinch, did he ever
11  communicate with you about your going on light duty?
12    A.   No.
13    Q.   Did he ever say anything that you're aware of
14  that would lead you to believe that he had done
15  anything retaliatory to you?
16    A.   I'm not sure of the question.  Could you just
17  explain the question to me again, please?
18    Q.   Let me ask it a little differently.
19         You've read a whole lot of newspaper
20  articles about the firearms training facility, haven't
21  you?
22    A.   Yes.
23    Q.   Do you think you have read everyone that's been
24  in The Delaware State News or The Wilmington News

Page 209

1  Journal since the beginning of 2004?
2     A.   Probably.
3     Q.   Did Colonel Chaffinch ever mention you by name
4  in any quote that was ever attributed to him?
5     A.   Not by name.
6     Q.   Did Thomas MacLeish ever mention you by name?
7     A.   Not to my knowledge.
8     Q.   Has he ever been quoted saying anything about
9  you or the firearms training unit?
10    A.   Not to my knowledge.
11    Q.   Going back to your comments a little while ago
12  about being accommodated, is it your belief that the
13  Delaware State Police should find a job for you no
14  matter what your injury and no matter how long it
15  would take you to reach age 55?
16    A.   Well, I think they have done that in the past.
17  They have set a precedent.
18    Q.   You won't be 55 for, what, another 12 years?
19    A.   Another eight.
20    Q.   Eight?
21    A.   I'm currently 47.
22    Q.   And who have they carried -- you have already
23  been on light duty for well over a year, right?
24    A.   That's correct.

53 (Pages 206 to 209)

Price, et al.                                         v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                October 17, 2005

Page 210

1   Q.  So who have they carried for nine years in a
2   position as somebody who couldn't function as an
3   active trooper?
4   A.  Major Joseph Forrester is one.
5   Q.  For nine years?
6   A.  I don't know how long they carried him with a
7   hearing aid, but they carried him for quite some time,
8   until he was 55 and he retired.
9   Q.  You don't know how long though?
10  A.  No.
11  Q.  Do you know anybody who has been carried for
12  nine years?
13  A.  Sergeant Steve Swaine is still working.  I
14  don't know when his accident occurred, but he's been
15  working in the evidence unit ever since the accident
16  and he came back to work.
17  Q.  But you don't know why he's in the evidence
18  unit other than what you have heard from rumors?
19  A.  Yeah.  Usually people aren't assigned to one
20  duty that long within the division.  There has to be a
21  reason.
22  Q.  Anybody else?
23  A.  You would have to refer to my interrogatories
24  to look at other comparators.  I can't think of all of

Page 211

1   them right off the top of my head.
2   Q.  As you're sitting here today, can you think of
3   anybody who's been unable to function full duty as a
4   trooper who has been carried for as long as nine
5   years?
6   A.  I can't think off the top of my head.
7   Q.  Could you envision if enough troopers had that
8   type of physical problem it being difficult to staff
9   certain functions of the State Police?
10  A.  Yes.
11  Q.  How did you come to have a meeting with the
12  investigators from the state auditor's office?
13  A.  They called and asked for an interview.
14  Q.  Who did they call?
15  A.  I talked to them on the phone.
16  Q.  So somebody from the auditor's office called
17  you directly?
18  A.  Right.
19  Q.  And who was it who called?  Do you remember?
20  A.  I think his name was Jean Roethlisberger.  I'm
21  pretty sure.  I talked to two different guys there and
22  I'm not sure what the other guy's name was, but I
23  think it was Jean who called called and said, "We want
24  to talk to you.  When can we set up a meeting?"

Page 212

1   Q.  And that's Jean, J-e-a-n, right?
2   A.  Yes.
3   Q.  But it's a male?
4   A.  That's correct.
5   Q.  Did you inform your supervisor that you had
6   received the call?
7   A.  I'm pretty sure I did.
8   Q.  In order for you to talk to somebody outside of
9   the State Police on State Police business, you had to
10  have authority from the command structure, didn't you?
11  A.  Well, we were cooperating with an
12  investigation.
13  Q.  I understand that.  But in order to do that,
14  you have to have permission, don't you?
15  A.  In that event?
16  Q.  Maybe you don't.  I'm not trying to put words
17  in your mouth.  I thought that you did.
18  A.  And I can't recall who I even talked to about
19  that.
20  Q.  Do you recall getting permission from anybody
21  to talk to the state auditor?
22  A.  No.
23  Q.  Where did you meet with him?
24  A.  At Mr. Neuberger's office.

Page 213

1   Q.  Who was present?
2   A.  My attorney, Mr. Neuberger, and there were
3   three, I believe there were three investigators and
4   Roethlisberger, Roethensberger, whatever his last name
5   is.  I don't want to butcher his name.
6   Q.  I think Roethlisberger is the quarterback for
7   the Pittsburgh Steelers.
8       I think it's Rothenburger.
9   A.  It's close.  I don't think there's anyone in
10  the office with that name.
11      I believe there were two other
12  investigators also.
13  Q.  Do you remember their names?
14  A.  No, I do not.
15  Q.  Were there any other officers from the FTU
16  present during your interview with the state auditor?
17  A.  No.
18  Q.  How long before the meeting with the state
19  auditor was the appointment made?
20  A.  I'm not sure.
21  Q.  The meeting was on May 11th, right?
22      MR. NEUBERGER:  I think it was April 20th,
23  wasn't it?
24      MR. ELLIS:  Well, let's find out.

A - 176

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Case 1:04-cv-01207-GMS    Document 75-7    Filed 02/02/2006    Page 15 of 33

Price, et al.                           v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1        C.A. # 04-956-GMS            October 17, 2005

Page 214

1        THE WITNESS: You're going to have to
2   refer to a document because I have no recollection of
3   the date.
4        MR. ELLIS: Mark this as Exhibit 7.
5        Exhibit 7 is a document that has at the
6   top of the first page My Chronology with the Firearms
7   Training Facility Corporal/3 Wayne Warren, May 11,
8   2004.
9        (Defendant's Deposition Exhibit No. 7 was
10  marked for identification.)
11       MR. NEUBERGER: I'm sorry. I misspoke.
12  April 20th is when the Governor ordered the
13  investigation. I was confused. I thought they met on
14  the 12th.
15       MR. ELLIS: I'm going to ask you to mark
16  Exhibit 8 also.
17       (Defendant's Deposition Exhibit No. 8 was
18  marked for identification.)
19  BY MR. ELLIS:
20  Q.   When you get a chance, Corporal Warren, take a
21  look at 7 and 8.
22  A.   All right. (Reviewing documents).
23       Are these the same?
24       MR. NEUBERGER: No. No, they're not the

