| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Christopher D. Foraker, Volume 1   C.A. # 04-956-GMS | | December 13, 2005 |

Page 62

1  problem because of that situation. So we didn't, I
2  didn't have them go back there.
3      Q.  I'm really referring to the front of the range
4  where the trainees were and where your men were
5  supervising the trainees in the shooting process. Did
6  it ever occur to you to get people out of there
7  because it might be a dangerous condition?
8      A.  I'm not an industrial hygienist and the state
9  has one and I'm asking him, I'm asking him what do we
10 do? And he doesn't do anything.
11     Q.  All I'm asking you is whether that thought ever
12 occurred to you, whether it ever occurred, not
13 whether -- I understand that you talked to people at
14 facilities and I understand that you ultimately had
15 the place tested.
16         But my question is whether it ever
17 occurred to you as the NCOIC at the firing range to
18 remove the students and your instructors from a
19 circumstance that might be hazardous to their health?
20     A.  I'll put it to you this way: I did not have
21 the authority to shut that range down and I didn't
22 have the authority to stop without some sort of
23 evidence that the place is a problem, that it's a
24 contaminated facility where we should not be training.

Page 63

1      Q.  My question to you though was whether -- I
2  recognize that you said what you believed to be your
3  authority. And I'm simply asking you whether the
4  thought ever crossed your mind that you should remove
5  your people and the students from what might be a
6  contaminated area?
7      A.  I don't recall if it did at this time.
8      Q.  As I understand it, you never made that
9  recommendation to Captain Warren, right, that the
10 place be shut down prior to February 11th anyway?
11     A.  No. I wanted to get information to fully
12 inform people that had that authority to shut it down
13 or not.
14     Q.  I understand. When you are running
15 qualification training for active members of the State
16 Police, what is your authority over higher-ranking
17 officers while they're in the facility?
18     A.  I'm in charge of conducting the training that
19 they receive.
20     Q.  You're in charge of conditions and procedures
21 on the shooting range itself, right?
22     A.  I'm in charge of the curriculum and the
23 training that they receive.
24     Q.  When, say, there's a requalification or

Page 64

1  recertification training going on -- let me back up a
2  second so I will make the record clear.
3          Every member of the State Police has to
4  qualify twice a year on their weapons, right?
5      A.  Correct.
6      Q.  Do you call it qualification or certification?
7      A.  Qualification.
8      Q.  That means that all the lieutenants and all the
9  captains and all the majors have to come and shoot,
10 right?
11     A.  Correct.
12     Q.  When they come into the facility are they under
13 your supervision?
14     A.  They're under the supervision of all of us,
15 yes.
16     Q.  All of you meaning you and your staff at the
17 firearms training unit?
18     A.  Yes, strictly as a firearms training
19 environment.
20     Q.  That's what I mean.
21         So that if someone who is higher ranking
22 than you is doing something unsafe or what you believe
23 to be unsafe in the range, you can have them removed,
24 can't you?

Page 65

1      A.  You would have to paint that picture pretty
2  clear for me to answer that correctly. I'm not going
3  to try to exercise my authority over someone who is
4  higher ranking than me.
5          If they're doing something unsafe, then we
6  will correct them. But as far as removing them, that
7  would have to be something very extreme for me to
8  remove somebody.
9      Q.  Very serious?
10     A.  Very extreme. They would have to be a danger
11 to themselves and to others.
12     Q.  And if they were, you would remove them, right?
13     A.  I would cease fire at that particular time.
14 And since it's never happened to me before, I would
15 have to consult with other ranking officers there at
16 the time to see what we would do. That wouldn't be a
17 sole decision by me.
18     Q.  Now, when you say that you would correct the
19 higher-ranking officer, what do you mean by that?
20     A.  We would stop their action, per se.
21     Q.  So that if the --
22     A.  And counsel them and say, "Hey, this is what
23 you did. Please don't do that."
24     Q.  The firing range has been described to me as a

A - 210

17 (Pages 62 to 65)

Case 1:04-cv-01207-GMS  Document 75-9  Filed 02/02/2006  Page 2 of 19

Price, et al. v. Chaffinch, et al.
Christopher D. Foraker, Volume 1   C.A. # 04-956-GMS   December 13, 2005

Page 66

1  very Democratic environment. Would you agree with
2  that characterization?
3  A. I guess it would be your interpretation of
4  Democratic. What do you mean?
5  Q. I mean that when officers of the State Police
6  are undergoing firearms training, regardless of their
7  rank they all submit to the authority of the person in
8  charge of the range?
9  A. They submit to the authority of the
10 instructors, not just one in particular, but whoever
11 is calling the line, whoever is standing behind them
12 giving them direction.
13 Q. And that would be you and the people that work
14 on your staff?
15 A. That's correct.
16 Q. Could you go back, please, to the MacLeish 5
17 Exhibit, which is the newspaper article that we
18 started out with this morning.
19     On the second page of Exhibit MacLeish 5,
20 I want to ask you about the paragraph about three
21 quarters of the way down that begins with the
22 phrase "'The bullet trap wasn't cleaned properly,'
23 Mrs. Homer said. 'The back, where the track is, was
24 so poorly maintained that it became unworkable.'"

Page 67

1     Is it correct that the track was
2  unworkable as of April 6, 2004? By "the track" I
3  would assume she means the conveyor system or the drag
4  system as you call it?
5  A. I'm not exactly sure what she means by that.
6  Q. Well, there's only one track on the bullet
7  trap, isn't there?
8  A. Is it a track?
9  Q. Pardon me?
10 A. Is it a track?
11 Q. Doesn't it look like a tank track? Isn't the
12 belt that we have been talking about, isn't it metal?
13 A. Yeah. Okay. So you're saying it looks like a
14 tank track?
15 Q. Yes. Doesn't it?
16 A. I guess you could say that, yes.
17 Q. It was not workable at the point Mrs. Homer saw
18 it, right?
19 A. That's correct. It had failed again.
20 Q. Go over to the third page of the document.
21     Now, I want to ask you down in the middle
22 of the page there's a statement attributed to Colonel
23 Chaffinch and it says, "Because of the frangible
24 ammunition we were using, the bullet trap required

Page 68

1  hands-on, daily cleaning. Sergeant Ashley was willing
2  to do that.'"
3     Do you believe that because of the
4  frangible ammunition the bullet trap required
5  hands-on, daily cleaning?
6  A. By a trained professional, yes.
7  Q. Do you agree that Sergeant Ashley was willing
8  to do hands-on daily cleaning?
9  A. What I can say about that is the bullet trap
10 had three dry ramps, dry points when I arrived on
11 December 1st. The conveyor system was a problem. He
12 tweaked and tinkered with it that very day and the
13 place was an utter mess everywhere throughout the
14 facility.
15     So I would have to say that Sergeant
16 Ashley didn't do that.
17 Q. He didn't do what?
18 A. He didn't do what they're claiming he did here.
19 And I believe -- interviewing and interrogation 101
20 when we're trained as police officers, you have an
21 idea of how to read someone, their body language. If
22 you're in their house and you question them if they
23 have any dope or any drugs and their eyes glance to a
24 certain area, you know that's where they're hiding

Page 69

1  their stash.
2     Also, when people say something like to
3  the fact like Lieutenant Colonel MacLeish said to
4  Corporal Price, "I'm not going to fuck you," you know
5  that that's exactly what their intent is. That's
6  interviewing and interrogation 101. And when Major
7  Baylor said when Colonel Chaffinch came back he said
8  he felt like he had been set up, well, that's exactly
9  what he was doing to me. He was setting me up for the
10 fall for the blame for this facility and the condition
11 that was there. And that condition already existed
12 prior to me stepping in the door on December 1st.
13     And by him saying that he felt he was set
14 up, that's exactly what he was doing to me. And I
15 know for a fact that he is friends with Sergeant
16 Ashley. That was established in my first trial. I
17 know that they are friends with Paul Eckrich, who has
18 the control of the budget, and they oftentimes have
19 lunch together. And I'm sure that it will be clear
20 when we gather the evidence from his computer if it
21 hasn't been destroyed that it will show that that was
22 premeditated.
23 Q. Whose computer are you talking about?
24 A. Colonel Chaffinch's computer.

A - 211

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 3 of 19

Price, et al.                                              v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1         C.A. # 04-956-GMS                    December 13, 2005

Page 70

1  Q. What is it that you're saying was premeditated?
2  A. I believe that they're framing me right here
3  for this, for the blame of this range being closed.
4  He's using that to blame me and destroy my reputation
5  and my men's reputations.
6  Q. We will get to that. But just for present
7  purposes, do you know what Sergeant Ashley did in
8  terms of maintaining the bullet trap while he was the
9  NCOIC at the range?
10 A. Like I said, apparently he wasn't doing what
11 they're saying he was doing because there were dry
12 ramps, there were problems with the conveyor system.
13 He tweaked and tinkered with that and then come to
14 find out that's what caused the tail shaft to break.
15 Q. Well, all of this are things that you're
16 surmising from --
17 A. No. I think it's pretty clear.
18 Q. Let me ask you this: Between the time you left
19 the range in April, it would have been April 8, 2002,
20 and when you came back on December 1, 2003, did you
21 ever go to the range?
22 A. Yes.
23 Q. How many times?
24 A. The time frame that I wasn't there?

