Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 1 of 19

Price, et al.                                                      Chaffinch, et al.
Christopher D. Foraker, Volume 2        v.                         December 22, 2005
                                    C.A. # 04-956-GMS

Page 187

VOLUME 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,           )
                                          )
            Plaintiffs,                   )
                                          )
                                          ) Civil Action
v.                                        ) No. 04-956-GMS
                                          )
COLONEL L. AARON CHAFFINCH, et al.,       )
                                          )
            Defendants.                   )
------------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,          )
                                          )
            Plaintiff,                    )
                                          )
                                          ) Civil Action
v.                                        ) No. 04-1207-GMS
                                          )
COLONEL L. AARON CHAFFINCH, et al.,       )
                                          )
            Defendants.                   )

        Continued deposition of CHRISTOPHER D. FORAKER
taken pursuant to notice at the law offices of
Montgomery, McCracken, Walker & Rhoads, LLP, 300
Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 2:00 p.m. on Thursday, December 22, 2005,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.
APPEARANCES:
        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
           2 East Seventh Street - Suite 302
           Wilmington, Delaware  19801
           For the Plaintiffs

A - 243

                    WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                      (302) 655-0477

Case 1:04-cv-01207-GMS    Document 75-11    Filed 02/02/2006    Page 2 of 19

Price, et al.                                                    v.                                      Chaffinch, et al.
Christopher D. Foraker, Volume 2              C.A. # 04-956-GMS              December 22, 2005

Page 188

1  APPEARANCES: (Cont'd)
2      EDWARD T. ELLIS, ESQ.
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
3        123 South Broad Street
         Philadelphia, Pennsylvania 19109
4        For the Defendants
5  ALSO PRESENT:
        B. KURT PRICE
6       WAYNE WARREN
7           - - - - -
8           CHRISTOPHER D. FORAKER,
9       the deponent herein, having first been
10      duly sworn on oath, was examined and
11      testified as follows:
12              EXAMINATION
13 BY MR. ELLIS:
14 Q.  Sergeant Foraker, good afternoon.
15 A.  Good afternoon, sir.
16 Q.  Will you tell me what you believe Thomas
17 MacLeish has done to you in retaliation for your
18 filing your prior lawsuit against Colonel Chaffinch?
19 A.  He has made the statement that he's connected
20 at the hip with Colonel Chaffinch and he adopted
21 everything that Colonel Chaffinch said against me.
22         I know for a fact that on July 20th of '04
23 there was a troop commander section chief meeting and
24 when I walked into that meeting I was the only one at

Page 189

1  that particular time at the threshold of that door,
2  there was nobody else around me, and Colonel Chaffinch
3  gave me an absolute hateful stare. I looked around to
4  make sure to see if he was looking at anybody else,
5  but there was nobody else around. I looked back at
6  him and he continued to give me a hateful stare.
7          And then I just proceeded to the back of
8  the room and when I went to the back of the room I
9  glanced back up there and there was Lieutenant Colonel
10 MacLeish and Colonel Chaffinch talking. And they both
11 looked at me and then within a minute's time
12 Lieutenant Colonel MacLeish came back and kicked me
13 out of the meeting.
14         And I can tell you that two days after
15 that was the funeral of Chris Shea and Captain McQueen
16 was in a position where he would call the commands for
17 people to come to attention, to salute, to come to
18 parade rest, to march, that sort of thing. And
19 colonel -- or Captain McQueen, I'm sorry, at that
20 troop commanders meeting had specifically asked that I
21 assist him in being his echo.
22         Apparently, he had seen the look that they
23 gave me and then he got the same look, I guess, from
24 both Lieutenant Colonel MacLeish and Colonel Chaffinch

Page 190

1  and they didn't like the idea that he was going to use
2  me and they suggested other people. And he, in turn,
3  said, "Well, Chris has the experience. I would really
4  like to have Chris help me." Because we had talked
5  out in the hallway before I came into the room and
6  Captain McQueen asked me then if I would help him and
7  I said, "Certainly, I will help you."
8          But Colonel MacLeish or Lieutenant Colonel
9  MacLeish and Colonel Chaffinch obviously with their
10 body language and their facial expression didn't like
11 that. Captain McQueen persisted that "I really need
12 him, need Chris to help me out here. He's got the
13 experience. He's done it before."
14         So I guess they eventually agreed because
15 on the 22nd when we buried Chris Shea I was a part of
16 that detail. After it was over in the parking lot of
17 Lewes Fire Hall Captain McQueen pulled me off to the
18 side and he told me that he couldn't believe -- he
19 said, his words were "If looks could kill, you'd be
20 dead," referring to the look that Colonel Chaffinch
21 gave to me. And then he actually said that the look
22 that they gave him was also a dirty look and he said
23 after the meeting was over he was talking to someone
24 and found out that Colonel MacLeish had thrown me out

Page 191

1  of the meeting.
2          He then proceeded to tell them, that
3  particular person he was talking to, that he's more,
4  Chris, he was referring to me, is more of a trooper
5  than either one of them and Chris needs to be a part
6  of this detail. He told me while we were in the
7  parking lot on the 22nd, he told me that...
8          I just want to get the wording correct.
9  That "It's obvious retaliation against you and it's no
10 wonder they're winding up getting sued because of the
11 way they act." And he reiterated to me that day, he
12 said, "I think you're a great trooper" and he said,
13 "I've known you for a long time and what they're doing
14 to you is not right. It's obvious retaliation."
15         Then a couple of days after that on the
16 28th at 8:32 a.m. at Troop 2 I was in the criminal
17 investigation unit, the detective unit at Troop 2. It
18 was just outside of the video room, video observation
19 room and the kitchenette that they have. And I ran
20 into Lieutenant Slank, Lieutenant Ford, Sergeant
21 Fiscella, Sergeant Corrigan and Corporal Warwick was
22 with me and Lieutenant Slank said, "I can't believe
23 they threw you out of that meeting." He said, "It is
24 obvious retaliation."

A - 244

Case 1:04-cv-01207-GMS    Document 75-11    Filed 02/02/2006    Page 3 of 19

Price, et al.                                                           Chaffinch, et al.
Christopher D. Foraker, Volume 2    C.A. # 04-956-GMS                December 22, 2005

Page 192

1  He also said, "It is ridiculous. You are
2  a section chief. Why would they throw you out of that
3  meeting?" He also said that "Corporal McCall is
4  always at those meetings. To use the excuse that
5  you're a sergeant and throw you out of that meeting,
6  that's ludicrous."
7  Q. Who is Corporal McCall?
8  A. Corporal Charles McCall.
9  Q. Is he in charge of some identified unit?
10 A. He is I think in charge of community relations.
11 Q. Where does he work out of?
12 A. Headquarters.
13 Q. Who does he report to?
14 A. I'm not sure. He's since retired.
15 Q. I don't mean to interrupt you. Are you done
16 answering yet?
17 A. Sergeant Corrigan also said that he's attended
18 those meetings and he's not a section chief.
19    And there was an incident where I attended
20 in-service training at Troop 2 where there was a
21 presentation given by then Major Seifert and Major
22 Seifert came up to me and said, "Chris, since you're
23 in charge of the range, how about you giving us an
24 update?"

Page 193

1  Q. Giving who an update?
2  A. Just giving the people that were attending
3  in-service, give them an update on the range issues
4  and about the upcoming in-service shoot.
5  Q. Okay.
6  A. And I expressed to him regarding the range "I
7  haven't attended any of the meetings since a period of
8  time. I wasn't invited to any of the meetings that
9  were supposedly the -- I don't know -- steering
10 committee, range committee. I hadn't been appointed
11 to that." So he said, "Oh, okay. Nevermind then."
12    But I'm used in that capacity as the
13 section chief of firearms where I can go to section
14 chief meetings and if I need to clarify training or
15 also troop commanders that are at those meetings will
16 talk to me about incidents that happened with their
17 troopers on the street. They will tell me something
18 that happened and thinking that we could implement
19 training that's relative to what is happening on the
20 street. We had scenario training where we would take
21 scenarios that are presented at these meetings from
22 the troop commanders that have interviewed and read
23 the reports of their troopers and they will say, "Hey,
24 look, this is something that happened to my trooper.

Page 194

1  What do you think? Do you think it can be addressed
2  in training," that sort of thing.
3     So when I was at those meetings I was
4  utilized in that capacity and that's why I was
5  attending those meetings if I was able to, if, in
6  fact, manpower allowed me to.
7  Q. Am I correct that what you're saying is that
8  Colonel MacLeish retaliated against you for your
9  lawsuit against Colonel Chaffinch by excluding you
10 from the commanders meetings?
11 A. I addressed this in my interrogatories.
12 Q. I know. I want you to address it in your
13 deposition.
14    I mean, is that what you're saying?
15 A. That's in addition. I mean, I think there's
16 many things that he's done. He's taken away my power
17 as a commander. I'm no longer a section chief
18 apparently.
19 Q. Well, I know that you're not working at
20 present. But what was your job title at the point
21 that you went on disability?
22 A. Apparently noncommissioned officer in charge of
23 the firearms training unit.
24 Q. And that's what you have been since December

Page 195

1  1st, 2003, correct?
2  A. It used to be that I was a section chief, but
3  he's taken that away from me.
4  Q. When you say that you used to be a section
5  chief, what does it mean to be a section chief other
6  than to go to the meetings that commanders went to?
7  At least you believe that.
8  A. You're able to interact with troop commanders
9  and section chiefs from other units within the
10 division.
11 Q. And how are you able to do that other than by
12 going to the commanders meetings?
13 A. It's an important dialogue to have. That's why
14 they have the meetings.
15 Q. I understand. All I'm asking you is: Is there
16 any aspect of it, is there anything to being, is there
17 anything that MacLeish has done to you other than to
18 tell you not to come to the commanders meetings?
19 A. Yes. And, like I said, I addressed a lot of
20 that in my interrogatories.
21 Q. I understand that. Well, other than telling
22 you you shouldn't come to the commanders meetings,
23 what else has he done that you can think of sitting
24 here right now?

