Case 1:04-cv-01207-GMS    Document 75-15    Filed 02/02/2006    Page 1 of 14

Price, et al.                                        v.                          Chaffinch, et al.
Thomas F. MacLeish                           C.A. # 04-1207                      July 19, 2007

Page 10

1  Q. At another commanders' meeting last summer,
2  after Colonel Chaffinch got upset in front of all the
3  commanders, did you gently rub his back until he felt
4  better?
5  A. I can't recall specifics, but I'm a touchy kind
6  of guy, yeah. I don't recall specifics of the incident
7  you're talking about, but it wouldn't be beyond me to do
8  that to someone if they were upset. Yes.
9  Q. I think you just said that Colonel Chaffinch was
10 a good man. Was that your testimony?
11 A. Yes.
12 Q. Was he a good trooper?
13 A. To my knowledge, yes, he was.
14 Q. Was he a fine man?
15    MR. ELLIS: Object to the form of the
16 question.
17 BY MR. NEUBERGER:
18 Q. In your opinion, was he a fine man?
19    MR. ELLIS: Object to the form of the
20 question.
21    MR. NEUBERGER: You can answer.
22 A. What's the difference between good and fine? He
23 was a good man who, for many reasons, I felt he was an
24 honorable man. I don't typically use "a fine man." If

Page 11

1  you can tell me what specifically you're referring to,
2  how I would define that, I'd be glad to --
3  Q. You're an intelligent person, aren't you?
4  A. I think so.
5  Q. You have been to high school?
6  A. Yes.
7  Q. And you went to college?
8  A. Yes.
9  Q. And you're now the superintendent of the
10 Delaware State Police; isn't that right?
11 A. Yes.
12 Q. Are you telling me that you don't know the
13 definition of the word "fine"?
14    MR. ELLIS: Object to the form of the
15 question.
16 A. "Fine" and "good" to me are synonymous.
17 Q. Okay. That works. Do you think that
18 Colonel Chaffinch was a good leader for the Delaware
19 State Police?
20    MR. ELLIS: Object to the form of the
21 question.
22    MR. NEUBERGER: You can answer.
23 A. I think Colonel Chaffinch did the best he could.
24 Q. So do you think he was a bad leader for the

Page 12

1  Delaware State Police?
2     MR. ELLIS: I object to the form of the
3  question.
4  A. No, I do not think he was a bad leader.
5  Q. Are you agreeing that he was a good leader or
6  are you disagreeing that he was a good leader?
7     MR. ELLIS: I object to the form of the
8  question.
9  A. Aaron did some good things while he was
10 superintendent of the State Police.
11 Q. Do you think that he was a good leader?
12    MR. ELLIS: I object to the form of the
13 question.
14 BY MR. NEUBERGER:
15 Q. Colonel, I see it's taking you a while to answer
16 that question. Do you not understand the question? Are
17 you trying to waste time?
18 A. No. Time is too valuable. I dedicated the day
19 to be up here. I'm not wasting any time, Mr. Neuberger.
20 The question of whether Colonel Chaffinch was a good
21 leader, to me, he was a good leader, yes.
22 Q. Do you strive to be the kind of leader that
23 Colonel Chaffinch was?
24 A. There are certain aspects of his leadership that

Page 13

1  I would attempt to emulate, but there are others that I
2  would not.
3  Q. Do you think that we need more Delaware State
4  Police troopers like Colonel L. Aaron Chaffinch?
5     MR. ELLIS: I object to the form of the
6  question.
7     MR. NEUBERGER: Specifically what's the
8  form problem so that I can correct it?
9     MR. ELLIS: It's impossible to answer that
10 on one -- it's a question that would provide for a number
11 of levels of answer, and you're not giving the witness an
12 opportunity to do that. To say do you need more troopers
13 like Aaron Chaffinch when he was working undercover, more
14 troopers like him when he was directing traffic, more
15 troopers like him when he was in operations? It's a
16 question that has a lot of different parts. You're
17 putting it to the witness like there's only one. I don't
18 think that's fair to the witness. I object to the form
19 of the question.
20    MR. NEUBERGER: I will try to be a little
21 bit more fair, then.
22 BY MR. NEUBERGER:
23 Q. You served with Colonel Chaffinch for a long
24 time, haven't you?

A - 328

4 (Pages 10 to 13)

Case 1:04-cv-01207-GMS    Document 75-15    Filed 02/02/2006    Page 2 of 14

Price, et al.                              v.                           Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                          July 19, 2007

Page 14

1  A. I served under him for approximately three
2  years.
3  Q. Did you ever have a chance to take the measure
4  of the man?
5      MR. ELLIS: I object to the form of the
6  question.
7  A. Yes, I did.
8  Q. Upon taking that measure of the man, do you
9  think we need more troopers who measure up to that
10 standard?
11     MR. ELLIS: I object to the form of the
12 question.
13     MR. HAVERLY: In the future, when you
14 object to the form of the question, could you identify
15 specifically so Mr. Neuberger can appropriately change
16 the question if possible? That's the normal way that is
17 transacted in Delaware.
18     MR. ELLIS: I was told by Mr. Neuberger's
19 father the last round of depositions that that was not
20 the way it was transacted in Delaware. I'm trying to do
21 it in a way that accommodates the local bar. I'll put
22 every objection I have on the record at length if you
23 want.
24     MR. HAVERLY: Not at length. Just

Page 15

1  briefly. If the problem is it's vague, just say
2  objection, vague, and that helps Mr. Neuberger to know
3  what the problem is.
4      MR. ELLIS: Does he need help? Can he
5  speak for himself?
6      MR. HAVERLY: He can. He has been.
7      MR. ELLIS: I didn't hear him asking me for
8  help. I will try to accommodate you.
9  BY MR. NEUBERGER:
10 Q. I think we're still on the question do you think
11 we need more troopers like Colonel Chaffinch.
12     MR. ELLIS: My objection stands, for the
13 reasons stated.
14 A. **I think there are certain qualities of retired
15 Colonel Chaffinch that every trooper could possess.**
16 Q. Are you aware that on April 24th of 2002
17 Sergeant Christopher D. Foraker filed a First Amendment
18 free speech retaliation lawsuit against
19 Colonel Chaffinch?
20 A. Yes.
21 Q. You gave a deposition in that case, didn't you?
22 A. Yes, I did.
23 Q. You were a major at the time, I believe?
24 A. Yes, I was.

