Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

## Page 142

1  BY MR. NEUBERGER:
2  Q.  This is another report prepared by the FTU
3  staff; isn't that right?
4  A.  Yes.
5  Q.  Have you ever seen this report before?
6  A.  May I look it over?
7  Q.  Absolutely.
8  A.  I'm remembering I had asked Sergeant Foraker to
9  prepare a report for me that addressed maintenance
10  responsibilities and so forth, and I believe there's
11  parts of this that are included in that report that he
12  prepared for me, but I'm not recalling seeing this
13  specific report.
14  Q.  In that case you can put the document down.
15       Now, in general, just independent of all
16  these documents, did anyone tell you at any point from
17  December of 2003 through approximately April of 2004 that
18  Sergeant Chris Foraker and corporals Warren and Price
19  were concerned about their working environment at the
20  FTU?
21  A.  I assumed that from the initial documentation
22  that was submitted on December the 19th by
23  Sergeant Foraker, and that's why I addressed it to the
24  captain in charge of the training academy to determine

## Page 143

1  what problems they were having and propose solutions.
2  Q.  Eventually the captain of the training academy
3  prepared some kind of a report, correct?
4  A.  Yes, he did.  But what preceded that report was
5  his phone call to me on the 29th where -- and now looking
6  at the documentation that was submitted from the 23rd and
7  throughout the month, that there were multiple issues
8  there and that it had risen to such a level that we
9  needed to take prompt and immediate action.
10  Q.  Who did you talk to during this same time frame
11  about the problems at the FTU?
12       MR. ELLIS:  Who did who talk to?
13       MR. NEUBERGER:  Who did Colonel MacLeish
14  talk to at the time he was lieutenant colonel.
15  BY MR. NEUBERGER:
16  Q.  Who did you talk to about those problems at the
17  FTU?
18       MR. ELLIS:  Again, we're talking in
19  December of '03 to April '04?
20       MR. NEUBERGER:  That is correct.
21  A.  Major Eckrich, Captain Warren.  Lieutenant Davis
22  was present during some of those.  I stopped and spoke to
23  Sergeant Foraker at the range in mid -- I believe it was
24  mid-January.  I was returning from a meeting up north.  I

## Page 144

1  spoke to -- I briefed the colonel on what was occurring
2  up there.
3  Q.  So you briefed the colonel on the problems that
4  were occurring at the FTU?
5  A.  The initial submission by Sergeant Foraker, I
6  briefed him on the content of that and the direction I
7  had given.  And then toward the end of January when
8  everything was coming in, he was briefed on that.
9  Q.  After January.  So moving forward from January
10  of '04 through the end of April of '04, did you ever talk
11  to Colonel Chaffinch about the problems at the FTU again?
12  A.  Yes, I had conversations with him about it.
13  Q.  What did you talk about during those
14  conversations?
15  A.  Briefing him from that point.  From that point,
16  January 29th, January 30th, we established a series of
17  meetings that took place between the Firearms Training
18  Unit, myself, Major Eckrich, and the academy staff to
19  discuss a course of action, how were we going to fix the
20  problems.  That's what it boiled down to, what we were
21  going to do to address the problems that we had at the
22  range.  The unknown substance that was there, the
23  frangible ammunition, what was going on with that?  What
24  were they being exposed to?  The test was scheduled for

## Page 145

1  the 11th, and, if I'm not mistaken, the 11th was a date
2  the SORT team was -- the Special Operations Response
3  Team -- scheduled to shoot on the range.  So we weren't
4  bringing in anyone else, and it was going to be strictly
5  for their shoot to have this testing material in there to
6  conduct what was in the air when guns were discharged.
7  And that took place on the 11th.
8       There was one test.  There was another test
9  that we scheduled.  But there were meetings that were set
10  up with Facilities Management to try to sit down with
11  them at the table and say what are we going to do -- what
12  are we going to do to fix this problem?  What are our
13  problems?  What do we need to do to fix them?
14       Obviously, one of the first things was it
15  needed to be cleaned.  The facility needed to be taken
16  care of.  It needed to be cleaned.  It had been cleaned
17  on two prior occasions, and it's basically a HAZMAT
18  cleanup because of the lead that's there.  One of them
19  was referenced earlier in one of these documents that you
20  provided me where the range was shut down because of the
21  high levels of lead, and it was cleaned.
22       If you looked at when the range opened in
23  '98 and this is 2004, it appeared to be cleaned on about
24  every two-year basis.  So I was looking at it in that

**A - 361**

Price, et al.                         v.                          Chaffinch, et al.
Thomas F. MacLeish           C.A. # 04-1207           July 19, 2007

Page 146

1  light. Six-year mark it's due to be cleaned again. Step
2  up Facilities Management, let's get this done.
3         We were looking at the air-handling system
4  in the facility because of what was prior history and it
5  constantly was tweaked. That's the term that was used.
6  And that turned out to tweak meant rebalanced. When the
7  officers on the range noticed there was an issue there,
8  they would rebalance the system.
9  Q.  I'm sorry. Who would rebalance the system?
10  A.  The Facilities Management would. Whether they
11  contracted with somebody to do that, I don't know, but
12  that was one of the fixes that would take place on a
13  relatively regular basis to address the air-handling
14  problems within the range.
15         We had got hold of the fire community, got
16  hold of Mr. Preventure who prepared a report on the range
17  itself, and then subsequent to that you find out that he
18  had been involved with the range many years before which
19  had him familiar with the facility, but at the same time
20  you could understand how he could be considered to be
21  prejudice, and I didn't say he was, but I just said the
22  perception could be that he would be -- already have a
23  dog in the fight, so to speak, in giving his opinion on
24  it. Facilities Management saying no, everything is fine.

Page 147

1  You got this guy saying everything is messed up about it.
2         My point there was let's put this together
3  and get somebody independent in here, totally not related
4  to you, Facilities Management, because the guys at the
5  Firearms Training Unit don't trust him and I told
6  Mr. Preventure, who has addressed issues here before, and
7  let's find somebody independent to do an engineering
8  study of our area.
9         That is the ultimate issue, but the bottom
10  line was we had to clean the range first before we even
11  moved forward. We weren't going to shoot on it. For all
12  intents and purposes, that range was shut down as of the
13  first week in February, because the recruits were done,
14  we weren't scheduled for shooting, and I think early
15  before anything ever really developed I told
16  Captain Warren, I believe Sergeant Foraker was present,
17  "We need to have a contingency plan for our fall shoot."
18  He had already -- he had already or very quickly
19  thereafter already contacted the National Guard about
20  using their range -- I said fall. I meant our spring
21  shoot that was going to be upcoming in March and April.
22  Q.  You mentioned Mr. Bill Preventure.
23  A.  Yes.
24  Q.  Is he the gentleman who has designed and built

Page 148

1  approximately 50 firing ranges for the United States
2  Navy?
3  A.  I know he has had a hand in the building of
4  firing ranges, Mr. Neuberger. I can't say whether it was
5  50. I know he had experience in building firing ranges.
6  There's some affiliation with the U.S. Navy, yes.
7  Q.  Do you know if he built any firing ranges for
8  the federal government?
9  A.  I believe he did, yes.
10  Q.  Do you have any idea if he's considered an
11  expert in the field?
12  A.  I think he came with some real good credentials.
13  Q.  To change gears a little bit, was the condition
14  of the Firearms Training Unit a subject of media
15  attention from the time period of say December of 2003
16  onward in the Delaware media?
17  A.  No.
18  Q.  Were there any articles in the Delaware State
19  News or The News Journal from December 2003 say for the
20  next six months about the conditions at the FTU?
21  A.  Yes.
22  Q.  Was there a lot of media attention?
23  A.  Yes.
24  Q.  Do you understand that The News Journal and the

Page 149

1  Delaware State News are the two newspapers of general
2  circulation in the state of Delaware?
3  A.  Yes.
4  Q.  Did you and Colonel Chaffinch ever talk about
5  the media coverage of the conditions at the FTU?
6  A.  Yes, we did.
7  Q.  Did Colonel Chaffinch express to you any
8  feelings of unhappiness with that media coverage?
9  A.  I think it was a mutual discussion of
10  unhappiness with what occurred at the range. The media
11  coverage, the initial outlet of the media coverage that
12  took place. When I first became aware of it, I was at a
13  fellow trooper's father's funeral service when I got a
14  call from another cabinet secretary inquiring as to what
15  was being discussed with the media with regards to the
16  range, and, to my knowledge, I wasn't aware of anybody
17  discussing anything. And subsequent to that I found out
18  that Tom Eldred had inquired -- he had received one of
19  his anonymous tips that there was problems at the range,
20  and he was inquiring as to it being closed. And
21  Lieutenant Aviola forwarded that to Captain Warren to
22  address.
23         I'm getting this call on Friday and that
24  pass-on took place on Wednesday. So there had already

**A - 362**

38 (Pages 146 to 149)

Price, et al.
Thomas F. MacLeish

v.

C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 150

1   been discussion about that. So I was trying to find
2   out -- the cabinet secretary was wondering what was said,
3   what was discussed, what information was given.
4       Q.  What cabinet secretary was it?
5       A.  Secretary Homer.
6       Q.  Did you ever hear that Captain Warren had
7   described the range as, quote, "The absolute epitome of a
8   project from hell since its very inception," close quote?
9       A.  I read that in the paper. The day I tried to
10  find out what was said, there was a telephone
11  conversation on that Friday with Captain Warren. I was
12  in the parking lot of a church off of Route 7 with
13  Major Baylor in the car with me, and the phone was on
14  speakerphone, and I was talking to Captain Warren, asking
15  him about what occurred, and what he kept answering me
16  was "I told the truth. I told the truth." I would ask
17  him what the details of the truth were. He told me he
18  told the truth.
19          I wasn't getting anywhere, and Major Baylor
20  passed me a note that said ask him to write it down what
21  he said. So I asked him to do that. He said he would.
22  I told him I would be returning and I would expect to see
23  it when I got back to headquarters. Subsequent to that
24  the article appeared in the paper.

Page 151

1       Q.  In those meetings that you had with
2   Colonel Chaffinch talking about the media coverage about
3   the FTU, do you remember discussing those a few minutes
4   ago?
5       A.  Yes.
6       Q.  Those meetings took place in the December '03 to
7   April of '04 time frame, correct?
8       A.  No. The media issues took place -- media
9   discussion issues took place on that Friday when I found
10  out what had occurred. I believe it was March, Friday in
11  March when I found out that. I think the article was
12  published that weekend. And our conversations about the
13  media took place at that time.
14      Q.  Did you ever talk about any other media coverage
15  that occurred of the problems at the FTU?
16      A.  During what time frame, sir?
17      Q.  March, April, May, June, July of '04.
18      A.  In March and April there were a lot of
19  discussions that took place about the media coverage.
20      Q.  Is that because there was a lot of media
21  coverage during that time frame?
22      A.  Quite a bit was generated, yes.
23      Q.  During those discussions with Colonel Chaffinch,
24  did he ever say to you or indicate to you that he blamed

Page 152

1   the FTU personnel for the problems at the range?
2       A.  Initial conversations took place over how the
3   information originally was released and our dismay at the
4   actions of Captain Warren in releasing and basically
5   attacking another state agency that we're trying to work
6   with, and that's why we wouldn't allow him to speak
7   anymore. We felt that the division could be represented
8   more professionally by a member of staff by stating that
9   we had issues at the range, we were working with another
10  agency to address them and clean them up.
11          Subsequent to that, when Colonel Chaffinch
12  made the determination of who was responsible for the
13  problems there, I knew he had those feelings, but I
14  didn't share with him the fact -- I didn't feel they
15  should be -- they were not inaccurate, but it's not the
16  professional way to address problems.
17      Q.  Back on those meetings you had with
18  Colonel Chaffinch, and just to frame the time period
19  again, we're going to say December of '03 through July of
20  '04. Anytime in that time frame. Okay?
21      A.  Yes.
22      Q.  Did you have meetings with Colonel Chaffinch
23  during that time frame about the issues at the FTU?
24      A.  Yes.

Page 153

1       Q.  During any of those meetings did
2   Colonel Chaffinch state or indicate to you that he blamed
3   the FTU personnel for the conditions at the FTU?
4       A.  He indicated they bore some responsibility, yes.
5       Q.  Did you disagree with him?
6       A.  I did not disagree with him.
7           MR. ELLIS:  Are you asking whether he
8   disagreed with him in his mind or whether he articulated
9   in a conversation that he disagreed with
10  Colonel Chaffinch?
11      Q.  Did you disagree with him in your mind?
12      A.  Personally, I felt that the Firearms Training
13  Unit, as I have said earlier, had a responsibility in
14  some of the events that occurred at the range. I also
15  felt that the range, the air-handling system and the
16  bullet trap system, were of an age that they -- that we
17  needed to address them, too. I think they were
18  contributing factors to what occurred there. It was true
19  that prior to December the 1st we didn't have these
20  issues at the range. We didn't. It's just a known fact.
21  We had issues with the bullet-handling system and we had
22  issues with the air-handling system on occasion, but they
23  were addressed through Facilities Management. They were
24  rebalanced or whatever and we were operational.

A - 363

39 (Pages 150 to 153)

Price, et al.                          v.                    Chaffinch, et al.
Thomas F. MacLeish                 C.A. # 04-1207                July 19, 2007

Page 154

1    After December the 1st, the cleanliness and
2  the upkeep, it was obvious that it wasn't there
3  subsequent to the fact, that I was last at the range in
4  September. It was in one of these pieces of paper for
5  our fall shoot. It seemed to be clean and kept up. When
6  I stepped in there -- when I stopped in to see the
7  facility in January, mid-January, you could see that
8  there was less -- it was not as clean as it was
9  previously.
10    Q.  So things went downhill when Sergeant Foraker
11  came in?
12    A.  There was a noticeable difference in the way the
13  facility was being maintained.
14    Q.  Was it a positive difference or a negative
15  difference?
16    A.  In the cleanliness, it was a negative
17  difference.
18    Q.  Did there come a time when you heard that the
19  Governor ordered an investigation of the FTU by the State
20  Auditor's Office?
21    A.  Yes.
22    Q.  How did you learn about that?
23    A.  I believe it was through the cabinet secretary
24  at that time.

