Case 1:04-cv-01207-GMS    Document 75-18    Filed 02/02/2006    Page 1 of 14

Price, et al.                                     v.                          Chaffinch, et al.
John A. Yeomans                          C.A. # 04-956-GMS                    October 3, 2005

Page 10
1  fitness for duty examinations or approaching those
2  examinations, one or the second, because we had two
3  examinations. I know I had meetings with MacLeish on
4  at least two, maybe more occasions about those
5  examinations and I know one occasion in which Colonel
6  Chaffinch stopped in basically while Colonel MacLeish
7  and I were meeting and he discussed it briefly with
8  us.
9  Q.  Was that meeting down in your offices?
10 A.  It was actually in Colonel McLeish's office at
11 the time when he was the lieutenant colonel.
12 Q.  Right. So did all these meetings occur while
13 Aaron Chaffinch was still on active duty as the
14 colonel?
15 A.  I know we had subsequent meetings after his
16 departure. Some of those were in Colonel McLeish's
17 office. Some of those were in my office. That's
18 pretty -- there may have been some meetings in the
19 small conference room next to Colonel McLeish's
20 office, but pretty much it was Colonel MacLeish and
21 myself.
22       There was one other meeting that was
23 called, now that I'm thinking about this, that did not
24 involve either colonel but it involved Major Hughes,

Page 11
1  Major Eckrich, Debra Lawhead. And I know Mike Tupman
2  was invited to the meeting, but he didn't show up.
3  Q.  Debra Lawhead, that name doesn't ring a bell
4  for me. Who is she?
5  A.  She's with the state insurance office. She
6  deals with workmen's comp. claims. She's actually I
7  guess technically under the budget director now, but
8  she handles insurance claims relative to the State
9  Police matters, among other divisions of the state
10 but, you know, car accidents involving our divisional
11 vehicles. And she also is sort of the coordinator
12 between the division of State Police and the PMA,
13 which is the workmen's comp company that reviews
14 workmen's comp claims and orders up independent
15 medical examinations and those sort of things.
16       So she's been there a number of years and
17 has worked with State Police over the years regarding
18 different insurance matters and workmen's compensation
19 matters.
20 Q.  Okay. Is it fair to say that you have met with
21 either Colonel MacLeish or Colonel Chaffinch or the
22 two of them and others over at least five times?
23 A.  Yes.
24 Q.  Now, Major Hughes, correct me if I'm wrong,

Page 12
1  isn't he the operations major for Kent and Sussex
2  County?
3  A.  Yes, he is.
4  Q.  Major Eckrich is the budget major, right?
5  A.  Correct.
6  Q.  So this meeting that Major Hughes was present
7  with Eckrich and Lawhead, why was Hughes present?
8        MR. FITZGERALD: Captain, I'm going to
9  instruct you not to answer to the extent this question
10 seeks any communications that you had with the people
11 that you have just listed relating to this litigation,
12 either communications concerning the facts for
13 purposes of fact gathering or communications relating
14 to anything that the lawyers may have said to anybody
15 in that group or anything like that.
16       To the extent he's asking for information
17 relating to communications as to how to deal with the
18 underlying facts relating to the FTU or workmen's
19 compensation or anything like that, you can answer.
20       Is that clear?
21       THE WITNESS: I think so.
22 BY MR. NEUBERGER:
23 Q.  I'm not asking for communications from your
24 lawyers to you or whatever.

Page 13
1  A.  Right.
2  Q.  I just didn't understand why Major Hughes would
3  be there.
4        MR. FITZGERALD: An example would be any
5  communications that lawyers may have given you that
6  you then passed on to anybody in that other group
7  or --
8        MR. NEUBERGER: Right.
9        MR. FITZGERALD: -- communications that
10 lawyers may have given Colonel MacLeish or Major
11 Eckrich that then came up in that group not to talk
12 about it.
13 Q.  Right. So I'm not asking you anything that you
14 may have told Major Hughes from your lawyers or
15 whatever.
16 A.  Yes, sir.
17 Q.  So what can you tell me?
18 A.  Basically, it was a meeting to bring together
19 Major Hughes from -- his role was mainly because he
20 had become involved with this because at some point
21 the academy and firearms training unit had shifted
22 under his TO. He was overseeing it. So he was
23 included, but also because he was part of a committee
24 that was formed between the DSTA, our administration,

Price, et al.
John A. Yeomans
v.
C.A. # 04-956-GMS
Chaffinch, et al.
October 3, 2005

Page 14

1  I believe members of the range staff were involved to
2  look at mainly the range itself, the repair process or
3  recommendations, whatever was going to need to be
4  done, as well as issues relative to their medical
5  status and well-being, where we were with this whole
6  thing.
7        Debbie Lawhead, she was invited because of
8  her role with workmen's comp. There had been a number
9  of claims filed and what the status on those were.
10 And basically the meeting was called together because
11 you had the human resource component of it with the
12 medical issues and fitness for duty. You had the
13 range issue, the structural concerns and
14 recommendations that were being made to fix the range,
15 the workmen's comp component.
16       Major Eckrich was invited because of the
17 fiscal issue relative to any reparations that were
18 going to be made. So it was pretty much just to get
19 everyone together and see if we were on the same page
20 with what issues were being addressed or what weren't.
21 Q.  Thank you.
22      Just to go back a second, you identified
23 various things you reviewed before testifying today
24 and one of which was you called it comparator files?

Page 15

1  A.  Right.
2  Q.  Right. So by comparator files did you mean the
3  medical and other personnel files of other troopers in
4  the State Police who may have been on various kinds of
5  leave after they were injured?
6  A.  Yes.
7  Q.  And are there such files or records kept by the
8  State Police?
9  A.  Yes.
10 Q.  So you looked at the files, right?
11 A.  Well, I reviewed summaries or synopses of those
12 files. Members of my staff actually sat down and went
13 through the files and provided time lines to me
14 relative to their absence from the workplace, their
15 particular injuries, whether they had returned to
16 full-duty or light-duty status, whether they had
17 separated from the division, what that time period
18 was, those sort of things.
19      So I have had the opportunity to review
20 some data relative to those officers.
21 Q.  Okay. And who would have been your staff
22 people who prepared those summaries or synopses for
23 you?
24 A.  Namely, Ms. Lisa McNatt and Ms. Kristy Tuxward,

Page 16

1  who are both HR specialists in my office.
2  Q.  I think I have heard Ms. McNatt's name before.
3  She's been there a long time. Is that right?
4  A.  Yes.
5  Q.  A very experienced person?
6  A.  Yes, she is.
7  Q.  Would the kinds of files they were making
8  summaries from, would they include medical records?
9  A.  Yes.
10 Q.  Would they include other kinds of personnel
11 records that you would have custody of?
12 A.  Yes.
13 Q.  And just to wrap this up, how about Secretary
14 Mitchell, has he ever discussed with you any of these
15 cases?
16 A.  No.
17 Q.  Has anybody from his staff ever discussed with
18 you any of these cases?
19 A.  No.
20 Q.  Now, why don't we start with the year you
21 graduated from the academy and then you can just sort
22 of march me through your career? I don't think I have
23 ever done that before as to what your various
24 assignments were.

