Price, et al.
John A. Yeomans

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 142

1  Q.  And there are some troopers who were on
2  suspended with pay status facing discipline or
3  criminal charges who were on suspended with pay status
4  for a full two years?
5  A.  That I don't know.  I don't know if, I don't
6  know if there's instances where it would go up to two
7  full years being suspended with or without pay.  That
8  I'm not sure about, sir.
9  Q.  You know it went beyond, some went beyond one
10  year I think you're telling me?
11  A.  Yeah.  Yeah.
12  Q.  And you just right now don't have any names,
13  right?
14  A.  No.  I mean no.
15  Q.  Then we have our next one is a Corporal Bo
16  Sarley.  Does that ring a bell with you?
17  A.  I know the name.  I know he was on the job, but
18  I don't know his extent of injuries or disability or
19  any of those things.
20  Q.  Do you know if he was a trooper?
21  A.  He was a trooper.  I know he worked in the
22  north.
23  Q.  In the north?
24  A.  But that's about it.

Page 143

1  Q.  Do you know if he had a back injury?
2  A.  No, I don't.
3  Q.  You don't know the nature -- do you know
4  whether he had an injury?
5  A.  No, I don't.
6  Q.  You don't know anything about him?
7  A.  I don't know anything about him.
8  Q.  So you haven't looked at his record?
9  A.  No.
10  Q.  Do you know if he's retired?
11  A.  He's been gone a while, I believe.  The only
12  reason I even know the name is because he FTO'd a
13  friend of mine, but other than that I don't really
14  know the guy.
15  Q.  I think you said he was in the north?
16  A.  Yes.
17  Q.  Major Baylor's career was in the north, right?
18  A.  Right.
19  Q.  How about a Corporal Thomas Robbins, do you
20  know anything about him and an injury in a helicopter
21  crash?
22  A.  Yes.  I know that he was assigned aviation.  He
23  had a helicopter crash.  That was probably, wow, in
24  the early to mideighties.  I know he has separated

Page 144

1  from the job, he retired and I believe he applied for
2  a disability pension.
3  But beyond that I don't know the extent of
4  his injuries or how long he was out or how long he was
5  on light duty or any of those things.
6  Q.  Do you know if he was on light duty?
7  A.  I believe he was at different times.
8  Q.  Do you know if he retired and sought a
9  disability pension?
10  A.  I believe he did, yes, sir.
11  Q.  Do you know if he got a disability pension?
12  A.  I don't know.
13  Q.  And how about a Corporal Michael Linz, L-i-n-z?
14  A.  Mike Linz?  Yeah.  He's another one.  I mean,
15  he's been gone for a while.  I worked with him briefly
16  at Troop 3.  I just vaguely remember he had some sort
17  of injury.
18  Q.  Was it a neck injury?
19  A.  I don't recall.
20  Q.  He had some sort of an injury?
21  A.  Right.  And I want to say he had applied for a
22  pension, disability pension, but I don't know if he
23  got it or not.
24  Q.  Are you aware that he was on light duty for two

Page 145

1  years?
2  A.  That sounds -- I know, I know he had been on
3  light duty.  As a matter of fact, I think he ended his
4  career in KentCom, which is the dispatch center.
5  Q.  Right.  That's like the 911 center?
6  A.  Yes.  Yes, sir.
7  Q.  Okay.
8  A.  And so I wouldn't doubt it if he had been on
9  light duty that long.
10  Q.  Thank you.
11  How about a Laurel Mehew-King, does that
12  name ring a bell?
13  A.  She is -- she I believe worked out of Troop 9.
14  Q.  Troop 9?
15  A.  Yes.  Patrol.  She's actually a classmate of
16  mine.  I'm somewhat familiar with her.  I do know that
17  she had been in a car crash or rear-ended I believe
18  was the case and sustained a back injury.  I'm pretty
19  sure she went off on a disability.
20  I don't know if it was, you know, full
21  disability or partial disability.  I don't know the
22  time period she was in and out of work, but I do know
23  she did sustain a pretty severe back injury.
24  Q.  And then she went off on retirement or

**A - 427**

37 (Pages 142 to 145)

Price, et al.                                                        v.                                         Chaffinch, et al.
John A. Yeomans                                    C.A. # 04-956-GMS                                    October 3, 2005

Page 146

1   disability is what you're saying?
2   A.  Yes, sir.
3   Q.  Now, was this in the late eighties?
4   A.  I believe probably late eighties, yeah, that
5   sounds about right.
6   Q.  And she was on light duty before she went --
7   A.  I would assume, yeah.
8   Q.  You're not sure?
9   A.  No.
10  Q.  You don't know one way or the other?
11  A.  No.
12  Q.  You said she did have a back injury, a car
13  crash?
14  A.  Yes.  And I know she applied for a pension and
15  I'm pretty sure she got it, but the light-duty status
16  I'm not sure about.
17  Q.  Does this ring a bell, first 25-year trooper to
18  pension off?  Maybe she was a precedent setter?  Does
19  that ring any bells with you?
20          MR. FITZGERALD:  I object to form.
21  A.  No, not really.
22  Q.  So you don't know if she was on or off light
23  duty?
24  A.  No.  No.

Page 147

1   Q.  How about Trooper Randy Armistad?
2   A.  Randy Armistad?  I'm not familiar with the
3   medical file.  However, I know he was involved in a
4   horrendous crash and underwent a tremendous amount of
5   rehabilitation in an attempt to come back onto the job
6   and he never did.  I don't know how long he was out.
7          Let me correct that.  I don't know that he
8   ever came back to be on light duty or anything like
9   that.  I think he had the crash and he went through a
10  tremendous amount of rehabilitation and I just don't
11  recall him ever coming back to work.
12  Q.  Well, do you recall -- and I think Major Baylor
13  has testified that he was pensioned off after two
14  years, two years after his injury.  What would that
15  tell you?  What does that mean?  That he was paid for
16  the two years, be it sick leave or worker's comp. or
17  what?
18  A.  Yeah.  Sure.  He was probably compensated for
19  that two-year period.  I can't imagine him not being
20  under those circumstances.
21  Q.  Well, let me ask.  How much sick leave does a
22  trooper accumulate in an average year?
23  A.  Well, it's one-and-a-quarter days per month,
24  ten days a year.

Page 148

1   Q.  So you accumulate ten days a year?
2   A.  Right.
3   Q.  So if you're a ten-year trooper, you will
4   accumulate a hundred days of sick leave?
5   A.  Right.
6   Q.  Right?
7   A.  (The witness nodded.)
8   Q.  A twenty-year trooper will only have
9   accumulated, if he's never been sick will only have
10  accumulated 200 days of sick leave?
11  A.  Right.
12  Q.  And 200 days I guess divided by 5 days a week
13  gives you how many weeks could you accumulate over a
14  20-year career?
15          Let's do it.  Here we go.  200 divided by
16  5.  That should be easy.  That's 40 weeks.  Do you
17  agree?
18  A.  Yeah.
19  Q.  So if you have been a trooper for 20 years and
20  you have never taken a sick day, at the end of your
21  20th year you would have accumulated 40 weeks of pay?
22  A.  Right.
23  Q.  So if you're Trooper Armistad -- and I don't
24  know how many years he had been a trooper.  When he

Page 149

1   was injured, do you know if he was a ten-year trooper
2   or --
3   A.  No.  He hadn't been on long at all.
4   Q.  So he didn't really have a lot of sick leave?
5   A.  No.
6   Q.  So he might have had --
7   A.  Workmen's comp.
8   Q.  Okay.
9   A.  Coupled with whatever time he had on the books.
10  Beyond that, I really don't know how he was
11  compensated.
12  Q.  Right.  He could have been compensated by being
13  put on a light-duty list, couldn't he?
14  A.  Sure.  Yeah.
15  Q.  That's all I'm trying to understand.
16  A.  Gotcha.
17  Q.  This was I think we were talking about in his
18  incident, his terrible accident happened in the
19  eighties sometime, right?
20  A.  Right.
21  Q.  And you joined the force back in the eighties?
22  A.  '83.
23  Q.  '83.  And it's been the policy of the State
24  Police since you've been on the force that if a

**A - 428**

Price, et al.
John A. Yeomans

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 150

1  trooper is injured the State Police tries to ensure
2  that the trooper has a steady income, a steady stream
3  of his wage and benefits, his wage and benefits for as
4  long as permitted?
5  **A.  Correct.**
6  Q.  Is that a fair statement?
7  **A.  Yep, even to the extent we have a shared**
8  **compensation or leave program.  If someone is really**
9  **down on their time or usage of time, we can put**
10 **something out throughout the state for other state**
11 **employees or people within the division to donate**
12 **leave for coverage, so yeah.**
13 Q.  But when we're talking about light duty,
14 there's some provisions that -- well, let's go back to
15 Citro.
16       When you were talking about Captain Citro,
17 you talked about he was running up against a two-year
18 barrier.  Do you remember that?
19 **A.  Yes.**
20 Q.  And you were telling him when you called him
21 that he was running up or two years was as long as he
22 was going to be permitted under the policies to be in
23 this status, right?
24 **A.  Unless he could demonstrate recovery, which he**

Page 151

1  **couldn't.**
2  Q.  Right.  Right.  But there was a ceiling on how
3  long he could be in that status?
4  **A.  Yes.**
5  Q.  Right?
6  **A.  Right.**
7  Q.  And when we go back to Trooper Armistad I think
8  you're telling me if he didn't have a lot of
9  accumulated sick leave and people didn't donate a lot
10 of sick leave to him, if that was allowed back then,
11 if he was kept for two years it would have had to be
12 in some combination of other statuses that he was put
13 in to let him keep his income going?
14       MR. FITZGERALD:  I object to form and
15 foundation.
16 **A.  Yes.**
17 Q.  One option of which would have been he could
18 have been put on light-duty status?
19       MR. FITZGERALD:  I object to foundation.
20 **A.  If that was, in fact, the case.**
21       **Are you suggesting he was put on light**
22 **duty?**
23 Q.  No.  I'm saying that was an option.
24 **A.  Yeah.  Oh, yeah.  Sure.  Sure.**

Page 152

1  Q.  Sure?
2  **A.  Yeah.**
3  Q.  Right.  Then I have got a Mark Gibbons.  Does
4  that name ring a bell with you, Mark Gibbons?
5  **A.  No.**
6  Q.  No?
7  **A.  Don't know him.**
8  Q.  Then we have an Herb Murray.  Does that name
9  ring a bell with you?
10 **A.  Herb Murray?  Burt Murray?**
11 Q.  No.  I just have a Herb Murray, M-u-r-r-a-y.
12 **A.  No.**
13 Q.  How about a Rick Van Brunt?
14 **A.  No.**
15 Q.  Then we're almost done the list here.
16 **A.  Those guys must have been a lot older.**
17 Q.  Maybe.
18       A Lieutenant Jeff David?
19 **A.  Yes.**
20 Q.  A detective in licensing?
21 **A.  Yes.**
22 Q.  Do you know anything about him and his stroke?
23 **A.  Yes, I do.  He had a stroke and he was out**
24 **almost two years to the day prior to coming back to**

Page 153

1  **work.**
2  Q.  Okay.  So he had a stroke and then he --
3  **A.  For full-duty status I mean.**
4  Q.  Right.  After his stroke he was put on light
5  duty?
6  **A.  Yeah.  He was actually out for quite a while**
7  **after the stroke, I mean actually out on medical, came**
8  **back to work in a light-duty capacity and probably on**
9  **light duty close to a year before he went back to**
10 **full-duty status.  I'm pretty sure he came really**
11 **close to the two-year mark.**
12 Q.  So I think what you're saying is that he had
13 the stroke and he probably used a lot of sick leave,
14 right?
15 **A.  Yes.**
16 Q.  And you, for example, could have 40 weeks or
17 whatever of sick leave?
18 **A.  Right.**
19 Q.  And then he was able to come back on a
20 light-duty status?
21 **A.  Yes.**
22 Q.  And then he was starting to approach this
23 two-year mark and he was able to get himself back on
24 full-duty status before he hit that two-year mark?

A - 429

Price, et al.                                    v.                    Chaffinch, et al.
John A. Yeomans              C.A. # 04-956-GMS         October 3, 2005

Page 154

1    A.  Correct.
2    Q.  If he had hit the two-year mark, then he might
3    have had to sever his relationship with the division
4    and retire?
5    A.  Possibly, yes.
6    Q.  Possibly?
7    A.  Yeah.
8    Q.  Do you know what his assignment was before his
9    stroke, I mean what he was a lieutenant of? Upstate?
10   Downstate? What troop? What function?
11   A.  I thought he had been at SBI, a detective in
12   licensing when it occurred, State Bureau of
13   Identification.
14   Q.  So that means he works out of licensing?
15   A.  Correct.
16   Q.  And lastly a Steve Swaine, does that --
17   A.  Sure.  A sergeant --
18   Q.  Steve Swaine.
19   A.  -- assigned to the evidence detection unit at
20   Troop 4. I'm not familiar with his medical status
21   though.
22   Q.  Do you know if he has a speech impediment or
23   not?
24   A.  He does have that, yes.

Page 155

1    Q.  Does that cause him to be on a light-duty
2    status?
3    A.  No.
4    Q.  Do you know if he's ever been on a light-duty
5    status?
6    A.  No. I'm not aware, no. No.
7    Q.  Does the speech impediment impair his ability
8    to perform all the functions of the job?
9    A.  Not that I'm aware of. I mean, I've worked
10   with him at different crime scenes. He seems to --
11   it's a hoarseness in his voice, especially when he
12   gets kind of nervous or excited, but it seems like he
13   could communicate pretty well.
14   Q.  With witnesses and things like that?
15   A.  Yeah.
16   Q.  Let's move off of that.
17   A.  Okay.
18       MR. FITZGERALD: Tom, can I get two
19   minutes?
20       MR. NEUBERGER: Yes.
21       (A brief recess was taken.)
22   BY MR. NEUBERGER:
23   Q.  I did have one more name that came up. Okay?
24   A.  Okay.

Page 156

1    Q.  A Scott Kleckner with some sorts of
2    degenerative changes to his hips or whatever, does
3    that ring a bell for you?
4    A.  I know who he is, but I'm not familiar with his
5    medical history.
6    Q.  Well, who is he?  Is he a currently trooper?
7    A.  Yes. I believe he works out of Troop 9.
8    Q.  He works out of Troop 9?
9    A.  Yes.
10   Q.  Do you know how many years he's been on the
11   force approximately?
12   A.  I don't.  He hasn't been on there a real long
13   time, but -- yeah. I think less than ten.
14   Q.  But you don't know anything at all about his
15   medical condition?
16   A.  No, sir.
17   Q.  You don't know if he's had a medical condition
18   that's been accommodated or not?
19   A.  I'm not familiar with it.
20   Q.  Do you know what his assignment is at Troop 9?
21   A.  Patrol as far as I know.
22   Q.  He's just a patrol officer?
23   A.  Yeah.
24   Q.  All right.  Let's just move on.

