Not Reported in A.2d                                                                                      Page 6
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

As noted above, the issues Copeland raised have been explored exhaustively and rejected in Martin's prior law suits. *Martin v. Sparks,* D.C.Del, No. 90-235, Huyett, J. (August 16, 1991). They may not be relitigated now. The remaining issue under this claim arising out of the Santoro-Copeland telephone conversation is whether *anything* Santoro said was defamatory.

"Defamation generally is understood as a false publication calculated to bring one into disrepute." *Snavely v. Booth,* Del.Super., 176 A. 649, 654 (1935). The gist of an action for defamation is the injury to reputation, business or occupation. It must expose a plaintiff to public contempt or ridicule or lower him in the estimation of the community in which he lives. *Danias v. Fakis,* Del.Super., 261 A.2d 529, 531 (1969); *Pierce v. Burns,* Del.Supr., 185 A.2d 477, 479 (1962).

A plaintiff in a defamation action is presumed to have stated his claim in the best light. *Snavely,* 176 A. at 654. In determining whether words are defamatory, the Court must take their plain and natural meaning and understand them as would a person of average intelligence and perception. *Danias,* 261 A.2d at 531. The Court cannot find anything defamatory in what Santoro said to Copeland. The references to events which Martin claims are defamatory are by *Copeland* not Santoro.

*7 Prior to Copeland's telephone call to Santoro, Martin had executed a release to Copeland to examine and copy "neuropsychiatric records about me" from Dr. Rebecca Jaffe [Appendix D]. Shortly after this telephone conversation, Martin signed a release in favor of Copeland waiving "any confidentiality rights" to his Widener file [Appendix E]. The "waiver" also included authority for Copeland to copy Martin's records.

It is inconceivable that with all the litigation occurring prior to the telephone conversation, Martin's relationship with Copeland FN4 and the prior and subsequent releases that anything defamatory occurred during the conversation. Martin's claim against Widener and Santoro arising out of the Copeland-Santoro telephone conversation is utterly without merit. The defendant's motion to dismiss this claim will be GRANTED. Martin's motion for summary judgment on this claim is DENIED.

FORUM ARTICLE

Martin seeks damages from Widener, Santoro and Bierman for an article Bierman authored which was published in the *Forum* [Appendix B]. As described earlier, *ante* at 2, this newspaper is circulated to Delaware Law School students, faculty, alumni and the local legal community. Martin claims that he was defamed by various specific portions of the article and by the thrust of the entirety of the article. Resolution of the motions on these claims, in turn, requires resolution of a series of threshold issues.

A

The first of these issues is to determine Martin's status. The United States Supreme Court and the Delaware Supreme Court have recognized that a public official may not recover in libel unless he or she can show that the media source printed a defamatory falsehood relating to official conduct with actual malice, that is, that the statement was made with knowledge it was false or with reckless disregard of whether or not it was false. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Ross v. News Journal Co.,* Del.Supr., 228 A.2d 531 (1967).

Martin is not a public official, However, the United States Supreme Court and the Delaware Supreme Court have recognized that in certain circumstances a non-public official can become a public figure. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Gannett Co., Inc. v. Re,* Del.Supr., 496 A.2d 553 (1985).

The original language defining a public figure is found in *Gertz:*
In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 569

Not Reported in A.2d                                                                                          Page 7

Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz,* 417 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

### B

There can be no argument that Martin does not fit into the first category of public figure. The question is whether he fits into the second, "limited" category. There are several guidelines to answer this question. It is necessary to examine the nature and extent of Martin's participation in the controversy giving rise to alleged defamation. *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. A collateral issue is how much did Martin engage the public in an attempt to influence the resolution of the issues involved. *Wolston v. Reader's Digest Ass'n. Inc.,* 443 U.S. 157, 168, 99 S.Ct. 2701, 2707, 61 L.Ed. 450, 460 (1979).

### C

*8 An integral question also to be answered is to determine whether Martin has injected himself into a public controversy. *See Gannett,* 496 A.2d at 556 . More specifically, this Court must decide whether a dispute over whether the character traits of honesty and candor are relevant considerations in accepting or denying application to the bar is a matter of public controversy. "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.1980), *cert. denied* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *Avins v. White,* 627 F.2d 637, 647 (3rd Cir.1980), *cert. denied* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (recognizing the accreditation of Delaware Law School as a public controversy).

Delaware has recognized "the interest of this State in matters pertaining to the admission and regulation of lawyers practicing before our courts is essential to the primary governmental function of administering justice, and in meeting our obligation to protect the public by assuring and maintaining high standards of conduct of persons admitted to this Bar." *In Re Green,* Del.Supr., 464 A.2d 881, 885 (1983). "Admission to the Bar ... depends on three basic and unalterable prerequisites: good moral character, learning and demonstrated competence.... Good moral character has many attributes, but none are more important than honesty and candor. *Id.* "Moreover, the attributes of honesty and candor are absolute prerequisites to the admission to our Bar." *Kosseff v. Board of Bar Examiners,* Del.Supr., 475 A.2d 349, 353 (1984).

