Westlaw.

Slip Copy                                                                                               Page 1

Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
(Cite as: Slip Copy)

C
Briefs and Other Related Documents

United States District Court,D. Delaware.
Michelle COLLIER, Plaintiff,
v.
TARGET STORES CORPORATION, Defendant.
No. CUV. 03-1144-SKR.

April 13, 2005.

William D. Fletcher, and Noel E. Primos, of Schmittinger & Rodrigues, P.A., Dover, Delaware, for Plaintiff.
Sherry Ruggiero Fallon, of Tybout, Redfearn & Pell, Wilmington, Delaware, for Defendant, Abbey G. Hairston, of Seyfarth Shaw, L.L.P., Washington, District of Columbia, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On December 17, 2003 plaintiff Michele Collier instituted this litigation against defendant Target Stores Corporation, alleging in her complaint: (1) violation of the Family and Medical Leave Act ("FMLA"); (2) breach of the implied covenant of good faith and fair dealing; (3) violation of 19 Del. C. § 709; and (4) slander. (D.I. 1) On July 12, 2004, plaintiff filed a second lawsuit against defendant, alleging the same set of facts as in the first lawsuit, but including a new claim for alleged violation of the Americans with Disabilities Act ("ADA"). Based on a stipulation by the parties (D.I.30), this court consolidated the two lawsuits, thereby adding plaintiff's ADA claim to the present matter. This court has jurisdiction over plaintiff's FMLA and ADA claims under 28 U.S.C. § 1331 and over plaintiff's breach of the implied covenant of good faith and fair dealing, violation of 19 Del. C. § 709, and slander claims under 28 U.S.C. § 1367(a). Presently before the court is defendant's motion for summary judgment. (D.I.46) For the reasons set forth below, the court grants defendant's motion for summary judgment against plaintiff's ADA, breach of implied covenant of good faith and fair dealing, slander, and 19 Del. C. § 709 claims, but denies defendant's motion for summary judgment against plaintiff's FMLA claim.

II. BACKGROUND

In March 2001, defendant opened a new store in Dover, Delaware (the "Dover Store"). (D.I. 48, ex. 1 at A3) In addition to selling goods to the general public, the Dover Store also offered a pharmacy. Plaintiff was hired by defendant as Head Pharmacist in the Dover Store in December of 2000. (D.I. 1 at 2; D.I. 47 at 3) At or around the same time, Ellicia Weber ("Weber") was transferred to the Dover Store as a part-time pharmacist. (D.I. 48 at A14-A15, A182) The pharmacy staff at the Dover Store included plaintiff, Weber, and pharmacy technicians. (D.I. 47 at 4-5; D.I. 48 at A8-A9) At all times relevant to this action, plaintiff was supervised by Area Pharmacy Manager Michael Thomas ("Thomas"), Store Team Leader James Bellamy ("Bellamy"), and Regional Human Resources Director Todd Landis ("Landis"). (D.I. 48 at A4, A172, A282-A283)

During 2001, Bellamy and Thomas noted that plaintiff and Weber were having problems getting along. (D.I. 48 at A6-A14, A187-A189) On February 26, 2002, plaintiff submitted her resignation to Bellamy and Thomas. (D.I. 48 at A270) Thomas asked plaintiff to withdraw her resignation and she agreed. (D.I. 48 at A208-A210)

In March 2002, plaintiff became aware that Weber had incorrectly filed a Class II narcotic prescription. (D.I. 48 at A18-A20, A191) Specifically, a customer received a generic prescription but did not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 619

Slip Copy                                                                                                                    Page 2

Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
(Cite as: Slip Copy)

like the medication and returned it to the pharmacy. Weber accepted the medication, which was a violation of Delaware law. (D.I. 48 at A18-A20, A192) Plaintiff reported the misfiling of the prescription to the Delaware State Board of Pharmacy (the "State Board"). (D.I. 48 at A298) Despite investigating the complaint, the State Board took no formal action against either Weber or defendant regarding this incident. (D.I. 48 at A196-A197)

*2 In late March of 2002, plaintiff experienced migraine headaches and sought FMLA leave from April 3 through April 22. (D.I. 48 at A127-A128, A207) Neither Bellamy nor Landis were aware of the reason why plaintiff sought leave. (D.I. 48 at A39-A43, A301-A302) Thomas was aware that plaintiff's leave was taken due to stress, but was not told that the stress was work related. (D.I. 48 at A207-A208) Plaintiff sought an extension of her FMLA leave up through May 13, 2002, which defendant approved. (D.I. 48 at A271-A272) In seeking the extended period of leave, plaintiff released her medical history to defendant. (D.I. 48 at A273) Plaintiff's physician filled out a statement indicating that plaintiff suffered from "major depression" and "generalized anxiety." (D.I. 48 at A274) Plaintiff's physician had begun treating her for anxiety attacks in May 1998. (D.I. 48 at A275)

While plaintiff was on leave, Thomas telephoned her at home. (D.I. 48 at A211-A212, A277) Since defendant had a policy of not contacting employees on leave, plaintiff filed a complaint regarding this call. (D.I. 48 at A214, A277-A278; D.I. 53 at B37)

Although plaintiff was scheduled to return to work on May 13, 2002, she did not report for work or provide notice from her doctor of the need for additional leave. On May 13, Thomas sent an email to Landis inquiring whether he could "act fast and consider [plaintiff] a no show and abandoned her job [.]" (D.I. 53 at B1) Defendant contacted plaintiff and requested that she provide additional information to support her need for more leave.

On May 16, 2002, while plaintiff was still on leave, Thomas sent an email to Landis inquiring whether he could remove plaintiff from the Pharmacy Third Party Committee (the "Committee"), FN1 "as she has been unavailable to the team for many weeks." (D.I. 48 at A280) On May 18, 2002, Landis responded by indicating that he supported removing plaintiff's Committee responsibilities. (D.I. 48 at A279)

> FN1. The Pharmacy Third Party Committee was responsible for marketing to help drive pharmacy sales, and to help pharmacists at other stores with third-party (i.e., insurance) billing questions. (D.I. 47 at 8; D.I. 52 at 7)

On May 24, 2002, plaintiff sent an email to Thomas confirming that she would not be back to work until June 24, 2002. (D.I. 48 at A335; D.I. 53 at B38) On June 7, 2002, defendant issued a new policy on pharmacy lunch breaks. The policy required that pharmacists remain in the store during their lunch period. (D.I. 48 at A340-A349) This policy was published on defendant's intranet and Weber informed plaintiff of the policy change when plaintiff returned to work on June 24, 2002. (D.I. 48 at A136)

On July 23, 2002, Thomas verbally reprimanded plaintiff for allegedly not using "FFF" ("Fast, Fun, and Friendly") communications with Weber. (D.I. 48 at A350) In an August 17, 2002 email, plaintiff confirmed that she was still having trouble communicating with Weber. (D.I. 48 at A351-A352)

