## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **SERGEANT CHRISTOPHER D. FORAKER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH,** | : | **C.A.No.04-1207-GMS** |
| **individually and in his official capacity as** | : | |
| **Superintendent of the Delaware State Police;** | : | |
| **LIEUTENANT COLONEL THOMAS F.** | : | |
| **MACLEISH, individually and in his official** | : | |
| **capacity as Deputy Superintendent of the** | : | |
| **Delaware State Police; DAVID B. MITCHELL,** | : | |
| **in his official capacity as the Secretary of the** | : | |
| **Department of Safety and Homeland Security of** | : | |
| **the State of Delaware; and DIVISION OF** | : | |
| **STATE POLICE, DEPARTMENT OF SAFETY** | : | |
| **AND HOMELAND SECURITY, STATE OF** | : | |
| **DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY**
**AT LAW**
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Attorneys for Plaintiffs

Dated: February 8, 2006

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING.........................................................................1

SUMMARY OF THE ARGUMENT.........................................................................................1

STATEMENT OF FACTS.......................................................................................................1

ARGUMENT........................................................................................................................2

    I.       STANDARD OF REVIEW.........................................................................................2

    II.     THE FILING, PROSECUTION AND SETTLEMENT OF PLAINTIFF'S FIRST
           AMENDMENT FREE SPEECH RETALIATION LAWSUIT CHALLENGING THE
           ILLEGAL ACTIONS OF THE HIGHEST RANKING POLICE OFFICER IN THE
           STATE CONSTITUTES PROTECTED SPEECH AND PETITIONING OF THE
           GOVERNMENT FOR REDRESS OF GRIEVANCES UNDER THE FIRST
           AMENDMENT.........................................................................................................3

    III.    DEFENDANTS' RETALIATION AGAINST PLAINTIFF WOULD CHILL A
           PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST
           AMENDMENT RIGHTS.............................................................................................3

          A.     The "Chill a Person of Ordinary Firmness" Standard ............................................3

          B.     Defendants' Long Course of Retaliation Against Sgt. Foraker Would Chill a
               Person of Ordinary Firmness.................................................. ..............................5

          C.     The Cases Cited by Defendants.......................................................... 9

          D.     Summary.........................................................................................................13

    IV.    THE RECORD IS OVERFLOWING WITH CAUSAL EVIDENCE WHICH
           DEMONSTRATES THAT PLAINTIFF'S PROTECTED FIRST AMENDMENT
           ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE
           RETALIATION AGAINST HIM.................................................................................14

          A.     Substantial or Motivating Factor.........................................................................14

               1.     Motive in General.................................................................................14

              2.     Chaffinch's Involvement........................................................................15

                   a.     MacLeish's Participation.........................................................15

                    b.     Chaffinch's Involvement, Authorization and Acquiescence......15

          B.     Same Decision Anyway.......................................................................................17

*i*

V.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.........................17

      A.    Introduction.................................................................................................17

      B.    The Facts Show that Defendants Violated Plaintiff's First Amendment
            Rights.........................................................................................................18

      C.    Plaintiff's First Amendment Rights Were Clearly Established...........................18

            1.    Free Speech.......................................................................................21

                  a.    The Retaliatory Harassment Line of Cases................................22

            2.    Petition Clause ..................................................................................24

VI.   DEFENDANTS DEFAMED SGT. FORAKER WHEN THEY ACCUSED HIM
      OF NEGLECTING HIS DUTY BY FAILING TO ADEQUATELY CLEAN AND
      MAINTAIN THE FIREARMS TRAINING UNIT FACILITY........................................25

      A.    The Basics..................................................................................................25

      B.    Neglect of Duty...........................................................................................26

      C.    The Doctrine of Substantial Truth Does Not Apply in This Case.......................30

      D.    The Four Factor Test to Determine Whether a Statement is Fact or Opinion.....32

            1.    Social Setting and Context....................................................................33

            2.    Objective Verification and Common Usage.............................................33

      E.    Plaintiff is Not a Limited Purpose Public Figure....................................................34

VII.  DEFENDANTS PLACED PLAINTIFF IN A FALSE LIGHT WHEN THEY ON
      MULTIPLE OCCASIONS TOLD THE MEDIA THAT HE WAS TO BLAME FOR
      THE SHUTDOWN OF THE FTU FACILITY WITHOUT REFERENCING THE
      MANY PROBLEMS ASSOCIATED WITH THE FACILITY, EVEN BEFORE HE
      BECAME THE SECTION CHIEF OF THE FTU, WHILE SIMULTANEOUSLY
      ORDERING BOTH FORAKER AND HIS SUPERIORS NOT TO SPEAK WITH
      THE MEDIA ON THE SUBJECT........................................................................37

      A.    The Basics About False Light Law....................................................................37

      B.    The Factual Basis For This Tort.......................................................................38

CONCLUSION.................................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                                    **<u>Page</u>**

<u>Abrams v. U.S.</u>, 250 U.S. 616 (1919)........................................................................................12

<u>Adkins v. Rumsfeld</u>, 389 F.Supp.2d 579 (D.Del. 2005)...............................................................15

<u>Agosto-de-Feliciano v. Aponte-Rogue</u>, 889 F.2d 1209 (1st Cir. 1989) (en banc).......................4

<u>Allah v. Seiverling</u>, 229 F.3d 220 (3d Cir. 2000)..............................................................4,9,14

<u>Anderson v. Creighton</u>, 483 U.S. 635 (1987)................................................................................19

<u>Anderson v. Davila</u>, 125 F.3d 148 (3d Cir. 1997)....................................................................14,24

<u>Andrews v. City of Phila.</u>, 895 F.2d 1469 (3d Cir. 1990)..............................................................5

<u>Assaf v. Fields</u>, 178 F.3d 170 (3d Cir. 1999)................................................................................20

<u>Atkinson v. Taylor</u>, 316 F.3d 257 (3d Cir. 2003)........................................................................17

<u>Azzaro v. County of Allegheny</u>, 110 F.3d 968 (3d Cir. 1997) (en banc)......................................21

<u>Baca v. Sklar</u>, 398 F.3d 1210 (10th Cir. 2005).............................................................................4

<u>Baldassare v. State of N.J.</u>, 250 F.3d 188 (3d Cir. 2001)....................................................9,14,21-22

<u>Banks v. East Baton Rouge Parish Sch. Bd.</u>, 320 F.3d 570 (5th Cir.  2003)...............................5

<u>Barbieri v. News-Journal Co.</u>, 189 A.2d 773 (Del. 1963)......................................................37-38

<u>Bart v. Telford</u>, 677 F.2d 622 (7th Cir. 1982)................................................................................4

<u>Bennett v. Hendrix</u>, 423 F.3d 1247 (11th Cir. 2005)....................................................................4

<u>Bennett v. Murphy</u>, 274 F.3d 133 (3d Cir. 2002).........................................................................18

<u>Bennett v. Murphy</u>, 2005 WL 78581 (3d Cir. Jan. 14, 2005).......................................................18

<u>Bennis v. Gable</u>, 823 F.2d 723 (3d Cir. 1987)............................................................................3,20

<u>Bhd. of R.R. Trainmen v. Va. Ex Rel. Va. State Bar</u>, 377 U.S. 1 (1964)....................................24

<u>Bieregu v. Reno</u>, 59 F.3d 1445 (3d Cir. 1995).............................................................................20

<u>Bloch v. Ribar</u>, 156 F.3d 673 (6th Cir. 1998)...............................................................................4

<u>Boyle v. County of Allegheny, Pa.</u>, 139 F.3d 386 (3d Cir. 1998)................................................2

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003).................................................................5,10,21,23-24

C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159 (3d Cir. 2005)....................................................15

C.H. v. Olivia, 226 F.3d 198 (3d Cir. 2000) (en banc)...............................................................15

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972)......................................24

Carroll v. Pfeffer, 262 F.3d 847 (8th Cir. 2001)........................................................................4

Collins v. State of Ill., 830 F.2d 692 (7th Cir. 1987)..................................................................4

Connolly v. Labowitz, 519 A.2d 138 (Del. Super. 1986)............................................................36

Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474 (4th Cir. 2005)........5

Coszalter v. City of Salem, 320 F.3d 968 (9th Cir. 2003)...........................................................5

Crawford-El v. Britton, 523 U.S. 574 (1998)............................................................................19

Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983)...................................................................21

Doe v. Delie, 257 F.3d 309 (3d Cir. 2001)...........................................................................19-20

Ellis v. Crawford, 2005 WL 525406 (N.D.Tex. Mar. 3, 2005)......................................................5

Elrod v. Burns, 427 U.S. 347 (1976)........................................................................................6

Feldman v. Phila. Housing Auth., 43 F.3d 823 (3d Cir. 1994)...................................................21

Foraker v. Chaffinch, C.A.No.02-302-JJF (D.Del. June 18. 2003)(slip op.)................................22

Gannett Co., Inc. v. Re, 496 A.2d 553 (Del. 1985)...................................................................31

Garcia v. City of Trenton, 348 F.3d 726 (8th Cir. 2003)............................................................5

Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)...........................................................32,34,37

Godbehere v. Phoenix Newspapers, Inc., 783 P. 2d 781 (Ariz. 1989)........................................38

Good v. Dauphin County, 891 F.2d 1087 (3d Cir. 1989).........................................................19-20

Guthridge v. Pen-Mod, Inc., 239 A.2d 709 (Del.Super. 1967)...................................................37

Harlow v. Fitzgerald, 457 U.S. 800 (1982)..............................................................................19

Hicks v. Finney, 770 F.2d 375 (3d Cir. 1985)..........................................................................20

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005).........................................................2-3,16,24

Hinshaw v. Smith, – F.3d –, 2006 WL 212372 (8th Cir. Jan. 30, 2006)....................................12

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)..........................................................21

Hope v. Pelzer, 536 U.S. 730 (2002)...........................................................................................19

Jackson v. Filiben, 281 A.2d 604 (Del. 1971).............................................................................37

Jensen v. Potter, — F.3d —, 2006 WL 224002 (3d Cir. Jan. 31, 2006)........................................8

Johnson v. Lincoln Univ. of Com. System of Higher Educ., 776 F.2d 443 (3d Cir. 1985).......................21

Kadetsky v. Egg Harbor Township Bd. of Educ., 82 F.Supp.2d 327 (D.N.J. 2000)....................................4

Kanaga v. Gannett Co., Inc., 687 A.2d 173 (Del. 1996)..................................................25-26,32

Katzenmoyer v. City of Reading, 2001 WL 1132374 (E.D.Pa. Sept. 21, 2001)...........................................4

Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992)................................................................15

Keenan v. Tejeda, 290 F.3d 252 (5th Cir. 2002)...........................................................................4

Kelleher v. City of Reading, 2002 WL 1067442 (E.D.Pa. May 29, 2002)...................................................4

Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist., 2006 WL 167443 (3d Cir. Jan. 24, 2006)............4

Leveto v. Lapina, 258 F.3d 156 (3d Cir. 2001)...........................................................................20

Lewis v. Casey, 518 U.S. 343 (1996)...........................................................................................20

Marrero v. Camden County Bd. of Social Serv., 164 F.Supp.2d 455 (D.N.J. 2001)....................................4

Martin v. Widener School of Law, 1992 WL 153540 (Del. Super. Jun. 17, 1992)...............................34-35

McDonald v. Smith, 472 U.S. 479 (1985)....................................................................................24

McKee v. Hart, — F.3d —, 2006 WL 27474 (3d Cir. Jan. 6, 2005).............................................9-10,22-24

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)..................................................................25,32

Monsanto v. Quinn, 674 F.2d 990 (3d Cir. 1982)....................................................................21

Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999)............................................................................5

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)............................................14,21

NAACP v. Button, 371 U.S. 415 (1963).....................................................................................24

New York Times Co. v. Sullivan, 376 U.S. 254 (1964).............................................................12,37

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000)..........................................................17

O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989)...........................................................21

