# Unreported Opinions



**H**
Briefs and Other Related Documents

This case was not selected for publication in the Federal ReporterNOT PRECEDENTIALThis case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL   Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,Third Circuit.
Sally BENNETT, Administratrix of the ESTATE OF David BENNETT, Appellant,
v.
Francis J. MURPHY, III, Individually and as a Pennsylvania State Police Officer of the Commonwealth of Pennsylvania; Mark F. Nowakowski, Individually and in his capacity as a corporal of the Pennsylvania State Police of the Commonwealth of Pennsylvania.
**No. 04-1643.**

Submitted pursuant to Third Circuit LAR 34.1(a) on Dec. 6, 2004.
Decided Jan. 14, 2005.

**Background:**  Estate of suspect killed by state trooper brought § 1983 action alleging use of excessive force. On remand, 274 F.3d 133, the United States District Court for the Western District of Pennsylvania, Arthur J. Schwab, J., granted summary judgment for trooper on qualified immunity grounds, and estate appealed.

**Holding:**  The Court of Appeals, Shadur, Senior District Judge, sitting by designation, held that trooper was not entitled to qualified immunity.

Reversed and remanded.

West Headnotes

Civil Rights 78 🔑1376(6)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity;  Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
"Immediate threat" standard for use of deadly force was sufficiently clear, in case of officer who shot armed distraught suspect who, although refusing to drop his weapon over course of hour-long standoff, had never pointed his single-shot shotgun at anyone but himself and who was not in flight at time of shooting, to warrant denial of qualified immunity from § 1983 liability. 42 U.S.C.A. § 1983.

***914** On Appeal from the United States District Court for the Western District of Pennsylvania.   D.C. Civ. No. 94-214.  District Judge:  The Honorable Arthur J. Schwab.

Vincent A. Coppola, Pribanic & Pribanic, Pittsburgh, PA, for Appellant.
John G. Knorr, III, Office of Attorney General of Pennsylvania, Harrisburg, PA, for Appellee.

Before AMBRO and VAN ANTWERPEN, Circuit Judges, and SHADUR, FN* District Judge.

    FN* Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

OPINION OF THE COURT

SHADUR, District Judge.
****1** Sally Bennett ("Bennett") appeals the District Court's grant of summary judgment in favor of State Trooper Francis Murphy ("Murphy") on the ground of qualified immunity in Bennett's suit for damages

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

120 Fed.Appx. 914
120 Fed.Appx. 914, 2005 WL 78581 (C.A.3 (Pa.))
**(Cite as: 120 Fed.Appx. 914)**

following the fatal shooting of her son David Bennett ("David"). Because we conclude that the District Court erred in holding that the law regarding the use of deadly force was insufficiently clear as applied to the facts alleged by Bennett, we hold that Murphy is not entitled to qualified immunity. Accordingly we reverse the District Court's grant of summary **\*915** judgment in Murphy's favor and remand the case for trial.

*Background*

Murphy shot David fatally following a prolonged armed standoff between David and police in a field near an apartment complex on January 4, 1994. Bennett brought suit in February 1994 under [42 U.S.C. § 1983](#) ("[Section 1983](#)"), alleging the use of excessive force by a police officer in violation of the Fourth Amendment. Following a trial on the merits in September 1996, the jury returned a verdict in Murphy's favor. Bennett filed a motion for a new trial one year later on the ground that information in Murphy's personnel records relevant to his credibility had been withheld during discovery. After the District Court granted that motion, Murphy in turn moved for summary judgment on the ground of qualified immunity. Concluding in *"[Bennett I,](#)" 127 F.Supp.2d 689, 699 (W.D.Pa.2000)* that "Murphy is not entitled to qualified immunity on summary judgment because of disputes of fact and issues of credibility that should be submitted to a jury," the District Court denied that motion.

During the pendency of Murphy's ensuing appeal to this Court, the Supreme Court decided *[Saucier v. Katz,](#) 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)*, which definitively prescribed the analysis to be undertaken by courts facing claims of qualified immunity in excessive force cases. Engaging in *Saucier's* two-step analysis, we held in *[Bennett v. Murphy,](#) 274 F.3d 133, 136 (3d Cir.2001)* ("*Bennett II*") that the facts taken in the light most favorable to Bennett indeed showed a constitutional violation. But we remanded the case for the District Court to engage in the second step of the *Saucier* inquiry: whether the law regarding the use of excessive force, as applied to the facts alleged by Bennett, was clearly established at the time of the incident (*[Bennett II, 274 F.3d at](#)*

[136-37).](#)

In the interim Judge Robert Cindrich, the District Court judge who had been presiding over the case, announced his retirement and the case was reassigned to Judge Arthur Schwab. In a memorandum opinion dated February 20, 2004 Judge Schwab concluded in "*Bennett III,*" No. 94-214, mem. order at 7 that "under the factual scenario asserted by the plaintiff, a reasonable police officer would not have understood that his actions were prohibited, nor would it have been clear to a reasonable officer what the law required." Because he thus held that Murphy was entitled to qualified immunity, Judge Schwab granted his motion for summary judgment. Bennett appeals, and we have jurisdiction under [28 U.S.C. § 1291](#).

*Murphy's Lack of Entitlement to Qualified Immunity*

**\*\*2** Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (*[Harlow v. Fitzgerald,](#) 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)*). After nearly two decades of further development of that doctrine, *Saucier* dictated a two-part inquiry to be used in determining whether an official is entitled to qualified immunity. At step one, the question is whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right ([533 U.S. at 201](#)). If that question is answered in the affirmative, "the next, sequential step is to ask whether the right was clearly established" (*id.*).

**\*916** Judge Cindrich's initial opinion in *[Bennett I,](#) 127 F.Supp.2d at 690-91* (record citations omitted) summarized the facts alleged, viewed in the light most favorable to Bennett:

The state police were called to the courtyard of a group of apartment buildings on the evening of January 4, 1994 to confront a man, David Bennett, who they soon learned was distraught at being unable to see his girlfriend. He was armed with a single shot shotgun

120 Fed.Appx. 914                                                                                     Page 3
120 Fed.Appx. 914, 2005 WL 78581 (C.A.3 (Pa.))
**(Cite as: 120 Fed.Appx. 914)**

that he held vertically in front of him, with the barrel pointed up at his head, and the stock facing down. He was "very deliberate in holding [the gun] toward himself or in the air," and did not point the gun at anyone, including state troopers. He said that he wanted to kill himself. As the troopers took up positions surrounding him in the open area between the apartment buildings, he became agitated and began moving toward a group of them, but stopped for perhaps four seconds before he was shot. Murphy was positioned 80 yards behind Bennett when he fired. Almost an hour passed between the time the state troopers first arrived on the scene, and the time Bennett was shot.

We adopted that version of the facts in *Bennett II,* and we do so again for purposes of the present qualified immunity inquiry.

In terms of the first step of the *Saucier* analysis, *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) had earlier held that the use of force by police is subject to the Fourth Amendment and its "reasonableness standard." And *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) had still earlier made it clear that the use of deadly force by an officer is constitutionally unreasonable and violates the Fourth Amendment unless a felony suspect poses an immediate threat of physical harm to police or others.

On that score we concluded in *Bennett II,* 274 F.3d at 136 that the facts alleged by Bennett demonstrated that David did not pose a threat to anyone but himself, hence the use of deadly force against him was objectively unreasonable. Although we did not then quote the summary of facts in *Bennett I,* 127 F.Supp.2d at 691 that compelled that conclusion, we find that statement unexceptionable:
**\*\*3** Bennett admittedly was angry and defiant in the face of a group of determined, armed state troopers. But to take the version of the facts most favorable to Bennett, is it indisputably reasonable as a matter of law for a law enforcement officer 80 yards away; at night; under conditions of poor visibility; to shoot someone who is standing still; facing away; with a gun pointed at his own head, threatening suicide; surrounded by

heavily armed fellow officers in close proximity; out of fear of a threat to other troopers positioned at one third the distance; who were in a much better position to see the decedent; and who did not shoot; after almost an hour had passed with no offensive action by the state police?

Because we not only agreed with the District Court's "no" answer to that question but affirmatively concluded that a constitutional violation had occurred under Bennett's version of the facts, we remanded for the District Court to consider whether David's Fourth Amendment right was clearly established, explaining the inquiry as follows (*Bennett II,* 274 F.3d at 136-37 (emphasis in the original)):[I]n the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited? The focus in this step is solely upon the law. If it would not **\*917** have been clear to a reasonable officer *what the law required* under the facts alleged, he is entitled to qualified immunity. If the requirements of the law would have been clear, the officer must stand trial.

As stated earlier, the District Court then concluded that the law with respect to excessive force was not clearly established as applied to Bennett's factual scenario. Its holding relied on two cases: *Montoute v. Carr,* 114 F.3d 181, 185 (11th Cir.1997), and *Leong v. City of Detroit,* 151 F.Supp.2d 858 (E.D.Mich.2001). Both of those cases involved armed suspects as to whom, although they never pointed their weapons at police, the courts concluded that the police reasonably believed the suspects presented an immediate threat and that the use of deadly force was therefore justified. In light of those cases, the District Court accepted Murphy's argument that even though *Graham* and *Garner* clearly established the "immediate threat" standard, that standard was not clear as applied to David, who was armed and refused commands to drop his weapon. On appeal Bennett argues that the law of excessive force was not as murky as Murphy would have it and that the cases relied upon by the District Court, because they involved dramatically different factual scenarios, do not support its conclusion that Murphy reasonably believed the law entitled him to shoot David.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

120 Fed.Appx. 914                                                                                   Page 4
120 Fed.Appx. 914, 2005 WL 78581 (C.A.3 (Pa.))
**(Cite as: 120 Fed.Appx. 914)**

At the outset we recognize that there is a degree of "duplication inherent in [*Saucier's*] two-part scheme" as applied to excessive force cases (*Saucier,* 533 U.S. at 213) (Ginsburg, J., concurring in the judgment). That is, the question whether the amount of force an officer used was unreasonable and violated the Fourth Amendment may be viewed as blending somewhat into the question whether the officer reasonably believed that the amount of force he used was lawful. But *Saucier* makes clear that the two inquiries are distinct: Even where an officer's actions are unreasonable under *Graham's* constitutional standard (as *Bennett II* held was true of Murphy's conduct), that officer is still entitled to immunity if he or she has a reasonable "mistaken understanding as to whether a particular amount of force is legal" in a given factual situation (*Saucier,* 533 U.S. at 205). Murphy thus asserts that even assuming his actions were constitutionally unreasonable, he made a reasonable mistake as to the legality of those actions. To support that assertion he puts forth two related arguments.

**\*\*4** First, he contends that *Garner's* "immediate threat" standard, while clearly established, offered no guidance in the particular situation he faced. In that respect we are of course mindful of the principle, which the Supreme Court recently reaffirmed in *Brosseau v. Haugen,* --- U.S. ----, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004)(per curiam)(quoting *Saucier,* 533 U.S. at 201), that the inquiry whether an injured party's constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Applying that principle, *Brosseau, id.* at 599-600 stated that *Graham* and *Garner* "are cast at a high level of generality" and provided little guidance as applied to the situation confronting the officer in that case: "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."

We agree of course that *Graham* and *Garner* set out a standard that is general in nature in the context addressed in *Brosseau.* And we also agree with the District Court that there are circumstances, such as those in *Brosseau,* in which the "immediate threat" standard may be "subject to **\*918** differing interpretations in practice" (*Bennett III,* mem. order at 7). But we cannot say that the *Graham* and *Garner* "immediate threat" standard is lacking in adequate substantive content as applied to the very different situation that Murphy addressed in Bennett's factual scenario: whether to shoot an armed distraught man who, although refusing to drop his weapon over the course of an hour-long standoff, had never pointed his single-shot shotgun at anyone but himself and who was not in flight at the time he was shot. [FN1] As *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) teaches, "general statements of the law are not inherently incapable of giving fair and clear warning" to public servants that their conduct is unlawful. And because (as we held in *Bennett II*) the facts alleged by Bennett disclose no basis from which to conclude that David posed an immediate threat to anyone but himself, we conclude that this case is one in which the "general constitutional rule already identified in decisional law ... appl[ies] with obvious clarity to the specific conduct in question" (*Id.*).

> FN1. Before David was shot, officers far closer than Murphy (who was fully 80 yards away and did not have full vision of the entire scene) had ordered him to halt (he had begun to move toward them, with the snow at the scene posing some difficulty in that regard). Witnesses whose testimony must be credited for present purposes swore that David had not only obeyed that "halt" order for a full four seconds when Murphy nevertheless chose to shoot him, but one of those witnesses said that David had actually taken a step backwards. And the duration of a time measured in seconds is seldom appreciated until one recites "one thousand and one, one thousand and two" and so on in a measured cadence to mark that passage of time.

Murphy's second and related argument is that in light of what he terms "similar" cases involving deadly force, his mistaken application of the "immediate threat" standard was reasonable. Murphy cites two of those cases, *Montoute* and *Leong,* in support of the proposition that he reasonably believed David could

120 Fed.Appx. 914                                                                                                    Page 5
120 Fed.Appx. 914, 2005 WL 78581 (C.A.3 (Pa.))
**(Cite as: 120 Fed.Appx. 914)**

lawfully be shot because he had a weapon and refused to put it down.   But in reality neither of those cases calls into question the rule, recognized as clearly established prior to this incident by the Ninth Circuit in *Harris v. Roderick,* 126 F.3d 1189, 1204 (9th Cir.1997), that under *Graham* and *Garner* "[l]aw enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." [FN2]

> [FN2.] Although the District Court refused to consider *Harris* because it was decided in 1997, three years after this incident, that refusal was misguided-for *Harris* had analyzed the state of the law as it existed at the time of the infamous Ruby Ridge incident in 1992.  While it is therefore true that Murphy cannot be charged with knowledge of the decision itself, *Harris* is nonetheless relevant to our own analysis of the state of the law in 1994 as to the use of deadly force by police.

**\*\*5** As to *Montoute,* Murphy seizes on the court's statement (114 F.3d at 185) that "[a]t least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."   But the portion of the opinion immediately following that language (*id.*) demonstrates that the court's holding that the suspect posed an immediate threat did not rest upon the suspect's mere possession of a weapon, but rather on the use the suspect had made of his weapon:

Sergeant Carr faced a situation fraught with danger.   Montoute had fired an illegal weapon while in a crowd of people in a near-riot situation.   He was armed with a 12-gauge, pistol-grip, sawed-off, pump shotgun.   Such weapons are specifically**\*919** designed or altered, and frequently used, by criminals to kill people....Any officer would know that, and would know that pump shotguns can carry and fire more than one round....Montoute's unexplained refusal to obey the repeated orders to drop the sawed-off shotgun provided an additional basis for inferring that he presented a risk of serious physical injury to an officer or someone else.

We simply cannot accept Murphy's position that *Montoute* shows him to have been reasonably mistaken about the legality of his actions in a factual matrix worlds away from the one confronting the officer in that case.

That applies as well to *Leong,* where "[t]he officers in this case were faced with a situation where (i) Mr. Leong had led them on a chase through several streets and alleys;  (ii) upon cornering the suspect, he fired his shotgun into the roof of his truck and emerged from his vehicle with this weapon;   and (iii) Mr. Leong disregarded repeated warnings that he put down his gun, and instead racked his gun and invited the officers to shoot him" (151 F.Supp.2d at 868).   It was in that factual context that the court said (*id.* at 866):

Plainly, an armed and gun-wielding suspect can turn and train his weapon on an officer or bystander in an instant, with disastrous consequences.

So *Leong* and its sharply different factual situation likewise offer no support for Murphy's contention that he made a reasonable mistake as to the legality of his action in killing David.

Murphy cites a number of other cases in his brief in attempted support of his contention that he could not reasonably understand what the law required in the circumstances he faced.   To the contrary, the contrast between the situations confronting the officers in those cases-cases such as *Rhodes v. McDannel,* 945 F.2d 117, 118, 120 (6th Cir.1991)(per curiam), *Wilson v. Meeks,* 52 F.3d 1547, 1549-50, 1552-54 (10th Cir.1995) and *Sigman v. Town of Chapel Hill,* 161 F.3d 782, 784-85, 786-88 (4th Cir.1998)-and the scenario in this case actually point in the opposite direction.   On the facts as we must credit them, Murphy acted precipitately at a time and under circumstances totally lacking in the urgency posed by all of those cases:  More than an hour had passed during the standoff with David, a period throughout which he had threatened to harm no one but himself;  and when Murphy chose that instant to shoot to kill, David was at a standstill 20 to 25 yards from the nearest officer and fully 80 yards from Murphy himself.

**\*\*6** Surely Murphy cannot rely on such cases, all of them involving suspects who unquestionably posed an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

120 Fed.Appx. 914                                                                                    Page 6
120 Fed.Appx. 914, 2005 WL 78581 (C.A.3 (Pa.))
**(Cite as: 120 Fed.Appx. 914)**

immediate threat of physical harm to police, in support
of the contention that he reasonably believed it was
lawful to shoot David, who posed no such threat.   To
be sure, those other cases may illustrate that the concept
of excessive force "is one in which the result depends
very much on the facts of each case" (_Brosseau,_ 125
_S.Ct. at 600)._   But as we have already explained, the
facts alleged by Bennett, which we take as true for
purposes of the qualified immunity inquiry, are such
that any reasonable officer would understand, without
reference to any other case law, that _Graham_ and
_Garner_ prohibited shooting David.   For that reason we
conclude that Murphy is not entitled to qualified
immunity.

<em>Conclusion</em>

We have determined on the record before us that
Murphy is not entitled to qualified immunity.   That of
course is not the end of the matter-we reiterate our
statement in _Bennett II,_ 274 F.3d at 137 **920** that
nothing precludes Murphy "from arguing that he
reasonably perceived the facts to be different from
those alleged by the plaintiff.   An officer may still
contend that he reasonably, but mistakenly, believed
that his use of force was justified by the circumstances
as he perceived them;  this contention, however, must
be considered at trial."   We thus reverse the District
Court's grant of summary judgment in Murphy's favor
and remand the case for a full consideration of Bennett's
claims at trial.

C.A.3 (Pa.),2005.
Bennett ex rel. Estate of Bennett v. Murphy
120 Fed.Appx. 914, 2005 WL 78581 (C.A.3 (Pa.))

Briefs and Other Related Documents (Back to top)

• 04-1643 (Docket) (Mar. 11, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Texas, Dallas
Division.
Kevin ELLIS, et al., Plaintiffs,
v.
Eddie CRAWFORD, et al., Defendants.
**No. Civ.A. 3:03CV2416D.**

March 3, 2005.

Douglas R. Larson, Law Office of Douglas R. Larson,
Mesquite, TX, for Plaintiffs.
Janice Smith Moss, Dallas City Attorney's Office,
Dallas, TX, for Defendants.

MEMORANDUM OPINION AND ORDER

FITZWATER, J.
**\*1** Defendants' motion to dismiss under Fed.R.Civ.P.
12(b)(6) presents the questions whether defendants are
entitled to qualified immunity from plaintiffs' suit to
recover under 42 U.S.C. § 1983 for alleged violations
of the First and Fourteenth Amendments and whether
plaintiffs have stated a claim for relief under 42 U.S.C.
§ 1985(2). For the reasons that follow, the court grants
the motion in part and denies it in part and permits
plaintiffs to file an amended Rule 7(a) reply.

I

Plaintiffs Kevin Ellis ("Ellis"), Lee Bush ("Bush"),
Tom Clayton ("Clayton"), Shawn Wash ("Wash"), and
Steve Fuentes ("Fuentes") sue under 42 U.S.C. § 1983
to recover for violations of their First and/or Fourteenth
Amendment rights to freedom from discrimination,
retaliation, and/or equal protection of the law, [FN1] and
under § 1985(2) for conspiracy to violate their civil
rights. [FN2] Ellis and Clayton are Caucasian, Wash and
Bush are African-American, and Fuentes is of Hispanic

heritage. Plaintiffs allege that defendants Eddie
Crawford ("Crawford"), Randy Hampton ("Hampton"),
Terrell Bolton ("Bolton"), Roseanna Renaud
("Renaud"), June Kim Edwards ("Edwards"), Joe Gunn
("Gunn"), Rick Andrews ("Andrews"), and Scott
Gerdes ("Gerdes") unlawfully retaliated against Bush
for obtaining a promotion to the rank of sergeant
through a settlement of a race discrimination suit
against the City of Dallas ("City") and individuals in the
Dallas Police Department ("DPD"). They aver that
defendants retaliated against the other four plaintiffs
because they appeared to support Bush.

FN1. Plaintiffs allege in their complaint that
defendants acted "in violation of Title 42
U.S.C. § 1983[.]" Compl. ¶ 23. Section 1983
cannot be "violated." "Section 1983 creates a
private right of action for redressing the
violation of federal law by those acting under
color of state law. It is not itself a source of
substantive rights, but merely provides a
method for vindicating federal rights
conferred elsewhere." Colson v. Grohman,
174 F.3d 498, 504 n. 2 (5th Cir.1999) (citation
omitted). "Section 1983 provides that any
person who, under color of state law, deprives
another of any rights, privileges or immunities
secured by the Constitution and laws shall be
liable to the party injured in an action at law,
suit in equity, or other proper proceeding for
redress [.] Rather than creating substantive
rights, § 1983 simply provides a remedy for
the rights that it designates. Thus, an
underlying constitutional or statutory violation
is a predicate to liability under § 1983."
Harrington v. Harris, 118 F.3d 359, 365 (5th
Cir.1997) (quoting, inter alia, Johnston v.
Harris County Flood Control Dist. ., 869 F.2d
1565, 1573 (5th Cir.1989)) (citations and
internal quotation marks omitted).

FN2. Contending it is unclear whether
plaintiffs intend to allege a claim under Title

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 2
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* defendants move to dismiss such a claim, if made. On January 31, 2005 plaintiffs filed a notice of error that indicates that the reference in their complaint to Title VII is mistaken. This notice also clarifies that plaintiffs are asserting claims solely under 42 U.S.C. §§ 1983 and 1985. Accordingly, the court need not address this ground of defendants' motion.

According to plaintiffs' complaint and Rule 7(a) reply, after being passed over several times for promotion, Bush sued the City and several members of the DPD command staff, including former DPD Police Chief Bennie Click ("Click"). Under the terms of a settlement, Bush was promoted to the rank of sergeant. Before the case settled, the City promoted Bolton, who is also African-American, to the position of Chief of Police. Bolton replaced virtually all members of Click's command staff who had been responsible for the discrimination against Bush. All the persons who were formerly members of Click's command staff were members of the Dallas Police Association ("DPA"), a union that represents DPD officers. Defendant Crawford was the DPA Vice President.

In February 2001 Bush was assigned to command the Interactive Community Policing ("ICP") Unit of DPD's Northwest Division. Each other plaintiff was also assigned to that Unit and was under Bush's direct supervision. Before Bush took over command, all six DPD ICP Units were treated similarly. Afterward, however, the Northwest Division ICP Unit was singled out for discriminatory and retaliatory treatment, including unfounded claims of misconduct, denial of the ability to earn overtime, and unfavorable work hours. Other ICP Units are not subjected to such treatment.

Edwards, an Assistant Police Chief, commanded the Northwest Division. Bush's immediate supervisors were Renaud, Gunn, Andrews, and Gerdes, each of whom is Caucasian. Edwards, Renaud, Gunn, Andrews, and Gerdes are DPA members, as are the vast majority of DPD members. Many minorities perceive DPA to be racist, so many African-American and Hispanic officers

are members of other unions. DPA is the largest union, however, and carries the most clout with the DPD administration. Most DPA members objected to Bush's promotion. Plaintiffs allege that Crawford, Renaud, Edwards, Gunn, Andrews, and Gerdes are racists and are among the DPA members who resent Bush's advancement via a lawsuit in which he alleged racism.

**\*2** The members of DPD upper management whom Bolton replaced were active members of the DPA. DPA perceived Bolton as having replaced union members whom Bush had accused of racial discrimination, and it resented Bush for his role in terminating several senior officers who were DPA members. DPA has great influence over the activities and operations of DPD because it is the largest police union and a majority of DPD supervisory officers are DPA members. DPD supervisory staff, including Bolton, Renaud, Andrews, Gunn, Gerdes, and Edwards, permit DPA officers to conduct union business while on duty.

Crawford, as DPA Vice President, enjoys privileges not given other officers, including conducting DPA business while on duty. Because of his position in the DPA, he enjoys an aura of protection from criticism for misconduct and for performing DPA business while on duty. Just before Bush assumed command of the Northwest Division ICP Unit, Crawford vented his personal dislike for Bush to several division officers and made it clear that he did not want to serve with him and was against his assignment to the Division. He promised several DPA members that he had a plan to get rid of Bush when he arrived.

Wash once observed Crawford attempt to gain unlawful entrance to Bush's locked office at the Northwest Division. Another officer was nearby. When Wash alerted them to his presence, they walked away. Later that same day, Ellis attempted to learn the role of the other officer who was present. Ellis and Wash made written reports of their observations and/or activities, and Bush submitted a complaint and reports to the DPD Internal Affairs Division ("IAD"). Fuentes and Clayton supported the actions of the other plaintiffs.

