press about the matter). A retaliation claim cannot be based on speech or conduct if the defendant erroneously believed that the plaintiff engaged in such speech or conduct. *Id.; Barkoo v. Melby,* 901 F.2d 613, 619 (7th Cir.1990) ("[Plaintiff] provides no authority for the proposition that her free speech rights are deprived in violation of § 1983 when the speech at issue admittedly never occurred.")

> FN3. "A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social or other concern to the community.' " *Green,* 105 F.3d at 885-86 (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In this respect, we focus on the content, form, and context of the activity in question. *Connick,* 461 U.S. at 147-48; *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995). Speech in a form that is not deemed a matter of public concern in one context does not become a matter of public concern simply because it could be deemed protected in a different context. *See Connick,* 461 U.S. at 148 n. 8.

Here, Plaintiff alleges that the Defendants retaliated against her because of their perception that she engaged in speech or conduct relating to two public issues: the municipal trash collection referendum and the proposal to abolish the Reading Area Water Authority ("Authority"). She alleges that this speech and conduct was protected by the First Amendment. The primary incident occurred in 1998, and related to Plaintiff's role in organizing and overseeing a televised debate on the trash collection referendum. (Compl. ¶ 22; Defs.' Ex. F ("Kelleher Dep.") at 88, 90-91.) Plaintiff testified in her deposition that her role in the debate was helping to secure a debate representative for each side and establishing rules regarding the format of the debate. (Kelleher Dep. at 88.) Kelleher testified that while she was involved in screening calls to put on the air, she only screened the calls to ensure the remarks related to the debate topic, and not to determine which side the caller intended to support. (*Id.* at 89-90.) She testified

that after the debate, she perceived that Eppihimer was upset with her "because of the way the programming went." (*Id.* at 92.) Plaintiff did not appear on the debate or speak to the Defendants on the issue at that time.

In light of Plaintiff's own testimony regarding the limited nature of her activities in connection with the debate, and her testimony that she did not engage in the specific conduct that purportedly motivated the Defendants to retaliate against her, Plaintiff's showing is insufficient to establish that she engaged in conduct that is protected by the First Amendment. For example, even if Plaintiff could show at trial that Eppihimer became upset with her because he perceived that she barred callers from speaking against the municipal trash collection referendum, Plaintiff's own deposition testimony that she did not engage in such activity means that any actions taken on his part in retaliation for such conduct would be based on a mistaken belief as to what Plaintiff had done. Even if such conduct were protected, [FN4] the fact that Plaintiff did not actually engage in such conduct means that the televised debate incident cannot be the basis for Plaintiff's First Amendment retaliation claim. [FN5] *See Barkoo,* 901 F.2d at 619.

> FN4. Because the Court determines that the Plaintiff has failed to establish a genuine issue of material fact as to whether she engaged in the purportedly protected activity, it need not consider the legal question of whether such conduct would be protected by the First Amendment.

> FN5. Plaintiff further testified in her deposition that she spoke on the subject of municipal trash collection when she objectively told Eppihimer the "pros and cons" of adopting such a plan. (Pl.'s Resp. to Defs.' Mot. Ex. 1 ("Kelleher Verification") ¶ 23.) This speech, however, is not alleged in the Complaint, and therefore is not part of Plaintiff's retaliation claim here. Furthermore, Plaintiff fails to identify the specifics of that speech, such as the time and place at which it took place or the circumstances in which the speech was given. Even had Plaintiff included

an allegation that she engaged in such speech, Plaintiff has provided insufficient evidence to establish a genuine issue of material fact concerning whether she engaged in speech that was protected.

**\*5** Plaintiff's evidence is similarly insufficient concerning the other alleged incident. Plaintiff alleges that in 1997, Eppihimer, then a Councilman, asked her to draft an ordinance to abolish the Authority. (Compl. ¶ 13.) Plaintiff alleges that she researched the issue and learned that abolishing the Authority would, among other things, place restrictions on the City's sale of water to outlying communities and force the City to assume the Authority's bond debt. (*Id.* ¶ 14.) When Plaintiff informed Eppihimer of these facts, he "began yelling at her, and saying that she was against him and he would have her fired." (*Id.* ¶ 15.) Plaintiff's retaliation claim, with respect to this incident, is based on the Defendant's perception that she was speaking against his position on the abolition of the Authority.

Kelleher testified in her deposition, however, that she made no such recommendation or criticism regarding the merits of Eppihimer's proposal to abolish the Authority. (Kelleher Dep. at 53-54.) Plaintiff admits that she did not have an opinion as to whether the authority should be abolished. (*Id.*) She denies that she did anything other than objectively relay the results of her research to Eppihimer. (*Id.*) Because Plaintiff denies having engaged in the speech that forms the alleged basis of Defendants' alleged retaliatory motive, that speech cannot form the basis of her retaliation claim.

2. *Nexus Between Alleged Retaliation and Speech*

Furthermore, even if Plaintiff could establish that she engaged in protected speech and conduct, she has failed to establish a connection between that speech and conduct and the allegedly retaliatory conduct by the Defendants. A plaintiff must show that her protected activity was a substantial or motivating factor in the actions alleged to be retaliatory. *Anderson v. Davila, 125 F.3d 148, 161 (3d Cir.1997).* Even assuming that Plaintiff engaged in protected activity, Plaintiff has

failed to meet her burden to show that the protected activity was a substantial or motivating factor in the alleged retaliatory actions.

In this case, Plaintiff alleges that the Defendants engaged in a campaign of harassment that included a host of different retaliatory actions: (a) Plaintiff's one-week suspension; (b) Plaintiff's lock-out from City Hall during her suspension; (c) the retrieval and reading of Plaintiff's e-mails; (d) dissemination of her e-mail messages to the media; (e) dissemination of the ethics complaint to the media; (f) public comments regarding Plaintiff's suspension; (g) refusal to issue Plaintiff a parking permit; (h) refusal to pay Plaintiff additional salary allotted by the City Council; and (i) initiation of rumors of Plaintiff's extramarital affairs. [FN6]

> [FN6.] Because the Court determines that Plaintiff has failed to establish a genuine issue of material fact with respect to there being a retaliatory motive, it is unnecessary to examine in detail the evidence that such retaliation took place at the hands of the Defendants. The Court notes, however, that in several respects, Plaintiff's evidentiary showing is insufficient to establish genuine issues of material fact.
> For example, Plaintiff points to no admissible evidence that she was actually locked out of either the building (after hours) or the computer system during the relevant period. Although Plaintiff testified in her deposition that Councilman Waltman ordered her to be locked out of City Hall and the computer system, and that Eppihimer did so, (Kelleher Dep. at 282-88), Plaintiff admits that she had no personal knowledge of Mr. Waltman having told Defendant Eppihimer to lock Plaintiff out of City Hall. (Kelleher Dep. at 288.)
> Similarly, Plaintiff provides no admissible evidence that Defendants actually disseminated the e-mails. Plaintiff provides a statement in her Verification that Don Kaiser, a television news reporter, "sent [a copy of] the e-mails and ethics complaint to me after I

agreed to trim off the header. I looked at the header before I trimmed it off, and saw that the facsimile had been sent from the Mayor's office, ..." (Kelleher Verification ¶ 58.) However, this account of events is contradicted by her prior deposition testimony, in which she indicated that "... Kaiser and.... Weiler ... told me they received copies of the complaint. It was faxed. And although they, let's say, trimmed the lead, whatever you call that section at the top, they did tell me that it was from the mayor's office." Plaintiff also testified in her deposition that she never saw any copy of the ethics complaint with any fax identifier on it. (Kelleher Dep. at 238, 324-26). Given the conflict in testimony, it is appropriate to disregard the subsequent verification statement, because on a motion for summary judgment, a court may properly refuse to consider testimony presented in an affidavit when the non-movant's affidavit contradicts, without satisfactory explanation, testimony previously provided in deposition. *See Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir.1988)* ("The objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit.") Furthermore, Plaintiff's statements as to what Kaiser and Weiler told her about the origins of the e-mails (that they came from Eppihimer's office) are inadmissible hearsay.

Moreover, Plaintiff fails to establish that all of the allegedly retaliatory actions were sufficiently serious enough for purposes of the retaliation claim. In a First Amendment retaliation case, the alleged retaliatory action itself does not have to infringe on a federally protected right independent of the First Amendment. *See Perry v. Sinderman, 408 U.S. 593, 596-98 (1972)* ("[E]ven though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, ... [the government] may not deny a benefit to a person on a basis that

infringes his constitutionally protected interests ... his interest in freedom of speech.); *see also Rutan v. Republican Party of Illinois, 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).*

Nevertheless, while the actions taken do not independently need to violate a constitutional right, not every action of harassment is actionable under § 1983 in a retaliation case. Rather, the actions must be such that they would "deter a person of ordinary firmness" from exercising her First Amendment rights. *Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir.2000).* "[I]n the field of constitutional torts de minimis non curat lex. Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ..." *Suppan, 203 F.3d at 235* (quoting *Bart v. Telford, 677 F.2d 622, 625 (7th Cir.1982)*).

Several of the retaliatory actions likely do not pass the *Suppan* test. For example, Plaintiff alleges that the Defendants monitored and screened her private e-mails, yet she adduces no evidence to demonstrate that such correspondence was confidential. In fact, Plaintiff admits that she signed a statement saying that she received and read a copy of the City's usage guidelines, which specifically reserve the City's right to read and monitor e-mail communications. (Kelleher Dep. at 430-33; Defs.' Ex. T ("Guidelines.") Plaintiff also does not dispute that such monitoring has occurred on other occasions with other employees. (Defs.' Ex. C ("Tangredi Dep.") at 121-24.) Given that Plaintiff was clearly subject to such monitoring, had notice of such monitoring, and that such monitoring had occurred before with another employee, the action seems far less likely to deter a person of ordinary firmness from the exercise of protected activity.

Similarly, Plaintiff alleges that the Defendants denied her a dashboard parking permit.

However, notwithstanding her unsubstantiated claim that it "is undisputed that free parking is one of the fringe benefits of fulltime employees of the City of Reading who work in City Hall," (Pl.'s Resp. at 12), Plaintiff adduces no evidence, and there is no evidence in the record, which establishes such an entitlement. Plaintiff, in fact, did not receive a new permit until after the City Council passed an ordinance granting parking passes to the City Council and employees, thus suggesting that she was not entitled to such a permit. (*See* Kelleher Dep. at 418.) Furthermore, Plaintiff's primary grievance is the large number of parking tickets that she received; yet Plaintiff received tickets for parking in areas where she admits she did not know whether the dashboard permits allowed for the waiver of the parking rules. (*See* Kelleher Dep. at 426-27.) In light of Plaintiff's failure to adduce evidence that she was entitled to such a permit and that such a permit would have prevented all of her parking tickets, it is unlikely that such a denial of the permit would deter a person of ordinary firmness from engaging in protected conduct.

**\*6** Examining the evidence in the record, however, the Court can identify no admissible evidence that draws a connection between Plaintiff's alleged speech and conduct in 1997 and 1998, and the alleged retaliatory actions that form the "campaign of harassment." [FN7] None of the deposition testimony or the documentary evidence establishes such a connection. Plaintiff argues that this connection can be inferred from the series of retaliatory actions themselves; however, this kind of circular reasoning simply underscores the fact that there is no genuine issue of material fact with respect to a nexus between the protected conduct and the retaliation. In the absence of some other type of evidence, this inference is not one that can be supported solely by the alleged "retaliatory campaign." This is particularly true in light of Plaintiff's failure even to adduce evidence to support that all of the actions took place.

FN7. Plaintiff does point to statements that

tend to indicate Eppihimer's desire to see Plaintiff terminated as the City Clerk. (Kelleher Dep. at 84.) However, these statements, even if admissible, are insufficiently connected to Plaintiff's speech in 1997 and 1998. Moreover, the statements are an insufficient basis upon which to infer that Defendants engaged in particular activities for the purpose of retaliating against her.

Moreover, the large gap in time between the allegedly protected speech (in 1997 and 1998) and the alleged retaliatory activities (in 2000 and later) cuts against Plaintiff's position that the Defendants' actions were motivated by a retaliatory motive. [FN8] Temporal proximity between the protected activity and the allegedly retaliatory action is a factor to consider in retaliation cases. *See Grimm v. Borough of Norristown,* No.01-CV-431, 2002 U.S. Dist. LEXIS 3954, at \*83 (E.D.Pa. Mar. 11, 2002) (citing *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-80 (3d Cir.2000)* (noting that temporal proximity has probative value in retaliation cases, but that other evidence suggesting a causal connection between protected activity and allegedly retaliatory action may be considered)); *Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)* (noting that if timing alone could ever be sufficient to establish a causal link, the timing of the alleged retaliatory action must be "unusually suggestive" of retaliatory motive); *see generally Russoli v. Salisbury Twp., 126 F.Supp.2d 821, 855 (E.D.Pa.2000).*

FN8. The only exception is that the alleged spreading of rumors took place closer in time to Plaintiff's allegedly protected speech. However, Plaintiff has adduced no admissible evidence that either individual Defendant was responsible for spreading any such rumors. Plaintiff states that "I believe that Mr. Eppihimer was responsible for these rumors [of extramarital affairs] because a variety of people told me that they heard that he was spreading the rumors." (Kelleher Verification ¶ 13.) Plaintiff also discusses at length in her deposition the various rumors. (Kelleher Dep.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 8
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

at 58-77.) However, Plaintiff provides no testimony from any of the individuals that allegedly heard Mr. Eppihimer make such statements or otherwise had personal knowledge that he spread the rumors. Plaintiff has likewise provided insufficient evidence upon which to infer that Eppihimer was responsible for starting them. Accordingly, the Court has not considered the rumors as part of Plaintiff's contention that there was a retaliatory motive behind the alleged "campaign of harassment."

Accordingly, judgment on the retaliation claims is granted in favor of the City of Reading and the individual Defendants in their official and individual capacities.

### C. *Conspiracy Claims* [FN9]

> **FN9.** Count 3 brings a conspiracy claim under 42 U.S.C. § 1983 against the City of Reading and the individual Defendants in their official capacities. Count 4 brings the same conspiracy claim against the individual Defendants in their individual capacities.

**\*7** Plaintiff also alleges that the Defendants conspired to violate her First Amendment rights. To demonstrate a conspiracy under § 1983, a plaintiff must show: (1) there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences; (2) the purpose of the plan was to violate a constitutional right of the plaintiff; (3) an overt act resulted in an actual deprivation of the plaintiff's constitutional rights; and (4) the constitutional violation was the result of an official custom or policy of the municipality. *Sieger v. Township of Tinicum,* Civ.A. No. 89-5236, 1990 WL 10349, at *2 (E.D.Pa. Feb. 6, 1990).

As discussed above, Plaintiff has failed to demonstrate the deprivation of a constitutional right, because she has failed to demonstrate retaliation under the First Amendment. Accordingly, her conspiracy claims fail,

and Defendants are entitled to judgment on those claims.

### D. *Invasion of Privacy Claim*

Plaintiff's final count is a claim for invasion of privacy against Defendant Cramsey in his individual capacity. Pennsylvania law provides four theories on which a claim of invasion of privacy can be based: (1) intrusion upon seclusion; (2) appropriation of name and likeness; (3) publicity given to private life; and (4) publicity placing a person in false light. *Smith,* 112 F.Supp.2d at 434. Plaintiff's claim proceeds on the "intrusion upon seclusion" and "publicity given to private life" theories. For the reasons that follow, the Court determines that Defendant is entitled to judgment on this Count.

The Pennsylvania courts have adopted section 652B of the Restatement (Second) of Torts which provides:
One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1976); *Harris v. Easton Publ'g Co.,* 335 Pa.Super. 141, 483 A.2d 1377, 1383 (Pa.Super.Ct.1984). The invasion may take various forms including: (a) physical intrusion into a place where the plaintiff has secluded herself; (2) use of the defendant's senses to oversee or overhear the plaintiff's private affairs; or (3) some other form of investigation into plaintiff's private concerns. Restatement (Second) of Torts § 652B cmt. b (1976); *Harris,* 483 A.2d at 1383. Defendant is subject to liability under this section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about her person or affairs. Restatement (Second) of Torts § 652B cmt. c (1976). There is no liability unless the interference with the plaintiff's seclusion is both substantial and highly offensive to the ordinary reasonable person. *Id.* cmt. d; *Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 621 (3d Cir.1992).

Defendant first contends that Plaintiff had no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

expectation of privacy with respect to her e-mail communications. Some courts have held that there is no reasonable expectation of privacy in e-mail communications. *See Smyth v. Pillsbury Co.,* 914 F.Supp. 97, 101 (E.D.Pa.1996) ("[U]nlike urinalysis and personal property searches, we do not find a reasonable expectation of privacy in e-mail communications voluntarily made by an employee to his supervisor over the company e-mail system notwithstanding any assurances that such communications would not be intercepted by management."); *see also Commonwealth v. Proetto,* 771 A.2d 823, 827, 830-31 (Pa.Super.Ct.2001) (rejecting criminal defendant's challenge under the Fourth Amendment that e-mail evidence used against him at trial was improper). *Smyth* and *Proetto* do not necessarily foreclose the possibility that an employee might have a reasonable expectation of privacy in certain e-mail communications, depending upon the circumstances of the communication and the configuration of the e-mail system. *See, e.g., McLaren v. Microsoft Corp.,* No. 05-97-00824-CV, 1999 Tex.App. LEXIS 4103, at *10-12 (Tex.Ct.App. May 28, 1999) (examining the configuration of the company e-mail system to determine if there was an expectation of privacy).

**\*8** In this case, however, the uncontroverted evidence demonstrates that Plaintiff did not have a reasonable expectation of privacy with respect to her e-mail. The City's Guidelines regarding the expectation of privacy of e-mail messages, which are uncontroverted, explicitly informed employees that there was no such expectation of privacy:

Messages that are created, sent, or received using the City's e-mail system are the property of the City of Reading. The City reserves the right to access and disclose the contents of all messages created, sent, or received using the e-mail system. The E-mail system is strictly for official City of Reading messaging.

(Defs.' Ex. T ("Guidelines")). Plaintiff signed an acknowledgment that she had received and read the Guidelines on September 16, 1999. (*Id.;* Kelleher Dep. at 431-33.) Although Plaintiff contends that other employees were not subject to such review, she adduces no evidence to support her allegations, and, in fact,

Defendant presents evidence, again uncontroverted, of at least one other instance in which an employee had his e-mail communications monitored and reviewed. (Defs.' Ex. C ("Tangredi Dep.") at 131-32.) It is clear from the undisputed evidence in the record that there is no genuine issue of material fact, and that the Plaintiff clearly lacked a reasonable expectation of privacy with respect to her e-mail communications on the City of Reading's e-mail system. *See Smyth,* 914 F.Supp. at 101.

Aside from the e-mail communications, Plaintiff alleges that Defendant "disseminated information about the executive session in which it was decided to suspend her without pay for one week; and/or disseminated information about the Ethics Complaint which had been lodged against her." (Compl. ¶ 109.) Whether these allegations are sufficient to support the intrusion upon seclusion claim depends on whether Plaintiff had a reasonable expectation of privacy in this information. Plaintiff alleges that the information involved was not part of the public record, and that she therefore had a reasonable expectation of privacy in this information. [FN10] However, Plaintiff adduces no evidence to support her contention that she had a reasonable expectation of privacy in this information. Although she testified in her deposition that Mayor Eppihimer had previously said that the reasons that he fired an employee were confidential, such evidence does not tend to demonstrate that her being disciplined by a different body-here, the City Council-is similarly confidential.

FN10. If, for example, this information was deemed to be part of the public record, then there could be no intrusion upon seclusion for publicizing the information. Restatement (Second) of Torts § 652B cmt. c.

**\*9** Similarly, Plaintiff's privacy claim fails under the publicity of private life theory. Section 652D of the Restatement (Second) of Torts states:

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter published is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 10
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

public.

Restatement (Second) of Torts § 652D; *Harris,* 483 A.2d at 1384. To state a cause of action, the plaintiff must prove that the defendant (1) publicized (2) private facts (3) that would be highly offensive to a reasonable person, and (4) are not of legitimate concern to the public. *Id.* The publicity element requires that the matter be communicated "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Kryeski v. Schott Glass Techs., Inc.,* 426 Pa.Super. 105, 626 A.2d 595, 601 (Pa.Super.Ct.1993) (quoting Restatement (Second) of Torts § 625E (1976)); *Harris,* 483 A.2d at 1384. Disclosure of information to only a small number of people is insufficient to constitute publicity. *See Kryeski,* 626 A.2d at 602 (disclosure to two people is insufficient); *Harris,* 483 A.2d at 1384 (disclosure to one person is insufficient).

To determine if facts are "private facts," the line is drawn "when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. The limitations, in other words, are those of common decency...." Restatement (Second) of Torts § 652D cmt. h.

In this case, Plaintiff adduces no evidence demonstrating that the fact of her suspension by the City Council constitutes private information, the publication of which would offend standards of decency. Plaintiff has cited no evidence demonstrating that she had any expectation of privacy in this information, which related to her professional conduct in the course of her job as the clerk for the City Council.

**\*10** Furthermore, even if Plaintiff did adduce evidence establishing that she had a privacy right in the fact of her being suspended by the City Council, or that the fact of her suspension constituted private facts the disclosure of which would represent an intrusion into her private life, she has adduced no evidence that

Defendant Cramsey, the only Defendant remaining in this Count, took any action to publicize or distribute the information. Plaintiff's only evidence is testimony from her deposition that Cramsey spent a great deal of time with Mayor Eppihimer. Such evidence is insufficient to support an inference that proves Plaintiff's position.

For these reasons, the Court grants judgment in favor of Defendant Cramsey as to the invasion of privacy claims.

III. Conclusion

For all of the above reasons, the Court grants Defendant Waltman's Motion for Summary Judgment and Defendants City of Reading, Joseph Eppihimer, and Kevin Cramsey's Motion for Summary Judgment. The claims against Defendant Waltman are dismissed under the doctrine of qualified immunity. Judgment is entered in favor of the remaining Defendants on all of the remaining claims.

An appropriate Order follows.

*ORDER*

AND NOW, this day of May, 2002, upon consideration of Defendants' Unopposed Motion to File Reply Brief (Doc. No. 26), IT IS HEREBY ORDERED that said Motion is GRANTED and the Reply Brief is filed herewith. IT IS FURTHER ORDERED that:
1. Upon consideration of Plaintiff's Motion to Amend Response to Defendants' Motion for Summary Judgment (Doc. No. 28), and the response thereto, said Motion is GRANTED and the Response is considered AMENDED as specified by Plaintiff.
2. Upon consideration of Defendant Jeffrey Waltman's Motion for Summary Judgment (Doc. No. 16), and all responsive and supporting briefing, IT IS HEREBY ORDERED that said Motion is GRANTED. All claims against said Defendant are DISMISSED under the doctrine of qualified immunity.
3. Upon consideration of Defendants City of Reading, Joseph D. Eppihimer, and Kevin Cramsey's Motion for Summary Judgment (Doc. No. 21), and all responsive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2002 WL 1067442 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

and supporting briefing, IT IS HEREBY ORDERED
that said Motion is GRANTED. Judgment is
ENTERED in favor of said Defendants on all remaining
counts.

E.D.Pa.,2002.
Kelleher v. City Of Reading
Not Reported in F.Supp.2d, 2002 WL 1067442
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:01CV03386 (Docket) (Jul. 05, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                      Page 1
Slip Copy, 2006 WL 167443 (C.A.3 (Del.))
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.This
case was not selected for publication in the Federal
Reporter.NOT PRECEDENTIAL  Please use FIND to
look at the applicable circuit court rule before citing
this opinion. Third Circuit Local Appellate Rule 28.3(a)
and Internal Operating Procedure 5.3. (FIND CTA3
Rule 28.0 and CTA3 IOP APP I 5.3.)
          United States Court of Appeals,Third Circuit.
              Thomas F. LAPINSKI, Appellant
                              v.
         THE BOARD OF EDUCATION OF THE
    BRANDYWINE SCHOOL DISTRICT; Joseph P.
   Dejohn; Donald Fantine, Jr.; Ralph Ackerman; Paul
   Hart; Robert Blew; Nancy Doorey; G. Lawrence
   Pelkey, Jr.; G. Harold Thompson; Raymond
                      Tomasetti, Jr.
                    **No. 04-1709.**

                 Argued Jan. 10, 2005.
                 Decided Jan. 24, 2006.

On Appeal from the United States District Court for the
District of Delaware.  (Dist.Ct. No. 00-cv-00173).
District Judge: Hon. Kent A. Jordan.

Swartz Campbell LLC, Wilmington, Delaware, By:
Neil R. Lapinski (Argued), for Appellant.
Young Conaway Stargatt & Taylor, LLP, Wilmington,
Delaware, By: Barry M. Willoughby (Argued), William
W. Bowser, Scott A. Holt, for Appellees.

Before ROTH and CHERTOFF, [FN*] Circuit Judges, and
RESTANI, [FN**] Chief Judge.

          FN* Judge Chertoff heard oral argument in
          this case but resigned prior to the time the
          opinion was filed. The opinion is filed by a
          quorum of the panel. 28 U.S.C. § 46(d).

          FN** The Honorable Jane A. Restani, Chief

Judge of the United States Court of
International Trade, sitting by designation.

               OPINION OF THE COURT

ROTH, Circuit Judge.
**\*1** Appellant Thomas F. Lapinski appeals the decision
by the District Court granting summary judgment for
appellees. We will reverse and remand.

                              I

The facts of this case are set forth in detail in the
District Court's opinion. We briefly set forth only the
most relevant facts here, in the light most favorable to
Lapinski. Lapinski alleges that, during his time as
principal of Mount Pleasant High School (MPHS),
appellees engaged in certain retaliatory actions against
him due to "whistle blowing" letters he wrote and
statements he made to appellee former superintendent
Joseph P. DeJohn and other Brandywine School District
administrators. The specific whistle blowing activities
are set forth in the District Court's opinion, *see Lapinski
v. Bd. of Educ.,* No. 00-173, 2004 U.S. Dist. LEXIS
1124, at *3-7 & nn. 3-4 (D.Del. Jan. 29, 2004), and we
will not repeat them here. Lapinski alleges that in
response to these whistle blowing activities, appellees
decided in December 1999 not to renew his
employment contract, though under Delaware law
Lapinski could have stayed on at MPHS as a teacher,
earning a teacher's salary rather than the higher
principal's salary.

