

2006 WL 212372 Page 1
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

**Briefs and Other Related Documents**

United States Court of Appeals,
Eighth Circuit.
Cathryn E. HINSHAW, Appellee,
v.
Roger SMITH, Individually and as State Representative; The Arkansas Local Police and Fire Retirement System; Joanne Bush; Mike Gaskill; William Milburn; Charles Lawrence; Donna Marie Adkins; Van B. Alexander; Troy Waters, Individually and as Trustees; Ted Mullinex, Appellants.
**No. 05-1205, 05-1217, 05-1218.**

Submitted: Oct. 10, 2005.
Filed: Jan. 30, 2006.

**Background:** Former state employee brought civil rights action against state representative, lobbyist, state employer, and other state officials, alleging that she was disciplined and constructively discharged for engaging in protected speech, and asserting state law claims. The United States District Court for the Eastern District of Arkansas, William R. Wilson, J., denied defendants' motion for summary judgment on bases of qualified and absolute immunity. Defendants appealed.

**Holdings:** The Court of Appeals, Hansen, Circuit Judge, held that:
(1) Court of Appeals had jurisdiction to review denials of defendants' claims for qualified immunity;
(2) Court of Appeals had pendent jurisdiction over former state employee's state law claims for wrongful termination;
(3) Court of Appeals lacked jurisdiction to review denial of lobbyist's claim of *Noerr-Pennington* immunity;
(4) discipline and discharge resulting from the communication of employee's views to governor's office did not constitute First Amendment retaliation;
(5) state representative was entitled to absolute legislative immunity for some of his conduct; and
(6) representative's alleged conduct in verbally pressuring state employer to hire him was entitled to First Amendment protection as free speech.
Appeal dismissed in part; reversed and remanded in part.

**[1] Federal Courts** 574

170Bk574 Most Cited Cases
While the denial of a motion for summary judgment is generally unreviewable as an impermissible interlocutory appeal, the Court of Appeals has limited authority under the collateral order doctrine to review the denial of a motion for summary judgment to the extent the motion is based on the right to absolute or qualified immunity, which protects a defendant from having to defend a lawsuit.

**[2] Federal Courts** 763.1

170Bk763.1 Most Cited Cases
In reviewing the denial of a claim for qualified immunity, the Court of Appeals reviews whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.

**[3] Federal Courts** 579

170Bk579 Most Cited Cases
The Court of Appeals lacked jurisdiction to review denials of qualified immunity claims to the extent they involved questions of evidence sufficiency.

**[4] Federal Courts** 579

170Bk579 Most Cited Cases
The Court of Appeals had jurisdiction to review denials of state officials' claims for qualified immunity from liability, in former state employee's § 1983 claim, alleging that she was disciplined and constructively discharged for engaging in protected speech. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[5] Federal Courts** 768.1

170Bk768.1 Most Cited Cases
The Court of Appeals has pendent jurisdiction when the appellate resolution of a collateral appeal necessarily resolves the pendent claim as well.

**[6] Federal Courts** 770

170Bk770 Most Cited Cases
The Court of Appeals had pendent jurisdiction over former state employee's state law claims for wrongful termination, to the extent that disposition of those claims rested on legal issue of whether employee's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS   Document 87-2   Filed 02/17/2006   Page 2 of 15

2006 WL 212372                                                                                                      Page 2
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

speech was protected under the First Amendment, which arose on interlocutory appeal from denial of defendants' qualified claims. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law** 90.1(1)
92k90.1(1) Most Cited Cases

**[7] Constitutional Law** 91
92k91 Most Cited Cases
The denial of *Noerr-Pennington* immunity, protecting private right to petition and right to free speech, is not immediately appealable under the collateral order doctrine, as the immunity does not provide an immunity from suit, but rather only a defense against liability. U.S.C.A. Const.Amend. 1.

**[7] Federal Courts** 574
170Bk574 Most Cited Cases
The denial of *Noerr-Pennington* immunity, protecting private right to petition and right to free speech, is not immediately appealable under the collateral order doctrine, as the immunity does not provide an immunity from suit, but rather only a defense against liability. U.S.C.A. Const.Amend. 1.

**[8] Federal Courts** 579
170Bk579 Most Cited Cases

**[8] Federal Courts** 770
170Bk770 Most Cited Cases
The Court of Appeals lacked jurisdiction to review denial of lobbyist's claim of *Noerr-Pennington* immunity, protecting private right of free speech, in former state employee's civil rights action alleging that she was disciplined and constructively discharged for engaging in protected speech in violation of the First Amendment; denial of *Noerr-Pennington* immunity was not immediately appealable under collateral order doctrine, and the immunity claim was not inextricably intertwined with reviewable denials of qualified immunity claims asserted by other defendants. U.S.C.A. Const.Amend. 1.

**[9] Federal Courts** 776
170Bk776 Most Cited Cases
The Court of Appeals reviews de novo the denial of a motion for summary judgment based on qualified immunity.

**[10] Civil Rights** 1376(2)
78k1376(2) Most Cited Cases
"Qualified immunity" protects public officials from personal liability under § 1983 when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

**[11] Civil Rights** 1376(1)
78k1376(1) Most Cited Cases
In analyzing a qualified immunity claim, the court first addresses whether the facts alleged show that the state actor's conduct violated a constitutional right.

**[12] Civil Rights** 1376(1)
78k1376(1) Most Cited Cases
If the government official's conduct does not violate a constitutional right, he is entitled to qualified immunity in civil rights suit.

**[13] Civil Rights** 1376(2)
78k1376(2) Most Cited Cases
In analyzing a claim of qualified immunity, if a constitutional right may have been violated by the government official's conduct, the court proceeds to the second step and determines whether the right was clearly established.

**[14] Civil Rights** 1430
78k1430 Most Cited Cases
The inquiry into the protected status of speech, for purpose of public employee's First Amendment retaliation claim, is one of law, not fact. U.S.C.A. Const.Amend. 1.

**[15] Civil Rights** 1430
78k1430 Most Cited Cases
For purpose of public employee's First Amendment retaliation claim, the balancing of the interests of a public employee, as a citizen, in commenting on matters of public concern, and the interests of the public employer, in promoting the efficiency of the public service it performs through its employees, is a legal chore for the court, although fact disputes concerning any of the factors are appropriately submitted to a jury. U.S.C.A. Const.Amend. 1.

**[15] Constitutional Law** 45
92k45 Most Cited Cases
For purpose of public employee's First Amendment retaliation claim, the balancing of the interests of a public employee, as a citizen, in commenting on matters of public concern, and the interests of the public employer, in promoting the efficiency of the public service it performs through its employees, is a legal chore for the court, although fact disputes concerning any of the factors are appropriately

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS    Document 87-2    Filed 02/17/2006    Page 3 of 15

2006 WL 212372                                                                                                            Page 3
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

submitted to a jury. U.S.C.A. Const.Amend. 1.

**[16] Constitutional Law** 90.1(7.2)
92k90.1(7.2) Most Cited Cases
In applying the *Pickering* test, in a public employee's First Amendment retaliation claim, the court weighs the employee's right to engage in the particular speech at issue with such considerations as whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. U.S.C.A. Const.Amend. 1.

**[17] Constitutional Law** 90.1(7.2)
92k90.1(7.2) Most Cited Cases
The public employee's status as a policymaking or confidential employee weighs heavily on the public employer's side of the *Pickering* balancing test, in analyzing employee's First Amendment retaliation claim, when the speech concerns the employee's political or substantive policy views related to her public office. U.S.C.A. Const.Amend. 1.

