Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781
**(Cite as: Not Reported in F.Supp.2d)**

workers compensation context differs from its application in the corporate law arena. *See Buddingh v. South Chicago Cable, Inc.,* 830 F.Supp. 437, 443 (N.D.Ill.1993)

FN5. We recognize that ownership in the corporation is a necessary factor to finding an alter ego in the corporate context for the purpose of piercing the corporate veil. We have noted, however, that the concept of alter ego plays a different role in the Workers Compensation arena. While we find ownership in the defendant-corporation to be an important factor in designating an individual as an alter ego in this context, it is not determinative. *See Buddingh v. South Chicago Cable Inc.,* 830 F.Supp. 437, 443 (N.D.Ill.1993)

Applying this standard, we conclude that Kochan was the alter ego of H & H. Kochan is the only individual whom the plaintiff actually alleged was the alter ego of H & H. Indeed, Kochan satisfies all three factors outlined above: (1) as president of the company he likely had a (2) dominant position in the organization as well as (3) decision-making authority. In addition, Kochan is the owner of H & H. This situation is much like that of *McKay v. Town & Country Cadillac, Inc.,* where the Plaintiff alleged that one of the assailants was the owner and president of the defendant-corporation. The *McKay* court denied the corporate defendant's motion to dismiss, finding that the plaintiff could potentially establish that the individual-defendant was the alter ego of the defendant corporation. 911 F.Supp. 966, 971 (N.D.Ill.1997).

**\*6** We cannot find, however, that Art Ghiotto, Paul Ghiotto, and Rich Wenserith were the alter egos of H & H. The only facts Newman has alleged that would support an inference that these employees were the alter ego of H & H is that Art and Paul Ghiotto were employed in a "management capacity," and that Wenserith was the Comptroller of H & H. Although Newman explicitly alleged that Kochan was the alter ego of H & H, she made no such allegation with regard to Art Ghiotto, Paul Ghiotto, or Wenserith. Furthermore, we know nothing about the role these individuals played in the company, whether they had dominant positions, owned any interest in H & H, or had final decision-making authority.

As such, we must conclude that Art Ghiotto, Paul Ghiotto, and Wenserith were not the alter egos of H & H. With regard to Newman's intentional infliction

of emotional distress claim, we find that only the conduct of Kochan can be attributed to H & H. Because Newman's allegations of battery are based solely on the actions of Art and Paul Ghiotto, we dismiss this count against H & H. FN6

FN6. Our holding that Art and Paul Ghiotto and Rich Wenserith were not the alter egos of H & H does not free them of liability for these torts in their individual capacity, but merely means that their tortious conduct cannot be imputed onto H & H.

C. Newman stated a claim for Intentional Infliction of Emotional Distress

Having found that the IWCA does not preempt Newman's IIED claim as it relates to Kochan's conduct, we must now look at the sufficiency of Newman's IIED allegations against H & H. Because we have found that only Kochan acted as the alter ego of H & H, only his conduct can be evaluated as we determine whether Newman has stated a claim for IIED against the company.

There are three elements to a claim of IIED: (1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause severe emotional distress. *See McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806, 809 (Ill.1989).

We find the alleged conduct of Kochan, as an alter ego of H & H, and of each of the named Defendants in their individual capacity to be truly extreme and outrageous. The Defendants subjected Newman to far more than "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." FN7 *Graham,* 252 Ill.Dec. 320, 742 N.E.2d at 866. Newman was frequently yelled and cursed at, called derogatory names, humiliated, and subjected to suggestive comments about her physical appearance, including her breasts. In addition, "[m]anagement laughed at, and mocked her personal misfortunes, including her father's suicide, her child getting injured, and her dog being put to sleep." Compl. ¶ 10. In addition, "the degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous." *McGrath,* 127 Ill.Dec. 724, 533 N.E.2d at 809. Here, Kochan was Newman's boss, owner and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 6
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781
**(Cite as: Not Reported in F.Supp.2d)**

president of H & H. Each of the individual Defendants held some type of management position. Another factor strengthening Newman's case against H & H is that Kochan was likely aware that Newman was "susceptible to emotional distress" *Id.* at 811. In fact, it appears that Kochan and others actually fed upon Newman's vulnerabilities-seizing upon her personal misfortunes such as her father's suicide and her child's injury to exacerbate her emotional distress. The inference that Kochan and the individual defendants intentionally inflicted emotional distress upon Newman is further supported by the fact that the offensive conduct continued despite Newman's objections.

> FN7. Newman's complaint sometimes specifies which of her co-workers engaged in the allegedly tortious conduct; most times it merely refers to the conduct of "management" and her "co-workers." Because we must construe all allegations in the light most favorable to Newman, we will consider vague references to "management" and "co-workers" to refer to Kochan, Art and Paul Ghiotto, and Rich Wenserith.

**\*7** Although we are mindful that "courts often hesitate to find a claim for intentional infliction of emotional distress in employment situations," *Graham v. Commonwealth Edison Company,* 318 Ill.App.3d 736, 252 Ill.Dec. 320, 742 N.E.2d 858, 867 (Ill.App.Ct. 1st Dist.2000), we believe Newman's allegations of Kochan's conduct are sufficient to support a claim against H & H. The allegations are also sufficient to state a claim against Harold Kochan, Art Ghiotto, Paul Ghiotto, and Rich Wenserith in their individual capacities. We thus deny the Defendants' Motion to Dismiss Count III.

### F. Sufficiency of the Offensive Battery Allegations Against Art and Paul Ghiotto

Under Illinois law, battery is defined as the willful, unauthorized touching of another. *See Pechan v. Dynapro, Inc.,* 251 Ill.App.3d 1072, 190 Ill.Dec. 698, 622 N.E.2d 108, 117 (Ill.App.Ct.1993); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 622 (7th Cir.1989). "To be liable for battery, the defendant must have done some affirmative act, intended to cause an unpermitted contact." *Mink v. University of Chicago,* 460 F.Supp. 713, 717 (N.D.Ill.1978). The contact must be harmful or offensive in nature. *See Welch v. Ro-Mark, Inc.,* 79 Ill.App.3d 652, 34

Ill.Dec. 910, 398 N.E.2d 901, 905 (Ill.1979). When evaluating whether contact was harmful or offensive the emphasis is on "the plaintiff's lack of consent to the touching." *Cohen v. Smith,* 269 Ill.App.3d 1087, 207 Ill.Dec. 873, 648 N.E.2d 329, 332 (Ill.App.Ct.1995). Newman has alleged that Art Ghiotto "would regularly touch or rub her arms, shoulders, back, and buttocks." Compl. ¶ 10. Newman has also alleged that she complained about the abusive conduct directed towards her. Based on these allegations, we can reasonably infer that Art Ghiotto intentionally touched Newman. We can also infer that Newman did not authorize these touches. Thus, Newman has stated a claim for battery against Art Ghiotto, and defendant's motion to dismiss this claim as to Art Ghiotto is denied. *See Dockter v. Rudolf Wolfe Futures, Inc.,* 684 F.Supp. 532, 536 (N.D.Ill.1988) (noting that supervisor's unauthorized patting, kissing, and fondling of the plaintiff constituted battery).

