exchange for destroying the tape. Because Livas's remarks could be interpreted as stating actual facts, the remarks are not protected opinion.

Livas's statements that plaintiff was "incompetent" and "stupid" are different. These statements are **not capable of being proven true or false** as they are inherently subjective. See *Sullivan,* 959 F.Supp. at 881. The statements are not statements of fact which can be verified, but rather are Livas's subjective opinions. See *Doherty v. Kahn,* 289 Ill.App.3d 544, 224 Ill.Dec. 602, 682 N.E.2d 163, 172 (1st Dist.1997) (statements that plaintiff was fired because among other things he was "lazy," "incompetent," and "could not do his job or what was expected of him" were mere expressions of opinion, and not actionable defamation); *see also Rinaldi v. Hold, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1306 (1977) (statement that judge was "incompetent" expresses protected opinion) and *Catalano v. Pechous,* 83 Ill.2d 146, 50 Ill.Dec. 242, 419 N.E.2d 350, 357-58 (1980) (citing *Rinaldi* with favor). Livas made no specific charges about the plaintiff's purported incompetence or stupidity with reference to specific facts as to her job performance as to make his statements capable of verification. See *Finck v. City of Tea,* 443 N.W.2d 632, 635-36 (S.D.1989) (statements characterizing chief of police as "dumb son-of-a-bitch" and "incompetent" in front of city council and others were statements of opinion rather than fact); *Stepien v. Franklin,* 39 Ohio App.3d 47, 528 N.E.2d 1324, 1327-29 (1988) (dumb, stupid protected statements of opinion); *DeMoya v. Walsh,* 441 So.2d 1120, 1121 (1983) (statements characterizing co-worker as a "raving maniac" and "raving idiot" were opinion). In this instance, the statements "stupid" and "incompetent" are protected statements of opinion. Accordingly, defendant is entitled to summary judgment on these statements.

**\*16** Livas's statement that plaintiff is a "liar" may be defamatory in this instance because the statement was made in response or reference to plaintiff's complaint. See *Pease v. International Union of Operating Eng'r Local 150,* 208 Ill.App.3d 863, 870, 153 Ill.Dec. 656, 567 N.E.2d 614, 619 (1st Dist.1991). In *Pease,* a newspaper reporter interviewed a union representative of defendant's union, regarding a charge made by Pease that defendants engaged in acts of vandalism. In response to a reporter's question, the representative stated: "He lies a lot." The court held his statement actionable because it was made in a specific factual context. *Id.* Here, Livas made his comments in regards to a specific factual context, in response to being confronted with plaintiff's sexual harassment allegations. Livas's statement about events that occurred between he and plaintiff are subject to verification; they may be determined to be true or false. In the present case, use of the term liar is a statement of fact. *Id.* Compare *Piersall v. Sportsvision of Chicago,* 230 Ill.App.3d 503, 172 Ill.Dec. 40, 595 N.E.2d 103, 107-08 ( Dist.1992) (statement that plaintiff was "liar" not actionable, without a factual basis surrounding the statement). Accordingly, Livas motion for summary judgment as to this comment fails.

*Innocent Construction*

If a statement is reasonably capable of an innocent construction, it may not be regarded as defamatory per se. See *Kolegas,* 180 Ill.Dec. 307, 607 N.E.2d at 206; *Barakat,* 208 Ill.Dec. 111, 648 N.E.2d at 1042. Whether a statement is subject to an innocent construction is a question of law. *Chapski,* 65 Ill.Dec. 884, 442 N.E.2d at 199. If a statement cannot reasonably be innocently interpreted, then a jury is to decide whether the statement was in fact defamatory or in reference to the plaintiff. *Id.*

Under the innocent construction rule, a statement is to be construed in the context in which it is published, with the words accorded their natural and obvious meanings. *Chapski,* 65 Ill.Dec. 884, 442 N.E.2d at 199. "The test is not whether the words reasonably can be innocently interpreted, but rather 'whether the words, considered in context and given their natural and obvious meaning, may reasonably be innocently interpreted.' " *Barakat,* 208 Ill.Dec. 111, 648 N.E.2d at 1042 (citations omitted). Courts must interpret allegedly defamatory words as they appeared to have been used and according to the idea they were intended to convey to the listener. *Bryson,* 220 Ill.Dec. 195, 672 N.E.2d at 1217.

Livas's comments to the effect that plaintiff was a prostitute and his remarks that she tried to get or "extort" money from him when considered in context and given their natural and obvious meaning are defamation *per se,* incapable of innocent interpretation. Defendant offers no plausible non-defamatory interpretation or context for "prostitute" or "extortion." The natural and obvious meaning of Livas's statements to the effect that plaintiff engaged in prostitution, extortion, and an affair impute criminal actions, fornication and adultery and fall outside the confines of the innocent construction rule. Similarly, Livas's remarks that plaintiff was a liar, when considered in context, are not capable of

Not Reported in F.Supp.2d                                                                                                           Page 13
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

innocent construction as Livas used the remark to prejudice plaintiff during the investigation of her claim and intended to convey to the listener that she was deceitful and not trustworthy. Accordingly, Livas is not entitled to summary judgment on these points.

*Privilege*

**\*17** Livas seeks to shield the statements he made to Hartgrove administration and the IDPR behind the cloak of privilege. Livas argues that the statements he made to Hartgrove during its investigation of plaintiff's allegations are entitled to qualified privileged and that his statements before the IDPR are entitled to absolute immunity. Plaintiff responds that Livas's remarks are not entitled to privilege or that Livas abused his privilege because his participation in Hartgrove's investigation primarily consisted of his making statements to discredit her allegations and harm her reputation in retaliation for her complaints against him.

A privileged communication is one which except for the circumstances under which it is made, might be defamatory and actionable. *Kuwick,* 188 Ill.Dec. 765, 619 N.E.2d at 133. Whether or not an allegedly defamatory statement is protected by an absolute or qualified privilege is a question of law to be determined by the court. *Barakat,* 208 Ill.Dec. 111, 648 N.E.2d at 1038-39. Absolute privilege affords complete immunity and is generally limited to situations which involve legislative, judicial or quasi-judicial proceedings and other acts of State. *Id. at 1039.* The qualified privilege only protects a defendant if it is not abused. *Gibson,* 226 Ill.Dec. 393, 685 N.E.2d at 654.

The qualified privilege places additional burdens upon the plaintiff to prove that the defendant either intentionally published the material while knowing the matter was false or displayed a reckless disregard as to the matter's falseness. *Kuwick,* 188 Ill.Dec. 765, 619 N.E.2d at 133 (citing *Mittelman v. Witous,* 135 Ill.2d 220, 142 Ill.Dec. 232, 552 N.E.2d 973, 981 (1989)). Reckless disregard as to the matter's falseness has been defined in Illinois as publishing the defamatory matter "despite a high degree of awareness of the probable falsity or entertaining serious doubts as to its truth." *Id.* (quoting *Mittelman v. Witous,* 135 Ill.2d 220, 142 Ill.Dec. 232, 552 N.E.2d at 981).

