Not Reported in A.2d    Page 12
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

showing failure to investigate adequately before publication. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153, 87 S.Ct. 1975, 1990, 18 L.Ed.2d 1094, 1110 (1967).

The facts in the case before this Court differ from the U.S. Supreme Court decision in *Milkovich,* where the alleged defamatory statement itself concerned an allegation of perjury. In *Milkovich,* a high school wrestling coach testified in a hearing before an athletic association concerning a brawl and months later testified in court about the same incident. A local sports columnist inferred that Milkovich perjured himself by polishing and reconstructing his testimony in the second proceeding. Whether or not Milkovich had perjured himself was provable by comparing the transcript of the hearing with the transcript of the court testimony. Here it is Martin (not Bierman) who has raised the allegation of a third party's perjury (not Bierman's). Comparing the transcript of the Maudsley statement with a tape recording may establish some other party's tampering but it would *not* establish libel against Bierman on a constitutional level.

Even under the possible *Milkovich* dilution of the "opinion exception", as a matter of law, the repetition of the Maudsley quote is constitutionally protected. Martin is required to prove Maudsley's statement as false before there can be liability. *Milkovich,* 497 U.S. at ---, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. Maudsley's words "any potential problem" and "seems to be answered" indicate that Martin frequently appears to litigate when confronted with barriers. A fair reading of the Maudsley quotation does not indicate that Martin litigates over *every* stumbling block he faces. In any event, *his own* listing of cases he has filed [Appendix C] shows a propensity to extensively litigate his personal life.

**\*17** Further, the Court must determine whether the Maudsley quotation is capable of a defamatory meaning. The Court finds as a matter of law that it is not. In effect, the gist or sting is that Martin is accused of being litigious. In today's society where lawyers are under much criticism for being litigious and our society, as compared with other countries, is criticized for litigiousness, the Maudsley comment can hardly be viewed as defamatory. *Cf. Andres v. Williams,* Del.Supr., 405 A.2d 121 (1979).

Assuming, *arguendo,* that Maudsley's comment is not protected as "opinion" and is capable of a defamatory meaning, the Court must, as a matter of law, first determine if the statement was made with actual malice. *Milkovich,* 497 U.S. at ---, 110 S.Ct. at 2705, 111 L.Ed.2d at 17. [FN9]

Martin cannot cross this initial constitutional threshold. One, the initial Maudsley quotation, as the *Forum* article notes, is in the *Inquirer.* Martin has not sued the *Inquirer.* Two, there is no evidence Martin has sued Maudsley for defamation. Three, Martin's own recitation of extensive litigation, overwhelmingly unsuccessful [Appendix C], indicates that he could not meet his burden of proving falsity. Fourth, based on the record in this case, viewed most favorably to Martin, he could not show Bierman had a high degree of awareness of the probable falsity of Maudsley's quotation or underlying information she used in expressing her views or that she or Bierman entertained serious doubts as to the truth of the publication. [FN10]

*Article as a Whole*

I

Martin claims the *Forum* article taken as a whole is libel *per se.* To constitute defamation *per se,* the nature of the charge must be such that the person has been injured in his reputation, business or occupation. *Danias,* 261 A.2d at 531. Martin alleges the article defames him in his trade (lawyer) and imputes a loathsome disease (mental illness).

The term defamatory *per se* is misleading and a misnomer in that it infers the defamation is actionable in itself or taken alone. Falling within one of the four categories of defamation *per se* changes the common law requirement that plaintiff show damages to pursue a claim of slander. In some jurisdictions, a plaintiff had to show damages in order to pursue a claim of libel, unless the libel was *per se,* in which case the damage requirement was again waived. Delaware does not distinguish between libel *per se* and libel *per quod;* thus, any libel is actionable without a showing of special damages. *Spence v. Funk,* Del.Supr., 396 A.2d 967, 971 (1978). Simply waiving the damages' requirement does not make the libel actionable in itself, the claim is still subject to other defenses and the appropriate standards of proof. *Id.* at 973. Martin's pleadings fail to state a claim upon which relief may be granted regardless of qualifying as a *per se* status and a showing or failure to show special damages.

**\*18** Martin claims the *Forum* article is defamatory as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                           Page 13
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

a whole as it implies "that I am a dangerous lunatic who sues innocent persons on account of a violent, psychotic temperament that renders me unfit for the practice of law." The article does not make such a statement in direct words, however, a libel by implication is actionable if "it imputes something which tends to disgrace a man, lower him in, or exclude him from society or bring him into contempt or ridicule." *Klein v. Sunbeam Corp.,* Del.Supr., 94 A.2d 385, 390 (1952). A libel need not be direct and open. "The publication must be judged by its general tenor; and if, taking their terms in their ordinary acceptation, it conveys a degrading imputation, however indirectly, it is a libel." *Rice v. Simmons,* Del.Ct. of Error and Appeals, 2 Harr. 417, 429 (1839); *Spence,* 396 A.2d at 971. Whether the article suffices to meet state and common law libel requirements, Martin's claim fails first on the constitutional level.

The Court has found Martin to be a limited public figure. He faces the same threshold burdens as such a figure when he attacks the entire article as he does when attacking pieces of it. The sum of the article is not greater than the whole. It is unnecessary to repeat the hurdles he faces under *New York Times, Gertz, Riley* and *Ramada Inns.* His attack on the whole article does not surmount constitutional hurdles.

### INVASION OF PRIVACY

Martin's fifth claim is for invasion of privacy alleging the *Forum* article placed him in a false light in the public eye. The United States Supreme Court has held the actual malice standard applicable to a false light suit by private individuals when the subject of the article involved matters of public interest. *Time, Inc. v. Hill,* 385 U.S. 374, 380-91, 87 S.Ct. 534, 538-43, 17 L.Ed.2d 456, 462-68 (1967). This Court holds that "when a plaintiff, who is a limited public figure with regard to a defamation claim, also sues under a false light theory that has as its factual basis the same allegedly false material, that plaintiff must prove actual malice in order to recover on the false light claim." *Fitzgerald v. Penthouse International, Ltd.,* D.Md., 525 F.Supp. 585, 603 (1981), aff'd in part, rev'd in part on other grounds, 691 F.2d 666 (4th Cir.1982), cert. denied, 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983). For all the reasons stated, *supra,* Martin has failed to carry his burden of proof in showing falsity or actual malice.

While this failure extinguishes the false light claim, an action for invasion of privacy upon public disclosure of private facts could survive this deficit. The right of privacy is not an absolute right but, rather is qualified by the circumstances and also by the rights of others. *Guthridge v. Pen-Mod, Inc.,* Del.Super., 239 A.2d 709, 714 (1967). The general purpose of protecting the right of privacy relates to one's *private* life, not when that life has become a matter of legitimate *public* interest. There are a number of limitations to this right: the freedom of the press, matters of legitimate public interest, matters involving public figures and the newsworthiness of the article. *Reardon v. News-Journal Co.,* Del.Supr., 164 A.2d 263, 266-67 (1960). The media has the right, guaranteed by the federal and state constitutions, to publish news and all matters of public concern. One who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency. *Barbieri v. News Journal Co.,* Del.Supr., 189 A.2d 773, 774 (1963).

**\*19** Given the avalanche of litigation that Martin has pursued concerning his past medical history and his interaction with Widener and his disclosure to *Inquirer* reporters of his view of the events, he may not now complain of the publicity he himself has engendered. Martin did not sue the *Inquirer,* a newspaper of infinitely greater circulation than the *Forum,* which contained much of the same information. Martin has functionally invited the discussion and publicity to this part of his life and he may not now assert a right he has effectively waived. Martin had already transformed the private nature of the facts to public and the recitation of those public facts does not violate an ordinary decency.

While attending Widener, Martin received a standard administrative form concerning a student's consent to have personal data released or published in a student directory. Martin returned the form denying consent to publicize any personal information. Martin now contends that the form effectively prevents any disclosure of information by the school and is a basis for his invasion of privacy claim. For all the reasons stated *infra,* this Court finds that Martin's actions and behavior override the notice to the school and he may not now predicate an invasion of privacy claim upon that form.

### CONCLUSION

Martin's causes of action for injunctive and declaratory relief are barred by the doctrine of claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 14
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

preclusion. The slander claim based on the Copeland/Santoro telephone conversation is barred by the doctrine of claim preclusion, as well as being wholly lacking in substance. This Court concludes Martin has limited public figure status and, thus, bears the burden of showing falsity, as well as actual malice as to the *Forum* article. Martin has failed to show any false statement upon which to base his defamation claim. Therefore, this Court cannot envision any set of circumstances in which Martin could prove defendant's knowledge of falsity or reckless disregard of truth. The claim for invasion of privacy based on a false light theory also fails for the same reasons. A claim for invasion of privacy based on public disclosure of private facts is precluded as Martin has effectively waived the private nature of those facts recited in the *Forum* article.

