IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| B. KURT PRICE, WAYNE WARREN, AND CHRISTOPHER D. FORAKER, <br><br> Plaintiffs, <br><br> v. <br><br> L. AARON CHAFFINCH, THOMAS F. MACLEISH, DAVID B. MITCHELL, AND DIVISION OF STATE POLICE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) C.A. No. 04-956 (GMS) ) ) ) ) ) ) ) |
| CHRISTOPHER D. FORAKER, <br><br> Plaintiff, <br><br> v. <br><br> L. AARON CHAFFINCH, THOMAS F. MACLEISH, DAVID B. MITCHELL, AND DIVISION OF STATE POLICE, <br><br> Defendants. | ) ) ) ) ) ) ) ) C.A. No. 04-1207 (GMS) ) ) ) ) ) ) ) |

**MEMORANDUM**

**I.   INTRODUCTION**

The above-captioned actions were consolidated on April 18, 2006. In Civil Action No. 04-956 ("the Price case"), three state troopers assigned to the Delaware State Police's ("DSP") Firearms Training Unit facility ("FTU") allege that their First Amendment rights were violated by two superiors who retaliated against them for speaking out against hazardous health conditions at the

FTU. Thus, the Price complaint states one count of Free Speech retaliation and one count of Petition Clause retaliation, both pursuant to 42 U.S.C.A. § 1983 (2003). In Civil Action No. 04-1207 ("the Foraker case"), Sergeant Christopher Foraker individually alleges that his First Amendment rights were violated by the same two superiors after they retaliated against him for filing (and winning) a First Amendment retaliation lawsuit in 2002. Thus, like the Price complaint, the Foraker complaint also states one count of Free Speech retaliation pursuant to § 1983, and one count of Petition Clause retaliation pursuant to § 1983. Additionally, the Foraker complaint states two state law causes of action: defamation and false light invasion of privacy. Presently before the court are the defendants' motions for summary judgment on all counts in both cases. For the following reasons, the court concludes that summary judgment is inappropriate for all counts except Foraker's false light claim.

## II. STANDARD OF REVIEW

Evaluating a motion for summary judgment requires the court to "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' [while refraining from] weighing the evidence or making credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000) (citation omitted). If [the court is able to] determine that 'there is no genuine issue as to any material fact' and that the movant is entitled to judgment as a matter of law," summary judgment must be granted. *Hill v. City of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

## III. BACKGROUND

The FTU, a multi-million dollar indoor firing range for the DSP, became operational in September of 1998. A few months later, due to concerns about the ventilation system, an environmental-assessment firm hired to conduct a study of the air quality in the facility concluded

that the amount of lead in the air significantly exceeded the maximum acceptable level recommended by the Occupational Safety and Health Administration. (D.I. 85 at A222.)[1] By at least as early as June 14 of the following year, the FTU's air-quality problems became the subject of public scrutiny after *The News Journal* – a local Delaware newspaper – publicized the results of the study in an article entitled, "Shooting range under fire for lead: State police are exposed to levels of metal in air twice federal standard." (Id. at A2639-A2640.)

Foraker became the non-commissioned officer in charge ("NCOIC") of the FTU on August 1, 2001. At that time, he supervised several firearms instructors, including Corporal B. Kurt Price and Corporal Wayne Warren. Foraker also supervised Corporal Eddie Cathell, who was a personal friend Colonel L. Aaron Chaffinch. Foraker and Cathell had a rather rocky professional relationship, and on several occasions Foraker spoke out against Cathell. On February 22, 2002, Foraker was involuntarily transferred from the FTU to another position within the DSP. In response, Foraker filed a § 1983 action against Chaffinch for unlawful First Amendment retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003. After his reinstatement, Foraker learned that the FTU had the same air-quality issues that it had prior to his involuntary transfer in 2002. Not surprisingly, the air quality weighed on the minds of Foraker, Price, and Warren. Foraker soon began to voice their concerns to their commanding officers, including Lieutenant Colonel Thomas MacLeish. Eventually, the trio's concerns worked their way up the chain of command to Chaffinch.

---

[1] "D.I. 85," which refers to Docket Item 85 in the Price case, was also filed as Docket Item 65 in the Foraker case.

In March of 2004, the FTU's air quality remained poor and, as a result, the facility was formally closed. Due to the public attention the FTU's closing generated, Chaffinch gave two media tours of the facility in April 2004. Before the first tour, however, Chaffinch revealed his intent to blame Foraker for the FTU's closing to Captain Glenn Dixon:

> [Chaffinch] talked about the meeting that he was going to at the range, and at that time he mentioned Sergeant Foraker and that he was going to put it on Foraker during the meeting. He had outlined that he had the newspaper people going [sic] to be present at the meeting and that he is going to put it on Foraker and lay a lot of the blame on Foraker for the range.