Page 215

1   same. These are different documents.
2   Q.   D-7 should have My Chronology with the Firearms
3   Training Facility on the top and D-8 should have
4   Concerns about the Firearms Training Unit Facility on
5   the top.
6        Can you tell me what D-7 is?
7   A.   This was prepared for the auditor's office.
8   It's my chronology of the firearms training facility.
9   Q.   Did you prepare this before the meeting that
10  you had with the auditor's office?
11  A.   Yes.
12  Q.   How long before?
13  A.   I'm unsure.
14  Q.   Did you have help in preparing it?
15  A.   No.
16  Q.   After you had prepared it, did you show it to
17  anyone before you showed it to the auditors?
18  A.   I'm pretty sure I showed it to my attorney.
19  Q.   Did you show it to other members of the
20  firearms training unit?
21  A.   I'm not sure.
22  Q.   Did you present this to the auditor's on May
23  11th?
24  A.   Yes, if that's when we spoke with the auditors.

Page 216

1   A.   I'm going to assume because the date says May
2   11th here on the document that that's when you met
3   with him.
4        If you didn't, whatever date you met with
5   him, did you give him this?
6   A.   Yes, I did.
7   Q.   Did you read it to him?
8   A.   Yes, I did.
9   Q.   You read the entire document to him?
10  A.   I'm not sure if I read the entire document or
11  not.
12  Q.   Look now at Exhibit D-8. D-8 is a different
13  document.
14       Did you also prepare this?
15  A.   Yes.
16  Q.   Did you have any help in preparing this?
17  A.   No.
18  Q.   Did you show this to anybody before the meeting
19  that you had with the auditor's office?
20  A.   Probably my attorney.
21  Q.   Anybody else?
22  A.   I'm not sure.
23  Q.   Did you hand a copy of Exhibit D-8 to the
24  auditors when you met with them?

Page 217

1   A.   I'm not sure.
2   Q.   Did you read it to them?
3   A.   I can't recall that.
4   Q.   Did they ask you any questions at this first
5   meeting?
6   A.   I can't recall if they questioned me or not.
7   Q.   I'm pretty sure that there were questions asked, but I
8   can't recall any substance of the questions.
9   Q.   During the course of the meeting with the
10  auditors did your lawyers say anything?
11  A.   I'm not sure.
12  Q.   You don't remember?
13  A.   No.
14  Q.   I think you testified that the other members of
15  the FTU were not present in the meeting you had with
16  the auditors, right?
17  A.   That's correct.
18  Q.   Did they meet with them separately on the same
19  date?
20  A.   Yes.
21  Q.   Did you all go to Wilmington together?
22  A.   Yes.
23  Q.   Where did you meet that morning?
24  A.   I'm not sure.

A - 177

Price, et al.                          v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1        C.A. # 04-956-GMS            October 17, 2005

Page 218

1    Q.  Did you drive up with somebody else?
2    A.  I'm pretty sure I drove up by myself to at
3    least Smyrna usually.
4    Q.  You're coming all the way from Lewes, right?
5    A.  Right.
6    Q.  Did you meet other members of the firearms
7    training unit someplace and drive into Wilmington with
8    them?
9    A.  Yes.
10   Q.  Do you remember where you met them?
11   A.  No.
12   Q.  Were you present during the meetings that they
13   had with the auditor?
14   A.  No.
15   Q.  Did you provide any documents other than D-7
16   and D-8 to the auditors on the day that you met with
17   them?
18   A.  No.  I think the binders were provided by
19   Captain Warren, I believe.
20   Q.  Okay.  My understanding was the binders were
21   provided by your lawyer.
22        Do you have any recollection of that?
23   A.  No.  That could have happened.
24   Q.  Were you present when the binders were handed

Page 219

1    over to the auditors?
2    A.  I don't believe so.
3    Q.  Do you know whether that had occurred before
4    you got there or whether it happened after you left?
5    A.  No.
6    Q.  Am I correct that your lawyer had a news
7    conference the day that you met with the auditors?
8    A.  I believe so.
9    Q.  Were you present for the news conference?
10   A.  No.
11   Q.  Where were you when the news conference
12   occurred?
13   A.  I have no idea.
14   Q.  Did you know that it was going to happen after
15   you were done talking to the auditors?
16   A.  I'm not sure.
17   Q.  I'm sorry.  I asked that question badly.
18        Did you know that there was going to be a
19   news conference before it actually happened?
20   A.  I'm not sure.
21        MR. NEUBERGER:  Just for a sake of the
22   record, if you're saying I had a press conference, I
23   don't remember having a press conference.  I could be
24   wrong.

Page 220

1        MR. ELLIS:  That's okay.
2        MR. NEUBERGER:  I have lots of press
3    conferences.
4        MR. ELLIS:  Other people remember and I
5    know you have so many that it's hard to keep track of
6    them all.
7        MR. NEUBERGER:  I might have answered
8    questions from the press in some fashion, but I don't
9    know if I had a press conference.  Maybe I did.
10   BY MR. ELLIS:
11   Q.  Did you have a second meeting with the
12   auditors?
13   A.  No, I did not.
14   Q.  Did you have an appointment to meet with the
15   auditors a second time?
16   A.  No, I did not.
17   Q.  Were you ever contacted by the auditors to meet
18   a second time?
19   A.  No, I was not.
20       MR. NEUBERGER:  Are you sure of that?
21       THE WITNESS:  I'm positive.
22       MR. NEUBERGER:  Okay.
23       He goes away to sports events at times.
24       MR. ELLIS:  Who does?