Page 71

1  Q. Right.
2  A. I believe it was three times.
3  Q. Would those have been your qualification
4  shoots?
5  A. Yes.
6  Q. Any time other than that?
7  A. I don't believe so.
8  Q. Do you know what Sergeant Ashley was doing in
9  terms of bullet trap maintenance on a daily basis?
10 A. No, I don't. I don't know if he was doing
11 anything at all.
12 Q. I understand. Go to the next paragraph.
13 A. I know that when I took over on December 1st he
14 actually made the statement while we were back there
15 and he was tinkering with it that this is a full-time
16 job just taking care of the bullet trap, which is one
17 thing that I do agree with. It's a full-time job for
18 a professional that knows what they're doing, they're
19 trained, not only in how to operate and fix and clean
20 the equipment but also trained and equipped to protect
21 them against hazardous materials.
22 Q. Go to the next paragraph, please.
23 A. Where are you?
24 Q. The one immediately below the one that we just

Page 72

1  discussed and that begins with the statement "'I
2  cannot say Sergeant Foraker was willing to do that.'"
3  During the time that is really at issue
4  here, which is December 1, 2003 until April 2004, did
5  you do maintenance of the water system on the bullet
6  trap? I'm referring to you personally.
7  A. We weren't able to.
8  Q. The answer is no, you did not do it then?
9  A. That's correct. We weren't able to.
10 Q. When you say, "we" you're referring to you
11 and --
12 A. Me and my staff.
13 Q. That would be Price, Wayne Warren and Warwick?
14 A. Correct.
15 Q. Is it true that you were interested in
16 instruction and teaching people how to shoot?
17 A. That's my passion and that's our job, yes.
18 Q. Is it true that you did not feel the bullet
19 trap cleaning was part of your purview?
20 A. No. That's an absolute lie.
21 Q. Did you feel the bullet trap cleaning was part
22 of your purview?
23 A. Yes.
24 Q. And did you do any bullet trap cleaning between

Page 73

1  December 1st and April 6th, 2004?
2  A. No. I was unable to.
3  Q. Did you feel that doing bullet trap cleaning
4  was putting you in harm's way?
5  A. I thought the possibility existed.
6  Q. Well, as of April here you know a lot more
7  about the facility than you knew in December 2003,
8  didn't you?
9  A. That's correct.
10 Q. And as of April 2004 you knew what all the
11 chemicals were that were used in the bullet trap,
12 didn't you?
13 A. As of when?
14 Q. April 6, 2004.
15 A. Yes.
16 Q. And did you believe that for you to deal with
17 those chemicals was putting yourself in harm's way?
18 A. Without the proper training and equipment
19 provided to me and my men, yes.
20 Q. Now, you said that you were unable to do the
21 cleaning of the bullet trap between December 1st and
22 the time the range shut down. Why was that? What was
23 it about the circumstances that made it impossible for
24 you to do that?

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 4 of 19

Price, et al. v. Chaffinch, et al.
Christopher D. Foraker, Volume 1   C.A. # 04-956-GMS   December 13, 2005

Page 74

1  A.  Like Sergeant Ashley had said to me, it's a
2  full-time job and being the NCOIC of the firearms
3  training unit is a full-time job. I requested a fifth
4  person when I was there the first time in 2001 to 2002
5  and that was granted for that unit, but I was
6  transferred away from it. I was illegally transferred
7  out of there by Colonel Chaffinch.
8      Ashley, Sergeant Ashley, who took my
9  place, was afforded a fifth person.
10 Q.  Okay.
11 A.  Even though he had a fifth person, he still
12 wasn't able to keep up, if he says he was doing the
13 bullet trap maintenance he still wasn't able to keep
14 up with the conditions of that range. The conditions
15 of that range when I walked in there on December 1st
16 were a mess. It was a disaster everywhere.
17 Q.  Are you saying that you couldn't do the work on
18 the bullet trap because you didn't have time?
19 A.  That's a large part of it, yes.
20 Q.  Are there other parts of it?
21 A.  We didn't have time. We didn't have enough
22 personnel to do that.
23 Q.  That's the same thing as saying you don't have
24 enough time, right?

Page 75

1  A.  If you surmise it that way, yes.
2  Q.  Was there any other reason other than the
3  number of people you had working there?
4  A.  The fact that Dr. Green had said what was
5  causing their blood levels, my staff's blood levels to
6  rise and spike up, with that that was also an issue
7  that I was thinking about that maybe I shouldn't have
8  them do that. I contacted Captain Warren and told him
9  the circumstances of the bullet trap, that it's far
10 behind on maintenance now; can we look into having
11 either Savage or facilities management putting
12 somebody in this position here to take care of this
13 that's trained in dealing with any type of hazards
14 that they come across in this bullet trap and also be
15 able to take care of the mechanical aspect, a
16 technician that can be trained to take care of this
17 bullet trap because we're unable to do that? And
18 we're also having problems with our lead levels
19 rising.
20      When I talked with him, I then also after
21 talking with him I got in touch with Mark D'Allesandro
22 from facilities management and I brought him in and we
23 talked over the bullet trap problems and all of the
24 issues to deal with that. He agreed that's a

Page 76

1  full-time position. He said that he would have to
2  talk to his superiors as to whether they could afford
3  to put a technician there full time; they may not be
4  able to do that.
5      So then I went beyond that and contacted
6  mechanical companies in the area to try to get them to
7  come in and give us a price quote of somebody
8  maintaining the bullet trap. Once they found out,
9  once those mechanical companies found out that they
10 would be dealing with lead exposure, they wanted
11 nothing to do with it.
12     Then eventually I contacted Environmental
13 Solutions and talked with them about it. Joe Farrell
14 from Environmental Solutions then came in. He looked
15 at the facility and the bullet trap and he was trying
16 to work out, come up with some idea of how to make
17 this a simpler cleaning process back there with the
18 bullet trap to keep the water clean and fresh because
19 as it stood there now it's not working.
20     And technically it never really did work
21 right. It was constantly being modified over the
22 years.
23 Q.  You're referring to the bullet trap now?
24 A.  Yes. That's what I was talking about just

Page 77

1  then. The ventilation system has always been modified
2  and a constant problem.
3  Q.  Did you discuss with Rich Ashley on December 1,
4  2003 the condition of the bullet trap?
5  A.  Yes.
6  Q.  And what did he say to you about the condition
7  of the bullet trap?
8  A.  He said that "We replaced the conveyor system
9  and put a drag belt in and we have had problems with
10 it. We have been trying to get it to work." And then
11 he wanted to explain it to me and we walked back
12 behind it and he showed it to me. And while he's
13 talking about it, he picks up a wrench in hand and
14 there was a plate that was over top of a sprocket and
15 chain assembly. That was removed. He had that off.
16 And while the system was running, the chain was just
17 slapping the edge of a bracket.
18     And he started tinkering with adjustment
19 points for that motor assembly to tighten that chain,
20 slide the sprocket further away to tighten the chain
21 and so forth. And I'm thinking to myself I don't know
22 what you're doing; I know that you're adjusting
23 things, but I'm not a technician. And he said, "Well,
24 I can do this because I have my chicken farm, my

A - 213     20 (Pages 74 to 77)

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 5 of 19

Price, et al.  
Christopher D. Foraker, Volume 1     C.A. # 04-956-GMS

Chaffinch, et al.  
December 13, 2005

Page 78

1  poultry farm, and I have a lot of equipment that is
2  similar and I work on it and keep it running, so I
3  have been keeping this thing running."
4     Q.  Did you discuss while you were back behind the
5  bullet trap with Rich Ashley whether the pumps were
6  working as they're supposed to?
7     A.  He said it was a daily, daily issue where the
8  pumps were clogging, where they would become dry on
9  the other side at different locations. I noted that
10  in my mind that there were three spots that were dry
11  December 1st. Those were the same three spots that
12  were dry when we shut the range down in March. We
13  just shot around those dry spots in the wet areas.
14           He actually said that he replaced the
15  original pumps with more super heavy-duty trash pumps
16  and he said that there's so much silt in the water
17  that it's got, it's got to push the silt through the
18  sprayers.
19     Q.  Okay. Did you discuss the changing of the
20  filters with Mr. Ashley or with Sergeant Ashley?
21     A.  He just said maintaining this is a full-time
22  job in and of itself.
23     Q.  After you took over the range on December 1st,
24  2003, did you replace any of the pumps?

Page 79

1     A.  I had checked on one or two of them that were
2  dry and the pump itself was fine. It was running,
3  which would mean that the -- and I think I opened up
4  the canister. And the canister where the --
5     Q.  Where the filter is?
6     A.  -- where the filter is wasn't completely
7  clogged. I mean, it had debris in it, but it was
8  flowing through it. I put the cap back on. So that
9  would probably have meant that the sprayer head or the
10  valve itself was bad.
11     Q.  Did you repair the sprayer head or the valve?
12     A.  No, I didn't. It was getting to where it was
13  too time consuming what was going on and there were so
14  many other things, so many other things at the
15  facility that was going on that was wrong or that was
16  broken or that needed attention and so forth.
17     Q.  After you returned to the range on December
18  1st, 2003, from that point until the time the range
19  was shut down did you or the staff working under you
20  replace any pumps?
21     A.  I don't believe so because, like I just said, I
22  think I checked on at least one, maybe two of the
23  three that had dry ramps out in front and they didn't
24  need a new pump that I could tell. It was something

Page 80

1  else. The diagnosis was not -- I didn't finish
2  finding out what exactly it was because that would be
3  labor intensive and time consuming to take the sprayer
4  heads off and try to get them unclogged.
5     Q.  Well, fixing a sprayer head that was clogged is
6  something that you had done during your first tour of
7  duty as the NCOIC at the range, right?
8     A.  I had done that prior to us shooting frangible
9  ammunition. Since frangible ammunition, that stuff
10  like turns to concrete when it gets dry.
11     Q.  I understand that.
12     A.  I would imagine that you probably would have to
13  order new sprayer heads and have them reinstalled
14  because they're like a bar and if the silt lays in
15  there and it's blocking it, it's probably turned to
16  concrete at some point in time where it got dry and
17  then dried out and then turned to concrete, so you're
18  not going to be able to get that out of there.
19     Q.  During your first tour of duty as the NCOIC
20  were you shooting frangible ammunition?
21     A.  Yes.
22     Q.  Did the residue from the frangible ammunition
23  clog the sprayer heads at some point or another?
24     A.  Sometimes it would, but a lot of times it would

Page 81

1  clear itself.
2     Q.  Did it clog the filters?
3     A.  Yes.
4     Q.  This is during your first tour of duty?
5     A.  Yes.
6     Q.  That would be August 2001 through April 2002?
7     A.  Yes.
8     Q.  I thought you testified earlier this morning
9  that during that period when you were the NCOIC in
10  2001 and 2002 that you and the people working under
11  you replaced pumps, cleaned the filters and unclogged
12  the sprayer heads.
13           Was I mistaken in that? Is that what your
14  testimony was?
15     A.  No. That was all what occurred, yes.
16     Q.  Now, when you came back beginning December 1,
17  2003 did you and the people that worked under you at
18  the range do those same things, replacing the filters,
19  replacing the pumps, cleaning the sprayer heads?
20     A.  When I came back December 1st?
21     Q.  Yes.
22     A.  No. That had not been done.
23     Q.  Was it done during the period from December
24  2003 to when the range closed?