3 (Pages 192 to 195)

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 4 of 19

Price, et al.                                    v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 2    C.A. # 04-956-GMS          December 22, 2005

Page 196

1  A. Obviously to me he has adopted the attitude
2  that Colonel Chaffinch had towards me, the vendetta
3  that Colonel Chaffinch had for me he adopted it, with
4  his attitude whenever he sees me, you know, shakes my
5  hand but growls at me when I was at a graduation
6  ceremony. He's very agitated and he grits his teeth
7  and that sort of thing when he's around me.
8  Q. When you say he growls at you, what do you mean
9  by that?
10 A. I mean is when I said how are you doing, sir, I
11 stuck out my hand, he begrudgingly shook my hand but
12 grit his teeth and growled at me.
13 Q. You mean like a dog?
14 A. That's correct.
15 Q. Now, has he demoted you?
16 A. Reference my authority, yes.
17 Q. You're saying that because he told you not to
18 come to the commanders meetings?
19 A. No. I believe I was being absolutely
20 micromanaged. Never before, it's unprecedented for a
21 section chief in charge of a budget to then have
22 someone else sit in on their budget meetings. That's
23 never happened before with the firearms training unit.
24 The person in charge goes to budget meetings by

Page 197

1  himself.
2  Q. By himself? Who is the budget meeting with?
3  A. Generally with Major Eckrich or whoever the
4  major is in charge of the budget.
5  Q. Okay. And in what way do you feel you're being
6  micromanaged?
7  A. Well, it started with as soon as Captain Homiak
8  took over all of a sudden then I have to -- he's going
9  to go to the meeting with me.
10 Q. Now, Captain Homiak, you said as soon as he
11 took over. You mean as soon as he took over the
12 academy class?
13 A. Correct.
14 Q. So what you believe is that MacLeish told
15 Homiak to micromanage you?
16 A. Yes. I believe so. I really do. I was
17 also -- that graduation ceremony that I spoke of was
18 the last time I had an opportunity to speak at a
19 graduation ceremony. From that point on after he
20 growled at me, I was no longer permitted to speak at a
21 graduation ceremony.
22 Q. When did that graduation ceremony take place?
23 A. I believe it was in June of '04.
24 Q. And so how many graduations have there been

Page 198

1  since then?
2  A. Several. Usually two per year.
3  Q. So how many is that? Three then?
4  A. Probably so.
5  Q. How many graduation ceremonies have you spoken
6  at altogether in your life?
7  A. Probably five, six maybe.
8  Q. So why is it that you get to give a speech at
9  the graduation ceremony?
10 A. To present the outstanding shooter award.
11 Q. So who gave the outstanding shooter award last
12 time?
13 A. I gave it out. However, I wasn't allowed to
14 speak.
15 Q. Well, did you tell somebody you wanted to
16 speak?
17 A. I was told that that format has been changed.
18 Q. What do you mean by "that format"?
19 A. The format where the award ceremony, giving out
20 the best shooter award, the outstanding shooter award
21 is just going to be given out and somebody else is
22 going to read the name off; there won't be any speech
23 for that.
24 Q. How many awards are given out at an academy

Page 199

1  graduation?
2  A. Several.
3  Q. More than just the best shooter award?
4  A. Yes.
5  Q. Do you know what the names of the other awards
6  are?
7  A. The outstanding recruit award, the attorney
8  general's award, outstanding fitness award. I believe
9  that there's another one like a spirit award or
10 something along that line.
11 Q. Well, under the old format, as I think you put
12 it, was there somebody who presented each one of these
13 awards?
14 A. Yes.
15 Q. And at the point they presented it did they
16 make a little speech?
17 A. Yes.
18 Q. And I take it what somebody decided was that
19 there aren't going to be speeches with the
20 presentation of the award anymore?
21 A. Just with the shooter's award.
22 Q. So everybody else gets to make a speech but
23 you?
24 A. Correct.

A - 246

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 5 of 19

Price, et al.                                                              v.                                          Chaffinch, et al.
Christopher D. Foraker, Volume 2        C.A. # 04-956-GMS                December 22, 2005

Page 200

1  Q. And did anybody tell you why?
2  A. They just wanted to cut down on the time.
3  Q. Who was it that told you this?
4  A. Captain Homiak.
5  Q. So what you're saying is that everybody else
6  who gets to give an award gets to give a speech but
7  you don't?
8  A. That's correct.
9  Q. Is there anything else Thomas MacLeish has done
10 to you by way of retaliation?
11       MR. NEUBERGER: For the sake of the
12 record, you may have asked some of this question at
13 the first day of the deposition. And I assume are you
14 asking in addition to what you may have said at the
15 first day?
16       MR. ELLIS: Well, I think what I asked in
17 the first day had to do with speaking out; in other
18 words, in the lawsuit that has the three plaintiffs.
19       What I have asked him specifically today
20 was in retaliation for his, was relevant to
21 retaliation for his having sued Chaffinch in the first
22 lawsuit.
23       MR. NEUBERGER: Okay. So this is
24 different. I didn't pick that up. This is different

Page 201

1  than the speaking out?
2        MR. ELLIS: Yes.
3        MR. NEUBERGER: Okay.
4  BY MR. ELLIS:
5  Q. Did you understand that, Sergeant Foraker?
6  A. No, I did not.
7  Q. I take it what you're giving me are things that
8  you believe Colonel Chaffinch did to retaliate against
9  you for whatever reason colonel -- I'm sorry. Let me
10 back up.
11       You're giving me reasons Thomas MacLeish
12 retaliated against you without respect to what his
13 motive might have been?
14 A. His motive is adopting the thought process of
15 Colonel Chaffinch who they're connected at the hip.
16 Q. Okay. My original question to you was: What
17 do you believe he did because you had filed suit
18 against Colonel Chaffinch? And you gave me the
19 discussion about the July 20, 2004 meeting where he
20 had you leave the commanders meeting and then you gave
21 me some other things and I thought that you were
22 responding with respect to things that you believe he
23 did to you because of your prior lawsuit.
24       Now, is that what you were intending to

Page 202

1  give me when you answered those questions?
2  A. You're going to have to rephrase that.
3  Q. You believe that Colonel MacLeish did certain
4  bad things to you, right?
5  A. Absolutely.
6  Q. I'm trying to separate bad things that he did
7  to you because you filed the lawsuit that you filed
8  against Aaron Chaffinch back in 2002, I'm trying to
9  separate that out from things that he did to you
10 because you allege you have made statements that
11 brought to light certain problems at the firearms
12 training unit facility in Smyrna.
13       Are you able in your mind to differentiate
14 between the two?
15 A. I guess it would be hard to differentiate
16 between the two because it's been constant retaliation
17 since I spoke out. It's been retaliation against me
18 and my men for speaking out and when we spoke out to
19 the auditors they condemned us, without a doubt they
20 condemned us.
21 Q. Who is the "they"?
22 A. Colonel Chaffinch and Lieutenant Colonel
23 MacLeish.
24 Q. Okay.

Page 203

1  A. He adopted everything that lieutenant --
2  correction: He adopted everything that Colonel
3  Chaffinch said, as when you look into his deposition,
4  again, he says we're 50 percent responsible for this
5  range failure.
6  Q. I just want then to ask you again with respect
7  to what Tom MacLeish did to you. Number one, you told
8  me that he removed you from a commanders meeting.
9        That's one thing you believe he did to
10 retaliate against you, right?
11 A. Yes.
12 Q. The second thing you think he did is you think
13 he told Nate McQueen that he didn't want you to be in
14 the honor guard at Chris Shea's funeral. Is that
15 right?
16 A. Absolutely.
17 Q. But, nevertheless, you were in the honor guard?
18 A. That's correct.
19 Q. You said there was some person who told McQueen
20 that MacLeish had thrown you out of the meeting.
21       Who is the person who you believe told
22 McQueen that MacLeish had thrown you out of the
23 meeting?
24 A. I don't know who Captain McQueen spoke with.