Page 16

1  Q. That case went to trial in June of 2003; isn't
2  that right?
3  A. That's correct.
4  Q. You testified at that trial, didn't you?
5  A. Yes, I did.
6  Q. You were still a major at that time; is that
7  correct?
8  A. Yes, I was.
9  Q. When you testified at deposition in that trial,
10 Christopher Foraker's first case, did you tell the truth?
11 A. Yes, I did.
12 Q. Is lying under oath a significant offense in the
13 Delaware State Police?
14 A. Yes, it is.
15 Q. Can a Delaware State Police trooper be punished
16 for lying under oath?
17 A. Yes, they can.
18 Q. Does the Delaware State Police have several
19 rules and regulations about telling the truth?
20 A. Yes.
21 Q. Is telling the truth something that is important
22 in the Delaware State Police?
23 A. Yes, it is.
24 Q. Is it important to you as a superintendent and

Page 17

1  the colonel of the Delaware State Police?
2  A. Yes, it is.
3  Q. Is it important to you personally?
4  A. Yes, it is.
5  Q. Should troopers lie under oath?
6  A. **They should not.**
7  Q. Why not?
8  A. **It goes to their integrity.**
9  Q. Do you think that lying under oath would hurt a
10 trooper's credibility in a criminal case?
11 A. **Absolutely.**
12 Q. Would it hurt their credibility in a civil case?
13 A. Yes.
14 Q. Is it important to you that troopers hold
15 themselves to a higher standard of conduct than the
16 average citizen?
17 A. Yes, it is.
18 Q. And does that include telling the truth and not
19 lying under oath?
20 A. Yes.
21 Q. As part of Christopher Foraker's first lawsuit,
22 do you recall that he claimed that the colonel of the
23 Delaware State Police, meaning Colonel Chaffinch, had
24 retaliated against him for speaking out about several

Case 1:04-cv-01207-GMS    Document 75-15    Filed 02/02/2006    Page 3 of 14

Price, et al.                                v.            Chaffinch, et al.
Thomas F. MacLeish       C.A. # 04-1207                    July 19, 2007

Page 18

1  issues?
2  A. Yes, I'm familiar with that.
3  Q. Do you recall that one of those issues was that
4  he had disciplined one of Colonel Chaffinch's close
5  friends for lying in the course of his duties?
6  A. I'm familiar with that in the lawsuit, yes.
7  Q. Do you recall that that was one of the claims
8  that Chris made?
9  A. Yes.
10 Q. Do you also recall that another thing that
11 Sergeant Foraker spoke out about was that this same
12 friend of Colonel Chaffinch be disciplined for sexually
13 harassing and groping a female civilian? I believe it
14 was a cleaning contractor at the FTU.
15 A. I believe that was one of the claims. You're
16 telling me it was. I know there were circumstances in
17 there. Yes, I would say if you're telling me that that
18 was what was in that lawsuit, then, yes, it was in there.
19      MR. ELLIS: The question is whether you
20 remember it yourself, not whether you can accept what
21 Mr. Neuberger tells you. Two different things.
22      MR. NEUBERGER: I'm not asking you to take
23 my word for it. I want to know what you know.
24      THE WITNESS: I don't recall specifically

Page 19

1  reading that in the lawsuit.
2  BY MR. NEUBERGER:
3  Q. Did you testify about that?
4  A. I don't think so, because I wouldn't have any
5  firsthand knowledge of it.
6  Q. Do you recall that one of the claims that
7  Sergeant Foraker made was that he had given this friend
8  of Colonel Chaffinch an honest evaluation that was
9  negative in several areas?
10 A. I don't recall, Mr. Neuberger.
11 Q. Do you recall one of the areas that
12 Sergeant Foraker spoke out about were about blood lead
13 levels of Colonel Chaffinch's friend?
14 A. I recall that in a general sense.
15 Q. This friend served at the FTU?
16 A. Yes.
17 Q. Do you recall that one of the areas was that
18 Sergeant Foraker was speaking out about were health and
19 safety concerns at the FTU?
20 A. I don't recall that specific part of the suit.
21 I thought the crux of the suit was that he had been moved
22 inappropriately for actions taken against a friend of the
23 colonel's. That's what I recall about the suit. I don't
24 recall those specific things, those specific areas you're

Page 20

1  defining.
2  Q. As colonel of the Delaware State Police, is the
3  Constitution of the United States of America important to
4  you?
5  A. Yes, it is.
6  Q. Is it important to the division as a whole?
7  A. Yes, it is.
8  Q. Do you recall that in June of 2003 a federal
9  court jury found Colonel Chaffinch had violated the First
10 Amendment of the United States Constitution?
11 A. I know the jury found against him in that trial.
12 Q. Do you recall that they found against him and
13 found that he had violated the First Amendment of the
14 United States Constitution?
15      MR. ELLIS: I think it was the Fourteenth
16 Amendment.
17      MR. NEUBERGER: Actually, you can sue
18 directly upon the First Amendment, but that's another
19 matter.
20 A. I know we lost the suit, Mr. Neuberger. The
21 specifics under what title and conditions, I was a major
22 at that time. I didn't have specific responsibility for
23 that directly.
24      MR. NEUBERGER: I'd like to mark an

Page 21

1  exhibit. This would be MacLeish Deposition Exhibit
2  No. 1.
3       (MacLeish Deposition Exhibit No. 1 was
4  marked for identification.)
5  BY MR. NEUBERGER:
6  Q. Colonel MacLeish, do you have this document in
7  front of you?
8  A. Yes, I do.
9  Q. I'd like you to take a look at the first page.
10 Does this appear to be a newspaper headline that says,
11 "Jury: Trooper's Rights violated"?
12 A. Yes.
13 Q. Does this appear to have been in the Delaware
14 State News?
15 A. It doesn't say that on the front page. It says
16 "Downstate Delaware."
17 Q. Turning to the second page, does that appear to
18 be a headline from The News Journal which says, "Trooper
19 awarded $100,000"?
20 A. Yes, it does.
21 Q. Turning two more pages, does that appear to be a
22 headline from the Delaware State News which says, "Del.
23 To Pay $243K settlement"?
24 A. Yes.

A - 330

Price, et al.
Thomas F. MacLeish
v.
C.A. # 04-1207
Chaffinch, et al.
July 19, 2007

Page 22

1  Q. Turning to the second-to-last page in the
2  packet, does that appear to be a headline from the
3  Wilmington News Journal saying, "State to pay damages to
4  trooper"?
5  A. Yes, it does.
6  Q. Were you aware of Sergeant Foraker's lawsuit
7  receiving media coverage?
8  A. Yes.
9  Q. Did you ever see any of these articles?
10 A. Yes, I did.
11 Q. You can put the document down.
12     Sergeant Foraker's case settled in November
13 of 2003; isn't that right?
14 A. That's correct.
15 Q. And Sergeant Foraker was ordered to be
16 reinstated back to his position of NCOIC of the FTU by
17 Judge Farnan; isn't that right?
18 A. That's correct.
19 Q. There is a judicial order by Judge Farnan
20 setting forth the specifics of the reinstatement; isn't
21 that correct?
22 A. Yes.
23     MR. NEUBERGER: I'll put another document
24 in front of you. We will call this MacLeish Deposition

Page 23

1  Exhibit No. 2.
2     (MacLeish Deposition Exhibit No. 2 was
3  marked for identification.)
4  BY MR. NEUBERGER:
5  Q. Colonel MacLeish, does the front of this
6  document say, Sergeant Christopher D. Foraker, Lieutenant
7  Colonel, Secretary David B. Mitchell, and the Division of
8  State Police?
9  A. Yes, it does.
10 Q. Does this appear to be a complaint filed by
11 Sergeant Foraker?
12 A. Yes, it does.
13 Q. I'd like you to turn to the second-to-last page
14 of this document.
15 A. (Complied.)
16 Q. Are you there?
17 A. I'm there.
18 Q. At the top right-hand corner does it say, "Filed
19 Clerk U.S. District Court District of Delaware 2003
20 Nov 20 AM 10:38"?
21 A. Yes.
22 Q. Does it say "Stipulated Order"?
23 A. Yes, it does.
24 Q. Below where it says "Stipulated Order" does it

Page 24

1  say, "The parties to this case, acting through their
2  authorized counsel, hereby stipulate and agree as
3  follows, subject to the approval of the Court"?
4  A. Yes, it does.
5  Q. Is there a number 1 after that?
6  A. Yes, there is.
7  Q. Does it say that "Sergeant Christopher D.
8  Foraker is ordered reinstated to his prior position as
9  the Non-Commissioned Officer-in-Charge of the Firearms
10 Training Unit of the Delaware State Police with all the
11 rights, privileges, duties, responsibilities and
12 supervisory authority previously held by him when he
13 earlier occupied that position on February 20, 2002"?
14 A. Yes, it does.
15 Q. Turning to the next page, does that say,
16 "Joseph J. Farnan, Jr., United States District Court
17 Judge"?
18 A. Yes, it does.
19 Q. Up a little higher is the signature of
20 W. Michael Tupman, Esquire?
21 A. Yes.
22 Q. Is he one of the Deputies Attorney General who
23 serves the Delaware State Police?
24 A. Yes.