Page 155

1    Q.  Would that have been secretary Jim Ford?
2    A.  Yes.
3    Q.  Or Jim Ford, Jr.?
4    A.  Yes.
5        MR. NEUBERGER:  How about we take a short
6  five-minute break?
7        (A recess was taken.)
8  BY MR. NEUBERGER:
9    Q.  Colonel, from September of 2003 through
10  December 1st of 2003, how many times did you go to the
11  FTU?
12    A.  Twice that I can recall.
13    Q.  When did you go to the FTU during that time
14  frame?
15    A.  I can be general. Once was during the fall
16  shoot.
17    Q.  Which would have been?
18    A.  Which would have been sometime in
19  September/October time frame. And then the second time
20  would have been just before Sergeant Foraker returned to
21  duty there.
22    Q.  Sergeant Foraker returned to duty on
23  December 1st of 2003, correct?
24    A.  Yes.

Page 156

1    Q.  Are you saying you would have visited the FTU
2  sometime in November of 2003?
3    A.  Late November. I made a point of going up
4  there. When we were told Sergeant Foraker was coming
5  back, I made a point of scheduling an appointment with
6  the firearms training staff to talk to them.
7    Q.  Would that have been all of the staff there at
8  the time or was it only Sergeant Ashley?
9    A.  I believe everyone was there. Sergeant Foraker
10  wasn't there. It was Sergeant Ashley, Corporal Price,
11  Corporal Warren, Corporal Warwick. Corporal Peachey was
12  assigned and he came in at the time we said we were going
13  to start. I think I said we were going to start at 8:30,
14  and I got there early. I think it was -- there was like
15  a half-hour difference in the time we started and the
16  time I said we were going to start. It was either 8:30
17  and I got there early. But he came in in the middle of
18  it. So I was there then. We talked in the conference
19  room.
20    Q.  Do you have personal knowledge of the conditions
21  of the FTU on December 1st, 2003?
22    A.  No, I do not.
23    Q.  Before we took the break I started to ask you
24  some questions about the State Auditor investigation. Do

Page 157

1  you recall that?
2    A.  Would you refresh my memory.
3    Q.  No problem. At some point did you find out that
4  the Governor had ordered the State Auditor's Office to
5  investigate the FTU?
6    A.  Yes.
7    Q.  You found that out from Secretary Ford, correct?
8    A.  That's what I recall. Typically that's the way
9  I would have found that type of information out, yes.
10    Q.  Was there any media coverage of the decision to
11  have the State Auditor's Office investigate the FTU?
12    A.  Do I recall specifically sitting here right now
13  that media covered that? I can't say that, but I would
14  assume, yeah, there was coverage. As you said earlier,
15  there was a lot of coverage during that period of time.
16    Q.  You would agree with that statement, that there
17  was a lot of coverage during that period of time?
18    A.  Yes.
19        MR. ELLIS:  A lot of coverage of what? Of
20  the auditor investigation or the range?
21        MR. NEUBERGER:  Of the range.
22        THE WITNESS:  Of the range, yes. There had
23  been from mid-March through April/May time frame, yes.
24

A - 364

40 (Pages 154 to 157)

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 158

1  BY MR. NEUBERGER:
2      Q.  Did there come a time when you learned that
3  Sergeant Foraker and corporals Price and Warren had
4  spoken to the Auditor's Office?
5      A.  My understanding was they gave statements to the
6  State Auditor's Office.  They did not necessarily speak
7  to them.  Statements were given through this office.
8      Q.  Did you ever talk to Colonel Chaffinch about
9  that?
10     A.  Yes.
11     Q.  What did you say to Colonel Chaffinch about
12  that?
13     A.  I found it odd that when the Auditor's Office
14  met with them, that they would meet at an attorney's
15  office to give their statements and then they wouldn't
16  speak.  It would just be written statements handed over
17  by an attorney.  That was the crux of what we discussed.
18     Q.  What did Colonel Chaffinch say to you about them
19  giving those statements to the State Auditor's Office, if
20  anything?
21     A.  I can't recall him saying anything specifically.
22     Q.  How about generally?
23     A.  Generally, it was the same thing.  I just
24  described what I said, the oddity of them giving

Page 159

1  statements at their attorney's office.  I guess that was
2  telling us at that point in time that there was -- that
3  there was going to be a lawsuit in the future and we were
4  heading down that road again.
5      Q.  Do you recall how soon after the men spoke to
6  the State Auditor's Office that you learned about it?
7      A.  I don't recall at this point.
8          MR. NEUBERGER:  I'd like to put another
9  exhibit in front of you.  We will call this MacLeish
10  Deposition Exhibit 17.
11         (MacLeish Deposition Exhibit No. 17 was
12  marked for identification.)
13  BY MR. NEUBERGER:
14     Q.  Colonel, do you have that document in front of
15  you?
16     A.  Yes, I do.
17     Q.  On page 1 does this appear to be a copy of the
18  front page of the Delaware State News for Friday,
19  May 14th, 2004?
20     A.  Yes, it does.
21     Q.  Does the top headline say in big bold letters,
22  "Shots traded over range"?
23     A.  Yes.
24     Q.  Underneath that does it say, "Troopers differ on

Page 160

1  blame for health woes at Smyrna site"?
2      A.  Yes.
3      Q.  Do you think you ever saw this article?
4      A.  Yes, I did.
5      Q.  When bad things about the Delaware State Police
6  are in the papers, are they usually brought to your
7  attention when you were either lieutenant colonel or when
8  you are colonel?
9      A.  Yes, they are.
10     Q.  For example, I think there was a story in The
11  News Journal about a month ago dealing with the trooper
12  holding up a noose that was on the front page of the
13  paper.  Was that brought to your attention?
14     A.  Yes, it was.
15     Q.  On the first page of this exhibit, there's a
16  front-page story of the State News, and that was brought
17  to your attention, also, wasn't it?
18     A.  Actually, I think I read this at home.
19     Q.  Do you think you read the entire article?
20     A.  Yes.
21     Q.  Could we turn to the very last page of this
22  exhibit?  Are you there?
23     A.  I'm there.
24     Q.  At the bottom right-hand corner of the page does

Page 161

1  it say "FTU2897"?
2      A.  Yes, it does.
3      Q.  Does this appear to be an article with the
4  title, "Troopers discuss firing range"?
5      A.  Yes.
6      Q.  Was it written by Mary Allen?
7      A.  Yes.
8      Q.  Is it dated May 13th, 2004?
9      A.  Yes.
10     Q.  Do you think you saw that article?
11     A.  May I look at it quickly?
12     Q.  Absolutely.
13     A.  Yes, I probably read it.
14     Q.  You can put that document down.
15         Did you ever talk to Colonel Chaffinch
16  about these two articles?
17         MR. ELLIS:  About specifically these two
18  articles or the information that's in them?
19         MR. NEUBERGER:  Specifically these two
20  articles.
21     A.  I'm sure we did, but I don't recall the
22  specifics of whatever -- of what we discussed.  It didn't
23  involve anything that would have resulted in any action
24  we were going to take divisionally.

A - 365

Price, et al.                                    v.                        Chaffinch, et al.
Thomas F. MacLeish                      C.A. # 04-1207                July 19, 2007

Page 162

1    Q.  Were you happy that the Delaware State Police
2  was back on the front pages of the Delaware State News,
3  for example?
4    A.  It was an article of ongoing interest over what
5  was occurring at the range.  And happy?  I was somewhat
6  dismayed when, being told not to speak to the media,
7  there was a way that -- they found a way to get into the
8  media.  But according to counsel, it was done through
9  their counsel and it was okay to do it the way they did
10  it, because the statements were attributed to them, but
11  they were read by their attorneys.
12    Q.  Did you ever talk to anyone on the executive
13  staff at the time about these two media articles?
14    A.  I'm sure in a general discussion way, yeah, it
15  was discussed the articles being in the paper, but
16  whether it was Major Papili -- I know Eckrich or Hughes
17  or Baylor at that point in time in a general sense were
18  staff officers.  You're going to discuss things that are
19  in the paper, positive and negative.
20    Q.  Did you ever discuss with the members of the
21  executive staff Sergeant Foraker, Corporal Price, or
22  Corporal Warren during this same time frame?
23       MR. ELLIS:  You're talking May 13th,
24  May 14th?

Page 163

1       MR. NEUBERGER:  I'll specify the time frame
2  a little better.
3  BY MR. NEUBERGER:
4    Q.  From December of 2003 through approximately July
5  of '04, did you ever talk to members of the executive
6  staff about Sergeant Foraker, Corporal Price, or Corporal
7  Warren?
8    A.  I'm sure that I did.
9    Q.  Do you remember what you said to them?
10    A.  Not specifically, no.
11    Q.  Do you recall if you said good things about them
12  or if you said bad things about them?
13    A.  Maybe a little bit of both.  During that period
14  of time hidden in here is when we became -- hidden in
15  here during this time frame is when we found that there
16  may be some hearing problems associated with people at
17  the range, although it wasn't specific, and there was
18  frustration in why weren't people forthcoming in telling
19  us about their hearing-related issues.  And that came out
20  I believe at the March 17th meeting.  And then we got the
21  specifics on that so we could act on that.
22       I may have discussed with members of the
23  staff the placement of Price and Warren -- because they
24  were going to be placed on light-duty status -- at that

Page 164

1  point in time they were on light-duty status, but what
2  should we do if their hearing is affected and we don't
3  know the extent of that hearing loss?  Was it a result of
4  recently being exposed to loud noises?  And I use the
5  example of myself working in the flight line when I was
6  in the service.  I worked a 3:00-to-11:00 shift and I
7  worked the flight line with planes coming in and going
8  out and different apparatus you used.
9       At night when I would go home, I'd listen
10  to my radio on the way back to the barracks.  The next
11  morning when I would get up to go and do something and
12  I'd start the car, the radio would be blaring.  Obviously
13  I had to turn it up that loud.  I didn't think it was
14  that loud the night before.  I use the example that my
15  hearing was deadened.
16       So where did we go?  Was it the appropriate
17  course of action to say once it was determined that Price
18  and Warren had suffered a hearing loss to put them back
19  in that same environment not knowing where or the extent
20  of their hearing loss?  So I think I discussed that with
21  members of staff and to get their ideas and thoughts
22  about it.
23    Q.  Did you ever say to any member of the staff that
24  these guys are a real pain in the rear?

Page 165

1    A.  I may have said that as I became frustrated in
2  dealing with getting information from them in this
3  regard.
4    Q.  Did you use the word "rear" or would you have
5  used another term such as "ass"?
6    A.  I have been known to use that word on occasion.
7    Q.  Do you recall which one you used at the time?
8    A.  It was probably the latter.
9    Q.  So you said these guys are a real pain in the
10  ass?
11    A.  You're saying did I say it.  I'm saying it's a
12  possibility I said it.  I don't recall saying it, but did
13  I feel that way?  Yes.  But you're the one saying that I
14  said that.  I don't recall specifically saying that I
15  said they were a pain in the rear.  But could I have said
16  that?  Yeah, I possibly could have.
17    Q.  You mentioned light duty.  I'm going to skip
18  around a little bit and ask you some general questions
19  about that.
20       As lieutenant colonel, and now it's
21  colonel, of the Delaware State Police, do you care about
22  the troopers under your command?
23    A.  I absolutely do.
24    Q.  Do you only care because you're colonel or

**A - 366**

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 166

1  because you were the lieutenant colonel or have you
2  generally always cared for your subordinates?
3      A.  I care for all the men and women in this
4  division.
5      Q.  Do you care about their health and safety
6  specifically?
7      A.  Yes, I do.
8      Q.  Do you care deeply about their health and
9  safety?
10     A.  Every night I take them to bed with me.
11     Q.  How many times have you called Sergeant Foraker
12  and expressed your concern for his health, safety, and
13  general wellbeing?  To limit the time frame from December
14  of '03 forward.
15     A.  None.
16     Q.  How many times from December of '03 forward have
17  you called Corporal Warren and expressed concern for his
18  health, safety, and general wellbeing?
19     A.  Once.
20     Q.  When?
21     A.  It was in -- I believe it was 911 day in Sussex
22  County.  He was down at Sussex County Airport.  He was
23  there and I had a discussion with him and I expressed my
24  concern for him.

Page 167

1      Q.  I'm sorry.  This is when?
2      A.  It was in -- I believe it was May of '04.  I
3  think it was.  Whenever Sussex County's open house was, I
4  ran into him there.
5      Q.  Have you ever expressed concern for his health,
6  safety, and wellbeing since then to him?
7      A.  No, I have not.
8      Q.  How many times have you called Corporal Price
9  and expressed concern for his health, safety, and general
10  wellbeing?
11     A.  I did one time at the range that was in April of
12  '04, and then subsequent to that I called to inquire
13  that -- I had heard he was upset, so I was calling to
14  inquire what he was upset about, and subsequent to that I
15  received an e-mail from you, but I went ahead and talked
16  to him anyway.
17          During that conversation I asked how he was
18  doing.  But when I say it, I have 637 troopers that work
19  for me.  I don't call them up every night and ask them
20  how they're doing.  During any given time there are
21  different levels -- if they suffered injury, they may
22  have had surgery, I make every effort to try to express
23  my concerns if not personally, then through their
24  commanders, and my expectation is that the information

Page 168

1  keeps going down to them of how they're doing and making
2  sure that they're being taken care of through not just
3  myself but through my majors, my captains, and so forth.
4      Q.  You mentioned one time when you talked to
5  Corporal Price at the firing range.
6      A.  Yes.
7      Q.  Is that the FTU or was that at the National
8  Guard range?
9      A.  It was at the National Guard range.
10     Q.  I'm going to use some profanity right now.  I
11  want you to tell me if that's accurate.  I apologize if I
12  offend you.
13     A.  Yes.
14     Q.  Did you ever state to him that, quote, "I am not
15  going to fuck you," close quote?
16     A.  Perhaps, yes, I said that.  I don't recall
17  saying it, but if he wrote it down that I said it, then I
18  guess I did.  I'm not going to dispute the fact --
19     Q.  Would you take Corporal Price's word for it,
20  that if he later testifies that you made that statement,
21  would you disagree with that?
22     A.  In the context of that conversation, I was
23  trying to assure him that the reason why he wasn't
24  allowed on the range was for his safety and the

Page 169

1  division's interest and in the best interest of the
2  division to keep him away from an unknown at that point.
3  We knew he had suffered a hearing loss.  Was it
4  attributable to the range?  And I was the one that wanted
5  to keep him assigned to the Firearms Training Unit
6  because he's a good instructor.  There's classroom
7  instruction and he's also an armor.  I thought there
8  would be armor's work to be done there, also.
9      Q.  You're indicating you wanted him to work at the
10  Firearms Training Unit but not on the firing line?
11     A.  I didn't want him anywhere near that line.  That
12  was the information that was passed on to his captain
13  that I felt was relayed down through his chain of command
14  through Sergeant Foraker to him.
15     Q.  Did you ever say to Kurt, be it at this meeting
16  or any other meeting, that "Kurt, we just don't know what
17  to do with you because you have been at the range so
18  long"?
19     A.  If I had the whole conversation, I may be able
20  to recall it, Mr. Neuberger, but he had been at the range
21  since it opened.  He could always go back on the street.
22  He could always go back and work in patrol.
23     Q.  Is that a threat -- I'm sorry.  Go ahead.
24     A.  No.  None of that was meant as a threat.