Page 17

1       What academy class were you?
2  A.  I was with the 47th DSP recruit class.
3  Q.  What year was that?
4  A.  It started on September 19, 1983.
5  Q.  1983. Okay. Go ahead.
6  A.  Graduated -- well, I actually went to the field
7  training program following the completion of the
8  live-in residential academy. We actually lived there
9  Monday through Friday for a 13-week period. At that
10 time it was 13 weeks.
11 Q.  They just reinstated that?
12 A.  Well, back then it was 13. Now it's 22, I
13 guess. 20, 22.
14 Q.  Yes.
15 A.  We were on an accelerated program, I guess.
16      I went to the FTO program on December 19,
17 1983. That was at that time a 12-week program.
18      And I was then permanently assigned to
19 Troop 3 in February of 1984.
20 Q.  Troop 3. Okay. That's where you started?
21 A.  Right.
22 Q.  That's the Dover troop?
23 A.  Yes.
24 Q.  Okay.

A - 395

Page 18

1  A. I was assigned to patrol at Troop 3.
2     I also while assigned to Troop 3 was
3  assigned to the criminal investigation unit as a
4  detective.
5     I left Troop 3 August 12th of 1991 where I
6  was assigned to our homicide unit.
7  Q. Where was that working out of?
8  A. Headquarters.
9  Q. Okay.
10 A. And I remained in homicide until an
11 administrative position, a staff support position in
12 July of 1995.
13 Q. Where did you go then in July of '95?
14 A. Staff support. That was also housed at
15 headquarters.
16 Q. Staff support?
17 A. Right.
18 Q. Okay.
19 A. I remained in that position until June of 1998,
20 where I went to internal affairs.
21    I remained in that position until January
22 11 of 1999, when I went to the public information
23 office, media relations.
24 Q. Were you the PIO?

Page 19

1  A. Yes. And then I remained in that position
2  until June 15th of 2000, at which time I went to human
3  resources as the assistant director of human
4  resources, where I oversaw primarily the recruitment
5  and selection process for uniformed officers.
6  Q. Let me just stop there.
7     Did you replace Major Seifert?
8  A. Yes, I did.
9  Q. So that would have made you the highest-ranking
10 uniformed person in the human resource function?
11 A. Correct.
12 Q. So go ahead.
13 A. I remained in the assistant director role until
14 April 15th of 2002, at which time upon the departure
15 of Mr. John Dillman I was named the human resources
16 director and have remained in that capacity since.
17 Q. Okay. Do you belong to professional
18 organizations in human resources, that kind of thing?
19 Do you go around the country?
20 A. I belong to the Society of Human Resource
21 Management, the national and state chapter.
22    I serve on the board of directors for the
23 National Law Enforcement Recruiters Association in
24 Arlington, Virginia.

Page 20

1     I do a lot of teaching for an educational
2  broker in preemployment background investigation for
3  recruitment and selection practices. I teach law
4  enforcement officers up and down the Mid-Atlantic
5  seaboard.
6     And I'm a part-time adjunct for Wilmington
7  College.
8  Q. In what?
9  A. In organizational management in their M.B.A.
10 program. And I have been teaching that within the
11 last three years and prior to that I taught a lot of
12 undergrad criminal justice courses. And I have been
13 employed by them since 1992.
14 Q. Maybe I should ask you about your degrees then
15 too. Why don't you tell me -- well, I always ask
16 everybody what high school they went to.
17    Are you local or are you from somewhere
18 else?
19 A. I'm local. I actually graduated from Lake
20 Forest High School in 1979, graduated from the
21 University of Delaware in 1993 with an undergrad in
22 criminal justice.
23    And I went on after getting on the State
24 Police, I got a master's degree in human resource

Page 21

1  management from Wilmington College and that was
2  probably about 1989 that I completed my master's
3  degree.
4  Q. Any postgraduate courses since you have done
5  the master's?
6  A. No. No.
7  Q. You have been doing these various teaching
8  kinds of things that you identified?
9  A. Teaching, yeah. Of course, I take periodically
10 different courses that are offered throughout the
11 state, different HR courses. Some are offered right
12 up here in Wilmington, a couple of different
13 employment law firms, just courses here and there, not
14 necessarily a certification but just updates on
15 different topics.
16 Q. I think I've seen little articles. You publish
17 little articles or things like that in various
18 publications?
19 A. I've published in Delaware Trooper's Magazine.
20 I'm also the coordinator for the Delaware State Police
21 Critical Incident Stress Management Team.
22    I've published some articles on that in
23 Trooper's Magazine and also on recruitment and
24 retention for law enforcement. I publish articles on

A - 396

Case 1:04-cv-01207-GMS    Document 75-18    Filed 02/02/2006    Page 4 of 14

Price, et al.                                           Chaffinch, et al.
John A. Yeomans        v.    C.A. # 04-956-GMS          October 3, 2005

Page 22

1  that.
2  Q.  You haven't written any books like Greg Warren
3  did?
4  A.  No. No books.
5  Q.  Now, when you were the director, became the
6  director of human resources in April of 2002, did you
7  report to the lieutenant colonel?
8  A.  Yes, I did.
9  Q.  Right?
10 A.  Yes, I did.
11 Q.  Did you continue to be a direct report to the
12 lieutenant colonel until very recently?
13 A.  Very recently that changed, yes.
14 Q.  Was that change as of October 1st or when was
15 that change?
16 A.  That change is effective October 1st, that's
17 correct.
18 Q.  Right. So from April 15th, I think you said,
19 of 2002 through October 1st of 2005 you were a direct
20 report to the lieutenant colonel?
21 A.  That's correct.
22 Q.  That meant you were a direct report for a
23 period of time to Lieutenant Colonel Tom Marcin?
24 A.  Correct.