Page 157

1    A.  Yes.
2    Q.  I need to understand how a trooper, in some
3    circumstances how a trooper is declared unfit for
4    duty.
5        We all know troopers carry weapons, right?
6    A.  (The witness nodded.)
7    Q.  Yes?
8    A.  Yes.
9    Q.  There are times when trooper's psychiatric
10   fitness can be called in question. Is that true?
11   A.  That's correct.
12   Q.  And the State Police retains the authority to
13   send troopers for fitness for duty exams out of
14   psychiatric concerns. Is that correct?
15   A.  That's correct.
16   Q.  So, for example, troopers witness grisly
17   crimes, right?
18   A.  Right.
19   Q.  Troopers investigate suicides?
20   A.  Yes.
21   Q.  You know, very sad occasions and things like
22   that, right?
23   A.  Right.
24   Q.  That's all part of a very difficult job, right?

A - 430

40 (Pages 154 to 157)

Price, et al.
John A. Yeomans

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 158

1    A.  Yes.
2    Q.  If you suspect that a trooper is having
3    emotional or other kinds of issues that could
4    interfere with his doing his job properly, does the
5    State Police on occasion send troopers for fitness for
6    duty exams?
7    A.  Yes.
8    Q.  Once again, I'm focusing on psychiatric issues
9    here.
10    A.  Right.
11    Q.  So, for example, you could send a trooper off
12    to have a psychiatrist exam them?
13    A.  Yes.
14    Q.  If the psychiatrist says that the trooper is
15    unfit for duty, you would have to take action?
16    A.  Yes.
17    Q.  Right.  Somebody would have to make a decision
18    on whether the trooper should have his duty status
19    altered?
20    A.  Yes.
21    Q.  Would that be the colonel or HR?
22    A.  That's the colonel.
23    Q.  That's the colonel?
24    A.  Right.

Page 159

1    Q.  So in the past have troopers been found unfit
2    for duty because of psychiatric issues?
3    A.  Yes.
4    Q.  And is there a status they're placed in
5    regularly or do they go off on sick leave, whatever?
6    A.  It's both.
7    Q.  Tell me about it.
8    A.  In some instances the forensic psychologist --
9    that's what we use, is a forensic psychologist that we
10    contract with.
11    Q.  Who would that be?
12    A.  Dr. Karen DeBernardo from Baltimore County,
13    Maryland.
14    Q.  Okay.  Go ahead.
15    A.  She will make a recommendation that a person is
16    not fit for duty and one of two things will occur.
17    She will either recommend that they be placed on a
18    light-duty assignment, minimizing or diminishing their
19    regular assigned duties while they're either being
20    medicated or receiving counseling.  In most instances
21    she will recommend that within 30 to 60 days that they
22    come back to see her for reevaluation, at which time
23    she will evaluate them and indicate whether or not
24    they should continue on light duty or return to

Page 160

1    full-duty status.
2         There have been some very limited
3    circumstances where she has come back and said, "I
4    don't think it's in the best interest of this
5    individual or the department for the person to return
6    to work at this time in a light-duty or full-duty
7    capacity but to be off on leave, medical leave pending
8    counseling, medication and further evaluation."  And
9    the couple of instances I'm thinking of the person was
10    basically out on medical using their sick time and
11    they were reevaluated and then placed in a light-duty
12    capacity and then evaluated in some instances -- well,
13    actually not some.  I think in all instances I can
14    recall they came back for another evaluation, at which
15    time she said okay, now they can return to full duty.
16    Q.  So if your psychologist, your psychiatrist
17    finds there are issues, you're saying historically
18    there's two options or two paths that have been
19    followed, right?
20    A.  Right.  Or they're fit for duty.  I didn't
21    throw that in.  In some instances they're fine.  It's
22    more of a behavioral issue as opposed to something
23    psychology.
24    Q.  So the first option or path we were talking

Page 161

1    about was the healthcare professional has recommended
2    and people have been placed on light duty while
3    they're taking their meds and/or getting counseling,
4    right?
5    A.  Yes.  Usually a combination thereof.
6    Q.  Right.  Then the periodic reevaluations,
7    correct?
8    A.  Correct.
9    Q.  But also there's precedence for the medical
10    condition being such that the psychiatrist says they
11    should basically be on a medical leave?
12    A.  Right.
13    Q.  While they're taking their meds and getting
14    their counseling and getting their head together?
15    A.  Yes.
16    Q.  Now, what happens when you go on medical leave?
17    I mean, how do they -- they're just using their sick
18    leave?
19    A.  Yes.
20    Q.  What if there isn't any sick leave available,
21    what happens?
22    A.  I don't think we have had any where we haven't
23    had it, I don't think we have had that situation yet.
24    Q.  Okay.  But the precedent is that sometimes

A - 431

41 (Pages 158 to 161)

Price, et al.                                      v.                          Chaffinch, et al.
John A. Yeomans                          C.A. # 04-956-GMS                     October 3, 2005

Page 162

1  people while they're recuperating have just been put
2  on a status where they're not reporting to the job?
3  A.  Right.  Right.
4  Q.  But they're still receiving pay and benefits?
5  A.  Yes.  Yes.  Definitely.
6  Q.  I guess sometimes, sometimes have I seen
7  references to a leave of absence and things like that?
8  Can you still be carried on the rolls but receive a
9  leave of absence?
10  A.  (Witness shakes head).
11  Q.  No?
12  A.  No.
13  Q.  We will talk about that a little bit later.
14  We're going to look at your regulations or whatever.
15        But a leave of absence doesn't ring any
16  bells for you?
17  A.  No.  I mean, I'm familiar with the term, but
18  it's not typically a paid leave of absence.
19  Q.  No, I'm not talking paid.  Aren't there unpaid
20  leaves of absences where your benefits haven't ended
21  yet?
22  A.  Terminal leave.  Is that what you're making
23  reference to?
24  Q.  Well, terminal leave they're paying paid,

Page 163

1  right?
2  A.  Right.  I mean, you're out of the workplace,
3  but you're being paid your accumulated vacation, sick
4  leave, comp time, whatever the case may be.
5  Q.  Right.
6  A.  But when I think of leave of absence I'm
7  thinking of someone who has requested a six-month,
8  twelve-month leave to go and do whatever it is that
9  they're seeking to do with the colonel's permission
10  and that is unpaid.
11  Q.  No.  I understand.  I understand that.
12        But can you be on an unpaid leave of
13  absence where you're still drawing your non-wage
14  benefits, in other words, you're still getting your
15  medical insurance, that kind of stuff?
16  A.  No.
17  Q.  No?
18  A.  No.
19  Q.  So unpaid leave of absence means you're not
20  getting benefits or wages?
21  A.  Right.
22  Q.  Let's have a couple of things marked.  Let's
23  talk about a couple of things here.
24  A.  Okay.

Page 164

1  Q.  I have here some exhibits that were marked at
2  the deposition of Dave Baylor.  Okay?  Let me show you
3  what was marked as Baylor Deposition Exhibit 1.
4        MR. NEUBERGER: I have got a copy here for
5  you, Robert, if you want.
6  BY MR. NEUBERGER:
7  Q.  Here was Baylor Deposition Exhibit No. 1 which
8  was a letter to Kurt Price dated June 25th, 2003.  I'm
9  going to ask you, first of all, if that's a typo and
10  it should be 2004.  We will put that in front of you
11  first.
12        Now, have you seen this before?
13  A.  Yes.
14  Q.  Now, that is a letter.  It does have a typo at
15  the top.  It should say June 25, 2004.  Is that
16  correct?
17  A.  2004, right.
18  Q.  Now, this was a letter that Colonel MacLeish
19  sent to Kurt Price, right?
20  A.  Right.
21  Q.  And then let me show you what was Baylor
22  Deposition Exhibit No. 2.  This is a similar letter to
23  Wayne Warren bearing the same date.
24  A.  (Reviewing document).

Page 165

1  Q.  This Wayne Warren letter, it had a typo at the
2  top also, right?
3  A.  Yes.
4  Q.  So that should also be 2004?
5  A.  Four.
6  Q.  Right?
7  A.  Right.
8  Q.  Now, both these letters are signed by
9  Lieutenant Colonel Thomas MacLeish, right?
10  A.  Correct.
11  Q.  Then you received copies of them.  Is that
12  correct?
13  A.  Yes.
14  Q.  Now, these letters are identical, aren't they?
15  A.  They would appear so, yes.
16  Q.  Now, in this letter both Corporals Price and
17  Warren were placed on light-duty status as of June 25,
18  2004.  Is that correct?
19  A.  Correct.
20  Q.  And we're going to sort of march through it
21  here.  Let's start with the first paragraph.  Okay?
22  A.  Okay.
23  Q.  At the end of the first paragraph it says, "you
24  will be considered in a light duty status."  Is that

42 (Pages 162 to 165)

Price, et al.
John A. Yeomans

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 166

1  correct?
2     A.  Correct.
3     Q.  Then if we look at item No. 1, it says, "Your
4  work status will be Light Duty."  Is that correct?
5     A.  Yes.
6     Q.  And it goes on and says, "Non-Uniformed
7  consisting of administrative desk duties," right?
8     A.  Right.
9     Q.  And then in No. 3 it says they're allowed to
10  keep their weapon but it wasn't to be used for police-
11  related duties, right?
12     A.  Right.
13     Q.  Do you see that?
14     A.  Yes.
15     Q.  No. 4 talked about what they had to do if they
16  observed a crime in progress, right?
17     A.  Right.
18     Q.  Now, Lieutenant Colonel MacLeish had the
19  authority to send this letter, correct?
20     A.  Correct.
21     Q.  And did you disagree with this letter going
22  out?
23        Let me put it this way:  The lieutenant
24  colonel made the decision to put them on light-duty

Page 167

1  status.  Is that correct?
2     A.  Correct.
3     Q.  That was his decision to make, right?
4     A.  Yes.
5     Q.  Is that because the lieutenant colonel has
6  operational command of the various troops under the
7  organizational structure?
8     A.  Correct.
9     Q.  So this was his decision to make?
10     A.  Correct.
11     Q.  Now, before doing that would he have consulted
12  with the colonel, Aaron Chaffinch, at the time, if you
13  know?
14     A.  I don't know if he did or didn't.
15     Q.  You don't know.  We would have to ask him about
16  that?
17     A.  Yes.
18     Q.  And as far as the reasons why he sent them this
19  letter, would we have to ask him or had he told you
20  the reasons why he sent this letter?
21     A.  I mean, I had discussed this letter with the
22  lieutenant colonel.
23     Q.  Has he ever told you the reasons for putting
24  them on light-duty status?

Page 168

1     A.  Yeah.  Based on the recommendations from
2  Dr. Green due to the concern about their hearing and
3  being deemed not fit for duty by Dr. Aaron Green.
4     Q.  I'm just trying to focus on why he sent the
5  letter.  And I think you're telling me that you did
6  have a discussion about that with him?
7     A.  Absolutely.  Yeah.
8     Q.  So I think you're telling me that he told you
9  that the reason he was sending the letter was because
10  Dr. Green had concerns about their hearing?
11     A.  Right.  Well, I mean, this --
12     Q.  I'm going to try to get into as many reasons as
13  you have.  I'm not locking you in.  I'm just trying to
14  get this one down.  Okay?
15     A.  Right.
16     Q.  Did he indicate other reasons why he was
17  sending the letter?
18     A.  No.  Only that because of Dr. Green's
19  evaluation that they should be placed on light duty.
20     Q.  And was this discussion with him held before or
21  after he sent the letter?
22     A.  It would have been before.
23     Q.  Shortly before?
24        MR. FITZGERALD:  I object to form.

Page 169

1     Q.  Was it that day or that week?
2     A.  It probably would have been the preceding week
3  because I think their evaluation was actually about a
4  week or more before this letter.
5     Q.  Let me just turn to something.  Okay.  Let's
6  move on from that.
7        MR. NEUBERGER:  You can keep those if you
8  want, Robert.
9        (Discussion off the record.)
10  BY MR. NEUBERGER:
11     Q.  Then I want to show you a letter dated May
12  11th, 2005.
13        MR. NEUBERGER:  Let's mark this.  I think
14  this will be the second deposition dxhibit here.
15        (Yeomans Deposition Exhibit No. 2 was
16  marked for identification.)
17  BY MR. NEUBERGER:
18     Q.  Have you looked at that letter?
19     A.  Yes.
20     Q.  Why don't you read it over?  You have read that
21  over?
22     A.  (Reviewing document).
23     Q.  Now, is this a letter that then Colonel
24  MacLeish sent to Kurt Price on May 11th of 2005?

**A - 433**

43 (Pages 166 to 169)

Price, et al.                           v.                    Chaffinch, et al.
John A. Yeomans                  C.A. # 04-956-GMS            October 3, 2005

Page 170

1    A.  Yes, it is.
2    Q.  And is this a letter indicating that Kurt
3  Price's light-duty assignment was going to have to end
4  as of June 10th, 2005?
5        Do you see the last paragraph?
6    A.  Yes.
7    Q.  So as of the date of this letter was Kurt Price
8  being told that his light-duty assignment was going to
9  have to end on that date?
10   A.  That's correct.
11   Q.  Did Colonel MacLeish explain to you -- well,
12  did Colonel MacLeish make the decision to send this
13  letter?
14   A.  Yes.
15   Q.  And did Colonel MacLeish ever explain to you
16  the reasons why he sent this letter?
17   A.  Yeah.  I mean, it was in conversation about the
18  determination made by Dr. Emmett and Kurt Price's, you
19  know, inability to recover essentially and his
20  interpretation of the policy was such that it was two
21  years and out.
22        So, yeah, that's why he decided to send
23  him the letter.
24   Q.  I want to make sure I understand that.

Page 171

1        So, first of all, we know Colonel MacLeish
2  made the decision to send this letter, right?
3    A.  Yeah.  I mean, that's ultimately the decision.
4    Q.  Right.  And then you're telling me -- I'm
5  asking you the reasons why he sent the letter and I
6  think you're saying the first reason was that this
7  Dr. Emmett had said some things?
8    A.  Right.
9    Q.  Right?
10   A.  Yeah.
11   Q.  And then I think you're saying the second
12  reason he sent it was something about policy.  What
13  were you trying to tell me?  I didn't quite get it.
14   A.  That our policy was that we could keep them on
15  up to two years light duty or accommodate them, unless
16  there was no indication that they would be able to
17  recover.  And based on what Dr. Emmett was saying
18  here, the colonel decided that he would essentially
19  adhere to that policy or his interpretation of the
20  policy and direct Kurt Price to separate from the
21  division.
22   Q.  So I think you're telling me on the second
23  reason was that the colonel had an interpretation of
24  the Delaware State Police's policy on light duty?