In recognizing the licensure of lawyers as a public controversy, this Court concludes that the licensing procedures affect "the general public or some segment of it in an appreciable way," meeting the *Waldbaum* standard. The unremitting duty of candor to all persons charged with investigating and passing upon an applicant's qualifications is "a dispute ... between sides holding opposing views" and, thus, meets the controversy standard set forth in *Gannett. Gannett,* 496 A.2d at 556. This Court rejects the notion that merely because most people would agree that there is a duty of candor for Bar applicants, there is no "controversy" regarding this matter. *Marcone v. Penthouse Intern. Magazine for Men,* 754 F.2d 1072, 1083 n. 8 (3rd Cir.1985). [FN5]

In *Connolly v. Labowitz,* Del.Super., 519 A.2d 138 (1986) this Court concluded that the dissemination of information concerning the qualification and performance of a particular physician is not a matter of public concern. The court considered whether applying traditional libel standards, instead of constitutional standards, would have a chilling effect on the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people". *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 759, 762-63, 105 S.Ct. 2945, 2957, 86 L.Ed.2d 602, 605 (1985). The court reasoned that because 24 *Del.C.* § 1768 provided that the physician peer review mechanism

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 570

Not Reported in A.2d                                                                                          Page 8
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

shall be private and not subject to public examination, the qualifications and performance of an individual physician is not a matter of public concern. This Court recognizes that to stifle discussion of the public controversy concerning the proper licensure of lawyers simply because the discussion relates to a specific individual would have a chilling effect upon the interchange of ideas necessary for bringing about social changes. The topic area is a public controversy regardless of Martin's or any other individual's specific involvement.

### D

**\*9** Since it is clear that the alleged libel involves a public controversy, it is next necessary to examine the nature and extent of Martin's participation in that controversy. *Avins,* 627 F.2d at 647. In general, to be a "limited" public figure, the plaintiff must thrust himself into the vortex of the dispute. *Marcone,* 754 F.2d at 1083. Martin has filed a multitude of litigation [FN6] concerning his dealings with Widener, various bar examiners and the mental hospitals. The filing of a lawsuit alone will not necessarily elevate a private plaintiff to public figure status. When the private plaintiff goes further than the courtroom in telling his side of the story, however, he may change his status by voluntarily injecting himself into the controversy.

In *Street v. National Broadcasting Co.,* 645 F.2d 1227, 1235 (6th Cir.1981), plaintiff's status changed from private to limited public figure after granting press interviews to aggressively promote her version of the case outside of her actual courtroom testimony. Similarly, an agent who holds news conferences to attract media attention for himself and his client is a public figure in that context. *Woy v. Turner,* N.D.Ga., 573 F.Supp. 35 (1983).

Whether Martin actually solicited the attention by approaching the *Inquirer* reporter is a question of fact, however, it is not material as it is clear that, at a minimum, Martin acquiesced in granting a personal interview. He is quoted throughout the article. This Court notes that an individual who speaks with reporters may reasonably expect those comments to be disseminated to the press. Martin need not have solicited the reporters' attention to raise his status. "It may be sufficient that [plaintiff] engaged in a course of conduct that was bound to attract attention and comment." *Marcone,* 754 F.2d at 1086; *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 861 (5th Cir.1978). Martin cannot avoid the change in status by claiming he did not intend to voluntarily inject himself into the controversy. "The status of public figure *vel non* does not depend upon the desires of an individual. The purpose served by limited protection to the publisher of comment upon a public figure would often be frustrated if the subject of the publication could choose whether or not he would be a public figure." *Id.*

This Court recognizes that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707, 61 L.Ed.2d at 460. The plaintiff in *Wolston* was dragged unwillingly into the controversy and "never discussed this matter with the press and limited his involvement to that necessary to defend himself...." *Id.* Martin differs significantly in that while he may not have desired the original disclosure of his past history, he *has* discussed the matter with the press and, therefore, *not* limited his involvement to that necessary to defend himself.

**\*10** This Court finds that although he is a private figure in most aspects, Martin is a limited public figure in the context of the controversy preceding and including the *Forum* article. The filing of a multitude of lawsuits concerning his past medical history, particularly repeated unsuccessful lawsuits, in combination with granting a personal interview with the *Inquirer* reporters cumulatively acts to voluntarily inject plaintiff into this public controversy. While neither filing an action by itself nor granting an interview to reporters would necessarily raise plaintiff's status, it is the combination of the two actions and the number of suits filed that changes Martin's status. This is the Court's finding whether Martin actually sought out the *Inquirer* reporters or merely acquiesced in answering their questions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 9
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Martin has a limited public figure status. Under the rule of *New York Times v. Sullivan* and its progeny, he cannot recover for a defamatory falsehood unless he can show by clear and convincing evidence either knowledge of falsity or reckless disregard for the truth. *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *see Riley v. Moyed,* Del.Supr., 529 A.2d 248, 250 (1987). The application of this standard was recognized for limited public figures in *Gertz.* The burden of proof is upon the plaintiff to show the falsity of the statement even in a case of a limited public figure plaintiff suing a media defendant. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Martin, therefore, bears the burden of showing falsity. *Riley,* 529 A.2d at 251. "Before there can be defamation of a public figure there must be a false statement of fact." *Ramada Inns, Inc. v. Dow Jones & Co.,* Del.Super., 543 A.2d 313, 337 (1987), citing *Old Dominion Branch No. 496, Nat'l. Ass'n. of Letter Carriers v. Austin,* 418 U.S. 264, 283-84, 94 S.Ct. 2770, 2780-81, 41 L.Ed.2d 745, 761 (1974). "Libel plaintiffs who are either public officials or public figures must prove both falsity and actual malice to recover." *Ramada,* 543 A.2d at 337, citing numerous United States Supreme Court decisions.

Martin alleges that he was defamed in the *Forum* article in two ways. First, he singles out individual passages. Second, he attacks as defamatory the gist of the article taken as a whole.