In October 2002, plaintiff closed the pharmacy during her lunch break in order to fill a prescription at another pharmacy. FN2 In so doing, plaintiff violated defendant's policy on pharmacy lunch breaks. When plaintiff returned to the pharmacy, she was questioned by Rod Rodriguez ("Rodriguez"), Assets Protection Team Leader. (D.I. 48 at A232-A235) Thomas was present when Rodriguez confronted plaintiff about violating the store's policy. (D.I. 48 at A232)

> FN2. Defendant had a policy forbidding pharmacists from filling their own prescriptions. (D.I. 53 at B41)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 620

Slip Copy                                                                                                                   Page 3
Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
**(Cite as: Slip Copy)**

*3 Before any final decision was made regarding possible sanctions for plaintiff's violation of the pharmacy lunch break policy, plaintiff sought and obtained a second FMLA leave of absence. On October 10, 2002, plaintiff's doctor provided defendant with a note indicating that plaintiff needed two weeks of leave due to the "situation and stress work represents." (D.I. 48 at A355) On October 14, 2002 Thomas sent an email to Landis stating plaintiff's leave of absence would "take her up to [her requested] vacation [time] (convenient)[.] It will be forever before we can address her!" (D.I. 53 at B3) On October 23, 2002, plaintiff's doctor provided additional information to support her request for leave extended beyond October 26, 2002 to November 23, 2002. (D.I. 48 at A356) Plaintiff then sought leave through January 1, 2003. (D.I. 48 at A358) Defendant approved these requests. (D.I. 48 at A357-A358)

During plaintiff's second FMLA leave, Landis contacted her concerning certain checks she had presented to defendant which allegedly were returned for insufficient funds. (D.I. 48 at A376) Defendant classifies an employee's issuance of a dishonored check as a minor offense. (D.I. 48 at A373-A374) When plaintiff investigated the matter, she found that two of the checks were not accepted by defendant's bank because they had been presented electronically. (D.I. 48 at A376)

Plaintiff returned to work on January 6, 2003, on a reduced work schedule of four hours per day for three to four days per week. (D.I. 48 at A377) Even though this reduced work schedule continued up until plaintiff ceased working for defendant, she continued to be paid as a full-time employee. [FN3] (D.I. 48 at A321-A322; A377-A381)

> FN3. Plaintiff contests this statement, alleging that she returned to full-time status before she ceased working for defendant. However, plaintiff fails to point to any evidence to support her position. In contrast, defendant points to several notes from plaintiff's psychiatrist from January 27, 2003 through plaintiff's last day working for defendant which only allowed plaintiff to work part-time. (D.I. 48 at A378-A381)

Sometime after plaintiff's return from her second FMLA leave, defendant installed a camera over the pharmacy so that activities of the pharmacy employees could be observed. (D.I. 48 at A64-A82, A147, A388-390; D.I. 53 at B14)

On January 24, 2003, Bellamy and Landis met with plaintiff and provided her with two final warnings-one related to the passing of bad checks and the other related to violation of the policy regarding pharmacy lunch breaks. (D.I. 48 at A382-A384)

In February 2003, defendant issued an evaluation of plaintiff's 2002 work performance (the "2003 Evaluation"). (D.I. 52 at 13; D.I. 53 at B6-B12) Plaintiff received an overall score of sixty-nine, which translated to "Satisfactory." (D.I. 53 at B7) In plaintiff's only previous evaluation (the "2002 Evaluation"), she received a score in the eighties, which corresponded to "Excellent." (D.I. 53 at B7, B98)

In May 2003 plaintiff filed an incident report on Weber when Weber issued a medication with an improperly high dosage. (D.I. 48 at A82-A83, A151-A154)

While plaintiff continued to work on a reduced schedule, Weber was charged with creating the work schedule for the pharmacy technicians. (D.I. 48 at A95, A157-A159, A245) One of the technicians complained to plaintiff about her schedule and plaintiff changed the schedule without consulting with Weber. (D.I. 48 at A157) On May 12, 2003, Thomas met with plaintiff and informed her that she was to leave the scheduling to Weber. (D.I. 48 at A391)

*4 On June 2, 2003, plaintiff submitted her two weeks' notice. (D.I. 48 at A394-A395) Bellamy accepted her resignation and advised her that she need not report to work, but would be paid for the two weeks. (D.I. 48 at A97-A98, A161-A162, A328)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 621

Slip Copy                                                                                                                    Page 4
Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
**(Cite as: Slip Copy)**

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are ' genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### IV. DISCUSSION

#### A. The Family and Medical Leave Act

Congress enacted the FMLA to help working men and women balance the conflicting demands of work and personal life. 29 U.S.C. § 2601(b)(1). The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: ... (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. The FMLA also provides for "intermittent" leave, which allows an employee to take such leave intermittently when medically necessary. 29 U.S.C. § 2612(b).

There are two types of claims an employee can bring against an employer under the FMLA, " interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c) ('An employer is prohibited from discriminating against employees ... who have used FMLA leave.')." *Strickland v. Water Works & Sewer Bd.,* 239 F.3d 1199, 1206-07 (11th Cir.2001); *see also Bachelder v. Am. W. Airlines, Inc.,* 259 F.3d 1112, 1122 (9th Cir.2001); *Thomas v. Pearle Vision, Inc.,* 251 F .3d 1132, 1139 (7th Cir.2001); *Peter v. Lincoln Technical Inst., Inc.,* 255 F.Supp.2d 417, 438 (E.D.Pa.2002); *Marrero v. Camden County. Bd. of Social Servs.,* 164 F.Supp.2d 455, 463 (D.N.J.2001).

*5 Retaliation claims under the FMLA are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Bearley v. Friendly Ice Cream Corp.,* 322 F.Supp.2d 563, 571 (M.D.Pa.2004); *Baltuskonis v. U.S. Airways, Inc.,* 60 F.Supp.2d 445, 448 (E.D.Pa.1999); *Lepore v. Lanvision Sys., Inc.,* No. 03-3619, 2004 WL 2360994, at *3 (3d Cir.2004). *McDonnell Douglas* sets forth a three-step analysis for retaliation claims. First, the plaintiff must establish a prima facie case of retaliation. A prima facie case of retaliation under the FMLA is established by showing: (1) plaintiff availed herself of a protected right under the FMLA; (2) plaintiff suffered an adverse employment action; and (3)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 5
Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
**(Cite as: Slip Copy)**

there was a causal connection between the employee's protected activity and the employer's adverse employment action. *Conoshenti v. Pub. Serv. Elec & Gas Co.,* 364 F.3d 135 (3d Cir.2004); *Bearley,* 322 F.Supp.2d at 571; *Baltuskonis,* 60 F.Supp.2d at 448. "After establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action." *Bearley,* 322 F.Supp.2d at 571; *see also Baltuskonis,* 60 F.Supp.2d at 448. "Finally, if a legitimate non-discriminatory reason is provided, the plaintiff must present evidence to show that the defendant's proffered reasons were not its true reasons, but were merely a pretext for its illegal action." *Baltuskonis,* 60 F.Supp.2d at 448; *see also Bearley,* 322 F.Supp.2d at 571. In order to survive summary judgment, a plaintiff must "either (i) discredit[ ] the [defendant's] proffered reasons ..., or (ii) adduc [e] evidence ... that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Torre v. Casio,* 42 F.3d 825, 830 (3d Cir.1994) (discussing *McDonnell Douglas* shifting burden in an Age Discrimination in Employment Act ("ADEA") case).