Paff v. Kaltenback, 204 F.3d 425 (3d Cir. 2000)....................................................................19

Pickering v. Bd. of Educ., 391 U.S. 563 (1968).......................................................................21

Power v. Summers, 226 F.3d 815 (7th Cir. 2000)......................................................................4

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996)........................................................................21

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)......................................2,16

Ramada Inns, Inc. v. Dow Jones & Company, Inc., 543 A.2d 313 (Del. Super. 1988).........................30-32

Ramunno v. Cawley, 705 A.2d 1029 (Del. 1998)...........................................25-26,31-34

Rankin v. McPherson, 483 U.S. 378 (1987)..............................................................................21

Read v. Carpenter, 1995 WL 945544 (Del.Super. June 8, 1995)..............................................26

Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367 (1969).....................................................12

Rhodes v. Robinson, 408 F.3d 559 (9th Cir. 2005)......................................................................5

Riley v. Moyed, 529 A.2d 248 (Del. 1987)..........................................................................31-32

Rivera-Jimenez v. Pierluisi, 362 F.3d 87 (1st Cir. 2004).............................................................4

Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)..............................................5,15

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)................................................................21

Rodriguez v. Torres, 60 F.Supp.2d 334 (D.N.J. 1999)............................................................4-5

Rogers v. Powell, 120 F.3d 446 (3d Cir. 1997).........................................................................17

Rutan v. Republican Party, 497 U.S. 62 (1990)..........................................................................3

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)..........................................................24

Saucier v. Katz, 533 U.S. 194 (2001)..................................................................................17-18

Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069 (3d Cir. 1988)..........................................35

Shehee v. City of Wilm., 67 Fed.Appx. 692 (3d Cir. May 13, 2003)...........................................4

Smith v. Plati, 258 F.3d 1167 (10th Cir. 2001)............................................................................4

Snavely v. Booth, 176 A. 649 (Del.Super. 1935)..................................................................34

Spence v. Funk, 396 A.2d 967 (1978).............................................................................25-27

Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3d Cir. 1989)..................................20

Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000)................................................10-12

Sunkett v. Misci, 183 F.Supp.2d 691 (D.N.J. 2002)...............................................................4

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)....................................3-5,9-10,13-14,23-24

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002)...................................................6,13

Trujillo v. Bd. of Educ. of Albuquerque Public Sch., 377 F.Supp.2d 994 (D.N.M. 2005).......5

Trzeciak v. Village of LaGrange, 2003 WL 1193319 (N.D.Ill. Mar. 13, 2003).........................5

United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217 (1967)......................24

U.S. v. Lanier, 520 U.S. 259 (1997).....................................................................................20

U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454 (1995)..............................................6

Washington v. County of Rockland, 373 F.3d 310 (2d Cir. 2004)...........................................4

Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995)............................................................21

We, Inc. v. City of Phila., 174 F.3d 322 (3d Cir. 1999).........................................................24

Whitney v. California, 274 U.S. 357 (1927)..........................................................................12

Wilson v. Layne, 526 U.S. 603 (1999)..........................................................................17,19-20

Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157 (1979)...............................................35

Wright v. City of Phila., 409 F.3d 595 (3d Cir. 2005)............................................................18

Wyshock v. Malekzadeh, 1992 WL 148002 (Del. Super. Jun. 10, 1992)................................38

X-Men Sec., Inc. v. Pataki, 196 F.3d 56 (2d Cir. 1999)....................................................10-12

Zugarek v. Southern Tioga Sch. Dist., 214 F.Supp.2d 468 (M.D.Pa. 2002)............................4

## Constitutions, Statutes and Rules

U.S. Const., Amend. I.................................................................................................passim

State of Del. Const., Article I, Section 9................................................................................25

Fed.R.Civ.P. 56(c)............................................................................................................................2

11 <u>Del</u>. <u>C</u>. § 9200......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9201......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9202......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9203......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9204......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9205......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9206......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9207......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9208......................................................................................................................36,38

11 <u>Del</u>. <u>C</u>. § 9209......................................................................................................................36,38

24 <u>Del</u>. <u>C</u>. § 1768..........................................................................................................................36

<u>Prosser and Keeton on the Law of Torts</u>, § 111 (1971)..................................................................25

<u>Restatement (Second) of Torts</u> § 559 (1977)..............................................................................25

<u>Restatement (Second) of Torts</u> § 652D Comment A (1977).........................................................38

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff relies upon the Nature and Stage of the Proceedings set forth in his Opening Brief in Support of his Motion for Summary Judgment.  (D.I. 64).  This is plaintiff's answering brief and appendix ("B___") in opposition to defendants' motion for summary judgment.[1]

## SUMMARY OF THE ARGUMENT

Defendants concede Sgt. Foraker clearly engaged in protected First Amendment activity by filing his earlier lawsuit and there is abundant record evidence for plaintiff to meet his causal burden of proving that his earlier lawsuit was a substantial or motivating factor in the retaliation against him.  Additionally, defendants' long and continuing course of retaliatory harassment against Sgt. Foraker is more than sufficient to chill a person of ordinary firmness from exercising their First Amendment rights.  Likewise, long established First Amendment retaliation law makes it clear that the defense claims of qualified immunity in this regard also are without merit.

As to plaintiffs' supplemental state law claims, the record evidence establishes that defendants defamed Sgt. Foraker and placed him in a false light when they accused him of neglecting his duty by failing to clean and maintain the FTU which allegedly lead to the shutdown and destruction of that multimillion dollar firearms training facility.

## STATEMENT OF FACTS

In the interests of brevity and judicial economy, plaintiff relies upon and incorporates by reference the exhaustive Statement of Facts contained in his opening briefs in this case and in the companion Price action, as well as his contemporaneously filed answering brief in opposition to the defense summary judgment motion in the companion Price action.

---

[1] Defendants' summary judgment opening brief will be cited as "DOB" and plaintiff's own summary judgment opening brief will be cited as "POB."

**ARGUMENT**

**I.      STANDARD OF REVIEW.**

A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c).  "All facts and inferences are construed in the light most favorable to the non-moving party." Boyle, 139 F.3d at 393.  At summary judgment, "a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." Id.  To raise a genuine issue of material fact, "the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the 'mere scintilla' standard." Id. (internal punctuation omitted).

The Third Circuit recently revisited summary judgment standards in the First Amendment retaliation context.  The recent opinion in Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005), held that when an employer moves for summary judgment, even the uncontradicted testimony of interested witnesses supporting the employer, such as supervisors, employees and other workers, should not be considered or otherwise weighed in the summary judgment balancing.  "[W]hen evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant." Hill, 411 F.3d at 131 n.22 (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149-151 (2000)); see also Hill, 411 F.3d at 129 n.16.

Thus, the Hill decision reaffirms long existing Third Circuit and Supreme Court precedent and dictates that the defense reliance herein upon testimony and affidavits from its own employees is misplaced at the summary judgment stage due to their obvious bias, fear of losing their jobs or other possible retaliation.  Thus, their testimony should be excluded from the Court's analysis of summary judgment issues.  Additionally, defendants' own testimony should

be disregarded because, as defendants, they certainly are "interested witness[es]" under <u>Hill</u>. 411

F.3d at 131 n.22.

## II. THE FILING, PROSECUTION AND SETTLEMENT OF PLAINTIFF'S FIRST AMENDMENT FREE SPEECH RETALIATION LAWSUIT CHALLENGING THE ILLEGAL ACTIONS OF THE HIGHEST RANKING POLICE OFFICER IN THE STATE CONSTITUTES PROTECTED SPEECH AND PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES UNDER THE FIRST AMENDMENT.

Defendants have conceded that the filing, successful prosecution and settlement of

plaintiff's earlier First Amendment retaliation lawsuit against defendant Chaffinch constitutes

protected activity under the First Amendment.  (DOB at 15).  No doubt this is because of the

wealth of case law in this regard on this key legal issue.

## III. DEFENDANTS' RETALIATION AGAINST PLAINTIFF WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST AMENDMENT RIGHTS.

Not surprisingly, no where in the defense brief have defendants discussed or even set

forth the well-established legal standards governing adverse action in the First Amendment

retaliation context.  In the interest of actually discussing the relevant legal principles, that law is

discussed below.

**A. The "Chill a Person of Ordinary Firmness" Standard.**  In the First Amendment

context, "the constitutional violation is not in the harshness of the sanction applied, but in the

imposition of *any* disciplinary action for the exercise of permissible free speech." <u>Bennis v.</u>

<u>Gable</u>, 823 F.2d 723, 731 (3d Cir. 1987) (public employee context) (emphasis added).  It "is

implicated whenever a government employee is disciplined for his speech." <u>Id.</u>  As the U.S.

Supreme Court took pains to note (and as the Third Circuit has recognized),

> [T]he First Amendment ... protects state employees [not only from dismissals] but also from even an act of retaliation as trivial as <u>failing to hold a birthday party</u> for a public employee ... <u>when intended to punish her for exercising her free speech rights</u>.

<u>Rutan v. Republican Party</u>, 497 U.S. 62, 76 n.8 (1990) (public employee context) (internal

punctuation omitted) (emphasis added); <u>accord</u> <u>Suppan v. Dadonna</u>, 203 F.3d 228, 234 (3d Cir.

2000) (public employee context). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." Suppan, 203 F.3d at 235 (quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)); cf. Collins v. State of Ill., 830 F.2d 692, 703 (7th Cir. 1987) ("One does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture.").

Adverse action is found if "retaliatory conduct [is] *sufficient to deter a person of ordinary firmness* from exercising his First Amendment rights." Suppan, 203 F.3d at 235 (internal punctuation omitted) (emphasis added); accord Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000); Shehee v. City of Wilm., 67 Fed.Appx. 692, 694 (3d Cir. May 13, 2003) (public employee context); see Lapinski v. Bd. of Educ. of the Brandywine Sch. Dist., 2006 WL 167443, *2 (3d Cir. Jan. 24, 2006) (public employee context) (reversing the district court for failing to apply the person of ordinary firmness standard in a First Amendment retaliation case).[2] Put another way, the retaliatory actions must be sufficient to "cause reasonably hardy individuals" to refrain from protected activity. Agosto-de-Feliciano, 889 F.2d at 1217.[3] This is an objective

---

[2] Numerous other courts have adopted this standard. See e.g. Bennett v. Hendrix, 423 F.3d 1247, 1254-55 (11th Cir. 2005); Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002); Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir. 2001); Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir. 2001); Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998); . Agosto-de-Feliciano v. Aponte-Rogue, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc); Bart, 677 F.2d at 625; Rodriguez v. Torres, 60 F.Supp.2d 334, 349 (D.N.J. 1999); Kadetsky v. Egg Harbor Township Bd. of Educ., 82 F.Supp.2d 327, 337 (D.N.J. 2000); Katzenmoyer v. City of Reading, 2001 WL 1132374, *2 (E.D.Pa. Sept. 21, 2001); Marrero v. Camden County Bd. of Social Serv., 164 F.Supp.2d 455, 467 (D.N.J. 2001); Sunkett v. Misci, 183 F.Supp.2d 691, 708 (D.N.J. 2002); Kelleher v. City of Reading, 2002 WL 1067442, *5 (E.D.Pa. May 29, 2002); Zugarek v. Southern Tioga Sch. Dist., 214 F.Supp.2d 468, 476-77 (M.D.Pa. 2002).

[3] The person of ordinary firmness standard is an easier standard to meet than the statutorily based adverse employment action Title VII test. See Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004) ("the standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII)."); Baca v. Sklar, 398 F.3d 1210, 1220 (10th Cir. 2005) ("we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII."); Power v. Summers, 226 F.3d 815, 820-21 (7th Cir. 2000) (noting that the explicit Title VII

test, not a subject one.  Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003).[4]

"Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts."  Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003); see Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990) ( "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario").  The retaliatory acts must "be more than de minimis or trivial."  Brennan, 350 F.3d at 419.  Importantly however, liability also may be established "based upon a continuing course of conduct even though some or all of the conduct complained of would be de minimis by itself or if viewed in isolation."  Id. at 419 n.16; see Suppan, 203 F.3d at 235 (noting that what is "trivial in detail may have been substantial in gross").  Herein, looking at all the facts and the big picture continuing course of retaliatory harassment directed towards plaintiff, it is clear that plaintiff meets and far exceeds the chill a person of ordinary firmness standard.