Crawford obtained copies of the statements and/or complaints that Bush, Ellis, and Wash had made and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

posted them on a bulletin board at Northwest Division headquarters. He did this to signal to all DPA members that they should shun and retaliate against Bush and the other plaintiffs who associated with him and/or were persons who supported his IAD complaint. The posting also signaled that Bush and the other plaintiffs had violated the code of silence and that other DPD officers should join him in retaliating against Bush and any officer who supported him. And it challenged Bolton and Hampton not to take action against him because he and the DPA would view punishment of him as support for Bush and the other plaintiffs.

Renaud, Edwards, Gunn, Andrews, and Gerdes joined Crawford in his retaliatory and racially-inspired actions against plaintiffs. Bolton and Hampton joined in the actions to avoid any direct attack against Crawford, a high profile DPA member. Bolton and Hampton thus failed to take action against Crawford for illegally attempting to enter Bush's office and failed to take action against Renaud, Edwards, Gunn, Andrews, and Gerdes for taking racially-inspired and retaliatory actions against plaintiffs. Bolton and Hampton had received extensive criticism from DPA officials that Bolton had promoted minorities over more-qualified Caucasians. Bolton had also been criticized for the perception that he had been responsible for the favorable resolution of Bush's discrimination suit.

**\*3** Plaintiffs later reported and complained about Crawford's retaliatory and racially-motivated posting of their complaint and statements. Each time they attempted to obtain relief from the racially-inspired retaliatory acts and treatment that Crawford instigated, Renaud, Bolton, Hampton, Edwards, Gunn, Andrews, and/or Gerdes refused to take any action to resolve or prevent the retaliatory treatment. Because of plaintiffs' submissions to IAD and the other defendants' failure to take action against Crawford for attempting to burglarize Bush's office and for his acts of retaliation in posting the documents, plaintiffs have been falsely accused of several acts of misconduct. [FN3]

> FN3. The court discusses below the actions that are relevant to its analysis of defendants' motion to dismiss.

Defendants Crawford, Hampton, Renaud, Edwards, and Gerdes [FN4] move to dismiss under Rule 12(b)(6), contending they are entitled to dismissal of plaintiffs' claims under §§ 1983 and 1985 based on qualified immunity.

> FN4. Defendants point out that Bolton, Gunn, and Andrews have not been served. They do not address the claims against these defendants, noting instead that the actions against them are subject to dismissal under Rule 4(m). The court has not addressed plaintiffs' claims against these defendants, and it has today filed an order under Rule 4(m) that requires plaintiffs to show good cause why the actions against them should not be dismissed.

II

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity likewise applies to state officials sued for constitutional violations under § 1983. *See id.* at n. 30 (citing *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)); *Palmer v. Johnson,* 193 F.3d 346, 351 (5th Cir.1999). It also applies to a claim brought under 42 U.S.C. § 1985. *See Kinney v. Weaver,* 367 F.3d 337, 351-55 (5th Cir.2004) (en banc) (addressing whether defendants were entitled to qualified immunity from § 1985 claim); *Southard v. Tex. Bd. of Criminal Justice,* 114 F.3d 539, 556 (5th Cir.1997) (holding that defendant had qualified immunity as to claims under §§ 1983 and 1985). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Cozzo v. Tangipahoa Parish Council-President Gov't,* 279 F.3d 273, 284 (5th Cir.2002) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

To decide whether defendants are entitled to qualified immunity, the court must first answer the threshold question whether, taken in the light most favorable to plaintiffs as the parties asserting the injuries, the facts they have alleged show that defendants' conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991))). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* "Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Wallace v. County of Comal,* --- F.3d ----, 2005 WL 348155, at *3 (5th Cir. Feb.14, 2005). "The objective reasonableness of allegedly illegal conduct is assessed in light of the rules clearly established at the time it was taken." *McClendon v. City of Columbia,* 258 F.3d 432, 438 (5th Cir.2001); *see Wooley v. City of Baton Rouge,* 211 F.3d 913, 919 (5th Cir.2000). " 'The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the' plaintiff's asserted constitutional or federal statutory right." *Cozzo,* 279 F.3d at 284 (quoting *Thompson v. Upshur County, Tex.,* 245 F.3d 447, 457 (5th Cir.2001)).
051 Extra cent-Y found within cent-Y markup.
**\*4** Plaintiffs were not required to anticipate the defense of qualified immunity and "provide greater specificity" in their complaint. *Todd v. Hawk,* 72 F.3d 443, 446 (5th Cir.1995) (per curiam) (citing *Schultea v. Wood,* 47 F.3d 1427, 1430, 1433-34 (5th Cir.1995) (en banc)). They were obligated initially to "file a short and plain statement of [their] claim pursuant to Rule 8(a)(2)[.]" *Id.* When, as here, defendants raised the affirmative defense of qualified immunity and the court required

that they file a Rule 7(a) reply, [FN5] plaintiffs became obligated to augment their complaint with "a more particularized reply pursuant to Rule 7[.]" *Id.; see Schultea,* 47 F.3d at 1433. "[W]hen a plaintiff sues a public official under § 1983, the district court must insist on heightened pleading by the plaintiff." *Morin v. Caire,* 77 F.3d 116, 121 (5th Cir.1996) (citing *Schultea,* 47 F.3d at 1433). "[T]he reply must be tailored to the assertion of qualified immunity and fairly engage its allegations." *Schultea,* 47 F.3d at 1433. "Heightened pleading requires allegations of fact focusing specifically on the conduct of the individual who caused the plaintiff['s] injury." *Reyes v. Sazan,* 168 F.3d 158, 161 (5th Cir.1999). The case should not be allowed to proceed unless plaintiffs can assert specific facts that, if true, would overcome the defense. *See Morin,* 77 F.3d at 120 ("Public officials are entitled to qualified immunity *from suit* under § 1983 unless it is shown by *specific allegations* that the officials violated clearly established law." (emphasis added)); *Schultea,* 47 F.3d at 1434 ("The district court need not allow any discovery unless it finds that plaintiff has supported his claim with sufficient precision and factual specificity[.]"). "*Schultea* says that a plaintiff must first 'support [ ] his claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts.' " *Baker v. Putnal,* 75 F.3d 190, 197 (5th Cir.1996) (quoting *Schultea,* 47 F.3d at 1434).[6]

FN5. The magistrate judge granted defendants' motion to require plaintiffs to file a Rule 7(a) reply.

FN6. Relying on *Swierkiewicz v. Sorema,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), plaintiffs maintain that their complaint satisfies the notice pleading standard of Rule 8(a)(2). This argument is irrelevant. *Swierkiewicz* addressed the sufficiency of facts alleged in a complaint and did not pertain to what a plaintiff must allege to overcome the defense of qualified immunity. In this circuit, a district court may require a plaintiff to respond to a public official's assertion of a qualified immunity defense by way of a Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

7(a) reply. *See Schultea, 47 F.3d at 1433.* *Schultea* holds that the Rule 8(a) pleading standard is inapplicable to a Rule 7 reply. *Id.* "[T]he more exacting jurisprudence of Rule 7(a)" controls whether plaintiffs have alleged facts that are sufficient to overcome defendants' qualified immunity defense. *Hoskins v. Kaufman Indep. Sch. Dist., 2003 WL 22364356, at \*3 (N.D.Tex. Aug.25, 2003)* (Fitzwater, J.).

                         III

Defendants contend they are entitled to dismissal of plaintiffs' First Amendment retaliation claim based on qualified immunity.

                          A

To establish a First Amendment retaliation claim under *§ 1983*, plaintiffs must show: (1) that [they] suffered an adverse employment action; (2) as a result of speech involving a matter of public concern; (3) that [their] interest in commenting on the matter of public concern outweighed the [defendants'] interest in promoting efficiency, and (4) that the adverse action was motivated by the protected speech.

*Foley v. Univ. of Houston Sys., 355 F.3d 333, 341 (5th Cir.2003).*

Defendants maintain that none of plaintiffs' allegations concerning Bush and Wash asserts that a defendant took an adverse employment action against them, that plaintiffs have failed to show that any defendant violated clearly established law or a constitutional right, and that they cannot defeat qualified immunity for defendants Crawford, Hampton, Renaud, Edwards, and Gerdes.

**\*5** Regarding Ellis, Fuentes, and Clayton, defendants posit that the only arguable adverse employment action is a reprimand that Renaud issued. They contend that, even assuming Renaud's reprimand constitutes an adverse employment action, these plaintiffs have not shown that their speech was a matter of public concern,

because all matters were raised internally as employment grievances or matters that involved their personal employment disputes. Defendants also maintain that plaintiffs have not shown that Ellis, Fuentes, and Clayton suffered an adverse employment action committed by Crawford, Hampton, Edwards, or Gerdes, that they have therefore failed to demonstrate that the actions of these four defendants amounted to a violation of clearly established law or a constitutional right of which a reasonable person would have known, and that they cannot overcome the defense of qualified immunity.

                          B

The Fifth Circuit takes a "narrow view of what constitutes an adverse employment action[.]" *Breaux v. City of Garland, 205 F.3d 150, 157 (5th Cir.2000).* Included in the list of recognized adverse employment actions are "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Id.* (citing *Pierce v. Tex. Dep't of Criminal Justice, Institutional Div., 37 F.3d 1146, 1149 (5th Cir.1994)*). The court has also recognized that, in some circumstances, transfers can constitute adverse employment actions. *See Sharp v. City of Houston, 164 F.3d 923, 933 (5th Cir.1999)* ("[F]or the purposes of a *§ 1983* retaliation claim, an adverse employment action can include a transfer, because it may serve as a demotion."); *Breaux, 205 F.3d at 157* ("Transfers can constitute adverse employment actions if they are sufficiently punitive or if the new job is markedly less prestigious and less interesting than the old one." (citations omitted)). The court has suggested that disciplinary filings may also qualify under *§ 1983. See Banks v. E. Baton Rouge Parish Sch. Bd., 320 F.3d 570, 580 (5th Cir.2003)* (observing that "the definition of adverse employment action under *§ 1983* may include reprimands and disciplinary filings[.]"). But it has " 'declined to expand the list of actionable actions, noting that some things are not actionable even though they have the effect of chilling the exercise of free speech.' " *Breaux, 205 F.3d at 157* (quoting *Benningfield v. City of Houston, 157 F.3d 369, 376 (5th Cir.1998)*). The *Breaux* panel explained that "[t]he reason for not expanding the list of adverse employment actions is to ensure that *§ 1983*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 6
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

does not enmesh federal courts in 'relatively trivial matters.' " *Id.* (quoting *Dorsett v. Bd. of Trustees,* 940 F.2d 121, 123 (5th Cir.1991)).

                                                C

" 'Whether the speech at issue relates to a matter of public concern is a question of law to be resolved by the court.' " *Bradshaw v. Pittsburg Indep. Sch. Dist.,* 207 F.3d 814, 816 (5th Cir.2000) (per curiam) (quoting *Tompkins v. Vickers,* 26 F.3d 603, 606 (5th Cir.1994)). In making this determination, the court considers the " 'content, form, and context of a given statement, as revealed by the whole court record.' " *Teague v. City of Flower Mound, Tex.,* 179 F.3d 377, 380 (5th Cir.1999) (quoting *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The court examines "whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee." *Terrell v. Univ. of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986). The Fifth Circuit has distilled "three reliable principles" from its determinations regarding whether speech was a matter of public concern:

**\*6** First, the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government. If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature. Second, speech need not be made to the public, but it may relate to the public concern if it is made against the backdrop of public debate. And third, the speech cannot be made in furtherance of a personal employer-employee dispute if it is to relate to the public concern.

*Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 372 (5th Cir.2000) (citations omitted). Public employees' speech on matters of private concern in most instances will not support a First Amendment violation.We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only

personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick,* 461 U.S. at 147; *see Teague,* 179 F.3d at 381 ("[S]peech concerning the conditions of one's employment is a private matter."). Cases can also involve so-called "mixed speech," i.e., speech that involves both public and private concerns. *See Teague,* 179 F.3d at 381.

                                                IV

The court initially considers whether plaintiffs have adequately pleaded [FN7] that each defendant committed a retaliatory act that qualifies as an adverse employment action. Plaintiffs appear to rely on acts that affected them collectively and those that impacted them individually. The court will first address whether they have adequately pleaded that the actions that affected all plaintiffs are adverse employment actions.

> **FN7.** Unless the court specifically differentiates between plaintiffs' complaint and their Rule 7(a) reply, it has considered both pleadings in assessing the adequacy of their allegations.

                                                A

Plaintiffs assert in their Rule 7(a) reply that "[o]vertime and compensatory time is denied to all ICP Officers at Northwest per Chief Edwards," and that other ICP Units are permitted overtime. Rule 7(a) Rep. ¶ 20(jj). They also assert that, "[a]t all relevant times," they were assigned to the Northwest Division ICP Unit. They therefore appear to allege that Edwards denied all of them the opportunity to earn overtime and compensatory time. [FN8]

> **FN8.** The period during which Edwards is alleged to have denied Northwest Division

ICP Unit employees from working overtime and compensatory time is not stated explicitly. Plaintiffs aver that Wash was transferred to another unit on July 24, 2002. If Edwards' decision to deny overtime to Northwest Division ICP Unit employees occurred after this date, Wash apparently would not have been affected. Because plaintiffs allege that "at all relevant times" they were employees of the Northwest Division ICP Unit, this is sufficient to assert that Wash was employed there when Edwards allegedly prevented unit employees from working overtime and compensatory time.

### 1

This allegation is insufficient to serve as the basis for plaintiffs' First Amendment retaliation claim. To prove such a claim, plaintiffs must show, *inter alia,* that they suffered an adverse action that "was motivated by [their] protected speech." *Foley,* 355 F.3d at 341. They have not specified when Edwards made the decision to deny them overtime. This deficiency is fatal to the claim because, without specifying when Edwards made the decision, they have failed to show that she acted in response to plaintiffs' exercise of their First Amendment rights.

**\*7** Although defendants have not included this ground in their motion to dismiss, the court may raise it *sua sponte* as a basis for dismissal as long as the procedure employed is fair to the parties. *See, e.g., Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 633 (N.D.Tex.1999) (Fitzwater, J.). To ensure fairness, the court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that addresses this deficiency.

### 2

Even if plaintiffs are able to correct the above-noted defect, the court must still consider whether a denial of overtime constitutes an adverse employment action. [FN9]

FN9. The court's reasoning concerning overtime applies equally to plaintiffs' allegations regarding the denial of compensatory time as now asserted in their pleadings. Accordingly, the court will not discuss compensatory time separately from overtime.

Citing *Benningfield* defendants maintain that the denial of overtime does not constitute an adverse employment action. *Benningfield* considered, *inter alia,* whether a plaintiff's allegation that she had "not received overtime and travel reimbursement due her" asserted an adverse employment action. *Benningfield,* 157 F.3d at 376-77. The court held that it did not, because her allegations involved "administrative matters." *Id.* at 377. Although it is not entirely clear from the opinion, it appears that the plaintiff in *Benningfield* actually worked overtime hours for which she was not paid. *See id.* at 376 ("[Plaintiff] contends that she ... has not received overtime and travel reimbursement *due her."* (emphasis added)). This is different from a scenario in which a plaintiff is prevented from working overtime in the first place. *Benningfield* thus does not address a case like this one, where plaintiffs appear to contend they were prevented from earning overtime.

### 3

The Fifth Circuit has not decided, in the context of a First Amendment retaliation claim, whether a denial of the opportunity to work overtime is an adverse employment action. This court has held, however, that such conduct is an ultimate employment decision that will support a Title VII retaliation claim. *See Hadad v. Am. Airlines, Inc.,* 2003 WL 292170, at *7 (N.D.Tex. Feb.7, 2003) (Fitzwater, J.) (denying summary judgment on Title VII retaliation claim because plaintiff "adduced evidence of at least one ultimate employment decision-a denial of overtime[.]"); *Williams v. J.B. Parks Wholesale Florist, Inc.,* 1997 WL 160194, at *1, *5 (N.D.Tex. Mar.31, 1997) (Fitzwater, J.) (holding in Title VII retaliation context that plaintiff's allegation that overtime was reduced was actionable because it related to compensation and "caused an immediate reduction in her income."). The Fifth Circuit has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 8
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

recognized that " § 1983's definition of adverse employment action may be broader than Title VII's definition, which limits the meaning of adverse employment action to ultimate employment decisions." *Banks,* 320 F.3d at 580 (citing *Sharp,* 164 F.3d at 933 n. 21). "Section 1983's definition of adverse employment action, like Title VII's definition, includes ultimate employment decisions, such as hiring, granting leave, discharging, promoting, demoting, and compensating." *Id.* (discussing these definitions when considering whether plaintiffs alleged adverse employment action in context of First Amendment retaliation claim). But it has recognized that certain actions that do not constitute ultimate employment actions under Title VII-like reprimands and disciplinary filings-can be actionable under § 1983. *Id.*

**\*8** The court concludes that, in some circumstances, denial of the opportunity to earn overtime can qualify as an adverse employment action that will support a First Amendment retaliation claim. As noted above, "discharges, demotions, refusals to hire, refusals to promote, and reprimands" are recognized adverse employment actions. *See, e.g., Breaux,* 205 F.3d at 157. Although panels in this circuit often cite this list when discussing what an adverse employment action is, *see, e.g., id.; Benningfield,* 157 F.3d at 376; *Pierce,* 37 F.3d at 1149, the court has "not held this list to be exclusive[.]" *Sharp,* 164 F.3d at 933 n. 21. [FN10] Accordingly, the fact that a denial of overtime does not appear in this list is not dispositive.

> FN10. "Transfers can constitute adverse employment actions if they are sufficiently punitive or if the new job is markedly less prestigious and less interesting than the old one." *Breaux,* 205 F.3d at 157 (citations omitted). That the Fifth Circuit has held that some transfers constitute adverse employment actions in the context of First Amendment retaliation claims demonstrates that it considers the list to be non-exclusive.

4

Several acts that would be unpleasant if suffered by an

employee are not adverse employment actions. *See Breaux,* 205 F.3d at 157-58 (observing that Fifth Circuit has held, *inter alia,* that false accusations, criticism, and investigations are not adverse employment actions); *see also Southard,* 114 F.3d at 555 ("Not every negative employment decision or event is an adverse employment action that can give rise to a discrimination or retaliation cause of action under 1983."). Even the capacity of an action to stigmatize an employee is inadequate to make it one. *See Breaux,* 205 F.3d at 158 n. 14 ("Stigma by itself, without an impact on one's employment, does not constitute an adverse employment action.") (citing *Blackburn v. City of Marshall,* 42 F.3d 925 (5th Cir.1995)). Instead, to qualify as an adverse employment action that will support a First Amendment retaliation claim, the act taken must alter an important condition of employment, result in the denial of an employment benefit, or have a negative consequence on the plaintiff's employment. *See id.* at 159 & n. 16 ("Some benefit must be denied or some negative consequence must impinge on the Plaintiff's employment before a threat of discharge is actionable."); *Click v. Copeland,* 970 F.2d 106, 110 (5th Cir.1992) (recognizing that, in *Bickel v. Burkhart,* 632 F.2d 1251 (5th Cir.1980), the Fifth Circuit "held that an employee could establish a deprivation by showing that his employer altered an important condition of employment." (internal quotation marks omitted)); *Sharp v. City of Houston,* 960 F.Supp. 1164, 1179 (S.D.Tex.1997) (observing that, in *Pierce,* the Fifth Circuit "did not merely rely on its 'short list' of adverse actions, instead, it evaluated whether the employment actions at issue could be regarded as punishment of the employee and analyzed whether they had led to adverse results."), *aff'd,* 164 F.3d 923 (5th Cir.1999). The retaliatory act must also be more than a trivial one. *See Sharp,* 164 F.3d at 933 (recognizing that, "[a]lthough the Supreme Court has intimated that the First Amendment protects against trivial acts of retaliation, this court has required something more than the trivial[.]" (citing *Pierce,* 37 F.3d at 1146) (footnote omitted)). It must be equivalent to a discharge, demotion, refusal to hire, refusal to promote, or reprimand in its seriousness, causing "some serious, objective, and tangible harm[.]" *Serna v. City of San Antonio,* 244 F.3d 479, 482-83 (5th Cir.2001) (holding in context of First Amendment retaliation claim that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiff must make such showing to demonstrate that he suffered adverse employment action by being transferred).

**\*9** Although plaintiffs apparently allege that they were prevented from accumulating overtime and compensatory time credit, they have not alleged facts that permit the court to determine whether this denial was " 'sufficiently serious to constitute a constitutional injury.' " *Serna,* 244 F.3d at 483 (quoting *Breaux,* 205 F.3d at 152). Specifically, their pleadings lack any facts that show that the alleged denial was significant enough that it could be considered analogous to the actions the Fifth Circuit lists as examples of adverse employment actions, as opposed to something more trivial. Without such detail, the court is unable to determine whether plaintiffs have pleaded a First Amendment violation. This failure prevents plaintiffs from overcoming the qualified immunity defense because the allegations fail to show that the alleged denial of overtime and compensatory time constituted an adverse employment action.

The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that the denial rises to the level of an adverse employment action. [FN11]

> FN11. In today's decision, the court is allowing plaintiffs to file an amended Rule 7(a) reply not only when it raises a ground for dismissal *sua sponte,* but in other instances when it appears possible that plaintiffs can plead facts that would permit them to overcome the defense of qualified immunity. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir.2002) (Fitzwater, J.). Although plaintiffs were on notice through the order of

the magistrate judge requiring a Rule 7(a) reply that they were obligated to plead sufficient facts to defeat qualified immunity, this opinion is the first that explicitly discusses the substantive deficiencies in plaintiffs' pleadings, and the court in its discretion will allow plaintiffs one more opportunity to attempt to plead the facts necessary to overcome the defense of qualified immunity.

B

Plaintiffs also allege that required hours of employment for the Northwest Division ICP Unit, which included night duty, were different from those in DPD's other ICP Units and "were established by the Defendants for racial and/or retaliatory reasons." Rule 7(a) Rep. ¶ 20(ii). A mere change in an employee's work hours is not alone an adverse employment action. *See Benningfield,* 157 F.3d at 377. In *Benningfield* the court rejected an argument that a transfer to the night shift was an adverse employment action. *Id.* Although "a transfer may also constitute a demotion," *id.,* plaintiffs allege in this case only that they were required to work different hours, not that they were transferred. They have not adequately pleaded an adverse employment action on this basis.

C

Plaintiffs also assert that they have been falsely accused of several acts of misconduct for "racially and/or retaliatory reasons[.]" Rule 7(a) Rep. ¶ 18. This allegation is insufficient to show that plaintiffs suffered an adverse employment action, because "mere accusations, without more, are not adverse employment actions." *Benningfield,* 157 F.3d at 376. Moreover, even if this was an adverse employment action, the allegation cannot serve as a basis for plaintiffs' claim because it fails to connect the action to a particular defendant. "In order to state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." *Woods v. Edwards,* 51 F.3d 577, 583 (5th Cir.1995) (per curiam); *see also*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

*Reyes,* 168 F.3d at 161 ("Heightened pleading requires allegations of fact focusing specifically on the conduct *of the individual who caused the plaintiff['s] injury."* (emphasis added)). Because plaintiffs have failed to identify the defendants who were personally involved in accusing them of acts of misconduct, the allegation is insufficient to support a § 1983 claim. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

                                    D

**\*10** Plaintiffs advance certain allegations that appear to focus on defendants' failure to take action when adverse actions were taken against plaintiffs. For example, they assert that "Hampton failed to take action against Crawford for his attempted illegal entry into Bush's office and have failed to take action against Defendants Renaud, Edwards, Gunn, Andrews and Gerdes when these Defendants took racially inspired and retaliatory actions against the [p]laintiffs." Rule 7(a) Rep. ¶ 16. In a similar allegation, they maintain that all defendants engaged in this type of conduct. Plaintiffs assert that, because, *inter alia,* of defendants' failure to take action against Crawford for attempting to burglarize Bush's office and for his posting the IAD complaint and statements of Bush, Ellis, and Wash, they have been falsely accused of acts of misconduct. They also allege that on numerous occasions Hampton misrepresented the status of plaintiffs' complaints of mistreatment and falsely claimed to have initiated investigations into Crawford's misconduct, but none actually occurred. Plaintiffs assert that Hampton overlooked acts of racist conduct and retaliation by the other defendants to cover up his refusal to take action against Crawford.

These allegations are insufficient to show that plaintiffs suffered an adverse employment action. Plaintiffs have not pleaded facts to show that an important condition of their employment was altered by these actions or that they otherwise suffered an action that rises to the level of a constitutional violation as a result of these actions. Although they have suggested that defendants' failure to act was one impetus of false allegations of misconduct

against them, as already explained above, false allegations do not constitute adverse employment actions. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

                                    V

Beginning with Bush, the court now considers whether plaintiffs have sufficiently pleaded that they individually incurred adverse employment actions.