On March 13, 2000, Lapinski filed a complaint
alleging, inter alia, various forms of First Amendment
retaliation. On January 29, 2004, the District Court
granted appellees' motion for summary judgment.
Lapinski thereafter filed a motion for reargument,
which the District Court denied.

                             II

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 2
Slip Copy, 2006 WL 167443 (C.A.3 (Del.))
**(Cite as: Slip Copy)**

Our review of a District Court's grant of summary judgment is plenary. *See Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co., 316 F.3d 431, 443 (3d Cir.2003)*. We assess the record using the same summary judgment standard that guides district courts. *See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir.2000)*. To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In granting appellees' motion for summary judgment, the District Court noted that Lapinski had voluntarily resigned as the principal of MPHS after learning that appellees did not intend to renew his contract. Concluding that an employee's decision to resign or retire, even in the face of pending termination, is presumptively voluntary, the District Court required Lapinski to show that he had been constructively discharged.

We need not address whether Lapinski was constructively discharged, as appellees' failure to renew Lapinski's employment contract constitutes an adverse employment action for purposes of Lapinski's First Amendment retaliation claim. In *Suppan v. Dadonna,* we held that defendants' action of placing plaintiffs lower on promotion ranking lists in retaliation for the exercise of their First Amendment free speech rights was sufficiently adverse to state a claim for retaliation. 203 F.3d 228, 234-35 (3d Cir.2000). In doing so, we relied primarily on *Rutan v. Republican Party, 497 U.S. 62 (1990).* The *Rutan* "Court rejected the argument that the First Amendment rights of public employees had 'not been infringed because they [had] no entitlement to promotion, transfer, or rehire.' " *Suppan,* 203 F.3d at 234 (alteration in original) (quoting *Rutan,* 497 U.S. at 72). *See also Brennan v. Norton,* 350 F.3d 399, 419 (3d Cir.2003) ("A public employer adversely affects an employee's First Amendment rights when it refuses to rehire an employee because of the exercise of those rights or when it makes decisions, which relate to promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights." (quotation marks omitted)).

**\*2** We therefore conclude that appellees' failure to renew Lapinski's employment contract was "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights," *Suppan,* 203 F.3d at 235. That Lapinski had a right under Delaware law to remain at MPHS as a teacher does not change our conclusion. Even though appellees could not have terminated Lapinski's employment entirely, the nonrenewal was a demotion in title and salary and therefore actionable conduct. *See, e.g., Brennan,* 350 F.3d at 419; *Baldassare v. New Jersey,* 250 F.3d 188, 201 (3d Cir.2001) (noting that it is clearly established that a public employee cannot be demoted in retaliation for exercising his or her First Amendment rights).

### III

For the foregoing reasons, we will reverse the judgment of the District Court and remand for further proceedings not inconsistent with this opinion.

C.A.3 (Del.),2006.
Lapinski v. Board of Educ. of Brandywine School Dist.
Slip Copy, 2006 WL 167443 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

• 04-1709 (Docket) (Mar. 18, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

H

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware, New Castle County.
James L. MARTIN, Plaintiff,
v.
WIDENER UNIVERSITY SCHOOL OF LAW,
Anthony J. Santoro and Mitchell S. Bierman,
Defendants.
**Civ.A. No. 91C-03-255.**

Submitted:  Aug. 29, 1991.
Decided June 4, 1992.
Memorandum Opinion Submitted:  Aug. 12, 1991.
Decided June 17, 1992.

Upon Motion of Plaintiff for Summary
Judgment-Denied,
Upon Motion of Defendants to Dismiss-Granted.

James L. Martin, pro se.
Somers S. Price, Jr., of Potter, Anderson & Corroon,
for defendants.

OPINION

HERLIHY, Judge.
*1 Presently before the Court are two motions.  The
first motion filed is defendants' motion to dismiss for
failure to state a claim under Superior Court Rule
12(b)(6).  The second motion filed is plaintiff's motion
for summary judgment.

Plaintiff James L. Martin [Martin] has filed suit in this
Court against Widener University School of Law [FN1]
[Widener], its dean Anthony J. Santoro [Santoro] and
a Widener newspaper writer Mitchell S. Bierman
[Bierman] [collectively "defendants"].  This last suit
stems from a long-standing dispute between Martin and
Widener.

When applying to Widener in 1979, Martin answered
"no" to a question asking if he had ever been a patient
in a mental, penal or correctional institution.  This was
not a correct answer as Martin had been
institutionalized in 1975. [FN2]  Widener later
communicated to various state bar examiners Martin's
incorrect answer.  An avalanche of litigation, including
this matter, has ensued.

FACTS

Some of the claims raised in this litigation result from
events which occurred in the last several years since
Widener's communication to various boards of bar
examiners.  On July 14, 1989 Dr. Eric Copeland
[Copeland], who refers to himself as a client of Martin,
called Santoro and tape-recorded their phone
conversation.  Martin claims Santoro slandered him in
this conversation.  Martin supplied transcribed portions
of the conversation with his complaint.  The details of
that conversation will be discussed as necessary to
resolve the allegations.

On February 18, 1990, *The Philadelphia Inquirer
[Inquirer]* published an article detailing the
controversy, "1 answer thwarts his law career"
[Appendix A].  The article was sympathetic to Martin
in that it highlighted the opinion of professors from two
other law schools who stated they would have
overlooked Martin's lack of candor and would not have
communicated any related facts to the various bar
examiners.  The article also gave full detail to Martin's
explanation of the events.  Defendants claim Martin
solicited the article by approaching the reporters.
Martin denies he voluntarily sought the publicity.

The *Delaware Law Forum [Forum* ] is a small topical
newspaper with circulation to Widener's students,
faculty, alumni and the local legal community.  Staff
writer Bierman authored an article that summarized the
*Inquirer* article.  Bierman quoted extensively from and
repeatedly referenced the *Inquirer* article to the degree
of precise page number per quote.  *Delaware Law*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 2
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*Forum,* May 1990, Vol. 17, No. 6 [Appendix B]. Pertinent portions of the article will be discussed as is necessary to resolve the issues herein.

Martin seeks various forms of relief: (1) an injunction against Widener preventing any further dissemination of information about him without his consent; (2) a "declaratory judgment" to purge Widener's files on him which he contends are defamatory; (3) damages for alleged libel by the defendants Widener and Bierman; (4) damages against Widener and Santoro for slander; and (5) damages from all defendants for invading his privacy.

The basis of Martin's action is that several or all of the defendants (1) falsely reported his Widener graduation date, (2) recast his personal and academic history, (3) misrepresented his litigation against the law school, (4) falsely wrote about his contacts with certain hospitals which are the subject matter of other litigation, (5) falsely described his high school career, (6) falsely wrote about police contacts he had, and (7) falsely described his litigation in New Jersey and his bar status there. These claims will be detailed later as is necessary to resolve them.

**\*2** Defendants argue that the doctrine of *res judicata* or collateral estoppel and/or lack of merit to Martin's complaint entitle them to judgment in their favor. They also contend this Court lacks jurisdiction to grant Martin's request for equitable relief. Believing no genuine issues of material fact exist, Martin, in turn, contends he is entitled to summary judgment.

### STANDARD

A motion to dismiss for failure to state a claim upon which relief can be granted made pursuant to Superior Court Rule 12(b)(6) will not be granted if the plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. *Spence v. Funk,* Del.Super., 396 A.2d 967 (1978). In considering this motion, all well-pleaded allegations in the complaint must be accepted as true. *American Ins. Co. v. Material Transit, Inc.,* Del.Super., 446 A.2d 1101 (1982).

A motion for summary judgment may only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Pullman, Inc. v. Phoenix Steel Corp.,* Del.Super., 304 A.2d 334 (1973). All facts and inferences are considered in a light most favorable to the non-moving party. *Shultz v. Delaware Trust Co.,* Del.Super., 360 A.2d 576 (1976).

### RES JUDICATA

As noted, Martin has filed a number of law suits involving claims against Widener. The claims he brought against Widener in one of those suits are summarized as follows:

### BACKGROUND FACTS.

The relevant facts, as alleged by Plaintiff [Martin] in his Complaint and various briefs, are as follows. Plaintiff claims that Polyclinic and Philhaven admitted and detained him against his will without cause or hearing. Apparently, this action occurred in 1975. Plaintiff alleges that Philhaven subsequently erroneously informed the Law Examiners that he had voluntarily admitted himself to Philhaven for psychiatric care. He alleges that L.V.C. [Lebanon Valley College], where Plaintiff had been an undergraduate student, falsified his transcripts and supplied "disinformation" to employees of Polyclinic and Philhaven, which was later given to the Law Examiners. Plaintiff alleges that Defendants James Reilly and John Feather, in their capacities as Lebanon County Legal Services attorneys, acted improperly by agreeing to represent Plaintiff in a proceeding against L.V.C., while they were associates of the law firm which was representing L.V.C. Plaintiff alleges that Defendants Judge Gates and Judge Walters improperly "issued orders against him" in his efforts to "get relief from the college's disinformation scheme". Plaintiff alleges that [Widener] refused to send his transcript to the U.S. Department of Justice, thus preventing him from obtaining full-time employment. Plaintiff alleges that [Widener] also erroneously concluded that he had falsified his law school application by denying that he had been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 3
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

committed to a mental hospital, and later sent this information to each of the State Boards of Law Examiners to which Plaintiff had applied for admittance. Plaintiff alleges that the Law Examiners refused to admit him to the Bar after he passed the Bar Examination. Plaintiff alleges that the [Pennsylvania] D.O.T. improperly revoked his driver's license in 1981 by relying upon "not [sic] existent medical reports about a neuro-psychiatric condition", and that [Commonwealth National Bank] wrongfully dishonored his checks following his enrollment in law school after agreeing not to do so.

**\*3** *Martin,* 625 F.Supp at 1293, *aff'd.* 884 F.2d 1384 (3rd Cir.1989), *cert. denied,* 110 S.Ct. 411 (1989), *reh'g denied,* 110 S.Ct. 766 (1990).

In another action, filed in Pennsylvania, Martin made five claims against Widener and Santoro with their dispositions as follows:

]Widener] and [Santoro] are named, either specifically or as one of "the defendants" by plaintiff in five claims arising under federal statutes or the United States Constitution: the first claim (Rehabilitation Act of 1973 29 U.S.C. § 794); second claim (fourteenth amendment equal protection clause); third claim (first amendment right to freedom of association); fourth claim (fourteenth amendment guarantee of due process); and eleventh claim (Family Education Rights and Privacy Act 20 U.S.C. § 1232).

These defendants argue that plaintiff is barred from pursuing these claims, *inter alia,* under the doctrine of res judicata [sic]. The claims recited in plaintiff's instant complaint are based on the law school's determination that plaintiff made a knowing misrepresentation on his law school application and communicated this finding to the Pennsylvania Board of Law Examiners.

In 1985 plaintiff initiated civil action No. 85-53 in the United States District Court for the District of Delaware naming, *inter alia,* [Widener] as a defendant and alleging virtually identical facts and claims recited in the instant complaint. (See plaintiff's complaint filed in CA 85-53 attached as court exhibit B). In particular, plaintiff alleged [Widener] violated his rights provided under the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title 7, 42 U.S.C. § 2000e-2; 42 U.S.C. §§ 1983, 1985 and 1986; Fourteenth amendment; and the Family

Educational Rights and Privacy Act of 1976, 20 U.S.C. § 1232g.

All of these claims were dismissed by the District Court in December of 1985, (*Martin v. Delaware Law School of Widener University,* 625 F.Supp. 1288, 1302 (D.Del.1985)). Plaintiff, however, was permitted to file an amended complaint. In October of 1986, the court held that the amended complaint "merely rehashes the allegations in the original Complaint, which this Court has found to be insufficient" [sic] *Martin v. Delaware Law School of Widener University.* [sic], No. 85-53 Civ. 3. (D.Del October 16, 1986). The Amended Complaint was dismissed with prejudice. An appeal was unsuccessful. *Martin v. Delaware Law School of Widener University,* 625 F.Supp. 1288 (D.Del.1985), *aff'd* 884 F.2d 1384 (3rd Cir.1989), *cert. denied* 110 S.Ct. 422, *reh'g. denied,* 110 S.Ct. 766 (1990).

While seeking appellate relief, plaintiff filed civil action 88-0768 on March 22, 1988 in the United States District Court for the District of Columbia naming [Widener] and [Santoro], *inter alia,* as defendants (see court exhibit C). This complaint alleged facts and claims virtually identical to those averred in civil action 85-53 and was dismissed as "barred under the principles of res judicata [sic]." *Martin v. Delaware Law School of Widener University, Inc.,* et al., [sic] No. 88-0768 Civil (D.D.C. July 22, 1988).

**\*4** *Martin v. Walmer,* D.C.E.D.Pa., C.A. No. 90-2752 at 8-10, Huyett, J. (September 26, 1990). All five claims were dismissed on grounds of claims or issue preclusion. *Id.* at 10-11; *Napier v. Thirty or More Unidentified Fed. Agents,* 855 F.2d 1080 (3rd Cir.1988).

It is unnecessary to catalogue the multitude of state and federal law suits Martin has filed in Pennsylvania, New Jersey, Delaware, Virginia and the District of Columbia. *See, e.g., Martin v. Delaware Law School of Widener Univ.,* D.C.Del., C.A.No. 88-298-JJF (December 14, 1990) (memorandum opinion); Martin's opening brief before Third Circuit, Appeal No. 91-3026, January 24, 1991 [Appendix C].

Defendants assert that most of Martin's claims are barred by the principle of *res judicata* now also referred

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                Page 4
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

to as claim preclusion or by collateral estoppel, now also known as issue preclusion. The doctrine of claim preclusion holds that a final judgment upon the merits rendered by a court of competent jurisdiction operates as a bar and prevents relitigation of all grounds for, or defenses to, recovery that were then available to the parties before the particular court rendering the judgment in relation to the same claim regardless of whether all grounds for recovery or defenses were judicially determined. *Federated Dept. Stores v. Moitie,* 452 U.S. 394, 398 (1981); *Trans World Airlines, Inc. v. Hughes,* Del.Ch., 317 A.2d 114, 118 (1974) aff'd, 336 A.2d 572 (1975).

Defendants argue that the present action is grounded in the "basic transaction of his conduct in submitting his application, the related background and related events thereafter." Defendants contend this action is simply a repackaging of the old underlying claim concerning Widener's communication to various state bar examiners.

The modern transactional view of *res judicata* bars litigation between the same parties if the claims in the later litigation arose from the same "transaction" that formed the basis of the prior adjudication and not on the substantive legal theories or types of relief sought. The modern transactional view of the doctrine ... does not require that the claim subsequently asserted be based on a same cause of action to be barred, but permits the doctrine to be invoked to bar litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication.... The determination, therefore, whether the doctrine shall be invoked is now based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily, a transaction gives rise to only one claim regardless of the number of ways that the claim may be asserted.

*Maldonado v. Flynn,* Del.Ch., 417 A.2d 378, 381 (1980); *rev'd on other grounds sub nom.,* Del.Supr., 430 A.2d 779 (1981). The *Restatement (Second) of Judgments* § 24, comment b (1982) describes a "transaction" as:**5** In general, the expression connotes a natural grouping or common nucleus of operative

facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of the trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded.

Despite defendants' portrayal of these occurrences as "one lengthy transaction", this Court recognizes a new transaction having occurred upon publishing the article in the school newspaper. The libel and invasion of privacy claims against Widener and Bierman arise from that new transaction. The act of publishing the *Forum* article is remote in time from the initial transaction, creating a new origin for the defamation and invasion of privacy claims. Any attempt to relitigate the initial transaction concerning the Widener communication of Martin's negative response on the law school application is precluded by the doctrine of *res judicata*. Applying this principle, the prayers for injunctive and declaratory relief are barred.

*Injunctive Action*

Martin seeks to enjoin Widener from issuing any statements concerning his medical condition, standing as an attorney or performance as a student. The basis for this claim stems from the initial transaction and despite repackaging with additional defendants and new forms of relief, the claim is precluded by the doctrine of claim preclusion. A court of competent jurisdiction rendered a final judgment upon the merits. *Martin v. Delaware Law School of Widener University, et al.,* D.Del., C.A.No. 85-53-JJF, Farnan, J. (October 16, 1986). "It is simply not fair to require a defendant to return to court time and time again to defend against the same allegations as plaintiff moves from one theory of recovery to another." *Poe v. Kuyk,* D.Del., 448 F.Supp. 1231, 1234 (1978), aff'd, 591 F.2d 1336 (3rd Cir.1979), *cert. denied,* 442 U.S. 943 (1979).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Further, Martin's request for injunctive relief is not within the jurisdiction of this Court. Delaware Constitution, Article IV, §§ 7 and 10. While the request for such relief could be transferred to Chancery Court pursuant to 10 Del.C. § 1901, claim preclusion, at a minimum, otherwise prevents it.

### Declaratory Judgment

Martin also seeks a declaratory judgment to alter and/or delete his school record "to show what actually occurred". "What actually occurred" has been litigated. Martin v. Delaware Law School of Widener University, supra. This claim, therefore, is barred by the doctrine of claim preclusion. Despite terming the relief requested as a declaratory judgment, Martin seeks affirmative mandatory relief by asking the Court to alter and/or delete portions of the record. Relief of this type is not within the subject matter jurisdiction of this Court. Further, Martin's request to purge Widener's files on him is in the nature of a request for a mandatory injunction. Such power lies in the Court of Chancery, not this Court. Cf. Simmons v. Steiner, Del.Ch., 108 A.2d 173 (1954), rev'd on other grounds, Del.Supr., 111 A.2d 574 (1955). However, as with his prayer for injunctive relief, claim preclusion prohibits transfer under 10 Del.C. § 1901.

### COPELAND CONVERSATION

#### A

*6 Martin seeks damages from Widener and Santoro. Martin argues that Santoro's remarks were defamatory per se. He argues Santoro "tried to justify [Widener's] view that I should not be certified for practicing law ... imputed a mental disease upon me ... and interfered with my law licenses by claiming I am also dishonest...." It is clear that while the telephone conversation occurred in 1989, the underlying complaint against Santoro relates back to the fundamental, oft-litigated dispute between Widener and Martin. Martin has been uniformly unsuccessful in all that litigation. Thus, on this ground alone, his claim

against Santoro is issue barred. Migra v. Warren City School Dist. Bd. of Ed., 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); Neoplan USA Corp. v. Taylor, D.C.Del., 604 F.Supp. 1540 (1985).

#### B

Martin's complaint included portions of an apparent transcription of the Santoro-Copeland telephone conversation. An alleged "authenticated", full transcription is included with Martin's motion for summary judgment. While there is insufficient authentication of the transcription, for purposes of the motions, the Court will view the transcription as full and accurate.

Copeland telephoned Santoro and asked to meet with him about alleged deficiencies in Widener's records on Martin. Santoro expressed a willingness to listen to Copeland but remarked that Widener was in litigation with Martin. There is a reference to a letter Copeland previously sent to Santoro with many people copied, including Delaware Governor Castle. [FN3] The conversation boils down to this alleged exchange:
Santoro: Basically, what is it you want?
Copeland: I want to know why the law school has not corrected misrepresentations about Mr. Martin's character. He did not lie on his answer to question number 6 [that is the question which inquired about prior mental institutionalization].

Copeland repeated a number of allegations and claims Martin has made in his numerous law suits. As noted above, the issues Copeland raised have been explored exhaustively and rejected in Martin's prior law suits. Martin v. Sparks, D.C.Del, No. 90-235, Huyett, J. (August 16, 1991). They may not be relitigated now. The remaining issue under this claim arising out of the Santoro-Copeland telephone conversation is whether anything Santoro said was defamatory.

"Defamation generally is understood as a false publication calculated to bring one into disrepute." Snavely v. Booth, Del.Super., 176 A. 649, 654 (1935). The gist of an action for defamation is the injury to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 6
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

reputation, business or occupation. It must expose a
plaintiff to public contempt or ridicule or lower him in
the estimation of the community in which he lives.
*Danias v. Fakis,* Del.Super., 261 A.2d 529, 531 (1969);
*Pierce v. Burns,* Del.Supr., 185 A.2d 477, 479 (1962).

A plaintiff in a defamation action is presumed to have
stated his claim in the best light. *Snavely,* 176 A. at
654. In determining whether words are defamatory,
the Court must take their plain and natural meaning and
understand them as would a person of average
intelligence and perception. *Danias,* 261 A.2d at 531.
The Court cannot find anything defamatory in what
Santoro said to Copeland. The references to events
which Martin claims are defamatory are by *Copeland*
not Santoro.

**\*7** Prior to Copeland's telephone call to Santoro, Martin
had executed a release to Copeland to examine and
copy "neuropsychiatric records about me" from Dr.
Rebecca Jaffe [Appendix D]. Shortly after this
telephone conversation, Martin signed a release in favor
of Copeland waiving "any confidentiality rights" to his
Widener file [Appendix E]. The "waiver" also
included authority for Copeland to copy Martin's
records.

It is inconceivable that with all the litigation occurring
prior to the telephone conversation, Martin's
relationship with Copeland [FN4] and the prior and
subsequent releases that anything defamatory occurred
during the conversation. Martin's claim against
Widener and Santoro arising out of the
Copeland-Santoro telephone conversation is utterly
without merit. The defendant's motion to dismiss this
claim will be GRANTED. Martin's motion for
summary judgment on this claim is DENIED.

FORUM ARTICLE

Martin seeks damages from Widener, Santoro and
Bierman for an article Bierman authored which was
published in the *Forum* [Appendix B]. As described
earlier, *ante* at 2, this newspaper is circulated to
Delaware Law School students, faculty, alumni and the
local legal community. Martin claims that he was

defamed by various specific portions of the article and
by the thrust of the entirety of the article. Resolution
of the motions on these claims, in turn, requires
resolution of a series of threshold issues.

A

The first of these issues is to determine Martin's status.
The United States Supreme Court and the Delaware
Supreme Court have recognized that a public official
may not recover in libel unless he or she can show that
the media source printed a defamatory falsehood
relating to official conduct with actual malice, that is,
that the statement was made with knowledge it was
false or with reckless disregard of whether or not it was
false. *New York Times v. Sullivan,* 376 U.S. 254, 84
S.Ct. 710, 11 L.Ed.2d 686 (1964); *Ross v. News
Journal Co.,* Del.Supr., 228 A.2d 531 (1967).

Martin is not a public official, However, the United
States Supreme Court and the Delaware Supreme Court
have recognized that in certain circumstances a
non-public official can become a public figure. *See*
*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct.
2997, 41 L.Ed.2d 789 (1974); *Gannett Co., Inc. v. Re,*
Del.Supr., 496 A.2d 553 (1985).

The original language defining a public figure is found
in *Gertz:*
In some instances an individual may achieve such
pervasive fame or notoriety that he becomes a public
figure for all purposes and in all contexts. More
commonly, an individual voluntarily injects himself or
is drawn into a particular public controversy and
thereby becomes a public figure for a limited range of
issues. In either case such persons assume special
prominence in the resolution of public questions.

*Gertz,* 417 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at
812.

B

There can be no argument that Martin does not fit into
the first category of public figure. The question is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 7
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

whether he fits into the second, "limited" category. There are several guidelines to answer this question. It is necessary to examine the nature and extent of Martin's participation in the controversy giving rise to alleged defamation. *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. A collateral issue is how much did Martin engage the public in an attempt to influence the resolution of the issues involved. *Wolston v. Reader's Digest Ass'n. Inc.,* 443 U.S. 157, 168, 99 S.Ct. 2701, 2707, 61 L.Ed. 450, 460 (1979).


C

**\*8** An integral question also to be answered is to determine whether Martin has injected himself into a public controversy. *See Gannett,* 496 A.2d at 556. More specifically, this Court must decide whether a dispute over whether the character traits of honesty and candor are relevant considerations in accepting or denying application to the bar is a matter of public controversy. "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.1980), *cert. denied* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *Avins v. White,* 627 F.2d 637, 647 (3rd Cir.1980), *cert. denied* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (recognizing the accreditation of Delaware Law School as a public controversy).

Delaware has recognized "the interest of this State in matters pertaining to the admission and regulation of lawyers practicing before our courts is essential to the primary governmental function of administering justice, and in meeting our obligation to protect the public by assuring and maintaining high standards of conduct of persons admitted to this Bar." *In Re Green,* Del.Supr., 464 A.2d 881, 885 (1983). "Admission to the Bar ... depends on three basic and unalterable prerequisites: good moral character, learning and demonstrated competence.... Good moral character has many attributes, but none are more important than honesty and candor. *Id.* "Moreover, the attributes of honesty and candor are absolute prerequisites to the admission

to our Bar." *Kosseff v. Board of Bar Examiners,* Del.Supr., 475 A.2d 349, 353 (1984).

In recognizing the licensure of lawyers as a public controversy, this Court concludes that the licensing procedures affect "the general public or some segment of it in an appreciable way," meeting the *Waldbaum* standard. The unremitting duty of candor to all persons charged with investigating and passing upon an applicant's qualifications is "a dispute ... between sides holding opposing views" and, thus, meets the controversy standard set forth in *Gannett. Gannett,* 496 A.2d at 556. This Court rejects the notion that merely because most people would agree that there is a duty of candor for Bar applicants, there is no "controversy" regarding this matter. *Marcone v. Penthouse Intern. Magazine for Men,* 754 F.2d 1072, 1083 n. 8 (3rd Cir.1985). [FN5]

In *Connolly v. Labowitz,* Del.Super., 519 A.2d 138 (1986) this Court concluded that the dissemination of information concerning the qualification and performance of a particular physician is not a matter of public concern. The court considered whether applying traditional libel standards, instead of constitutional standards, would have a chilling effect on the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people". *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 759, 762-63, 105 S.Ct. 2945, 2957, 86 L.Ed.2d 602, 605 (1985). The court reasoned that because 24 *Del.C.* § 1768 provided that the physician peer review mechanism shall be private and not subject to public examination, the qualifications and performance of an individual physician is not a matter of public concern. This Court recognizes that to stifle discussion of the public controversy concerning the proper licensure of lawyers simply because the discussion relates to a specific individual would have a chilling effect upon the interchange of ideas necessary for bringing about social changes. The topic area is a public controversy regardless of Martin's or any other individual's specific involvement.