**[18] Constitutional Law** 90.1(7.2)
92k90.1(7.2) Most Cited Cases
State employees' retirement benefits board's interests in restricting speech made by executive director of board about her beliefs that new legislation concerning board was bad policy outweighed any free speech interest that director had in communicating her personal views of the legislation to governor's office, and thus, discipline and eventual discharge that executive director faced resulting from the communication of her views to governor's office did not constitute First Amendment retaliation; even assuming that speech was on matter of public concern, director was policymaking employee, speech related to her substantive policy views and her position as executive director, communication was made despite prior directives that executive director refrain from commenting on the legislation without the prior knowledge and concurrence of the board chairman, and her position required loyalty to the board. U.S.C.A. Const.Amend. 1.

**[18] States** 53
360k53 Most Cited Cases
State employees' retirement benefits board's interests in restricting speech made by executive director of board about her beliefs that new legislation concerning board was bad policy outweighed any free speech interest that director had in communicating her personal views of the legislation to governor's office, and thus, discipline and eventual discharge that executive director faced resulting from the communication of her views to governor's office did not constitute First Amendment retaliation; even assuming that speech was on matter of public concern, director was policymaking employee, speech related to her substantive policy views and her position as executive director, communication was made despite prior directives that executive director refrain from commenting on the legislation without the prior knowledge and concurrence of the board chairman, and her position required loyalty to the board. U.S.C.A. Const.Amend. 1.

**[19] Constitutional Law** 82(11)
92k82(11) Most Cited Cases
Employee acts of insubordination can tip the balancing process, in a public employee's First Amendment retaliation claim, in favor of the public employer. U.S.C.A. Const.Amend. 1.

**[20] States** 28(2)
360k28(2) Most Cited Cases
Absolute legislative immunity protects state legislators from suit for actions taken in furtherance of legitimate legislative activity.

**[21] Civil Rights** 1376(10)
78k1376(10) Most Cited Cases
State representative was entitled to absolute legislative immunity for his conduct, in reporting state agency employee's meeting with governor's office to state agency employer, reporting employee's alleged nonresponsiveness to state legislators, and allegedly pushing through a bill without following state
procedure, in employee's § 1983 action, arising from her discharge resulting from communication of her public policy views to governor; pushing through legislation was legislative duty, and representative's discussions with state agency about agency employee were also part of his responsibilities on legislative committee. 42 U.S.C.A. § 1983.

**[22] Constitutional Law** 90(1)
92k90(1) Most Cited Cases
The critical line for First Amendment free speech protection must be drawn between advocacy, which is entitled to full protection, and action, which is not. U.S.C.A. Const.Amend. 1.

**[23] Constitutional Law** 90.1(1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS   Document 87-2   Filed 02/17/2006   Page 4 of 15

2006 WL 212372                                                                                                                    Page 4
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

92k90.1(1) Most Cited Cases

There is no First Amendment right to prevent state legislators from expressing their own views, as long as they do so without engaging in any threat or coercion. U.S.C.A. Const.Amend. 1.

**[24] Constitutional Law** 90.1(1)
92k90.1(1) Most Cited Cases

State representative's alleged conduct in verbally pressuring state agency employer to hire him for policymaking position was entitled to First Amendment protection as free speech, where representative did not engage in threats or coercion. U.S.C.A. Const.Amend. 1.

**[24] States** 28(2)
360k28(2) Most Cited Cases

State representative's alleged conduct in verbally pressuring state agency employer to hire him for policymaking position was entitled to First Amendment protection as free speech, where representative did not engage in threats or coercion. U.S.C.A. Const.Amend. 1.

Appeals from the United States District Court for the Eastern District of Arkansas.

Counsel who presented argument on behalf of the appellee Catherine Hinshaw was Richard C. Madison of North Little Rock, AR. Morgan E. "Chip" Welch filed Hinshaw's brief.

Before RILEY, HANSEN, and COLLOTON, Circuit Judges.

[PUBLISHED]

HANSEN, Circuit Judge.

**\*1** The appellants bring these interlocutory appeals from the district court's denial of their claims of qualified and absolute immunity in the civil rights lawsuit filed by Cathryn Hinshaw following her resignation from employment with The Arkansas Local Police and Fire Retirement System in 2003. We dismiss Ted Mullinex's appeal for lack of appellate jurisdiction. We reverse the district court's denial of summary judgment to the remaining appellants and remand to the district court to enter judgment in favor of the defendants on the claims that are properly before us in these interlocutory proceedings.

I.

The Arkansas Local Police and Fire Retirement System (LOPFI) was created to establish a benefit program and retirement system for police officers and firefighters in Arkansas. Cathryn Hinshaw had been the executive director of LOPFI since its inception in the early 1980s. As executive director, Hinshaw represented LOPFI during the sessions of the Arkansas General Assembly and interacted with legislators. The general administration of LOPFI, a state administrative agency, was vested in its five-member Board of Trustees (Board), to whom Hinshaw reported. Hinshaw made recommendations to the Board, and she appointed the clerical and professional employees of LOPFI, but she was precluded from being involved with the appointment of Board members. The Governor of Arkansas appoints the Board members based on recommendations made by the House and Senate Joint Committee on Public Retirement and Social Security Programs (Joint Committee). *See* Ark.Code § 24-10-201(a). Defendants Joanne Bush, Mike Gaskill, William Milburn, Charles Lawrence, and Troy Waters (collectively "the individual Board members") were the five Board members at the time of the events relevant to this case. [FN1]

Roger Smith was an Arkansas state representative and cochaired the Joint Committee. In February 2003, the Joint Committee introduced a bill that would increase the number of Trustees on the Board by two, from five to seven. Hinshaw thought that the bill was bad policy because it would create an imbalance on the Board between members from public employee interest groups and public employer interest groups and taxpayer constituents. Nevertheless, the bill passed.

Hinshaw alleged in her civil rights complaint that Representative Smith wanted her job when his legislative term expired and that he conspired with defendant Mullinex, a lobbyist, and members of the Board in early 2003 to have Mr. Smith replace Ms. Hinshaw as executive director. Hinshaw alleged that Smith made false accusations to the Board members about Hinshaw's alleged poor performance in an effort to get her fired, and that these actions violated an Arkansas law that prevents a legislator from using his position to secure special privileges for himself.

Ted Mullinex was a lobbyist who represented the interests of the public employees covered by LOPFI. Hinshaw alleged in her complaint that Mullinex approached Board members in July 2003 seeking a commitment by them to replace Hinshaw with Smith. According to Hinshaw, Smith directed Mullinex to talk to the Board members on his behalf, and she

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS   Document 87-2   Filed 02/17/2006   Page 5 of 15

2006 WL 212372                                                                                                    Page 5
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

asserted that these communications were in violation of Arkansas law because Mullinex did not disclose in required state lobbyist filings that he was a lobbyist on Smith's behalf.

**\*2** Hinshaw, an at-will employee, was placed on probation and suspended twice in 2003. In February of 2003, Hinshaw provided erroneous information to a magazine, which published it. When confronted by the Board at its March meeting, Hinshaw denied providing the information. She was placed on a six-month probation in June 2003 based on the Board's investigation of the comments to the magazine, a lack of oversight during the most recent legislative session, failure to respond to legislative phone calls, and other enumerated concerns about her performance. On August 11, 2003, LOPFI suspended Hinshaw without pay for twelve days based on its determination that she had in fact lied at the March meeting about providing the erroneous information to the magazine.