As to Paul Ghiotto, however, we dismiss Newman's claim of offensive battery. As discussed above, battery requires an offensive touching. Although Paul Ghiotto's conduct in grabbing the arms of Newman's chair, leaning over Newman and screaming in her face may have been unauthorized by Newman, it does not constitute a touching. As such, the battery count against Paul Ghiotto is dismissed.

### G. Defamation

In the final count of her complaint, Newman alleges Mr. Wenserith defamed her. Newman seeks to hold H & H liable for the defamation under the theory of respondeat superior. To state a claim for defamation, Newman must allege that (1) the defendant made a false statement about her; (2) there was an unprivileged publication of a defamatory statement to a third party by defendant; and (3) the publication damaged her. *Vickers v. Abbott Laboratories,* 308 Ill.App.3d 393, 241 Ill.Dec. 698, 719 N.E.2d 1101, 1107 (Ill.App.Ct.1999). Newman alleges that Wenserith told current and subsequent employees that she was an "alcoholic, was incompetent at her job, and was stupid." Comp. P. 14. Newman alleges that Wenserith made these statements knowing that they were untrue. Newman further contends that these defamatory statements harmed her reputation. Thus, Newman has alleged facts sufficient to state a claim for defamation. Nonetheless, we find that Wenserith's defamatory statements that Newman was incompetent and stupid are not actionable.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 7
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781
**(Cite as: Not Reported in F.Supp.2d)**

**\*8** Even where a comment is defamatory per se, the statement is not actionable if it is a statement of opinion. *Hopewell v. Vitullo,* 299 Ill.App.3d 513, 233 Ill.Dec. 456, 701 N.E.2d 99, 102 (Ill.App.Ct.1998). Wenserith's statements that Newman was "incompetent at her job" and "stupid" are opinions, not statements of fact. These statements are, therefore, not actionable. *See id.* (defamatory statement that officer was "fired because of incompetence" was nonactionable opinion); *see also Quiroz v. Hartgrove Hospital,* 1999 WL 281343, 15 (N.D.Ill.1999) (holding that defendant's statements that plaintiff was "stupid" and "incompetent" were nonactionable opinions).

We cannot say, however, that Wenserith's alleged statement that Newman was an alcoholic is merely an opinion. Courts apply a three part test to determine whether a statement is one of fact or opinion. "First, we consider whether the language of the statement has a precise and readily understood meaning, while bearing in mind that the first amendment protects overly loose, figurative, rhetorical, or hyperbolic language, which negates the impression that the statement actually presents facts." *Hopewell,* 233 Ill.Dec. 456, 701 N.E.2d at 103. Although the term "alcoholic" has a precise meaning, we cannot tell from the complaint exactly how Wenserith used the term. Second, we look at the statement in its context. *Id.* Wenserith allegedly made the statement "to excuse the short period of time the two previous receptionists stayed with the Company." Compl. ¶ 38. This indicates that Wenserith made a statement of fact, rather than opinion. Third, we consider whether the statement is "susceptible of being objectively verified as true or false." *Id.* Although alcoholism may be a somewhat subjective disease to diagnose, we believe it is generally a statement that can be objectively verified as true or false. We cannot say that Newman can prove no set of facts in support of her claim that Wenserith's defamatory statement was a fact, rather than opinion. We therefore deny defendants' motion to dismiss Newman's defamation claim.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss Counts III and V is denied. Defendant's Motion to Dismiss Count IV is granted as to Hansen & Hempel and Paul Ghiotto, and denied as to Art Ghiotto.

It is so ordered.

N.D.Ill.,2002.

Newman v. Hansen & Hempel Co.
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781

Briefs and Other Related Documents (Back to top)

• 2002 WL 32602054 (Trial Pleading) Defendants' Answer and Affirmative Defenses to Counts III, IV, and IV of the Complaint (Nov. 18, 2002)
• 2002 WL 32600534 (Trial Motion, Memorandum and Affidavit) Plaintiff, Heidi Newman's, Brief in Support of Denying Defendant's Motion to Dismiss Plaintiff's Title VII Claims for Failure to Comply with the 90 Day Rule (Aug. 16, 2002)
• 2002 WL 32600530 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Dismissing Title VII Claims Due to Plaintiff's Non-Compliance with 90-Day Filing Requirement (Jul. 26, 2002)
• 2002 WL 32600526 (Trial Motion, Memorandum and Affidavit) Supplememtal Brief in Support of Plaintiff's Brief in Opposition to Motion to Dismiss Counts I and II For Being Untimely (May. 07, 2002)
• 2002 WL 32600519 (Trial Motion, Memorandum and Affidavit) Brief in Support of Plaintiff's Compliance with the 90 Day Filing Period (Apr. 30, 2002)
• 2002 WL 32600522 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Dismissing Title VII Claims Due to Plaintiff's Non-Compliance with 90-Day Filing Requirement (Apr. 30, 2002)
• 2002 WL 32600515 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of Their Motion to Dismiss Certain Counts Contained in Plaintiff's Complaint (Apr. 12, 2002)
• 2002 WL 32600513 (Trial Pleading) Plaintiff, Heidi Newman's Response to Defendants Mostion to Dismiss Counts III, IV, and V of Plaintiff's Complaint (Apr. 01, 2002)
• 2002 WL 32600507 (Trial Motion, Memorandum and Affidavit) Defendants Hansen & Hempel Company, Harold Kochan, Paul Ghiotto, Art Ghiotto, and Rich Wenserith's Memorandum of Law in Support of Their Motion to Dismiss Certain Counts Contained in Heidi Newman's Complaint (Mar. 11, 2002)
• 2002 WL 32602048 (Trial Pleading) Answer to Complaint Counts I and II (Mar. 11, 2002)
• 2001 WL 34617902 (Trial Pleading) Complaint for Sexual Harassment, Retaliation, and Intentional Infliction of Emotional Distress (Dec. 26, 2001)
• 1:01CV09871 (Docket) (Dec. 26, 2001)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2002 WL 31455990 (N.D.Ill.), 19 IER Cases 781
**(Cite as: Not Reported in F.Supp.2d)**

• 2001 WL 34617329 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of Dismissing Title VII Claims Due to Plaintiff's Non-Compliance with 90-day Filing Requirement (2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

H
**Briefs and Other Related Documents**

United States District Court, N.D. Illinois, Eastern
Division.
Eva M. QUIROZ, Plaintiff, Counterdefendant,
v.
HARTGROVE HOSPITAL Defendant,
Bernardo LIVAS, M.D., Defendant, Counterplaintiff.
**No. 97 C 6515.**

March 24, 1999.

MEMORANDUM OPINION AND ORDER

HART, District J.
**\*1** Plaintiff Eva M. Quiroz, brings this action against
defendants Dr. Bernardo Livas ("Livas") and
Hartgrove Hospital ("Hartgrove") claiming sexual
harassment in employment in violation of Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et
seq.,* and defamation of character. In Count I,
plaintiff alleges that Hartgrove, primarily through the
conduct of Livas acted to create and maintain a
hostile work environment because of her gender. She
also claims that she suffered retaliation and was
constructively discharged because of her problems
with Livas. In Count II, plaintiff alleges that
defendant Livas defamed her by promulgating to her
co-workers malicious and false rumors.