The elements of conditional privilege for defamatory statements are as follows: "good faith by the defendant, an interest or duty to uphold, a statement limited to its scope to that purpose, a proper occasion, and publication in a proper manner and to the proper parties only." *Davis v. John Crane, Inc.,* 261 Ill.App.3d 419, 199 Ill.Dec. 133, 633 N.E.2d 929, 937 (1st Dist.1994). To determine whether a qualified privilege exists, Illinois has adopted the approach set forth in the restatement: "[u]nder the Restatement (Second) of Torts, a court looks only to the occasion itself for the communication and determines as a matter of law and general policy whether the occasion created some recognized duty or interest to make the communication so as to make it privileged." *Kuwick,* 691 N.E.2d at 134.

In determining whether an occasion is privileged, the comparison is to be made between the value of the type of interest involved and the serious character of the general kind of harm threatened thereto and the degree of harm to another's reputation normally to be expected from the sort of defamatory matter that would usually be necessary to protect such an interest. In short, the courts here have to deal with the law of general averages based on human experience and must shape a general policy to deal with a general problem.

**\*18** *Id.* (quoting S. Harper, F. James & O. Gray, *The Law of Torts* § 5.25 at 214 (2d ed.1986)). Statements made in the context of workplace investigations are conditionally privileged. *Scherer v. Rockwell Int'l Corp.,* 766 F.Supp. 593, 607 (N.D.Ill.1991) (statements made in sexual harassment investigation to employer protected by qualified privilege under Illinois law).

Applying this approach to the present case, Livas's statements during Hartgrove's internal investigation are entitled to qualified privilege. The statements were made in the context of a situation in which not only Livas's own interests were at stake, but also those of plaintiff and Hartgrove as well. Moreover, Title VII requires employers to investigate and act upon serious allegations of sexual harassment. *See, e.g., Baskerville,* 50 F.3d at 432. Private compliance and enforcement procedures are essential to the success of efforts to eliminate employment discrimination, such private enforcement would be undermined if statements made during investigations were not protected by a qualified privilege. *See Garziano v. E.I. du Pont de Nemours & Co.,* 818 F.2d 380, 386-88 (5th Cir.1987); *Stockley v. AT & T Information Sys., Inc.,* 687 F.Supp. 764, 769 (E.D.N.Y.1988) (qualified privilege extended to sexual harassment investigations so as not to leave

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS    Document 87-4    Filed 02/17/2006    Page 3 of 15

Not Reported in F.Supp.2d                                                                                   Page 14
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

"employers between the rock of defamation suits and the hard place of liability under Title VII").

Statements made by Livas to administrators as part of Hartgrove's internal investigation are protected by qualified privilege. See *Stockstill v. Shell Oil Co.,* 3 F.3d 868, 872 (5th Cir.1993) (qualified privilege extended to defamatory statements made in connection with employer's investigation of discrimination); *Bertotti v. Philbeck, Inc.,* 827 F.Supp. 1005, 1013 (S.D.Ga.1993) (conditional privilege extended to statements made in response to sex discrimination investigation); *Muthuswamy v. Burke,* 269 Ill.App.3d 728, 207 Ill.Dec. 50, 646 N.E.2d 616, 619 (1st Dist.1993) (department chairman entitled to qualified privilege for statements made regarding performance of employee under his supervision); *Lambert v. Morehouse,* 68 Wash.App. 500, 843 P.2d 1116, 1120 (1993) (conditional privilege extended to workplace sexual harassment investigation); *Lawson v. Boeing,* 58 Wash.App. 261, 792 P.2d 545, 549 (1990) (same); *Missick v. Big Supermarkets, Inc.,* 459 N .Y.S.2d 994, 997 (1985) (qualified privilege extended to statements made during security investigation of salesman).

To prove an abuse of a qualified privilege, a plaintiff must show "a direct intention to injure another, or ... a reckless disregard of [her] rights and the consequences that may result to [her]." *Kuwick,* 188 Ill.Dec. 765, 619 N.E.2d at 135-36. An abuse of qualified privilege may consist of "any reckless act which shows a disregard for the defamed party's rights, including failure to properly investigate the truth of the matter ...." *Id.* Here, there is sufficient evidence to infer that Livas made intentionally false statements or acted with reckless disregard of the truth. Accordingly, Livas is not entitled to summary judgment based on qualified privilege.

**\*19** The statements Livas made to the IDPR must be treated differently. Statements made to quasi-judicial bodies or in quasi-judicial proceedings are entitled to absolute immunity. See *Kalish v. Illinois Educ. Ass'n,* 157 Ill.App.3d 969, 110 Ill.Dec. 72, 510 N.E.2d 1103, 1105 (1st Dist.1987). The IDPR is a quasi-judicial body that conducted an investigation into plaintiff's allegations against Livas. The IDPR possesses powers including the ability to conduct hearings on proceedings to revoke suspend, renew, place on probation or take other disciplinary action authorized in any licensing Act administered by the Department. As such, Livas's statements to the IDPR investigators are absolutely privileged.

Accordingly, Livas's summary judgment motion is granted in part with respect to statements he made to the IDPR and the statements that plaintiff was stupid and incompetent. The remainder of his motion is denied for the reasons stated above.

QUIROZ'S SUMMARY JUDGMENT MOTIONS

In his counterclaim, Livas claims, in part, that plaintiff defamed him by falsely accusing him of having made statements that plaintiff was having an affair with another doctor and that plaintiff was a prostitute. Plaintiff's summary judgment motion is limited to these two statements. Since Livas now concedes that he made these statements about Quiroz, Quiroz's statements cannot be false. See *Pope v. Chronicle Publishing Co.,* 95 F.3d 607, 613 (7th Cir.1996). This aspect of the counterclaim will be dismissed.

Turning now to plaintiff's motion for summary judgment on her own claims, factual disputes remain which preclude the entry of summary judgment in plaintiff's favor as to abuse of conditionally privileged statements made during the investigation, whether she attempted to extort money from Livas, and whether she was a prostitute. For purposes of resolving plaintiff's summary judgment motion disputes must be drawn in Livas's favor. *Valance,* 110 F.3d at 1274. Livas presents evidence that he perceived that plaintiff was a prostitute attempting to extort money from him. For instance, Livas testified that plaintiff had told him that she would go out with a man "if the price was right." Livas also testified that he believed plaintiff was trying to extort money from him. Thus, summary judgment cannot be granted on these statements.

CONCLUSION

IT IS THEREFORE ORDERED that defendant Hartgrove Hospital's motion to strike plaintiff's affidavit [78-1] is denied without prejudice. Defendant Hartgrove Hospital's motion for summary judgment [44-1] is denied. Defendant Livas's motion for summary judgment [56-1] is granted in part and denied in part. Count II is dismissed to the extent it is based on statements that plaintiff was "stupid" or "incompetent." Plaintiff's motion for summary judgment on Count II [53-1] is granted in part and denied in part. The counterclaim is dismissed in part as regards accusations of an affair with a doctor and being a prostitute.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 15
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833
**(Cite as: Not Reported in F.Supp.2d)**

***20** This case is referred to the assigned magistrate for purposes of holding a settlement conference within 30 days. Status hearing before Judge Hart is set for May 6, 1999 at 11:00 a.m.