For the reasons stated herein, the motion of defendants Widener University School of Law, Anthony J. Santoro and Mitchell S. Bierman to dismiss is GRANTED. The motion of plaintiff James L. Martin for summary judgment is DENIED.

APPENDIX A

1 ANSWER THWARTS HIS LAW CAREER

*"This is not only an inappropriate question, this is a*

*cruel question." said a Stanford law professor.*

By Mary Jane Fine

and Mark Fazlollah

*Inquirer Staff Writers*

On Dec. 17, 1979, James L. Martin, then 26 years old, filled out an application to the Delaware Law School of Widener University. His answers, neatly typed, informed school authorities, among other things, that his Law School Aptitude Test score was an above-average 582, that his draft status was 4-F and that he also planned to apply to the law school at the University of California at Davis.

**\*20** The application's final seven questions called for a simple "yes" or "no" response. Jim Martin answered "no" to every one.

Three years later-after Martin graduated from Delaware Law School-Question Number Six came back to haunt him.

It is haunting him still.

Because of Question Number Six, Jim Martin believes, he has never been permitted to practice law. Because of that question, he is suing Delaware Law School and the New Jersey Bar Examiners, among others. Because of that question, Martin filed a complaint with the Office for Civil Rights of the U.S. Department of Education, which found the question to be in violation of federal law.

Question Number Six-which Delaware Law School has since eliminated-asked: "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

When James Martin answered "no" to Question Number Six, he set in motion a chain of events that continues to add link after link.

At some point prior to Martin's graduation, law school officials learned-it is not known precisely how-that he had, indeed, been in a mental hospital briefly in 1975. The circumstances of his confinement remain somewhat clouded, and Martin disputes the legality of his confinement, but school officials took a hard line.

In a letter to Martin dated Feb. 2, 1983, then-Associate Professor Edward C. Smith wrote that "the misrepresentation raised a question as to your character and fitness for the practice of law, and accordingly that the matter should be brought to the attention of the Board of Examiners of any bar to which you applied."

Smith, who now works for a pharmaceutical firm in Cleveland, said that as far as he was concerned, the only issue was the appropriateness of the question, not Delaware Law School's decision to notify bar examiners.

"I certainly don't see any problem with pointing out that someone told an untruth," he said in an interview.

Several other law schools, however, said that it was debatable whether they would have taken the same

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 15
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

action.

"This is not only an inappropriate question, this is a cruel question," said Stanford University law Professor Robert Weisberg, former dean of faculty affairs at Stanford. "It's putting cruel pressure on people to lie.... I would be very, very reluctant to tell the bar."

Weisberg strongly questioned Delaware Law School's contention that Martin's incorrect answer reflected on his character.

"It strikes me as a weird moral fastidiousness," he said.

Richard Lonsdorf, a professor of psychiatry and law at the University of Pennsylvania, said that although Martin's answer may have demonstrated "faulty judgment," Penn probably would not have pursued the matter.

"We probably would have decided that this is a kid," Lonsdorf said. "It was a stupid thing to have done, a foolish peccadillo."

*Legal paperwork*

Over the last six years since Delaware Law School made its decision, the legal paperwork surrounding Martin's claims has grown mountainous. Working out of his neat, two-story brick home in Wilmington, Martin, now 36, does accounting work for a living. Over the years, he figures that he has filed about 20 lawsuits, four of them against Delaware Law School.

**\*21** Somers S. Price, Jr., an attorney for Delaware Law School, says that two of the suits were dismissed and two-which Price says are similar to those dismissed-are pending. The suits seek unspecified damages and ask that the school be prohibited from continuing to disseminate information about his medical background and his response to Question Number Six. The law school says that its actions were proper.

Jim Martin grew up on a 150-acre farm in Palmyra, Lebanon County, the eighth of nine children. He describes his parents as strict Mennonites who rejected the ideas of higher education and participation in the wider world.

A fat looseleaf binder of personal memorabilia contains glimpses of the young Jim as a well-rounded boy who brought home A's and B's on his report cards and ribbons in soccer, science and wrestling. A letter written in 1970, when Jim was 16, congratulates his parents on his acceptance into the local chapter of the National Honor Society.

Later entries, however, chronicle a harsher period in his life, when he was a senior at Lebanon Valley College. On Feb. 2, 1975, according to medical records contained in the binder, Martin was admitted to Polyclinic Hospital in Harrisburg. The day before, the records say, "The patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had supernatural powers." The records quote Martin as saying, "I'm perfectly well, and it seemed like a bad dream. I was caught between my [parents'] Mennonite world and that of the school."

*Family dispute*

According to Martin, Polyclinic's account is "inaccurate and greatly exaggerated." The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away.

On Feb. 21, the records note, Martin was discharged-"improved"-to outpatient care.

A second admission-this time to the local Philhaven Hospital-occurred on April 2. According to admission notes, Martin was escorted to Philhaven by a Lebanon Valley professor and two students "because he wanted to walk around in the nude, spoke about he and God having a mission to kill, was otherwise irrational, bizarre, hyperactive and violent."

Martin denies ever walking around in the nude and says, "There was no more truth to that [account] than what they wrote in Harrisburg."

He was discharged to his parents' custody, according to May 10 notes by John D. Walmer, a psychiatrist at Philhaven.

After his brief hospitalizations, Martin graduated from Lebanon Valley, and in March 1976 he gained membership in Phi Alpha Epsilon, a scholastic honor society.

*Accounting work*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                    Page 16
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

After working for accounting firms for several years, Martin applied to Delaware Law School. He gives two reasons for answering "no" to the question about psychiatric hospitalization and treatment on the school's application form.

First, he explains, he felt that his admissions constituted an illegal confinement-"bogus," he calls it-and, therefore, did not count. Second, he says, he was advised by Walmer to say that he had never been treated for mental illness.

**\*22** Walmer, who retired in 1982, said in a telephone interview that, although he remembered Martin, he recalled no such conversation. "I'm just distressed to know that this [episode] is still bothering him," Walmer said.

Apart from the brouhaha over his application-which erupted just prior to graduation in December 1982-Martin's law school career appears to have been unremarkable.

Although the school's current administrators declined to discuss his case because of pending litigation, Smith, the former professor, remembered Martin as a "fairly good" student with adequate grades-"not a superstar."

Smith said that Martin had been in his civil procedure class. Asked to characterize Martin at the time, Smith said, "I've had some students that I thought were candidates for [mental] treatment; [Jim] just seemed eccentric."

Immediately after graduation, Martin applied to the Washington, D.C., bar. In the spring of 1983, he applied to the Pennsylvania and New Jersey bars and later to Maryland.

Each time, he passed the written section of the bar exam. But when Delaware Law School's letter was sent to the bar examining committees, the approval process slowed to a crawl.

The bars in Pennsylvania, Washington and Maryland refused to admit Martin. Though the Pennsylvania State Board of Law Examiners would not release records of the proceedings, documents from a related hearing indicated that the examiners' decision was based on Delaware Law School's report and on Martin's failure to undergo a current psychological evaluation. Past treatment for mental illness would not prevent an individual from being allowed to practice law.

The bar examining committee in New Jersey, which has tabled consideration of Martin's applications pending the outcome of his federal suit against it, has been involved in a somewhat more complicated dispute.

Martin applied in the spring of 1983 and quickly passed the written section. In April 1984, it seemed his dream had come true. The clerk of the New Jersey Supreme Court issued him the official certificate, in Gothic print and sealed with the court's gold emblem.

"James Lee Martin was constituted and appointed an Attorney at Law of this State on April 2, 1984," it said.

David Johnson, director of the New Jersey Supreme Court's attorney ethics division, acknowledged that Martin had good reason to think he was a lawyer because "you don't get the certificate without being admitted."

*One-page letter*

But at the end of April, Martin was devastated by a one-page letter from New Jersey Supreme Court Clerk Stephen Townsend.

There had been a mistake, the letter stated, and Martin's certificate was sent to him in error. It was void and he had no right to practice law. The bar's character committee was still reviewing whether he was fit to be an attorney, the letter stated.

Townsend declined to discuss the case other than saying that Martin's application was still pending before the state Supreme Court.

**\*23** The transcript from a June 1985 hearing by the New Jersey Supreme Court's Committee on Character showed that Widener's letter was still a central issue blocking Martin's application.