(Dixon Dep. at 8:7-13.) Consistent with this statement, Chaffinch was quoted during the tour as saying:

> The previous sergeant in charge did a good job. Things changed in December [2003] when another sergeant came in. That's at least a portion of where the ball was dropped.
> . . .
> Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. [The previous sergeant] was willing to do that. . . . I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way.

(D.I. 85 at A850.) Foraker was unable to respond to these allegations, which were printed in both the *Delaware State News* and *American Police Beat Magazine*, because Chaffinch placed a gag order on his troopers. Nevertheless, Foraker, Price, and Warren all gave statements in cooperation with an investigation by the State Auditor's Office. Shortly thereafter, Price and Warren were placed on light duty – ostensibly because they had disabilities rendering them unfit for regular duty – and Foraker was banned from attending Section Chief meetings he had attended in the past.

## IV.  DISCUSSION

### A.  First Amendment Retaliation (Counts I and II)

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment." *Hill*, 411 F.3d at 125. The employee must show at step one that the activity in question is protected by the First Amendment. *Hill*, 411 F.3d at 125. At step two, the employee must show "that the protected activity 'was a substantial factor in the alleged retaliatory action[s].'" *Hill*, 411 F.3d at 125 (citations omitted). Step two also requires the court to inquire whether the alleged retaliatory actions were serious enough to be actionable. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000) ("[N]ot every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation.") (cited by *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006). However, this is an extremely low hurdle to overcome:

> First Amendment retaliation claims are always individually actionable, even when relatively minor. Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee," if "intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights. *Suppan v. Dadonna*, 203 F.3d 228, 234-35 (3d Cir. 2000) (citing *Rutan v. Republican Party*, 497 U.S. 62, 76 n.8, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990)). A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low: as we said in *Suppan*, a cause of action is supplied by all but truly de minimis violations. *Id.*

*O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006). Finally, at step three, "the employer may defeat the employee's claim by demonstrating that the same adverse action[s] would have taken place in the absence of the protected conduct."[2] *Id. See also Mount Healthy City Sch.*

---

[2]The plaintiffs contend that the defendants waived this affirmative defense – familiarly known as the *Mount Healthy* defense – by failing to raise it in their pleadings. The defendants point

*Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).

Here, all three plaintiffs clearly engaged in protected First Amendment activity by speaking out about the air-quality issues at the FTU,[3] and in Foraker's case, by filing suit in 2002. Chaffinch had an obvious motive to retaliate in response to the plaintiffs' activities, and a jury could reasonably infer that MacLeish (who was allegedly "joined at the hip" with Chaffinch) would be similarly motivated to retaliate. Furthermore, the allegedly retaliatory actions – publicly blaming the plaintiffs for the FTU's poor air quality,[4] placing Price and Warren on light duty, banning Foraker from meetings, etc. – are more than *de minimis*. And, with regard to the *Mount Healthy* defense, the plaintiffs point to several similarly-situated troopers who were not subject to the same allegedly retaliatory actions. Thus, the plaintiffs have demonstrated a genuine issue of material fact at each step of the analysis, thereby rendering summary judgment inappropriate as to Counts I and II.

---

out that the plaintiffs raised it in the complaints by alleging that "[t]he defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiffs" (D.I. 45 ¶ 94 (the Price case); D.I. 1 ¶ 84 (the Foraker case)), and the defendants denied the allegation in their answers. (D.I. 51 ¶ 94 (the Price case); D.I. 7 ¶ 84 (the Foraker case).) The court concludes that such denials were sufficient to put the plaintiffs on notice that the *Mount Healthy* defense would be at issue.

[3]The defendants argue that Price and Warren's Petition Clause claim (Count II) fails because their cooperation with the Auditor's investigation does not qualify, as a matter of law, as an attempt to petition the government under the First Amendment. Due to the number of disputed facts in this case, including facts regarding the nature of the plaintiffs' cooperation with the Auditor, the court believes the most prudent course of action at this stage is to deny summary judgment as to Count II and revisit the issue after trial.

[4]Although Chaffinch's comments to the media were explicitly directed at Foraker, there is evidence in the record suggesting that at least one trooper understood Chaffinch to be speaking about Price and Warren as well.