Page 221

1        MR. NEUBERGER:  He wasn't there the second
2    time.  He took his daughter, went to a baseball game
3    with his daughter or something.  That's what it is.
4    Okay.
5    BY MR. ELLIS:
6    Q.  Why do you believe that either Colonel
7    Chaffinch or Colonel MacLeish or both are retaliating
8    against you for complaining about conditions at the
9    firing range in Smyrna?
10   A.  Why do I think they did that?  I don't
11   understand what you're asking me.
12   Q.  I'm asking you why do you think that things
13   that have happened to you were done by them out of a
14   retaliatory motive?
15       In other words, what makes you think that
16   they are doing things to you because you made
17   complaints about the firearms training unit facility?
18   A.  Well, I spoke out about a facility that was
19   doomed from the very inception.  The government
20   problems with the bidding process it's already been
21   uncovered that there was a problem with the bidding.
22   Q.  Let me just stop you right here.  I understand
23   that there is a lot of information that suggests that
24   the bidding was screwed up, that the HVAC system

**A - 178**

Case 1:04-cv-01207-GMS    Document 75-7    Filed 02/02/2006    Page 17 of 33

Price, et al.                                                    Chaffinch, et al.
Wayne H. Warren, Volume 1          v.                            October 17, 2005
                            C.A. # 04-956-GMS

Page 222

1  wasn't designed properly, that there's all kinds of
2  issues as to the compatibility of the bullet trap with
3  the ammunition being used. I recognize all of those
4  things are there and I don't really need for you to
5  recite that.
6          What I am trying to ask you is why you
7  think that your being placed on light duty is a result
8  of your having complained about conditions at the
9  range?
10  A.  Because all of those things that happened were
11  signs of corruption. We exposed the corruption. We
12  were causing problems with another government agency,
13  which was facilities management. Once we started,
14  they didn't want us to continue. So in order to try
15  to keep us quiet and to hush this whole exposure, they
16  just started putting pressure on us and one of the
17  things or one of the ways to get rid of us is to put
18  us on light duty and then out the door.
19          And the minute they can get us out the
20  door, then we're out of the hair of the State Police.
21  We're not going to cause any more problems. It took a
22  lot for us to come forward with all this information.
23  No one came forward before us to expose all the
24  wrongdoing with the different government agencies. We

Page 223

1  did that. Now we're giving their administration a
2  black eye because they can't control their employees.
3          So, therefore, they have got to come out
4  and get rid of us. They send us for a hearing test.
5  That's an easy fix because there are no standards for
6  them to go by to determine whether or not we have a
7  hearing problem. So they can just tell the doctors
8  that hey, are they capable of working? Well, what
9  standards did the doctors have to follow? No. They
10  have high frequency hearing loss and we will get them
11  out the door. The financial impact of that move is
12  enormous. It was over $22,000 a year in overtime for
13  me. Take the car. Let's play games with them. Let's
14  transfer them around, take them out of that building,
15  give them this to do, give them that job to do,
16  meaningless jobs.
17  Q.  Did --
18  A.  Excuse me. I'm sorry. I just had this other
19  thought come into my mind.
20          And I believe Colonel Chaffinch testified
21  in his deposition that he didn't want to cause
22  problems with another government agency. He didn't
23  want that to happen. Well, it happened. It is what
24  it is. We are public safety. Let's take care of the

Page 224

1  public.
2          But because the public was informed -- and
3  I think Colonel MacLeish and both Colonel Chaffinch
4  testified that they didn't like the fact that it got
5  in the newspapers.
6  Q.  Okay. Anything else?
7  A.  That's all I can think of at this time.
8          Sorry about interrupting there, but that
9  thought came into my mind as to what was happening.
10  Q.  Okay. That's okay.
11          Did the information that you presented to
12  the auditor identify any official at facilities
13  management as having been corrupt?
14  A.  Well, I believe it identified, not that I
15  provided, but as a result of the investigation that
16  was conducted that Alrita Annett was going to award
17  the contract to build that building to a Delaware firm
18  regardless of who applied for it and I believe that
19  was being looked into by the Attorney General's
20  Office. There's not been an outcome to my knowledge
21  at this time.
22  Q.  Anybody else?
23  A.  I'm not sure who would be responsible for
24  monitoring air quality of the building, but that was

Page 225

1  not being done. And whoever would be in charge of EPA
2  compliance, I guess that person would be subject to
3  questioning also.
4  Q.  Did you accuse anybody in the State Police of
5  corruption?
6  A.  No.
7  Q.  When you say that being put on light duty had a
8  financial impact on you, is it because you missed
9  overtime?
10  A.  That's correct.
11  Q.  Anything else?
12  A.  Well, overtime is special duty jobs or anything
13  else available to troopers who want to make extra
14  money.
15  Q.  Now, when you talk about special duty jobs,
16  what are you talking about?
17  A.  In my area one of the jobs I would work would
18  be transports of mental patients. When a hospital
19  commits a mental patient to one of the three northern
20  facilities, there has to be two off-duty officers to
21  transport the mental patient to that facility. And I
22  was on the on-call list for those special duty jobs,
23  which was a four-hour pay job.
24  Q.  How does the mental patient transport work?

**A - 179**

Price, et al.                                v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1        C.A. # 04-956-GMS              October 17, 2005

Page 226

1  Are you in a police vehicle?
2    A.  You're in a marked police vehicle with two
3  officers and you're transporting a mental patient from
4  the hospital, usually in Sussex County, that's to
5  either Rockford, the State Hospital or MeadowWood or
6  you could take them to there's a place in Dover also.
7    Q.  Are you wearing a uniform --
8    A.  No.
9    Q.  -- when you do that?
10   A.  No.
11   Q.  What's the purpose behind having a state
12 trooper transport the mental patient?
13   A.  It's just the policy of the state and I think
14 it was a decision reached by the Attorney General's
15 Office that the State Police would do the transport.
16   Q.  Is the issue that the patient could become
17 violent?
18   A.  That could happen, but it's more or less
19 transportation for the patient from the committing
20 hospital to one of the facilities that can receive
21 him.
22   Q.  Is there somebody from the hospital in the
23 vehicle while the transport is occurring?
24   A.  No.

Page 227

1    Q.  So it's two state troopers and one mental
2  patient?
3    A.  That's correct.
4    Q.  You're not a taxicab service, right?
5    A.  Yes, that's what we are.
6    Q.  Well, are you armed when you make this
7  transport?
8    A.  Yes.
9    Q.  What other special duty jobs were you able to
10 do before that you can't do now?
11   A.  The NASCAR races in Dover and all the special
12 operations overtime, along with the firearms training
13 overtime.
14   Q.  What did you do in terms of NASCAR races?  Is
15 this basically providing security for the races?
16   A.  Yeah.  Just physical presence, riding around
17 the campground areas is what I was assigned to do.
18   Q.  In a marked car?
19   A.  No.
20   Q.  Riding around in what then?
21   A.  In a Dodge Durango.
22   Q.  Are you in uniform?
23   A.  Yes.
24   Q.  So you're in a uniform in your government