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 6 of 19

Price, et al.                                        v.                                  Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS              December 13, 2005

Page 82

1  A.  No, it had not been.
2  Q.  Now, did you make a conscious decision not to
3  do that because of the environmental hazard you felt
4  that activity posed to the people that worked for you?
5  A.  Relative to their blood lead levels, yes.
6  Q.  Was there anything other than the blood lead
7  levels that caused you to do that, that caused you to
8  discontinue the maintenance of the water system behind
9  the bullet trap?
10 A.  The mere time that it took to maintain it.
11 Q.  So there are two reasons?
12 A.  It's a full-time job.
13 Q.  I understand.  One is the time and the second
14 is the blood lead levels?
15 A.  Correct.
16 Q.  Now, when was it that you made that decision to
17 stop doing that work?
18 A.  I believe that was in December.  I don't know
19 the exact date.
20 Q.  So it would be December 2003?
21 A.  Correct.
22 Q.  Was that a decision that you made individually
23 or was that a decision that you made in conjunction
24 with the people that were in your staff?

Page 83

1  A.  We talked about it as a staff.  We round tabled
2  what was going on.  We knew that we would be
3  shooting -- stop shooting in February.  We knew we
4  would have downtime at that point in time.  Then we
5  could bring a company in and decide on what we're
6  going to do, what can we do and how can we do it
7  better, how can we get somebody that can do it full
8  time to maintain it that is trained, that's a
9  technician that has an expertise in maintaining this
10 bullet trap, has an understanding of it and can
11 maintain it and can also be equipped with protective
12 gear to protect them against being contaminated or
13 being exposed to hazardous materials.
14 Q.  So your decision to discontinue doing that type
15 of work occurred somewhere the first half of December?
16 A.  Somewhere in there, yes.
17 Q.  What were the blood lead levels that caused you
18 concern in the early part of December?
19 A.  Not necessarily the blood level per se but how
20 quickly the levels jumped.  When Corporal Price and
21 Corporal Warren were working on the bullet trap,
22 particularly Corporal Price's lead levels I think
23 jumped I believe six points in a short period of time.
24 Q.  Was it still below 10?

Page 84

1  A.  I believe it went above 10.  I believe it was
2  11.
3  Q.  That would still be within the 6 to 12 range
4  that you had used as a target in 2002, right?
5  A.  Yes.  But, like I said, Dr. Schwartz had said
6  we should stay below a 10, a 10 or below.
7      Now, when we said, when it was said 6 to
8  12, that was being told to me by Major Swiski at the
9  time because then it went okay, well, now it's okay to
10 be a 15 and then when certain individuals reached that
11 point, then it was okay to go a little higher than
12 that.
13 Q.  Okay.
14 A.  And then now I believe we have gone backwards
15 now.  We're back to a 10.  We want to keep it below a
16 10 again.
17 Q.  Did you tell Captain Warren that you had made a
18 decision not to continue doing the water system
19 maintenance at the bullet trap in December 2003?
20 A.  Yes.  And I thoroughly explained to him about
21 the issues with having downtime coming in February
22 where we could bring a company in.  He asked me to
23 make some phone calls to mechanical companies in the
24 area, also talk to facilities management, which I did

Page 85

1  and D'Allesandro said they didn't have anybody; it
2  would have to be somebody who was newly hired, a new
3  position specific to that facility.  And the
4  bureaucracy involved in that, I didn't understand what
5  exactly he was telling me, but it sounded like they
6  weren't going to provide anybody to do that work.
7  Q.  Hasn't facilities always taken the position
8  that the bullet trap was not their responsibility?
9  A.  Well, pretty much.  They pretty much said the
10 ventilation system is working fine or, as D'Allesandro
11 put it, "I wish I could say it was working.  All I can
12 say is it's working as well as it can."
13 Q.  With respect to responsibility, hasn't it
14 always been the case that facilities management has
15 taken the position that they were responsible for the
16 HVAC system and that the State Police was responsible
17 for the bullet trap?
18 A.  Yes.
19 Q.  That's been true since 1998, right?
20 A.  Yes.
21 Q.  Now, did you ever tell Captain Warren in
22 writing that you were going to stop doing the
23 maintenance on the back of the bullet trap, the water
24 system on the back of the bullet trap?

A - 215

Case 1:04-cv-01207-GMS    Document 75-9    Filed 02/02/2006    Page 7 of 19

Price, et al.                                                                    v.                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1         C.A. # 04-956-GMS                                December 13, 2005

Page 86

1  A. I don't know that I did.
2  Q. Could you take I think it's Exhibit 1, yes,
3  Exhibit 1 up for a minute, please?
4     Go to the third page of Exhibit 1. And
5  this is the tail end of the e-mail that you sent to
6  MacLeish and Eckrich on December 19, 2003. And in the
7  first full paragraph there's discussion of context you
8  had with Joseph Farrell of Environmental Solutions
9  Group.
10    Do you see that?
11 A. Which page are you on?
12 Q. The third page.
13 A. The third page?
14 Q. Yes.
15 A. Okay.
16 Q. Do you see that?
17 A. Yes.
18 Q. The end of it says, the last sentence -- it's
19 not the last sentence.
20    The next-to-last sentence says,
21 "Mr. Farrell and a team of corporate engineers are
22 attempting to devise a plan that will prevent the
23 clogging of the filters, screens and sprayer jet
24 heads."

Page 87

1     Do you see where it says that?
2  A. Mm-hmm. Yes.
3  Q. Had Mr. Farrell been out to the range prior to
4  the date you sent this e-mail?
5  A. He may have. I don't recall at this time.
6  Q. It says in the last sentence of that paragraph
7  "He," I think referring to Mr. Farrell, "will forward
8  a proposal to me in the near future."
9     Is that something Mr. Farrell told you he
10 was going to do?
11 A. Yes.
12 Q. Would it be logical to assume that in order for
13 him to do that he would have had to have been at the
14 facility looking at it before he made up such a
15 proposal?
16 A. Yes.
17 Q. It says here, there's reference here to a team
18 of corporate engineers.
19    Did Mr. Farrell bring a team of corporate
20 engineers to the firearms facility prior to you
21 writing this e-mail?
22 A. No. I'm going by what he told me, Mr. Farrell
23 told me.
24 Q. You don't have a present recollection of him

Page 88

1  being there before you sent this e-mail, right? You
2  just think he was?
3  A. I know he's been to that facility many times
4  because he comes up and picks up the hazardous waste
5  that we produce. So he would have been there many
6  times. I don't know the exact date he was there.
7  Q. So he was familiar, as far as you're concerned
8  he would have been familiar with that facility
9  regardless of whether he was there prior to December
10 18th?
11 A. Right. Right.
12 Q. Now, what was your understanding of what he was
13 going to come back to you with in terms of a proposal?
14 What was it going to be a proposal to do?
15 A. To maintain, to maintain the bullet trap, the
16 water system of the bullet trap.
17 Q. Now go over to D-1 again.
18    MR. NEUBERGER: You mean the front page?
19    MR. ELLIS: I'm sorry. Yes, the front
20 page. The first page of D-1 as opposed to the last
21 page of D-1.
22 BY MR. ELLIS:
23 Q. Now look down at the end of the third
24 paragraph. There's a sentence here that says, "I

Page 89

1  expect to hear back from Environmental Solutions this
2  week with a proposal to combat the frangible material
3  and to maintain that area of the operation."
4     Do you see where it says that?
5  A. Yes, I do.
6  Q. Did you ever hear back from Environmental
7  Solutions with a proposal to deal with the frangible
8  material and maintain that area of the system?
9  A. Mr. Farrell actually came back a couple of
10 different times and talked with me about it, but we
11 didn't get to a proposal. That was all put on hold
12 because of the closing of the range.
13 Q. So when you said here "I expect to hear back
14 this week," that would have been the week of January
15 5th. That never happened, I take it?
16 A. Right. That's correct.
17 Q. At no point between January 2004 and today has
18 Farrell come back to you with a proposal for
19 maintaining the water system in the bullet trap?
20 A. No. In fact, the priority came to be that we
21 were going to have his company do the swipe samples
22 along with Art Nielson, the industrial hygienist, to
23 come in and do that.
24 Q. I recognize that Farrell's group did other

A - 216

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 8 of 19

Price, et al.                              v.                    Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 90

1  types of testing for you at the range. I do recognize
2  that.
3       I'm just trying to figure out whether they
4  ever came back with a proposal that's referenced here
5  in this e-mail.
6  A.  No. In fact, when Captain Warren and I spoke
7  it got to the point where the system that Mr. Farrell
8  was talking about putting together would have been
9  expensive and it would be unproven, just like they did
10 with the drag conveyor. That's unproven. You know,
11 all of the different tweaking and tinkering and
12 modifications that they have done to that bullet trap,
13 it would be almost doing, it would be like doing that
14 again and not knowing whether it would work or not.
15      So we were actually talking about the
16 possibility of maybe a new bullet trap and he wanted
17 me to then contact other companies and see what's out
18 there, see what's available.
19 Q.  Who is the "he"?
20 A.  Captain Warren.
21 Q.  Captain Warren. And when did he tell you to
22 contact other companies about the possibility of a new
23 bullet trap?
24 A.  I believe January time frame, January of '04.