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 6 of 19

Price, et al.                                v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 2   C.A. # 04-956-GMS          December 22, 2005

Page 204

1  Q. He just told you that somebody had told him
2  that. Is that right?
3  A. He told me that he had spoken to someone after
4  the meeting.
5  Q. You've told me that Lieutenant Slank,
6  Lieutenant Ford and Sergeant Fiscella and Sergeant
7  Corrigan had a meeting with you in which some of those
8  guys told you that this was obvious retaliation?
9  A. We didn't have a meeting. It was just we were
10 standing around the kitchenette.
11 Q. In Troop 2?
12 A. At Troop 2, yes, sir.
13 Q. On July 28th?
14 A. Correct.
15 Q. You said that Colonel MacLeish growled at you
16 at the graduation in June of 2004?
17 A. That's correct.
18 Q. And you said that for some reason they won't
19 let you speak at graduation when you give out the
20 shooter award and you believe that was retaliation for
21 whatever you have done?
22 A. Absolutely.
23 Q. Is there anything else that you can think of?
24 A. Yes. Like I said, they have demoted me. I am

Page 205

1  being micromanaged. I have a budget that I'm supposed
2  to be able to make purchases on. Recently I had to
3  buy shirts for the men in the unit and they questioned
4  that and things like that were never questioned
5  before. I had to justify that and he made me justify,
6  try to justify a fifth person again, Lieutenant
7  Colonel MacLeish.
8  Q. Well, when you say you're being micromanaged,
9  in what ways are you being micromanaged other than
10 that you had to have, that you went to your budget
11 meeting with your boss basically?
12 A. That was captain -- well, again, it continued
13 because then it was Captain Downs.
14 Q. Did Downs replace Homiak?
15 A. Correct.
16 Q. Downs was your boss at the point you stopped
17 working, right?
18 A. No. He's been promoted to major. Both of
19 those have been promoted to major.
20 Q. Who was your boss at the point that you went on
21 disability?
22 A. Well, the transition was happening between
23 Downs and Captain Shamany and then underneath them is
24 Lieutenant Hagan.

Page 206

1  Q. So Lieutenant Hagan was your direct supervisor
2  when Downs was the head of the academy?
3  A. That's correct. And he too was micromanaging
4  me and --
5  Q. What do you mean by "micromanaging"?
6  A. Making my job absolutely impossible.
7  Q. What did he do to make your job impossible?
8  A. I wanted -- I needed for the unit vehicles, we
9  needed a computer. We needed things like that in
10 order to function. He continually wanted me to stay
11 up on my e-mails and wanted me to make sure that all
12 of the electronic documents are taken care of. I
13 can't do that from the range location.
14 Q. Who is the "he"?
15 A. I'm talking about Lieutenant Hagan.
16 Q. So is it Hagan who is micromanaging you?
17 A. All of the above.
18 Q. So you need vehicles and they're asking you to
19 justify why you need vehicles?
20 A. Yes.
21 Q. Is that what you're saying?
22 A. Yes.
23 Q. And you consider that micromanaging?
24 A. No. Because I have justified it many, many

Page 207

1  times.
2  Q. And I take it they don't agree that you have
3  justified them? Is that the problem?
4  A. It's a continual thing that we need. We have
5  ammunition and weapons, body armor, electronic
6  headsets. We have tools. We have weapon parts. We
7  have all these things in our police cars or in my case
8  a Buick Century. We have these things in vehicles
9  that are not conventional. We need SUV-type vehicles
10 with gun vaults in them so things don't get stolen.
11      For instance, Lieutenant Hagan went to
12 Baltimore in November, November 30th I believe it was
13 of 2004. He was at some sort of conference. His
14 vehicle was parked in a parking garage. He left his
15 hotel and came out to the vehicle and found his Dodge
16 Durango had been broken into. The window was smashed
17 and he identified that there was a camera missing and
18 that's about it that he gave as far as the report.
19 That was in November of '04.
20      By June or July of '05 he calls me up on
21 the phone and says, "I'm coming to shoot today. Do
22 you have a vest for me?" I'm thinking he forgot his
23 vest. And he said, "No. Mine I believe was stolen."
24 I said, "Did you report it?"

A - 248

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 7 of 19

Price, et al.                                         v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 2    C.A. # 04-956-GMS              December 22, 2005

Page 208

1  "Well, no."
2  "It's not in the computer?"
3  "No."
4  "It's not in NCIC?"
5  "No."
6  "Okay. Yeah, I have one for you to use."
7  So he comes up and ironically that very
8  same day in the afternoon or actually about 10:00
9  o'clock I get a phone call on my cell phone and it's
10 the ATF from Baltimore. They say, "We've recovered
11 one of your stolen vests" or "We have recovered a vest
12 of yours. We need to verify that it's been stolen.
13 We have contacted the manufacturer with the serial
14 number and they say it belongs to the State Police,
15 Delaware State Police."
16     So I said, "Okay." And I wrote down the
17 information who to contact, who to call back. And
18 right away they said it was a blue carrier with it
19 would have had State Police on it. So I immediately
20 then talked with Captain Downs and Lieutenant Hagan
21 right there at the range. I said, "Hey, I think that
22 Baltimore City has recovered your vest. The vest was
23 used by an assailant in a home invasion."
24     And I explained to him that it was

Page 209

1  Baltimore and Lieutenant Hagan turns white and he
2  said, "Oh, it must have been stolen in November and I
3  didn't know it was stolen." I said, "Okay." I said,
4  "It must have been yours because it had a blue
5  exterior carrier." Well, then he turned white again.
6  He said, "I didn't know that one was missing." I
7  said, "How many vests did you have?" He said, "Well,
8  I had two." He said, "The one I thought was stolen
9  was a white one."
10     So we have two vests out there, one of
11 them has been recovered in a felony home invasion
12 which will be the first case tried in Baltimore City
13 under the statute of wearing body armor in the
14 commission of a felony.
15   Q. Does this have anything to do with Lieutenant
16 Hagan micromanaging you?
17   A. Yes. Because I had to jump through hoops to
18 talk to the ATF to convince them that now we have two
19 vests missing because now he's saying oh, it must have
20 been stolen, both vests must have been stolen on
21 November 30th in Baltimore. He was then saying, at
22 one point in time he was saying, "Well, one of them I
23 think was stolen in March of '05 from the academy."
24     So we were all over the map and we're

Page 210

1  trying to figure out when it was actually missing
2  because he had no idea. So --
3    Q. But --
4    A. Hold on. Let me finish. I need to explain it
5  to you so you get the full truth of what's going on.
6         I mean, is that okay? You want the truth?
7         MR. NEUBERGER: Go ahead.
8    Q. I want you to complete your explanation, but I
9  don't see how this has anything to do with him
10 micromanaging your work.
11        MR. NEUBERGER: Finish your explanation.
12   A. Absolutely, it does because he turns around and
13 tells me that "Oh, they must have both been stolen at
14 the same time in November."
15        So I called the ATF unit in Baltimore and
16 they think I'm off my rocker, like "Okay, now you're
17 saying two of them were stolen on that day and you
18 guys didn't know that they were gone until we called
19 you?" I was like "Yeah, I see your point, but we need
20 them entered into NCIC."
21        So they had to pull the original report
22 that was issued by Baltimore City. I had to then fill
23 out a report, a little explanation as to what had
24 happened apparently so they could add that, those two

Page 211

1  items being stolen at that particular time and then
2  they then entered the white vest into NCIC as being
3  stolen. Otherwise, you wouldn't know where they came
4  from unless you called the manufacturer. On a weekend
5  that's next to impossible.
6    Q. I understand.
7    A. But, anyway, I did that for him and he never,
8  of course, didn't think that he did anything wrong, I
9  guess. But I'm jumping through hoops and on the
10 phone, on my cell phone, I'm trying to make all this
11 stuff happen. And he micromanaged me about what
12 reports, our monthly activity sheets coming in late
13 when I don't even have a computer at my location. I
14 have to drive 20 minutes to 25 minutes in traffic to
15 Troop 2 to try to get that accomplished when I'm
16 shorthanded with manpower.
17   Q. Is it part of your job as the head of the
18 firearms training unit to deal with the body armor?
19 You order the body armor, don't you?
20   A. Actually, no. The body armor gets ordered by
21 supply.
22   Q. Do you keep an inventory of the body armor?
23   A. We take down serial numbers on each shoot.
24 They write down the serial numbers to their handgun,

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 8 of 19

Price, et al.                           v.                    Chaffinch, et al.
Christopher D. Foraker, Volume 2    C.A. # 04-956-GMS        December 22, 2005

Page 212

1  shotgun and their body armor.
2  Q. And is that how you could tell that Lieutenant
3  Hagan was the person assigned to the body armor that
4  was stolen in Baltimore?
5  A. No. Because the problem was that we had manual
6  records and they were all over the place because they
7  made us move from the range to the academy, then from
8  the academy to a trailer and then from the trailer to
9  Troop 2. So a lot of our documents were actually
10 housed at the range but outside in a Conex and to find
11 anything in there is just impossible.
12       So actually I contacted the manufacturer
13 and they --
14 Q. Is it part of your responsibility as the NCOIC
15 of the firearms training unit to keep track of who has
16 what vest?
17 A. I think that's what we do because we have to
18 keep track of handgun and shotgun serial numbers.
19 Q. And also bulletproof vest serial numbers?
20 A. I believe that the supply section when they get
21 their recruits measured that it actually comes into
22 them and then they pass it off to the recruit and the
23 recruit then wears it and when they come down to shoot
24 we record what they're wearing, their body armor

Page 213

1  serial numbers.
2  Q. Why do you record what they're wearing?
3  A. I guess to keep track of it in case this
4  happens, in case something gets stolen. That way we
5  know what the serial number is and we can get it to
6  the agency that's making out the report and get it
7  entered into NCIC.
8  Q. In what other ways has Lieutenant Hagan
9  micromanaged you?
10 A. Again, I believe I touched on this in my
11 interrogatory answers.
12 Q. Can you remember anything else as you're
13 sitting here today?
14 A. At this point in time I can't remember anything
15 else.
16 Q. Is there any way that Captain Homiak
17 micromanaged you other than what you've described
18 about going to a budget meeting?
19 A. Yes. Well, that came into play when I was
20 trying to buy shirts for my men.
21 Q. What was the way in which he micromanaged you?
22 A. I had to report my purchases to him before and
23 he had to approve them before I went and purchased
24 anything.