Page 25

1  Q. Were you aware of this order?
2  A. Yes, I was.
3  Q. You can put the document down.
4     In your opinion, did Colonel Chaffinch
5  disgrace both himself and the division by his actions in
6  the first lawsuit brought by Sergeant Foraker?
7  A. **We received a lot of bad press out of it. Did**
8  **he disgrace himself and the division? He didn't put a**
9  **shining light on us. It was a jury's finding that went**
10 **against us.**
11 Q. I'm sorry. Are you still testifying or are you
12 just hesitating?
13 A. **I'm hesitating. The actions as they appeared in**
14 **the papers did not bring favor to the division.**
15 Q. Is that something you were happy about?
16 A. **I was not happy about it.**
17 Q. Do you think that the civil justice system in
18 the United States of America is a good thing or bad
19 thing?
20 A. **It's a good thing.**
21 Q. Do you think the federal judiciary is a good
22 thing or bad thing?
23     MR. ELLIS: I object to the form of the
24 question. It's much too vague.

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A - 331

Case 1:04-cv-01207-GMS   Document 75-15   Filed 02/02/2006   Page 5 of 14

Price, et al.                             v.                         Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                        July 19, 2007

Page 26

1   A. It's a good thing.
2   Q. Do you think that federal judges want their
3   judicial orders taken seriously?
4   A. I'm sure they do.
5   Q. Do you think they like it when their judicial
6   orders are violated?
7   A. I'm sure they don't.
8   Q. Do you think that the judicial orders of federal
9   judges should be obeyed?
10  A. Yes.
11  Q. Do you think that a person should make every
12  possible effort to obey and comply with the judicial
13  orders made by federal judges?
14  A. Yes, I do.
15  Q. Do you agree that a person should be punished if
16  they fail to obey a judicial order made by a federal
17  judge?
18  A. To knowingly disobey it? Yes.
19  Q. Do you agree that a person should be punished
20  severely if they fail to obey a judicial order made by a
21  federal judge?
22       MR. ELLIS: I object to the form of the
23  question.
24       MR. NEUBERGER: You can answer.

Page 27

1   A. You're talking life in prison for disobeying an
2   order? What is reasonable? There should be reasonable
3   action taken against someone that does.
4   Q. Do you think they should just get a slap on the
5   wrist?
6   A. If that judge feels that's what's necessary for
7   whatever the violation of the order would be.
8   Q. So you think it's up to the discretion of the
9   judge?
10  A. Yes. Within reason. There's appeals if you
11  disagree with it.
12  Q. You have been a police officer for over
13  25 years; isn't that right?
14  A. My 28th year, yes.
15  Q. You're currently the superintendent of the DSP?
16  A. Yes, I am.
17  Q. What would your reaction be if a trooper first
18  class refused to follow a judicial order made by a
19  federal judge?
20       MR. ELLIS: I object to the form of the
21  question. It's a hypothetical, too vague.
22       MR. NEUBERGER: I think he's the Colonel of
23  the State Police. I think this is within the scope of
24  his authority.

Page 28

1       MR. ELLIS: I'm not saying he can't answer.
2   I'm just saying I object to the question.
3   A. I would question more detail, what did he
4   violate, what did he do, was it intentional, was it an
5   act of omission or act of commission? I'd get the
6   details of what took place to try to determine what was
7   he or she thinking at that point in time.
8   Q. What if it was an intentional violation?
9   A. I believe we would have a duty to act.
10  Q. Would you have the same reaction regardless of
11  whether it was a trooper first class or whether it was a
12  higher-ranking officer?
13  A. I would go through the same process.
14  Q. What if that trooper was openly defiant of the
15  federal judicial order issued by that federal judge?
16       MR. ELLIS: I object to the form of the
17  question for the same reasons previously stated.
18  A. I would take further action against that
19  individual, find out, you know -- if the level of
20  discipline begins to escalate as you get -- as you move
21  through, that if he's openly defiant, said I'm not going
22  to comply with it, he would be charged and we would go
23  through the Internal Affairs investigation and processed.
24  Obviously I can't have somebody disobeying a federal

Page 29

1   judge's order.
2   Q. Are you saying they should be punished?
3   A. If in, in fact -- yes. If they were openly
4   defiant of this order, sure.
5   Q. Do Delaware state troopers make it a habit of
6   defying lawful judicial orders?
7   A. Not that I'm aware of.
8   Q. Should troopers ever disobey a lawful judicial
9   order made by a federal judge?
10  A. I think there are -- without knowing the
11  specific nature of the order, the application of the law
12  on the street sometimes takes a discretionary mode.
13  Sometimes you have to act in what's best in that
14  situation. You'd have to investigate it and evaluate
15  what were the actions and why did they do them and so
16  forth.
17  Q. So are you saying that sometimes the Delaware
18  state trooper should disobey orders made by federal
19  judges?
20  A. I'm saying that there are times when an officer
21  faced with a situation on the street in trying to make a
22  determination to act or not act or to do something or not
23  do something, that they have to have that area of
24  discretion and that you would evaluate that afterwards.

| Price, et al.<br>Thomas F. MacLeish | v.<br>C.A. # 04-1207 | Chaffinch, et al.<br>July 19, 2007 |

Page 30
1  That's what our system is built upon, why did you do what
2  you did and why do people violate the law all the time
3  and why did they do it. If it's a stipulated order from
4  the judge, you would think they would be in full
5  compliance of it, and sometimes things happen and they
6  don't. You take that into consideration.
7     Q.  Are you in favor or against the general concept
8  of trial by jury in America?
9     A.  I'm in favor of it.
10    Q.  Do you think that juries are good for American
11 democracy?
12    A.  Yes, I do.
13    Q.  Do you think that juries are part of the beauty
14 of our American system of government?
15       MR. ELLIS: I object to the form of the
16 question.
17    A.  Yes. Do I always agree with their findings?
18 No. But that's our system.
19    Q.  Do you think that juries like having their time
20 wasted?
21    A.  No, they don't.
22    Q.  To change gears a little bit, I believe I
23 previously showed you an exhibit dealing with some of the
24 media coverage of Sergeant Foraker's jury verdict and

Page 31
1  subsequent settlement. Do you recall that exhibit?
2     A.  Yes, sir, I do.
3     Q.  Were you happy that Sergeant Foraker had sued
4  Colonel Chaffinch and the Delaware State Police?
5     A.  No, I wasn't happy.
6     Q.  Do you like it when troopers sue the Delaware
7  State Police?
8     A.  Typically, no.
9     Q.  How does it make you feel when troopers sue the
10 Delaware State Police?
11    A.  The publicity that takes place typically that
12 surrounds a suit around the division is negative in
13 nature, and I'd like to see the problems resolved through
14 the division versus going outside the division first.
15    Q.  So do you like it when a trooper goes outside
16 the division and files a lawsuit?
17    A.  It's their right to do that. Do I personally
18 like it if we haven't had a chance to address it inside?
19 No, I don't, but I understand they have a right to do
20 that.
21    Q.  For example, Sergeant Foraker went outside the
22 division in April of 2002 and filed a federal lawsuit,
23 didn't he?
24    A.  Yes, he did.