A - 367

43 (Pages 166 to 169)

Price, et al.                                  v.                          Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                        July 19, 2007

Page 170

1    Q.  You can continue your answer, then I'll ask you
2  another question. I cut you off.
3    A.  The entire context of that conversation with
4  Corporal Price --
5    Q.  At which conversation?
6    A.  The one that took place at the firing range in
7  April when I stopped by there. I believe it was either
8  the first or second week of recruit training at the
9  range, firearms training, and I stopped by to see how was
10  it going for the men and women there and what was going
11  on.
12        When I walked up, I believe it was a break
13  for lunch, they were picking up brass, the recruits were
14  picking up brass, and as I approached the range, walking
15  across the range with a headset in his hand was
16  Corporal Price. When I saw the headset in his hand, my
17  first thought was he was out there while they were
18  shooting, and I thought my instructions had been pretty
19  specific and explicit that you don't -- I didn't want him
20  anywhere near the shooting; he should be in a classroom
21  teaching or doing armor's work, not involved near or by
22  that range in any way with the students while they were
23  live firing.
24        Sergeant Foraker was not there at that

Page 171

1  time. Trying to think who was calling the range that
2  day. I don't recall. But my discussion with
3  Corporal Price was to explain my position in asking him
4  not to be on that range and that it was for his health
5  and his welfare and he was going to be kept there
6  and I wasn't out to screw him.
7    Q.  And the word you used was a different word?
8    A.  It was a different -- yeah. We went from where
9  everybody was gathered and we walked around to another
10  shooting site, because they were shooting the recruits on
11  a facility that we weren't -- when I say "we," that for
12  inservice purposes we weren't going to be shoot.
13  And Kurt walked me over to where we would be, and him and
14  I had a talk over there.
15        What goes beyond just lieutenant colonel to
16  corporal is Corporal Price and I have known each other
17  for most of our careers from Troop 3 all the way through
18  the years. Our families swam at the same swim club and
19  everything else. I wanted to assure him that nobody was
20  out to hurt him; we're just trying to do what was right.
21    Q.  On the question of "Kurt, we don't know what to
22  do with you because you have been at the range so long,"
23  do you recall ever making that statement?
24    A.  I don't recall making it.

Page 172

1    Q.  Have you ever stated to either the FTU personnel
2  or Captain Greg Warren that, quote, "They should expect
3  hearing loss; they work at the range," close quote?
4    A.  In its context was much the same as what I
5  shared earlier about my experiences on the flight line.
6  You're in an occupation and you're in a specific job
7  function that exposes you to high noise levels. Law
8  enforcement in general suffers some type of hearing loss
9  if you spend a great deal of time riding in a patrol car,
10  marked unit, and you're running your siren and things of
11  that nature. That's a given fact. Our helicopter pilots
12  are exposed to higher levels of noise.
13        So in a broad perspective, yes, but that
14  terminology was used when discussing what is the
15  extent -- we have heard that you have a hearing loss,
16  what do we have to back that up? We weren't getting that
17  type of information.
18    Q.  On another occasion did you ever state to any of
19  the FTU personnel or to Captain Greg Warren that, quote,
20  "Just like if you work in the artillery in the military,
21  you work at a range, you would expect to have high lead
22  levels and hearing loss," close quote?
23    A.  I don't know if those are my exact words, but I
24  did talk about a corporal that was on the job,

Page 173

1  John Powell. He was a K9 officer out of Troop 3, and he
2  worked artillery. Every other word you said to him, he
3  said huh. He had a hearing loss. Obviously wasn't
4  enough to keep him off the job. But that was many, many
5  years ago. That example was just used in the same type
6  of context.
7    Q.  Are you saying you did give that example once?
8    A.  I have used that example.
9    Q.  Then I believe you testified a little while at
10  some point today about the paper dust mask?
11    A.  Yes.
12    Q.  Do you recall testifying about that?
13    A.  I do recall testifying about that.
14    Q.  That occurred during a conversation with Captain
15  Greg Warren; is that correct?
16    A.  Yes.
17    Q.  You told him to have the FTU staff personnel put
18  on a paper dust mask to protect them from the hazardous
19  materials in the air?
20    A.  And the recruits. Because that was when I was
21  informed of the ingestion of the dust and the clouds and
22  everything else, and it was a recommendation, and a
23  strong one, that they wear them for their safety.
24    Q.  Did you ever have a conversation with Sergeant

A - 368

44 (Pages 170 to 173)

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 174

1   Chris Foraker about that?
2      A.  I can't recall.
3      Q.  I think you also testified a little bit ago that
4   you called Corporal Price three times to express concern
5   for his health, safety, and wellbeing.  Do you recall
6   testifying to that?
7      A.  I don't think I said three times.  I think I
8   said I contacted him at the firing range and then I
9   contacted him subsequent to that as a result of a meeting
10  with the secretary and the president of DSTA where the
11  president expressed concern that he had heard that as a
12  result of an interview with the auditors, that
13  Corporal Price was -- they were all concerned, but
14  Corporal Price was the main one, that he was concerned
15  about there was an allegation that the division had
16  directed the Auditor's Office to conduct an Internal
17  Affairs investigation.  That was the gist of what I got
18  out of Sergeant Facella (phonetic).
19     Q.  During this contact with Corporal Price, did you
20  call him on the telephone or page him somehow?
21     A.  I attempted to contact him.  I think I got this
22  on Wednesday or Thursday at the secretary's office.  I
23  returned back to my office.  I called over and I was
24  informed, I think it was through Lieutenant Davis, that

Page 175

1   he was out sick that day.  I said don't bother him; I
2   would catch up with him in the morning.  I think I left
3   the instruction to have him call me in the morning, but
4   don't bother him at home if he's sick.
5          The next morning I called and
6   Lieutenant Davis wasn't in.  Captain Warren wasn't in.
7   Sergeant Foraker was.  I spoke to Sergeant Foraker on the
8   phone and said I needed to talk to Kurt and this is what
9   it was about, and I told him that, as a result of a
10  meeting I had, he told me he was spending time with his
11  family.  I said no problem, don't get that opportunity to
12  do that very often, just let him know I'd like to talk to
13  him on Monday and I needed to talk to him Monday about
14  it.  That was the message that was left.
15     Q.  Then subsequently did you receive an e-mail from
16  one of Corporal Price's attorneys saying don't meet
17  with and interrogate my client without my presence?
18     A.  Yes, I did receive that.
19     Q.  Did you subsequently talk with Corporal Price
20  anyway outside of the presence of his attorneys?
21     A.  Yes, I did.
22     Q.  Did you interrogate Corporal Price during that
23  meeting?
24     A.  No, I did not.

Page 176

1      Q.  Did you browbeat Corporal Price during that
2   meeting?
3      A.  No, I did not.
4      Q.  Did you attempt to interview him during that
5   meeting?
6      A.  No, I did not.
7      Q.  Did you grill him during that meeting?
8      A.  No, I did not.
9      Q.  Did you tell Corporal Price during that meeting
10  that if he was found to be culpable for any of the
11  problems at the FTU, that you would be bringing him up on
12  Internal Affairs charges?
13     A.  No, I did not.
14     Q.  Now, do you think that it is of paramount
15  importance for employees of the DSP to work in a safe and
16  healthy working environment?
17          MR. ELLIS:  I object to the form of the
18  question.
19          MR. NEUBERGER:  You can answer.
20     A.  In a very general sense, yes.
21     Q.  You testified a little while ago about a group
22  called the National Institute of Occupational Safety and
23  Health, didn't you, also known as NIOSH?
24     A.  Yes.

Page 177

1      Q.  Are you aware that they are a federal agency of
2   some type which deals with occupational safety and
3   health?
4      A.  Yes.
5      Q.  At any time did anyone tell you that NIOSH was
6   willing to come in and investigate the problems at the
7   FTU free of charge to the DSP?
8      A.  Yes, I became aware of that.
9      Q.  How did you become aware of that?
10     A.  Through Major Hughes.
11     Q.  Did Major Hughes also tell you that NIOSH was
12  offering free medical, audiological, and other types of
13  care for the FTU staff?
14     A.  I don't recall that.
15     Q.  Ultimately did NIOSH come in and investigate the
16  FTU and give free medical care to the FTU staff?
17     A.  Not that I'm aware of.
18     Q.  Do you know why they didn't come in?
19     A.  There was a discussion between our attorneys
20  with NIOSH, and it had to do with standing, and we
21  invited them to come in and talk to us, and, to my
22  knowledge, that meeting never took place.
23     Q.  Do you know why?
24     A.  No, I don't.

A - 369

45 (Pages 174 to 177)

Price, et al.                                          v.                              Chaffinch, et al.
Thomas F. MacLeish                        C.A. # 04-1207                         July 19, 2007

Page 178

1    Q.   Any idea who would know why?
2    A.   Major Hughes may.
3    Q.   Do you think having full resources of the
4    federal government investigating the problems at the FTU
5    would have been a good thing for the Delaware State
6    Police?
7              MR. ELLIS:  I object to the form of the
8    question.
9              MR. NEUBERGER:  You can answer.
10   A.   Would you repeat the question again, please.
11             MR. NEUBERGER:  Could you repeat the
12   question?
13             (The reporter read back as instructed.)
14             THE WITNESS:  Not necessarily.  At that
15   point in time we had Facilities Management and we hired
16   outside -- people had been brought in.  Money had been
17   expended to take a look at the range, and it was really
18   in Administrative Services' hands.  That's another party
19   that got involved in the issue of having NIOSH come in to
20   sit down and discuss it.  It was pretty much in
21   Facilities Management's hands at that point in time.
22             We were at such a level with an outside
23   engineering firm having been hired to come in and look
24   and assess what needed to be done and assurances that the

Page 179

1    facility wouldn't open if it wasn't safe to do so, and it
2    was beyond our scope at that point in time to have them
3    come in.
4    Q.   Are you aware that NIOSH routinely conducts
5    health hazard evaluation reports of police firing ranges
6    all over the country?
7    A.   No, I was not.
8              MR. ELLIS:  I object to the form of the
9    question.
10   Q.   Are you aware that in March 2003 NIOSH
11   investigated the Fort Collins, Colorado, police firing
12   ranges?
13   A.   No, I was not.
14             MR. NEUBERGER:  We're going to call this
15   MacLeish Deposition Exhibit No. 18.
16             (MacLeish Deposition Exhibit No. 18 was
17   marked for identification.)
18   BY MR. NEUBERGER:
19   Q.   Colonel, do you have that document in front of
20   you?
21   A.   Yes, I do.
22   Q.   Does this appear to be an e-mail from
23   Jim Warwick to Greg Warren which was copied to
24   Chris Foraker, Wayne Warren, Kurt Price, and Ralph Davis?

Page 180

1    A.   Yes.
2    Q.   Does it say sent Wednesday, April 21st, 2004?
3    A.   Yes.
4    Q.   Does the subject line say "NIOSH"?
5    A.   Yes.
6    Q.   Could you just read this e-mail quietly to
7    yourself and tell me when you're done?
8    A.   (Complied.)
9         This is the first I have seen it.
10   Q.   I'd like to direct your attention to the first
11   paragraph.  Does that paragraph indicate that
12   Corporal Warwick did some investigating and found out
13   that NIOSH had conducted some extensive testing at the
14   request of Fort Collins's police department?
15   A.   That's what it says.
16   Q.   You don't have any independent knowledge of
17   that, do you?
18   A.   No, I do not.
19   Q.   Do you know who Dr. Randy Tubbs is?
20   A.   No, I do not.
21   Q.   Do you see the third paragraph?
22   A.   Yes.
23   Q.   I'll just read the first two sentences to you.
24   Okay?

Page 181

1    A.   Yes, sir.
2    Q.   Does it say, "On Tuesday, April 20, 2004, I
3    received a call from Dr. Randy Tubbs.  He told me that
4    Mr. Doyle Tiller had just called him and said that a
5    'Political Block' is now preventing him from allowing
6    NIOSH to come in and conduct testing on the air handling
7    system."
8         Do you know who Mr. Doyle Tiller is?
9    A.   Yes, I do.
10   Q.   He works for Facilities Management?
11   A.   Yes, sir.
12   Q.   I'm going to keep on reading.  "He said
13   Mr. Tiller told him that the state police could give
14   NIOSH permission to come in and conduct testing, however,
15   he could not due to politics."
16        Do you see that?
17   A.   Yes, I do.
18   Q.   Would it be fair to say that that paragraph is
19   indicating that some kind of political block had stopped
20   Facilities Management from allowing NIOSH to come in and
21   investigate?
22             MR. ELLIS:  I object to the form of the
23   question.
24   A.   That's what it indicates.