Page 23

1  Q.  Right?
2  A.  Yes, sir.
3  Q.  Then you were a direct report to Lieutenant
4  Colonel Tom MacLeish?
5  A.  That's correct.
6  Q.  And then a direct report to Lieutenant Colonel
7  Mark Seifert?
8  A.  Correct.
9  Q.  Now, on October 1st of 2005 there has been some
10 sort of reorganization in the State Police?
11 A.  Yes, sir, there has.
12 Q.  So you're no longer a direct report to the
13 lieutenant colonel?
14 A.  That's correct.
15 Q.  You're a direct report to a major, Major Harry
16 Downes?
17 A.  That's correct.
18 Q.  And what is the title of the position that
19 you're supposed to be reporting to?
20 A.  It's a newly created position. I think it's
21 titled administrative services commander or bureau.
22 It just oversees human resources and the training
23 academy.
24 Q.  Okay. So the functions at least that are there

Page 24

1  within this position are human resources and the
2  training academy?
3  A.  That's correct.
4  Q.  And both of those used to be responsibilities
5  of the lieutenant colonel. Is that right?
6  A.  Correct. Well --
7  Q.  No, not the training academy?
8  A.  Well, the training academy actually had shifted
9  under Major Hughes, but prior to that traditionally
10 the training academy fell, that that captain, the OIC
11 or director of the training academy reported to the
12 deputy superintendent.
13      But somewhere along the line that changed
14 and they had a major overseeing that.
15 Q.  Did you know Major David Baylor?
16 A.  Yes.
17 Q.  Did you serve with him over the years?
18 A.  I did.
19 Q.  He was a PIO during his career, wasn't he?
20 A.  Yes, sir.
21 Q.  Was that before you?
22 A.  That would have been before me, yes.
23 Q.  He was the second in command to John Dillman in
24 the human resources function during his career. Isn't

Page 25

1  that correct?
2  A.  Yes, sir.
3  Q.  Now, you know others who have worked with Major
4  Baylor during his career. Isn't that correct?
5  A.  Yes, sir.
6  Q.  Is Major Baylor a truthful man?
7  A.  Yes.
8  Q.  What's his reputation for truthfulness? Good?
9  Bad? Poor?
10 A.  Good.
11 Q.  Good?
12 A.  Yes.
13 Q.  Okay. Now I want to go back to your working
14 with John Dillman for a little while. Okay?
15 A.  All right.
16 Q.  You indicated that in June of 2000 you became
17 the assistant director working under John Dillman. Is
18 that correct?
19 A.  Correct.
20 Q.  And for it looks like 22 months through April
21 15th of 2002 you worked under him, right?
22 A.  Correct.
23 Q.  Now, John Dillman was a civilian. Is that
24 correct?

Price, et al.                               v.                                Chaffinch, et al.
John A. Yeomans          C.A. # 04-956-GMS           October 3, 2005

Page 26

1    A.  That's correct.
2    Q.  In fact, the Delaware State Police has several
3  hundred civilian employees. Isn't that right?
4    A.  Yes.
5    Q.  And at present the State Police has over 600
6  uniformed employees?
7    A.  661.
8    Q.  661 now?
9    A.  Right.
10   Q.  Okay. If we go back to when you were working
11 with John Dillman, it was probably just a little bit
12 over 600 or a little bit under 600?
13   A.  Maybe a little under, yes, sir.
14   Q.  A little under of uniformed people?
15   A.  Yes.
16   Q.  Is it a fair statement that there was between
17 250 or 300 civilian employees at that time when you
18 were working with John Dillman?
19   A.  Maybe a little less than that. Maybe around
20 220, yeah, civilians.
21   Q.  Okay. The civilians, the civilian employees,
22 there's a whole separate procedure for discipline;
23 there's a written procedure for disciplining them,
24 progressive discipline, that kind of a system. Is

Page 27

1  that true?
2    A.  Yes.
3    Q.  Then there's a separate procedure for uniformed
4  officers for disciplining them. Is that correct?
5    A.  Yes, sir.
6    Q.  That's different from the civilian procedure?
7    A.  Yes.
8    Q.  And the uniformed officers, I mean, there's
9  contractual provisions, there's the law enforcement
10 officer's bill of rights, thing like that that come
11 into play when a uniformed officer is to be
12 disciplined, right?
13   A.  Yes.
14   Q.  The civilians, they are not in that system,
15 right?
16   A.  Right. Different system.
17   Q.  Now, John Dillman, is it true that John Dillman
18 was the state director of personnel during the
19 administration of Governor Pete du Pont?
20        Do you remember that?
21   A.  Yes, sir, I do.
22   Q.  Is it true before the administration of
23 Governor Pete du Pont that John Dillman was the
24 civilian director of personnel?

Page 28

1    A.  Yes. Right.
2    Q.  Is it also true that after the administration
3  of Pete du Pont, John Dillman returned to his position
4  as civilian director of personnel for the Delaware
5  State Police?
6    A.  That's correct.
7    Q.  And he continued in that position through April
8  15th of 2002, right?
9    A.  Yes.
10   Q.  Now, as far as the personnel function when you
11 were working under him, is it true that you were the
12 second in command to John Dillman?
13   A.  Yes.
14   Q.  And before you took over your function is it
15 true that now Lieutenant Colonel Mark Seifert was the
16 second in command?
17   A.  That's correct.
18   Q.  The way the personnel function was structured
19 when John Dillman was still there, there was a
20 civilian who was at the top of the pyramid responsible
21 for the personnel function. Is that right?
22   A.  Correct.
23   Q.  And the uniformed officer was only the second
24 in command for personnel, right?

Page 29

1    A.  That's correct.
2    Q.  Is it a fair statement that this gave the
3  civilian director of personnel a certain degree of
4  autonomy and independence in exercising the personnel
5  function?
6    A.  Yes.
7    Q.  Then the State Police changed that structure.
8  Is that correct?
9    A.  That's correct.
10   Q.  And there no longer is a civilian who is in
11 charge of the personnel function, right?
12   A.  That's correct.
13   Q.  Now the person in charge of the personnel
14 function is a uniformed officer of the State Police.
15 Is that correct?
16   A.  Correct.
17   Q.  And the uniformed officer of the State Police
18 who fulfills the personnel function is subject to the
19 chain of command in the State Police. Is that
20 correct?
21   A.  Yes.
22   Q.  Now, what I would like to do is refresh your
23 recollection on some testimony you gave in the Bullen
24 and Giles trial. Okay?

A - 398

Price, et al.
John A. Yeomans
v.
C.A. # 04-956-GMS
Chaffinch, et al.
October 3, 2005

Page 30

1  A. Okay.
2  Q. This is found at pages 48 and 51. I'm just
3  going to ask you to read through it.
4      In fact, I'm going to take a break and get
5  my thing of water here and we will just ask you to
6  read through these pages and then we will start.
7  Okay?
8  A. Okay.
9      (A brief recess was taken.)
10     THE WITNESS: Through 51?
11     MR. NEUBERGER: Yes, through 51.
12     THE WITNESS: Okay.
13     MR. NEUBERGER: We will give that as a
14  copy for your lawyer.
15     Why don't we mark this as Yeomans Exhibit
16  1?
17     (Yeomans Deposition Exhibit No. 1 was
18  marked for identification.)
19  BY MR. NEUBERGER:
20  Q. In that testimony you explained about a policy
21  that human resources had about physical fitness
22  testing for applicants to be a state trooper. Is that
23  correct?
24  A. Yes, I did.