Page 172

1    A.  Correct.
2    Q.  And that the colonel decided to adhere to his
3  interpretation of the policy?
4    A.  Correct.
5    Q.  And according to his interpretation of the
6  policy, he would not be able to keep them for two
7  years if there was no possibility of Kurt Price
8  recovering from his medical condition?
9    A.  That's correct.
10   Q.  Okay.  Did the colonel explain to you how he
11  had come to that interpretation of the policy?
12   A.  No.
13   Q.  Okay.  Thank you.
14        Okay.  I just want to look at the letter
15  now, a few things in the letter.  There's no dispute
16  that Kurt Price was on light-duty status prior to
17  getting this letter, right?
18   A.  Correct.
19   Q.  The earlier document we had talked about,
20  Baylor Deposition Exhibits 1 and 2, specifically
21  mentioned putting them on light duty.  You remember
22  that?
23   A.  Right.
24   Q.  And in paragraph two of the document in front

Page 173

1  of you, Yeomans Exhibit 2, he mentions light duty
2  again.
3        Do you see that?
4    A.  Yes.
5    Q.  So we're starting from the baseline that Kurt
6  Price had been on light-duty status, right?
7    A.  Right.
8    Q.  And then he says in the third paragraph, the
9  fourth line down "I am not aware of any situation in
10  which a trooper remained on light duty after receiving
11  word that a return to full duty was medically
12  impossible."
13        Do you see that?
14   A.  I do.
15   Q.  So that the colonel is indicating there that it
16  would be unprecedented to allow Kurt Price to stay on
17  for two years.  Is that a fair reading of that?
18   A.  To his knowledge.  That's how I would interpret
19  that.
20   Q.  Right.  We talked about Bruce Peachey earlier
21  today, for example.
22   A.  Sure.
23   Q.  And I think we talked about the injuries to his
24  ankle?

A - 434

44 (Pages 170 to 173)

Price, et al.                                                      Chaffinch, et al.
John A. Yeomans                    v.                             October 3, 2005
                          C.A. # 04-956-GMS

Page 174

1    A.  Right.
2    Q.  And we may have talked about Major Baylor
3    testifying that his ankle was shattered.  Do you
4    remember that?
5    A.  Yes.
6    Q.  And I think we may have talked about Major
7    Baylor testifying that somewhere within three to six
8    months after Peachey's injuries he went to the colonel
9    about putting him on light-duty status for two years.
10        Do you remember that testimony that I
11   pointed out?
12   A.  Yes.
13        MR. FITZGERALD:  Again, I will object only
14   to the extent that the testimony is what the testimony
15   is in the Baylor deposition.
16   BY MR. NEUBERGER:
17   Q.  Did the lieutenant, well, did now Colonel
18   MacLeish examine whether the Bruce Peachey incident
19   would have been a precedent for allowing Kurt Price to
20   stay on?
21   A.  If he did, I'm not aware of it.  I don't know.
22   Q.  Right.  So you're unaware of whether or not he
23   looked into how Bruce Peachey had been treated by the
24   State Police?

Page 175

1    A.  He may have.  He may not have.
2    Q.  Right.  You just don't know?
3    A.  I don't know.
4    Q.  Then we talked about Major Forrester earlier
5    today.
6        Do you remember that?
7    A.  Yes.
8    Q.  And it's fair to say that, well, Colonel
9    MacLeish came up through Troop 3 in Dover, didn't he?
10   A.  Right.
11   Q.  Right?
12   A.  Yes.
13   Q.  And Colonel MacLeish was the operations
14   commander for Kent and Sussex County in his career,
15   right?
16   A.  Yes.
17   Q.  Colonel MacLeish replaced Major Forrester as
18   the operations commander for Kent and Sussex County
19   when Major Forrester retired, correct?
20   A.  That's correct.
21   Q.  Then Major MacLeish had worked with Major
22   Forrester when Major Forrester was his superior
23   officer in the chain of command, right?
24   A.  Right.

Page 176

1    Q.  So now Colonel MacLeish had a personal, had in
2    the course of his career interacted with Major
3    Forrester?
4    A.  Sure.
5    Q.  Sure.  He had worked with him, right?
6    A.  Yeah.
7    Q.  And is it fair to say that Colonel MacLeish
8    knew that Major Forrester had at least one hearing
9    device in his ears?
10        MR. FITZGERALD:  I'll object to the form.
11        MR. NEUBERGER:  Sure.
12   BY MR. NEUBERGER:
13   Q.  You're a police officer and you're trained to
14   be attentive to detail.  Isn't that true?
15   A.  Correct.
16   Q.  Right?
17   A.  Right.
18   Q.  Part of your job is to take in your
19   surroundings and be aware of what's going on around
20   you, right?
21   A.  If he was wearing one you would think he
22   probably observed it.
23   Q.  Right.
24   A.  Okay.

Page 177

1    Q.  Okay.  Did Colonel MacLeish tell you that when
2    he was talking, when he was saying that there was no
3    precedent for allowing Kurt Price to stay on now that
4    he had an injury that was permanent, did he tell you
5    he had looked into the situation relating to Major
6    Forrester and his wearing hearing aids?
7    A.  No, not specifically.  That name -- I mean, if
8    I could, that particular line where he's saying, "I am
9    not aware of any situation in which a trooper remained
10   on light duty after receiving word that a return to
11   full duty was medically impossible," I do know that he
12   based his decision and some of that verbiage in the
13   letter based on personnel files and records that were
14   provided by human resources, an analysis, if you will,
15   of whether or not someone had been deemed permanently
16   disabled and allowed to stay on for two years or more.
17   So I think that might be where that line is coming
18   from.
19        Now, in terms of what he looked at on an
20   individual basis, I don't know.
21   Q.  Well, do you know what names were analyzed for
22   the colonel, what troopers were analyzed?
23   A.  There were a lot of them, sir, a lot of them.
24   And I don't have the list and I would hate to

45 (Pages 174 to 177)

Price, et al.                                    v.                          Chaffinch, et al.
John A. Yeomans                          C.A. # 04-956-GMS                   October 3, 2005

Page 178

1  speculate at this point.
2  Q.  Right.  I'm asking you specifically was Bruce
3  Peachey one of them?  And I think you're telling me
4  you don't know if he was one of them?
5  A.  I don't know if he was.  I know he was provided
6  a list of different medical histories when people were
7  in and out of the workplace, but it would be unfair to
8  speculate.  I mean, without having that in front of
9  me, I can't definitively say who was on it and who
10  wasn't.
11  Q.  And you don't know whether Major Forrester was
12  on the list?
13  A.  I do not.
14  Q.  But if he was an observant police officer when
15  he interacted with Major Forrester in Major
16  Forrester's last years with the State Police, he had
17  the opportunity to know that Major Forrester wore at
18  least a hearing aid in one ear according to your best
19  memory?
20  A.  If he was wearing it, I would think he would
21  see it based on his daily interaction or periodic
22  interaction with the major.
23  Q.  Right.  Would you agree that Major Forrester
24  had a permanent loss of hearing in his ear?

Page 179

1  A.  I don't know.  He obviously had a loss.  But
2  permanent?  I don't know.  I don't know the extent of
3  it.  I really don't.  I don't know if it was permanent
4  or what.  I don't know.  I don't know how to determine
5  that.
6  Q.  Well, we're going to go into something you have
7  said a little later.
8         Haven't you been told by physicians that
9  once you have a hearing loss it doesn't come back?
10  A.  That's correct.
11  Q.  By "permanent" that's what I meant.
12  A.  Right.
13  Q.  I don't want to mislead you.
14  A.  Once it's lost, you don't get it back.  That's
15  what I understand.
16  Q.  And I'm asking you because I think you told me
17  earlier today that you have seen some medical records
18  in the annual physical provided by Major Forrester's
19  physician and he did check off some hearing issue,
20  right?
21  A.  Yes.
22  Q.  And I'm asking you do you recall that it was
23  indicated by his physician or the physician that he
24  had hearing loss?

Page 180

1  A.  Yes.
2  Q.  All right.  If he had hearing loss, we can
3  agree that that can't be recovered by natural means?
4  A.  That's correct.
5  Q.  And you could use a hearing aid to enhance your
6  ability to hear, right?
7  A.  Sure.
8  Q.  So now I'm asking you the question as an HR
9  person, would you agree that Major Forrester had a
10  hearing loss that would not heal itself on its own?
11  A.  Probably not.
12  Q.  I'm sorry.  I don't understand what you mean by
13  "Probably not."
14         Are you saying you do agree or you don't
15  agree that he had a hearing loss?
16  A.  I agree to the extent that the technology that
17  we have or don't have now, probably not.
18  Q.  By that you mean it won't grow back?
19  A.  Right.
20  Q.  Right.  By that I think you're telling me that
21  you agree that Major Forrester had a hearing loss that
22  could only be rectified by using a hearing aid?
23  A.  Apparently so, yes, sir.
24  Q.  You're saying that from what you know of

Page 181

1  looking at his medical records as well as you have
2  seen him wearing a hearing aid?
3  A.  Right.
4  Q.  Right.  So we're still back on Yeomans Exhibit
5  2 here, we're back to the third paragraph.  Okay?
6  A.  Okay.
7  Q.  So we're back to the fourth line in the third
8  paragraph.  It's really the third full sentence that
9  says, "I am not aware of any situation in which a
10  trooper remained on light duty after receiving word
11  that a return to full duty was medically impossible."
12         Then he goes on and talks about it being
13  irresponsible, you know, to keep you in there because
14  your condition is permanent.
15         You see all of that, right?
16  A.  Right.
17  Q.  Maybe we have already agreed on this.  I don't
18  know.
19         Major Forrester had a permanent condition
20  from which he would not recover?
21  A.  It appears as though Major Forrester had
22  hearing loss to the extent that he had to wear a
23  hearing aid.  I would imagine that was some permanent
24  condition, yeah.  Sure.

**A - 436**

46 (Pages 178 to 181)

Price, et al.
John A. Yeomans

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 182

1   Q.  And then we're on the second page of Yeomans
2   Exhibit 2, that first full paragraph at the top and
3   there I think the colonel is talking about the kinds
4   of records that human resources did present to him,
5   right?
6   A.  Yes.
7   Q.  And he's saying in each case of whatever was
8   presented to him the medical evidence was inconclusive
9   as to whether the trooper could return to full duty?
10  A.  Right.
11  Q.  Do you see that?
12  A.  Yes.
13  Q.  And I think you've indicated that Major
14  Forrester was not one of the situations that was
15  presented to the colonel?
16          MR. FITZGERALD:  Objection.
17  A.  I don't know.
18  Q.  I'm sorry.  I don't want to misstate.
19          You're not sure whether it was or not?
20  A.  I don't know.
21  Q.  How would we find out?  Is there a list that we
22  would have to ask you to produce?
23  A.  Yes.
24  Q.  Just for the sake of the record here, prior to

Page 183

1   May 11th, 2005 there was a list that indicates the
2   documents that were reviewed for Colonel MacLeish that
3   are mentioned here in the fourth paragraph of this
4   letter, right?
5   A.  Right.
6          MR. NEUBERGER:  And just for the sake of
7   the record, I'm going to send you a letter and ask if
8   you would agree to produce that.
9          MR. FITZGERALD:  Okay.  And just for the
10  sake of the record, that list is going to be identical
11  to either the first request for production of
12  documents in this case or whatever list of comparators
13  that were provided by plaintiffs.
14          MR. NEUBERGER:  Okay.  So you think -- we
15  will just look.
16          MR. FITZGERALD:  I don't know what he
17  looked at either, but the list is going to be --
18  unless Corporal Price identified people in the e-mail
19  as referenced in this letter, which I don't think he
20  did, but my guess is the list is the list of people
21  you already have gone through in this deposition.
22          MR. NEUBERGER:  Okay.  Okay.
23  BY MR. NEUBERGER:
24  Q.  But there is a document out there?

Page 184

1   A.  Yes.
2   Q.  So like was it a memo to him from you or your
3   staff or was it a memo with an attachment?  I mean,
4   what are you saying here?
5   A.  What I am saying is that we have a list of
6   names in HR.  He had consulted me on, you know, what
7   he really wanted to know is is there someone on that
8   list who was deemed permanently disabled but allowed
9   to stick around for two years or more?
10          The research in HR did not reveal that to
11  be the case.  I operated off of that list that was
12  provided to me by my staff.  I don't know that he
13  actually ever came down and viewed the list or what he
14  did outside of that, I don't know.
15  Q.  Then there was a letter to Wayne Warren bearing
16  the same date.
17          MR. NEUBERGER:  Let's mark that as Yeomans
18  No. 3.
19          (Yeomans Deposition Exhibit No. 3 was
20  marked for identification.)
21  BY MR. NEUBERGER:
22  Q.  Have you looked that one over?
23  A.  Yes.
24  Q.  Is this a similar letter directed to my client,

Page 185

1   Wayne Warren, on the same date?
2   A.  Yes.
3   Q.  And, once again, was my client told that by
4   June 10th of 2005 he was going to have to sever his
5   relationship with the Delaware State Police?
6   A.  Yes.
7          MR. FITZGERALD:  I will object to form.
8   Q.  He was going to have to retire or submit to a
9   disability pension?
10  A.  Yes.
11  Q.  And the same thing.  The colonel had the
12  authority to make this decision, right?
13  A.  Correct.
14  Q.  And were his reasons for making this
15  decision -- well, was one of his reasons the fact that
16  he had received a report from Dr. Emmett again?
17  A.  Yes.
18  Q.  And a report from a Dr. Green?
19  A.  Correct.
20  Q.  So the fact of the receipt of those reports,
21  was that one of the reasons why the colonel sent this
22  letter?
23  A.  Yes.
24  Q.  And the second reason, was it the same as the

A - 437

47 (Pages 182 to 185)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                    v.                              Chaffinch, et al.
John A. Yeomans                         C.A. # 04-956-GMS                        October 3, 2005

Page 186

1  one that you explained before about the policy was to
2  keep you for two years unless you can't recover and he
3  had his interpretation of the policy, the same reason
4  you explained before?
5      A.  Yes.
6      Q.  And then I think is it fair to say that there
7  were no other reasons other than the two that you have
8  explained to me?
9      A.  Right.
10     Q.  Now, he talks in this one about the functional
11 hearing requirements of a Delaware State trooper.  Do
12 you see that in the first paragraph?  This is the
13 fourth line down, the end going over to the fifth
14 line.
15     A.  Right.
16     Q.  He's saying that based upon Dr. Emmett's
17 opinion and that of Dr. Green "it is apparent that you
18 have sustained hearing loss that does not allow you to
19 meet the functional hearing requirements for the
20 position of a Delaware State Trooper."
21         Do you see that?
22     A.  Yes.
23     Q.  And he doesn't define what the functional
24 hearing requirements are in there, does he?