*Specific Portions*

E

The following five sentences are self-authored by Bierman:
James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS. In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission: " Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

Somehow, DLS found out that Martin had in fact been confined to an institution.... As of February of this year (1990), the case was pending before the New Jersey Supreme Court ... Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.

*11 *Forum,* May 1990, Vol. 17, No. 6 [Appendix B].

Martin's burden as a limited public figure has been stated, *ante* at 16. Before the Court reaches the issue of actual malice, it must, as a matter of law, determine two questions: (1) is the alleged statement an expression of fact or of an opinion and (2) is the statement capable of a defamatory meaning. *Slawik v. News-Journal Co.,* Del.Supr., 428 A.2d 15, 17 (1981). If the Court answers either question against the plaintiff, it does not reach the actual malice issue. *Riley,* 529 A.2d at 251.

The Court, in the first instance, will determine whether the communication is capable of defamatory meaning. Martin first claims the 1983 graduation date is falsely reported "in an attempt to cast me as an unremarkable student". Martin officially graduated on December 31, 1982. Defendants raise the defense of substantial truth. " It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Restatement (Second) of Torts* § 581A comment (f). There is no liability for defamation when a statement is determined to be substantially true. If the alleged libel was no more damaging to plaintiff's reputation in the mind of the average reader than a truthful statement would have been, the statement is substantially true. *Gannett,* 496 A.2d at 557. In making the evaluation, the court considers whether the "gist" or "sting" of the article was true. The gist or sting is true "if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Riley,* 529 A.2d at 253.

This Court finds the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of the statement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 572

Not Reported in A.2d    Page 10
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

that he graduated in 1983. This statement is no more damaging in the mind of the average reader than is the precise truth, *i.e.,* that he graduated December 31, 1982. It is unnecessary, therefore, to consider the issue of whether this statement is an expression of an opinion or fact.

The next statement Martin attacks is that "[s]omehow, [Widener] found out that Martin had in fact been confined to an institution". Martin does not contend that he was not confined but rather infers the statement is false as he knows the circumstances that revealed his past medical history to the school. In effect, he alleges defamation in the word "somehow". Whether Martin or Widener know the specific manner how these facts came to be revealed is not at issue here. The statement is not false merely because it does not spell out the specific method the facts came to Widener's attention. Libel by omission is only actionable if the public figure plaintiff carries his burden of showing that the omission makes an already published material assertion of fact untrue. *Ramada Inns,* 543 A.2d at 338. Martin attaches too much to the word somehow. Again, it is unnecessary to reach the fact versus opinion analysis determination.

*\*12* Martin also charges that the statement "[a]s of February of this year (1990), the case was pending before the New Jersey Supreme Court" is false. He contends that the matter was pending before the (his label) "New Jersey Committee" which is appointed by the New Jersey Supreme Court. Again, the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of this statement. The statement is no more damaging than is the precise truth, that the matter is pending before a committee. Arguably, the misstatement actually places Martin in a more favorable light in the mind of the average reader in that reaching the court itself would attribute more credence to the legitimacy of his claim than merely reaching a committee. With this determination, the Court need not weigh the issue of fact versus opinion.

F

Martin also attempts to base his libel claim on the falsity of statements which are summaries of the *Inquirer* article. [FN7] Defendants err in arguing that a report of judicial proceedings is absolutely privileged even where there are allegations of malice or ill will. *See Read v. News Journal Co.,* Del.Supr., 474 A.2d 119 (1984). While a judicial proceeding itself is protected by an absolute privilege, the report of a judicial proceeding is only conditionally privileged. *Restatement (Second) of Torts* § 611:

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

This Court must weigh if the conditional privilege is lost due to inaccuracy or incompleteness and whether the report is a fair abridgement of the proceedings. In making this evaluation, the Court notes that the decision in *Read* was hinged upon a direct comparison of the news article with the actual Court of Chancery letter opinion the article was discussing. *Read,* 474 A.2d at 120. The instant case differs in that the alleged defamatory article details the background of a multitude of lawsuits brought by Martin but does not actually refer to any specific case or court decision. Defendants attempt to invoke the privilege by referring to the plaintiff's tidal wave [*see* Appendix C] of litigation but cannot point to a specific court document of which the article is allegedly a report.

In a similar case, the Ninth Circuit held that a law review case note that was an accurate republication of an Arizona Supreme Court opinion denying plaintiff admission to the Arizona Bar due to his past mental history was privileged. *Ronwin v. Shapiro,* 657 F.2d 1071 (9th Cir.1981). The *Ronwin* court not only directly compared the case note with the opinion but noted that "the bulk of it is a verbatim republication of language from the Arizona Supreme Court's opinion." *Id.* at 1075. The *Forum* article is not really an abridgement of judicial proceedings but rather is predominately an abridgement of the *Inquirer* article. On the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 573

Not Reported in A.2d                                                                                      Page 11
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

evidence presented, this Court concludes that the article is not protected by being within the scope of the conditional privilege sheltering the right to report on an official proceeding.

*13 The remainder of Martin's specific libel claims are based on allegedly false statements which are Bierman's abridgement of the *Inquirer* article. Martin contends the statement "Martin was admitted to Polyclinic Hospital in Harrisburg on February 2, 1975 and released on February 21, 1975" is false. He contends he was neither admitted nor released. Martin also claims the statement "[t]he second admission, from April 2nd to May 10th, was to Philhaven Hospital" is false for the same reason. His defamation claim may not be based on this assertion of falsity for multiple reasons. First, Martin is attempting to relitigate the underlying claim from the original transaction of Widener communicating that Martin had misrepresented that he had some type of experience with mental institutions to various bar examiners. This issue is precluded from relitigation by the doctrine of collateral estoppel. *Supra* at 7-8.