Third Circuit opinions that have dealt with the FMLA have only involved termination of the plaintiff. *Conoshenti v. Pub. Serv. Elec & Gas Co.,* 364 F.3d 135 (3d Cir.2004); *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375 (3d Cir.2002); *Chittister v. Dep't of Cmty. & Econ. Dev.,* 226 F.3d 223 (3d Cir.2000); *Churchill v. Star Enters.,* 183 F.3d 184 (3d Cir.1999); *Victorelli v. Shayside Hosp.,* 128 F.3d 184 (3d Cir.1997); *Lepore v. Lanvision Sys., Inc.,* No. 03-3619, 2004 WL 2360994, at *3 (3d Cir.2004); *Conroy v. Township of Lower Merion,* No. 02-3217, 2003 WL 22121002 (3d Cir.2003); *Katekovich v. Team Rent A Car,* No. 00-2389, 2002 WL 1288766 (3d Cir.2002); *Barcola v. Interim Healthcare Servs., Inc.,* No. 01-1993, 2002 WL 463286 (3d Cir.2002). Thus, the Third Circuit has not had the opportunity to explain what constitutes an adverse employment action under the FMLA. However, several Third Circuit opinions have examined the meaning of " adverse employment actions" under Title VII, the ADA, and the ADEA.

*6 In order for retaliatory conduct to rise to the level of an adverse employment action under Title VII, it "must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment...." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300-01 (3d Cir.1997). " An adverse employment action necessarily encompasses all tangible employment actions such as 'hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits." ' *Sherrod v. Phila. Gas Works,* No. 02-2153, 2003 WL 230709, *4 (3d Cir.2003) (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998)); *see also Abramson v. William Patterson Coll.,* 260 F .3d 265, 288 (3d Cir.2001) (finding termination of employment is clearly an adverse employment action). Constructive discharge is also an adverse employment action. [FN4] *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885 (3d Cir.1984). Paying an individual a lower salary for discriminatory reasons can also be an adverse employment action. *Sherrod,* 2003 WL 230709 at *4 (citing *Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir.2000)). Job transfers, even without loss of pay or benefits, may, in some circumstances, constitute an adverse employment action. *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 412 (3d Cir.1999) (finding that each of two separate transfers, the first depriving a teacher of the opportunity to teach physics and the second placing the teacher in a "difficult school," constituted adverse employment actions); *DiIenno v. Goodwill Indus.,* 162 F.3d 235, 236 (3d Cir.1998) ("Transfer to a job that an employer knows an employee cannot do may constitute adverse employment action for purposes of Title VII retaliation action."); *Torre,* 42 F.3d at 831 n. 7 (finding that transfer to a dead end job because of age may constitute an adverse employment action for ADEA claim); *see also McGrenaghan v. St. Denis Sch.,* 979 F.Supp. 323 (E.D.Pa.1997) (finding an adverse employment action under the ADA where transfer resulted in " significantly diminished job responsibilities.").

FN4. Under Title VII, an employer constructively discharges an employee if " the employer knowingly permitted conditions of discrimination in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 623

Slip Copy                                                                                                  Page 6
Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
**(Cite as: Slip Copy)**

employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 888 (3d Cir.1984).

The Third Circuit has found that oral and written reprimands are insufficient to establish an adverse employment action. *Robinson,* 120 F.3d at 1300 (finding that oral reprimands did not rise to the level of what Third Circuit cases have described as adverse employment action); *Weston v. Pennsylvania,* 251 F.3d 420, 431 (3d Cir.2001) (" Weston failed to establish how these two [written] reprimands effect a material change in the terms or conditions of his employment. We cannot, therefore, characterize them as adverse employment actions."). Furthermore, "unnecessary derogatory comments" do not amount to adverse employment actions. *Robinson,* 120 F.3d at 1300 (3d Cir.1997) (finding that "unnecessary derogatory comments" do not rise to the level of what Third Circuit cases have described as adverse employment actions).

*7 The Third Circuit also has not had the opportunity to discuss causation, the third step in the *McDonnell Douglas* burden shifting framework, for a FMLA claim. Once again, the Third Circuit's analysis of causation under Title VII, the ADA, and the ADEA provides helpful guidance. Cases examining causation under Title VII, the ADA, and the ADEA have often focused on the "temporal proximity between the employee's protected activity and the adverse employment action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action." ' *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997) (citing *Zanders v. Nat'l R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990)). In *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), the Third Circuit found that where an alleged retaliatory action occurred two days after the plaintiff engaged in a protected activity, the plaintiff demonstrated a causal link. However, the Third Circuit has subsequently limited the applicability of *Jalil:*
We believe that, if *Jalil* is to be interpreted as holding that timing alone can be sufficient [to establish causation], that holding must be confined to the unusually suggestive facts of *Jalil.* Thus, even if timing alone can prove causation where the discharge follows only two days after the complaint, the mere fact that the adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.

*Robinson,* 120 F.3d at 1302; *see also Weston,* 251 F.3d at 431 n. 5.

B. FMLA Analysis

With respect to the FMLA, plaintiff only alleges a retaliation claim against defendant. (D.I. 1 at 6; D.I. 52 at 16) There is no dispute that the first element of a prima facie case of retaliation has been established. Plaintiff and defendant are in agreement that on two separate occasions, plaintiff took leave under the FMLA. (D.I. 47 at 7, 11; D.I. 52 at 7, 9).

Plaintiff has identified the following adverse employment actions: (1) Bellamy's "constant" harassment of plaintiff [FN5] (D.I. 52 at 18); (2) Bellamy's reference to plaintiff as "psycho" and " mental" in conversations with management level employees and a temporary pharmacist (*id.*); (3) Bellamy's "invasion of plaintiff's privacy" by having a camera installed to surveil plaintiff's work ( *id.*); (4) the final warnings that plaintiff received (*id.* at 19); (5) the 2003 Evaluation, which was lower than the 2002 Evaluation (*id.*); (6) relieving plaintiff of her scheduling duties and her Committee position (*id.*); (7) instigation of a false incident report filed by Weber against plaintiff (*id.* at 19); [FN6] (8) plaintiff's constructive discharge (*id.*); (9) Thomas' call to plaintiff's home while she was on leave (*id.* at 20); and (10) verbal reprimands for alleged negative communications with Weber (*id.*).