### B.  Defendants' Long Course of Retaliation Against Sgt. Foraker Would Chill a

---

statutory language upon which Title VII adverse action law is based is not present in 42 U.S.C. § 1983); Banks v. East Baton Rouge Parish Sch. Bd., 320 F.3d 570, 580 (5th Cir. 2003) (recognizing that "§ 1983's definition of adverse employment action may be broader than Title VII's definition"); Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir. 2003); Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999); Ellis v. Crawford, 2005 WL 525406, *7-8 (N.D.Tex. March 3, 2005); Trujillo v. Bd. of Educ. of Albuquerque Public Sch., 377 F.Supp.2d 994, 1010-11 (D.N.M. 2005); Trzeciak v. Village of LaGrange, 2003 WL 1193319, *11-12 (N.D.Ill. March 13, 2003); Rodriguez, 60 F.Supp.2d at 345 n.10 (recognizing the distinction between the adverse action standards in the First Amendment and Title VII contexts); cf. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1297-1300 (3d Cir. 1997) (setting forth the stricter Title VII standard).

[4]  Because this is an objective standard, a plaintiff need not demonstrate that he actually was deprived of his First Amendment rights.  See Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005).  Indeed, "[s]peech can be chilled, even when not completely silenced."  Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005); see Constantine, 411 F.3d at 500 ("The cause of action targets conduct that tends to chill such activity, not just conduct that freezes it completely").

**Person of Ordinary Firmness.** As discussed in greater detail in plaintiff's opening briefs in both this and the companion <u>Price</u> action, defendants' long and continuing course of retaliatory harassment and adverse actions against plaintiff include the following.[5]

• Launching a local, regional, national and international media campaign against Sgt. Foraker in which defendants blamed him for the destruction of the multi-million dollar firearms training facility. (POB at 15-19). This international media campaign has destroyed Sgt. Foraker's professional reputation, not just in the close-knit DSP and other police communities, but also in the larger national and international firearms industry. (Castro Expert Rpt. B10-17; Fini Expert Rpt. B31-34).[6] Defendants' retaliatory media campaign was carried throughout the local print and television media. It was carried in American Police Beat Magazine a national and international police magazine, "a publication read by every major law enforcement agency in the United States." (American Police Beat article; B28-30; Fini Expert Rpt. p. 4; B34). They were spread throughout Sgt. Foraker's local community. (<u>Price</u> Inter. #3 p.11-13; A2276-78).

• Chaffinch and MacLeish's imposition of absolute gag orders to prevent Sgt. Foraker and his men from responding to Chaffinch's defamatory personal and professional attacks accusing them of cowardice, incompetence and of destroying the FTU. (POB at 16-17). This gag order was a clear unconstitutional prior restraint on plaintiff's First Amendment right to freedom of speech under the Supreme Court's decision in <u>U.S. v. Nat'l Treasury Employees Union</u>, 513 U.S. 454, 468 (1995); <u>see</u> <u>Swartzwelder v. McNeilly</u>, 297 F.3d 228, 235-41 (3d Cir. 2002). Thus, defendants again violated and deprived Sgt. Foraker and his men of their First Amendment rights. As then Judge, now Justice Alito explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," <u>Swartzwelder</u>, 297 F.3d at 241 (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976)), and *a fortiori*, adverse action. As a matter of law, gagging an employee and depriving him of his First Amendment right to freedom of speech (especially when he is being publicly, falsely and maliciously attacked) is sufficient to chill a person of ordinary firmness and keep him from trying to exercise his rights.

• Defendants' material violation of the terms of Judge Farnan's reinstatement order that ended Sgt. Foraker's first lawsuit. (POB at 5-6).

• Defendants' material violation of the plain terms of the settlement agreement that ended Sgt. Foraker's first lawsuit. (POB at 5-6).

---

[5] Plaintiff acknowledges the overlap in retaliatory conduct between the <u>Foraker</u> and <u>Price</u> suits. As Sgt. Foraker testified, it is "hard to differentiate between the two because it's been constant retaliation since I spoke out. It's been retaliation against me and my men for speaking out and when we spoke out to the auditors they condemned us, without a doubt they condemned us." (Foraker 202; A775). This is another reason why the trial of both suits should be consolidated.

[6] As numerous representatives from within the firearms industry have told him, "Perception is reality and the perception is wrong doing." (<u>Foraker</u> Inter. #3 at p. 10; #13 at p. 31-32; A062,083-84; <u>Price</u> Inter. #3 p. 11; A2276).

- Diminishing Sgt. Foraker's job duties by throwing him out of Commanders and Section Chief's meetings and ordering that he never return. (POB at 24-26).[7]

- Diminishing Sgt. Foraker's job duties and responsibilities by removing his position and title as a Section Chief. (Foraker 194-95; A773).[8]

- In violation of historical practice, barring Sgt. Foraker from speaking at graduation ceremonies when he presented the 'Best Shooter' award. He was the only officer presenting who was no longer allowed to speak, while all other officers were still permitted to give their traditional speeches when presenting their awards. (Foraker 197-200; A774-75).

- Upon his reinstatement to the FTU, diminishing the prestige of his position by changing the chain of command so that he no longer reported directly to Major Eckrich and Lt. Col. MacLeish, but was now instead only reporting to a lieutenant and a captain. (G. Warren 33-44; A1930-33).

- Depriving him of the personnel needed to run the FTU, while previously giving such personnel to his predecessors. (Foraker Inter. #12 p. 29; Foraker 205; A81,776).

- Depriving him of the ability to make even the most minor of financial decision. While previously he had managed a $300,000 budget (Foraker 126-27; G. Warren 15; A1130,1165), plaintiff was now required to run items as minor as work t-shirt purchases by his commanders for approval. (Foraker Inter. #12 p. 29-30; Foraker 205, 213-14; A82-82,776,778).

- Diminishing his command authority and autonomy by, for example, tasking his superior officers to sit in on FTU budget meetings, where this had never been done before. (Foraker 196-97, 213-16; G. Warren 39-40,43; A774,778-79,1932-33).

- Bad mouthing of Sgt. Foraker throughout the Division and claiming he does not care

---

[7] As Sgt. Foraker explained in his interrogatories, attendance at these meetings was one of the important responsibilities of his position as the NCOIC of the FTU during his prior tenure in this position. Denying Sgt. Foraker access to these meetings following his reinstatement has crippled his ability to positively impact the entire division with regard to any and all issues pertinent to firearms, force and tactical training and the FTU. As NCOIC of the FTU, Sgt. Foraker has a wealth of knowledge to share about firearms, tactical training and related issues that he is not being allowed to impart to the commanders and other section chiefs of the division. (Foraker Inter. #12 at p.28; Foraker 193-95; A80, 773).

[8] As to the false defense claim that there is no evidence that Sgt. Foraker is a section chief, this is addressed in plaintiff's opening brief at pages 24-25. The record there demonstrates that Major Baylor, Captain Davis and Sgt. Foraker all testified that, of course, Sgt. Foraker is the section chief of the FTU and every individual to previously hold his position was a section chief who attended these meetings. Only MacLeish denies this, yet contradictorily however, he and all defendants previously admitted in their Answer that Sgt. Foraker was in fact a section chief. (Foraker 2 Compl. & Ans. ¶ 3; A9-10,37).

about health and safety dangerously undermines Sgt. Foraker's command authority in the eyes of all the Troopers who he is expected to train and whose respect is essential in the dangerous world of tactical firearms training. At the FTU, safety is paramount and if those training do not respect the NCOIC's commands, safety is jeopardized.[9]

• Ordering superior officers to "micro-manage" and nit-pick him in an effort to pressure him to retire. (Foraker Inter. #12 p. 29, #15 p.35-36; Foraker 196-97, 205-16; A81, 87-88, 774,776-79). Notably, both of the Captains that defendants tasked to micro manage and harass Sgt. Foraker were rewarded with promotion to Major by MacLeish. (Foraker 205; A776).[10]

• Publicly trying to dissuade Capt. McQueen from using Sgt. Foraker as his second at the funeral of a fallen comrade. This sends the clear message to other officers that associating with Sgt. Foraker is frowned upon. (McQueen 8-12,14,17,21-22,24,28; Foraker 189-90, 203; A1542-47, 772, 775).[11]

• Sending him for multiple fitness for duty exams, despite the fact that he continually passed each exam he was sent for. By way of analogy, Sgt. Foraker was repeatedly found to not have cancer. Yet instead of being happy about the fact that he had received a clean bill of health, defendants continued and kept sending him for more and more of the same fitness for duty examinations. All total, they sent him for three such retaliatory fitness for duty examinations until they finally grew frustrated and gave up. (Price OB at 15-16; Foraker Decl. ¶ 9; Compl. & Ans. ¶ 63-64; A2987-88, 23-25).

• Repeatedly withholding exculpatory medical records from DSP physicians when sending Sgt. Foraker for these fitness for duty and other medical examinations. (Price OB at 16 n.14).

• Sending Sgt. Foraker and his men for audiological and other hearing testing when they had only asked for blood and urine testing to detect the presence of heavy metal exposures. In addition to independently being sufficient to deter a person of ordinary

---

[9] In addition to badmouthing Sgt. Foraker within the DSP, defendants and their agents also regularly attack Sgt. Foraker in front of firearms representatives. For example, one of defendants' own attorneys makes it a point to belittle and attack Sgt. Foraker in front of industry representatives, calling him a "bad penny [who] just keeps showing up." (Foraker Inter. #13 at 32-33; A084-85; Foraker 238-39; A784).

[10] To the extent defendants claim there is no causal or logical nexus between this retaliation and defendants, the Third Circuit's recent decision in Jensen v. Potter, – F.3d –, 2006 WL 224002, *5 (3d Cir. Jan. 31, 2006), is instructive and defeats defendants' claim. There, now Justice Alito explained that even when harassment like this, "[s]tanding alone ... [might] contain no indicia of retaliation," in light of the overall course of harassment and big picture of threats and hostility being directed towards plaintiff and his men, "this intervening antagonism tends to show that these seemingly unrelated incidents were components of an integrated pattern of retaliation." Id.

[11] In light of Chaffinch's angry visual reaction to Capt. McQueen's request and the hot topic of conversation that this angry visual reaction became among the officer's present (McQueen 14-17,24; A1544, 1546), this only further serves to undermine Sgt. Foraker's authority and respect in eyes of the many officers in this paramilitary organization.

firmness from exercising their First Amendment rights, such an "unusual" (Dillman 149-151, 159, 157-58, 3-5,110-13; A2525-27,2535,2533-34,2379-81,2486-89), course of conduct makes it clear that this was done in order to find a pretext to retaliate against Sgt. Foraker and his men. (Price OB at 15; Foraker Decl. ¶¶ 4-7; A2987).

• Refusing to accommodate and take care of the men serving under his command as a means to get back at Sgt. Foraker for his protected speech. (Price OB at 17-23).[12]

• Lastly, this entire course of retaliatory conduct against Sgt. Foraker has absolutely devastated him. (Foraker Inter. #3; A56-63). This long course of retaliatory harassment has psychologically destroyed Sgt. Foraker. As defendants neglect to mention in their brief, Sgt. Foraker is currently on light duty after being declared psychologically unfit for duty in the fall of 2005 as a direct and proximate result of the harassment and other retaliation against him in the workplace. (Unfit for Duty Medical Records; B1-3,25).