                                    A

Plaintiffs allege that Bush sustained the following acts of retaliation: (1) Crawford attempted to enter Bush's office unlawfully [FN12] and posted his IAD complaint on a bulletin board in the Northwest Division headquarters as a signal to other police officers that all DPA members should shun and retaliate against Bush and the other plaintiffs, and as a signal that Bush and the other plaintiffs had violated the code of silence and that all DPD officers should retaliate against Bush and any officer who supported him; [FN13] (2) Renaud required Bush to answer recorded questions regarding Andrews' transfer, required him to pick up sign-in and sign-out sheets from county court for her, Fuentes, and Ellis, required him to carry out her orders and relay opinions regarding those under his command, rejected his nomination for Supervisor of the Year, (with Gerdes' knowledge) placed false and adverse comments in his personnel file without his knowledge, after Bush indicated interest, and, acting together with Edwards, informed him that a decision had been made not to fill a position within DPD's deployment section that had been advertised, and informed Bush that he was no longer permitted to attend committee meetings that would result in receiving compensatory time or overtime, even though no other ICP supervisors were similarly prohibited; (3) Edwards required him to relinquish his keys to his assigned vehicle, directed Gunn to question Bush's work performance, and told Bush that he was no longer permitted to attend community meetings and claim compensatory time or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

overtime, even though other ICP supervisors were allowed to do so; (4) Gerdes downgraded Bush on his performance evaluation as a result of Renaud's adverse comments; (5) a grievance Bush filed based on Gerdes' evaluation was intentionally not acted upon; (6) after Bush requested that Gerdes and then Edwards, Hampton, and Bolton intercede to prevent an unfounded investigation of Ellis, Fuentes, and Clayton on the basis that they had improperly used City property, they ignored the requests, and Gerdes intentionally withheld pertinent evidence from IAD that Bush had provided him; [FN14] and (7) Renaud, Gerdes, and Edwards initiated an investigation against Bush stemming from allegations that he made inappropriate workplace comments.

> **FN12.** Although it is unclear whether plaintiffs rely on Crawford's attempted entry into Bush's office as a basis for their claims, for purposes of this motion, the court will address whether it constitutes an adverse employment action.

> **FN13.** Plaintiffs also assert that Crawford did so as a challenge to Bolton and Hampton to take no action against him. This assertion does not appear to state a claim of retaliation against any particular defendant.

> **FN14.** Plaintiffs also allege that Bush once attempted to correct information contained in Fuentes' internal affairs file and, for retaliatory reasons, the file was not altered.

### B

**\*11** The court turns first to the assertion that Renaud and Edwards told Bush that he could no longer attend community meetings that would result in receiving compensatory time or overtime. The allegations concerning Renaud and Edwards differ slightly. Plaintiffs allege that "Renaud informed Bush that he was no longer permitted to attend community meetings that would result in receiving compensatory time or overtime." Rule 7(a) Rep. ¶ 20(o). This appears to suggest that Bush was not prevented from attending all community meetings, but only if doing so would result

in his receiving compensatory or overtime pay. Plaintiffs assert that Edwards "told Sgt. Bush he could no longer attend community meetings and claim overtime or compensatory time." *Id.* ¶ 20(jj). It is not clear from this allegation whether Bush was only denied the opportunity to receive overtime or compensatory pay for attending community meetings or whether he was prevented from attending the meetings. [FN15] It also is not evident from this allegation whether Edwards denied Bush the opportunity to accumulate overtime or compensatory time altogether, or only through attending community meetings. The allegation considered *supra* in § IV(A) suggests that the former may be the case.

> **FN15.** Plaintiffs' Rule 7(a) reply contains language that follows their allegation that Edwards told Bush he could no longer attend community meetings and claim overtime or compensatory time and that suggests that Bush may not have been prohibited from attending community meetings altogether. *See* Rule 7(a) Rep. ¶ 20(jj) ("If an ICP Officer at the Northwest Division has a late community meeting to attend, Northwest Division ICP Officers must flex hours for that day.").

Even if Bush was completely precluded from attending community meetings, this would not of itself rise to the level of an adverse employment action. *See Benningfield,* 157 F.3d at 376 (holding that allegation that plaintiff was denied opportunity to attend conferences was not actionable). Moreover, the assertion that Bush was denied the opportunity to earn compensatory time or overtime pay are alone insufficient to show that he suffered an adverse employment action. *See supra* § IV(A)(2)-(4). The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that the denial of overtime or compensatory time rises to the level of an adverse employment action.

### C

The court next considers Gerdes' decision to downgrade

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Bush on his performance evaluation.

### 1

Defendants maintain that, under *Benningfield,* lowering one's job performance rating does not constitute an adverse employment action. In *Benningfield* the panel concluded that an adverse employment action did not result from lowering an employee's job performance rating when it was restored to its previous level two days afterward. *Benningfield,* 157 F.3d at 376. Because the prior rating was reinstated, the panel did not decide whether the performance rating reduction, if it remained, would have qualified. Although the Fifth Circuit does not appear to have decided the question whether a downgraded performance review constitutes an adverse employment action, one district court in this circuit has recently held that it does not. *See Chiasson v. City of Thibodaux,* 347 F.Supp.2d 300, 307 (E.D.La.2004) ( "[Plaintiff's] receipt of lower evaluation scores, along with any other warnings and criticism she received ... are administrative or departmental matters, not adverse employment actions." (citing *Harrington v. Harris,* 118 F.3d 359, 366 (5th Cir.1997)).

### 2

*12 The court concludes that, in some circumstances, a downgraded performance review can qualify as an adverse employment action that will support a First Amendment retaliation claim. As the court explains *supra* at § IV(A)(3), the fact that downgraded performance reviews are not included in the standard list of adverse employment actions is not dispositive. It is possible that a downgraded performance evaluation can constitute an adverse employment action when it functions as a formal reprimand rather than as a mere criticism or accusation. *See Colson v. Grohman,* 174 F.3d 498, 511 (5th Cir.1999) ( "Formal reprimands ... do qualify as adverse employment actions and, when given in retaliation for First Amendment activity, are actionable."); [FN16] *Benningfield,* 157 F.3d at 376 ("[M]ere accusations, without more, are not adverse employment actions."); *Harrington,* 118 F.3d at 366

("[M]ere criticisms do not give rise to a constitutional deprivation for purposes of the First Amendment."). "[A] formal reprimand, by its very nature, goes several steps beyond a criticism or accusation and even beyond a mere investigation; it is punitive in a way that mere criticisms, accusations, and investigations are not." *Colson,* 174 F.3d at 512 n. 7.

> **FN16.** The Fifth Circuit "has never explicitly explained why formal reprimands given in retaliation for the exercise of First Amendment rights are actionable but less formal criticisms and accusations are not." *Colson,* 174 F.3d at 512 n. 7.

Plaintiffs do not assert that, as a result of the downgraded performance evaluation, Bush suffered the alteration of an important condition of employment, was denied an employment benefit or incurred some other negative employment consequence, or that the lower rating functioned as a formal reprimand. Although plaintiffs allege that Bush was "downgraded" on his review, they do not even plead facts that show that the review could be construed as negative. *See Merriweather v. Ala. Dep't of Pub. Safety,* 17 F.Supp.2d 1260, 1274-75 (M.D.Ala.1998) (holding in context of Title VII retaliation claim that "since [plaintiff's] lowest score fell within the high end of her employer's 'meets expectations' range of scores and no adverse employment consequences resulted from or were based on these evaluation scores, [plaintiff's] ... employee performance appraisal scores could not be established as negative."). Absent such facts, plaintiffs have failed to allege that Bush's downgraded appraisal was significant enough to rise to the level of a constitutional violation.

### 3

Defendants base their qualified immunity arguments solely on the contention that Bush has not alleged an adverse employment action. Nevertheless, the court holds that, even if in some circumstances a downgraded performance review can constitute an adverse employment action, defendants are entitled to qualified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 13
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

immunity because, at the time Gerdes downgraded Bush on his performance review, it was not clearly established in this circuit that such an action could constitute an adverse employment action. "Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.' " *Kinney,* 367 F.3d at 350 (quoting *Saucier,* 533 U.S. at 206). The court has not located on its own a decision of a court in this circuit that has held that a downgraded performance review constitutes an adverse employment action. This was also the state of the law when Gerdes allegedly downgraded Bush on his performance evaluation. Thus it cannot be said that Gerdes or any other reasonable official would have known that, if he downgraded an employee on a performance review, it could give rise to a retaliation claim by the employee. For this reason, plaintiffs have failed to overcome Gerdes' qualified immunity defense.

**\*13** The court raises this ground for dismissal *sua sponte.* To ensure fairness, the court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that shows that, at the time Gerdes downgraded Bush on his performance review, the law was clearly established that such an action would violate Bush's First Amendment rights. The amended Rule 7(a) reply must also plead sufficient facts to show that the downgraded performance review rises to the level of constitutional significance.

                                     D

Plaintiffs' allegation that Renaud placed false and adverse comments in Bush's personnel file without his knowledge similarly fails to show an adverse employment action. They neither characterize the comments as a reprimand nor plead facts to show that the comments could be construed as something akin to a formal reprimand. The Fifth Circuit has recognized that criticism alone is not an adverse employment action. *See Breaux,* 205 F.3d at 157; *Harrington,* 118 F.3d at 366 ("[M]ere criticisms do not give rise to a constitutional deprivation for purposes of the First Amendment."). Because plaintiffs do not allege any

facts to show that these comments were anything more than criticism of Bush, they have failed to plead an adverse employment action. *See Benningfield,* 157 F.3d at 377 (holding that allegations that plaintiff was verbally reprimanded failed to state claim where she did not present evidence to show that reprimands "were anything more than mere criticisms.").

The allegation that Gerdes downgraded Bush on his performance review as a result of Renaud's comments is also insufficient to show that the comments rise to the level of a constitutional harm, especially when the comments themselves have not been pleaded. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that Renaud's comments are akin to a formal reprimand rather than simply criticism, or that they otherwise rise to the level of constitutional significance.

                                     E

The failure of Gerdes, Edwards, Hampton, and Bolton to intercede at Bush's request to prevent an unfounded investigation of Ellis, Fuentes, and Clayton regarding their alleged improper use of City property does not constitute an adverse employment action. Nor does Gerdes' alleged withholding of pertinent evidence that Bush provided him. Plaintiffs' allegation that Bush once attempted to correct information contained in Fuentes' internal affairs file and that, for retaliatory reasons, the file was not altered similarly fails to show that Bush suffered an adverse employment action. [FN17] Plaintiffs have not pleaded facts that show that the refusal to halt an investigation that did not involve Bush, the improper handling of evidence pertinent to the investigation, or the failure to correct information in another employee's file affected the conditions of Bush's employment or otherwise negatively impacted him. Although it is difficult at this juncture to envision how such actions could constitute adverse employment actions with respect to Bush, the court will allow plaintiffs an opportunity to make such a showing, if possible, by pleading sufficient facts in their amended Rule 7(a) reply.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 14
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

FN17. Plaintiffs have also failed to connect the failure to alter Fuentes' file to a specific defendant.

F

**\*14** The allegations that Renaud required Bush to answer recorded questions regarding Andrews' transfer, pick up court sign-in and sign-out sheets, and carry out her orders and relay her opinions to those under his command are likewise inadequate to plead an adverse employment action. "Undesirable work assignments are not adverse employment actions." *Southard,* 114 F.3d at 555 (addressing § 1983 retaliation claim) (citing *Harrington,* 108 F.3d at 604). The Fifth Circuit has declined on several occasions to hold that assignments given to employees constituted adverse employment actions in the context of First Amendment retaliation claims. *See Pierce,* 37 F.3d at 1149-50 (holding that plaintiff's assignment to guard showers was not actionable because it was regular assignment for someone in her position and there was no evidence that assignment was punishment); *Benningfield,* 157 F.3d at 376-77 (holding that assignment of "an unusually heavy work load" was not adverse employment action, but involved "administrative matters"); *Dorsett v. Bd. of Trustees for State Colleges & Univs.,* 940 F.2d 121, 123-124 (5th Cir.1991) (declining to hold that decisions concerning, *inter alia,* teaching assignments rose "to the level of a constitutional deprivation," and concluding that court had "neither the competency nor the resources to undertake to micromanage the administration of thousands of state educational institutions."). The court similarly declines to hold that Renaud's directives to Bush rise to the level of a constitutional violation. Although plaintiffs maintain that Bush was embarrassed, belittled, harassed, and placed under duress by having to answer questions regarding Andrews' transfer, and that Renaud did not require other employees to provide court sign-in and sign-out sheets in similar circumstances, this is insufficient to plead that Renaud's acts constituted an adverse employment action. Plaintiffs have failed to plead that the duties Renaud assigned Bush rise to the level of constitutional significance. Therefore, these allegations fail to plead an adverse employment action. The court will give plaintiffs 30 days from the date of

this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

G

Plaintiffs have not sufficiently pleaded that Bush suffered an adverse employment action when Edwards allegedly required him to relinquish the keys to his assigned vehicle. In *Dorsett* the court recognized that "[i]n public schools and universities across this nation, interfaculty disputes arise daily over teaching assignments, room assignments, administrative duties, classroom equipment ... and a host of other relatively trivial matters," and it concluded that "[a] federal court is simply not the appropriate forum in which to seek redress for such harms." *Dorsett,* 940 F.2d at 123. The court observed that it had "neither the competency nor the resources to undertake to micromanage the administration of thousands of state educational institutions." *Id.* at 124. Edwards' decision concerned the use of a departmental resource and is more appropriately characterized as one involving an "administrative matter" rather than an adverse employment action. *See Benningfield,* 157 F.3d at 376-77 (holding that allegations that plaintiff was assigned heavy work load and had not received overtime and travel reimbursement involved "administrative matters" and were not adverse employment actions). This court has neither the competence nor the inclination to second-guess decisions made concerning the proper allocation of resources to DPD officers. The court declines to hold that the denied use of a work vehicle rises to the level of a constitutional deprivation. This allegation is therefore insufficient.

H

**\*15** Renaud, Gerdes, and Edwards initiated an investigation against Bush based on an allegation that he made inappropriate workplace comments. An investigation by itself does not constitute an adverse employment action. *See Pierce,* 37 F.3d at 1150 (holding that investigations of plaintiff were not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Page 15

actionable where they did not result in any action); *Benningfield,* 157 F.3d at 376 ("Although a reprimand can constitute an adverse employment action, an investigation does not."); *Breaux,* 205 F.3d at 158 (holding that police officers did not suffer adverse employment action by being subjected to internal affairs investigation). Plaintiffs do not allege that any action has been taken against Bush pursuant to the investigation that Edwards, Gerdes, and Renaud initiated. Accordingly, it does not constitute an adverse employment action. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that an action was taken against Bush as a result of the investigation.

I

The allegation that Renaud rejected Bush's nomination for Supervisor of the Year is likewise insufficient to show an adverse employment action. The court can neither say that the denial of such recognition is equivalent in gravity to a discharge, demotion, refusal to hire, refusal to promote, or reprimand, nor can it conclude from plaintiffs' allegations that Bush suffered "some serious, objective, and tangible harm" as a result of not being nominated. *See Serna,* 244 F.3d at 483. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that this action rises to the level of an adverse employment action.

J

Neither Crawford's posting of Bush's IAD complaint nor his attempted unlawful entry into Bush's office constitutes an adverse employment action. Plaintiffs have not pleaded facts that show that the posting of a complaint regarding another officer's misconduct altered an important condition of Bush's employment or resulted in the denial of an employment benefit or some other negative consequence. Thus it cannot be classified with the activities that constitute adverse employment actions. This same reasoning applies to Crawford's

attempt to enter Bush's office. Although it appears unlikely that plaintiffs can plead facts that show that this constituted an adverse employment action, the court will allow them an opportunity to do so. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that addresses this deficiency.

K

Edwards' directive to Gunn to question Bush's work performance is not an adverse employment action. Merely questioning an employee about his work performance cannot, without more, serve as the basis for a First Amendment retaliation claim.

L

Plaintiffs allege that, after Bush informed Renaud and Edwards of his interest in filling an advertised vacancy in the DPD's deployment section, Renaud and Edwards told Bush that a decision had been made not to fill the position. Because Bush was already employed by DPD, the court construes the allegation as being akin to a refusal to promote than to a refusal to hire.

*16 Although it is clear that a refusal to promote is an adverse employment action, *see Breaux,* 205 F.3d at 157,* the court is unable to conclude, based on the facts alleged, that plaintiffs have pleaded an adverse employment action. They have not asserted any facts to show that the deployment position could be considered a promotion. The absence of such facts is determinative, because without an indication that the position was somehow better than Bush's current one, they have not pleaded that Bush suffered an action that was equivalent to the denial of a promotion.

Additionally, in *Mylett v. City of Corpus Christi,* 97 Fed. Appx. 473 (5th Cir.2004) (unpublished opinion), the court considered an employee's claim that he had been denied a promotion in the context of a discrimination and retaliation claim brought under both Title VII and § 1983. *Id.* at 474, 476. Observing that the district court had found that the positions for which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

the plaintiff applied "either did not exist or were already filled when he applied," the court concluded that "[i]f a position is not available, an employee has no actionable claim for not being promoted." *Id.* This same reasoning applies to the allegation here. FN18 The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that addresses these deficiencies.

FN18. Although defendants do not raise the point, the court notes that plaintiffs have not pleaded facts to show when the decision was made not to fill the position. If the decision had already been reached by the time Bush informed Renaud and Edwards of his interest, Bush cannot establish that the decision was motivated by a retaliatory animus.

M

The allegation that Bush's grievance regarding Gerdes' downgraded performance evaluation was intentionally not acted upon does not allege an adverse employment action. It fails to connect the action to a specific defendant. Moreover, plaintiffs have not pleaded facts to show that the failure to act on the grievance altered an important condition of Bush's employment or otherwise affected him adversely. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

N

As presently constituted, plaintiffs' allegations are insufficient to show that Bush suffered an adverse employment action at the hands of any defendant. Nevertheless, plaintiffs may still be able to plead facts to show that Bush suffered an adverse employment action. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

VI

The court now turns to plaintiffs' allegations pertaining to Wash.

A

Plaintiffs allege that the following acts of retaliation were taken against Wash: (1) Crawford posted his IAD statement on a bulletin board in the Northwest Division headquarters as a signal to other police officers that all DPA members should shun and retaliate against him and the other plaintiffs, and as a signal that he and the other plaintiffs had violated the code of silence and that all DPD members should retaliate against him and any officer who supported him; (2) his work hours were changed from 7:00 a.m. to 3:00 p.m. to 10:00 a.m. to 6:00 p.m.; (3) Edwards removed from internal mail a memorandum Wash and Ellis had written to Bolton concerning the posting of their IAD letters; (4) when Ellis and Wash met with Edwards regarding their memorandum, Edwards falsely stated that she kept the memorandum from Bolton because the department was unable to investigate; FN19 (5) Renaud denied Wash overtime even though she had authorized overtime for other officers in the ICP unit; (6) he was twice denied relief on grievances he filed, once by Renaud and once by a Grievance Review Committee; and (7) he was transferred twice, once at Edwards' behest after he was promoted from the ICP unit to First Watch Patrol, even though other officers who were promoted at the same time were left in the ICP units on special assignments, and once by Edwards and Gunn to an unspecified unit.

FN19. Plaintiffs aver that there was no investigation because Hampton did not wish to offend the DPA. This alleged failure to investigate is insufficient to plead an adverse employment action for the reasons stated *supra* at § IV(D).

B

*17 Plaintiffs' allegations that Renaud denied Wash overtime fail to establish that he suffered an adverse

Not Reported in F.Supp.2d                                                      Page 17
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

employment action for the reasons stated above. *See supra* § IV(A)(2)-(4). Nevertheless, plaintiffs may be able to allege facts to show that Renaud's denial rises to the level of an adverse employment action. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address this deficiency.

C

Crawford's posting of Wash's statement, Edwards' removal of Wash's memorandum to Bolton informing him of that posting, and Edwards' false explanation as to why she removed the memorandum are not adverse employment actions. Although these acts may have been unpleasant to Wash, plaintiffs have failed to plead specific facts that establish that they alone adversely affected an important condition of his employment or otherwise affected him negatively. This same reasoning applies to the adverse decisions regarding the validity of Wash's grievances. [FN20] The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

> FN20. The allegation that a Grievance Review Committee denied one of Wash's grievances also fails to connect any defendant to this action. Thus even if the allegation adequately pleads an adverse employment action, it fails to implicate any particular defendant.

D

The allegation that Wash incurred a shift change is insufficient to show that he suffered an adverse employment action, because a mere change in an employee's work hours is not alone sufficient. *See Benningfield,* 157 F.3d at 377. Plaintiffs have also failed to connect this allegation to any defendant.

E

Plaintiffs' allegations regarding Wash's transfers are similarly inadequate to allege that he suffered an adverse employment action. In certain circumstances, a transfer may constitute an adverse employment action for purposes of a First Amendment retaliation claim. *See Serna,* 244 F.3d at 482 (holding in context of First Amendment retaliation claim that "[u]nder 42 U.S.C. § 1983 a transfer may, under certain circumstances, constitute an adverse employment action."). In *Breaux* the Fifth Circuit explained that "[t]ransfers can constitute adverse employment actions if they are sufficiently punitive or if the new job is markedly less prestigious and less interesting than the old one." *Breaux,* 205 F.3d at 157 (citations omitted). Similarly, in *Sharp* the court held that, "for the purposes of a § 1983 retaliation claim, an adverse employment action can include a transfer, because it may serve as a demotion," and that a transfer can be equivalent to a demotion, even without an attendant loss of pay, grade, or title, "if the new position proves objectively worse-such as being less prestigious or less interesting or providing less room for advancement." *Sharp,* 164 F.3d at 933; *see also Forsyth v. City of Dallas,* 91 F.3d 769, 774-75 (5th Cir.1996) (affirming judgment under § 1983 against individual defendants where positions from which plaintiffs were transferred "were more prestigious, had better working hours, and were more interesting than night patrol" and where few others voluntarily made such transfers and other officers had received same type of transfer as punishment); *Click,* 970 F.2d at 110-11 (holding that "plaintiffs presented sufficient evidence of a 'deprivation' of rights under § 1983 to reach the jury" where there was evidence that they were transferred to less interesting and less prestigious jobs and lost seniority rights).

**\*18** Plaintiffs fail to allege that Wash suffered any adverse consequences as a result of the transfers. With respect to Wash's transfer from the ICP unit to First Watch Patrol, plaintiffs do not assert any facts to show that assignment to the First Watch Patrol is less interesting or less prestigious than assignment to the ICP Unit. Nor do they allege that Wash suffered an attendant reduction in pay or benefits from the transfer. Plaintiffs have also failed to allege similar facts concerning Wash's other transfer, even neglecting to specify the nature of the post to which he was assigned.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

They have failed to plead facts that show that the transfers were punitive or adverse in nature. For these reasons, plaintiffs have not alleged facts that demonstrate that Wash suffered an adverse employment action by being transferred. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that these transfers constitute adverse employment actions.

### F

Plaintiffs have failed to allege facts that show that Wash suffered an adverse employment action. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address the deficiencies that the court has identified.

### VII

The court now considers the actions allegedly taken against Ellis.

### A

Plaintiffs allege that the following adverse actions have been taken against Ellis: (1) Crawford posted Ellis' memorandum to IAD on a bulletin board in the Northwest Division headquarters; (2) Ellis found a new dent on his truck one day after his IAD memorandum was posted; (3) Edwards removed from internal mail a letter Wash and Ellis had written to Bolton concerning the posting of their IAD letters; (4) when Ellis and Wash met with Edwards regarding their memorandum, Edwards falsely stated that she kept it from Bolton because the department was unable to investigate; [FN21] (5) at various times, Ellis was informed that grievances he lodged were invalid or were not going to result in any action; (6) Renaud denied Ellis overtime, reprimanded him, (along with Edwards) ordered Bush to issue to Ellis a white copy or supervisor's report for not being alert, ordered Ellis, through Bush, to get a haircut, glared at Ellis when he refused to speak with

her and ordered Bush to give an "advice and instruction" to him, required Bush to inform Ellis that she wanted Ellis transferred, and falsely claimed that Ellis had a bad attitude and that he had threatened her; (7) Ellis' nomination for the Police Shield, even though approved, disappeared; (8) Crawford, Renaud, Edwards, and Gerdes initiated an IAD investigation against Ellis based on false charges and Gerdes intentionally withheld evidence pertinent to the investigation; and (9) after Ellis filed an appeal concerning the supervisor's report issued at the behest of Renaud and Edwards, Edwards prevented the appeal from being resolved.

> FN21. Plaintiffs aver that there was no investigation because Hampton did not wish to offend the DPA. This alleged failure to investigate is insufficient to plead an adverse employment action for the reasons stated *supra* at § IV(D).

### B

**\*19** Crawford's posting of Ellis' memorandum and the refusal to act on Ellis' grievances do not constitute adverse employment actions for reasons the court has explained above. *See supra* §§ V(M) and VI(C). [FN22] The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

> FN22. Not only have plaintiffs failed to plead sufficient facts to show that Ellis suffered an adverse employment action as a result of the alleged actions, in the case of two of Ellis' grievances, plaintiffs have not connected any defendant to the failure to act on those grievances.