D

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 8
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*9** Since it is clear that the alleged libel involves a public controversy, it is not necessary to examine the nature and extent of Martin's participation in that controversy. *Avins,* 627 F.2d at 647. In general, to be a "limited" public figure, the plaintiff must thrust himself into the vortex of the dispute. *Marcone,* 754 F.2d at 1083. Martin has filed a multitude of litigation FN6 concerning his dealings with Widener, various bar examiners and the mental hospitals. The filing of a lawsuit alone will not necessarily elevate a private plaintiff to public figure status. When the private plaintiff goes further than the courtroom in telling his side of the story, however, he may change his status by voluntarily injecting himself into the controversy. In *Street v. National Broadcasting Co.,* 645 F.2d 1227, 1235 (6th Cir.1981), plaintiff's status changed from private to limited public figure after granting press interviews to aggressively promote her version of the case outside of her actual courtroom testimony. Similarly, an agent who holds news conferences to attract media attention for himself and his client is a public figure in that context. *Woy v. Turner,* N.D.Ga., 573 F.Supp. 35 (1983).

Whether Martin actually solicited the attention by approaching the *Inquirer* reporter is a question of fact, however, it is not material as it is clear that, at a minimum, Martin acquiesced in granting a personal interview. He is quoted throughout the article. This Court notes that an individual who speaks with reporters may reasonably expect those comments to be disseminated to the press. Martin need not have solicited the reporters' attention to raise his status. "It may be sufficient that [plaintiff] engaged in a course of conduct that was bound to attract attention and comment." *Marcone,* 754 F.2d at 1086; *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 861 (5th Cir.1978). Martin cannot avoid the change in status by claiming he did not intend to voluntarily inject himself into the controversy. "The status of public figure *vel non* does not depend upon the desires of an individual. The purpose served by limited protection to the publisher of comment upon a public figure would often be frustrated if the subject of the publication could choose whether or not he would be a public figure." *Id.*

This Court recognizes that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707, 61 L.Ed.2d at 460. The plaintiff in *Wolston* was dragged unwillingly into the controversy and "never discussed this matter with the press and limited his involvement to that necessary to defend himself...." *Id.* Martin differs significantly in that while he may not have desired the original disclosure of his past history, he *has* discussed the matter with the press and, therefore, *not* limited his involvement to that necessary to defend himself.

**\*10** This Court finds that although he is a private figure in most aspects, Martin is a limited public figure in the context of the controversy preceding and including the *Forum* article. The filing of a multitude of lawsuits concerning his past medical history, particularly repeated unsuccessful lawsuits, in combination with granting a personal interview with the *Inquirer* reporters cumulatively acts to voluntarily inject plaintiff into this public controversy. While neither filing an action by itself nor granting an interview to reporters would necessarily raise plaintiff's status, it is the combination of the two actions and the number of suits filed that changes Martin's status. This is the Court's finding whether Martin actually sought out the *Inquirer* reporters or merely acquiesced in answering their questions.

Martin has a limited public figure status. Under the rule of *New York Times v. Sullivan* and its progeny, he cannot recover for a defamatory falsehood unless he can show by clear and convincing evidence either knowledge of falsity or reckless disregard for the truth. *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *see Riley v. Moyed,* Del.Supr., 529 A.2d 248, 250 (1987). The application of this standard was recognized for limited public figures in *Gertz.* The burden of proof is upon the plaintiff to show the falsity of the statement even in a case of a limited public figure plaintiff suing a media defendant. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Martin, therefore, bears the burden of showing falsity. *Riley,* 529 A.2d at 251. "Before there can be defamation of a public figure there

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

must be a false statement of fact." *Ramada Inns, Inc. v. Dow Jones & Co.,* Del.Super., 543 A.2d 313, 337 (1987), citing *Old Dominion Branch No. 496, Nat'l. Ass'n. of Letter Carriers v. Austin,* 418 U.S. 264, 283-84, 94 S.Ct. 2770, 2780-81, 41 L.Ed.2d 745, 761 (1974). "Libel plaintiffs who are either public officials or public figures must prove both falsity and actual malice to recover." *Ramada,* 543 A.2d at 337, citing numerous United States Supreme Court decisions.

Martin alleges that he was defamed in the *Forum* article in two ways.  First, he singles out individual passages.  Second, he attacks as defamatory the gist of the article taken as a whole.

*Specific Portions*

E

The following five sentences are self-authored by Bierman:
James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS.  In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission:  "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"
Somehow, DLS found out that Martin had in fact been confined to an institution....  As of February of this year (1990), the case was pending before the New Jersey Supreme Court ... Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.

**\*11** *Forum,* May 1990, Vol. 17, No. 6 [Appendix B].

Martin's burden as a limited public figure has been stated, *ante* at 16.  Before the Court reaches the issue of actual malice, it must, as a matter of law, determine two questions:  (1) is the alleged statement an expression of fact or of an opinion and (2) is the statement capable of a defamatory meaning. *Slawik v. News-Journal Co.,* Del.Supr., 428 A.2d 15, 17 (1981).
 If the Court answers either question against the plaintiff, it does not reach the actual malice issue.

*Riley,* 529 A.2d at 251.

The Court, in the first instance, will determine whether the communication is capable of defamatory meaning.  Martin first claims the 1983 graduation date is falsely reported "in an attempt to cast me as an unremarkable student".  Martin officially graduated on December 31, 1982.  Defendants raise the defense of substantial truth. "It is not necessary to establish the literal truth of the precise statement made.    Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Restatement (Second) of Torts* § 581A comment (f).  There is no liability for defamation when a statement is determined to be substantially true.  If the alleged libel was no more damaging to plaintiff's reputation in the mind of the average reader than a truthful statement would have been, the statement is substantially true. *Gannett,* 496 A.2d at 557.    In making the evaluation, the court considers whether the "gist" or "sting" of the article was true.  The gist or sting is true "if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Riley,* 529 A.2d at 253.

This Court finds the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of the statement that he graduated in 1983.  This statement is no more damaging in the mind of the average reader than is the precise truth, *i.e.,* that he graduated December 31, 1982.  It is unnecessary, therefore, to consider the issue of whether this statement is an expression of an opinion or fact.

The next statement Martin attacks is that "[s]omehow, [Widener] found out that Martin had in fact been confined to an institution".  Martin does not contend that he was not confined but rather infers the statement is false as he knows the circumstances that revealed his past medical history to the school.  In effect, he alleges defamation in the word "somehow".  Whether Martin or Widener know the specific manner how these facts came to be revealed is not at issue here.  The statement is not false merely because it does not spell out the specific method the facts came to Widener's attention.  Libel by omission is only actionable if the public figure plaintiff carries his burden of showing that the omission makes an already published material assertion of fact

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 10

untrue. Ramada Inns, 543 A.2d at 338. Martin attaches too much to the word somehow. Again, it is unnecessary to reach the fact versus opinion analysis determination.

*12 Martin also charges that the statement "[a]s of February of this year (1990), the case was pending before the New Jersey Supreme Court" is false. He contends that the matter was pending before the (his label) "New Jersey Committee" which is appointed by the New Jersey Supreme Court. Again, the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of this statement. The statement is no more damaging than is the precise truth, that the matter is pending before a committee. Arguably, the misstatement actually places Martin in a more favorable light in the mind of the average reader in that reaching the court itself would attribute more credence to the legitimacy of his claim than merely reaching a committee. With this determination, the Court need not weigh the issue of fact versus opinion.

F

Martin also attempts to base his libel claim on the falsity of statements which are summaries of the Inquirer article. FN7 Defendants err in arguing that a report of judicial proceedings is absolutely privileged even where there are allegations of malice or ill will. See Read v. News Journal Co., Del.Supr., 474 A.2d 119 (1984). While a judicial proceeding itself is protected by an absolute privilege, the report of a judicial proceeding is only conditionally privileged. Restatement (Second) of Torts § 611:
The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

This Court must weigh if the conditional privilege is lost due to inaccuracy or incompleteness and whether the report is a fair abridgement of the proceedings. In

making this evaluation, the Court notes that the decision in Read was hinged upon a direct comparison of the news article with the actual Court of Chancery letter opinion the article was discussing. Read, 474 A.2d at 120. The instant case differs in that the alleged defamatory article details the background of a multitude of lawsuits brought by Martin but does not actually refer to any specific case or court decision. Defendants attempt to invoke the privilege by referring to the plaintiff's tidal wave [see Appendix C] of litigation but cannot point to a specific court document of which the article is allegedly a report.

In a similar case, the Ninth Circuit held that a law review case note that was an accurate republication of an Arizona Supreme Court opinion denying plaintiff admission to the Arizona Bar due to his past mental history was privileged. Ronwin v. Shapiro, 657 F.2d 1071 (9th Cir.1981). The Ronwin court not only directly compared the case note with the opinion but noted that "the bulk of it is a verbatim republication of language from the Arizona Supreme Court's opinion." Id. at 1075. The Forum article is not really an abridgement of judicial proceedings but rather is predominately an abridgement of the Inquirer article. On the evidence presented, this Court concludes that the article is not protected by being within the scope of the conditional privilege sheltering the right to report on an official proceeding.

*13 The remainder of Martin's specific libel claims are based on allegedly false statements which are Bierman's abridgement of the Inquirer article. Martin contends the statement "Martin was admitted to Policlinic Hospital in Harrisburg on February 2, 1975 and released on February 21, 1975" is false. He contends he was neither admitted nor released. Martin also claims the statement "[t]he second admission, from April 2nd to May 10th, was to Philhaven Hospital" is false for the same reason. His defamation claim may not be based on this assertion of falsity for multiple reasons. First, Martin is attempting to relitigate the underlying claim from the original transaction of Widener communicating that Martin had misrepresented that he had some type of experience with mental institutions to various bar examiners. This issue is precluded from relitigation by the doctrine of

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 11

collateral estoppel. *Supra* at 7-8.

Second, the burden is upon Martin to show by clear and convincing evidence both the falsity of the statement and Bierman's knowledge of falsity or reckless disregard for truth. *Riley,* 529 A.2d at 250. Martin has done neither. Furthermore, there is no set of circumstances that this Court can envision in which Martin could meet this burden. Finally, Martin's own pleadings establish that he was involuntarily confined to the hospitals. Quibbling over whether he was technically ever "admitted and released" or merely confined against his will does not change the substantial truth of the statement. The gist or sting of the statement is true.

Martin contends that the following *Forum* article passage is false and libelous: "The medical records indicate family problems. Martin claims he had announced to his parents that he was going to drop out of high school. Consequently, the police were called from whom Martin was attempting to escape." Martin asserts that he was never an aspiring high school drop out and was defamed by being labelled a potential high school and not a college drop out. The *Inquirer* article actually read, "The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away." Comparing the *Inquirer* article with the *Forum* abridgement shows that Bierman erroneously stated Martin was considering dropping out of high school when, in fact, he was referring to college.

Again, the substantial truth doctrine is recognized in Delaware. *Riley,* 529 A.2d 248; *Ramada Inns,* 543 A.2d 313. "If the alleged libel was no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been, then the statement is substantially true." *Ramada Inns,* 543 A.2d at 317, citing *Riley* 529 A.2d at 253 and *Gannett,* 496 A.2d at 557. The requirement of proving falsity necessary entails the burden of negating substantial truth. *Ramada Inns,* 543 A.2d 318. Under this approach, the fact that Martin was considering dropping out of college and not high school in the context of this case is substantially true.

**\*14** The *Forum* misstatement that Martin was thinking of dropping out of high school rather than college cannot be viewed as defamatory. As a matter of law, the Court cannot find that Martin's reputation would be harmed or persons would be harmed from associating or dealing with him because he considered dropping out of high school rather than dropping out of college. Not every misstatement gives rise to a cause of action for libel. *Cf. Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

In addition, when the misstatement of high school is put in context with the balance of the paragraph, whatever "gist or sting" arises from the misstatement pales. Martin does not attack as defamatory the *Inquirer* reference to "[t]he records note that, 'the patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had supernatural powers.'"

G

Martin also attempts to base the defamation count on the *Forum* statement "[c]onsequently, the police were called from whom Martin was attempting to escape." Martin now claims the police were called concerning his brother and that Martin himself never attempted to escape.

This Court will assume for purposes of this motion that Martin's current claim is truthful. This Court also finds that the statement concerning the police and escape is capable of a defamatory meaning. Furthermore, the statement is not protected as an opinion. That being so, it is next necessary, as a matter of law, to consider whether this allegation is sufficient to overcome the constitutional burden of actual malice. *Riley,* 529 A.2d at 250. Martin must show by clear and convincing evidence Bierman's knowledge of falsity or reckless disregard of truth. *Id.*

Bierman's abridgement was based on the *Inquirer* statement that "[a]ccording to Martin, Polyclinic's account is 'inaccurate and greatly exaggerated.' The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran

Not Reported in A.2d                                                                                    Page 12
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

from the house when police arrived to take him away." [Appendix A-3] Bierman clearly relied on the *Inquirer* which appears to be referencing Martin himself as the source. Further, there is nothing in the record to indicate that Martin has sued the *Inquirer* for that statement.

This Court holds, as a matter of law, that Martin has not shown Bierman's actual malice. *Harte-Hanks,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562.

### H

Although he did not sue the *Inquirer,* Martin contends that the repetition from the *Inquirer* article of a quote by Mary Maudsley of the New Jersey Supreme Court's Committee on Character is defamatory. The quote reads, "Any potential problem which Mr. Martin encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it." [*See* Appendix A and B]. The Maudsley comment gives rise to initially determine whether it is an expression of an opinion or a fact. *See, ante,* at 18.

**\*15** A recent United States Supreme Court case has cast some doubt on the efficacy of the "opinion" protection afforded by the First Amendment. *Milkovich v. Lorain Jorunal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). "Thus we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption from anything that might be labelled 'opinion'." *Id.* at ----, 110 S.Ct. at 2705, 111 L.Ed.2d at 17.

As noted, *Riley* requires that before reaching the actual malice question, the court must determine two questions as a matter of law. One, is the statement capable of a defamatory meaning and, two, is it an expression of fact or opinion? *Riley,* 529 A.2d at 251. *Riley* was decided prior to *Milkovich.* There is no Delaware Supreme Court case on this issue since *Milkovich.*

*Riley* adopted a four-part test used to determine whether an average reader would view a statement as one of fact or one of opinion. *Riley,* 529 A.2d at 251. The test

came from *Ollman v. Evans,* 750 F.2d 970, 979 n. 16 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

While there is some doubt that there is a viable "opinion exception" to defamation actions, the *Ollman* four-part test is "still helpful for determining whether a statement implies actual facts that can be proven false." *Lund v. Chicago and Northwestern Transportation Company,* Minn.Ct.App., 467 N.W.2d 366, 369 (1991) [FN8]. Whether an allegedly libelous statement constitutes a statement of fact or an expression of opinion is a question of law for the court to determine. *Slawik,* 428 A.2d 17; *Lund,* 467 N.W.2d at 369.

The four-part *Ollman* test asks: (1) considering the common usage or meaning of the specific language of the challenged statement, is the statement indefinite and ambiguous; (2) whether the statement is capable of being objectively characterized as true or false; (3) considering the entire article in which the statement appears, to what extent will the unchallenged language surrounding the allegedly defamatory statement influence the average reader's readiness to infer that a particular statement has factual content, and (4) the broader social context into which the statement fits. *Riley,* 529 A.2d at 251-52. Applying this analysis, the statement is an opinion.

First, the common usage of the specific language is indefinite. The inclusion of the words "seems to be answered" injects a note of speculation or indefiniteness. Second, the challenged statement cannot be *objectively* verified. Attempting to analyze what constitutes "any potential problem in his life" necessarily entails a subjective decision. Third, the language surrounding the allegedly defamatory statement influences the average reader by clarifying the statement is an opinion. The immediately preceding line in the *Forum* article reads: "In addition to the 'knowing misrepresentation', the New Jersey bar examiners are also concerned with Martin's alleged propensity to file lawsuits." The specific use of the words "concerned with" and "alleged propensity" influences the average reader to infer this is an opinion, not a factual statement. Fourth, analyzed within the broader social context in which the article appeared,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*i.e.,* that it addressed an issue of current controversy regarding the licensure of lawyers and the consideration of honesty and candor as proper criteria of licensure, "language which might otherwise be considered statements of fact have here assumed the character of statements of opinion." *Riley,* 529 A.2d at 253 [citations omitted]; *Ramada Inns,* 543 A.2d at 327.

**\*16** Martin further alleges that the Maudsley quote is defamatory in that the *Forum* article did not note "that Maudsley herself is a defendant and is partially responsible for tampering with transcripts of the proceedings before the committee, so that what appears in the transcripts is not the same as what one hears from listening to the tape recordings of the same proceedings." The *Forum* article did not have to state that Maudsley was a defendant in some other suit (even assuming Bierman knew this) as libel by omission is only actionable if the omission makes an already published material assertion of fact untrue. *Ramada Inns,* 543 A.2d at 337-38.

The allegation that Maudsley tampered with the transcripts to alter her statement fails to show an actionable libel against Bierman on the constitutional level. Even assuming what Martin alleges about Maudsley is true, that would not satisfy Martin's burden of proof to show "actual malice", *i.e.,* knowledge of falsity or reckless disregard of truth or falsity. Furthermore, this Court can envision no set of circumstances whereby Martin could meet this burden as Bierman had noted his source of this quote as the *Inquirer* article. Bierman's failure to compare the transcript with any tape recording made of the proceedings does not amount to reckless disregard of truth or falsity. Malice may not be found merely by showing failure to investigate adequately before publication. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153, 87 S.Ct. 1975, 1990, 18 L.Ed.2d 1094, 1110 (1967).

The facts in the case before this Court differ from the U.S. Supreme Court decision in *Milkovich,* where the alleged defamatory statement itself concerned an allegation of perjury. In *Milkovich,* a high school wrestling coach testified in a hearing before an athletic association concerning a brawl and months later

testified in court about the same incident. A local sports columnist inferred that Milkovich perjured himself by polishing and reconstructing his testimony in the second proceeding. Whether or not Milkovich had perjured himself was provable by comparing the transcript of the hearing with the transcript of the court testimony. Here it is Martin (not Bierman) who has raised the allegation of a third party's perjury (not Bierman's). Comparing the transcript of the Maudsley statement with a tape recording may establish some other party's tampering but it would *not* establish libel against Bierman on a constitutional level.

Even under the possible *Milkovich* dilution of the "opinion exception", as a matter of law, the repetition of the Maudsley quote is constitutionally protected. Martin is required to prove Maudsley's statement as false before there can be liability. *Milkovich,* 497 U.S. at ---, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. Maudsley's words "any potential problem" and "seems to be answered" indicate that Martin frequently appears to litigate when confronted with barriers. A fair reading of the Maudsley quotation does not indicate that Martin litigates over *every* stumbling block he faces. In any event, *his own* listing of cases he has filed [Appendix C] shows a propensity to extensively litigate his personal life.

**\*17** Further, the Court must determine whether the Maudsley quotation is capable of a defamatory meaning. The Court finds as a matter of law that it is not. In effect, the gist or sting is that Martin is accused of being litigious. In today's society where lawyers are under much criticism for being litigious and our society, as compared with other countries, is criticized for litigiousness, the Maudsley comment can hardly be viewed as defamatory. *Cf. Andres v. Williams,* Del.Supr., 405 A.2d 121 (1979).

Assuming, *arguendo,* that Maudsley's comment is not protected as "opinion" and is capable of a defamatory meaning, the Court must, as a matter of law, first determine if the statement was made with actual malice. *Milkovich,* 497 U.S. at ----, 110 S.Ct. at 2705, 111 L.Ed.2d at 17. [FN9]

Martin cannot cross this initial constitutional threshold.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 14
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

One, the initial Maudsley quotation, as the *Forum* article notes, is in the *Inquirer*. Martin has not sued the *Inquirer*. Two, there is no evidence Martin has sued Maudsley for defamation. Three, Martin's own recitation of extensive litigation, overwhelmingly unsuccessful [Appendix C], indicates that he could not meet his burden of proving falsity. Fourth, based on the record in this case, viewed most favorably to Martin, he could not show Bierman had a high degree of awareness of the probable falsity of Maudsley's quotation or underlying information she used in expressing her views or that she or Bierman entertained serious doubts as to the truth of the publication. [FN10]

*Article as a Whole*

I

Martin claims the *Forum* article taken as a whole is libel *per se.* To constitute defamation *per se,* the nature of the charge must be such that the person has been injured in his reputation, business or occupation. *Danias,* 261 A.2d at 531. Martin alleges the article defames him in his trade (lawyer) and imputes a loathsome disease (mental illness).

The term defamatory *per se* is misleading and a misnomer in that it infers the defamation is actionable in itself or taken alone. Falling within one of the four categories of defamation *per se* changes the common law requirement that plaintiff show damages to pursue a claim of slander. In some jurisdictions, a plaintiff had to show damages in order to pursue a claim of libel, unless the libel was *per se,* in which case the damage requirement was again waived. Delaware does not distinguish between libel *per se* and libel *per quod;* thus, any libel is actionable without a showing of special damages. *Spence v. Funk,* Del.Supr., 396 A.2d 967, 971 (1978). Simply waiving the damages' requirement does not make the libel actionable in itself, the claim is still subject to other defenses and the appropriate standards of proof. *Id.* at 973. Martin's pleadings fail to state a claim upon which relief may be granted regardless of qualifying as a *per se* status and a showing or failure to show special damages.

**\*18** Martin claims the *Forum* article is defamatory as a whole as it implies "that I am a dangerous lunatic who sues innocent persons on account of a violent, psychotic temperament that renders me unfit for the practice of law." The article does not make such a statement in direct words, however, a libel by implication is actionable if "it imputes something which tends to disgrace a man, lower him in, or exclude him from society or bring him into contempt or ridicule." *Klein v. Sunbeam Corp.,* Del.Supr., 94 A.2d 385, 390 (1952). A libel need not be direct and open. "The publication must be judged by its general tenor; and if, taking their terms in their ordinary acceptation, it conveys a degrading imputation, however indirectly, it is a libel." *Rice v. Simmons,* Del.Ct. of Error and Appeals, 2 Harr. 417, 429 (1839); *Spence,* 396 A.2d at 971. Whether the article suffices to meet state and common law libel requirements, Martin's claim fails first on the constitutional level.

The Court has found Martin to be a limited public figure. He faces the same threshold burdens as such a figure when he attacks the entire article as he does when attacking pieces of it. The sum of the article is not greater than the whole. It is unnecessary to repeat the hurdles he faces under *New York Times, Gertz, Riley* and *Ramada Inns.* His attack on the whole article does not surmount constitutional hurdles.

INVASION OF PRIVACY

Martin's fifth claim is for invasion of privacy alleging the *Forum* article placed him in a false light in the public eye. The United States Supreme Court has held the actual malice standard applicable to a false light suit by private individuals when the subject of the article involved matters of public interest. *Time, Inc. v. Hill,* 385 U.S. 374, 380-91, 87 S.Ct. 534, 538-43, 17 L.Ed.2d 456, 462-68 (1967). This Court holds that "when a plaintiff, who is a limited public figure with regard to a defamation claim, also sues under a false light theory that has as its factual basis the same allegedly false material, that plaintiff must prove actual malice in order to recover on the false light claim." *Fitzgerald v. Penthouse International, Ltd.,* D.Md., 525 F.Supp. 585, 603 (1981), *aff'd in part, rev'd in part on*

*other grounds,* 691 F.2d 666 (4th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983).   For all the reasons stated, *supra,* Martin has failed to carry his burden of proof in showing falsity or actual malice.

While this failure extinguishes the false light claim, an action for invasion of privacy upon public disclosure of private facts could survive this deficit.   The right of privacy is not an absolute right but, rather, is qualified by the circumstances and also by the rights of others. *Guthridge v. Pen-Mod, Inc.,* Del.Super., 239 A.2d 709, 714 (1967).   The general purpose of protecting the right of privacy relates to one's *private* life, not when that life has become a matter of legitimate *public* interest.   There are a number of limitations to this right: the freedom of the press, matters of legitimate public interest, matters involving public figures and the newsworthiness of the article.    *Reardon v. News-Journal Co.,* Del.Supr., 164 A.2d 263, 266-67 (1960).   The media has the right, guaranteed by the federal and state constitutions, to publish news and all matters of public concern.   One who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency. *Barbieri v. News Journal Co.,* Del.Supr., 189 A.2d 773, 774 (1963).

**\*19** Given the avalanche of litigation that Martin has pursued concerning his past medical history and his interaction with Widener and his disclosure to *Inquirer* reporters of his view of the events, he may not now complain of the publicity he himself has engendered. Martin did not sue the *Inquirer,* a newspaper of infinitely greater circulation than the *Forum,* which contained much of the same information.   Martin has functionally invited the discussion and publicity to this part of his life and he may not now assert a right he has effectively waived.   Martin had already transformed the private nature of the facts to public and the recitation of those public facts does not violate an ordinary decency.

While attending Widener, Martin received a standard administrative form concerning a student's consent to have personal data released or published in a student directory.   Martin returned the form denying consent to publicize any personal information.    Martin now contends that the form effectively prevents any disclosure of information by the school and is a basis for his invasion of privacy claim.   For all the reasons stated *infra,* this Court finds that Martin's actions and behavior override the notice to the school and he may not now predicate an invasion of privacy claim upon that form.

CONCLUSION

Martin's causes of action for injunctive and declaratory relief are barred by the doctrine of claim preclusion. The slander claim based on the Copeland/Santoro telephone conversation is barred by the doctrine of claim preclusion, as well as being wholly lacking in substance.   This Court concludes Martin has limited public figure status and, thus, bears the burden of showing falsity, as well as actual malice as to the *Forum* article.   Martin has failed to show any false statement upon which to base his defamation claim. Therefore, this Court cannot envision any set of circumstances in which Martin could prove defendant's knowledge of falsity or reckless disregard of truth.  The claim for invasion of privacy based on a false light theory also fails for the same reasons.   A claim for invasion of privacy based on public disclosure of private facts is precluded as Martin has effectively waived the private nature of those facts recited in the *Forum* article.

For the reasons stated herein, the motion of defendants Widener University School of Law, Anthony J. Santoro and Mitchell S. Bierman to dismiss is GRANTED. The motion of plaintiff James L. Martin for summary judgment is DENIED.

APPENDIX A

1 ANSWER THWARTS HIS LAW CAREER

*"This is not only an inappropriate question, this is a*

*cruel question."  said a Stanford law professor.*

Not Reported in A.2d                                                                 Page 16
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

By Mary Jane Fine


and Mark Fazlollah


*Inquirer Staff Writers*


On Dec. 17, 1979, James L. Martin, then 26 years old, filled out an application to the Delaware Law School of Widener University.   His answers, neatly typed, informed school authorities, among other things, that his Law School Aptitude Test score was an above-average 582, that his draft status was 4-F and that he also planned to apply to the law school at the University of California at Davis.