While on the twelve-day suspension, Hinshaw scheduled a meeting with the Governor's office to discuss the two new Board positions created by the legislation introduced by Representative Smith's Joint Committee. She met with members of the Governor's staff on August 14, but did not indicate to the Governor's staff members that she was suspended at the time. Ms. Hinshaw urged the Governor to postpone naming the new Board members even though the legislation had already passed. After this meeting, the Governor's staff told Representative Smith that according to Hinshaw the LOPFI Board opposed naming the two new Board members. Mr. Smith asked the Board members about their position on the appointments and informed them of Hinshaw's August 14 conversation with the Governor's office. Ms. Hinshaw says she does not recall whether she indicated to the Governor's staff that she was speaking on behalf of LOPFI, but does not dispute the Governor's staff member's statement that she represented herself at the meeting as appearing on behalf of LOPFI and as expressing the Board's views.

On September 4, 2003, Hinshaw received a 30-day suspension without pay. She was reminded that she was prohibited from attempting to influence gubernatorial appointments or supporting or opposing legislation unless directed to do so by the Board. On December 4, 2003, during an executive session of the Board, the LOPFI Board gave Hinshaw the options of either resigning or being terminated. Hinshaw resigned and brought this civil rights lawsuit. Hinshaw brought claims under 42 U.S.C. § § 1983 and 1985 against LOPFI, the individual Board members, Representative Smith, and lobbyist Mullinex, alleging that she was disciplined and constructively discharged for engaging in protected speech in violation of the First Amendment, the Fifth Amendment, and the Fourteenth Amendment. She also brought several state law claims.

The district court granted summary judgment to the defendants on the § 1985 conspiracy claim, the § 1983 claims premised on the Fifth and Fourteenth Amendment due process violations, and a state law defamation claim. The district court determined that disputes of material fact existed concerning the § 1983 First Amendment claim, as well as the state law wrongful discharge, civil conspiracy, and tortious interference with contract claims, and it denied summary judgment on those claims. The district court also determined that the fact issues surrounding the First Amendment claim prevented it from granting qualified immunity to the individual Board member defendants because the First Amendment and qualified immunity analysis was identical under the *Pickering-Connick* [FN2] test. The district court also declined to grant either absolute or qualified immunity to Representative Smith, finding that issues of fact existed concerning whether Mr. Smith was acting in his legislative capacity when he communicated with the Board. Finally, the district court found that fact issues defeated Mullinex's immunity defense under *Noerr-Pennington.* [FN3] The defendants bring these interlocutory appeals seeking review of the denial of their claimed immunities.

II.

A. Appellate Jurisdiction

**\*3** [1][2][3][4] While the denial of a motion for summary judgment is generally unreviewable as an impermissible interlocutory appeal, we have limited authority under the collateral order doctrine to review the denial of a motion for summary judgment to the extent the motion is based on the right to absolute or qualified immunity, which protects a defendant from having to defend a lawsuit. *See Johnson v. Jones,* 515 U.S. 304, 311, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Crow v. Montgomery,* 403 F.3d 598, 601 (8th Cir.2005) (qualified immunity); *Maitland v. Univ. of Minn.,* 260 F.3d 959, 962 (8th Cir.2001) (legislative immunity). We review " 'whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." ' *Johnson,* 515 U.S. at 312 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS   Document 87-2   Filed 02/17/2006   Page 6 of 15

2006 WL 212372                                                                                                    Page 6
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

L.Ed.2d 411 (1985)). We therefore have jurisdiction over the individual Board members' appeals, as well as Smith's appeal to the extent those appeals challenge the district court's denial of qualified or absolute immunity on legal grounds, but not to the extent they involve questions of evidence sufficiency. See Johnson, 515 U.S. at 313.

[5][6] We also have pendent jurisdiction over claims that are "inextricably intertwined" with the qualified immunity issue, "that is, [we have jurisdiction] when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well ." Kincade v. City of Blue Springs, Mo., 64 F.3d 389, 394 (8th Cir.1995) (internal marks omitted), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996). This pendent jurisdiction extends to the claims that Hinshaw's speech was not constitutionally protected for First Amendment purposes, as the issues "require application of the same constitutional test, and therefore, the question concerning whether the speech is entitled to constitutional protection is 'coterminous with, or subsumed in' the qualified immunity issue." Id. at 395. We therefore have jurisdiction over the § 1983 claim against LOPFI as an entity (which is not eligible for qualified immunity) and the state law wrongful termination claims to the extent disposition of those claims rests on the legal conclusion of whether Hinshaw's speech was entitled to protection. However, claims not premised on this constitutional issue-such as disputes involving causation or state law claims unrelated to Hinshaw's First Amendment rights-are not properly before the court, and we do not address them. *Id.*

[7][8] Mr. Mullinex did not seek summary judgment on the basis of qualified or absolute immunity, as he is not a state actor. See Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1103 (8th Cir.2004). Rather, his motion for summary judgment was based on application of the *Noerr-Pennington* doctrine, which is a defense to liability premised on the defendant's actions of exercising his own private rights to free speech and to petition the government. See Acoustic Sys., Inc. v. Wenger Corp., 207 F.3d 287, 294 (5th Cir.2000). Our sister circuits have explicitly held that *Noerr-Pennington* immunity protects a defendant from liability but not from suit, and that the denial of the defense is not immediately appealable under the collateral order doctrine. See id . at 295 ("Although the *Noerr-Pennington* doctrine is frequently referred to as an 'antitrust immunity,' it provides only a defense to liability, not an immunity from suit."); We, Inc. v. City of Philadelphia, 174 F.3d 322, 326-30 (3d Cir.1999) ("Because we conclude that the *Noerr-*

*Pennington* doctrine does not confer a right not to stand trial, but rather provides only a defense against liability for certain conduct, we find that an order denying *Noerr-Pennington* immunity ... is not an appealable collateral order."). Our court has similarly characterized the *Noerr-Pennington* doctrine as providing a defense to liability, see Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1080 n. 4 (8th Cir.1999) ("[T]he First Amendment generally immunizes the act of filing a lawsuit from tort liability under the *Noerr-Pennington* doctrine."); South Dakota v. Kan. City S. Indus., Inc., 880 F.2d 40, 50 (8th Cir.1989) ("The *Noerr-Pennington* doctrine has been applied in evaluating whether this particular activity is entitled to protection from liability." (footnote omitted)), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990), but we have never characterized it as immunity from standing trial. We join our sister circuits in holding that the denial of *Noerr-Pennington* immunity is not immediately appealable under the collateral order doctrine. *See also Will v. Hallock,* No. 04-1332, slip op. at 7 (U.S. Jan. 18, 2005) (clarifying the narrow limitations of the collateral order doctrine and noting that "it is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is 'effectively' unreviewable if review is to be left until later.").

**\*4** Nor is Mullinex's claim to a *Noerr-Pennington* defense inextricably intertwined with the claims of qualified or absolute immunity that are properly before us. The Supreme Court held in Swint v. Chambers County Comm'n, 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), that a court of appeals has limited pendent appellate jurisdiction, noting "that there was no 'pendent party' appellate jurisdiction" where a co-defendant's claims were not inextricably intertwined with the qualified immunity claim. Mullinex's claim to immunity is based on his own right of free speech and his right to petition the government (in this case the LOPFI board) on behalf of his clients, the employee groups covered by the LOPFI retirement system. The issues raised by that claim are totally unrelated to whether the LOPFI board members were entitled to qualified immunity when they suspended and effectively terminated Hinshaw's employment. Neither are the issues raised by Mullinex's *Noerr-Pennington* defense "inextricably intertwined" with Representative Smith's claims of legislative or qualified immunity in communicating with the LOPFI board members. We lack jurisdiction to consider Mullinex's appeal, and accordingly, we dismiss the appeal in No. 05-1217.