Livas brings a counterclaim for defamation against
Quiroz alleging that she made false statements about
him in connection with her sexual harassment
allegations. Presently pending are: (1) defendants'
motions for summary judgment and (2) plaintiff's
motion for summary judgment on Livas's
counterclaim and Count II of her complaint. FN1

> FN1. Also pending is Hartgrove's motion to
> strike plaintiff's affidavit. On a motion for
> summary judgment a court may not consider
> those parts of an affidavit that are
> insufficient under Federal Rule of Civil
> Procedure 56(e). *Adusumilli v. City of
> Chicago,* 164 F.3d 353, 359-60 (7th
> Cir.1998). The motion to strike will be
> denied without prejudice. However, to the
> extent the affidavit contains inadmissible

hearsay or other inadmissible materials, it
has not been accepted.

SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings,
depositions, answers to interrogatories and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c);
*Patel v. Allstate Insurance Co.,* 105 F.3d 365, 367
(7th Cir.1997). In evaluating a motion for summary
judgment, the entire record is considered with all
inferences and factual disputes resolved in favor of
the nonmovant. *Valance v. Wisel,* 110 F.3d 1269,
1274 (7th Cir.1997). The movant bears the initial
burden of establishing that the record presents no
genuine issue of material fact. *Essex v. United Parcel
Service, Inc.,* 111 F.3d 1304, 1308 (7th Cir.1997).
Then the burden shifts to the nonmovant to "set forth
specific facts showing that there is a genuine issue for
trial." Fed.R.Civ.P. 56(e).

The nonmovant cannot succeed in creating a factual
dispute solely by resting on allegations in the
pleadings but must produce evidence showing that
there is a disputed issue for trial. *Selan v. Kiley,* 969
F.2d 560, 564 (7th Cir.1992). In order to withstand
summary judgment, the nonmovant "must do more
than simply show that there is some metaphysical
doubt as to the material facts." *Matsushita Elec.
Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586,
106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only
disputes over facts that might affect the outcome of
the suit under the governing law will properly
preclude summary judgment. *Anderson v. Liberty
Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91
L.Ed.2d 202 (1986).

FACTS

Resolving all genuine factual disputes and drawing
all reasonable inferences from the evidence in
plaintiff's favor, the facts assumed to be true for the
purposes of resolving defendants' summary judgment
motions are as follows. Defendant Hartgrove, a
small, community-based psychiatric hospital, hired
plaintiff as a mental health worker in October 1994.
Plaintiff became a Licenced Practical Nurse ("LPN")

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

for Hartgrove after she became licenced in Illinois in May 1995. Plaintiff worked for Hartgrove from October 1994 to September 25, 1997. During the majority of her employment with Hartgrove, plaintiff worked primarily in the hospital's in-patient adult unit ("1-South"). Defendant Livas is a psychiatrist. He began working at Hartgrove in 1993 as staff psychiatrist and became employed as Clinical Director of the Adult Crisis Stabilization Program in 1996. Plaintiff was twenty-two years old at the time of the alleged incidents; Livas was forty-nine.

**\*2** Hartgrove did not formally assign Quiroz to work with any particular physician and Livas was never formally assigned as Quiroz's supervisor during her employment with the hospital. Livas did not have direct formal control over Quiroz's compensation, benefits, promotion, or retention. However, Livas was the attending physician for a significant number of 1-South patients. Livas's patients usually occupied approximately one-third of the 1-South beds. As a physician, Livas had authority to direct Quiroz on patient care issues. Should Quiroz refuse to follow his directions, Livas could report her to a nursing supervisor. In his capacity as a physician, Livas could, and to some extent did, take actions that potentially restricted plaintiff's work responsibilities and opportunities.

In early 1996, Quiroz and Livas discussed the possibility of her working for him in his "private practice" and seeing his private practice out-patients. From approximately May through August 1996, Quiroz worked independently with Livas, assisting in the treatment of his private practice out-patients. All treatment sessions with Livas's private patients took place in a conference room located at Hartgrove. Both Livas and Quiroz were present at these sessions and both discussed private patients while on the premises of Hartgrove. Quiroz was compensated for each session and Livas was present at each session.

On numerous occasions during the time period that Quiroz treated Livas's private practice patients, Livas invited Quiroz out for lunch or dinner to discuss patients. Livas and Quiroz dispute whether these meals were in fact considered patient "staffings" or social dates. Livas denies the meetings were staffings, while Quiroz perceived the meetings to be for professional purposes. Livas and Quiroz had approximately four or five meals off Hartgrove premises. Plaintiff testified that, though she attended a few staffings with Livas outside the office, he asked her out on many more social dates. She repeatedly turned him down.

At these dinners and lunches, Livas and Quiroz would, in addition to discussing patient matters, occasionally talk about plaintiff's personal life, including her relationship with her parents and their possible divorce. Plaintiff and Livas also discussed plaintiff's personal finances. Edgar Moreno, a man plaintiff was dating at the time, also came up in their conversations, though it is not clear in what context. After one lunch at a mall, Livas gave Quiroz forty dollars to buy a pair of jeans. Plaintiff considered Livas a friend. However, that friendship turned sour when Livas made unwelcome sexual advances towards plaintiff and did not accept her refusals.

During the Spring and Summer of 1996, Livas began requesting that plaintiff date him. He invited her to go on vacation with him to Europe, which she refused. Plaintiff testified that she received a telephonic page from Livas one weekend in the summer of 1996. When she returned the call, Livas told her that he had just been attacked, and that he needed to talk with someone. Reluctantly, plaintiff agreed to meet Livas in a Chinatown parking lot. From there, Livas drove to a lounge. They were in the lounge for about two hours, with Livas drinking alcohol and plaintiff drinking soda. At the end of the evening, Livas offered plaintiff $20,000 to sleep with him. When she refused, he offered $25,000. Plaintiff demanded that Livas take her back to her car at the parking lot.

**\*3** In his car, Livas tried to touch and kiss plaintiff several times. Later that night, he repeatedly called her home and she refused to speak with him. The next morning, Livas left two messages on her answering machine apologizing for his conduct the night before and asking her forgiveness. Plaintiff had tape recorded some of their meeting that evening, but she later destroyed the tape at Livas's request. Still, Livas's sexual advances continued.

In July, 1996, after a patient session, Livas attempted to kiss plaintiff in a conference room at Hartgrove. Plaintiff pushed him away and terminated her independent working relationship with him. On another occasion, when plaintiff was working the nursing station, Livas handed her a note which read: "$500 for four hours." Contemporaneous with these events, plaintiff had confided in her co-worker, registered 1-South nurse Angela Tassin. Quiroz told Tassin that Livas was asking her out and calling her for non-patient reasons, and that she feared him. Quiroz did not contemporaneously report these incidents to hospital authorities.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

Although Quiroz quit working in Livas's private practice due to his behavior, she continued to treat his patients that were admitted to Hartgrove. Plaintiff began avoiding Livas and refused to accept phone calls from him. Plaintiff used Tassin to communicate with Livas regarding patient matters. Bridgette Walker, the unit secretary, testified that she and Tassin would intercept Livas's calls to plaintiff on numerous occasions prior to plaintiff's formal allegations. On several occasions, when Livas arrived to perform his rounds, plaintiff would hide in medicine closets until he left. After she rejected his advances, Livas visited Hartgrove more frequently and would stare at plaintiff as she worked.