N.D.Ill.,1999.
Quiroz v. Hartgrove Hosp.
Not Reported in F.Supp.2d, 1999 WL 281343 (N.D.Ill.), 75 Empl. Prac. Dec. P 45,833

Briefs and Other Related Documents (Back to top)

• 1:97cv06515 (Docket) (Sep. 15, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                                        Page 1
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.
James L. MARTIN, Plaintiff,
v.
WIDENER UNIVERSITY SCHOOL OF LAW,
Anthony J. Santoro and Mitchell S. Bierman,
Defendants.
**Civ.A. No. 91C-03-255.**

Submitted: Aug. 29, 1991.
Decided June 4, 1992.
Memorandum Opinion Submitted: Aug. 12, 1991.
Decided June 17, 1992.

Upon Motion of Plaintiff for Summary Judgment-Denied,
Upon Motion of Defendants to Dismiss-Granted.

James L. Martin, pro se.
Somers S. Price, Jr., of Potter, Anderson & Corroon, for defendants.

OPINION

HERLIHY, Judge.
**\*1** Presently before the Court are two motions. The first motion filed is defendants' motion to dismiss for failure to state a claim under Superior Court Rule 12(b)(6). The second motion filed is plaintiff's motion for summary judgment.

Plaintiff James L. Martin [Martin] has filed suit in this Court against Widener University School of Law [FN1] [Widener], its dean Anthony J. Santoro [Santoro] and a Widener newspaper writer Mitchell S. Bierman [Bierman] [collectively "defendants"]. This last suit stems from a long-standing dispute between Martin and Widener.

When applying to Widener in 1979, Martin answered "no" to a question asking if he had ever been a patient in a mental, penal or correctional institution. This was not a correct answer as Martin had been institutionalized in 1975. [FN2] Widener later communicated to various state bar examiners Martin's incorrect answer. An avalanche of litigation, including this matter, has ensued.

*FACTS*

Some of the claims raised in this litigation result from events which occurred in the last several years since Widener's communication to various boards of bar examiners. On July 14, 1989 Dr. Eric Copeland [Copeland], who refers to himself as a client of Martin, called Santoro and tape-recorded their phone conversation. Martin claims Santoro slandered him in this conversation. Martin supplied transcribed portions of the conversation with his complaint. The details of that conversation will be discussed as necessary to resolve the allegations.

On February 18, 1990, *The Philadelphia Inquirer [Inquirer]* published an article detailing the controversy, "1 answer thwarts his law career" [Appendix A]. The article was sympathetic to Martin in that it highlighted the opinion of professors from two other law schools who stated they would have overlooked Martin's lack of candor and would not have communicated any related facts to the various bar examiners. The article also gave full detail to Martin's explanation of the events. Defendants claim Martin solicited the article by approaching the reporters. Martin denies he voluntarily sought the publicity.

The *Delaware Law Forum [Forum* ] is a small topical newspaper with circulation to Widener's students, faculty, alumni and the local legal community. Staff writer Bierman authored an article that summarized the *Inquirer* article. Bierman quoted extensively from and repeatedly referenced the *Inquirer* article to the degree of precise page number per quote. *Delaware Law Forum,* May 1990, Vol. 17, No. 6 [Appendix B]. Pertinent portions of the article will be discussed as is necessary to resolve the issues herein.

Martin seeks various forms of relief: (1) an injunction against Widener preventing any further dissemination of information about him without his consent; (2) a "declaratory judgment" to purge Widener's files on him which he contends are defamatory; (3) damages for alleged libel by the defendants Widener and Bierman; (4) damages against Widener and Santoro for slander; and (5) damages from all defendants for invading his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                            Page 2
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

privacy.

The basis of Martin's action is that several or all of the defendants (1) falsely reported his Widener graduation date, (2) recast his personal and academic history, (3) misrepresented his litigation against the law school, (4) falsely wrote about his contacts with certain hospitals which are the subject matter of other litigation, (5) falsely described his high school career, (6) falsely wrote about police contacts he had, and (7) falsely described his litigation in New Jersey and his bar status there. These claims will be detailed later as is necessary to resolve them.

**\*2** Defendants argue that the doctrine of *res judicata* or collateral estoppel and/or lack of merit to Martin's complaint entitle them to judgment in their favor. They also contend this Court lacks jurisdiction to grant Martin's request for equitable relief. Believing no genuine issues of material fact exist, Martin, in turn, contends he is entitled to summary judgment.

### STANDARD

A motion to dismiss for failure to state a claim upon which relief can be granted made pursuant to Superior Court Rule 12(b)(6) will not be granted if the plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. *Spence v. Funk,* Del.Supr., 396 A.2d 967 (1978). In considering this motion, all well-pleaded allegations in the complaint must be accepted as true. *American Ins. Co. v. Material Transit, Inc.,* Del.Super., 446 A.2d 1101 (1982).

A motion for summary judgment may only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Pullman, Inc. v. Phoenix Steel Corp.,* Del.Super., 304 A.2d 334 (1973). All facts and inferences are considered in a light most favorable to the non-moving party. *Shultz v. Delaware Trust Co.,* Del.Super., 360 A.2d 576 (1976).

### RES JUDICATA

As noted, Martin has filed a number of law suits involving claims against Widener. The claims he brought against Widener in one of those suits are summarized as follows:

BACKGROUND FACTS.

The relevant facts, as alleged by Plaintiff [Martin] in his Complaint and various briefs, are as follows. Plaintiff claims that Polyclinic and Philhaven admitted and detained him against his will without cause or hearing. Apparently, this action occurred in 1975. Plaintiff alleges that Philhaven subsequently erroneously informed the Law Examiners that he had voluntarily admitted himself to Philhaven for psychiatric care. He alleges that L.V.C. [Lebanon Valley College], where Plaintiff had been an undergraduate student, falsified his transcripts and supplied "disinformation" to employees of Polyclinic and Philhaven, which was later given to the Law Examiners. Plaintiff alleges that Defendants James Reilly and John Feather, in their capacities as Lebanon County Legal Services attorneys, acted improperly by agreeing to represent Plaintiff in a proceeding against L.V.C., while they were associates of the law firm which was representing L.V.C. Plaintiff alleges that Defendants Judge Gates and Judge Walters improperly "issued orders against him" in his efforts to "get relief from the college's disinformation scheme". Plaintiff alleges that [Widener] refused to send his transcript to the U.S. Department of Justice, thus preventing him from obtaining full-time employment. Plaintiff alleges that [Widener] also erroneously concluded that he had falsified his law school application by denying that he had been committed to a mental hospital, and later sent this information to each of the State Boards of Law Examiners to which Plaintiff had applied for admittance. Plaintiff alleges that the Law Examiners refused to admit him to the Bar after he passed the Bar Examination. Plaintiff alleges that the [Pennsylvania] D.O.T. improperly revoked his driver's license in 1981 by relying upon "not [sic] existent medical reports about a neuro-psychiatric condition", and that [Commonwealth National Bank] wrongfully dishonored his checks following his enrollment in law school after agreeing not to do so.
**\*3** *Martin,* 625 F.Supp at 1293, *aff'd.* 884 F.2d 1384 (3rd Cir.1989), *cert. denied,* 110 S.Ct. 411 (1989), *reh'g denied,* 110 S.Ct. 766 (1990).