Committee member Mary Maudsley told Martin that his answer to Question Number Six on Widener's law school admission form was "a knowing misrepresentation." In the hearing, Martin provided extensive information about his stay in the mental hospitals and there was no suggestion that he misled the examiners.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  Page 17
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Maudsley also said she was concerned about Martin's inclination to file suits.

"Any potential problem which Mr. Martin has encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it," she told the committee.

Committee member Frank M. Lario Jr. then asked whether Martin's past mental health problems influenced "your filing of lawsuits at the present time or your feeling of persecution that may be existing at this time."

Martin's response was that, "There is no feeling of persecution, that is for sure. There is an obvious injustice."

In a recent interview, Martin appeared rueful about the prolonged legal entanglement with his former school. He says he did not foresee it.

"It's like being out in the desert, and you think there's water out there," he said. "You know how the sun plays tricks on you and you see a mirage and you have the feeling that it's just up ahead and you can sit down and rest.... Then when it isn't, you have too much invested to turn around."

APPENDIX B

DLS: Defendant

Mitchell S. Bierman

Staff Writer

James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS. In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission: "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

Somehow, DLS found out that Martin had in fact been confined to an institution. "Each time, [Martin] passed the written section of the bar exam. But when [DLS]'s letter was sent to the bar examining committee, the approval process slowed to a crawl." (*The Philadelphia Inquirer,* Sunday February 18,
1990, Mary Jane Fine and Mark Fazollah, p. 1 Section B.)

This happened in New Jersey, Washington, Maryland and Pennsylvania. Martin challenged DLS on the fairness and legality of the question by filing a complaint with the Office for Civil Rights of the U.S. Department of Education. The question was found to be a violation of federal law. Martin has filed four different lawsuits against DLS. Two were dismissed and two are pending.

As reported in the article in *The Philadelphia Inquirer,* Martin was admitted to Polyclinic Hospital in Harrisburg on February 2, 1975 and released on February 21, 1975. The medical records indicate family problems. Martin claims that he had announced to his parents that he was going to drop out of high school. Consequently, the police were called from whom Martin was attempting to escape. The records note that, "The patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had super-natural powers." ID p. 10-BJ, CITE [sic] Martin characterizes these records as "inaccurate and greatly exaggerated."

**\*24** The second admission from April 2nd to May 10th was to Philhaven Hospital. This confinement allegedly was due to Martin's behavior which, at that time, was deemed, "[sic] .. irrational, bizarre, hyperactive and violent." ID. p. 10-BJ.

Martin claims that the attending psychiatrist at Philhaven advised him to answer "no" to the question. Martin also alleges that the confinements were illegal which he feels justifies his negative answer to the question.

To complicate matters, Martin is pursuing another federal lawsuit against the bar examining committee in New Jersey. Apparently, after passing the New Jersey bar, Martin was sent the official certificate recognizing him as an attorney in New Jersey in April, 1984. Shortly thereafter, however, Martin received a letter from the New Jersey Supreme Court clerk stating that the certificate issued was a mistake. The letter further explained that Martin's character was still under review. As of February of this year (1990), the case was pending before the New Jersey Supreme Court.

In addition to the "knowing misrepresentation," the New Jersey bar examiners are also concerned with Martin's alleged propensity to file law suits.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"Any potential problem which Mr. Martin has encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it, "[sic] said Mary Maudsley of the New Jersey Supreme Court's Committee on Character. ID. P. 10-BJ.

Other law schools are not certain whether they would have pursued the same course of action as that of DLS. Robert Weisberg, law professor and former dean of Stanford University was quoted by the Philadelphia Inquirer [sic] as saying, "This is not only an inappropriate question, this is cruel. It's putting cruel pressure on people to lie. I would be very reluctant to tell the bar." Id. 10-BJ. Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.

APPENDIX C

STATEMENT OF RELATED CASES

*Martin v. ETS, Inc.,* C3909-79, 179 NJSuper. 317 (1981)

*Martin v. PA Real Estate Commission,* 9 C.D.1983

*Martin v. PA State Real Estate Commission, et. al.,* 85-2349 ED

*Martin v. Mrvos and Sinibaldi,* 3rd Cir. 88-5005, *IN RE: James Lee Martin,* 87-6622, Man./Proh. den., 108 S.Ct. 1756 (1988), *reh. den.,* 108 S.Ct. 2889 (1988) *reh. den.,* 6-27-88.

*Martin v. PA State Real Estate Commission, et. al.,* 89-5271, *cert. den.,* 110 S.Ct. 220 (1989) [Justice Brennan took no part in the consideration or decision of this petition], *reh. den.,* 11-27-89, at 110 S.Ct. 532 (1989)

*Martin v. PA State Real Estate Commission, et. al.,* --- U.S. ----, *cert. pet. pending.*

*Martin v. Sample, et. al.,* 81-1114, filed on 9-25-81, Middle Dist. PA, *cert. den.,* 459 US 850, *reh. den.,* 459 US 1024 (1982)

IN RE: APPEAL OF JAMES L. MARTIN from PennDOT, Bureau of Traffick Safety Operations; Civil Action-Law, Trust Book 47, p. 30, Lancaster County Court of Common Pleas, PA (2 cases).

*25 IN RE: James Lee Martin,* 87-278, DC Court of App., *den., reh. en banc pending.*

*Martin v. DC Court of App., et. al.,* 89-2789 (TPJ)

*Martin v. PA Board of Law Examiners,* 143 E.D.PA Sup. 84, *cert. den.,* 471 US 1022, *reh. den.,* 471 US 1120 (1985)

*Martin v. PA Board of Law Examiners, et. al.,* 86-1363, E.Dist. PA., 3rd Cir. *app.* at 86-1719, *consolidated with DLS et. al.,* 85-53 (JJF), *app.* to 3rd Cir. at 88-3428. Both *app. dis. w/o prejudice* for lack of juris. on 3-24-87, with *sua sponte* amendment on 4-22-87 to specify that dismissal related exclusively to DLS at 85-53. In interim, I wrote to Judge Huyett to request that the matter be finally resolved, but he refused, so I app. to 3rd Cir. at 87-1440. My app. was dismissed as "frivolous," but the recusal and disqualification on 12-7-87 rendered it rather dubious. Pet. for Writ of Cert. filed on 12-17-87 at 87-6072, *cert. den.,* 2-22-88; *reh. den.,* 3-28-88; supplemental brief was returned. Rule 60(b) Motion filed in E. Dist. of PA on 7-16-88. Huyett denied it on 8-15-88. [Motion for Reopen and to Certify for Interlocutory Appeal.]

*Martin v. Supreme Court of PA, et. al.,* app. to 3rd Cir. at 89-1088, 877 F.2d 56,

*cert. den.,* 89-5211, 110 S.Ct. 213 (1989), *reh. den.,* 89-5211, 11-13-89, 110 US 421 (1989)

2nd time, *cert. den.,* 89-7118, on 5-29-90, *reh. den.,* 89-7118, on 6-28-90.

IN RE: *James Lee Martin,* Misc.Dkt. 89-0207, E. Dist. of PA, Pet. for Writ of *Man./Proh.* against Kunz; app. to 3rd Cir. at 89-1618;

pet. for Man./Proh. in US on 1-24-90 at 89-6551, *man./proh. den.,* 3-19-90, *reh. den.,* 5-14-90,

pet. for cert. in US on 3-2-90 at 89-6839, *cert. den.,* 4-30-89, *reh. den.,* 6-11-90.

IN RE: *Application of James Lee Martin,* No. 17,835-17, NJ Committee on Character

*Martin v. Townsend, et. al.,* 86-1352, NJ DC, 87-5270, 826 F.2d 1056, *cert. den.,* 108 S.Ct. 191 (1987)

*Martin v. Townsend, et. al.,* 88-7435, 875 F.2d 311, *cert. den.,* 110 S.Ct. 212 (1989), *reh. den.,* 110 S.Ct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  Page 19
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

524 (1989).

IN RE: *James L. Martin,* US, rec'd on 3-22-90 but returned to me on 3-23-90. I resubmitted it as a Writ of Cert. on 3-26-90, but it was returned to me again on 3-29-90. I resubmitted it on 3-30-90, but they were returned to me again on 4-4-90, without filing.