### B. Qualified Immunity

The defendants argue that, even if summary judgment in their favor is inappropriate, they are nevertheless entitled to qualified immunity with regard to Counts I and II. "Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *McKee*, 436 F.3d at 169 (internal quotations omitted). "To determine whether an official has lost his or her qualified immunity, [the court] must first decide whether a constitutional right would have been violated on the facts alleged." *Id.* (internal quotations omitted). "If the answer to that question is 'yes,' [the court] must then consider whether the right was clearly established." *Id.* (internal quotations omitted). "If [the court] also answer[s] 'yes' to the second question, [the court] must conclude that the official does not have qualified immunity." *Id.*

Because disputed issues of material fact exist regarding the constitutional violations alleged in Counts I and II, the answer to the first question depends upon the resolution of those factual disputes. Assuming *arguendo* that the answer to the first question turns out to be "yes," the court must inquire whether those rights, if violated, were clearly established. In *McKee*, the Third Circuit succinctly summarized the proper approach to such a query:

> "'Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "it is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case*, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) (per curiam) (quoting *Saucier[ v. Katz*, 533 U.S. 194, 201 (2001)]) (emphasis added).

436 F.3d at 171. Although this inquiry "must be undertaken in light of the specific context of the case," *Brosseau*, 543 U.S. at 198, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "Accordingly . . . the salient question . . . is whether the state of the law [at the time of the acts in question] gave [the defendants] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." *Id.*

In this case, the defendants admit that First Amendment retaliation is unlawful in general, but they argue that at the time of the alleged retaliation the state of the law did not give them fair warning that their treatment of Foraker was actionable. The court disagrees. In *Brennan v. Norton*, 350 F.3d 399 (3d Cir. 2003) – a case decided before the retaliation in this case – the Third Circuit further defined the line between actionable and non-actionable retaliation. There, the court stated that, if there is a "nexus between [the] protected conduct and [the] alleged retaliation," an act as simple as affixing a sticker bearing the phrase "Department Asshole" on the plaintiff-firefighter's helmet "could rise to the level of a First Amendment violation." *Id.* at 419. The few retaliatory actions mentioned above are obviously more severe than the harassing sticker in *Brennan*. Therefore, the court holds that if the disputed issues of fact are resolved against the defendants, they will not be protected by qualified immunity.

C.  **Defamation (Count III)**

"Under Delaware law, the tort of defamation has five elements: (1) the statement must be of a defamatory character; (2) publication to a third party; (3) the communication must refer to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Gill v. Del. Park, LLC*, 294 F. Supp. 2d 638, 646 (D. Del. Dec. 2, 2003). Viewing the

facts in the light most favorable to Foraker, Chaffinch's statements to the media easily satisfy the five elements of defamation: (1) assigning (allegedly) unwarranted blame to Foraker for the FTU's air quality is defamatory; (2) making a statement to a newspaper is publication to a third party; (3) mentioning Foraker by name obviously refers to him; (4) any person reading Chaffinch's statement would understand it to be defamatory; and (5) maligning a person in his profession is injurious *per se*, *Johnson v. Campbell*, No. 00-510-JJF, 2001 U.S. Dist. LEXIS 25596, at *14-*15 (D. Del. Mar. 30, 2001). Likewise, MacLeish's statements – the air-quality problems had began only recently, and procedure had not been followed at the FTU – also satisfy all five elements. To be sure, MacLeish's statements present a closer case because he neither referred to Foraker by name, nor explicitly blamed the FTU's problems on him. Nevertheless, a reasonable jury could infer from the context of the controversy that MacLeish's statements were in fact defamatory of Foraker.

The defendants argue that they cannot be held liable for defamation because they were merely stating their opinions. In *Milkovich v. Lorain Journal Co.*, the Supreme Court explained:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

497 U.S. 1, 18-19 (1990). Here, the defendants' opinions "imply a knowledge of facts" leading to the conclusion that Foraker's performance as the NCOIC was inadequate. Accordingly, the defendants may not escape liability by hiding behind the "opinion" shield. The defendants also contend that they cannot be held liable for defamation because their statements were substantially true. However, as the defendants must understand, the question of who was at fault for the FTU's

poor air quality is fraught with so many disputed facts that the court cannot determine the truth or falsity of the defendants' statements at this stage.

The only remaining issue is whether Foraker is a public figure. "Where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant have acted with actual malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' *Id.*" *Gill*, 294 F. Supp. 2d at 646. The determination of whether a plaintiff is a public figure is a legal issue for the court to resolve. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 938 (3d Cir. 1990). "*Gertz* [*v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)] identified three classes of public figures: those who achieve such stature or notoriety that they are considered public figures in all contexts; those who become public figures involuntarily, but these are 'exceedingly rare'; and those who are deemed public figures only within the context of a particular public dispute." *U.S. Healthcare*, 898 F.2d at 938. The latter class – limited purpose public figures – comprise "individuals who voluntarily 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" *Id.* (quoting *Gertz*, 418 U.S. at 345). "Generally, two factors inform this determination. The first factor indicative of a [plaintiff's] status is his relative access to the media." *U.S. Healthcare*, 898 F.2d at 938. "The second factor is the manner in which the risk of defamation came upon [the plaintiff]." *Id.*