Page 228

1  Durango?
2    A.  That's correct.
3    Q.  What type of problems come up at the NASCAR
4  races?  Drunks?
5    A.  Drunks.
6    Q.  Mostly drunks?
7    A.  Yes.
8    Q.  Do you have to arrest people?
9    A.  I never had to arrest anyone.
10   Q.  Do state troopers occasionally have to arrest
11 people at the Dover Downs Speedway?
12   A.  I think it's minimal.
13   Q.  It happens though?
14   A.  Yes.
15   Q.  Now, you said there was SORT team overtime?
16   A.  That's correct.
17   Q.  What type of work is that?
18   A.  High-risk search warrants, surveillance.
19   Q.  The regular duty of the SORT team?
20   A.  That's correct.
21   Q.  And you also mentioned FTU overtime.
22   A.  That's correct.
23   Q.  What type of work is that?
24   A.  Working with recruits, training patrol

Page 229

1  procedures.  That was overtime.  We did our normal,
2  our tour of duty at the firearms training unit as a
3  firearms instructor and then we had overtime training
4  patrol procedures, instructing the training for the
5  patrol procedures.  Sorry.
6    Q.  Is that done at the academy?
7    A.  No.  That was done at the range.
8    Q.  Now, since you were put on light duty -- which
9  is what?  June 2004?
10   A.  That's correct.
11   Q.  You were assigned to the academy, right?
12   A.  Yes.
13   Q.  What assignments were you given?
14   A.  At the firearms training unit?
15   Q.  Well, you were still part of the firearms
16 training unit when you were put on light duty, were
17 you not?
18   A.  Yes.
19   Q.  And for most of that first year you were
20 undergoing periodic testing to determine whether your
21 hearing loss would prevent you from performing the
22 duties of a trooper, weren't you?
23   A.  That's correct.
24   Q.  And then at roughly the end of the first year

**A - 180**

Price, et al.
Wayne H. Warren, Volume 1

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 17, 2005

Page 230

1  you were told that you could not perform the duties of
2  a trooper, right?
3     A.  That's correct.
4     Q.  So during that year that you were on light duty
5  before you had been told that you couldn't be returned
6  to full duty, what assignments were you given?
7     A.  Just administrative duties, assisting with
8  equipment, investigating different types of equipment,
9  assisting with administrative duties for the firearms
10 training unit.  So if they needed to contact a vendor
11 or to look into something, we did that.
12    Q.  Now, during that period roughly June 2004 to
13 May 2005, the firearms training unit, the rest of the
14 firearms training unit was not in Dover, was it?
15    A.  No.
16    Q.  It was up at Troop 2?
17    A.  That's correct.
18    Q.  And so you and Corporal Price were in Dover
19 whereas the rest of the unit was up in Troop 2?
20    A.  Right.  I'm sorry.  Also when the range was
21 being cleaned, I had to respond to the range also and
22 be present while the cleaning crew was working in the
23 range.
24    Q.  Why were you present for that?  What was the

Page 231

1  purpose of that?
2     A.  Just as a liaison from the State Police to make
3  sure that --
4     Q.  Who assigned you to that job?
5     A.  I want to say Major Hughes.
6     Q.  Was there a point when somebody within the
7  management of the Delaware State Police suggested that
8  you and Corporal Price be put on a Title 3
9  surveillance?
10    A.  I'm not sure.
11    Q.  Do you remember being asked to go to a wire
12 room?
13    A.  I remember talk about that, but I mean I don't
14 know what came of it.  I mean, I just remember talk of
15 them discussing whether or not we were going to do
16 that.
17    Q.  Who was the "them"?
18    A.  I can't recall who it was.
19    Q.  Do you recall any discussion of that with
20 Sergeant Foraker?
21    A.  No.
22    Q.  Do you recall any discussion of it yourself
23 with anybody?  You seem to remember the events.  But
24 do you remember who you talked to about it?

Page 232

1     A.  No.  No.  The only thing I remember was that
2  being mentioned and I thought I've worked on wires
3  before and you have to pay close attention to
4  conversation on the phone.  There's probably going to
5  be background noise and that's something that I'm not
6  good at.  That would be kind of foolish to put me in a
7  serious situation as a Title 3, especially when it
8  involves minimization, what that if I miss something
9  and I didn't minimize properly or I violated the law
10 because of my hearing problem?
11       To me, that really didn't make sense.
12 Then I just dismissed it and it never came up again.
13 So the brief conversation, I can remember that briefly
14 but I don't remember anything past that because
15 nothing ever came of it.
16    Q.  Who did you have the conversation with?
17    A.  I can't recall.
18    Q.  Did you express to whoever that person was the
19 concern you had that you've just described here about
20 whether you could perform properly in a wire room
21 because of your hearing problem?
22    A.  I believe I did.
23    Q.  But you don't remember who you said it to?
24    A.  No.

Page 233

1     Q.  There are things that go on in a wire room that
2  don't involve sitting with the headphones on, aren't
3  there?
4     A.  That's correct.
5     Q.  And what functions would those be?
6     A.  Transcribing tapes, monitoring phone calls as
7  far as -- well, I haven't done one that's been
8  computerized.  Mine was with index cards and there was
9  a lot of manual labor involved.
10    Q.  There's a lot of paperwork, right?
11    A.  Right.  Now I understand it's pretty
12 computerized and it takes half the manpower that it
13 used to, other than the surveillance teams.
14    Q.  But there are functions in the wire room where
15 you would not need to use the headphones at all,
16 right?
17    A.  I'm not sure with today's operations with the
18 investigations.  I can't answer that because I know
19 it's entirely different than what I used to do.
20       What I used to do I would say yes because
21 we had cards to file and to analyze every day and we
22 had to give a written report.  But I understand now
23 that the computer does all the analyzation, tells the
24 amount of calls coming in, the amount of calls going

Chaffinch, et al.
October 17, 2005

Price, et al.
Wayne H. Warren, Volume 1

v.
C.A. # 04-956-GMS

Page 234

1  out, what the average time was on line. It prints out
2  the number of who the person is. They can do actual
3  searches to find out who the number is registered to.
4  It's entirely different than the way we used to do it.
5        My understanding is it's more labor
6  intensive on the surveillance than it is the wire room
7  itself.
8  Q.  So if it was the type of wire you used to sit
9  on, there would be plenty for you to do that didn't
10  involve headphones, right?
11  A.  There would be a fair amount of work, not
12  plenty.
13  Q.  Whoever it was that you had this discussion
14  with about being used in a Title 3, did you suggest to
15  them that you would be able to do that kind of work?
16  A.  No.
17  Q.  Would you have wanted to work on a Title 3?
18  A.  I used to love Title 3's.
19  Q.  So why didn't you try to make a place for
20  yourself in the Title 3 that was being discussed?
21  A.  Because of the seriousness of the investigation
22  and I think it would be kind of stupid for somebody
23  with a hearing disability to be involved in something
24  where you listen to conversation that occurs quickly.