Page 91

1  Q.  Can you be more precise as to the beginning or
2  end of January 2004?
3  A.  I don't recall exactly at this time.
4  Q.  Can you tell me approximately when it was that
5  you told Captain Warren that you were not going to
6  have your men do the work on the water system in the
7  bullet trap?
8  A.  It may have been as early as the first week or
9  second week in December.
10 Q.  Did you ever tell anybody in the State Police,
11 other than Captain Warren, that you were going to stop
12 having your men do the work on the water system in the
13 bullet trap?
14 A.  I don't recall at this time if I did.
15 Q.  Do you remember ever telling Ralph Davis about
16 it?
17 A.  I may have. I know that I was dealing directly
18 with Captain Warren.
19 Q.  I realize that and you said that before.
20      So you don't have a present recollection
21 of sitting in a room and talking to Ralph Davis about
22 it?
23 A.  I don't recall that I did at this time.
24 Q.  Was the discussion that you had with Captain

Page 92

1  Warren in the presence of the other members of your
2  staff?
3  A.  I believe so. I believe that was at the range.
4  I believe it was a meeting that we had at the range
5  and of course we went through the facility and looked
6  at it and so forth.
7       MR. ELLIS: Let me ask the court reporter
8  to mark whatever the next number is.
9       (Defendant's Deposition Exhibit No. 19 was
10 marked for identification.)
11 BY MR. ELLIS:
12 Q.  Can you take a look at what we have marked as
13 D-19, please? Tell me when you're done looking at it.
14 A.  (Reviewing document) Yes.
15 Q.  Is this a document you prepared?
16 A.  Yes.
17 Q.  I take it that this documents a meeting that
18 you had with your staff and Captain Warren on December
19 3, 2003?
20 A.  Yes.
21 Q.  Was this document prepared before or after the
22 meeting?
23 A.  Before.
24 Q.  Is the handwriting on the bottom of D-19 yours?

Page 93

1  A.  Yes.
2  Q.  Can you read it to me? Because it's a little
3  bit fuzzy in the photocopying.
4  A.  It says, "SLEAF approximately 9,000 for
5  training."
6       MR. NEUBERGER: What was the first word?
7       THE WITNESS: SLEAF, S-L-E-A-F.
8  BY MR. ELLIS:
9  Q.  That's an acronym that has to do with some
10 source for law enforcement money, isn't it?
11 A.  Correct.
12 Q.  So are you saying here that SLEAF is going to
13 get you about $9,000 for training somebody?
14 A.  I believe that it was discussed that there was
15 $9,000 that could possibly be used for training. I
16 was looking to send Warwick away to get his basic
17 certification.
18 Q.  Certification as a firearms instructor?
19 A.  Correct. He was transferred into the unit, but
20 he wasn't a firearms instructor as of yet.
21 Q.  Did you have this document in front of you when
22 the meeting was going on with Captain Warren?
23 A.  Yes, I believe it was.
24 Q.  It looks like there are check marks next to

A - 217

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 9 of 19

Price, et al.                                             v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS              December 13, 2005

Page 94

1  some of the bullet points on Exhibit D-19.
2      Are those your check marks or do you even
3  recognize them as check marks?
4  A. I guess they're check marks.
5  Q. Were you checking off each item as you talked
6  about it with Captain Warren?
7  A. I may have. I don't remember at this time.
8  Q. The second bullet point has to do with whether
9  you had sufficient personnel, correct?
10 A. Correct.
11 Q. Where was Corporal Peachey at this point?
12 A. Corporal Peachey was in an extreme amount of
13 pain and he was -- he would come in periodically, but
14 he had a difficult time being on his feet. So he was
15 taking a lot of time off, sick time off as he was
16 approaching the end of that two-year period.
17 Q. Did that circumstance exist before you got
18 there? In other words, was this a problem Ashley had
19 to deal with too?
20 A. Ashley told me that he made some sort of deal
21 with the staff and Peachey where he would be able to
22 take time off because he was going to lose time or
23 lose injured or sick time. I don't recall what he
24 said, but he made some sort of an agreement with the

Page 95

1  executive staff.
2  Q. I guess was it your understanding that as of
3  December 1, 2003 when you took over was Peachey going
4  to be available to you every day?
5  A. I know that he have was not available every
6  day.
7  Q. Do you know whether he had been available to
8  Ashley before you got there?
9  A. It sounded like to me that this deal that
10 Ashley was talking about had just been agreed upon and
11 he was now starting to take time off.
12 Q. The pain Peachey was having had to do with
13 getting shot in the ankle, right?
14 A. Yes.
15 Q. And that had occurred a long time before
16 December 2003, hadn't it?
17 A. February of '02.
18 Q. So was it your understanding that Peachey had
19 been in that pain ever since February '02?
20 A. I guess. I mean, I'm sure that they considered
21 it a permanent injury I'm sure just shortly after it
22 happened.
23 Q. Was the firearms training unit busier in
24 December 2003 than it had been during your first tour

Page 96

1  of duty in 2001 and 2002?
2  A. Yes, in the aspect that there were a lot of
3  things going on at one time, plus there were a lot of
4  things wrong with the facility at the same time. As I
5  explained in my interrogatories, there is, there was
6  numerous things at issue with that facility, the
7  ventilation system, the bullet trap, the armorer's
8  room and the condition it was in, the fact that both
9  the dumpster, trash dumpster and the target dumpster
10 were overflowing and had trash all over the fields. I
11 spent a good many days picking up trash while my
12 instructors conducted the training on the range.
13 Q. Well, did the assigned functions of the
14 firearms training unit change between the first time
15 you were in charge and the second time you were in
16 charge?
17 A. I believe everything was the same.
18 Q. Were you having an unusual flurry of activity
19 in December 2003 and January of 2004 because of the
20 amount of people that had to shoot?
21 A. No. I don't think that was the case. I think
22 the case was that it was overwhelming with the amount
23 of things that had to be accomplished with the
24 facility.

Page 97

1  Q. So you believe you were busier because the
2  facility --
3  A. Was in the condition that it was in.
4  Q. Okay. That's fine.
5      Going down Exhibit D-19, bullet point 3
6  I'm afraid I don't understand. Are you able to
7  explain what you're referring to in terms of "None
8  police shoots unsafe to instructors & public"?
9  A. I actually misspelled that. It should be
10 non-police shoots unsafe.
11 Q. Oh, non-police shoots. Okay.
12     I didn't realize that you had shooting
13 going on that was not by police officers of one kind
14 or another. Is it true --
15 A. Sergeant Ashley had told me that the colonel,
16 Colonel Chaffinch at the time, he asked for the
17 Citizens Police Academy and I believe the 911 centers
18 and some other civilians for them to come in, I
19 believe even the academy, the relatives of academy
20 personnel come in and shoot and that's what Ashley and
21 he agreed upon to do.
22     And I felt that was very unsafe because I
23 don't know who's who that is coming through the door
24 and we're putting a gun in their hands and I don't

Page 98

1  think that's very safe. We don't know their mental
2  state. We don't know anything about them and I felt
3  that that was very unsafe.
4    Q. Okay. Did you discontinue that practice?
5    A. The practice of putting, of actually having
6  them shoot? Yes. They could observe shooting. They
7  could have a tour of the facility and be out and about
8  and we could show them different things that we would
9  do, but that would be it. They wouldn't actually fire
10  a gun.
11    Q. Going down to the last bullet point, "Serious
12  Maintenance issue with the bullet trap." Can you
13  recall your discussion with Captain Warren on this
14  point on December 3rd, 2003?
15    A. I explained to him the current condition of the
16  bullet trap. We were doing research on frangible
17  shotgun ammunition. We were still at this point
18  shooting leaded shotgun ammunition. We were doing
19  research on the frangible ammunition, but it wasn't,
20  it wasn't quite perfected to where we would consider
21  it as accurate and may cause additional failures,
22  whereas service ammunition if we were shooting the
23  leaded ammunition people wouldn't fail as often
24  because it wasn't as accurate.

Page 99

1    Q. I understand.
2    A. But that frangible ammunition would then just
3  multiply the amount of debris that would be imposed on
4  the bullet trap.
5    Q. Right. Is there anything else that was part of
6  that discussion as to bullet point, I guess it's the
7  sixth bullet point? Is that all you talked about, was
8  the frangible ammunition for the shotguns?
9    A. We discussed the maintenance of the bullet
10  trap, what was explained to me from my men, what was
11  explained to them by Dr. Green, explaining why their
12  lead levels jumped so high in such a short period of
13  time. We discussed those things and I believe it was
14  that day that I told him that we have downtime coming
15  in February; that if we stop bullet trap maintenance
16  at that particular time there's not going to be an
17  issue on the other side where we shoot from because we
18  don't shoot into the dry ramps. So we would stop that
19  maintenance until we can figure out who could do that
20  maintenance safely without being contaminated or
21  exposed to hazards.
22    Q. So that's the meeting at which you decided to
23  stop doing the maintenance on the water system?
24    A. Yes, I do believe that is the meeting.