Page 214

1  Q. He's your boss, right?
2  A. It's never been done before.
3  Q. Well, he is your boss though, right?
4  A. He is. But I'm in charge of the budget and the
5  expenditures are entrusted to me to buy for the needs
6  of the unit.
7  Q. So he wanted to see what kind of shirts you
8  were buying and how much you were going to pay for
9  them? Is that what you're telling me?
10 A. No. I believe he's micromanaging me.
11 Q. I'm just asking you for the facts.
12       Did he want to see how many shirts you
13 were buying and what you were paying for them? Is
14 that what he asked for?
15 A. I believe that there's more to it than that.
16 Q. What was it?
17 A. I believe that he's micromanaging me just to
18 make my job, just take away my authority, constantly
19 eroded my authority.
20 Q. That may well be, but my only question to you
21 is factually whether he asked for the number of shirts
22 and how much you were paying for them?
23 A. That was provided to him.
24 Q. So he asked for that and you gave it to him?

Page 215

1  A. Actually, I believe it was provided by Lori
2  Gooch in supply.
3  Q. Well, in what other ways did he micromanage you
4  or did he micromanage you when he was your boss?
5  A. Yes, he did.
6  Q. But what else did he do that you can remember
7  sitting here today that you considered micromanaging?
8  A. I just can't remember everything at this point
9  in time.
10 Q. I understand.
11       Harry Downs was your supervisor at some
12 point, right?
13 A. That's correct.
14 Q. In what way did he micromanage you?
15 A. He then took over for Captain Homiak and
16 micromanaged me and he actually sat in on my budget
17 meeting.
18 Q. Did Homiak sit in on the budget meeting?
19 A. He wanted to and was going to and he got called
20 away for some reason and couldn't make it to the
21 budget meeting.
22 Q. So Homiak didn't sit in on the budget meeting?
23 A. No. He was intending on being there. He just
24 couldn't at the last minute.

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 9 of 19

Price, et al.                                         v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 2      C.A. # 04-956-GMS           December 22, 2005

Page 216

1  Q.  Downs did sit in on the budget meeting?
2  A.  That's correct.
3  Q.  Other than that, what did he do to micromanage
4  you?
5  A.  At this time I can't think of anything else
6  right now.
7  Q.  Did any of these supervisors that you've had
8  since December, well, actually since the Smyrna range
9  shut down in March of 2004, did any of them come onto
10  the site while you were conducting the training
11  exercise?
12  A.  Lieutenant Colonel MacLeish did.
13  Q.  I was really referring to the immediate
14  supervisors the academy had during that time from
15  March 2004 to the present.  Did any of the academy --
16  A.  No, they did not.
17  Q.  How many times did MacLeish do that?
18  A.  A couple of times.
19  Q.  Was it both times at the New Castle range?
20  A.  No.  One was at the New Castle range.  One was
21  at the old range.
22  Q.  Well, did MacLeish come in there after March
23  2003?  I'm sorry.  March 2004?
24  A.  Come where?

Page 217

1  Q.  Into the Smyrna range after March of 2004
2  during the time you were doing --
3  A.  Just to shoot for his qualifications.
4  Q.  In the Smyrna range after March of 2004?
5  A.  I'm sorry.  I thought you were referring to the
6  National Guard range.
7  Q.  No.  I was really referring to the old range,
8  what I will call the Smyrna range, the one that is
9  closed done because of the contamination.
10  A.  Yes.  He was there April 6th when they did the
11  press release to slander us.
12  Q.  And you were not there that day, right?
13  A.  That's right.  I was not.
14  Q.  How many times since then has MacLeish come
15  onto the range during the training exercises?
16  A.  I'm sorry.  Can you repeat that?
17  Q.  How many times has MacLeish come onto the range
18  during a training exercise since March of 2004?
19  A.  Which range?
20  Q.  Any of them.  Any of them that you were in
21  charge of while you were training people.
22  A.  Two or three.
23  Q.  Did he ever come onto the range after March
24  2004 in any capacity other than as a trainee?

Page 218

1  A.  Yes.  Like I said, the April 6th, 2004 --
2  Q.  Aside from that?
3  A.  -- media campaign.
4  Q.  Aside from that?  Did he ever come onto a range
5  where you were training people after March 2004 in any
6  capacity other than as a trainee?
7  A.  I don't believe so.
8  Q.  Now let me go back to December 2003 for a
9  minute.
10      After you came back as the head of the
11  firearms training unit in December 2003 did anybody in
12  that building use the floor scrubber?  By that I mean
13  the thing that was referred to as the Zamboni.
14  A.  What dates are you talking again?
15  Q.  At any point after December 1, 2003.
16  A.  No.  It was only used once and that was the day
17  that it was repaired.
18  Q.  So that would be one day in December?
19  A.  Correct.
20  Q.  And who ran it?
21  A.  I did.
22  Q.  How long did you run it for?
23  A.  I don't know.  I bet probably a half an hour
24  maybe.

Page 219

1  Q.  Did you clean the floor in the shooting area?
2  A.  Yes, I did.
3  Q.  But it wasn't run since then?  Is that right?
4  A.  No.  It hadn't been run since June previous to
5  that 2003.
6  Q.  But since that date in December am I correct
7  that it hasn't been run?
8  A.  I don't believe so.
9  Q.  At least it wasn't run while you were there?
10  A.  Right.  Because there was nowhere or no way to
11  empty out the contaminants inside it.
12  Q.  Why not?  Is that the reason you didn't run it
13  after the one day in December that you ran it?
14  A.  It was filled at that point in time that it
15  needed to be emptied and we kept asking for facilities
16  management to give us some direction on what to do
17  with the contaminants and how to get rid of it.  And
18  at one point in time Mark DeVore, we cornered him and
19  said, "How can we get that out?"
20      And he said, he kept saying, "Well, I'll
21  have to get back to you on that.  I'll have to get
22  back to you on that."  And I believe Corporal Warren
23  even said at one point in time "What do you want us to
24  do?  Dump it on the ground?"  And he paused and

Case 1:04-cv-01207-GMS    Document 75-11    Filed 02/02/2006    Page 10 of 19

Price, et al.                                v.                                Chaffinch, et al.
Christopher D. Foraker, Volume 2    C.A. # 04-956-GMS              December 22, 2005

Page 220

1  stuttered and said, "No, don't do that."
2      Well, that's the only way we could empty
3  it because there's no place else to empty it. There's
4  no way to get it out and they're not providing any way
5  for us to get it out and replenish the fluid in there.
6  Q. You know who Environmental Solutions is, right?
7  A. Yes.
8  Q. Didn't the State Police have an agreement with
9  Environmental Solutions to remove contaminated liquid
10 from the firing range?
11 A. They actually removed contaminated debris. It
12 sometimes included a little bit of slush water.
13 Q. I'm talking about drums of liquid. Wasn't
14 there an agreement for Environmental Solutions to
15 remove drums of contaminated liquid from the firing
16 range?
17 A. We didn't have drums of contaminated liquid.
18 We had residue from shot.
19 Q. You dealt with Environmental Solutions, didn't
20 you?
21 A. Yes.
22 Q. You yourself as part of trying to find out what
23 was wrong with the range?
24 A. Yes.

Page 221

1  Q. Did you ever ask them if they could dispose of
2  the water that was in the floor cleaning machine?
3  A. No, I did not.
4  Q. Why not?
5  A. I just did not. I felt that facilities
6  management could provide us with a way to pump it out
7  or get rid of it, where to put it.
8  Q. Well, the State Police was responsible for
9  disposing of what you just called the sludge that was
10 in the bottom of the bullet trap, right?
11 A. Correct.
12 Q. Why would you think that somebody other than
13 the State Police would be responsible for what came up
14 off the floor in the shooting area?
15 A. The machine belongs to them. They purchased
16 the machine and that belongs to them. I wanted them
17 to provide us with an avenue to get the contaminated
18 water out of it.
19 Q. Is what you're telling me that you didn't
20 believe it was your job to get rid of the contaminated
21 water?
22 A. I didn't know how to get rid of the water.
23 Q. Did you believe it was your job to get rid of
24 the contaminated water in the floor cleaning machine?

Page 222

1  A. No. Because I don't believe that I had an
2  avenue to get rid of it. That's why I was asking
3  Doyle Tiller and Mark DeVore from facilities
4  management.
5  Q. The answer is no, then, you didn't believe it
6  was your job to get rid of the water that was in the
7  floor cleaning machine?
8  A. Correct. I believe that should have been
9  coming from them as to what we're supposed to do with
10 that water.
11 Q. In December 2003 was there what they call a
12 HEPA vac. at the range?
13 A. Yes.
14 Q. Did anybody operate it after December 1, 2003?
15 A. No.
16 Q. Why not?
17 A. It's an extremely slow and tedious job to try
18 to vacuum that massive range. The wand is about the
19 same width as a normal vacuum and that's why
20 facilities management bought the floor scrubber.
21 Q. Okay. Did copper dust accumulate in the
22 shooting area of the range in December and January,
23 December 2003 and January 2004?
24 A. What are the dates again?