Page 32
1     Q.  Are you telling me that you weren't happy that
2  he had done that?
3     A.  He has a right to do it. Was I happy about it?
4  Typically, no, I wouldn't be happy about that.
5     Q.  What were your personal feelings about the fact
6  that Sergeant Foraker had filed a lawsuit against
7  Colonel Chaffinch?
8     A.  Personally, he had the right to do so, but did I
9  feel that he was wronged at that time? No, I did not.
10 Not with the information that I had in his transfer that
11 he was -- to that point people are transferred all the
12 time. Chris was transferred. It was like he was a good
13 trooper. He worked for -- I worked with him, and I think
14 he worked for me back at Troop 3 many years ago. He was
15 a good officer. He was going to land on his feet and do
16 well. That's pretty much the way I felt personally. I
17 felt that life would go on, he would be all right,
18 because of his work ethic.
19    Q.  Isn't it true that you never liked
20 Sergeant Foraker?
21    A.  That couldn't be further from the truth.
22    Q.  Isn't it true you don't like him now?
23    A.  That's not true, either.
24    Q.  Isn't it true you bear ill will towards him?

Page 33
1     A.  No.
2     Q.  Isn't it true you were angry at him?
3     A.  No.
4     Q.  Isn't it true you bear animosity towards him?
5     A.  No.
6     Q.  But you don't like the fact that he filed a
7  lawsuit against Colonel Chaffinch?
8        MR. ELLIS: Objection. Asked and answered.
9        MR. NEUBERGER: You can answer.
10    A.  Again, I felt that there were other options
11 available.
12    Q.  Are you drawing a distinction between
13 Sergeant Foraker as a person and then his actual action
14 in going outside the division and filing a lawsuit?
15       MR. ELLIS: I object to the form of the
16 question.
17    A.  Could you clarify that for me? What exactly are
18 you referring to?
19    Q.  I believe you just indicated to me that you
20 don't bear any ill will towards Chris as a person.
21    A.  That's correct.
22    Q.  I believe you also indicated that you don't like
23 it when troopers don't raise issues internally and
24 instead go outside the division and file lawsuits.

A - 333     9 (Pages 30 to 33)

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | C.A. # 04-1207 | July 19, 2007 |

Page 34

1  A.  Yes. You asked me how I personally felt.
2  Q.  So would it be fair to say that you didn't like
3  his lawsuit but you like him?
4  A.  You don't let personal feelings influence
5  professional decisions. My opinion of Sergeant Foraker
6  goes back many, many years. It was formed in the '80s as
7  a young trooper and through the years working together.
8  He has a different -- he's shown a different tack to
9  resolving issues that affect him and the division that I
10 don't necessarily agree with. But at the same time I
11 still respect the fact that he's a qualified firearms
12 instructor.
13 Q.  You weren't happy with the fact that he had gone
14 outside the division and filed a lawsuit?
15         MR. ELLIS:  Objection. You asked it two or
16 three times now.
17 A.  He has a right to do that. Was I happy about
18 it? No, I was not.
19 Q.  Did it irritate you?
20 A.  I would say I was mildly irritated.
21 Q.  Did it piss you off?
22 A.  I wasn't happy with it, Mr. Neuberger.
23 Q.  Are you saying yes, it did piss you off?
24 A.  No. I said I'm not happy with it.

Page 35

1  Q.  I believe you testified earlier that you didn't
2  like the fact that negative publicity resulted towards
3  the Delaware State Police as a result of the lawsuit and
4  the jury verdict and the subsequent settlement.
5  A.  Yes. I stated that the negative publicity that
6  comes from lawsuits, I'm not happy about that on the
7  front pages of the paper. It's also a fact of life
8  that's going to happen.
9  Q.  Is it true that you wanted the Delaware State
10 Police to get off of the front pages of the paper?
11 A.  Yes. For that type of stuff, I'd like to see
12 the positive stuff out there, but for the negative stuff,
13 yes, I would. I would like to do what's right to get off
14 the front pages of the paper.
15 Q.  Do lawsuits against the Delaware State Police
16 typically result in stories in the local media?
17 A.  Yes, they do.
18 Q.  You worked closely with Colonel Chaffinch; isn't
19 that right?
20 A.  Yes.
21 Q.  Does Colonel Chaffinch like Sergeant Foraker?
22        MR. ELLIS:  I object to the form of the
23 question.
24        MR. NEUBERGER:  I'll rephrase.

Page 36

1  BY MR. NEUBERGER:
2  Q.  Using your sensory perceptions and all the time
3  you have spent with Colonel Chaffinch, you have been
4  around Colonel Chaffinch and you have worked closely with
5  Colonel Chaffinch. Based on your observations of him,
6  using all five of your senses, does Colonel Chaffinch
7  like Sergeant Foraker?
8         MR. ELLIS:  I object to the form of the
9  question.
10 A.  I don't believe he's going to invite him for
11 dinner. Colonel Chaffinch would have to answer whether
12 he likes him or not, but my perception is he's not real
13 fond of him.
14 Q.  Do you think Colonel Chaffinch was happy with
15 the fact that Sergeant Foraker had filed a lawsuit
16 against him?
17        MR. ELLIS:  Do we have a time period on
18 that?
19        MR. NEUBERGER:  The April 2002 lawsuit.
20        MR. ELLIS:  The question was was he happy
21 in April 2000 --
22        MR. NEUBERGER:  Was he happy about the fact
23 that the April 2002 lawsuit was filed.
24        MR. ELLIS:  So the response is from

Page 37

1  April 2002 to the present?
2         MR. NEUBERGER:  Sure.
3         MR. ELLIS:  The way you asked it, it
4  sounded like you meant 2002.
5  A.  I can only say in April 2002 I don't believe
6  anyone on staff was happy that a lawsuit had been filed.
7  The concern had just been made in February of '02. But
8  to answer the question, no, I don't believe he was happy
9  about it.
10 Q.  Do you know if Colonel Chaffinch was happy about
11 the June 2003 jury verdict against him?
12        MR. ELLIS:  I object to the form of the
13 question.
14 A.  I don't believe he was happy about that jury
15 verdict, no.
16 Q.  Did you think it made him look bad?
17        MR. ELLIS:  I object to the form of the
18 question.
19 A.  Sure. It made him look bad, yeah.
20 Q.  Did he ever talk to you about his feelings about
21 Sergeant Foraker or Sergeant Foraker's lawsuit?
22 A.  He never talked to me specifically about his
23 feelings. He wasn't -- I can only give you from a
24 general sense. Specific conversations I don't recall.