A - 370

46 (Pages 178 to 181)

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 182

1  Q.  That's just what this document says.  I'm not
2  asking you if that's true.
3  A.  Yes, that's what it indicates.
4  Q.  Independent of this document, has anyone told
5  you that a political block stopped Facilities Management
6  from inviting NIOSH to come in and investigate the range?
7  A.  No.  First time I am aware of anything within
8  this document is two minutes ago when I read it.
9  Q.  I just want to ask you some more questions about
10  the document.
11  A.  Okay.
12  Q.  Do you know if a political block stopped
13  Major Hughes from inviting NIOSH to come in and
14  investigate the range?
15  A.  No.
16  Q.  Did Major Hughes ever tell you the reason why
17  NIOSH was not invited to come in and investigate the
18  range on behalf of the Delaware State Police?
19  A.  No.  I know there was an issue of standing and
20  they were trying to make the arrangements to get that
21  done, and that -- once again, we aren't in this time
22  frame.  We aren't in the 4/21/04 time frame.  We're
23  talking --
24  Q.  April/May of 2005?

Page 183

1  A.  Yes.  It was almost a year later when the NIOSH
2  issue and having somebody came in first came to my
3  attention.
4  Q.  Has anyone told you that politics played a role
5  in how the FTU situation regarding Sergeant Foraker,
6  Corporal Price, and Corporal Warren has been handled?
7  MR. ELLIS:  I object to the form of the
8  question.  What do you mean by "situation"?
9  MR. NEUBERGER:  I'll rephrase.
10  BY MR. NEUBERGER:
11  Q.  Has anyone told you that politics played a role
12  in how Sergeant Foraker, Corporal Price, Corporal Warren
13  had been blamed for the problems at the FTU?
14  MR. ELLIS:  I object to the form of the
15  question.
16  MR. NEUBERGER:  You can answer.
17  A.  Has anyone told me --
18  Q.  Yes.
19  A.  -- that politics played a role in it?  No.
20  Q.  Have you told anyone that?
21  A.  No.
22  Q.  Through your own personal opinion, do you think
23  politics played a role?
24  A.  In the way they have been treated?

Page 184

1  Q.  Yes.
2  A.  No.
3  Q.  Do you think personal animosity played a role?
4  A.  No.  I called the shots in this.  I was the
5  one -- not this document, but in this from the beginning
6  to the end within what was in my purview of trying to
7  make the best decisions with the information I had.
8  Q.  Did there come a time when you sent
9  Chris Foraker, Wayne Warren, Kurt Price, and
10  Jimmy Warwick for fitness-for-duty exams?
11  A.  Yes.
12  Q.  Do you recall when that was?
13  A.  I believe it took place when we received the
14  results of the physicals that they had that indicated
15  each of them had some type of hearing loss, but it
16  wasn't -- it wasn't clear as to what -- the extent of the
17  loss in all of them.  We first tried to get further
18  information from Omega who contacts the person out in the
19  Midwest somewhere that was trying to do a survey, and
20  then it became they took their hearing test approximately
21  a month after the range had closed down.  It was
22  recommended by the doctors that they have a second test
23  that could, quote/unquote, be called a baseline test,
24  would there be a change in a month, to determine if there

Page 185

1  was another problem if the problem was still there.  And
2  that kind of falls in with was it a temporary hearing
3  loss or not.
4  They were sent back for that, and then
5  those results -- I think that was the second set of
6  results.  I think that was when they were sent for their
7  fitness for duty or we got those results in and then they
8  were sent to Dr. Green to have those results interpreted
9  and a determination made.
10  Q.  Who had involvement in that process, was it you
11  or was it Colonel Chaffinch?
12  A.  It was me.
13  Q.  Did you tell Colonel Chaffinch what you were
14  doing?
15  A.  The decision to do that was made between -- I
16  was going on recommendations from HR from
17  Captain Yeomans.
18  Q.  Did Wayne and Kurt pass the fitness-for-duty
19  exams?
20  A.  No, I don't believe they did.
21  Q.  Did Chris Foraker pass the fitness-for-duty
22  exam?
23  A.  Yes.
24  Q.  Did you then send Chris Foraker for a second

**A - 371**

47 (Pages 182 to 185)

Price, et al.                                v.                          Chaffinch, et al.
Thomas F. MacLeish                  C.A. # 04-1207                    July 19, 2007

Page 186

1  opinion after he passed his fitness-for-duty exam?
2     A.  Yes, he was sent for a second opinion.
3     Q.  Why did you send him for a second opinion after
4  he passed his fitness-for-duty exam?
5     A.  It was the recommendation of the HR director.
6     Q.  It's your position that you weren't just trying
7  to find a way to get rid of him; you were concerned for
8  his health and I guess his hearing?
9     A.  Absolutely, yes.
10    Q.  Were you concerned about the health and hearing
11  of all of the troopers under your command in general?
12    A.  Yes.
13    Q.  Then you were especially concerned about the
14  health and hearing of the troopers who had served at the
15  FTU, Sergeant Foraker, Corporal Price, Warren, and
16  Warwick?
17    A.  Yes.
18    Q.  Do you know who Sergeant Ryan Fitzpatrick is?
19    A.  Yes, I do.
20    Q.  He was the NCOIC of the FTU from approximately
21  1998 to 2000; isn't that right?
22    A.  I would assume, yes.  He was there for a period
23  of time.
24    Q.  At some point in the past he served at the

Page 187

1  current facility that is the FTU; is that correct?
2     A.  Yes.
3     Q.  He's currently with the Delaware State Police,
4  right?
5     A.  Yes, he is.
6     Q.  What are his current duties, do you know?
7     A.  He's a shift commander, Troop 4.
8     Q.  Where is Troop 4?
9     A.  It's located in Georgetown.
10    Q.  Did you ever contact Sergeant Brian Fitzpatrick
11  and tell him that maybe he should get his hearing checked
12  because he served at the FTU?
13    A.  No, I did not.
14    Q.  Do you know who Sergeant Ralph Matt Engler is?
15    A.  Yes, I do.
16    Q.  He served at the FTU for a period of time; isn't
17  that right?
18    A.  Yes.
19    Q.  Is he currently with the Delaware State Police?
20    A.  Yes.
21    Q.  Did you ever contact Sergeant Engler and tell
22  him perhaps he should get his hearing checked because you
23  had a concern about hearing loss of officers who had
24  served at the FTU?

Page 188

1     A.  No, I did not.
2     Q.  Do you know who Sergeant Al Parton is?
3     A.  Yes, I do.
4     Q.  He was at one time the NCOIC of the FTU?
5     A.  Yes.
6     Q.  Does he currently run the SORT team?
7     A.  Yes.
8     Q.  That is the Special Operations Response Team?
9     A.  Yes.
10    Q.  Is that the Delaware State Police's version of a
11  SWAT team?
12    A.  Yes.
13    Q.  Have you ever contacted him and said to
14  Sergeant Parton, maybe you should get your hearing
15  checked because you served at the FTU?  Have you ever
16  done that?
17    A.  No, I haven't.
18    Q.  Do you know if either Sergeant Fitzpatrick,
19  Sergeant Engler, or Sergeant Parton have been contacted
20  by anyone, be it in personnel or by you or by
21  Colonel Chaffinch, and told they should get their hearing
22  checked because they served at the FTU at one point?
23    A.  No, I have not.
24    Q.  Do you know who Corporal Eddie Cathell is?

Page 189

1     A.  Yes.
2     Q.  Isn't it true he served at the FTU for a
3  several-year period?
4     A.  Yes.
5     Q.  Do you recall if it was approximately 1998 to
6  the year 2003?
7     A.  I think that would be relatively accurate.
8     Q.  He's currently retired, isn't he?
9     A.  Yes.
10    Q.  He's actually one of the colonel's buddies,
11  isn't he?
12    A.  My understanding is he's a friend of the
13  colonel's, yes.
14    Q.  Did you or anyone else call up Corporal
15  Eddie Cathell and say, hey, Eddie, or hey,
16  Corporal Cathell, whatever your greeting is to him,
17  perhaps you should go get your hearing checked because
18  you served at the FTU for a long period of time?
19    A.  No, I did not.
20    Q.  Do you know who Corporal Bruce Peachey is?
21    A.  Yes, I do.
22    Q.  Corporal Peachey served for approximately a year
23  or so at the FTU in approximately 2002 to 2003?
24    A.  Yes.

**A - 372**                    48 (Pages 186 to 189)

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 190

1  Q.  He retired in early 2004; isn't that right?
2  A.  Yes.
3  Q.  Did you ever call up Corporal Peachey and say,
4  Corporal Peachey, perhaps you should get your hearing
5  checked because there are some issues with hearing of
6  officers?
7  A.  No.
8  Q.  Do you know if he was ever contacted by anyone
9  at DSP about that?
10  A.  To my knowledge, no.
11  Q.  Do you know who Sergeant William Rhoades is?
12  A.  Yes, I do.
13  Q.  Did he serve at the FTU from approximately 1998
14  to the year 2000?
15  A.  He served at the firing range. Those are
16  specific dates. I don't know.
17  Q.  But do you know that he served at the current
18  facility, that is the FTU in Smyrna off of something
19  something road? I'm blanking on the name of the road.
20  A.  Yes, he did.
21  Q.  He's currently retired?
22  A.  Yes.
23  Q.  Did you ever contact Sergeant William Rhoades
24  and say, Sergeant Rhoades, I have some concern for your

Page 191

1  hearing, you served at the FTU for a number of years, you
2  should come in and get your hearing checked?
3  A.  No, I did not.
4  Q.  Do you know if anyone from the DSP contacted him
5  and asked him?
6  A.  No, I do not.
7  Q.  Do you know who Sergeant Richard Ashley is?
8  A.  Yes, I do.
9  Q.  He was the NCOIC at the FTU from approximately
10  2002 to 2003?
11  A.  Yes.
12  Q.  He was the NCOIC at the FTU from April 8 of 2002
13  through November 30th of 2003. Does that sound ballpark
14  accurate to you?
15  A.  Yes.
16  Q.  He retired in early 2004, didn't he?
17  A.  Yes.
18  Q.  Did you ever contact him and say, hey,
19  Sergeant Ashley, perhaps you should get your hearing
20  checked because you served at the FTU where there were
21  problems with hearing issues?
22  A.  No, I did not.
23  Q.  To the best of your knowledge, did anyone from
24  DSP contact those people?

Page 192

1  A.  No, they did not.
2  Q.  Did you ever give an order to Captain Yeomans to
3  contact any of those seven troopers whose names I just
4  listed?
5  A.  No.
6  Q.  You're telling me that, to the best of your
7  knowledge, DSP has never contacted any of those troopers
8  and expressed concern for their hearing?
9  A.  No, I did not.
10  Q.  You never ordered that to happen?
11  A.  Did not. The division annually does physicals.
12  Q.  There's no question posed, Colonel.
13  MR. ELLIS: He's finishing answering the
14  last question, I think.
15  MR. NEUBERGER: The question was did he
16  give an order that those people be contacted.
17  MR. ELLIS: He's finishing his answer.
18  THE WITNESS: I was finishing my answer.
19  MR. NEUBERGER: Please finish.
20  THE WITNESS: The members of the division
21  are given physicals on an annual basis, and part of that
22  physical is sight, hearing, overall body function, and if
23  something were to come up, then it would be -- then it
24  would be addressed. But, to my knowledge, none of those

Page 193

1  officers have ever said they have got a hearing problem
2  or brought it to anyone's attention, either.
3  BY MR. NEUBERGER:
4  Q.  Does the DSP like to be proactive on health
5  issues?
6  A.  That's why we have annual physicals and we have
7  our physical fitness test.
8  Q.  Colonel MacLeish, did there come a time when
9  Kurt Price and Wayne Warren were placed on light duty?
10  A.  Yes.
11  Q.  Why were they placed on light duty?
12  A.  As a result of their fitness-for-duty
13  evaluation.
14  Q.  Was that because they had hearing problems?
15  A.  Yes.
16  Q.  Was that the extent of your concern in putting
17  them on light duty, were their hearing problems?
18  A.  The reason for placing them on light duty is the
19  doctor submitted that they were not fit for duty, and the
20  concern for them and the welfare -- their welfare and the
21  welfare of the public by the doctor telling me a trooper
22  is not fit for duty, I can't very well put them out there
23  in a full-duty capacity.
24  Q.  Did you have any other reasons for placing them

A - 373

49 (Pages 190 to 193)

Price, et al.                                    v.                          Chaffinch, et al.
Thomas F. MacLeish                        C.A. # 04-1207                      July 19, 2007

Page 194

1  on light duty?  Any other reasons whatsoever?
2      A.  No.
3      Q.  Were you trying to get rid of them?
4      A.  No, I was not.
5      Q.  Were you trying to remove a thorn from the side
6  of the Delaware State Police?
7      A.  No, I was not.
8      Q.  Were you trying to remove a thorn from your own
9  side?
10     A.  No.
11     Q.  Were you trying to remove a thorn from the side
12  of Colonel Chaffinch?
13     A.  No, I was not.
14     Q.  Was Colonel Chaffinch involved in the decision
15  to put Corporal Price and Corporal Warren on light duty?
16     A.  No, he was not.
17     Q.  It was just you?
18     A.  Yes.
19     Q.  Was Colonel Chaffinch informed of your decision
20  to put corporals Warren and Price on light duty?
21     A.  Yes.
22     Q.  What did he say, if anything, to you when he was
23  informed of that?
24     A.  Nothing sticks in my mind other than it was

Page 195

1  appropriate procedure.
2      Q.  I'd like to show you two documents that were
3  marked as Dave Baylor Deposition Exhibit 1 and
4  Dave Baylor Deposition Exhibit 2 yesterday.  Okay?
5      A.  Yes, sir.
6      Q.  Do you have copies of these?  I don't.
7          MR. ELLIS:  I know what they are.
8  BY MR. NEUBERGER:
9      Q.  Colonel MacLeish, could you take a quick look at
10  the top letter?  Who is that addressed to?
11     A.  Corporal Kurt Price.
12     Q.  Does the date say June 25th, 2003?
13     A.  Yes.
14     Q.  Does that appear to be a typo?
15     A.  Yes, it does.
16     Q.  Should the real date say June 23, 2004?
17     A.  Yes.
18     Q.  Could you take a look at the second letter which
19  would be Baylor Deposition Exhibit No. 2?  Do you see
20  that?
21     A.  Yes.
22     Q.  Who's that addressed to?
23     A.  Corporal Wayne Warren.
24     Q.  Is that also dated June 23rd, 2003?