Page 31

1  Q. And at that time you explained that the policy
2  for physical fitness testing only allowed an applicant
3  to take the test one time. Is that correct?
4  A. That's correct.
5  Q. And you explained in that testimony the reasons
6  why you as the HR person at that time thought, that
7  you and your staff thought that was a good policy,
8  right?
9  A. Yes.
10 Q. Then there was an applicant who had failed the
11 physical fitness test. Is that correct?
12 A. That's correct.
13 Q. And the colonel of the State Police had
14 received a communication from an elected official
15 asking that that applicant be allowed to retake the
16 test. Is that correct?
17 A. That's correct.
18 Q. And then I think you may have mentioned the
19 colonel appeared at your office door one day to talk
20 about that, right?
21 A. That's correct.
22 Q. And I think you explained at a previous time
23 that it was rather unusual for him to come down to
24 your office, right?

Page 32

1  A. Yes, it was.
2  Q. And he explained he wanted that applicant
3  retested?
4      MR. FITZGERALD: Objection to the
5  characterization of the testimony.
6      You can answer if that's what your
7  testimony was.
8  BY MR. NEUBERGER:
9  Q. Is it true that he wanted the applicant
10 retested?
11 A. He inquired about the possibility of the
12 applicant being retested.
13 Q. Right. And you explained why retests weren't
14 given?
15 A. I explained to him that we had an internal
16 policy that we were only affording one test for this
17 particular recruit class based on the fact that we had
18 seen that with offering two tests that most of the
19 time they weren't passing on the second attempt or
20 they weren't showing up, so myself and my staff felt
21 as though it really wasn't practical to offer a second
22 test.
23     He inquired about the possibility of this
24 person being afforded a second test and he also asked

Page 33

1  if there were other people who had failed. And I
2  indicated that if he were to afford this person a
3  second test, he needed to afford everyone a second
4  test.
5  Q. Right. For example, if we look at page 51 here
6  at the top, lines 1 through 3, once again, I'm just
7  trying to refresh your memory and then I asked "And
8  did he tell you he wanted you to consider testing this
9  applicant?" And the answer to that was "Yes." Is
10 that correct?
11 A. That's correct.
12 Q. Now, I understand that in the end you and your
13 staff decided that it would be fairer to all
14 applicants if anyone who had failed that portion of
15 the physical fitness test be allowed to retest the
16 second time. Is that correct?
17 A. That's correct.
18 Q. So after the conversation with the colonel you
19 decided to allow everyone to retest. Is that right?
20 A. That's correct.
21 Q. Do you remember telling then Captain Greg
22 Warren of your dilemma in trying to resolve what to do
23 because of the colonel's request?
24 A. I do.

A - 399

9 (Pages 30 to 33)

Case 1:04-cv-01207-GMS   Document 75-18   Filed 02/02/2006   Page 7 of 14

Price, et al.                                         v.                              Chaffinch, et al.
John A. Yeomans                             C.A. # 04-956-GMS                         October 3, 2005

Page 34

1  Q. Is it fair to say that it put you in an ethical
2  dilemma?
3  A. Absolutely.
4  Q. Is it fair to say that in accord with your good
5  conscience you felt that you came up with a way to
6  treat all the applicants fairly and uniformly in light
7  of the colonel's request, correct?
8  A. Yes, sir.
9  Q. Is it true that when a superior officer in the
10 chain of command, in particular the colonel, tells you
11 to change a policy or a practice of the State Police
12 you have to obey?
13 A. Yes.
14 Q. Now, John Dillman since he wasn't a uniformed
15 officer, let's focus on him, if John Dillman was told
16 by the superintendent of the State Police to change a
17 policy of the State Police, he did not necessarily
18 have to obey, did he?
19 A. He didn't have to, but it probably would
20 behoove him to.
21 Q. I can understand. They could get rid of him if
22 they wanted to, right?
23 A. Right.
24 Q. But if they chose to get rid of him, there were

Page 35

1  written, as civilian employees there were written
2  procedures and all they had to go through?
3  A. Yes.
4  Q. Now, aside from a policy, if the superintendent
5  told John Dillman to change a practice of the State
6  Police, he did not have to obey. Is that correct?
7  A. He didn't have to.
8  Q. He wasn't in the chain of command?
9  A. Not in a uniformed sense.
10 Q. That's what I mean.
11 A. Right.
12 Q. The State Police is a paramilitary
13 organization, correct?
14 A. Correct.
15 Q. And there's a strict chain of command, right?
16 A. Right.
17 Q. And if you as a captain received an order from
18 a higher-ranking officer in your chain of command, you
19 have to obey. Is that right?
20 A. Correct.
21 Q. Now, there's been some testimony in this case
22 already by other witnesses, specifically Colonel
23 MacLeish, so I want to focus on that and we're talking
24 about my client, Sergeant Foraker, sitting here.

Page 36

1  A. Okay.
2  Q. I believe there's testimony by Colonel MacLeish
3  that he thinks Sergeant Foraker is a, quote, pain in
4  the ass, period, close quote. Okay?
5  A. Okay.
6  Q. Has he ever made that remark in your presence?
7  A. No.
8  Q. No? Okay. Has he ever expressed like feelings
9  about Sergeant Foraker in your presence?
10 A. No.
11 Q. Has he ever indicated displeasure or irritation
12 with Sergeant Foraker in your presence?
13 A. No.
14 Q. Well, how about my other two clients, Kurt
15 Price or Wayne Warren, has Colonel MacLeish ever
16 indicated in your presence that he was unhappy with
17 them?
18 A. Not them particularly, but I know there was an
19 occasion where I think there was a meeting that
20 Colonel MacLeish had scheduled or was attempting to
21 schedule and I know he got frustrated with an e-mail
22 that I believe he had received from Stephen Neuberger,
23 perhaps.
24 Q. Yes.

Page 37

1  A. I was in his office that day when he received
2  that, that e-mail, and he appeared to be frustrated
3  and agitated that he couldn't meet.
4  Q. So you were in his office?
5  A. Yes.
6  Q. And he was trying to set up a meeting with Kurt
7  Price, right?
8  A. That's correct.
9  Q. And he got an e-mail from Stephen Neuberger
10 saying that Kurt Price wanted to assert his right to
11 have a lawyer present with him at the meeting,
12 correct?
13 A. Right.
14 Q. That was your understanding?
15 A. Yes.
16 Q. And the colonel did have that meeting with Kurt
17 Price. Do you know that?
18 A. I didn't know that.
19 Q. Okay. The colonel had the meeting. He ignored
20 Stephen Neuberger's e-mail and met with Kurt Price
21 anyway.
22      Are you aware of that?
23 A. No, sir.
24 Q. All you know is that when he got the e-mail he

A - 400

10 (Pages 34 to 37)

Case 1:04-cv-01207-GMS    Document 75-18    Filed 02/02/2006    Page 8 of 14

Price, et al.                                                    Chaffinch, et al.
John A. Yeomans         C.A. # 04-956-GMS                        October 3, 2005