Page 187

1      A.  No, he does not.
2      Q.  In fact, in the letter to Kurt Price, Exhibit
3  No. 2, he never talks about what the functional
4  hearing requirements for a Delaware State Trooper are
5  either, does he?
6      A.  No.
7      Q.  I think we early in the deposition today talked
8  about some of the difficulties looking at the medical
9  literature and the professional literature about
10 defining hearing requirements to be a law enforcement
11 officer, right?
12     A.  Correct.
13     Q.  So we did address some of the problems there,
14 right?
15     A.  Right.
16     Q.  Did Colonel MacLeish tell you what he thought
17 the functional hearing requirements for the position
18 of a state trooper were when he wrote this letter?
19     A.  No.
20     Q.  Did he tell you whether or not he thought that
21 a hearing aid would help Corporal Warren perform
22 functional hearing requirements?
23     A.  No, he did not.
24     Q.  Did he tell you whether he thought a hearing

Page 188

1  aid would allow Corporal Price to perform functional
2  hearing requirements?
3      A.  No, he did not.
4      Q.  Okay.
5          MR. NEUBERGER:  Well, I'll tell you what.
6  Why don't we take our break?  It's been almost an hour
7  and 20 minutes.
8          Why don't we take our break now?  All
9  right?
10         MR. FITZGERALD:  All right.
11         (A brief recess was taken.)
12         MR. NEUBERGER:  Let's try to move on.
13 Let's mark this as Exhibit 4 here.
14         (Yeomans Deposition Exhibit No. 4 was
15 marked for identification.)
16 BY MR. NEUBERGER:
17     Q.  Have you looked at it?
18     A.  Yes.
19     Q.  Now, these are documents that were produced by
20 the lawyers for the State Police in discovery in this
21 case.  Okay?
22     A.  Okay.
23     Q.  So I'm really focusing on the first page of
24 this document that at the bottom says D2508.

Page 189

1          Do you see that?
2      A.  Yes.
3      Q.  Okay.  And counting up from the bottom, we go
4  one, two, three, four, five, the sixth line up says,
5  "Thanks, JY."
6          Do you see that?
7      A.  Yes.
8      Q.  And JY is you, right?
9      A.  Right.
10     Q.  And then we move up the page there to where it
11 says, "Original Message" about in the middle of the
12 page.
13         Do you see that?
14     A.  Mm-hmm.
15     Q.  It says from John Yeomans, right?
16     A.  Yes.
17     Q.  And then so from there down is an e-mail
18 message that you sent on June 18, 2004.  Is that
19 correct?
20     A.  That's correct.
21     Q.  Okay.  Then if my memory serves me right,
22 that's about the week before the colonel sent his
23 letter that was Baylor Deposition Exhibit 1 and 2, the
24 letter putting my clients on light-duty status.

A - 438

48 (Pages 186 to 189)

Price, et al.                                                      Chaffinch, et al.
John A. Yeomans                          v.                        October 3, 2005
                               C.A. # 04-956-GMS

Page 190

1        Do you remember that?
2    A.  Yeah.
3    Q.  So we're a week before that letter was sent
4    putting them on light-duty status as a context. It
5    was a June 25th letter.
6    A.  Okay.
7    Q.  So is this an e-mail to a Robert Williams?
8    A.  Yes.
9    Q.  And Robert Williams is the director of
10   audiology at something called the T K Group, Inc.,
11   right?
12   A.  Right.
13   Q.  And they're located in what state?
14   A.  Illinois.
15   Q.  In Illinois?
16   A.  Right.
17   Q.  So is he an audiologist? I mentioned that word
18   this morning.
19   A.  I believe he is.
20   Q.  Okay. So on June 18th you send this e-mail
21   to --
22   A.  He's the director of audiology anyway.
23   Q.  Right. And they do audiology testing, right?
24   A.  Right.

Page 191

1    Q.  So you sent him this three-paragraph letter,
2    right?
3    A.  Right.
4    Q.  And just so if there's any problem with
5    deciphering it, could you just read these three
6    paragraphs into the record?
7    A.  Starting with "Dr. Williams"?
8    Q.  Yes, please.
9    A.  "Dr. Williams: As an FYI Dr. Green conducted a
10   fitness for duty examination relative to officers'
11   Warren and Price hearing capabilities. He has
12   determined they are not fit for duty.
13        "As such we will place them on a light
14   duty status. Our policy is that we can only keep
15   officers in light duty capacity for two years before
16   they must separate from the agency and apply for a
17   disability pension.
18        "Would it be safe to say this type of
19   hearing loss is irreparable?
20        "Thanks, JY."
21   Q.  And then Robert Williams responded at the top
22   of this page to your e-mail, right?
23   A.  Yes.
24   Q.  And that's what's found at the top of the page?

Page 192

1    A.  Correct.
2    Q.  And let me see if I can read it to you. That
3    same day he responded, June 18th?
4    A.  Yes.
5    Q.  And did he say, quote, Captain, thanks for the
6    information; Most losses are irreversible unless
7    mechanically induced, i.e. middle ear conduction
8    apthology which may be medically correctable, signed
9    RW, close quote?
10        Do you see that?
11   A.  That's correct.
12   Q.  So he responded to your request about this type
13   of hearing loss being irreparable, right?
14   A.  Right.
15   Q.  And he told you that this type of hearing loss
16   is irreparable, right?
17   A.  That's what he's saying, yes, sir.
18   Q.  Right. And now your three-paragraph e-mail to
19   him, this wasn't sent by accident or anything, was it?
20   A.  Oh, no.
21   Q.  Right. This was a deliberate e-mail from you?
22   A.  Absolutely. Right.
23   Q.  This was sent and the things you said in the
24   e-mail were correct, right?

Page 193

1    A.  Yes.
2    Q.  So, for example, you talked about that there is
3    a light-duty status in the Delaware State Police?
4    A.  Right.
5    Q.  Do you see that?
6    A.  Right.
7    Q.  You made reference to that in the second
8    paragraph, right?
9    A.  Right.
10   Q.  And we have made various references to light
11   duty throughout the deposition today, right?
12   A.  Right.
13   Q.  You've understood those references to be
14   referring to the light-duty status found in the
15   Delaware State Police. Is that right?
16   A.  Yes.
17   Q.  And then we're still in the second paragraph.
18   The second sentence you indicate "Our policy."
19        Do you see that?
20   A.  Yes.
21   Q.  And that's talking about the light-duty policy
22   of the Delaware State Police?
23   A.  Yes.
24   Q.  And you indicate that "Our policy is that we

A - 439                    49 (Pages 190 to 193)

Price, et al.                                    v.                          Chaffinch, et al.
John A. Yeomans                          C.A. # 04-956-GMS                   October 3, 2005

Page 194

1  can only keep officers in a light duty capacity for
2  two years before they must separate from the agency
3  and apply for a disability pension." Is that correct?
4  **A.  Correct.**
5  Q.  And you were told in response that the hearing
6  loss my clients had suffered was irreparable, right?
7  **A.  Yes.**
8  Q.  And we looked at this.  This was Yeomans
9  Exhibit No. 2 and 3.
10      They were the letters dated May 11, 2005
11  from the colonel to my clients, right?
12  **A.  Right.**
13  Q.  That's where they were told they were going to
14  have to be retiring prior to two years, right?
15  **A.  Right.**
16  Q.  And they were told by the colonel there that
17  because their conditions were permanent they were
18  going to have to retire, right?
19  **A.  Right.**
20  Q.  Now, those statements that they were going to
21  have to retire because they have permanent conditions
22  is contrary to what you were saying to Mr. Williams in
23  this sentence about your policy.  Isn't that correct?
24  **A.  How's it contrary?**

Page 195

1  Q.  Well, the policy says that people are put on
2  light-duty status for two years even if they're
3  irreparable and that's what you were asking him.
4      MR. FITZGERALD:  I object to form and
5  foundation.
6  **A.  Yeah, I mean that's what I stated.**
7  **What I didn't state was that if they were**
8  **permanently disabled that they shouldn't stay beyond**
9  **two years, so we can only carry them for so long.  I**
10  **mean, I didn't state that and I wouldn't expect him to**
11  **infer that, but I could see where the discrepancy**
12  **would lie.**
13  Q.  Right.  So you admit that there's a discrepancy
14  in what you said on June 18th in this e-mail and what
15  Colonel MacLeish is saying in Yeomans Exhibit 2, in
16  Exhibit 2, right?
17      MR. FITZGERALD:  I object to form.
18  **A.  Just point it out to me.**
19  Q.  Sure.  At the bottom here where it says, start
20  with "I am not aware" through the bottom (indicating).
21  **A.  (Reviewing document).**
22      MR. FITZGERALD:  For the record, what did
23  you point out to him?
24      MR. NEUBERGER:  The third paragraph, the

Page 196

1  middle to the end.
2      MR. FITZGERALD:  The entire paragraph or
3  the -- the middle to the end?
4      MR. NEUBERGER:  Yes.
5  **A.  I mean, side by side, yeah, it's a discrepancy.**
6  **But I guess the inference, and he wouldn't know that,**
7  **was that if they were disabled, permanently disabled**
8  **that they couldn't remain for two years I guess is**
9  **what I was suggesting based on how I interpreted the**
10  **policy.**
11      **Now, I didn't put that in here, but I**
12  **could see where the discrepancy occurred.**
13  Q.  Right.  You're saying the words you chose to
14  communicate --
15  **A.  Weren't the best.**
16  Q.  Right.  You're saying in hindsight --
17  **A.  In retrospect, I probably could have worded it**
18  **differently.**
19  Q.  You're saying in hindsight you wish you would
20  have worded this e-mail differently?
21  **A.  And then --**
22  Q.  Yes or no?  In hindsight, you wish you would
23  have worded this e-mail differently?
24  **A.  Yes.**

Page 197

1      **Can I expound?**
2  Q.  Sure.  Go ahead.
3  **A.  I guess in my e-mail to him though I put that**
4  **in relative to our policy, but what I am mainly**
5  **interested in from this guy was was it irreversible or**
6  **what was the case?  You know, he's supposedly the guru**
7  **of audiology and that's really the intent of the**
8  **e-mail.**
9      **Do you follow me?**
10  Q.  I understand what you're saying, right.
11      My question to you is:  Do you agree with
12  your statement in this paragraph that the policy of
13  the Delaware State Police is that it can only keep
14  officers in a light-duty capacity for two years before
15  they must separate?
16  **A.  If they're permanently disabled.**
17  Q.  Right.  Right.  We understand, we understand --
18  let's just go back a second.
19  **A.  Okay.**
20  Q.  You have heard the phrase in your line of work
21  temporary total disability and permanent total
22  disability, right?
23  **A.  Right.**
24  Q.  I think you were just saying if a person is

**A - 440**

Price, et al.
John A. Yeomans

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 198

1  totally disabled we can only keep them for two years.
2  Is that what you just said?
3  A.  Up to two years.  We can carry someone on light
4  duty up to two years unless they're able to return to
5  full-duty status, and that's probably the way I should
6  have worded it to him, but I didn't.
7  Q.  Right.  Okay.
8  A.  Because that wasn't really my interest with
9  him.  I mean, I put that in there, but what I really
10  wanted to know from this guy, as I wanted to know from
11  all of these doctors with respect to these gentlemen,
12  was whether or not they had a hearing loss, if it was
13  disabling to the point that they could not be Delaware
14  State Troopers and, most importantly, would they ever
15  be able to be Delaware State troopers?
16      That's what I was interested in.
17  Q.  Would you agree that the policy of the Delaware
18  State Police concerning light-duty status is not
19  written down anywhere?
20  A.  It's fragmented.  It's not that we have a clear
21  light-duty policy.  It's broken up in bits and pieces
22  between the workmen's comp policy and modified, I
23  think it's referred to as the modified leave policy,
24  sick leave policy.  There's reference to a two-year

Page 199

1  window, the ability of the division to seek
2  independent medical exams and things like that.
3      So you're correct.  I don't know that it's
4  really laid out the way it should be.
5  Q.  And that is my understanding.  Okay?
6  A.  Okay.
7  Q.  So let's talk about what is laid out.  We're
8  going to turn to an exhibit now because I think this
9  does lead us into that.  Okay?
10  A.  Sure.
11  Q.  So let me put these away here.
12      MR. NEUBERGER:  Robert, I think you might
13  have brought it with you.  Did you bring Baylor
14  Exhibit No. 7 with you?  If you can put that in front
15  of him.
16      MR. FITZGERALD:  Okay.  I got it.
17      MR. NEUBERGER:  Could we put it in front
18  of the witness?
19      MR. FITZGERALD:  Okay.
20  BY MR. NEUBERGER:
21  Q.  Now, what's marked as Baylor Exhibit No. 7 is a
22  document that I believe at the deposition of retired
23  Major Baylor was identified by counsel for the
24  Delaware State Police and a lot of questions were

Page 200

1  asked about it.  Okay?
2  A.  Okay.
3  Q.  So you have seen this before?
4  A.  Yes.
5  Q.  And this is the current statement of section
6  III, pages 634 through 645 of the Delaware State
7  Police manual, right, operations manual?
8  A.  It's III-6-34 through III-6-41 of the
9  administrative manual.
10  Q.  Okay.  I identified too many pages.  Okay.
11      So it's III-6-41 which you have?
12  A.  Right.
13  Q.  Now we're going back.  I was just asking you
14  whether there's a section in the administrative manual
15  called light-duty status and it's got a long
16  several-page definition of light-duty status.
17  A.  We don't have that.
18  Q.  Right.  Instead we do have whatever is found
19  here on Baylor Deposition Exhibit 7 which addresses
20  various issues, right?
21  A.  Yes.
22  Q.  And so before we go into that in some detail,
23  let's see if we can agree on a few things.
24      Because the Delaware State Police does not

Page 201

1  have in the administrative manual a written section on
2  light-duty status, the Delaware State Police has to
3  depend on its experience in administering its policies
4  in that regard?
5  A.  Correct.
6  Q.  Right?
7  A.  Right.
8  Q.  I mean, there's you in HR that have familiarity
9  with it, right?
10  A.  Right.
11  Q.  There would be your predecessors in HR who have
12  familiarity with it, right?
13  A.  Right.
14  Q.  Troop commanders would have familiarity with
15  it?
16  A.  Some, yes.
17  Q.  The members of the administrative staff would
18  have familiarity with it?
19  A.  Yes.
20  Q.  We agree because we have used it all day today
21  there is something called light-duty status?
22  A.  Correct.
23  Q.  The people who administer it have experience
24  with it, right?

A - 441

51 (Pages 198 to 201)

Price, et al.                                      v.                          Chaffinch, et al.
John A. Yeomans                          C.A. # 04-956-GMS                  October 3, 2005

Page 202

1    A.   Yes.
2    Q.   There would be precedence or situations in the
3    past that have arisen under light duty that the people
4    administering would have experience with, right?
5    A.   Correct.
6    Q.   Let me ask you this:  Is it a policy or is it
7    just a practice of the State Police?  Is it something
8    in between?  Is it a custom of the State Police, light
9    duty?  What is it?
10   A.   It's practice, it's custom and it's weakly
11   interwoven into some other policies.
12   Q.   Is it fair to say that in trying to identify
13   what the light duty practice, policy and custom is we
14   have to look at a lot of sources?
15   A.   Correct.  Right.
16   Q.   So now let's look at what we can find in this
17   Baylor Exhibit No. 7.
18   A.   Okay.
19   Q.   Okay.  Let me just write myself a note.
20        All right.  Here on the first page of
21   Baylor Exhibit No. 7, page III-6-34 at the top there's
22   something called a policy statement.
23        Do you see that?
24   A.   Yes.