Second, the burden is upon Martin to show by clear and convincing evidence both the falsity of the statement and Bierman's knowledge of falsity or reckless disregard for truth. *Riley,* 529 A.2d at 250. Martin has done neither. Furthermore, there is no set of circumstances that this Court can envision in which Martin could meet this burden. Finally, Martin's own pleadings establish that he was involuntarily confined to the hospitals. Quibbling over whether he was technically ever "admitted and released" or merely confined against his will does not change the substantial truth of the statement. The gist or sting of the statement is true.

Martin contends that the following *Forum* article passage is false and libelous: "The medical records indicate family problems. Martin claims he had announced to his parents that he was going to drop out of high school. Consequently, the police were called from whom Martin was attempting to escape."
   Martin asserts that he was never an aspiring high school drop out and was defamed by being labelled a potential high school and not a college drop out. The *Inquirer* article actually read, "The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away." Comparing the *Inquirer* article with the *Forum* abridgement shows that Bierman erroneously stated Martin was considering dropping out of high school when, in fact, he was referring to college.

Again, the substantial truth doctrine is recognized in Delaware. *Riley,* 529 A.2d 248; *Ramada Inns,* 543 A.2d 313. "If the alleged libel was no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been, then the statement is substantially true." *Ramada Inns,* 543 A.2d at 317, citing *Riley* 529 A.2d at 253 and *Gannett,* 496 A.2d at 557. The requirement of proving falsity necessary entails the burden of negating substantial truth. *Ramada Inns,* 543 A.2d 318. Under this approach, the fact that Martin was considering dropping out of college and not high school in the context of this case is substantially true.

*14 The *Forum* misstatement that Martin was thinking of dropping out of high school rather than college cannot be viewed as defamatory. As a matter of law, the Court cannot find that Martin's reputation would be harmed or persons would be harmed from associating or dealing with him because he considered dropping out of high school rather than dropping out of college. Not every misstatement gives rise to a cause of action for libel. *Cf. Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

In addition, when the misstatement of high school is put in context with the balance of the paragraph, whatever "gist or sting" arises from the misstatement pales. Martin does not attack as defamatory the *Inquirer* reference to "[t]he records note that, 'the patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had supernatural powers.'"

G

Martin also attempts to base the defamation count

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 12

Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

on the *Forum* statement "[c]onsequently, the police were called from whom Martin was attempting to escape." Martin now claims the police were called concerning his brother and that Martin himself never attempted to escape.

This Court will assume for purposes of this motion that Martin's current claim is truthful. This Court also finds that the statement concerning the police and escape is capable of a defamatory meaning. Furthermore, the statement is not protected as an opinion. That being so, it is next necessary, as a matter of law, to consider whether this allegation is sufficient to overcome the constitutional burden of actual malice. *Riley,* 529 A.2d at 250. Martin must show by clear and convincing evidence Bierman's knowledge of falsity or reckless disregard of truth. *Id.*

Bierman's abridgement was based on the *Inquirer* statement that "[a]ccording to Martin, Polyclinic's account is 'inaccurate and greatly exaggerated.' The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away." [Appendix A-3] Bierman clearly relied on the *Inquirer* which appears to be referencing Martin himself as the source. Further, there is nothing in the record to indicate that Martin has sued the *Inquirer* for that statement.

This Court holds, as a matter of law, that Martin has not shown Bierman's actual malice. *Harte-Hanks,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562.

H

Although he did not sue the *Inquirer,* Martin contends that the repetition from the *Inquirer* article of a quote by Mary Maudsley of the New Jersey Supreme Court's Committee on Character is defamatory. The quote reads, "Any potential problem which Mr. Martin encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it." [*See* Appendix A and B]. The Maudsley comment gives rise to initially determine whether it is an expression of an opinion or a fact. *See, ante,* at 18.

*15 A recent United States Supreme Court case has cast some doubt on the efficacy of the "opinion" protection afforded by the First Amendment. *Milkovich v. Lorain Jorunal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). "Thus we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption from anything that might be labelled 'opinion'." *Id.* at ----, 110 S.Ct. at 2705, 111 L.Ed.2d at 17.

As noted, *Riley* requires that before reaching the actual malice question, the court must determine two questions as a matter of law. One, is the statement capable of a defamatory meaning and, two, is it an expression of fact or opinion? *Riley,* 529 A.2d at 251. *Riley* was decided prior to *Milkovich.* There is no Delaware Supreme Court case on this issue since *Milkovich.*

*Riley* adopted a four-part test used to determine whether an average reader would view a statement as one of fact or one of opinion. *Riley,* 529 A.2d at 251. The test came from *Ollman v. Evans,* 750 F.2d 970, 979 n. 16 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

While there is some doubt that there is a viable "opinion exception" to defamation actions, the *Ollman* four-part test is "still helpful for determining whether a statement implies actual facts that can be proven false." *Lund v. Chicago and Northwestern Transportation Company,* Minn.Ct.App., 467 N.W.2d 366, 369 (1991) [FN8]. Whether an allegedly libelous statement constitutes a statement of fact or an expression of opinion is a question of law for the court to determine. *Slawik,* 428 A.2d 17; *Lund,* 467 N.W.2d at 369.