FN5. Plaintiff described "constant" harassment as including "a two and one-half hour meeting in January 2003 (soon after [p]laintiff had returned from taking her second FMLA leave), when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 624

Slip Copy                                                                                            Page 7

Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
**(Cite as: Slip Copy)**

Bellamy called plaintiff a 'b-ch' and told [p]laintiff that she was "nasty" and ruined [Bellamy's] life and career, as well as instruct[ed] other employees to ostracize [p]laintiff." (D.I. 52 at 18)

FN6. The court finds this allegation is not supported by the record. *See* D.I. 53 at B54.

*8 Of the adverse employment actions identified by plaintiff, only her claim of being constructively discharged is "serious and tangible enough" to be considered as altering plaintiff's terms, conditions or privileges of employment. *Robinson,* 120 F.3d at 1300-01. FN7 Moreover, the court finds that plaintiff has adduced minimally sufficient evidence FN8 to support the inference that she was in fact constructively discharged and that there is a causal connection between her discharge and her FMLA leave, when considering the totality of the circumstances described by plaintiff during her employment in 2002-2003.

FN7. Third Circuit caselaw indicates that derogatory statements and verbal reprimands do not amount to adverse employment actions. *Robinson,* 120 F.3d at 1300; *Weston,* 251 F.3d at 431. Similarly, such conduct as a single telephone call in violation of company policy and the installation of surveillance cameras in the general work place do not constitute tangible alterations in plaintiff's conditions or privileges of employment. There is no evidence of record that plaintiff's 2003 Evaluation had a tangible effect on her compensation. Finally, there is no convincing evidence of record that the scheduling duty and the Committee position were significant enough responsibilities among those plaintiff held as Head Pharmacist that relieving her of these duties while she was on leave constituted an adverse employment action. Of course, this conduct may be considered in evaluating plaintiff's claim of constructive discharge.

FN8. In addition to her allegations in this regard, plaintiff has presented two affidavits of Joan Siler, a former Target employee, in support of her allegations. (D.I.57, 59) To the extent that Ms. Siler avers to her knowledge of facts, the affidavits shall be considered by the court for purposes of the motion practice. To the extent Ms. Siler draws legal conclusions from these facts, the court has not considered such. Defendant's motion to strike (D.I.60) is granted in this regard, but otherwise denied, as Ms. Siler was sufficiently identified through discovery. Plaintiff's motion for leave to file (D.I.64) is granted, consistent with the above.

Having demonstrated a prima facie case of retaliation under the FMLA, it is defendant's burden to articulate a legitimate, nondiscriminatory reason for the employment action. In this regard, defendant denies the allegations that derogatory comments were made and argues in large measure that it was justified in its responses to plaintiff's job performance as Head Pharmacist. Especially in light of defendant's arguments that plaintiff's 2003 Evaluation and the change in her job responsibilities were due, at least in part, to her long absences from work (when she happened to be on FMLA leave), the court declines to make the credibility determinations a jury should make under these circumstances, and concludes that there are genuine issues of material fact that preclude the entry of a summary judgment in favor of defendant.

C. Americans with Disabilities Act

The ADA prohibits discrimination by an employer against a "qualified individual." 42 U.S.C. § 1112 (2003). To establish a prima facie case, a plaintiff must demonstrate that: (1) she has a disability within the meaning of the statute; (2) she is otherwise qualified to perform the essential functions of the job, with or without accommodations by the employer; and (3) as a result of her disability, she has suffered an adverse employment action. *See Williams v. Phila. Hous. Auth. Police Dep't,* 380 F.3d 751 (3d Cir.2004);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 8
Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
(Cite as: Slip Copy)

*Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir.2000); *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 142 (3d Cir.1998).

The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (2003). In the present case, plaintiff claims relief under the third classification of covered individuals, namely, those who are regarded as having a substantially limiting impairment. [FN9] (D.I. 52 at 24) To be "disabled" under the "regarded as" portion of the ADA's definition of disability, plaintiff must demonstrate either that: (1) although she had no impairment at all, defendant erroneously believed that she had an impairment that substantially limited major life activities; or (2) she had a non-limiting impairment that the defendant mistakenly believed limited a major life activity. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999); *Tice v. Ctr. Area Transp. Auth.,* 247 F.3d 506, 514 (3d Cir.2001).

> FN9. Plaintiff concedes that, given the current state of ADA law, it would be difficult for her to establish that she has a physical or mental impairment that substantially limits one or more of her major life activities. (D.I. 52 at 24) According to plaintiff, her "life history since her constructive discharge by [d]efendant has exhibited an improvement of her mental health. Thus, given the apparent non-permanence of her mental impairment, it is unlikely that she could establish an actual substantial limitation of one or more of her major life activities due to the impairment." (*Id.*)

*9 Plaintiff claims that defendant, through its agent Bellamy, regarded plaintiff as having a disability. (*Id.*) Specifically, plaintiff states, "Bellamy constantly referred to [p]laintiff as 'psycho' and 'mental' both with management-level employees and with those assigned to substitute for [p]laintiff during her periods of leave." [FN10] (*Id.*) Plaintiff claims that "it is certainly plausible that Bellamy regarded [p]laintiff as having a severe mental impairment, and that this constituted at least a partial and substantial motivation in the numerous and adverse employment actions ... that Bellamy took against plaintiff." (D.I. 52 at 24)

> FN10. Bellamy, however, denies having ever made such statements. (D.I. 53 at B100-B101) Furthermore, Jane Webb testified in her deposition that she never heard Bellamy refer to plaintiff as "psycho" or "mental." (D.I.57, ex. 23)

The record does not support plaintiff's position in this regard. The Siler affidavits, plaintiff's sole source of evidence that Bellamy made these statements (D.I. 52 at 10), classified Bellamy's statements as "derogatory," suggesting that Bellamy did not genuinely believe that plaintiff suffered a mental impairment. (D.I. 53 at B13) Indeed, the record, seen in a light most favorable to plaintiff, indicates that Bellamy expressed frustration and anger over plaintiff's FMLA leave, that plaintiff was getting paid to sit at home during the holidays while other employees were working, and that plaintiff was abusing the system for reasons that had nothing to do with a valid medical condition. (D.I.59) Consequently, the record demonstrates that if Bellamy did refer to plaintiff as "psycho" and "mental," he did so disparagingly, and did not believe that plaintiff suffered a serious mental impairment. As a result, the court grants defendant's motion for summary judgment with respect to plaintiff's ADA claim.