As the foregoing 2 ½ page list makes clear, under both Suppan, 203 F.3d at 234-35, and McKee v. Hart, – F.3d –, 2006 WL 27474, *3-5 (3d Cir. Jan. 6, 2005), this long "campaign of retaliatory harassment," against Sgt. Foraker is more than "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." Suppan, 203 F.3d at 234-35. At the very least, given that this is a factual determination, see id. at 235; Allah, 229 F.3d at 225; Baldassare, 250 F.3d at 195, it is up to a jury of plaintiff's peers to determine this issue.[13]

**C. The Cases Cited by Defendants.** Defendants claim that each act of retaliatory harassment against plaintiff, by itself, does not amount to adverse action. Although plaintiff would be more than happy to expound on this point and explain in excruciating detail how each and every act is in fact sufficient to deter a person of ordinary firmness, the law simply does not require this. Instead, the big picture of the long campaign of retaliatory harassment against Sgt. Foraker and his men is independently sufficient as a whole to constitute adverse action under both Suppan, 203 F.3d at 234-35, and McKee, – F.3d –, 2006 WL 27474, *3-5. For as the Third Circuit has repeatedly held, liability also may be established "based upon a continuing course of

---

[12] In light of the type of honorable man and outstanding Trooper that Sgt. Foraker is, the retaliation against his men, the Troopers serving under his command who wanted nothing more than to work in a safe environment, strikes at him almost more than anything.

[13] Judge Farnan submitted this precise question to the jury at the first Foraker trial. (Special Verdict Form ¶ 3 - Chaffinch ex. 1; A477).

conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." Brennan, 350 F.3d at 419 n.16; see Suppan, 203 F.3d at 235 (noting that what is "trivial in detail may have been substantial in gross"). Thus, this big picture approach dooms the defense effort of attacking each individual act of retaliation. The retaliation cannot be viewed in isolation.

The defense efforts to shoehorn plaintiff's case into the factual setting of McKee, 2006 WL 27474, also do not survive scrutiny. In McKee, the plaintiff was only able to point to three comments that the defendants made to him as being retaliatory adverse action, but he could not point to anything else or to any concrete acts. Notably, these comments by his employer were comments urging him not to lose his focus as he was neglecting to do the job that had been assigned to him. Id. at *5, 6. Consequently, the Third Circuit simply held that, as a matter of law, these three comments by themselves were an insufficient basis to establish adverse action. Id. at *4. The Circuit distinguished Suppan where the plaintiffs were subjected to a course of retaliatory harassment for more than a year and contrasted this with the constructive criticism the McKee plaintiff received and found them to be of a qualitatively different nature. Id. at *5. As discussed above, like the plaintiff in Suppan, Sgt. Foraker suffered a long course of retaliatory harassment more than sufficient to meet and far surpass the adverse action threshold.

Similarly, the defense claim that plaintiff suffered mere criticism, not actionable under McKee; Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000); and X-Men Sec., Inc. v. Pataki, 196 F.3d 56 (2d Cir. 1999), also is without merit. (DOB at 16-19). First, as discussed above, the adverse action was not limited to mere criticism. Instead, it is the long course of retaliatory harassment which is actionable. But second, plaintiff did not suffer from mere criticism. The criticism discussed in McKee, 2006 WL 27474, *2, was directed from the defendant directly to the plaintiff in one on one conversations with his supervisor. Neither McKee nor any other of the cases cited by defendants deal with a defendant with malicious motives who publicly

-10-

declared that "**I'm going to get that son of a bitch**" (Dixon 17-18,77; A527-28,542), and who

proceeded to launch an unprecedented local, regional, national and international media campaign

where he threw plaintiff and his men "under the bus" (Baylor 417; A406), and blamed them for

destroying a multi-million dollar firearms training facility, false allegations which that same

defendant himself now admits he knows are false.  (See POB at 20; Chaffinch 56-58; A439-40).

In other words, the attacks and very public criticism in our present case are of a qualitatively

different and far more serious and widespread nature than that present in McKee.

      But additionally, and much more fundamentally, neither Suarez, 202 F.3d 676, nor X-

Men, 196 F.3d 56, (which arise in the Fourth and Second Circuits respectively - Circuits much

less welcoming of civil rights claims than our own) are cases that occur in the employment law

context.  Instead, they both address speech by a government employee or official about a private

company or citizen, a context in which much different interests are at stake.[14]  Because they do

not occur in the employment law context, a different mode of analysis must apply and the mode

of analysis applied in both Suarez and X-Men does not carry over into the public

employer/employee free speech retaliation context.  In a portion of the opinion which defendants

neglected to discuss, X-Men itself discusses this distinction.

> Cases holding that a decisionmaker may not take action for impermissible reasons do not
> provide the proper analytical framework for claims against persons who are not
> decisionmakers, but merely advocates.

X-Men, 196 F.3d at 70 (emphasis added).

> [S]peech by persons who are not decisionmakers and who merely engage in advocacy
> without threats, intimidation, or coercion is protected by the First Amendment.

Id. at 71 (emphasis added).  As the Second Circuit in X-Men took great pains to point out, a

different mode of analysis applies in employer/employee context when the actions of a

---

[14]  Their requirements that even defamatory speech contain a threat, coercion or intimidation
arises from the recognition that the government has a strong interest in protecting citizens and consumers
from unscrupulous companies and affiliated private citizens and that government officials have
independent free speech rights when speaking in public.

decisionmaker are being challenged, versus in a context outside of the employer/employee relationship.[15]  The Eighth Circuit recently addressed this same point.  See Hinshaw v. Smith, – F.3d –, 2006 WL 212372, *9 (8th Cir. Jan. 30, 2006) (adopting the reasoning of X-Men and discussing how a different test applies to speech by employer decisionmakers than to "speech by persons who are not decisionmakers").  It is undisputed in our present case that defendants Chaffinch and MacLeish both are the key decisionmakers who made all adverse retaliatory actions that plaintiff is challenging in this lawsuit.  Thus, defendants' efforts to force this square legal peg into a round legal hole are inappropriate.[16]

Additionally, X-Men, Suarez and their progeny rest on the implicit assumption that a private citizen who is so criticized by a government official, even when defamed, has the fundamental First Amendment right to speak out and respond.  In other words - that the remedy for false speech is more speech.  Let the marketplace of ideas sort it all out.[17]  But that is not our case.  Out of fear the defendants knowing that their ideas have absolutely no redeeming value whatsoever, have roundly rejected the marketplace of ideas approach and instead prefer to publicly defame plaintiff and his men, and then impose a cowardly gag order so that they cannot respond and defend themselves.  As discussed above, such an unconstitutional prior restraint and

---

[15]  No doubt this is due to the inherently coercive nature of the employer/employee relationship.

[16]  Even assuming *arguendo* that this inapposite line of cases applied, it is clear that defendants' speech did in fact contain a threat or intimidation.  Chaffinch was clearly telling plaintiff to back off and stop speaking out.  If he did not do so, Chaffinch would do even worse things to him in order to fulfill his bloodlust for vengeance. (See Dixon 71-72; A1586; Dixon 24,44; A529,34).

[17]  See Abrams v. U.S., 250 U.S. 616, 630 (1919) (Holmes dissenting) ("the ultimate good desired is better reached by free trade in ideas--that the best test of truth is the power of the thought to get itself accepted in the competition of the market."); Whitney v. California, 274 U.S. 357, 377 (1927) (Brandeis and Holmes concurring) (when an noxious idea rears its ugly head, instead of government's heavy hand, "the remedy to be applied is more speech, not enforced silence."); Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 390 (1969) ( "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail...."); New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) ( "The First Amendment . . . presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.") (internal punctuation omitted).

deprivation of plaintiff's First Amendment rights is an independent and extremely weighty adverse action which "unquestionably constitutes irreparable injury." Swartzwelder, 297 F.3d at 241.

**D.   Summary.**   As the evidence listed above (and the causal evidence discussed below) makes clear, by embarking on (1) their long continuing course of retaliatory harassment, and (2) their international media campaign in which they publicly blamed Sgt. Foraker and his men for destroying a multi-million dollar firearms training facility, defendants intended to maliciously punish and humiliate Sgt. Foraker for exercising his First Amendment rights.  They intended to ensure that they exacted a heavy price from him for daring to successfully challenge Chaffinch in court.  Such a long course of retaliatory harassment and defamation is certainly sufficient to make a person of ordinary firmness think twice about exercising their First Amendment rights. Any reasonably hardy individual would think twice about filing a lawsuit if they knew that defendants later would publicly destroy them, all the while gagging and harassing them to the point of breaking down psychologically and becoming unfit for duty as a result.  Indeed, who would dare to stand up and file a lawsuit if they know that the defendant then will destroy their reputation in the close-knit police community, destroy their reputation in the national firearms industry and ensure that the plaintiff's future plans to work in the firearms industry are forever destroyed?  Importantly however, the adverse action standard is satisfied if the "retaliatory conduct [is] sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." Suppan, 203 F.3d at 235.  All that is needed is a chill, and the defense efforts certainly meet this standard.  To the extent that the Court has any doubts in this regard, again, the question of whether a retaliatory action would chill a person with an ordinary backbone from exercising their rights is uniquely a question to be resolved by a jury.[18] Additionally, in light of the standard of review in which plaintiff receives all the inferences, it is

---

[18] As Judge Farnan did in the first trial.  (Special Verdict Form ¶ 3 - Chaffinch ex. 1; A477).

clear that plaintiff has met his burden and that summary adjudication for lack of adverse action is inappropriate. For the above mentioned reasons, there is overwhelming record evidence of adverse action. Accordingly, defendants' motion for summary judgment on this ground should be denied.

**IV.    THE RECORD IS OVERFLOWING WITH CAUSAL EVIDENCE WHICH DEMONSTRATES THAT PLAINTIFF'S PROTECTED FIRST AMENDMENT ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST HIM.**

   **A. Substantial or Motivating Factor.**  To the extent that defendants allege there is no evidence for plaintiff to meet his burden of proving substantial or motivating factor under Suppan, 203 F.3d at 234-35, and Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977), plaintiff notes and incorporates by reference the extensive discussion of causal evidence set forth in his opening brief and in the opening brief in the companion Price case.

       **1. Motive in General.**  Importantly, to the extent defendants allege that their motives were pure, and that they were simply taking actions that they had a plain legal right to take, it is clear that they have missed a very fundamental point of First Amendment jurisprudence. It has long been established that "an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997). As far as it relates to the First Amendment, "motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual." Id. "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Allah, 229 F.3d at 224-25. Motives are key in this context. That is why causal determinations such as this are reserved for the province of the fact-finder. See Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001). Thus, to the extent defendants claim that their

motives are pure, this issue is certainly not ripe for summary adjudication in their favor in light of the overwhelming record evidence to the contrary.  Accordingly, summary judgment should be denied to defendants on this point.

      **2.  Chaffinch's Involvement.**  Defendants appear to contest that they had any personal involvement in any of the adverse action that plaintiff suffered.  (DOB at 18-19).  But plaintiff only has to initially demonstrate that the defendants knew of the protected activity.  Keenan v. City of Phila., 983 F.2d 459, 466 (3d Cir. 1992).  It is undisputed that defendants knew of Sgt. Foraker's earlier successful lawsuit.  (Foraker 2 Compl. & Ans. ¶ 18; MacLeish 15-16,25; Chaffinch 17; A8,52,39,97,99,429).

      Supervisor liability also may be established 1) "through allegations of personal direction or of actual knowledge and acquiescence," or 2) "through proof of direct discrimination by the supervisor."  Id.  Importantly, "[w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct."  Robinson, 120 F.3d at 1294; accord Adkins v. Rumsfeld, 389 F.Supp.2d 579, 585-86 (D.Del. 2005).  "To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it."  C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005) (citing C.H. v. Olivia, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).

      **a.  MacLeish's Participation.**  In light of the record cited in plaintiff's opening brief, MacLeish's involvement in the retaliatory actions is not at issue, since he participated in the violations.[19]

      **b.  Chaffinch's Involvement, Authorization and Acquiescence.**

---

[19]  To the extent defendants hang their hat on the fact that MacLeish was not present for the April 6, 2004 media tour (DOB at 19), he was in fact present at the second April media tour. (Chaffinch 88; MacLeish 81-82; A447,113-14).