### C

The alleged investigation of Ellis initiated by Crawford, Renaud, Edwards, and Gerdes, and Gerdes' act of withholding evidence pertinent to that investigation, are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 19
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

not adverse employment actions. Even if false allegations were made against Ellis, false accusations do not constitute an adverse employment action. *See Breaux,* 205 F.3d at 157-58 (citing *Colson,* 174 F.3d at 511). Gerdes' act of withholding evidence pertinent to an investigation of Ellis is not itself actionable because plaintiffs have not pleaded sufficient facts to show that an adverse consequence attended it. Although Ellis may have been saved from enduring the investigation if the evidence Bush provided had not been withheld, *see* Rule 7(a) reply § 20(gg) (averring that Gerdes withheld the evidence because he "knew that IAD would not accept the complaint if the evidence justifying the deployment was included."), as already explained, investigations by themselves do not constitute adverse employment actions. *See supra* § V(H). Thus some greater harm must have attended the withholding of the evidence for it to be significant. Plaintiffs have failed to plead the existence of any such harm. Their allegations therefore fail to plead an adverse employment action. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

### D

Plaintiffs fail to assert facts to show that any defendant was responsible for the dent on Ellis' truck. Thus even assuming that denting one's vehicle can constitute an adverse employment action, the allegation is insufficient to show that Ellis suffered an adverse employment action committed by a particular defendant. Plaintiffs also fail to impute the disappearance of Ellis' Police Shield nomination to a specific defendant. Accordingly, the allegations are insufficient to show that Ellis suffered an adverse employment action at the hands of any defendant. Plaintiffs have therefore failed to state a claim under § 1983 against defendants based on these allegations. *See Woods,* 51 F.3d at 583 ("In order to state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged."). Moreover, plaintiffs have not alleged facts to show that

an important condition of Ellis' employment was altered by this action or that he otherwise suffered some constitutionally significant harm. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

### E

**\*20** Plaintiffs have sufficiently pleaded that Ellis suffered an adverse employment action at the hands of Renaud and Edwards. As the court explains above, formal reprimands are adverse employment actions. *See supra* § V(C)(2). Plaintiffs allege that Renaud and Edwards ordered Bush to issue a white copy or supervisor's report to Ellis for not being alert. Although it is not entirely clear whether this was a formal reprimand, the terms "white copy" and "supervisor's report" suggest that some formal record of the reprimand was made. Drawing all inferences from these adequately-pleaded facts in the light most favorable to Ellis, the court concludes that this allegation is sufficient to plead an adverse employment action. This conclusion does not, of course, preclude a later determination (e.g., at the summary judgment stage) that the supervisor's report does not in fact constitute a formal reprimand. Because this allegation sufficiently pleads that Ellis suffered an adverse employment action at the hands of Renaud and Edwards, the court need not consider whether other acts taken by these defendants constitute adverse employment actions.

### F

In sum, plaintiffs have adequately alleged that Renaud and Edwards took an adverse employment action against Ellis. They have failed to assert adequately that any other defendant committed an adverse employment action against him. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that Ellis suffered an adverse employment action committed by the other defendants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

VIII

A

Plaintiffs allege that Clayton suffered the following acts of retaliation: (1) Renaud reprimanded him, yelled at him, and falsely claimed that a response he gave her was rude, (along with Edwards) ordered Bush to issue a white copy or supervisor's report to Clayton for failing to be alert; [FN23] (2) Crawford, Renaud, Edwards, and Gerdes initiated an IAD investigation against Clayton on a false claim of using city property for personal gain, and Gerdes withheld evidence pertinent to the investigation; (3) a Grievance Review Committee informed Clayton that a grievance he filed did not fit the definition of a grievance; and (4) defendants ignored grievances that Clayton filed concerning alleged racially-discriminatory behavior by officers at the Northwest Division against black members of the ICP unit.

FN23. After Clayton appealed the supervisor's report issued at the behest of Renaud and Edwards, Edwards prevented the appeal from being resolved.

B

The allegation that Renaud and Edwards directed Bush to issue Clayton a white copy or supervisor's report for failing to be alert is sufficient to show an adverse employment action for the reasons stated above. *See supra* § VII(E). The allegations regarding the IAD investigation fail to allege an adverse employment action for the reasons already explained. *See supra* § VII(C). Similarly, plaintiffs have failed to show that the failure to act on Clayton's grievances constitutes an adverse employment action for the reasons set out *supra* at §§ V(M) and VI(C). [FN24] Plaintiffs have only adequately alleged that Renaud and Edwards committed an adverse employment action against Clayton.

FN24. The allegation that a Grievance Review Committee informed Clayton that a grievance

he filed did not fit the definition of a grievance also fails to link the conduct to a specific defendant.

**\*21** Before dismissing Clayton's First Amendment retaliation claim against the other defendants, the court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address these deficiencies.

IX

A

Plaintiffs allege that Fuentes suffered the following retaliatory acts: (1) Renaud reprimanded Fuentes and (along with Edwards) ordered Bush to issue him a white copy or supervisor's report; [FN25] (2) Edwards, Gerdes, Renaud, and Crawford initiated an IAD investigation against him based on false charges, and Gerdes withheld evidence pertinent to the investigation; (3) a Grievance Review Committee informed Fuentes that a grievance he filed did not fit the definition of a grievance; and (4) Renaud notified Fuentes of a Public Integrity complaint against him, potentially in Ellis' presence, [FN26] and, although the complainant's affidavit was later determined to be false and DPA members attempted to intimidate witnesses against Fuentes, this information was omitted from the final IAD report. Although Bush wrote a memorandum detailing the need to correct the information in the file, no such action was taken.

FN25. After Fuentes appealed the supervisor's report issued at the behest of Renaud and Edwards, Edwards prevented the appeal from being resolved.

FN26. Plaintiffs' Rule 7(a) reply alleges that "Renaud notified Plaintiff Fuentes of the Public Integrity complaint against him. In the presence of Plaintiff Ellis, Renaud loudly stated, "Hey! Señor Fuentes! Contact this

Not Reported in F.Supp.2d                                              Page 21
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

lieutenant at Public Integrity as soon as possible." Rule 7(a) Rep. ¶ 20(m).

B

The allegation that Fuentes was issued a white copy of supervisor's report at the direction of Edwards and Renaud is sufficient to show that he suffered an adverse employment action for reasons explained above. *See supra* § VII(E). Accordingly, there is no need to consider whether other actions these defendants may have taken against Fuentes also constitute adverse employment actions. The allegations pertaining to the IAD investigations that Edwards, Gerdes, Renaud, and Crawford initiated fail to plead an adverse employment action. *See supra* § VII(C). The assertion regarding the Grievance Review Committee's decision on Fuentes' grievance is also insufficient because it fails for the reasons explained *supra* at §§ V(M) and VI(C), and plaintiffs have failed to link any specific defendant to the action. The allegation that witnesses were intimidated during the investigation of the Public Integrity complaint against Fuentes, and that Fuentes' file was not corrected to reflect accurate information concerning the investigation, also fails to implicate any specific defendant. Additionally, even if plaintiffs linked these actions to a specific defendant, their allegations are insufficient to show that an important condition of Fuentes' employment was altered or that he otherwise suffered adverse consequences that rise to the level of constitutional significance.

For these reasons, Fuentes only adequately alleges that he suffered an adverse employment action at the hands of Renaud and Edwards. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that Fuentes suffered an adverse employment action at the hands of the other defendants.

X

Defendants contend that the First Amendment retaliation claims of Ellis, Fuentes, and Clayton must be dismissed because plaintiffs cannot show that the issues on which they spoke concerned matters of public concern. They maintain that their complaint shows that they spoke about personnel issues raised internally within DPD. Plaintiffs have not responded to this argument, and they do not specify what speech serves as the basis for their retaliation claims.

A

**\*22** The court first considers whether Ellis' IAD memorandum regarding Crawford's alleged attempted break-in of Bush's office relates to a matter of public concern. The subject line of Ellis' memorandum is: "Attempted entry into Sgt. Lee Bush's office." The contents of the memorandum concern facts that Ellis gathered in a conversation he had with the officer who was present at the time of the attempted break-in. It is written on City letterhead and, in signing the memorandum, Ellis included his badge number and specified that he was a police officer in the Northwest Operations Division.

The court considers the "content, form, and context" of the statement, "as revealed by the whole court record," *Teague,* 179 F.3d at 380 (internal quotation marks omitted), and examines whether the speech "was made primarily in ... plaintiff's role as citizen or primarily in his role as employee," *Terrell,* 792 F.2d at 1362. "Speech concerning police misconduct is public in content." *Teague,* 179 F.3d at 383; *see Markos v. City of Atlanta, Tex.,* 364 F.3d 567, 570-71 (5th Cir.2004) (observing that Fifth Circuit "has often stated that allegations of police misconduct and corruption are important matters of public concern," and holding that plaintiff's speech that "involved allegations of a police cover up ... addressed a matter of significant public concern.") (citing, *inter alia, Thompson v. City of Starkville,* 901 F.2d 456, 463 (5th Cir.1990), and *Brawner v. City of Richardson,* 855 F.2d 187, 191-92 (5th Cir.1988)); *Branton v. City of Dallas,* 272 F.3d 730, 739 (5th Cir.2001) ("While speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern, speech 'complaining of misconduct within the police department ... [is] speech addressing a matter of public concern,' " (quoting *Thompson,* 901 F.2d at 463) (citation omitted))). "Speech which discloses any

Not Reported in F.Supp.2d                                                                                    Page 22
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

evidence of corruption, impropriety, or other malfeasance on the part of city officials ... concerns matter of public import." *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1998) (per curiam) (quoted in *Thompson,* 901 F.2d at 463). The content of the memorandum is public in nature because it exposes potential misconduct by Crawford.

In evaluating the context of the speech, the Fifth Circuit has examined whether it was conveyed in the context of an employer-employee dispute. A finding that it was suggests that the speech is private. *See Teague,* 179 F.3d at 383 (holding that where plaintiff's grievance "was made in the setting of a private employee-employer dispute," it was "more appropriately characterized as private" in context); *Bradshaw,* 207 F.3d at 818 (holding that where speech was made after decision had been made to reassign plaintiff, speech was "more akin to a personal grievance rather than a matter of public concern."). The Fifth Circuit has also considered the fact that speech was made outside the context of an employment dispute in reaching the conclusion that it related to a matter of public concern. *See Harris v. Victoria Indep. Sch. Dist.,* 168 F.3d 216, 222-23 (5th Cir.1999) (holding that speech at issue was matter of public concern where, *inter alia,* "[t]here [was] no evidence that the Plaintiffs' speech merely concerned an employment related squabble with their supervisor" and where "the [d]efendants did not point to any evidence of an underlying personal dispute between the [p]laintiffs' and their supervisor). Plaintiffs do not allege any facts that suggest that Ellis was involved in any dispute with defendants or anyone else at DPD before he wrote his internal memorandum to IAD. Therefore, this favors the conclusion that the memorandum was public in context.

**\*23** The Fifth Circuit has also examined whether the speech occurred " 'against a backdrop of widespread debate in the community.' " *Markos,* 364 F.3d at 572 (quoting *Harris,* 168 F.3d at 222). Plaintiffs' pleadings are devoid of any mention of public debate or any indication that the public was aware of, or concerned about, misconduct within DPD. This favors the conclusion that Ellis' memorandum was private in context. Thus Ellis' memorandum is neither wholly private nor wholly public in its context.

The court now considers the form of Ellis' memorandum. In *Bradshaw* the Fifth Circuit considered whether three memoranda written by a high school principal addressed a matter of public concern. *Bradshaw,* 207 F.3d at 815, 817-18. In evaluating the form of the memoranda, the court noted that they were signed by the principal as "High School Principal," and that "[a]t least two of the memoranda were on [school] [l]etterhead." *Id.* at 817. The court held that "[t]hese facts heavily favor a conclusion that [the principal's] speech did not constitute matters of public concern." *Id.* The court also noted that the principal did not voice her concerns publicly, and that her concerns in the memoranda "were made in the form of a response in an employer-employee dispute." *Id.; see Teague,* 179 F.3d at 383 (pointing specifically to language in plaintiff's grievance letter that indicated that speech pertained to employment dispute to support court's conclusion that "the speech in question is undeniably private in form."). The court held that "[t]he form of the memoranda provides ... support that [plaintiff] drafted the documents in her capacity as a public employee rather than as a public citizen." *Bradshaw,* 207 F.3d at 817.

Ellis wrote his memorandum on City letterhead, included his badge number, and, in signing the memorandum, specified that he was a police officer. As in *Bradshaw,* these facts suggest that Ellis wrote the memorandum in his capacity as a public employee. It was also addressed internally to an officer in IAD, which favors a conclusion that the speech is of private concern rather than public. *See Teague,* 179 F.3d at 383; *Bradshaw,* 207 F.3d 817. Nevertheless, the fact that Ellis communicated his message internally is only one factor to be considered. *See Teague,* 364 F.3d at 571 ("Publicization of the speech is a factor to be weighed in determining whether the speech was of public concern."); *Benningfield,* 157 F.3d at 375 ("The fact that the Plaintiffs chose to file internal grievances rather than publicize their complaints is not dispositive."); *Thompson,* 901 F.2d at 467 ("[T]he fact that [plaintiff] chose to make his superiors aware of his grievances (and to help others do the same), instead of alerting the public, does not preclude our finding that his alleged speech addressed issues of public concern."). That said, the foregoing factors favor the conclusion that the speech was private in its form,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

although it should be noted that, unlike in *Bradshaw,* where the speech took the "form of a response in an employee-employer dispute," nothing about the way Ellis' memorandum is written indicates that it was written in the context of an employment dispute.

**\*24** The Fifth Circuit has also considered the motivation behind the employee's speech when determining whether it relates to a matter of public concern. *See Teague,* 179 F.3d at 383-84 (noting that plaintiffs' "focus ... was primarily on clearing their names-not on rooting out police corruption *per se,"* and their "grievances were primarily motivated by, and primarily addressed, concerns particular to their private interests" in evaluating whether plaintiffs were speaking as employees or citizens). Although an assessment of the employee's motivation does not displace the content-form-context analysis, *see Markos,* 364 F.3d at 572, it can be relevant in determining whether the employee was speaking as a citizen or as an employee. In *Thompson* the court evaluated circumstances that helped to indicate the employee's motivations for speaking when determining whether the speech at issue was a matter of public concern. *See Thompson,* 901 F.2d at 465-66. In considering a grievance the employee had filed, the court observed that language illustrated "that [plaintiff] stood to gain little personally through his grievance" and further noted that his assistance in helping others to file complaints similar to his own "did not redound to his own benefit." *Id.* The court also pointed out that other aspects of plaintiff's speech "drew attention to matters well beyond any personal interest he might have had in filing his written grievance[.]" *Id.* at 466. In the present case, there is no indication that Ellis was motivated by personal reasons to write the memorandum to inform IAD of potential misconduct by a fellow officer.

Although the context in which the speech was conveyed yields an equivocal result, and the form of the speech took favors the conclusion that it was private rather than public, the court holds that the speech pertains to a matter of public concern. This conclusion is supported by *Thompson,* where the plaintiff's speech pointed, as here, "to misconduct on the part of various police officers," and the Fifth Circuit held that, if his allegations were true, it would support the conclusion

that his "speech addressed issues of public concern," even where he communicated "his grievances in a private, internal manner, instead of seeking to publicize his complaints [.]" *Thompson,* 901 F.3d at 466-67. Moreover, just as *Thompson* noted aspects of the plaintiff's speech that suggested that he was not motivated by a desire for personal benefit, plaintiffs' pleadings do not contain facts that suggest that Ellis was motivated by personal interests. Thus the court concludes that Ellis' memorandum relates to a matter of public concern.

Accordingly, the court rejects defendants' contention that plaintiffs have failed to show that Ellis spoke on a matter of public concern.

### B

Plaintiffs allege that "[o]n or about February 1, 2002, Plaintiff[s] Wash, Fuentes, Bush, Ellis and Clayton reported and complained of Defendant Crawford's retaliatory and racially motivated posting of the Plaintiffs' complaint and statements ... on the Police bulletin board at the Northwest Division headquarters." Rule 7(a) Rep. ¶ 18. They also assert that Ellis, Wash, Fuentes, and Clayton submitted a class action grievance for disparity in treatment. The court holds that these allegations are insufficient to overcome defendants' qualified immunity defense because plaintiffs have not adequately pleaded the speech they contend was protected.

**\*25** In *Foley* the court evaluated whether a plaintiff had sufficiently asserted that she had engaged in speech related to a matter of public concern, thereby enabling her to overcome a qualified immunity defense. *See Foley,* 355 F.3d at 341-42. The panel concluded that "[n]either in the court below nor in this Court has [the plaintiff] identified the precise speech which she claims to have addressed a matter of public concern and to have triggered retaliation." *Id.* at 342. This was necessary because "the precise identification of the speech ... would permit consideration of its content, context, and form as required by the Supreme Court." *Id.* The court held that because the plaintiff maintained "that the Appellees retaliated against her for making

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 24
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

statements protected by the First Amendment, she [was] required to be specific as to when her statement or statements were made, to whom they were made, whether they were oral or written, and the content of those statements." *Id.* (emphasis omitted). The court observed that if plaintiff could not be so specific, she could not overcome a qualified immunity defense. *Id.* Based on the record, the court held that the plaintiff "failed to show the deprivation of a clearly established First Amendment right." *Id.* (emphasis omitted).

As in *Foley,* plaintiffs' conclusory allegations that they complained of and reported the posting of Bush's, Wash's, and Ellis' complaint and statements, and that Ellis, Wash, Clayton, and Fuentes filed a grievance for disparity in treatment, insufficiently identify the speech at issue. With respect to the complaints about the posting of the IAD complaint and statements, plaintiffs do not identify to whom the speech was directed, specify the content of the speech, or allege whether the complaints were written or oral. The absence of this information prevents the court from determining whether the speech addressed a matter of public concern. The allegation regarding the grievance for disparity in treatment is equally insufficient because plaintiffs have not pleaded facts sufficient to set out the context in which it was filed or the form of the grievance. Additionally, although they state that the grievance was for disparity in treatment, they have not specified the content of the grievance. As explained above, such facts are relevant in determining whether the speech concerns a matter of public concern. Thus, as in *Foley,* these deficiencies prevent plaintiffs from overcoming defendants' qualified immunity defense, at least to the extent their First Amendment retaliation claims rest on these allegations.

Although these assertions are presently insufficient to show that Ellis, Clayton, and Fuentes spoke on a matter of public concern, the court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that the speech in question pertained to a matter of public concern.

C

**\*26** In their Rule 7(a) reply, plaintiffs allege that "Clayton observed and filed grievances concerning racially discriminatory treatment accomplished by officers at the Northwest Division against black members of the ICP Unit." Rule 7(a) Rep. ¶ 20(kk). Plaintiffs attach a memorandum addressed to Hampton that alleges, *inter alia,* that Lieutenant Archie King engaged in acts of racism against other police officers. The memorandum is signed by Clayton and Fuentes and is dated March 10, 2004. Even if the grievances or the memorandum constitutes speech on a matter of public concern, the allegations cannot serve as the basis for plaintiffs' First Amendment retaliation claims. Plaintiffs do not allege when Clayton filed the grievances. To show that they suffered acts of retaliation as a result of First Amendment activity, plaintiffs must show, *inter alia,* "that the adverse action was motivated by the protected speech." *Foley,* 355 F.3d at 341. Because plaintiffs have failed to state when Clayton filed these grievances, the court is unable to determine whether any of the adverse actions that plaintiffs allege could have been motivated by these grievances. [FN27] Additionally, the memorandum that Clayton and Fuentes signed cannot serve as a basis for plaintiffs' First Amendment retaliation claim because plaintiffs have not sufficiently alleged that any adverse action was taken by defendants after March 10, 2004. Accordingly, these allegations fail to serve as a basis for plaintiffs' First Amendment retaliation claims. Because the court is raising this ground for dismissal *sua sponte,* to ensure fairness, the court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that addresses these deficiencies.

FN27. The allegations regarding the grievances also fail to identify adequately the speech at issue, which prevents the court from determining whether it pertains to a matter of public concern. *See supra* § X(B).

D

Plaintiffs have sufficiently alleged that Ellis spoke on a matter of public concern. Their allegations, however, are insufficient to show that adverse employment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 25
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

actions were taken against Clayton and Fuentes for speaking on a matter of public concern. The court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that address this deficiency.

## XI

The court now considers whether defendants are entitled to qualified immunity concerning plaintiffs' § 1983 race discrimination claims. Defendants maintain that these actions must be dismissed because plaintiffs have not shown that they suffered an adverse employment action at the hands of any defendant that rises to the level of a constitutional violation or a violation of clearly established law of which a reasonable person would have known.

To prevail on these claims in the absence, as here, of direct evidence of racial discrimination, plaintiffs must make out a *prima facie* case through use of a four-prong test. *See Wallace,* 80 F.3d at 1047-48 (addressing, *inter alia,* § 1983 claim). Each plaintiff must show that he " '(1) is a member of a protected class; (2) was qualified for [his] position; (3) was subject to *an adverse employment action;* and (4) was replaced by someone outside the protected class,' or, in the case of disparate treatment, show[ ] 'that others similarly situated were treated more favorably.' " *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.,* 245 F.3d 507, 512-13 (5th Cir.2001) (addressing Title VII claim) (emphasis added) (quoting, *inter alia, Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 404 (5th Cir.1999)).

**\*27** Defendants posit that plaintiffs have failed to adequately show that they have suffered an adverse employment action. As the court discusses above, *see supra* § IV(A)(3), " § 1983's definition of adverse employment action may be broader than Title VII's definition, which limits the meaning of adverse employment action to ultimate employment decisions." *Banks,* 320 F.3d at 580. Despite this distinction, defendants cite several Title VII cases to argue that "[t]he Fifth Circuit requires that an 'adverse employment action' be an 'ultimate employment

decision [ ] ... such as hiring, granting leave, discharging, promoting, [or] compensating.' " Ds. Br. at 20 (quoting *Zaffuto v. City of Hammond,* 308 F.3d 485, 493 (5th Cir.2002) (quoting *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (quoting *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995))). Thus defendants appear to maintain that the court should apply the Title VII definition of adverse employment action in assessing whether plaintiffs have adequately pleaded § 1983 race discrimination claims.

The distinction between the two definitions is significant in this case. For instance, the court has already held in the context of plaintiffs' First Amendment retaliation claims that Ellis, Clayton, and Fuentes suffered an adverse employment action at the hands of Renaud and Edwards in the form of supervisor reports that could be construed as formal reprimands. This same allegation, however, would not constitute an adverse employment action for purposes of plaintiffs' § 1983 race retaliation claims if the court applies the Title VII definition of adverse employment action. *See Banks,* 320 F.3d at 580 ("[T]he definition of adverse employment action under § 1983 may include reprimands ... which do not qualify as ultimate employment decisions under Title VII.").

The court holds that the broader definition of adverse employment action, which may include reprimands, disciplinary filings, and some transfers, applies to plaintiffs' § 1983 race discrimination claims as it does to their First Amendment retaliation claims. In *Southard* the Fifth Circuit considered whether a defendant was entitled to qualified immunity from a plaintiff's § 1983 sex discrimination and retaliation claims. *Southard,* 114 F.3d at 554-55. The panel evaluated whether the plaintiff had suffered an adverse employment action. *Id.* It recognized that "[n]ot every negative employment decision or event is an adverse employment action that can give rise to a *discrimination or retaliation* cause of action under 1983." *Id.* at 555 (emphasis added). And it held that "[a]dverse employment actions include discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Id.* The court's inclusion of "reprimands" in what constitutes an adverse employment action suggests that it was applying the broader definition of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 26
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

adverse employment action to the plaintiff's claims. The court did not distinguish between the plaintiff's discrimination and retaliation actions.

**\*28** Because this court is applying the same definition of adverse employment action to plaintiffs' § 1983 race discrimination and First Amendment retaliation claims, the same reasoning applies. [FN28] Based on the analysis discussed above, the continued viability of Bush's and Wash's § 1983 race discrimination claims depend on their alleging facts sufficient to show that they suffered an adverse employment action. Accordingly, the court will give plaintiffs 30 days from the date of this memorandum opinion and order to file an amended Rule 7(a) reply that alleges facts that show that they suffered an adverse employment action.

> FN28. The only exception concerns part of the court's reasoning with respect to the allegation that Edwards denied plaintiffs the opportunity to earn overtime and compensatory time. *See supra* § IV(A). This allegation was deemed insufficient to serve as a basis for plaintiffs' First Amendment retaliation claim because, *inter alia,* plaintiffs failed to plead facts that would allow the court to determine whether the denial could have been motivated by the expression of protected speech. *See supra* § IV(A)(1). This reasoning is inapplicable to plaintiffs' race discrimination claim. Nevertheless, the allegation is still insufficient to serve as a basis for plaintiffs' race discrimination claim because, as already explained, plaintiffs have not pleaded sufficient facts to show that the denial constitutes an adverse employment action. *See supra* § IV(A)(2)-(4).

Ellis, Clayton, and Fuentes sufficiently allege that they suffered an adverse employment action at the hands of Renaud and Edwards, but they have failed to plead sufficient facts to make such a showing as to Crawford, Gerdes, and Hampton. Accordingly, in their amended Rule 7(a) reply, plaintiffs must allege facts that show that these defendants took an adverse employment action against Ellis, Clayton, and Fuentes.