**\*20** The application's final seven questions called for a simple "yes" or "no" response.   Jim Martin answered "no" to every one.

Three years later-after Martin graduated from Delaware Law School-Question Number Six came back to haunt him.

It is haunting him still.

Because of Question Number Six, Jim Martin believes, he has never been permitted to practice law.   Because of that question, he is suing Delaware Law School and the New Jersey Bar Examiners, among others. Because of that question, Martin filed a complaint with the Office for Civil Rights of the U.S. Department of Education, which found the question to be in violation of federal law.

Question Number Six-which Delaware Law School has since eliminated-asked:  "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

When James Martin answered "no" to Question Number Six, he set in motion a chain of events that continues to add link after link.

At some point prior to Martin's graduation, law school officials learned-it is not known precisely how-that he had, indeed, been in a mental hospital briefly in 1975.   The circumstances of his confinement remain somewhat clouded, and Martin disputes the legality of his confinement, but school officials took a hard line.

In a letter to Martin dated Feb. 2, 1983, then-Associate Professor Edward C. Smith wrote that "the misrepresentation raised a question as to your character and fitness for the practice of law, and accordingly that the matter should be brought to the attention of the Board of Examiners of any bar to which you applied."

Smith, who now works for a pharmaceutical firm in Cleveland, said that as far as he was concerned, the only issue was the appropriateness of the question, not Delaware Law School's decision to notify bar examiners.

"I certainly don't see any problem with pointing out that someone told an untruth," he said in an interview.

Several other law schools, however, said that it was debatable whether they would have taken the same action.

"This is not only an inappropriate question, this is a cruel question," said Stanford University law Professor Robert Weisberg, former dean of faculty affairs at Stanford.  "It's putting cruel pressure on people to lie.... I would be very, very reluctant to tell the bar."

Weisberg strongly questioned Delaware Law School's contention that Martin's incorrect answer reflected on his character.

"It strikes me as a weird moral fastidiousness," he said.

Richard Lonsdorf, a professor of psychiatry and law at the University of Pennsylvania, said that although Martin's answer may have demonstrated "faulty judgment," Penn probably would not have pursued the matter.

"We probably would have decided that this is a kid," Lonsdorf said.  "It was a stupid thing to have done, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 17
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

foolish peccadillo."

### Legal paperwork

Over the last six years since Delaware Law School made its decision, the legal paperwork surrounding Martin's claims has grown mountainous. Working out of his neat, two-story brick home in Wilmington, Martin, now 36, does accounting work for a living. Over the years, he figures that he has filed about 20 lawsuits, four of them against Delaware Law School.

**\*21** Somers S. Price, Jr., an attorney for Delaware Law School, says that two of the suits were dismissed and two-which Price says are similar to those dismissed-are pending. The suits seek unspecified damages and ask that the school be prohibited from continuing to disseminate information about his medical background and his response to Question Number Six. The law school says that its actions were proper.

Jim Martin grew up on a 150-acre farm in Palmyra, Lebanon County, the eighth of nine children. He describes his parents as strict Mennonites who rejected the ideas of higher education and participation in the wider world.

A fat looseleaf binder of personal memorabilia contains glimpses of the young Jim as a well-rounded boy who brought home A's and B's on his report cards and ribbons in soccer, science and wrestling. A letter written in 1970, when Jim was 16, congratulates his parents on his acceptance into the local chapter of the National Honor Society.

Later entries, however, chronicle a harsher period in his life, when he was a senior at Lebanon Valley College. On Feb. 2, 1975, according to medical records contained in the binder, Martin was admitted to Polyclinic Hospital in Harrisburg. The day before, the records say, "The patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had supernatural powers." The records quote Martin as saying, "I'm perfectly well, and it seemed like a bad dream. I was caught between my [parents'] Mennonite world and that

of the school."

### Family dispute

According to Martin, Polyclinic's account is "inaccurate and greatly exaggerated." The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away.

On Feb. 21, the records note, Martin was discharged-"improved"-to outpatient care.

A second admission-this time to the local Philhaven Hospital-occurred on April 2. According to admission notes, Martin was escorted to Philhaven by a Lebanon Valley professor and two students "because he wanted to walk around in the nude, spoke about he and God having a mission to kill, was otherwise irrational, bizarre, hyperactive and violent."

Martin denies ever walking around in the nude and says, "There was no more truth to that [account] than what they wrote in Harrisburg."

He was discharged to his parents' custody, according to May 10 notes by John D. Walmer, a psychiatrist at Philhaven.

After his brief hospitalizations, Martin graduated from Lebanon Valley, and in March 1976 he gained membership in Phi Alpha Epsilon, a scholastic honor society.

### Accounting work

After working for accounting firms for several years, Martin applied to Delaware Law School. He gives two reasons for answering "no" to the question about psychiatric hospitalization and treatment on the school's application form.

First, he explains, he felt that his admissions constituted an illegal confinement-"bogus," he calls it-and, therefore, did not count. Second, he says, he was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                          Page 18
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

advised by Walmer to say that he had never been treated for mental illness.

**\*22** Walmer, who retired in 1982, said in a telephone interview that, although he remembered Martin, he recalled no such conversation. "I'm just distressed to know that this [episode] is still bothering him," Walmer said.

Apart from the brouhaha over his application-which erupted just prior to graduation in December 1982-Martin's law school career appears to have been unremarkable.

Although the school's current administrators declined to discuss his case because of pending litigation, Smith, the former professor, remembered Martin as a "fairly good" student with adequate grades-"not a superstar."

Smith said that Martin had been in his civil procedure class. Asked to characterize Martin at the time, Smith said, "I've had some students that I thought were candidates for [mental] treatment; [Jim] just seemed eccentric."

Immediately after graduation, Martin applied to the Washington, D.C., bar. In the spring of 1983, he applied to the Pennsylvania and New Jersey bars and later to Maryland.

Each time, he passed the written section of the bar exam. But when Delaware Law School's letter was sent to the bar examining committees, the approval process slowed to a crawl.

The bars in Pennsylvania, Washington and Maryland refused to admit Martin. Though the Pennsylvania State Board of Law Examiners would not release records of the proceedings, documents from a related hearing indicated that the examiners' decision was based on Delaware Law School's report and on Martin's failure to undergo a current psychological evaluation. Past treatment for mental illness would not prevent an individual from being allowed to practice law.

The bar examining committee in New Jersey, which has tabled consideration of Martin's applications pending

the outcome of his federal suit against it, has been involved in a somewhat more complicated dispute.

Martin applied in the spring of 1983 and quickly passed the written section. In April 1984, it seemed his dream had come true. The clerk of the New Jersey Supreme Court issued him the official certificate, in Gothic print and sealed with the court's gold emblem.

"James Lee Martin was constituted and appointed an Attorney at Law of this State on April 2, 1984," it said.

David Johnson, director of the New Jersey Supreme Court's attorney ethics division, acknowledged that Martin had good reason to think he was a lawyer because "you don't get the certificate without being admitted."

*One-page letter*

But at the end of April, Martin was devastated by a one-page letter from New Jersey Supreme Court Clerk Stephen Townsend.

There had been a mistake, the letter stated, and Martin's certificate was sent to him in error. It was void and he had no right to practice law. The bar's character committee was still reviewing whether he was fit to be an attorney, the letter stated.

Townsend declined to discuss the case other than saying that Martin's application was still pending before the state Supreme Court.

**\*23** The transcript from a June 1985 hearing by the New Jersey Supreme Court's Committee on Character showed that Widener's letter was still a central issue blocking Martin's application.

Committee member Mary Maudsley told Martin that his answer to Question Number Six on Widener's law school admission form was "a knowing misrepresentation." In the hearing, Martin provided extensive information about his stay in the mental hospitals and there was no suggestion that he misled the examiners.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 19
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Maudsley also said she was concerned about Martin's inclination to file suits.

"Any potential problem which Mr. Martin has encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it," she told the committee.

Committee member Frank M. Lario Jr. then asked whether Martin's past mental health problems influenced "your filing of lawsuits at the present time or your feeling of persecution that may be existing at this time."

Martin's response was that, "There is no feeling of persecution, that is for sure.   There is an obvious injustice."

In a recent interview, Martin appeared rueful about the prolonged legal entanglement with his former school. He says he did not foresee it.

"It's like being out in the desert, and you think there's water out there," he said.  "You know how the sun plays tricks on you and you see a mirage and you have the feeling that it's just up ahead and you can sit down and rest....   Then when it isn't, you have too much invested to turn around."


APPENDIX B

DLS:  Defendant

Mitchell S. Bierman


Staff Writer


James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS.  In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission:  "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

Somehow, DLS found out that Martin had in fact been confined to an institution.  "Each time, [Martin] passed the written section of the bar exam.  But when [DLS]'s letter was sent to the bar examining committee, the approval process slowed to a crawl."   (*The Philadelphia Inquirer,* Sunday February 18, 1990, Mary Jane Fine and Mark Fazollah, p. 1 Section B.)

This happened in New Jersey, Washington, Maryland and Pennsylvania.   Martin challenged DLS on the fairness and legality of the question by filing a complaint with the Office for Civil Rights of the U.S. Department of Education.   The question was found to be a violation of federal law.   Martin has filed four different lawsuits against DLS.   Two were dismissed and two are pending.

As reported in the article in *The Philadelphia Inquirer,* Martin was admitted to Polyclinic Hospital in Harrisburg on February 2, 1975 and released on February 21, 1975.   The medical records indicate family problems.  Martin claims that he had announced to his parents that he was going to drop out of high school.   Consequently, the police were called from whom Martin was attempting to escape.   The records note that, "The patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had super-natural powers."   ID p. 10-BJ, CITE [sic] Martin characterizes these records as "inaccurate and greatly exaggerated."

**\*24** The second admission from April 2nd to May 10th was to Philhaven Hospital.  This confinement allegedly was due to Martin's behavior which, at that time, was deemed, "[sic] .. irrational, bizarre, hyperactive and violent."   ID. p. 10-BJ.

Martin claims that the attending psychiatrist at Philhaven advised him to answer "no" to the question. Martin also alleges that the confinements were illegal which he feels justifies his negative answer to the question.

To complicate matters, Martin is pursuing another federal lawsuit against the bar examining committee in New Jersey.   Apparently, after passing the New Jersey bar, Martin was sent the official certificate recognizing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 20
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

him as an attorney in New Jersey in April, 1984. Shortly thereafter, however, Martin received a letter from the New Jersey Supreme Court clerk stating that the certificate issued was a mistake.  The letter further explained that Martin's character was still under review.  As of February of this year (1990), the case was pending before the New Jersey Supreme Court.

In addition to the "knowing misrepresentation," the New Jersey bar examiners are also concerned with Martin's alleged propensity to file law suits.

"Any potential problem which Mr. Martin has encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it, "[sic] said Mary Maudsley of the New Jersey Supreme Court's Committee on Character.  ID. P. 10-BJ.

Other law schools are not certain whether they would have pursued the same course of action as that of DLS.  Robert Weisberg, law professor and former dean of Stanford University was quoted by the Philadelphia Inquirer [sic] as saying, "This is not only an inappropriate question, this is cruel.  It's putting cruel pressure on people to lie.  I would be very reluctant to tell the bar." Id. 10-BJ.  Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.


APPENDIX C

STATEMENT OF RELATED CASES


*Martin v. ETS, Inc.,* C3909-79, 179 NJSuper. 317 (1981)

*Martin v. PA Real Estate Commission,* 9 C.D.1983

*Martin v. PA State Real Estate Commission, et. al.,* 85-2349 ED

*Martin v. Mrvos and Sinibaldi,* 3rd Cir. 88-5005, *IN RE: James Lee Martin,* 87-6622, *Man./Proh. den.,* 108 S.Ct. 1756 (1988), *reh. den.,* 108 S.Ct. 2889 (1988)

*reh. den.,* 6-27-88.

*Martin v. PA State Real Estate Commission, et. al.,* 89-5271, *cert. den.,* 110 S.Ct. 220 (1989) [Justice Brennan took no part in the consideration or decision of this petition], *reh. den.,* 11-27-89, at 110 S.Ct. 532 (1989)

*Martin v. PA State Real Estate Commission, et. al.,* --- U.S. ----, *cert. pet. pending.*

*Martin v. Sample, et. al.,* 81-1114, filed on 9-25-81, Middle Dist. PA, *cert. den.,* 459 US 850, *reh. den.,* 459 US 1024 (1982)

*IN RE:  APPEAL OF JAMES L. MARTIN from PennDOT, Bureau of Traffick Safety Operations;* Civil Action-Law, Trust Book 47, p. 30, Lancaster County Court of Common Pleas, PA (2 cases).

**\*25** *IN RE:  James Lee Martin,* 87-278, DC Court of App., *den., reh. en banc pending.*

*Martin v. DC Court of App., et. al.,* 89-2789 (TPJ)

*Martin v. PA Board of Law Examiners,* 143 E.D.PA Sup. 84, *cert. den.,* 471 US 1022, *reh. den.,* 471 US 1120 (1985)

*Martin v. PA Board of Law Examiners, et. al.,* 86-1363, E.Dist. PA., 3rd Cir. *app.* at 86-1719, *consolidated with DLS et. al.,* 85-53 (JJF), *app.* to 3rd Cir. at 88-3428.  Both *app. dis. w/o prejudice* for lack of juris. on 3-24-87, with *sua sponte* amendment on 4-22-87 to specify that dismissal related exclusively to DLS at 85-53.  In interim, I wrote to Judge Huyett to request that the matter be finally resolved, but he refused, so I app. to 3rd Cir. at 87-1440.  My app. was dismissed as "frivolous," but the recusal and disqualification on 12-7-87 rendered it rather dubious.  Pet. for Writ of Cert. filed on 12-17-87 at 87-6072, *cert. den.,* 2-22-88; *reh. den.,* 3-28-88;  supplemental brief was returned.  Rule 60(b) Motion filed in E. Dist. of PA on 7-16-88.  Huyett denied it on 8-15-88. [Motion for Reopen and to Certify for Interlocutory Appeal.]

*Martin v. Supreme Court of PA, et. al.,* app. to 3rd Cir.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 21
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

at 89-1088, 877 F.2d 56,

*cert. den.,* 89-5211, 110 S.Ct. 213 (1989), *reh. den.,*
89-5211, 11-13-89, 110 US 421 (1989)

2nd time, *cert. den.,* 89-7118, on 5-29-90, *reh. den.,*
89-7118, on 6-28-90.

*IN RE: James Lee Martin,* Misc.Dkt. 89-0207, E. Dist.
of PA, Pet. for Writ of *Man./Proh.* against Kunz; app.
to 3rd Cir. at 89-1618;

pet. for Man./Proh. in US on 1-24-90 at 89-6551,
*man./proh. den.,* 3-19-90, *reh. den.,* 5-14-90,

pet. for cert. in US on 3-2-90 at 89-6839, *cert. den.,*
4-30-89, *reh. den.,* 6-11-90.

*IN RE: Application of James Lee Martin,* No.
17,835-17, NJ Committee on Character

*Martin v. Townsend, et. al.,* 86-1352, NJ DC, 87-5270,
826 F.2d 1056, *cert. den.,* 108 S.Ct. 191 (1987)

*Martin v. Townsend, et. al.,* 88-7435, 875 F.2d 311,
*cert. den.,* 110 S.Ct. 212 (1989), *reh. den.,* 110 S.Ct.
524 (1989).

*IN RE: James L. Martin,* US, rec'd on 3-22-90 but
returned to me on 3-23-90. I resubmitted it as a Writ
of Cert. on 3-26-90, but it was returned to me again on
3-29-90. I resubmitted it on 3-30-90, but they were
returned to me again on 4-4-90, without filing.

*Martin v. Townsend, et. al.,* Mot to Reinstate denied
again, *app.* to 3rd Cir. 90-5417, *app. aff., reh. en banc
den., cert. den.,* 90-6230, --- U.S. ----, 1-7-91, *reh.
pending.*

*Martin, et. al., v. Townsend, et. al.,* (CSF), 90-2616, NJ
Dist., *dis., reh. pending.*

*IN RE Application of James M. for Adm. to MD Bar,*
Misc. No. 3-Sept. Term 1988, app. to US, 88-5084,
appeal dis. for want of juris., reformed as cert. pet.,
*cert. den.,* 10-3-88, *reh. den.,* 11-7-88.

*MD Court of Appeals, et. al.,* 88-1999 DC MD, app. to
4th Cir., 88-1749 870 F.2d 655; 88-7103, *cert. den.,*
109 S.Ct. 3195, *reh. den.,* 110 S.Ct. 14 (1989), Motion
for Stay rec'd on 7-3-89 is returned 7-7-89; stay motion
resub. on 7-31-89 is returned again on 7-19-89;
resubmitted stay motion is returned for 3rd time on
8-11-89.

**\*26** *IN RE: Application of James Lee Martin for Adm
to VA Bar.* Passing score deemed failure.

*Martin v. VA Board of Bar Examiners, et. al.,*
88-0269-R, *app.* to 4th Cir. at 88-1752, consolidated
with MD Court of Appeals for disposition in 4th Cir.
870 F.2d 655; pet. for writ of cert, US, 88-7103, *cert.
den.,* 109 S.Ct. 3195, *reh. den.,* 110 S.Ct. 14 (1989),
Motion for Stay rec'd on 7-3-89 is returned 7-7-89; stay
motion resub. on 7-31-89 is returned again on 7-19-89;
resubmitted stay motion is returned for 3rd time on
8-11-89.

*IN RE Application of James Lee Martin to the DE Bar;*

(1) app. filed with DE Sup. on 4-19-89, 190, 1989; *IN
RE: James Lee Martin,* 88-7221, *Man./Proh. den.,* 110
S.Ct. 222 (1989), *reh. den.,* 110 S.Ct. 420 (1989);

(2) app. again filed with DE Sup. on 7-2-90, *app.
dismissed* 10-22-90, *reh. en banc den.,* 11-5-90, *cert.
pending* at No. 90-6229, --- US ----.

*Martin v. Sparks, et. al.,* 90-235, D.DE, pending.

*Martin v. DLS, et. al.,* 85-53 (JJF), 625 F.Supp. 1288,
884 F.2d 1384, *cert. den.,* 110 S.Ct. 411 (1989), *reh.
den.,* 110 S.Ct. 766 (1990)

*Martin v. DLS, et. al.,* 88-768 DC Dist, app. to DC
Court of App. for DC Cir. at 89-7024, 89-5210, *cert.
den.,* 110 S.Ct. 212 (1989), *reh. den.,* 110 S.Ct. 421
(1990)

*IN RE: James L. Martin,* 88-5988, --- US ----, pet for
*man./proh. den.* on 2-21-89, motion for leave to file
*reh. den.,* 11-6-89.

*Martin v. DLS, et. al.,* 88-3420, E.Dist. of PA,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 22
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

pending.

*Martin v. Shank, et. al.,* 86-2205, Dist. of MD,

(1) app. to 4th Cir. at 87-2039,

(2) app. to 4th Cir. at 87-2040,

(3) app. to 4th Cir. at 87-2100; pet. for writ of cert.,
89-7126, *cert. den.,* 5-29-90, *reh. den.,* 6-28-90

(4) app. to 4th Cir. at 87-2162, *IN RE: James Lee
Martin,* 87-6616, *Man./ Proh. den.,* on 5-16-88, 108
S.Ct. 1757 (1988), *reh. den.* on 6-27-88, 108 S.Ct. 2888
(1988).

(5) app. to 4th Cir. at 87-2177, 838 F.2d 1210;

(a) *IN RE:  James Lee Martin,* 87-6790, *Man./Proh.
den.* on 6-6-88, 108 S.Ct. 2045 (1988), *reh. den.,* on
6-30-88, 108 S.Ct. 2921 (1988)

(b) *Martin v. Shank, et al.,* 87-6903, *cert. den.* 6-27-88,
*reh. den.,* on 9-15-88

*Martin v. Shank, et. al.,* 86-1748, DC, *app.* to DC Cir.,
87-7088, pet. for writ of *cert. den.* on 10-3-88 at
87-7005; *reh. den.,* 11-7-88 at 87-7005

*Martin v. Shank, et. al.,* DC Cir. 87-7008, pet. for writ
of *cert. den.* on 2-21-89 at 88-6145, *reh. den.* on
3-27-89 at 88-6145 [re costs for appendix and briefs]

*In the Matter of James Lee Martin,* Case Ref. No.
03852042, US Dept. of Education, *app.* to DC Dist.
88-1788, app. to DC Cir., pet. for *cert.* 89-7669, *den.,*
10-1-90, *reh. den.*

*Martin v. US Dept. of Education,* No. 90-2492 (TPJ),
DC Dist., *pending.*

*Martin v. Wilson, PA State Police, et. al.,* 88-2300 (ED
Pa.), *pending.*

*Martin v. Farnan,* 89-8008, 3rd Cir.; *IN RE: James
Lee Martin,* 89-6594, *man./ proh. den.,* 3-19-90; *reh.
den.,* 4-30-90.

**\*27** *Martin v. Farnan,* 90-8035, 3rd Cir.;

(1) 89-7446, *cert. den.,* 6-28-90, *reh. den.*

(2) 89-7700, *cert. den.,* 10-1-90, *reh. pending.*

*Martin v. Farnan,* 89-8088, 3rd Cir.;    *v. Farnan,*
89-7817, --- US ---- pet. for writ of *cert. den.,* 10-1-90,
*reh. den.*

*Martin v. Farnan,* 90-8102, 3rd Cir., *man. den., reh. en
banc pending.*

*Martin v. Huyett,* 89-8011, 3rd Cir.; *IN RE:  James Lee
Martin,* 88-7157, *Man./ Proh. den.,* 109 S.Ct. 3231
(1988), *reh. den.,* 110 S.Ct. 15 (1989)

*Martin v. Huyett,* 89-8076, 3rd Cir.;

(1) *James Lee Martin v. US Court of Appeals for the
3rd Cir.,* 89-6098, *cert. den.,* 1-16-90, *reh. den.,* 3-5-90

(2) *Martin v. Huyett,* 89-7449, *cert. den.,* 6-28-90, *reh.
den.,* 8-13-90;

*Martin v. Huyett,* No. 90-8101, 3rd Cir., *man. den., reh.
en banc pending.*

*Martin v. Fisher,* No. 90-8103, 3rd Cir., *man. den., reh.
en banc pending.*

*IN RE:  James L. Martin,* No. 4, 1989, Leb. Orphans
Ct., app. to PASuper., 118 HBG 89, pet. for allow. of
app. to PA Sup., 233 M.D.Alloc. Dkt. 89, *cert. den.* at
89-7119 on 5-29-90 in *Martin v. PA Supreme Court,*
*reh. den.,* 6-28-90.

*Martin v. Walmer, et. al.,* 90-2752 (E.Dist. of PA), *dis.*
on 9/26/90, *recon. den.*  (Huyett ignored unopposed
Motion to Recuse), app. to 3rd Cir. pending at No.
91-1010.

*Joyce E. Richards and James L. Martin v. Medical
Center of DE, Inc., et. al.,* No. 90-6373, --- US ----, *pet.
for writ of cert. pending.*

*Bucher, Martin, et. al. v. Omega Medical Center*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 23

*Assoc., L.P.,* No. 90-3461, 3rd Cir., *aff., reh. en banc den., pet. for writ of cert.* for filing in US has been served.

I view the "related cases" section narrowly and therefore do not include many other cases that could otherwise be considered "related.".

### APPENDIX D

### MEDICAL AUTHORIZATION AND RELEASE

I, James L. Martin, soc. sec. no █████████ birthdate, hereby authorize Dr. Eric S. Copeland, 513 Twadell Mill Rd.; Wilm., DE, 19807 to procure any medical records pertaining to neuropsychiatric impairment about me from Rebecca Jaffe, M.D., 1941 Limestone Rd.; Suite 107; Wilmington, DE 19808. To the extent no such impairment has been diagnosed, this request may be satisfied with a signed statement suggested below.

This authorization is good for ninety (90) days.

DATE /s/June 24, 1989

/s/JAMES LEE MARTIN

### STATEMENT OF REBECCA JAFFE, M.D.

I have no reason to believe James Martin is mentally or neuropsychiatrically impaired and have been his doctor for the past five (5) years.

DATE /s/last seen 11/15/88, /s/signed 7/5/89

/s/Rebecca Jaffe, M.D.

### APPENDIX E

### WAIVER OF CONFIDENTIALITY

I, James L. Martin, at 912 McCabe Ave.; Wilm., DE 19802 (soc. Sec. # █████████ ) hereby waive any confidentiality rights to the file about me at the Delaware Law School (now Widener University School of Law) under 20 USC Sec. 1232 [Buckley Amendment], and that Dr. Eric S. Copeland may obtain copies of all such records and/or access to them at such time as may be arranged between the School and him. This waiver shall remain effective for as long as may be necessary to access all such records.

*28 DATED: August 30, 1989

BY: /s/James L. Martin

### MEMORANDUM OPINION

*Upon Motion of Plaintiff for Reargument-DENIED*

Plaintiff, James L. Martin [Martin] has filed a motion for reargument of this Court's opinion of June 4, 1992. In that opinion, the Court denied Martin's motion for summary judgment and granted the defendants' motion to dismiss on the pleadings.

Martin now seeks reargument on the basis of various federal legislation involving discrimination and disabilities. The role of this legislation in Martin's current claims against the defendants was reviewed by the United States District Court for Delaware in its opinion of *Martin v. Delaware Law School of Widener University,* D.Del., 625 F.Supp. 1288 (1985), *aff'd.* 884 F.2d 1384 (3rd Cir.1989), *cert. denied,* 493 U.S. 966, 110 S.Ct. 411, 107 L.Ed.2d 376 (1989), *rehearing denied,* 493 U.S. 1038, 110 S.Ct. 766, 107 L.Ed.2d 781 (1990). It was also considered in the case of *Martin v. Walmer,* D.C.E.D.Pa., C.A. No. 90-2752, Huyett, J. (September 26, 1990).

For all of the reasons discussed in this Court's opinion of June 4, 1992 dealing with the issue of claim and issue preclusion, Martin's arguments in his motion to reargue have been explored thoroughly by courts of competent jurisdiction and now cannot be raised again. In addition, the points which he makes in his current

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 24
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

motion for reargument were considered by the Court in reaching its decision announced on June 4, 1992.

Accordingly, James L. Martin's motion for reargument is DENIED.

IT IS SO ORDERED.

> FN1. Formerly Delaware Law School.