Case 1:04-cv-01207-GMS   Document 87-2   Filed 02/17/2006   Page 7 of 15

2006 WL 212372                                                                                                      Page 7
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

B. Qualified Immunity/First Amendment Violation by LOPFI Defendants

[9] "We review 'de novo the denial of a motion for summary judgment based on qualified immunity.' " *Wright v. Rolette County,* 417 F.3d 879, 884 (8th Cir.2005) (quoting *Vaughn v. Ruoff,* 253 F.3d 1124, 1127 (8th Cir.2001)), *petition for cert. filed,* 47 U.S.L.W. 3363 (U.S. Dec. 7, 2005) (No. 05-742). At this stage, we construe the facts in the light most favorable to Hinshaw, the nonmoving party, and accept those facts asserted by Hinshaw that are supported by the record. Summary judgment is inappropriate if "there is a genuine dispute concerning predicate facts material to the qualified immunity issue." *Id.* (internal marks omitted).

[10][11][12][13] Qualified immunity protects public officials from personal liability under § 1983 when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal marks omitted). We first address whether the facts alleged show that the state actor's conduct violated a constitutional right. [FN4] *Davis v. Hall,* 375 F.3d 703, 712 (8th Cir.2004). If that threshold question is answered in the negative, we need not proceed further, as the defendant is entitled to qualified immunity. If a constitutional right may have been violated, we proceed to the second step and determine whether the right was clearly established. *Id.*

[14][15] In addressing Hinshaw's First Amendment claim, we first determine whether her speech touched on a matter of public concern. *See Connick,* 461 U.S. at 143; *Kincade,* 64 F.3d at 395. If it did, then we apply the *Pickering* balancing test, which requires a " 'balanc[ing] between the interests of the employee, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees.' " *Connick,* 461 U.S. at 142 (quoting *Pickering,* 391 U.S. at 568). "The inquiry into the protected status of speech is one of law, not fact." *Id.* at 148 n. 7. The balancing of the *Pickering* factors is a legal chore for the court, though fact disputes concerning any of the factors are appropriately submitted to a jury. *See Gordon v. City of Kansas City, Mo.,* 241 F.3d 997, 1003 (8th Cir.2001).

*5 The parties dispute whether Hinshaw was acting in her capacity as a concerned citizen when she spoke with the Governor's staff or whether she was representing the views of the Board and acting within the scope of her employment. The district court determined that this fact issue precluded summary judgment for the defendants. Even if Hinshaw was arguably speaking as a citizen on a matter of public concern, we would then apply the *Pickering* balancing test, which is also a legal issue for the court. As further explained below, the *Pickering* balancing test favors the LOPFI Board, making the fact issue of whether Hinshaw was speaking on a matter of public concern, upon which the district court relied in denying summary judgment, irrelevant to the outcome of this case. We thus presume, for summary judgment purposes, that Hinshaw was speaking on a matter of public concern and proceed to the *Pickering* balancing test.

[16] " '[C]onstitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign.' " *Altman v. Minn. Dep't of Corr.,* 251 F.3d 1199, 1202 (8th Cir.2001) (quoting *Waters v. Churchill,* 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion)). While the government's actions toward its citizenry in general is greatly circumscribed by the individual rights guaranteed by the Constitution, "the [g]overnment, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." *Connick,* 461 U.S. at 151 (internal marks omitted). That is not to say that government employees relinquish all of their First Amendment protections when they accept public employment. Rather, applying the *Pickering* test we weigh the employee's right to engage in the particular speech at issue with such considerations as "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

The defendants urge us to forego the *Pickering* balancing test and instead apply the rule established by the Sixth Circuit in *Rose v. Stephens,* 291 F.3d 917, 922 (6th Cir.2002), which holds that the *Pickering* balance favors the government as a matter of law when a policymaking or confidential employee's speech is related to the employee's political or policy views. This view, in effect,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS    Document 87-2    Filed 02/17/2006    Page 8 of 15

2006 WL 212372                                                                                                                      Page 8
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

represents an extension of Supreme Court precedent as enunciated in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In those cases, the Supreme Court established that the termination of a government employee based on the employee's political affiliation violates the First Amendment unless the hiring authority can demonstrate that party affiliation is an appropriate and reasonable requirement for the effective performance of the public office involved. *See Branti,* 445 U.S. at 517-18. We have recognized that in cases like *Elrod* and *Branti* involving pure patronage dismissals, the individual and government interests are essentially fixed, so that there is no need to perform a *Pickering* balance. *See Horton v. Taylor,* 767 F.2d 471, 480 (8th Cir.1985). In effect, the "balancing [has] really already [been] achieved by the very formulation of the [*Elrod/Branti* ] rule." *Id.* at 480-81 n. 10. *See also O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 719, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (noting the advantages of avoiding a balancing test in pure partisan cases). Thus, we have held that "[i]f discharge solely because of party affiliation is found, this will involve applying the narrow *Branti* justification test. If a discharge for overt expressive conduct is found, it will involve application of the *Pickering-Givhan-Connick* balancing test." *Horton,* 767 F.2d at 481 (internal marks omitted). The Supreme Court has also indicated that where speech is intermixed with a political affiliation requirement, *Pickering* balancing is appropriate. *See O'Hare Truck Serv., Inc.,* 518 U.S. at 718-19. *See also Barker v. City of Del City,* 215 F.3d 1134, 1139 (10th Cir.2000) (noting that the Supreme Court in *O'Hare Truck Service* implicitly rejected the position that a "political affiliation" employee can be terminated for her speech without the need to consider the *Pickering* balancing factors).

**\*6** The present case does not involve any claims of political affiliation. In *Rose,* the Sixth Circuit expanded the *Elrod/Branti* policymaker exception analysis to include a situation where a policymaking employee was terminated for expressive conduct even though political affiliation was not at issue. *See* 291 F.3d at 921. The Seventh Circuit is in accord with the Sixth Circuit. *See Vargas-Harrison v. Racine Unified Sch. Dist.,* 272 F.3d 964, 973 (7th Cir.2001) ("[T]he [policymaker] corollary is a shorthand for the *Pickering* balancing; in certain instances, the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that the fact-specific *Pickering* inquiry

is not required." (internal marks omitted)), *cert. denied,* 537 U.S. 826, 123 S.Ct. 120, 154 L.Ed.2d 38 (2002). *Cf. Biggs v. Best, Best, & Krieger,* 189 F.3d 989, 994-95 (9th Cir.1999) (noting that "an employee's status as a policymaker or confidential employee would be dispositive of any First Amendment retaliation claim" in a case involving both speech and political affiliation). Other courts continue to apply the *Pickering* balancing test when a policymaking or confidential employee is terminated based on speech rather than political affiliation, while recognizing that the significance of the employee's status as a policymaker weighs heavily in the government's favor in applying the *Pickering* balance. *See McEvoy v. Spencer,* 124 F.3d 92, 101, 102-03 (2d Cir.1997) (rejecting *Elrod* and applying a modified *Pickering* test, which gives significant but not dispositive weight to the policymaking status of the employee, when a policymaking employee is discharged solely for speaking out on matters of public concern and political affiliation is not involved in the decision); *see also Curinga v. City of Clairton,* 357 F.3d 305, 314 (3d Cir.2004) ("Although the result is likely to be the same under *Elrod* and *Pickering,* when an employee's speech is intermixed with political affiliation, the *Pickering* balancing standard is the better analysis to apply."); *Flynn v. City of Boston,* 140 F.3d 42, 46-47 (1st Cir.) (establishing "a reasonable working rule that, where the employee is subject to discharge for political reasons under the *Elrod* and *Branti* cases, a superior may also-without offending the First Amendment's free speech guarantee-consider the official's substantive views" in applying the *Pickering* balance), *cert. denied,* 525 U.S. 961, 119 S.Ct. 403, 142 L.Ed.2d 327 (1998).