In October, 1996, plaintiff and others attended a staff meeting held by Livas to discuss his patients. Plaintiff perceived that Livas had become angry with her at the meeting. Immediately after the meeting, Livas directed the 1-South manager Pat Witte, to transfer all of his patients to another unit. Plaintiff speculates that the transfer was motivated by Livas's anger with her, but the reason for Livas's decision is not apparent in the record. Livas's decision to remove his patients from 1-South resulted in decreased staffing needs and also could have resulted in fewer opportunities for plaintiff to work because nurses working on under-utilized wings were either floated to other units, if available, or were forced to take unpaid days off or use accrued sick or vacation time. Several weeks passed before Livas again assigned his patients to 1-South.

On November 7, 1996, Livas called while plaintiff was working 1-South and repeatedly asked that she go out with him. When plaintiff again refused, Livas stated: "I don't make a habit of destroying lives, but I know people in the Mafia and lawyers too." Plaintiff took this as a threat and feared for her safety. The next day she reported the incident to her supervisor, Witte. Witte noted that she perceived plaintiff to be sincerely afraid of Livas and that whatever happened seemed very real for Quiroz. Witte instructed plaintiff to write down her complaints and referred her to the administration: Associate Administrator Renee Spruill-Joiner, and Administrator Karen Johnson.

**\*4** On November 8, 1996, Quiroz met with Johnson and Joiner. Plaintiff reported the following: Livas had been harassing her about dating him since May, 1996; Livas had on two separate occasions offered her a substantial amount of money to be his companion; Livas tried to kiss her after a session with

a patient in a hospital conference room; Livas's behavior forced her to resign from her independent work with his out-patients; and Livas consistently called her at home and at work asking her out, including a recent threatening call. Plaintiff also informed Johnson and Joiner that she had a tape recording from her home answering machine which identified Livas as a caller who had repeatedly called her home a few months prior.

Joiner informed Quiroz that she would review the substance of Quiroz's complaint with the hospital administration and that Livas would be confronted with the substance of the allegations and appropriate action taken. Joiner offered Quiroz the option of transferring to another unit, but plaintiff declined, stating that she could continue in the unit because she was not alone with Livas on the unit.

On November 11, 1996, Hartgrove interviewed Livas as part of its investigation of plaintiff's harassment allegations. During his meeting with Johnson and Tom Dattalo, also of Hartgrove administration, Livas denied Quiroz's allegations. He further stated that plaintiff was a "prostitute" or "hooker" and that her "pimp" was a person named Edgar. He also stated that plaintiff "had been with" several physicians at the hospital, including a married man, Dr. Edrosa. Johnson understood Livas to mean that plaintiff had some kind of sexual relationship or contact with these other physicians. Livas also charged that plaintiff "tried to extort $20,000 from him." Additionally, Livas claimed that plaintiff had been pushing him for a social relationship, that they had met on a number of occasions at restaurants, and that she had pressed him for money. Hospital administrators advised Livas that he should have no further contact with Quiroz during the course of the investigation.

At the close of the conversation, Livas requested that plaintiff not be permitted to distribute medications to his patients. Livas contacted the nursing office the next day and instructed that plaintiff was not to distribute medication to his patients under any circumstances. Subsequently, plaintiff was indefinitely reassigned to another unit.

In response to plaintiff's sexual harassment allegations against him, Livas started to discuss plaintiff with a number of her co-workers, including: Tassin, Walker, and the Hispanic Coordinator Marcella Bicoff. In conversations with plaintiff's co-workers, Livas called plaintiff "incompetent," "stupid," a "liar," a "whore," and a "night caller." He also said that she was "trying to extort [or get]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

money" from him. On at least four or five occasions, Livas told Walker that plaintiff was a "night caller," a term Walker understood to mean "prostitute." On two occasions, Livas told Walker that plaintiff and Dr. Edrosa were having an affair. Livas told Walker that plaintiff tried to extort money or "get money" from him. Some of the conversations between Livas and Walker occurred at Roseland Hospital. While Tassin could not remember an occasion where Livas told her plaintiff was a hooker, whenever Livas would make such statements to Walker about plaintiff, Walker would call Tassin and tell her about it.

**\*5** On November 12, 1996, Johnson instructed the nursing department to indefinitely reassign plaintiff to adolescent and child units. The reassignment was to have no affect on Quiroz's compensation, benefits, hours or opportunity for advancement. The hospital believed that Livas could not be assigned to a different unit consistent with his responsibilities and qualifications as a psychiatrist principally involved in the care of adult patients.

On November 13, 1996, Johnson and Joiner met with Quiroz. During the meeting, Quiroz discussed her recent reassignment and possible additional support there. Quiroz asked whether the reassignment had been at the request of Livas. Johnson advised Quiroz that the reassignment had been solely the decision of Hartgrove in order to protect her and provide her with a more comfortable environment. Quiroz told Johnson that there was nothing else she wanted to have happen in the new unit. Quiroz also reported that Livas had contacted Walker to discuss the allegations. Johnson told Quiroz that she would contact Livas regarding the inappropriateness of his conversation with Walker. Johnson also discussed the importance of confidentiality regarding Quiroz's complaint, and emphasized that only she, Joiner, and Dattalo would be involved in the investigation.

On November 13, 1996, Johnson also met with Livas, informing him that he must not discuss the events leading up to the investigation or the investigation with any other hospital employees besides herself, Dattalo, and Joiner. Johnson indicated to Livas that she would be forced to address the issue with the Medical Executive Committee if he did not comply. Both plaintiff and Livas continued to discuss the investigation with others.

On November 29, 1996, Livas met with the administration and explained that he felt the need to defend himself because Quiroz continued to discuss the investigation. He also advised them that, as far as

he was concerned, the case was closed and that Quiroz could return to 1-South without further contact between the two of them. On December 2, 1996, Livas asked Johnson if plaintiff had been reassigned to 1-South, repeating his belief that the case was closed and that they could limit their contact to discussions of patient care. On December 9, 1996, Quiroz informed Joiner that she wanted to return to 1-South because she felt as if she were hiding and she had no reason to hide. She also complained that Livas continued to contact her co-workers about the investigation. Plaintiff made this same complaint again on December 11, 1996.

On December 20, 1996, Hartgrove ended its investigation, finding the results were "inconclusive." Hartgrove's formal investigation involved the individual meetings with plaintiff and Livas described above. In addition, more than a month after the initial complaint, Hartgrove administration met once with Tassin, Walker, and Bicoff. Plaintiff was returned to 1-South per her request. Both plaintiff and Livas were advised to maintain a professional work relationship and to refrain from social contact. Hartgrove indicated to both that it would be necessary for the administration to take further action if either failed to follow these guidelines. At the conclusion of its investigation, other than an admonishment not to talk to Quiroz's co-workers, Hartgrove did not take any disciplinary action against Livas.

**\*6** After the investigation concluded, Witte, in a January 14, 1997 memorandum, informed Johnson that Quiroz had reported that she was receiving pages to funeral homes that she believed were threats from Livas. Witte also wrote that plaintiff indicated she was uncomfortable at Hartgrove and would be looking for a new job. She also reported that Tassin and Walker complained that Livas had been calling them "repeatedly at work (both here and at other jobs) to discuss this situation." They reported that he called each of them at least once on January 14, 1997, "and it wasn't about patients since he transferred them to 3-North," Witte wrote. Witte adds that "Livas himself has talked to me repeatedly behind closed doors and keeps telling me that he is uncomfortable with her here. He seems unwilling/unable to discuss his patients or what is best for them, he can only discuss [plaintiff]." Hartgrove did not speak with Livas regarding the information contained in Witte's letter.