In another action, filed in Pennsylvania, Martin made five claims against Widener and Santoro with their dispositions as follows:
]Widener] and [Santoro] are named, either specifically or as one of "the defendants" by plaintiff in five claims arising under federal statutes or the United States Constitution: the first claim (Rehabilitation Act of 1973 29 U.S.C. § 794); second claim (fourteenth amendment equal protection clause); third claim (first amendment right to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 3
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

freedom of association); fourth claim (fourteenth amendment guarantee of due process); and eleventh claim (Family Education Rights and Privacy Act 20 U.S.C. § 1232).

These defendants argue that plaintiff is barred from pursuing these claims, *inter alia,* under the doctrine of res judicata [sic]. The claims recited in plaintiff's instant complaint are based on the law school's determination that plaintiff made a knowing misrepresentation on his law school application and communicated this finding to the Pennsylvania Board of Law Examiners.

In 1985 plaintiff initiated civil action No. 85-53 in the United States District Court for the District of Delaware naming, *inter alia,* [Widener] as a defendant and alleging virtually identical facts and claims recited in the instant complaint. (See plaintiff's complaint filed in CA 85-53 attached as court exhibit B). In particular, plaintiff alleged [Widener] violated his rights provided under the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title 7, 42 U.S.C. § 2000e-2; 42 U.S.C. §§ 1983, 1985 and 1986; Fourteenth amendment; and the Family Educational Rights and Privacy Act of 1976, 20 U.S.C. § 1232g.

All of these claims were dismissed by the District Court in December of 1985, (*Martin v. Delaware Law School of Widener University,* 625 F.Supp. 1288, 1302 (D.Del.1985)). Plaintiff, however, was permitted to file an amended complaint. In October of 1986, the court held that the amended complaint "merely rehashes the allegations in the original Complaint, which this Court has found to be insufficient" [sic] *Martin v. Delaware Law School of Widener University.* [sic], No. 85-53 Civ. 3. (D.Del October 16, 1986). The Amended Complaint was dismissed with prejudice. An appeal was unsuccessful. *Martin v. Delaware Law School of Widener University,* 625 F.Supp. 1288 (D.Del.1985), *aff'd* 884 F.2d 1384 (3rd Cir.1989), *cert. denied* 110 S.Ct. 422, *reh'g. denied,* 110 S.Ct. 766 (1990).

While seeking appellate relief, plaintiff filed civil action 88-0768 on March 22, 1988 in the United States District Court for the District of Columbia naming [Widener] and [Santoro], *inter alia,* as defendants (see court exhibit C). This complaint alleged facts and claims virtually identical to those averred in civil action 85-53 and was dismissed as "barred under the principles of res judicata [sic]." *Martin v. Delaware Law School of Widener University, Inc.,* et al., [sic] No. 88-0768 Civil (D.D.C. July 22, 1988).

**\*4** *Martin v. Walmer,* D.C.E.D.Pa., C.A. No. 90-2752 at 8-10, Huyett, J. (September 26, 1990). All five claims were dismissed on grounds of claims or issue preclusion. *Id.* at 10-11; *Napier v. Thirty or More Unidentified Fed. Agents,* 855 F.2d 1080 (3rd Cir.1988).

It is unnecessary to catalogue the multitude of state and federal law suits Martin has filed in Pennsylvania, New Jersey, Delaware, Virginia and the District of Columbia. *See, e.g., Martin v. Delaware Law School of Widener Univ.,* D.C.Del., C.A.No. 88-298-JJF (December 14, 1990) (memorandum opinion); Martin's opening brief before Third Circuit, Appeal No. 91-3026, January 24, 1991 [Appendix C].

Defendants assert that most of Martin's claims are barred by the principle of *res judicata* now also referred to as claim preclusion or by collateral estoppel, now also known as issue preclusion. The doctrine of claim preclusion holds that a final judgment upon the merits rendered by a court of competent jurisdiction operates as a bar and prevents relitigation of all grounds for, or defenses to, recovery that were then available to the parties before the particular court rendering the judgment in relation to the same claim regardless of whether all grounds for recovery or defenses were judicially determined. *Federated Dept. Stores v. Moitie,* 452 U.S. 394, 398 (1981); *Trans World Airlines, Inc. v. Hughes,* Del.Ch., 317 A.2d 114, 118 (1974) *aff'd,* 336 A.2d 572 (1975).

Defendants argue that the present action is grounded in the "basic transaction of his conduct in submitting his application, the related background and related events thereafter." Defendants contend this action is simply a repackaging of the old underlying claim concerning Widener's communication to various state bar examiners.

The modern transactional view of *res judicata* bars litigation between the same parties if the claims in the later litigation arose from the same "transaction" that formed the basis of the prior adjudication and not on the substantive legal theories or types of relief sought.

The modern transactional view of the doctrine ... does not require that the claim subsequently asserted be based on a same cause of action to be barred, but permits the doctrine to be invoked to bar litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication.... The determination, therefore, whether the doctrine shall be invoked is now based on the underlying

transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily, a transaction gives rise to only one claim regardless of the number of ways that the claim may be asserted.

*Maldonado v. Flynn,* Del.Ch., 417 A.2d 378, 381 (1980); *rev'd on other grounds sub nom.,* Del.Supr., 430 A.2d 779 (1981). The *Restatement (Second) of Judgments § 24*, comment b (1982) describes a "transaction" as:**5** In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of the trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded.

Despite defendants' portrayal of these occurrences as "one lengthy transaction", this Court recognizes a new transaction having occurred upon publishing the article in the school newspaper. The libel and invasion of privacy claims against Widener and Bierman arise from that new transaction. The act of publishing the *Forum* article is remote in time from the initial transaction, creating a new origin for the defamation and invasion of privacy claims. Any attempt to relitigate the initial transaction concerning the Widener communication of Martin's negative response on the law school application is precluded by the doctrine of *res judicata.* Applying this principle, the prayers for injunctive and declaratory relief are barred.

*Injunctive Action*

Martin seeks to enjoin Widener from issuing any statements concerning his medical condition, standing as an attorney or performance as a student. The basis for this claim stems from the initial transaction and despite repackaging with additional defendants and new forms of relief, the claim is precluded by the doctrine of claim preclusion. A court of competent jurisdiction rendered a final judgment upon the merits. *Martin v. Delaware Law School of Widener University, et al.,* D.Del., C.A.No.