*Martin v. Townsend, et. al.,* Mot to Reinstate denied again, *app.* to 3rd Cir. 90-5417, *app. aff., reh. en banc den., cert. den.,* 90-6230, --- U.S. ----, 1-7-91, *reh. pending.*

*Martin, et. al., v. Townsend, et. al.,* (CSF), 90-2616, NJ Dist., *dis., reh. pending.*

IN RE Application of James M. for Adm. to MD Bar, Misc. No. 3-Sept. Term 1988, app. to US, 88-5084, appeal dis. for want of juris., reformed as cert. pet., *cert. den.,* 10-3-88, *reh. den.,* 11-7-88.

MD Court of Appeals, et. al., 88-1999 DC MD, app. to 4th Cir., 88-1749 870 F.2d 655; 88-7103, *cert. den.,* 109 S.Ct. 3195, *reh. den.,* 110 S.Ct. 14 (1989), Motion for Stay rec'd on 7-3-89 is returned 7-7-89; stay motion resub. on 7-31-89 is returned again on 7-19-89; resubmitted stay motion is returned for 3rd time on 8-11-89.

***26** IN RE: Application of James Lee Martin for Adm to VA Bar. Passing score deemed failure.

*Martin v. VA Board of Bar Examiners, et. al.,* 88-0269-R, *app.* to 4th Cir. at 88-1752, consolidated with MD Court of Appeals for disposition in 4th Cir. 870 F.2d 655; pet. for writ of cert, US, 88-7103, *cert. den.,* 109 S.Ct. 3195, *reh. den.,* 110 S.Ct. 14 (1989), Motion for Stay rec'd on 7-3-89 is returned 7-7-89; stay motion resub. on 7-31-89 is returned again on 7-19-89; resubmitted stay motion is returned for 3rd time on 8-11-89.

IN RE Application of James Lee Martin to the DE Bar;

(1) app. filed with DE Sup. on 4-19-89, 190, 1989; IN RE: James Lee Martin, 88-7221, *Man./Proh. den.,* 110 S.Ct. 222 (1989), *reh. den.,* 110 S.Ct. 420 (1989);

(2) app. again filed with DE Sup. on 7-2-90, *app. dismissed* 10-22-90, *reh. en banc den.,* 11-5-90, *cert. pending* at No. 90-6229, --- US ----.

*Martin v. Sparks, et. al.,* 90-235, D.DE, pending.

*Martin v. DLS, et. al.,* 85-53 (JJF), 625 F.Supp. 1288, 884 F.2d 1384, *cert. den.,* 110 S.Ct. 411 (1989), *reh. den.,* 110 S.Ct. 766 (1990)

*Martin v. DLS, et. al.,* 88-768 DC Dist, app. to DC Court of App. for DC Cir. at 89-7024, 89-5210, *cert. den.,* 110 S.Ct. 212 (1989), *reh. den.,* 110 S.Ct. 421 (1990)

IN RE: *James L. Martin,* 88-5988, --- US ----, pet for *man./proh. den.* on 2-21-89, motion for leave to file *reh. den.,* 11-6-89.

*Martin v. DLS, et. al.,* 88-3420, E.Dist. of PA., pending.

*Martin v. Shank, et. al.,* 86-2205, Dist. of MD,

(1) app. to 4th Cir. at 87-2039,

(2) app. to 4th Cir. at 87-2040,

(3) app. to 4th Cir. at 87-2100; pet. for writ of cert., 89-7126, *cert. den.,* 5-29-90, *reh. den.,* 6-28-90

(4) app. to 4th Cir. at 87-2162, IN RE: *James Lee Martin,* 87-6616, *Man./ Proh. den.,* on 5-16-88, 108 S.Ct. 1757 (1988), *reh. den.* on 6-27-88, 108 S.Ct. 2888 (1988).

(5) app. to 4th Cir. at 87-2177, 838 F.2d 1210;

(a) IN RE: *James Lee Martin,* 87-6790, *Man./Proh. den.* on 6-6-88, 108 S.Ct. 2045 (1988), *reh. den.,* on 6-30-88, 108 S.Ct. 2921 (1988)

(b) *Martin v. Shank, et al.,* 87-6903, *cert. den.* 6-27-88, *reh. den.,* on 9-15-88

*Martin v. Shank, et. al.,* 86-1748, DC, *app.* to DC Cir., 87-7088, pet. for writ of *cert. den.* on 10-3-88 at 87-7005; *reh. den.,* 11-7-88 at 87-7005

*Martin v. Shank, et. al.,* DC Cir. 87-7008, pet. for writ of *cert. den.* on 2-21-89 at 88-6145, *reh. den.* on 3-27-89 at 88-6145 [re costs for appendix and briefs]

*In the Matter of James Lee Martin,* Case Ref. No. 03852042, US Dept. of Education, *app.* to DC Dist. 88-1788, app. to DC Cir., pet. for *cert.* 89-7669, *den.,* 10-1-90, *reh. den.*

*Martin v. US Dept. of Education,* No. 90-2492 (TPJ), DC Dist., *pending.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)  
**(Cite as: Not Reported in A.2d)**

Page 20

*Martin v. Wilson, PA State Police, et. al.,* 88-2300 (ED Pa.), *pending.*

*Martin v. Farnan,* 89-8008, 3rd Cir.; *IN RE: James Lee Martin,* 89-6594, *man./ proh. den.,* 3-19-90; *reh. den.,* 4-30-90.

**\*27** *Martin v. Farnan,* 90-8035, 3rd Cir.;

(1) 89-7446, *cert. den.,* 6-28-90, *reh. den.*

(2) 89-7700, *cert. den.,* 10-1-90, *reh. pending.*

*Martin v. Farnan,* 89-8088, 3rd Cir.; *v. Farnan,* 89-7817, --- US ---- pet. for writ of *cert. den.,* 10-1-90, *reh. den.*

*Martin v. Farnan,* 90-8102, 3rd Cir., *man. den., reh. en banc pending.*

*Martin v. Huyett,* 89-8011, 3rd Cir.; *IN RE: James Lee Martin,* 88-7157, *Man./ Proh. den.,* 109 S.Ct. 3231 (1988), *reh. den.,* 110 S.Ct. 15 (1989)

*Martin v. Huyett,* 89-8076, 3rd Cir.;

(1) *James Lee Martin v. US Court of Appeals for the 3rd Cir.,* 89-6098, *cert. den.,* 1-16-90, *reh. den.,* 3-5-90

(2) *Martin v. Huyett,* 89-7449, *cert. den.,* 6-28-90, *reh. den.,* 8-13-90;

*Martin v. Huyett,* No. 90-8101, 3rd Cir., *man. den., reh. en banc pending.*

*Martin v. Fisher,* No. 90-8103, 3rd Cir., *man. den., reh. en banc pending.*

*IN RE: James L. Martin,* No. 4, 1989, Leb. Orphans Ct., app. to PASuper., 118 HBG 89, pet. for allow. of app. to PA Sup., 233 M.D.Alloc. Dkt. 89, *cert. den.* at 89-7119 on 5-29-90 in *Martin v. PA Supreme Court, reh. den.,* 6-28-90.

*Martin v. Walmer, et. al.,* 90-2752 (E.Dist. of PA), *dis.* on 9/26/90, *recon. den.* (Huyett ignored unopposed Motion to Recuse), app. to 3rd Cir. pending at No. 91-1010.

*Joyce E. Richards and James L. Martin v. Medical Center of DE, Inc., et. al.,* No. 90-6373, --- US ----, *pet. for writ of cert. pending.*

*Bucher, Martin, et. al. v. Omega Medical Center Assoc., L.P.,* No. 90-3461, 3rd Cir., *aff., reh. en banc den., pet. for writ of cert.* for filing in US has been served.

I view the "related cases" section narrowly and therefore do not include many other cases that could otherwise be considered "related.".

### APPENDIX D

### MEDICAL AUTHORIZATION AND RELEASE

I, James L. Martin, soc. sec. no. ███████ ███ birthdate, hereby authorize Dr. Eric S. Copeland, 513 Twadell Mill Rd.; Wilm., DE, 19807 to procure any medical records pertaining to neuropsychiatric impairment about me from Rebecca Jaffe, M.D., 1941 Limestone Rd.; Suite 107; Wilmington, DE 19808. To the extent no such impairment has been diagnosed, this request may be satisfied with a signed statement suggested below.

This authorization is good for ninety (90) days.

DATE /s/June 24, 1989

/s/JAMES LEE MARTIN

### STATEMENT OF REBECCA JAFFE, M.D.

I have no reason to believe James Martin is mentally or neuropsychiatrically impaired and have been his doctor for the past five (5) years.

DATE /s/last seen 11/15/88, /s/signed 7/5/89

/s/Rebecca Jaffe, M.D.