Here, Foraker's access to the media was limited to the point of being non-existent by Chaffinch's imposition of a gag order. Certainly, that cuts against Foraker's public-figure status. On the other hand, the air quality at the FTU was a public controversy as early as 1999. And yet,

Foraker, who was aware of the ongoing controversy, actively sought to be reinstated as the NCOIC of the FTU. Thus, Foraker knew or should have known that he was injecting himself into a situation in which, as the head of a controversial facility, there was a substantial risk of public scrutiny and defamation. The question the court must answer, then, is whether Chaffinch's gag order outweighs Foraker's voluntary assumption of risk. In *Sculimbrene v. Reno*, 158 F. Supp. 2d 8 (D.D.C. Feb. 16, 2001), the D.C. district court was confronted with a similar situation. In that case, the plaintiff was a former FBI Special Agent who became involved in the "Filegate" scandal as a result of his employment at the White House Liaison Office. After media commentator Lanny Davis made disparaging comments about the plaintiff on CNN and CNBC, the plaintiff sought permission to respond publicly. However, that request was denied by his superiors. *Id.* at 11-14; *id.* at 23. The plaintiff then sued Davis under a defamation-like federal statute. In spite of the FBI's refusal to allow the plaintiff to respond publicly, the court concluded that the plaintiff was a limited purpose public figure both because of the high public interest in "Filegate," and because of the plaintiff's significant role in determining the outcome of the controversy. *Id.* at 23-24. Likewise here, although Foraker was subject to a gag order, as the NCOIC of the FTU he was a significant player in a controversy with high (local) public interest. Moreover, unlike the plaintiff in *Sculimbrene*, Foraker sought the NCOIC position with advance knowledge of the attendant controversy. Therefore, as with the FBI agent in *Sculimbrene*, Foraker is a limited purpose public figure in this context, and therefore, he must prove his defamation case using the heightened "actual malice" standard. The court further holds that the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice. Thus, summary judgment will be denied as to Count III.

### D. False Light Invasion of Privacy (Count IV)

The common law right of privacy was first recognized by the Delaware Supreme Court in *Barberi v. News-Journal Co.*, 56 Del. 67 (1963). "The general purpose of protecting the right of privacy relates to one's private life, not when that life has become a matter of legitimate public interest." *Martin v. Widener Univ. Sch. of Law*, No. 91C-03-255, 1992 Del. Super. LEXIS 267, at *54 (Del. Super. Ct. June 4, 1992). Thus, "[o]ne who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency." *Barberi*, 56 Del. at 70.

With those principles in mind, the defendants argue that "a public figure cannot sustain an action for false light invasion of privacy because someone has publicized his public activities." (D.I. 62 at 32.) The court agrees. Although the act of publicly shedding false light on a person's job performance can be deeply offensive and hurtful, there is simply no invasion of *privacy* when the person being criticized is a public figure and the performance being criticized is the very activity that gave rise to the person's public-figure status in the first place. *See Godbehere v. Phoenix Newspapers*, 783 P.2d 781, 789 (Ariz. 1989) (holding that "a plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties"). Therefore, the court concludes that allegedly unwarranted criticism of Foraker's performance as the NCOIC at the controversial FTU does not give rise to a cause of action for false light invasion of privacy.

## V. CONCLUSION

For the reasons stated, the court will deny summary judgment as to Counts I, II, and III. The court will grant summary judgment as to Count IV.

Dated: May 12, 2006

_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| B. KURT PRICE, WAYNE WARREN, AND CHRISTOPHER D. FORAKER, )<br><br>Plaintiffs, )<br><br>v. )<br><br>L. AARON CHAFFINCH, THOMAS F. MACLEISH, DAVID B. MITCHELL, AND DIVISION OF STATE POLICE, )<br><br>Defendants. ) | C.A. No. 04-956 (GMS) |
| CHRISTOPHER D. FORAKER, )<br><br>Plaintiff, )<br><br>v. )<br><br>L. AARON CHAFFINCH, THOMAS F. MACLEISH, DAVID B. MITCHELL, AND DIVISION OF STATE POLICE, )<br><br>Defendants. ) | C.A. No. 04-1207 (GMS) |

**ORDER**

IT IS HEREBY ORDERED THAT:

1. The defendants' motion for summary judgment in the Price case (D.I. 80) be DENIED; and

2. The defendants' motion for summary judgment in the Foraker case (D.I. 60) be DENIED as to Counts I, II, and III, and GRANTED as to Count IV.

Dated: May 12, 2006

_____
UNITED STATES DISTRICT JUDGE