Page 236

1  A.  That's correct.
2  Q.  At some point, assuming that you're not allowed
3  to do that, do you intend to file for a disability
4  pension?
5  A.  It depends on if I'm forced out and if I can't
6  work, what are they going to tell me?
7  Q.  I'm sorry. I don't understand you.
8  A.  It depends on the division. Are they --
9  Q.  Assuming that at some point you are told that
10  you can no longer continue as a state trooper because
11  you're unable to perform the essential functions of
12  the job, is it your intention to file for a disability
13  pension?
14        MR. NEUBERGER: For the sake of the
15  record, I think that's asking, that's asking for
16  what's going to happen in the future after he gets the
17  advice of his lawyers at whatever point in time. I
18  don't think he can answer that question honestly to
19  you.
20  A.  That's actually what I was going to tell you.
21  I would have to consult with my attorney and see the
22  options and what would be available with the
23  information the state would provide me.
24  Q.  What do you mean by the information that the

Page 235

1  And in that situation --
2  Q.  I'm really not disputing that.
3  A.  I don't think that that would have been a good
4  thing for me to do for the State Police or myself.
5  Q.  Why is that?
6  A.  Because of my disability.
7  Q.  But how about if you were put on functions that
8  were not, that were not, that did not involve
9  listening to the conversations on the wire?
10  A.  In my experience we always shortcut everything
11  so sooner or later I would have been the one to listen
12  to a phone conversation and I want no parts of that.
13  That's the way we do business. It happens all the
14  time. We always operate shorthanded.
15        MR. NEUBERGER: Do you think we will
16  finish at 5:00?
17        MR. ELLIS: What time is it?
18        MR. NEUBERGER: Ten of 5:00.
19        MR. ELLIS: Off the record.
20        (Discussion off the record.)
21  BY MR. ELLIS:
22  Q.  You testified that it was your intention of
23  working to age 55 with the State Police. Is that
24  correct?

Page 237

1  state would provide you?
2  A.  I have received the letter stating that I was
3  on light duty. I received a letter telling me that I
4  had to separate from the division on June 10th. I
5  received another letter from the state telling me I
6  was going to have to separate from the division on
7  August 10th. And then I received a letter that those
8  letters have been rescinded until further notice. And
9  that's about the extent of the communication that I
10  have with the State Police or our human resource
11  center.
12  Q.  If you were to get a disability retirement,
13  what percentage of your pay would that give you?
14  A.  That's determined by the Pension Board.
15  Q.  Whether you get it is determined by the Pension
16  Board, isn't it?
17  A.  No. The percentage is determined also. That's
18  my understanding.
19  Q.  Are you not guaranteed three-quarters of your
20  pay?
21  A.  I'm not guaranteed that, no, I'm not, sir.
22  Q.  What is it that the state has to determine in
23  order to decide how much of your pay you're going to
24  get?

Price, et al.
Wayne H. Warren, Volume 1

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 17, 2005

Page 238

1  A. I'm not really sure. I have not had anyone
2  explain it. I don't know if anyone can explain that.
3  Q. Okay. It says in your interrogatory answers
4  that troopers who served at the FTU have a track
5  record of obtaining lucrative post-DSP employment.
6  A. That's correct.
7  Q. What troopers would you be referring to there?
8  A. A retired Captain Paul Cunningham went to work
9  for Smith & Wesson and I think he eventually became
10  the president of Smith & Wesson.
11       Dave Lawson started an indoor range in the
12  Dover area. And he was training, he's got contracts
13  with several municipalities in qualifying or I should
14  say recertifying municipal police officers. I think
15  he also has the DNREC contract and maybe a couple of
16  other state agencies.
17       Let's see. I think Lieutenant Bill Bryson
18  is currently the chief of Camden, but he was a
19  consultant, a range consultant with JAED Construction
20  also.
21  Q. That's the company that fouled up the range,
22  isn't it?
23  A. That's correct.
24       MR. NEUBERGER: Off the record.

Page 239

1       (Discussion off the record.)
2  BY MR. ELLIS:
3  Q. Bryson is a police chief now, right?
4  A. That's correct.
5  Q. When did Cunningham leave the police force?
6  A. Unsure.
7  Q. He was a captain?
8  A. Yes.
9  Q. What rank was Lawson?
10  A. Lieutenant.
11  Q. Is there any reason you can't open up your own
12  indoor range?
13  A. Is there any reason?
14  Q. Yes. Why couldn't you start up your own indoor
15  range when you leave the State Police?
16  A. I'm a little gun-shy about the indoor ranges
17  right now.
18  Q. Well, aside from that?
19  A. Would there be any reason why I couldn't?
20  Q. Yes, other than the fact that you got a hearing
21  problem.
22       Is that what you meant when you said that
23  you were gun-shy of indoor ranges?
24  A. No. There's ventilation problems and a host of

Page 240

1  other things and then who -- because we have been
2  bashed the true story has not been told about this
3  situation. There's been one side of the story told at
4  this point. So with what happened to us even more
5  in the division really don't know what's going on in
6  this situation and with my reputation.
7  Q. Well, what is your reputation?
8  A. I really don't know at this point. It was
9  sterling before this happened.
10  Q. Well, what's to say it's not sterling now?
11  A. Well, I have been placed on light duty. I have
12  been blamed in the newspaper that we let a $3 million
13  building go down the drain. It was on WBOC TV, a
14  local station in the area in which I live.
15       So perception is really everything and
16  only one side of the story has been told.
17  Q. Was your name on WBOC?
18  A. No.
19  Q. Is there anybody else that has left the
20  firearms training unit for a lucrative post-DSP job?
21  A. Those are all that I can think of at the
22  present time.
23  Q. Does retired Lieutenant Lawson's indoor range
24  have ventilation problems?

Page 241

1  A. Not to my knowledge.
2  Q. Have you ever been there?
3  A. Yes.
4  Q. Would I be correct in saying that there are
5  certain jobs that you would not be able to perform
6  after you leave the State Police because of your
7  hearing problem?
8  A. Correct.
9  Q. Have you talked to anybody outside of the State
10  Police about a job when you leave the State Police?
11  A. I've talked to several people just inquiring
12  about what's available.
13  Q. Well, who have you talked to?
14  A. I talked to a local roofing contractor about
15  being, he talked to me about being an appraiser for
16  his business.
17  Q. Do you have any background as a roofing
18  appraiser?
19  A. No. None.
20  Q. Is it easy to pick up?
21  A. I guess it is.
22  Q. Did this roofing contractor offer you a job?
23  A. He just told me if I retire or whatever happens
24  to me with the State Police to look him up.