Page 100

1        MR. NEUBERGER: Do you want to take a
2  lunch break now when you finish this up?
3        MR. ELLIS: Yes. This is as good a time
4  as any. That's fine.
5        MR. NEUBERGER: Why don't we take an hour
6  then? Is that okay?
7        MR. ELLIS: That's fine.
8        (Recessed for lunch at 12:40 p.m.)
9           - - - - -
10        AFTERNOON SESSION
11           1:45 p.m.
12        MR. ELLIS: Why don't we mark this next
13  exhibit, whatever we're up to, 20.
14        (Defendant's Deposition Exhibit No. 20 was
15  marked for identification.)
16  BY MR. ELLIS:
17    Q. Can you take a look at Exhibit 20, please,
18  Sergeant Foraker? Tell me when you have had a chance
19  to look at it.
20    A. (Reviewing document) Okay.
21    Q. Can you tell me what this document is?
22    A. This is a document that I prepared of questions
23  that I could think of to ask in the transition meeting
24  when I was Court ordered back to the firearms training

Page 101

1  unit on December 1, 2003, questions that I could ask
2  of Sergeant Ashley.
3    Q. Did you prepare this yourself?
4    A. I did.
5    Q. Where?
6    A. At home.
7    Q. Did you give a copy to Sergeant Ashley before
8  you had the meeting with him?
9    A. No.
10    Q. Did you have any help preparing it?
11    A. No.
12    Q. I notice that there are certain parts of it
13  that appear to be filled in before the meeting. Is
14  that correct?
15    A. What are we talking about?
16    Q. Well, look, for example, at the personnel
17  section, which is the first one on the first page of
18  the exhibit, where next to Bruce Peachey, next to
19  Bruce Peachey's name the status appears to have been
20  typed in beforehand. Is that correct? Is that what
21  happened?
22    A. Yes. I put that in there.
23    Q. Did you put that in there before the meeting
24  that you had with Sergeant Ashley?

A - 219

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 11 of 19

Price, et al.                                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1     C.A. # 04-956-GMS              December 13, 2005

Page 102

1  A. Yes. I believe I did.
2  Q. Where did you get the information to put in
3  there?
4  A. I believe I may have talked to Corporal Jim
5  Warwick and he told me what was going on with Bruce
6  Peachey and I put that in there before I came into
7  work that day.
8  Q. Is all of the handwriting on these three pages
9  of Exhibit D-20 your handwriting?
10  A. Yes, sir.
11  Q. In the upper right-hand corner of the first
12  page is some characters that I can't entirely make
13  out.
14      Is that your handwriting also?
15  A. No, that isn't. I'm sorry.
16      MR. NEUBERGER: That looks like SJN,
17  co-counsel.
18      MR. ELLIS: That would be Stephen J.
19  Neuberger?
20      MR. NEUBERGER: Yes. I think so. That
21  looks like his handwriting.
22  BY MR. ELLIS:
23  Q. Do you know how his handwriting got on the
24  upper right-hand corner of Exhibit D-20, "his" meaning

Page 103

1  Stephen J. Neuberger's?
2  A. No, I don't know how it got there.
3  Q. Did you give Stephen J. Neuberger a copy of
4  this document?
5  A. I may have. I don't recall doing it at this
6  time, but I may have.
7  Q. Did you speak with Stephen J. Neuberger during
8  the week before you returned to the range in December
9  2001?
10  A. I don't believe so.
11  Q. How about in the week after your return to the
12  range?
13  A. I don't believe so.
14  Q. When was the first time you spoke to Stephen
15  Neuberger after December 1, 2003?
16  A. At this time I don't recall.
17  Q. Aside from the initials in the upper right-hand
18  corner on the first page, is everything in here your
19  handwriting, is all of the handwriting yours?
20  A. It looks to be mine.
21  Q. Look on the bottom of the last page, the
22  words "Environmental Solutions" and some other words
23  below that. Is that your handwriting or not?
24  A. Yes, it is.

Page 104

1  Q. How did you work with this form? In other
2  words, how did you fill in what you filled out during
3  the course of your discussion with Sergeant Ashley?
4  A. Captain Warren, Lieutenant Davis, Sergeant
5  Ashley and myself sat down for a transition meeting
6  December 1st. I believe it was like 9:00 o'clock
7  maybe in the morning.
8  Q. Okay.
9  A. I handed a copy of this to each one of them and
10  retained one myself.
11  Q. Okay.
12  A. And basically Captain Warren ran the meeting
13  and I basically just asked if we could go through this
14  so I could understand what's going on with the
15  facility. It was in a way of keeping me organized in
16  trying to transition where I would get as much
17  information as I could and get up to speed on what's
18  going on with the facility.
19  Q. Did you write what you wrote on this document
20  during the course of the meeting?
21  A. Yes, sir.
22  Q. Was this all in the meeting where you were
23  together in an office as opposed to when you were
24  walking around the range?

Page 105

1  A. Correct. We were seated in the conference room
2  at the firearms training unit.
3  Q. It appears on the top of the page you had
4  originally entered for Bruce Peachey an injured status
5  where it looks like you're saying calls off injured
6  Monday and Thursday, works Wednesday, calls off
7  injured Tuesday and Friday. Is that what you wrote in
8  down there?
9  A. Yes. That's what I thought was going on with
10  him at that particular time, what they had agreed upon
11  between Corporal Peachey, Sergeant Ashley and
12  executive staff.
13  Q. Did you find out when you got to this meeting
14  that that wasn't the case; in other words, that what
15  you had written down in advance was not actually what
16  was going on? The reason I ask the question is
17  because you have got it crossed out.
18  A. I don't believe that that was what he was
19  actually following. I think it was more or less he
20  came in when he could depending on how he felt and he
21  would stay as long as he could depending on how he
22  felt.
23  Q. There's a notation in your handwriting to the
24  right of that that says, "need doctor excuse for each

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 12 of 19

Price, et al.                                   v.                    Chaffinch, et al.
Christopher D. Foraker, Volume 1     C.A. # 04-956-GMS     December 13, 2005

Page 106

1  day out."
2       Can you tell me what that means?
3  A.  There was a request, I think Sergeant Ashley
4  said that there was a request for him to get a
5  doctor's note.
6  Q.  "Him" meaning Bruce Peachey?
7  A.  Bruce Peachey, yes.
8  Q.  On the left-hand side of the personnel section
9  on the first page of the exhibit is the notation
10 "family night Wednesday."
11      What's that mean?
12 A.  The recruits' families, the recruits that are
13 currently in the academy and their families will have
14 a night where we get together with them and we talk
15 about firearms safety and give them a tour of the
16 range, that sort of thing.
17 Q.  Did that occur every Wednesday night?
18 A.  No.  It usually only happens once a recruit
19 class, one time a recruit class.
20 Q.  Does the notation you made here reflect that it
21 was going to be the Wednesday night that immediately
22 followed your transition meeting?
23 A.  It may be.  I don't recall at this time.
24 Q.  Under FTU Budget there's a notation that says,

Page 107

1  "Spend dollars on OT for extra body" and then I can't
2  read the rest of it.
3       Since it's your handwriting, why don't you
4  tell me what it is you wrote there?
5  A.  It says, "Spend money on overtime for extra
6  body not to sacrifice safety."
7  Q.  What does that mean?
8  A.  That means use overtime for extra help when you
9  need it.
10 Q.  Is this something Ashley is telling you or is
11 that something that you're telling Ashley or what?
12 A.  That may have been coming from Captain Warren.
13 Q.  You're not sure?
14 A.  That or that may have been what was told to
15 Ashley and Ashley is then telling me.
16 Q.  Down in the bottom under FTU Weapon Inventory
17 there appears to have been a piece of this form that
18 was filled out before you actually went to the
19 meeting.
20      Am I correct that that's what's going on
21 here, that the sentence "Barrel not manufactured to
22 specs & tolerances to accept aftermarket sling bracket
23 product" was typed in beforehand?
24 A.  Right.

Page 108

1  Q.  And where did you get that information?
2  A.  That's information that I knew about prior to
3  going into the meeting.
4  Q.  That's my question.  My question is:  Where did
5  you get the information?
6  A.  I had done research on the shotgun barrels that
7  we transitioned all our shotguns and refitted them
8  with new shotgun barrels.
9  Q.  That had occurred the first time you were the
10 NCOIC, right?
11 A.  Correct.
12 Q.  Was this entry that you made an indication that
13 there was a problem with the shotgun sling brackets?
14 A.  I wanted to ask that question if there was a
15 problem.
16 Q.  Okay.  So it's a notation to yourself to ask
17 that question?
18 A.  That's correct.
19 Q.  Under the section for facility there's a
20 notation in the category of Overall Building
21 Conditions.
22      Do you see that to the right of that?
23 A.  Yes.
24 Q.  Can you read that to me?