Page 223

1  Q. December 2003-January 2004. During that period
2  did copper dust accumulate?
3  A. There was already copper dust everywhere in
4  that area.
5  Q. I realize that. Did more accumulate in
6  December and January?
7  A. It may have. If it was coming from anywhere,
8  it was coming from the muzzle blast of the gun and
9  floating backwards and depositing behind us.
10 Q. Well, if a copper round hit the bullet trap, it
11 would disintegrate and cause copper dust, wouldn't it?
12 A. In the water it would cause sludge.
13 Q. But if it had a spot that wasn't wet like the
14 top of it, it would cause dust, wouldn't it?
15 A. It could.
16 Q. Were you concerned that --
17 A. But most of the time it deflects and goes down,
18 the debris.
19 Q. Regardless of where it came from, whether it
20 was from the muzzle blast or from the bullet trap, did
21 you have a concern that the copper dust could ignite
22 on a stray round?
23 A. Copper dust ignite?
24 Q. Yes.

A - 252

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 11 of 19

Price, et al.                                          v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 2   C.A. # 04-956-GMS                December 22, 2005

Page 224

1  A. No.
2  Q. Aren't there incidents in ranges where copper
3  dust will ignite during shooting?
4  A. Copper dust?
5  Q. Yes.
6  A. I don't believe so.
7  Q. Were there any other types of chemicals in that
8  dust that had a risk of ignition? If you know.
9  A. It's possible, I guess.
10 Q. Are you saying you don't know whether it was
11 possible to ignite the dust?
12 A. We didn't know what was in the dust on the
13 floor because no one took any samples of it. No one
14 from facilities management was maintaining and keeping
15 check on what is on the floor and at what level of
16 clean and so forth.
17 Q. I recognize that. But you knew what was in the
18 frangible ammunition, didn't you, because you had an
19 MSDS by the beginning of January?
20 A. January 8th.
21 Q. Right. So you knew what was in the bullet,
22 right?
23 A. Right.
24 Q. And you knew there was gunpowder in whatever

Page 225

1  starts the bullet out of the gun, right?
2  A. Right.
3  Q. And you knew the other chemicals that were used
4  in the shotgun rounds, didn't you?
5  A. Correct.
6  Q. So based on that you could have figured out
7  what was in the dust on the floor, couldn't you?
8  A. I'm not a chemist, but I guess it could have
9  been.
10 Q. Was there anything there that you were
11 concerned about igniting?
12 A. No, I wasn't concerned about it igniting.
13 Q. When you were at the range the first time, and
14 I'm referring now to when you were in charge of the
15 range, the NCOIC in 2001 and 2002, was ammunition
16 stored in the area behind the bullet trap?
17    MR. NEUBERGER: I'm sorry. Just so I
18 understand, you're saying when he had his first tour
19 there?
20    MR. ELLIS: When he was the NCOIC the
21 first time.
22 A. I don't believe so.
23 Q. Was it stored there after you came back on
24 December 1, 2003?

Page 226

1  A. It was there when I came December 1st, 2003.
2  Q. Did you leave it there?
3  A. Yes. My understanding was that the bomb unit
4  would be taking it and having it destroyed at some
5  point in time.
6  Q. Did you believe it was a good idea to leave
7  ammunition in the area behind the bullet trap?
8  A. I'm not sure.
9  Q. Could you see any risk to the facility or to
10 personnel from having ammunition stored in the area
11 behind the bullet trap?
12 A. I know it's very damp back there. There's a
13 lot of evaporation. There was a lot of condensation
14 on the walls. The boxes were very wet. So I believe
15 that if they were back there for any extended period
16 it would probably deaden the primers of anything that
17 might have been live back there.
18 Q. So does that mean you think it was safe to
19 store the ammunition behind the bullet trap?
20 A. I don't know that it's safe to store ammunition
21 anywhere in the building because we don't have a
22 sprinkler system.
23 Q. So is what you're saying that no ammunition
24 should have been stored anywhere in that building?

Page 227

1  A. I don't know. I'm not an expert in that field
2  and I don't know.
3  Q. I'm really asking for not your expert opinion
4  because I recognize that you're not an expert, but I'm
5  asking for your opinion as the NCOIC at a firearms
6  training unit.
7    Do you believe it was safe to have
8  ammunition stored in any part of that building?
9  A. If a fire occurred, no.
10 Q. Did it ever occur to you to move the ammunition
11 out?
12 A. No. Because we really didn't have another
13 place to store the ammunition.
14 Q. Did it ever occur to you to move it out from
15 behind the bullet trap and put it in a room at the
16 other end of the building?
17 A. No. Because, like I said, it's damp back
18 there, it's not dry. It's very damp.
19 Q. Is there a lot of copper dust back there?
20 A. Yes.
21 Q. After December 1, 2003 when you returned as the
22 NCOIC did you or the people that worked for you at the
23 range do anything to get the dust cleaned up from the
24 floor, the walls, the equipment, that type of thing?

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 12 of 19

Price, et al.                           v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 2   C.A. # 04-956-GMS   December 22, 2005

Page 228

1  A. At one point in time we used the shovels and
2  scooped up the target blowback and the shotgun wadding
3  and so forth that was on the ramp, the dry ramp at the
4  bottom.
5  Q. Anything else that you did to clean up the
6  dust?
7  A. No.
8  Q. I have a couple of questions about the
9  psychiatric report that your attorney has provided to
10 us and this is the one from Carol Tavani. I'm not
11 going to mark it as an exhibit. If you need to look
12 at it, I think it will simplify the protective order
13 issues if we don't bother marking it as an exhibit,
14 but I'm just going to read you a section or two and
15 ask you if you can comment on some things.
16     There is reference on the sixth page -- if
17 you need to see this, I can show it to you. But
18 there's reference on the sixth page to hypervigilance
19 on your part and it refers to an individual that you
20 felt represented a danger before who has now been
21 fired and he's returned, he or she has returned from
22 being out of the country.
23     Are you familiar with the issue I'm
24 talking about?

Page 229

1  A. Yes.
2  Q. Who is the individual that you felt represented
3  a danger?
4  A. Corporal Cathell.
5  Q. What type of a danger did you feel he
6  represented to you?
7  A. I think Serpico is a real person. I think
8  there was a person from Easton, PA SWAT team that was
9  recently killed by another SWAT team member. And I
10 wouldn't put anything past him. I know he's been out
11 of the country over in the Middle East and it wouldn't
12 surprise me if he wanted me dead.
13 Q. So you thought Corporal Cathell wanted to kill
14 you?
15 A. I wouldn't put it past him if something
16 happened to me or my family.
17 Q. Did Corporal Cathell ever tell you he wanted to
18 kill you?
19 A. No. But I can tell you that his best friend is
20 Colonel Chaffinch and when Colonel Chaffinch looked at
21 me in that meeting, I've seen that look two times
22 before that and both times were on the street and
23 those people did want to kill me and they told me so.
24 And the way he looked at me, he hated my guts and he

Page 230

1  and Corporal Cathell are very close friends.
2  Q. So you think Aaron Chaffinch wants to kill you?
3  Is that what you think?
4  A. I'm going to tell you I don't put anything past
5  him.
6  Q. I just want to know if you think he wants to
7  kill you.
8  A. I don't put anything past him, sir.
9  Q. Does that mean that you think he wants to kill
10 you?
11 A. I wouldn't put anything past him.
12 Q. Do you know if Corporal Cathell ever killed
13 anybody?
14 A. He may have. I don't know.
15 Q. You don't know of anybody that he's killed, do
16 you?
17 A. I don't know.
18 Q. How about Aaron Chaffinch, do you know if he
19 ever killed anybody?
20 A. No, sir, I don't know.
21 Q. When is the last time you saw Eddie Cathell?
22 A. 2002.
23 Q. How long do you expect to continue to serve as
24 a Delaware State Trooper?

Page 231

1     MR. NEUBERGER: Excuse me. Do you mean
2  how long does he intend, does he want to serve or does
3  he think he's going to serve? There's a lot of ways
4  to answer the question.
5     MR. ELLIS: I want to know his present
6  intent. How long does he plan to serve as of today as
7  a Delaware State Trooper?
8  A. As long as I possibly can.
9  Q. That would be until age 55?
10 A. Quite possibly. I mean unless something else
11 came along, but with my reputation ruined the way it's
12 been ruined by Colonel Chaffinch and Lieutenant
13 Colonel MacLeish there's no way that I can enter into
14 any type of job after. I know that for sure.
15 Q. So you're how old today?
16 A. I'm 43.
17 Q. So your current intention would be to work
18 until age 55 as a Delaware State Trooper?
19 A. I would have to, yes.
20 Q. Is there a difference in your mind between a
21 commissioned officer and a noncommissioned officer?
22 A. One is considered brass and one is not.
23 Q. What's the distinction in your mind?
24 A. Lieutenants and above are OIC's of a unit,

A - 254

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 13 of 19

Price, et al.                                           v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 2        C.A. # 04-956-GMS                December 22, 2005