A - 334

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

| Price, et al. | | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | v. C.A. # 04-1207 | July 19, 2007 |

Page 38

1  Q. How about in that general sense?
2  A. In a general sense, he was not happy with the
3  jury verdict. He wasn't happy with the actions, the
4  lawsuit itself, in the fact that we lost the lawsuit. I
5  don't think any superintendent would be happy with losing
6  a lawsuit.
7  Q. Prior to the June of 2003 jury verdict against
8  Colonel Chaffinch, are you aware of any time in the last
9  20 years that a jury has ruled against the Delaware State
10 Police in that fashion?
11 A. Specifically against the superintendent, no. I
12 know the division has been in court before for various
13 other things, but I couldn't tell you over the course of
14 20 years what we lost or didn't. I don't know if we were
15 100 percent wins in all that, but I know a superintendent
16 had never been -- never went to trial and lost at trial.
17 I don't believe.
18 Q. So to the best of your knowledge, was that
19 unprecedented?
20 A. Yes, it was.
21 Q. You're currently the highest-ranking officer in
22 the State Police, right?
23 A. Yes, I am.
24 Q. Does the buck stop with you now that you're

Page 39

1  colonel?
2  A. Yes, it does.
3  Q. For better or worse?
4  A. For richer, for poorer. Yes. I'm sorry. Yes.
5  Q. Are you familiar with the Firearms Training
6  Unit?
7  A. Yes, I am.
8  Q. What is it?
9  A. It's our unit that trains all our recruits,
10 municipal officers, does the requalification, looks at
11 weapons that we carry, ammunition that we carry, makes
12 recommendations for -- that they currently work under the
13 training academy. They're a subdivision of our training
14 academy. Currently they're working under Captain
15 Harry Downes, who's the director of training.
16 Q. Is it also a physical location in Smyrna
17 somewhere?
18 A. That's where our site is located, yes.
19 Q. Historically, based on what you know from your
20 long career as a Delaware state trooper, has the FTU been
21 a troubled facility?
22      MR. ELLIS: I object to the form of the
23 question.
24 A. If I could ask for clarification, Mr. Neuberger.

Page 40

1  In what way? Employee-wise, facility-wise, or what
2  specifically are you referring to?
3  Q. How about facility-wise?
4  A. Facility-wise, yes, it has been.
5  Q. Has the FTU had a very long history of problems
6  since its very inception, to the best of your knowledge?
7  A. To the best of my knowledge, yes.
8  Q. Can you share any details with me? What are
9  some of the specifics of that long history of troubles
10 that you're aware of?
11 A. Funding construction to begin with, budgetary
12 restraints, air-handling problems, lead exposure problems
13 to our employees. I think that would about cover it.
14 Q. Did there come a time in the last several years
15 when the FTU was shut down?
16 A. Yes. It's been shut down on a few different
17 occasions.
18 Q. When was the most recent time?
19 A. The most recent time was in -- effectively, the
20 date was March, but we, for all intents and purposes, had
21 it shut down by the first week in February.
22 Q. What year?
23 A. I'm sorry. Of '04.
24 Q. How did that come about, the FTU being shut

Page 41

1  down?
2  A. It was brought to the training academy's
3  attention; therefore, it came to my attention that there
4  was projectiles we were shooting that were producing a
5  dust that was creating health problems with the recruits
6  that were in training and the firearms training staff.
7  And it became at that point what we thought was -- prior
8  to that point it was always referred to as ceramic
9  ammunition, frangible ammunition that everybody thought
10 was ceramic, and ceramic to many, I think it was some
11 type of clay-type product. But then it came to our
12 attention that this frangible ammunition was made up of
13 copper, tin, and zinc, I believe. It was creating mucous
14 problems to the -- for the recruits and a copper taste in
15 their mouth and things of that nature.
16 Q. How did you first learn about it?
17 A. Through Sergeant Foraker who informed
18 Captain Warren who then informed me.
19 Q. You're saying that Sergeant Foraker through the
20 chain of command brought these things to your attention?
21 A. Yes. Through the chain of command he did.
22 Q. I think you just talked a little bit about your
23 involvement in the process with the chain of command.
24 Are you above the academy?

A - 335    11 (Pages 38 to 41)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Case 1:04-cv-01207-GMS    Document 75-15    Filed 02/02/2006    Page 9 of 14

Price, et al.                          v.                      Chaffinch, et al.
Thomas F. MacLeish        C.A. # 04-1207                       July 19, 2007

Page 42

1  A. Yes. At that point in time I was.
2  Q. What was the chain of command below you in
3  reference to the FTU?
4  A. It would have been the captain, director of the
5  academy, and then down through Sergeant Foraker.
6  Q. Was there a major between you?
7  A. There is a major who was my administrative
8  officer.
9  Q. Who was that at the time?
10 A. Major Paul Eckrich.
11 Q. Who was the captain at the time?
12 A. At that point in time it was Captain
13 Greg Warren.
14 Q. Who were the FTU firearms instructors at the
15 time?
16 A. Sergeant Foraker, Corporal Price,
17 Corporal Warren, Corporal Jim Warwick. I believe that's
18 it.
19 Q. Who made the decision to shut down the FTU?
20 A. I asked that question when it was brought to my
21 attention on January 29th. I received a call from
22 Captain Warren who indicated they were having severe
23 problems at the range. That evening -- and he was
24 talking about his firearms instructors, about a dust

Page 43

1  cloud and breathing problems, and that evening I asked
2  him: "Do we need to shut this down?" He told me no. I
3  said, "Blood work and physicals for the employees."
4       He says, "We will get the blood work done
5  now."
6       I said, "Let's meet tomorrow morning."
7       And we met Friday, the 30th. And it was
8  Major Eckrich, Captain Warren, Lieutenant Davis, who was
9  the deputy director of the academy. We met in our
10 conference room.
11 Q. What was said at that meeting?
12 A. We discussed the conditions at the range. Once
13 again, it was reiterated do we need to shut it down.
14 "No, we can finish this shoot." The municipal class was
15 coming up. I believe that was their final week -- the
16 upcoming week was going to be their final week of
17 firearms training, and they were shooting shotguns, I
18 believe. So it was leaded. It wasn't the frangible
19 ammunition. And we began making plans to finish that out
20 so that they could do so safely and then meet and discuss
21 what we were going to do to address the problems as they
22 were presented at the range.
23 Q. When was the first time you learned about these
24 problems at the range?

Page 44

1  MR. ELLIS: Object. Which problems?
2  MR. NEUBERGER: All the problems he just
3  discussed.
4  A. There was an e-mail December 19th from
5  Sergeant Foraker that discussed a problem with the bullet
6  recovery system. I was on vacation at that time. And I
7  responded to that on I believe it was when I returned
8  January the 6th to Captain Warren to address the issues
9  that Sergeant Foraker had brought to his attention and to
10 take appropriate action. And that's on January the 6th.
11 That's what my response was. And Captain Warren then
12 dealt with the Firearms Training Unit to address whatever
13 problems they had.
14 Q. Did he take appropriate action?
15 A. I know he worked with them in order to try to
16 resolve the issues. They began working -- they were
17 working with Facilities Management in order to address
18 some of the issues they were having, because they're the
19 keepers of the facility, so to speak, and they worked
20 with them.
21      I relied on Captain Warren to address the
22 issues as they were -- and brief conversations between
23 January the 6th and the 29th, but the 29th it was like
24 that was the culmination of all the problems we were

Page 45

1  having there at the range, that it was of such magnitude
2  that something needed to be done and it needed to be done
3  immediately. That's when I asked: "Do we shut the range
4  down?"
5       And I was told: "No, we don't need to. We
6  can finish out the shoot."
7  Q. Who said that?
8  A. Captain Warren.
9  Q. In your opinion, is there any fault involved for
10 the problems and conditions which resulted in the FTU
11 being shut down?
12 A. My approach to this from the very beginning was
13 not to assess blame or fault. It was to correct the
14 problems that we were having at the range. Initially,
15 the range had been shut down on two prior occasions for a
16 massive cleanup. That's the direction I was going. In
17 working with Facilities Management, have that done once
18 the range was shut down.
19      The area we were looking at in order to
20 move into the future of the range was to identify the
21 potential problem that we were having. Was it the
22 ammunition? Was the bullet trap not capable of handling
23 that? Was it the air handling system? There was a
24 multitude of areas there that we needed to examine.