Page 196

1      A.  Yes, it is.
2      Q.  Is that a typo?
3      A.  Yes.
4      Q.  That should really say June 25th, 2004?
5      A.  Yes.
6      Q.  Can you take a quick look at these two letters
7  and just compare them and if you could tell me if they're
8  identical except for the names?
9      A.  Yes, they are identical.
10     Q.  I'd like you to take a look at Baylor Deposition
11  Exhibit No. 1.  If you can just put to the side Exhibit
12  No. 2.
13     A.  Okay.
14     Q.  Were you sending these letters to corporals
15  Price and Warren to let them know that they were on
16  light-duty status?
17     A.  Yes.
18     Q.  Is it true they had been on light-duty status
19  since the date on this letter, since the actual date of
20  this letter, which would be June 25th, 2004?
21     A.  Yes.
22     Q.  I'd like you to take a look at --
23         MR. ELLIS:  Point of question here.
24  There's a pencil mark on both these documents, and the

Page 197

1  "3" is crossed out and the "4" is written in in pencil.
2  Is that something that was done in Baylor's deposition,
3  because I have not seen that in other copies?
4          MR. NEUBERGER:  I think it may have been.
5  I think Robert actually -- I wasn't in the depo., but I
6  think Robert pointed out it was the wrong date.
7          MR. ELLIS:  It's clearly the wrong date.
8          MR. HAVERLY:  I was present, and that is
9  what happened.
10         MR. ELLIS:  Somebody in the deposition
11  yesterday wrote on it?
12         MR. HAVERLY:  Yes.
13         MR. ELLIS:  Who wrote on it?
14         MR. HAVERLY:  It may have been Robert, but
15  I'm not sure.
16  BY MR. NEUBERGER:
17     Q.  Just to confirm, Colonel, that is the wrong date
18  the date that is written on this document, June 25th,
19  2003?
20         MR. ELLIS:  I will stipulate to that.  I'm
21  not disagreeing with that.  I have seen two or three
22  different versions of this letter.
23  BY MR. NEUBERGER:
24     Q.  Colonel, there are a number of things enumerated

A - 374

50 (Pages 194 to 197)

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 198

1  on here, 1 through 6; isn't that right?
2     **A.  Yes.**
3     Q.  Does No. 1 say, "Your work status will be light
4  duty, nonuniformed, consisting of administrative desk
5  duties"?
6     **A.  Yes.**
7     Q.  Is this letter considered an order to
8  Corporal Price and Corporal Warren?
9     **A.  Yes.**
10     Q.  If they violate this order, they could be
11  disciplined for not following orders; isn't that right?
12     **A.  Yes, they could.**
13     Q.  No. 2 says that they have to report to work in
14  civilian business attire?
15     **A.  Yes.**
16     Q.  It orders them that they are not to wear a DSP
17  uniform for work purposes or otherwise?
18     **A.  Yes.**
19     Q.  No. 3 says that they can keep their assigned
20  divisional weapon; however, it shall not be used for any
21  police-related duties?
22     **A.  Yes.**
23     Q.  Would it be fair to say that No. 4 says if they
24  observe a crime in progress, that they are to run the

Page 199

1  other way?
2     MR. ELLIS:  I object to the form of the
3  question.
4     **A.  It doesn't say run the other way.  It talks**
5  **about if you observe a crime in progress or foresee that**
6  **a situation may occur which has the potential of placing**
7  **you in a confrontational or dangerous position, you are**
8  **to remove yourself from the situation and notify a**
9  **full-duty officer or a communication officer of the**
10  **situation.**
11     **I think what they're telling them to do is**
12  **if they're observing something that looks like it's**
13  **getting ready -- that some type of confrontation, they're**
14  **involving themselves in a physical confrontation, because**
15  **it says "confrontational or dangerous situation."**
16  **Confrontational, the way I interpret it is one in which**
17  **they would have to physically become involved with a**
18  **subject.  As they see that develop, they're supposed to**
19  **pick up a phone and call 911 and get a full-duty police**
20  **officer there.**
21     Q.  They're not supposed to get involved in that
22  situation other than calling 911 or notifying some type
23  of law enforcement authority?
24     **A.  That's correct.**

Page 200

1     Q.  So if a woman was being raped by a gun-toting
2  maniac, they were supposed to walk the other way and
3  contact the appropriate authorities?
4     **A.  No, because I think that's why if we did not**
5  **want them to be involved in anything at all, I think they**
6  **would -- their divisional weapon would have been removed**
7  **from them.  We realized that they're able to act in some**
8  **way, shape, or form.  If it says if you observe a crime**
9  **in progress or foresee that a situation which has the**
10  **potential of placing you in confrontation or a dangerous**
11  **situation, you are to remove yourself from the situation**
12  **and act in the same capacity as a civilian by notifying a**
13  **full-duty officer.  There's civilians that act --**
14     Q.  But also says they're supposed to remove
15  themselves from the situation.  Wouldn't a gun-toting
16  maniac be a confrontational or dangerous situation?
17     **A.  It would be, yes.  And in that they would in**
18  **fact -- what they're saying is that they're not to act in**
19  **full-duty capacity as an officer, as a trooper.  They**
20  **have got to use discretion.  It's probably not the**
21  **best-worded -- this was written by our HR department and**
22  **signed by me, and I'm responsible for my signature on it,**
23  **but they aren't to go out and put themselves in positions**
24  **where that can happen.  If there was the gun-toting**

Page 201

1  maniac raping a woman, I think any one of us would act,
2  and they would not be held in violation of an order.
3     Q.  Would that action be in violation of an order?
4     **A.  In its finite sense, would they be prosecuted**
5  **for that?  Absolutely not.**
6     Q.  Would it be a violation of this order?
7     **A.  It could be in violation of the order.**
8     Q.  You see No. 6, as well, it says, "You are to
9  avoid any situations that potentially work against the
10  successful rehab of your illness or injury"?
11     **A.  Right.  Yes.**
12     Q.  That was also an order, right?
13     **A.  Yes.**
14     Q.  You can put that document down.
15     Isn't it true that you have subsequently
16  ordered both corporals Warren and Price -- since this
17  letter was sent to corporals Warren and Price, have you
18  since also ordered them to separate from the DSP by
19  August of 2005?
20     **A.  They must submit their paperwork for that by --**
21  **I thought it was August the 10th of 2005.**
22     Q.  What kind of paperwork?
23     **A.  Submit for a disability retirement, pension.**
24     Q.  If they were not to submit their disability

**A - 375**                    51 (Pages 198 to 201)

Price, et al.                          v.                          Chaffinch, et al.
Thomas F. MacLeish                 C.A. # 04-1207                        July 19, 2007

Page 202

1    retirement pension papers by that date, would the
2    division fire them?
3        A.   That course needs -- remains to be determined
4    through HR and our attorneys, but they have been asked to
5    submit their pension paperwork and asked to separate from
6    the division.
7        Q.   You used the word "asked." Isn't it true they
8    have been ordered to do that by that date?
9        A.   They have been directed to submit -- I don't
10   have that document in front of me, but they have been --
11   I'm sure you have it. But they have been asked -- they
12   have been directed, too. They have been given an
13   extension to August 10th to have their paperwork
14   submitted, yes, for disability pension.
15       Q.   In March of 2005 did you receive an e-mail from
16   Corporal Price requesting that he be allowed to stay on
17   light duty for two years?
18       A.   Yes.
19       Q.   Why aren't you allowing them to stay on the
20   light duty for two years? By "them," I mean corporals
21   Warren and Price.
22       A.   By our policy, by what it's interpreted by our
23   policy, by our HR director, in researching that, that
24   their disability -- their injury is permanent, it cannot

Page 203

1    change, it cannot be accommodated. Therefore, the policy
2    is set to give the second year in the event that a
3    trooper would be able to return to full-duty capacity.
4    We know now that they do not have the ability to return
5    to full-duty capacity. So by the advice I was given from
6    HR and our attorney through the application of this
7    policy, indicated that separation was the proper course.
8        Q.   By "attorney" you mean Deputy Attorney General
9    Mike Tupman or Ralph Durstein?
10       A.   Mike Tupman.
11       Q.   Are there any other reasons for your refusal to
12   grant Corporal Price and Corporal Warren two years of
13   light duty?
14       A.   No.
15       Q.   Was this your decision to make or was this
16   Colonel Chaffinch's decision?
17       A.   It was my decision to make.
18       Q.   Did Colonel Chaffinch have any involvement in
19   that decision?
20       A.   No, he did not.
21       Q.   Was he notified of that decision?
22       A.   He was off at that time. I was the acting
23   superintendent.
24       Q.   When was the decision made?

Page 204

1        A.   In March 2005.
2        Q.   Was he subsequently notified about that decision
3    after he came back in March or April of 2005?
4        A.   He returned the end of March. I was in Hawaii
5    at the time. He was informed at that point in time.
6        Q.   Did he say don't do that, give them two years?
7        A.   No, he did not.
8        Q.   Had you and Colonel Chaffinch talked about that
9    at any other time since that one conversation you just
10   referenced?
11       A.   I talked to him sporadically during this time
12   that he was on administrative leave, but I did not recall
13   the specifics of that because it evolved to the point of
14   trying to make that determination and that was between
15   HR, our attorneys, and myself.
16       Q.   Did Colonel Chaffinch have the authority to
17   overrule your determination because he was the colonel of
18   the Delaware State Police after he came back from was it
19   administrative leave?
20       A.   Yes.
21       Q.   Did he have that authority to overrule your
22   determination and give them the two years?
23       A.   He was the colonel. He could have if he elected
24   to or if it was brought to his attention.

Page 205

1        Q.   You're indicating that it was brought to his
2    attention, wasn't it?
3        A.   He was informed of the decision, yes.
4        Q.   Did he overrule your decision?
5        A.   No, he did not.
6        Q.   I'd like to put this e-mail in front of you,
7    this e-mail from Corporal Price to you. Call it MacLeish
8    Deposition Exhibit No. 19.
9            (MacLeish Deposition Exhibit No. 19 was
10   marked for identification.)
11   BY MR. NEUBERGER:
12       Q.   Colonel, do you have this e-mail in front of
13   you?
14       A.   Yes.
15       Q.   Does this appear to be an e-mail from Kurt Price
16   to you dated Saturday, March 5th, 2005, at 12:02 p.m.?
17       A.   Yes.
18       Q.   Did you read this e-mail before?
19       A.   Yes, I have.
20       Q.   Are you familiar with its contents?
21       A.   Relatively familiar, yes.
22       Q.   Could you take a look at it and just read it
23   quietly to yourself and then tell me when you're done?
24       A.   (Complied.)

A - 376

Price, et al.                                        v.                    Chaffinch, et al.
Thomas F. MacLeish                          C.A. # 04-1207                    July 19, 2007

Page 206

1          Okay.  I read this.
2      Q.   Is this the same e-mail that you actually
3  received from Kurt Price?
4      A.   Yes.
5      Q.   You can put that document down.
6          Remember a few minutes ago I asked you
7  about a long list of troopers who had previously served
8  at the FTU and who had not been either sent for or
9  advised of going for hearing exams?
10     A.   Yes.
11     Q.   I have one more trooper I'd like to ask you
12  about.  Do you know who Lieutenant William Bryson is?
13     A.   Yes, I do.
14     Q.   Was he the NCOIC of the FTU at one point?
15     A.   Yes, he was.
16     Q.   Do you recall when he served there?
17     A.   He opened the facility and stayed -- I think he
18  preceded Sergeant Fitzpatrick.  I believe.  He preceded
19  Sergeant Fitzpatrick.
20     Q.   He's now retired now, isn't he?
21     A.   Yes, he is.
22     Q.   He's a --
23     A.   Police chief.
24     Q.   Of Camden, Delaware?

Page 207

1      A.   Camden Police Department.
2      Q.   You were the best man at his wedding?
3      A.   Yes.
4      Q.   Have you contacted him and said,
5  Lieutenant Bryson or Chief Bryson or Bill, whatever you
6  call him, you've had some issues with hearing problems at
7  the FTU, you should get your hearing checked?
8      A.   No, I have not.
9          MR. NEUBERGER:  I'd like to take a short
10  break.
11          (A recess was taken.)
12  BY MR. NEUBERGER:
13     Q.   Colonel, I think you mentioned that in the end
14  of November of 2003 you had a meeting at the FTU with
15  Sergeant Ashley and some of the other range personnel?
16     A.   Yes, I did.
17     Q.   Where was that meeting at in the FTU?
18     A.   It was located in the conference room.
19     Q.   Were you able to see the firing line of the
20  range from there?
21     A.   No.
22     Q.   Were you able to see behind the bullet trap from
23  there?
24     A.   No.

Page 208

1      Q.   Did you go and inspect the firing line?
2      A.   No.
3      Q.   Did you go in and inspect behind the bullet
4  trap?
5      A.   No.
6      Q.   Did you ever speak to the State Auditor's Office
7  about the conditions at the FTU?
8      A.   Yes, I did.
9      Q.   When was that?
10     A.   They would have the specific date I was
11  interviewed.  June/July '04.  I think.  I believe it's
12  that time frame.  I don't know specifically.
13     Q.   Was Colonel Chaffinch interviewed at the same
14  time you were?
15     A.   I don't believe so.  I think it was just -- I
16  remember they came in; they interviewed Major Eckrich.
17  Following that I was interviewed, an interview with the
18  Auditor's Office.  I don't recall being interviewed with
19  Colonel Chaffinch there.  I went to a presentation of
20  their -- that was done by the State Auditor, Tom Wagner,
21  and I'm mixing up my dates or losing my years here.  I
22  believe Secretary Mitchell was there.  Take took place at
23  the Auditor's Office.
24     Q.   Was that the initial presentation of the

Page 209

1  preliminary report?
2      A.   Yes, it was.
3      Q.   I want to focus solely on your interview.
4      A.   Okay.
5      Q.   At any point during that interview did you say
6  that the problems at the FTU were the fault of the staff,
7  including Sergeant Foraker, Corporal Price,
8  Corporal Warren, and any other staff there?
9      A.   I believe that I indicated, as my earlier
10  testimony, that they were a component of that -- the
11  problems at the range.
12     Q.   Did you also indicate that they had never
13  received training in certain types of maintenance
14  procedures required at such a specialized facility?
15     A.   I believe I indicated that I was aware that they
16  hadn't received specialized training, but that in prior
17  years it had been -- we did not face these issues, these
18  specific issues.
19     Q.   Did you give them any documents during your
20  meeting?
21     A.   I don't recall.
22     Q.   Do you know if you gave them any documents prior
23  to your meeting or after your meeting as part of the
24  Auditor's investigation?