Page 38

1  was, to use your words, frustrated or agitated towards
2  Kurt Price?
3      A.  About receiving the e-mail.
4      Q.  Right.
5      A.  And I think his frustration was he was wanting
6  to meet with Kurt and felt as though based on that
7  e-mail that he wasn't going to be able to do that.
8  And of course I didn't know about the subsequent
9  meeting.
10     Q.  Right. You weren't present for that?
11     A.  No.
12     Q.  How about on any other occasion did he ever
13 express that he was annoyed or unhappy with anything
14 that Kurt Price did?
15     A.  No. Not in particular Kurt, no.
16     Q.  Now, how about Wayne Warren? And we're just
17 focusing on Colonel MacLeish now. Okay?
18     A.  Yes.
19     Q.  Wayne Warren, did he ever indicate that he was
20 unhappy or displeased with anything that Wayne Warren
21 was saying or doing?
22     A.  Not directly Wayne, no.
23     Q.  Not directly Wayne, okay. The two of them?
24     A.  Well, I'll just cut to it. I think he was

Page 39

1  frustrated with some of the things that were said in
2  the media. I do know that he was concerned about --
3  and I don't know who in particular said it, but I just
4  know he was concerned about the verbiage in the press
5  about him or the division not caring about, not caring
6  about their wellness or physical well-being, and I
7  know he was upset about that.
8      Q.  Was there a particular news story that you
9  remember he was talking about or anything?
10     A.  I can't identify the one. I just know it was
11 out there and I remember reading it myself, but I know
12 he was frustrated about that one.
13     Q.  Okay. Are there any other occasions when you
14 remember him expressing frustration or displeasure
15 with either of those two men or Sergeant Foraker?
16     A.  Yeah. I can't pinpoint it, but I know there
17 was an e-mail about -- I don't know. I can't recall
18 now if it was Wayne. I want to say it was Wayne.
19         There was an e-mail that was sent asking
20 about some of the medical examinations. There was
21 something that I believe it was Wayne had sent and I
22 don't know if the frustration was as much at Wayne as
23 the colonel -- I know he called me and was concerned
24 about if HR was tracking the things, making sure the

Page 40

1  appointments were lined up because I think the colonel
2  was under the impression one thing was being done and
3  Wayne was basically articulating that things weren't
4  being done or something. So I think he got a little
5  frustrated.
6         I don't know if it was so much with Wayne.
7  Perhaps it was with me, but that's a very vague
8  recollection of that.
9      Q.  Let's flip to Colonel Chaffinch before he
10 retired. Okay?
11     A.  Okay.
12     Q.  In Colonel Chaffinch's presence did he ever
13 express any of the following about any of my clients
14 or them as a group, that they were a pain in the ass?
15     A.  No.
16     Q.  Did he call any of them dickhead?
17     A.  No.
18     Q.  Pardon me. Did he call any of them fucking
19 assholes?
20     A.  No.
21     Q.  Say, "I'm done with this motherfucker"
22 referring to Chris Foraker?
23     A.  No.
24     Q.  Did you ever hear a remark like Chris Foraker

Page 41

1  is a bad penny and it just won't go away?
2      A.  I heard that remark somewhere, but I haven't
3  heard it -- I don't recall hearing it directly from
4  the colonel, but I had heard that remark somewhere.
5      Q.  Right?
6      A.  Yeah.
7      Q.  So you have heard this?
8      A.  Yes. I'm familiar with that remark.
9      Q.  So you have heard that one?
10     A.  I have.
11     Q.  Let's just see if we can jog your memory over
12 that. Okay?
13     A.  Okay.
14     Q.  Is it correct that there was some sort of a
15 meeting with a vendor or something like that at which
16 some member of the staff referred to Chris Foraker as
17 a bad penny that just won't go away?
18     A.  I've heard that remark, but I wasn't at the
19 meeting. Actually, the only meeting I ever had -- I
20 only had one meeting where Chaffinch really kind of
21 talked about these guys at all and that was the day up
22 in Colonel McLeish's office because I rarely, rarely
23 saw Colonel Chaffinch.
24     Q.  Well, then, let's just try to focus. Before we

Case 1:04-cv-01207-GMS    Document 75-18    Filed 02/02/2006    Page 9 of 14

Price, et al.                          v.                    Chaffinch, et al.
John A. Yeomans           C.A. # 04-956-GMS                  October 3, 2005

Page 42

1 leave that, let me focus on it.
2     You're telling me you have heard that
3 Chris Foraker is a bad penny that just won't go away?
4 A. I've heard that remark. And I don't know who
5 said it or where it was, but I did hear that somewhere
6 along the line.
7     The other things, no. But that one, yeah.
8 Q. But you didn't hear that from Chris Foraker?
9 A. No.
10 Q. Right. You didn't hear it from Wayne Warren or
11 Kurt Price?
12 A. No. No.
13 Q. Now, you're talking about there was a meeting
14 where Colonel Chaffinch was present and then
15 Lieutenant Colonel MacLeish was present?
16 A. Yes.
17 Q. And what do you recall about that meeting and
18 any frustrations or anger at that meeting?
19 A. That particular meeting where Chaffinch popped
20 into MacLeish's office there was none of this kind of
21 comments or dialogue. At that time it was about the
22 second opinion or referral to Dr. Emmett and I know
23 there was some discussion about sending these officers
24 up to Dr. Emmett up at U Penn. And we were talking

Page 43

1 and Colonel Chaffinch was just basically like "You
2 know, whatever it takes. You know, if that's where
3 you think you ought to send them, send them. If this
4 guy is supposedly the best, then send them up there."
5 But very little -- he said, "Yeah, whatever it takes
6 to make it right."
7     And that was about it. That's really I
8 think the only time throughout any of this I've had a
9 conversation with Aaron Chaffinch about any of this.
10 Q. So you would be dealing with the lieutenant
11 colonel because he was your direct report?
12 A. Correct.
13 Q. Is that right?
14 A. Yeah.
15 Q. And you weren't in Colonel Chaffinch's shall we
16 just say inner circle of friends, were you?
17 A. Not at all.
18 Q. Right. Are you considered an upstater or a
19 downstater in the State Police or both?
20 A. Honestly, I don't know. I don't know what I'm
21 considered. I live in Kent County. I go to work
22 every day and do my job.
23 Q. I mean, you grew up in Kent County?
24 A. Yes, sir.

Page 44

1 Q. And you were never assigned to a troop in
2 Sussex County or anything, right?
3 A. No.
4 Q. So you've explained what you could recall about
5 Colonel MacLeish and feelings he expressed, right?
6 A. Yes.
7 Q. And you told us about the one incident, the
8 only one incident with, one meeting with Colonel
9 Chaffinch, right?
10 A. Yes.
11 Q. What I am going to do is I'm going to start
12 asking you about people we will call comparators.
13 Okay?
14 A. Okay.
15 Q. Because you have indicated that you've looked
16 at summaries of how different troopers in the past
17 were treated with reference to medical or emotional
18 conditions, so I'm just going to march through a list,
19 a long list of people, and I'm going to ask you what
20 you might know about those people or where records
21 are. Okay?
22 A. (The witness nodded).
23     MR. NEUBERGER: Maybe we will just go off
24 the record here for a second.