Page 203

1    Q.   In the first sentence there do you see where it
2    says, "It is the policy of the Delaware State Police
3    to provide reasonable accommodation to allow an
4    injured or ill employee to retain salary or benefits"?
5    A.   Yes.
6    Q.   You told me earlier the Delaware State Police
7    is a paramilitary organization, right?
8    A.   Right.
9    Q.   Isn't it fair to say that there's a great
10   degree of loyalty and esprit de corps among the
11   different members of the State Police?
12        MR. FITZGERALD:  I object to form and
13   foundation.
14   Q.   Based on your experience?
15   A.   Yes.
16   Q.   Is it fair to say that the Delaware State
17   Police care about each other?
18   A.   Yes.
19   Q.   Is it fair to say that if a member of the
20   Delaware State Police has a tragedy such as Trooper
21   Armistad, serious, debilitating, traumatic head
22   injuries, people would come forward and donate sick
23   leave, right?
24   A.   They step up to it, yeah, definitely.  Yeah.

Page 204

1    Q.   Right.  When tragedies happen and troopers are
2    killed in the line of duty --
3    A.   Absolutely.
4    Q.   -- everybody rises to the occasion to help the
5    family and everything?
6    A.   Without question.
7    Q.   And is it fair to say that when a trooper is
8    injured on the job, let's just talk about on the job,
9    that the Delaware State Police wants to make
10   reasonable accommodations so they can keep getting
11   salary and benefits?
12   A.   Right.  Yes.
13   Q.   There might have to be certain limits to that,
14   right?
15   A.   Of course.  Yes.
16   Q.   For budget or other reasons?
17   A.   Right.
18   Q.   Right?
19   A.   Right.
20   Q.   But troopers have families and management
21   understands that, right?
22   A.   Right.
23   Q.   Troopers have expectations about their income?
24   A.   Yes.

Page 205

1    Q.   Right?
2    A.   Yes.
3    Q.   Troopers make plans about how they're going to
4    send their kids to college and things like that,
5    right?
6    A.   Yes.
7    Q.   And when a trooper has a health or other
8    injury, the Delaware State Police historically has
9    tried to provide a floor of income and benefits to
10   them as best it could.  Is that a fair statement?
11   A.   Yes.
12   Q.   And the first sentence here that I have been
13   referring to, the context, that's the historical
14   context for this statement found in the first sentence
15   here.  Is that fair?
16   A.   Yes.
17        MR. FITZGERALD:  I object to foundation.
18   Q.   Yes?
19   A.   Correct.
20   Q.   Then the second sentence tries to give some
21   content to it and it's indicating that reasonable
22   accommodation may be in the form of worker's
23   compensation benefits --
24   A.   Right.

**A - 442**

52 (Pages 202 to 205)

Price, et al.                                                                    Chaffinch, et al.
John A. Yeomans                                                                  October 3, 2005
                              v.
                        C.A. # 04-956-GMS

Page 206

1    Q.  -- sick leave or other accrued leave, permanent
2    or temporary reassignment or job restructuring or a
3    combination of these functions.  Is that right?
4    A.  Right.
5    Q.  So there's three categories of things that are
6    mentioned here.  It talked about worker's comp. as a
7    category, right?
8    A.  Right.
9    Q.  It talked about sick or other accrued leave as
10   a category?
11   A.  Right.
12   Q.  And it talked about job restructuring and even
13   reassignments as another category?
14   A.  Right.
15   Q.  And it also talked about trying to make up a
16   mix of these three different categories, right?
17   A.  Right.
18   Q.  And that would all be towards the goal of
19   helping a trooper retain that floor of salary and
20   benefits, right?
21   A.  Sure.  Yes.
22   Q.  I mean, you're the HR person.  You have been
23   there many years and you understand that as a policy
24   of the State Police, right?

Page 207

1    A.  Correct.
2    Q.  And while you're trying to retain salary and
3    benefits, is it fair to say that this policy statement
4    here is trying to find ways to keep a trooper on the
5    active payroll?
6    A.  Yes.
7    Q.  Then there's another policy statement here.
8    There's a second paragraph in this policy statement.
9         Do you see that?
10   A.  Yes.
11   Q.  Have you read that over?
12   A.  Yes.
13   Q.  Now, does this indicate that when an illness or
14   injury occurs or it becomes permanent -- do you see
15   that?
16   A.  Yes.
17   Q.  And the employee is unable to perform essential
18   job functions.  Do you see that?
19   A.  Yes.
20   Q.  Then the policies on pension or separations
21   apply, right?
22   A.  Yes.
23   Q.  Now, this is talking about, shall we say this
24   paragraph is talking about two conditions.  Would you

Page 208

1    agree?
2    A.  Sure.
3    Q.  The first condition is if you're ill, be it
4    temporary or whatever or permanent, if you're ill?
5    That's a condition, right?
6    A.  Right.
7    Q.  And let's call it temporary or permanent.  If
8    you're temporarily disabled or permanently disabled,
9    it's talking about that, right?
10   A.  Right.
11   Q.  Then it goes on and talks about a second
12   condition, unable to perform essential job functions.
13        Do you see that?
14   A.  Yes.
15   Q.  Now, this policy here is talking about when an
16   employee is ill or disabled looking at ability to
17   perform essential job functions.  Is that correct?
18   A.  Right.
19   Q.  Now, essential job functions, is it a fair
20   statement that there's some discretion on the part of
21   the State Police in how it defines the essential job
22   functions for a trooper?
23        MR. FITZGERALD:  Objection to foundation.
24   Q.  Once again, you're the personnel director.

Page 209

1    There's not going to be anybody besides you who is
2    better equipped --
3         MR. FITZGERALD:  At determining the
4    essential job functions of the Delaware State Police?
5         MR. NEUBERGER:  Who would be able to
6    address essential job functions of the Delaware State
7    Police, yes, I agree with that statement.
8         MR. FITZGERALD:  Okay.  I object to
9    foundation.
10   BY MR. NEUBERGER:
11   Q.  Do you think as the personnel director of the
12   Delaware State Police you are qualified to address
13   what it takes to be a law enforcement officer in the
14   Delaware State Police?
15   A.  Medically?  Psychologically?  I mean are you --
16   Q.  No.  The kind of things that a cop has to do.
17   A.  Yeah.  I think I can pretty much state what
18   they are.
19   Q.  For example, if I asked you what an officer
20   assigned to the video lottery enforcement unit does,
21   you would be able to describe what that officer does,
22   right?
23   A.  Pretty much, yeah.
24   Q.  There are desk, there are people at the various

A - 443

53 (Pages 206 to 209)

Price, et al.                                          v.                          Chaffinch, et al.
John A. Yeomans                              C.A. # 04-956-GMS                October 3, 2005

Page 210

1  troops who answer the phones and work with the radio
2  people, right?
3  A.  Yes.
4  Q.  We have had testimony about that.
5  A.  Right.
6  Q.  You know the kinds of things that those people
7  do?
8  A.  Yes.
9  Q.  We talked about a trooper earlier on who in his
10 career worked as a supply officer?
11 A.  Yes.
12 Q.  When that was still a uniformed position, you
13 would have known what they do, right?
14 A.  Right.  Right.
15 Q.  There are Major Baylor probably identified for
16 us thirty or more positions in the Delaware State
17 Police other than road trooper that corporals or
18 people below the rank of corporal can perform.
19         Would you agree there are many positions
20 in the State Police other than road trooper?
21 A.  Absolutely.
22 Q.  Absolutely?
23 A.  Yeah.
24 Q.  And for those various positions you would be

Page 211

1  able to identify what the job requires, right?
2  A.  Pretty much.
3  Q.  Because you work in HR?
4  A.  Right.
5  Q.  So if a person is working at the desk at a
6  troop handling the incoming calls and everything,
7  you're aware of the kinds of duties they perform,
8  right?
9  A.  Yes.
10 Q.  You know they're not out there making arrests
11 on the street?
12 A.  Correct.
13 Q.  You know they're not out there engaging in
14 crowd control, right?
15 A.  Right.
16 Q.  You know they're not on the SWAT team breaking
17 down doors?
18 A.  Right.
19 Q.  Right?
20 A.  Right.
21 Q.  Okay.  Now, these two paragraphs here we have
22 been looking at, looking at the second paragraph,
23 "unable to perform essential job functions," do you
24 see that?

Page 212

1  A.  Yes.
2  Q.  And then at the end of the first paragraph it
3  talked about job restructuring.
4         Do you see that?
5  A.  Right.
6  Q.  If a trooper -- let's just take a trooper who
7  let's just say has a bad knee.  We talked about some
8  of them today or even a shattered foot.  Okay?
9  A.  Right.
10 Q.  That kind of a trooper may not be able to chase
11 down a suspect?
12 A.  Right.
13 Q.  He's not going to be as agile as another
14 trooper, right?
15 A.  Mm-hmm.
16 Q.  If he had been injured on the job, that kind of
17 a trooper could have his job restructured and he could
18 be put in a different position temporarily.  Isn't
19 that correct?
20 A.  Temporarily, correct.
21 Q.  Right. I'm not talking for the rest of his
22 career.
23 A.  Right.
24 Q.  But a trooper who can't chase down a suspect

Page 213

1  could temporarily be put in a different job, right?
2  A.  Sure.
3  Q.  We might call that job restructuring or maybe
4  we could even call that temporary reassignment.
5         Do you see that in the first paragraph
6  there?
7  A.  Sure.
8  Q.  We talked today about a trooper who had some
9  sort of problem, a female trooper who was put into HR
10 for I think two years?
11 A.  Okay.
12 Q.  Do you remember that?
13 A.  Yeah.
14 Q.  So that person might have been a patrol officer
15 before but all of a sudden they had a desk job for two
16 years?
17 A.  Okay.
18 Q.  That kind of temporary reassignment could be
19 allowed, right?
20 A.  Right.
21 Q.  Now, if that trooper is not able to run down a
22 suspect, to try to maintain that trooper on the active
23 payroll wasn't that trooper's job functions being
24 altered?  Wasn't that trooper being put into HR?

A - 444

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.
John A. Yeomans

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 214

1    MR. FITZGERALD: I object to form.
2    A. Their functions were being altered, sure, their
3    day-to-day functions and duties were altered.
4    Q. Right. Right. So are we saying that
5    historically within the State Police when we're trying
6    to maintain this goal of letting troopers remain on
7    the active payroll for a period of time that
8    historically troopers have been reassigned to
9    different jobs?
10    A. Absolutely. Sure.
11    Q. Absolutely. There's no dispute about that,
12    right?
13    A. No.
14    Q. And isn't it true that the essential job
15    functions of that particular trooper have changed when
16    they get reassigned?
17    A. Yeah. Sure. For that assignment, sure.
18    Q. Let's just take a trooper who has been on
19    patrol who then would be moved into HR.
20    A. Right.
21    Q. Let's go back. I understand there's a lot of
22    paperwork that HR does? Yes?
23    A. Oh, yeah.
24    Q. So let's take a trooper on patrol who is making

Page 215

1    arrests and directing traffic and doing all the things
2    you do on patrol and we put that trooper into HR.
3    That trooper is not going to be making arrests
4    anymore, is he or she, in HR?
5    A. Well, they could be. You're not talking about
6    a reassignment as a result of -- you're not talking
7    about a light-duty assignment? You're talking
8    about --
9    Q. I'm trying to talk about light duty. Right now
10    let's just assume we're saying we're putting him or
11    her into HR.
12    A. As a light-duty assignment?
13    Q. As a light-duty assignment.
14    A. No, we don't want them out running down felons
15    or anything else, engaging in physical confrontations
16    that might exacerbate their condition, you're right.
17    Q. You brought up about light duty and maybe
18    here's where we're talking about the interaction of
19    some of these written policies with the historic
20    practice of the Delaware State Police. Okay?
21    A. Okay.
22    Q. Do you find that that kind of an assignment for
23    light duty for somebody would be consistent with the
24    policy statement that is here in the first two

Page 216

1    paragraphs we have been talking about?
2    A. Sure.
3    Q. Right. And then there's always this reference
4    to the two years.
5    A. Right.
6    Q. We have heard up to two years, over a year.
7    Okay?
8    A. Right.
9    Q. There's bits and pieces of that found in this
10    written policy statement found here in Baylor Exhibit
11    7. Is that correct?
12    A. Yes.
13    Q. So, for example, if we looked at the second
14    page here, F down here (indicating), they talk
15    about -- and this is when you're talking about
16    combining worker's comp. with other kinds of benefits.
17        Do you see that?
18    A. Yes.
19    Q. When we're combining these things so that we
20    can keep the people up to their old pay level, right?
21    A. Right.
22    Q. And it talks about the discretion of the
23    superintendent a one-year period and then the
24    possibility of two six-month periods after that?

Page 217

1    A. Right.
2    Q. But then it says after that it's got to end,
3    right?
4    A. Yes.
5    Q. And there are other references found in this
6    document to that kind of thing, right?
7    A. Even under the sick leave policy III-6-36
8    section C.
9    Q. But the point is the superintendent does have
10    under these written policies some discretion to extend
11    things but only so far, right?
12    A. Right. Okay.
13        MR. NEUBERGER: I think we're going to move
14    off of that. Let's just check here, Robert.
15        I think let me just take a break and then
16    I think there's just a few little housekeeping kind of
17    things. All right?
18        THE WITNESS: All right.
19        MR. NEUBERGER: Let's just take a break,
20    guys.
21        (A brief recess was taken.)    A - 445
22    BY MR. NEUBERGER:
23    Q. I talked a little bit earlier about the letter
24    indicating when, the first letter from the colonel

55 (Pages 214 to 217)

Price, et al.                                v.                          Chaffinch, et al.
John A. Yeomans                    C.A. # 04-956-GMS                October 3, 2005

Page 218

1  indicating when my clients had to separate.  Okay?
2        You're aware that he extended that one
3  time?  Do you know that?
4  A.  I am, yes.  Right.
5  Q.  Right now it's in something called a suspended
6  status or something like that.
7        Are you aware of that?
8  A.  Yeah.  I'm aware of that now too.
9  Q.  Do you have any idea when or whenever that he's
10  going to make another decision on suspended status?
11  A.  I have no idea, sir.
12  Q.  That's not your bailiwick?
13  A.  No.
14  Q.  No.
15        MR. NEUBERGER:  Well, let's just mark this
16  as the next exhibit.
17        Robert, this is your e-mail to me.  I'm
18  sorry.  It's Ed's e-mail to me.
19        (Yeomans Deposition Exhibit No. 5 was
20  marked for identification.)
21  BY MR. NEUBERGER:
22  Q.  Have you seen that before?
23  A.  No, I have not.
24  Q.  That takes care of that.