The four-part *Ollman* test asks: (1) considering the common usage or meaning of the specific language of the challenged statement, is the statement indefinite and ambiguous; (2) whether the statement is capable of being objectively characterized as true or false; (3) considering the entire article in which the statement appears, to what extent will the unchallenged language surrounding the allegedly defamatory statement influence the average reader's readiness to infer that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 575

Not Reported in A.2d                                                                                                                          Page 13
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

a particular statement has factual content, and (4) the broader social context into which the statement fits. *Riley,* 529 A.2d at 251-52. Applying this analysis, the statement is an opinion.

First, the common usage of the specific language is indefinite. The inclusion of the words "seems to be answered" injects a note of speculation or indefiniteness. Second, the challenged statement cannot be *objectively* verified. Attempting to analyze what constitutes "any potential problem in his life" necessarily entails a subjective decision. Third, the language surrounding the allegedly defamatory statement influences the average reader by clarifying the statement is an opinion. The immediately preceding line in the *Forum* article reads: "In addition to the 'knowing misrepresentation', the New Jersey bar examiners are also concerned with Martin's alleged propensity to file lawsuits." The specific use of the words "concerned with" and "alleged propensity" influences the average reader to infer this is an opinion, not a factual statement. Fourth, analyzed within the broader social context in which the article appeared, *i.e.,* that it addressed an issue of current controversy regarding the licensure of lawyers and the consideration of honesty and candor as proper criteria of licensure, "language which might otherwise be considered statements of fact have here assumed the character of statements of opinion." *Riley,* 529 A.2d at 253 [citations omitted]; *Ramada Inns,* 543 A.2d at 327.

**\*16** Martin further alleges that the Maudsley quote is defamatory in that the *Forum* article did not note "that Maudsley herself is a defendant and is partially responsible for tampering with transcripts of the proceedings before the committee, so that what appears in the transcripts is not the same as what one hears from listening to the tape recordings of the same proceedings." The *Forum* article did not have to state that Maudsley was a defendant in some other suit (even assuming Bierman knew this) as libel by omission is only actionable if the omission makes an already published material assertion of fact untrue. *Ramada Inns,* 543 A.2d at 337-38.

The allegation that Maudsley tampered with the transcripts to alter her statement fails to show an actionable libel against Bierman on the constitutional level. Even assuming what Martin alleges about Maudsley is true, that would not satisfy Martin's burden of proof to show "actual malice", *i.e.,* knowledge of falsity or reckless disregard of truth or falsity. Furthermore, this Court can envision no set of circumstances whereby Martin could meet this burden as Bierman had noted his source of this quote as the *Inquirer* article. Bierman's failure to compare the transcript with any tape recording made of the proceedings does not amount to reckless disregard of truth or falsity. Malice may not be found merely by showing failure to investigate adequately before publication. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153, 87 S.Ct. 1975, 1990, 18 L.Ed.2d 1094, 1110 (1967).

The facts in the case before this Court differ from the U.S. Supreme Court decision in *Milkovich,* where the alleged defamatory statement itself concerned an allegation of perjury. In *Milkovich,* a high school wrestling coach testified in a hearing before an athletic association concerning a brawl and months later testified in court about the same incident. A local sports columnist inferred that Milkovich perjured himself by polishing and reconstructing his testimony in the second proceeding. Whether or not Milkovich had perjured himself was provable by comparing the transcript of the hearing with the transcript of the court testimony. Here it is Martin (not Bierman) who has raised the allegation of a third party's perjury (not Bierman's). Comparing the transcript of the Maudsley statement with a tape recording may establish some other party's tampering but it would *not* establish libel against Bierman on a constitutional level.

Even under the possible *Milkovich* dilution of the "opinion exception", as a matter of law, the repetition of the Maudsley quote is constitutionally protected. Martin is required to prove Maudsley's statement as false before there can be liability. *Milkovich,* 497 U.S. at ---, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. Maudsley's words "any potential problem" and "seems to be answered" indicate that Martin frequently appears to litigate when confronted with barriers. A fair reading of the Maudsley quotation does not indicate that Martin

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 576

Not Reported in A.2d                                                                                           Page 14
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

litigates over *every* stumbling block he faces. In any event, *his own* listing of cases he has filed [Appendix C] shows a propensity to extensively litigate his personal life.

*17 Further, the Court must determine whether the Maudsley quotation is capable of a defamatory meaning. The Court finds as a matter of law that it is not. In effect, the gist or sting is that Martin is accused of being litigious. In today's society where lawyers are under much criticism for being litigious and our society, as compared with other countries, is criticized for litigiousness, the Maudsley comment can hardly be viewed as defamatory. *Cf. Andres v. Williams,* Del.Supr., 405 A.2d 121 (1979).

Assuming, *arguendo,* that Maudsley's comment is not protected as "opinion" and is capable of a defamatory meaning, the Court must, as a matter of law, first determine if the statement was made with actual malice. *Milkovich,* 497 U.S. at ----, 110 S.Ct. at 2705, 111 L.Ed.2d at 17. [FN9]

Martin cannot cross this initial constitutional threshold. One, the initial Maudsley quotation, as the *Forum* article notes, is in the *Inquirer.* Martin has not sued the *Inquirer.* Two, there is no evidence Martin has sued Maudsley for defamation. Three, Martin's own recitation of extensive litigation, overwhelmingly unsuccessful [Appendix C], indicates that he could not meet his burden of proving falsity. Fourth, based on the record in this case, viewed most favorably to Martin, he could not show Bierman had a high degree of awareness of the probable falsity of Maudsley's quotation or underlying information she used in expressing her views or that she or Bierman entertained serious doubts as to the truth of the publication. [FN10]

*Article as a Whole*

I

Martin claims the *Forum* article taken as a whole is libel *per se.* To constitute defamation *per se,* the nature of the charge must be such that the person has been injured in his reputation, business or occupation. *Danias,* 261 A.2d at 531. Martin alleges the article defames him in his trade (lawyer) and imputes a loathsome disease (mental illness).