### D. Implied Covenant of Good Faith and Fair Dealing

Under the common law, an employee is considered "at-will" and may be dismissed from employment at any time without cause and regardless of motive. *See Merrill v. Crothall-Am., Inc.,* 606 A.2d 96 (Del.Super.1992). Delaware law, however, has evolved from the harshness of the "employment-at-will" doctrine. It now recognizes a limited implied covenant of good faith and fair

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 626

Slip Copy                                                                                                                                    Page 9

Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
**(Cite as: Slip Copy)**

dealing exception to protect at-will employees from wrongful termination. *Id.* Nevertheless, the Delaware Supreme Court has limited the application of this exception to four narrowly defined categories: (1) where the termination violated public policy; (2) where the employer misrepresented an important fact and the employee relied thereon either to accept a new position or to remain in her present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past services; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *Lord v. Souder,* 748 A.2d 393, 400 (Del.2000) (citing *E.I. Dupont de Nemours & Co. v. Pressman,* 679 A.2d 436, 442-44 (Del.Super.1996)). "Plaintiff's breach [of implied covenant of good faith and fair dealing] claim rests squarely under the first category, the public policy exception." (D.I. 52 at 25) The court, therefore, focuses its analysis solely on whether defendant's alleged constructive discharge of plaintiff violated public policy.

*10 To demonstrate a breach of the covenant of good faith and fair dealing under the public policy category, an employee must satisfy a two-part test: (1) the employee must assert a public interest recognized by some legislative, administrative, or judicial authority; and (2) the employee must occupy a position with responsibility for advancing or sustaining that particular interest. *Lord,* 748 A.2d at 401 (citing *Pressman,* 679 A.2d at 441-42). The parties agree for purposes of this motion that plaintiff was in a position with responsibility for ensuring that defendant's pharmacy operated in compliance with Delaware law, thereby satisfying the second prong of the two-part test. (D.I. 47 at 28; D.I. 52 at 26) Consequently, the court need only decide the first prong, namely, whether defendant terminated plaintiff's employment in violation of a clearly mandated public policy recognized by some legislative, administrative or judicial authority. (D.I. 47 at 28-29; D.I. 2 at 26)

Plaintiff claims she was subjected to severe harassment in retaliation for reporting to the State Board that Weber accepted a returned generic narcotic medication and substituted a brand-name narcotic medication without contacting the physician for the issuance of a new prescription. (D.I. 52 at 26) Plaintiff claims the following acts were harassment: (1) Thomas telling her that she should have pushed the medication to the back of the safe rather than reporting the problem to the State Board (D.I. 53 at B33-B34); (2) Thomas telling plaintiff that she handled the situation improperly (*id.* at B35); (3) Thomas telling plaintiff that he was not disturbed by Weber's failure to know all of Delaware's pharmacy laws (*id.* at B86); (4) Thomas removing plaintiff from the Committee (*id.* at B38-B39); (5) Thomas verbally reprimanding plaintiff for negative communications with Weber (*id.* at B2, B88-B89); (6) Thomas' email expressing a desire to "act fast and consider [plaintiff] a no show and abandoned her job[ ]" (*id.* at B1). Plaintiff claims these activities amounted to constructive discharge in violation of public policy. Even assuming that these acts amount to harassment, plaintiff has not produced any evidence that she experienced this harassment because she fulfilled her responsibilities pursuant to Delaware law. Consequently, plaintiff has failed to show she was terminated in violation of public policy.

E. Slander and 19 Del. C. § 709

Plaintiff claims that defendant violated 19 Del. C. § 709 [FN11] by providing false and misleading information to prospective employers of plaintiff. (D.I. 1 at 8) Plaintiff also claims that defendant slandered plaintiff by making false oral statements to plaintiff's potential employers. (D.I. 1 at 9; D.I. 52 at 28)

> FN11. According to 19 Del. C. § 709:
> An employer or any person employed by the employer who discloses information about a current or former employee's job performance to a prospective employer is presumed to be acting in good faith; and unless a lack of good faith is shown, is immune from civil liability for such disclosure or its consequences ... the presumption of good faith may be rebutted upon a showing that the information of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 627

Slip Copy                                                                                                                Page 10

Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319
(Cite as: Slip Copy)

good faith by such employer was knowingly false, was deliberately misleading or was rendered with malicious purpose....

Plaintiff does not provide, and the court is unaware of, any precedent applying 19 Del. C. § 709. Consequently, it remains unclear what plaintiff's burden of proof is under 19 Del. C. § 709.

After plaintiff ceased working for defendant, she completed two rounds of interviews with a prospective employer, the Delaware Hospital for the Chronically Ill ("DHCI"). (D.I. 53 at B56) According to plaintiff, DHCI initially expressed interest in hiring plaintiff, but this interest abruptly ended after representatives of DHCI spoke with a male member of management at the Dover Store. (*Id.*) Plaintiff claims to have subsequently spoken with two male managers at the Dover Store other than Bellamy, and each of these male managers stated they had not been contacted by a representative of DHCI. (*Id.*) Plaintiff surmises that "Bellamy was likely the only other mal[e] manager at the Dover [S]tore." (D.I. 52 at 28) However, plaintiff admits that she is not certain, one way or the other, whether Bellamy provided any information to DHCI and, if he did, what information was provided. (D.I. 53 at B56) Consequently, plaintiff has failed to establish a genuine issue of material fact for both her slander and her 19 Del. C. § 709 claims. *See, e.g., Layfield v. Beebe Med. Ctr., Inc.,* No. 95C-12-007, 1997 WL 716900, *7 (Del.Super.Ct.1997) ("Plaintiff fails to identify a specific false or defamatory communication made by any Beebe employee to a third party.... [S]imply alleging that there is circumstantial evidence of defamation is insufficient to overcome Beebe's motion for summary judgment, because [p]laintiff must allege specific facts which demonstrate a genuine issue of material fact."). Defendant's motion to dismiss plaintiff's slander and 19 Del. C. § 709 claims is granted.

V. CONCLUSION

*11 For the reasons set forth above, the court grants defendant's motion for summary judgment against plaintiff's ADA, breach of implied covenant of good faith and fair dealing, slander, and 19 Del. C. § 709 claims. The court denies defendant's motion for summary judgment against plaintiff's FMLA claim. An appropriate order shall issue.

ORDER

At Wilmington this 13th day of April, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant's motion for summary judgment against plaintiff's ADA, breach of implied covenant of good faith and fair dealing, slander, and 19 Del. C. § 709 claims (D.I.46) is granted.

2. Defendant's motion for summary judgment against plaintiff's FMLA claim (D.I.46) is denied.

D.Del.,2005.
Collier v. Target Stores Corp.
Slip Copy, 2005 WL 850855 (D.Del.), 30 NDLR P 60, 10 Wage & Hour Cas.2d (BNA) 1192, 16 A.D. Cases 1319

Briefs and Other Related Documents (Back to top)

• 1:03CV01144 (Docket) (Dec. 17, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy    Page 1

Slip Copy, 2005 WL 1993774 (E.D.Pa.)
(Cite as: Slip Copy)

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Robert J. MITCHELL, Plaintiff,
v.
Mayor John F. STREET and The City of Philadelphia, Defendants.
No. Civ.A. 04-3213.