Defendants also contend that there is no evidence of Chaffinch's involvement in any retaliatory actions. (DOB at 24-25). Here, plaintiff notes that there would be a great deal more evidence of Chaffinch's involvement if defendants had not erased Chaffinch's computer hard drive and forever destroyed the Arch system messages that plaintiff had expected to use to prove involvement with direct evidence.

However, there is more than sufficient circumstantial evidence to demonstrate Chaffinch's involvement despite his self-serving denials - denials that are to be disregarded given our present summary judgment posture and the standard of review. See Hill, 411 F.3d at 131 n.22; Reeves, 530 U.S. at 149-151; Hill, 411 F.3d at 129 n.16.

As numerous witnesses testified, Chaffinch carried an open vendetta against Sgt. Foraker as a result of the filing of his first lawsuit. He publicly bragged, "I'm going to get that son of a bitch." (Dixon 17-18,77; A527-28,542). He was "pissed" off. (Baylor 402; A402). He himself admits that he was "upset" and "unhappy" with Sgt. Foraker because of his lawsuit. (Chaffinch 40; A435). This evidence is discussed in greater detail in plaintiff's opening brief. (POB at 6-7). Additionally, there is a great deal of record evidence that Chaffinch and MacLeish are "buddies" and "friends." (Chaffinch 16-17; MacLeish 7; A429,95). In fact, MacLeish publicly brags that he and Chaffinch are "joined at the hip." (MacLeish 9; A95). Thus, it is a fair inference that Chaffinch's good buddy MacLeish was acting at Chaffinch's direction when he instituted many of the retaliatory actions against plaintiff, the person who had hurt and upset his good friend. This inference is strengthened all the more in light of the record evidence that Chaffinch expects "blind loyalty" from all those under his command and his history of vindictiveness and vengefulness towards those who oppose him. (See POB at 27). Additionally, in light of defendants' destruction of evidence, the compelling temporal proximity, the violation of numerous DSP policies, practices and customs and the other categories of causal evidence discussed below and in plaintiff's opening brief, it is a fair inference that Chaffinch was in fact

-16-

involved in even more of the retaliation against plaintiff.

**B. Same Decision Anyway.**  Not surprisingly in light of the fact that defendants waived it by not asserting it in their Answer, defendants have not even attempted to move on their same decision anyway affirmative defense.  <u>Nicholas v. Pa. State Univ.</u>, 227 F.3d 133, 144 (3d Cir. 2000). Regardless, as plaintiff discussed in his opening brief, defendants waived this defense earlier in the case by not including it in their Answer.

## V.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendants also assert that they are entitled to qualified immunity because, as they claim, it was not clearly established that they could not engage in a continuing campaign of harassment against Sgt. Foraker in retaliation for the filing of his lawsuit.  As discussed below, they are mistaken.

**A. Introduction.**  Qualified immunity is a two part inquiry.  <u>Atkinson v. Taylor</u>, 316 F.3d 257, 261 (3d Cir. 2003) (noting that the Supreme Court reaffirmed the "two-part inquiry" in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001)).  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?"  <u>Atkinson</u>, 316 F.3d at 261.  Next, the court must next decide whether the right allegedly violated was a clearly established one.  <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999).  "Whether a governmental official is entitled to protection under the doctrine of qualified immunity is a 'purely legal question.'"  <u>Rogers v. Powell</u>, 120 F.3d 446, 454 (3d Cir. 1997).

The Constitutional rights at issue are plaintiff's First Amendment right to be free of retaliation for exercising his rights to freedom of speech and to petition the government for redress of grievances.  So the test for qualified immunity in this case is whether it was clearly established for a public official from December 2003 and onward to know that it was unlawful to engage in a long continuing course of retaliatory harassment against Sgt. Foraker because he

filed his lawsuit.[20]

**B. The Facts Show that Defendants Violated Plaintiff's First Amendment Rights.**

As explained both above and in plaintiff's opening brief in support of his motion for summary

judgment, plaintiff has established that defendants violated his First Amendment free speech and

petition clause rights. Thus, plaintiff has met prong one of his qualified immunity burden and

established a constitutional violation.

**C. Plaintiff's First Amendment Rights Were Clearly Established.** "Once it is

determined that evidence of a constitutional violation has been adduced, courts evaluating a

qualified immunity claim move to the second step of the analysis to determine whether the

constitutional right was clearly established." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir.

2002) ("Bennett I").

> That is, *in the factual scenario established by the plaintiff*, would a reasonable officer
> have understood that his actions were prohibited. *The focus in this step is solely upon
> the law*. If it would not have been clear to a reasonable officer what the law required
> *under the facts alleged*, he is entitled to immunity. If the requirements of the law would
> have been clear, the officer must stand trial.

Id. at 136-37 (emphasis added) (original emphasis removed); accord Bennett v. Murphy, 2005

WL 78581, *3 (3d Cir. Jan. 14, 2005) (Bennett II); Wright v. City of Phila., 409 F.3d 595, 600

(3d Cir. 2005); Saucier, 533 U.S. at 201.

The prong two question becomes would a reasonable public official be put on notice that

the constitutional violation already established under prong one runs afoul of clearly established

law.[21]

---

[20]  Notably, each of the defendants testified that they know it is illegal to retaliate against an
employee who files a lawsuit. (MacLeish 14-15; Chaffinch 9; A1190,427). Thus it is apparent that
defendants themselves are already well aware of clearly established law in this regard.

[21]  The reasonableness of an official's conduct is not a separate question from whether the law
was clearly established. Instead, these are two sides of the same coin. The "relevant, dispositive inquiry
in determining whether a right is clearly established is whether it would be clear to a reasonable officer
that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. This is because
"[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably

If there was any doubt on what is needed to put a reasonable public official on notice of

clearly established law, the short answer is found in the U.S. Supreme Court case of Hope v.

Pelzer, 536 U.S. 730 (2002).  Hope held that "officials can still be on notice that their conduct

violates established law even in *novel factual circumstances.*"  Id. at 741 (emphasis added).  The

Supreme Court unanimously agreed on this issue.  Id. at 753-54 (Thomas, J. dissenting with

whom Rehnquist, C.J. and Scalia, J. join) (agreeing that "officials can still be put on notice that

their conduct violates established law even in novel factual circumstances").  This holding is in

accord with a plethora of preexisting Third Circuit and Supreme Court law, discussed in much

greater length below, and puts to rest in our present case any conceivable uncertainty regarding

the level of factual correspondence needed between the right asserted and prior cases.

Even prior to the Hope decision, the law was the same as is demonstrated by many other

Third Circuit and Supreme Court opinions.  "[Q]ualified immunity applies if 'reasonable

officials in the defendants' position at the relevant time could have believed, *in light of what was*

*in the decided case law*, that their conduct would be lawful.'"  Doe v. Delie, 257 F.3d 309, 318

(3d Cir. 2001) (emphasis added) (quoting Good v. Dauphin County, 891 F.2d 1087, 1092 (3d

Cir. 1989)).  Continuing -

> Thus, having determined that Doe has alleged a violation of a constitutional right, we
> must determine whether Doe's right [ ] was "clearly established" in a "particularized"
> sense. Anderson v. Creighton, 483 U.S. 635, 640 (1987). "The contours of the right must
> be sufficiently clear that a reasonable official would understand that what he is doing
> violates that right." Id. *We do not require precise factual correspondence between the*
> *right asserted and prior case law.* Good, 891 F.2d at 1092. Whether an official may be
> protected by qualified immunity turns on the "objective legal reasonableness of the
> action, assessed in light of the legal rules that were clearly established at the time it was
> taken." Wilson v. Layne, 526 U.S. 603, 614 (1999) (internal quotes omitted). The issue is
> whether, given the established law and the information available to Defendants,
> reasonable [] officials in Defendants' positions could have believed that their conduct
> was lawful.  See Paff v. Kaltenback, 204 F.3d 425, 431 (3d Cir. 2000).

competent public official should know the law governing his conduct."  Crawford-El v. Britton, 523 U.S.
574, 591 (1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)).  In other words, the law
presumes that reasonably competent public officials are aware of clearly established law.  Thus if the law
is clearly established, a reasonably competent public official would have known of it.  Id.

Doe, 257 F.3d at 318 (emphasis added).  The Third Circuit also has explained that the "clearly

established" language test requires "some but not precise factual correspondence and [demands]

that officials apply general, well-developed legal principles."  Bennis, 823 F.2d at 733; see also

Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989) ("the general legal

principles governing analogous factual situations, if any, and a subsequent determination whether

the official should have related this established law to instant situations" are the basis for the

court's inquiry); accord Hicks v. Finney, 770 F.2d 375, 380 (3d Cir. 1985).[22]  The Supreme Court

in U.S. v. Lanier, 520 U.S. 259, 271 (1997), also stated that a "general constitutional rule already

identified in the decisional law" may give fair warning to a public official if the rule applies

"[w]ith obvious clarity to the specific conduct in question" even though the specific issue has not

been previously addressed.  Finally, in the Third Circuit a law may be clearly established even if

the Court has not ruled on an issue and even if there is some disagreement among other Circuits,

as long as "[n]o gaping divide has emerged in the jurisprudence" which would lead a party to

"reasonably expect" the Courts in this Circuit to rule other than one way.  Bieregu v. Reno, 59

F.3d 1445, 1459 (3d Cir. 1995) (overruled on other grounds by Lewis v. Casey, 518 U.S. 343

(1996)).

Thus, government officials will not be granted immunity if they fail to make obvious

inferences from a generally established right and apply the right in particular situations.  So it

was unreasonable in our case for defendants to believe that they could, for example, maliciously

retaliate against plaintiff because he had dared to expose defendant Chaffinch's illegal actions in

_____

[22]  Additionally as indicated by the Supreme Court, all that is required to defeat a qualified
immunity claim is a "consensus of cases of persuasive authority."  Wilson, 526 U.S. at 616.  Note that
this says nothing of a consensus of binding authority.  This is the point made in 1989 by the Third Circuit
in Good, 891 F.2d at 1092, that precise factual correspondence is not needed between the right asserted
and prior cases.  "A right may be clearly established even if there is no 'previous precedent directly in
point.'"  Leveto v. Lapina, 258 F.3d 156, 162 (3d Cir. 2001)(quoting Good, 891 F.2d at 1092); see also
Assaf v. Fields, 178 F.3d 170, 177 (3d Cir. 1999).  This point was reiterated again by the Third Circuit in
1999, that a court need not have ruled on a case bearing a "precise factual correspondence" with the one
under consideration. Assaf, 178 F.3d at 177.

violation of the First Amendment by filing his lawsuit in light of (1) the obvious inference from the large body of prior Supreme Court and Third Circuit public employee case law that such retaliation is illegal and (2) defendants' admitted knowledge that such conduct is illegal.