XII

Defendants move to dismiss plaintiffs' § 1985(2) conspiracy claim, [FN29] contending they have failed to state a claim on which relief can be granted because defendants are entitled to qualified immunity. [FN30] They argue, *inter alia,* that the conspiracy allegations against them are general, conclusory, and lack detail concerning the actionable conduct that they undertook to make their conduct a conspiracy. The court agrees.

> FN29. Although plaintiffs' pleadings appear to invoke language from § 1985(2) and (3), in their response to defendants' motion to dismiss, they state that their pleadings incorrectly refer to § 1985(3) and should cite § 1985(2). In their reply brief, defendants ask the court to dismiss plaintiffs' § 1985(2) claim to the extent plaintiffs are attempting to amend their complaint to add a new cause of action under § 1985(2). The inclusion of language from § 1985(2) in their brief was sufficient to put defendants on notice of their claim. Thus the court will consider the viability of plaintiffs' claim under this subsection.

> FN30. The doctrine of qualified immunity is applicable to claims brought under § 1985 as well as to those brought under § 1983. *See Southard,* 114 F.3d at 555 (holding that defendant was entitled to qualified immunity as to plaintiff's claims brought under §§ 1983 and 1985).

To prevail on a § 1985(2) claim, plaintiffs must prove either (1) a conspiracy "designed to deny or interfere with equal protection rights" or (2) "a nexus between the alleged conspiracy and a proceeding in federal court." *See Bradt v. Smith,* 634 F.2d 796, 801 (5th Cir. Unit A Jan.1981). In pleading a conspiracy, plaintiffs "must plead the operative facts upon which their claim is based. Mere conclusory allegations are insufficient." *Holdiness v. Stroud,* 808 F.2d 417, 424 (5th Cir.1987); *see also Lynch v. Cannatella,* 810 F.2d 1363, 1369-70 (5th Cir.1987); *Henrise v. Horvath,* 174 F.Supp.2d 493,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 27
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

501 (N.D.Tex.2001) (Lindsay, J.) (citing *Holdiness, 808 F.2d at 424).* That plaintiffs may not rely on conclusory allegations of a conspiracy to overcome defendants' qualified immunity defense is bolstered by the applicability of *Schultea'* s heightened pleading to plaintiffs' § 1985 claim, which requires that plaintiffs support their claim "with sufficient precision and factual specificity to raise a genuine issue as to the illegality of [defendants'] conduct at the time of the alleged acts." *Schultea,* 47 F.3d at 1434. Plaintiffs may, however, "rely on circumstantial evidence and reasonable inferences therefrom, since conspiracies 'are rarely evidenced by explicit agreements.' " *Way v. Mueller Brass Co.,* 840 F.2d 303, 308 (5th Cir.1988) (quoting *Mack v. Newton,* 737 F.2d 1343, 1350-51 (5th Cir.1984) (quoting *Michelman v. Clark Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1043 (2d Cir.1976))).

*\*29 Since conspiracies, whether among businessmen or others, are rarely evidenced by explicit agreements, the determination of whether a conspiracy existed almost inevitably rests on the inferences that may fairly be drawn from the behavior of the alleged conspirators. At a minimum, their actions, to support a finding of a conspiracy, must suggest a commitment to a common end. The circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.*

*Mack,* 737 F.2d at 1351 (quoting *Michelman,* 534 F.2d at 1043) (internal quotation marks omitted).

Plaintiffs aver in their complaint that "[t]he Defendants individually and jointly conspired and/or agreed to jointly undertake the actions against the Plaintiffs which are set out herein." Compl. ¶ 8. In their Rule 7(a) reply, they alter this language only slightly, asserting that "[t]hese Defendants individually and jointly conspired and/or agreed among themselves presently unknown to Plaintiff to undertake the actions against the Plaintiffs which are set out herein." Rule 7(a) Rep. ¶ 2. Plaintiffs' complaint and Rule 7(a) reply also allege that "[t]he individual Defendants separately, and in concert with one another and others unknown to Plaintiff, have acted outside the scope of their respective jurisdictions and without authorization of law," and "[o]n or prior to the 14th day of October, 2001, in the City of Dallas ... the

individual Defendants, and each of them, in violation of Title 42 U.S.C. § 1983 and/or § 1985, did conspire and agree between themselves and with other person or persons[.]" Compl. ¶¶ 22-23; Rule 7(a) Rep. ¶¶ 22-23. These allegations are conclusory and, of themselves, are insufficient to overcome defendants' qualified immunity defense. Moreover, plaintiffs fail to allege facts in their pleadings that even circumstantially suggest the existence of an agreement among the defendants to violate plaintiffs' civil rights. Because they have failed to allege such facts, they cannot overcome defendants' qualified immunity defense. For these reasons, plaintiffs' § 1985(2) conspiracy claims are dismissed against all defendants.

For the reasons set out, the court grants in part and denies in part defendants' motion to dismiss and permits plaintiffs to file an amended Rule 7(a) reply that addresses certain of the pleading deficiencies addressed above. FN31

> FN31. In their reply brief, defendants point out that plaintiffs allege for the first time in their response that they have been subjected to a hostile work environment. Plaintiffs maintain in their response to defendants' motion to dismiss that they "have been subjected to a hostile work environment." Ps. Resp. at 5. This allegation is conspicuously missing, however, from their complaint and Rule 7(a) reply. Because plaintiffs do not include this claim in either pleading, the court will not address it.

SO ORDERED.

N.D.Tex.,2005.
Ellis v. Crawford
Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2759001 (Trial Motion, Memorandum and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 525406 (N.D.Tex.)
**(Cite as: Not Reported in F.Supp.2d)**

Affidavit) Defendant's Reply to Plaintiffs' Response to Defendant's rule 12 Motion for Judgment on the Pleadings (Oct. 03, 2005)

• 2005 WL 3137622 (Trial Motion, Memorandum and Affidavit) Defendant's Reply to Plaintiffs' Response to Defendant's Rule 12 Motion for Judgment on the Pleadings (Oct. 03, 2005)

• 2005 WL 2758757 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Defendant Crawford's Motion for Judgment (Sep. 27, 2005)

• 2005 WL 988606 (Trial Motion, Memorandum and Affidavit) Plaintiffs' April 2005 7(a) Reply (Apr. 04, 2005)

• 2004 WL 1597276 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Rule 7(a) Reply (Apr. 26, 2004)

• 2004 WL 1597275 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Defendants' Motion for A Rule 7(a) Reply (Mar. 09, 2004)

• 2003 WL 23660037 (Trial Pleading) Defendant June Kim Edwards' Original Answer, Affirmative Defenses, and Jury Demand (Dec. 09, 2003)

• 2003 WL 23660041 (Trial Pleading) Defendant Roseanna Renaud's Original Answer, Affirmative Defenses, and Jury Demand (Dec. 09, 2003)

• 2003 WL 23660045 (Trial Pleading) Defendant Eddie Crawford's Original Answer, Affirmative Defenses, and Jury Demand (Dec. 09, 2003)

• 2003 WL 23660033 (Trial Pleading) Defendant Scott Gerdes's Original Answer, Affirmative Defenses, and Jury Demand (Dec. 04, 2003)

• 2003 WL 23660029 (Trial Pleading) Defendant Randy Hampton's Original Answer, Affirmative Defenses, and Jury Demand (Nov. 25, 2003)

• 2003 WL 23660020 (Trial Pleading) Plaintiffs' Original Complaint and Jury Demand (Oct. 15, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2003 JUN 18 AM 8: 48

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT CHRISTOPHER D. FORAKER,           :
                                           :
          Plaintiff,                       :
                                           :
     v.                                    :      C.A. No. 02-302-JJF
                                           :
COLONEL L. AARON CHAFFINCH,                :
individually and in his official           :
capacity as Superintendent of the         :
Delaware State Police, DIVISION            :
OF STATE POLICE, DEPARTMENT OF             :
PUBLIC SAFETY, STATE OF DELAWARE,          :
                                           :
          Defendants.                      :

## MEMORANDUM AND ORDER

In Plaintiff's Bench Memorandum on the Issue of Qualified Immunity, Plaintiff objects to Defendants' proposed jury instruction regarding qualified immunity.  Plaintiff contends that there are no fact driven qualified immunity issues and that the issue is not appropriate for the jury.

In response, Defendant admits that qualified immunity is a legal issue but argues that the issue cannot be resolved in this case until the jury resolves three material factual disputes: (1) whether Sgt. Foraker's protected speech was a substantial or motivating factor in Col. Chaffinch's decision to transfer him; (2) whether Col. Chaffinch would have transferred Sgt. Foraker for other reasons in the absence of any protected speech; and (3) whether a transfer from the FTU to Troop 6 would chill a person of reasonable firmness from exercising his right of free speech.

1

Defendant contends that once the jury resolves these factual issues, the Court can then resolve whether it was clearly established in 2002 that a transfer like Sgt. Foraker's was an adverse employment action.

In the Court's view, the issue is whether transferring a public employee to a less desirable position for engaging in protected speech could constitute an adverse employment action in February 2002.  In 1999, three years before the events at issue in the instant case transpired, the Third Circuit held in <u>Jones v. School Dist. of Philadelphia</u>, 198 F.3d 403, 411-12 (3d Cir. 1999), that an undesirable transfer with equal pay made in retaliation for protected speech could rise to the level of an adverse employment action.  Thus, the Court concludes that Sgt. Foraker's right to not be transferred for engaging in protected speech was clearly established by 1999, and therefore, the Court further concludes that qualified immunity is not available for Col. Chaffinch's alleged actions as a matter of law.

NOW THEREFORE, IT IS HEREBY ORDERED that Plaintiff's written objection to Defendants' proposed qualified immunity jury instruction is **SUSTAINED**.



6|18|03
DATE

UNITED STATES DISTRICT JUDGE

2

Westlaw.

--- F.3d ----                                                                                        Page 1
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Eighth Circuit.
Cathryn E. HINSHAW, Appellee,
v.
Roger SMITH, Individually and as State
Representative; The Arkansas Local Police and Fire
Retirement System; Joanne Bush; Mike Gaskill;
William Milburn; Charles Lawrence; Donna Marie
Adkins; Van B. Alexander; Troy Waters, Individually
and as Trustees; Ted Mullinex, Appellants.
**No. 05-1205, 05-1217, 05-1218.**

Submitted: Oct. 10, 2005.
Filed: Jan. 30, 2006.

**Background:** Former state employee brought civil
rights action against state representative, lobbyist, state
employer, and other state officials, alleging that she was
disciplined and constructively discharged for engaging
in protected speech, and asserting state law claims. The
United States District Court for the Eastern District of
Arkansas, William R. Wilson, J., denied defendants'
motion for summary judgment on bases of qualified and
absolute immunity. Defendants appealed.

**Holdings:** The Court of Appeals, Hansen, Circuit
Judge, held that:

4(1) Court of Appeals had jurisdiction to review denials
of defendants' claims for qualified immunity;

6(2) Court of Appeals had pendent jurisdiction over
former state employee's state law claims for wrongful
termination;

8(3) Court of Appeals lacked jurisdiction to review
denial of lobbyist's claim of *Noerr-Pennington*
immunity;

18(4) discipline and discharge resulting from the

communication of employee's views to governor's office
did not constitute First Amendment retaliation;

21(5) state representative was entitled to absolute
legislative immunity for some of his conduct; and

24(6) representative's alleged conduct in verbally
pressuring state employer to hire him was entitled to
First Amendment protection as free speech.

Appeal dismissed in part; reversed and remanded in
part.

[1] Federal Courts 170B ☞574

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk572 Interlocutory Orders
Appealable
                170Bk574 k. Other Particular Orders.
Most Cited Cases
While the denial of a motion for summary judgment is
generally unreviewable as an impermissible
interlocutory appeal, the Court of Appeals has limited
authority under the collateral order doctrine to review
the denial of a motion for summary judgment to the
extent the motion is based on the right to absolute or
qualified immunity, which protects a defendant from
having to defend a lawsuit.

[2] Federal Courts 170B ☞763.1

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on
Nature of Decision Appealed from
                170Bk763.1 k. In General. Most Cited
Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                Page 2
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

In reviewing the denial of a claim for qualified immunity, the Court of Appeals reviews whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.

[3] **Federal Courts 170B** ☜579

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk576 Particular Actions, Interlocutory Orders Appealable
                    170Bk579 k. Civil Rights Cases. Most Cited Cases
The Court of Appeals lacked jurisdiction to review denials of qualified immunity claims to the extent they involved questions of evidence sufficiency.

[4] **Federal Courts 170B** ☜579

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk576 Particular Actions, Interlocutory Orders Appealable
                    170Bk579 k. Civil Rights Cases. Most Cited Cases
The Court of Appeals had jurisdiction to review denials of state officials' claims for qualified immunity from liability, in former state employee's § 1983 claim, alleging that she was disciplined and constructively discharged for engaging in protected speech. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

[5] **Federal Courts 170B** ☜768.1

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
                    170Bk768.1 k. In General. Most Cited Cases
The Court of Appeals has pendent jurisdiction when the

appellate resolution of a collateral appeal necessarily resolves the pendent claim as well .

[6] **Federal Courts 170B** ☜770

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
                    170Bk770 k. On Separate Appeal from Interlocutory Judgment or Order. Most Cited Cases
The Court of Appeals had pendent jurisdiction over former state employee's state law claims for wrongful termination, to the extent that disposition of those claims rested on legal issue of whether employee's speech was protected under the First Amendment, which arose on interlocutory appeal from denial of defendants' qualified claims. U.S.C.A. Const.Amend. 1.

[7] **Constitutional Law 92** ☜90.1(1)

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations
                92k90.1(1) k. In General. Most Cited Cases

**Constitutional Law 92** ☜91

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k91 k. Right of Assembly and Petition. Most Cited Cases

**Federal Courts 170B** ☜574

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk572 Interlocutory Orders Appealable
                  170Bk574 k. Other Particular Orders.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 3
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

Most Cited Cases

The denial of *Noerr-Pennington* immunity, protecting private right to petition and right to free speech, is not immediately appealable under the collateral order doctrine, as the immunity does not provide an immunity from suit, but rather only a defense against liability. U.S.C.A. Const.Amend. 1.

The denial of *Noerr-Pennington* immunity, protecting private right to petition and right to free speech, is not immediately appealable under the collateral order doctrine, as the immunity does not provide an immunity from suit, but rather only a defense against liability. U.S.C.A. Const.Amend. 1.

**[8] Federal Courts 170B ⟷579**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(C) Decisions Reviewable
       170BVIII(C)2 Finality of Determination
         170Bk576 Particular Actions, Interlocutory Orders Appealable
           170Bk579 k. Civil Rights Cases. Most Cited Cases

**Federal Courts 170B ⟷770**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
       170BVIII(K)1 In General
         170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
           170Bk770 k. On Separate Appeal from Interlocutory Judgment or Order. Most Cited Cases

The Court of Appeals lacked jurisdiction to review denial of lobbyist's claim of *Noerr-Pennington* immunity, protecting private right of free speech, in former state employee's civil rights action alleging that she was disciplined and constructively discharged for engaging in protected speech in violation of the First Amendment; denial of *Noerr-Pennington* immunity was not immediately appealable under collateral order doctrine, and the immunity claim was not inextricably intertwined with reviewable denials of qualified immunity claims asserted by other defendants. U.S.C.A.

Const.Amend. 1.

**[9] Federal Courts 170B ⟷776**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
       170BVIII(K)1 In General
         170Bk776 k. Trial De Novo. Most Cited Cases

The Court of Appeals reviews de novo the denial of a motion for summary judgment based on qualified immunity.

**[10] Civil Rights 78 ⟷1376(2)**

78 Civil Rights
   78III Federal Remedies in General
     78k1372 Privilege or Immunity; Good Faith and Probable Cause
       78k1376 Government Agencies and Officers
         78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

"Qualified immunity" protects public officials from personal liability under § 1983 when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 ⟷1376(1)**

78 Civil Rights
   78III Federal Remedies in General
     78k1372 Privilege or Immunity; Good Faith and Probable Cause
       78k1376 Government Agencies and Officers
         78k1376(1) k. In General. Most Cited Cases

In analyzing a qualified immunity claim, the court first addresses whether the facts alleged show that the state actor's conduct violated a constitutional right.

**[12] Civil Rights 78 ⟷1376(1)**

78 Civil Rights
   78III Federal Remedies in General

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                              Page 4
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

78k1372 Privilege or Immunity; Good Faith and Probable Cause
    78k1376 Government Agencies and Officers
        78k1376(1) k. In General. Most Cited Cases
If the government official's conduct does not violate a constitutional right, he is entitled to qualified immunity in civil rights suit.

**[13] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
In analyzing a claim of qualified immunity, if a constitutional right may have been violated by the government official's conduct, the court proceeds to the second step and determines whether the right was clearly established.

**[14] Civil Rights 78 ☞1430**

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1430 k. Employment Practices. Most Cited Cases
The inquiry into the protected status of speech, for purpose of public employee's First Amendment retaliation claim, is one of law, not fact. U.S.C.A. Const.Amend. 1.

**[15] Civil Rights 78 ☞1430**

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1430 k. Employment Practices. Most Cited Cases

**Constitutional Law 92 ☞45**

92 Constitutional Law
    92II Construction, Operation, and Enforcement of Constitutional Provisions
        92k44 Determination of Constitutional Questions
            92k45 k. Judicial Authority and Duty in General. Most Cited Cases
For purpose of public employee's First Amendment retaliation claim, the balancing of the interests of a public employee, as a citizen, in commenting on matters of public concern, and the interests of the public employer, in promoting the efficiency of the public service it performs through its employees, is a legal chore for the court, although fact disputes concerning any of the factors are appropriately submitted to a jury. U.S.C.A. Const.Amend. 1.

For purpose of public employee's First Amendment retaliation claim, the balancing of the interests of a public employee, as a citizen, in commenting on matters of public concern, and the interests of the public employer, in promoting the efficiency of the public service it performs through its employees, is a legal chore for the court, although fact disputes concerning any of the factors are appropriately submitted to a jury. U.S.C.A. Const.Amend. 1.

**[16] Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment. Most Cited Cases
In applying the *Pickering* test, in a public employee's First Amendment retaliation claim, the court weighs the employee's right to engage in the particular speech at issue with such considerations as whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. U.S.C.A. Const.Amend. 1.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                              Page 5
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

[17] **Constitutional Law 92 🔑90.1(7.2)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and
Limitations
         92k90.1(7) Labor Matters
           92k90.1(7.2) k. Public Employment.
Most Cited Cases
The public employee's status as a policymaking or
confidential employee weighs heavily on the public
employer's side of the *Pickering* balancing test, in
analyzing employee's First Amendment retaliation
claim, when the speech concerns the employee's
political or substantive policy views related to her
public office. U.S.C.A. Const.Amend. 1.

[18] **Constitutional Law 92 🔑90.1(7.2)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and
Limitations
      92k90.1(7) Labor Matters
         92k90.1(7.2) k. Public Employment.
Most Cited Cases

**States 360 🔑53**

360 States
   360II Government and Officers
      360k53 k. Appointment or Employment and
Tenure of Agents and Employees in General. Most
Cited Cases
State employees' retirement benefits board's interests in
restricting speech made by executive director of board
about her beliefs that new legislation concerning board
was bad policy outweighed any free speech interest that
director had in communicating her personal views of
the legislation to governor's office, and thus, discipline
and eventual discharge that executive director faced
resulting from the communication of her views to
governor's office did not constitute First Amendment
retaliation; even assuming that speech was on matter of
public concern, director was policymaking employee,

speech related to her substantive policy views and her
position as executive director, communication was
made despite prior directives that executive director
refrain from commenting on the legislation without the
prior knowledge and concurrence of the board
chairman, and her position required loyalty to the
board. U.S.C.A. Const.Amend. 1.

State employees' retirement benefits board's interests in
restricting speech made by executive director of board
about her beliefs that new legislation concerning board
was bad policy outweighed any free speech interest that
director had in communicating her personal views of
the legislation to governor's office, and thus, discipline
and eventual discharge that executive director faced
resulting from the communication of her views to
governor's office did not constitute First Amendment
retaliation; even assuming that speech was on matter of
public concern, director was policymaking employee,
speech related to her substantive policy views and her
position as executive director, communication was
made despite prior directives that executive director
refrain from commenting on the legislation without the
prior knowledge and concurrence of the board
chairman, and her position required loyalty to the
board. U.S.C.A. Const.Amend. 1.

[19] **Constitutional Law 92 🔑82(11)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
      92k82 Constitutional Guaranties in General
         92k82(6) Particular Rights, Limitations, and
Applications
         92k82(11) k. Public Employees; Military
Personnel. Most Cited Cases
Employee acts of insubordination can tip the balancing
process, in a public employee's First Amendment
retaliation claim, in favor of the public employer.
U.S.C.A. Const.Amend. 1.

[20] **States 360 🔑28(2)**

360 States
   360II Government and Officers
      360k24 Legislature
         360k28 Members

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                           Page 6
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

360k28(2) k. Privileges and Exemptions. Most Cited Cases

Absolute legislative immunity protects state legislators from suit for actions taken in furtherance of legitimate legislative activity.

[21] **Civil Rights 78 🔑1376(10)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(10) k. Employment Practices. Most Cited Cases

State representative was entitled to absolute legislative immunity for his conduct, in reporting state agency employee's meeting with governor's office to state agency employer, reporting employee's alleged nonresponsiveness to state legislators, and allegedly pushing through a bill without following state procedure, in employee's § 1983 action, arising from her discharge resulting from communication of her public policy views to governor; pushing through legislation was legislative duty, and representative's discussions with state agency about agency employee were also part of his responsibilities on legislative committee. 42 U.S.C.A. § 1983.

[22] **Constitutional Law 92 🔑90(1)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90(1) k. In General. Most Cited Cases

The critical line for First Amendment free speech protection must be drawn between advocacy, which is entitled to full protection, and action, which is not. U.S.C.A. Const.Amend. 1.

[23] **Constitutional Law 92 🔑90.1(1)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations

92k90.1(1) k. In General. Most Cited Cases

There is no First Amendment right to prevent state legislators from expressing their own views, as long as they do so without engaging in any threat or coercion. U.S.C.A. Const.Amend. 1.

[24] **Constitutional Law 92 🔑90.1(1)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations

92k90.1(1) k. In General. Most Cited Cases

**States 360 🔑28(2)**

360 States
    360II Government and Officers
        360k24 Legislature
            360k28 Members
                360k28(2) k. Privileges and Exemptions. Most Cited Cases

State representative's alleged conduct in verbally pressuring state agency employer to hire him for policymaking position was entitled to First Amendment protection as free speech, where representative did not engage in threats or coercion. U.S.C.A. Const.Amend. 1.

State representative's alleged conduct in verbally pressuring state agency employer to hire him for policymaking position was entitled to First Amendment protection as free speech, where representative did not engage in threats or coercion. U.S.C.A. Const.Amend. 1.

Appeals from the United States District Court for the Eastern District of Arkansas.

Counsel who presented argument on behalf of the appellee Catherine Hinshaw was Richard C. Madison of North Little Rock, AR. Morgan E. "Chip" Welch filed Hinshaw's brief.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Before RILEY, HANSEN, and COLLOTON, Circuit Judges.

[PUBLISHED]

HANSEN, Circuit Judge.

**\*1** The appellants bring these interlocutory appeals from the district court's denial of their claims of qualified and absolute immunity in the civil rights lawsuit filed by Cathryn Hinshaw following her resignation from employment with The Arkansas Local Police and Fire Retirement System in 2003. We dismiss Ted Mullinex's appeal for lack of appellate jurisdiction. We reverse the district court's denial of summary judgment to the remaining appellants and remand to the district court to enter judgment in favor of the defendants on the claims that are properly before us in these interlocutory proceedings.

I.

The Arkansas Local Police and Fire Retirement System (LOPFI) was created to establish a benefit program and retirement system for police officers and firefighters in Arkansas. Cathryn Hinshaw had been the executive director of LOPFI since its inception in the early 1980s. As executive director, Hinshaw represented LOPFI during the sessions of the Arkansas General Assembly and interacted with legislators. The general administration of LOPFI, a state administrative agency, was vested in its five-member Board of Trustees (Board), to whom Hinshaw reported. Hinshaw made recommendations to the Board, and she appointed the clerical and professional employees of LOPFI, but she was precluded from being involved with the appointment of Board members. The Governor of Arkansas appoints the Board members based on recommendations made by the House and Senate Joint Committee on Public Retirement and Social Security Programs (Joint Committee). *See* Ark.Code § 24-10-201(a). Defendants Joanne Bush, Mike Gaskill, William Milburn, Charles Lawrence, and Troy Waters (collectively "the individual Board members") were the five Board members at the time of the events relevant to this case. [FN1]

Roger Smith was an Arkansas state representative and cochaired the Joint Committee. In February 2003, the Joint Committee introduced a bill that would increase the number of Trustees on the Board by two, from five to seven. Hinshaw thought that the bill was bad policy because it would create an imbalance on the Board between members from public employee interest groups and public employer interest groups and taxpayer constituents. Nevertheless, the bill passed.