> FN2. *See Martin v. Delaware Law School of Widener University,* D.C.Del, 625 F.Supp. 1288, 1293 n. 1 (1985) detailing litigation on this issue.

> FN3. This letter has not been made a part of the record.

> FN4. Copeland was or is a co-plaintiff of Martin's in another lawsuit. *Copeland, et al. v. Omega Medical Center Associates,* D.C.Del. C.A. No. 91-193. Copeland is or was a co-plaintiff with Martin in a consolidated appeal involving the boards of bar examiners of several states, including Delaware and the New Jersey Supreme Court and Widener. *Martin, Copeland v. Townsend,* No. 91-5085, (3rd Cir. June 3, 1991) (ORDER).

> FN5. The *Inquirer* article itself indicates that a controversy exists over whether Widener should or should not have communicated to the various boards of bar examiners Martin's incorrect answer.

> FN6. Refer to Appendix C.

> FN7. There is no indication Martin sued the *Inquirer* for the article which formed the basis of the *Forum* article.

> FN8. The *Lund* court referred to the four-part test found in *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir.1986), *cert. denied* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249

(1986). *Janklow* adopted the *Ollman* four-part test.

> FN9. In *Harte-Hanks,* actual malice has been defined to include a high degree of awareness of probable falsity, or the media defendant entertained serious doubts as to the truth of his publication. *Harte-Hanks,* 491 U.S. at 667; 109 S.Ct. at 2685-86, 105 L.Ed.2d at 576.

> FN10. *See footnote 9, supra.*

Del.Super.,1992.
Martin v. Widener University School of Law
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.3d ----                                                                 Page 1
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

H
Briefs and Other Related Documents

United States Court of Appeals,Third Circuit.
Dwight L. MCKEE; Allen L. Jones
v.
Henry HART; Wesley Rish; Albert Masland; James
Sheehan; Daniel P. Sattelle Daniel P. Sattele,
Appellant.
No. 04-1442.

Argued March 10, 2005.
Jan. 6, 2006.

**Background:** Investigator for the state office of
inspector general sued supervisor under § 1983 alleging
supervisor had retaliated against him for his refusal to
stop voicing his concerns about the pharmaceutical
industry, in violation of the First Amendment. The
United States District Court for the Middle District of
Pennsylvania, 2004 WL 1454108, Richard Caputo, J.,
denied supervisor's motion for summary judgment on
qualified immunity basis, and appeal was taken.

**Holdings:** The Court of Appeals, Ambro, Circuit
Judge, held that:

7(1) supervisor's allegedly retaliatory comments to
employee did not rise to level of retaliatory harassment
under First Amendment, and

8(2) even if supervisor violated employee's First
Amendment rights, such rights were not clearly
established at time of alleged conduct.

Reversed and remanded.

[1] **Federal Courts 170B** 754.1

170B Federal Courts

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk754 Review Dependent on Whether
Questions Are of Law or of Fact
170Bk754.1 k. In General. Most Cited
Cases
An appellate court exercises plenary review over a
district court's conclusions of law in its qualified
immunity analysis.

[2] **Federal Courts 170B** 763.1

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk763 Extent of Review Dependent on
Nature of Decision Appealed from
170Bk763.1 k. In General. Most Cited
Cases
In reviewing a district court's qualified immunity
analysis, an appellate court may review whether the set
of facts identified by the district court is sufficient to
establish a violation of a clearly established
constitutional right, but may not consider whether the
district court correctly identified the set of facts that the
summary judgment record is sufficient to prove.

[3] **Civil Rights 78** 1376(2)

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and
Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and
Reasonableness; Knowledge and Clarity of Law;
Motive and Intent, in General. Most Cited Cases
Qualified immunity insulates government officials
performing discretionary functions from suit insofar as
their actions could reasonably have been thought
consistent with the rights they are alleged to have
violated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                          Page 2
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

[4] **Civil Rights 78 🔑1376(1)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity;  Good Faith and
Probable Cause
         78k1376 Government Agencies and Officers
           78k1376(1) k. In General. Most Cited
Cases

**Civil Rights 78 🔑1376(2)**

78 Civil Rights
    78III Federal Remedies in General
       78k1372 Privilege or Immunity;  Good Faith and
Probable Cause
         78k1376 Government Agencies and Officers
           78k1376(2) k. Good Faith and
Reasonableness;  Knowledge and Clarity of Law;
Motive and Intent, in General. Most Cited Cases
To determine whether an official has lost his or her
qualified immunity, a court must first decide whether a
constitutional right would have been violated on the
facts alleged, and if the answer to that question is "yes,"
the court must then consider whether the right was
clearly established.

[5] **Constitutional Law 92 🔑90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
       92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and
Limitations
           92k90.1(7) Labor Matters
             92k90.1(7.2) k. Public Employment.
Most Cited Cases
A public employee has a First Amendment
constitutional right to speak on matters of public
concern without fear of retaliation. U.S.C.A.
Const.Amend. 1.

[6] **Constitutional Law 92 🔑90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
       92k90 Freedom of Speech and of the Press

         92k90.1 Particular Expressions and
Limitations
           92k90.1(7) Labor Matters
             92k90.1(7.2) k. Public Employment.
Most Cited Cases
In determining whether a cognizable First Amendment
claim has been stated by a public employee, the effect
of the alleged conduct on the employee's freedom of
speech need not be great in order to be actionable, but
it must be more than de minimis. U.S.C.A.
Const.Amend. 1.

[7] **Constitutional Law 92 🔑90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
       92k90 Freedom of Speech and of the Press
         92k90.1 Particular Expressions and
Limitations
           92k90.1(7) Labor Matters
             92k90.1(7.2) k. Public Employment.
Most Cited Cases

**States 360 🔑53**

360 States
    360II Government and Officers
       360k53 k. Appointment or Employment and
Tenure of Agents and Employees in General. Most
Cited Cases
Supervisor's allegedly retaliatory comments to special
investigator for Pennsylvania Office of Inspector
General (OIG), including telling him to go with the
flow and not permitting him to speak to anyone about
investigation into pharmacist without supervisor's
permission, did not rise to level of harassment, under
First Amendment, in retaliation for his speaking out
about pharmaceutical industry; comments were aimed
at getting investigator to focus on investigation to which
he was assigned instead of focusing on his own
wide-ranging concerns about pharmaceutical industry as
a whole, and investigator suffered no alteration in his
employment benefits, pay, or job classification as a
result of speaking out about potential corruption in
pharmaceutical industry. U.S.C.A. Const.Amend. 1.

Supervisor's allegedly retaliatory comments to special

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                       Page 3
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
(Cite as: --- F.3d ----)

investigator for Pennsylvania Office of Inspector General (OIG), including telling him to go with the flow and not permitting him to speak to anyone about investigation into pharmacist without supervisor's permission, did not rise to level of harassment, under First Amendment, in retaliation for his speaking out about pharmaceutical industry; comments were aimed at getting investigator to focus on investigation to which he was assigned instead of focusing on his own wide-ranging concerns about pharmaceutical industry as a whole, and investigator suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in pharmaceutical industry. U.S.C.A. Const.Amend. 1.

[8] Civil Rights 78 ⚖══1376(10)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(10) k. Employment Practices.
Most Cited Cases
Supervisor of special investigator for Pennsylvania Office of Inspector General (OIG) was entitled to qualified immunity from investigator's § 1983 claim that supervisor retaliated against him, in violation of First Amendment, for speaking out against pharmaceutical industry, since constitutional right allegedly violated was not clearly established; reasonable official in supervisor's position would not have been aware that making a few comments over the course of a few months, the gist of which was asking an employee to focus on his job, could violate First Amendment. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

[9] Constitutional Law 92 ⚖══90.1(7.2)

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.

Most Cited Cases
A public employee states a First Amendment claim by alleging that his or her employer engaged in a campaign of retaliatory harassment in response to the employee's speech on a matter of public concern, even if the employee could not prove a causal connection between the retaliation and an adverse employment action. U.S.C.A. Const.Amend. 1.

Appeal from the United States District Court for the Middle District of Pennsylvania, (D.C. Civil Action No. 02-cv-01910), District Judge: Honorable Richard Caputo.

Charles W. Rubendall, II, (Argued), Donald M. Lewis, III, Keefer, Wood, Allen & Rahal, LLP, Harrisburg, PA, for Appellant.

Donald A. Bailey, (Argued), Bailey Stretton & Ostrowski, Harrisburg, PA, for Appellee.

Before SCIRICA, Chief Judge, ROTH and AMBRO, Circuit Judges.

OPINION OF THE COURT

AMBRO, Circuit Judge.
*1 Daniel Sattele appeals the District Court's denial of his summary judgment motion seeking qualified immunity in a suit brought by Allen Jones alleging that Sattele, among others, had retaliated against him for exercising his First Amendment rights. Because Jones did not allege that Sattele deprived him of a constitutional right-and because even if he had, that right was not clearly established at the time Sattele engaged in the alleged conduct-we conclude that Sattele is entitled to qualified immunity. We therefore reverse the decision of the District Court and remand for further proceedings.

I. Factual and Procedural History

In May 2002, Jones was hired as a special investigator for the Pennsylvania Office of Inspector General ("OIG"). [FN1] The OIG is responsible for investigating allegations of fraud, waste, misconduct, and abuse in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                  Page 4
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

executive agencies of the Commonwealth. At the time of the events at issue in this case, Sattele was an Investigations Manager at OIG and was Jones's supervisor.

In mid- to late-July 2002, Jones was given a lead role in the investigation of Steve Fiorello, the chief pharmacist at Harrisburg State Hospital. There was only one other person assigned to the investigation. A few weeks after the investigation began, Jones told Sattele that he was concerned about problems in the pharmaceutical industry that went beyond the Fiorello investigation-specifically that he believed the industry was routinely bribing state officials. Jones informed Sattele that he wanted to broaden the Fiorello investigation to include the entire pharmaceutical industry. Thereafter, Jones continued to inform Sattele about his concerns regarding the industry.

In response, Sattele told Jones to stay focused on the Fiorello investigation and not to investigate corruption in the pharmaceutical industry as a whole. Sattele subsequently removed Jones from his lead role in the Fiorello investigation in September 2002 [FN2] because Jones had, in Sattele's words, "lost focus." Sattele based this conclusion on the fact that Jones continued to voice concerns about the entire pharmaceutical industry even after Sattele had told him to concentrate only on Fiorello.

In October 2002, Dwight McKee, one of Jones's colleagues at OIG, filed a complaint against other OIG employees, alleging that they had retaliated against him for exercising his First Amendment rights. In November 2002, an amended complaint was filed, joining Jones as a plaintiff and Sattele as a defendant. Jones brought a cause of action under 42 U.S.C. § 1983, alleging that Sattele and the other defendants had also retaliated against him for exercising his First Amendment rights. Jones claimed generally that he was retaliated against-through intimidation and harassment by his supervisors-for complaining to his supervisors that public corruption investigations were being obstructed and delayed for reasons that were not legitimate.

In particular, at his deposition Jones identified three comments by Sattele that he perceived as harassment in

retaliation for his refusal to stop voicing his concerns about the pharmaceutical industry. [FN3] First, he testified that Sattele told him that

**\*2** Mac [McKee] was torpedoed. Some of the things that he got maybe he deserved, but a lot of them he didn't. He was torpedoed. You keep your mouth shut.... Mac has been torpedoed, keep your mouth shut or the same thing can happen to you.

In a similar vein, Jones recalled that Sattele told him, in early October 2002, that if Jones could not adjust to the way OIG operated, he would have to leave his employment there.

Second, Jones testified that Sattele told him to "quit being a salmon," by which he meant that Jones should "quit swimming against the current with the pharmaceutical case." (Sattele testified at his deposition that he told Jones to "go with the flow" and not "swim against the current" because he was concerned that Jones was not working with the lawyers in the office and was not operating within a "team concept.")

Third, Jones related an incident that occurred in October 2002, after he had been removed as co-leader of the Fiorello investigation. Jones stated that thereafter he was not allowed to speak to anyone about the investigation without Sattele's permission. He nevertheless went to pick up documents from Fiorello, the target of the investigation, while Sattele and another of his supervisors were out of the office. Jones testified that, when he got back, Sattele met him "first thing," took him into a room with another OIG colleague, "and demanded to know why [he] went ... without [Sattele's] permission to pick up papers." Jones also stated that Sattele and his colleague accused Jones of having had an interview with the Director of the Department of Public Welfare, something Jones denied.

All defendants moved for summary judgment in August 2003, and the District Court granted the motion with respect to all defendants except Sattele in February 2004. As for Jones's claims against Sattele, the District Court determined, based on the three comments identified by Jones, that (1) "with respect to Mr. Sattele, Mr. Jones has presented evidence that could lead a reasonable jury to conclude that his requests to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
Page 5
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

investigate the pharmaceutical industry were a substantial or motivating factor in the retaliatory harassment or intimidation he may have suffered" and (2) it could not decide whether Sattele had qualified immunity absent a factual determination as to whether Sattele's conduct constituted retaliatory harassment. In its decision, the District Court also determined that Jones was not disciplined in connection with voicing his concerns about the pharmaceutical industry and that "[a]t no time during his employment has Mr. Jones's job classification, pay, or benefits been reduced or altered." Sattele now appeals from the denial of summary judgment on qualified immunity grounds.

## II. Jurisdiction & Standard of Review

The District Court had federal question jurisdiction over Jones's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. *See Doe v. Groody,* 361 F.3d 232, 237 (3d Cir.2004) ("[A] denial of qualified immunity that turns on an issue of law-rather than a factual dispute-falls within the collateral order doctrine that treats certain decisions as 'final' within the meaning of 28 U.S.C. § 1291." (citing, *inter alia, Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)); *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 147 (3d Cir.2002) ("When a defendant moves for summary judgment based on qualified immunity, the denial of the motion may be appealed immediately under the collateral-order doctrine because '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability [ ] and ... is effectively lost if a case is erroneously permitted to go to trial." ' (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (alterations, emphasis, and omission in original)). FN4

**\*3** [1] [2] We exercise plenary review over the District Court's conclusions of law in its qualified immunity analysis. *Doe,* 361 F.3d at 237. In addition, "we may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is

sufficient to prove." *Forbes,* 313 F.3d at 147 (internal quotation marks omitted).

We note also that at this stage of the litigation we are looking at the facts as presented by Jones, *i.e.,* Sattele's statements were retaliatory, rather than the exercise by Satelle of appropriate supervisory limits on Jones's performance of his assignment.

## III. Discussion

[3] [4] Qualified immunity insulates government officials performing discretionary functions from suit "insofar as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 148 (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). To determine whether an official has lost his or her qualified immunity, we must first "decide 'whether a constitutional right would have been violated on the facts alleged....'" ' *Doe,* 361 F.3d at 237 (quoting *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)) (omission in original). If the answer to that question is "yes," we must then "consider whether the right was 'clearly established.'" ' *Id.* at 238 (quoting *Saucier,* 533 U.S. at 201)). If we also answer "yes" to the second question, we must conclude that the official does not have qualified immunity.

Sattele contends that he is entitled to qualified immunity because (1) his three statements to Jones about his work on the Fiorello investigation did not deprive Jones of his First Amendment rights, and (2) even if Jones did allege a violation of a constitutional right, that right was not clearly established at the time Sattele made the comments. We address each argument in turn.

### A. *Did Sattele Violate a Constitutional Right of Jones?*

[5] "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Brennan v. Norton,* 350 F.3d 399, 412 (3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.2003) (internal quotation marks omitted). In light of this fundamental principle, we have held that, in certain circumstances, a public employee may bring a cause of action alleging that his or her First Amendment rights were violated by retaliatory harassment for the employee's speech about a matter of public concern even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment. *See* *Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000). In *Suppan,* we indicated that when the "plaintiffs' complaint allege[d] a campaign of retaliatory harassment culminating in ... retaliatory rankings [low ratings on promotion lists]," then a "trier of fact could determine that a violation of the First Amendment occurred at the time of the rankings on the promotion lists and that some relief [was] appropriate even if plaintiffs [could not] prove a causal connection between the rankings and the failure to promote." *Id.* This holding is premised on the idea that being the victim of petty harassments in the workplace as a result of speaking on matters of public concern is in itself retaliation-even if the employee cannot prove a change in the actual terms of his or her employment-and thus could be actionable under the First Amendment. *Id.* at 235.

**\*4** **[6]** In this context, the key question in determining whether a cognizable First Amendment claim has been stated is whether "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights...." *Id.* at 235 (internal quotation marks omitted). The effect of the alleged conduct on the employee's freedom of speech " 'need not be great in order to be actionable," ' but it must be more than *de minimis. Id.* (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) (Posner, J.)); *see also* *Brennan,* 350 F.3d at 422 n. 17 (noting that "incidents of what might otherwise be trivial 'harassment' " may be actionable through their "cumulative impact ... even though the actions would be *de minimis* if considered in isolation"). As stated earlier, the District Court determined that Jones's allegation that Sattele retaliated against him for speaking out about the pharmaceutical industry met the standards set out in *Suppan.*

[7] Sattele does not dispute the District Court's

conclusion that Jones sufficiently alleged that he was speaking out on a matter of public concern. Sattele does argue, however, that the District Court's conclusion (by pointing to the three statements Sattele made to Jones, the latter alleged a retaliatory harassment claim under the First Amendment) was incorrect. In particular, Sattele contends that his three allegedly retaliatory comments were trivial and insufficient to deter a person of ordinary firmness from exercising his First Amendment rights. We agree.

Despite our holding in *Suppan* that a plaintiff's allegation of a "campaign of retaliatory harassment" by a public employer as a result of the plaintiff's speech created a cognizable First Amendment claim even without an alleged causal connection to a change in the plaintiff's terms of employment, not every critical comment-or series of comments-made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights. *See* *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000) (stating that "not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation"); *Bart,* 677 F.2d at 625 (holding that plaintiff had alleged an actionable First Amendment claim when she claimed that "an entire campaign of harassment[,] which though trivial in detail may have been substantial in gross," had been mounted against her, but cautioning that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise"). We have noted that " 'courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." ' *Brennan,* 350 F.3d at 419 (quoting *Suarez,* 202 F.3d at 686) (holding that allegations that a supervisor stopped using the plaintiff's job title and did not capitalize the plaintiff's name as a result of plaintiff's speech, even if true, did not rise to the level of a constitutional violation because they were *de minimis* ). The comments made by Sattele fall into this category.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

Page 7

**\*5** Sattele's statements to Jones in the fall of 2002 were all aimed at getting Jones to focus on the investigation to which he was assigned-looking into the activities of a particular person in a particular state agency-instead of focusing on Jones's own wide-ranging concerns about the pharmaceutical industry as a whole, something that OIG was not investigating. There is no question Sattele's statements were critical of Jones's job performance, and they may be construed as reprimands for Jones's continued expressions of concern about potential corruption in the pharmaceutical industry. However, even looking at the record in the light most favorable to Jones (as we must at this stage in the proceedings), we cannot conclude that Sattele's comments, taken together, would have deterred a person of ordinary firmness from exercising his First Amendment rights.

In *Suppan,* the plaintiffs allegedly were subjected to repeated chastisements and threats from their superiors over a period of more than a year based on their membership in a union negotiating team, and they alleged that they were given low ratings on their promotion eligibility evaluations in retaliation for those activities. 203 F.3d at 230-31. By contrast, Jones was admonished a few times for straying from the scope of the task he was assigned. The District Court explicitly found that, despite Jones's changed role in the Fiorello investigation, he suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in the pharmaceutical industry. Based on the set of facts identified by the District Court, Jones's allegations about Sattele's conduct simply do not rise to the level of a retaliatory harassment claim under the First Amendment.

Because Jones has not alleged the deprivation of a constitutional right, Sattele is entitled to qualified immunity. For the sake of completeness however, we now turn to the second prong of the qualified immunity analysis and determine whether-assuming that Jones had sufficiently alleged the violation of a constitutional right-that right was clearly established at the time of Sattele's alleged conduct.

*B. Assuming Sattele Violated a Constitutional Right of Jones, Was that Right Clearly Established at the Time of the Alleged Conduct?*

[8] " '[C]learly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson,* 271 F.3d 566, 571 (3d Cir.2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "[i]t is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case,* not as a broad general proposition." ' *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (*per curiam* ) (quoting *Saucier,* 533 U.S. at 201) (emphasis added).

**\*6** [9] Before Sattele allegedly engaged in the conduct at issue in this case, we held, as discussed at Section III(A), *supra,* that a public employee states a First Amendment claim by alleging that his or her employer engaged in a "campaign of retaliatory harassment" in response to the employee's speech on a matter of public concern, even if the employee could not prove a causal connection between the retaliation and an adverse employment action. *Suppan,* 203 F.3d at 234-35. We then reiterated, in *Baldassare v. New Jersey,* 250 F.3d 188 (3d Cir.2001), that "[a] public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Id.* at 194 (citing, *inter alia, Rankin v. McPherson,* 483 U.S. 378, 383-84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). Jones contends that *Suppan* and *Baldassare,* taken together, were sufficient precedent to put Sattele on notice that his conduct-making harassing comments to Jones arising out of Jones's voicing of concerns about corruption in the pharmaceutical industry-was constitutionally prohibited.

In *Suppan,* however, we gave little guidance as to what the threshold of actionability is in retaliatory harassment cases. Instead, we merely held that such a claim existed. *Suppan,* 203 F.3d at 235. Moreover, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 8
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

alleged conduct in *Suppan* spanned more than a year and involved the supposed lowering of ratings on employees' promotion evaluations and the admonishment of employees because of their union activities and support for a particular mayoral candidate. *Id.* at 230-31. Based only on our acknowledgment of a retaliatory harassment cause of action in *Suppan* and the facts of that case, a reasonable official in Sattele's position would not have been aware that making a few comments over the course of a few months (the gist of which was asking an employee to focus on his job) might have run afoul of the First Amendment.

*Baldassare* also does not further Jones's argument that his First Amendment right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct. That case involved a straightforward retaliation claim brought under the First Amendment in which the plaintiff alleged a direct causal connection between his speech on a matter of public concern and his demotion, *see Baldassare, 250 F.3d at 194* (plaintiff claimed he was demoted because of his statements regarding his investigation and report about conduct of his co-workers), not that he was subject to a campaign of retaliatory harassment such as the one involved in *Suppan* and alleged by Jones in this case. Thus, *Baldassare* would not have helped Sattele understand that his conduct might be constitutionally prohibited. [FN5]

We did touch on the retaliatory harassment theory again in our *Brennan* decision, noting once more that "a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." *350 F.3d at 419 n. 16*. *Brennan* provided some additional guidance about what types of conduct would support such a claim, holding that some of the plaintiff's allegations (that he had been taken off the payroll for some time and given various suspensions as a result of his speech) would support a retaliation claim, whereas other of his allegations (including his claim that his supervisor stopped using his title to address him) would not because of their triviality. *Id.* at 419. However, *Brennan* was not decided until 2003, after Sattele's alleged

conduct, which occurred in the fall of 2002, had already taken place. Thus, to the extent that *Brennan* added some specificity to the contours of the retaliatory harassment cause of action, an employee's First Amendment right to be free from such harassment was still not clearly established at the time of Sattele's conduct. *See Brosseau, 125 S.Ct. at 600 n. 4* (noting that the parties had pointed the Court to "a number of ... cases ... that postdate the conduct in question" and that "[t]hese decisions, of course, could not have given fair notice to [the official] and are of no use in the clearly established inquiry").

**\*7** Moreover, as discussed at Section III(A), *supra,* we also stated in *Brennan* that courts have not found violations of employees' First Amendment rights "where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." *350 F.3d at 419* (internal quotation marks omitted). *Brennan* therefore lends support to Sattele's argument that his critical comments to Jones did not violate Jones's First Amendment rights.

Accordingly, because of the dearth of precedent of sufficient specificity (and factual similarity to this case) regarding a public employee's First Amendment right to be free from retaliatory harassment by his or her employer at the time of Sattele's conduct, we cannot say that the constitutional right Jones alleged Sattele violated was clearly established. Sattele is therefore entitled to qualified immunity under the second, as well as the first, prong of our *Saucier* analysis.

### IV. Conclusion

The three comments made by Sattele in response to Jones's voicing of his concerns about potential corruption in the pharmaceutical industry, although critical of Jones's speech, were all intimately related to Jones's job performance and would not have deterred a person of ordinary firmness from exercising his or her First Amendment rights. As the District Court found, the comments were also unaccompanied by any change in Jones's employment benefits or wages. We cannot conclude, based on this factual situation, that Jones alleged a deprivation of a constitutional right.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                        Page 9
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

Moreover, even if there had been such a deprivation, Jones's constitutional right to be free from a campaign of retaliatory harassment was not clearly established at the time of Sattele's alleged conduct. *Suppan* (and *Baldassare* to the extent it is applicable), although they were decided before the events at issue in this case, did not define the bounds of a retaliatory harassment cause of action with sufficient specificity, nor were their facts sufficiently similar to those alleged here, such that Sattele would have been on notice that his conduct was constitutionally prohibited.

Accordingly, Sattele is entitled to qualified immunity, and we reverse the contrary decision of the District Court and remand for further proceedings.

  FN1. Jones had previously been employed by OIG. He left that position in 1991.

  FN2. Jones was still assigned to that investigation even though his role had changed.

  FN3. Jones also identified a fourth incident that he alleged was harassment, involving Henry Hart, another defendant. Hart, however, is not a party to this appeal, and as that incident is not relevant to our decision, we do not discuss it here.

  FN4. Sattele contends that there is no factual dispute preventing us from exercising jurisdiction over this appeal, and Jones does not dispute that position.

  FN5. Moreover, we note that even if *Baldassare* were relevant to determining whether Jones's right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct, that case would not necessarily put a reasonable official in Sattele's position on notice that making comments such as Sattele's would violate the First Amendment. Under the traditional retaliation analysis articulated in *Baldassare,* the second inquiry, after the

plaintiff has established that he or she was engaging in activity protected by the First Amendment, is whether the plaintiff's "interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees." 250 F.3d at 195. We have stated that, in determining the interest of the employer for purposes of this balancing test, "we must consider 'whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." ' *Id.* at 198 (quoting *Rankin,* 483 U.S. at 388) (alteration in original). The District Court determined in this case that there was no evidence that OIG's interest in conducting an efficient investigation was impaired by Jones's speech. However, given our precedent on this issue, a reasonable official in Sattele's position could have *understood* his actions toward Jones as being justified because the need to maintain efficient working relationships and to improve Jones's performance of his duties on the Fiorello investigation outweighed his interest in speaking generally about potential corruption in the pharmaceutical industry, a matter outside the scope of the investigation OIG was conducting. *Cf. Sprague v. Fitzpatrick,* 546 F.2d 560, 565 (3d Cir.1976) (holding that, even though speech leading to public employee's discharge "concerned matters of grave public import," the balance weighed against finding that speech protected by the First Amendment when it had "completely undermined" the effectiveness of the employer-employee relationship).