[17] We hesitate to expand the *Elrod-Branti* exception to a case where party affiliation is not alleged as a basis for the termination. Accordingly, we decline to follow all aspects of *Rose* in this case. [FN5] We do recognize the necessarily adverse effect an employee's speech on a matter related to the employee's policymaking or confidential duties would have on the factors enumerated in the *Pickering* balancing test, however, and we agree with those circuits that conclude that the employee's status as a policymaking or confidential employee weighs heavily on the government's side of the *Pickering* scale when the speech concerns the employee's political or substantive policy views related to her public office.

**\*7** [18] We turn then to the *Pickering* balancing test. Hinshaw was no doubt a policymaking employee as

Case 1:04-cv-01207-GMS   Document 87-2   Filed 02/17/2006   Page 9 of 15

2006 WL 212372                                                                                         Page 9
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

that term is used in the context of First Amendment protection for government employees. As executive director, Hinshaw made administrative recommendations to the Board, gave the Board her opinion on whether proposed legislation conflicted with other laws, considered whether proposed legislation would achieve the Board's objectives, conveyed the covered members' interests to the Board, and served as the liaison between the Board and members of the legislature. (Smith App. at 183-99.) Hinshaw contacted legislators regarding the LOPFI legislative package each legislative session and presented the Board's views to the legislature. (*Id.* at 300, 576-77.) She talked to the Governor's office about various bills, answering their questions about the intent of the bill and the costs of the bill. She represented LOPFI and the Board's interests during her discussions with legislators and the Governor's office when she communicated to them about bills relevant to LOPFI. (*Id.* at 577-78.) Hinshaw recognized herself that it was important for the Board to have confidence in her as the executive director in order for her to effectively perform her duties. (*Id.* at 183.)

The speech for which Hinshaw was disciplined clearly related to her substantive policy views and her position as executive director of LOPFI. Hinshaw believed that the new legislation was bad policy because it skewed the balance of the Board toward the covered members of the system and against the cities (and ultimately the taxpayers) who funded the system. (*Id.* at 207.) Hinshaw was disciplined for her misrepresentations to the Governor's office about the Board's view of the newly-enacted legislation and her suggestion that the Governor not follow the new law. Regardless of whether Hinshaw conveyed to the Governor's office that she was giving her own opinion, the Governor's office was undisputably left with the impression that the Board, not just Hinshaw, wanted the Governor to ignore the law. Hinshaw communicated with the Governor's office despite prior directives to refrain from lobbying for or against pension legislation without the prior knowledge and concurrence of the Board chairman and to avoid involvement with Board appointments. (*Id.* at 254.)

[19] These factors overwhelmingly outweigh whatever interest Hinshaw may have had in communicating her own personal views of the legislation as a citizen to the Governor's office. As relevant as the legislation was to the taxpayers of Arkansas who ultimately help fund the retirement systems, Hinshaw's interest as a private citizen did not give her *carte blanche* to ignore her employer's directives and miscommunicate the Board's views of the legislation to the Governor's office. The LOPFI Board has a legitimate expectation that its executive director will not undermine the Board's efforts by misrepresenting its position on matters related to the Board. "[I]t is insubordination for an employee whose position requires loyalty to speak on job-related issues in a manner contrary to the position of [her] employer." *Rose,* 291 F.3d at 923. Even more so, it is insubordination to misrepresent the employer's position as being consistent with the employee's personal opinion. "[A]s the Supreme Court has recognized, 'employees may always be discharged for good cause, such as insubordination ....' " *Id.* (quoting *Elrod,* 427 U.S. at 366). Employee acts of insubordination can tip the balancing process in favor of the employer. *See Barnard v. Jackson County, Mo.,* 43 F.3d 1218, 1224 (8th Cir.), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 17 (1995).

**\*8** The Board's interests as Hinshaw's employer clearly outweighed Hinshaw's interests in speaking out as a private citizen, and Hinshaw's speech was not protected by the First Amendment. The district court erred in finding that a fact dispute prevented summary judgment. Because there was no First Amendment violation, the individual Board member defendants are entitled to qualified immunity, and LOPFI is entitled to summary judgment on the § 1983 claim against it premised on the First Amendment.

Hinshaw's counsel clarified during oral argument that Hinshaw's state law wrongful discharge claim was premised on the alleged violation of her First Amendment rights. The district court declined to grant summary judgment on the state law claim because it found that a fact dispute remained concerning whether Hinshaw was properly exercising her First Amendment rights. Our determination that there was no First Amendment violation removes the district court's basis for denying summary judgment on Hinshaw's state law wrongful discharge claim. Accordingly, summary judgment should have been granted on this claim in favor of the LOPFI defendants as well. [FN6] The district court's judgment denying summary judgment to the individual Board members and to LOPFI on Hinshaw's § 1983 claim and state law wrongful discharge claim is reversed.

C. Legislative and Qualified Immunity to Representative Smith

2006 WL 212372                                                                                                       Page 10
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

The allegations against Mr. Smith include that he reported Hinshaw's meeting with the Governor's office to the Board, allegedly falsely reported to the Board that Hinshaw did not return legislators' phone calls, pushed through a bill without following state procedure, and pressured the Board members to give Hinshaw's job to him. Smith admits that pressuring Board members for Hinshaw's job is not related to his legislative position, and he is not seeking legislative immunity regarding those allegations. (Smith Br. at 16; Smith Reply Br. at 3-4, 8.) We limit our discussion of absolute immunity to the remaining three allegations.

[20][21] Absolute legislative immunity protects legislators from suit for actions taken in furtherance of legitimate legislative activity. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris,* 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). Introducing a bill is "quintessentially legislative," *id.* at 55 (holding that voting on an ordinance is protected by legislative immunity), and any actions taken by Mr. Smith related to the February 2003 bill are protected by legislative immunity. In addition, as cochairman of the Joint Committee, Smith was responsible for submitting names to the Governor to fill the vacant Board positions. His discussion with the Board members about Hinshaw's representations to the Governor's office that the Board did not want the newly-created positions filled falls within his legislative duties. Finally, we find that Smith's communications with the Board about Hinshaw's responsiveness to legislators in general, regardless of his motive for making the communications, similarly fall within the realm of Smith's duties as a legislator. Smith is protected by absolute legislative immunity for the allegations concerning these events.