On January 17, 1997, plaintiff filed a charge of discrimination with the EEOC alleging sexual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

harassment. After plaintiff filed the EEOC charge. Livas, with Hartgrove's knowledge, continued to spread malicious rumors about plaintiff. Joiner and Johnson met with plaintiff to discuss her EEOC action. Plaintiff then reported that Livas continued to burden her co-workers with gossip and to slander her even after both were advised not to discuss the investigation. She again reported that she was receiving pages from funeral homes that she believed Livas sent. Hartgrove did nothing in response to this information.

Plaintiff also initiated a complaint against Livas at the Illinois Department of Professional Regulation ("IDPR"), alleging that Livas sexually harassed her. In early February, 1997, the IDPR conducted an investigation. In her statement to the IDPR, Walker said that she observed Livas touch plaintiff's face in the presence of patients. Both Walker and Tassin stated that they observed plaintiff receiving that appeared to be unwelcome and harassing phone calls from Livas. The results of the IDPR investigation were inconclusive.

Plaintiff continued her employment with Hartgrove. To accommodate her school schedule, in the summer of 1997, she transferred from her weekday position on 1-South to weekend shifts. Plaintiff states that Witte told plaintiff to talk to her when she wanted to return to her old position on 1-South. At the end of the summer, plaintiff approached Witte about the position. From the end of August to October 1997, plaintiff's efforts to be reinstated to her former work schedule were unsuccessful. Plaintiff alleges that Hartgrove's refusal to reinstate her to her former schedule was done in retaliation for her complaint to the EEOC.

On September 13, 1997, Livas reported that plaintiff had mishandled a patient interaction. Plaintiff denies that she mishandled the patient and wrote a memorandum to Hartgrove explaining her actions, adding that she feared Livas's accusation was personal, not professional, in origin. Plaintiff was never advised of the status of her memorandum. On September 25, 1997, plaintiff submitted a letter to Hartgrove stating that the circumstances of her employment had been made intolerable by Livas's conduct, leading her to conclude that she had been constructively discharged.

DISCUSSION

*COUNT I: Hartgrove's Summary Judgment Motion*

In Count I, plaintiff alleges that Hartgrove knew Livas created a hostile work environment for her and that Hartgrove failed to adequately respond to her complaints about Livas. Hartgrove counters that it cannot be vicariously liable for Livas's alleged actions because he was not plaintiff's supervisor and because his conduct did not result in a significant change in plaintiff's employment status. Hartgrove further submits that plaintiff cannot establish a prima facie case of hostile environment sexual harassment. Hartgrove argues that, even if plaintiff could present a prima facie case, her claim still must fail because Hartgrove took prompt and reasonable steps that remedied the conduct.

*Sexual Harassment*

Harassment "involves conduct that unreasonably interferes with a person's work performance or creates an intimidating, hostile, or offensive work environment. Title VII protects a worker against conduct which is sufficiently severe or pervasive that a reasonable person would find it hostile and which the victim himself subjectively sees as abuse." *Ngeunjuntr v. Metropolitan Life Insurance Co.,* 146 F.3d 464, 467 (7th Cir.1998). In determining whether conduct reaches the level of a hostile work environment, all the circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

**\*7** Plaintiff presents evidence that, over a six-month period, Livas repeatedly and persistently asked her out on dates that she repeatedly refused; that he would not take no for an answer; that on two separate occasions he offered her substantial amounts of money for sex; that he tried to kiss her in a conference room at Hartgrove; that he tried to touch and kiss her while she was in his car; that he asked her to go on vacation with him, which she refused; and that, after she repeatedly refused to go out with him he threatened to destroy her with the Mafia and his lawyers. Livas's harassing conduct led plaintiff to: refuse to talk to him when he called her at work; hide in a small medicine closet on the unit to avoid Livas when he made his rounds; enlist other nurses on the unit to act as go-betweens for her in order to avoid

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 6
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

speaking with Livas directly; fear for her personal safety; and eventually report his conduct to Hartgrove's administration.

Plaintiff's claims, if true, are sufficiently intimidating and abusive to rise to the level of actionable harassment. The Seventh Circuit has suggested that actionable conduct be demarcated by "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 526, 533-35 (7th Cir.1995). Livas's repeated requests for dates crossed the line. *See Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1456-57 (7th Cir.1994)* (series of offensive utterances give rise to objectively hostile work environment where comments and innuendo were overtly sexual in nature and specifically directed at plaintiff). Livas's attempts to touch and kiss plaintiff while she was riding in his car crossed the line. *See Barret v. Omaha Nat'l Bank, 584 F.Supp. 22, 24 (D.Neb.1983), aff'd, 726 F.2d 424 (8th Cir.1984)* (one incident of offensive touching while inside vehicle from which plaintiff could not escape was sufficient to constitute sexual harassment). *Accord Baskerville,* 50 F.3d at 430-31 (placing unwanted physical contact on the "hostile or deeply repugnant" side of the line demarcating the boundary of actionable sexual harassment). Plaintiff was the target of Livas's comments and conduct, not merely an observer. *See Carr v. Allison Gas Turbine Div. Gen. Motors, 32 F.3d 1007, 1010 (7th Cir.1994)* ("it is more uncomfortable to be the target of offensive words and conduct than to be merely an observer of them"). Moreover, the complained of conduct was protracted and egregious, as distinct from an isolated or ambiguous act. *See Saxton,* 10 F.3d at 533 (" 'relatively isolated' instances of non-severe misconduct will not support a hostile environment claim"); *Weiss v. Coca-Cola Bottling Co., 990 F.2d 333, 337 (7th Cir.1993).* Livas's physical advances, attempts to touch and kiss plaintiff, and repeated requests for dates over time were aggressive affronts. Here, plaintiff endured nearly six months of Livas's advances.

**\*8** A reasonable person could find unwanted touching, attempted kisses, and sexual advances over the course of several months hostile and abusive. It may reasonably be inferred from plaintiff's practice of hiding in closets to avoid Livas and her refusal to take his phone calls that plaintiff subjectively perceived her work environment to be hostile. Under this set of facts, a reasonable jury could conclude that plaintiff's work environment negatively affected her performance and that actionable harassment occurred.

An employer's liability for hostile environment sexual harassment depends on whether the alleged harasser is the victim's supervisor or merely a co-employee. *Parkins v. Civil Constructors of Ill. Inc. ., 163 F.3d 1027, 1032 (7th Cir.1998)* (citations omitted). In *Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998),* and *Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998),* the Supreme Court set forth the standard for employer liability in the sexual harassment context holding that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth, 118 S.Ct. at 2270; Faragher, 118 S.Ct. at 2292-93* (heightened liability standard exists because the "acts of supervisors have greater power to alter the environment than acts of co-employees generally ....").