85-53-JJF, Farnan, J. (October 16, 1986). "It is simply not fair to require a defendant to return to court time and time again to defend against the same allegations as plaintiff moves from one theory of recovery to another." *Poe v. Kuyk,* D.Del., 448 F.Supp. 1231, 1234 (1978), *aff'd,* 591 F.2d 1336 (3rd Cir.1979), *cert. denied,* 442 U.S. 943 (1979).

Further, Martin's request for injunctive relief is not within the jurisdiction of this Court. Delaware Constitution, Article IV, § § 7 and 10. While the request for such relief could be transferred to Chancery Court pursuant to 10 *Del.C.* § 1901, claim preclusion, at a minimum, otherwise prevents it.

*Declaratory Judgment*

Martin also seeks a declaratory judgment to alter and/or delete his school record "to show what actually occurred". "What actually occurred" has been litigated. *Martin v. Delaware Law School of Widener University, supra.* This claim, therefore, is barred by the doctrine of claim preclusion. Despite terming the relief requested as a declaratory judgment, Martin seeks affirmative mandatory relief by asking the Court to alter and/or delete portions of the record. Relief of this type is not within the subject matter jurisdiction of this Court. Further, Martin's request to purge Widener's files on him is in the nature of a request for a mandatory injunction. Such power lies in the Court of Chancery, not this Court. *Cf. Simmons v. Steiner,* Del.Ch., 108 A.2d 173 (1954), *rev'd on other grounds,* Del.Supr., 111 A.2d 574 (1955). However, as with his prayer for injunctive relief, claim preclusion prohibits transfer under 10 *Del.C.* § 1901.

*COPELAND CONVERSATION*

A

**\*6** Martin seeks damages from Widener and Santoro. Martin argues that Santoro's remarks were defamatory *per se.* He argues Santoro "tried to justify [Widener's] view that I should not be certified for practicing law ... imputed a mental disease upon me ... and interfered with my law licenses by claiming I am also dishonest...." It is clear that while the telephone conversation occurred in 1989, the underlying complaint against Santoro relates back to the fundamental, oft-litigated dispute between Widener and Martin. Martin has been uniformly

Not Reported in A.2d    Page 5
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

unsuccessful in all that litigation. Thus, on this ground alone, his claim against Santoro is issue barred. *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Neoplan USA Corp. v. Taylor,* D.C.Del., 604 F.Supp. 1540 (1985).

*B*

Martin's complaint included portions of an apparent transcription of the Santoro-Copeland telephone conversation. An alleged "authenticated", full transcription is included with Martin's motion for summary judgment. While there is insufficient authentication of the transcription, for purposes of the motions, the Court will view the transcription as full and accurate.

Copeland telephoned Santoro and asked to meet with him about alleged deficiencies in Widener's records on Martin. Santoro expressed a willingness to listen to Copeland but remarked that Widener was in litigation with Martin. There is a reference to a letter Copeland previously sent to Santoro with many people copied, including Delaware Governor Castle.[FN3] The conversation boils down to this alleged exchange:
Santoro: Basically, what is it you want?
Copeland: I want to know why the law school has not corrected misrepresentations about Mr. Martin's character. He did not lie on his answer to question number 6 [that is the question which inquired about prior mental institutionalization].

Copeland repeated a number of allegations and claims Martin has made in his numerous law suits. As noted above, the issues Copeland raised have been explored exhaustively and rejected in Martin's prior law suits. *Martin v. Sparks,* D.C.Del, No. 90-235, Huyett, J. (August 16, 1991). They may not be relitigated now. The remaining issue under this claim arising out of the Santoro-Copeland telephone conversation is whether *anything* Santoro said was defamatory.

"Defamation generally is understood as a false publication calculated to bring one into disrepute." *Snavely v. Booth,* Del.Super., 176 A. 649, 654 (1935). The gist of an action for defamation is the injury to reputation, business or occupation. It must expose a plaintiff to public contempt or ridicule or lower him in the estimation of the community in which he lives. *Danias v. Fakis,* Del.Super., 261 A.2d 529, 531 (1969); *Pierce v. Burns,* Del.Supr., 185 A.2d 477, 479 (1962).

A plaintiff in a defamation action is presumed to have stated his claim in the best light. *Snavely,* 176 A. at 654. In determining whether words are defamatory, the Court must take their plain and natural meaning and understand them as would a person of average intelligence and perception. *Danias,* 261 A.2d at 531. The Court cannot find anything defamatory in what Santoro said to Copeland. The references to events which Martin claims are defamatory are by *Copeland* not Santoro.

**7** Prior to Copeland's telephone call to Santoro, Martin had executed a release to Copeland to examine and copy "neuropsychiatric records about me" from Dr. Rebecca Jaffe [Appendix D]. Shortly after this telephone conversation, Martin signed a release in favor of Copeland waiving "any confidentiality rights" to his Widener file [Appendix E]. The "waiver" also included authority for Copeland to copy Martin's records.

It is inconceivable that with all the litigation occurring prior to the telephone conversation, Martin's relationship with Copeland [FN4] and the prior and subsequent releases that anything defamatory occurred during the conversation. Martin's claim against Widener and Santoro arising out of the Copeland-Santoro telephone conversation is utterly without merit. The defendant's motion to dismiss this claim will be GRANTED. Martin's motion for summary judgment on this claim is DENIED.

*FORUM ARTICLE*

Martin seeks damages from Widener, Santoro and Bierman for an article Bierman authored which was published in the *Forum* [Appendix B]. As described earlier, *ante* at 2, this newspaper is circulated to Delaware Law School students, faculty, alumni and the local legal community. Martin claims that he was defamed by various specific portions of the article and by the thrust of the entirety of the article. Resolution of the motions on these claims, in turn, requires resolution of a series of threshold issues.

*A*

The first of these issues is to determine Martin's status. The United States Supreme Court and the Delaware Supreme Court have recognized that a

Not Reported in A.2d                                                                                                              Page 6
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

public official may not recover in libel unless he or she can show that the media source printed a defamatory falsehood relating to official conduct with actual malice, that is, that the statement was made with knowledge it was false or with reckless disregard of whether or not it was false. New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Ross v. News Journal Co., Del.Supr., 228 A.2d 531 (1967).

Martin is not a public official, However, the United States Supreme Court and the Delaware Supreme Court have recognized that in certain circumstances a non-public official can become a public figure. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Gannett Co., Inc. v. Re, Del.Supr., 496 A.2d 553 (1985).

The original language defining a public figure is found in *Gertz:*
In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz,* 417 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812.