### APPENDIX E

### WAIVER OF CONFIDENTIALITY

I, James L. Martin, at 912 McCabe Ave.; Wilm., DE 19802 (soc. Sec. # ███████ hereby waive any confidentiality rights to the file about me at the Delaware Law School (now Widener University School of Law) under 20 USC Sec. 1232 [Buckley Amendment], and that Dr. Eric S. Copeland may obtain copies of all such records and/or access to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 21
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

them at such time as may be arranged between the School and him. This waiver shall remain effective for as long as may be necessary to access all such records.

*28 DATED: August 30, 1989

BY: /s/James L. Martin

### MEMORANDUM OPINION

*Upon Motion of Plaintiff for Reargument-DENIED*

Plaintiff, James L. Martin [Martin] has filed a motion for reargument of this Court's opinion of June 4, 1992. In that opinion, the Court denied Martin's motion for summary judgment and granted the defendants' motion to dismiss on the pleadings.

Martin now seeks reargument on the basis of various federal legislation involving discrimination and disabilities. The role of this legislation in Martin's current claims against the defendants was reviewed by the United States District Court for Delaware in its opinion of *Martin v. Delaware Law School of Widener University,* D.Del., 625 F.Supp. 1288 (1985), *aff'd.* 884 F.2d 1384 (3rd Cir.1989), *cert. denied,* 493 U.S. 966, 110 S.Ct. 411, 107 L.Ed.2d 376 (1989), *rehearing denied,* 493 U.S. 1038, 110 S.Ct. 766, 107 L.Ed.2d 781 (1990). It was also considered in the case of *Martin v. Walmer,* D.C.E.D.Pa., C.A. No. 90-2752, Huyett, J. (September 26, 1990).

For all of the reasons discussed in this Court's opinion of June 4, 1992 dealing with the issue of claim and issue preclusion, Martin's arguments in his motion to reargue have been explored thoroughly by courts of competent jurisdiction and now cannot be raised again. In addition, the points which he makes in his current motion for reargument were considered by the Court in reaching its decision announced on June 4, 1992.

Accordingly, James L. Martin's motion for reargument is DENIED.

IT IS SO ORDERED.

FN1. Formerly Delaware Law School.

FN2. *See Martin v. Delaware Law School of Widener University,* D.C.Del, 625 F.Supp. 1288, 1293 n. 1 (1985) detailing litigation on this issue.

FN3. This letter has not been made a part of the record.

FN4. Copeland was or is a co-plaintiff of Martin's in another lawsuit. *Copeland, et al. v. Omega Medical Center Associates,* D.C.Del. C.A. No. 91-193. Copeland is or was a co-plaintiff with Martin in a consolidated appeal involving the boards of bar examiners of several states, including Delaware and the New Jersey Supreme Court and Widener. *Martin, Copeland v. Townsend,* No. 91-5085, (3rd Cir. June 3, 1991) (ORDER).

FN5. The *Inquirer* article itself indicates that a controversy exists over whether Widener should or should not have communicated to the various boards of bar examiners Martin's incorrect answer.

FN6. Refer to Appendix C.

FN7. There is no indication Martin sued the *Inquirer* for the article which formed the basis of the *Forum* article.

FN8. The *Lund* court referred to the four-part test found in *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir.1986), *cert. denied* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). *Janklow* adopted the *Ollman* four-part test.

FN9. In *Harte-Hanks,* actual malice has been defined to include a high degree of awareness of probable falsity, or the media defendant entertained serious doubts as to the truth of his publication. *Harte-Hanks,* 491 U.S. at 667; 109 S.Ct. at 2685-86, 105 L.Ed.2d at 576.

FN10. *See footnote 9, supra.*

Del.Super.,1992.
Martin v. Widener University School of Law
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                                     Page 1
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

H

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware, Sussex County.
Raymond T. STEVENS, Jr., Plaintiff,
v.
INDEPENDENT NEWSPAPERS, INC., a Delaware corporation, t/a Delaware State News and Tom Troy, Defendants.
Submitted: Feb. 11, 1988.
Decided: March 10, 1988.

Plaintiff's Motion for Summary Judgment-Granted
Defendant's Motion for Summary Judgment-Granted

Kevin M. Howard, Schmittinger and Rodriguez, P.A., Dover, for plaintiff.
Thomas I. Barrows, Hudson, Jones, Jaywork & Williams, Dover, and Leonard H. Freiman, Baker & Hostetler, Washington, D.C., for defendants.

MEMORANDUM OPINION

LEE, Judge.

*1 Plaintiff Raymond T. Stevens has sued Independent Newspapers, Inc. and reporter Tom Troy for defamation as a result of a series of five articles published in the *Delaware State News* in July and August of 1985. The defendants have filed an amended counterclaim alleging abuse of process and intentional infringement of their constitutional rights under the First and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Delaware Constitution. Plaintiff's earlier motion to dismiss defendants' abuse of process action was denied by this Court in *Stevens v. Independent Newspapers, Inc.,* Del.Super., C.A. No. 85C-OC-11, Chandler, J. (Nov. 13, 1986). This is now the Court's decision on the parties' cross-motions for summary judgment.

On a motion for summary judgment pursuant to Super.Ct.Civ.R. 56, this Court must review the evidence in the record in a light most favorable to the non-moving party. *Sweetman v. Strescon Industries, Inc.,* Del.Super., 389 A.2d 1319 (1978). It is the burden of the moving party to show that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law. *Oliver B. Cannon & Sons v. Dorr-Oliver, Inc.,* Del.Super., 312 A.2d 322 (1973).

Defendants assert that they are entitled to summary judgment in their favor because the undisputed facts demonstrate that the allegedly false and defamatory statements are either not defamatory or are substantially true statements of fact or constitutionally protected expressions of opinion, all absolute defenses to a libel action. Alternatively, defendants argue that they are entitled to summary judgment because plaintiff, a public official, is unable to demonstrate that a reasonable jury would find clear and convincing evidence of actual malice as required under *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, (1986). Because I agree with defendants' first line of argument and find the statements at issue not actionable, I need not decide whether plaintiff is a private individual, as he contends, or a public figure.

The series of articles published in the *Delaware State News* questions the use of state-owned vehicles by state employees for commuting or carpooling purposes. The first article details the daily morning itinerary of Mr. Stevens, a field audit manager for the Office of the Auditor of Accounts, from his home in Selbyville to work in Dover. According to the article, Stevens drives first to the nearby Selbyville Middle School where he parks his car and gets into a car bearing "State-Owned" tags. Then he drives to Seaford and Milford to pick up three other state employees before arriving in Dover after a total distance of approximately 72 miles. Although the articles describe such commuting as a statewide practice involving other agencies besides the Office of the Auditor of Accounts, Mr. Stevens is the state employee most frequently named as being engaged in this practice.

Troy's inquiry into the personal use of state-owned cars was prompted by an anonymous tip received by the newspaper. Troy thereafter interviewed, among others, Dennis E. Greenhouse, the State Auditor of Accounts and Stevens' supervisor, George Hale, Secretary of the Department of Administrative Services, and Richard Cathcart, Administrator of Fleet Management of the Department of Administrative Services. The investigation resulted in four articles published on July 25 and 26, 1985 and August 15 and 16, 1985 and an editorial published on

Not Reported in A.2d                                                                                                                          Page 2
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

July 26, 1985. It was the opinion of the Editorial Board of the newspaper that such commuting was not "the proper use of vehicles purchased by the taxpayers for public purposes."

**\*2** Stevens' complaint specifically alleges that sixteen statements printed in the articles and editorial are false and defamatory. I will review each statement individually further on in this opinion. Stevens also complains that the articles convey the impression that he was involved in improper and illegal use of a state vehicle, that the articles subjected him to public scorn and hatred and have damaged his reputation for honesty, integrity and virtue. He further alleges that the defendants wrote and published the articles despite having knowledge that his use of the state vehicle was proper under the then-existing guidelines.

The elements of a cause of action for defamation are, according to the *Restatement (Second) of Torts § 558*:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting to at least negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

A commonly accepted definition of defamation is that adopted by the *Restatement* in § 559: "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Whether a statement is capable of bearing the particular meaning ascribed to it by the plaintiff and whether that meaning is defamatory in character are questions of law for the court to decide in the first instance. *Slawik v. News-Journal Co.,* Del.Supr., *428 A.2d 15, 17 (1981)*; *Restatement, supra* at § 614.

The allegedly false and defamatory statements published by the *Delaware State News* are:

1. Each day, audit manager, Raymond T. Stevens, Jr. leaves his home in Selbyville about 7:00 a.m.

2. He drives to nearby Selbyville Middle School, parks his car and gets in his Silver Caprice Classic station wagon that bears the words "State-Owned" on its tags. He drives to Seaford and Milford to pick up two auditor's office employees.