A - 183

61 (Pages 238 to 241)

Price, et al.                                    v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1            C.A. # 04-956-GMS              October 17, 2005

Page 242

1    Q.  Any other person you have talked to outside of
2    the State Police about potential employment?
3    A.  How long ago of a time frame are you talking
4    about now?
5    Q.  I'm talking about for about the last year and a
6    half since the problems have occurred at the range.
7    A.  No.  Not that I can recall.
8    Q.  Have you talked to Smith & Wesson about a job?
9    A.  No.
10   Q.  Does Cunningham still work for Smith & Wesson?
11   A.  No.
12   Q.  Have you talked to Cunningham about how he got
13   into the industry?
14   A.  I've talked to him, but I didn't really I guess
15   ask him how he broke into the industry.
16   Q.  What did you talk to him about?
17   A.  Firearms, training, construction of the
18   building.
19   Q.  It says in your interrogatory answers troopers
20   and others, and this refers to the situation with the
21   range and the media coverage, troopers and others in
22   the law enforcement and firearms communities are
23   talking.
24        Who is talking?  What troopers are talking

Page 243

1    about you?
2    A.  I'm not familiar what you're asking me.
3    Q.  I'm not going to mark this.
4        MR. NEUBERGER:  Do you know what number
5    that is just so I have it?
6        MR. ELLIS:  It's page 12 and it is
7    interrogatory 3 and the way you have answered it it's
8    sub(c).
9        MR. NEUBERGER:  Okay.  Why don't you just
10   show it to him?
11   BY MR. ELLIS:
12   Q.  That's the subsection there (indicating).
13   A.  (Reviewing document)  Okay.
14   Q.  What are you referring to in that sentence that
15   I just read to you?
16   A.  People in the community making comments about
17   following the firearms training unit in the media and
18   that, you know, we were getting blamed for the
19   destruction of that building.
20   Q.  Who blamed you for the destruction of the
21   building?
22   A.  It was in the media.
23   Q.  Who is it that has talked to you and said that
24   you were being blamed for that?  I mean, your

Page 244

1    neighbors?
2    A.  Different contacts in the community.
3    Q.  Give me an example.
4    A.  I can't give you a name right off the top of my
5    head, but since this has broken I mean it's a subject
6    of conversation.
7        You know, my next-door neighbor, we talked
8    about it the other day:  "How are you doing?  Are they
9    still blaming you for the building?"
10   Q.  Did you ever tell him that somebody was blaming
11   you for problems in the building?
12   A.  Did I ever tell him?
13   Q.  Yes.
14   A.  No.  He saw it in the newspaper.  And a lot of
15   people make jokes about it.  One person just said, you
16   know, "Can you hear me?  They're really putting you
17   guys down about the fall of the firearms training
18   unit."
19   Q.  He says, "Can you hear me"?
20   A.  Yes.
21   Q.  Joking about your hearing loss?
22   A.  Right.
23   Q.  Has your hearing loss been in the newspaper?
24   A.  Yes.

Page 245

1    Q.  How did your hearing loss get in the newspaper?
2    A.  Our wives spoke out in the newspaper.
3    Q.  So your wives put it in the newspaper?
4    A.  That's correct.
5    Q.  I'm sorry.  Can you slide that back?
6        MR. ELLIS:  What time is it, Tom?
7        MR. NEUBERGER:  It's about eight after.
8        MR. ELLIS:  I'll tell you what.  Let me
9    knock off.  I've got like maybe another 10, 15, 20
10   minutes ago.  Why don't we start it first thing in the
11   morning?
12       MR. NEUBERGER:  That's fine.  Just finish
13   up in the morning.  That's fine.
14       MR. ELLIS:  Off the record.
15       (Discussion off the record.)
16       (Deposition recessed at 5:10 p.m. until
17   Tuesday, October 18, 2005 at 9:30 a.m.)
18
19
20
21
22
23                                      **A - 184**
24

62 (Pages 242 to 245)

Price, et al.                                    v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                      October 17, 2005

Page 246

1            I N D E X
2    DEPONENT: WAYNE H. WARREN         PAGE
3      Examination by Mr. Ellis          2
4          E X H I B I T S
5    DEFENDANT'S DEPOSITION EXHIBITS        MARKED
6    1 E-mail to Thomas F. MacLeish from
        Christopher Foraker dated
7        January 5, 2004              140
8    2 Multipage document captioned "Delaware
        State Police Firearms Training Range
9        Current Range Status And Analysis"
        dated 01/30/04              173
10
     3 Multipage document captioned "Delaware
11      State Police Firearms Training Facility
        Responsibility Status Analysis dated
12      01/30/04                   179
13   4 Seven-page letter to Captain John A.
        Yeomans, M.D. from Edward A. Emmett,
14      M.D. dated January 21, 2005     187
15   5 Letter to Captain John A. Yeomans
        from Edward A. Emmett, M.D. dated
16      February 24, 2005             189
17   6 Letter to Captain John A. Yeomans
        from Edward A. Emmett, M.D. dated
18      March 18, 2005              195
19   7 Multipage document captioned "My Chronology
        with the Firearms Training Facility Cpl/3
20      Wayne Warren May 11, 2004"      214
21   8 Three-page document captioned "Concerns
        about the Firearms Training Unit Facility
22      Prepared By Cpl/3 Wayne Warren"    214
23   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 247
24   CERTIFICATE OF REPORTER          PAGE 248

Page 248

1    State of Delaware   )
                          )
2    New Castle County   )
3
4          CERTIFICATE OF REPORTER
5
         I, Kurt A. Fetzer, Registered Diplomate
6    Reporter and Notary Public, do hereby certify that
     there came before me on Monday, October 17, 2005, the
7    deponent herein, WAYNE H. WARREN, who was duly sworn
     by me and thereafter examined by counsel for the
8    respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17       Kurt A. Fetzer, RDR, CRR
         Certification No. 100-RPR
18       (Expires January 31, 2008)
19
     DATED:
20
21
22
23
24

Page 247

1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**A - 185**



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Price, et al.

## v.

# Chaffinch, et al.

### C.A. # 04-956-GMS

---

## Transcript of:

# Wayne H. Warren

## Volume # 2

## October 18, 2005

---

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

**A - 187**

Price, et al.
Wayne H. Warren, Volume 2

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 249

VOLUME 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

B. KURT PRICE, et al.          )
                               )
      Plaintiffs,              )
                               )
        v.                     )  C.A. No. 04-956-GMS
                               )
L. AARON CHAFFINCH, et al.,    )
                               )
      Defendants.              )
                               )
                               )
                               )
CHRISTOPHER FORAKER,           )
                               )
      Plaintiff,               )
                               )
        v.                     )  C.A. No. 04-1207-GMS
                               )
L. AARON CHAFFINCH, et al.,    )
                               )
      Defendants.              )
                               )

            Continued deposition of WAYNE H. WARREN
taken pursuant to notice at the law offices of Montgomery
McCracken Walker & Rhoads, LLP, 300 Delaware Avenue,
Suite 750, Wilmington, Delaware, beginning at 9:25 a.m.,
on Tuesday, October 18, 2005, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.