Page 109

1  A.  It says, "moving exhaust hood to armor room."
2  Q.  Is that something Sergeant Ashley was telling
3  you?
4  A.  He said that he was in touch with facilities
5  management about a ventilation issue in the armorer's
6  room.
7  Q.  Did he tell you that facilities was going to
8  move the exhaust hood to the armorer's room?
9  A.  I believe that's what it says.
10 Q.  And was that Sergeant Ashley's response to the
11 complaints that the staff had about a new form of
12 solvent that was being used?
13 A.  I'm sorry.  Can you rephrase that?
14 Q.  Was that Sergeant Ashley's response to
15 complaints that he had received from his subordinates
16 about the solvent that was being used to clean the
17 weapons?
18 A.  It may have been.
19 Q.  The next line down says, "Roof leaks" and
20 you've written in "Normal."  What's that mean?
21 A.  Normal leaks.
22 Q.  In other words, the roof leaked all the time?
23 A.  Correct.
24 Q.  It leaked back when you were the NCOIC the

A - 221

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 13 of 19

Price, et al.                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1    v.    C.A. # 04-956-GMS     December 13, 2005

Page 110

1  first time?
2  A.  Correct.
3  Q.  And before that even?
4  A.  Correct.
5  Q.  The next line down says HVAC - Heater & Air
6  Conditioning Chiller System and you've written in now
7  chilled.
8  A.  Actually, it's "new chiller."
9  Q.  "New chiller." Okay. That's why I should
10 always ask you to read it rather than guessing as to
11 what it says.
12      Is that again something that Sergeant
13 Ashley told you?
14 A.  Yes.
15 Q.  The Fuel Oil Delivery, can you read that for
16 me, please?
17 A.  "Facilities management."
18 Q.  What's that mean?
19 A.  They are on a schedule with facilities
20 management.
21 Q.  Before you turn the page, on the second page of
22 Exhibit D-20, was this form that you had prepared
23 meant to remind you to ask certain questions about the
24 systems because you were aware that some of the

Page 111

1  systems had had problems in the past?
2  A.  This was to get a good understanding of what's
3  going on with the facility, if there are needs that I
4  need to address and what order to address them, what's
5  urgent, what's not, trying to get a handle. I know
6  there's a lot involved with the FTU. I was there
7  before, so I understand that there's a lot involved.
8      And I wanted -- this is things that I
9  could put together and think of before my meeting and
10 I'm sure there are many things that I didn't put on
11 here that I probably asked in that meeting that may
12 have come to me either after the meeting or whenever
13 that brought themselves to light.
14      But this was what I could think of prior
15 to the meeting.
16 Q.  Because of your prior service at the firing
17 range, you knew that there were certain problems you
18 could anticipate when you came back, didn't you?
19 A.  Like the ventilation system, yes.
20 Q.  Or like roof leaks? You knew there were roof
21 leaks because you worked there before, right?
22 A.  Right.
23 Q.  Others would be the ventilation system, right?
24 A.  Correct.

Page 112

1  Q.  Did you ask Sergeant Ashley how the ventilation
2  system was working?
3  A.  Yes, I did.
4  Q.  What did he tell you?
5  A.  He said it was balanced.
6  Q.  Now, do you know what it means to balance the
7  air-handling system?
8  A.  No, I don't.
9  Q.  Did you ask him what he meant by balanced?
10 A.  That's always been a phrase that facilities
11 management has used. They basically come in. They do
12 some things on the computer. They do some things on
13 the roof to the ventilation system and they said it's
14 balanced and then leave.
15 Q.  To your observation, has the system worked
16 better when it was balanced than when it wasn't
17 balanced?
18 A.  No. The system has never worked.
19 Q.  Did you ask Sergeant Ashley after he told you
20 the system was balanced whether it was working; in
21 other words, it was effectively removing smoke and
22 dust from the environment?
23 A.  No, I didn't ask him that.
24 Q.  Look farther down where it says, "Bullet Trap."

Page 113

1  A.  Yes.
2  Q.  What did you write just to the right of that on
3  page 3?
4  A.  "Savage in September."
5  Q.  Okay. What's that mean to you?
6  A.  That they came in September.
7  Q.  Did Sergeant Ashley tell you that they had
8  changed the type of belt or chain or whatever you want
9  to call it that was in the bullet trap?
10 A.  Yes.
11 Q.  Did he offer any opinion as to whether that
12 made things better or worse?
13 A.  He said that the system has to run 24 hours a
14 day, the belt and the water system. The pumps have to
15 stay on. If you turn them off or stop the conveyor,
16 the silt turns to concrete and it will freeze up the
17 entire system.
18 Q.  Did somebody from Mayfran also tell you that at
19 some point when they were working on the system?
20 A.  Actually, Ashley told me that that's what they
21 told him at that particular time.
22 Q.  Did anybody from Mayfran ever tell you that
23 independently of what they told to Sergeant Ashley?
24 A.  I don't recall at this time if they did say

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 14 of 19

Price, et al.                                v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS         December 13, 2005

Page 114

1  that.
2  Q. Over on the right side of page 3 is a notation
3  that says, "can reduce number of pumps."
4      Do you know what that refers to?
5  A. Sergeant Ashley had told me that he put in
6  bigger, more powerful pumps to push the residue
7  through the sprayer heads and just to overpower the
8  clogging by more power, pushing it through, pushing
9  the water and oil through. And he said that you can
10 even reduce the number of pumps that you're using.
11      But I found that to be incorrect because
12 when I went out there, there were three -- well, I
13 thought it was incorrect because when I went out
14 there, there were three dry spots. And that could be
15 any number of things as to why they're dry.
16 Q. Did you understand him to be saying that you
17 could, on the one hand, either operate with fewer
18 pumps running at the same time or, on the other hand,
19 you wouldn't have to replace the pumps as often?
20      In other words, when he says that you can
21 reduce the number of pumps, do you know whether he
22 meant that you wouldn't have to replace them as often
23 or that you could run your system with some of them
24 not operating at all?

Page 115

1  A. You could run it with less.
2  Q. In other words, run it with some of them not
3  operating at all?
4  A. Right. Because they were more powerful pumps.
5  Q. Did you ask him specifically that and ask him
6  if that's what he meant when he said that you can
7  reduce the number of pumps?
8  A. No. To me, it was quite clear that's what he
9  was saying.
10 Q. There's supposed to be something like 20 pumps
11 on this system, right, one for each lane?
12 A. I think there's 18.
13 Q. If a pump goes out that's in the middle, in
14 other words, it's not number 1 or number 18, it's
15 somewhere in the middle, that's going to leave you a
16 dry spot in the middle of the wet spots, right?
17 A. It may. It depends on what output the other
18 sprayer heads are having.
19 Q. It's possible for a sprayer head to cover the
20 dry spot simply by being strong enough itself to push
21 water into the dry spot?
22 A. Some. Sometimes that's possible.
23 Q. Down below where we just read from there's a
24 notation or there's a line for Floor Scrubber. What

Page 116

1  did you write next to that?
2  A. He said it works okay.
3  Q. Did you find that to be correct?
4  A. That is incorrect. That floor scrubber had
5  been dormant for some time. After talking with
6  Corporal Price he said it was down since, it hadn't
7  been used since the summertime of 2003. And it's
8  consistent, that's consistent because when you looked
9  at the floor scrubber, it's bright yellow, sort of
10 like the color of your paper there, and on the top of
11 it and on the seat that's black, you couldn't tell
12 what color they were because it had a reddish dust on
13 top of it.
14 Q. Down below in the Corporate Contractors &
15 Suppliers section, the bottom line there reads "Dave
16 Lawson does" something.
17      Can you read that for me?
18 A. "Dave Lawson does FFL for $12."
19 Q. What's FFL?
20 A. Federal firearms license.
21 Q. What's that got to do with anything involving
22 the range?
23 A. We were talking about buying guns. When
24 someone retires they can buy guns and he was, Ashley

Page 117

1  was explaining to me that 10 percent, when somebody
2  buys a gun 10 percent goes back to the federal
3  government and with Dave Lawson it's $12 to send
4  someone with their gun to get it reregistered from the
5  State Police into their name.
6  Q. I see. Okay.
7      Do you believe that Tom MacLeish has made
8  defamatory statements about you?
9  A. Absolutely.
10 Q. What is it that Tom MacLeish said about you
11 that was defamatory?
12 A. Tom MacLeish has treated me in certain
13 situations with contempt. I remember at a graduation
14 ceremony where I was permitted to go and speak at a
15 graduation ceremony and present the firearms award.
16 After I was done, I sat down. The recruit class had
17 graduated. We had broken the meeting and we were all
18 going to head back to the academy.
19      The actual graduation ceremony I think was
20 in June. It was for municipals and it was held at a
21 Dover Elementary School and we were in the auditorium
22 and on stage. We stepped off stage and Lieutenant
23 Colonel MacLeish walked towards or by me and I stuck
24 my hand out and said, "How are you doing, sir?" And

A - 223

Case 1:04-cv-01207-GMS   Document 75-9   Filed 02/02/2006   Page 15 of 19

Price, et al.                                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1      C.A. # 04-956-GMS        December 13, 2005

Page 118

1  he looked at me, he grabbed my hand and he bit down
2  and he growled at me like a dog. He was angry with
3  me.
4  Q.  When was this?
5  A.  I believe it was in June of '04.
6  Q.  My question was whether he said anything that
7  you believe is defamatory about you.
8  A.  Yes. I mean, he agreed with everything that
9  was in that newspaper.
10 Q.  When did he do that?
11 A.  He participated in it.
12 Q.  He participated in what?
13 A.  He participated in that news article. He
14 participated at that press release. He participated
15 in the Channel 16 presentation on TV.
16 Q.  Well, when you say, "press release," are you
17 talking about MacLeish Exhibit 5?
18 A.  He was there during that particular press
19 release.
20 Q.  Would you agree with me that his name does not
21 appear in Exhibit MacLeish 5? Take a look at it if
22 you want.
23 A.  It may not appear there, but I know that he was
24 there.