Page 232

1  officers in charge, and sergeants and below are
2  noncommissioned.
3  Q.  Any other difference?
4  A.  Pay scale.
5  Q.  Anything else?
6  A.  No.
7  Q.  Are there criteria that you have to meet to be
8  a lieutenant or captain that you don't have to meet to
9  be a sergeant?
10 A.  It depends on when you came on the job.
11 Q.  How about in your case?
12 A.  In my case I would need a four-year degree in
13 order to be promoted to lieutenant. I can test and be
14 banded for lieutenant, but until I receive my
15 four-year degree or equivalent thereof would I be able
16 to be promoted.
17 Q.  Is there any other qualification you don't have
18 that you can think of?
19 A.  Is there any other qualification that I don't
20 have?
21 Q.  Yes, other than the four-year degree that would
22 prevent you from becoming a lieutenant.
23 A.  I don't believe so.
24 Q.  Are you presently treating with a psychologist

Page 233

1  or psychiatrist?
2  A.  Yes.
3  Q.  When is the last time you -- first of all, who
4  is it?
5  A.  Dr. Kozma.
6  Q.  That's K-o-z-m-a?
7  A.  Yes.
8  Q.  And when is the last time you saw Dr. Kozma?
9  A.  I believe it was November.
10 Q.  Of this year?
11 A.  Correct.
12 Q.  And when did you see him prior to that?
13 A.  October.
14 Q.  Are you on a schedule to see him once a month?
15 A.  Yes.
16 Q.  Are you seeing any other mental health
17 professional other than Dr. Kozma for treatment?
18 A.  No. Because the fitness for duty exams that I
19 was sent for by the state, those were just
20 observations, I believe.
21 Q.  I'm not referring to them. I meant seeing
22 someone for treatment.
23     Are you seeing a psychiatrist for
24 treatment?

Page 234

1  A.  Now you have me questioning whether Dr. Kozma
2  is a psychiatrist or a psychologist and I don't know
3  the difference at this point.
4  Q.  I think Dr. Kozma is a psychologist. And if
5  that's the case, then I'm wondering who is prescribing
6  your medication?
7  A.  That would be my family physician.
8  Q.  Okay. Thanks.
9     The report that Dr. Tavani gave us says
10 that you're having what she calls flashbacks of
11 conversations and the report says you're having
12 flashbacks of conversations, most especially the media
13 event.
14    What media event --
15    MR. NEUBERGER:  Could I see the page
16 you're talking about?
17    MR. ELLIS:  I'm sorry. Page 6 of the
18 report.
19    MR. NEUBERGER:  Thanks.
20    MR. ELLIS:  This is her report of
21 September 13, 2005.
22 BY MR. ELLIS:
23 Q.  What media event does that refer to?
24 A.  The April 7th, 2004 media event.

Page 235

1  Q.  You mean the event that was reported in the
2  April 7th newspaper?
3  A.  Correct.
4  Q.  What do you have --
5  A.  And on WBOC, Channel 16, and also what was put
6  in the International Police Beat magazine.
7  Q.  What's in the Police Beat magazine is Tom
8  Eldred's article, is it not?
9  A.  I don't know that it has Tom Eldred written on
10 it.
11 Q.  Do you know, is it different from Tom Eldred's
12 article that appeared in The State News?
13 A.  It's very similar.
14 Q.  What is it exactly you're having the flashback
15 of? Is it the newspaper or is it the video from the
16 TV?
17 A.  It's being blamed for something that I did not
18 do. It's being blamed for and targeted out of
19 retaliation, me speaking out, my men speaking out
20 about things of public concern. We have an enormous
21 amount of public people that come through that range
22 from the cleaning lady to the 4-H Club, to the Boy
23 Scouts, to 911 center, the Citizens Police Academy.
24 We have people come through that range and when we

Price, et al.                                   v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 2       C.A. # 04-956-GMS         December 22, 2005

Page 236

1 spoke out they immediately retaliated against us.
2 Q. I understand that's what you're contending in
3 the case.
4     My question is simply: When you have a
5 flashback, what do you see?
6 A. I see the face of both MacLeish and Chaffinch.
7 Q. And where are they when you see the face, the
8 faces?
9 A. I know the graduation ceremony where Lieutenant
10 Colonel MacLeish growled at me, I see that face. I
11 see the hateful face of Colonel Chaffinch when I
12 walked into that meeting. I see him taking the tour,
13 taking Gloria Homer on the tour of the range. I see
14 Colonel MacLeish in there talking to the news media,
15 blaming me and my guys, my men for the closure of that
16 range.
17 Q. So you're having a flashback of something that
18 you didn't see firsthand? Is that what you're telling
19 me? I'm referring here to your --
20 A. I read it in the news media and I saw it on the
21 TV myself.
22 Q. Okay. So are you having a flashback of the TV
23 account on WBOC?
24 A. That also, yes.

Page 237

1 Q. But you're having a flashback of MacLeish and
2 Chaffinch being in the range on April 6th? Is that
3 what you're saying?
4 A. Yes. Because not only was their picture taken
5 but there was video of that as well on WBOC.
6 Q. I'm just trying to figure out what you're
7 having the flashback of, that's all.
8     What you're having a flashback of is the
9 news account and people being at the range?
10 MR. NEUBERGER: He also said some more
11 things.
12 Q. And other things. But in terms of the media
13 event, it's the news account on WBOC and it's also
14 things that are physically happening in the range. Is
15 that what you're telling me?
16 A. Also the auditor's report.
17 Q. You're having a flashback of the auditor's
18 report?
19 A. Absolutely. If you were interrogated like I
20 was, yeah, you would.
21 Q. Anything else?
22 A. I know I addressed this in my interrogatories
23 as well.
24 Q. As you're sitting here now, can you think of

Page 238

1 anything else that you're having a flashback of?
2 A. Not at this time.
3     MR. NEUBERGER: Let's take a break. Can
4 we break?
5     MR. ELLIS: Can I do one last question?
6     MR. NEUBERGER: On the Tavani thing?
7     MR. ELLIS: Yes.
8 BY MR. ELLIS:
9 Q. One last question on the psych. report.
10 There's an incident that she describes that you
11 apparently told her about where there was a remark
12 portraying you as a, quote, bad penny, unquote, made
13 by someone representing the State Police in front of a
14 committee on which you served attended by vendors and
15 colleagues.
16     What event is that and who is the person
17 who made the bad penny remark?
18 A. That was by Deputy Attorney General Mike Tupman
19 in a meeting over holsters attended by both a
20 Safariland representative, Armor Holdings
21 representative and Lawmen Supply.
22 Q. Who is it that told you Tupman made the remark
23 about you being a bad penny?
24 A. He told me that personally.

Page 239

1 Q. Tupman told you that?
2 A. That's correct. He told me "You're a bad penny
3 that just keeps showing up."
4 Q. As I understand the psychiatric report, he made
5 a comment that you were a bad penny to a bunch of
6 other people.
7 A. It was in front of all those other people.
8 Q. And were you there?
9 A. He made it to me, directly to me.
10 Q. I'm sorry. Okay. Now I understand.
11     So Mr. Tupman was at a meeting of a
12 committee and says to you that "You're a bad penny,
13 you keep turning up" in front of a bunch of other
14 people?
15 A. That's correct.
16 Q. Okay. Now I understand.
17     Now, there's also a comment in here that
18 one of the vendors explained things to the others
19 present. Who was that vendor and what is it that he
20 or she said?
21 A. Brian Byrne, who is the representative from
22 Lawmen Supply who lives in this area and reads the
23 newspaper accounts, explained it to the Armor Holdings
24 representative.

A - 256

Case 1:04-cv-01207-GMS    Document 75-11    Filed 02/02/2006    Page 15 of 19

Price, et al.                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 2    C.A. # 04-956-GMS              December 22, 2005

Page 240

1  Q. Okay. Thanks.
2      MR. NEUBERGER: Let's take a break.
3      MR. ELLIS: Yes.
4      (A brief recess was taken.)
5  BY MR. ELLIS:
6  Q. Sergeant Foraker, we know from some of the
7  exhibits in this case, and I'm going to put Exhibit 1
8  in front of you, D-1, that you sent an e-mail to then
9  Lieutenant Colonel MacLeish on January 5th, 2005.
10     Can you tell me what the next contact you
11 had with Lieutenant Colonel MacLeish was after that
12 e-mail?
13 A. (Pause)
14 Q. I haven't found any e-mails between you and
15 Colonel MacLeish or Lieutenant Colonel MacLeish then
16 the whole rest of the month of January.
17     Does that stand to your recollection?
18 A. I don't recall at this time.
19 Q. Can you remember any conversation you had
20 between January 5th and the end of January with Thomas
21 MacLeish?
22 A. Yes. He came up on January 21st and that's
23 when he told me that -- when I tried to explain to him
24 the conditions of the range and the problem with the

Page 241

1  ventilation system and so forth, he said that he
2  didn't come up there for that. "I didn't come here
3  for that," he said.
4  Q. That's the day that you had the conversation
5  about the radio sets with him?
6  A. Correct.
7  Q. And he told you to contact the guy in the
8  communications office?
9  A. Correct.
10 Q. Any other contact with him for the month of
11 January that you can remember?
12 A. Not that I recall at this time.
13 Q. Now, do you recall being at a meeting in early
14 February, about approximately February 10th, with
15 people from facilities management, Tom MacLeish, Major
16 Eckrich, Captain Warren and Bill Bryson?
17 A. Yes. There were a couple of meetings with
18 those same players that you just mentioned.
19 Q. All right. Well, Bill Bryson wouldn't have
20 been in all of these meetings because he didn't even
21 work for the State Police anymore, would he?
22 A. No. But he's very close personal friends with
23 Lieutenant Colonel MacLeish and Lieutenant Colonel
24 MacLeish wanted him involved since he had been