A - 336

**Page 46**

1    Initially, it was the health of our people.
2  What was the status of their health? What was the effect
3  of this ammunition that we were shooting the copper,
4  zinc, and tin? I think I said it earlier. I think it
5  was copper, tin, and zinc were the three ingredients.
6  What effect did that have on them? What exactly were
7  they being exposed to? We didn't know. We began making
8  plans to have the air -- to do a testing to find out
9  exactly what was in the facility and we ramped up
10 meetings with Facilities Management in order to start
11 addressing some of the problems and the issues.
12    Q.  Are you saying that the problems at the FTU were
13 not anyone's fault?
14    A.  Our equipment in that facility was more than six
15 years old at that point.
16    Q.  I'm sorry. The what?
17    A.  Our equipment. The bullet trap was more than
18 six years old. There had always been questions about the
19 air-handling system in the facility. I wasn't intimately
20 knowledgeable at that point in time about exactly what
21 they were. I know far more today than I knew in January
22 of '04 about the -- that air-handling system and what
23 recommended industry standards there are and so forth,
24 what is an acceptable lead level, what isn't an

**Page 47**

1  acceptable lead level, things of that nature. I didn't
2  have knowledge of that prior to January '04, but in the
3  subsequent weeks and months that followed, I began to get
4  more knowledgeable about those type of things.
5     Q.  Did Chris Foraker destroy the FTU?
6        MR. ELLIS:  Objection to the form of the
7  question.
8     A.  I haven't done an investigation to indicate
9  that.
10    Q.  Did Master Corporal Kurt Price destroy the FTU?
11       MR. ELLIS:  Objection to the form of the
12 question. There's no evidence it's been destroyed.
13 That's the basis for my objection. At least if he's
14 talking about the physical facility.
15       MR. NEUBERGER:  You can answer.
16    A.  There's been no investigation that I have
17 conducted to indicate that.
18    Q.  Did Master Corporal Wayne Warren destroy the
19 FTU?
20       MR. ELLIS:  Same objection.
21    A.  There's been no indication, no investigation
22 that indicates that to me.
23    Q.  If they had destroyed the FTU, would there have
24 been an investigation into their conduct?

**Page 48**

1        MR. ELLIS:  Objection. Hypothetical.
2     A.  The division didn't order an investigation. The
3  division's stance at that point in time was to correct
4  the problems that we were having and get the facility
5  cleaned, operating appropriately and safely, and get it
6  reopened. That's the division's stance in January of
7  '04.
8     Q.  I believe Joe Aviola may have testified about a
9  month ago one time he got in a minor fender-bender and he
10 was disciplined for getting a dent in the bumper of the
11 car. Are troopers disciplined for getting into minor
12 fender-benders or backing into telephone poles?
13    A.  Yes, they are.
14    Q.  You're indicating that no discipline has been
15 handed down to Sergeant Foraker, Master Corporal Warren
16 or Price for their actions or inactions at the FTU?
17    A.  That's correct.
18    Q.  If you had to assign blame for the conditions at
19 the FTU, where would you assign blame?
20       MR. ELLIS:  Objection.
21    A.  I would go to the source. I would go to the
22 NCOIC in the unit and say what happened, what went wrong.
23    Q.  Are you telling me that you're not blaming the
24 NCOIC of the unit, Sergeant Christopher Foraker?

**Page 49**

1     A.  In January of '04 my thought was to just get
2  that facility up and running, and I thought it was a
3  culmination of factors. The facility was six years old,
4  let's get it right, let's get it back open again.
5     Q.  Let's expand the time period. Let's go through
6  the base of knowledge as of the end of April of 2004.
7  We're expanding from what you knew from January of 2004,
8  which I believe you just indicated you had been talking
9  about, to what you knew as of April 2004. Okay?
10    A.  Yes.
11    Q.  That's our baseline. That's where my questions
12 are going to come from. Do you understand that?
13    A.  Yes.
14    Q.  Based on what you knew as of April 2004, did you
15 think that Sergeant Christopher D. Foraker was the cause
16 of the conditions at the FTU?
17    A.  I had discovered at that point in time that
18 maintenance that had been done before was not -- had not
19 been conducted. It seemed to me the magnitude of the
20 problems we had up there were greater than what any one
21 individual could have been responsible for, meaning the
22 breakdown in the bullet trap system, the dust that was
23 created from the frangible ammunition, contamination
24 behind the range and on the range itself; that in a

Case 1:04-cv-01207-GMS   Document 75-15   Filed 02/02/2006   Page 11 of 14

Price, et al. v. Chaffinch, et al.
Thomas F. MacLeish   C.A. # 04-1207   July 19, 2007

Page 50

1  period from December the 1st to the end of January, that
2  one person could have been responsible for all that?
3  Just didn't seem -- were there certain things that
4  weren't done? Yes, they weren't done. I found out
5  through the course of January to April. Once again,
6  during that time period the main thought in the process
7  was to work with Facilities Management. It was not to
8  assign blame. It was to fix the facility.
9    Q.  Blame has been assigned subsequently, hasn't it?
10   A.  The division has taken no action.
11   Q.  Isn't it your position in this case that
12 Sergeant Foraker, Master Corporal Wayne Warren, and
13 Kurt Price destroyed the FTU?
14       MR. ELLIS: I object to the form of the
15 question.
16       MR. NEUBERGER: You can answer.
17   A.  That is not my position. My position was to fix
18 the range and get it open.
19   Q.  So are you telling me that's not a position or
20 defense you're taking in this case --
21       MR. ELLIS: I object to the form of the
22 question.
23 BY MR. NEUBERGER:
24   Q.  -- that those troopers destroyed the FTU?