A - 377

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                           v.                    Chaffinch, et al.
Thomas F. MacLeish                C.A. # 04-1207              July 19, 2007

Page 210

1    A.  I know that they asked for documents, and
2  Major Eckrich was the one responsible for gathering those
3  documents for them.  Did I specifically give them any?  I
4  may have, but I don't recall.
5    Q.  Did Colonel Chaffinch tell you that he was
6  interviewed?
7    A.  I don't recall him telling me that.
8    Q.  Do you know if Colonel Chaffinch ever was
9  interviewed from any other source?
10   A.  By the Auditor's Office?
11   Q.  Yes.
12   A.  Not that I can recall.
13   Q.  To the best of your knowledge, was anyone else
14  on the executive staff level interviewed by the Auditor's
15  Office?  You mentioned Major Eckrich -- actually, did you
16  mention that Major Eckrich was?
17   A.  Yes, I did.
18   Q.  Then you mentioned Colonel Chaffinch you just
19  didn't know, correct?
20   A.  That's correct.
21   Q.  You mentioned yourself who was?
22   A.  Yes.
23   Q.  There's Major Baylor, Major Papili?
24   A.  I believe Major Hughes was.

Page 211

1    Q.  Did you ever talk to those executive staff
2  officers about their interviews with the Auditor?
3    A.  No.
4    Q.  I asked you probably at some point this morning
5  whether you liked Chris Foraker.
6    A.  Yes.
7    Q.  I think you said that you did?
8    A.  I have to go back and ask her to look back
9  through all that.
10   Q.  I can just strike the question.
11   A.  You asked me if I disliked him, and I said no.
12   Q.  I'll go with that.
13       Do you like Kurt Price?
14   A.  Yes.
15   Q.  Do you like Wayne Warren?
16   A.  Yes.  Known those troopers a long time.
17   Q.  Isn't it true that you bear ill will towards
18  both Kurt Price and Wayne Warren?
19   A.  No, that's not true.
20   Q.  Isn't it true that you were angry at those
21  officers as of today?
22   A.  I have been disappointed in the course of action
23  they have taken.
24   Q.  Meaning?

Page 212

1    A.  In some of their actions that when I have
2  reached out, what's come back has come back in a negative
3  way.  There's a mistrust there.  Simple act of taking a
4  meeting with a secretary and the president of DSTA to
5  reach out to Kurt and I attempted to do so and within
6  relative minutes of making that inquiry through chain of
7  command I'm getting a notice from an attorney.
8        Am I frustrated by those type of actions?
9  Sure.  Sure, because it does inhibit the natural ebb and
10  flow of the relationship and conversation when everything
11  is geared towards a lawsuit, appears to be geared towards
12  a lawsuit, that there are -- it does inhibit your natural
13  interaction with others.  Do I hate them?  No, I do not
14  hate them.
15   Q.  Do you bear any animosity towards them?
16   A.  No, I do not.
17   Q.  Is it true that you don't like that they spoke
18  out about the health and safety problems at the FTU?
19   A.  The manner in which they did so I don't like and
20  I don't agree with.  I think they could have done the
21  same thing in-house.  We sat at a table together for
22  months in attempting to resolve the issue.  Nothing was
23  ever spoken at that time about a lot of these issues.  We
24  were working to resolve them is what we were doing.

Page 213

1    Q.  So are you saying that you're not happy about
2  how they spoke to the Auditor?
3    A.  No.  They had to talk to the Auditor.  The
4  manner in which they did so when they spoke to the
5  Auditor was on the front pages of the papers.  Everybody
6  else who was interviewed wasn't on the front pages of the
7  paper with the Auditor, all the other interviews that
8  took place.  They chose that path.  Am I disappointed in
9  choosing that path?  Sure.
10   Q.  You're disappointed at what they said ended up
11  on the front pages of the paper?
12   A.  I'm disappointed in the path that they chose to
13  talk to the auditors.  Not disappointed that they talked
14  to them.  They have to talk to the auditors.  But in
15  talking to the auditors, of course in the course of the
16  investigation they want to publicize it.
17   Q.  Isn't it true that you don't like Kurt Price,
18  Wayne Warren, and Chris Foraker because they sued you?
19   A.  No.
20   Q.  No, you do like them or, no, you don't like them
21  because of that?
22       MR. ELLIS:  I object to the form of the
23  question.  Sounds like there's all three at once.
24

A - 378

54 (Pages 210 to 213)

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 214

1  BY MR. NEUBERGER:
2      Q.  How about individually?  First Chris Foraker, do
3  you like the fact that he sued you, Chaffinch, and the
4  Delaware State Police?
5      A.  Do I like that, the fact that I'm sued?  No.
6      Q.  Does it make you angry?
7      A.  No.  It concerns me.
8      Q.  Are you displeased about it?
9      A.  I would rather not be in that position.  Do I
10  relish the thought of being sued?  No, I do not.
11      Q.  It's a rather unpleasant experience, isn't it?
12      A.  It is when you think of four children and
13  putting them through college and everything you work for,
14  your life, and you're personally named, yes.  It makes a
15  big difference.
16      Q.  Are you pissed off that they sued you?
17          MR. ELLIS:  I object to the form of the
18  question.
19  BY MR. NEUBERGER:
20      Q.  I'm sorry.  That Chris Foraker sued, are you
21  pissed off that Chris Foraker sued you?
22          MR. ELLIS:  My objection is that the term
23  "pissed off" is a little imprecise.
24

Page 215

1  BY MR. NEUBERGER:
2      Q.  Are you irritated that Chris Foraker sued you?
3      A.  I'm disappointed in being sued.
4      Q.  Are you equating irritation with disappointment?
5      A.  I'm disappointed in being sued.
6      Q.  But you're not irritated?
7      A.  I'm disappointed in being sued.
8      Q.  But are you irritated?
9      A.  I'm disappointed in being sued.
10      Q.  You're indicating that you're not irritated?
11      A.  I'm disappointed in being sued.
12      Q.  I think you're expressing you're disappointed in
13  being sued?
14      A.  I'm disappointed in being sued.
15      Q.  Are you peeved at being sued?
16      A.  I'm disappointed in being sued.
17      Q.  How about being disgusted?
18      A.  I'm disappointed in being sued.
19      Q.  Do you like the fact that Kurt Price filed a
20  lawsuit against you and Colonel Chaffinch and the
21  Delaware State Police?
22      A.  No, I do not like the fact that I'm being sued
23  personally.
24      Q.  Are you angry at him for it?

Page 216

1      A.  No, I'm not.
2      Q.  Are you disappointed in him for it?
3      A.  I am disappointed in being sued.
4      Q.  Fair to say you're unhappy as a result of that?
5      A.  I'm disappointed in being sued.
6      Q.  How about Corporal Wayne Warren, are you happy
7  that he filed a lawsuit against you and Chaffinch and
8  Delaware State Police?
9      A.  No, I am not happy over it.
10      Q.  Would it be fair to say you're disappointed in
11  that action?
12      A.  I am disappointed in that action.
13      Q.  Isn't it true that you weren't happy that as a
14  result of Sergeant Foraker, Corporal Price, and
15  Corporal Warren speaking out about health and safety
16  issues, that negative publicity for the Delaware State
17  Police resulted?
18          MR. ELLIS:  I object to the form of the
19  question.  Which speaking out are you referring to, any
20  particular speaking out?
21          MR. NEUBERGER:  The entire course of
22  speaking out about the health and safety issues at the
23  Delaware State Police that are at issue in this lawsuit.
24  Entire course of conduct.

Page 217

1      A.  What was the first part of that question?
2      Q.  Isn't it true that you didn't like the negative
3  publicity that resulted from them speaking out about
4  health and safety issues?
5      A.  I would have preferred to have them bring those
6  issues to the division and we handle them and handle them
7  in-house and had the opportunity to address them, and we
8  were.  As it continued on and on, the dialog pretty much
9  stopped.  So I was disappointed in the fact that we
10  didn't get an opportunity to fully work through the
11  issues that they were presenting without going public
12  with them.  We were working on them.  We were addressing
13  them.
14      Q.  Today is July 19th of the year 2005; isn't that
15  right?
16      A.  That is correct.
17      Q.  Is the FTU fixed and operating?
18      A.  No.  We're still working at getting it fixed.
19      Q.  Has Colonel Chaffinch ever told you that he
20  bears animosity or ill will towards any of the plaintiffs
21  in this lawsuit, meaning Sergeant Foraker,
22  Corporal Price, or Corporal Warren?
23      A.  He has never told me he bears animosity toward
24  any one of them.

A - 379

Price, et al.                                          v.                              Chaffinch, et al.
Thomas F. MacLeish                                C.A. # 04-1207                              July 19, 2007

Page 218

1    Q.  Has he ever said he just doesn't like them very
2    much?
3    A.  Trying to remember conversations I have had with
4    Colonel Chaffinch and when he's talked about the members
5    of the FTU unit.  I know he hasn't been happy with
6    their -- some of their actions, but...
7    Q.  What actions was he unhappy with?
8    A.  Same type of things we just discussed, the
9    publicity -- the fact that they had issues with what was
10   going on out there.  Fine, bring them to our attention,
11   but the manner in which they brought them to our
12   attention through the media and, therefore, the division
13   gets placed in a bad light.  That's what's been
14   disappointing.
15   Q.  Now, has the colonel ever said anything to you
16   which either indicates or implies that he bears any type
17   of animosity, ill will, or anger towards Corporal Price,
18   Corporal Warren, or Sergeant Foraker?
19       MR. ELLIS:  I object to the form of the
20   question.
21       MR. HAVERLY:  Based on what?
22       MR. ELLIS:  It's the same question he asked
23   a couple minutes ago.  He just asked the exact same
24   question.

Page 219

1        MR. NEUBERGER:  I think I actually used
2    different words.
3        MR. ELLIS:  It's awful close.
4        MR. NEUBERGER:  Colonel?
5    A.  One more time with the question, please.  I'm
6    sorry.  It's been a long day for all of us.
7        MR. NEUBERGER:  Could you read that
8    question back?
9        (The reporter read back as instructed.)
10       THE WITNESS:  He's expressed, as I said,
11   disappointment in their actions, and he has never told me
12   he hates them, that he can't stand them.  I have never
13   heard him use those words around me.
14   BY MR. NEUBERGER:
15   Q.  Has he ever said to you that "I'm going to get
16   them"?
17   A.  No.
18   Q.  I'd like to change gears a little bit and talk
19   about a different topic.  Isn't it true that since
20   Chris Foraker was reinstated to the FTU on December 1st
21   of 2003, that his job duties as NCOIC of the FTU have
22   been changed?
23   A.  We have put him in a different facility, but
24   other than that, the basic duties are still there.

Page 220

1    Q.  So is it your position that his duties as of
2    today, with the exception of the facility change, are the
3    same duties he had as of April 8 of 2002?
4    A.  The unit did not fall under me on April the 8th
5    of 2002, but the duties and responsibilities that he
6    currently has are similar to what our firearms
7    instructors are required to do.
8    Q.  Isn't it true that his duties now are less than
9    what they once were?
10   A.  Not to my knowledge.
11   Q.  Isn't it true that you personally have
12   diminished his job duties?
13   A.  I don't believe that's true.
14   Q.  Isn't it true that you once publicly threw him
15   out of a commanders and section chiefs meeting?
16   A.  No.  I removed him from a commanders and section
17   chiefs meeting.  Publicly did so?  I went over and I
18   spoke to him one-on-one.  He was sitting in the back of
19   the room.  And commanders meetings are lieutenants and
20   captains and section chiefs.  And if a section chief of
21   the Firearms Training Unit falls under the academy staff,
22   I had talked to -- I think Lieutenant Davis was present
23   at that meeting.  I asked him if he had him there for a
24   specific reason.  He said he did not.  If one of my

Page 221

1    section chiefs or troop commanders is going to have a
2    specific reason to have someone there to address the
3    group, they're allowed to remain in the group.
4        When he was present he was -- and I did ask
5    him to leave because he didn't have anything to present.
6    He had his lieutenant and his direct line of command was
7    present in that room representing the DSP academy.
8    Q.  Was Sergeant Foraker a section chief as the
9    NCOIC of the FTU?
10   A.  That fell under the academy.  So no, he was not
11   in the intent -- with the intention of who was present in
12   that room.
13   Q.  So you're indicating that Sergeant Foraker
14   doesn't qualify as a section chief?
15   A.  Under the format of who's required to be at that
16   meeting, no, he did not.
17   Q.  Was that a commanders and section chiefs
18   meeting?
19   A.  Yes, it is section chiefs being those that stand
20   alone.  PIO, homicide unit stand alone.  They don't
21   report to a commander of one of those units.
22   Q.  Are you aware that Sergeant Foraker was
23   previously allowed to attend those meetings prior to
24   April 8 of 2002?

A - 380

56 (Pages 218 to 221)

Price, et al.
Thomas F. MacLeish

v.