Page 45

1     (Discussion off the record.)
2     (A brief recess was taken.)
3 BY MR. NEUBERGER:
4 Q. We're back on the record. I did remember a
5 question that I forgot to ask way, way back in the
6 beginning. Okay?
7     You understand that I could have
8 subpoenaed you to appear today, right?
9 A. Yes.
10 Q. And you would have been forced to testify
11 truthfully, right?
12 A. Right.
13 Q. Since you're the director of human resources,
14 the defendants agreed to produce you without a
15 subpoena.
16     You know that, right?
17 A. Yes.
18 Q. But you did not volunteer to come here today to
19 give your testimony at my request?
20 A. Correct.
21 Q. Now let's start talking about some of these we
22 will call them comparators. Okay?
23 A. All right.
24 Q. Let's start with a Major Joseph Forrester.

A - 402

12 (Pages 42 to 45)

Case 1:04-cv-01207-GMS    Document 75-18    Filed 02/02/2006    Page 10 of 14

Price, et al.                                              Chaffinch, et al.
John A. Yeomans        v.   C.A. # 04-956-GMS              October 3, 2005

Page 46

1  Okay?
2  A.  Yes.
3  Q.  Are you aware that there was a Major Joseph
4  Forrester in the Delaware State Police?
5  A.  Yes, I am.
6  Q.  Now, is it true that he served about 25 or more
7  years on the force?
8  A.  That sounds about right.
9  Q.  And is it true that he wore hearing aids in
10 both ears?
11 A.  Both, I don't know.  But when all of this
12 started and I heard people talking about Joe Forrester
13 and I thought back to Joe Forrester, I think I did see
14 a hearing aid.
15     I don't know if it was in both, but I'm
16 pretty sure I saw it in at least one.
17 Q.  If Major Baylor has testified that he wore
18 hearing aids in both ears, would you disagree with
19 that testimony?
20 A.  I couldn't, no.
21 Q.  Major Forrester I believe was the operational
22 officer for Kent and Sussex County at the end of his
23 career.  Is that right?
24 A.  Yes, he was.

Page 47

1  Q.  And I think Tom Marcin, Lieutenant Colonel Tom
2  Marcin served as the operations officer for New Castle
3  County at the same time Major Forrester was serving
4  downstate.
5     Does that sound about right?
6  A.  It could be, yeah.
7  Q.  Do you remember that when Major Forrester
8  retired that then Major Marcin also for a period of
9  several months took over operational command of Kent
10 and Sussex for Forrester?
11 A.  I didn't know that.
12 Q.  Okay.  But, anyway, we're in agreement that you
13 remember him wearing at least a hearing aid in one of
14 his ears, right?
15 A.  Yes.
16 Q.  Do you know anything about the level of hearing
17 loss he had?
18 A.  No, I do not.
19 Q.  Do you know if the Delaware State Police ever
20 had him tested for hearing loss?
21 A.  I believe he was.
22 Q.  Do you know what his test results were?
23 A.  I believe it --
24     MR. FITZGERALD:  I object to form.

Page 48

1  Q.  Are you aware of what your records show as far
2  as his test results?
3  A.  I seem to recall seeing that it was noted that
4  he had some hearing loss, but that the physician
5  signed off on him.  That was my recollection.
6     Without having that in front of me, I seem
7  to recall looking at one of those evaluations and it
8  was noted he had hearing loss.  Actually, I think
9  there were a couple of evaluations I looked at where
10 he had hearing loss it was noted and another one it
11 wasn't noted but, in any event, he was signed off on
12 by the attending physician as being fit for duty.
13 Q.  Okay.  You're talking about the annual
14 physicals?
15 A.  Yes.  That's what I am making reference to,
16 yes.
17 Q.  Since you're the human resources person let's
18 sort of walk through that.  Okay?
19 A.  Okay.
20 Q.  Every year uniformed officers have to have an
21 annual physical.  Is that correct?
22 A.  That's correct.
23 Q.  And are they given the option of having their
24 family doctor do their annual physical or having a

Page 49

1  physician supplied by the Delaware State Police do
2  that?
3  A.  They have the option, either one, yes, sir.
4  Q.  So they could choose to use their family doctor
5  for their annual physicals, right?
6  A.  Yes.
7  Q.  Then there's a how many page form that the
8  physician has to complete?
9  A.  It's only a couple of pages.  It's like a front
10 and back basically.
11 Q.  It's a front and back?
12 A.  Yeah.
13 Q.  And what are some of the things on the form?
14 A.  There's, you know, some medical history
15 information, basic bio data.  Then there's some
16 questions, EKG, vision, hearing.
17     There's also an opportunity for a blood
18 workup, lipid test, the entire blood workup, which
19 would be white blood cell count, red blood cell count,
20 lipids, cholesterol, the whole count.
21     But basically what he does is runs you
22 through an actual physical examination, reflexes and
23 pulses, just a complete looking over, any discussion
24 about any complaints or ailments you may be having,

Case 1:04-cv-01207-GMS   Document 75-18   Filed 02/02/2006   Page 11 of 14

Price, et al.                                                    v.                                         Chaffinch, et al.
John A. Yeomans                                         C.A. # 04-956-GMS                October 3, 2005

Page 50

1  any problems, that sort of thing. But a chest X-ray
2  is part of that, complete cardiopulmonary workup, just
3  a physical, entire physical.
4  Q. Right. Now, the labs and things like that,
5  once again, they're given a choice of having their
6  family doctor send it to his labs or use labs provided
7  by the Delaware State Police. Is that right?
8  A. That's correct.
9  Q. And then at the end of the two-sided form the
10 physician makes a determination of whether or not the
11 uniformed officer is fit for duty or not?
12 A. Yes.
13 Q. Right?
14 A. Yes.
15 Q. So he says like yes or no?
16 A. Correct.
17 Q. Then you're saying if we looked at Major
18 Forrester's physicals, there may be something noted
19 under hearing but at the end --
20 A. Right.
21 Q. Yes?
22 A. Yes.
23 Q. But at the end he was listed by his family
24 physician as fit for duty?