Page 219

1        You have had various meetings probably
2  with my clients over the past year or so about their
3  status.  Is that correct?
4  A.  Sure.
5  Q.  So there may be some things that I'm just going
6  to ask you about those meetings.
7  A.  Okay.
8  Q.  If you remember.  Okay?
9  A.  Okay.
10  Q.  Do you remember whether you had a meeting with
11  Corporal Price around April of 2004 in your office and
12  talked about a pension application for him, maybe a 30
13  or 40 percent pension, and whether a discussion came
14  back about his going back on the road as a patrol
15  trooper?
16  A.  I recall that.
17  Q.  What do you remember about that?
18  A.  I think we were just talking about what the
19  possibilities were if Kurt was deemed disabled and
20  would have to separate from the division what he might
21  be looking at percentage-wise from the pension office.
22  And I think where that number comes from was probably
23  worst case scenario or if it could be demonstrated
24  that it was a full disability duty-connected it might

Page 220

1  go as high as 75 percent with 10 percent for each
2  dependent child is my understanding of the disability
3  pension plan for someone with his years of service and
4  the plan that he would fall under.
5        We talked about that because I mean
6  obviously I know he was concerned about what it meant
7  for him and his future and his family's future.  So I
8  know we talked about, you know, what are we looking at
9  here?
10        The other thing was if he was going to
11  be -- the only thing I can possibly recall about the
12  road assignment would be if he were deemed fit for
13  duty if he would be looking at going back to the road.
14  I don't know.
15  Q.  So that was something you said was a
16  possibility?
17  A.  Sure.  It always is.
18  Q.  This is the exams that -- first of all, the
19  State Police, I think we have mentioned it this
20  morning, initiated hearing exams of my clients, Kurt
21  Price and Wayne Warren, right?
22  A.  (Pause).
23  Q.  Let me go back.
24        It wasn't an annual medical report on

Page 221

1  their fitness by Kurt's family physician or Wayne's
2  family physician which led to the hearing exams, was
3  it?
4  A.  No, it was not.
5  Q.  The State Police chose to send them for hearing
6  exams.  Is that correct?
7  A.  As part of a complete medical workup, yes.
8  Q.  Yes.
9  A.  Right.
10  Q.  Let's fast forward to January of 2005, the end
11  of the month, around the 27th of January.
12        Do you remember my clients being concerned
13  about getting bills from the University of
14  Pennsylvania that should have been sent to the State
15  Police for medical exams they were required to
16  undergo?
17  A.  I do recall that, yes.
18  Q.  Did you have a meeting with Wayne Warren and
19  Lynn Price in your offices at the end of January 2005
20  to talk about that issue?
21  Q.  Do you remember that?
22  A.  I don't know if it was Wayne and Lynn together.
23  I mean, I know they both had a concern about it.  I
24  know I had talked to Kurt about it on the phone.

A - 446

56 (Pages 218 to 221)

Price, et al.
John A. Yeomans

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 3, 2005

Page 222

1    Frankly, I was extremely disappointed that
2  they had gotten the bills because they shouldn't have
3  gotten the bills. The State Police should have gotten
4  the bills, but for whatever reason they got sent to
5  these troopers. So I mean we were trying to rectify
6  it as best as we could with the University of
7  Pennsylvania billing department.
8    Q.   And do you remember anything else about the
9  conversations that day?
10   A.   No, other than if it's the one I'm thinking of,
11 I was just trying to instill in them that I would do
12 everything I could to get it changed because it not
13 only happened once, I think it happened a couple of
14 times.
15   Q.   I think I misspoke. I think Kurt Price was
16 present at the meeting too. It would have been the
17 three of them.
18      Does that ring a bell?
19   A.   Yeah. That sounds about right, yeah.
20   Q.   Was there any discussion that day about the
21 fact that the colonel could be forcing, could order
22 them to be separated at any time, if you remember?
23   A.   I don't recall it, but I'm not saying it didn't
24 happen.

Page 223

1    Q.   So it could have happened?
2    A.   Sure.
3    Q.   But you just don't remember one way or the
4  other right now?
5    A.   No.
6    Q.   Now, this is a March meeting, March 3rd, 2005,
7  around 11:30 and it's about the bill again. Okay? It
8  might set some context. But it's a meeting in your
9  office with you and Kurt Price. Okay?
10      And do you remember if there was a
11 discussion about then Lieutenant Colonel MacLeish
12 supporting Kurt's disability pension request and an
13 indication by you that the colonel was not interested
14 in keeping him on light duty for two years?
15      Does that ring any bells?
16   A.   I don't remember the exact verbiage in a
17 conversation, but we probably did talk about that,
18 yeah. Sure.
19   Q.   Do you remember anything else that you might
20 have said that day?
21   A.   No. Not specifically, no.
22      MR. NEUBERGER: We're done. I don't have
23 any other questions. Your turn.
24      And from my point of view, we will recess

Page 224

1  the deposition, as I indicated earlier, subject to
2  maybe some re-call about documents, if necessary.
3      MR. FITZGERALD: About documents? Yes.
4      MR. NEUBERGER: Yes.
5  BY MR. FITZGERALD:
6    Q.   Captain Yeomans, you were asked earlier about
7  testimony you had given in the Bullen v. Chaffinch
8  case a couple of years ago, I think, and there was
9  some testimony about retesting of recruits.
10      Do you remember that?
11   A.   Yes.
12   Q.   Can you tell me how many recruits got a second
13 test physical exam?
14   A.   I know that there were a number of them that
15 were invited back to take the test, but I think only a
16 handful of them actually took the opportunity to
17 retest and I want to say it might have been half a
18 dozen.
19   Q.   Do you know how many of those who took that
20 opportunity passed the test?
21   A.   Probably three or four.
22   Q.   And of those three or four, do you know how
23 many got through the entire process and became
24 Delaware State troopers?

Page 225

1    A.   Well, the applicant in question for which
2  Colonel Chaffinch inquired about he got hired and then
3  there was another applicant that -- because following
4  the P.T. test they still have to go through polygraph,
5  background and everything else.
6    Q.   Right.
7    A.   So there was another one that actually went all
8  the way through and got hired.
9    Q.   So two out of the six got through the process,
10 were able or took advantage of the second test,
11 through that, passed the remaining elements of the
12 recruiting process and became Delaware State troopers?
13   A.   Correct.
14   Q.   Are they still with the Delaware State Police?
15   A.   Yes.
16   Q.   At any time in conversations that you have had
17 with now Colonel MacLeish or Colonel Chaffinch
18 regarding the plaintiffs or the FTU, have they
19 indicated anything to you other than that their goal
20 was to take care of the plaintiffs and fix the
21 firearms training unit?
22   A.   Anything other than that?
23   Q.   Yes.
24   A.   No.

A - 447

57 (Pages 222 to 225)

Price, et al.                                                     v.                                Chaffinch, et al.
John A. Yeomans                                      C.A. # 04-956-GMS                        October 3, 2005

Page 226

1    Q.  You testified earlier about the broad standard
2    used by the Delaware State Police for hearing and you
3    used the phrase normal hearing.
4         Do you know what standards Dr. Green used
5    when he evaluated plaintiffs?
6    A.  No.
7    Q.  Do you know where he got -- do you know whether
8    or not he had a standard?
9    A.  He has decibel levels, and he could explain it
10   best as he's a doctor, that he looks at in terms of
11   what he would deem normal hearing or what would be
12   required for a police officer to effectively
13   communicate.
14   Q.  You were asked a question earlier about
15   testimony that John Dillman would give if he was going
16   to give testimony that the State Police does not have
17   a requirement for hearing for current troopers because
18   that could decimate the personnel.
19        Do you remember that question?
20   A.  Right.
21   Q.  Do you know anything about a policy formed by
22   John Dillman or anybody else about not adopting a
23   hearing standard because it would kick out too many
24   people?

Page 227

1    A.  No.
2    Q.  You were asked some questions about certain
3    troopers who were either on light-duty status or
4    suspended with pay pending criminal investigations or
5    IA investigations and how long they were on the
6    status, whatever it may have been.
7         Does the human resources department or
8    personnel department at the Delaware State Police
9    determine the pace of a criminal investigation?
10   A.  No.
11   Q.  Does the superintendent determine the pace of a
12   criminal investigation?
13   A.  No.
14   Q.  If a trooper goes out on FMLA are they paid for
15   that leave?
16   A.  They can be.
17   Q.  Depending on what?
18   A.  Vacation and sick time accrual.
19   Q.  But if they don't have any vacation or sick
20   time --
21   A.  They can take it unpaid.
22   Q.  A leave of absence?
23   A.  You can take up to twelve weeks unpaid under
24   the FMLA.

Page 228

1    Q.  And do they still get benefits during that
2    time?
3    A.  Yeah, they do.
4         MR. NEUBERGER:  I'm sorry.  My mind
5    wandered.
6         Did you just indicate that when they're
7    getting unpaid FMLA their benefits do continue?
8         THE WITNESS:  Yes.  They still accrue
9    vacation and things like that, sure.
10   BY MR. FITZGERALD:
11   Q.  Going back to Yeomans Exhibit Deposition
12   Exhibit 2, the May 11th letter from Lieutenant Colonel
13   MacLeish to Corporal Price directing him to submit a
14   disability pension application by June 10th, does that
15   letter contain a description of some kind concerning
16   the rehabilitation and separation policy of the
17   Delaware State Police?
18   A.  Well, yeah.  I mean, to the extent that it...
19   Q.  How would you characterize what he's decribing
20   in the letter?
21   A.  Well, basically what he's saying is if there's
22   irreparable damage to the point that the person is
23   disabled, if the person is permanently disabled he's
24   not going to be able to carry him on for more than two

Page 229

1    years or actually he goes as far as to say that --
2    scratch that.  That's what he's saying.
3    Q.  Is he saying that if a person is permanently
4    disabled -- what do you mean by "permanently
5    disabled"?
6    A.  If you're permanently disabled within that
7    two-year window, whenever you're deemed permanently
8    disabled you got to go; you're not just going to hang
9    on for two years is the way I interpret that.
10   Q.  Okay.  And you indicated that the colonel, then
11   lieutenant colonel sent this letter because of
12   conclusions from doctors?
13   A.  Right.
14   Q.  And his interpretation of the policy?
15   A.  The policy.
16   Q.  Do you know where Colonel MacLeish got his
17   understanding of the policy?
18   A.  It's outlined in the admin. manual, what we
19   went over previously, the workmen's comp and sick
20   leave.
21   Q.  Did you have discussions with him about the
22   policy?
23   A.  Sure.
24   Q.  Was this letter consistent with your

**A - 448**

Price, et al.                                          Chaffinch, et al.
John A. Yeomans                    v.                  October 3, 2005
                          C.A. # 04-956-GMS

Page 230

1  understanding of the policy?
2  A.  Yes.
3  Q.  Was there anybody else that you spoke with,
4  Mike Tupman, Lisa McNatt, anybody else in human
5  resources that you spoke with about the policy?
6  A.  No.  The only person I spoke with really
7  about -- well, no.  I take that back.
8      I have talked to Lisa McNatt about it.  I
9  talked to Debbie Lawhead from the state insurance
10  office about it and how that might relate to other
11  policies within the state.
12  Q.  Was this description of the policy in the
13  letter of May 11th, 2005 to Kurt Price consistent with
14  their understanding of the policy?
15  A.  Yes.
16  Q.  Let me show you or look again at Yeomans
17  Deposition Exhibit 4, the e-mails between you and
18  Robert Williams of the T K Group.  And looking at the
19  e-mail from you to Mr. Williams of June 18th, 2004 at
20  1:41 p.m., this is the e-mail that counsel directed
21  you to, specifically the third paragraph.
22      Did you consider this e-mail to be a
23  definitive description of the policy?
24  A.  No.

Page 231

1  Q.  Why did you ask Mr. Williams whether or not the
2  hearing loss was irreparable?
3  A.  Because I thought as the division and for the
4  benefit of the officers -- maybe "benefit" is not the
5  best word.  In terms of their future with the division
6  one way or the other from his position if he thought
7  it was irreversible or permanent.
8  Q.  Well, how would that fact change how they would
9  be treated under the policy?
10  A.  Well, because if it was deemed permanent or
11  irreversible, then it goes to the policy that they
12  would have to leave.
13  Q.  And I just want to see if I can get some
14  clarification on your testimony earlier.
15      How was your description in this e-mail to
16  Mr. Williams inconsistent with the description of the
17  policy provided by Lieutenant Colonel MacLeish in his
18  May 11th letter to Corporal Price?
19  A.  It's inconsistent because I don't address
20  permanency here in terms of permanent disability.
21  Q.  Why do you not address it there?
22  A.  I just didn't.  I didn't.  I mean, I wrote that
23  but, again, like I said earlier, I was more -- this
24  last line, "Would it be safe to say this type of

Page 232

1  hearing loss is irreparable," is really what I was
2  asking the man.
3  Q.  On June 18th, 2004 had you been able to
4  determine whether or not it was irreparable?
5  A.  No.
6  Q.  That's why you're asking Mr. Williams the
7  question?
8  A.  Correct.
9  Q.  Are there some essential job functions of a
10  Delaware State Trooper that apply to every position?
11  A.  Sure.
12  Q.  Why are people on light-duty status given two
13  years, if they're given two years?  What's the point
14  of two years?
15  A.  I guess the point of two years is to afford
16  them an opportunity, a window, a two-year window,
17  whether it involves surgery or rehabilitation or
18  therapy or whatever the case may be, to correct
19  whatever the problem may be medically or in some cases
20  psychologically, but also to allow them to stay in the
21  workplace and produce in whatever capacity that they
22  can.
23  Q.  You mentioned five minutes ago that plaintiffs
24  were sent for a hearing test as part of a complete

Page 233

1  medical workup?
2  A.  Right.
3  Q.  They were sent by the Delaware State Police.
4  Why?
5  A.  Well, because of the concerns that started in
6  January of '04, I guess, leading up to March of '04,
7  the concerns about the range, the concerns about their
8  health.  The lead blood level was really the first and
9  original concern, was the issue of the lead.
10      There were also comments about the
11  baffling or things relative to hearing and we just
12  asked for a complete medical workup.
13  Q.  And where did you send them?
14  A.  The initial testing was at Omega at Christiana.
15  Q.  And why were they sent to Omega instead of to
16  Dr. Green?
17  A.  Well, actually, that's a good question because
18  actually they went to Omega.  I didn't direct them.  I
19  think they had called in.  I don't know where they got
20  the name Omega from and what caused them to go to
21  Omega because we're actually contracted with Health
22  Works.  And when I first heard that they went to Omega
23  I was thinking Christiana Care.  I thought that's who
24  we were contracted with.