The term defamatory *per se* is misleading and a misnomer in that it infers the defamation is actionable in itself or taken alone. Falling within one of the four categories of defamation *per se* changes the common law requirement that plaintiff show damages to pursue a claim of slander. In some jurisdictions, a plaintiff had to show damages in order to pursue a claim of libel, unless the libel was *per se,* in which case the damage requirement was again waived. Delaware does not distinguish between libel *per se* and libel *per quod;* thus, any libel is actionable without a showing of special damages. *Spence v. Funk,* Del.Supr., 396 A.2d 967, 971 (1978). Simply waiving the damages' requirement does not make the libel actionable in itself, the claim is still subject to other defenses and the appropriate standards of proof. *Id.* at 973. Martin's pleadings fail to state a claim upon which relief may be granted regardless of qualifying as a *per se* status and a showing or failure to show special damages.

*18 Martin claims the *Forum* article is defamatory as a whole as it implies "that I am a dangerous lunatic who sues innocent persons on account of a violent, psychotic temperament that renders me unfit for the practice of law." The article does not make such a statement in direct words, however, a libel by implication is actionable if "it imputes something which tends to disgrace a man, lower him in, or exclude him from society or bring him into contempt or ridicule." *Klein v. Sunbeam Corp.,* Del.Supr., 94 A.2d 385, 390 (1952). A libel need not be direct and open. "The publication must be judged by its general tenor; and if, taking their terms in their ordinary acceptation, it conveys a degrading imputation, however indirectly, it is a libel." *Rice v. Simmons,* Del.Ct. of Error and Appeals, 2 Harr. 417, 429 (1839); *Spence,* 396 A.2d at 971. Whether the article suffices to meet state and common law libel requirements, Martin's claim fails first on the constitutional level.

The Court has found Martin to be a limited public figure. He faces the same threshold burdens as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 577

such a figure when he attacks the entire article as he does when attacking pieces of it. The sum of the article is not greater than the whole. It is unnecessary to repeat the hurdles he faces under *New York Times, Gertz, Riley* and *Ramada Inns.* His attack on the whole article does not surmount constitutional hurdles.

### INVASION OF PRIVACY

Martin's fifth claim is for invasion of privacy alleging the *Forum* article placed him in a false light in the public eye. The United States Supreme Court has held the actual malice standard applicable to a false light suit by private individuals when the subject of the article involved matters of public interest. *Time, Inc. v. Hill,* 385 U.S. 374, 380-91, 87 S.Ct. 534, 538-43, 17 L.Ed.2d 456, 462-68 (1967). This Court holds that "when a plaintiff, who is a limited public figure with regard to a defamation claim, also sues under a false light theory that has as its factual basis the same allegedly false material, that plaintiff must prove actual malice in order to recover on the false light claim." *Fitzgerald v. Penthouse International, Ltd.,* D.Md., 525 F.Supp. 585, 603 (1981), *aff'd in part, rev'd in part on other grounds,* 691 F.2d 666 (4th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983). For all the reasons stated, *supra,* Martin has failed to carry his burden of proof in showing falsity or actual malice.

While this failure extinguishes the false light claim, an action for invasion of privacy upon public disclosure of private facts could survive this deficit. The right of privacy is not an absolute right but, rather is qualified by the circumstances and also by the rights of others. *Guthridge v. Pen-Mod, Inc.,* Del.Super., 239 A.2d 709, 714 (1967). The general purpose of protecting the right of privacy relates to one's *private* life, not when that life has become a matter of legitimate *public* interest. There are a number of limitations to this right: the freedom of the press, matters of legitimate public interest, matters involving public figures and the newsworthiness of the article. *Reardon v. News-Journal Co.,* Del.Supr., 164 A.2d 263, 266-67 (1960). The media has the right,

guaranteed by the federal and state constitutions, to publish news and all matters of public concern. One who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency. *Barbieri v. News Journal Co.,* Del.Supr., 189 A.2d 773, 774 (1963).

*19 Given the avalanche of litigation that Martin has pursued concerning his past medical history and his interaction with Widener and his disclosure to *Inquirer* reporters of his view of the events, he may not now complain of the publicity he himself has engendered. Martin did not sue the *Inquirer*, a newspaper of infinitely greater circulation than the *Forum,* which contained much of the same information. Martin has functionally invited the discussion and publicity to this part of his life and he may not now assert a right he has effectively waived. Martin had already transformed the private nature of the facts to public and the recitation of those public facts does not violate an ordinary decency.

While attending Widener, Martin received a standard administrative form concerning a student's consent to have personal data released or published in a student directory. Martin returned the form denying consent to publicize any personal information. Martin now contends that the form effectively prevents any disclosure of information by the school and is a basis for his invasion of privacy claim. For all the reasons stated *infra,* this Court finds that Martin's actions and behavior override the notice to the school and he may not now predicate an invasion of privacy claim upon that form.