Aug. 16, 2005.

James E. Beasley, William T. Hill, The Beasley Firm, Philadelphia, PA, for Plaintiff.
Shelley R. Smith, City of Philadelphia Law Department, Philadelphia, PA, for Defendants.

MEMORANDUM

KELLY, J.

I. *INTRODUCTION*

*1 Presently pending before this Court is the Defendants', Mayor John F. Street ("Mayor Street") and the City of Philadelphia, Motion for Summary Judgment. On July 7, 2004, Mitchell filed his Complaint with this Court. Mitchell's Complaint contains three counts. Specifically, the counts are: Violation of the First & Fourteenth Amendment and 42 U.S.C. § 1983 (Count I); Violation of Article I, Section I, of the Pennsylvania Constitution (Count II); and Violation of Article I, Section XI, of the Pennsylvania Constitution (Count III). Defendants have moved for summary judgment on all three counts. For the following reasons, Defendants' Motion is denied. However, as will be explained in *infra* Part IV.B, Counts II and III of the Complaint will be dismissed without prejudice.

II. *BACKGROUND*

Plaintiff, Robert J. Mitchell ("Mitchell") is the former Deputy Police Commissioner for the City of Philadelphia. Mitchell held that title from 1996 until 2004. In early 2004, a rumor began to circulate that Mitchell had obtained an illegal gun permit. In late February, 2004, the media picked up the story and reported that Mitchell allegedly possessed an illegal gun permit. Initially, Police Commissioner Sylvester Johnson ("Johnson") announced his support for Mitchell at a press conference on February 26, 2004. That same day, Mayor Street called a meeting to discuss the gun permit issue. Present at this meeting were Mayor Street, Johnson, Mitchell, Mayor Street's Chief of Staff Joyce Wilkerson ("Wilkerson"), Communications Director Barbara Grant ("Grant") and Police Counsel Karen Simmons, Esquire ("Simmons"). At the meeting, Mitchell denied any wrongdoing with respect to the gun permit. The parties dispute the actual outcome of this meeting as it related to Mitchell's continued employment, however, what is certain is that on February 27, 2004, at a press conference, Mayor Street stated that Mitchell would be taking a leave of absence from his position as Deputy Police Commissioner. An investigation then commenced into the gun permit issue.

On March 11, 2004, Mitchell filed a complaint in Equity with the Court of Common Pleas of Philadelphia County. The complaint sought to enjoin Mayor Street and the City of Philadelphia from removing him from his post as Deputy Police Commissioner pending the results of the investigation regarding the gun permit.[FN1]

FN1. That complaint was dismissed as moot by the Court of Common Pleas on June 11, 2004. (*See* Defs.' Mot. Summ. J. Ex. E).

On May 26, 2004, Philadelphia District Attorney Lynne Abraham announced the results of her investigation into the gun permit issue. The District

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 629

Slip Copy                                                                                                    Page 2

Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

Attorney concluded that Mitchell had engaged in no wrongdoing whatsoever.

On May 27, 2004, Mitchell appeared on the Michael Smerconish ("Smerconish") radio program. [FN2] During this appearance, Smerconish and Mitchell discussed the District Attorney's public announcement regarding the gun permit issue and her findings that Mitchell engaged in no wrongdoing. On June 1, 2004, Mitchell received a letter from Johnson terminating his employment. Mitchell subsequently filed his Complaint with this Court approximately one month later.

> FN2. Mitchell previously appeared on the Smerconish show on March 4, 2004 after the announcement by Street that Mitchell was suspended from his position as Deputy Police Commissioner.

### III. STANDARD

*2 "Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.' " *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 267 (3d Cir.1991) (citations omitted). The inquiry is " whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. [FN3] *Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992). Once the moving party has produced evidence in support of summary judgment, the non-movant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial. *Id.* at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> FN3. "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.' " *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F.Supp. 554, 561 n. 14 (E.D.Pa.1998) (citations omitted), *aff'd,* 172 F.3d 40 (3d Cir.1998).

### IV. DISCUSSION

Defendants have moved for summary judgment on all three counts. Under Count I, Defendants assert that no genuine issue of material fact exists regarding Plaintiff's claim for retaliation under both his First Amendment right to free speech and his right to petition. Second, under Counts II and III, Defendants assert that there is no cause of action for damages under the Pennsylvania Constitution. Finally, Mayor Street asserts he is shielded from liability based upon the doctrine of qualified immunity. These arguments will be considered in turn. [FN4]

> FN4. The Defendants do not contest that the Plaintiff has met the threshold for there to be municipal liability under *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, I will not engage in a discussion of this issue.

#### A. COUNT I

Count I actually contains two separate causes of action. First, Mitchell asserts that the Defendants retaliated against him and terminated his employment based upon the filing of his equity complaint with the Court of Common Pleas of Philadelphia County. Mitchell asserts this violated his right to petition the government for a redress of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 630

Slip Copy                                                                                                    Page 3
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

grievances. Additionally, Mitchell asserts that he was fired in retaliation for exercising his free speech rights by appearing on the Smerconish radio program. The parties are in agreement as to the elements that make up both of these claims. Both claims require the following three-step analysis:

[f]irst, plaintiff must show that he engaged in a protected activity. Second, plaintiff must show that the protected activity was a substantial factor motivating the dismissal decision. Finally, defendant may defeat plaintiff's claim by demonstrating that the same action would have taken place even in the absence of the protected conduct.

*San Filippo v. Bongionvanni,* 30 F.3d 424, 430 (3d Cir.1994) (citations omitted). [FN5] I will consider these elements as they relate to Plaintiff's right to petition and free speech causes of action.

> FN5. As set out in *San Filippo,* "a public employer may dismiss an employee for speech addressing a matter of public concern if the state's interest, as an employer, in promoting the efficiency of its operations outweighs the employee's interest, as a citizen, in commenting upon matters of public concern." 30 F.3d at 434 n. 11 (citation omitted). However, "[t]his balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." *Id.; see also, Dennison v. Pa. Dep't of Corr.,* 268 F.Supp.2d 387, 399 (M.D.Pa.2003). The Defendants deny that they fired Mitchell because of his allegedly protected speech so as to deem the balancing test inapplicable. Furthermore, neither party asserts that the balancing test should be utilized in this case.

1. Protected Activity

*3 The first step requires this Court to consider whether Mitchell engaged in a protected activity under his right to petition and free speech claims.

As to his right to petition, Defendants concede that the filing of Mitchell's equity complaint with the Court of Common Pleas of Philadelphia County was a protected activity. However, Defendants vigorously contest that Mitchell engaged in any protected activity under his free speech claim.