      **1. Free Speech.** In the same way, there are more than 23 years of protection for public employees from retaliatory actions arising from protected speech, Baldassare, 250 F.3d at 201, protections which have been granted at the Supreme Court, Third Circuit and district court level. In the light of long established First Amendment case law protecting legions of public employees in both the Supreme Court and the Third Circuit, there is no way that defendants could have reasonably believed that they could retaliate against plaintiff by engaging in a long course of retaliatory harassment and publicly defaming him on an international scale because he had dared to file a lawsuit against Chaffinch challenging his illegal activities.[23] Concerning the huge body of public employee case law (only a portion of which is listed in the preceding footnote), the Third Circuit recently held that in our Circuit *since 1982*, the law has been clearly

---

    [23] See e.g., Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc) (public employee who reported and opposed gender discrimination by a superior protected); Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) (public employee's criticism of racism in police department protected); Monsanto v. Quinn, 674 F.2d 990 (3d Cir. 1982) (public employee who criticized management policies in a public agency protected); Pickering v. Bd. of Educ., 391 U.S. 563 (1968) (public school teacher who criticized school district superintendent and school board protected); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) (public school teacher who criticized school district policy protected); Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001) (public employee who conducted internal investigation into wrongdoing and breach of the public trust in a public agency protected); Feldman v. Phila. Housing Auth., 43 F.3d 823 (3d Cir. 1994) (public employee who exposed corruption, inefficiency, and other improprieties in public agency protected); Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983) (public employee who criticized waste and inefficiency in public agency protected); Johnson v. Lincoln Univ. of Com. System of Higher Educ., 776 F.2d 443 (3d Cir. 1985) (public university professor's speech was on a matter of public concern when he criticized department chair over academic standards, among other issues); Rankin v. McPherson, 483 U.S. 378 (1987) (public employee who stated a hope that the next assassination attempt on President Reagan would be successful protected); O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989) (public employee's statements that police chief was fixing traffic citations protected); Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) (public employee's speech criticizing actions of city council was on a matter of public concern); Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995) (public employee who criticized policies in public agency protected); Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996) (public employee who was subpoenaed to testify at supervisor's divorce proceeding protected); Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003) (public employee who criticized policies and health hazards in a public agency protected).

established that no public employee can suffer adverse action or other "retaliation for exercising his rights under the first amendment." <u>Baldassare,</u> 250 F.3d at 201.

In fact, as Judge Farnan held in Sgt. Foraker's first case, it was clearly established as of 1999 <u>that defendant Chaffinch himself</u> could not retaliate against and transfer Sgt. Foraker to a less desirable position in retaliation for his protected speech. <u>Foraker v. Chaffinch</u>, C.A.No. 02-302-JJF (D.Del. June 18, 2003) (slip op. at 2) (attached).[24]

The general legal principles from these many closely analogous cases would put any reasonable official on notice that plaintiff had a clearly established First Amendment right to be free of retaliation against him for exercising his free speech rights by filing a lawsuit challenging illegal and unconstitutional conduct by the highest ranking officer in the Delaware State Police. There is more than enough factual correspondence between these cases and the present one so that defendants knew that their actions were illegal. Accordingly, plaintiff's First Amendment right as a public employee to be free of retaliation was clearly established and readily apparent to any reasonably informed public official. As a result, qualified immunity should be denied.

      **a. The Retaliatory Harassment Line of Cases.** Defendants pin their hopes to the Third Circuit's recent opinion in <u>McKee</u>, and half-heartedly pray that somehow it saves them from the consequences of their illegal conduct. (DOB at 21-23). Unfortunately for defendants, as discussed in the adverse action section above, it does not.

As discussed above, the purported adverse action discussed in <u>McKee</u> consisted of "making a few comments over the course of a few months (the gist of which was asking an employee to focus on his job)." <u>McKee</u>, 2006 WL 27474, *6. The plaintiff in <u>McKee</u> had nothing else to point to, other than constructive criticism he received. So the Third Circuit held

_____

[24] In light of the fact that in Sgt. Foraker's first lawsuit it was held to be clearly established that Chaffinch could not retaliate against him and Chaffinch's admitted knowledge of the law in this regard, it is intellectually dishonest for defendants to now assert ignorance of the aforementioned and clearly established law.

that it was not clearly established that a reasonable official in that defendants' position would have known that making this constructive criticism was illegal. Id. The Third Circuit thus found McKee distinguishable from the course of retaliatory harassment that it found actionable in Suppan, 203 F.3d at 234-35. See McKee, 2006 WL 27474, *6. It found that the McKee plaintiff had failed to even meet the low First Amendment adverse action threshold.

However, as discussed at length in the adverse action section above, in our case Sgt. Foraker was subjected to a long course of retaliatory harassment which is actionable in light of the Third Circuit's year 2000 decision in Suppan. See Suppan, 203 F.3d at 234-35 (plaintiffs allege "a campaign of retaliatory harassment," which the Court found to be actionable). This is substantially more than the piddling of constructive criticism to which the McKee plaintiff was subjected. Herein, defendants imposed an unconstitutional prior restraint on Sgt. Foraker's First Amendment rights, diminished his job duties, threw him out of meetings, diminished his command authority, launched an international defamatory media campaign against him, took away his speaking role at graduations, changed his line of report in the chain of command, sent him for numerous fitness for duty exams with the purpose of finding a pretext to get rid of him and changed his blood lead levels examination and instead had the doctors also test his hearing in the hopes he would have problems.

Additionally, Sgt. Foraker also benefits from our Circuit's December 5, 2003 opinion in Brennan, 350 F.3d 309, where the Court again touched and elaborated on the theory of a continuing course of harassment against a plaintiff in retaliation for exercising his First Amendment rights. The Circuit held that -

> a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be de minimis by itself or if viewed in isolation.

Brennan, 350 F.3d at 419 n.16 (quoted in McKee, 2006 WL 27474, *6); see Suppan, 203 F.3d at 235 (noting that what is "trivial in detail may have been substantial in gross"). Given that all of

the retaliatory conduct at issue against Sgt. Foraker occurred after December 5, 2003, <u>Brennan</u> and <u>Suppan</u> are clearly sufficient to put defendants on notice of clearly established law in this regard, prohibiting a course of continuing harassment against a public employee in retaliation for exercising his First Amendment rights.[25]

       **2. Petition Clause.**  In the same way, the right to petition has been clearly established for even longer than the rights protected by the free speech clause.  A citizen's right to petition the government was part of the Magna Carta and also was such a well-recognized part of the law that it was included in Blackstone's famous works.  <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 443 and n. 22-23 (3d Cir. 1994).  In the U.S., the right to petition the government has been clearly established under decades of Supreme Court precedent.  <u>See e.g.</u>, <u>NAACP v. Button</u>, 371 U.S. 415, 429-30 (1963); <u>Bhd. of R.R. Trainmen v. Va. Ex Rel. Va. State Bar</u>, 377 U.S. 1, 5 (1964); <u>United Mine Workers of America v. Ill. State Bar Ass'n</u>, 389 U.S. 217, 221-225 (1967); <u>Cal. Motor Transport Co. v. Trucking Unlimited</u>, 404 U.S. 508, 510-16 (1972); <u>McDonald v. Smith</u>, 472 U.S. 479, 482-85 (1985).  Similarly, the Third Circuit has repeatedly and exhaustively discussed the right of a public employee to petition the government for redress of grievances, including by filing lawsuits. <u>See</u> <u>San Filippo</u>, 30 F.3d at 434-43 (retaliation for filing a grievance); <u>Anderson</u>, 125 F.3d at 161-63 (retaliation for filing a lawsuit and an EEOC charge); <u>Hill</u>, 411 F.3d at 126-27 (retaliation for filing a lawsuit); <u>Brennan</u>, 350 F.3d at 417; <u>see also</u> <u>We, Inc. v. City of Phila.</u>, 174 F.3d 322, 326-30 (3d Cir. 1999) (non-employment context).  All of these are controlling precedent that have been clearly established for many years, sufficient to put reasonable officials on notice of the law prohibiting retaliation against an employee for protected petitioning.

---

    [25]  This is unlike the plaintiff in <u>McKee</u>, who was unable to take advantage of <u>Brennan</u>'s holding because it was decided after he claimed to have been retaliated against.  <u>McKee</u>, 2006 WL 27474, *6.

**VI.    DEFENDANTS DEFAMED SGT. FORAKER WHEN THEY ACCUSED HIM OF NEGLECTING HIS DUTY BY FAILING TO ADEQUATELY CLEAN AND MAINTAIN THE FIREARMS TRAINING UNIT FACILITY.**

**A.    The Basics.**  An individual's right to the enjoyment of his good name and reputation is of constitutional magnitude under Delaware law.  As the Delaware Supreme Court has often recognized, Article I, Section 9, of the Delaware Constitution provides a "strong state constitutional basis for remedies to recompense damage to one's reputation."  Ramunno v. Cawley, 705 A.2d 1029, 1035 (Del. 1998); Kanaga v. Gannett Co., Inc., 687 A.2d 173, 177, 183 (Del. 1996).

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being - a concept at the root of any decent system of ordered liberty.
>                              * * *
> The destruction that a defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem.  Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.

Kanaga, 687 A.2d at 183 (quoting Milkovich v. Lorain Journal Co., 497 U.S. 1, 22-23 (1990)).

> A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Restatement (Second) of Torts § 559 (1977) (quoted in Spence v. Funk, 396 A.2d 967, 969 (1978)).  Stated slightly differently, defamation is:

> That which tends to injure the reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.

W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 111 (1971) (quoted in Spence, 396 A.2d at 969).  In the present case, plaintiff Foraker has been accused of neglecting his duty so badly by failing to clean up and maintain the FTU facility that he was at least 50 % responsible for its shut down. (MacLeish 57-58; A107-108).

Defamation consists of the twin torts of libel and slander.  Spence, 396 A.2d at 970.  "[L]ibel is written defamation while slander is oral defamation."  Id.  Five elements must be

provided to establish a defamation claim: 1) the defamatory character of the communication;[26] 2) publication; 3) the communication must refer to the plaintiff; 4) a third party's understanding of the communication's defamatory character; and 5) injury.  Read v. Carpenter, 1995 WL 945544, *2 (Del.Super. June 8, 1995).

There are four categories of defamation *per se* that are actionable without special damages, including statements which "malign one in a trade, business or profession,"  Spence, 396 A.2d at 970, which is at issue in our case.  Slander *per se* does not require proof of special damages.  Read, 1995 WL 945544, at *2.

**B.  Neglect of Duty.**  As pointed out by MacLeish, the entire gist of Chaffinch's remarks to the media was that Foraker was "not doing his job very well." (MacLeish 90; A116).  Thus, Chaffinch told the press that Foraker had neglected his duty, a defamatory statement *per se.*

The law does not require that the statement be viewed standing alone.  When a police officer is smeared in the press, who is the Section Chief of the FTU, has an excellent work record, and was providing information on problems up the chain of command,  this falsely implies that something is wrong with him and that he must have neglected his duty.  Indeed, defendant MacLeish admitted that it is "pretty clear from reading" the articles that Chaffinch's statements imply that Foraker was not doing his job very well.  (MacLeish 90; A116).

As the Delaware Supreme Court has stated, the "character of a libel is to be judged [ ] by the effect it produces on the mind."  Spence, 396 A.2d at 972.  But because very often "you can at once put your finger on the libelous matter," the attempt to do so depends upon "inferential reasoning."  Id.  See also Kanaga, 687 A.2d at 180-81 (recognizing that inferences may be drawn to determine defamatory meaning).  Herein, the effect of defendants' statements is defamatory, especially in light of the fact that Chaffinch mentions no other governmental employee,

---

[26] A determination of whether a statement is susceptible of a defamatory meaning is a question of law.  Ramunno, 705 A.2d at 1035 n. 14.

governmental <u>agency</u>, <u>building</u> <u>contractor</u>, <u>or</u> <u>other</u> <u>person</u> <u>or entity</u> as a possible culprit for the

problems at the FTU which led to its shutdown. According to Chaffinch's statements to the

newspapers, Sgt. Foraker must have done something wrong. This is the inferential step which

the Delaware Supreme Court recognized as part of its common law. <u>Spence</u>, 396 A.2d at 972.

Indeed, Delaware does not even recognize a distinction between defamation *per se* and

defamation *per quod*. <u>Id.</u> at 971-72. Thus, it is actionable "whether the defamatory nature is

apparent on the face of the statement or only by reference to extrinsic facts." <u>Id.</u> at 971. In this

light, what defendants implied about plaintiff is absolutely false. There is nothing wrong with

plaintiff. Instead, he is an outstanding and eminently qualified police officer whose written

evaluation was exemplary during the time period for which Chaffinch skewered him. (A834-

842). But defendants' statements would make an average reader/television viewer think that

there is something wrong with Sgt. Foraker.

     A review of the April 7, 2004 Delaware State News article reveals the following

defamatory statements made by Chaffinch:[27]

    1.    When discussing the FTU with reporters, he acknowledged there were problems
        but <u>indicated</u> <u>the</u> <u>blame</u> <u>lies</u> with one or two troopers under his command,
        meaning Sgt. Foraker [28] (emphasis added).