Hinshaw alleged in her civil rights complaint that Representative Smith wanted her job when his legislative term expired and that he conspired with defendant Mullinex, a lobbyist, and members of the Board in early 2003 to have Mr. Smith replace Ms. Hinshaw as executive director. Hinshaw alleged that Smith made false accusations to the Board members about Hinshaw's alleged poor performance in an effort to get her fired, and that these actions violated an Arkansas law that prevents a legislator from using his position to secure special privileges for himself.

Ted Mullinex was a lobbyist who represented the interests of the public employees covered by LOPFI. Hinshaw alleged in her complaint that Mullinex approached Board members in July 2003 seeking a commitment by them to replace Hinshaw with Smith. According to Hinshaw, Smith directed Mullinex to talk to the Board members on his behalf, and she asserted that these communications were in violation of Arkansas law because Mullinex did not disclose in required state lobbyist filings that he was a lobbyist on Smith's behalf.

**\*2** Hinshaw, an at-will employee, was placed on probation and suspended twice in 2003. In February of 2003, Hinshaw provided erroneous information to a magazine, which published it. When confronted by the Board at its March meeting, Hinshaw denied providing the information. She was placed on a six-month probation in June 2003 based on the Board's investigation of the comments to the magazine, a lack of oversight during the most recent legislative session, failure to respond to legislative phone calls, and other enumerated concerns about her performance. On August 11, 2003, LOPFI suspended Hinshaw without pay for twelve days based on its determination that she

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 8
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

had in fact lied at the March meeting about providing the erroneous information to the magazine.

While on the twelve-day suspension, Hinshaw scheduled a meeting with the Governor's office to discuss the two new Board positions created by the legislation introduced by Representative Smith's Joint Committee. She met with members of the Governor's staff on August 14, but did not indicate to the Governor's staff members that she was suspended at the time. Ms. Hinshaw urged the Governor to postpone naming the new Board members even though the legislation had already passed. After this meeting, the Governor's staff told Representative Smith that according to Hinshaw the LOPFI Board opposed naming the two new Board members. Mr. Smith asked the Board members about their position on the appointments and informed them of Hinshaw's August 14 conversation with the Governor's office. Ms. Hinshaw says she does not recall whether she indicated to the Governor's staff that she was speaking on behalf of LOPFI, but does not dispute the Governor's staff member's statement that she represented herself at the meeting as appearing on behalf of LOPFI and as expressing the Board's views.

On September 4, 2003, Hinshaw received a 30-day suspension without pay. She was reminded that she was prohibited from attempting to influence gubernatorial appointments or supporting or opposing legislation unless directed to do so by the Board. On December 4, 2003, during an executive session of the Board, the LOPFI Board gave Hinshaw the options of either resigning or being terminated. Hinshaw resigned and brought this civil rights lawsuit. Hinshaw brought claims under 42 U.S.C. §§ 1983 and 1985 against LOPFI, the individual Board members, Representative Smith, and lobbyist Mullinex, alleging that she was disciplined and constructively discharged for engaging in protected speech in violation of the First Amendment, the Fifth Amendment, and the Fourteenth Amendment. She also brought several state law claims.

The district court granted summary judgment to the defendants on the § 1985 conspiracy claim, the § 1983 claims premised on the Fifth and Fourteenth Amendment due process violations, and a state law

defamation claim. The district court determined that disputes of material fact existed concerning the § 1983 First Amendment claim, as well as the state law wrongful discharge, civil conspiracy, and tortious interference with contract claims, and it denied summary judgment on those claims. The district court also determined that the fact issues surrounding the First Amendment claim prevented it from granting qualified immunity to the individual Board member defendants because the First Amendment and qualified immunity analysis was identical under the *Pickering-Connick* [FN2] test. The district court also declined to grant either absolute or qualified immunity to Representative Smith, finding that issues of fact existed concerning whether Mr. Smith was acting in his legislative capacity when he communicated with the Board. Finally, the district court found that fact issues defeated Mullinex's immunity defense under *Noerr-Pennington.* [FN3] The defendants bring these interlocutory appeals seeking review of the denial of their claimed immunities.

II.

A. Appellate Jurisdiction

**\*3** [1] [2] [3] [4] While the denial of a motion for summary judgment is generally unreviewable as an impermissible interlocutory appeal, we have limited authority under the collateral order doctrine to review the denial of a motion for summary judgment to the extent the motion is based on the right to absolute or qualified immunity, which protects a defendant from having to defend a lawsuit. *See Johnson v. Jones,* 515 U.S. 304, 311, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Crow v. Montgomery,* 403 F.3d 598, 601 (8th Cir.2005) (qualified immunity); *Maitland v. Univ. of Minn.,* 260 F.3d 959, 962 (8th Cir.2001) (legislative immunity). We review " 'whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." ' *Johnson,* 515 U.S. at 312 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). We therefore have jurisdiction over the individual Board members' appeals, as well as Smith's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appeal to the extent those appeals challenge the district court's denial of qualified or absolute immunity on legal grounds, but not to the extent they involve questions of evidence sufficiency. *See Johnson,* 515 U.S. at 313.

[5] [6] We also have pendent jurisdiction over claims that are "inextricably intertwined" with the qualified immunity issue, "that is, [we have jurisdiction] when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well ." *Kincade v. City of Blue Springs, Mo.,* 64 F.3d 389, 394 (8th Cir.1995) (internal marks omitted), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996). This pendent jurisdiction extends to the claims that Hinshaw's speech was not constitutionally protected for First Amendment purposes, as the issues "require application of the same constitutional test, and therefore, the question concerning whether the speech is entitled to constitutional protection is 'coterminous with, or subsumed in' the qualified immunity issue." *Id.* at 395. We therefore have jurisdiction over the § 1983 claim against LOPFI as an entity (which is not eligible for qualified immunity) and the state law wrongful termination claims to the extent disposition of those claims rests on the legal conclusion of whether Hinshaw's speech was entitled to protection. However, claims not premised on this constitutional issue-such as disputes involving causation or state law claims unrelated to Hinshaw's First Amendment rights-are not properly before the court, and we do not address them. *Id.*

[7] [8] Mr. Mullinex did not seek summary judgment on the basis of qualified or absolute immunity, as he is not a state actor. *See Lawyer v. City of Council Bluffs,* 361 F.3d 1099, 1103 (8th Cir.2004). Rather, his motion for summary judgment was based on application of the *Noerr-Pennington* doctrine, which is a defense to liability premised on the defendant's actions of exercising his own private rights to free speech and to petition the government. *See Acoustic Sys., Inc. v. Wenger Corp.,* 207 F.3d 287, 294 (5th Cir.2000). Our sister circuits have explicitly held that *Noerr-Pennington* immunity protects a defendant from liability but not from suit, and that the denial of the defense is not immediately appealable under the collateral order doctrine. *See id .* at 295 ("Although the

*Noerr-Pennington* doctrine is frequently referred to as an 'antitrust immunity,' it provides only a defense to liability, not an immunity from suit."); *We, Inc. v. City of Philadelphia,* 174 F.3d 322, 326-30 (3d Cir.1999) ("Because we conclude that the *Noerr-Pennington* doctrine does not confer a right not to stand trial, but rather provides only a defense against liability for certain conduct, we find that an order denying *Noerr-Pennington* immunity ... is not an appealable collateral order."). Our court has similarly characterized the *Noerr-Pennington* doctrine as providing a defense to liability, *see Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1080 n. 4 (8th Cir.1999) ("[T]he First Amendment generally immunizes the act of filing a lawsuit from tort liability under the *Noerr-Pennington* doctrine."); *South Dakota v. Kan. City S. Indus., Inc.,* 880 F.2d 40, 50 (8th Cir.1989) ("The *Noerr-Pennington* doctrine has been applied in evaluating whether this particular activity is entitled to protection from liability." (footnote omitted)), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990), but we have never characterized it as immunity from standing trial. We join our sister circuits in holding that the denial of *Noerr-Pennington* immunity is not immediately appealable under the collateral order doctrine. *See also Will v. Hallock,* No. 04-1332, slip op. at 7 (U.S. Jan. 18, 2005) (clarifying the narrow limitations of the collateral order doctrine and noting that "it is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is 'effectively' unreviewable if review is to be left until later.").

**\*4** Nor is Mullinex's claim to a *Noerr-Pennington* defense inextricably intertwined with the claims of qualified or absolute immunity that are properly before us. The Supreme Court held in *Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), that a court of appeals has limited pendent appellate jurisdiction, noting "that there was no 'pendent party' appellate jurisdiction" where a co-defendant's claims were not inextricably intertwined with the qualified immunity claim. Mullinex's claim to immunity is based on his own right of free speech and his right to petition the government (in this case the LOPFI board) on behalf of his clients, the employee

--- F.3d ----                                                                    Page 10
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

groups covered by the LOPFI retirement system. The issues raised by that claim are totally unrelated to whether the LOPFI board members were entitled to qualified immunity when they suspended and effectively terminated Hinshaw's employment. Neither are the issues raised by Mullinex's *Noerr-Pennington* defense "inextricably intertwined" with Representative Smith's claims of legislative or qualified immunity in communicating with the LOPFI board members. We lack jurisdiction to consider Mullinex's appeal, and accordingly, we dismiss the appeal in No. 05-1217.

B. Qualified Immunity/First Amendment Violation by LOPFI Defendants

[9] "We review 'de novo the denial of a motion for summary judgment based on qualified immunity.' " *Wright v. Rolette County,* 417 F.3d 879, 884 (8th Cir.2005) (quoting *Vaughn v. Ruoff,* 253 F.3d 1124, 1127 (8th Cir.2001)), *petition for cert. filed,* 47 U.S.L.W. 3363 (U.S. Dec. 7, 2005) (No. 05-742). At this stage, we construe the facts in the light most favorable to Hinshaw, the nonmoving party, and accept those facts asserted by Hinshaw that are supported by the record. Summary judgment is inappropriate if "there is a genuine dispute concerning predicate facts material to the qualified immunity issue." *Id.* (internal marks omitted).

[10] [11] [12] [13] Qualified immunity protects public officials from personal liability under § 1983 when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal marks omitted). We first address whether the facts alleged show that the state actor's conduct violated a constitutional right. [FN4] *Davis v. Hall,* 375 F.3d 703, 712 (8th Cir.2004). If that threshold question is answered in the negative, we need not proceed further, as the defendant is entitled to qualified immunity. If a constitutional right may have been violated, we proceed to the second step and determine whether the right was clearly established. *Id.*

[14] [15] In addressing Hinshaw's First Amendment

claim, we first determine whether her speech touched on a matter of public concern. *See Connick,* 461 U.S. at 143; *Kincade,* 64 F.3d at 395. If it did, then we apply the *Pickering* balancing test, which requires a " 'balanc[ing] between the interests of the employee, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees.' " *Connick,* 461 U.S. at 142 (quoting *Pickering,* 391 U.S. at 568). "The inquiry into the protected status of speech is one of law, not fact." *Id.* at 148 n. 7. The balancing of the *Pickering* factors is a legal chore for the court, though fact disputes concerning any of the factors are appropriately submitted to a jury. *See Gordon v. City of Kansas City, Mo.,* 241 F.3d 997, 1003 (8th Cir.2001).

**\*5** The parties dispute whether Hinshaw was acting in her capacity as a concerned citizen when she spoke with the Governor's staff or whether she was representing the views of the Board and acting within the scope of her employment. The district court determined that this issue precluded summary judgment for the defendants. Even if Hinshaw was arguably speaking as a citizen on a matter of public concern, we would then apply the *Pickering* balancing test, which is also a legal issue for the court. As further explained below, the *Pickering* balancing test favors the LOPFI Board, making the fact issue of whether Hinshaw was speaking on a matter of public concern, upon which the district court relied in denying summary judgment, irrelevant to the outcome of this case. We thus presume, for summary judgment purposes, that Hinshaw was speaking on a matter of public concern and proceed to the *Pickering* balancing test.

[16] " '[C]onstitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign.' " *Altman v. Minn. Dep't of Corr.,* 251 F.3d 1199, 1202 (8th Cir.2001) (quoting *Waters v. Churchill,* 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion)). While the government's actions toward its citizenry in general is greatly circumscribed by the individual rights guaranteed by the Constitution, "the [g]overnment, as an employer, must have wide discretion and control

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                          Page 11
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

over the management of its personnel and internal affairs." *Connick,* 461 U.S. at 151 (internal marks omitted). That is not to say that government employees relinquish all of their First Amendment protections when they accept public employment. Rather, applying the *Pickering* test we weigh the employee's right to engage in the particular speech at issue with such considerations as "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

The defendants urge us to forego the *Pickering* balancing test and instead apply the rule established by the Sixth Circuit in *Rose v. Stephens,* 291 F.3d 917, 922 (6th Cir.2002), which holds that the *Pickering* balance favors the government as a matter of law when a policymaking or confidential employee's speech is related to the employee's political or policy views. This view, in effect, represents an extension of Supreme Court precedent as enunciated in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In those cases, the Supreme Court established that the termination of a government employee based on the employee's political affiliation violates the First Amendment unless the hiring authority can demonstrate that party affiliation is an appropriate and reasonable requirement for the effective performance of the public office involved. *See Branti,* 445 U.S. at 517-18. We have recognized that in cases like *Elrod* and *Branti* involving pure patronage dismissals, the individual and government interests are essentially fixed, so that there is no need to perform a *Pickering* balance. *See Horton v. Taylor,* 767 F.2d 471, 480 (8th Cir.1985). In effect, the "balancing [has] really already [been] achieved by the very formulation of the [*Elrod/Branti* ] rule." *Id.* at 480-81 n. 10. *See also O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 719, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (noting the advantages of avoiding a balancing test in pure partisan cases). Thus, we have held that "[i]f discharge solely because of party affiliation is found,

this will involve applying the narrow *Branti* justification test. If a discharge for overt expressive conduct is found, it will involve application of the *Pickering-Givhan-Connick* balancing test." *Horton,* 767 F.2d at 481 (internal marks omitted). The Supreme Court has also indicated that where speech is intermixed with a political affiliation requirement, *Pickering* balancing is appropriate. *See O'Hare Truck Serv., Inc.,* 518 U.S. at 718-19. *See also Barker v. City of Del City,* 215 F.3d 1134, 1139 (10th Cir.2000) (noting that the Supreme Court in *O'Hare Truck Service* implicitly rejected the position that a "political affiliation" employee can be terminated for her speech without the need to consider the *Pickering* balancing factors).

**\*6** The present case does not involve any claims of political affiliation. In *Rose,* the Sixth Circuit expanded the *Elrod/Branti* policymaker exception analysis to include a situation where a policymaking employee was terminated for expressive conduct even though political affiliation was not at issue. *See* 291 F.3d at 921. The Seventh Circuit is in accord with the Sixth Circuit. *See Vargas-Harrison v. Racine Unified Sch. Dist.,* 272 F.3d 964, 973 (7th Cir.2001) ("[T]he [policymaker] corollary is a shorthand for the *Pickering* balancing; in certain instances, the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that the fact-specific *Pickering* inquiry is not required." (internal marks omitted)), *cert. denied,* 537 U.S. 826, 123 S.Ct. 120, 154 L.Ed.2d 38 (2002). *Cf. Biggs v. Best, Best, & Krieger,* 189 F.3d 989, 994-95 (9th Cir.1999) (noting that "an employee's status as a policymaker or confidential employee would be dispositive of any First Amendment retaliation claim" in a case involving both speech and political affiliation). Other courts continue to apply the *Pickering* balancing test when a policymaking or confidential employee is terminated based on speech rather than political affiliation, while recognizing that the significance of the employee's status as a policymaker weighs heavily in the government's favor in applying the *Pickering* balance. *See McEvoy v. Spencer,* 124 F.3d 92, 101, 102-03 (2d Cir.1997) (rejecting *Elrod* and applying a modified *Pickering* test, which gives significant but not dispositive weight to the policymaking status of the employee, when a policymaking employee is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discharged solely for speaking out on matters of public concern and political affiliation is not involved in the decision); *see also* Curinga v. City of Clairton, 357 F.3d 305, 314 (3d Cir.2004) ("Although the result is likely to be the same under *Elrod* and *Pickering*, when an employee's speech is intermixed with political affiliation, the *Pickering* balancing standard is the better analysis to apply."); Flynn v. City of Boston, 140 F.3d 42, 46-47 (1st Cir.) (establishing "a reasonable working rule that, where the employee is subject to discharge for political reasons under the *Elrod* and *Branti* cases, a superior may also-without offending the First Amendment's free speech guarantee-consider the official's substantive views" in applying the *Pickering* balance), *cert. denied,* 525 U.S. 961, 119 S.Ct. 403, 142 L.Ed.2d 327 (1998).

[17] We hesitate to expand the *Elrod-Branti* exception to a case where party affiliation is not alleged as a basis for the termination. Accordingly, we decline to follow all aspects of *Rose* in this case. [FN5] We do recognize the necessarily adverse effect an employee's speech on a matter related to the employee's policymaking or confidential duties would have on the factors enumerated in the *Pickering* balancing test, however, and we agree with those circuits that conclude that the employee's status as a policymaking or confidential employee weighs heavily on the government's side of the *Pickering* scale when the speech concerns the employee's political or substantive policy views related to her public office.

**\*7** [18] We turn then to the *Pickering* balancing test. Hinshaw was no doubt a policymaking employee as that term is used in the context of First Amendment protection for government employees. As executive director, Hinshaw made administrative recommendations to the Board, gave the Board her opinion on whether proposed legislation conflicted with other laws, considered whether proposed legislation would achieve the Board's objectives, conveyed the covered members' interests to the Board, and served as the liaison between the Board and members of the legislature. (Smith App. at 183-99.) Hinshaw contacted legislators regarding the LOPFI legislative package each legislative session and presented the Board's views to the legislature. (*Id.* at 300, 576-77.) She talked to the

Governor's office about various bills, answering their questions about the intent of the bill and the costs of the bill. She represented LOPFI and the Board's interests during her discussions with legislators and the Governor's office when she communicated to them about bills relevant to LOPFI. (*Id.* at 577-78.) Hinshaw recognized herself that it was important for the Board to have confidence in her as the executive director in order for her to effectively perform her duties. (*Id.* at 183.)

The speech for which Hinshaw was disciplined clearly related to her substantive policy views and her position as executive director of LOPFI. Hinshaw believed that the new legislation was bad policy because it skewed the balance of the Board toward the covered members of the system and against the cities (and ultimately the taxpayers) who funded the system. (*Id.* at 207.) Hinshaw was disciplined for her misrepresentations to the Governor's office about the Board's view of the newly-enacted legislation and her suggestion that the Governor not follow the new law. Regardless of whether Hinshaw conveyed to the Governor's office that she was giving her own opinion, the Governor's office was undisputably left with the impression that the Board, not just Hinshaw, wanted the Governor to ignore the law. Hinshaw communicated with the Governor's office despite prior directives to refrain from lobbying for or against pension legislation without the prior knowledge and concurrence of the Board chairman and to avoid involvement with Board appointments. (*Id.* at 254.)

[19] These factors overwhelmingly outweigh whatever interest Hinshaw may have had in communicating her own personal views of the legislation as a citizen to the Governor's office. As relevant as the legislation was to the taxpayers of Arkansas who ultimately help fund the retirement systems, Hinshaw's interest as a private citizen did not give her *carte blanche* to ignore her employer's directives and miscommunicate the Board's views of the legislation to the Governor's office. The LOPFI Board has a legitimate expectation that its executive director will not undermine the Board's efforts by misrepresenting its position on matters related to the Board. "[I]t is insubordination for an employee whose position requires loyalty to speak on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

job-related issues in a manner contrary to the position of [her] employer." _Rose,_ 291 F.3d at 923. Even more so, it is insubordination to misrepresent the employer's position as being consistent with the employee's personal opinion. "[A]s the Supreme Court has recognized, 'employees may always be discharged for good cause, such as insubordination ....' " _Id._ (quoting _Elrod,_ 427 U.S. at 366). Employee acts of insubordination can tip the balancing process in favor of the employer. _See Barnard v. Jackson County, Mo.,_ 43 F.3d 1218, 1224 (8th Cir.), _cert. denied,_ 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 17 (1995).

**\*8** The Board's interests as Hinshaw's employer clearly outweighed Hinshaw's interests in speaking out as a private citizen, and Hinshaw's speech was not protected by the First Amendment. The district court erred in finding that a fact dispute prevented summary judgment. Because there was no First Amendment violation, the individual Board member defendants are entitled to qualified immunity, and LOPFI is entitled to summary judgment on the § 1983 claim against it premised on the First Amendment.

Hinshaw's counsel clarified during oral argument that Hinshaw's state law wrongful discharge claim was premised on the alleged violation of her First Amendment rights. The district court declined to grant summary judgment on the state law claim because it found that a fact dispute remained concerning whether Hinshaw was properly exercising her First Amendment rights. Our determination that there was no First Amendment violation removes the district court's basis for denying summary judgment on Hinshaw's state law wrongful discharge claim. Accordingly, summary judgment should have been granted on this claim in favor of the LOPFI defendants as well. [FN6] The district court's judgment denying summary judgment to the individual Board members and to LOPFI on Hinshaw's § 1983 claim and state law wrongful discharge claim is reversed.

C. Legislative and Qualified Immunity to Representative Smith

The allegations against Mr. Smith include that he

reported Hinshaw's meeting with the Governor's office to the Board, allegedly falsely reported to the Board that Hinshaw did not return legislators' phone calls, pushed through a bill without following state procedure, and pressured the Board members to give Hinshaw's job to him. Smith admits that pressuring Board members for Hinshaw's job is not related to his legislative position, and he is not seeking legislative immunity regarding those allegations. (Smith Br. at 16; Smith Reply Br. at 3-4, 8.) We limit our discussion of absolute immunity to the remaining three allegations.

[20] [21] Absolute legislative immunity protects legislators from suit for actions taken in furtherance of legitimate legislative activity. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." _Bogan v. Scott-Harris,_ 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). Introducing a bill is "quintessentially legislative," _id._ at 55 (holding that voting on an ordinance is protected by legislative immunity), and any actions taken by Mr. Smith related to the February 2003 bill are protected by legislative immunity. In addition, as cochairman of the Joint Committee, Smith was responsible for submitting names to the Governor to fill the vacant Board positions. His discussion with the Board members about Hinshaw's representations to the Governor's office that the Board did not want the newly-created positions filled falls within his legislative duties. Finally, we find that Smith's communications with the Board about Hinshaw's responsiveness to legislators in general, regardless of his motive for making the communications, similarly fall within the realm of Smith's duties as a legislator. Smith is protected by absolute legislative immunity for the allegations concerning these events.

**\*9** Ms. Hinshaw's argument focuses on Mr. Smith's actions of pressuring Board members to give him Hinshaw's job, which we assess against Smith's claim to qualified immunity. The district court applied the _Pickering_ balancing test to Hinshaw's § 1983 claim against Smith, discussing the test in terms of a public employer terminating an employee. However, Smith was not Hinshaw's employer and had no decision-making authority over Hinshaw. At most,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 14
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

Hinshaw claims that Smith pressured the Board to fire her so that he could have her position. The *Pickering* balancing test is not apposite to this situation. *See X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 70 (2d Cir.1999) ("[C]ases holding that a decisionmaker may not take action for impermissible reasons do not provide the proper analytical framework for claims against persons who are not decisionmakers but merely advocates."); *Burnham v. Ianni,* 119 F.3d 668, 678 (8th Cir.1997) (en banc) (noting that the *Pickering* balancing test does not apply outside of the context of an employee discipline case).

The Second Circuit case of *X-Men* is directly on point, and we adopt its reasoning. *X-Men* involved two legislators who publicly criticized the state's employment of a security firm, X-Men, whose employees were affiliated with the Nation of Islam, and the legislators pressured the state not to renew the contract. X-Men claimed that the nonrenewal of its contract violated its right to freedom of association and freedom of religion. The court held that the legislators, who were not the decisionmakers, were entitled to qualified immunity because there was no clearly established federal right for an individual "to prevent legislators from exercising their rights merely to express their views." *X-Men Sec.,* 196 F.3d at 70.

 [22] [23] [24] While persons in a similar position who augment their advocacy with threats or coercion might be vulnerable to liability, "speech by persons who are not decisionmakers and who merely engage in advocacy without threats, intimidation, or coercion is protected by the First Amendment. The 'critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not.' " *Id.* at 70-71 (quoting *Healy v. James,* 408 U.S. 169, 192, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972)). Smith's pressure on the Board members falls within this protection. There are no allegations that Smith threatened or coerced any of the Board members. At most, he may have pressured them verbally, but his advocacy for Hinshaw's position never moved beyond the realm of speech. *See id.* at 71 ("While the complaint alleges that the legislators exerted 'pressure' on the decisionmakers, there is no allegation that such 'pressure' took the form of anything other than

speech."). There is no First Amendment right to prevent legislators from expressing their own views, as long as they do so without engaging in any threat or coercion. *Id.* at 70.