C.A.3 (Pa.),2006.
McKee v. Hart
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 10
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**


• <u>04-1442</u> (Docket) (Feb. 23, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                                                Page 1
Not Reported in A.2d, 1995 WL 945544 (Del.Super.)
(Cite as: Not Reported in A.2d)

H

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware.
Walter A. READ
v.
Elizabeth CARPENTER and Ruth Giberson
**No. 95C-03-171.**

June 8, 1995.

Letter Opinion and Order on Defendants' Motion to
Dismiss For Failure to State a Claim-Motion Granted.

Mr. Walter A. Read, New Castle.
Andrew McK. Jefferson, Esquire, Michael A. Pittenger,
Esquire, Potter Anderson & Corroon, Wilmington.

QUILLEN, J.
**\*1** Gentlemen:

In response to a four-count complaint filed by the
plaintiff, Walter A. Read ("plaintiff"), the defendants,
Elizabeth Carpenter ("Carpenter") and Ruth Giberson
("Giberson"), have filed a Motion to Dismiss for
Failure to State a Claim. FNI

> FN1. The Court has considered the
> contentions raised by plaintiff in a document
> titled "Objection to May 16, 1995 Hearing"
> filed by plaintiff on May 25, 1995. The Filing
> does not change the result herein. The
> Defendants' Motion to Strike Plaintiff Walter
> A. Read's Objection Dated May 25, 1995 and
> For a Scheduling Order, in response to the
> filing, need not be considered.

FACTS

The facts as alleged by plaintiff are as follows: The

plaintiff lives in the Mobile Home Village Trailer Park
in New Castle, Delaware on lot # 7. The defendants,
Carpenter and Giberson, are sisters who live in the
same trailer park on lot # 19. On April 14, 1993, the
plaintiff was involved in an altercation with the
defendants. On that date, Carpenter signed an Affidavit
of Probable Cause and a Complaint and
Summons/Warrant in the Justice of the Peace Court 11
which charged plaintiff with Trespassing with Intent to
Peer or Peep into a Door or Window of Another in
violation of 11 Del. C. § 820. The charge was
subsequently nolle prossed.

The plaintiff, who is pursuing this action pro se,
maintains that the charge was groundless and initiated
this action seeking general and punitive damages. The
plaintiff's complaint contains four counts: malicious
prosecution; slander per se; aiding and abetting [a]
tortfeasor; and abuse of court process.

According to the Carpenter affidavit, which is attached
to plaintiff's complaint, Carpenter was on the phone
with the manager of the Mobile Village Trailer Court
who had called to tell her that the plaintiff "was on her
property-walking all around the trailer-taking pictures
of her yard." The affidavit states further that Carpenter
"hung up the telephone-turned and saw [plaintiff]
looking in the front-center bay window."

The plaintiff alleges that the park manager lied to
Carpenter "as she lives on Lot 21 and cannot see all
around trailer 20 to the Carpenter's lot and trailer on lot
# 19." The plaintiff further alleges that the front part of
Carpenter's trailer and bay window is on the common
trailer-park street because it is too long for the lot and
extends out into the street itself.

DISCUSSION

The defendants challenge plaintiff's claims here on a
Superior Court Civil Rule 12(b)(6) Motion to Dismiss
for Failure to State a Claim. In evaluating the Motion,
the Court must assume all well-pleaded facts in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 2
Not Reported in A.2d, 1995 WL 945544 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

complaint to be true. *Nix v. Sawyer,* Del.Super., 466 A.2d 407, 410 (1983) (quoting *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* Del.Super., 372 A.2d 168 (1976)). A complaint will not be dismissed unless plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof. *Id.* (quoting *Diamond State Tel. Co. v. Univ. of Delaware,* Del.Supr., 269 A.2d 52 (1970)). A complaint may not be dismissed unless it is clearly without merit, which may be a matter of law or fact. *Diamond State Tel. Co.,* 269 A.2d at 58.

### Count I-Malicious Prosecution

With respect to a cause of action for malicious prosecution, such a claim is viewed with disfavor by the Delaware courts and, therefore, assessed with careful scrutiny. *Nix,* 466 A.2d at 411 (quoting *Kaye v. Pantone, Inc.,* Del. Ch., 395 A.2d 369 (1978)). There are five elements necessary to sustain a cause of action for malicious prosecution: 1) the institution of regular judicial proceedings; 2) without probable cause; 3) with malice; 4) termination of the proceedings in the aggrieved party's favor; and 5) damages. *Id.; See also Wells v. Parsons,* Del.Supr., 3 Harr. 505 (1842); *Stidham v. Diamond State Brewery, Inc.,* Del.Super., 21 A.2d 283 (1941). The defendants contend that the second and third elements are not present such that Count I of plaintiff's complaint should be dismissed.

**\*2** It may be as defendants argue that a prima facie case of probable cause exists here because the Affidavit of Probable Cause and the Complaint and Summons were signed by a judicial officer attesting to the existence of probable cause. [FN2] But even more apparent, Count I of plaintiff's complaint should be dismissed because a bare allegation that defendants' instituted "proceedings solely to intimidate and harass is insufficient" to plead malice. *Nix,* 466 A.2d at 412. The addition of the incidental fact that they felt indignation or resentment toward the plaintiff will not make them liable. *Id.* (quoting *Kaye,* 395 A.2d 369).

FN2. In *Lengle v. Dukes,* Del.Super., C.A. No. 80C-NO-10, Tease, J. (June 9, 1982), *aff'd,*

Del.Supr., 461 A.2d 693 (1983) (quoting *Anthony v. White,* D. Del., 376 F.Supp. 567, 573 (1974), the court said:

A complainant who swears out an arrest warrant before a magistrate entrusts that magistrate with the task of evaluating the legal sufficiency of the charges he has brought; assuming his motive is proper, the complainant should not be penalized for subsequently disclosed errors in legal judgment. Similarly, even if the complainant has acted in bad faith, the goal of efficient enforcement of the criminal laws requires that he be free from liability when he has commenced criminal proceedings in a reasonable and justifiable belief that the alleged wrongdoer is guilty.

Furthermore, regarding the element of malice in the claim for malicious prosecution, plaintiff sets forth only a bare allegation that defendants acted "with bad faith, malice, and ill-will" against him. Complaint at ¶ 9. As in *Nix,* plaintiff's bare allegation is insufficient to sustain a claim for malicious prosecution, and this Court has no facial basis for concluding "that malice was even an ancillary motive of defendants" in pursuing the prosecution of the plaintiff. *See Nix,* 466 A.2d 412; Super. Ct. Civ. R. 9(b). As noted, an action for malicious prosecution is viewed with disfavor by the Delaware courts and, therefore, Count I of plaintiff's complaint is DISMISSED. IT IS SO ORDERED.

### Count II-Slander Per Se

In paragraphs 16-20 of Count II, plaintiff alleges a claim of slander per se. "A study of the cases clearly indicates the Courts of this State do not look with favor upon suits for libel or slander." *Danias v. Fakis,* Del.Super., 261 A.2d 529, 532 (1969). Defamation consists of the twin torts of libel and slander; in the shortest terms, libel is written defamation, and slander is oral defamation. *Spence v. Funk,* Del.Supr., 396 A.2d 967, 970 (1978). In general, the scope of liability for slander is not as great as that for libel, and *the pleading requirements for slander are more strict. Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 945544 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

A plaintiff must plead five elements in a defamation action: 1) the defamatory character of the communication; 2) publication; 3) that the communication refers to the plaintiff; 4) the third party's understanding of the communication's defamatory character; and 5) injury. *Los v. Davis,* Del.Super., C.A. No. 89C-OC-122, Goldstein, J., Opinion and Order at 3 (Apr. 9, 1991), *aff'd,* Del.Supr., 602 A.2d 1081 (1991) (quoting *Re v. Horstmann,* Del.Super., C.A. No. 83C-FE-82, Poppiti, J. (Aug. 11, 1987)).

The general rule is that oral defamation is not actionable without special damages. *Id.* (quoting 50 *Am.Jur.2d* Libel and Slander §§ 9-10; 53 *C.J.S.* Libel and Slander § 170; and Prosser *Law of Torts* (1971) § 112). There are four traditional categories of defamation, however, commonly called slander per se, which are actionable without proof of special damages. *Id.* In broad terms, these are statements which: 1) malign one in a trade, business or profession; 2) impute a crime; 3) imply one has a loathsome disease; or 4) impute unchastity to a woman. Because plaintiff does not allege the existence of special damages, Count II is premised upon a claim of slander per se. Particularly, plaintiff alleges that defendants uttered statements imputing a crime to him.

**\*3** The unifying characteristic of the four categories concerning slander per se is the tendency of the slander to isolate the object of the defamation from society. *Spence,* 396 A.2d at 970; *Q-Tone Broadcasting, Co. v. Musicradio of Maryland,* Del.Super., C.A. No. 93C-09-021, Silverman, J. (Aug. 22, 1994). One who is defamed by one of these ways might never know the extent of a lost opportunity to relate and associate with others because he could be avoided without knowing the reason and without having a chance to rebut the defamation. *Id.*

As an initial matter, although defamation is generally subject to liability, "affirmative defenses to a prima facie case exist for statements made in certain contexts where there is a particular public interest in unchilled freedom of expression." *Barker v. Huang,* Del.Supr., 610 A.2d 1341, 1344 (1992). One such defense is the absolute privilege, a long recognized common law rule in Delaware, "that protects from actions for defamation

statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial proceeding and were relevant to a matter at issue in the case." *Id.* at 1345 (quoting *Hoover v. Van Stone,* D. Del., 540 F.Supp., 1118, 1121 (1982); *Short v. News Journal,* Del.Supr., 212 A.2d 718, 719 (1965); *Klein v. Sunbeam Corp.,* Del.Supr., 94 A.2d 385, 392 (1953); and *Nix,* 466 A.2d at 410).

In paragraph 16 of the complaint, plaintiff states:
On April 14, 1993 at Magistrate Court 11, New Castle, Delaware, Defendant Carpenter maliciously injured Plaintiff in his good reputation and otherwise appeared before Judge Joyce E. Nolan and without probable cause whatsoever, charged Plaintiff with two crimes, thus procuring a warrant for Plaintiff on two criminal charges and his subsequent arrest on the said charges of peeping tom and trespassing based on hate, malice, ill-will and bad faith.

The allegations contained in paragraph 16 concern statements offered by defendants in the course of a judicial proceeding that are clearly relevant to the proceeding itself. Therefore, the alleged defamatory statements contained in paragraph 16 are subject to absolute immunity. Furthermore, just on the face of the complaint, the Court is "satisfied that it was in the public interest to cause an investigation of [plaintiff's] activities," and the Court therefore concludes that defendants' "communications are privileged as a matter of law." *See Re, supra,* slip op. at ¶ 11. Therefore, paragraph 16 of plaintiff's complaint is DISMISSED. IT IS SO ORDERED.

Paragraphs 17 and 18 of plaintiff's complaint state:
17. When Carpenter's neighbor told her Read was walking all around the trailer taking pictures and was trespassing/peeping tom, Carpenter then published this to her house-mate, Ruth Giberson, and they subsequently published this slander around the trailer park where Plaintiff lives and causing injury to his reputation.
**\*4** 18. On her Affidavit of Dec. 10, 1994, Ruth Giberson states the following: "Elizabeth Carpenter called me while I was at work. She was upset because

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 4
Not Reported in A.2d, 1995 WL 945544 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

she had just seen Mr. Read looking in our window with his face pressed to the glass. I instructed my sister to call police and immediately came home. When I arrived, a police officer was already there; he was talking to a large group of people up the street who were upset because Mr. Read has been taking pictures ...[.]"

The defendants contend that the allegations of paragraph 17 and 18 in Count II of the complaint do not impute criminal behavior.

It is the function of the Court to determine whether a communication is capable of bearing a particular meaning, and whether that meaning is defamatory. *Drainer v. O'Donnell,* Del.Super., CA. No. 94C-08-062, Alford, J. (May 30, 1995); *Re, supra,* slip op. at ¶ 10 (quoting *Restatement (Second) of Torts § 614 (1977)*). The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient. *Id.* "Both the judge and the jury, in performing their respective functions, take into account all the circumstances surrounding the communication of the matter complained of as defamatory. Thus the context of written or spoken words is an important factor in determining the meaning that they reasonably might convey to the person who heard or read them." *Restatement (Second) of Torts § 614* cmt. d (1977). "Thus, an imputation may be defamatory as applied to one person at a given time and place, although it would not be derogatory of another person at a different time or in a different place." *Id.*

The gist of plaintiff's allegations contained in paragraphs 17 and 18 is that the defendants said he was walking all around the trailer park taking pictures, trespassed onto their lot, and looked into the window of their trailer. However, plaintiff himself states that he was out in the street taking pictures of the park. Complaint at ¶ 29. Plaintiff also alleges that defendants' "trailer and bay window is on the common trailer park street-being too long for the lot and extending out into the street itself." Complaint at ¶ 8. Additionally, plaintiff attached two sets of interrogatories to his complaint addressed to each defendant. Question number 12 in each set asks: "Is it possible to walk around the Mobile Home Village Trailer Park without

looking at someone's window?"

It seems that plaintiff himself has placed the allegedly defamatory statements in a non-defamatory context. First, he states that he was walking around the trailer park taking pictures, and in particular taking pictures on the street. Second, he states that he believes that defendants' trailer was on the street. And third, he asks if it is possible to walk around the trailer park without looking in a window. Also, plaintiff bases his allegations, in part, on statements made during a call by a third person, the park manager, who said he was walking in defendants' yard. Thus, in the context as presented by plaintiff, the allegedly defamatory statements are not defamatory at all. As stated above, an imputation may be defamatory as applied to one person at a given time and place, although it would not be derogatory of another person at a different time or in a different place. The statements attributed to defendants by plaintiff essentially restate actions which plaintiff attributes to himself. [FN3]

> **FN3.** Viewed in the light most favorable to the plaintiff, this incident, notwithstanding the criminal charges, at best is a neighborhood misunderstanding, wherein the plaintiff is trying to make a slanderous mountain out of a de minimus mole hill. Courts are available for many purposes, and providing an outlet clothed with some sense of civility for minor emotional controversies is one service courts perform. But as with other causes of action, including possibly the criminal charges herein, after reflection, surely there must be "a cultural sense of [a] community standard on de minimus [claims of slander per se]." *Cf. Crump v. Beckley Newspapers, Inc.,* W. Va., 173 W.Va. 699, 320 S.E.2d 70, 90 (1983). After all, we all suffer some inconvenience as the price of living. But, *de minimus non curat lex.*

**\*5** As indicated above, the Court determines whether a communication is capable of bearing a particular meaning, and whether that meaning is defamatory. *Re, supra,* slip op. at ¶ 10. Therefore, noting that the courts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                         Page 5
Not Reported in A.2d, 1995 WL 945544 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

of this state do not look with favor on suits for slander, under the rules of law stated above, the Court concludes that the statements attributed by plaintiff to defendants are not defamatory per se. Accordingly, paragraphs 17 and 18 of the complaint are DISMISSED. IT IS SO ORDERED.

Paragraph 19 of plaintiff's complaint alleges that:
It is assumed that Defendants published that Read had committed a crime to others before they went to [C]ourt 11 to press charges against Plaintiff by Defendant Carpenter's publishing this to others in the crowd of committing two crimes and thus injuring Plaintiff's reputation and his peace of mind, opprobrium, with severe mental pain and suffering caused by Defendants' negligence.

As noted above, publication is an element of a defamation claim which plaintiff must plead. *Los, supra.* Because plaintiff has stated that publication "is assumed," he has not adequately alleged publication. Therefore, paragraph 19 of plaintiff's complaint is also DISMISSED. IT IS SO ORDERED.

Lastly regarding Count II of the Complaint, paragraph 20 is an ad damnum clause containing a bare allegation that plaintiff suffered personal injuries proximately caused by defendants "with hate, malice and ill will." Consequently, paragraph 20 of the complaint does not provide support for plaintiff's slander per se claim and is also DISMISSED. IT IS SO ORDERED.

As noted, actions for slander are viewed with disfavor by the courts in Delaware. *Danias,* 261 A.2d at 532. Also as noted, the scope of liability for slander is not as great as that for libel and *the pleading requirements for slander are more strict. Spence,* 396 A.2d at 970. Accordingly, Count II of plaintiff's complaint regarding a claim for slander per se is DISMISSED. IT IS SO ORDERED.

*Count III-Aiding and Abetting a Tortfeasor*

Liability as an aider and abettor is premised upon underlying tortious conduct. *Patton v. Simone,* Del.Super., C.A. Nos. 90C-JA-29 and 90C-JL-219

Consolidated, Herlihy, J. (Dec. 14, 1992); *Restatement (Second) of Torts § 876 (1977).* The underlying tortious conduct alleged by plaintiff in Count III to support his claim of aider and abettor liability is malicious prosecution. [FN4] Because the Court has dismissed Count I, malicious prosecution, there is no underlying tortious conduct upon which to premise plaintiff's claim for aider and abettor liability. Accordingly, Count III must be DISMISSED. IT IS SO ORDERED.

> FN4. The other allegations in Count III do not allege aider and abettor liability. Plaintiff's contention in paragraph 25 of the complaint that Giberson "committed malicious prosecution" under the "Joint Tortfeasors Act under [10 Del. C. § 6301]" is without merit.

*Count IV-Abuse of Process*

In Count IV of his complaint, plaintiff alleges that Carpenter and Giberson wilfully and knowingly made a false complaint to a police officer in violation of 11 Del. C. § 511 based in part on false information provided by the manager of the Mobile Village Trailer Court. The plaintiff further alleges that defendants had an "ulterior purpose" in the use of legal process.

*6 The parameters of a cause of action for abuse of process were considered in *Unit, Inc. v. Kentucky Fried Chicken Corp.,* Del.Super., 304 A.2d 320 (1973), overruled on other grounds Mann v. Oppenheimer & Co.,* Del.Supr., 517 A.2d 1056, 1058 (1986). *Nix,* 466 A.2d 412. In *Nix,* the court said that the essential elements of a claim for abuse of process are:
1) an ulterior purpose; and 2) a wilful act in the use of the process not proper in the regular conduct of the proceedings. In explaining these elements, Prosser notes that some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required. Merely carrying out the process to its authorized conclusion, even though with bad intentions, does not result in liability. Some form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, must be shown.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 6
Not Reported in A.2d, 1995 WL 945544 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


*Id.* (quoting Prosser, *Law of Torts,* § 121 (4th Ed.1971). In this case, the plaintiff's allegations cannot support a claim for abuse of process. The plaintiff has failed to "allege 1) a willful and improper act in the use of process; 2) any form of coercion; and 3) a collateral advantage to defendants arising from said coercion." *See Nix,* 466 A.2d at 412. Therefore, Count IV of plaintiff's complaint is DISMISSED. IT IS SO ORDERED.


### CONCLUSION

The Court has dismissed each of the four counts contained in plaintiff's complaint. Accordingly, Defendants' Motion to Dismiss the Complaint for Failure to State a Claim is GRANTED. IT IS SO ORDERED.

Del.Super.,1995.
Read v. Carpenter
Not Reported in A.2d, 1995 WL 945544 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



H
Briefs and Other Related Documents

United States District Court,N.D. Illinois, Eastern
Division.
William K. TRZECIAK, Plaintiff,
v.
VILLAGE OF LAGRANGE, an Illinois municipal
corporation and body politic, and Loren Clark,
Defendants.
**No. 01 C 4977.**

March 13, 2003.

police sergeant, sued village under Title VII and police
chief and village under § 1983, claiming he experienced
retaliation because he provided too positive an
evaluation of subordinate who had brought claims of
sex discrimination and for testifying truthfully in
deposition in her case. Defendants moved for summary
judgment. The District Court, Hart, J., held that: (1)
sergeant did not have sufficient direct evidence of any
of his claims; (2) sergeant established prima facie
retaliation claim under Title VII against village; (3) §
1983 claim against police chief was based on his
personal participation in retaliation; (4) chief was final
policymaking official, so village could also be held
liable under § 1983; and (5) sergeant did not
sufficiently establish Title VII or § 1983 retaliation
claim based on merit and efficiency rating (MER)
scores and denial of promotion.

Motion granted in part and denied in part.

West Headnotes

**[1] Civil Rights 78 ⟜1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most Cited
Cases

**Municipal Corporations 268 ⟜185(1)**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(B) Municipal Departments and Officers
Thereof
            268k179 Police
                268k185 Suspension and Removal of
Policemen
                    268k185(1) k. Grounds for Removal or
Suspension. Most Cited Cases
Police sergeant's nondiscriminatory annual performance
review of patrol officer who was otherwise being
subject to pattern of discrimination was "protected
activity" for purposes of Title VII retaliation claim.
Civil Rights Act of 1964, § 704(a), as amended, 42
U.S.C.A. § 2000e-3(a).

**[2] Constitutional Law 92 ⟜90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.
Most Cited Cases
While internally complaining about discrimination
against oneself is not speech on matter of public
concern for purposes of First Amendment retaliation
claim, speaking out as to discrimination against others
may be. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 ⟜1249(1)**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1249 Public Employment
                78k1249(1) k. In General. Most Cited
Cases

**Municipal Corporations 268 ⟜185(1)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

268 Municipal Corporations
   268V Officers, Agents, and Employees
     268V(B) Municipal Departments and Officers Thereof
       268k179 Police
         268k185 Suspension and Removal of Policemen
           268k185(1) k. Grounds for Removal or Suspension. Most Cited Cases
Police sergeant's lowered performance review and resulting smaller raise was "adverse action" for purposes of Title VII retaliation claim; sergeant received 2% raise instead of 2.25%, representing difference of $135 annually plus additional percentage increases in following years. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[4] Civil Rights 78 ⇝1252**

78 Civil Rights
   78II Employment Practices
     78k1241 Retaliation for Exercise of Rights
       78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases

**Municipal Corporations 268 ⇝184.1**

268 Municipal Corporations
   268V Officers, Agents, and Employees
     268V(B) Municipal Departments and Officers Thereof
       268k179 Police
         268k184.1 k. Promotion of Policemen. Most Cited Cases
Police sergeant failed to establish prima facie case of retaliation under Title VII based on his lowered merit and efficiency rating (MER) scores and denial of promotion; lieutenant's MER was turned in before sergeant engaged in the protected activity and thus could not have been motivated by retaliation, and chief's MER score by itself did not affect sergeant's ranking on promotional eligibility list and thus did not have materially adverse effect on sergeant's promotion. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[5] Constitutional Law 92 ⇝90.1(7.2)**

92 Constitutional Law
   92V Personal, Civil and Political Rights
     92k90 Freedom of Speech and of the Press
       92k90.1 Particular Expressions and Limitations
         92k90.1(7) Labor Matters
           92k90.1(7.2) k. Public Employment. Most Cited Cases

**Municipal Corporations 268 ⇝184.1**

268 Municipal Corporations
   268V Officers, Agents, and Employees
     268V(B) Municipal Departments and Officers Thereof
       268k179 Police
         268k184.1 k. Promotion of Policemen. Most Cited Cases
Police sergeant did not sufficiently establish § 1983 claim based on chief's lowering of his merit and efficiency rating (MER) scores and denial of promotion, allegedly in retaliation for his protected speech on behalf of subordinate; MER was confidential and not likely to deter exercise of First Amendment rights by sergeant, who had no actual knowledge of rating chief had given him on MER until after lawsuit was filed. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ⇝1421**

78 Civil Rights
   78III Federal Remedies in General
     78k1416 Weight and Sufficiency of Evidence
       78k1421 k. Employment Practices. Most Cited Cases
(Formerly 78k242(3))
Police sergeant established causation element of retaliation claims through evidence that, immediately after sergeant gave somewhat favorable performance review of subordinate who was being subjected to pattern of discrimination, police chief pulled out that review and indicated to sergeant that he had rated subordinate too high, that chief informed lieutenant about meeting shortly thereafter, and that lieutenant then revised sergeant's own annual performance review downward, with chief's approval. 42 U.S.C.A. § 1983;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[7] **Civil Rights 78** ⇒1359

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1359 k. Employment Practices. Most Cited Cases
(Formerly 78k207(2), 78k207(1))
Police chief could be held liable under § 1983 for First Amendment retaliation, if proven, against sergeant in which he had personally participated, and village could also be held liable given that chief was official with final policymaking authority. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.


MEMORANDUM OPINION AND ORDER

HART, J.

*1 Plaintiff William Trzeciak works in the Police Department of defendant Village of LaGrange, Illinois. Also named as a defendant is Police Chief Loren Clark. Plaintiff claims he experienced retaliation because he provided too positive an evaluation of an officer who had brought claims of sex discrimination and also for testifying truthfully in a deposition taken in that case. Count I is a claim against the Village under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Count II is a constitutional claim against both defendants under 42 U.S.C. § 1983. Presently pending is defendants' motion for summary judgment.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.2002); Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 462 (7th Cir.), cert. denied, 537 U.S. 820, 123 S.Ct. 97, 154 L.Ed.2d 27 (2002); Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir.2000). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir.2001); Wollin v. Gondert, 192 F.3d 616, 621-22

(7th Cir.1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Billings v. Madison Metropolitan School District, 259 F.3d 807, 812 (7th Cir.2001). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir.1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). As the Seventh Circuit has summarized:
The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Logan v. Commercial Union Ins. Co., 96 F.3d 971, 978 (7th Cir.1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by " 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S.Ct. 2548, 91 L.Ed.2d 265. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.' " Logan, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute ." Id. (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." McGinn v. Burlington

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 4
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

*Northern R.R. Co.,* 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party....' " *Logan,* 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

**\*2** *Outlaw,* 259 F.3d at 837.

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiff's favor, the facts assumed to be true for purposes of summary judgment are as follows. The LaGrange Police Department ("LPD") consists of the Chief, three lieutenants, five sergeants, and 19 patrol officers. The LPD prepares annual performance reviews which evaluate all significant aspects of job performance, suggest areas for improvement, and identify future performance goals. As of 1999, the ratings for each category were 1 to 4, with 4 being the best rating. The overall score on the performance review determines the annual base salary increase for all non-union personnel. Typically, a sergeant generates a draft review for each patrol officer on his or her shift, which is then reviewed and possibly revised by the shift's lieutenant, and finalized by the Chief. Sergeant reviews typically are conducted by a supervising lieutenant. Lieutenants typically create their own initial drafts, which are then reviewed, revised, and finalized by the Chief.