*9 Ms. Hinshaw's argument focuses on Mr. Smith's actions of pressuring Board members to give him Hinshaw's job, which we assess against Smith's claim to qualified immunity. The district court applied the *Pickering* balancing test to Hinshaw's § 1983 claim against Smith, discussing the test in terms of a public employer terminating an employee. However, Smith was not Hinshaw's employer and had no decision-making authority over Hinshaw. At most, Hinshaw claims that Smith pressured the Board to fire her so that he could have her position. The *Pickering* balancing test is not apposite to this situation. *See X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 70 (2d Cir.1999) ("[C]ases holding that a decisionmaker may not take action for impermissible reasons do not provide the proper analytical framework for claims against persons who are not decisionmakers but merely advocates."); *Burnham v. Ianni,* 119 F.3d 668, 678 (8th Cir.1997) (en banc) (noting that the *Pickering* balancing test does not apply outside of the context of an employee discipline case).

The Second Circuit case of *X-Men* is directly on point, and we adopt its reasoning. *X-Men* involved two legislators who publicly criticized the state's employment of a security firm, X-Men, whose employees were affiliated with the Nation of Islam, and the legislators pressured the state not to renew the contract. X-Men claimed that the nonrenewal of its contract violated its right to freedom of association and freedom of religion. The court held that the legislators, who were not the decisionmakers, were entitled to qualified immunity because there was no clearly established federal right for an individual "to prevent legislators from exercising their rights merely to express their views." *X-Men Sec.,* 196 F.3d at 70.

[22][23][24] While persons in a similar position who augment their advocacy with threats or coercion might be vulnerable to liability, "speech by persons who are not decisionmakers and who merely engage in advocacy without threats, intimidation, or coercion is protected by the First Amendment. The 'critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not.' " *Id.* at 70-71 (quoting *Healy v. James,* 408 U.S. 169, 192, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972)). Smith's pressure on the Board members falls within this protection. There are no allegations that Smith threatened or coerced any of the Board members. At most, he may have pressured them verbally, but his advocacy for Hinshaw's position never moved beyond the realm of speech. *See id.* at 71 ("While the complaint alleges that the legislators exerted 'pressure' on the decisionmakers, there is no allegation that such 'pressure' took the form of anything other than speech."). There is no First Amendment right to prevent legislators from expressing their own views, as long as they do so without engaging in any threat or coercion. *Id.* at 70.

As in *X-Men,* the district court here relied solely on employment cases. The proper focus should be on whether an objective person in Smith's shoes would have known that he violated Hinshaw's clearly established right to free speech when he sought her job. Whether or not Smith violated state law when he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 212372                                                                                                                                    Page 11
--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633
**(Cite as: 2006 WL 212372 (8th Cir.(Ark.)))**

sought Hinshaw's job does not establish a violation of Hinshaw's constitutional right to free speech. Based on the reasoning of *X-Men,* Smith is entitled to qualified immunity on Hinshaw's § 1983 claim that Smith violated her First Amendment rights by seeking her job because she has failed to state a claim for a violation of her constitutional rights.

**\*10** The district court denied summary judgment to Smith on Hinshaw's state law claims of wrongful termination, civil conspiracy, and tortious interference with contract based on the existence of material fact disputes. As noted above, Hinshaw's counsel confirmed that the wrongful termination claim was premised on the First Amendment claim. As such, the wrongful termination claim is inextricably intertwined with our qualified immunity holding that Smith did not violate Hinshaw's First Amendment rights, and accordingly, the district court's denial of summary judgment on that claim is reversed. We do not address the remaining state law claims in this interlocutory appeal. *See Kincade,* 64 F.3d at 395.

### III. Conclusion

The district court's judgment in Appeal No. 05-1205, denying the motion for summary judgment on Hinshaw's § 1983 claim and state wrongful termination claim against LOPFI, Bush, Gaskill, Milburn, Lawrence, and Waters, is reversed and remanded for the entry of an order dismissing those claims against those defendants. The district court's judgment in Appeal No. 05-1218, denying summary judgment on Hinshaw's § 1983 claim and state wrongful termination claim against Representative Smith, is likewise reversed and remanded to the district court for the entry of an order dismissing those claims against defendant Smith. Appeal No. 05-1217, involving the district court's denial of *Noerr-Pennington* immunity to Mullinex, is dismissed for lack of interlocutory appellate jurisdiction.

We recognize that our disposition leaves this case in an odd posture, leaving Mr. Mullinex, the lobbyist, alone to face Hinshaw's remaining federal § 1983 claim. Our limited appellate jurisdiction over interlocutory appeals dictates this conclusion. It does not prevent any of the parties from seeking further summary dispositions in the district court concerning any of the remaining claims over which we did not exercise interlocutory appellate jurisdiction.

FN1. Donna Marie Adkins and Van B. Alexander were appointed to the Board after Hinshaw's termination. The district court granted them summary judgment, and they are not part of these interlocutory appeals.

FN2. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

FN3. *See United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

FN4. We may dispose of the pendent claims that depend on a First Amendment violation only if we decide the qualified immunity claim at this first step, because it is the lack of a constitutional violation that would necessarily resolve those pendent claims.

FN5. Although we cited *Rose* with approval in *Bradford v. Huckabee,* 394 F.3d 1012, 1015 (8th Cir.2005), the issue of the application of the *Elrod-Branti* policymaker exception to the *Pickering* balancing test was not directly at issue in *Bradford. Bradford* 's citation to the Sixth Circuit's opinion in *Rose* provides no basis to deviate from our prior precedent established in *Horton,* as discussed *supra.*

FN6. Hinshaw's remaining claim against LOPFI and the individual Board members is a state law civil conspiracy claim that is not part of this appeal.

--- F.3d ----, 2006 WL 212372 (8th Cir.(Ark.)), 23 IER Cases 1633

**Briefs and Other Related Documents (Back to top)**

• 05-1218 (Docket) (Jan. 20, 2005)

• 05-1217 (Docket) (Jan. 20, 2005)

• 05-1205 (Docket) (Jan. 19, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Briefs and Other Related Documents

United States District Court,N.D. Illinois, Eastern Division.
Heidi NEWMAN, Plaintiff,
v.
HANSEN & HEMPEL COMPANY, Harold Kochan, Paul Ghiotto, Art Ghiotto and Rich Wenserith, Defendants.
**No. 01 C 9871.**

Nov. 1, 2002.

*MEMORANDUM OPINION AND ORDER*

ASPEN, J.
**\*1** Plaintiff Heidi Newman has brought a five count complaint against the firm of Hansen & Hempel and individual Defendants Harold Kochan, Paul Ghiotto, Art Ghiotto, and Rich Wenserith alleging sexual harassment and related charges. The Defendants have moved to dismiss Count III (Intentional Infliction of Emotional Distress), Count IV (Offensive Battery), and Count V (Defamation of Character). Defendants' motion is denied in part and granted in part. FN1

> FN1. Counts I and II, not the subject of Defendants' motion, allege sexual harassment and constructive termination, respectively.

I. BACKGROUND

The following facts are taken from the Plaintiff's Complaint and are assumed to be true for the purposes of adjudicating this motion. Plaintiff Heidi Newman ("Newman") was employed by the firm of Hansen & Hempel ("H & H") as a full-time secretary/receptionist for about eight months ending on August 24, 2000. As a construction company, H & H had over 100 employees at all times relevant to this complaint, but most employees were union workers who spent most of their time out in the field. As such, Newman was one of just seven office workers.