Thus, "the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor." *Id.; see also Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1271 (10th Cir.1998)* (the operative question in determining supervisory status is whether the employee in question "had sufficient control over the plaintiff to be considered her supervisor ..."). When a supervisor is at such a low level that he could not be said to be the company's agent or effectively act on the employer's behalf an employer is not held to a heightened standard. *Saxton,* 10 F.3d at 536 n. 19. The central inquiry that divides low-level employees who are equivalent to co-workers from true supervisors who have authority and power sufficient to make consequential employment decisions affecting subordinates turns on how much or what kind of authority is exercised. *Parkins, 163 F.3d at 1033-34.* The essence of supervisory status may often be manifest in the authority to affect the terms and conditions of the victim's employment consisting of some entrustment to hire, fire, demote, promote, transfer or discipline an employee. *Id. at 1034* (citing *Swenteck v. USAir, Inc., 830 F.2d 552, 558 (4th Cir.1987)* (pilots not supervisors of flight attendants because they did not possess authority to "hire, fire, promote, or demote flight attendants"). However, supervisory authority does not begin and end with the actual power to hire, fire, or otherwise affect the terms and conditions of employment; an employer may be liable where an employee has apparent authority to alter the employment terms and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 7
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

conditions of subordinates. *See Quiroz v. Ganna Construction,* 1999 WL 59836 *18 (N.D.Ill. Jan.27 1999)* (employer does not avoid liability where employee with no actual power to hire, fire, had apparent authority to affect terms and conditions of subordinate); *Savino v. C.P. Hall Co.,* 988 F.Supp. 1171, 1184-85 (N.D.Ill.1997) (same). Liability is predicated on the misuse of supervisory authority. *Id.* at 1033.

**\*9** Applying this standard to the present case, plaintiff has raised a genuine issue of material fact as to whether Livas had supervisory authority over her. Hartgrove argues that Witte, not Livas was plaintiff's supervisor. Hartgrove contends that attending physicians did not supervise nurses employed by the hospital, noting that physicians did not have authority to hire, fire, or suspend a nurse or alter his or her working hours or salary.

Plaintiff sets forth facts from which contrary inferences may be drawn. Plaintiff argues that, unlike the usual corporation, a hospital is a unique environment where the hierarchy is based not merely on traditional supervisory responsibilities, but on the treatment of patients. Plaintiff presents factual support that, as a physician, Livas had more authority over plaintiff and other nurses, including nurse supervisor Witte, than would a mere co-worker. Livas and other doctors were the ones who, on a daily basis, directed plaintiff in her treatment of patients. Further, the record reveals that Livas's requests as to who would work under him were honored by the hospital.

Plaintiff also points to events in October 1996, when immediately after plaintiff questioned Livas's handling of a patient matter in a staff meeting, Livas transferred all of his patients from the unit. Livas's actions could have affected plaintiff's pay, since a Hartgrove nurse's income was partially linked to the number of patients occupying the unit he or she served.

In addition to her pay, Livas was in a position to affect plaintiff's job responsibilities. For instance, after Hartgrove confronted him with plaintiff's allegations, Livas directed that her ability to treat his patients be limited. Although he previously considered plaintiff qualified enough to work with him, Livas directed Hartgrove that plaintiff be forbidden from administering medication to patients. The day after Livas made this request, plaintiff was transferred to a different unit. Here, Livas was entrusted with sufficient authority to be an agent of the employer and possessed sufficient power and influence with which he might harass a lower level employee. *See Parkins,* 163 F.3d at 1032.

Although Livas was not plaintiff's immediate supervisor, there is sufficient evidence to find that Livas had significant authority over her and possessed the power to alter her working conditions. *Cf. Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 266 (8th Cir.1993) (cardiologist that did not have power to hire or fire staff did direct, discipline them and worked in close physical contact with staff). For summary judgment purposes, it could be found that Livas was a supervisor of Quiroz.

In *Ellerth,* the Supreme Court further held that when the plaintiff employee has suffered no tangible employment action, "a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Ellerth,* 118 S.Ct. at 2270. *See also, Faragher,* 118 S.Ct. at 2292-93. Since there is no evidence that plaintiff suffered economic injury, this defense may be raised. The affirmative defense set forth by the Supreme Court has two elements; a defending employer must prove: (1) that it exercised reasonable care to prevent and promptly correct harassment, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. *Id.*

**\*10** The Seventh Circuit has held that the reasonableness of an employer's response to a complaint rests in part on the gravity of the harassment and in part on the sufficiency of the information made available by the employee. *See Perry v. Harris Chernin, Inc.,* 126 F.2d 1010, 1013-14 (7th Cir.1997); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 432 (7th Cir.1995). Whether remedial action is timely and is likely to prevent a recurrence of the offending conduct are further factors to be taken into account. *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990). The focus is not on whether remedial activity ultimately succeeded, but on whether the employer's response was reasonable under the circumstances that then existed. *Brooms v. Regal Tube Co. .,* 881 F.2d 412, 421 (7th Cir.1989). It does not matter whether the remedial actions meet the employee's expectations so long as they are reasonably likely to keep the harassment from recurring. *Rushing v. United Airlines,* 919 F.Supp. 1101, 1108 (N.D.Ill.1996).

A permissible means of safeguarding against a recurrence of the offending conduct is to transfer the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

victim, provided that the transfer does not negatively affect the conditions of the victim's employment. *Guess,* 913 F.2d at 465. In challenging an employer's remedial action, a plaintiff must produce evidence of significant shortcomings in the employer's response. *Jones v. Gatzambide,* 940 F.Supp. 182, 187-88 (N.D.Ill.1996).

Plaintiff argues that Hartgrove's response to her complaints was inadequate under the circumstances. Plaintiff maintains that, while Hartgrove responded to her complaints by speaking with her and Livas on several occasions, the hospital administration confused activity with remedy. Only after plaintiff twice told Hartgrove that Livas was making disparaging remarks about her to her co-workers did Hartgrove follow up by talking to others who potentially had information about the complaints. Hartgrove did not discipline Livas in any way, nor did Hartgrove ever warn Livas that he would face suspension or termination or lose any privileges if his conduct continued or was found to be true. Nothing in the record indicates that Hartgrove did anything to investigate or follow up on plaintiff's complaint that she suspected telephonic pages that she received from funeral homes were sent by Livas.

Hartgrove argues that its response to plaintiff's first complaint was reasonable, prompt and effective. Hartgrove met with Livas the first business day after plaintiff complained and advised him to have no further contact with plaintiff during the investigation of her charge. Hartgrove argues that the alleged sexual harassment, as opposed to the alleged defamation, stopped after the first meeting with Livas. After the initial meeting, Livas made no additional request for dates and did not press her for a social relationship or attempt to see her. Livas did, however, engage in a slander campaign, telling co-workers that Quiroz was a prostitute.

**\*11** Harassment can be purely verbal. *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994). The Seventh Circuit has indicated that:
Unfounded accusations that a woman worker is a "whore," a siren, carrying on with her co-workers, a Circe, "sleeping her way to the top," and so forth are capable of making the workplace unbearable for the woman verbally so harassed, and since these are accusations based on the fact that she is a woman they could constitute a form of sexual harassment.

*McDonnell v. Cisneros,* 84 F.3d 256, 259-60 (7th Cir.1996).

The distinction Hartgrove attempts to draw between the harassment and the defamation fails to recognize that the manner in which Livas defamed plaintiff to her co-workers also constituted a form of sexual harassment. Also, it may reasonably be inferred that Livas defamed plaintiff because she spurned his sexual advances. Hartgrove's meetings with Livas were timely, but failed to correct his behavior or prevent a recurrence of offending conduct.