### B

There can be no argument that Martin does not fit into the first category of public figure. The question is whether he fits into the second, "limited" category. There are several guidelines to answer this question. It is necessary to examine the nature and extent of Martin's participation in the controversy giving rise to alleged defamation. Gertz, 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. A collateral issue is how much did Martin engage the public in an attempt to influence the resolution of the issues involved. Wolston v. Reader's Digest Ass'n. Inc., 443 U.S. 157, 168, 99 S.Ct. 2701, 2707, 61 L.Ed. 450, 460 (1979).

### C

**\*8** An integral question also to be answered is to determine whether Martin has injected himself into a public controversy. See Gannett, 496 A.2d at 556. More specifically, this Court must decide whether a dispute over whether the character traits of honesty and candor are relevant considerations in accepting or denying application to the bar is a matter of public controversy. "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C.Cir.1980), *cert. denied* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); Avins v. White, 627 F.2d 637, 647 (3rd Cir.1980), *cert. denied* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (recognizing the accreditation of Delaware Law School as a public controversy).

Delaware has recognized "the interest of this State in matters pertaining to the admission and regulation of lawyers practicing before our courts is essential to the primary governmental function of administering justice, and in meeting our obligation to protect the public by assuring and maintaining high standards of conduct of persons admitted to this Bar." In Re Green, Del.Supr., 464 A.2d 881, 885 (1983). "Admission to the Bar ... depends on three basic and unalterable prerequisites: good moral character, learning and demonstrated competence.... Good moral character has many attributes, but none are more important than honesty and candor. *Id.* "Moreover, the attributes of honesty and candor are absolute prerequisites to the admission to our Bar." Kosseff v. Board of Bar Examiners, Del.Supr., 475 A.2d 349, 353 (1984).

In recognizing the licensure of lawyers as a public controversy, this Court concludes that the licensing procedures affect "the general public or some segment of it in an appreciable way," meeting the *Waldbaum* standard. The unremitting duty of candor to all persons charged with investigating and passing upon an applicant's qualifications is "a dispute ... between sides holding opposing views" and, thus, meets the controversy standard set forth in Gannett. Gannett, 496 A.2d at 556. This Court rejects the notion that merely because most people would agree that there is a duty of candor for Bar applicants, there is no "controversy" regarding this matter. Marcone v. Penthouse Intern. Magazine for Men, 754 F.2d 1072, 1083 n. 8 (3rd Cir.1985). [FN5]

In Connolly v. Labowitz, Del.Super., 519 A.2d 138 (1986) this Court concluded that the dissemination of information concerning the qualification and performance of a particular physician is not a matter of public concern. The court considered whether applying traditional libel standards, instead of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                           Page 7
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

constitutional standards, would have a chilling effect on the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people". *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 759, 762-63, 105 S.Ct. 2945, 2957, 86 L.Ed.2d 602, 605 (1985). The court reasoned that because 24 Del.C. § 1768 provided that the physician peer review mechanism shall be private and not subject to public examination, the qualifications and performance of an individual physician is not a matter of public concern. This Court recognizes that to stifle discussion of the public controversy concerning the proper licensure of lawyers simply because the discussion relates to a specific individual would have a chilling effect upon the interchange of ideas necessary for bringing about social changes. The topic area is a public controversy regardless of Martin's or any other individual's specific involvement.

### D

**\*9** Since it is clear that the alleged libel involves a public controversy, it is next necessary to examine the nature and extent of Martin's participation in that controversy. *Avins,* 627 F.2d at 647. In general, to be a "limited" public figure, the plaintiff must thrust himself into the vortex of the dispute. *Marcone,* 754 F.2d at 1083. Martin has filed a multitude of litigation [FN6] concerning his dealings with Widener, various bar examiners and the mental hospitals. The filing of a lawsuit alone will not necessarily elevate a private plaintiff to public figure status. When the private plaintiff goes further than the courtroom in telling his side of the story, however, he may change his status by voluntarily injecting himself into the controversy. In *Street v. National Broadcasting Co.,* 645 F.2d 1227, 1235 (6th Cir.1981), plaintiff's status changed from private to limited public figure after granting press interviews to aggressively promote her version of the case outside of her actual courtroom testimony. Similarly, an agent who holds news conferences to attract media attention for himself and his client is a public figure in that context. *Woy v. Turner,* N.D.Ga., 573 F.Supp. 35 (1983).

Whether Martin actually solicited the attention by approaching the *Inquirer* reporter is a question of fact, however, it is not material as it is clear that, at a minimum, Martin acquiesced in granting a personal interview. He is quoted throughout the article. This Court notes that an individual who speaks with reporters may reasonably expect those comments to be disseminated to the press. Martin need not have solicited the reporters' attention to raise his status. "It may be sufficient that [plaintiff] engaged in a course of conduct that was bound to attract attention and comment." *Marcone,* 754 F.2d at 1086; *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 861 (5th Cir.1978). Martin cannot avoid the change in status by claiming he did not intend to voluntarily inject himself into the controversy. "The status of public figure *vel non* does not depend upon the desires of an individual. The purpose served by limited protection to the publisher of comment upon a public figure would often be frustrated if the subject of the publication could choose whether or not he would be a public figure." *Id.*

This Court recognizes that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707, 61 L.Ed.2d at 460. The plaintiff in *Wolston* was dragged unwillingly into the controversy and "never discussed this matter with the press and limited his involvement to that necessary to defend himself...." *Id.* Martin differs significantly in that while he may not have desired the original disclosure of his past history, he *has* discussed the matter with the press and, therefore, *not* limited his involvement to that necessary to defend himself.

**\*10** This Court finds that although he is a private figure in most aspects, Martin is a limited public figure in the context of the controversy preceding and including the *Forum* article. The filing of a multitude of lawsuits concerning his past medical history, particularly repeated unsuccessful lawsuits, in combination with granting a personal interview with the *Inquirer* reporters cumulatively acts to voluntarily inject plaintiff into this public controversy. While neither filing an action by itself nor granting an interview to reporters would necessarily raise plaintiff's status, it is the combination of the two actions and the number of suits filed that changes Martin's status. This is the Court's finding whether Martin actually sought out the *Inquirer* reporters or merely acquiesced in answering their questions.

Martin has a limited public figure status. Under the rule of *New York Times v. Sullivan* and its progeny, he cannot recover for a defamatory falsehood unless he can show by clear and convincing evidence either knowledge of falsity or reckless disregard for the truth. *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

L.Ed.2d 562 (1989); see Riley v. Moyed, Del.Supr., 529 A.2d 248, 250 (1987). The application of this standard was recognized for limited public figures in *Gertz*. The burden of proof is upon the plaintiff to show the falsity of the statement even in a case of a limited public figure plaintiff suing a media defendant. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Martin, therefore, bears the burden of showing falsity. Riley, 529 A.2d at 251. "Before there can be defamation of a public figure there must be a false statement of fact." Ramada Inns, Inc. v. Dow Jones & Co., Del.Super., 543 A.2d 313, 337 (1987), citing Old Dominion Branch No. 496, Nat'l. Ass'n. of Letter Carriers v. Austin, 418 U.S. 264, 283-84, 94 S.Ct. 2770, 2780-81, 41 L.Ed.2d 745, 761 (1974). "Libel plaintiffs who are either public officials or public figures must prove both falsity and actual malice to recover." Ramada, 543 A.2d at 337, citing numerous United States Supreme Court decisions.