3. About 72 miles later, all four arrive in Dover and thus begin another working day.

I do not find these three statements from the first article of July 25 to be defamatory as a matter of law. Mr. Stevens has asserted that these statements give the impression that he must exceed the speed limit in order to drive 72 miles in an hour. A review of the entire article makes it clear that this is a tenuous claim. There is no question that the focus of the article is on the personal use of state vehicles for commuting, not for speeding. Nor is there anything in these straightforward statements to imply that plaintiff had committed a crime or otherwise to harm his reputation.

Furthermore, even if these statements could be considered defamatory, there is no liability for defamation if a defamatory statement is true. *See Gannett Co. v. Re,* Del.Supr., *496 A.2d 553, 557 (1985)*; *Restatement, supra,* at § 581A. Even reviewing the record in a light most favorable to Stevens, the non-moving party, there is no genuine issue as to the substantial truth of these statements. By deposition Stevens has admitted that during the time period reported by the newspaper articles, he left his home each morning at approximately 6:30 a.m. He drove to the Selbyville Middle School approximately one mile from his home, parked his car and got into a Silver Caprice Classic station wagon that was state-owned and assigned to him. The car did not, however, have tags that said "State-Owned"; rather, it bore confidential tags which are often used when state-owned vehicles are being used for surveillance or other confidential purposes. Thereafter he drove to Georgetown where he picked up a clerk-typist in his office who lived in Bridgeville and then drove to Milford where he picked up another field auditor and the Director of the Division of Motor Vehicles. All four later arrived in Dover after a total distance of approximately 55 miles.

**\*3** Immaterial errors in the facts reported do not prevent a statement from being substantially true as long as the "gist" or "sting" of the statement is true. *See Gannett, 496 A.2d at 557;* W. Keeton, D. Dobbs, R. Keeyon, D. Owen, *Prosser and Keeton on Torts* § 116 (5th ed. 1984). The fact that Stevens drove 55 miles instead of 72 miles, drove a state-owned vehicle that had confidential tags rather than "State-

Not Reported in A.2d  Page 3
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

Owned" tags, and picked up riders in Georgetown and Milford rather than Seaford and Milford would make no difference in the mind of the average reader. He did essentially what the newspaper article said he did.

4. Such "commuting" has been a standard practice in the auditor's office for at least three years. [FN1]

Statement 4 also comes from the first article of July 25 and is attributed to Dennis Greenhouse. This statement is not defamatory as a matter of law and, hence, not actionable. Greenhouse also admits that he probably made this statement to Troy, although he does not believe that he used the word commuting. Plaintiff denies that his practice amounted to commuting. He instead calls it carpooling. "Commute" is defined in *Webster's Third New International Dictionary* as "travel back and forth regularly or frequently." "Carpool" is defined in the same dictionary as "a joint arrangement by a group of private automobile owners or drivers in which each in turn drives his own car and takes the other passengers." Whatever it may have been called, in the mind of the ordinary reader Stevens' practice of driving regularly between Selbyville and Dover picking up passengers along the way is more akin to commuting than carpooling. The statement is therefore substantially true and not actionable for this reason as well.

5. "If there are no auditing activities in Selbyville, the car should be left in Dover," Cathcarte [sic] said.

**\*4** 6. But Cathcarte [sic] conceded that the rules may not be entirely clear to the auditor's office, where the practice has been widespread and unchallenged for years.

7. For that reason, Cathcarte [sic] has begun a sweeping review of state vehicle policy and has distributed draft copies to all department heads to seek suggestions for clarifications.

Statements 5, 6 and 7 are the result of Troy's interview with Richard Cathcart. Cathcart admits making statement 5, but claims that it was made in the context of a discussion about the proposed new regulations. According to Cathcart, he was comparing Stevens' use of the car with permitted uses under the new policies currently being drafted. This statement is not defamatory and it is an accurate quotation. It is not actionable. Cathcart does not recall making statement 6, although he does not deny that he might have made it. Even assuming that Cathcart never made such a statement, it is not actionable because there is nothing defamatory about it.

As for statement 7, Stevens claims that it is false and defamatory because it implies that as a result of the his actions, Cathcart began the sweeping review. By deposition Cathcart testified that he began his review of state vehicle policies as a result of a Senate Resolution [FN2] and prior to learning of Stevens' vehicle usage. However, analysis of the July 25, 1985 article requires this Court to reject plaintiff's interpretation of this statement's meaning as unreasonable. The clause "[f]or that reason" logically refers to the sentence immediately above: "[b]ut Cathcart conceded that the rules may not be entirely clear to the auditor's office, where the practice has been widespread and unchallenged for years." Even though that statement may never have been made by Cathcart, it is not defamatory and reference to it does not render statement 7 defamatory. Thus statement 7 is also not actionable.

8. Abuse of State Vehicles Affirmed. [headline]

Statement 8 is the headline from the July 26, 1985 article. Defendants contend that this statement is a expression of opinion absolutely protected under the First Amendment. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974) ("Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."). Plaintiff argues that it is a statement of fact because Troy has testified that the July 25 and 26, 1985 articles were intended as recitations of fact.

The determination whether a statement is an expression of opinion or a factual representation is a question of law. *Slawik v. News-Journal Co.,* Del.Supr., 428 A.2d 15, 17 (1981). The Delaware Supreme Court has adopted the four-part test expounded in *Ollman v. Evans,* D.C.Cir., 750 F.2d 970 (1984) (en banc), *cert. denied,* 471 U.S. 1127 (1985), to determine whether the average reader would view a statement as one of fact or one of opinion. *See Riley v. Moyed,* Del.Supr., 529 A.2d 248, 251 (1987). The factors in this test are (1) the common usage or meaning of the challenged language (*Ollman,* 750 F.2d at 979-80); (2) the degree to which the statement is objectively verifiable as true or false (*Id.* at 981); (3) the context in which the statement appears (*Id.* at 982); and (4) the broader social context into which the statement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01207-GMS    Document 87-5    Filed 02/17/2006    Page 14 of 19

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

fits (*Id.* at 984).

Applying the four-part test to the facts of this case, I conclude that this headline is an expression of opinion. First, as to the meaning of the challenged language, the focus of this analysis is to determine whether the allegedly defamatory statement has a precise meaning which is likely to give rise to factual implications. *Id.* at 980. Stevens argues that the headline falsely implies that he "was doing something wrong with his state vehicle" and "had committed a breach of the public trust." The vagueness inherent in Stevens' own interpretation of this statement, however, underscores the weakness in his argument. **Doing something wrong is a concept** that is open to many interpretations and does not necessarily imply highly damaging facts. The word "abuse" is not fact-laden, but rather reflects the subjective perceptions of the speaker. Indeed, the term "abuse" is so imprecise that the Delaware Supreme Court has held the phrase "abuse of office" to be an expression of opinion and not a word of art. *See Slawik,* 428 A.2d at 17. "Abuse of state cars" is a phrase even less capable of definition. However, the full statement that is alleged to be false and defamatory is "[a]buse of state cars affirmed." Its meaning is ambiguous and this ambiguity complicates the second factor in the *Ollman* test.

**\*5** The second factor is the extent to which a challenged statement can be objectively verified. If a statement is capable of proof or disproof, a reader might reasonably view it as conveying actual facts. 750 F.2d at 981. In one sense the headline of July 26 can be read as a statement of fact and is capable of proof or disproof. Did one of the persons interviewed affirm or state positively that the reported use of state cars was an abuse? Both Cathcart and Hale have denied using the word "abuse" in their conversations with Troy. In another sense, however, the statement can be read to mean that it was the belief of the newspaper that what was being affirmed; that is, the reported use of state cars, was an abuse. In this latter sense the statement is not objectively verifiable and is an expression of opinion.

This leads us to the third factor, the immediate context of the allegedly defamatory statement. As the headline to the July 26, 1985 article, the statement must be read in the context of the entire article. Initially, Troy quotes the comments of Secretary Hale regarding the excessive use of state-owned vehicles for commuting purposes. Troy then discusses briefly the proposed new regulations and the potential loophole whereby a state employee might evade the new requirement of the Secretary's approval to keep a car permanently at his residence by parking the car at a nearby state facility. The article continues by describing the practices in the Auditor's Office that Greenhouse claims are justified by the unique responsibilities of the auditors and cites Greenhouse's reactions to the proposed regulations.