APPEARANCES:

            THOMAS S. NEUBERGER, ESQUIRE
            THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
            Wilmington, Delaware 19801
            for the Plaintiffs

            WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

**A - 189**

Price, et al.                                        v.                            Chaffinch, et al.
Wayne H. Warren, Volume 2              C.A. # 04-956-GMS                October 18, 2005

Page 250

1  APPEARANCES (cont'd):
2        EDWARD T. ELLIS, ESQUIRE
         ROBERT J. FITZGERALD, ESQUIRE
3        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
         123 South Broad Street
4        Avenue of the Arts
         Philadelphia, Pennsylvania 19109
5        for the Defendants
6  ALSO PRESENT:
7        CHRISTOPHER D. FORAKER
         B. KURT PRICE
8
              - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 251

1                    WAYNE H. WARREN,
2        having been previously sworn as a witness,
3        was resumed on examination and testified
4        further as follows:
5        MR. ELLIS:  I'm going to ask the court
6  reporter to mark this as No. 9.
7        (Defendants' Deposition Exhibit No. 9 was
8  marked for identification.)
9  BY MR. ELLIS:
10   Q.   We received this in the medical records that
11  you produced.  Can you tell me what this is?
12   A.   That I produced?
13   Q.   Yes.
14        MR. NEUBERGER:  It came from us.  It was
15  in our records.
16  BY MR. ELLIS:
17   Q.   Just by way of identification for the record,
18  D-9 is a three-page document that has Bates stamps
19  FTU4676 through FTU4678, and it's got "Wayne H. Warren"
20  on the top of the front page.
21        Have you ever seen that before?
22   A.   No, I haven't.
23   Q.   Then that's fine.  I don't need to ask you --
24  do you have any idea what it is?

Page 252

1    A.   Yes.  It looks like a report.
2    Q.   It's clearly a report on your medical
3  condition.
4    A.   That's correct.
5    Q.   Do you know who it's from?
6    A.   Says Dr. Emmett.  So I assume it's from
7  Dr. Emmett.
8    Q.   But that's just an assumption?
9    A.   That's correct.
10        MR. ELLIS:  I ask you to take a look at
11  Exhibit 10.
12        (Defendants' Deposition Exhibit No. 10 was
13  marked for identification.)
14  BY MR. ELLIS:
15   Q.   This is a three-page document that's got on the
16  top of the front page "FTU Transition meeting
17  12/01/2003."
18        Have you seen that document before?
19   A.   Yes.
20   Q.   Where did you first see that document?
21   A.   In one of the depositions.
22   Q.   Is that one of the depositions in this case
23  that you were attending?
24   A.   That's correct.

Page 253

1    Q.   But you were not the deponent?
2    A.   No.
3    Q.   Had you ever seen it prior to that?
4    A.   No.
5    Q.   Was Ralph Davis the deponent on the day that
6  you first saw this document?
7    A.   Yes.
8    Q.   I don't have any more questions about that.
9        Yesterday you testified about an
10  investigation that you participated in on the background
11  and history of the firing range in Smyrna.  Can you tell
12  me who else was involved in the investigation?
13   A.   Corporal Price and Sergeant Foraker.
14   Q.   Did you and Corporal Price and Sergeant Foraker
15  divide up the work that you were going to do?
16   A.   Yes.  Different people did different sections
17  of it.
18   Q.   Was Corporal Warwick involved?
19   A.   Yes, I believe he was.
20   Q.   Can you describe for me your assignment, so to
21  speak, as part of the investigation?
22   A.   There wasn't any specific assignment.  We were
23  just digging to find out what was wrong with the
24  building, why were we experiencing these problems, and

A - 190

2 (Pages 250 to 253)

Price, et al.
Wayne H. Warren, Volume 2

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 254

1  how we got to this point, how we got to the point where
2  the building was in such disarray and breakdown because
3  of the ventilation system.
4      Q.   When I asked you about assignments, I meant did
5  you divie up the parts of the investigation so that, for
6  example, one of you dealt with the Certificate of
7  Occupancy, whereas somebody else dealt with the HVAC
8  specifications, that type of thing?
9      A.   Yes.
10     Q.   Well, what was your particular role?
11     A.   What my particular role was?
12     Q.   Yes.
13     A.   I was finding out as much information about the
14  different aspects of the building as I could.  I didn't
15  have a specific assignment.  We divied up the jobs, and
16  what we thought would help in determining what happened
17  with the building.  But there was no formal job
18  assignments as to who was to do what.
19     Q.   You didn't divide the work by, for example,
20  area of the building or subject matter.  In other words,
21  did one of you look at health issues and another one look
22  at the specs for the HVAC system, another person look at
23  some other aspect?
24     A.   Different people looked at different aspects of

Page 255

1  the building, that's correct.
2      Q.   Do you remember what parts you had?
3      A.   No.
4      Q.   Do you remember what parts Sergeant Foraker
5  had?
6      A.   No.
7      Q.   How about what parts Corporal Price had?
8      A.   No.
9      Q.   How about what parts Corporal Warwick had?
10     A.   Only thing I remember about Corporal Warwick is
11  he contacted NIOSH, the National Institute of
12  Occupational Safety and Health, and he was looking into
13  hearing protection.  That's the only thing that stands
14  out in my mind at this point.
15     Q.   Does anything stand out in your mind for what
16  Price or Foraker did?
17     A.   Not really.
18     Q.   When you had your meeting with the Auditor's
19  Office on May 11th or May 12th, 2004, was
20  Corporal Warwick with you?
21     A.   I can't recall if he was there or not.
22     Q.   I think you said you drove up to Wilmington
23  with other people in the car with you after you met
24  somewhere.