Page 119

1  Q.  Would you agree with me that he's not quoted
2  anywhere in that article?
3  A.  No, I don't believe he is quoted in there.
4  Q.  And you weren't there, right?
5  A.  That's correct.
6  Q.  What makes you think he was there?
7  A.  I saw him on TV there.
8  Q.  Okay. Did he say anything on TV?
9  A.  I don't recall at this time if he said anything
10 on TV, but he was in -- I believe he did say
11 something, but I can't recall what it was at this
12 time.
13 Q.  Let me ask you this question: How many times
14 was there news coverage of tours of the shut down
15 range to your best recollection? How many times was
16 there a tour conducted of the range in which newspaper
17 or TV stations or radio stations were present?
18 A.  I believe that one there that you pointed out
19 to me.
20 Q.  You think that was the only one?
21 A.  There may have been more. I don't recall at
22 this time.
23 Q.  I'm just asking for the best of your
24 recollection.

Page 120

1      As you're sitting here today, you can only
2  remember one?
3  A.  Correct, at this time.
4  Q.  Now, do you believe that Tom MacLeish said
5  anything that was printed in the press during that
6  tour?
7  A.  There may have been. I don't recall at this
8  time.
9  Q.  What words came out of then Lieutenant Colonel
10 MacLeish's mouth that were defamatory toward you?
11 A.  He blamed me and my men for the condition of
12 the range.
13 Q.  And who did he say that to?
14 A.  I believe he said that during that media tour.
15 Q.  How do you know he said that? Have you seen a
16 news account that quotes MacLeish?
17 A.  I believe he said something to the Channel 16
18 news.
19 Q.  Is Channel 16 WBOC?
20 A.  Correct.
21 Q.  The Salisbury, Maryland station?
22 A.  Correct.
23 Q.  What is it that you believe he said?
24 A.  I believe he blamed me and my men for the

Page 121

1  condition of that facility.
2      MR. ELLIS: Can we go off the record for
3  just a second?
4      (Discussion off the record.)
5  BY MR. ELLIS:
6  Q.  Is there any statement that you're aware of
7  that Tom MacLeish has made aside from whatever
8  happened on April 6, 2004 at that tour that you
9  believe is defamatory towards you?
10 A.  Anywhere?
11 Q.  Yes, anywhere.
12 A.  He said it in his deposition.
13 Q.  Aside from that?
14 A.  I don't recall at this time.
15 Q.  Now let me go back to this exhibit which will
16 be No. 21.
17     (Defendant's Deposition Exhibit No. 21 was
18 marked for identification.)
19 BY MR. ELLIS:
20 Q.  Have you had a chance to look at that?
21 A.  Yes.
22 Q.  Can you tell me what D-21 is?
23 A.  Notes that I prepared for a meeting between
24 myself and Lieutenant Davis at the time.

Price, et al.                              v.                         Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS          December 13, 2005

Page 122

1   Q.  Is this a document you prepared before the
2   meeting that you had with Lieutenant Davis?
3   A.  Correct.
4   Q.  Now, I noticed that the subject matters on
5   Exhibit D-21 are very similar or in some cases the
6   same as the subject matters in Exhibit 19, which is a
7   document prepared prior to your meeting with Captain
8   Warren.
9       Why did you find it necessary to discuss
10  the instructor headset problem with Lieutenant Davis
11  after you had already discussed it with Captain
12  Warren?
13  A.  I believe I had a meeting with Lieutenant Davis
14  because Captain Warren wasn't there on that particular
15  day and I knew I was meeting with Lieutenant Davis.
16  These were just things that I wanted to present to him
17  to make sure that he was fully aware of what I was
18  doing, what was going on with me and the FTU at the
19  time because I knew he was busy doing other things
20  with the recruits and so forth.
21  Q.  You had discussed the headsets with Captain
22  Warren on the 3rd, right?
23  A.  Correct.
24  Q.  I guess my question is: Why are you talking

Page 123

1   about it again with Davis on the 12th? Was there
2   something unfinished about the discussion that you had
3   with Warren?
4   A.  No. I believe I'm just keeping him informed of
5   what's going on.
6   Q.  On Exhibit D-21 there appears to be handwriting
7   and, again, this is the best I have in terms of a
8   photocopy.
9       Is that your handwriting? Can you tell?
10  A.  It kind of looks -- yeah. I believe it's mine.
11  Q.  Can you tell what it was that you were writing
12  in the middle of the page after the discussion about
13  the instructor headsets? Is that more SLEAF money?
14  A.  Yeah. "Possible SLEAF money," I think.
15  Q.  So was it Davis telling you that there might be
16  available funding for new headsets?
17  A.  It's possible, but I don't recall exactly at
18  this time.
19  Q.  Do you recall what Davis -- I take it at this
20  meeting you were complaining to Davis about the
21  headsets?
22  A.  I was informing him of all of this that I wrote
23  down.
24  Q.  Did you expect Davis to do something about it?

Page 124

1   A.  I don't believe so. I believe I was just
2   keeping him up to speed on what was going on.
3   Q.  Let me ask you this question: If you believed
4   that the headsets that the instructors used are
5   inadequate for whatever reason, whose responsibility
6   is it to fix the problem; in other words, to get
7   headsets that are adequate?
8   A.  The problem is we don't really know what
9   adequate is because there's never been a decibel level
10  testing in that range. We know that those particular
11  headsets hurt our ears. They're not protecting us
12  well enough.
13  Q.  There are six points that you raise with
14  Lieutenant Davis on December 12th. It looks to me
15  like five of the six have to do with the problem of
16  interference from outside communications.
17      Am I correct on that?
18  A.  Correct.
19  Q.  One of the six deals with the volume. Not the
20  volume but the noise levels, right?
21  A.  Right.
22  Q.  Did you believe at this point that the system
23  that your instructors were using was inadequate
24  because of the way the communication was set up; in

Page 125

1   other words, that it was on a wavelength where you
2   could get interference from outside entities?
3   A.  It was inadequate for a few reasons which I put
4   on there.
5   Q.  Whose responsibility is it to change the
6   headsets and get a proper set of headsets for the
7   instructors?
8   A.  I guess it would have to fall on me.
9   Q.  So is the problem you had that you didn't know
10  where to find the money to get it?
11  A.  Yes. I'm looking for money at that time
12  because I was told that we really didn't have the
13  money to get it out of the FTU budget.
14  Q.  Who told you that?
15  A.  Sergeant Ashley at the time.
16  Q.  Did you on December 3rd ask Captain Warren if
17  he could find you money to get a new set of headsets?
18  A.  No, I don't believe so.
19  Q.  When you told Captain Warren about the
20  inadequacies of the headsets on December 3rd, what was
21  his response?
22  A.  I don't recall at this time.
23  Q.  When you were talking to Lieutenant Davis on
24  December 12th, I take it he's telling you you may be

A - 225

Price, et al.                                v.                            Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS         December 13, 2005

Page 126

1 able to get some money from SLEAF?
2   A.  The possibility existed.  He would have to look
3 into it, I guess.
4   Q.  Did he ever get back to you?
5   A.  I don't recall if he did.
6   Q.  Had he gotten back to you on it before you had
7 your discussion with Tom MacLeish about it on January
8 21st about the headsets?
9   A.  I don't believe it turned out there was SLEAF
10 money available.  I believe Lieutenant Davis did look
11 into it and the money was not available.
12   Q.  Did you look in your own budget to see if there
13 were any funds available, in other words, not relying
14 on Rich Ashley, did you go into the financial
15 information you had available to you as the head of
16 the range and see whether there was money available
17 for new instructor headsets?
18   A.  No.  There wasn't money available for us to buy
19 the headsets.  The money was committed to other
20 things.
21   Q.  What fiscal year were you on?  Do you remember?
22   A.  I believe it was '03.
23   Q.  I'm sorry.  What I meant is did the fiscal year
24 end on December 31st or some other point in the year?

Page 127

1   A.  Of July.  So it would have been '04's budget.
2   Q.  That's fine.
3       Now, the other --
4   A.  If I could clarify something?
5   Q.  Sure.
6   A.  When I spoke with Sergeant Ashley about the
7 budget, he had it broken down with what was remaining
8 was already going to be committed to certain things,
9 whether it be ammunition or what have you.  So I was
10 looking for additional funding outside of that to buy
11 these headsets.
12   Q.  So as I understand it, you were taking over in
13 the middle of the year where the budgetary money was
14 already committed, correct?
15   A.  That's correct.
16   Q.  You believe you had a problem because the
17 instructor headsets were inadequate and unsafe, right?
18   A.  Correct.
19   Q.  So you were looking around for money to get new
20 headsets?
21   A.  That's correct.
22   Q.  You don't remember asking Captain Warren for
23 the money, but you do remember asking Lieutenant Davis
24 for money?

Page 128

1   A.  I believe so, yes.
2   Q.  Now, did you ever ask Major Eckrich for money
3 for headsets?
4   A.  I don't recall if I did at this point in time.
5   Q.  You did raise the question with Lieutenant
6 Colonel MacLeish on January 21st, right?
7   A.  Correct.
8   Q.  And he said talk to Bill Carroll?
9   A.  Correct.
10   Q.  Carroll is the guy in the communications unit?
11   A.  That's correct.
12   Q.  Is he a civilian?
13   A.  Yes.
14   Q.  Going back to Exhibit D-21, the other thing
15 that you talked about with Ralph Davis that day, this
16 would be December 12th, is the current condition of
17 the bullet trap, correct?
18   A.  Correct.
19   Q.  You have got three points to talk to him about.
20 Did you talk about all of these three points?
21   A.  I talked about these with him and basically
22 told him what I was doing, is getting contractors in.
23   Q.  Is that what it says here in the bottom in your
24 handwriting?  It says, "get contractors in"?