Page 242

1  previously involved in the range, so he was made a
2  part of the committee and also attended the meetings.
3  Q. Do you recall anything that happened at that
4  meeting that occurred on approximately February 10th?
5  This is a meeting with Mark DeVore, Doyle Tiller and
6  the State Police representatives that I just
7  mentioned.
8  A. What was your question again?
9  Q. Do you remember anything that happened at that
10 meeting?
11 A. Nothing specific at the time.
12 Q. Do you remember anything that the lieutenant
13 colonel said to the facilities people at that meeting
14 about the condition of the range?
15 A. I don't recall at this time.
16 Q. Now, do you recall a second meeting later in
17 the month, somewhere in the neighborhood of February
18 25th in which you were present with the three
19 subordinates you had in the firearms training unit,
20 Greg Warren, a guy named Sharp, I think it's Gene
21 Sharp from the fiscal section? You know who he is,
22 right?
23 A. Yes.
24 Q. Also Major Eckrich and Tiller and DeVore. Do

Page 243

1  you recall being at that meeting?
2  A. Yes, I do recall being at meetings with those
3  individuals.
4  Q. Do you remember specifically a meeting
5  occurring in late February and a discussion of the
6  ventilation system at that meeting?
7  A. I do know that the ventilation system was
8  discussed.
9  Q. Do you remember anything that MacLeish said to
10 the facilities representatives about the ventilation
11 system at that meeting?
12 A. No, I don't recall at this time.
13 Q. Do you remember any discussion at that meeting
14 as to whether the building was safe?
15 A. I don't believe it could have been determined
16 at that point in time. I don't know if they had the
17 swipe samples back by that time. I know we had hired
18 Environmental Solutions to come in and do swipe
19 sampling and we were awaiting their test results. I'm
20 not exactly sure when they came in.
21 Q. Do you --
22 A. When I say, "we," actually it would have been
23 the lieutenant, the colonel, Secretary Ford and
24 Secretary Homer that were awaiting those results to

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 16 of 19

Price, et al.                              v.                    Chaffinch, et al.
Christopher D. Foraker, Volume 2    C.A. # 04-956-GMS    December 22, 2005

Page 244

1 determine whether the range should be shut down or
2 not.
3   Q.  I guess really my question is what you remember
4 about the particular meeting I described on February
5 25th, 2004.
6       Do you remember there being questions
7 asked of the facilities people as to whether the range
8 was safe for occupancy?
9   A.  This was late February?
10  Q.  Yes.
11  A.  I don't recall at this time.
12  Q.  Now, do you remember a meeting on March 4th at
13 which instead of just Tiller and DeVore there were
14 about five or six people from facilities, including a
15 guy name Bob Furman?
16  A.  Yes. I was at a meeting with those players
17 involved, yes.
18  Q.  Do you remember where that meeting was?
19  A.  There were a couple of different meetings with
20 those individuals. I know that there was one at the
21 academy and I believe there was one at Secretary
22 Ford's conference room.
23  Q.  Do you remember which of those came first?
24  A.  I don't recall at this time.

Page 245

1   Q.  With respect to the one that occurred at
2 Secretary Ford's conference room, who was present? Do
3 you recall?
4   A.  Secretary Ford, Secretary Homer, Bob Furman, I
5 believe Doyle Tiller, Mark DeVore, I believe Captain
6 Warren was there. There might have been a couple of
7 other people from facilities management.
8   Q.  Was Tom MacLeish there?
9   A.  Yes. And Colonel Chaffinch was there also.
10  Q.  Were the three guys that worked under you in
11 the FTU present?
12  A.  No, they were not.
13  Q.  All right. First I'm going to ask you about
14 the meeting that occurred involving Bob Furman on
15 March 4th. And you said you think that occurred at
16 the academy?
17  A.  There was one that occurred at the academy with
18 Bob Furman attending.
19  Q.  What do you recall occurred in that meeting?
20  A.  I believe the discussion at one point in time
21 was about the ventilation system, that they were not
22 going to replace it; that they were going to rebalance
23 it.
24  Q.  Do you recall any discussion at that meeting

Page 246

1 about the cause of the problem?
2   A.  Which problem are you speaking of?
3   Q.  Well, the problem that made the range unfit for
4 use.
5   A.  Yes. They were discussing the ventilation
6 system.
7   Q.  Was there any discussion of the bullet trap at
8 that meeting?
9   A.  I believe there was.
10  Q.  And do you remember what the substance was of
11 the discussion of the bullet trap?
12  A.  I believe they were thinking as to what the
13 cost may be to refurbish it. It had been altered so
14 many times since it was put in place that it wasn't
15 close, even close to the condition that it originally
16 had been in. There were so many alterations made that
17 I guess, I believe that facilities management was in
18 contact with Savage Range directly about the bullet
19 trap and also considering a new bullet trap.
20  Q.  Do you remember any other discussion about the
21 bullet trap in that meeting?
22  A.  Not that I recall at this time.
23  Q.  Do you recall any discussion at that meeting
24 about maintenance that had been done in the building?

Page 247

1   A.  I believe that there were some questions asked
2 about the maintenance.
3   Q.  What questions do you recall being asked about
4 the maintenance?
5   A.  Who would do the maintenance? Whether it would
6 be an outside firm or it would be facilities
7 management. I believe Mark D'Allesandro was in there.
8 He reiterated that the maintenance of that bullet trap
9 would take a full-time technician to maintain it and
10 they were kicking around the idea of it being a
11 facilities management person or hiring someone outside
12 like they do at FLETC.
13  Q.  Was there any discussion in that meeting as to
14 what maintenance had been done on the bullet trap over
15 the course of the last few months? I'm sorry. Not of
16 the bullet trap.
17      Was there any discussion at that meeting
18 about what maintenance had been done at the range
19 since December 1, 2003?
20  A.  They had asked about the floor scrubber and I
21 had told them that I was informed that the floor
22 scrubber, when I arrived on December 1, 2003 that the
23 floor scrubber had not been utilized since I believe
24 June of '03 and that as soon as I got there I

A - 258

| Price, et al. | | Chaffinch, et al. |
|---|---|---|
| Christopher D. Foraker, Volume 2 | v.  C.A. # 04-956-GMS | December 22, 2005 |

Page 248

1  recognized that the floor scrubber wasn't running.
2  The horizontal surface on the top of it was covered
3  with a reddish dust. So I had that repaired and the
4  day that it was repaired I ran it in the facility and
5  then the following, I believe it was the following day
6  that I asked my guys "How do we get rid of the water?"
7  And they said, "We don't. No one has told us anything
8  about how to get rid of the water." That was an issue
9  back before when I was there the first time, what to
10 do with the water, the contaminated water and still no
11 one had come up with a solution.
12        And so then I contacted Mark DeVore and
13 Doyle Tiller and they kept saying, "We'll get back to
14 you on that. We'll get back to you on that."
15 Q. Did you repeat all of this that you're telling
16 me now in that meeting on March 4th, 2004?
17 A. I don't believe that I was free to talk at that
18 meeting.
19 Q. I'm really asking you, what I meant to ask you
20 is: Was there a discussion at that meeting of what
21 maintenance had been done since December 1, 2003? And
22 you have said to me that you told people that you
23 fixed the floor scrubbing machine?
24 A. I had someone come in and fix it. It was like

Page 249

1  a 1200-and-some-dollar bill to fix it.
2  Q. Did you also tell them then that you didn't run
3  it, that you hadn't run it since it was fixed?
4  A. Yes. Because we didn't know what to do with
5  the fluid that was inside.
6  Q. Did you also tell the people at that meeting
7  that you hadn't swept up or otherwise vacuumed the
8  dust that was in the shooting area since December 1,
9  2003?
10 A. Like I said, when the floor scrubber was
11 repaired on December 19th, I did do that on December
12 19th.
13 Q. But you hadn't otherwise done any cleanup of
14 the dust?
15 A. That's correct.
16 Q. Did you tell people that at that March 4th
17 meeting?
18 A. I believe so.
19 Q. Did you also tell them that you had stopped
20 doing maintenance on the water system of the bullet
21 trap in December 2003?
22 A. I don't believe I used the word "stopped." I
23 believe that it hadn't been done for quite some time
24 and the reason being was the sheer fact that it was so

Page 250

1  far behind it was a monumental task and a full-time
2  job to do just that, maintain the bullet trap.
3  Q. Do you remember what reaction Bob Furman had at
4  that meeting when you told the group at that meeting
5  these things that you just told me?
6  A. I don't recall exactly what he said at this
7  time.
8  Q. Do you remember anything that Lieutenant
9  Colonel MacLeish said in response to what you have
10 just described to me?
11 A. I remember at one point in time Lieutenant
12 Colonel MacLeish asked me, he was asking -- I don't
13 know whether he was asking me a question or he was
14 telling me something and I was writing it down. And
15 he got very agitated at me and said, "Look at me when
16 I'm talking to you." He's volatile.
17 Q. Do you remember anything other than that?
18 A. Not at this time.
19 Q. Did you get the impression that Colonel
20 MacLeish didn't know that you hadn't been doing
21 cleanup tasks at the range since December 2003?
22 A. I don't know that.
23 Q. You made a reference to the floor scrubber
24 machine during the first period when you were the