Page 51

1        MR. ELLIS: I object to the form of the
2  question.
3    A.  My position is from the beginning was to fix the
4  problems at the range to get it open. It was not one to
5  assign blame. There has been an auditor's report that
6  was ordered by the Governor that indicated a lack of
7  maintenance being conducted resulted in the failure of
8  the range.
9        My position as the lieutenant colonel and
10 now as superintendent is and was to get the range fixed,
11 get it fixed right, get it done safely, and reopen the
12 doors.
13   Q.  Do you believe that Sergeant Foraker, corporals
14 Price and Warren put recruits and other personnel in
15 harm's way in December of 2003 through the closing of the
16 range?
17   A.  Chris was the NCOIC of the facility, and if he
18 felt it was unsafe for them to be there, he would shut
19 the range done. He had that authority to do so as the
20 NCOIC.
21   Q.  You're indicating that Sergeant Foraker had the
22 authority to shut down the FTU?
23   A.  If he needed to. If he felt it was unsafe for
24 his employees and those recruits that were shooting, then

Page 52

1  he had the authority to do so.
2    Q.  Is it your position that Sergeant Foraker,
3  corporals Price and Warren did not care about the safety
4  of their students?
5        MR. ELLIS: I object to the form of the
6  question.
7    A.  Would you please repeat the question.
8    Q.  Is it your position that Sergeant Foraker,
9  Corporal Price, and Corporal Warren did not care about
10 the safety of the students they trained at the FTU?
11   A.  No, I don't feel that way.
12   Q.  Is it your position that Sergeant Foraker,
13 Corporal Price, and Corporal Warren were incompetent?
14   A.  In the training of the firearms? No.
15   Q.  Is it your position that they were incompetent
16 in their management of the FTU?
17       MR. ELLIS: Could we have a time frame on
18 that?
19       MR. NEUBERGER: December 2003 through the
20 closing of the FTU.
21   A.  Their actions and subsequent knowledge that no
22 maintenance was being conducted comes into question, but,
23 once again, I questioned the equipment that we had in
24 there at that point in time that was six years old and

Page 53

1  broken down and that things weren't functioning properly.
2  I haven't done a full in-depth analysis of -- I guess,
3  Mr. Neuberger, that I never looked at this to assign
4  blame for what occurred there. It was to fix what went
5  wrong and move on. That was the position that I adopted
6  from the beginning and it still is today.
7    Q.  Did Colonel Chaffinch look at it to assign
8  blame?
9        MR. ELLIS: I object to the form of the
10 question.
11   A.  We never conducted an -- there was never an
12 Internal Affairs investigation conducted. The closest
13 that that came to was when I told Captain Warren that
14 Sergeant Foraker had submitted an e-mail alluding to
15 sabotage of equipment, and I asked Captain Warren to look
16 into that and make a determination if we had somebody
17 sabotaging the equipment, was it sabotage to me as a
18 direct -- taking direct action in order to create a
19 problem, and I think that's the closest that --
20 if Captain Warren had come back and said yes, we have got
21 an issue of that manner, we need to conduct an
22 investigation, I would have done so. But everything
23 subsequently to that, that's not the direction I was
24 going or leading.

A - 338

Price, et al.
Thomas F. MacLeish
v.
C.A. # 04-1207
Chaffinch, et al.
July 19, 2007

Page 54

1    Colonel Chaffinch did not play a role in
2 the decision-making process of how this was going to be
3 handled. He never told me to launch a criminal
4 investigation -- or an Internal Affairs investigation of
5 what was going on. He let me handle it.
6    Q. That's because you were the operational officer
7 for the Delaware State Police at the time?
8    A. That's correct.
9    Q. You were lieutenant colonel at the time, right?
10    A. Yes.
11    Q. So as operational officer for the DSP, you're
12 telling me that the personnel at the FTU did not do
13 anything wrong at the FTU?
14        MR. ELLIS: I object to the form of the
15 question.
16    A. I had worked through the chain of command,
17 directed Captain Warren to look into the problems that
18 were associated with the range and what were those
19 problems and what were we going to do to correct them.
20 He submitted a report that did not indicate any behavior
21 by Sergeant Foraker or anyone on his staff that they had
22 done anything wrong. He indicated there was an issue
23 with the air system, the fact that the bullet recovery
24 system had failed, and that is the direction I went in.

Page 55

1 It was to fix what the problems were, not to assign
2 blame.
3        If he would have indicated that there were
4 issues there with the personnel that worked for him and
5 recommended action, we would have done so.
6    Q. Is the State Police a paramilitary organization?
7    A. Yes, it is.
8    Q. So you have to rely on, I guess, the reports of
9 those who are below you in the chain of command?
10    A. Yes, you do.
11    Q. Are you indicating that you relied on
12 Captain Warren's report that there was no wrongdoing at
13 the FTU?
14        MR. ELLIS: I object to the form of the
15 question.
16    A. I relied on Captain Warren to do his job and
17 report -- and to take appropriate action where he felt
18 was necessary, yes.
19    Q. As of today, July of 2005, I'm not sure of the
20 exact date, do you believe that Captain Warren did his
21 job?
22    A. I believe he did not fully answer all the
23 questions that were presented in 2005. What I asked for
24 as far as what occurred and what went on, he went through

Page 56

1 an historical perspective of what occurred at that range.
2 He submitted a report to me in late January that I had
3 asked for on the 6th of January with what issues
4 Sergeant Foraker had brought to our attention, and that
5 report was a large report on history and what happened
6 here -- there was no assessment of blame in the body of
7 that report.
8    Q. Was Captain Warren ever disciplined?
9    A. No, he was not.
10    Q. Was he ever disciplined for not following your
11 order, as I believe you indicated?
12    A. No, he was not.
13    Q. Just to be clear, because we have been all over
14 the place here -- would you agree with me?
15    A. Yes.
16    Q. -- it's your position that Sergeant Foraker,
17 Corporal Price, and Corporal Warren were not responsible
18 for the problems that caused the shutdown of the FTU?
19        MR. ELLIS: I object to the form of the
20 question.
21        MR. NEUBERGER: You can answer.
22    A. It is my -- I think their lack of maintenance
23 resulted in some of the conditions that occurred at that
24 range, resulted in some of the problems that we saw, but

Page 57

1 I also feel that there was equipment failures in there
2 that they did not have control of. So what came first,
3 the chicken or the egg? To specifically assign blame, I
4 didn't go into this -- into this from the very beginning
5 looking to assign blame to anyone. I looked to fixing
6 the problem.
7    Q. Are you telling me that they had any culpability
8 at all?
9    A. Their culpability would have been their lack of
10 conducting general maintenance, but I believe there's the
11 contributing factors of the age of the equipment and the
12 air-handling system and those type of things were
13 equally -- equally contributory to the shutdown of the
14 range.
15    Q. If you had to assign a percentage to their
16 culpability, what would that percentage be?
17        MR. ELLIS: Objection. He just did.
18    A. I think I used the term --
19        MR. NEUBERGER: I'm sorry. What's your
20 objection?
21        MR. ELLIS: He just did. He said equally
22 culpable. That's 50/50.
23        MR. NEUBERGER: He named more than two
24 things.

A - 339

15 (Pages 54 to 57)

Price, et al.                                             v.                                    Chaffinch, et al.
Thomas F. MacLeish                         C.A. # 04-1207                                       July 19, 2007

Page 58

1    MR. ELLIS: He said that their
2  culpability -- I don't want to review his testimony. I
3  don't care. I'm not instructing him not to answer.
4  BY MR. NEUBERGER:
5    Q. What percentage of culpability would you assign
6  to them?
7    A. I use the term "equally culpable" on both sides,
8  equipment and otherwise. 50/50.
9    Q. So despite this 50 percent culpability, the men
10 were never brought up on charges?
11   A. No, they were not. To clarify that,
12 Mr. Neuberger, the intent was never to assign blame for
13 what occurred there on behalf of this division. It was
14 to fix the problems that we had.
15   Q. Is it your position that you never assigned
16 blame to the men until today?
17   A. That's correct.
18   Q. Is it your position that Colonel Chaffinch never
19 assigned blame until today?
20   A. Colonel Chaffinch, by his statement in one of
21 the papers, indicated in a broad sense that -- I believe
22 his term was he who lives in glass houses shouldn't throw
23 stones, or something of that nature. I believe that's
24 what his statement was.