C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 222

1  A. Prior administration. We made those changes to
2  the structure of our commanders meetings to make them
3  more efficient, more effective, that we did not have
4  sergeants there. It was command staff and command staff
5  only.
6      Q. Are you aware that Sergeant Foraker was actually
7  invited to attend that meeting?
8      A. I was not aware of that. I know there was a
9  series of e-mails that went out, and in one of them there
10 was a question about having the proper -- having
11 photographs of the proper section chiefs and so forth,
12 and I think that's how he became included in the
13 invitation to that.
14     Q. So the only reason that he got those e-mails
15 were because of the photo issue?
16     A. From what I understand of that, yes, because it
17 did become a question. He informed me he was invited to
18 that, and I knew that he should not have been. Not
19 because he's Chris Foraker, because there were other --
20 there weren't other sergeants in charge of sections that
21 were present. The only other sergeant that's normally
22 there is Sergeant Alex Peterson from our planning
23 section. Our planning section set up the meetings, and
24 he sits in on occasion when Lieutenant Cohee or now

Page 223

1  Captain Davis may or may not be able to be present there.
2  But, for the most part, sergeants are not at that meeting
3  unless they're going to present something specific.
4      MR. NEUBERGER: I'd like to mark another
5  exhibit as MacLeish Deposition Exhibit No. 20.
6      (MacLeish Deposition Exhibit No. 20 was
7  marked for identification.)
8  BY MR. NEUBERGER:
9      Q. Colonel, do you have this document in front of
10 you?
11     A. Yes, I do.
12     Q. Does it appear to be a multipage document?
13     A. It's multi pages.
14     Q. At the bottom of the first page in the bottom
15 right-hand corner does it say "CF20"?
16     A. Yes, it does.
17     Q. Could you flip to the very, very last page?
18     A. (Complied.)
19     Q. Does that say in the bottom right-hand corner,
20 does it say "CF63"?
21     A. Yes, it does.
22     Q. Can you turn back to the first page again?
23     A. (Complied.)
24     Q. Does this appear to be an e-mail sent by

Page 224

1  Captain Homiak on March 29th of 2004?
2      A. Yes.
3      Q. Is it sent to DSP troop commanders and DSP
4  section chiefs sworn?
5      A. Yes.
6      Q. At the top left of this e-mail it says, "Foraker
7  Christopher D (DSP)"?
8      A. Yes.
9      Q. Circumstantially at least would that indicate
10 that this e-mail was sent to Sergeant Foraker?
11     A. Yes, it does.
12     Q. Could you turn to the next page? At the bottom
13 right-hand corner does it say "CF21"?
14     A. Yes.
15     Q. Does this appear to be an e-mail from
16 Captain Homiak?
17     A. Yes.
18     Q. Dated May 27, 2004?
19     A. Yes, it does.
20     Q. Is the subject June commanders meeting?
21     A. Yes.
22     Q. Does the text of the e-mail say, "Good morning,
23 The June Commanders Meeting is scheduled for June 23 at"
24 9:00 a.m. at the DSP academy?

Page 225

1      A. Yes.
2      Q. Again, circumstantially would it appear that
3  this e-mail was sent to Sergeant Foraker?
4      A. By going by what's at the top, yeah, I would
5  assume that it would indicate that it applied to him.
6      Q. Don't the two lines say that it was sent to DSP
7  section chiefs sworn and DSP troop commanders?
8      A. Yes.
9      Q. Can you turn several more pages to the page that
10 at the bottom right-hand corner says CF27?
11     A. (Complied.)
12     Q. Tell me when you found that.
13     A. Got it.
14     Q. Is this also an e-mail from Captain Homiak?
15     A. Yes.
16     Q. Date of June 29th, 2004, at 12:22 p.m.?
17     A. Yes.
18     Q. In the "To" line, DSP section chiefs sworn and
19 DSP troop commanders?
20     A. Yes.
21     Q. Does the subject line say, "Commanders Meeting
22 and NIBRS Numbers"?
23     A. Yes.
24     Q. Does the text of this e-mail appear to be a

A - 381

Wilcox & Fetzer, Ltd.           Professional Court Reporters                (302)655-0477

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 226

1 reminder to attend the July commanders meeting?
2   A. Yes, it does.
3   Q. Circumstantially, looking at the top left-hand
4 corner of this document, would it appear that this e-mail
5 was sent to Sergeant Foraker?
6   A. Yes. As we go through these, Sergeant Foraker
7 in our computer system and notification system, it's
8 easier, rather than have to write everybody out, that he
9 is under that designation of a section chief as a
10 firearms instructor of the FTU. That falls under the
11 training academy. I would venture to say that
12 Corporal Anderson, who is our K9 officer, also received
13 these. He doesn't come to the commanders meetings. He's
14 the section chief of our K9 section, but he is not -- the
15 intent of the commanders meetings and section chiefs are
16 for those commissioned officers.
17   Q. You're indicating that the DSP computer system
18 recognizes Sergeant Foraker as a DSP section chief and
19 sends section chief e-mails to section chief
20 Sergeant Foraker?
21       MR. ELLIS: I object to the form of the
22 question.
23   A. I thought -- you paraphrased what I said, but
24 what I'm saying is that for the ease -- our computer

Page 227

1 support section, when identifying individuals to make
2 global e-mails for notification of section chiefs, would
3 need to have without filtration through their chain of
4 command, that's why they do that. There can be numerous
5 sections. Our intel section has numerous subsections
6 under it where they're identified as the section chief.
7 They're not invited to the commander and section chiefs
8 meetings. It would grow too large.
9   Q. Can you turn to the page that says CF29 on the
10 bottom right-hand corner?
11   A. (Complied.)
12   Q. Are you at that page?
13   A. I am.
14   Q. At the very top does it say from Laurie A.
15 Robbins, DSP?
16   A. Yes.
17   Q. Does it say sent Thursday, July 15, 2004,
18 3:19 p.m.?
19   A. Yes.
20   Q. Does the "To" line say, among many other names,
21 DSP troop commanders and DSP section chiefs sworn?
22   A. Yes.
23   Q. Going down to the body of the e-mail, does it
24 say, "The following email has been authorized by Colonel

Page 228

1 L. Aaron Chaffinch"?
2   A. Yes.
3   Q. At the top left-hand corner of this document,
4 does it say, "Foraker Christopher D"?
5   A. Yes.
6   Q. Turning several more pages ahead to the page
7 that in the bottom right-hand corner says CF35, are you
8 at that page?
9   A. Yes, I am.
10   Q. Does this say from Richard Cohee, DSP?
11   A. Yes, it does.
12   Q. Dated August 23, 2004?
13   A. Yes.
14   Q. Is it sent to DSP section chiefs, DSP troop
15 commanders, and executive staff?
16   A. Yes.
17   Q. Does it say in large bold underlined words,
18 "THIS MESSAGE SENT AUTHORITY OF COLONEL L. AARON
19 CHAFFINCH"?
20   A. Yes.
21   Q. I want you to keep on turning a few more pages
22 to the page which in the bottom right-hand corner says
23 CF62. Tell me when you have arrived at that page.
24   A. Got it.

Page 229

1   Q. Is this an e-mail from Elizabeth B. Seay?
2   A. Yes.
3   Q. Is it dated Friday, June 10th, 2005, at
4 2:31 p.m.?
5   A. Yes.
6   Q. Is it to DSP troop commanders, DSP section
7 chiefs sworn?
8   A. Yes.
9   Q. At the top left-hand corner does it say,
10 "Foraker Christopher D (DSP)"?
11   A. Yes.
12   Q. In the body of the e-mail does it say, "Troop
13 Commanders and Section Chiefs:"? Does it say that?
14   A. Yes.
15   Q. Does it go on to say that the commanders meeting
16 scheduled for Wednesday, June 15th, has been postponed
17 until the following week, the date and location to be
18 determined. The planning section will make the
19 notification. Does it say that?
20   A. Yes.
21   Q. Does it go on to say that "This message is being
22 sent authority of Colonel Thomas F. MacLeish"?
23   A. Yes.
24   Q. You mentioned a little while ago the meeting

A - 382

58 (Pages 226 to 229)

Price, et al.
Thomas F. MacLeish

v.
C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 230

1    which you asked Sergeant Foraker to leave. Do you recall
2    that?
3        A.  Yes, I do.
4        Q.  Did you take him out in the hallway to tell him
5    to leave?
6        A.  I went and sat down by him seated in a room and
7    I explained to him that these meetings were for
8    commissioned officers and, in fact, was he presenting
9    something specific on firearms. He said no. I said,
10   "Then you're not to attend the meeting." And he wanted
11   to have an exchange. We then went into the hall, and I
12   just reiterated my position.
13       Q.  Out in the hallway did you order him to leave?
14       A.  I told him he was not to attend the meeting.
15       Q.  Did you intend that to be an order?
16       A.  Yes.
17       Q.  At that point did you go back in the meeting?
18       A.  Yes, I did.
19       Q.  Did you talk to anybody in there about what you
20   had just done, to the best of your recollection?
21       A.  I can't recall whether I did. I know I
22   subsequently spoke to Lieutenant Davis and explained to
23   him why Sergeant Foraker was not to attend the meeting.
24   Other sergeants, other section chiefs that fell under an

Page 231

1    existing branch were not in attendance at those meetings.
2        Q.  At some point in that meeting did Captain Nate
3    McQueen stand up and ask for Sergeant Foraker's
4    assistance in organizing certain funeral activities
5    arising out of the tragic death of a fallen trooper?
6        A.  At this same meeting? I remember Captain
7    McQueen asking -- I think that was Corporal Shay's
8    funeral. I remember Captain McQueen's asking for
9    Foraker's assistance.
10       Q.  Did you get angry at Captain McQueen?
11       A.  No.
12       Q.  Did you give him a dirty look?
13       A.  Not that I can recall.
14       Q.  Did you glare at him?
15       A.  Not that I'm aware of.
16       Q.  Changing gears a little bit again. Is it your
17   position that Sergeant Foraker's job duties are the same
18   now as they were prior to April 8 of 2002?
19       A.  Yes, it is my opinion that it is the same.
20       Q.  Is safe staffing levels at the FTU an important
21   thing?
22       A.  Yes, they are.
23       Q.  Are you aware that Sergeant Ashley was given a
24   fifth full-time firearms instructor at the FTU while he

Page 232

1    was in charge of the facility?
2        A.  I count five including Sergeant Ashley. Is that
3    what you're referring to?
4        Q.  Yes.
5        A.  Yes.
6        Q.  Sergeant Foraker has never had five since he has
7    been reinstated; isn't that correct?
8        A.  I believe when he first started he had five
9    because he had the same group that Sergeant Ashley had
10   with the exception of Sergeant Ashley. It was
11   Sergeant Foraker, Corporal Warren, Corporal Price,
12   Corporal Warwick, and Corporal Peachey.
13       Q.  Corporal Peachey was still working at that
14   point?
15       A.  Yes, he was. As of December the 1st.
16       Q.  It's your position that he continued to serve at
17   the FTU thereafter?
18       A.  Until his retirement. I think he retired in
19   January of '04.
20       Q.  Have you ordered Major Eckrich, Captain Homiak,
21   and Lieutenant Hagen and other officers above
22   Sergeant Foraker in the chain of command to harass him in
23   the performance of his daily --
24       A.  No.

Page 233

1        Q.  Are you aware of Colonel Chaffinch giving such
2    an order?
3        A.  No, I'm not.
4        Q.  Do you know if Corporal Peachey was mostly out
5    on sick leave during his time at the FTU in December 2003
6    due to his injuries?
7        A.  It had come to my attention through
8    Captain Warren that Corporal Peachey was using sick time.
9    If he was using his sick time, then he was to be
10   accountable just as anybody else was.
11       Q.  I'm sorry. I'm not following.
12       A.  If, in fact, you have an employee that's using
13   their sick time, then they must have documentation as to
14   why they're using their sick time. He was directed to do
15   that.
16           The other issue of minimum staffing in a
17   firing range and maintaining those minimum standards, it
18   does fall back to the NCOIC of the unit that we have
19   always used others from the field to help and make those
20   numbers work, whether it's on a student shoot or a
21   inservice reshoot, requalification. There are those in
22   the field that have that. Sometimes people show up to
23   shoot that day. They are tapped into service and it's
24   NCOIC's responsibility to make sure that he or she has

A - 383

59 (Pages 230 to 233)

Price, et al.                              v.                    Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207              July 19, 2007

Page 234

1   the sufficient numbers to conduct the shoot.
2       Q.   If he doesn't have the sufficient numbers, what
3   should the NCOIC do?
4       A.   He would adjust accordingly.
5       Q.   So, for example, he wouldn't train as many
6   people that day?
7       A.   Maybe that's the case.  If he felt he didn't
8   have sufficient numbers to do so with what was in reason,
9   then my expectation would be that he would make those
10  adjustments.
11      Q.   You have been a police officer for more than
12  25 years; isn't that correct?
13      A.   I'm in my 28th year.
14      Q.   Do you know that under our form of government
15  the highest law of the land is something called the
16  United States Constitution?
17      A.   Yes.
18      Q.   Are you aware that there is also a Bill of
19  Rights?
20      A.   Yes.
21      Q.   Are you aware that there are also amendments to
22  the United States Constitution?
23      A.   Yes.
24      Q.   Is the United States Constitution something that

Page 235

1   is important to the Delaware State Police?
2       A.   Yes, it is.
3            MR. ELLIS:  Asked and answered.  Come on.
4   You asked him all these questions already.
5            MR. NEUBERGER:  Did I?
6       Q.   As a police officer, you have been trained to
7   obey the U.S. Constitution?
8       A.   Yes.
9       Q.   For example, under the Fourth Amendment you have
10  been trained in laws governing search and seizure and
11  things like that?
12      A.   Yes.
13      Q.   You know that under the Constitution you can't
14  discriminate against an officer in transfers or
15  promotions or things like that because of their religion?
16      A.   That's correct.
17      Q.   Or their gender?
18      A.   Yes.
19      Q.   That's because the Fourteenth amendment to the
20  U.S. Constitution forbids that?
21      A.   Yes.
22      Q.   You know you can't transfer or punish an officer
23  because of where he goes to church?
24      A.   That's right.

Page 236

1       Q.   You can't transfer or punish an officer because
2   of how he votes; isn't that right?
3       A.   That's right.
4       Q.   That's because the First Amendment to the United
5   States Constitution forbids that; isn't that right?
6       A.   Yes.
7       Q.   You know you can't punish an officer who reports
8   corruption in the workplace; isn't that right?
9       A.   That's right.
10      Q.   You know that you can't punish an officer who
11  reports that police officers are taking bribes?
12      A.   That's right.
13      Q.   You know you can't punish an officer who speaks
14  out about health and safety in the workplace?
15      A.   That's correct.
16      Q.   For example, if there was an officer at the DSP
17  headquarters in Dover who reported that the building was
18  contaminated with asbestos, you know that you couldn't
19  retaliate against that officer for their speech on that
20  matter?
21      A.   That's correct.
22      Q.   You know you can't punish an officer who files a
23  lawsuit in the state court, right?
24      A.   That's correct.