Page 51

1  A. Or whoever the attending physician was, right.
2  Q. Right. It could have been your physician?
3  A. It could have been.
4  Q. You just don't remember?
5  A. Right.
6  Q. The point is whoever the physician was, they
7  noted some hearing issues, yes?
8  A. Yes.
9  Q. But they found him fit for duty, right?
10 A. That's my recollection, yes, sir.
11 Q. Now, Kurt Price and Wayne Warren, just to jump
12 ahead a little bit, their family physicians did not at
13 any point in time up until today declare them unfit
14 for duty, have they?
15 A. Not to my knowledge, no.
16 Q. Kurt Price and Wayne Warren, their family
17 physicians have not notified the Delaware State Police
18 of hearing loss on their parts?
19 A. Correct.
20 Q. The Delaware State Police asked that they be
21 subjected to various hearing tests. Is that correct?
22 A. Correct.
23 Q. The records you've seen show that Major
24 Forrester's physician, whoever it was, did identify

Page 52

1  hearing issues, right?
2  A. Correct.
3  Q. The Delaware State Police did not in the
4  records you've seen send Major Forrester for
5  independent testing about the levels of his hearing
6  loss. Is that correct?
7  A. That would be correct.
8  Q. And you haven't seen any records that would
9  indicate why Major Forrester wasn't independently
10 tested, have you?
11 A. I have not.
12 Q. Just so we're clear, I think you were serving
13 in the human resources function when Major Forrester
14 was still on duty. Isn't that right?
15 A. Well, I was. But I wasn't in the capacity that
16 I presently am. I don't think I --
17 Q. Right. You were deputy to John Dillman, right?
18 A. Right. And at that time I had nothing to do
19 with medical records.
20 Q. Right. My point is simply Major Forrester, his
21 issues were issues that were -- he retired around
22 2000, 2001. Is that a fair statement? We could check
23 his records.
24 A. Yeah. I mean, if that's what you have, I

Page 53

1  wouldn't, I wouldn't object to that. That's probably
2  accurate.
3  Q. I think you said you went into the human
4  resources function --
5  A. In June of 2000.
6  Q. -- in June of 2000?
7  A. Right, as the assistant.
8  Q. Well, let's just jump ahead a little bit here.
9  Okay? It really has to do with this issue of Major
10 Forrester was not asked to be independently tested.
11 Okay?
12     When you went into the human resources
13 function in 2000 -- let's just take it through today,
14 through today.
15 A. Okay.
16 Q. Isn't it true that you tried to stay, the State
17 Police has tried to stay away from examining hearing
18 loss issues with its troopers?
19     If that's too big of a question, I can
20 break that down. Let me break that down into pieces.
21 Okay?
22 A. Okay.
23 Q. If I called John Dillman as a witness I think
24 he would testify that the State Police when he was

A - 404

Case 1:04-cv-01207-GMS   Document 75-18   Filed 02/02/2006   Page 12 of 14

Price, et al.                                    v.                    Chaffinch, et al.
John A. Yeomans         C.A. # 04-956-GMS                    October 3, 2005

Page 54

1  working there did hearing testing at the recruitment
2  stage, when you're in the academy and when you're
3  going through your exam. Is that a true statement?
4  A. That's correct.
5  Q. I think John Dillman would testify that after
6  an officer was sworn in that hearing appears on the
7  annual physical form?
8  A. Right.
9  Q. There was no other independent examination of
10 hearing issues that the State Police would
11 periodically require. Is that a fair statement?
12 A. That's fair to say, yes.
13 Q. And that would apply to my clients, right?
14 A. Right.
15 Q. So hearing would come up annually on the
16 physicals by their doctors, right?
17 A. Correct.
18 Q. But the State Police is not inquiring about
19 their hearing other than during their annual physical.
20 Is that correct?
21 A. Well, actually, I mean since a lot of this has
22 started, we have since December of '03 specifically
23 requested FTU officers to get their hearing checked.
24 Q. Let's just stop at December '03 now.

Page 55

1  A. That's independent of the annual medicals.
2  Q. Right. So let's just take it up until December
3  of '03. Okay?
4        Prior to December of '03 aside from the
5  annual physicals the Delaware State Police was not
6  looking into hearing issues of its uniformed troopers,
7  right?
8  A. Right.
9  Q. I believe John Dillman would testify that
10 within the medical literature and within the human
11 resource function and literature, it's very difficult
12 to determine a specific level of hearing for
13 individuals that would be considered essential to a
14 law enforcement function.
15       Would you agree with that testimony?
16 A. I think it's difficult. It's an area that I
17 think there's probably still a lot of research being
18 done.
19       I mean, I'll just cut to it. I mean, we
20 have a policy that's very broad: normal hearing. It
21 doesn't outline specific decibel categories and cycles
22 and these sort of things. So I think it's probably an
23 area that there's still a lot of research perhaps
24 being done and, no, it's not clear.

Page 56

1  Q. Right. And you as a human resources
2  professional have some familiarity with the research
3  and all that's out there relating to hearing issues,
4  right?
5  A. Right.
6  Q. You've got familiarity with research that's out
7  there on lead levels in people's blood, right?
8  A. Right.
9  Q. That's another thing that you have to do,
10 right?
11 A. Right.
12 Q. There's all sorts of health issues that you
13 have to deal with as a human resources professional,
14 right?
15 A. Sure.
16 Q. And what you're telling us is that there's not
17 a lot of agreement out there as far as what the
18 essential levels of hearing are for law enforcement
19 officers?
20 A. I'm not sure there's a real standard of care.
21 Okay?
22 Q. Okay. And if John Dillman said that, you would
23 agree with that?
24 A. Right.

Page 57

1  Q. In fact, I think John Dillman would indicate
2  that the human resources office did do research but
3  the office was unable to come up with good studies or
4  research on the subject.
5        Would you agree with that?
6  A. I would agree.
7        Could you tell me when that was dated?
8  Q. This was before he left. We're just taking
9  this up to April of 2002 I think is when you --
10 A. Okay.
11 Q. Okay.
12 A. All right.
13 Q. Since April of 2002 through the present, has
14 your office been able to come up with good studies or
15 research about specific hearing levels for law
16 enforcement officers?
17 A. There's some research, there's some things that
18 I have looked at, but it hasn't risen to the level
19 that we have written a policy that this is the
20 standard and this is where they should be or not be.
21 Okay?
22 Q. Okay. And I think when they're testing to get
23 into the State Police, when these young men and women
24 are recruits going through the battery of tests and

15 (Pages 54 to 57)

Page 58

1 everything, is the level that you use just simply
2 ability to distinguish verbal stimuli, to discern
3 danger or something to that effect? What is it?
4  A. It's supposed to be normal hearing.
5  Q. It's normal hearing, okay.
6  A. That's what's on our initial application.
7      Now, I will tell you that, you know, in
8 discussions with Dr. Green, I mean there are, there
9 are decibel levels, there are ranges that they look at
10 to determine what I guess one would consider normal
11 hearing or to differentiate different stimuli from
12 background noises or those sort of things, so there is
13 something that he looks at.
14      But traditionally it's been normal hearing
15 and we have relied on people like him to tell us if
16 these candidates can hear.
17  Q. Okay. A person becomes a state trooper and
18 they have been working for five or ten years in the
19 various kinds of things that troopers do on patrol and
20 all the other permutations that are available. Okay?
21  A. Okay.
22  Q. John Dillman would testify that while he was
23 there through 2000 that the State Police -- I'm
24 sorry -- that the human resources office did not want