A - 449

59 (Pages 230 to 233)

Price, et al.                                    v.                        Chaffinch, et al.
John A. Yeomans                        C.A. # 04-956-GMS                    October 3, 2005

Page 234

1    But it turned out later I was advised by
2  someone in my office that we weren't contracted with
3  them but, regardless, they made the appointment and we
4  said we would pay for it.
5    Q.  There was some testimony or a little bit of a
6  discussion earlier about I believe it was Baylor
7  Exhibit 1, which is the June 25th, 2004 letter from
8  Colonel MacLeish, then Lieutenant Colonel MacLeish to
9  Corporal Price and the identical letter was sent to
10  Corporal Warren instructing that they were being
11  placed on light-duty status.
12    Does every trooper who is on light-duty
13  status get written confirmation or a description of
14  their status?
15    A.  No.
16    Q.  Why not?
17    A.  I guess it's on an individual basis perhaps,
18  but it hasn't always been historically done.  I guess
19  depending on the circumstances involved in terms of
20  what the ailment, disability, their assignment may be.
21  I mean, I have seen that letter, but I don't know that
22  that has historically gone out to everyone that's been
23  placed on light duty.
24    Q.  Do you know why Corporal Warren and Corporal

Page 235

1  Price got a letter in this case?
2    A.  Well, I think there was some questions about
3  what light-duty status meant and where they were going
4  to be assigned and what vehicles they were going to be
5  assigned and things like that.  And that's I think
6  what prompted him to send that letter.
7    Q.  Who was asking those questions?
8    A.  Well, I think it was namely coming from their
9  supervisors.
10    Q.  "Their supervisors" being?
11    A.  Like their chain of command actually coming up
12  all the way through Major Hughes I believe was the one
13  that I seem to recall having a conversation about what
14  would light duty entail and what should they be doing
15  or not doing and that sort of thing.
16    Q.  "Their" being who?  What do you mean by "their
17  supervisors"?
18    A.  Corporals Price and Warren.
19    Q.  In regards to the letters sent by Lieutenant
20  Colonel MacLeish, the light duty letters and then the
21  May 2005 letters concerning applications for
22  disability, did you have any conversation with
23  Lieutenant Colonel MacLeish before these letters were
24  sent out?

Page 236

1    A.  Sure.
2    Q.  Did you have any conversations with Colonel
3  Chaffinch before these letters were sent out?
4    A.  I don't believe so.  No.
5    Q.  What role did Colonel Chaffinch have in the
6  decisions to put Corporals Price and Warren on
7  light-duty status?
8    A.  As far as my interaction?  None.
9    Q.  What role did Colonel Chaffinch play, if any,
10  in the May 2005 letters and determination that they
11  apply for disability pensions?
12    A.  I never discussed that with him.  As far as my
13  involvement and discussions with him, none.  I think I
14  only had one conversation with him about this entire
15  issue.
16    MR. FITZGERALD:  That's all I have.
17  BY MR. NEUBERGER:
18    Q.  Just to wrap it up, Colonel Chaffinch was two
19  levels above you in the chain of command at that time?
20    A.  Correct.
21    Q.  You reported to Lieutenant Colonel MacLeish?
22    A.  That's correct.
23    Q.  So it would not have been normal for you to be
24  having meetings to discuss with Colonel Chaffinch

Page 237

1  sending those letters, right?
2    A.  Probably not.
3    Q.  Right.  And all you're telling us is you have
4  no knowledge one way or the other whether Colonel
5  Chaffinch played any role in any of those letters?
6    A.  I have no knowledge what role he played, no.
7    Q.  If any?
8    A.  If any at all.
9    Q.  He could have played a role?
10    A.  He could have.
11    Q.  And he might not have, he could not have played
12  a role?
13    A.  He might not have.
14    Q.  You just don't know?
15    A.  I don't know.
16    Q.  Right.  Then just to wrap it up, you were asked
17  about two minutes ago some questions about the
18  complete medical workup that was ordered for my
19  clients to undergo.
20    A.  Mm-hmm.
21    Q.  Do you remember that?
22    A.  Yes.
23    Q.  Then you mentioned some issues which were
24  involved in the medical workup.  You mentioned lead in

**A - 450**

60 (Pages 234 to 237)

Price, et al.                                      v.                              Chaffinch, et al.
John A. Yeomans                         C.A. # 04-956-GMS                    October 3, 2005

Page 238

1    the blood was a major issue.  Is that fair?
2        A.  Yes.
3        Q.  Now, you know that lead in the blood is
4    something that they have been following at the range
5    since at least the year 2000?
6        A.  September '98, actually.
7        Q.  Right.  And you know they have been monitored
8    every three months for their blood levels?
9        A.  Correct.
10       Q.  And you know that historically there's been
11   some dispute over what's a dangerous level of lead in
12   the blood, right?
13       A.  Yes.
14       Q.  At sometimes the State Police was operating
15   under the assumption that anything approaching 20 was
16   dangerous, right?
17       A.  Right.
18       Q.  And then at other times the Delaware State
19   Police has operated under the assumption that you have
20   to be above 40 units or whatever in the blood for a
21   measurement to be dangerous, right?
22       A.  Correct.
23       Q.  So in all that time from 1998, as you indicate,
24   to December of 2003 no steps were taken about the

Page 240

1        Q.  And that was while Aaron Chaffinch was still
2    the superintendent of the Delaware State Police?
3        A.  Correct.
4        Q.  So it's very possible that then Lieutenant
5    Colonel MacLeish consulted with Aaron Chaffinch before
6    he ordered the workups?
7        A.  He may have.
8            MR. FITZGERALD:  Objection to form.
9        A.  He may have.
10       Q.  But we do know it came from Lieutenant Colonel
11   MacLeish?
12       A.  Yes.
13           MR. NEUBERGER:  Okay.  Do you have any
14   other questions, Robert?
15           MR. FITZGERALD:  No.  I don't think so.
16           MR. NEUBERGER:  That's it.  We really
17   appreciate your coming in.  Thank you.
18           (Deposition concluded at 4:30 p.m.)
19
20
21
22
23
24

Page 239

1    blood levels other than the monitoring every three
2    months, right?
3        A.  Correct.
4        Q.  Right.  And in all that time no steps were
5    taken to monitor other heavy metals that these
6    individuals would have been exposed to such as zinc,
7    copper and other metals found in the frangible bullets
8    they used.
9            Is that a true statement?
10       A.  Yeah.  Not up until the Omega testing, correct.
11       Q.  Right.  And the Omega testing is what you're
12   saying my clients went for?
13       A.  Right.
14       Q.  Right.  Now, you described these kinds of
15   conditions that led to the medical workup, but you
16   weren't asked who ordered the medical workups.  I
17   don't think you testified that you ordered these
18   medical workups.
19       A.  No.
20       Q.  That came from your superior officers?
21       A.  Right.
22       Q.  Right.  That came from then Lieutenant Colonel
23   MacLeish, right?
24       A.  Right.

Page 241

1                    I N D E X
2    DEPONENT: JOHN A. YEOMANS            PAGE
3        Examination by Mr. Neuberger        2
         Examination by Mr. Fitzgerald     224
4        Examination by Mr. Neuberger      236
5            E X H I B I T S
6    YEOMANS DEPOSITION EXHIBITS              MARKED
7    1 Excerpt of transcript in the Bullen
     vs. Chaffinch case                      30
8
     2 Letter to Master Corporal B. Kurt Price
9    from Colonel Thomas F. MacLeish dated
     May 11, 2005                           169
10
     3 Letter to Master Corporal Wayne H. Warren
11   from Colonel Thomas F. MacLeish dated
     May 11, 2005                           184
12
     4 Four pages of e-mails Bates stamped D2508
13      through D2511                       188
14   5 E-mail to Thomas S. Neuberger from Edward
     Ellis dated August 9, 2005             218
15
16   ERRATA SHEET/DEPONENT'S SIGNATURE   PAGE 242
17   CERTIFICATE OF REPORTER             PAGE 243
18
19
20
21
22
23
24

A - 451

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                    v.                              Chaffinch, et al.
John A. Yeomans                          C.A. # 04-956-GMS                  October 3, 2005

Page 242

1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 243

1   State of Delaware   )
                        )
2   New Castle County   )
3
4            CERTIFICATE OF REPORTER
5
        I, Kurt A. Fetzer, Registered Diplomate
6   Reporter and Notary Public, do hereby certify that
    there came before me on Monday, October 3, 2005, the
7   deponent herein, JOHN A. YEOMANS, who was duly sworn
    by me and thereafter examined by counsel for the
8   respective parties; that the questions asked of said
    deponent and the answers given were taken down by me
9   in Stenotype notes and thereafter transcribed by use
    of computer-aided transcription and computer printer
10  under my direction.
11      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17          Kurt A. Fetzer, RDR, CRR
            Certification No. 100-RPR
18          (Expires January 31, 2008)
19
    DATED:
20
21
22
23
24

A - 452

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Price, et al.
# v.
# Chaffinch, et al.

## C.A. # 04-956-GMS

---

## Transcript of:

## Nathaniel McQueen, Jr.

## January 13, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

**A - 453**

Price, et al.
Nathaniel McQueen, Jr.

v.

C.A. # 04-956-GMS

Chaffinch, et al.
January 13, 2006

Page 26

1  end this.  Okay.
2          Chris has a recollection, he indicates here,
3  about you saying something about it's obvious retaliation
4  against him and it's no wonder they are winding up getting
5  sued because of the way they acted.
6          Did you make a remark like that that day to
7  him?
8  A  Not that I recall.
9  Q  Okay.  So you don't recall that one.  Okay.
10         Then he says, I think you're a great trooper or
11 something to that effect.
12         Did you say anything like that to him that day,
13 if you recall?
14 A  I'm sure -- that sounds like something I would have
15 said, yeah.
16 Q  Then he concludes with his memory saying something
17 like you said something to the effect that you have known
18 him for a long time and what they are doing to you is not
19 right.
20         Does that jog your memory about something you
21 might have said that day?
22         MR. FITZGERALD:  That's a compound question.
23         MR. NEUBERGER:  Okay.  Let me break that down.
24 It's really two questions there.

Page 27

1  BY MR. NEUBERGER:
2  Q  Chris is indicating that he has a memory that, as
3  part of your conversation, you said something to the effect
4  of what they are doing to you is not right.  Does that jog
5  your memory of anything you said?
6  A  Yes.
7  Q  So that sounds like something you said to him that
8  day?
9  A  Yes.
10 Q  And does it sound like you mentioned that you have
11 known Chris for a long time that day?
12 A  Yes.
13 Q  Do you recall saying anything about it's obvious
14 retaliation that day?
15 A  No.
16 Q  Okay.  Why don't we take a quick break and then I
17 will be done and then we'll see how long he wants to take.
18 A  Okay.
19         MR. NEUBERGER:  Thank you.
20         (A brief recess was taken.)
21         MR. NEUBERGER:  Robert, I don't have any other
22 questions.  Maybe you do.
23              EXAMINATION
24 BY MR. FITZGERALD:

Page 28

1  Q  At the commanders' meeting, the troop commanders'
2  and section chiefs' meeting in July 2004, you indicated that
3  towards the end of the meeting but during the meeting, those
4  present were asked what roles would be played at Corporal
5  Shea's funeral, is that correct?
6  A  Yes.
7  Q  And you gave a list of people you had selected to
8  assist you, is that correct?
9  A  Yes.
10 Q  Do you remember who was on that list, who first
11 offered?
12 A  I know Chris was on there.  I think Sergeant
13 Kracyla, Sergeant Rob Kracyla.  I think it was probably
14 Sergeant Royster.  And I think at the time, I don't know if
15 he was a sergeant or corporal at the time.  Sergeant Bond.
16 Those are probably some of the names that I mentioned
17 initially.
18 Q  Was Al Parton one of those?
19 A  And Al Parton.
20 Q  And you indicated, when you listed these troopers,
21 then Colonel Chaffinch gave you a look, is that right?
22 A  Yes.
23 Q  And you don't recall Lieutenant Colonel, then
24 Lieutenant Colonel MacLeish, giving you a look, is that

Page 29

1  correct?
2  A  That's correct.
3  Q  Did anybody say anything at that meeting and after
4  you gave that list that Chris Foraker should not participate
5  in Corporal Shea's funeral?
6  A  No.
7  Q  There was testimony that alternative names were
8  offered during that meeting, is that correct?
9  A  Yes.
10 Q  Do you remember who gave those alternatives?
11 A  I want to say it was Major Hughes.
12 Q  Did Aaron Chaffinch offer alternatives?
13 A  No.
14 Q  Did Lieutenant Colonel MacLeish offer alternatives?
15 A  No.
16 Q  When Major Hughes offered the alternatives, do you
17 know why he gave a list of different names?
18 A  No.
19 Q  Did he suggest that he was giving different names to
20 replace Chris Foraker?
21 A  No.
22 Q  Did you understand him to be providing alternatives
23 for Chris Foraker?
24 A  No.

**A - 454**

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.
Nathaniel McQueen, Jr.

v.

C.A. # 04-956-GMS

Chaffinch, et al.
January 13, 2006

Page 30

1    Q    During that meeting, after you gave your list, did
2  anyone mention that perhaps not everyone on your list would
3  be able to participate?
4    A    Yes.
5    Q    Do you remember who that was, who mentioned not
6  everybody can participate?
7    A    I think it might have been Major Papili said they
8  thought Al was not available or something like that.
9    Q    Al Parton?
10   A    Yes.
11   Q    You indicated before that Chris, you used Chris
12  Foraker because you had made up your mind to use Chris
13  Foraker?
14   A    Yes.
15   Q    Did anyone tell you during the meeting or after the
16  meeting not to use Chris Foraker at Corporal Shea's funeral?
17   A    No.
18   Q    Did Lieutenant Colonel MacLeish ever tell you not to
19  use Chris Foraker?
20   A    No.
21   Q    Did he ever tell you that he was not pleased with
22  the selection of Chris Foraker?
23   A    No.
24   Q    Did Colonel Chaffinch tell you not to use Chris

Page 31

1  Foraker?
2    A    No.
3    Q    Did he ever tell you that he was displeased with
4  that selection?
5    A    No.
6    Q    On page 190 of Chris Foraker's deposition, lines 18
7  through 20, he said, his words were, quote, if looks could
8  kill, you'd be dead. Referring to the look that Colonel
9  Chaffinch gave to me.
10       As I read that, that's Chris Foraker's
11  suggestion that that's what you told him in the parking lot
12  of the Lewes Fire Hall. Is that how you read that?
13   A    Yes.
14   Q    You did not see any look that Colonel Chaffinch gave
15  Chris Foraker, is that right?
16   A    Not that I recall.
17   Q    During the commanders' meeting?
18   A    No.
19   Q    You subsequently found out that Lieutenant Colonel
20  MacLeish had asked Chris Foraker to leave the July 2004
21  meeting, is that right?
22   A    Yes.
23   Q    Do you know why he asked him to leave? Did
24  Lieutenant MacLeish ever tell you why he asked him to leave?