### CONCLUSION

Martin's causes of action for injunctive and declaratory relief are barred by the doctrine of claim preclusion. The slander claim based on the Copeland/Santoro telephone conversation is barred by the doctrine of claim preclusion, as well as being wholly lacking in substance. This Court concludes Martin has limited public figure status and, thus, bears the burden of showing falsity, as well as actual malice as to the *Forum* article. Martin has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 578

Not Reported in A.2d                                                                                                    Page 16
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

failed to show any false statement upon which to base his defamation claim. Therefore, this Court cannot envision any set of circumstances in which Martin could prove defendant's knowledge of falsity or reckless disregard of truth. The claim for invasion of privacy based on a false light theory also fails for the same reasons. A claim for invasion of privacy based on public disclosure of private facts is precluded as Martin has effectively waived the private nature of those facts recited in the *Forum* article.

For the reasons stated herein, the motion of defendants Widener University School of Law, Anthony J. Santoro and Mitchell S. Bierman to dismiss is GRANTED. The motion of plaintiff James L. Martin for summary judgment is DENIED.

APPENDIX A

1 ANSWER THWARTS HIS LAW CAREER

*"This is not only an inappropriate question, this is a*

*cruel question." said a Stanford law professor.*

By Mary Jane Fine

and Mark Fazlollah

*Inquirer Staff Writers*

On Dec. 17, 1979, James L. Martin, then 26 years old, filled out an application to the Delaware Law School of Widener University. His answers, neatly typed, informed school authorities, among other things, that his Law School Aptitude Test score was an above-average 582, that his draft status was 4-F and that he also planned to apply to the law school at the University of California at Davis.

**\*20** The application's final seven questions called for a simple "yes" or "no" response. Jim Martin answered "no" to every one.

Three years later-after Martin graduated from Delaware Law School-Question Number Six came back to haunt him.

It is haunting him still.

Because of Question Number Six, Jim Martin believes, he has never been permitted to practice law. Because of that question, he is suing Delaware Law School and the New Jersey Bar Examiners, among others. Because of that question, Martin filed a complaint with the Office for Civil Rights of the U.S. Department of Education, which found the question to be in violation of federal law.

Question Number Six-which Delaware Law School has since eliminated-asked: "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

When James Martin answered "no" to Question Number Six, he set in motion a chain of events that continues to add link after link.

At some point prior to Martin's graduation, law school officials learned-it is not known precisely how-that he had, indeed, been in a mental hospital briefly in 1975. The circumstances of his confinement remain somewhat clouded, and Martin disputes the legality of his confinement, but school officials took a hard line.

In a letter to Martin dated Feb. 2, 1983, then-Associate Professor Edward C. Smith wrote that "the misrepresentation raised a question as to your character and fitness for the practice of law, and accordingly that the matter should be brought to the attention of the Board of Examiners of any bar to which you applied."

Smith, who now works for a pharmaceutical firm in Cleveland, said that as far as he was concerned, the only issue was the appropriateness of the question, not Delaware Law School's decision to notify bar examiners.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 579

Not Reported in A.2d                                                                                 Page 17

Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

"I certainly don't see any problem with pointing out that someone told an untruth," he said in an interview.

Several other law schools, however, said that it was debatable whether they would have taken the same action.

"This is not only an inappropriate question, this is a cruel question," said Stanford University law Professor Robert Weisberg, former dean of faculty affairs at Stanford. "It's putting cruel pressure on people to lie.... I would be very, very reluctant to tell the bar."

Weisberg strongly questioned Delaware Law School's contention that Martin's incorrect answer reflected on his character.

"It strikes me as a weird moral fastidiousness," he said.

Richard Lonsdorf, a professor of psychiatry and law at the University of Pennsylvania, said that although Martin's answer may have demonstrated "faulty judgment," Penn probably would not have pursued the matter.

"We probably would have decided that this is a kid," Lonsdorf said. "It was a stupid thing to have done, a foolish peccadillo."

*Legal paperwork*

Over the last six years since Delaware Law School made its decision, the legal paperwork surrounding Martin's claims has grown mountainous. Working out of his neat, two-story brick home in Wilmington, Martin, now 36, does accounting work for a living. Over the years, he figures that he has filed about 20 lawsuits, four of them against Delaware Law School.

*21 Somers S. Price, Jr., an attorney for Delaware Law School, says that two of the suits were dismissed and two-which Price says are similar to those dismissed-are pending. The suits seek unspecified damages and ask that the school be prohibited from continuing to disseminate information about his medical background and his response to Question Number Six. The law school says that its actions were proper.

Jim Martin grew up on a 150-acre farm in Palmyra, Lebanon County, the eighth of nine children. He describes his parents as strict Mennonites who rejected the ideas of higher education and participation in the wider world.

A fat looseleaf binder of personal memorabilia contains glimpses of the young Jim as a well-rounded boy who brought home A's and B's on his report cards and ribbons in soccer, science and wrestling. A letter written in 1970, when Jim was 16, congratulates his parents on his acceptance into the local chapter of the National Honor Society.

Later entries, however, chronicle a harsher period in his life, when he was a senior at Lebanon Valley College. On Feb. 2, 1975, according to medical records contained in the binder, Martin was admitted to Polyclinic Hospital in Harrisburg. The day before, the records say, "The patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had supernatural powers." The records quote Martin as saying, "I'm perfectly well, and it seemed like a bad dream. I was caught between my [parents'] Mennonite world and that of the school."

*Family dispute*

According to Martin, Polyclinic's account is "inaccurate and greatly exaggerated." The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away.

On Feb. 21, the records note, Martin was discharged-"improved"-to outpatient care.