The United States Court of Appeals for the Third Circuit ("Third Circuit") has noted that in a claim for retaliatory discharge from government employment, the plaintiff "must establish that the conduct which triggered the discharge was protected under the first amendment." *San Filippo,* 30 F.3d at 434. Specifically:

[w]here the alleged retaliation is based on expressive conduct constituting speech, a court must first determine whether or not the speech can be fairly characterized as addressing a 'matter of public concern,' for a governmental employee who makes public comments about problems not of 'public concern' has no first amendment immunity against employer discipline.

*Id.* "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Baldassare v. N.J.,* 250 F.3d 188, 195 (3d Cir.2001)(internal quotation marks and citation omitted). Thus, a court must focus on the "content, form, and context of the activity in question." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995)). Furthermore, "[t]he content of the speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Id.* (internal quotation marks and citations omitted). Determining whether the public employee's speech involved a matter of public concern is a question of law for the court. *Id.* (citing *Watters,* 511 U.S. at 668; *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997)).

The parties dispute whether Mitchell's appearance on the Smerconish radio program to discuss the gun permit issue and the District Attorney's findings constituted a matter of public concern. Defendants assert that this case is similar to *Connick v. Myers,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 4

Slip Copy, 2005 WL 1993774 (E.D.Pa.)
(Cite as: Slip Copy)

461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, and that I should therefore find as a matter of law that Mitchell's speech did not involve a matter of "public concern." However, for the following reasons, I find that *Connick* is distinguishable from the instant case.

In *Connick*, the plaintiff, Shiela Myers ("Myers"), was employed as an Assistant District Attorney in New Orleans for five and one half years. 461 U.S. at 140. Myers was informed that she would be transferred to prosecute cases in a different section of the criminal court. *Id.* Myers opposed this transfer and she then "prepared a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. She then distributed the questionnaire to her co-workers the next day. *Id.* Later that day, Myers was terminated by Harry Connick ("Connick") the District Attorney for Orleans Parish for refusing the transfer. Myers brought suit under 42 U.S.C. § 1983, asserting that she was wrongfully terminated because she had exercised her constitutionally protected right to free speech by distributing the questionnaire. *Id.*

*4 The United States Supreme Court ("Supreme Court") noted that practically all of Myers questions did "not fall under the rubric of matters of 'public concern.' " *Id.* at 145. The Supreme Court noted that the questionnaire did not seek to inform the public that the District Attorney's office was discharging its governmental responsibilities in the investigation or prosecution of criminal cases in an improper manner nor did the questionnaire seek to bring to light actual or potential wrongdoing on the part of Connick or others. *Id.* The Supreme Court continued by noting that the questions posed by Myers reflected her dissatisfaction with her transfer and her "attempt to turn that displeasure into a cause celebre." *Id.*

Unlike the majority of the questions posed in *Connick*, however, I find that the issues discussed on the Smerconish radio program did involve matters of public concern. Unlike *Connick*, the gun permit issue involved possible illegal activity and corruption on the part of a high ranking government official, namely Mitchell. As previously noted, the courts have stated that matters of public concern can include attempts to bring to light actual or potential wrongdoing on the part of government officials. *See Baldassare,* 250 F.3d at 195 (citations omitted). Thus, it follows that the discussion on the Smerconish radio program regarding the District Attorney's investigation and findings regarding the possible wrongdoing and/or illegality of how Mitchell received the gun permit involved matters of "public concern." The instant case goes beyond the intra-office dissatisfaction in *Connick* since there is the additional element of potential wrongdoing/illegality that brought the gun permit issue to the forefront of the pubic sphere in the first place. Therefore, as Mitchell's appearance on the Smerconish radio program involved a matter of "public concern," Mitchell engaged in a protected activity under the law.

2. Substantial Factor Motiving the Dismissal

The next step in the analysis is to determine whether Mitchell's protected activities were a substantial factor which motivated the decision to terminate Mitchell's employment. The Defendants assert that Mitchell cannot satisfy this element. The Plaintiff asserts that he can survive summary judgment with respect to this element by discrediting the Defendants' reasons for his termination. For the following reasons, I agree with Plaintiff's position.

To survive summary judgment, "a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted). In this case, Mitchell attempts to discredit the Defendants reason for his termination. FN6

FN6. While *Fuentes* was a Title VII case,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 632

Slip Copy   Page 5
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

courts have noted that "[p]retext analysis used in Title VII cases is also useful in deciding First Amendment retaliation claims." *Cavicchia v. Phila. Hous. Auth.,* No. 03-0116, 2003 WL 22595210, at *9 n. 2 (E.D.Pa. Nov.7, 2003), *aff'd,* 2005 WL 1506038 (3d Cir. June 27, 2005) (non-precedential)(citing *Azzaro v. County of Allegheny,* 110 F.3d 968, 981 (3d Cir.1997)(en banc); *Feldman v. Phila. Hous. Auth.,* 43 F.3d 823, 831 (3d Cir.1994); *Zappan v. Pa. Bd. of Prob. & Parole,* No. 00-1409, 2002 WL 32174230, at *11 (E.D.Pa. Nov.25, 2002); *Rodriguez v. Torres,* 60 F.Supp.2d 334, 340 n. 2 (D.N.J.1999) *Fogarty v. Boles,* 938 F.Supp. 292, 299 n. 4 (E.D.Pa.1996), *aff'd,* 121 F.3d 886 (3d Cir.1997)).

*5 The Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. Thus, it is the Defendants' position that Mitchell could not be retaliated against for his protected activities because the decision to fire him occurred before any of the protected activities occurred. However, I find that there are factual inconsistencies in the record that would allow a reasonable fact finder to find Defendants' proffered reason unworthy of credence. *See Fuentes,* 32 F.3d at 765 (citations and footnote omitted). For example, the Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. This meeting was called to discuss the gun permit issue. No party suggests that budgetary concerns were discussed at this meeting as it related to Mitchell's further employment as Deputy Police Commissioner. Yet, Johnson's press conference on June 1, 2004 detailing Mitchell's termination and the corresponding news coverage explains that Mitchell was fired for budgetary reasons. (*See* Pl.'s Resp. Defs.' Mot. Summ. J., Ex. O). This and other inconsistencies in the record discredit Defendants' proffered theory of Mitchell's termination enough so as to create material issues of fact as to this element. FN7

FN7. Additionally, with respect to the free speech retaliation claim, the Third Circuit has noted that the temporal proximity between the employee's protected activity and the adverse employment action "is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997) (internal quotation marks and citations omitted). In this case, Mitchell appeared on the Smerconish radio program and was terminated less than one week later. It is worth noting, however, that Mitchell's termination was also soon after the District Attorney made her findings with respect to the gun permit issue.