    2.    "The previous sergeant in charge did a good job," implying that Sgt. Foraker did
        not do a good job.

    3.    "Things changed in December when another sergeant [Foraker] came in. <u>That's</u>
        at least a portion of <u>where</u> <u>the</u> <u>ball</u> <u>was</u> <u>dropped</u>," (brackets and emphasis
        added), indicating that Sgt. Foraker did not do a good job.

    4.    "I think people who live in glass houses shouldn't throw stones. It's a lot dirtier
        now. Things seemed in their proper place in the fall. I've never seen it like
        this," implying that there were no problems under Sgt. Ashley and all of the
        problems must be attributable to Sgt. Foraker.

---

[27] (<u>See also</u> Chaffinch 65-84; A441-446; MacLeish 85-94; A114-117).

[28] MacLeish stated that one of the two troopers was Foraker, (MacLeish 86-87; A115), and the
context of Chaffinch's other statements to the press reveal that Foraker was one of the two troopers to
which Chaffinch referred.

5.  "When I was here in the fall, everything was going as well as the previous times I'd been here," suggesting that there were no problems under Sgt. Ashley and all of the problems must be attributable to Sgt. Foraker.

6.  He claims that when he was there in the fall, "There was some discoloration of the bullet trap but that was about it," implying that Sgt. Ashley did his job and Sgt. Foraker did not.

7.  "We will work collectively with Administrative Services to make corrections and establish a standard operating procedure protocol . . . If the people that are assigned here now don't feel that protocol is part of their protocol, they will be assigned elsewhere," falsely implying that Sgt. Foraker is unwilling to follow protocols. (emphasis added).

8.  Continued to praise Sgt. Ashley while implying that Foraker was not doing his job by stating, " . . . the bullet trap required hands-on, daily cleaning . . . Sgt. Ashley was willing to do that. I cannot say that Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel (bullet trap cleaning) was part of his purview. He felt that was putting him in harm's way." Of course, Chaffinch neglected to say that experts told Foraker that only Hazmat experts with special protective clothing should attempt to maintain the bullet trap and that Foraker did not want the officers he was supervising or himself to suffer health problems which could impact upon the DSP in the form of potential Workers' Compensation claims, OSHA violations, etc. Of course, a reasonable jury could infer that Sgt. Foraker's job responsibilities as the Section Chief of the Firearms Training Unit did not include this type of Hazmat maintenance.

(A2723-2726). This article specifically states that Foraker was the Sgt. who came in after Sgt. Ashley.

Chaffinch made all of these negative comments about Foraker without mentioning any of the myriad of other preexisting problems at the range which he was already aware of prior to making the statements. (See Chaffinch 51-64; A438-441).

Much of this Delaware State News Article then was included in an article for American Police Beat Magazine, an international Police trade publication with a circulation of at least 55,000. (See B28-30). This article also mentions Sgt Foraker by name. So workers in the police and firearms industries who read this article and/or search for Foraker's name on the internet will

think that he was personally to blame for the shutdown of the FTU facility.[29]

The News Journal and the Delaware State News later published other articles which, due to defendants' statements, either directly or by implication indicate that Sgt. Foraker failed to do his duty.  (See A2639-41, 2697-2702, 2714-92).

The defamatory WBOC-TV news story[30] also firmly places false blame on the officers assigned to the FTU, namely Sgt. Foraker and his subordinates.  MacLeish states, "The Firearms Training Unit began experiencing some problems - health problems, that copper taste in your mouth - runny nose, stuffiness, things of that nature," (emphasis added), implying that problems at the FTU only just began recently.  He says, "On the Delaware State Police's side, there will be a very sound, strict, standard operating procedure that will be done and followed."  This statement, especially within the context of the rest of the piece, falsely implies that Foraker and the other officers assigned to the FTU did *not* follow prior procedures and they better follow them in the future.[31]

Moreover, Chaffinch and MacLeish both adopted, sanctioned and ratified Sec. Gloria Homer's false statements on TV by standing right next to her without correcting her in any way.  Certainly the viewer would expect the two top officers of the DSP to speak out on their trooper's behalf to provide balance to the Facilities Management Director's blaming of their troopers.  Instead, by not contradicting her, they clearly affirmed that what she was saying was true and correct.[32]  Moreover, Chaffinch even admits that he was aware of the factual inaccuracies of

---

[29] Indeed, Bud Fini, plaintiff's firearms industry expert, indicates in his expert report that the publicity "has severely damaged [Foraker's] ability to be hired by a major company in the firearms industry" because the articles "have undoubtedly cast suspicion on his ability to manage and operate a range."  (Fini Expert Rpt. p.4; B34).

[30] A VHS copy will be filed with the Court contemporaneously with this Brief.

[31] Of course, there were no procedures for handling hazardous waste from the broken sweeper/zamboni, sweeping the ammunition dust off the ground, etc.

[32] Although his name was not specifically mentioned, anyone within WBOC-TV's broadcast range who knew that Sgt. Foraker worked at the range or later learned that he worked at the range (i.e.

Homer (see DOB at 26, n.4),[33] and testified that he "just stood back and watched" Homer lambast

Sgt. Foraker.  (Chaffinch 70; A443).  Chaffinch also comments on TV, "Our concern first is with

the people that will be in here training.  So, until such time as we know that it's safe and healthy

to be here, we won't be here," again falsely implying that everything Sec. Homer said was true

and not defending his men.

At the beginning of day two of his deposition, Sgt. Foraker testified in detail, line by

line, as to what was false and defamatory in the initial Delaware State News article. (Foraker 4-

55; A681-94).  His lengthy Answers to Interrogatories (A64-70) further point out the false

aspects of the statements made by defendants.[34]

Defendants' many public statements about Sgt. Foraker's neglect of duty were

defamatory per se for all the reasons stated.

**C.    The Doctrine of Substantial Truth Does Not Apply in This Case.**  Although

Delaware law protects a publisher from liability for defamation when the statements attributable

to the publisher are determined to be substantially true, a review of the facts in this case through

the prism of substantial truth law results in the inescapable conclusion that the substantial truth

doctrine does not shield defendants from liability.

"If the alleged libel was no more damaging to the plaintiff's reputation in the mind of the

average reader than a truthful statement would have been, then the statement is substantially

true." Ramada Inns, Inc. v. Dow Jones & Company, Inc., 543 A.2d 313, 317 (Del. Super. 1988),

---

via review of other news articles which mention him as the Sgt. at the facility) would think that Foraker
was responsible for the problems at the range

[33]  Indeed, he and MacLeish had been present at a March 4, 2004 meeting where Foraker pointed
out a number of problems with the facility. (Foraker 244-50; A786-87).

[34]  Of course, some of the negative statements about Sgt. Foraker blame him for not doing Hazmat
maintenance which was not even part of his job.  Indeed, he was simply protecting both he and the men
under his command.  Moreover, as a mere Sergeant he could not close the range, and the range could not
be closed without actual evidence that it was truly contaminated.  (Foraker  61-63, 81-85, 99; A695-
96,700-01,705).

quoting <u>Riley v. Moyed</u>, 529 A.2d 248, 253 (Del. 1987) (citing to <u>Gannett Co., Inc. v. Re</u>, 496

A.2d 553, 557 (Del. 1985)); <u>see</u> <u>Ramunno</u>, 705 A.2d at 1035.  "In evaluating whether a statement

is substantially true, the Court must consider whether the 'gist' or 'sting' of the statement is

true." <u>Id</u>.  "The gist or sting of the statement is true 'if it produces the same effect on the mind of

the recipient which the precise truth would have produced.'" <u>Ramada Inns</u>, 543 A.2d at 317-318

(quoting <u>Riley</u>, 529 A.2d at 253); <u>see</u> <u>Ramunno</u>, 705 A.2d at 1035.  "The defense of substantial

truth may necessarily entail some inferential judgment concerning the importance of a falsity to

the average reader.  The notion of substantial truth necessarily implies a thread of untruth.  The

conclusion that a statement is substantially true will therefore involve the uncertain

determination that whatever errors abound in the statement are irrelevant in the minds of the

audience."  <u>Ramunno</u>, 705 A.2d at 1036 (original emphasis removed) (pointing out the

unavoidably inferential nature of the substantial truth doctrine).

     Here defendant MacLeish has identified the gist or sting of the statements made against

plaintiff and they do not produce a true statement.  He admits that the effect on the mind of the

hearer is that Sgt. Foraker was not doing his job very well, according to Chaffinch. (MacLeish

90; A116).  He had "dropped the ball." (Chaffinch 86; A447).  He neglected his duty.  Indeed,

an analysis of all the statements by defendants can only lead to the same conclusion.

     So in this case, the defendants failed to disclose additional material facts, namely, that

the HVAC system had historically failed, plaintiff and his subordinates were not provided with

information about how to dispose of hazardous waste, they were not provided with protective

clothing and gear to dispose of hazardous waste, they were not provided with procedures for

cleaning the floor, the sweeper/zamboni did not work.  Without such additional facts, while

defendants' statements arguably could be claimed to be literally true[35] the gist of the statement is

---

[35] Again, Foraker does not herein admit to the truth, either in whole or in part, of the statements
made by defendants.

not true.  Sgt. Foraker did not fail in his duties. So the purportedly substantially true statements

lead to a false inference which is actionable because they still are capable of a defamatory

meaning.  See Ramada Inns, 543 A.2d at 326 (the failure of the Wall Street Journal to report

break-even estimates or opinions by respected security analysts which were significantly lower

than the only estimate which was reported by the Wall Street Journal, and which were favorable

to plaintiff, rendered its statements capable of defamatory meaning).  Just as in Ramada Inns,

Inc., the defendants' failure to evenhandedly disclose material facts changed the whole tone of

the articles and television broadcasts about the FTU facility, they created an untrue sting or gist,

thus making them capable of a defamatory meaning.

### D.   The Four Factor Test to Determine Whether a Statement is Fact or Opinion.[36]

Contrary to defendants' assertions, "there is no wholesale exemption from defamation law for

any statement cast in the form of an opinion."  Ramunno, 705 A.2d at 1036.  See also Milkovich,

497 U.S. at 18.  As the U.S. Supreme Court has noted, the use of  Gertz v. Robert Welch, Inc.,

418 U.S. 323, 339-40 (1974), "has become the opening salvo in all arguments for protection from

defamation actions on the ground of opinion, even though the case [itself] did not remotely

concern the question."  Milkovich, 497 U.S. at 18.  As has been recognized, Gertz did not "create

a wholesale defamation exemption for anything that might be labeled 'opinion.'"  Milkovich, 497

U.S. at 18; Kanaga, 687 A.2d at 177.[37]   "A speaker may not insulate himself or herself from

liability simply by phrasing defamatory statements as opinions where an imbedded defamatory

fact may be inferred."  Ramunno, 705 A.2d at 1036; See Kanaga, 687 A.2d at 177-78. Instead,

if an opinion implies a false assertion of objective fact, the opinion is actionable.  Ramunno, 705

---

[36]   It is a question of law whether a defamatory statement is a factual representation or an
opinion.  Ramunno, 705 A.2d at 1035 n. 14.

[37]   Indeed the Delaware Supreme Court has questioned the continuing vitality of Riley v. Moyed,
529 A.2d 248 (Del. 1987), in the area of opinion in light of the U.S. Supreme Court's Milkovich
decision.  Kanaga, 687 A.2d at 178.  Of course, even if Riley v. Moyed was applied in Plaintiff Foraker's
case, he still would have more than enough evidence to prove his defamation claim.

-32-

A.2d at 1036.[38]  Such is certainly the case for the defendant's statements about Sgt. Foraker, they imply false assertions of objective fact, even if hidden in opinion language.

Indeed, Defendants' brief says, "the statements by Col. Chaffinch are mostly expressions of opinion." (DOB at 28).  So logically defendants own brief admits that at least some of the statements made by defendants were not opinion and thus summary judgment cannot be appropriate.