As in *X-Men,* the district court here relied solely on employment cases. The proper focus should be on whether an objective person in Smith's shoes would have known that he violated Hinshaw's clearly established right to free speech when he sought her job. Whether or not Smith violated state law when he sought Hinshaw's job does not establish a violation of Hinshaw's constitutional right to free speech. Based on the reasoning of *X-Men,* Smith is entitled to qualified immunity on Hinshaw's § 1983 claim that Smith violated her First Amendment rights by seeking her job because she has failed to state a claim for a violation of her constitutional rights.

**\*10** The district court denied summary judgment to Smith on Hinshaw's state law claims of wrongful termination, civil conspiracy, and tortious interference with contract based on the existence of material fact disputes. As noted above, Hinshaw's counsel confirmed that the wrongful termination claim was premised on the First Amendment claim. As such, the wrongful termination claim is inextricably intertwined with our qualified immunity holding that Smith did not violate Hinshaw's First Amendment rights, and accordingly, the district court's denial of summary judgment on that claim is reversed. We do not address the remaining state law claims in this interlocutory appeal. *See Kincade,* 64 F.3d at 395.

III. Conclusion

The district court's judgment in Appeal No. 05-1205, denying the motion for summary judgment on Hinshaw's § 1983 claim and state wrongful termination claim against LOPFI, Bush, Gaskill, Milburn, Lawrence, and Waters, is reversed and remanded for the entry of an order dismissing those claims against those defendants. The district court's judgment in Appeal No. 05-1218, denying summary judgment on Hinshaw's § 1983 claim and state wrongful termination claim against Representative Smith, is likewise reversed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 15
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))
**(Cite as: --- F.3d ----)**

and remanded to the district court for the entry of an order dismissing those claims against defendant Smith. Appeal No. 05-1217, involving the district court's denial of *Noerr-Pennington* immunity to Mullinex, is dismissed for lack of interlocutory appellate jurisdiction.

We recognize that our disposition leaves this case in an odd posture, leaving Mr. Mullinex, the lobbyist, alone to face Hinshaw's remaining federal § 1983 claim. Our limited appellate jurisdiction over interlocutory appeals dictates this conclusion. It does not prevent any of the parties from seeking further summary dispositions in the district court concerning any of the remaining claims over which we did not exercise interlocutory appellate jurisdiction.

FN1. Donna Marie Adkins and Van B. Alexander were appointed to the Board after Hinshaw's termination. The district court granted them summary judgment, and they are not part of these interlocutory appeals.

FN2. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

FN3. *See United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

FN4. We may dispose of the pendent claims that depend on a First Amendment violation only if we decide the qualified immunity claim at this first step, because it is the lack of a constitutional violation that would necessarily resolve those pendent claims.

FN5. Although we cited *Rose* with approval in *Bradford v. Huckabee,* 394 F.3d 1012, 1015 (8th Cir.2005), the issue of the application of the *Elrod-Branti* policymaker exception to the *Pickering* balancing test was not directly at

issue in *Bradford. Bradford* 's citation to the Sixth Circuit's opinion in *Rose* provides no basis to deviate from our prior precedent established in *Horton,* as discussed *supra.*

FN6. Hinshaw's remaining claim against LOPFI and the individual Board members is a state law civil conspiracy claim that is not part of this appeal.

C.A.8 (Ark.),2006.
Hinshaw v. Smith
--- F.3d ----, 2006 WL 212372 (C.A.8 (Ark.))

Briefs and Other Related Documents (Back to top)

• 05-1218 (Docket) (Jan. 20, 2005)
• 05-1217 (Docket) (Jan. 20, 2005)
• 05-1205 (Docket) (Jan. 19, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



--- F.3d ----
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Third Circuit.
Anna M. JENSEN, Appellant
v.
Jack E. POTTER, Postmaster General U.S. Postal
Service.
No. 04-4078.

Argued Sept. 29, 2005.
Jan. 31, 2006.

**Background:** Postal employee brought Title VII action
against employer alleging retaliation and sex
discrimination. The United States District Court for the
Middle District of Pennsylvania, Richard P. Conaboy,
J., granted employer's motion for summary judgment.
Employee appealed.

**Holdings:** The Court of Appeals, Alito, Circuit Judge,
held that:

1(1) retaliatory harassment which is severe and
pervasive enough to create a hostile work environment
is cognizable as retaliatory adverse employment action
under Title VII;

6(2) employee established intentional discrimination
element of prima facie case of Title VII retaliatory
harassment claim; and

7(3) issue of material fact existed regarding whether
conditions of employee's employment changed after she
made report.

Reversed and remanded.

**[1] Civil Rights 78 ☞1250**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1250 k. Harassment; Work Environment.
Most Cited Cases
Retaliatory harassment which is severe and pervasive
enough to create a hostile work environment is
cognizable as retaliatory adverse employment action
under Title VII. Civil Rights Act of 1964, § 704, 42
U.S.C.A. § 2000e-3(a).

**[2] Civil Rights 78 ☞1250**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1250 k. Harassment; Work Environment.
Most Cited Cases
To prevail on a claim of retaliatory harassment under
Title VII, employee must prove that: (1) she suffered
intentional discrimination because of her protected
activity; (2) the discrimination was severe or pervasive;
(3) the discrimination detrimentally affected her; (4) it
would have detrimentally affected a reasonable person
in like circumstances; and (5) a basis for employer
liability is present. Civil Rights Act of 1964, § 704, 42
U.S.C.A. § 2000e-3.

**[3] Civil Rights 78 ☞1251**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1251 k. Motive or Intent; Pretext. Most
Cited Cases
The ultimate question in any retaliation case under Title
VII is an intent to retaliate vel non. Civil Rights Act of
1964, § 704, 42 U.S.C.A. § 2000e-3.

**[4] Civil Rights 78 ☞1541**

78 Civil Rights
   78IV Remedies Under Federal Employment
Discrimination Statutes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 2

--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))

**(Cite as: --- F.3d ----)**

[78k1534](#) Presumptions, Inferences, and Burden of Proof

   [78k1541](#) k. Retaliation Claims. [Most Cited Cases](#)

Temporal proximity between protected activity and alleged discrimination can raise the requisite inference of retaliation under Title VII when it is unusually suggestive of retaliatory motive, but even if temporal proximity is missing, courts may look to the intervening period for other evidence of retaliatory animus. Civil Rights Act of 1964, § 704, [42 U.S.C.A. § 2000e-3](#).

[5] **Civil Rights 78 🗝️1137**

[78](#) Civil Rights
   [78II](#) Employment Practices
     [78k1137](#) k. Motive or Intent; Pretext. [Most Cited Cases](#)

Because it is often difficult to determine the motivations of an action, the discrimination analysis under Title VII must concentrate not on individual incidents, but on the overall scenario. Civil Rights Act of 1964, § 701 et seq., [42 U.S.C.A. § 2000e](#) et seq.

[6] **Civil Rights 78 🗝️1251**

[78](#) Civil Rights
   [78II](#) Employment Practices
     [78k1241](#) Retaliation for Exercise of Rights
       [78k1251](#) k. Motive or Intent; Pretext. [Most Cited Cases](#)

**Postal Service 306 🗝️5**

[306](#) Postal Service
   [306I](#) Postal Service in General
     [306k3](#) The Postal Service
       [306k5](#) k. Officers, Clerks, and Employees. [Most Cited Cases](#)

Postal employee established intentional discrimination element of prima facie case of Title VII retaliatory harassment claim based on her prior report of unwanted sexual proposition which resulted in supervisor being transferred and terminated; coworker's habitual insults directed at employee expressly referenced transfer of supervisor, another coworker who had previously been a friend began menacing employee with heavy

equipment after supervisor was transferred and expressed disagreement with transfer decision, and employee's car was repeatedly vandalized after report. Civil Rights Act of 1964, § 704, [42 U.S.C.A. § 2000e-3](#).

Postal employee established intentional discrimination element of prima facie case of Title VII retaliatory harassment claim based on her prior report of unwanted sexual proposition which resulted in supervisor being transferred and terminated; coworker's habitual insults directed at employee expressly referenced transfer of supervisor, another coworker who had previously been a friend began menacing employee with heavy equipment after supervisor was transferred and expressed disagreement with transfer decision, and employee's car was repeatedly vandalized after report. Civil Rights Act of 1964, § 704, [42 U.S.C.A. § 2000e-3](#).

[7] **Federal Civil Procedure 170A 🗝️2497.1**

[170A](#) Federal Civil Procedure
   [170AXVII](#) Judgment
     [170AXVII(C)](#) Summary Judgment
       [170AXVII(C)2](#) Particular Cases
         [170Ak2497](#) Employees and Employment Discrimination, Actions Involving
           [170Ak2497.1](#) k. In General. [Most Cited Cases](#)

Genuine issues of material fact existed regarding whether retaliatory harassment permeated the workplace and changed the conditions of employee's employment after she made report of unwanted sexual proposition which resulted in supervisor being transferred and terminated and whether employer failed to take prompt remedial action, precluding summary judgment in employee's Title VII retaliatory harassment claim against employer. Civil Rights Act of 1964, § 704, [42 U.S.C.A. § 2000e-3](#).

[8] **Civil Rights 78 🗝️1250**

[78](#) Civil Rights
   [78II](#) Employment Practices
     [78k1241](#) Retaliation for Exercise of Rights
       [78k1250](#) k. Harassment; Work Environment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 3
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

Most Cited Cases

In determining whether harassment was severe or pervasive enough to support hostile work environment claim, the court must determine whether employee suffered retaliatory harassment severe or pervasive enough to alter the conditions of her employment and create an abusive working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
Factors to be weighed in determining whether harassment was severe or pervasive enough to a support hostile work environment claim include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
Under Title VII, if supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e-2.

**[11] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat

Superior. Most Cited Cases
Under Title VII, when coworkers are the perpetrators of creating a hostile work environment, the plaintiff must prove employer liability using traditional agency principles. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e-2.

**[12] Civil Rights 78 ☞1149**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1149 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
In order to establish employer negligence in a coworker harassment case, the plaintiff must show that management knew or should have known about the harassment, but failed to take prompt and adequate remedial action. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e-2.

On Appeal from the United States District Court for the Middle District of Pennsylvania, (Dist.Ct. No. 03-cv-01201), District Court Judge: Hon. Richard P. Conaboy.

Kimberly D. Borland, David P. Tomaszewski (Argued), Borland & Borland, Wilkes Barre, PA, for Appellant.

J. Justin Blewitt, Jr. (Argued), Assistant United States Attorney, Scranton, PA, for Appellee.

Before ALITO and AMBRO, Circuit Judges, and RESTANI, FN* Chief Judge, United States Court of International Trade.

OPINION OF THE COURT

ALITO, Circuit Judge.
**\*1** Appellant Anna Jensen is a letter carrier with the Kingston, Pennsylvania branch of the United States Post Office. In this action against her employer, she brings claims for retaliation and sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The District Court granted the Postmaster General's motion for summary judgment as to both claims, and Jensen appealed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                   Page 4
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

We will reverse and remand. With respect to retaliation, the District Court incorrectly held that coworker harassment cannot violate 42 U.S.C. § 2000e-3(a). As to sex discrimination, the record contains evidence sufficient to support a finding that the alleged retaliatory harassment was also discrimination "because of ... sex." See 42 U.S.C. § 2000e-2(a).

I.

Both Jensen's claims arise from a series of events that began with an unwanted sexual proposition. While at work on Saturday morning, September 15, 2001, Jensen received a phone call from supervisor Carl Waters. Waters had the day off, and he asked if Jensen knew the way to his home. When Jensen said she didn't, he gave her directions. As he spoke, Waters struggled with the pronunciation of certain street names. He apologized to Jensen and attributed the slurred speech to an all-night drinking binge.

After completing the directions, Waters said: "Now Anna, I don't care what [obscenity] you go in and tell those guys in the office, get out of there right now [because] I want to make love to you all day long." App. 63. Jensen declined, but Waters persisted, asking her at least to join him for breakfast. Jensen again said no, and Waters responded: "Anna, you put me in a compromising position." App. 63. Jensen made it clear that her decision was final, and the conversation ended.

The next day, Jensen phoned Kingston branch manager Chris Moss and reported the incident. A more detailed discussion occurred when Jensen returned to work on Tuesday the 18th. Waters continued to work at the Kingston branch for two more days, but Jensen and he did not interact. On Thursday the 20th, the Postal Service transferred Waters to the Ashley branch. An investigation followed, and in January 2002 Waters was fired.

Meanwhile, on September 26, 2001, supervisor Rick Honeychurch moved Jensen's workstation from Moss's office to a stand-up desk in an area of the Post Office called Unit 1. Jensen's stay in Moss's office had begun after an injury required the use of crutches and the

elevation of Jensen's leg. Moss testified that he instructed Honeychurch to move Jensen for two reasons: her leg had healed and he had confidentiality concerns about the pending Waters investigation. For her part, Jensen heard third-hand that Moss feared being alone with her. Whatever the reason, Jensen's new desk was the former workspace of Carl Waters, and her reception in Unit 1 was not friendly.

Right away, letter carrier Joe Sickler began to pepper Jensen with insults. On September 26, he referred to Jensen as "the [obscenity] who got [Waters] in trouble." App. 65. He then remarked within Jensen's earshot that she would have to get off her "fat [obscenity]" once a new supervisor arrived. The next day, Jensen overheard Sickler discussing a proposed petition to bring Waters back. Sickler also stated that Waters should not have to apologize for anything. Some time later, Sickler crept up behind Jensen and clapped two objects together. Startled, Jensen cringed with fright. She then reported Sickler's behavior to Moss and asked to be removed from Unit 1. Moss said he would talk to Sickler, but he declined to move Jensen despite the availability of another workstation. When asked at his deposition to explain why he did not move Jensen, Moss answered: "Because I didn't." App. 195. Sickler's offensive comments continued at a pace of two to three times per week for about 19 months.

**\*2** Besides Sickler, letter carrier Ed Jones, a friend to Jensen before she reported Waters, now threatened her by driving U-Carts toward her at a rapid pace. He also told Jensen that he disagreed with the decision to terminate Waters. Approximately one year after the Waters incident, unknown vandals twice scratched Jensen's car with a key, spit on the car, and spilled coffee on it. All the incidents occurred in the Post Office parking lot; before the Waters telephone call vandals had never victimized Jensen.

In addition to her initial request to leave Unit 1, Jensen repeatedly complained to Moss and Honeychurch about her coworkers' behavior. At some point during the relevant period-exactly when is unclear-Honeychurch claims to have confronted Sickler about his offensive comments. Conditions did not improve, however, until 19 months after Jensen's first complaint. At that time,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Jensen complained to a new supervisor, Melissa White. White brought Jensen into Moss's office, and Jensen again detailed her treatment at the hands of coworkers. Moss, White, and union officials then confronted Sickler, and Jensen's troubles quickly abated.

During this 19-month period, Jensen suffered panic attacks, she used sick time because of stress, and her asthma caused trips to the emergency room. She attributes these problems to working conditions at the Post Office.

Based on these events, Jensen brought two claims: sex discrimination pursuant to 42 U.S.C. § 2000e-2(a), and retaliation under 42 U.S.C. § 2000e-3(a). The District Court granted the defendant's motion for summary judgment on both claims, and this appeal followed. Our review is plenary, and we view the facts in the light most favorable to Jensen. *See United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 396 n. 3 (3d Cir.2003). If a reasonable jury could find for her, we must reverse. *Neumeyer v. Beard,* 421 F.3d 210, 213 (3d Cir.2005).

II.

Jensen claims that her employer is liable for her coworkers' actions under Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a). That provision makes it an unlawful employment practice to "discriminate" against an employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." FN1 The parties dispute both the scope of this prohibition and its application to this case. As a result, we must first clarify § 2000e-3(a)'s meaning and then apply those principles to the record before us.

A.

[1] The threshold question is whether a retaliation claim predicated upon a hostile work environment is cognizable under 42 U.S.C. § 2000e-3(a). Jensen says it is, the Postmaster says it isn't, and our sister circuits are split. A majority has held that the statute prohibits

severe or pervasive retaliatory harassment. *See Noviello v. City of Boston,* 398 F.3d 76, 90 (1st Cir.2005); *Von Gunten v. Maryland,* 243 F.3d 858, 866 (4th Cir.2001); *Ray v. Henderson,* 217 F.3d 1234, 1244-45 (9th Cir.2000); *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999); *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1264 (10th Cir.1998); *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998); *Knox v. Indiana,* 93 F.3d 1327, 1334-35 (7th Cir.1996); *see also Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 791-92 & n. 8 (6th Cir.2000) (holding that retaliatory harassment by a supervisor is actionable but "tak[ing] no position on whether an employer can be liable for coworkers' retaliatory harassment"). The Fifth and Eighth Circuits, however, limit § 2000e-3(a) to "ultimate employment decisions," and thus do not view harassment to be within the statute's reach. *See Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997); *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997).

*3 While our Court has never addressed the precise question, the logic of our decision in *Robinson v. City of Pittsburgh,* 120 F.3d 1286 (3d Cir.1997), points toward the majority approach. In *Robinson,* we held that "[r]etaliatory conduct other than discharge or refusal to rehire" violates Title VII when it "alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities', or 'adversely affect[s] his [or her] status as an employee.'" *Id.* at 1300 (quoting 42 U.S.C. § 2000e-2(a)) (alterations in original). Put another way, § 2000e-3(a) prohibits a quantum of discrimination coterminous with that prohibited by § 2000e-2(a). *Id.* at 1300-01; *see also Von Gunten,* 243 F.3d at 865 (rejecting the Fifth Circuit's ultimate employment decision standard because "conformity between the provisions of Title VII is to be preferred") (internal quotation omitted).

Under § 2000e-2(a), the cognizability of a discrimination claim founded upon a hostile work environment is well-established. *See, e.g., Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (sex); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
Page 6
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

(1986) (same); *Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir.2005) (race); *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2005) (national origin); *Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 276-77 n. 5 (3d Cir.2001) (religion). The statutory basis for these claims is the notion that discriminatory ridicule or abuse can so infect a workplace that it alters the terms or conditions of the plaintiff's employment. *See Meritor,* 477 U.S. at 67. If harassment can alter the terms or conditions of employment under § 2000e-2, then *Robinson* teaches that the same is true under § 2000e-3. *See Robinson,* 120 F.3d at 1300-01. We thus hold that both provisions can be offended by harassment that is severe or pervasive enough to create a hostile work environment.

**B.**

 [2] [3] In light of the consistency between the two provisions, our usual hostile work environment framework applies equally to Jensen's claim of retaliatory harassment. Thus, Jensen must prove that (1) she suffered intentional discrimination because of her protected activity; [FN2] (2) the discrimination was severe or pervasive; [FN3] (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *See Weston v. Pennsylvania,* 251 F.3d 420, 426 (3d Cir.2001); *Robinson,* 120 F.3d at 1300-01.

The test's first element concretely expresses the principle that Title VII is not "a general civility code for the American workplace." *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief. This first step, therefore, requires us to identify what harassment, if any, a reasonable jury could link to a retaliatory animus. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280-81 (3d Cir.2000); *Shaner v. Synthes,* 204 F.3d 494, 500-01 (3d Cir.2000); *cf. Aman v. Cort Furniture,* 85 F.3d 1074, 1081-83 (3d Cir.1996).

**\*4** [4] In determining whether conduct was retaliatory, our cases have tended to focus on two factors: (1) the "temporal proximity" between the protected activity and the alleged discrimination and (2) the existence of " 'a pattern of antagonism in the intervening period." ' *See Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir.2001) (quoting *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920-21 (3d Cir.1997)). Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive," but even if "temporal proximity ... is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503-04 (3d Cir.1997). Despite this focus, "[t]hese are not the exclusive ways to show causation, as the proffered evidence, taken as a whole, may suffice to raise the inference." *Farrell,* 206 F.3d at 280; *see also Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.").

 [5] This same principle applies in our hostile work environment cases under § 2000e-2(a). There, we have deemed it improper to isolate incidents of facially neutral harassment and conclude, one by one, that each lacks the required discriminatory animus. *See, e.g., Cardenas,* 269 F.3d at 260-61; *Aman,* 85 F.3d at 1081-84. Because "it is often difficult to determine the motivations of an action[,] .... [the] discrimination analysis must concentrate not on individual incidents, but on the overall scenario ." *Andrews,* 895 F.2d at 1484.

 [6] With these principles in mind, we turn to the summary judgment record before us. The prime antagonist in Jensen's retaliation claim is letter carrier Joe Sickler. Shortly after Waters's transfer to the Ashley office, Sickler called Jensen "the [obscenity] who got [Waters] in trouble;" he also stated that when a new supervisor came Jensen would have to get off her "fat [obscenity]." App. 65. Because these insults directly relate to Jensen's complaint against Waters, they raise an obvious inference of retaliatory animus. *Cf. Andrews,* 895 F.2d at 1482 n. 3 ("The intent to discriminate on the basis of sex in cases involving ... sexually derogatory language is implicit, and thus

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should be recognized as a matter of course."). More important, these statements may provide a window into Sickler's thinking throughout the 19-month barrage of offensive comments. If Sickler's conduct were viewed in isolation, his motives would be unclear, but his earlier statements provide a reasonable basis for thinking that the later abuse resulted from latent hostility to Jensen's whistleblowing. Thus, the record as a whole supports a finding that all of Sickler's harassment was based on a retaliatory animus.

Jensen also alleges physical threats by letter carrier Ed Jones. Like Sickler's loud and frightening clap, Jones's alleged assaults are facially neutral. Nonetheless, the record contains other evidence from which a factfinder could infer motive. First, before the Waters incident, Jensen and Jones were friends; shortly after it, Jones menaced her with heavy equipment. This temporal proximity between the protected activity and Jones's changed behavior is probative of a retaliatory intent. *See Abramson,* 260 F.3d at 288. Second, the record contains evidence that Jones expressed disagreement with the decision to remove Waters. This statement, when combined with the sudden shift in behavior, permits an inference that Jones's newfound hostility resulted from Jensen's protected activity.

**\*5** In addition to Sickler's habitual insults and Jones's threatening use of postal equipment, Jensen alleges that vandals twice keyed her car, spit on it, and spilled coffee on it. Standing alone, these acts of vandalism contain no indicia of retaliation. But as with the other events, the analysis changes significantly upon consideration of the overall scenario. *See Andrews,* 895 F.2d at 1482 n. 3. Though the vandalism did not begin until approximately one year after Jensen reported Waters, Sickler's berating of Jensen allegedly continued even 19 months after the Waters incident. If true, and we assume it to be so on summary judgment, this intervening antagonism tends to show that these seemingly unrelated incidents were components of an integrated pattern of retaliation. *See Abramson,* 260 F.3d at 288-89; *cf. Aman,* 85 F.3d at 1083 (concluding that, in light of racially abusive remarks, a reasonable jury could infer that facially neutral acts like stealing time cards were "part of a complex tapestry of discrimination"). In sum, a reasonable jury could find

that all the alleged coworker harassment-namely, Sickler's insults, Jones's physical threats, and vehicle damage caused by unknown vandals-were the product of intentional discrimination because of Jensen's protected activity.

[7] Having identified the conduct that a reasonable jury could label retaliatory, our next task is to measure the harassment's severity or pervasiveness. As stated earlier, this inquiry has both subjective and objective components. *See Faragher,* 524 U.S. at 787. We can quickly dispense with the subjective prong. At her deposition, Jensen testified that her coworkers' actions caused anxiety attacks, trips to the emergency room, and stress-induced use of her sick leave. App. 129-30, 136-38. This evidence would support a finding that Jensen subjectively viewed the work environment to be hostile. *See Harris,* 510 U.S. at 21-22.

[8] Of course, Jensen's subjective reaction to the discrimination is not enough. She must also show an objectively hostile work environment. Two elements of our test relate to this question. The second prong requires severe or pervasive harassment; the fourth requires discrimination that would have detrimentally affected a reasonable person. *See ante* at 7-8. When applied, they coalesce into a single inquiry: did the plaintiff suffer retaliatory harassment severe or pervasive enough to "alter the conditions of [her] employment and create an abusive working environment"? *See Meritor,* 477 U.S. at 67; *Robinson,* 120 F.3d at 1300-01.

[9] Like the requirement of intentional discrimination, the need for an objectively abusive work environment further distinguishes Title VII from a generalized "civility code." *Oncale,* 523 U.S. at 81. The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not "permeate" the workplace and change the very nature of the plaintiff's employment. *See Faragher,* 524 U.S. at 788; *Harris,* 510 U.S. at 21. Factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interferes with an employee's work performance." *Harris,* 510 U.S. at 23. No one factor is dispositive, and the analysis must focus on the "totality of the circumstances." *Andrews,* 895 F.2d at 1482.

**\*6** While the severe or pervasive standard applies equally to § 2000e-2 and § 2000e-3, it is especially crucial in the retaliation context. When one employee makes a charge under Title VII against another, some strain on workplace relationships is inevitable. *See Von Gunten,* 243 F.3d at 870. Sides will be chosen, lines will be drawn, and those who were once the whistleblower's friends may not be so friendly anymore. *See Noviello,* 398 F.3d at 92-93. But what the statute proscribes is retaliation, not loyalty to an accused coworker or a desire to avoid entanglement in workplace controversy. *Id.; see also Brooks v. City of San Mateo,* 229 F.3d 917, 929 (9th Cir.2000) ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action."). Thus, while we must consider the totality of the circumstances, some circumstances do not affect our analysis because they are not retaliatory.