The LPD's promotion process is distinct from the annual review process. Promotion decisions are solely within the authority of the LaGrange Board of Fire and Police Commissioners ("BFPC"), which is an independent entity consisting of three residents appointed by the Village President. Historically, the BFPC has filled each vacancy by appointing the next

candidate on the BFPC's eligibility list for that position. Every three years, the BFPC generates an eligibility list by ranking all candidates for the particular promotion. The ranking scores are based on (a) a written examination conducted by the BFPC, (b) an oral interview conducted by the BFPC, and (c) a merit and efficiency rating ("MER") determined by averaging the MER scores submitted for each candidate by each LPD supervisor ranked above that candidate. Points are also awarded based on seniority and military service.

MER's are generated separate from the annual performance reviews and are to be kept confidential, including from the person being rated. Clark states in his affidavit that, unlike performance reviews, MER's are to measure potential performance in the new position, not performance in the person's current position. However, the MER instructions contain no such direction. The general instructions are written in the present tense, referring to whether the candidate "demonstrates the particular characteristic." The "factors to consider" for each of the ten categories of characteristics are questions written in the present tense and refer to job performance that has occurred. For example, one of the factors under self sufficiency is: "Does this officer spend his/her time effectively performing his/her work assignments?" On defendants' summary judgment motion, it must be taken as true that, like a performance review, an MER is based on the employee's performance in his or her current position.

**\*3** Plaintiff began working for the LPD in 1984. In 1996, he was promoted to sergeant. In 1999, one of the lieutenant positions became vacant. The prior lieutenant eligibility list had expired and the BFPC had not yet undertaken the process of generating a new list. Clark had the authority to temporarily appoint an acting lieutenant. From May to October 1999, plaintiff was an acting lieutenant. As stated in the memorandum announcing the appointment, plaintiff was selected based on his job performance and the ability to carry out the duties of the position. [FN1] When the temporary lieutenant appointment expired, plaintiff continued as a sergeant. On September 4, 2002, it was announced that plaintiff would be appointed as a lieutenant effective September 27, 2002. [FN2]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 5
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

FN1. Clark has testified otherwise, but, on defendants' summary judgment motion, this factual dispute must be resolved in plaintiff's favor.

FN2. Plaintiff's answer to summary judgment was filed prior to the announcement of this appointment and the stated effective date was after defendants filed their reply. There is no indication that the appointment did not go through.

In Fall 1999, the LPD conducted annual performance reviews for the year ended August 31, 1999. Plaintiff had to draft performance reviews for eight subordinates, including patrol officer Marge Kielczynski who had a Title VII and § 1983 sex discrimination and retaliation case pending as against the Village and Clark. *See Kielczynski v. Village of LaGrange, Ill.,* 19 F.Supp.2d 877 (N.D.Ill.1998) (granting in part and denying in part motion to dismiss); *Kielczynski v. Village of LaGrange, Ill.,* 122 F.Supp.2d 932 (N.D.Ill.2000) ( *"Kielczynski II"* ) (denying motion for summary judgment). Plaintiff contends retaliation began immediately after he turned in his review of Kielczynski.

In accordance with instructions from Chief Clark, on Friday, October 8, 1999, plaintiff handed out his reviews to the officers that were present that day, including Kielczynski. On Monday October 11, plaintiff personally handed Clark all of the reviews plaintiff had written. At the time, discovery in Kielczynski's lawsuit was ongoing. Clark flipped through the reviews, immediately pulled out Kielczynski's, and reviewed it. Clark questioned the accuracy of plaintiff's review by stating, "Is she really this good?" FN3 Plaintiff contends that Clark thereafter retaliated by downgrading defendant's MER rating and annual performance review. Plaintiff also contends that Lieutenant Patrick O'Connor aided Clark in that retaliation by also giving a negative MER and review.

FN3. Defendants object that plaintiff's present affidavit to this effect should not be credited because it is inconsistent with plaintiff's prior deposition testimony. *See Johnson v.*

*Nordstrom, Inc.,* 260 F.3d 727, 736 (7th Cir.2001), *cert. denied,* 535 U.S. 928, 122 S.Ct. 1299, 152 L.Ed.2d 211 (2002) (quoting *Patterson v. Chicago Association for Retarded Citizens,* 150 F.3d 719, 720 (7th Cir.1998)) ("an affidavit cannot be used to create a genuine issue of material fact where the affidavit differs from prior deposition testimony to the point that it is unreliable"). At his deposition, plaintiff testified as follows: "Q: Did you ever have another discussion with him about her evaluation? Did he ever express any disagreement with it or tell you anything about how he felt about that evaluation? A: No, we never-after I gave it to him, he said he was going to hold on to it. And he said, you know, she's this good, or something like that. I said, yeah, I even had Bryan look at it. And that was the last time we discussed it, except he said he's going to hang on to it." Pl. Dep. I at 34. Contrary to defendants' contention, this testimony is consistent with the present affidavit. Plaintiff indicates Kielczynski's review was singled out. Further, "Is she really this good?" is "something like" "she's this good ." The affidavit is not so inconsistent with the deposition testimony that it cannot possibly be credited. Defendant also points to plaintiff's deposition response of "gee, no" to the question of whether he had any "evidence" that his MER ratings were related to the evaluation of Kielczynski. *Id.* at 161. A layperson cannot be expected to respond to such a question with either a full understanding of the term evidence or the evidence available in his case. That question is not a basis for finding that a later affidavit contradicts deposition testimony.

O'Connor's MER for plaintiff is dated Monday, October 4, 1999, which is prior to Clark receiving plaintiff's performance review of Kielczynski. If O'Connor did indeed create the MER on that date, it could not have been motivated by retaliation since there is no contention that, prior to October 11, Clark or O'Connor had any reason to retaliate. Plaintiff contends there is evidence from which a reasonable trier of fact could

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

conclude that O'Connor did not turn in plaintiff's MER until after plaintiff's October 11 meeting with Clark.

It is undisputed that the MER prepared by O'Connor was delivered to Cathy Benjamin, secretary for the BFPC. Plaintiff contends Benjamin was on leave the entire week of October 4, thereby giving O'Connor the opportunity to revise the MER before Benjamin returned. In his affidavit, plaintiff states he tried to turn in the MER's he had written, but was told that Benjamin was on vacation that entire week. He does not state that he was actually at Benjamin's office on October 5 to observe she was not there. Plaintiff's statement about Benjamin being absent the entire week is therefore hearsay from unspecified sources. Benjamin, however, provides an affidavit stating that she was in the office the morning of October 5. Corroborating attendance sheets are also provided. Additionally, Benjamin provides a cover memorandum from O'Connor that is dated October 5 and was taped to a sealed envelope containing all the MER's he prepared. Benjamin, though, does not state that she received the envelope while at work the morning of October 5. For purposes of defendants' motion for summary judgment, it must be assumed that Benjamin did not find the envelope until she returned on Monday October 11. But even making this assumption, that still meant Benjamin had O'Connor's MER's on October 11. There is no evidence that plaintiff's October 11 meeting with Clark was substantially earlier than Benjamin's arrival at work that day. There is no basis for finding that an adequate opportunity existed, following Clark's meeting with plaintiff, for Clark to contact O'Connor, O'Connor to modify the MER on his computer, and O'Connor to substitute a modified MER and reseal the envelope, prior to Benjamin arriving at her office that day. O'Connor's 1999 MER for plaintiff could not have been motivated by retaliation.

**\*4** Clark's MER for plaintiff is dated October 5. There is no evidence regarding when Clark actually provided this MER to the BFPC. However, there is also no contention by defendants that Clark did not have an opportunity to create or modify the MER after he met with plaintiff on October 11. [FN4] For present purposes, it must be assumed that Clark finalized plaintiff's MER after the October 11 meeting between plaintiff and

Clark.

FN4. In their opening brief, defendants raise no issue regarding the timing of Clark's MER. In their reply, defendants dispute that Clark's MER was based on conduct of plaintiff that occurred after October 5, but there is no express contention that the MER itself was not completed or modified after October 5. Since the issue is not raised by defendants, it will be assumed that Clark completed or modified the MER on October 11 or thereafter.

O'Connor also created the final draft of plaintiff's performance review, which was completed on October 12. However, it was prior to October 11 that Clark assigned O'Connor and Lieutenant John Neuzil to prepare plaintiff's performance review. [FN5] Clark discussed plaintiff's performance evaluation with O'Connor, but not Neuzil. [FN6] It was after plaintiff's October 11 meeting with Clark that O'Connor first told plaintiff that he was doing plaintiff's performance review. Also, O'Connor's initial draft of plaintiff's performance review contained references to performance reviews that plaintiff turned in to Clark on October 11. It is a reasonable inference that Clark and O'Connor discussed plaintiff's performance review after the October 11 meeting and before the performance review was finalized and signed by Clark on October 12. Although Neuzil worked and commented on an earlier draft of plaintiff's performance review, O'Connor was the one who prepared the final draft for Clark's signature.

FN5. Plaintiff contends that this is contrary to the normal procedure of having lieutenants prepare their own initial draft. Plaintiff, though, was an acting lieutenant, not a regular lieutenant. In any event, no retaliatory motive can be inferred from the action of assigning plaintiff's performance review to O'Connor and Neuzil since the decision to assign it to them occurred prior to October 11. Also, plaintiff's contention that selecting O'Connor to draft his performance review is also

Not Reported in F.Supp.2d                                                     Page 7
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

evidence of retaliation is belied by the fact that O'Connor had also drafted plaintiff's performance reviews from the immediately preceding years.

FN6. Clark testified that he did not recall Neuzil being present, but was not sure if he was there or not. On defendants' summary judgment motion, it must be assumed that Neuzil was not present.

It must be considered whether the evidence supports that plaintiff's performance review of Kielczynski was such that Clark would have been motivated to retaliate. FN7 It also must be considered whether the evidence supports that Clark's 1999 MER of plaintiff and the 1999 performance review of plaintiff were motivated by retaliation and, if so, if either had a material adverse effect on plaintiff.

FN7. Plaintiff's deposition in the *Kielczynski* case was taken in January 2000. Since plaintiff points to no evidence of retaliatory actions taken thereafter, the deposition testimony could not have motivated any retaliatory acts.

Defendants contend the performance review of Kielczynski could not have motivated any retaliation because it was not a very good review. There is no dispute that the *Kielczynski* case was being actively litigated as of October 1999. Also, evidence supports that Clark actually engaged in acts of discrimination and retaliation against Kielczynski, both before and after plaintiff's preparation of Kielczynski's 1999 performance review. FN8 Evidence supports that there was a "pattern of antagonism" toward Kielczynski. *See Kielczynski II,* 122 F.Supp.2d at 952 n. 7. Additionally, plaintiff's own affidavit is sufficient to support that plaintiff believed Kielczynski was experiencing discrimination FN9 and that he consciously chose to provide an accurate evaluation of Kielczynski rather than join in the discriminatory conduct.

FN8. As defendants concede, plaintiff relies on the same evidence that Kielczynski

presented in opposing summary judgment in her case. As is discussed in detail in *Kielczynski II,* 122 F.Supp.2d at 938-54, that evidence was sufficient to create a genuine factual dispute that Kielczynski suffered discrimination and retaliation.

FN9. Plaintiff's affidavit is admissible as evidence of his subjective beliefs. His mere opinions are not considered as evidence that the discrimination actually occurred.

Defendants contend the performance review of Kielczynski is "largely unremarkable," giving Kielczynski a "good" or "B" rating in nine of ten categories and giving her the fourth highest score of the five patrol officers plaintiff evaluated. As plaintiff points out, however, this is an overall good evaluation and is more favorable than performance reviews that Kielczynski had received the previous three years. The 1999 performance review also contained more favorable narrative comments than the prior performance reviews. As was noted in the summary judgment ruling in the *Kielczynski* case, the ratings plaintiff gave Kielczynski were "similar" to the ratings he gave other patrol officers and the evaluation "praised her productivity, cooperative attitude, and reliability." *Kielczynski II,* 122 F.Supp.2d at 942. Moreover, when Clark received the performance reviews prepared by plaintiff, Clark immediately picked out Kielczynski's and questioned whether she was "really this good." Some evidence supports that plaintiff's 1999 performance review for Kielczynski was better than Clark would have preferred and that Clark was not pleased with the review.

**\*5** Plaintiff's overall score on his 1999 performance review was 77. This resulted in a 2.00% increase in pay compared to a 2.25% increase that he would have received had he scored 79. FN10 O'Connor's initial draft of the performance review had the 77 overall score. Neuzil had then revised the draft to delete some negative comments and add a total of two points. Without further consulting Neuzil, O'Connor left in the two additional points, but reduced the "Employee Monitoring And Evaluation" category by one point. That resulted in an overall reduction of two points since

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
(Cite as: Not Reported in F.Supp.2d)

that category is counted double in determining the overall score. This last change was made after plaintiff's October 11 meeting with Clark. Clark approved and signed O'Connor's final draft.

> FN10. The difference between a 2.00% and a 2.25% increase was $135 per year. There is also a continuing effect in the following years in which further percentage increases would have been received. There is no evidence as to whether there would still be an effect once plaintiff was promoted to lieutenant in 2002.

Plaintiff disagreed with the rating for "Quantity of Work, Initiative & Industry," contending the calculation that he did not meet ticket-writing standards fails to properly take into account the days he was not assigned to the street because of authorized absences, training, or other duties. Plaintiff also disagreed with his rating for "Employee Monitoring And Evaluation." On October 13, plaintiff timely submitted a written memorandum requesting to meet with Clark to discuss the ratings for these two sections. Clark never responded. [FN11]

> FN11. Defendants provided the affidavit of Lieutenant Edward Lichner in which he states that he informed plaintiff that Clark authorized a meeting and that plaintiff declined to pursue the meeting. Lichner does not state when this occurred. In any event, on defendants' summary judgment motion, plaintiff's deposition testimony that there was no response to his request must be taken as true.

The possible ratings for "Quantity of Work, Initiative & Industry" were 1 ("little or no initiative"), 2 ("limited initiative"), 3 ("able worker"), and 4 ("progressive worker"). Plaintiff received a 2, with the comment being "This sergeant has to lead by example, during this period he wrote an average of 16 citations a month, which is lowest of the street Sergeants. He averaged only 31 self-initiated activities and completed only one criminal investigation. He had four misdemeanor and one felony arrests for the entire period. Much more effort is needed in this area."

Plaintiff questions the reference to 16 citations per month; he does not challenge the other comments. For the pertinent time period, LPD officers (including supervisors) were required to generate a certain number of traffic citations to meet standards. During each 28-day work cycle, 0-18 citations is "below standards," 19-24 citations is "average standards," and 25 or more is "above standards." The number is reduced by one for each day of authorized absence or other duty. In his October 13 memorandum, Plaintiff contends he actually averaged 19.9 per month, which would satisfy the "average standards" requirement. Plaintiff does not provide evidence to support the contention that he had a "monthly average" of 19.9 citations. [FN12] Plaintiff does point to Clark's deposition testimony and an attached exhibit that contains 9 of the 13 talley sheets for the year covered by the 1999 performance review. [FN13] Clark Dep. at 186-90 & Exh. 15. For those nine periods and taking into account authorized absences, plaintiff was "average standards" six times and was "below standards" three times. Plaintiff generated 144 citations for an average of 16 citations per period. However, taking into account his 28 authorized absences during those nine time periods, minimally reaching "average standards" would have required 143 citations (171 minus 28). Overall, plaintiff was on the low end of "average standards" since he issued 144 citations, one more than the overall minimum for those nine periods.

> FN12. As defendants point out, it is incorrect to consider a "monthly" average. The citations standard is based on a 28-day period. There are 13 28-day periods in a year, not 12 as with months. However, since plaintiff does not provide the underlying data, it is unclear how he calculated the 19.9 figure.

> FN13. A tenth talley sheet (for the period August 25 through September 21, 1999) is also provided, but it falls outside the annual review period that ended August 31, 1999.

*6 On the evidence before the court, it cannot be found that O'Connor was incorrect in calculating 16 citations per month. However, it also cannot be found, based on averaging out the periods and taking into account

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 9
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

absences, that overall plaintiff was below standards in issuing citations. It is undisputed that the comment and the 2 rating was on the performance review in O'Connor's initial draft. Neuzil did not disagree, though he did not examine the underlying citations data. Additionally, Clark's failure to meet with plaintiff to discuss this rating could have been motivated by retaliation. On the evidence before the court on defendants' summary judgment motion, it must be assumed that, had Clark met with plaintiff and not acted with a retaliatory motive, Clark would have agreed to modify the comment about averaging 16 citations per month, though he might have still included that plaintiff was "below standards" for at least three periods during the year. Nevertheless, plaintiff does not point to sufficient evidence from which it can be found that a nonretaliatory supervisor would have increased the rating in this category to 3. Even if plaintiff minimally satisfied the citations requirement, he does not challenge the other stated reasons for the 2 rating.

The other complaint about the 1999 performance review is receiving a 2 rating instead of a 3 rating for Employee Monitoring And Evaluation. A 2 rating is described as an "inconsistent evaluator" and a 3 rating is described as a "good evaluator." O'Connor's comment is: "The sergeant must be sure to note all employee deficiencies as well as an employee's good points. Part of being a good supervisor is the balanced picture an employee should get from his evaluation. The Sergeant has not been able to do this up to this point in his supervisory career. Performance evaluations are given on a timely basis." On the final draft, O'Connor unilaterally reduced this rating from 3 to 2 without informing Neuzil. Evidence supports that at least some of the stated reasons for the 2 rating are inconsistent with facts. The statement that plaintiff had had these same problems up to that point in his career is inconsistent with prior performance reviews that were also drafted by O'Connor. In both 1997 and 1998, O'Connor rated plaintiff 3 ("good evaluator"), including a comment in the 1997 performance review that plaintiff was "not afraid to engage in negative employee comments." Also, defendants' explanation that O'Connor and Clark rated plaintiff lower in 1999 because there were higher expectations for an acting lieutenant than a sergeant is inconsistent with the

comments that repeatedly refer to plaintiff as "Sergeant." On defendants' summary judgment motion, it must be assumed that plaintiff was actually entitled to a 3 rating in this category. It must also be assumed that Clark, had he acted without a retaliatory motive, would have agreed to revise this rating if he had met with plaintiff to discuss it. Such a change would have increased plaintiff's overall score to 79 and would have entitled him to the 2.25% raise instead of 2.00%. [FN14]

> [FN14.] An overall score of 79 would still have been the lowest that year for the LPD's four sergeants. The other three sergeants had overall scores of 89, 89, and 85. Also, whether the overall score is 77 or 79, it would still be close to plaintiff's overall score of 78 on his 1998 performance review.

**\*7** The Final Promotional Eligibility Register for Police Lieutenant was issued approximately October 24, 1999 and was to be effective for three years. The published list reports overall scores, it does not show the underlying ratings and calculations that determined the final score. Plaintiff was ranked fourth of four candidates, with a score of 65.10. The other candidates scored 80.20, 80.00, and 74.40. The MER ratings used in determining the overall score remained confidential. Plaintiff was unable to learn of the MER ratings until obtained in discovery after the present lawsuit was filed. *See* Complaint ¶ 13(f). In response to summary judgment, plaintiff does not point to any evidence as to any knowledge or speculation he had, as of 1999, regarding Clark's or O'Connor's scoring on his MER's.

Plaintiff presently contends that, if not for retaliation, O'Connor and Clark would have scored him higher on the MER's and he would have ranked third on the list instead of fourth, resulting in a promotion in August 2001. The rankings of the third-ranked candidate and plaintiff were calculated as follows.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 10
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

| | | |
|---|---:|---:|
| MER average | 74.67 | 53.67 |
| Written test | 71.00 | 69.00 |
| Oral Interview | 85.67 | 87.67 |
| Subtotal | 231.34 | 210.34 |
| (30% of subtotal) | 69.40 | 63.10 |
| Seniority | 5.00 | 2.00 |
| Military | 0.00 | 0.00 |
| Total | 74.40 | 65.10 |

Although not taken into account at the time, plaintiff was entitled to claim 3.5 military points. The only part of the total score that plaintiff contends was affected by retaliation was the MER average, which was based on MER's prepared by Clark (55), O'Connor (25), and Neuzil (81). Plaintiff does not contend that Neuzil acted with retaliation. As previously discussed, O'Connor completed his MER of plaintiff before October 11. Therefore, O'Connor's MER scoring could not have been affected by retaliation. Even if it is assumed that Clark would have scored plaintiff a perfect 100 absent any retaliatory motive, plaintiff's MER average would be 68.67 (206/3). Plaintiff's total score would then be calculated as follows:

| | |
|---|---:|
| MER average | 68.67 |
| Written test | 69.00 |
| Oral Interview | 87.67 |
| Subtotal | 225.34 |
| (30% of subtotal) | 67.60 |
| Seniority | 2.00 |
| Military | 3.50 |
| Total | 73.10 |

Thus, even assuming a perfect rating from Clark and the 3.5 military points, plaintiff would not have outscored the third-ranked candidate. Therefore, even assuming Clark retaliated by scoring plaintiff low on his MER, there was no possible impact on plaintiff's ranking on the 1999 promotional eligibility register.

As to whether Clark intentionally scored plaintiff lower than plaintiff deserved, the evidence is mixed. The MER form allows for a short comment at the end, but it primarily

consists of numerical rankings of 0 to 10 in ten categories. Clark scored plaintiff 55 and added the comment: "Bill has done a good job in the sergeants position. However, Bill is not ready for advancement to the position of lieutenant at this time."

**\*8** Plaintiff makes much of the fact that, on plaintiff's 1996 MER, Clark gave him a score of 76. That, however, was a rating for promotion to sergeant. Plaintiff had been a patrol officer for approximately 12 years at the time. When being considered for lieutenant, he had been a sergeant for

Not Reported in F.Supp.2d                                                                 Page 11
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

approximately three years. Plaintiff compares Neuzil, though, who rated plaintiff 56 on the 1996 MER, but 81 in 1999. On the other hand, however, O'Connor rated plaintiff 77 in 1996 and dropped him to 25 in 1999. Also, although there is no strict correlation between the annual performance review and MER, some categories are similar. Nevertheless, on the MER, Clark rated plaintiff comparatively lower in a number of the similar categories. Clark explains that, in completing the MER, he considered plaintiff's potential abilities as a lieutenant. Although consistent with his comment on the MER, that explanation is inconsistent with the instructions for the MER. Additionally, Clark's low rating on the MER is inconsistent with the stated reasons for temporarily appointing plaintiff as a lieutenant. Although a reasonable finder of fact could find either way, on defendants' motion for summary judgment, it must be assumed that Clark's MER rating was not reflective of plaintiff's actual qualifications.

In a recent decision, the Seventh Circuit established a new framework for analyzing retaliation claims on a motion for summary judgment. *See Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640 (7th Cir.), *cert. denied.,* 537 U.S. 879, 123 S.Ct. 79, 154 L.Ed.2d 134 (2002). That case states that there "should" be "two (and only two) distinct routes" for a plaintiff on a motion for summary judgment. *Id.* at 644. The first, "the more straightforward, ... is to present direct evidence (evidence that establishes without resort to inference from circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains.... The second route to summary judgment, the adaptation of *McDonnell Douglas* to the retaliation context, requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." *Id.* Unlike the direct evidence approach, the indirect method does not require any evidence of a causal link between the protected activity and adverse action. *Stone* eliminated a possible distinction between the direct and indirect methods whereby the former required proof of but-for causation, while the latter only involved a lower standard of proof of a causal link, that the protected activity and adverse action "were not wholly unrelated." *See id.* at 642-44.

Plaintiff contends he is relying on the direct evidence approach. [FN15] Plaintiff contends that he has presented sufficient evidence that (a) he engaged in protected activity, (b) he suffered adverse actions, and (c) a causal relation exists between the two. As to the last element, plaintiff primarily relies on the close temporal proximity between his conduct and the adverse action. The problem with plaintiff's purported reliance on the direct evidence approach is that he is relying on circumstantial evidence. *Stone,* 281 F.3d at 644, explicitly states that direct evidence does not include circumstantial evidence. The Seventh Circuit has described direct evidence as

> [FN15.] Plaintiff does not satisfy the indirect method *prima facie* case set forth in *Stone* because he does not present evidence of similarly situated employees who did not engage in protected activity. *See Rogers v. City of Chicago,* 320 F.3d 748, 2003 WL 483202 *6 (7th Cir. Feb.26, 2003).

**\*9** evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption. If the evidence consists of isolated statements, those statements should be causally related to the ... decision making process, for direct evidence relate [s] to the motivation of the decisionmaker responsible for the contested decision. Remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality.

*Walker v. Glickman,* 241 F.3d 884, 888 (7th Cir.2001) (quoting *Miller v. Borden, Inc.,* 168 F.3d 308, 312 (7th Cir.1999)). *Accord Clanton v. Kirk & Blum Manufacturing Co.,* 2002 WL 31761363 *8 (S.D.Ind. Dec.6, 2002). *See also Sanghvi v. St. Catherine's Hospital, Inc.,* 258 F.3d 570, 574 (7th Cir.), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 923, 151 L.Ed.2d 887 (2002); *Radue v. Kimberly Clark Corp.,* 219 F.3d 612, 616 (7th Cir.2000); *Shannon v. Sheahan,* 2003 WL 366584 *10 (N.D.Ill. Feb.18, 2003). Temporal proximity as proof of a causal relationship is generally considered to be circumstantial, not direct, evidence. *See Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.,* 277 F.3d 882, 895 (7th Cir.2001) (quoting *Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 918 (7th Cir.2000)); *Hunt-Golliday v. Metropolitan Water*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 12
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

*Reclamation District of Greater Chicago,* 104 F.3d 1004, 1014 (7th Cir.1997); *McKay v. Town & Country Cadillac, Inc.,* 2002 WL 664024 *23 (N.D.Ill. April 23, 2002); *Horwitz v. City of Chicago,* 2002 WL 1777050 *7 (N.D.Ill. Aug.1, 2002); *Medina v. City of East Chicago, Indiana,* 184 F.Supp.2d 805, 819-20 (N.D.Ind.2001). *But see Hamm v. Weyauwega Milk Products, Inc.,* 199 F.Supp.2d 878, 897 (E.D.Wis.2002); *Matheny v. Reid Hospital & Health Care Services, Inc.,* 2002 WL 655702 *9 (S.D.Ind. March 12, 2002). *Stone,* though, apparently leaves open the possibility that temporal proximity may be considered under the direct evidence approach. *See Stone,* 281 F.3d at 644 ("The question of how much evidence the plaintiff must present to establish a triable issue that the adverse employment action of which he complains was retaliatory is not susceptible of a general answer. But we remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."); *McKay,* 2002 WL 664024 at *23; *Smith v. Allstate Insurance Corp.,* 2002 WL 485374 *16 (N.D.Ill. March 29, 2002). But even if the reliance on temporal evidence as proof of causation does not take plaintiff out of the direct evidence approach, he also does not present any direct evidence of Clark's (or even O'Connor's) retaliatory motive. Plaintiff does not have sufficient direct evidence as to any of his claims.