For nearly the entire time of Newman's employment, she was subjected to offensive and abusive treatment from Harold Kochan ("Kochan"), the president and owner of H & H, Paul Ghiotto and Art Ghiotto, both employed by H & H in a management capacity, and Rich Wenserith ("Wenserith"), H & H's comptroller. Specifically, Newman was often verbally harassed by her male co-workers. Such harassment included being yelled at, cursed at, called derogatory names, and having her ability denigrated. These same co-workers often made degrading remarks to Newman about women in general and women of her acquaintance in particular and called women derogatory names. Art Ghiotto insisted on calling Newman such names as "sweetie" and "honey," despite Newman's objections. She was also subjected to repeated suggestive comments about her physical appearance. She was humiliated by management by frequently being chastised in front of others and being called "over-emotional," both to her face and behind her back. H & H management also denigrated her personal misfortunes, including her father's suicide, her child's injury, and her dog being put to sleep.

In addition to verbal abuse, Newman claims to have been subjected to unequal terms and conditions of employment compared to similarly situated male employees. She was expected to purchase breakfast for her co-workers and deliver it to the office on her own time at least once every week while similarly situated male co-workers were not expected to do so. Newman also claims that she was frequently required to do the work of her male co-workers because they were too drunk, high, or lazy to do it themselves. When this work was not done correctly or on time, she was chastised while her male co-workers were never chastised for their own poor job performance. Finally, when Newman was hired, she was assured that her total compensation package would include health and medical insurance for her family, including her severely handicapped son. In August 2000, however, with only one week's notice, H & H eliminated family health insurance. Newman alleges that she was the only one hurt by this change because all other H & H employees were either unionized under a separate policy or did not have dependants.

**\*2** Newman's complaint also alleges physical abuse. Despite her objections, Art Ghiotto would regularly touch or rub her arms, shoulders, back, and buttocks, and look at her cleavage. Finally, on August 24, 2000, Newman alleges that Paul Ghiotto grabbed both arms of the chair in which Newman was sitting,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 2
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781
**(Cite as: Not Reported in F.Supp.2d)**

leaned over her and screamed in her face, thereby physically intimidating her. Newman was forced to push him off her in order to escape. This event made Newman fear for her personal safety at H & H. Her complaint alleges that this conduct, combined with the other conduct described above, constituted her constructive termination. After the incident with Paul Ghiotto, Newman did not return to H & H.

Despite Newman's objections to the conduct described, H & H took no action to remedy the situation. Furthermore, there appeared to be no one at the company with whom Newman could lodge a formal complaint-H & H president Kochan was aware of, and participated in, the behavior in question. Finally, after Newman left H & H, Wenserith and other members of management told current and subsequent employees that Newman was an alcoholic, was incompetent at her job, and was stupid.

Newman filed a Charge of Discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission on May 17, 2001. Thereafter, the EEOC issued Newman a Notice of Right to Sue dated September 5, 2001, which Newman received on September 23, 2001. Newman filed this suit on December 26, 2001, within 90 days of receiving her "Right-to-Sue" letter from the EEOC. [FN2] In her complaint, Newman pleaded five counts: (1) sexual harassment and unequal terms and conditions of employment under Title VII of the Civil Rights Act (Count I); (2) constructive termination in violation of the Civil Rights Act (Count II); (3) intentional infliction of emotional distress (Count III); (4) offensive battery (Count IV); and (5) defamation of character (Count V). [FN3] Newman named H & H as a defendant on all five counts. Newman sued Harold Kochan in his individual capacity on Count III. Newman sued Paul and Art Ghiotto in their individual capacity on Counts III and IV. Newman sued Rich Wenserith in his individual capacity on Count V. Defendants have moved to dismiss Counts III, IV, and V as to both H & H and the individual defendants.

> FN2. Because we were unable to determine, from the complaint and motions, whether Newman filed this suit within 90 days of receiving her right-to-sue letter, we referred this issue to Magistrate Judge Ashman. Judge Ashman found that Newman timely filed this suit. Pursuant to 28 U.S.C. § 636(b)(1), we accept Judge Ashman's recommendation.
>
> FN3. Although listed separately, plaintiff numbered both the offensive battery and defamation counts as "Count IV." We will assume that this was a typographical error and will refer to the offensive battery claim as Count IV and the defamation of character claim as Count V.

II. ANALYSIS

The purpose of a motion to dismiss under Rule 12(b)(6) is to decide the adequacy of the complaint, not the merits of the case. Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir.1990). In considering a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc., 62 F.3d 967, 972 (7th Cir.1995), aff'd 161 F.3d 443 (7th Cir.1998), cert. denied 528 U.S. 810, 120 S.Ct. 43, 145 L.Ed.2d 38 (1999). Therefore, a complaint should not be dismissed "unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rule 12(b)(1) requires dismissal of claims over which the federal court lacks subject matter jurisdiction. Jurisdiction is the "power to decide" and must be conferred upon the federal court. In re Chicago, Rock Island & Pacific R.R. Co., 794 F.2d 1182, 1188 (7th Cir.1986). In reviewing a 12(b)(1) motion to dismiss, the Court may look beyond the complaint to other evidence submitted by the parties to determine whether subject matter jurisdiction exists. See United Transp. Union v. Gateway Western Ry. Co., 78 F.3d 1208, 1210 (7th Cir.1996). The plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met. See Kontos v. United States Dept. of Labor, 826 F.2d 573, 576 (7th Cir.1987).

A. Count III (Intentional Infliction of Emotional Distress) and Count IV (Offensive Battery) are not preempted by the Illinois Human Rights Act

**\*3** The Illinois Human Rights Act provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(C). Sexual harassment is considered a civil rights violation under the IHRA.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS   Document 87-2   Filed 02/17/2006   Page 14 of 15

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781
**(Cite as: Not Reported in F.Supp.2d)**

775 ILCS 5/2-102(D). Under *Geise v. Phoenix Co. of Chicago, Inc.,* 159 Ill.2d 507, 203 Ill.Dec. 454, 639 N.E.2d 1273, 1277 (Ill.1994), state tort law claims are preempted by the IHRA if they are "inextricably linked" to the alleged civil rights violations. The *Geise* court dismissed the plaintiff's claims for "negligent hiring" and "negligent retention" because these counts "depend[ed] on the [IHRA's] prohibitions against sexual harassment for their viability." *Id.* In 1997, the Illinois Supreme Court clarified their holding in *Geise,* stating that the IHRA does not preclude jurisdiction over "all tort claims factually related" to incidents of civil rights violations. *Maksimovic v. Tsogalis,* 177 Ill.2d 511, 227 Ill.Dec. 98, 687 N.E.2d 21, 23 (Ill.1997). "Rather, whether the circuit court may exercise jurisdiction over a tort claim depends on whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself." *Id.* A claim will not be preempted if the plaintiff has alleged the elements of her common law tort claims "without reference to *legal duties"* created by the IHRA. *Id.* (emphasis added). Thus, in *Maksimovic,* where the sexual harassment aspect of the case was "merely incidental to what [were] otherwise ordinary common law tort claims" the IHRA did not preempt the plaintiff's assault, battery, and false imprisonment claims. *Id.*

Like the common law tort claims in *Maksimovic,* Newman's allegations of IIED and offensive battery are "long-recognized tort actions which exist wholly separate and apart from a cause of action for sexual harassment" under the IHRA. *Id.* Although Newman's IIED and battery allegations rely on some of the same factual allegations pertinent to her sexual harassment allegation, Newman need not rely on any "legal duties" created by the IHRA to make out the elements of IIED or offensive battery. See *Rapier v. Ford Motor Co.,* 49 F.Supp.2d 1078, 1079 (N.D.Ill.1999) (claim of intentional infliction of emotional distress not "inextricably intertwined" with claim of sexual harassment); *Bruce v. South Stickney Sanitary District,* 2001 WL 789225, 4 (N.D.Ill.2001) (holding that plaintiff who was subjected to unwanted touching and discovered co-workers hiding in the women's bathroom while she used it could support a claim of IIED without relying on civil rights law). Furthermore, we do not believe this is a case where the allegations of intentional infliction of emotional distress or offensive battery are actionable only because they were motivated by gender. *Krocka v. City of Chicago,* 203 F.3d 507, 517 (7th Cir.2000). Accordingly, we hold that Newman's intentional infliction of emotional distress and offensive battery claims are not preempted by the IHRA.