Hartgrove takes the position that both Livas and plaintiff were repeatedly advised of the need for confidentiality and both failed to respect Hartgrove's admonition. Hartgrove argues it could not fairly act against one as long as both were in breach. Hartgrove does not explain why both could not have been reprimanded. Further, the record indicates that Livas did more than merely violate the confidentiality of the investigation; witnesses testified that he continued his campaign of harassment, albeit in a different form, by falsely telling other hospital employees that plaintiff was a prostitute, sleeping with other employees, and incompetent as a nurse, and that she should not be permitted to administer medication.

Plaintiff did avail herself of the preventive and corrective opportunities provided by Hartgrove to avoid harm. She accepted the unit transfer and she kept the hospital administration appraised of additional developments with Livas. Plaintiff may have breached the confidentiality of the investigation, but there is no indication that her breach hampered Hartgrove's investigation or follow-up.

On Hartgrove's summary judgment motion, the facts assumed to be true support the existence of a hostile work environment, that Livas was a supervisor, and that Hartgrove failed to adequately respond to the report of harassment. Accordingly, Hartgrove is denied summary judgment on plaintiff's sexual harassment claim.

*Retaliation*

To establish a prima facie case of retaliation, plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action by her employer; and (3) there was a causal link between the protected expression and the adverse action. *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 885 (7th Cir.1998). To establish a causal link, plaintiff must show that defendant would not have taken adverse action "but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 9
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

for" the protected expression. *McKenzie v. Illinois Department of Transp.,* 92 F.3d 473, 483 (7th Cir.1996). Causation cannot be inferred solely from the fact that a plaintiff engaged in protected activity and later suffered an adverse employment action, causation must be proved. *Hamann v. Gates Chevrolet, Inc.,* 910 F.2d 1417, 1420 (7th Cir.1990).

**\*12** Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer. *McKenzie,* 92 F.3d at 483. The employer must articulate an alternative, permissible explanation for the challenged employment decision. *Id.* If the employer makes this showing, then the plaintiff must show that the employer's explanation is pretext for retaliation. *Id.*

Plaintiff contends the retaliation took three forms: (1) Livas's continued slanderous statements; (2) Hartgrove's failure to provide her a change of hours in August 1997; and (3) her constructive discharge on September 25, 1997. [FN2]

> FN2. Hartgrove's brief does not address plaintiff's constructive discharge claim.

Adverse workplace actions may take the form of vicious gossip. *Knox v. State of Indiana,* 93 F.2d 1327, 1334-35 (7th Cir.1996) (employer's knowledge of vicious co-worker gossip and its failure to do anything about it may constitute employer acquiescence to such retaliation after plaintiff complained of sexual harassment). *See also, McDonnell,* 84 F.3d at 259. Arguably, plaintiff engaged in protected activity when she alerted Hartgrove to Livas's behavior toward her. Shortly thereafter, Livas began spreading the unsubstantiated rumor that plaintiff was a prostitute. There is no indication in the record that he had spread such rumors prior to plaintiff's complaint against him. The timing of plaintiff's complaint and Livas's conduct is sufficiently close to infer a causal connection between his retaliation and plaintiff's protected activity. Accordingly, Hartgrove is not entitled to summary judgment on this portion of plaintiff's retaliation claim.

Hartgrove argues that plaintiff's transfer was strictly lateral and that denial of a lateral transfer is not an adverse employment action. Plaintiff maintains that the transfer during the summer of 1997 was not a lateral transfer as she worked two 16-hour days each weekend, whereas her previous position working normal weekday hours was far more desirable. The

question is whether refusal to restore plaintiff to weekday hours is a minor or material change in working conditions.

An adverse action must be material to be actionable: "it must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993). Ordinarily, denying or imposing a lateral transfer is not an adverse employment action and cannot support a claim of retaliation. *See Williams v. Bristol Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996); *Spring v. Sheboygan Area School District,* 865 F.2d 883, 886 (7th Cir.1989) *Hayes v. Navistar Fin. Corp.,* 1997 WL 43248 \*5 (N.D.Ill. Jan.24, 1997). However, assigning an employee to an undesirable schedule can be more than a trivial inconvenience or minor change in the employee's working conditions. *See Mondzelewski v. Pathmark Stores, Inc.,* 162 F.3d 778, 788 (3rd Cir.1998) (change in employee's schedule to shift offering little free time and requiring weekend work); *Hamilton v. Rodgers,* 791 F.2d 439, 442 (5th Cir.1986) (transfer to night shift); *Florence v. Runyon,* 990 F.Supp. 485, 498 (N.D.Tex.1997) (transfer to new position with different work hours); *Khan v. Cook County,* No. 96-C-1113, 1996 WL 431410, at \*2 (N.D.Ill. July 30, 1996) (transfer to night shift); *Maddox v. County of San Mateo,* 746 F.Supp. 947, 953 (N.D.Cal.1990) (employer refused to transfer employee from graveyard shift); *see also Collins v. Illinois,* 830 F.2d 692, 703 (7th Cir.1987) (adverse action does not require loss of money or benefits, but may consist of changes in location, duties, perks or other basic aspects of the job).

**\*13** While it is true that plaintiff requested the transfer in the first instance to accommodate her school schedule, she always anticipated being able to transfer back once she completed the school session. Near the end of the summer, plaintiff spoke to Witte about returning to a weekday 1-South position. Witte did not respond to plaintiff's inquiries. Witte denied knowing that plaintiff wanted to return to her previous weekday position at 1-South. However, both plaintiff and Johnson testified that they talked to Witte about plaintiff's request. Plaintiff's EEOC proceeding was pending from January through June 1997. This denial of a transfer occurred from August through October. Witte's denial of knowledge of the request, even in face of Johnson's contrary testimony raises questions as to her motives. Furthermore, Hartgrove does not contend or show evidence that no opening was available in the weekday shift. [FN3] A reasonable factfinder could infer a retaliatory motive.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

FN4 Accordingly, Hartgrove's motion for summary judgment on Count I is denied. Hartgrove is not entitled to summary judgment on plaintiff's sexual harassment claim or her retaliation claim.

> FN3. In its reply, Hartgrove contends it would have filled the position with a mental health worker to save costs. Since raised for the first time in the reply this contention is not considered. *See Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 597 (7th Cir.1997) ( "[A]rguments raised for the first time in the reply brief are waived."); *Gold v. Wolpert,* 876 F.2d 1327, 1331 n. 6 (7th Cir.1989).

> FN4. Plaintiff testified that a co-worker told plaintiff that Witte did not want her back because of the Livas situation. That hearsay statement has not been considered.

### COUNT II

In Count II, plaintiff claims that defendant Livas defamed her in numerous statements. Both plaintiff and Livas have moved for summary judgment on this count. In addition, Livas has filed a counterclaim for defamation, claiming that plaintiff defamed him with statements she made in connection with her sexual harassment allegations against him. Plaintiff has moved for partial summary judgment on Livas's counterclaim. Livas has not moved for summary judgment on his counterclaim. The parties agree that Illinois law applies to the defamation claims.