Martin alleges that he was defamed in the *Forum* article in two ways. First, he singles out individual passages. Second, he attacks as defamatory the gist of the article taken as a whole.

*Specific Portions*

*E*

The following five sentences are self-authored by Bierman:
James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS. In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission: "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"
Somehow, DLS found out that Martin had in fact been confined to an institution.... As of February of this year (1990), the case was pending before the New Jersey Supreme Court ... Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.

**\*11** *Forum,* May 1990, Vol. 17, No. 6 [Appendix B].

Martin's burden as a limited public figure has been stated, *ante* at 16. Before the Court reaches the issue of actual malice, it must, as a matter of law, determine two questions: (1) is the alleged statement an expression of fact or of an opinion and (2) is the statement capable of a defamatory meaning. Slawik v. News-Journal Co., Del.Supr., 428 A.2d 15, 17 (1981). If the Court answers either question against the plaintiff, it does not reach the actual malice issue. Riley, 529 A.2d at 251.

The Court, in the first instance, will determine whether the communication is capable of defamatory meaning. Martin first claims the 1983 graduation date is falsely reported "in an attempt to cast me as an unremarkable student". Martin officially graduated on December 31, 1982. Defendants raise the defense of substantial truth. "It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." Restatement (Second) of Torts § 581A comment (f). There is no liability for defamation when a statement is determined to be substantially true. If the alleged libel was no more damaging to plaintiff's reputation in the mind of the average reader than a truthful statement would have been, the statement is substantially true. Gannett, 496 A.2d at 557. In making the evaluation, the court considers whether the "gist" or "sting" of the article was true. The gist or sting is true "if it produces the same effect on the mind of the recipient which the precise truth would have produced." Riley, 529 A.2d at 253.

This Court finds the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of the statement that he graduated in 1983. This statement is no more damaging in the mind of the average reader than is the precise truth, *i.e.,* that he graduated December 31, 1982. It is unnecessary, therefore, to consider the issue of whether this statement is an expression of an opinion or fact.

The next statement Martin attacks is that "[s]omehow, [Widener] found out that Martin had in fact been confined to an institution". Martin does not contend that he was not confined but rather infers the statement is false as he knows the circumstances that revealed his past medical history to the school. In effect, he alleges defamation in the word "somehow". Whether Martin or Widener know the specific manner how these facts came to be revealed is not at issue here. The statement is not false merely because it does not spell out the specific method the facts came to Widener's attention. Libel by omission is only actionable if the public figure plaintiff carries his burden of showing that the omission makes an already published material

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                          Page 9
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

assertion of fact untrue. *Ramada Inns,* 543 A.2d at 338. Martin attaches too much to the word somehow. Again, it is unnecessary to reach the fact versus opinion analysis determination.

**\*12** Martin also charges that the statement "[a]s of February of this year (1990), the case was pending before the New Jersey Supreme Court" is false. He contends that the matter was pending before the (his label) "New Jersey Committee" which is appointed by the New Jersey Supreme Court. Again, the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of this statement. The statement is no more damaging than is the precise truth, that the matter is pending before a committee. Arguably, the misstatement actually places Martin in a more favorable light in the mind of the average reader in that reaching the court itself would attribute more credence to the legitimacy of his claim than merely reaching a committee. With this determination, the Court need not weigh the issue of fact versus opinion.

F

Martin also attempts to base his libel claim on the falsity of statements which are summaries of the *Inquirer* article. [FN7] Defendants err in arguing that a report of judicial proceedings is absolutely privileged even where there are allegations of malice or ill will. See *Read v. News Journal Co.,* Del.Supr., 474 A.2d 119 (1984). While a judicial proceeding itself is protected by an absolute privilege, the report of a judicial proceeding is only conditionally privileged. *Restatement (Second) of Torts* § 611:
The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

This Court must weigh if the conditional privilege is lost due to inaccuracy or incompleteness and whether the report is a fair abridgement of the proceedings. In making this evaluation, the Court notes that the decision in *Read* was hinged upon a direct comparison of the news article with the actual Court of Chancery letter opinion the article was discussing. *Read,* 474 A.2d at 120. The instant case differs in that the alleged defamatory article details the background of a multitude of lawsuits brought by Martin but does not actually refer to any specific case

or court decision. Defendants attempt to invoke the privilege by referring to the plaintiff's tidal wave [*see* Appendix C] of litigation but cannot point to a specific court document of which the article is allegedly a report.

In a similar case, the Ninth Circuit held that a law review case note that was an accurate republication of an Arizona Supreme Court opinion denying plaintiff admission to the Arizona Bar due to his past mental history was privileged. *Ronwin v. Shapiro,* 657 F.2d 1071 (9th Cir.1981). The *Ronwin* court not only directly compared the case note with the opinion but noted that "the bulk of it is a verbatim republication of language from the Arizona Supreme Court's opinion." *Id.* at 1075. The *Forum* article is not really an abridgement of judicial proceedings but rather is predominately an abridgement of the *Inquirer* article. On the evidence presented, this Court concludes that the article is not protected by being within the scope of the conditional privilege sheltering the right to report on an official proceeding.

**\*13** The remainder of Martin's specific libel claims are based on allegedly false statements which are Bierman's abridgement of the *Inquirer* article. Martin contends the statement "Martin was admitted to Polyclinic Hospital in Harrisburg on February 2, 1975 and released on February 21, 1975" is false. He contends he was neither admitted nor released. Martin also claims the statement "[t]he second admission, from April 2nd to May 10th, was to Philhaven Hospital" is false for the same reason. His defamation claim may not be based on this assertion of falsity for multiple reasons. First, Martin is attempting to relitigate the underlying claim from the original transaction of Widener communicating that Martin had misrepresented that he had some type of experience with mental institutions to various bar examiners. This issue is precluded from relitigation by the doctrine of collateral estoppel. *Supra* at 7-8.

Second, the burden is upon Martin to show by clear and convincing evidence both the falsity of the statement and Bierman's knowledge of falsity or reckless disregard for truth. *Riley,* 529 A.2d at 250. Martin has done neither. Furthermore, there is no set of circumstances that this Court can envision in which Martin could meet this burden. Finally, Martin's own pleadings establish that he was involuntarily confined to the hospitals. Quibbling over whether he was technically ever "admitted and released" or merely confined against his will does not change the substantial truth of the statement. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                Page 10
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

gist or sting of the statement is true.

Martin contends that the following *Forum* article passage is false and libelous: "The medical records indicate family problems. Martin claims he had announced to his parents that he was going to drop out of high school. Consequently, the police were called from whom Martin was attempting to escape." Martin asserts that he was never an aspiring high school drop out and was defamed by being labelled a potential high school and not a college drop out. The *Inquirer* article actually read, "The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away." Comparing the *Inquirer* article with the *Forum* abridgement shows that Bierman erroneously stated Martin was considering dropping out of high school when, in fact, he was referring to college.