Although the immediate context is a news article and not an editorial or commentator's column, *see, e.g., Riley,* 529 A.2d at 252; *Slawik,* 428 A.2d at 16, a reasonable reading of the article and headline together indicates that the headline is not implying new facts, but rather is an expression of the newspaper's opinion of the import of the article, the improper use of state cars by state employees for personal commuting. Secretary Hale testified that he made the statements quoted or referred to in the first three paragraphs. The article thus recites the facts and the ordinary reader is able to agree or disagree with the newspaper's opinion that this practice constitutes an abuse.

**\*6** The fourth factor is the broad social context in which this headline appeared. The article was part of a series of reports designed to bring to the attention of the public the excessive personal use of state vehicles by state employees and the proposed regulations designed to restrict that use. The newspaper perceived an abuse involving public expenditures that the authorities were slow in correcting and its reports were calculated to challenge official complacency. The newspaper was acting in its role as a gadfly, stimulating public debate over matters of public concern. The use of provocative or exaggerated language in the headline attracted the public's attention while the article provided the factual basis for the report. The challenged statement would thus be understood by the public to be an expression of the newspaper's opinion.

Considering the foregoing analysis, this Court finds that the headline stating that the abuse of state cars was affirmed is a constitutionally protected expression of pure opinion [FN3] because an ordinary reader would not infer the existence of any undisclosed facts.

9. Hale made his comments after the Delaware State News reported Thursday morning that cars assigned to the office of the state auditor, Dennis E. Greenhouse are being used for what amounts to commuting to and from work.

10. Greenhouse, however, has said the rules are not

Not Reported in A.2d                                                                                                                                             Page 5
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

clear.  Further, he said that the practice of some employees taking cars home at night was inherited from previous auditors.

11. If the auditor watches out for other state agencies, who watches the auditor's staff? [FN4]

Statements 9 and 10 are not defamatory and therefore not actionable.  Statement 11 is the opening sentence of the editorial of July 26, 1985.  Stevens contends that this is false and defamatory because it implies that no one audits the Auditor's Office when in fact it is subject to an independent audit.  Defendants argue that this statement is an expression of opinion and non-actionable.

Initially, I note that the statement is neither defamatory nor concerns the plaintiff directly.  However, using the *Ollman* analysis, I also conclude that this is a statement of opinion and not fact.  The language involves a rhetorical play on words easily recognizable as such by the ordinary reader.  Although the word "watch" in this context could imply an audit, it also has many other meanings that are not capable of verification.  The immediate context of the statement is in an editorial in which the editorial board of the newspaper criticized Auditor Greenhouse for his "less than forceful comments" when questioned about the use of state-owned cars by his staff.  Again, this editorial and the series of reports were designed to increase public awareness about the longstanding and officially condoned practice of state employees using state-owned cars for commuting, a practice which the newspaper considered improper.  The series and editorial were also designed to prompt state officials into changing this practice.  This is one of the most important functions of a newspaper.  The use of exaggerated or sarcastic rhetoric typically employed in such circumstances signals to the reader that what is being expressed is opinion.  Given the import of the editorial, the opinion is not implying undisclosed facts.  Statement 11 therefore is a constitutionally protected expression of pure opinion and not actionable.

12. Auditor lectured for allowing use of state car for commuting.  [headline] Secretary of Administrative Services, said auditor of accounts Dennis E. Greenhouse should stop the practice of allowing an auditor to drive the "State-Owned" car to work in Dover from near his home in Selbyville.

**\*7** 13. "I don't think it is sufficient state business and I don't think he ought to be doing it", Hale said of audit manager Raymond T. Stevens, [sic] use of the state car to drive from a school parking lot near his home in Selbyville to Dover."

Statements 12 and 13 consist of the headline and first two sentences from the August 16, 1985 article.  Stevens has alleged that the headline is false and defamatory because the Auditor was never lectured by Hale.  Both Hale and Greenhouse have testified that there was no lecture.  The headline, however, is not defamatory and it does not concern Stevens.  As to the first sentence, Hale has testified that he said that if he, Hale, were in Greenhouse's position he would have taken action to stop the practice.  This is substantially what the newspaper reported.  Additionally, it is not defamatory.  The next sentence is a direct quotation from Secretary Hale.  Hale has testified that the substance of this statement is true and accurate.  Neither statement is actionable.

14. Audit manager, Raymond T. Stevens, Jr., who has been using a "State-Owned" car to drive from a state parking lot near his home in Selbyville to work in Dover, has been told he can no longer use the vehicle for carpooling.

15. A written policy in the auditor's office prohibits persons from riding in the cars unless they have specific state business with the car.

16. Stevens has also been providing transportation to a state clerk who lives in Seaford and an auditor who lives in Milford.

Statements 14, 15 and 16 are from the article of August 15, 1985.  None is defamatory as a matter of law.  Also, both Stevens and Greenhouse have testified that Stevens was told after returning from Florida that two of the three passengers, the clerk-typist and the Director of the Division of Motor Vehicles, could no longer ride with him in the state-owned car.  Statement 14 is therefore substantially true.  The evidence in the record indicates that a written policy in effect in the Auditor's Office at the time of the newspaper articles stated:  "[n]o persons will be permitted in state vehicles except on official state business, without the approval of the chief administrative auditor."  Statement 15 is therefore substantially correct.  Statement 16 essentially repeats part of Statement 2.  Aside from the minor error as to the residence of the clerk, it is true.  All three statements are non-actionable.

None of the sixteen statements alleged by Stevens to be false and defamatory is actionable as a matter of

Not Reported in A.2d                                                                                                           Page 6
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

law. Stevens' further allegation that the articles as a whole convey the impression that he was involved in illegal and improper use of a state vehicle is unsupportable. In my opinion, a careful reading of the articles conveys the impression that while Stevens was using a state vehicle for commuting, contrary to the proposed new regulations, the practice was both widespread, customary and pursuant to the officially-condoned policy of the auditor's office. The fact that the newspaper was vigorously criticizing this policy does not amount to defamation of Stevens. For all the above reasons, defendants' motion for summary judgment is granted.

Defendants have filed a counterclaim in which the first count alleges abuse of process by the plaintiff. They claim that in instituting his suit, Stevens "intended to stop any further publication by the defendants of facts known by the plaintiff to be true" and intended to harm defendants' good names and reputations. Docket Item No. 30, Answer to Complaint and Amended Counterclaim, ¶ 31. Further, they allege that "in maintaining the suit by engaging in discovery ..., [Stevens], by engaging in willful acts in the use of process not proper in the regular conduct of these proceedings, intended to stop further publication by defendants of facts known by [Stevens] to be true." *Id.* at ¶ 33.

**\*8** Stevens has moved for summary judgment on Count One of the counterclaim, arguing that there is no evidence of improper use of process and that such a cause of action cannot be maintained where he has merely instituted and pursued a colorable claim of defamation. In opposition to Stevens' motion, defendants argue that this is a frivolous lawsuit because they have amply demonstrated that the alleged defamatory statements are either substantially true or opinion. Therefore, they contend, Stevens instituted and maintained the suit solely to harass and to discourage them from publishing further articles about the plaintiff. Defendants have supplied an affidavit by Frank Fantini, executive editor of the *Delaware State News,* stating that it is his belief that Stevens filed the lawsuit to dissuade the newspaper from publishing further articles about Stevens and to punish the newspaper for the articles already published. Docket Item No. 51. Fantini also testified that after learning of the lawsuit he ceased publishing further articles about Stevens. *Id.*

The elements of a claim for abuse of process are: 1) an ulterior purpose; and 2) a willful act in the use of the process not proper in the regular conduct of the proceedings. *Unit, Inc. v. Kentucky Fried Chicken Corp.,* Del.Super., 304 A.2d 320, 331 (1973), *overruled on other grounds, Mann v. Oppenheimer & Co.,* Del.Supr., 517 A.2d 1056 (1986).

Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club.

W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on Torts* § 121 p. 898 (5th ed. 1984).

Different kinds of process have lent themselves to such coercion, including attachment, execution, garnishment, sequestration proceedings, arrest of the person and criminal prosecution. *Id.* at 899. It has also been said that "in a proper case an abuse of the powers which a litigant derives from the taking of a deposition on proper notice gives such notice the status of "process" for the purpose of the tort under consideration." *Thornton v. Rhoden,* Cal.App., 53 Cal.Rptr. 706, 717 (1966). The use of an interrogatory may be an abuse of process where, for example, it is being used to disclose a potentially damaging fact that has no logical relation to the lawsuit. *See Younger v. Solomon,* Cal.App., 113 Cal.Rptr. 113 (1974).