Page 256

1      A.   Yes, we did.
2      Q.   Do you remember who was in the car with you?
3      A.   No, I don't.
4      Q.   Do you remember if it was one person or more
5  than one person?
6      A.   No, I can't remember.
7          MR. ELLIS:  I don't have any more
8  questions.  Thank you.
9          MR. NEUBERGER:  I don't have any
10 questions, but we will want to review and sign the
11 deposition.
12         (Deposition concluded at 9:35 a.m.)
13              - - - - -
14
15
16
17
18
19
20
21
22
23
24

Page 257

1      T E S T I M O N Y
2
3  DEPONENT: WAYNE H. WARREN          PAGE
4
5  BY MR. ELLIS................................ 251
6
7      E X H I B I T S
8
9  DEFENDANTS' DEPOSITION EXHIBIT NO.        MARKED
10
11 9 - A three-page document headed "Wayne
       H. Warren"................................... 251
12
   10 - A three-page document entitled, "FTU
13 Transition meeting 12/01/2003"................ 252
14
15 ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 258
16
17 CERTIFICATE OF REPORTER           PAGE 259
18
19
20
21
22
23
24

**A - 191**

3 (Pages 254 to 257)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                v.                            Chaffinch, et al.
Wayne H. Warren, Volume 2        C.A. # 04-956-GMS              October 18, 2005

Page 258

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 259

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 18th day of
October, 2005, the deponent herein, WAYNE H. WARREN, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


        Kimberly A. Hurley
        Certification No. 126-RPR
        (Expires January 31, 2008)


DATED:

**A - 192**

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Price, et al.
## v.
# Chaffinch, et al.

### C.A. # 04-956-GMS

---

## Transcript of:

# Christopher D. Foraker
### Volume # 1
### December 13, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A - 193

Price, et al.
Christopher D. Foraker, Volume 1

v.

C.A. # 04-956-GMS

Chaffinch, et al.
December 13, 2005

Page 1

VOLUME 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,      )
                                     )
          Plaintiffs,                )
                                     ) Civil Action
     v.                              ) No. 04-956-GMS
                                     )
COLONEL L. AARON CHAFFINCH, et al.,  )
                                     )
          Defendants.                )
-------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,     )
                                     )
          Plaintiff,                 )
                                     )  Civil Action
     v.                              ) No. 04-1207-GMS
                                     )
COLONEL L. AARON CHAFFINCH, et al.,  )
                                     )
          Defendants.                )

          Deposition of CHRISTOPHER D. FORAKER
taken pursuant to notice at the law offices of
Montgomery, McCracken, Walker & Rhoads, LLP, 300
Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 9:35 a.m., on Tuesday, December 13, 2005,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.
APPEARANCES:
          THOMAS S. NEUBERGER, ESQ.
          THE NEUBERGER FIRM, P.A.
            2 East Seventh Street - Suite 302
            Wilmington, Delaware  19801
            For the Plaintiffs

**A - 194**

               WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477

Price, et al.                                                      Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS              December 13, 2005

Page 2

1  APPEARANCES: (Cont'd)
2      EDWARD T. ELLIS, ESQ.
          MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
3      123 South Broad Street
          Philadelphia, Pennsylvania 19109
4      For the Defendants
5  ALSO PRESENT:
      B. KURT PRICE
6      WAYNE WARREN
7          - - - - -
8          CHRISTOPHER D. FORAKER,
9      the deponent herein, having first been
10     duly sworn on oath, was examined and
11     testified as follows:
12          EXAMINATION
13  BY MR. ELLIS:
14    Q.  Sergeant Foraker, my name is Ed Ellis.  I'm
15  sure you know that by now.
16    A.  Yes, sir.
17    Q.  The purpose of our being here today is for me
18  to take your deposition in connection with the claims
19  you've made against Aaron Chaffinch and Thomas
20  MacLeish and the Delaware State Police.
21          Have you been deposed before?
22    A.  Yes, sir, I have.
23    Q.  How many times?
24    A.  Referring to this particular case or my

Page 3

1  previous case or my career?
2    Q.  Your career.
3    A.  I've probably been deposed fifteen times maybe.
4    Q.  Fifteen times all in civil cases?
5    A.  No, sir.
6    Q.  Some would have been in criminal cases?
7    A.  Some are criminal cases.
8    Q.  How many times have you been deposed in a civil
9  case?
10    A.  I believe three times.  This would be the
11  fourth time, I believe.
12    Q.  During the course of your career with the State
13  Police have you testified in court?
14    A.  Yes, sir.
15    Q.  How many times?
16    A.  (Pause).
17    Q.  Approximately.
18    A.  Probably fifty, sixty times, at least.
19    Q.  Were they all in criminal cases?
20    A.  Yes, sir.
21    Q.  Well, the purpose of the proceeding, as you
22  know, is for me to ask you questions about your case
23  and for you to give me answers.  So if you don't
24  understand the question, I'm sure you know by now to

Page 4

1  speak up and tell me you don't understand it.
2    A.  Yes, sir.
3    Q.  If you do understand it, just please answer the
4  question.
5          The first thing I'm going to show you
6  today is a document that has previously been marked in
7  another deposition as an exhibit and it's been marked
8  as Exhibit MacLeish 5 in Thomas MacLeish's deposition.
9          Are you familiar with that document?
10    A.  Yes.  I believe this is a news article written
11  by Tom Eldred of the Delaware State News.
12    Q.  When you first saw this document, would I be
13  correct that it didn't appear in its current format
14  but it was actually in the newspaper?
15    A.  That's correct.
16    Q.  Do you believe that you are defamed by any part
17  of this newspaper article?
18    A.  Yes, I do.
19    Q.  I want you to go down and point out to me each
20  paragraph that you believe is defamatory.
21    A.  (Reviewing document)  For one, there's I guess
22  the third article down or third paragraph down, it
23  says, "Flammable materials are stored in the shooting
24  area."

Page 5

1    Q.  Right.
2    A.  That's not true.  Flammable materials were not
3  stored in the shooting area.
4    Q.  Okay.
5    A.  I think the seventh paragraph down, "Mrs. Homer
6  said Facilities Management only provides 'custodial'
7  services and is not otherwise responsible."  That's an
8  incorrect statement.
9    Q.  Okay.
10    A.  Followed by "Colonel Chaffinch acknowledged
11  problems but indicated the blame lies only with one or
12  two troopers under his command."
13    Q.  Okay.  Keep going.
14    A.  The statement "'We are not responsible for the
15  equipment or cleanup of the range,' Mrs. Homer said as
16  she began the tour."
17          Facilities management is responsible for
18  that building.  It is their building.
19    Q.  As we go through this, Sergeant Foraker, please
20  remember that the question I asked you is whether the
21  statements in here were defamatory towards you and if
22  you believe that that statement is defamatory towards
23  you, that's fine.  But I'm not asking you just to
24  identify mistakes in the article or where people made

A - 195

2 (Pages 2 to 5)