Page 129

1   A.  Yeah.
2   Q.  So going back to your meeting with Captain
3 Warren on December 3rd, you discussed it, you
4 discussed the bullet trap issue with him on December
5 3rd, right?
6   A.  Correct.
7   Q.  And was Lieutenant Davis present on December
8 3rd?
9   A.  No, sir.
10   Q.  On December 12th you talk about it with
11 Lieutenant Davis, right?
12   A.  Correct.
13   Q.  Why are you talking about it with him when you
14 have already talked about it with his boss?
15   A.  Like I previously stated to you.
16   Q.  You just wanted to keep him involved?
17   A.  I just want to inform him of what's going on.
18   Q.  Was the involvement of contractors to do
19 maintenance on the bullet trap going to be an expense
20 that had not been budgeted for?
21   A.  Yes.  It would have to go above and beyond what
22 was budgeted for Savage Range to come in once a year.
23 Once a year was not even close to what needs to be
24 done.

33 (Pages 126 to 129)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Price, et al. v. Chaffinch, et al.
Christopher D. Foraker, Volume 1   C.A. # 04-956-GMS   December 13, 2005

Page 130

1  Q. So as in the case of the instructor headsets,
2  you needed to find more money? Is that what this is
3  about when you're talking to Lieutenant Davis?
4  A. Not in regards to the maintenance of the bullet
5  trap, no, I wasn't looking for more money at that
6  point in time.
7  Q. Was it going to require more money?
8  A. It may. It depends on whether facilities
9  management were going to come up with someone. At
10 that particular moment in time I was talking also with
11 Mark D'Allesandro and he was looking into whether he
12 was going to bring or whether he was going to be able
13 to get somebody placed there out of facilities
14 management.
15 Q. Did you ever put in writing the discussion or
16 make any record in writing of the discussions you say
17 you had with Mark D'Allesandro about putting the
18 facilities management person in the range to handle
19 the bullet trap problems?
20 A. Did I put that in writing?
21 Q. Yes.
22 A. I don't recall if I have or not at this time.
23         MR. ELLIS: Let me show you Exhibit 22.
24         (Defendant's Deposition Exhibit No. 22 was

Page 131

1  marked for identification.)
2  BY MR. ELLIS:
3  Q. Do you recognize this e-mail that's dated
4  December 11th, 2003 from Ralph Davis to you?
5  A. Do I remember it?
6  Q. Do you recognize it?
7  A. (Reviewing document) I'm sorry. What was your
8  question?
9  Q. My question is whether you recognize this
10 e-mail. Do you remember getting it?
11 A. No, I don't remember it.
12         MR. ELLIS: Let me show you Exhibit 23.
13         (Defendant's Deposition Exhibit No. 23 was
14 marked for identification.)
15 BY MR. ELLIS:
16 Q. I would like you to focus, in particular, on
17 the second e-mail on Exhibit D-23 and that would be
18 the one dated December 11, 2003, 2:11 p.m. from you to
19 Davis.
20         My question is: Is that an e-mail that
21 you sent to --
22 A. This one has 2:18 p.m.
23 Q. No. That's the top one. Remember, I said the
24 second one.

Page 132

1  A. 2:11. Okay.
2  Q. Okay. My question is: Does D-23 show a
3  message at 2:11 p.m. on December 11, 2003 that you
4  sent to Ralph Davis?
5  A. Yes.
6  Q. If you compare D-23 with D-22, doesn't D-23
7  appear to be your response to Davis's e-mail earlier
8  in the day?
9  A. Yes.
10 Q. In fact, you have got six paragraphs to your
11 message and Ralph Davis has six paragraphs to his,
12 right?
13 A. Yes.
14 Q. Now looking first at Exhibit D 22, which is
15 Davis's message to you, this deals with your efforts
16 to get a fifth person at the FTU because you were so
17 busy, right?
18 A. Correct.
19 Q. And you actually had a fifth person in Peachey,
20 but Peachey wasn't working very much so you didn't
21 consider him an effective fifth person, correct?
22 A. That's correct.
23 Q. Davis says to you in his e-mail of December
24 11th at 11:58 in the morning that Henry Speed would be

Page 133

1  available most days to help you, does he not?
2  A. Yes, he does.
3  Q. Did you use Henry Speed during January when the
4  recruits were in?
5  A. No. I attempted to do that through his
6  sergeant, Sergeant Carl Bond, and he did not make
7  Henry Speed available.
8  Q. So you never did use Speed?
9  A. That's correct. He wasn't available.
10 Q. It also says here that Rich Ashley was
11 available and willing to assist.
12         Did you use Rich Ashley during the
13 training in January of 2004?
14 A. Rich wasn't exactly friendly with me at the
15 time and didn't seem too interested in helping.
16 Q. Did you call Ashley and ask him to help?
17 A. I called him about some other things and his
18 attitude towards me wasn't friendly.
19 Q. Well, my question is: Did you ask Ashley to
20 come up and supervise the recruits in January of 2004?
21 A. No, I did not. I believe that he was busy on
22 projects that he was appointed to do. One in
23 particular I know was the vest project, trying to
24 straighten things out with that.

34 (Pages 130 to 133)

Case 1:04-cv-01207-GMS    Document 75-9    Filed 02/02/2006    Page 19 of 19

Price, et al.                                                    v.                                      Chaffinch, et al.
Christopher D. Foraker, Volume 1           C.A. # 04-956-GMS                            December 13, 2005

Page 134

1  Q. He was assigned to the planning section after
2  he left the FTU, right?
3  A. I think he was administrative support.
4  Q. Who did he work for?
5  A. I think the colonel.
6  Q. You believe Ashley as a sergeant reported
7  directly to the colonel?
8  A. Yes, I do.
9  Q. You said in your response to Ralph Davis's
10 e-mail, and this is paragraph 6 on December 11,
11 2003 -- I'm sorry. This is paragraph 6 of your 2:11
12 p.m. e-mail of December 11, 2003: "I have plans that
13 I would like to run by you when you" -- it says, "to
14 run by you when you tomorrow afternoon if you have a
15 minute." I assume there was a typo in there and that
16 there are plans that you wanted to run by Ralph Davis
17 having to do with the fifth person. Is that correct?
18 A. That would correlate with --
19 Q. Your paragraph 6?
20 A. Yes. My paragraph 6 would correlate with
21 Lieutenant Davis's paragraph 6.
22 Q. My question is: What were the plans that you
23 wanted to run by Lieutenant Davis?
24 A. I don't recall at this time.

Page 135

1        MR. ELLIS: Now let me show you Exhibit
2  24.
3        (Defendant's Deposition Exhibit No. 24 was
4  marked for identification.)
5  BY MR. ELLIS:
6  Q. I want to call your attention specifically to
7  the second e-mail on Exhibit D-24, the one dated
8  February 23, 2004 at 10:25 a.m. from Davis to you.
9        Do you recall getting this?
10 A. Yes.
11 Q. Did you ultimately get approval for the fifth
12 person?
13 A. I put things together for the fifth person and
14 sent them to Captain Warren for approval.
15 Q. And then what happened?
16 A. I didn't get anyone else in the unit.
17 Q. Well, you ended up getting three more people,
18 right, at some point?
19 A. Who were those three?
20 Q. Well, at some point you learned that Price and
21 Warren were going to be put on light duty, right?
22 A. I'm not exactly sure when that occurred or what
23 was going on because there was no e-mail sent out to
24 anybody saying anything. I didn't know anything.

Page 136

1  Q. Well, didn't you learn at some point that the
2  hearing tests that were conducted on the people in the
3  firearms training unit had flagged problems in hearing
4  for Wayne Warren and Kurt Price?
5  A. See, that's another area where I have no idea
6  what's going on. You're talking about they flagged
7  them. That's never been done before. People have
8  worked with hearing loss at different places in the
9  State Police, so I have no idea what was going on.
10 Q. Well, were you told at some point that you
11 couldn't use your two subordinates, Wayne Warren and
12 Kurt Price, in shooting situations?
13 A. Yes.
14 Q. Who told you that?
15 A. I believe that came from Lieutenant Colonel
16 MacLeish.
17 Q. And how did he tell you that?
18 A. I believe he said that in a meeting.
19 Q. And where was that meeting?
20 A. We had a number of meetings and I'm not sure
21 exactly which one it was at this time.
22 Q. Well, what did he say? What exactly did he say
23 about Price and Warren?
24 A. He said he didn't want them around the line of

Page 137

1  fire.
2  Q. And do you remember when that meeting was?
3  A. I don't recall at this time what date and what
4  meeting that was.
5  Q. Did you get a Sergeant Kracyla assigned to the
6  FTU? I may not be pronouncing that right.
7  K-r-a-c-y-l-a. If you want to correct me on that I
8  would be happy to pronounce it right.
9  A. Off and on. It was sporadic.
10 Q. Did you also get a Corporal Boulerice?
11 A. Yes. Again, off and on.
12 Q. And did you also get a Timothy Morris?
13 A. Yes.
14       MR. ELLIS: Let me show you Exhibit 25.
15       (Defendant's Deposition Exhibit No. 25 was
16 marked for identification.)
17 BY MR. ELLIS:
18 Q. Do you recognize this? This Exhibit D-25 is
19 two e-mails, one dated April 22 and one dated April
20 23, and they're in a chain. The first one is from Tom
21 MacLeish to Warren, Davis and you, and by "Warren" I
22 mean Greg Warren, Davis and yourself.
23       Do you remember receiving that e-mail?
24 A. Yes.

35 (Pages 134 to 137)