Page 251

1  NCOIC at the range in August, from August 2001 to
2  April 2002.
3        Did you use the floor scrubbing machine
4  during that period?
5  A. When I was there for those seven months in
6  charge and actually prior to that, Corporal Cathell,
7  that was like his big thing. He wanted to do the
8  floor scrubbing thing, so he ran the floor scrubber.
9  Q. Well, when you were Corporal Cathell's boss do
10 you know what Corporal Cathell did with the water?
11 A. The same thing he had been doing with it under
12 Sergeant Parton and Sergeant Fitzpatrick and
13 Lieutenant Bryson.
14 Q. What was that?
15 A. I believe he was dumping it out on the ground.
16 Q. Did you ever see him dump it out on the ground?
17 A. Yes.
18 Q. So did you think that was a good idea?
19 A. They apparently had it tested. I don't know
20 what the test results were. Sergeant Parton was a
21 part of that. I don't know what the test results
22 were.
23 Q. Did you think it was a proper thing for
24 Corporal Cathell to do, to be dumping water from the

A - 259        17 (Pages 248 to 251)

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 18 of 19

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 2        C.A. # 04-956-GMS                  December 22, 2005

Page 252
1  floor scrubbing machine out on the ground?
2  A. I didn't think it was a good idea, but I don't
3  know what the level of contamination was.
4  Q. Did you ever ask anybody?
5  A. No, I didn't.
6  Q. I mean, Parton is still with the State Police,
7  isn't he?
8  A. Yes, he is.
9  Q. Did you ever ask Parton what the contamination
10 test showed?
11 A. No, I didn't.
12 Q. You never asked Rich Ashley what he had them do
13 with the water when he was in charge, did you?
14 A. If the machine hadn't been run since, well,
15 since June, it was in a condition and a state that you
16 couldn't even move it. It was dead.
17 Q. I understand that.
18 A. And I know it hadn't been run for quite some
19 time.
20 Q. But that would have left 14 months in which
21 Ashley could have had Cathell running it, couldn't it?
22 A. I don't know when Cathell resigned or retired.
23 Q. Did you ever have a conversation with Ashley
24 about what he did with the water from the floor

Page 253
1  scrubbing machine?
2  A. No, I didn't. All I know is what my guys told
3  me and they told me that it was being dumped on the
4  ground.
5  Q. Do you remember anything else that occurred at
6  that March 4th meeting at the academy with Furman and
7  Tiller and DeVore and the representatives from the
8  State Police?
9  A. I don't recall at this time.
10 Q. Do you remember being at a meeting at the
11 museum conference room, the State Police Museum
12 conference room a little bit later in March, somewhere
13 around the 17th?
14 A. Yes, I do.
15 Q. Do you remember who was present at that
16 meeting?
17 A. I believe that was Lieutenant Colonel MacLeish,
18 Major Eckrich, Gene Sharp, I think Captain Homiak.
19 I'm not sure if Captain Homiak and Captain Yeomans
20 were there, but I know they had prepared two reports
21 that were being introduced at that meeting. I know
22 Lieutenant Davis was there, Captain Greg Warren was
23 there, Corporal Price, Corporal Warren and Corporal
24 Warwick were there and myself.

Page 254
1  Q. Do you know what the purpose was for that
2  meeting?
3  A. I don't recall at this time what the purpose of
4  that meeting was.
5  Q. Aside from the reports that Homiak and Yeomans
6  presented, either presented or were handed out, do you
7  recall anything else that occurred at that meeting?
8  A. That there was discussion about policies and
9  procedures that we didn't have. There was discussion
10 about there was no final inspection of the building.
11 There was no certificate of occupancy for the
12 building. The ventilation system had never worked and
13 that the maintenance of the facility should be done by
14 professionals that are trained to protect themselves
15 from hazardous exposure with Tyvek suits and
16 respirators; that the bullet trap was a full-time
17 maintenance job for a technician that's trained in how
18 to protect themselves against heavy metal exposures.
19 Q. Who was saying all these things?
20 A. It was I believe a discussion that was going
21 on. I believe that that was what also Captain Yeomans
22 and Captain Homiak, their reports were leaning in that
23 direction.
24 Q. Was there any disagreement among the group as

Page 255
1  to those issues?
2  A. I believe Lieutenant Colonel MacLeish was just
3  listening. I don't think he offered a thought either
4  way.
5  Q. So he didn't disagree?
6  A. I don't believe he offered up anything.
7  Q. Was there anybody in the group that was
8  meeting -- you're all State Police employees at that
9  point, right? There's no facility people at that
10 meeting, right?
11 A. No, there weren't.
12 Q. Was there anybody within that group that was
13 disagreeing with the positions that you've just
14 described concerning how the range should be handled?
15 A. Well, we had a disagreement. We disagreed on
16 the fact that Lieutenant Colonel MacLeish said, "It's
17 expected to have hearing loss. You work at a range.
18 It's expected to have high levels of lead and copper
19 in your system."
20      That's what he said and I disagreed with
21 that, absolutely.
22 Q. I was not referring to that. I was referring
23 to the testimony you gave a couple of minutes ago
24 about who would be responsible for maintenance, the

A - 260

Case 1:04-cv-01207-GMS   Document 75-11   Filed 02/02/2006   Page 19 of 19

Price, et al.  
Christopher D. Foraker, Volume 2    v.    C.A. # 04-956-GMS    Chaffinch, et al.  
December 22, 2005

Page 256

1 fact that the HVAC system didn't work right, I mean
2 all these things that you have described, including
3 the fact that there should be someone skilled or at
4 least experienced in handling hazardous metals that
5 would do the cleanup, that somebody in a Tyvek suit
6 might be needed to do the cleanup, all of these things
7 that were proposed by one or other members of the
8 State Police that were present at that meeting.
9     Was there any disagreement in the crowd
10 about where you were going to go in the future?
11 A.  I wasn't exactly sure where Lieutenant Colonel
12 MacLeish stood because he was -- the way he treated us
13 in that meeting...
14 Q.  Let me ask the question a little different way.
15     Did he say that he disagreed with you?
16 A.  He didn't say it, but his body language --
17 Q.  Did he tell you that he thought you should be
18 wearing Tyvek suits and dipping your hands into the
19 solution underneath the bullet trap?
20     MR. NEUBERGER:  Excuse me.  You did step
21 on his answer.
22     You said something about body language?
23 A.  Well, his body language was such that he was
24 like angry at us because I stepped in and disagreed

Page 257

1 with him on whether, because we worked there, whether
2 we should be harmed in some way or we should be
3 exposed to something when we have no training on how
4 to protect ourselves against this type of exposure.
5 There's no policies and procedures in place, and we
6 talked about that.
7     And he was --
8 Q.  Did he not assign you to prepare policies and
9 procedures?
10 A.  Again, that should be done, like I explained
11 the last time I talked with you, that should be done
12 by professionals who know how to protect themselves,
13 not by somebody who's a layman.  I'm a lowly sergeant
14 and that's five or six pay grades above me.  That's by
15 industrial hygienists and people that know what
16 they're doing.
17 Q.  Were you assigned to prepare SOP's?
18 A.  I was assigned to come up with some sort of
19 SOP.  But when you don't know what your facility is
20 going to be like or look like when supposedly changes
21 are going to be made to the building, you don't
22 prepare policies and procedures until you know what
23 you have, the environment has been set forth before
24 you and then you can make policies and procedures.

Page 258

1 Q.  So the answer is you were assigned to prepare
2 policies and procedures, right?
3 A.  I was assigned to look at policies and
4 procedures at different facilities.
5 Q.  Were you assigned to come up with policies and
6 procedures for the Delaware State Police firing range?
7 A.  Yes, of which I adamantly said I shouldn't be
8 the one that does that; I am not qualified to do that.
9 Q.  Was there a discussion of hearing loss at that
10 meeting?
11 A.  Like I said, he said when the hearing loss came
12 up he said that it's expected.
13 Q.  How did hearing loss come up?
14 A.  I don't recall at this time how that came up.
15 Q.  Do you recall MacLeish asking whether there
16 were any medical conditions or medical problems that
17 had not been addressed to that date?
18 A.  I don't recall at this time.
19 Q.  So you don't recall who raised the issue of
20 hearing loss?
21 A.  A lot of meetings, a lot of different people at
22 different meetings.
23 Q.  I understand that.  You seem to have a pretty
24 good recollection of this one and I thought I would

Page 259

1 see if you would remember who raised the issue of
2 hearing loss.
3     Are you saying that you don't remember?
4 A.  I don't recall at this time.
5 Q.  Now, what exactly was it that Lieutenant
6 Colonel MacLeish said in this meeting about exposure
7 to metals or lead or something of that sort?
8 A.  We discussed this the last time we were
9 together.
10 Q.  I don't recall us discussing this meeting at
11 all, but please give me the answer, if you could.
12 A.  Yes.  He made a statement that, you know,
13 "You're going to have hearing loss if you work at a
14 range."
15 Q.  No, that wasn't my question.  It had to do with
16 exposure to lead or other metals.
17 A.  Basically the same thing.  I remember him
18 saying, "It's expected that you're going to have
19 elevated lead levels and heavy metal exposures.  You
20 work at a range."
21 Q.  Is that all that he said about it?
22 A.  (Pause).
23 Q.  I mean, do you remember anything else?
24 A.  I disagreed with him on that.  I believe that I

A - 261