Page 59

1  I read that in the paper. I was not there
2  when he made that statement. Major Eckrich was. When I
3  was with him at the range with reporters on another
4  occasion and when asked who's responsible for this, I
5  told them I was.
6    Q. So would you disagree with Colonel Chaffinch's
7  statement that Chris Foraker was responsible for the
8  problems at the range?
9    A. By what was said, yes.
10   Q. I'm sorry?
11   A. What was reported in the paper, I would say yes.
12 That's who the colonel felt was responsible.
13   Q. Let's take a step back from just what was
14 reported in the paper to the overall scenario on
15 everything that had happened at the FTU. Okay? We're
16 stepping back just from what was in the paper to more of
17 the big picture. Do you understand that?
18   A. Yes.
19   Q. If Colonel Chaffinch said Sergeant Foraker and
20 the men under his command were responsible for the
21 conditions of the range, would you disagree with that
22 statement?
23     MR. ELLIS: When you say "big picture,"
24 what do you mean?

Page 60

1  BY MR. NEUBERGER:
2    Q. Do you understand what "big picture" means?
3    A. Are you talking about the very end? At that
4  point in time? Remember, if we carried this through
5  from opinions and things that were given early on in this
6  process after it all went public to what people's
7  opinions are of who's responsible for the shutdown,
8  Colonel Chaffinch felt that Sergeant Foraker and the
9  staff were responsible for the shutdown of the range.
10   Q. Let's say how about from as of the end of
11 April 2004. Okay?
12   A. Uh-huh.
13   Q. Do you disagree with Colonel Chaffinch's
14 statement that Sergeant Foraker and the men under his
15 command were responsible for the problems at the FTU?
16     MR. ELLIS: I object to the form of the
17 question.
18   A. Yes.
19   Q. How about if Colonel Chaffinch made that
20 statement today, would you agree or disagree with that
21 statement?
22   A. As I previously stated, I think it was a
23 culmination of things that led to the shutdown of the
24 range, problems with the range.

Page 61

1    Q. I think you indicated that men were responsible
2  for the upkeep of the range. Is that correct?
3    A. I said maintenance and upkeep.
4    Q. Maintenance and upkeep. Which conditions at the
5  range were caused by lack of maintenance?
6    A. The filters for the bullet trap system weren't
7  being taken care of, general cleanup was not being done
8  inside the facility that were typically done by the
9  firearms training staff.
10   Q. What do you mean by "general cleanup"?
11   A. Sweeping the floor, making sure the facility was
12 maintained in a clean and proper manner.
13   Q. And the only specific you have there is sweeping
14 the floor?
15   A. Well, the floor accumulates a great deal of
16 debris from shooting, and it didn't appear as though it
17 was being taken care of as it had been in the past.
18   Q. Do you know if the men had the training
19 necessary to clean the range?
20   A. Once again, I have learned many times you
21 shouldn't assume things, but the facility had been open
22 for approximately six years when this occurred and it was
23 always maintained in a clean state and taken care of, and
24 we had people there that had been there since the

A - 340

16 (Pages 58 to 61)

| Price, et al. | | Chaffinch, et al. |
|---|---|---|
| Thomas F. MacLeish | v.<br>C.A. # 04-1207 | July 19, 2007 |

Page 62

1  beginning, and my assumption was that they had been
2  trained in how to properly clean the facility, yes.
3     Q.  You said you're assuming that they had been
4  trained.
5     A.  Correct.
6     Q.  What if they had not actually been trained?
7     A.  Well, they had received training in firearms and
8  things in the past, and at that point in time, as I said,
9  the facility had been open -- I don't recall specifically
10 receiving training on how to sweep a floor.  When I was
11 14 I learned to be a janitor.  But there were brooms
12 there, there was a man there.  As I said, these people
13 had been at the range for quite sometime.  But am I
14 knowledgeable that they had specific training?  No, I am
15 not.
16    Q.  Are you saying it's like a common-sense thing
17 that everybody knows how to clean up a firing range?
18    A.  That prior to 2004 people apparently did know
19 how to clean the range.
20    Q.  Do you know if there were standard operating
21 procedures at the time for how to operate and clean the
22 firing range?
23    A.  I found out subsequent to that no, there is not.
24    Q.  Are there standard operating procedures for just

Page 63

1  about everything in the Delaware State Police?
2     A.  Yes, but we don't have standard operating
3  procedures for cleaning a troop.
4     Q.  You served as a troop commander at some point?
5     A.  Yes, I have.
6     Q.  Let's say a patrol car had a problem with its
7  engine.  Was the trooper who was driving the patrol car
8  authorized to fix it?
9     A.  No, he was not.
10    Q.  What did he have to do?
11    A.  He'd write it up and report it to a mechanic who
12 would fix it.
13    Q.  Would you agree that the FTU is a multi-million
14 dollar firearms facility?
15    A.  Yes.
16    Q.  Would you agree that it is a specialized
17 facility?
18    A.  Yes.
19    Q.  Do you agree that a lot of highly technical
20 equipment is located in that facility and is essential
21 for training?
22        MR. ELLIS:  I object to the form of the
23 question.
24    A.  Yes.

Page 64

1     Q.  Is it your position that the men had a
2  responsibility to clean and fix this highly technical
3  equipment?
4     A.  The air-handling system was handled by
5  Administrative Services who had people trained to do so.
6  So they would report it -- any type of malfunction or
7  problem that they had to them.
8        The bullet trap system was a system much
9  like the engine on a car.  I'm not saying it's exactly
10 similar, but there are certain things that you're
11 responsible for taking care of in a general sense.  You
12 check the oil, you make sure that it's running properly,
13 if you have problems, you report them.
14       That's the general sense that I have of the
15 range.
16    Q.  Do you know if the men were given respirators to
17 use while cleaning the range?
18    A.  They were not.
19    Q.  Do you know whether they were given Tyvec suits
20 to wear when cleaning the range?
21    A.  They were not.
22    Q.  Do you know if they were given moon suits to
23 wear when cleaning the range?
24    A.  They were not.

Page 65

1     Q.  Were they given little booties to wear over
2  their shoes while they were cleaning the range?
3     A.  They were not.  Was I aware they needed any of
4  those things?  No, I was not.
5         MR. NEUBERGER:  I'd like to put another
6  document in front of you.  Mark this as MacLeish
7  Deposition Exhibit 3.
8         (MacLeish Deposition Exhibit No. 3 was
9  marked for identification.)
10        (A recess was taken.)
11 BY MR. NEUBERGER:
12    Q.  Colonel, I just put a document in front of you;
13 isn't that right?
14    A.  Yes, you did.
15    Q.  At the top of this document does it say in the
16 darkened section, "Delaware State Police Planning
17 Section"?
18    A.  Yes, it does.
19    Q.  Underneath that does it say "MEMORANDUM"?
20    A.  Yes, it does.
21    Q.  Does this appear to be a memo to Lieutenant
22 Colonel MacLeish?  That would be right?
23    A.  Yes, it is.
24    Q.  Does it say it's from Captain Albert J. Homiak?

A - 341

17 (Pages 62 to 65)