Page 237

1       Q.   And you know you can't punish an officer who
2   files a lawsuit in federal court?
3       A.   That's correct.
4       Q.   In your opinion, should police officers violate
5   the Constitution or its amendments?
6       A.   No, they should not.
7       Q.   Is it a serious thing when police officers do
8   violate the Constitution or its amendments?
9       A.   Yes, it is.
10           MR. NEUBERGER:  I'd like to take another
11  break.
12           (A recess was taken.)
13           MR. NEUBERGER:  Colonel, I don't have any
14  more questions for you, but I'm going to recess the
15  deposition from plaintiffs' perspective because we
16  haven't gotten certain discovery in the case yet, meaning
17  when we do get that discovery, you're going to have to
18  come back.  Just for the purposes of the record, I'd like
19  to get that down.  Subject to that, I have no further
20  questions.
21           MR. ELLIS:  Are you referring to anything
22  other than what we just gave you in terms of discovery
23  you haven't gotten?
24           MR. NEUBERGER:  What discovery did we get

A - 384

60 (Pages 234 to 237)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                              v.                    Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                     July 19, 2007

Page 238

1  from you last?
2          MR. ELLIS:  I thought we just gave you a
3  box of documents yesterday.
4          MR. NEUBERGER:  I haven't even actually
5  seen that yet.  I think there's a box in my office
6  somewhere.  But I'm specifically referring to the
7  personnel file issue.  I think Robert and I are still
8  working that out.
9          MR. ELLIS:  Okay.  I don't know that this
10  witness is going to know any of those documents anyway.
11  For purposes of today, I'll accept that and we will
12  decide --
13          MR. HAVERLY:  I think they're also
14  documents dealing with the Foraker case solely.  There's
15  been requests served.  You may or may not have reviewed
16  it yet or anything like that.
17          MR. ELLIS:  When did it get to us?
18          MR. HAVERLY:  Sometime this week is when it
19  should get to you.
20          MR. ELLIS:  You just sent us some stuff.
21          MR. HAVERLY:  Yes.
22          MR. ELLIS:  I may not have seen it yet.  We
23  responded to two sets of requests for production of
24  documents I believe yesterday.  I hope it was yesterday.

Page 239

1  And we produced several thousand pages' worth of
2  documents.  If there's a new request for production, then
3  I'm not aware of it.
4          MR. HAVERLY:  I'm just saying that there
5  is.
6          MR. NEUBERGER:  I apologize for not being
7  up on the documents.  I'm sure we have them if you guys
8  sent them over.
9          MR. ELLIS:  Thank you.
10          MR. NEUBERGER:  Do you have any questions?
11          MR. ELLIS:  I'm not going to ask him
12  questions when you're not done.  That wouldn't be fair.
13          MR. NEUBERGER:  In that case we're going to
14  recess the deposition.  It's 4:10.
15          (Deposition concluded at 4:10 p.m.)
16          (Deposition to be continued.)
17              - - - - -
18
19
20
21
22
23
24

Page 240

T E S T I M O N Y

DEPONENT:  COLONEL THOMAS F. MacLEISH      PAGE

BY MR. NEUBERGER.............................. 3

E X H I B I T S

MacLEISH DEPOSITION EXHIBIT NO.            MARKED

1 - Copies of newspaper articles Bates
stamped CF69 through CF76.................... 21

2 - A multipage document entitled,
"COMPLAINT".................................. 23
3 - A three-page memorandum dated March 4,
2004......................................... 65

4 - A three-page document entitled,
"Recommendations and Design
Considerations For Indoor Rifle Ranges........ 74

5 - A four-page e-mail dated April 7, 2004.... 83

6 - A three-page document Bates stamped
FTU2756 through FTU2758..................... 105
7 - A memorandum dated 11/8/98.............. 108
8 - A letter to Mr. Doyle Tiller from
Kenneth M. Belmont, dated December 1, 1998... 111

9 - A two-page memorandum dated 12/3/98...... 113

10 - A memorandum dated April 29, 1999....... 115

Page 241

E X H I B I T S (cont'd)
MacLEISH DEPOSITION EXHIBIT NO.            MARKED
11 - Two-page e-mails Bates stamped
FTU3881 through FTU3882................... 117

12 - Two-page e-mails Bates stamped
FTU2348 through FTU2349................... 121
13 - A two-page e-mail dated January 9,
2004......................................... 123

14 - E-mails Bates stamped FTU3886........... 131

15 - An e-mail dated February 19, 2004....... 137

16 - A three-page document entitled,
"Firearms Training Unit Indoor Range
Maintenance and Service Report, dated
March 31, 2004............................... 140
17 - A six-page newspaper article Bates
stamped FTU2901 through FTU2897............. 159

18 - An e-mail dated 4/21/04................. 179

19 - An e-mail dated March 5, 2005........... 205

20 - Multiple pages of e-mails Bates
stamped CF20 through CF63.................... 223

ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 242

CERTIFICATE OF REPORTER          PAGE 243

A - 385

61 (Pages 238 to 241)

Price, et al.                                    v.                        Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                      July 19, 2007

Page 242

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 243

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                  )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 19th day of
July, 2005, the deponent herein, COLONEL THOMAS F.
MacLEISH, who was duly sworn by me and thereafter
examined by counsel for the respective parties; that the
questions asked of said deponent and the answers given
were taken down by me in Stenotype notes and thereafter
transcribed by use of computer-aided transcription and
computer printer under my direction.
        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


            Kimberly A. Hurley
            Certification No. 126-RPR
            (Expires January 31, 2008)


DATED:

A - 386

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Price, et al.

# v.

# Chaffinch, et al.

## C.A. # 04-956-GMS

---

## Transcript of:

## John A. Yeomans

## October 3, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A - 387

A - 388

Price, et al.
John A. Yeomans

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,        )
                                       )
            Plaintiffs,                )
                                       ) Civil Action
    v.                                 ) No. 04-956-GMS
                                       )
COLONEL L. AARON CHAFFINCH, et al.,    )
                                       )
            Defendants.                )
------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,       )
                                       )
            Plaintiff,                 )
                                       )  Civil Action
    v.                                 ) No. 04-1207-GMS
                                       )
COLONEL L. AARON CHAFFINCH, et al.,    )
                                       )
            Defendants.                )

            Deposition of JOHN A. YEOMANS taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A.,  2 East 7th Street, Wilmington, Delaware,
beginning at 9:35 a.m., on Monday, October 3, 2005,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.
APPEARANCES:
        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          For the Plaintiffs

                                        **A - 391**

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

Price, et al.                                    v.                          Chaffinch, et al.
John A. Yeomans                        C.A. # 04-956-GMS                    October 3, 2005

Page 2

1  APPEARANCES: (Cont'd)
2       ROBERT J. FITZGERALD, ESQ.
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
3       123 South Broad Street
        Philadelphia, Pennsylvania 19109
4       For the Defendants
5  ALSO PRESENT:
        B. KURT PRICE
6       CHRISTOPHER D. FORAKER
        WAYNE WARREN
7
8            - - - - -
9            JOHN A. YEOMANS,
10      the deponent herein, having first been
11      duly sworn on oath, was examined and
12      testified as follows:
13            EXAMINATION
14  BY MR. NEUBERGER:
15      Q.  Are you Captain John A. Yeomans?
16      A.  Yes.
17      Q.  And, Captain Yeomans, I have noticed your
18  deposition today and you're being forced to testify.
19          You understand that?
20      A.  Yes.
21      Q.  You're an employee of the Delaware State
22  Police, right?
23      A.  Yes.
24      Q.  And you're director of human resources?

Page 3

1       A.  Correct.
2       Q.  Make yourself comfortable.
3       A.  Thanks.
4       Q.  Now, we have only met twice before, I think. I
5   took your deposition on August 20th, 2003. Is that
6   correct?
7       A.  Yes, sir.
8       Q.  And that was in another case of Bullen versus
9   Chaffinch, correct?
10      A.  Yes, sir.
11      Q.  And then on January 13th of 2004 in that case
12  of Bullen versus Chaffinch I called you as a witness
13  to testify in that trial. Isn't that correct?
14      A.  Yes, sir.
15      Q.  Aside from that, we haven't met before?
16      A.  No.
17      Q.  Okay. Now, so you at least have had your
18  deposition taken on at least one occasion by me,
19  right?
20      A.  Yes, sir.
21      Q.  Have you given other depositions in other
22  cases?
23      A.  Yes, I have.
24      Q.  Well, you made a career in law enforcement,

Page 4

1   right?
2       A.  Yes.
3       Q.  You have testified in court on numerous
4   occasions. Is that right?
5       A.  I have, yes, sir.
6       Q.  So you understand -- well, let me just review
7   the process. Okay?
8       A.  Okay.
9       Q.  I'm going to ask questions. The court reporter
10  will take them down. They will then get typed up in a
11  transcript.
12      Q.  You understand that, right?
13      A.  Yes.
14      Q.  And if you made a mistake in answering a
15  question, you get to review that if you choose. So,
16  for example, if you said you were 35 years old and
17  you're really 40, you could fix a mistake like that.
18          You understand that, in 30 days or so?
19      A.  Sure.
20      Q.  Otherwise, if I call you to testify in this
21  case and at trial you said something different from
22  what you said at your deposition, you know I could
23  point that out to the judge and jury?
24      A.  Absolutely. Yes.

Page 5

1       Q.  Are you on any medications or anything that
2   would interfere --
3       A.  No.
4       Q.  Let me just finish.
5           (Continuing) that would interfere with
6   your ability to recall anything today?
7       A.  No.
8       Q.  And you know the significance of an oath to
9   tell the truth, right?
10      A.  Yes.
11      Q.  I tend to talk real fast. The court reporter
12  has the hardest job in the room so we just have to
13  take turns and try not to step on each other's
14  answers.
15          Do you understand that?
16      A.  Yes.
17      Q.  Now, if I ever ask you a question that you
18  don't understand, just let me know and I will be glad
19  to rephrase it. Is that okay?
20      A.  Yes, sir.
21      Q.  So the hardest question: How old are you?
22      A.  44.
23      Q.  Okay. And are you the custodian of records of
24  human resources at the Delaware State Police?

2 (Pages 2 to 5)

Price, et al.
John A. Yeomans

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 6

1   A.  I am.
2   Q.  Now, before today -- well, first of all, we're
3   here about two cases.  There's a case by Sergeant
4   Foraker against the Delaware State Police and others.
5       Do you understand that?
6   A.  Yes.
7   Q.  Then there's a case by Wayne Warren, Kurt Price
8   and Sergeant Foraker against the Delaware State
9   Police.
10      Do you understand that?
11  A.  Yes, sir.
12  Q.  Now, before today have you ever met with
13  lawyers for the State Police to discuss the
14  allegations in either of those cases?
15  A.  Yes.
16  Q.  So let's put that to the side.  I don't want to
17  ask you anything they have ever said to you or
18  whatever.
19  A.  Okay.
20  Q.  But was that on one or more occasions?
21  A.  More than one.
22  Q.  More than one?
23  A.  Right.
24  Q.  Okay.  More than two?

Page 7

1   A.  Possibly.  Yeah.
2   Q.  Besides lawyers, was anybody else present at
3   those meetings?
4   A.  (Pause.)
5   Q.  Let's say other employees of Delaware State
6   Police?
7   A.  Yeah.  Yeah.  I'm thinking probably the
8   colonel, Colonel MacLeish, perhaps.
9   Q.  How about Lieutenant Colonel Seifert?
10  A.  No.
11  Q.  Former Colonel Chaffinch?
12  A.  No.
13  Q.  Were any non-uniformed people there besides the
14  lawyers?
15  A.  No.
16  Q.  And did you review any documents at those
17  meetings?
18  A.  Yes.
19  Q.  What kinds of documents?
20  A.  Mainly our policies, any files we have
21  pertaining to the plaintiffs in the case, files
22  regarding comparators in the matter, historical data,
23  policies, procedures, really anything policy-wise or
24  data-wise pertaining to this case, medical records,

Page 8

1   those sort of things.
2   Q.  Some other depositions have been taken in this
3   case so far.  Were you shown any deposition testimony
4   by anybody given in these cases?
5   A.  No.
6   Q.  So, for example, I mean do you know former
7   Major David Baylor?
8   A.  Yes.
9   Q.  He's given a deposition in the case.
10  A.  I'm aware of that, yes.
11  Q.  Did you have an opportunity to review his
12  deposition testimony?
13  A.  No.
14  Q.  Now, Major Joseph Papili gave a deposition.
15  Have you had a chance to review it?
16  A.  No.
17  Q.  Was defendant Mitchell present in any of these
18  cases, in any of these meetings?
19  A.  No, sir.
20  Q.  Now, aside from those meetings that the lawyers
21  for the State Police were present, have you ever had
22  any meetings when the lawyers weren't present with
23  Colonel MacLeish about the allegations in the case?
24  A.  Yes.

Page 9

1   Q.  And when I said, "the case," I meant either of
2   the two cases.
3       Have you had meetings with Colonel
4   MacLeish about the allegations in Sergeant Foraker's
5   case or the other case?
6   A.  Primarily the other case with Corporals Warren
7   and Price.
8   Q.  And have you had those kinds of meetings on
9   more than one occasion with Colonel MacLeish?
10  A.  Yes, sir.
11  Q.  And who would have been present at those
12  meetings?
13  A.  For the most part, other than I think one
14  meeting, it was Colonel MacLeish and on one occasion
15  Colonel Chaffinch.
16  Q.  Okay.  So that was before Colonel Chaffinch
17  retired or after he retired?
18  A.  Before he retired.
19  Q.  So there were at least two meetings?
20  A.  Yes.
21  Q.  Do you remember the approximate dates of those
22  meetings?
23  A.  It would have been about the time that
24  Corporals Warren and Price were either undergoing