Page 59

1 to institute any program of specifically testing
2 experienced officers for hearing loss that may have
3 accumulated over the years because the concern was
4 that too many officers would have some degree of
5 hearing loss and this would disable the State Police
6 from performing its function; it would put too many
7 people in jeopardy.
8      Would you agree that that was the
9 disposition of the State Police to hearing issues up
10 until the time John Dillman stepped down?
11  A. (Pause).
12  Q. Do you understand the question?
13  A. I do. And I'm just trying to respond to
14 that --
15  Q. Take your time.
16  A. -- in such a way that -- I mean, I understand
17 what he's saying. I don't know that it would rise to
18 the level that it would decimate our staffing but,
19 then again, I don't know that it wouldn't. I don't
20 know.
21      I know that's not a great answer. But if
22 that was his line of thinking, I mean I wasn't in a
23 position to review the files at that time or to know
24 the history.

Page 60

1  Q. So you wouldn't disagree with it? You wouldn't
2 disagree that's where he was coming from?
3  A. Well, I don't want to disagree, but I don't
4 want to totally agree either. But I will say that I
5 think traditionally our hearing testing I mean from
6 our own standpoint it leaves a lot to be desired. I
7 can tell you I go to my own personal physician. It's
8 not an invasive, thorough hearing test that I receive.
9      So to that extent, I guess I'm kind of
10 trying to agree in part with him. If we did it
11 comprehensively, that everyone was run through an
12 audiogram and there were audiograms and functional
13 tests and those sort of things, I would say that we're
14 trying to adhere to a policy of wellness and soundness
15 when it comes to our membership's hearing ability or
16 inability.
17      Based on the way we have been doing it, I
18 don't think we are.
19  Q. For example --
20      MR. FITZGERALD: Real quickly.
21      MR. NEUBERGER: Go ahead, Robert.
22      MR. FITZGERALD: You have been reading off
23 an e-mail or a piece of paper about John Dillman's
24 perspective testimony. Has that document been

Page 61

1 produced in this case?
2      MR. NEUBERGER: No. No. This is just
3 work product of mine, interviewing a former HR person.
4      MR. FITZGERALD: All right.
5 BY MR. NEUBERGER:
6  Q. You may or may not know it. I have hearing
7 loss issues. Okay? And there are people out there
8 called audiologists, aren't there?
9  A. Sure.
10  Q. And audiologists, they put you in rooms and put
11 hearing things on you and they can run you through
12 various tests, right?
13  A. Right.
14  Q. You're familiar with that, right?
15  A. Yes.
16  Q. And they can also wire you up into different
17 things and attach them to your head and run all sorts
18 of electronic impulses through your brain and your
19 hearing. You're aware that's a different kind of a
20 test, right?
21  A. Right.
22  Q. And I think it's fair that the State Police
23 does not require that kind of testing of its members
24 periodically, right?

A - 406

Page 62

1   A.  Okay. Yeah. Right.
2   Q.  It relies on the physician during the annual
3 physical noting a hearing issue during the course of
4 that physical, right?
5   A.  Correct.
6   Q.  Thank you.
7       We will just jump ahead here. Do you
8 remember some lieutenant who may have been a driver
9 for Jane Brady who had some hearing issues?
10  A.  Charlie Klim? Is that who you're referring to?
11  Q.  Well, he's on my list then. He is on my list.
12 Well, he's next on my list.
13  A.  I didn't know that was an issue, but I know he
14 was a driver.
15  Q.  Do you remember anybody else who was a driver
16 for Jane Brady or the Governor who had hearing loss
17 issues?
18  A.  I don't know about the Governor. I don't know.
19      The only retired person I know that drove
20 for anyone at that level in state government would be
21 Charlie Klim who drove Jane Brady around. I don't
22 know. I guess he still does.
23      MR. FITZGERALD: If you're reading off of
24 that, I would ask for a copy of that document. I

Page 63

1 don't think an e-mail from John Dillman constitutes
2 work product.
3       If they were your notes obviously any
4 notations you have on that would be work product, but
5 I don't think a statement from John Dillman would
6 constitute work product.
7       MR. NEUBERGER: Sure. I've interviewed
8 John Dillman, who was my client and who is a former HR
9 director of the Delaware State Police, and the results
10 of my interview are confirmed in an e-mail. I think
11 that's work product.
12      So I have identified it for the sake of
13 the record so that if there's an issue that you want
14 to make of that, we can proceed with that. All right?
15      MR. FITZGERALD: Let me just clarify the
16 representation, Tom. Do you represent him in this
17 case?
18      MR. NEUBERGER: Do I represent him in this
19 case?
20      MR. FITZGERALD: Do you represent John
21 Dillman in this case?
22      MR. NEUBERGER: I think at the time I was
23 interviewing him I represented him in matters. I
24 would have to check my records.

Page 64

1       As far as whether I represent him in this
2 case, if anyone wants to depose him I guess that's to
3 be determined in the future, but I don't think I need
4 to depose him because of the answers I've gotten.
5       MR. FITZGERALD: Well, I understand
6 because you have interviewed him you don't need to
7 depose him. I understand that.
8       I'm just trying to clarify your
9 representation, Tom. I know you had represented him
10 years ago in other things.
11      MR. NEUBERGER: Time goes by.
12      MR. FITZGERALD: Yes, time does go by and
13 things come up. All right.
14 BY MR. NEUBERGER:
15  Q.  Anyway, we're back to Major Forrester so we
16 made a little trip there. Okay?
17  A.  Sure.
18  Q.  Did you ever have any conversations with Major
19 Forrester?
20  A.  Oh, yeah. Yes.
21  Q.  So, for example, you were a Troop 3 person for
22 part of your career?
23  A.  Yes.
24  Q.  And you spent a fair amount of your career in

Page 65

1 the headquarters building, right?
2   A.  Correct.
3   Q.  And is it fair that you would either attend
4 meetings that he would be present at or you had
5 conversations with him?
6   A.  Oh, definitely. Many, many times.
7   Q.  Many times. Okay.
8       Did he have difficulty hearing during
9 those conversations or those meetings that you
10 remember?
11  A.  No. No.
12  Q.  No?
13  A.  No, sir.
14  Q.  Okay.
15  A.  He never expressed it to me that he was having
16 difficulty.
17  Q.  Right. David Baylor has testified in response
18 to this question "Did his hearing, wearing hearing
19 aids interfere with his ability to interact with you"
20 and he's testified "I don't think so. I mean,
21 sometimes I don't think he really heard me."
22      "Question: Really?
23      "Answer: Yes. But I had to get closer to
24 him."

A - 407

17 (Pages 62 to 65)