Page 32

1    A    No.
2    Q    Did you ever have any conversations with Chris
3  Foraker wherein he told you what Lieutenant Colonel MacLeish
4  said to him that day?
5    A    Not that I can remember the specifics of.
6    Q    But you subsequently understood that he asked him
7  not to come back?
8    A    Yes.
9    Q    To that meeting.
10       And did Chris Foraker come to the August
11  meeting? Do you recall?
12   A    Not that I remember.
13   Q    Were you at the August meeting?
14   A    I'm pretty sure I was.
15   Q    Did you consider the fact, what you understood to be
16  Lieutenant Colonel MacLeish's asking Chris Foraker not to
17  attend the July meeting, to be a demotion of Chris Foraker?
18   A    No.
19   Q    After that meeting and to this day, do you consider
20  Chris Foraker to be the NCOIC of the firearms training unit
21  with all the rights, duties and responsibilities that go
22  with that position?
23   A    Yes.
24   Q    You testified as to Chris Foraker's reputation for

Page 33

1  honesty. Do you remember that?
2    A    Yes.
3    Q    You said it was pretty good?
4    A    Yes.
5    Q    Have you read or heard anything since December 2003
6  that made you change your mind as to his reputation for
7  honesty?
8    A    No.
9    Q    Do you consider Chris Foraker to be a good trooper?
10   A    Yes.
11   Q    Have you read or heard anything since December 2003
12  that made you rethink that conclusion?
13   A    No.
14   Q    Do you consider him to be a competent trooper?
15   A    Yes.
16   Q    Do you consider him to be a competent NCOIC of the
17  FTU?
18   A    Yes.
19   Q    Have you read or heard anything since December of
20  2003 that made you rethink that conclusion?
21   A    No.
22       MR. FITZGERALD: I have no further questions.
23       MR. NEUBERGER: I'll have to follow up on two
24  things.

**A - 455**

9 (Pages 30 to 33)

Price, et al.                                  v.                    Chaffinch, et al.
Nathaniel McQueen, Jr.              C.A. # 04-956-GMS            January 13, 2006

Page 38

1   Q   And they would also list all the other people being
2   invited to the commanders' meeting, right?
3   A   Yes.
4          MR. FITZGERALD:  Objection to form.
5   BY MR. NEUBERGER:
6   Q   Do you know one way or the other that, prior to this
7   July meeting, Chris Foraker, while he was the NCOIC, was one
8   of the people listed on those notices of people being
9   invited to the commanders' meetings?
10         MR. FITZGERALD:  Objection to form.
11  BY MR. NEUBERGER:
12  Q   You'll have to answer.  I'm asking you, are you
13  aware -- and if you don't know, you don't know.  I'm asking
14  you from your memory.  You can always go back and look.
15         But are you aware that, prior to that July
16  meeting, Chris Foraker was listed as one of the people being
17  invited to the commanders' meeting.
18         MR. FITZGERALD:  Objection to form.
19         THE WITNESS:  I don't know one way or the
20  other.
21  BY MR. NEUBERGER:
22  Q   And are you aware even after that July meeting, that
23  Chris Foraker was still one of the people listed on those
24  e-mails as being invited to the commanders' meetings?

Page 39

1          MR. FITZGERALD:  Objection to form.
2          THE WITNESS:  I don't know.
3   BY MR. NEUBERGER:
4   Q   You don't know one way or the other, right?
5   A   No.
6   Q   And if Chris Foraker, based on your experience with
7   the State Police, if Chris Foraker had been attending those
8   commanders' meetings before July of that year, okay, and if
9   he was ordered not to come anymore, that would have been a
10  change of his duties and responsibilities, wouldn't it?
11  A   Yes.
12         MR. NEUBERGER:  Okay.  Robert, do you have
13  anymore questions?
14              EXAMINATION
15  BY MR. FITZGERALD:
16  Q   Who has a duty to attend troop commanders' and
17  section chiefs' meetings?
18  A   Usually troop commanders, section chiefs and usually
19  the lieutenants from all the respective sections.
20  Q   Is the e-mail that goes out an invitation to attend
21  or is it a notice that the meeting is going to occur?
22  A   Notice that the meeting is going to occur.
23  Q   What goes on at these meetings?
24  A   Generally there are discussions about criminal and

Page 40

1   traffic productivity.  Things that are going on in each
2   troop or section.
3   Q   Is policy made at these meetings?
4   A   No.
5          MR. FITZGERALD:  That's all I have.
6          MR. NEUBERGER:  Just a follow-up.
7              EXAMINATION
8   BY MR. NEUBERGER:
9   Q   You know retired Major David Baylor?
10  A   Yes.
11  Q   You have worked with him, right?
12  A   Yes.
13  Q   In fact, when he was the operations commander for
14  New Castle County, you reported directly to him, right?
15  A   Yes.
16  Q   Now, Major Baylor I believe has testified in this
17  case that the NCOIC of the firearms training unit has always
18  attended the commanders' meetings up until this July date
19  that we have been talking about today.  If that's his
20  testimony, would you disagree with that?
21         MR. FITZGERALD:  I'll only object to the extent
22  that his testimony will speak for itself.
23  BY MR. NEUBERGER:
24  Q   He had more years on the force than you did?

Page 41

1   A   Yes.
2   Q   And I'm saying, would you have any facts that you
3   could point to that would dispute a contention that the
4   NCOIC of the firearms training unit has always attended
5   those commanders' meetings up until this July meeting?
6   A   No.
7   Q   Sergeant Parton, you remember he was the NCOIC of
8   the unit, right?
9   A   Yes.
10  Q   And you probably remember Sergeant Fitzpatrick being
11  the NCOIC of the unit, right?
12  A   Yes.
13  Q   Do you have a memory of them attending commanders'
14  meetings over the years when you attended?
15  A   Not specifically.
16  Q   Okay.  You don't remember one way or the other
17  whether they attended?
18  A   No.
19         MR. NEUBERGER:  All right.  That's fine.
20              EXAMINATION
21  BY MR. FITZGERALD:
22  Q   Do you remember whether or not Chris Foraker, when
23  he was NCOIC of the firearms training unit in the beginning
24  of 2002, 2001, 2002, do you remember him going to these

11 (Pages 38 to 41)



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Price, et al.
# v.
# Chaffinch, et al.

## C.A. # 04-956-GMS

---

## Transcript of:

## Gregory Allen Warren

## January 11, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A - 456.1

Price, et al.                          v.                    Chaffinch, et al.
Gregory Allen Warren          C.A. # 04-956-GMS           January 11, 2006

Page 126

1    So I may very well have gone over and met
2 with them or called for an emergency meeting or something
3 to talk about, I guess, what had transpired in that last
4 couple of days, yes. But I don't know. I mean, you may
5 have a date for me that you can refresh my memory or
6 whatever.
7    Q.  Well, that's what I'm asking you, February 2nd,
8 2004.
9    A.  I don't remember. I don't remember. It's been
10 too long ago.
11    Q.  Go back to the previous page. That's the
12 next-to-the-last page of Exhibit D-2.
13    A.  Okay.
14    Q.  I see where you've enumerated things that you
15 have said to the staff following your meeting with the
16 lieutenant colonel; right?
17    A.  Yes.
18    Q.  There are five items?
19    A.  Yes.
20    Q.  The last of those items is the paper air mask
21 item that you've discussed with me this morning. Do you
22 see that?
23    A.  Yes.
24    Q.  What did you say in response to the lieutenant

Page 127

1 colonel's suggestion that people wear the paper air
2 masks?
3    A.  Well, I hate to be rude here, but I kind of
4 chuckled a little bit and I said, "You got to be kidding
5 me." And he didn't smile. So that's when I knew, you
6 oh, I guess I shouldn't have just chuckled at that. And
7 that's when he went ahead and said, "Well, we have these
8 things in stock, don't we?" And he looked at Major
9 Eckrich because I remember Major Eckrich looking at -- I
10 think even Major Eckrich was like flabbergasted. And
11 Ralph, I looked over at Ralph and Ralph was just sitting
12 there almost like speechless. Like, a paper dust mask?
13 I mean, has he been listening to anything that's been
14 transpiring over the last month and a half?
15    So that's about all I can elaborate for you
16 about that.
17    Q.  My question is: Did you say anything to him
18 other than chuckling?
19    A.  I chuckled and I said, "You got to be kidding."
20 I said, "You want everybody to wear a paper dust mask?"
21 And I said, "That's going to obviously impede shooting up
22 there."
23    And I said, "On top of that, I mean, it's
24 not going to do anything. You and I both know what a

Page 128

1 paper dust mask is for." And here I've been discussing,
2 you know, types of heavy metals and things like that that
3 I don't think a paper dust mask was designed to, you
4 know, to filter out.
5    Q.  What was his response when you said that would
6 impair shooting?
7    A.  He said, "No, absolutely not." He said, "That's
8 what I want done." And he looked again, like I said,
9 over to Major Eckrich and said, "Don't we carry those in
10 stock? Maybe somebody back in the crime lab uses them or
11 something."
12    But -- I can't remember what Paul's
13 response was, but he said, "They will be gotten
14 immediately. I mean, if we don't have them in stock,
15 purchase them now." So I carried that message back.
16    Q.  Did the shooters at the range ever actually use
17 the paper dust masks?
18    A.  Not that I'm aware of. That would be something
19 you'd have to ask because I wasn't physically up there.
20 But to the best of my knowledge, that fell through
21 because my personal opinion is after Ralph and I left the
22 room, Paul Eckrich probably told him -- I don't know what
23 I would have done, but I wouldn't have done that because
24 that ended up being rescinded.

Page 129

1    And, in fact, when I called Lieutenant
2 Colonel MacLeish back later to say, "Listen, Colonel, the
3 guys say that won't work. You can't talk through the
4 masks. They won't be able to give commands. It's going
5 to be a safety issue amongst everything else while
6 shooting is going on."
7    Well, it was funny. He told us to have
8 this mask. He didn't think it was funny. Then he
9 ordered us a second time. And the major, "I want these
10 masks up there now. And if you have to, order them."
11    But when I went back to him the following
12 day or two days later and we talked about this, it was
13 like, well, listen, that was taken out of context. I
14 don't really mean I want everybody to wear a paper dust
15 mask. I just meant to show my concern for everyone up
16 there and that we should try to do something.
17    So then he was trying to make it look like
18 I was concerned about everyone and maybe I overreacted,
19 but I didn't mean what I said. Well, when, in fact, it
20 was very obvious he did mean what he said to the point I
21 put it in the report that it should be done.
22    Q.  At any point did you tell MacLeish that you
23 thought the range should be shut down because it was
24 unsafe?

33 (Pages 126 to 129)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        A - 456.2

Price, et al.                                   v.                        Chaffinch, et al.
Gregory Allen Warren                   C.A. # 04-956-GMS                 January 11, 2006

Page 130

1     A.  No.  I told him it would have to be shut down.
2   Okay?  But not at that very second because the guys were
3   working like crazy to try to get the recruit class done.
4   They didn't want to see the recruits not graduate because
5   *we couldn't finish the shoot.  Because we might be able*
6   to find them another place to shoot, but, one, the
7   classes are fairly large, but in the downtime it would
8   take us to find another range, to set up a schedule, to
9   move them to that location, it would have backed up the
10  entire recruit graduation and everything else.
11          And we also -- we train municipals on top
12  of just troopers.  It would have been a political
13  nightmare.  It just would have been horrendous trying to
14  tell everybody the recruits aren't graduating, it's going
15  to be put off for a couple more weeks because we had to
16  move to another range.
17          So I think everybody was trying to work to
18  get the recruits done and then realized the range will
19  have to be shut down immediately as soon as they are
20  done.
21      Q.  Did you tell the lieutenant colonel that the
22  range should not be shut down because you were trying to
23  get the recruit class through?
24      A.  No.  That came out of just a general

Page 131

1   conversation.  That's what we all came to when we were
2   sitting in the room together.
3       Q.  I'm asking what you said, not what the general
4   conversation was.
5           Did you ever tell the lieutenant colonel
6   that the range should be shut down because it was unsafe?
7       A.  Not shut down that second, but I told him, yes,
8   we are going to have to shut it down.
9       Q.  You told him you would have to shut it down
10  eventually?
11      A.  Oh, absolutely.  I don't mean eventually like a
12  month or two later.  I meant eventually as in the minute
13  we finish shooting this group of recruits and we get them
14  certified so they can graduate, we need to close this
15  thing down and just lock it up and then have the experts
16  come in and work on this for us.
17      Q.  Look at Exhibit 17 for a minute.  After you
18  received this e-mail from Chris Foraker, why didn't you
19  go to the colonel and tell him you thought the range
20  should be shut down?
21      A.  Because we were trying to get that last group of
22  recruits in.  And that seemed to be -- the range officers
23  were working hard.  I think they had the recruits' best
24  interests in mind.  MacLeish didn't want it shut down,

Page 132

1   obviously, because he knew that that would go public and
2   everybody would know about it and it would be a real pain
3   in his tail.  And so I think everybody just said let's
4   finish up this group of recruits and then we'll shut it
5   down if we have to.
6       Q.  Did MacLeish tell you he didn't want it shut
7   down?
8       A.  No, I don't recollect him saying, no, don't shut
9   it down or shut it down, either one.
10      Q.  Go back to Exhibit D-2, again, please.  The
11  next-to-the-last page, which is this chronology we've
12  been looking at, could you go up to the fourth paragraph
13  from the bottom of the page?  It starts with the words
14  "Captain Warren."
15      A.  Yes.
16      Q.  Do you see that?  It says:  "Captain Warren
17  contacted by Lieutenant Colonel MacLeish" --
18      A.  Yes.
19      Q.  It says here that you were "advised to present a
20  report ASAP that could be used to prepare a news
21  release" -- I guess this isn't quite grammatical, but
22  "from on the problems, issues and concerns at the Range."
23  Do you see that?  Was that contact that occurred on
24  Friday, January 30th?

Page 133

1       A.  That -- I don't recollect if it was on Friday,
2   the 30th, or, you know, within a couple days afterwards.
3   That I don't recollect.  Or even a couple days
4   beforehand.  Because as I said, we just didn't meet on
5   the 30th.  There were verbal conversations going on on
6   the phone, in the hallway, and things like that where he
7   was made aware of what was going on.
8           So in actuality, he could have told me that
9   a couple days before January 30th, but it had to be
10  within that range for me to place it right there.
11      Q.  Did you ever prepare such a report?
12      A.  No, no.  He wanted me to go ahead and do this.
13  And then before I ever got a chance to actually put the
14  report together, I was told, "Hold off on that.  This
15  thing is going to Facilities Management."  Before I ever
16  got to the point where I actually put another report
17  together, I remember being told we are going to basically
18  take this thing out of the hands of the State Police and
19  we are going to get Facilities Management involved in
20  this and -- now, I don't know what conversations took
21  place with cabinet secretaries and things, but I think
22  from what I'm gathering now after the fact, probably
23  Secretary Homer said basically I'll take this thing over
24  since it deals with the building and I'll make it all

34 (Pages 130 to 133)