A second admission-this time to the local Philhaven Hospital-occurred on April 2. According to admission notes, Martin was escorted to Philhaven by a Lebanon Valley professor and two students "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 580

Not Reported in A.2d                                                                                          Page 18

Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

because he wanted to walk around in the nude, spoke about he and God having a mission to kill, was otherwise irrational, bizarre, hyperactive and violent."

Martin denies ever walking around in the nude and says, "There was no more truth to that [account] than what they wrote in Harrisburg."

He was discharged to his parents' custody, according to May 10 notes by John D. Walmer, a psychiatrist at Philhaven.

After his brief hospitalizations, Martin graduated from Lebanon Valley, and in March 1976 he gained membership in Phi Alpha Epsilon, a scholastic honor society.

*Accounting work*

After working for accounting firms for several years, Martin applied to Delaware Law School. He gives two reasons for answering "no" to the question about psychiatric hospitalization and treatment on the school's application form.

First, he explains, he felt that his admissions constituted an illegal confinement-"bogus," he calls it-and, therefore, did not count. Second, he says, he was advised by Walmer to say that he had never been treated for mental illness.

*22 Walmer, who retired in 1982, said in a telephone interview that, although he remembered Martin, he recalled no such conversation. "I'm just distressed to know that this [episode] is still bothering him," Walmer said.

Apart from the brouhaha over his application-which erupted just prior to graduation in December 1982-Martin's law school career appears to have been unremarkable.

Although the school's current administrators declined to discuss his case because of pending litigation, Smith, the former professor, remembered Martin as a "fairly good" student with adequate grades-"not a superstar."

Smith said that Martin had been in his civil procedure class. Asked to characterize Martin at the time, Smith said, "I've had some students that I thought were candidates for [mental] treatment; [Jim] just seemed eccentric."

Immediately after graduation, Martin applied to the Washington, D.C., bar. In the spring of 1983, he applied to the Pennsylvania and New Jersey bars and later to Maryland.

Each time, he passed the written section of the bar exam. But when Delaware Law School's letter was sent to the bar examining committees, the approval process slowed to a crawl.

The bars in Pennsylvania, Washington and Maryland refused to admit Martin. Though the Pennsylvania State Board of Law Examiners would not release records of the proceedings, documents from a related hearing indicated that the examiners' decision was based on Delaware Law School's report and on Martin's failure to undergo a current psychological evaluation. Past treatment for mental illness would not prevent an individual from being allowed to practice law.

The bar examining committee in New Jersey, which has tabled consideration of Martin's applications pending the outcome of his federal suit against it, has been involved in a somewhat more complicated dispute.

Martin applied in the spring of 1983 and quickly passed the written section. In April 1984, it seemed his dream had come true. The clerk of the New Jersey Supreme Court issued him the official certificate, in Gothic print and sealed with the court's gold emblem.

"James Lee Martin was constituted and appointed an Attorney at Law of this State on April 2, 1984," it said.

David Johnson, director of the New Jersey Supreme Court's attorney ethics division, acknowledged that Martin had good reason to think he was a lawyer because "you don't get the certificate without being admitted."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 581

Not Reported in A.2d                                                                                                   Page 19
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*One-page letter*

But at the end of April, Martin was devastated by a one-page letter from New Jersey Supreme Court Clerk Stephen Townsend.

There had been a mistake, the letter stated, and Martin's certificate was sent to him in error. It was void and he had no right to practice law. The bar's character committee was still reviewing whether he was fit to be an attorney, the letter stated.

Townsend declined to discuss the case other than saying that Martin's application was still pending before the state Supreme Court.

*23 The transcript from a June 1985 hearing by the New Jersey Supreme Court's Committee on Character showed that Widener's letter was still a central issue blocking Martin's application.

Committee member Mary Maudsley told Martin that his answer to Question Number Six on Widener's law school admission form was "a knowing misrepresentation." In the hearing, Martin provided extensive information about his stay in the mental hospitals and there was no suggestion that he misled the examiners.

Maudsley also said she was concerned about Martin's inclination to file suits.

"Any potential problem which Mr. Martin has encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it," she told the committee.

Committee member Frank M. Lario Jr. then asked whether Martin's past mental health problems influenced "your filing of lawsuits at the present time or your feeling of persecution that may be existing at this time."

Martin's response was that, "There is no feeling of persecution, that is for sure. There is an obvious injustice."

In a recent interview, Martin appeared rueful about the prolonged legal entanglement with his former school. He says he did not foresee it.

"It's like being out in the desert, and you think there's water out there," he said. "You know how the sun plays tricks on you and you see a mirage and you have the feeling that it's just up ahead and you can sit down and rest.... Then when it isn't, you have too much invested to turn around."

APPENDIX B

DLS: Defendant

Mitchell S. Bierman

Staff Writer

James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS. In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission: " Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

Somehow, DLS found out that Martin had in fact been confined to an institution. "Each time, [Martin] passed the written section of the bar exam. But when [DLS]'s letter was sent to the bar examining committee, the approval process slowed to a crawl." (*The Philadelphia Inquirer,* Sunday February 18, 1990, Mary Jane Fine and Mark Fazollah, p. 1 Section B.)

This happened in New Jersey, Washington, Maryland and Pennsylvania. Martin challenged DLS on the fairness and legality of the question by filing a complaint with the Office for Civil Rights of the U.S. Department of Education. The question was found to be a violation of federal law. Martin has filed four different lawsuits against DLS. Two were dismissed and two are pending.

As reported in the article in *The Philadelphia Inquirer,* Martin was admitted to Polyclinic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 582