3. Same Action Would have been Taken Absent the Protected Activity

Defendants do not address this third element of Plaitniff's right to petition and free speech claims. Therefore, I find it unnecessary to address it in the context of deciding Defendants' Summary Judgment Motion. As there are material issues of fact remaining as to all three elements of Plaintiff's right to petition and free speech retaliation claims, I find summary judgment is inappropriate as it relates to Count I of Mitchell's Complaint.

B. COUNTS II AND III

Counts II and III seek money damages under the Pennsylvania Constitution, Article I, Section I and Article I, Section XI respectfully. The Defendants assert that summary judgment should be granted in their favor because Plaintiff cannot maintain a cause of action under the Pennsylvania Constitution for money damages. For the following reasons, based upon the discretion given to me as stated under 28 U.S.C. § 1367(c)(1), I will decline to exercise supplemental jurisdiction over these two counts and dismiss them without prejudice.

Section 1367(c)(1) states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if the claim raises a novel or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

complex issue of state law." As one court in this District has recently noted, "[t]he question of whether there exists a 'right of action for money damages against government officials of the Pennsylvania Constitution' is unclear." *Gremo v. Karlin,* 363 F.Supp.2d 771, 794 (E.D.Pa.2005) (quoting *Robbins v. Cumberland County Children & Youth Serv.,* 802 A.2d 1239, 1251 (Pa.Cmwlth.Ct.2002)); compare *Erdman v. Mitchell,* 207 Pa. 79, 90-91, 56 A. 327, 331 (1903) (holding that there is a right of action for injunctive relief under the first article of the Pennsylvania Constitution); *Harley v. Schuylkill County,* 476 F.Supp. 191, 195-96 (E.D.Pa.1979)(extending *Erdman* to apply to claims for damages); *Jones v. City of Phila.,* 68 Pa. D. & C.4th 47, 68-75 (writing in support of its determination that Article I of the Pennsylvania Constitution is self-executing and permits private parties to seek civil remedies for constitutional violations); with *Millar v. Windsor Township,* No. 04-2529, 2005 WL 1513120, at *3-4 (M.D.Pa. June 24, 2005)(stating that there is a dearth of case law on the issue and declining to exercise jurisdiction over the state constitutional claims because deference to the state appellate courts is appropriate); *Tillman v. Alonso,* No. 04-4391, 2005 WL 1311588, at *5-6 (E.D.Pa. May 31, 2005)(explaining the uncertainty of the state of the law on the issue of bringing a state constitutional claim under Article I and declining to exercise jurisdiction over state constitutional claims because of this uncertainty); *Mulgrew v. Fumo,* No. 03-5039, 2004 WL 1699368, at *2-4 (E.D.Pa. July 29, 2004)(explaining that the issue of whether a direct right of action under Article I of the Pennsylvania Constitution is unclear and declining to exercise supplemental jurisdiction over these state constitutional claims).

*6 In light of the unclear state of the law on Mitchell's state constitutional claims, I find that the most appropriate course of action in this particular case is to decline supplemental jurisdiction over Counts II and III of the Complaint pursuant to 28 U.S.C. 1368(c)(1).[FN8] Therefore, Counts II and III will be dismissed without prejudice.

FN8. This decision is particularly prudent in light of the fact that it appears that the issue of "whether a cause of action for money damages arises under the state constitution is an issue currently pending before the Commonwealth Court of Pennsylvania." *Millar,* 2005 WL 1513120, at *3 n. 5 (citing *City of Phila. v. Jones,* No. 795-CD-2004 (Pa. Commw. Ct. filed Apr. 19 2004). "Argument was heard by the [Commonwealth] court *en banc* on June 8, 2005." *Id.*

### C. QUALIFIED IMMUNITY

Finally, Defendant Mayor Street asserts that he is entitled to qualified immunity. "Qualified immunity is available to government officials performing discretionary functions." *Lodato v. Ortiz,* 314 F.Supp.2d 379, 385-86 (D.N.J.2004)(citing *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818 (citing *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)).
A court required to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [government official's] conduct violated a constitutional right? This must be the initial inquiry.. .. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties's submissions, the next, sequential step is to ask whether the right was clearly established.

*Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(internal citation omitted).

Regarding the first part of the qualified immunity test, as set out in *supra* Part IV.A., I have found that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 634

Slip Copy

Page 7

Slip Copy, 2005 WL 1993774 (E.D.Pa.)
(Cite as: Slip Copy)

Mitchell has alleged a violation of his constitutional rights to be free from retaliation for filing his equity complaint and for speaking out on a matter of public concern. Therefore, the first part of overcoming Mayor Street's qualified immunity has been satisfied by Mitchell.

Next, I note that the Defendants do not attempt to make any type of argument as to the second part of the qualified immunity test. Specifically, the Defendants sole argument with respect to qualified immunity is that, "[b]ecause the plaintiff cannot establish that his constitutional rights were violated, Defendant Mayor Street is entitled to qualified immunity, and, therefore, judgment in his favor." (Mem. Law. Supp. Defs.' Mot. Summ. J., at 11). Thus, Mayor Street does not attempt to contest that both of these rights were clearly established at the time he acted. However, it is clear that both of these rights were established at the time Mayor Street acted. *See Watters,* 55 F.3d at 891 (stating that "it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal.... Judicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech.") (citations omitted); *San Filippo,* 30 F.3d at 441-443 ("The mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee."); *Bennis v. Gable,* 823 F.2d 723, 733 (3d Cir.1987)(stating that the law was clearly established that a public employee could not be retaliated against for exercising his rights under the First Amendment). Thus, I find Defendant Mayor Street shall not be entitled to qualified immunity.

V. *CONCLUSION*

\*7 In conclusion, I find that summary judgment is improper as to Count I of the Complaint. I find that material issues of fact remain in Mitchell's claims for retaliation under the First Amendment's free speech and right to petition clauses. Additionally, I conclude that because Counts II and III raise novel and complex issues of state law, I will decline supplemental jurisdiction over these state constitutional claims and dismiss them without prejudice. Finally, I have concluded that Defendant Mayor Street is not entitled to qualified immunity.

An appropriate Order follows.

ORDER

AND NOW, this 16th day of August, 2005, upon consideration of the Defendants' Motion for Summary Judgment (Doc. No. 11), and the Response and Replies thereto, it is hereby ORDERED that:
1. the Motion is DENIED; and
2. Counts II and III of the Complaint are DISMISSED WITHOUT PREJUDICE.

E.D.Pa.,2005.
Mitchell v. Street
Slip Copy, 2005 WL 1993774 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2150103 (Trial Motion, Memorandum and Affidavit) Order (Jul. 12, 2005)
• 2:04cv03213 (Docket) (Jul. 07, 2004)
• 2:04cv01110 (Docket) (Mar. 15, 2004)
• 2004 WL 2695311 (Trial Pleading) Complaint (2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.