Alternatively, four factors are used to determine whether a statement is one of fact or opinion; social setting, context, common usage and objective verifiability.  Ramunno, 705 A.2d at 1036 n. 22.

**1. Social Setting and Context.**  The social setting and context are key to understanding why defendant's accusations are defamatory statements of fact.  Here, a multi-million dollar firearms facility was shutdown and someone had to take the fall in the public mind.  Defendants decided it should be plaintiff and the men who worked with him, not the high level officials who could not do simple arithmetic and awarded the construction contract, not to a qualified builder but, to one with no prior experience in building a highly sophisticated and dangerous facility.  The message must be that the problem did not lay in the political realm but simply with neglect of duty by low level employees.

**2. Objective Verification and Common Usage.**  Here neglect of duty is also objectively verifiable.  If plaintiff destroyed the facility, then the statements will be found to be true by the jury and truth is a defense to any defamation claim.

Contrary to defendants' assertions, an analysis of the objective verifiability does not take this court into forbidden First Amendment territory.  "[C]ourts must take the words in their plain and natural meaning and understand them as would a person of average intelligence and

---

[38] Even though couched as an opinion, a statement may suggest a defamatory factual basis not even  disclosed by the speaker. Ramunno, 705 A.2d at 1037.

perception." <u>Ramunno</u>, 705 A.2d at 1035-36.  Indeed "language is to be construed in the sense in which mankind in general would naturally understand it."  <u>Snavely v. Booth</u>, 176 A. 649, 653 (Del.Super. 1935).  In accordance with this, the words "dropped the ball" within the context of an administrative official referring to conduct by an underling during the course of his duties is not speculative or a mere opinion. It means he neglected his duties, just like an associate attorney at a big firm who failed to meet a statute of limitations deadline would have "dropped the ball" and thus neglected his duty.  This is an objective fact.

Defendants' statements, taken as a whole, indicated wrongdoing by plaintiff and implied an objective fact about plaintiff, he neglected his duty.  They defamed him.  <u>Ramunno</u>, 705 A.2d at 1036.

**E.  Plaintiff is Not a Limited Purpose Public Figure.**  Defendants also claim that plaintiff must provide evidence of actual malice because he is a public official and/or public figure. (DOB at 23-24).  The contention is misplaced when one looks at the temporal sequence and the difference between a public figure and a private person speaking out on matters of public concern.

Looking at the temporal sequence, plaintiff did not speak to the Auditor's office until <u>after</u> defendants made the false statements about him to the press.[39]  So he simply did not "thrust [himself] into the vortex of [a] public issue," as required by <u>Gertz</u>, 418 U.S. at 352, and the public figure defense fails since he was not a public figure when he was defamed.

Clearly, even as a limited pubic figure the result is the same.  The legal standard is the same.  "In general, to be a 'limited' public figure, the plaintiff must thrust himself into the vortex of the dispute," <u>Martin v. Widener School of Law</u>, 1992 WL 153540, *7 (Del. Super. Jun. 17, 1992), <u>Gertz</u>, 418 U.S. at 352, which did not occur until after he was defamed.

---

[39] Although plaintiff did speak out on matters of public concern by pointing out problems at the FTU range via the chain of command, he did not inject himself into the public milieu of the press.  He kept it in house.

Also with regard to his first successful lawsuit, the courts have held that the filing of a lawsuit alone will not necessarily elevate a private plaintiff to public figure status. Martin, 1992 WL 153540 at *9. A "private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 167 (1979).[40] Such as the first lawsuit.

Indeed, as the Third Circuit has recognized, a plaintiff must appear frequently in the news to be transformed from a private figure to public figure status. See Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069, 1078 (3d Cir. 1988). Such was not the case for Foraker until *after* defendants defamed him. Any subsequent appearances were a direct result of defendants' media blitz which was a malicious effort to destroy his ability to put food on the table for his family after he retires from the police department, efforts which are also the subject of plaintiff's false light invasion of privacy claim.[41]

A clear view of the facts reveals that plaintiff did not inject himself into the public eye concerning problems with the FTU facility. His comments concerning problems at the range were limited before and during his first lawsuit. He did not relay his initial public concern

---

[40] Defendants' opening brief misses the point. Becoming a public figure and speaking out on a matter of public concern is not the same thing. One involves the character or status of one's reputation in the community as noted in media reports or other public fora, while the other simply means that one has exercised his First Amendment right to speak up on a matter which is of concern to the public.

Such is especially the case for Foraker, who after he was reinstated as Section Chief of the FTU by Judge Farnan's Order and an agreement between the parties, only spoke upon matters of public concern by staying within the chain of command until after defendants defamed him. Certainly he did not become a public figure by virtue of speaking out on matters of public concern prior to the filing of his first lawsuit nor by his actual filing of his first lawsuit. Such an interpretation would flip the First Amendment on its head, allowing defendants who initially violated a Petitioner's First Amendment rights to retaliate against him thereafter by smearing him in the press and falsely hide behind the "public figure" defamation standard in order to get back at the Petitioner for petitioning the government for a legitimate redress of his grievances.

[41] Of course, defendant Chaffinch did not allow Foraker to speak to the press to allow for a balanced news story. Instead, he gagged Foraker, his supervisors, and the men Foraker supervised at the FTU in an effort to create a slanted story which would hurt Foraker. (4/7/04 Del. State News article; A2723-2726).

speech to the press.  Rather, he relayed it up the chain of command, and Chaffinch retaliated against him for doing so.   His testimony in court did not emphasize problems at the FTU facility.  Rather, it emphasized health and behavior problems with a friend of Chaffinch.  After obtaining a jury verdict, he did not run to the press to identify problems with the range which necessitated a shutdown.  When he ultimately was restored to the position of Section Chief, he noted problems at the facility but only by using the chain of command.  He did not  run to the press or even to the State Auditor.  However, in less than four months it was defendants who ran to the press and smeared him.  Plaintiff only spoke with the State Auditor after defendants defamed him.

Moreover, the neglect of duty which defendants accuse Sgt. Foraker of engaging in involves maintenance which Hazmat experts, not police officers, typically handle at FTU facilities.  (Foraker 61-62,82-83; A695-96,700-01).  Such work was beyond his responsibilities as a police officer.  Simply put, the false light publicity engendered by defendants does not revolve around traditional official acts or duties as a police officer.

Defendants' attempt to refocus the actual issue involving the defamation is telling.  The defamatory statements, as admitted by MacLeish, concern allegations of neglect of duty on Foraker's part.  They do not involve the public concern speech for which defendants retaliated against Foraker.

Moreover, the circumstances surrounding Sgt. Foraker's discharge of his duties do not cause him to rise to the level of a public official.[42]  The case law cited by defendants indicates that rank and file police officers can be considered public officials for the purpose of defamation law when they use excessive force against a citizen because the definition of a public official

---

[42] In an analogous situation, the Delaware courts determined that the performance of a particular physician is not a matter of public concern for defamation purposes because 24 Del. C. § 1768 provided that the physician peer review mechanism shall be private and not subject to public examination.  Connolly v. Labowitz, 519 A.2d 138, 141 (Del. Super. 1986).  Similarly, the police officer peer review mechanism for violations of neglect of duty, personnel files, etc. are kept confidential by the Law-Enforcement Officers' Bill of Rights, policy and practice.  See 11 Del. C. §§ 9200-9209.

must be construed liberally in order "to permit a citizen's complaint to a police officer's superiors." See Jackson v. Filiben, 281 A.2d 604, 605 (Del. 1971). But here plaintiff's superiors are the people who are making the defamatory statements.

So Sgt. Foraker should not be considered a public figure or a public official in this matter.

Nonetheless, plaintiff will address defendants' contentions regarding the culpability requirements of public officials and figures, if he were found to be one. See Gertz, 418 U.S. 323. Quite simply there is abundant proof of actual malice in this record. (POB at 6-7). Under New York Times v. Sullivan, 376 U.S. at 279-80, actual malice, requires that the defendants knew the falsity of their statements and/or recklessly disregarded the truth or falsity of their statements. This is certainly true here, where both Chaffinch and MacLeisch were aware that there were problems with the FTU long before Foraker returned in December of 2003. (Chaffinch 52-64; A438-41; MacLeish 40-79,106-112,114-15,122-28,138-53; A103-13,120-25,128-31), failed to point out any of the other problems associated with the facility, (Chaffinch 81-84; A445-46), and boasted about how he was going to get Foraker both before and after the press conference. (Baylor 386-91; A398-99; Dixon 8-10; A525-26; Conley Decl. ¶¶ 7,9-10; A1564-65).

**VII.   DEFENDANTS PLACED PLAINTIFF IN A FALSE LIGHT WHEN THEY ON MULTIPLE OCCASIONS TOLD THE MEDIA THAT HE WAS TO BLAME FOR THE SHUTDOWN OF THE FTU FACILITY WITHOUT REFERENCING THE MANY PROBLEMS ASSOCIATED WITH THE FACILITY, EVEN BEFORE HE BECAME THE SECTION CHIEF OF THE FTU, WHILE SIMULTANEOUSLY ORDERING BOTH FORAKER AND HIS SUPERIORS NOT TO SPEAK WITH THE MEDIA ON THE SUBJECT.**

**A.  The Basics About False Light Law.**   The "law recognizes that every person has a right to some degree of privacy." Guthridge v. Pen-Mod, Inc., 239 A.2d 709, 711 (Del.Super. 1967). The right to privacy "stems from the 'right to be left alone.'" Barbieri v. News-Journal Co., 189 A.2d 773, 774 (Del. 1963).

The tort of false light invasion of privacy was originally recognized by the Delaware

Supreme Court in Barbieri. It is defined as "the tort of giving publicity to something that places the plaintiff in a false light before the public, the false light being highly offensive to a reasonable person, and knowing of or acting in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."[43]    Wyshock v. Malekzadeh, 1992 WL 148002, *2 (Del. Super. Jun. 10, 1992) (internal quotation marks omitted). The same restrictions for defamation are also applicable to this tort. Id.

Defendants' reliance upon an Arizona case is misplaced. In Godbehere v. Phoenix Newspapers, Inc., 783 P.2d 781, 790 (Ariz. 1989), the court held that a sheriff and his deputies had "no right of privacy" and thus could not bring a false light invasion of privacy claim for matters involving official acts or duties. Id. at 789. First, it relies upon cases involving higher level police officers within the purview of their traditional normal police duties. Meanwhile, the neglect of duty which defendants accuse Sgt. Foraker of engaging in involves maintenance which Hazmat experts, not police officers, typically handle at FTU facilities. (Foraker 61-62,82-83; MacLeish ex. 3 p.2; A695-96,700-01, 208). Simply put, the false light publicity engendered by defendants do not revolve around official traditional acts or duties as a police officer. So plaintiff is not a public official in this instance. Indeed, by statute,[44] policies and practice a Delaware police officer's performance record is not supposed to be public record.

**B. The Factual Basis For This Tort.** In addition to the defamation arguments provided earlier in this Brief, the actions of defendants scream out for a false light claim in that they failed to disclose material information which they knew would place plaintiff in a more truthful light and simultaneously ordered that he could not talk to the press to tell his side of the story. Defendants actions at the press conferences and with the press in general were taken to paint him

---

[43] Publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D Comment A (1977).

[44] 11 Del. C. §§ 9200-9209.

in a false light. Indeed, the articles and television story portray him as the person responsible for the shutdown of the FTU range and imply that after only three months after his return as Section Chief he had broken this multi-million dollar facility.[45]

## CONCLUSION

Defendants' motion for summary judgment should be denied in its entirety.


Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY AT LAW**

/s/ Martin D. Haverly
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: February 8, 2006                Attorneys for Plaintiff

---

[45] Plaintiff incorporates by reference his discussion in the defamation argument above regarding Sgt. Foraker's status as a private figure and defendants' actual malice.

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

February 8, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:


Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**


Foraker/ Briefs / Foraker - -SJAB.final