For example, at her deposition, Jensen frequently stated that coworkers subjected her to the silent treatment. *See, e.g.,* Doc. 23, Exhibit D, Jensen Deposition at 97 ("I mean, the whole environment was different after I reported it, okay. People who used to talk to me didn't talk to me."). A cold shoulder can be hurtful, but it is not harassment. *See Brooks,* 229 F.3d at 929.

Mere expressions of opinion are also not retaliatory. For example, Jensen overheard Sickler discussing "a petition ... to bring Carl [Waters] back and that Carl shouldn't have to apologize for anything." App. 65-66. On another occasion, Ed Jones told Jensen that he disagreed with the decision to fire Waters. App. 114-16. These statements are useful to Jensen because they tend to show that a retaliatory motive animated *other* behavior by Sickler and Jones. But they have no independent weight in our "severe or pervasive" analysis. If Jones thought Waters had been treated harshly, he was entitled to express his opinion; if Sickler wanted to start a petition, he had every right to do so. Title VII prohibits retaliation against accusers,

not support for the accused.

Nonetheless, the record contains evidence of harassment that a jury might well find severe or pervasive. First, Sickler berated Jensen with retaliatory insults two to three times per week for 19 months, and the significance of these remarks lies in their pounding regularity. *See Harris,* 510 U.S. at 23. Second, the record contains evidence of more than just insults. Jensen also testified to an unspecified number of physical threats by Ed Jones and at least four instances of property damage to her vehicle. These incidents' severity and the insults' frequency combine to raise a material question of fact as to whether retaliatory harassment "permeated" the workplace and changed the terms or conditions of Jensen's employment. *See id.* at 21.

[10] [11] With that, we come to the fifth and final prong of the analysis: employer liability. Under Title VII, much turns on whether the harassers are supervisors or coworkers. If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher,* 524 U.S. at 807-08. When coworkers are the perpetrators, the plaintiff must prove employer liability using traditional agency principles. *Weston,* 251 F.3d at 426-27; *Bouton v. BMW of N. Am., Inc.,* 29 F.3d 103, 106-07 (3d Cir.1994). Typically, the plaintiff in a coworker harassment case argues for direct liability on a theory of "negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment." *See Bouton,* 29 F.3d at 106 (citing *Restatement (Second) of Agency* § 219(2)(b)). That is what Jensen argues here, so we will analyze this case as one of coworker harassment. *See* Pl. Br. at 26. [FN4]

**\*7** [12] In order to establish employer negligence, the plaintiff must show that management knew or should have known about the harassment, but "failed to take prompt and adequate remedial action." *Andrews,* 895 F.2d at 1486. An effective remedy-one that stops the harassment-is adequate per se. *Knabe v. Boury Corp.,* 114 F.3d 407, 411-12 n. 8 (3d Cir.1997). Even if not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

effective, an employer's remedial measure is nonetheless adequate if "reasonably calculated" to end the harassment. *Id.* at 412-13 (internal quotation omitted). Moreover, the remedy need not include discipline to be adequate. In *Knabe,* for example, the employer found insufficient evidence of harassment to justify disciplinary measures against the offending employee. *Id.* at 413. Nonetheless, because the employer promptly met with the alleged harasser and informed him of the company's strong policy against sexual harassment, we found the remedy adequate as a matter of law. *Id.*

Here, as in *Knabe,* the defendant held a meeting with the principal harasser and discussed the allegations. *See id.* Furthermore, this meeting was effective-it stopped the harassment. *See id.* at 412 n. 8. But to be reasonable the remedy must be both adequate *and* prompt. *Andrews,* 895 F.2d at 1486. Though Moss and Honeychurch claim to have had informal discussions with Sickler, the formal meeting between management, union officials, and Sickler did not occur until April or May of 2003. The effectiveness of so modest a remedial measure raises a question as to why, despite Jensen's repeated complaints, it took 19 months of harassment and the intervention of a new supervisor to make it happen. Because of this delay, we cannot deem the Postal Service's response prompt and adequate as a matter of law.

In sum, the record raises genuine issues of material fact as to all five elements of our hostile work environment test. We therefore reverse the District Court's order granting summary judgment for the defendant on the retaliation claim.

### III.

The District Court also granted summary judgment for the defendant on Jensen's sex discrimination claim. Despite the consistency between § 2000e-2(a) and § 2000e-3(a), and despite the fact that both Jensen's claims arise from a single series of events, separate analysis is still necessary. Section 2000e-2(a) makes it an unlawful employment practice to discriminate based on "race, color, religion, sex, or national origin." As

such, this claim stands or falls on whether Jensen suffered sex discrimination severe or pervasive enough to have changed the terms or conditions of her employment. *Harris,* 510 U.S. at 21.

Our task, then, is to identify the alleged harassment that a reasonable jury might deem intentional discrimination because of sex. *Weston,* 251 F.3d at 426. When harassment is facially sexual, i.e., when it "involv[es] sexual propositions, innuendo, pornographic materials, or sexually derogatory language," an inference of sex-based intent will usually arise. *Andrews,* 895 F.2d at 1482 n. 3; *see also Oncale,* 523 U.S. at 80. But discrimination comes in many forms, and it need not be overtly sexual to be actionable. *See Andrews,* 895 F.2d at 1485. As with our search for a retaliatory animus, we do not view each incident in isolation, but attempt to divine the existence of sex-based intent by considering the "overall scenario." *Id.* at 1484.

**\*8** Both parties agree that Waters's proposition raises an inference of intentional sex discrimination. Waters told Jensen to come to his house for the purpose of "mak[ing] love." The inference that he did so because Jensen is a woman arises as a matter of course. *See id.* at 1482 n. 3.

The disputed terrain is whether any of the harassment that followed the Waters incident-harassment that we have already decided a reasonable jury might find retaliatory-was sex discrimination. Jensen argues that because the Waters phone call triggered all the harassment that followed, it was all "because of ... [her] sex." Pl. Br. at 13-14. The defendant contends that, outside the Waters incident, the record contains no indicia of sex-based intent.

As an abstract matter, retaliation against a person based on the person's complaint about sexual harassment is not necessarily discrimination based on the person's sex. If the individuals carrying out the harassment would have carried out a similar campaign regardless of the sex of the person making the complaint, the harassment, while actionable as illegal retaliation, would not also be actionable as discrimination based on sex. In reality, however, when a woman who complains about sexual harassment is thereafter subjected to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 10
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

harassment based on that complaint, a claim that the harassment constituted sex discrimination (because a man who made such a complaint would not have been subjected to similar harassment) will almost always present a question that must be presented to the trier of fact. In such a situation, the evidence will almost always be sufficient to give rise to a reasonable inference that the harassment would not have occurred if the person making the complaint were a man. The difficult task of determining whether to draw such an inference in a particular case is best left to trial.

For these reasons, we hold that the plaintiff's claim of sex discrimination, like her claim of retaliation, should not have been rejected at the summary judgment stage.

                                  IV.

We reverse the District Court's judgment and remand the case for further proceedings.

FN* Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

FN1. The parties agree that Jensen "made a charge ... under [Title VII]" when she reported the Waters phone call to branch manager Chris Moss. *See* 42 U.S.C. § 2000e-3(a).

FN2. This element differs in wording, but not in substance, from our usual retaliation test's requirement of a "causal connection" between the protected activity and the adverse employment action. *See Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir.1995). By showing a causal link, the plaintiff raises an inference of retaliatory intent and satisfies her initial burden under the *McDonnell Douglas* framework. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir.1997). The ultimate question in any retaliation case is an intent to retaliate *vel non* . *See Shaner v.*

*Synthes,* 204 F.3d 494, 501 n. 8 (3d Cir.2000).

FN3. We have often stated that discriminatory harassment must be "pervasive and regular." *See, e.g., Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2001); *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir.1995); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990). But the Supreme Court's standard is "severe *or* pervasive." *Pa. State Police v. Suders,* 542 U.S. 129, 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (emphasis added); *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Harris,* 510 U.S. at 21; *Meritor,* 477 U.S at 67. The difference is meaningful, and the Supreme Court's word controls, so we use the severe or pervasive standard here. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[I]solated incidents (*unless extremely serious* ) will not amount to discriminatory changes in the terms and conditions of employment.") (emphasis added, internal quotation omitted); *see also* 2 Charles A. Sullivan, Michael J. Zimmer & Rebecca Hanner White, *Employment Discrimination Law and Practice* 455 (3d ed. 2002) ("The disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive.").

FN4. Though Jensen does not argue that the *Faragher/Ellerth* analysis applies, the proper standard may be an open question. After Waters's transfer to the Ashley office, supervisor Rick Honeychurch (at the apparent direction of Chris Moss) moved Jensen's workspace to Waters's old desk. Jensen claims this was done "to put [her] in a position of extreme vulnerability where coworkers supportive of Waters would foreseeable [sic] harass [her]." Pl. Br. At 8. Assuming

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))

**(Cite as: --- F.3d ----)**

Page 11

*arguendo* that the record contains evidence to support this inference, two questions arise. First, which liability standard applies when a supervisor intentionally facilitates coworker harassment? Second, is Rick Honeychurch (or, perhaps, Chris Moss) a "supervisor" for purposes of *Faragher/Ellerth? See Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1033 (7th Cir.1998) (stating that courts must "distinguish[ ] employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers"); *Compare Id.* at 1034 (holding that a "supervisor" must have "at least some" authority to "hire, fire, demote, promote, transfer, or discipline an employee"), *with Mack v. Otis Elevator Co.,* 326 F.3d 116, 125 (2d Cir.2003) (disagreeing with *Parkins* and holding that a "supervisor" is a person given authority that "enabled or materially augmented [his or her] ability ... to create a hostile work environment"). These are interesting questions, but we need not decide them. The parties do not raise them, and Jensen survives summary judgment under the more onerous coworker harassment standard.

C.A.3 (Pa.),2006.

Jensen v. Potter

--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))

Briefs and Other Related Documents (Back to top)

• 04-4078 (Docket) (Oct. 27, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Michael KATZENMOYER, Charlotte Katzenmoyer,
v.
CITY OF READING, et al.
**No. CIV. A. 00-5574.**

Sept. 21, 2001.

MEMORANDUM

JOHN R. PADOVA, Judge.
**\*1** Defendants move for summary judgment on Counts
VII and VIII of the Amended Complaint. For the
reasons that follow, the Court grants Defendants'
Motion and grants judgment in favor of Defendants on
these counts.
I. Background

In Count VII, Plaintiff Charlotte Katzenmoyer
("Katzenmoyer") brings a claim under § 1983 and the
First Amendment. Specifically, Katzenmoyer alleges
that Defendants City of Reading ("City"), Mayor
Joseph Eppihimer ("Eppihimer") and Jesus Pena
("Pena") refused to promote her to the position of City
Engineer in retaliation for filing and maintaining a
lawsuit against her. In Count VIII, Katzenmoyer seeks
"mandatory injunctive relief" in relation to the claims
made in Count VII.

In her response to Defendants' Motion, Plaintiff argued
that the existing record provided sufficient basis to deny
the motion, but, in the alternative, asked that the Court
defer disposition of the Motion until discovery had been
completed. The Court deferred judgment under Rule
56(f) until the completion of discovery, and set a
deadline for the filing of supplemental memoranda. On
August 30, 2001, Defendants filed a supplemental brief,
but Plaintiff did not, thus choosing to rely on her prior

submission. FN1

> FN1. By letter to the Court dated September 7,
> 2001, Plaintiff's counsel confirmed that she
> would not be filing any supplemental materials
> in opposition to the Motion for Partial
> Summary Judgment.

I. Legal Standard

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions
on file, together with affidavits, if any, show that there
is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of
law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the
evidence is such that a reasonable jury could return a
verdict for the non-moving party. *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91
L.Ed.2d 202 (1986). A factual dispute is "material" if
it might affect the outcome of the case under governing
law. *Id.*

A party seeking summary judgment always bears the
initial responsibility for informing the district court of
the basis for its motion and identifying those portions of
the record that it believes demonstrate the absence of a
genuine issue of material fact. *Celotex Corp. v. Catrett,*
477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265
(1986). Where the non-moving party bears the burden
of proof on a particular issue at trial, the movant's initial
*Celotex* burden can be met simply by "pointing out to
the district court that there is an absence of evidence to
support the non-moving party's case." *Id.* at 325. After
the moving party has met its initial burden, "the adverse
party's response, by affidavits or otherwise as provided
in this rule, must set forth specific facts showing that
there is a genuine issue for trial." Fed.R.Civ.P. 56(e).
That is, summary judgment is appropriate if the
non-moving party fails to rebut by making a factual
showing "sufficient to establish the existence of an
element essential to that party's case, and on which that
party will bear the burden of proof at trial." *Celotex,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

II. Discussion

**\*2** Section 1983 of Title 42 of the United States Code provides a remedy against "any person" who, under the color of law, deprives another of his constitutional rights. 42 U.S.C. § 1983 (1994). Courts apply a three-step, burden-shifting analysis for retaliation claims made pursuant to the First Amendment under § 1983. *Mount Healthy City Sch. Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 285-86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995). First, the plaintiff must show that she engaged in conduct or speech that is protected by the First Amendment. *Id.* Second, the plaintiff must show that the defendant responded with retaliation, and that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Anderson v. Davila,* 125 F.3d 148, 161 (3d Cir.1997); *Watters,* 55 F.3d at 892. Third, the defendant may defeat the plaintiff's claim by demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of the protected conduct. *Watters,* 55 F.3d at 892.

Defendants contend they are entitled to judgment because Plaintiff cannot establish that an adverse employment action was taken against her. (Def. Mot. at 11.) Specifically, Defendants contend that Plaintiff cannot demonstrate that she was entitled to or had a property right in the position, because she lacked the necessary professional licensing. In such a § 1983-First Amendment claim, however, a plaintiff need not demonstrate she was entitled to the promotion. *See Rutan v. Republican Party of Illinois,* 497 U.S. 62, 72, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (citing *Perry v.*

*Sinderman,* 408 U.S. 593, 596-98, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)); *Suppan v. Dadonna,* 203 F.3d 228, 234 (3d Cir.2000)(rejecting the argument that the First Amendment rights of public employees had not been infringed because they were not entitled to promotion, transfer, or rehire). Retaliatory conduct falling within the scope of § 1983 and the First Amendment is conduct that would "deter a person of ordinary firmness from exercising his First Amendment rights." *Suppan,* 203 F.3d at 235. "[T]he First Amendment ... protects from ... even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights." *Rutan,* 497 U.S. at 76 n. 8.

Defendants further contend, however, that they are entitled to judgment because Plaintiff cannot adduce evidence that there is a causal link between Plaintiff's exercise of First Amendment rights and Defendants' failure to promote her. The Court agrees. In a First Amendment retaliation case, the plaintiff has the initial burden of showing that the constitutionally protected conduct was a "substantial" or "motivating factor" in the relevant decision. *Mount Healthy,* 429 U.S. at 287. It is sufficient if a plaintiff establishes that the exercise of the First Amendment rights played some substantial role in the relevant decision; a plaintiff need not establish that the retaliation was motivated solely or even primarily by the protected activity. *Id.* at 270-71.

In response to Defendants' Motion, Plaintiff presents evidence consisting of an affidavit and a city job description. In order to be considered on summary judgment, facts set forth in affidavits must be such that they would be admissible in evidence. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.") Of Plaintiff's many averments, only a few appear to suggest any link to her filing and maintenance of the law suit with the decision not to promote her:

**\*3** 6. Mr. White told me on numerous occasions that Mr. Eppihimer told him that I would not be elevated to the position of Director Public Works unless and until

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

my husband Michael Katzenmoyer withdrew his law suit against the City of Reading.

7. Mr. White also advised me that Mayor Eppihimer would claim that I could not be elevated to the position of Director of Public Works because I did not yet have my Professional Engineer's license. Mr. White told me on more than one occasion that this was not true. He said Mayor Eppihimer told him that the basis for the denial of the promotion was the existence of Michael Katzenmoyer's law suit.

11. I had several conversations with Jeffrey White about my selection as Director of Public Works and was advised by him, ... that the reason I was not selected was in retaliation for my support of my husband Michael Katzenmoyer in his legal action against the City of Reading.

12. Mr. White made clear to me that my support of as well as my association with Michael Katzenmoyer and his law suit made me unacceptable [sic] Joseph Eppihimer

19. I spoke with Eppihimer about becoming Director of Public Works because of the Professional Engineer's license requirement of the City Charter he said "you know that is not the case."

Pl. Answer to Def. Mot. for Summ. Judgment Ex. A. None of these statements, however, are made on the affiant's personal knowledge; they are hearsay statements that would not be admissible into evidence. Plaintiff's only other submission-the job description-sheds no light as to causation. The Court concludes that Plaintiff's submissions are insufficient to show that there is a genuine issue of material fact as to the issue of whether Plaintiff's lawsuit was a substantial motivating factor in Defendants' decision not to promote her. Accordingly, the Court concludes that Defendants are entitled to judgment on Count VII. The Court also grants judgment in favor of Defendant on Count VIII, insofar as entitlement to the relief sought in Count VIII depends on proof of the claim in Count VII.

An appropriate Order follows.

## ORDER

AND NOW, this day of September, 2001, upon

consideration of Defendants' Motion for Partial Summary Judgment (Doc. No. 21), any responses thereto and all attendant briefing, IT IS HEREBY ORDERED that said Motion is GRANTED. Judgment is entered in favor of Defendants on Counts VII and VIII of the Amended Complaint.

E.D.Pa.,2001.
Katzenmoyer v. City of Reading
Not Reported in F.Supp.2d, 2001 WL 1132374 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:00CV05574 (Docket) (Nov. 02, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Linda KELLEHER,
v.
CITY OF READING, et al.
**No. CIV.A.01-3386.**

May 29, 2002.

*MEMORANDUM*

PADOVA, J.
**\*1** The instant matter arises on the two separate Motions for Summary Judgment filed by the Defendants. Plaintiff Linda Kelleher, the City Clerk of the City Council of Reading, Pennsylvania, filed this suit against the City of Reading ("City"), Mayor Joseph Eppihimer ("Eppihimer"), the Mayor's assistant Kevin Cramsey ("Cramsey"), and City Councilman Jeffrey Waltman ("Waltman") for a series of allegedly harassing actions taken by the Defendants against her in retaliation for exercising her First Amendment rights to free speech. Plaintiff brings First Amendment retaliation claims and conspiracy claims pursuant to 42 U.S.C. § 1983. She also brings a claim for invasion of privacy against Defendant Cramsey for allegedly publicizing e-mails and other purportedly private information relating to her suspension by the City Council. Defendant Waltman filed a Motion for Summary Judgment asserting qualified immunity as well as other bases for dismissal or judgment. The remaining Defendants filed a joint Motion for Summary Judgment asserting a variety of grounds for judgment. For the reasons that follow, the Court grants the Motions as to all claims in favor of all Defendants.

I. Legal Standard

Summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                         Page 2
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

II. Discussion

A. *Qualified Immunity-Claims Against Defendant Waltman*

**\*2** Defendant Waltman moves for summary judgment on all claims against him on the basis of qualified immunity. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Government officials have qualified immunity from suit under § 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The test is whether reasonable persons in the defendants' position at the relevant time "could have believed, in light of clearly established law, that their conduct comported with established legal standards." *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The defendant has the burden of pleading and proving qualified immunity. *Harlow,* 457 U.S. at 815.

When resolving issues of qualified immunity, a court must first determine whether the plaintiff has alleged a deprivation of a constitutional right. *Saucier,* 121 S.Ct. at 2156; *Torres v. McLaughlin,* 163 F.3d 169, 172 (3d Cir.1998) (internal citations omitted). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 121 S.Ct. at 2156. If the court determines that a constitutional violation is viable on a favorable view of the parties' submissions, the court must then ask whether the right was clearly established. *Saucier,* 121 S.Ct. at 2156. This inquiry must be undertaken in light of the specific context of the case, not as a broad

general proposition. *Id.* Although a right may be clearly established even if there is no prior precedent that is directly on point, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Saucier,* 121 S.Ct. at 2156 (internal quotations omitted); *Eddy v. Virgin Islands Water & Power Auth.,* No.99-3849, 2001 WL 770088, at \*2 (3d Cir. July 10, 2001). Accordingly, the relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier,* 121 S.Ct. at 2156; *Eddy,* 256 F.3d 204, 2001 WL 770088, at \*2.

Plaintiff alleges that Waltman spoke to the media and disclosed information relating to her suspension in order to retaliate against her for engaging in conduct that was protected by the First Amendment. Where a plaintiff alleges an unconstitutional subjective intent, she must proffer particularized evidence of direct or circumstantial facts that support the claim of an improper motive in order to avoid summary judgment on qualified immunity grounds. *Keating v. Bucks Cty. Water & Sewer Auth.,* Civil Action No. 99-1584, 2000 U.S. Dist. LEXIS 18690, at \*29 (E.D.Pa. Dec. 29, 2000). "The standard allows an allegedly offending official sufficient protection against baseless and unsubstantiated claims, but stops short of insulating an official whose objectively reasonable acts are besmirched by a prohibited unconstitutional motive." *Id.* at 30 (citing *Sheppard v. Beerman,* 94 F.3d 823, 828 (2d Cir.1996)).

**\*3** In this case, Plaintiff admits that she has no direct evidence demonstrating that Defendant Waltman disseminated copies of the e-mails to the media, but adduces some circumstantial evidence designed to establish such dissemination. (Pl.'s Resp. to Def. Waltman's Mot. at 6.) It is undisputed that Defendant Waltman spoke to the media in interviews. (Pl.'s Resp. to Def. Waltman's Mot. Ex. 3 at 6-8.) Plaintiff also presents evidence that Waltman advocated Plaintiff's termination. (Def. Waltman's Ex. A. at 68.)

Absent, however, is any evidence showing any connection between Plaintiff's alleged constitutionally

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

protected speech and any actions taken by this Defendant. FN1 In the context of qualified immunity analysis, Plaintiff has failed to provide any evidence of an improper motive by Defendant Waltman for any of the actions taken. Although Plaintiff alleges in her Complaint that the motive was to retaliate for speech in which she engaged, none of the evidence has the tendency to prove such a motive either directly or circumstantially. Plaintiff has likewise adduced no evidence demonstrating that Waltman conspired with the other Defendants for the purpose of retaliating against her for exercising her free speech rights. With no evidentiary connection whatsoever between any actions that might have been taken by this Defendant and Plaintiff's First Amendment free speech rights, reasonable persons in the Defendant's position at the relevant time "could have believed, in light of clearly established law, that [his] conduct comported with established legal standards." See *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Accordingly, Defendant Waltman is entitled to qualified immunity. The Court dismisses all claims against him.

> FN1. Because this part of the qualified immunity inquiry is based on the pleadings rather than evidence in the record, the Court has considered the possible connection between Plaintiff's alleged conduct relating to the Reading Water Authority and the televised debate. As indicated below, *infra,* Plaintiff has failed to establish that she engaged in the alleged conduct that serves as the basis for the alleged retaliation.

**B.** *First Amendment Retaliation Claim* FN2

> FN2. Count 1 brings a retaliation claim under 42 U.S.C. § 1983 against the City of Reading and each of the individual Defendants in their official capacities. Count 2 brings the same retaliation claim against the Defendants in their individual capacities.

Plaintiff alleges that the Defendants violated her constitutional rights by retaliating against her for exercising her First Amendment right to free speech. Plaintiff alleges that the Defendants engaged in a campaign of harassment as a result of certain conduct and speech which they thought she engaged in.

**\*4** The First Amendment protects public employees from retaliation by their employer. Under 42 U.S.C. § 1983, a public employee may sue to enforce that protection if: (1) she spoke on a matter of public concern; (2) her interest in that field outweighed the government's concern with the effective and efficient fulfillment of its responsibilities to the public; (3) the speech caused the retaliation; and (4) the retaliatory action would not have occurred but for the speech. *Green v. Philadelphia Housing Auth.,* 105 F.3d 882, 885 (3d Cir.1997).

The Court determines that Plaintiff has failed to establish a genuine issue of material fact to sustain her claim of First Amendment retaliation. Plaintiff has failed to adduce evidence that she engaged in speech or conduct that is protected by the First Amendment. Furthermore, even if Plaintiff could establish that she engaged in such speech or conduct, she has failed to establish that the conduct was the substantial motivating factor behind the allegedly retaliatory actions taken by the Defendants.

### 1. *Protected Speech*

In order to be considered protected speech under the First Amendment, the speech or activity engaged in must address a matter of public concern. *Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997). Speech addresses a matter of public concern when it relates "to any matter of political, social, or other concern to the community." FN3 *Id.* at 977. However, regardless of the subject of the alleged speech, a plaintiff must actually engage in the type of conduct protected from retaliation under the First Amendment. *Fogarty v. Boles,* 121 F.3d 886, 887-88 (3d Cir.1997) (dismissing retaliation claim based on allegation the employer believed plaintiff engaged in the protected conduct where plaintiff denied actually speaking to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.