**\*10** Although plaintiff does not make out a direct evidence case, the three elements that he claims to have shown state a standard formulation of the indirect method, *prima facie* case that predates *Stone. See, e.g., McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 796 (7th Cir.1997); *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1457 (7th Cir.1994) (quoting *Holland v. Jefferson National Life Insurance Co.,* 883 F.2d 1307, 1313 (7th Cir.1989)). Even after *Stone,* a number of Seventh Circuit cases have relied on this formulation. *See, e.g., Fine v. Ryan International Airlines,* 305 F.3d 746, 752 (7th Cir.2002); *Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 772-73 (7th Cir.2002); *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1008 (7th Cir.2002). Although, following *Stone,* a plaintiff may not be required to provide proof of a causal link in order to satisfy the *prima facie* case, *see Rogers v. City of Chicago,* 320 F.3d 748, 2003 WL 483202 *6 (7th Cir. Feb.26, 2003), a plaintiff is not necessarily precluded from attempting to make out the *prima facie* case by taking the more difficult

approach of showing a causal link. In light of *Stone,* though, the plaintiff must make a showing of but-for causation, not the lesser "not wholly unrelated" standard. *See Stone,* 281 F.3d at 642-44; *Wells,* 289 F.3d at 1008. [FN16]

> FN16. *Stone* indicates that making a showing of but-for causation satisfies a plaintiff's entire proofs, not just the *prima facie* case. *See Stone,* 281 F.3d at 643. This need not be resolved because plaintiff himself is not requesting summary judgment and defendants do not contend they have rebutted any *prima facie* case that has been shown. But-for causation is also applicable to the § 1983 claim. *See Abrams v. Walker,* 307 F.3d 650, 654 (7th Cir.2002); *Love v. City of Chicago Board of Education,* 241 F.3d 564, 569 (7th Cir.2001). *Compare Suppan v. Dadonna,* 203 F.3d 228, 236 (3d Cir.2000).

 [1] Defendants contend plaintiff has not provided adequate proof of any of the three elements. The first issue to consider is whether plaintiff has shown that he engaged in protected activity. Protected activity under Title VII includes "opposition conduct," that is "oppos[ing] any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a); *McDonnell v. Cisneros,* 84 F.3d 256, 262 (7th Cir.1996). This can include the passive conduct of declining to engage in discriminatory practices against other employees. *See id.* Evidence supports that there was a pattern of discrimination against Kielczynski and that plaintiff believed she was being discriminated against. Plaintiff declined to participate in that discrimination, instead choosing to score Kielczynski's annual performance review in a nondiscriminatory manner. Plaintiff has shown that he engaged in protected activity under Title VII.

 [2] The § 1983 retaliation claim is different. Plaintiff labels his § 1983 claim as an equal protection claim and refers to it as being "discrimination" based on the same facts as the Title VII retaliation claim. Plaintiff does not contend that he was discriminated against because of his gender, race, or nationality. To the extent his claim is one for discrimination, it would be based on being discriminated against for being a person who opposed discrimination. Such a claim is more properly analyzed as a First Amendment retaliation claim. *See Vukadinovich v. Bartels,* 853 F.2d 1387, 1391-92 (7th

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.1988). [FN17] A public employee is not engaging in protected speech unless he or she is speaking out on a matter of public concern. *Horwitz v. Board of Education of Avoca School District No. 37,* 260 F.3d 602, 618 (7th Cir.2001). In determining whether the speech at issue was on a matter of public concern, the content, form, context, and motivation of the speech must be considered. *Id.* It is well settled that internally complaining about discrimination against oneself is not speaking out on a matter of public concern. *Gray v. Lacke,* 885 F.2d 399, 411 (7th Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 419-20 (7th Cir.1988); *Mata v. Illinois State Police,* 2001 WL 292804 *5 (N.D.Ill. March 22, 2001).* On the other hand, speaking out as to discrimination against others may be speech on a matter of public concern. *See Marshall v. Allen,* 984 F.2d 787, 794-96 (7th Cir.1993); *Tindal v. Montgomery County Commission,* 32 F.3d 1535, 1539-40 (11th Cir.1994); *Kessel v. Cook County,* 2001 WL 826914 *5 (N.D.Ill. July 12, 2001).* Here, plaintiff was opposing discrimination against one other employee, not discrimination against himself. However, there is no evidence that plaintiff forthrightly expressed opposition to Clark's conduct. Plaintiff did not attempt to stop the discrimination other than to refuse to join in it. It is highly doubtful that plaintiff's completion of a nondiscriminatory evaluation constitutes speech on a matter of public concern that constitutes protected expression by a public employee. [FN18] However, since the parties have not expressly addressed this issue, it will be assumed that plaintiff's activity constituted protected speech for purposes of his constitutional claim.

FN17. Even if considered as an equal protection claim, defendants' actions would only be subject to strict scrutiny if the discrimination implicated a fundamental right such as First Amendment speech protections. *Martin v. Shawano-Gresham School District,* 295 F.3d 701, 712 (7th Cir.); *cert. denied,* 537 U.S. 1047, 123 S.Ct. 601, 154 L.Ed.2d 520 (2002); *Zehner v. Trigg,* 133 F.3d 459, 463 (7th Cir.1997). Thus, an equal protection claim based on the fundamental right of speech would still require that plaintiff show he engaged in protected speech in that he was speaking out on a matter of public concern. *See Vukadinovich,* 853 F.2d at

1392.

FN18. Plaintiff was also deposed in the *Kielczynski* case, but that occurred at a later time and there is no present contention that any retaliation occurred after the deposition was given.

**\*11** [3] The next issue to consider is whether plaintiff has made a sufficient showing of an adverse action. Although often referred to as the "adverse *employment* action" requirement, it is not a necessary element of a Title VII retaliation claim that the adverse action affect conditions of employment. *Aviles v. Cornell Forge Co. .,* 183 F.3d 598, 605-06 (7th Cir.1999); *Gawley v. Indiana University,* 276 F.3d 301, 314 (7th Cir.2001). *See also Herrnreiter v. Chicago Housing Authority,* 315 F.3d 742, 745-46 (7th Cir.2002) (*dictum* ). However, there still must be some form of materially adverse action. *Gawley,* 276 F.3d at 314. *But compare Herrnreiter,* 315 F.3d at 746 (suggesting in *dictum* that the adverse action may not need to be as severe for a Title VII retaliation claim as for a discrimination claim). The Seventh Circuit has repeatedly held that a negative evaluation or recordation in an employee's file is not, by itself, a sufficient adverse action to support a Title VII retaliation claim; there must also be a materially adverse effect. *Gawley,* 276 F.3d at 314-15; *Ribando v. United Airlines, Inc.,* 200 F.3d 507, 511 (7th Cir.1999); *Speer v. Rand McNally & Co.,* 123 F.3d 658, 664 (7th Cir.1997); *Smart v. Ball State University,* 89 F.3d 437, 442 (7th Cir.1996). *See also Silk v. City of Chicago,* 194 F.3d 788, 802-03 (7th Cir.1999) (Americans with Disabilities Act retaliation claim).

As to the 1999 performance review, there is sufficient evidence for the trier of fact to find that plaintiff was affected by receiving a 2.00% raise instead of a 2.25% raise. That represented a difference of $135.00 annually, plus additional percentage increases in the following years. The Seventh Circuit has held that a one-time reimbursement of $156.89 is too low and sporadic to satisfy the materially adverse requirement. *Fyfe v. City of Fort Wayne,* 241 F.3d 597, 602-03 (7th Cir.2001). That case, however, expressly distinguished one-time payments from raises. The raise that plaintiff lost was not discretionary; had he scored two more points on his performance review he would have automatically received the raise. Also, it would have affected his salary for future years as well, at least up until

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

he was promoted to lieutenant in 2002. In an alternative holding, and thus nonbinding *dictum,* the Seventh Circuit has held that the denial of a raise of several hundred dollars is sufficiently adverse to qualify as an adverse employment action. *See Power v. Summers,* 226 F.3d 815, 821 (7th Cir.2000). *See also Kersting v. Wal-Mart Stores, Inc.,* 250 F.3d 1109, 1115-16 (7th Cir.2001); *Boyd v. Illinois State Police,* 2001 WL 301150 *8 (N.D.Ill. March 28, 2001). Because the lowered score on plaintiff's 1999 performance review decreased his raise, it constitutes an adverse action for purposes of his Title VII retaliation claim.

[4] The Title VII retaliation claim regarding the MER scores and potential promotion to lieutenant, however, is different. As is discussed above, O'Connor's MER was turned in before plaintiff engaged in protected activity and therefore could not have been motivated by retaliation. Clark's MER score, by itself, did not affect plaintiff's ranking on the promotional eligibility list. Since Clark's MER did not have a materially adverse effect on plaintiff's promotion, it cannot support a Title VII retaliation claim. Plaintiff's Title VII claim based on the denial of a promotion will be dismissed.

*12 A different adverse action standard applies to the § 1983 retaliation claims. For the § 1983 claims, there is no requirement of an adverse employment action. *Power,* 226 F.3d at 820. A necessary element, though, is that there be some form of retaliatory conduct that is sufficiently adverse to deter the exercise of an employee's First Amendment rights. *Id.* at 820-21; *DeGuiseppe v.. Village of Bellwood,* 68 F.3d 187, 192 (7th Cir.1995). *Power* holds that it cannot be found, as a matter of law, that the denial of a raise of a few hundred dollars is unlikely to deter speech. 226 F.3d at 821. There is no basis for holding that the lowered score on the 1999 performance review was not sufficiently adverse to deter plaintiff's exercise of his First Amendment rights.

[5] The § 1983 retaliation claim based on the MER scores and denial of a promotion is different. The burden is on plaintiff to show that the action taken against him was sufficiently adverse. *See id.* at 820. Therefore, in response to a motion for summary judgment that raises an issue as to satisfying the adversity element, the burden was on plaintiff to provide evidence from which a jury could find that element. *See Celotex,* 477 U.S. at 317; *Billings,* 259 F.3d at 812. While the denial of a promotion would likely satisfy

that requirement, *see Rutan v. Republican Party of Illinois,* 497 U.S. 62, 72-75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Suppan v. Dadonna,* 203 F.3d 228, 234, 236-37 (3d Cir.2000), plaintiff was not actually denied a promotion because of the MER. However, at the time the MER was completed, it was not known that it would not actually affect plaintiff's ranking for a promotion. A supervisor's lowering of a promotion-related rating could deter the employee's exercise of speech if the rating had a potential of affecting the employee's chance to be promoted. *See Suppan,* 203 F.3d at 234-35. The problem with that theory, as applied to plaintiff's situation, is that the MER's were confidential. It is undisputed that plaintiff had no actual knowledge of the rating Clark had given him on the MER until after this lawsuit was filed. There is no contention that any retaliation was still occurring at that point. There is no basis in the record for finding that Clark's confidential scoring of plaintiff's 1999 MER was an action that was likely to deter plaintiff's exercise of his First Amendment rights. Therefore, the § 1983 retaliation claim based on the MER and denial of a promotion will be dismissed.

[6] Any claim related to the denial of a promotion has been dismissed. The remaining claims are limited to retaliation in the form of plaintiff's lowered annual performance review. It still must be considered whether there is sufficient evidence of a causal link between plaintiff's performance review of Kielczynski and the lowered scoring on his annual performance review. The evidence, viewed in the light most favorable to plaintiff, is that Clark immediately pulled out the annual performance review of Kielczynski and indicated to plaintiff that he had rated her too high. Shortly thereafter, Clark informed O'Connor about this meeting and O'Connor then revised plaintiff's annual performance review downward and Clark approved it. That downgrading occurred the same day as plaintiff's meeting with Clark or, at the latest, the next day. Also, the downgrading was done without informing Neuzil, who had worked on the prior drafts of plaintiff's performance review. Additionally, two days after October 11, plaintiff requested that Clark meet with him to discuss the performance review and Clark failed to even respond to the request. From this evidence, it can be inferred that the downgrading was motivated by Clark's displeasure with plaintiff's nondiscriminatory evaluation of Kielczynski. *See McClendon,* 108 F.3d at 796-97; *Johnson v. Sullivan,* 945 F.2d 976, 980 (7th Cir.1991).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 15
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

**\*13** [7] Plaintiff has shown that he engaged in protected activity (a nondiscriminatory annual performance review of Kielczynski), he was subjected to an adverse action (a lowered annual performance review that resulted in a smaller raise), and a causal connection between the two. The Title VII retaliation claim against the Village based on this conduct will not be dismissed. Since the claim is based on Clark's personal participation in the retaliation, the § 1983 retaliation claim against Clark also will not be dismissed. *See Boyce v. Moore,* 314 F.3d 884, 888 (7th Cir.2002); *Anderson v. Cornejo,* 225 F.Supp.2d 834, 859-60 (N.D.Ill.2002); *Kielczynski II,* 122 F.Supp.2d at 946, 953. As to the Village's § 1983 liability, it may be held liable if retaliation was performed by a person with final policymaking authority for the Village. *See Perkins v. Lawson,* 312 F.3d 872, 875 (7th Cir.2002); *Vela v. Village of Sauk Village,* 218 F.3d 661, 665-66 (7th Cir.2000). The Village does not dispute that Clark is a policymaking official of the Village. [FN19] *Cf. Kielczynski II,* 122 F.Supp.2d at 953. Therefore, the remaining § 1983 claim against the Village also will not be dismissed.

> FN19. As regards the denial of a promotion, the Village argues the BFPC is the policymaking body and that Clark is not a member of that body. As regards the annual performance review that underlies the remaining § 1983 claim, there is no argument that Clark is not a policymaking official with authority over the performance review. In defendants' statement of facts, defendants state that the LPD "is administered by a military, chain-of-command structure led by Chief Clark" and that annual performance reviews are "finalized by the Police Chief." Def. Rule 56.1 Stmt. ¶¶ 2, 5.

The only remaining claims are for retaliation that allegedly resulted in approximately $135 of damages per year from 1999 until 2002. Within two weeks the parties shall meet (in person or by telephone) to discuss the possibility of settlement. At the next status hearing, the parties shall report on the possibility of settlement or alternative means of resolving the remaining claims in this case.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [23-1] is granted in part and denied in part. All claims are dismissed except the Title VII and §

1983 retaliation claims based on the alleged lowering of plaintiff's 1999 annual performance review. Status hearing is set for April 2, 2003 at 11:00 a.m.

N.D.Ill.,2003.
Trzeciak v. Village of LaGrange
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160

Briefs and Other Related Documents (Back to top)

• 2002 WL 32451345 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum of Law in Support of Their Summary Judgment Motion (Sep. 23, 2002)

• 2002 WL 32603733 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum of Law in Support of Their Summary Judgment Motion (Sep. 23, 2002)

• 2002 WL 32603734 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiff's Rule 56.1(B)(3)(B) Fact Statement (Sep. 23, 2002)

• 2002 WL 32451336 (Trial Motion, Memorandum and Affidavit) Defendants' Unopposed Motion for 14-day Extension to File Reply Materials in Support of Their Summary Judgment Motion (Sep. 06, 2002)

• 2002 WL 32451327 (Trial Motion, Memorandum and Affidavit) Defendants' Unopposed Motion for 14-day Extension of Time to File Reply in Support of Their Summary Judgment Motion (Aug. 23, 2002)

• 2002 WL 32451309 (Trial Motion, Memorandum and Affidavit) Agreed Motion for Leave to File Brief In Excess of Fifteen Pages Instanter (Aug. 09, 2002)

• 2002 WL 32451319 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Aug. 09, 2002)

• 2002 WL 32603726 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Local Rule 56.1 Statement (Aug. 09, 2002)

• 2002 WL 32603729 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Aug.09, 2002)

• 2002 WL 32451302 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Summary Judgment (Jun. 24, 2002)

• 2002 WL 32603723 (Trial Motion, Memorandum and Affidavit) Response to Defendants' Second Request for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 16
Not Reported in F.Supp.2d, 2003 WL 1193319 (N.D.Ill.), 92 Fair Empl.Prac.Cas. (BNA) 160
**(Cite as: Not Reported in F.Supp.2d)**

Admission of Fact to Plaintiff (Mar. 11, 2002)
• 2002 WL 32451294 (Trial Motion, Memorandum and Affidavit) Motion to Extend Discovery Cut-Off (Feb. 25, 2002)
• 2002 WL 32451284 (Trial Motion, Memorandum and Affidavit) Motion to Compel Production of Documents (Feb. 11, 2002)
• 2002 WL 32451274 (Trial Motion, Memorandum and Affidavit) Agreed Motion for Leave to Depose Police Witnesses (Jan. 24, 2002)
• 2002 WL 32603719 (Trial Motion, Memorandum and Affidavit) Response to Defendants' Request for Admission of Fact to Plaintiff (Jan. 24, 2002)
• 2002 WL 32451265 (Trial Motion, Memorandum and Affidavit) Motion to Compel (Jan. 02, 2002)
• 2001 WL 34483842 (Trial Pleading) Defendants' Answer to Complaint (Oct. 05, 2001)
• 2001 WL 34618386 (Trial Pleading) Defendants' Answer to Complaint (Oct. 05, 2001)
• 2001 WL 34483837 (Trial Pleading) Complaint (Jun. 28, 2001)
• 2001 WL 34618385 (Trial Pleading) Complaint (Jun. 28, 2001)
• 1:01CV04977 (Docket) (Jun. 28, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1992 WL 148002 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**C**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware, New Castle County.
Thomas R. WYSHOCK, Plaintiff,
v.
Abdollah MALEKZADEH and Deborah A.
Malekzadeh, Defendants.
**Civ. A. No. 91C-09-22.**

Submitted:  Feb. 20, 1992.
Decided:  June 10, 1992.

On Defendants' Motion to Dismiss-Granted in part,
Denied in part.

Robert Jacobs, Jacobs & Crumplar, for plaintiff.
Richard G. Elliott, Jr., and David L. Finger, Richards,
Layton & Finger, for defendants.

ORDER

TAYLOR, Judge.
**\*1** Thomas Wyshock [plaintiff] has filed a complaint
against Abdollah and Deborah Malekzadeh
[defendants] alleging the torts of defamation, false light
invasion of privacy, and interference with professional
and business relations.  According to the complaint,
defendants are limited partners in Meadowood II
Enterprises, L.P. [Meadowood project];  plaintiff is the
general partner in the project (complaint at ¶¶ 7, 12).
Defendants have moved to dismiss the complaint under
Superior Court Civil Rule 12(b)(6), contending that
plaintiff's failure to plead special damages is fatal to the
first two claims and that plaintiff's failure to plead facts
demonstrating the elements of interference with
prospective business relations and/or existing
contractual relations is fatal to the third.

On a motion to dismiss, the Court reviews the
complaint and accepts all well-pleaded allegations as

true.  *Spence v. Funk,* Del.Supr., 396 A.2d 967, 968
(1978).   The motion must be denied if the "plaintiff
may recover under any reasonable conceivable set of
circumstances susceptible of proof under the
complaint." *Id.*  In general, a complaint need only set
forth a short and plain statement of the claim.  Superior
Court Civil Rule 8(a).   Only claims involving fraud,
negligence or mistake must set forth circumstances with
particularity.  Superior Court Civil Rule 9(b).

I.

The complaint alleges that defendant indicated in a
conversation with Roger Turk, a contractor hired by
plaintiff for the Meadowood project, that "money from
[the project] was being spent on other projects done by"
plaintiff and that money was missing from the
Meadowood project accounts, which the contractor
understood to mean that plaintiff was stealing money
from the partnership, and that defendant's attorney,
acting at the direction of defendant, called plaintiff's
other business partners to state that plaintiff had
improperly appropriated $250,000.  The complaint also
alleges that defendants have communicated statements
of a similar nature to David M. Miller, CPA,
"representatives of major lending institutions in
Delaware," and suppliers and tenants of the
Meadowood project, as well as "numerous other
individuals."  The complaint states further that plaintiff
is engaged in the business and profession of real estate
developer and investor, the pursuit of which depends in
large part upon his good name and reputation.

Defendants have moved for dismissal of Count I for the
plaintiff's failure to plead special damages in his claim
for slander.   Plaintiff counters that special damages
need not be pled in an action for slander *per se,*
contending that the statements made by defendant and
his agent maligned the plaintiff in his business or
imputed to him the commission of a crime of theft.

The categories of slander *per se,* which do not require
proof of special damages, "are statements which:  (1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 148002 (Del.Super.)
(Cite as: Not Reported in A.2d)

malign one in a trade, business or profession, (2) impute a crime, (3) imply that one has a loathsome disease, or (4) impute unchastity to a woman" *Spence v. Funk, supra* at 970. Applying the standards described above for evaluating a complaint on a motion to dismiss, I find that Count I sufficiently alleges matters within categories (1) and (2) of slander *per se.* Therefore, plaintiff is not required to plead special damages for Count I of the Complaint.

**\*2** Defendants raise two other matters in connection with Count I. First, they contend that plaintiff's claim of libel for allegations made in a Chancery Court action of theft or mishandling of $250,000 by plaintiff cannot be actionable here, because statements in a complaint are absolutely privileged. Second, they contend that the statements allegedly made by defendant's attorney do not state a claim because, according to an affidavit filed in another action, this attorney was working for a third party, and furthermore that the statements were made in connection with litigation and therefore are privileged.

Statements are absolutely privileged if made in connection with judicial proceedings and the alleged defamation is relevant to some issue in that case. *Nix v. Sawyer,* Del.Super., 466 A.2d 407 (1983). Therefore, the allegations of statements made in another court proceeding are not a basis for a libel or slander claim.

The statements allegedly made by defendant's attorney may or may not be related to a judicial proceeding. In furtherance of this position, defendants have filed with their motion to dismiss a copy of a non-party affidavit originally filed in a Chancery action and ask the Court to take judicial notice of it. The affidavit sheds no light on this action at this time, since it says only that Williams apparently has another client connected with the business disagreement and it repeats verbatim the alleged slander. At best, defendants have raised a another question of absolute privilege.

## II.

With respect to Count II labelled "False Light Invasion of Privacy", which alleges the tort of "false light"

invasion of privacy, defendants contend that plaintiff's failure to plead special damages is fatal to this claim. Plaintiff relies on the Restatement (Second) of Torts § 652E for the proposition that special damages are not necessary in this type of claim when the statements constituting the portrayal of plaintiff in a false light are slander *per se.*

The tort of false light invasion of privacy, recognized by the Delaware Supreme Court in *Barbieri v. News Journal Company,* Del.Supr., 189 A.2d 773 (1963), is defined in the Restatement (Second) of Torts § 652E (1977) as the tort of giving publicity to something that places the plaintiff in a false light before the public, the false light being highly offensive to a reasonable person, and knowing of or acting "in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." [FN1] Comment e to § 652E states that the restrictions for defamation are also applicable to this tort, using the example that "special damages [must] be pleaded and proved by the plaintiff in any case in which the defamatory words *are not actionable per se"* [emphasis added]. *See Martin Luther King v. American Heritage Products,* Ga.Supr., 296 S.E.2d 697 (1982).

Here, where plaintiff has alleged the elements of the tort of false light invasion of privacy based upon statements that are slanderous (and therefore defamatory) *per se,* plaintiff is not required to plead special damages.

## III.

**\*3** With respect to Count III, which alleges tortious business interference with prospective and existing professional and business relations, defendants contend that plaintiff "must plead facts demonstrating" the elements of both claims. Plaintiff relies on the same position as he does in the foregoing contentions, namely that special damages need not be pled in a case that involves slander *per se.* The complaint alleges that statements intentionally made by defendants to the entities and individuals named in Count I caused those business entities and individuals 1) not to enter into business and/or contractual relations with the plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 148002 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 3

and 2) not to continue in actual contractual and/or
business relations with the plaintiff.

The elements of the tort of business interference with
prospective business relations are defined as
(a) the reasonable probability of a business opportunity,
(b) the intentional interference by defendant with that
opportunity, (c) proximate causation, and (d) damages,
all of which must be considered in light of a defendant's
privilege to complete or protect his business interests in
a fair and lawful manner, [citations omitted]

*DeBonaventura v. Nationwide Mut. Ins. Co.,* Del.Ch.,
419 A.2d 942, 947 (1980), *aff'd* Del.Supr., 428 A.2d
1151, 1153 (1981).    The elements of the tort of
business interference with a contract are(1) a contract,
(2) about which defendant knew and (3) an intentional
act that is a significant factor in causing the breach of
such contract (4) without justification (5) which causes
injury.  [citations omitted]

*Irwin & Leighton v. W.M. Anderson Co.,* Del.Ch., 532
A.2d 983, 992 (1987).

With respect to the allegation of interference with a
contract, the complaint fails to identify the parties to the
contract or the contract which was breached because of
defendant's alleged statements.    With respect to the
allegation of interference with prospective business
relations, the complaint fails to identify the parties and
the subject matter of the business opportunity as to
which there was a reasonable probability of fruition
which ended because of defendant's alleged statements.
 Since each of these allegations requires a showing of
particular business dealing, special damages would be
required to be alleged.

IV.

Based upon the foregoing considerations, defendants'
motion to dismiss is GRANTED with respect to Count
III, plaintiff's claim for interference with prospective
and actual business relations, and is DENIED with
respect to Counts I and II.

IT IS SO ORDERED.

FN1. Publicity "means that the matter is made
public, by communicating it to the public at
large, or to so many persons that the matter
must be regarded as substantially certain to
become  one  of  public  knowledge."
Restatement  (Second)  of  Torts  §  652D,
comment a (1977).

Del.Super.,1992.
Wyshock v. Malekzadeh
Not Reported in A.2d, 1992 WL 148002 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.