B. Illinois Workers Compensation Act Preemption

**\*4** The Illinois Workers Compensation Act (IWCA) was designed to provide financial protection to workers for accidental injuries arising out of and in the course of employment. See *Meerbrey v. Marshall Field & Co. Inc.,* 139 Ill.2d 455, 151 Ill.Dec. 560, 564 N.E.2d 1222, 1225 (Ill.1990). The IWCA makes a tradeoff by imposing liability without fault upon the employer and, in return, making workers compensation the exclusive remedy for most workplace injuries. Section 5(a) of the IWCA states:
No common law or statutory right to recover damages from the employer ... or the agents or employees ... for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act. (Ill.Rev.Stat.1987 ch. 48, par. 138.5(a).)

Section 11 of the IWCA further provides:The compensation herein provided, together with the provisions of this Act, shall be the measure of the responsibility of any employer ... for accidental injuries sustained by any employee arising out of and in the course of the employment ... according to the provisions of this Act. (Ill. Rev.Stat.1987, ch 48, par. 138.11.).

The IWCA bars employees from bringing a common law cause of action against his or her employer unless: (1) the injury was not accidental; (2) the injury did not arise from his or her employment; (3) the injury was not received during the course of employment; or (4) the injury was not compensable under the Act. See *Meerberry,* 151 Ill.Dec. 560, 564 N.E.2d at 1226; see also *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1016 (7th Cir.1997). In addition, the IWCA's exclusivity provision will not bar a common law cause of action "for injuries that the employer or its alter ego intentionally inflicts upon an employee or which were commanded or expressly authorized by the employer." *Hunt-Golliday,* 104 F.3d at 1017. Newman argues that her claims against-H & H are not subject to the exclusivity provision for two reasons. First, Newman contends that her injuries were "not accidental." Second, Newman argues that contends that her injuries were inflicted by the alter ego of H & H, Harold Kochan.

Case 1:04-cv-01207-GMS    Document 87-2    Filed 02/17/2006    Page 15 of 15

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781
**(Cite as: Not Reported in F.Supp.2d)**

*Newman's injuries cannot be characterized as "not accidental"*

Newman contends that the torts of IIED and battery require a showing of intent and, therefore, cannot be characterized as "not accidental." Relying on the doctrine of respondeat superior, Newman seeks to transfer the intent of the individual employees to H & H. Newman fails to recognize, however, that "[t]he IWCA's exclusivity provision bars employees from bringing common law actions against their employers based solely upon the respondeat superior doctrine." Hunt-Golliday, 104 F.3d at 1017. Thus, Newman must establish that the injury was "not accidental" on behalf of the employer. Asserting that the injury resulted from an "intentional" tort is not enough, "[b]ecause injuries intentionally inflicted by a co-worker are accidental from the employer's point of view." Hunt-Golliday, 104 F.3d at 1016. To prove intent on the part of H & H, Newman must sufficiently allege that H & H "commanded or expressly authorized" its employees to inflict the injuries. Meerbrey 151 Ill.Dec. 560, 564 N.E.2d at 1226. Newman has not alleged that her injuries resulted from any kind of command or express authorization from H & H. She has merely argued that the harassment occurred in the course of employment, and has suggested that H & H knew or should have known of the harassment. The allegation that management was acting "within the scope of their authority is not equivalent to an allegation that [H & H] expressly authorized" the conduct. Meerbrey, 151 Ill.Dec. 560, 564 N.E.2d at 1227. Likewise, Newman's assertion that Kochan knew about the harassment is "insufficient to affix liability" upon H & H. *Damato v. Jack Phelan Chevrolet Geo, Inc.,* 929 F.Supp. 283, 292 (N.D.Ill.1996). Even if there was a pattern of harassment and tortious conduct by H & H employees, "such a pattern does not automatically mean that [H & H] itself intended [Newman] to suffer emotional distress as a result." Hunt-Golliday, 104 F.3d at 1017. Given Newman's failure to allege that H & H commanded or expressly authorized its employees to engage in tortious conduct towards Newman, we must conclude that Newman's injuries arising out of the IIED and battery were "accidental" within the meaning of the IWCA.

**\*5** *Newman has sufficiently alleged that Harold Kochan was the alter ego of H & H.*

The exclusivity provision of the IWCA will allow a common law suit against the employer for injuries "the employer or its alter ego [FN4] intentionally" inflicted upon the plaintiff. We consider several factors when determining whether an individual tortfeasor is the alter ego of a corporate defendant because "[t]here are no bright lines to be drawn or simplistic formalities to apply." Crissman v. Healthco International, Inc., 1992 WL 223820, 8 (N.D.Ill.1992). First, we consider the employee's dominance in the company. Where an individual is an officer, director, or holds an important management position, such as general manager, this factor will weigh in favor of finding an alter ego. *See Al-Dabbagh v. Greenpeace, Inc.,* 873 F.Supp. 1105, 1114 (N.D.Ill.1994). The second factor we look to is whether the individual tortfeasor has an ownership interest in the defendant corporation. [FN5] *See id.* The third factor is whether the individual has "final decision making authority" in that she "speaks for the company." Crissman v. Healthco International, Inc., 1992 WL 223820, 8 (N.D.Ill.1992); *see also* Johnson v. Federal Reserve Bank of Chicago, 199 Ill.App.3d 427, 145 Ill.Dec. 558, 557 N.E.2d 328, 331-32 (Ill.App.Ct.1990) (holding that bank managers who threatened dismissal, assigned extra hours of onerous work, issued unfavorable reviews, and subverted plaintiff-employee's authority over subordinates in retaliation for plaintiff's whistle-blowing might be alter ego of corporation); Reynolds v. Hitachi Seiki U.S.A., Inc., 1993 WL 384535, 3 (N.D.Ill.1993). Of particular importance is the individual's decision-making authority over the Plaintiff. For example, the supervisor was considered the alter ego of the defendant-corporation where he "had the discretionary power to grant tuition reimbursements, vacation days, sick leaves, and to discharge employees." Whitehead v. AM International, Inc., 860 F.Supp. 1280, 1290 (N.D.Ill.1994). Although an individual's managerial position is important, "[t]he fact that a supervisor was acting within the scope of his or her authority does not equal authorization by the employer for the commission of an intentional tort." Hunt-Golliday, 104 F.3d at 1017.

> FN4. The "alter ego" concept is one that originated in the corporate law context and enables a person injured by a corporation to recover against a shareholder, officer, or director when the corporation was "a mere instrumentality of the dominant personality and when strict adherence to the corporate form would promote fraud or injustice." Al-Dabbagh v. Greenpeace, Inc. 873 F.Supp. 1105, 1113 (N.D.Ill.1994). Although the basic concept remains the same, the application of the alter ego doctrine in the