### Livas's Summary Judgment Motion

Livas contends that he is entitled to summary judgment for three primary reasons. First, he argues that the allegedly defamatory statements are capable of innocent construction and are merely statements of his opinion of plaintiff. Second, Livas argues that his statements made to Hartgrove and to the IDPR during their investigations are privileged. Finally, Livas submits that plaintiff has failed to present a genuine issue of material fact that her reputation was damaged by Livas's comments. In Livas's view, plaintiff was not damaged by anything he said because those he told did not believe him.

### Defamation

There is no clear rule for determining whether language is defamatory, each case must be decided on its facts. *See Barakat v. Matz,* 271 Ill.App.3d 662, 208 Ill.Dec. 111, 648 N.E.2d 1033, 1038 (1st Dist.1995). Generally, a statement is defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him or her. *Quinn v. Jewel Food Stores, Inc.,* 276 Ill.App.3d 861, 213 Ill.Dec. 204, 658 N.E.2d 1225, 1229 (1st Dist.1995). To prove a claim of defamation, a plaintiff must show: (1) the defamer made a false statement concerning the claimant; (2) there was an unprivileged publication of the defamatory statement to a third party by defendant; and (3) claimant was damaged. *Gibson v. Philip Morris, Inc.,* 292 Ill.App.3d 267, 226 Ill.Dec. 383, 685 N.E.2d 638, 643 (1st Dist.1997). Under Illinois law, substantial truth is a complete defense to any defamation action. *Sullivan v. Conway,* 959 F.Supp. 877, 881 (1997).

**\*14** The claimed defamatory statements made by Livas can be placed into four broad categories: (1) remarks that plaintiff was a "liar," (2) remarks that plaintiff was a "night caller," "prostitute," "whore," or "hooker," with a pimp named Edgar and having an affair with Dr. Raymond Edrosa; (3) remarks that plaintiff engaged in extortion; and (4) remarks that plaintiff was "stupid" and "incompetent". It is Livas's position that these comments were statements of opinion, capable of an innocent construction, and deserving of a qualified privilege. Livas does not deny that he made these remarks to third parties.

### Defamation Per Se

Statements may be either defamatory *per quod,* or defamatory *per se. See Gibson,* 226 Ill.Dec. 383, 685 N.E.2d at 643 (citation omitted). A statement is defamatory *per se* if it is so obviously and naturally harmful to the person to whom it refers that injury to his or her reputation may be presumed. *Koelgas v. Heftel Broadcasting Corp.,* 154 Ill.2d 1, 10, 180 Ill.Dec. 307, 607 N.E.2d 201, 206 (1992). In an action for defamation *per se,* damages are presumed and the claimant need not prove that actual harm was sustained. *Gibson,* 226 Ill.Dec. 383, 685 N.E.2d at 647. Plaintiff contends all the statements are defamation *per se,* by virtue of her failure to allege damages, she does not rely on defamation *per quod.* Therefore, being able to prove damages is a non-issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 11
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

Under Illinois law, five categories of statements are considered defamatory *per se:* (1) words that impute commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in discharge of duties of office or employment; (4) words that prejudice a party or impute lack of ability in his or her trade, profession, or business; and (5) false accusations of fornication and adultery. *See Bryson v. News America Publications, Inc.,* 174 Ill.2d 77, 672 N.E.2d 1270, 1214-15 (1996); Illinois Slander and Libel Act 740 ILCS 145/1 *et seq.* (West 1992).

In the present case, Livas's statements to the effect that plaintiff was a prostitute with a pimp named Edgar impugn criminality and are defamatory *per se.* Four or five times, Livas told Walker that plaintiff was a "night caller," meaning whore or prostitute. He also made similar statements to Johnson during Hartgrove's investigation of plaintiff's complaints. Livas's statements that plaintiff was having an affair with another physician is also defamatory *per se* as it accuses plaintiff of fornication and adultery and calls into question plaintiff's integrity in her professional relationships and employment. *See Babb v. Minder,* 806 F.2d 749, 754-55 (7th Cir.1986) (statements that plaintiff had exposed herself to co-workers and offered sexual favors to a manager at work imputed both the commission of a crime and an inability to perform her job).

Similarly, Livas's statements that plaintiff attempted to extort or get money from him accuse plaintiff of criminal activity and are defamatory *per se.* It is undisputed that Livas told Walker and Johnson that plaintiff was trying to get money from him. [FN5] Livas's remarks to the effect that plaintiff was a "liar" could be placed in the category of words that impute a want of integrity. Similarly, Livas's comments to the effect that plaintiff was "stupid" may be understood as denoting a lack of ability in her profession. Finally, Livas's remarks that plaintiff was "incompetent" could be understood to call into question plaintiff's ability in her trade and profession, also falling within a *per se* category.

> FN5. There is some dispute over whether Livas used the precise word "extortion." This dispute is not material as "the offensive accusation need not state the commission of a crime in terms of art or with the particularity of an indictment." *Babb,* 806 F.2d at 758 (quoting *Zeinfeld v. Hayes*

*Freight Lines, Inc.,* 41 Ill.2d 345, 243 N.E.2d 217 (1968)).

**\*15** Even if a comment may fall within one of the categories of *per se* defamatory statements, it may not be actionable if shielded under the innocent construction rule, *Kolegas,* 180 Ill.Dec. 307, 607 N.E.2d at 206; *Chapski v. Copley Press,* 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195, 199 (1982); if safeguarded as a constitutionally protected expression of opinion, *Barakat,* 208 Ill.Dec. 111, 648 N.E.2d at 1038 (citing *Mittelman v. Witous,* 135 Ill.2d 220, 142 Ill.Dec. 232, 552 N.E.2d 973, 978-79 (1989)), if protected by qualified privilege, *Kuwick v. Starmark Star Marketing & Admin., Inc.,* 156 Ill.2d 16, 188 Ill.Dec. 765, 619 N.E.2d 129, 133 (1993); or if immunized by absolute privilege, *Barakat,* 208 Ill.Dec. 111, 648 N.E.2d at 1038 (citing *Layne v. Builders Plumbing Supply Co.,* 210 Ill.App.3d 966, 155 Ill.Dec. 493, 569 N.E.2d 1104 (1991)).

*Opinion*

Expressions of opinion are protected from defamation claims, statements of fact are actionable. *Barakat,* 208 Ill.Dec. 111, 648 N.E.2d at 1041 (citing *Mittelman v. Witous,* 135 Ill.2d 220, 232, 142 Ill.Dec. 232, 552 N.E.2d 973 (1989)). Mixed expressions of opinion and fact may also be actionable. *Id.* To determine whether a statement is one of fact or opinion, Illinois courts consider the totality of the circumstances and whether the statement can be objectively verified as true or false. *Id.* In addition, courts also consider whether a statement implies factual allegations; whether the statement is verifiable; whether the literary context of the statement would influence the average recipient's readiness to infer that a particular statement has factual content; and whether the broader social context or setting in which the remark is made signals use as either fact or opinion. *Id.* at 1042.

Livas's remarks that plaintiff was an adulteress, and a prostitute that had been with others and who tried to extort money from him are capable of being proven true or false. Plaintiff testified that she was not in fact any of the above. Livas in his deposition purports to set forth a verifiable factual basis as the foundation for his opinion. For instance, he testified that plaintiff told him she would loiter on various city streets, that she was a stripper and dancer, and that she would have sex for money. Livas also claims that plaintiff tape recorded a conversation between them, leaving him with the impression that she wanted money in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.