Again, the substantial truth doctrine is recognized in Delaware. *Riley,* 529 A.2d 248; *Ramada Inns,* 543 A.2d 313. "If the alleged libel was no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been, then the statement is substantially true." *Ramada Inns,* 543 A.2d at 317, citing *Riley* 529 A.2d at 253 and *Gannett,* 496 A.2d at 557. The requirement of proving falsity necessary entails the burden of negating substantial truth. *Ramada Inns,* 543 A.2d 318. Under this approach, the fact that Martin was considering dropping out of college and not high school in the context of this case is substantially true.

***14** The *Forum* misstatement that Martin was thinking of dropping out of high school rather than college cannot be viewed as defamatory. As a matter of law, the Court cannot find that Martin's reputation would be harmed or persons would be harmed from associating or dealing with him because he considered dropping out of high school rather than dropping out of college. Not every misstatement gives rise to a cause of action for libel. Cf. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

In addition, when the misstatement of high school is put in context with the balance of the paragraph, whatever "gist or sting" arises from the misstatement pales. Martin does not attack as defamatory the *Inquirer* reference to "[t]he records note that, 'the patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had supernatural powers.'"

### G

Martin also attempts to base the defamation count on the *Forum* statement "[c]onsequently, the police were called from whom Martin was attempting to escape." Martin now claims the police were called concerning his brother and that Martin himself never attempted to escape.

This Court will assume for purposes of this motion that Martin's current claim is truthful. This Court also finds that the statement concerning the police and escape is capable of a defamatory meaning. Furthermore, the statement is not protected as an opinion. That being so, it is next necessary, as a matter of law, to consider whether this allegation is sufficient to overcome the constitutional burden of actual malice. *Riley,* 529 A.2d at 250. Martin must show by clear and convincing evidence Bierman's knowledge of falsity or reckless disregard of truth. *Id.*

Bierman's abridgement was based on the *Inquirer* statement that "[a]ccording to Martin, Polyclinic's account is 'inaccurate and greatly exaggerated.' The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away." [Appendix A-3] Bierman clearly relied on the *Inquirer* which appears to be referencing Martin himself as the source. Further, there is nothing in the record to indicate that Martin has sued the *Inquirer* for that statement.

This Court holds, as a matter of law, that Martin has not shown Bierman's actual malice. *Harte-Hanks,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562.

### H

Although he did not sue the *Inquirer,* Martin contends that the repetition from the *Inquirer* article of a quote by Mary Maudsley of the New Jersey Supreme Court's Committee on Character is defamatory. The quote reads, "Any potential problem which Mr. Martin encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it." [*See* Appendix A and B]. The Maudsley comment gives rise to initially determine whether it is an expression of an opinion or a fact. *See, ante,* at 18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*15** A recent United States Supreme Court case has cast some doubt on the efficacy of the "opinion" protection afforded by the First Amendment. *Milkovich v. Lorain Jorunal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). "Thus we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption from anything that might be labelled 'opinion'." *Id.* at ----, 110 S.Ct. at 2705, 111 L.Ed.2d at 17.

As noted, *Riley* requires that before reaching the actual malice question, the court must determine two questions as a matter of law. One, is the statement capable of a defamatory meaning and, two, is it an expression of fact or opinion? *Riley,* 529 A.2d at 251. *Riley* was decided prior to *Milkovich.* There is no Delaware Supreme Court case on this issue since *Milkovich.*

*Riley* adopted a four-part test used to determine whether an average reader would view a statement as one of fact or one of opinion. *Riley,* 529 A.2d at 251. The test came from *Ollman v. Evans,* 750 F.2d 970, 979 n. 16 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

While there is some doubt that there is a viable "opinion exception" to defamation actions, the *Ollman* four-part test is "still helpful for determining whether a statement implies actual facts that can be proven false." *Lund v. Chicago and Northwestern Transportation Company,* Minn.Ct.App., 467 N.W.2d 366, 369 (1991) [FN8]. Whether an allegedly libelous statement constitutes a statement of fact or an expression of opinion is a question of law for the court to determine. *Slawik,* 428 A.2d 17; *Lund,* 467 N.W.2d at 369.

The four-part *Ollman* test asks: (1) considering the common usage or meaning of the specific language of the challenged statement, is the statement indefinite and ambiguous; (2) whether the statement is capable of being objectively characterized as true or false; (3) considering the entire article in which the statement appears, to what extent will the unchallenged language surrounding the allegedly defamatory statement influence the average reader's readiness to infer that a particular statement has factual content, and (4) the broader social context into which the statement fits. *Riley,* 529 A.2d at 251-52. Applying this analysis, the statement is an opinion.

First, the common usage of the specific language is indefinite. The inclusion of the words "seems to be answered" injects a note of speculation or indefiniteness. Second, the challenged statement cannot be *objectively* verified. Attempting to analyze what constitutes "any potential problem in his life" necessarily entails a subjective decision. Third, the language surrounding the allegedly defamatory statement influences the average reader by clarifying the statement is an opinion. The immediately preceding line in the *Forum* article reads: "In addition to the 'knowing misrepresentation', the New Jersey bar examiners are also concerned with Martin's alleged propensity to file lawsuits." The specific use of the words "concerned with" and "alleged propensity" influences the average reader to infer this is an opinion, not a factual statement. Fourth, analyzed within the broader social context in which the article appeared, *i.e.,* that it addressed an issue of current controversy regarding the licensure of lawyers and the consideration of honesty and candor as proper criteria of licensure, "language which might otherwise be considered statements of fact have here assumed the character of statements of opinion." *Riley,* 529 A.2d at 253 [citations omitted]; *Ramada Inns,* 543 A.2d at 327.

**\*16** Martin further alleges that the Maudsley quote is defamatory in that the *Forum* article did not note "that Maudsley herself is a defendant and is partially responsible for tampering with transcripts of the proceedings before the committee, so that what appears in the transcripts is not the same as what one hears from listening to the tape recordings of the same proceedings." The *Forum* article did not have to state that Maudsley was a defendant in some other suit (even assuming Bierman knew this) as libel by omission is only actionable if the omission makes an already published material assertion of fact untrue. *Ramada Inns,* 543 A.2d at 337-38.

The allegation that Maudsley tampered with the transcripts to alter her statement fails to show an actionable libel against Bierman on the constitutional level. Even assuming what Martin alleges about Maudsley is true, that would not satisfy Martin's burden of proof to show "actual malice", *i.e.,* knowledge of falsity or reckless disregard of truth or falsity. Furthermore, this Court can envision no set of circumstances whereby Martin could meet this burden as Bierman had noted his source of this quote as the *Inquirer* article. Bierman's failure to compare the transcript with any tape recording made of the proceedings does not amount to reckless disregard of truth or falsity. Malice may not be found merely by