While the existence of an ulterior motive may be inferred from the fact that the process has been misused, the reverse is not true; if the act of the prosecutor is in itself regular, his motive, ulterior or otherwise, is immaterial. 1 Am.Jur.2d, *Abuse of Process* § 4 (1962). An action for abuse of process cannot be maintained where the process was employed to perform no other function than that intended by law. *Id.*

**\*9** Defendants have presented some evidence that they discontinued any further publication concerning Stevens after the suit was filed. They also allege that Stevens had an improper motive in filing his lawsuit. However, they have failed to present any evidence tending to show that Stevens' willful acts, the requests for admissions and interrogatories and notice of deposition, activities which constitute part of the discovery process, were anything other than a legitimate use of the judicial process in the regular course of plaintiff's suit. There being no evidence of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                  Page 7
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

a threat or act in the use of process not proper in the regular conduct of the lawsuit, the defendants have failed to make out an essential element of the claim of abuse of process. Summary judgment is granted to Stevens as to this count.

Defendants allege in count two of their counterclaim that Stevens, through the commencement and continuation of his libel suit, violated the rights guaranteed to them by the First and Fourteenth Amendments to the United States Constitution and by the corresponding provisions of the Delaware Constitution. They further allege that Stevens' conduct was under color of state law because he invoked and used the judicial processes of the State of Delaware in his "scheme" to prevent defendants from publishing truthful articles about him.

Defendants' counterclaim, in effect, although not explicitly, appears to allege a cause of action under the Federal Civil Rights Act, specifically 42 U.S.C.A., § 1983 (1981). FN5 Although I know of no Delaware decision affirming or denying the jurisdiction of the courts of this State to entertain civil rights actions based upon 42 U.S.C. § 1983, it is recognized that state courts as well as federal courts have jurisdiction over federal constitutional questions. *Pajewski v. Perry,* Del.Super., 320 A.2d 763 (1974), *rev'd on other grounds,* Del.Supr., 363 A.2d 429 (1976). *See Belton v. Gebhart,* Del.Ch., 87 A.2d 862 (1952), *aff'd.,* Del.Supr., 91 A.2d 137 (1952), *aff'd., Brown v. Board of Education of Topeka, Kansas,* 349 U.S. 294 (1955). More importantly, the United States Supreme Court has held that state courts have concurrent jurisdiction with federal courts over § 1983 actions. *Martinez v. California,* 444 U.S. 277, *reh'g denied,* 445 U.S. 920 (1980); *Maine v. Thiboutot,* 448 U.S. 1 (1980). In *Neoplan USA Corp. v. Taylor,* D.Del., 604 F.Supp. 1540, 1545 (1985), the United States District Court for the District of Delaware decided that Chancery Court would have jurisdiction to hear § 1983 actions. Accordingly, I conclude that this Court also has jurisdiction to entertain such complaints.

Stevens has argued that he is entitled to summary judgment as a matter of law because defendants are essentially alleging misuse of the state judicial system. According to *Lugar v. Edmondson Oil Co.,* 457 U.S. 922 (1982), Stevens contends, it is not sufficient for defendants to have alleged that he misused the state judicial system, they must challenge the constitutionality of the judicial processes in order to satisfy the state-action requirement of § 1983. Defendants, however, argue that libel suits are treated differently. They cite *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), for that proposition that all state court libel plaintiffs are subject to the restrictions of the First and Fourteenth Amendments, even though the only government involvement is the provision of a judicial forum. Therefore, defendants contend, Stevens' conduct constitutes state action.

***10** Defendants have misinterpreted *New York Times Co. v. Sullivan.* I note initially that that case came before the United States Supreme Court on petitions for certiorari from a decision of the Alabama Supreme Court. The New York Times Co. challenged the constitutionality of certain state court rulings made during the course of a civil libel action. The trial judge had submitted the case to a jury under instructions that, *inter alia,% the alleged libelous statements were "libelous per se" and were not privileged, and because they were libelous* per se, *falsity, malice and general damages were presumed. The United States Supreme Court ultimately held that "the rule of law applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in a libel action brought by a public official against critics of his official conduct."* Id. at 264. *However, in response to the initial argument that the state court was shielded from constitutional scrutiny because the Fourteenth Amendment is directed at state action and not private action, the Court said:*

That proposition has no application to this case. Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute. See, e.g., Alabama Code, Tit. 7, § § 908-917. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.

*Id.* at 265 (citations omitted). Thus, the state action requirement was satisfied by the rulings of law promulgated by the Alabama state courts.

In contrast, in this case there have been no state court rulings which have restricted defendants' rights under the First and Fourteenth Amendments. I have just now granted defendants' motion for summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 8
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

judgment in their favor on Stevens' libel suit. Previously, the Honorable William B. Chandler III denied Stevens' motion to dismiss defendants' counterclaim for failure to state a cause of action. *See Stevens v. Independent Newspapers, Inc.,* Del.Super., C.A. No. 85C-OC-11, Chandler, J. (Nov. 13, 1986). There remains only the actions of Stevens in filing his lawsuit in state court and engaging in discovery pursuant to state court rules of civil procedure. The issue therefore is whether this activity constitutes state action which chilled defendants in the exercise of their constitutional rights, as they have claimed.

In Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922 (1982), the United States Supreme Court outlined a two-part test to determine whether conduct allegedly causing the deprivation of a federal right was fairly attributable to the state.

**\*11** First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible..... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

Id. at 937. Plaintiff has conceded in his brief that his right to bring this lawsuit is an exercise of a right or privilege created by the State of Delaware and satisfies the first part of this test. However, whether a private party acting pursuant to a state statute or rule should be characterized as a "state actor" depends upon an analysis of the facts and circumstances of the particular case. Id. at 939.

Count Two of defendants' counterclaim states that plaintiff "invoked the judicial processes of the State of Delaware in knowingly maintaining his baseless lawsuit" and that "employment of the judicial processes of the State of Delaware is an indispensable part of Plaintiff's scheme" which had "the purpose of silencing Defendants in the exercise of rights guaranteed to them ... and of punishing Defendants for accurately reporting to the public matters of legitimate public interest and concern." Answer to Complaint and Amended Counterclaim, Docket Item No. 30. Defendants essentially are complaining that plaintiff misused the judicial system by bringing a baseless lawsuit against them with an improper motive. This purported misuse cannot be attributed to state rule or state action. Count Two of defendants' counterclaim, therefore, does not state a cause of action under § 1983 but challenges only private action. *See* id. at 940. Defendants' second count of their counterclaim therefore also fails.

For all the above reasons, plaintiff's motion for summary judgment in his favor on the counterclaim is granted and defendants' motion for summary judgment in their favor on the complaint is also granted.

IT IS SO ORDERED.

>FN1. The statement quoted in the complaint is only part of the sentence actually printed in the newspaper article. The sentence as printed reads:
>"Such 'commuting' has been a standard practice in the auditor's office for at least three years, and possibly as far back as 20 years, he said."

>FN2. In fact, it was House Resolution No. 113, dated June 29, 1983, that prompted Cathcart to review the policies of the various state agencies. This Resolution was entitled: "Requesting the Fleet Management Office of the Facilities Management Division of the Department of Administrative Services to report to the General Assembly on the private use by state employees of state-owned motor vehicles."

>FN3. The analysis by the Court in *Ollman* distinguishes statements of fact and from those of opinion. The Delaware Supreme Court in *Riley* further distinguishes between pure and mixed opinions. 529 A.2d at 251. This distinction derives from the Restatement (Second) of Torts § 566 which states that an expression of opinion is actionable only if it implies the allegation of undisclosed defamatory facts. This is the so-called "mixed" type of opinion. A "pure" opinion is one that is based on facts that are stated or assumed by the parties to exist and is constitutionally protected. *Id.* at Comment c. The plurality opinion in *Ollman* noted the *Restatement* analysis, but found that a separate inquiry into whether a statement, already categorized by the four-part test as opinion, implied defamatory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                         Page 9
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097
**(Cite as: Not Reported in A.2d)**

facts would be superfluous. 750 F.2d at 985. The Court in *Riley* followed the four-part test and additionally concluded that the challenged statement was one of "pure" opinion.

FN4. The statement in the newspaper, as opposed to the plaintiff's complaint, actually reads: "If the auditor watches out for impropriety in state agencies, who watches the auditor's staff?"

FN5. 42 U.S.C. § 1983 provides:
§ 1983. Civil action for deprivation of rights.
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution or laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Del.Super.,1988.
Stevens v. Independent Newspapers, Inc.
Not Reported in A.2d, 1988 WL 25377 (Del.Super.), 15 Media L. Rep. 1097

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.